## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WE CHARITY,

      6500 Main Street, Suite Five
      Williamsville, NY 14221

                      *Plaintiff,*

vs.

CANADIAN BROADCASTING
CORPORATION,

      205 Wellington Street West
      Toronto, Ontario M5W 1E6
      Canada

                *Defendant.*

Civil Action No.  _____

## TABLE OF CONTENTS

COMPLAINT ............................................................................................................. 1

PRELIMINARY STATEMENT ................................................................................ 1

PARTIES .................................................................................................................. 6

    I.     PLAINTIFF WE CHARITY .......................................................................... 6

    II.    DEFENDANT CBC ...................................................................................... 7

SIGNIFICANT NON-PARTIES ............................................................................... 8

JURISDICTION AND VENUE ................................................................................ 9

FACTUAL BACKGROUND .................................................................................. 10

    I.     WE CHARITY IS A CHARITY THAT HELPS CHILDREN IN THE
         UNITED STATES AND ABROAD .......................................................... 10

         A.    WE Charity Promotes Charitable Giving and Volunteerism in U.S.
                Schools ................................................................................................ 10

         B.    WE Charity Provides Funds to Support the WE Organization's
                Development Work Around the World ................................................ 12

             i.    WE Charity's Five-Pillar Model Encourages Sustainable,
                    Holistic Development ................................................................. 13

             ii.    WE Charity Teaches Its Donors About Its Five-Pillar Model,
                    Including by Bringing Tens of Thousands of Visitors to See Its
                    Work First-Hand ........................................................................ 15

             iii.   WE Charity's Development in Kenya ................................... 18

         C.    WE Charity's Fundraising is Subject to Careful Oversight. .................... 19

    II.    2020: WE CHARITY CANADA ANNOUNCES WIND DOWN
         FOLLOWING A POLITICAL SCANDAL UNRELATED TO ITS
         OPERATIONS .......................................................................................... 20

    III.   EARLY FEBRUARY 2021:  THE CBC AIRS ITS FIRST FALSE *THE
         FIFTH ESTATE* EPISODE ABOUT WE CHARITY ............................... 21

A. *The Fifth Estate* is the CBC's Premier, Long-form Investigative News Program ........................................................................... 22

B. Facing Declining Viewership for *The Fifth Estate*, the CBC Devised a Strategy to Boost Ratings by Publishing "Clusters" of Stories about Already-Covered Topics with "Dramatic Twists and Turns" to Create "Social Buzz" ............................................. 23

C. On February 4, 2021, the CBC's *Fifth Estate* Falsely Reported that Multiple Donors Each Fully Funded the Same "Borehole" Project in Kenya ................................................................................... 24

 i. Whistler Water Never Stated It Fully Funded the Kipsongol Borehole ........................................................................... 25

 ii. Nicola Told the CBC That It Never Understood Its Donation to be the Sole Funding Source for the Kipsongol Borehole Project ......... 26

 iii. The UBC Student Group's Emails Made Clear That the Group Understood It Did Not Fully Fund the Kipsongol Borehole.................. 29

 iv. Unilever Never Purported to Fund a Borehole and To WE Charity's Knowledge, Never Confirmed CBC's Interpretation of Unilever's Campaign ........................................................... 31

 v. Other Donors Told the CBC That It Was Wrong, But CBC Kept That Fact from Its Viewers ................................................... 31

 vi. The CBC Knew the Facts Demonstrating That the February Episode Was Wrong, But Never Corrected Its False Reporting........... 32

IV. LATE FEBRUARY 2021: THE CBC RELIES ON A DISCREDITED SOURCE TO INITIATE ITS INVESTIGATION INTO WE CHARITY SCHOOLS IN KENYA ......................................................................... 34

A. Reed Cowan Claimed He Raised Millions of Dollars That Should Have Funded More Schools Than WE Charity Built, Then Admitted He Greatly Exaggerated His Donations.................................... 35

B. Reed Cowan's Public Attacks on WE Charity Were a Prelude to an Extortionate Demand for $40 Million, Threatening to Make WE Charity "Infamous".................................................................... 36

V. MARCH 2021: AFTER THE CBC AGAIN PUBLISHES FALSE CLAIMS ABOUT WE CHARITY'S PROJECTS IN KENYA, THE DONORS IN THE CBC'S COVERAGE REFUTE THE STORY AND EXPOSE THE CBC'S MISCONDUCT ........................................................................... 38

VI.     MARCH 2021:  THE CBC DOES NOT PUBLISH A STORY ABOUT WE
        CHARITY AFTER IT LEARNS ITS REPORTERS AGAIN
        MISREPRESENTED WHAT THE CHARITY TOLD ITS DONORS .................... 41

VII.    JUNE-SEPTEMBER 2021:  THE CBC PRESENTS FALSE FACTS TO
        SOURCES IN AN ATTEMPT TO PERSUADE THEM OF A
        PREDETERMINED NARRATIVE WHILE DISREGARDING
        INCONSISTENT FACTS. .......................................................................... 43

        A.      The CBC Requested Information Regarding WE Charity-Funded
                Schoolrooms in Kenya................................................................... 44

        B.      The CBC Falsely Informed Sources That WE Charity Deceived
                Donors Despite Knowing It Lacked the Data on Which to Base
                Such an Allegation....................................................................... 46

        C.      WE Charity Provided the CBC With Detailed Information,
                Including Photographic Evidence and Maps, Showing That It
                Funded 852 Schoolrooms in Kenya............................................ 49

        D.      Over a Hundred of WE Charity's Donors, Including Donors
                Responsible for the Majority of Funding for Kenya, Told the CBC
                That It Misunderstood the Donors' Expectations ...................... 52

        E.      The CBC Told a High-Level Kenyan Public Official That WE
                Charity Misused Donor Funds .................................................... 59

VIII.   SEPTEMBER 2021:  THE CBC CONDUCTS A SHAM INVESTIGATION
        IN KENYA THAT BY DESIGN COULD NOT VERIFY ITS REPORTING
        AND ENGAGES IN UNLAWFUL NEWSGATHERING CONDUCT.................... 60

        A.      The CBC Knew That It Had to Visit Kenya to Verify Its
                Allegations and Understood That to Do So, It Needed to Obtain
                Government Permission to Visit Government-Run Schools Funded
                by WE Charity ............................................................................ 61

        B.      The CBC Entered Schools in Kenya Without Government
                Permission During a Pandemic and Was Asked to Leave by
                Community Members .................................................................. 64

        C.      Kenyan Government Officials Complained About the CBC's
                Illegal Newsgathering Conduct.................................................. 67

        D.      The CBC's Senior Leadership Was Aware of Its Journalists'
                Misconduct................................................................................. 70

iii

IX.     SEPTEMBER – NOVEMBER 2021:  BACK IN NORTH AMERICA, THE
        CBC CONTINUES TO PURSUE A PREDETERMINED FALSE
        NARRATIVE WHILE PURPOSEFULLY AVOIDING THE TRUTH ................... 73

        A.      The CBC Cancelled a Promised On-Air Opportunity for WE
                Charity to Respond to Financial Allegations After WE Charity
                Performed Its Side of the Bargain ............................................................. 74

        B.      The CBC Refused to Wait to Review a Forensic Accounting
                Report on WE Charity's Financials ........................................................... 84

        C.      WE Charity Provided the CBC with a Preliminary Forensic Audit
                Report Showing That Money Donated for Kenya Was Used by WE
                Charity for Kenya ..................................................................................... 86

X.      NOVEMBER 2021 – JANUARY 2022:  THE CBC PUBLISHES FALSE
        AND DEFAMATORY STATEMENTS CONCERNING WE CHARITY .............. 88

        A.      The Teaser ................................................................................................ 90

        B.      The First Promo ........................................................................................ 90

                i.      The First Promo for the November Episode Falsely Accused WE
                        Charity of Fraud and Deceit .................................................... 90

                ii.     WE Charity Informed the CBC of the Errors in the First Promo ........... 92

        C.      The Second Promo ..................................................................................... 99

                i.      The Second Promo Again Accused WE Charity of Fraud and
                        Deceit ...................................................................................... 99

                ii.     WE Charity Informed the CBC of the Errors in the Second
                        Promo ..................................................................................... 100

                iii.    WE Charity Reminded the CBC That Its False and Defamatory
                        Reporting Would Be Targeting WE Charity in the United States,
                        And the CBC Did Not Disagree .......................................... 105

        D.      The Website Postings ............................................................................. 106

        E.      The Tweet ............................................................................................... 108

        F.      The Article Accused WE Charity of "Routinely" Misleading
                Donors ................................................................................................... 109

        G.      The Newsletter ....................................................................................... 111

        H.      CBC Radio: *The Current* episode with Matt Galloway ......................... 112

I.       The November Episode of The Fifth Estate ........................................... 118

J.       The Podcast ........................................................................................ 135

K.      The Enquête Episode ........................................................................ 138

XI.    THE CBC PUBLISHED THE CORE ALLEGATIONS IN THE DEFAMATORY PUBLICATIONS WITH KNOWLEDGE OF OR IN RECKLESS DISREGARD OF THEIR FALSITY .................................................. 141

    A.     The CBC Falsely Accused WE Charity of Defrauding Its Donors by Diverting Funds Donated for Use in Kenya. .................................... 144

        i.      The CBC Intended to Tell Its Audience That WE Charity Defrauded Donors by Diverting Funds Donated for Kenya ................ 144

        ii.     The CBC Knew That It Was False to Report that WE Charity Diverted Funds Donated for Use in Kenya to Other Purposes ........... 146

        iii.    The CBC Reported that WE Charity Hired a Forensic Auditor but Misleadingly Omitted the Content of His Report to Falsely Indicate That WE Charity Saw Merit in the CBC's Claims ............... 148

    B.     The CBC Falsely Reported That WE Charity's Own Forensic Auditor Confirmed That WE Charity Diverted $29 Million Raised for Kenya to Use for Canada Instead ....................................................... 148

    C.     The CBC Falsely Claimed That WE Charity's Own Count Showed That It Funded Only 360 Schoolrooms in Kenya When the CBC Knew the Correct Figure Was 852 ......................................................... 152

    D.     The CBC Falsely Claimed That WE Charity "Inflated" Its School Count by Counting Latrines as Schoolrooms ......................................... 155

    E.     The CBC Falsely Underreported the Number of Schoolrooms in Each of Six Kenyan Communities That Its Reporters Visited ............... 157

        i.      The CBC Misrepresented the Number of Schoolrooms in Pimbiniet .............................................................................................. 158

        ii.     The CBC Misrepresented the Number of Schoolrooms in Irkaat ........ 160

        iii.    The CBC Misrepresented the Number of Schoolrooms in Rongena ......................................................................................... 161

        iv.    The CBC Misrepresented the Number of Schoolrooms in Sikirar ...... 162

        v.     The CBC Misrepresented the Number of Schoolrooms in Eor Ewuaso ........................................................................................... 163

vi.    The CBC Misrepresented the Number of Schoolrooms in
       Mwangaza ........................................................................................ 165

vii.   The CBC Fabricated a WE Charity Response to the CBC's
       Counts of Schoolrooms in Kenyan Communities ............................... 166

F.     The CBC Misrepresented WE Charity's Donors as Publicly Stating
       That They "Fully Funded" Over 900 Primary Schools in Kenya ........... 167

i.     The CBC Knew from Prior Experience That It Would be
       Reckless at Best to Rely on Online Postings to Accuse WE
       Charity of Double-Funding Projects in Kenya .................................... 168

ii.    The CBC Knew That Social Media Postings Were Inherently
       Unreliable and Easily Misinterpreted but Refused to Verify Its
       Allegations with WE Charity ............................................................... 169

iii.   The CBC Claimed that Donors Believed They Fully Funded
       Schoolrooms Even When the Donors Told Them That Was
       Wrong ................................................................................................. 175

iv.    The CBC Knew of Specific Instances in Which It Had
       Misinterpreted Online and Social Media Postings Regarding WE
       Charity's Education Projects in Kenya ................................................ 177

v.     The CBC's Failure to Show Its Readers and Viewers the Social
       Media Statements on Which It Allegedly Relied Is Evidence of
       the CBC's Actual Malice ..................................................................... 182

G.     The CBC Falsely Claimed That WE Charity Told Multiple Donors
       They Each Fully Funded the Same Schoolrooms in Kenya ................... 183

i.     The CBC Falsely Accused WE Charity of Deceiving Donor
       Watson Jordan ..................................................................................... 183

ii.    The CBC Falsely Accused WE Charity of Deceiving Donors
       Rukshan de Silva and Iroquois Ridge High School ............................ 188

H.     The CBC Falsely Claimed that WE Charity's Internal Documents
       Showed That Multiple Donors Fully Funded the Same Structures
       in Kenya and that WE Charity Did Not Build Structures If It
       Believed Donors Would Not Notice ..................................................... 192

I.     The CBC Falsely Claimed That WE Charity Blocked the CBC
       from Filming at Primary Schools in Kenya .......................................... 196

i.      The CBC Did Not Get Government Permission It Knew It
        Needed to Access and Film at the Government-Run Schools
        Funded by WE Charity ........................................................ 200

ii.     Instead of Getting Permission, the CBC Attempted to Gain Entry
        to Schools Through Illegal Means, Prompting the Kenyan
        Government's Response that the CBC Falsely Portrayed as
        Obstruction by WE Charity ................................................ 204

iii.    The CBC Concealed the True Reason Why It Encountered
        Difficulties Filming at Government-Run Schools in Kenya and
        Instead Falsely Blamed WE Charity.................................... 206

J.      The CBC Misled Its Audience to Believe That WE Charity Had
        No Response to Many of Its Allegations ................................. 207

XII.    WE CHARITY HAS BEEN HARMED BY AND WILL CONTINUE TO
        SUFFER HARM FROM THE CBC'S PUBLICATION OF THE
        DEFAMATORY PUBLICATIONS AND ITS UNLAWFUL
        NEWSGATHERING CONDUCT........................................................... 214

CAUSES OF ACTION ........................................................................... 218

PRAYER FOR RELIEF .......................................................................... 222

## COMPLAINT

Plaintiff WE Charity ("WE Charity") alleges the following for its Complaint against Defendant Canadian Broadcasting Corporation ("CBC").

## PRELIMINARY STATEMENT

1.      In November 2021, the CBC defamed WE Charity by publishing coverage falsely claiming that the charity defrauded its donors and deprived Kenyan children of funds donated to help them.  The CBC knew these allegations were false and could scarcely be more defamatory.  At a time when faith in the media has never been lower, the CBC engineered a fabrication of astonishing breadth.

2.      Plaintiff WE Charity is a charity incorporated under the laws of New York.  For decades, WE Charity has been responsible for bringing education, clean water, healthcare, food and opportunity to hundreds of thousands of people around the world.  Domestically, WE Charity has partnered with thousands of schools in the United States to empower students to effect positive social change.

3.      In its false coverage, the CBC accused WE Charity of "routinely" deceiving and defrauding its donors in North America.  The CBC falsely claimed that donors said they fully funded over 900 schoolrooms in Kenya, but the charity built only 360.  CBC reporters said they flew to Kenya to see WE Charity's projects for themselves and found dozens of schools missing in every village they visited.  Asking repeatedly, "where did the money go?" the CBC left viewers with no doubt that WE Charity had stolen the money.  And the CBC alleged a cover-up, claiming that WE Charity conspired to block its investigation overseas.  None of this was true.

4.      In this Complaint, WE Charity relies on an extensive documentary record to demonstrate that the CBC set out to tell a false, predetermined narrative and published it with

1

knowledge of its falsity.  Months of the CBC's correspondence with WE Charity, its donors, its former employees, Kenyan government officials and others, unedited interview recordings, photos, and other documentation leave no doubt as to what the CBC knew and when it knew it.

5.      The evidence of the CBC's knowing falsehoods is too extensive to fully capture in any summary.  But consider the following examples:

6.      ***Documents reveal that the CBC doctored or even completely fabricated quotes to fit its false narrative***.  The CBC built its story around a claim that WE Charity *itself* said in a document that it funded only 360 schoolrooms in Kenya.  The CBC hid that the document actually says that the figure is "not exhaustive," and contains only a "sample" of schools to give an "overview of the breadth and depth of" of the charity's projects.  To ensure its audience didn't find out the truth, the CBC edited an interview with a WE Charity representative to exclude her reference to these critical qualifications in the document, cutting instead to her next sentence in the interview.  When reporting on other WE Charity documents, the CBC edited quotes to remove references to calendar years in a scheduling document, then claimed that the document contemplated *never* building the projects.  All of the projects were in fact built.  The CBC also claimed WE Charity deceived a donor by sending him a photo of a school in Kenya and writing, "Here is the schoolhouse built in memory of your son."  The CBC simply invented that quote; the document says nothing of the sort.

7.      ***There is extensive evidence that the CBC knew its reporting was false, including emails, photos, and interview footage***.  For example, email correspondence shows that from the outset of its reporting, WE Charity consistently told the CBC that it funded 852 schoolrooms in Kenya—not 360, as the CBC reported.  WE Charity's count did not fit the CBC's narrative about "missing" schools, so the CBC falsely claimed that WE Charity counted *latrines* as schools to

discredit the charity's figures.  Multiple emails with the CBC's reporters show they knew that

was not true. WE Charity even gave the CBC photographs of every one of the 852

schoolrooms—none were latrines.  Then, in an interview, the CBC's reporter asked a WE

Charity representative to confirm that the 852 figure, "doesn't include latrines," and she

confirmed latrines were not counted. The CBC cut this exchange.  Instead, in the broadcast

interview, after WE Charity's representative says the charity funded 852 schoolrooms, the CBC

cuts to a voiceover saying this figure included "*even latrines*, which inflated the total count."

8.      ***The CBC concealed or misrepresented key financial information showing that
WE Charity used donors' funds properly***.  Emails show that the CBC knew WE Charity had

hired the CBC's own go-to forensic auditor to conduct an independent review of WE Charity's

financial records, and WE Charity agreed to provide the results to the CBC prior its broadcast.

WE Charity gave the CBC the auditor's report concluding that all of the funding donors gave for

Kenya was used for Kenya, but the CBC never reported this fact.  Instead, the CBC reported that

the auditor reached the *opposite* of his actual conclusion.  Emails show high-level CBC editors

refused to correct this.

9.      ***The CBC's reporters deliberately ignored overwhelming evidence that did not fit
their preconceived narrative***.  The CBC described WE Charity as "routinely" deceiving donors

but relied on only two donors—out of WE Charity's more than 53,000 donors.  Before it aired

allegations about these two donors, communications between the CBC and more than 125 WE

Charity donors show that donors repeatedly told reporters their thesis was wrong. Donors who

told the CBC they were not deceived include donors responsible for funding most of WE

Charity's projects in Kenya.

10.     ***The CBC faked a cover-up rather than admit to viewers that it failed to get***

3

***Kenyan government clearance to film at schools***.  Email correspondence shows that prior to its visit to Kenya, the CBC knew it needed Kenyan government permission to film at WE Charity-funded schools, which are run by the government.  But the CBC didn't get permission (despite telling WE Charity that it had done so).  Kenyan government officials have since confirmed, "There is no record of the Ministry of Education issuing permission to the Canadian Broadcasting Corporation to film in schools in September 2021."  Not surprisingly, in the middle of a global pandemic, the CBC's film crews were denied access to school grounds without permission.  The CBC never told the public any of this, instead feigning surprise: "we were told we couldn't come in, which we found to be kind of odd."  Worse, the CBC falsely claimed WE Charity obstructed its investigation to hide its own failure to prepare for a visit that WE Charity *invited* the CBC to make.

11.     All year, the CBC falsely claimed WE Charity misled donors who told the CBC they were not misled.  In February and March 2021, the CBC aired two stories falsely claiming that WE Charity led donors to believe they each fully funded the same water projects in Kenya.  Donors identified in both of these stories told the CBC that they never believed any such thing and were not deceived.  The CBC nonetheless allowed the same reporters to simply shift their false narrative to reporting on funding for WE Charity's schools.  Having learned that WE Charity could prove its allegations false, and contrary to its own policies, the CBC refused to verify its reporting with WE Charity, denied it an opportunity to respond, and then falsely claimed to have engaged with WE Charity's co-founder about the reporting for months.

12.     The CBC's recent false coverage spanned two different hour-long documentary programs (in two languages), a radio show, a podcast, multiple online articles, an email newsletter, and social media content.  The CBC continues to republish its false coverage.  As the

CBC intended, its falsehoods were republished to new markets by other news outlets.  Every day, the CBC's falsehoods are repeated on social media around the world.

13.     WE Charity's reputation and ongoing fundraising efforts in the United States have been greatly harmed by the CBC's falsehoods.  Plaintiff provides most of the funding for its affiliate entities in Canada, Kenya and elsewhere by raising funds in the United States.  WE Charity's reputation in the United States is its most valuable asset.  Most of WE Charity and its affiliates' domestic programming takes place in the U.S., but the CBC's falsehoods threaten WE Charity's ability to continue having a positive impact on the lives of American schoolchildren. The cost of undoing the damage the CBC has caused will be enormous.

14.     WE Charity did not sue the CBC after its false coverage in February or March. The charity instead sought to engage directly with the CBC to persuade it to correct its false coverage.  But the CBC has demonstrated that it has no interest in publishing the truth when it comes to reporting on WE Charity.  It is clear that the CBC intends to continue its false attacks on WE Charity, leaving the charity no choice but to bring this lawsuit.

15.     WE Charity is suing the CBC to set the record straight:  WE Charity faithfully and effectively carried out its donors' wishes to improve the lives of children.  But most important, WE Charity brings this action to ensure it can continue to bring clean water, education, food, medical services, and economic opportunity to children around the world.  To boost declining ratings, the CBC undermined the public's trust in charitable giving and harmed those who rely on that generosity.  WE Charity's work is a matter of life and death for many. This lawsuit seeks to protect those who depend on WE Charity's reputation.

## PARTIES

### I.   PLAINTIFF WE CHARITY

16.   WE Charity is the largest funding source for an international charitable organization that seeks to (1) nurture volunteerism in students and give them the tools to create transformative social change, and (2) partner with local communities in Africa, Asia, and Latin America to transform lives with solutions that are adaptive, effective and sustained over the long term by the community itself.

17.   The original WE Charity entity was founded in Canada in 1995 under the name "Free the Children" by human rights advocates and brothers, Marc and Craig Kielburger (then 16 and 12 years old respectively), with a mission to stop child exploitation.  They have been internationally lauded for their global charitable endeavors.

18.   WE Charity operates through a network of affiliated entities around the world (referred to herein as the "WE Organization").  Affiliated entities in the United States, Canada and the United Kingdom put on domestic programming for students in their respective countries, and raise funds to support international development projects.  Development projects are managed through local affiliates, in accordance with local law.

19.   Plaintiff WE Charity is a New York domestic not-for-profit corporation.  It has been a registered 501(c)(3) charity in the United States since 1997 and is registered in 37 states and the District of Columbia.[1]  WE Charity's mailing address is 6500 Main Street, Suite Five, Williamsville, NY 14221.

---

[1]   Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia, Wisconsin, Washington D.C.

## II.  DEFENDANT CBC

20.    The CBC is a Canadian public broadcaster on radio and television.  It is also an online publisher of news content.  Its principal business is the commercial enterprise of broadcasting, including the production of its content, the solicitation and acceptance of commercial advertising, and the distribution of its broadcasting content throughout Canada, the United States and elsewhere abroad.

21.    In addition to its family of television networks and programs, CBC produces radio shows and podcasts, and maintains a number of websites and social media accounts relating to its various television networks, programs, radio shows, and podcasts.  The CBC's digital platform at cbcnews.ca has a substantial international reach, including in the United States.  The CBC also publishes its content through other popular U.S.-based sites including YouTube and Facebook.

22.    The CBC cross-promotes its content, including by airing promos and commercials for its content across its distribution channels.

23.    The CBC distributes and licenses its broadcast content in the United States pursuant to various commercial distribution and licensing agreements with U.S. domestic broadcasting entities.

24.    The CBC maintains an office in Washington, D.C. at 529 14th St NW, Washington, D.C. 20045.

25.    The CBC is registered to do business in the United States and has appointed an agent for service of process in the United States through its registration with the California Secretary of State, most recently renewed on December 8, 2021.

26.    The CBC is an agency or instrumentality of the Canadian government, within the meaning of 28 U.S.C. § 1603, and is organized and existing under Canadian law as a "crown corporation" pursuant to the Broadcasting Act of Canada, S.C. 1991, c. 11.  Defendant is wholly

owned by the Canadian government and receives $1.1 billion in annual government funding.

27.     The CBC purports to be governed by its "Journalistic Standards and Practices"

("JSPs") and makes these standards available to the public on its website.

## SIGNIFICANT NON-PARTIES

28.     Craig Kielburger is a co-founder of WE Charity. Mr. Kielburger is the youngest

ever graduate from the Kellogg-Schulich Executive MBA program.  He has received fifteen

honorary doctorates and degrees for his work in the fields of education and human rights.  He is

a *New York Times* bestselling author and has published twelve books.  Mr. Kielburger has

received The Order of Canada, and the World Children's Prize for the Rights of the Child.

29.     Marc Kielburger is a co-founder of WE Charity.  Mr. Kielburger graduated from

Harvard College with a degree in Government.  He won a Rhodes Scholarship and completed a

law degree from Oxford University.  He has also received ten honorary doctorates and degrees

for his work in the fields of education and human rights.  Like his brother, Mr. Kielburger is also

a New York Times bestselling author and has published eight books.  Mr. Kielburger was also

awarded the Order of Canada and was selected by the World Economic Forum as one of the

world's Young Global Leaders.  Mr. Kielburger has been inducted into Canada's Walk of Fame

for his humanitarian efforts and his work to empower youth to change the world.

30.     Robin Wiszowaty is WE Charity's Country Director for Kenya. She is employed

directly by, and receives her paychecks from, the United States-based plaintiff in this litigation.

She has worked for WE Charity for twenty years and is the author of the book *My Maasai Life:*

*From Suburbia to Savannah*.  Ms. Wiszowaty is a U.S. citizen and a resident of Roscommon,

Michigan.

31.     Carolyn (also known as Carol) Moraa is Director of WE Villages Projects in East

Africa and oversees the WE College and the Kisaruni Group of Schools. She has worked for WE Charity's Kenyan affiliate organization, Free The Children Kenya, for more than 10 years. Ms. Moraa has a Masters in Strategic Management from Jomo Kenyatta University of Agriculture and Technology and is completing a Masters in Educational Administration at Maseno University.  She has been an educator in private, public, and international schools in Kenya for over 16 years.  She is a founding member of the Kisaruni Group of Schools, designing a cutting-edge model of education within East Africa that honors the cultural education system and engages an active learning educational model.  Ms. Moraa is a resident of Kenya.

32.    Mark Kelley is the co-host of the CBC's *The Fifth Estate*, a weekly, hour-long investigative news program.

33.    Harvey Cashore is an investigative reporter and producer for the CBC's *The Fifth Estate.*

## **JURISDICTION AND VENUE**

34.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1605(a)(2), contained within the Foreign Sovereign Immunity Act ("FSIA").

35.    This Court further has personal jurisdiction over CBC pursuant to 28 U.S.C. § 1330, because, as an agency or instrumentality of Canada, the CBC is a "foreign state" within the meaning of 28 U.S.C. § 1603(a) and because Defendant is subject to suit under the FSIA.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4) because civil actions against a foreign state as defined by 28 U.S.C. § 1603(a) may be brought in this District.

## FACTUAL BACKGROUND

**I.   WE CHARITY IS A CHARITY THAT HELPS CHILDREN IN THE UNITED STATES AND ABROAD**

37.     As the WE Organization's U.S. charity, WE Charity is the primary source of funding for the entire WE Organization.  That funding supports both domestic programming in the United States through WE Charity's partnerships with American schools and international development abroad in countries such as Kenya, Ecuador, Sierra Leone, Ethiopia, Ghana, Tanzania, India, Haiti, Nicaragua, China, Sri Lanka and other countries.

**A.  WE Charity Promotes Charitable Giving and Volunteerism in U.S. Schools**

38.     WE Charity has been in operation in the Unites States since 1997.  Throughout that time, it has worked with American school children across the country to promote engagement with charitable causes, including but not limited to raising funds to support the WE Organization's international development work.

39.     Through the "WE Schools" program, WE Charity delivers year-long social action and leadership tools and opportunities to students across America. The program provides participants with free curriculum and classroom resources to support volunteerism, youth mental health, trauma-informed learning and positive character education.

40.     In the 2019-2020 school year, more than seven thousand schools in the United States had WE Schools groups, and WE Schools engaged more than 24,000 educators. More than 1.7 million students in the US benefitted from WE Schools, with almost 280,000 students participating directly in WE Schools groups, and another 1.42 million students being impacted by that programming. Also in the same year, eighty-four percent of WE Schools groups in the U.S. volunteered, contributing more than 3.5 million volunteering hours. That same year, the activities across WE Schools groups in the United States achieved an estimated total social

impact value of more than $90 million.[2]

41.     In 2020-2021, much of WE Charity's programming was virtual due to COVID shutdowns.  Worldwide, WE Schools programs were viewed more than 980,000 times that year in virtual global classrooms and virtual professional development programs for educators.

42.     WE Charity also partners with the College Board to provides the "AP with WE Service" program, which combines college-level learning from the Advanced Placement Program with WE's service-learning model to create an opportunity for AP students to apply their classroom work to the real world. Students who complete the AP with WE Service program receive a service-learning designation on their high school transcript.  Educators from all of the schools in the U.S. that use Advanced Placement are able to provide this program.

43.     At the end of each year-long WE Schools program, WE Charity sponsors a "WE Day" event.  Each WE Day is a day-long educational and inspirational event that celebrates the power of young people to make a positive difference in the world.  These events give young people the opportunity to hear from inspiring and engaging speakers and encourage engagement in charitable works.  Tens of thousands of students attend each WE Day.  WE Day events are supported by corporate donors and sponsors such as Allstate, Walgreens, and other donors with funding given specifically for that purpose.

44.     Attendance at WE Day is free for schools and youth to attend, but participants must earn their tickets through a commitment to one local and one global action of their choice through the WE Schools program.  Among other things, the WE Day events incentivize

---

[2]   The Total Social Impact Value is calculated as the sum of dollars raised, the value of youth volunteerism, and the value of local food collections. These values were established by WE Charity in consultation with Dr. Jonathan White, Director of the Bentley Service-Learning and Civic Engagement Center and Associate Professor of Sociology at Bentley University.

participation in the WE Schools program and thereby contributes to the good work done by that program.  WE Charity has held WE Day events in Texas, Minnesota, Washington, California, Maryland, Illinois, Kentucky, and New York.

45.     In addition to the current programming, WE Charity ran the "O Ambassadors Program" with Oprah's Angel Network to inspire young people to become active, compassionate and knowledgeable global citizens. The program offered the framework for youth to take action and to show how one person can make a difference. Nearly two thousand school-based clubs were established across the United States and approximately 67% of the participating schools were Title 1 designated schools.[3]  O Ambassadors was designed to educate, empower, engage and reward students through their schools at all levels in the United States (elementary, high school and college), with select O Clubs invited to apply for special programs, including international volunteer trips to East Africa and beyond.

46.     WE Charity also ran the "Heart Warming Project," sponsored by Hershey, through which students and educators applied for grants to make changes in their local communities.

**B.  WE Charity Provides Funds to Support the WE Organization's Development Work Around the World**

47.     In addition to implementing all WE Charity programming within the U.S., WE Charity is responsible for all fundraising in the U.S. for the WE Organization's international development work.

48.     U.S. donors, through WE Charity, provide most of the funding for the WE Organization's development work.  These donors include thousands of small donors, major U.S.-

---

[3]   Title 1 is a federal aid program for schools in the U.S. that provides financial assistance to schools with high numbers of children from low-income families.

based philanthropists, and U.S. corporate donors such as Microsoft and Hershey's.

49.     WE Charity also directly employs key staff responsible for overseeing the WE Organization's development work abroad, including the WE Organization's head of programming for Kenya, Robin Wiszowaty.

      i.   <u>WE Charity's Five-Pillar Model Encourages Sustainable, Holistic Development</u>

50.     When WE Charity was first founded, it sought to tackle child slavery by fundraising for organizations that raided factories and freed children from forced labor.  As it became clear that impoverished families were reselling the rescued children, WE Charity dedicated itself to addressing the root cause of child labor — poverty.

51.     More than a decade ago, WE Charity adopted a "five-pillar" development model called "WE Villages." The five pillars are: (1) education, (2) clean water and sanitation, (3) healthcare, (4) food security, (5) and alternative income programs.

52.     Through these five pillars, WE Charity funds infrastructure, programming and 5-7 years of capacity building to ensure self-sustainability and sustainable development.

53.     WE Charity's programs have helped provide over a million people with clean water facilities, built or renovated over 2,100 schoolrooms, and provided education to more than 200,000 children in Kenya, Ecuador, Sierra Leone, Ethiopia, Ghana, Tanzania, India, Haiti, Nicaragua, China, Sri Lanka and other countries

54.     WE Charity's education pillar is aimed at empowering people, particularly children, with knowledge, skills and confidence to develop their capabilities. In addition to building schoolrooms and providing communities with school furniture and basic school supplies, WE Charity's education pillar extends to partnering with local and regional governments to ensure the projects are maintained over the long-term, creating programming and initiatives to complement government-determined curriculum, and committing to providing all

students with quality education. Educational projects and programming include but are not limited to the following:

a) All construction, including materials, transportation, labor and storage, for new schools and school rooms, as well as boundary walls and/or gates as per country and government regulations;

b) Design and planning of school layout and technical supervision and architectural planning and oversight of all construction work;

c) Community and government documented approvals for all buildings to ensure all new structures have the proper designation, location, size, and usage;

d) Landscaping inclusive of safe walkways, levelling of land and beautification of school grounds;

e) Rebuilding or refurbishing existing schools and school rooms;

f) Outfitting of school dormitories with living space and bathrooms;

g) Connection of school facilities to available civil works;

h) Outfitting of classrooms with books, desks, chairs, educational resources, blackboard or whiteboard, lighting, shelving units, and initial basic supplies for classroom;

i) Construction of libraries, administration offices and teacher accommodations;

j) Outfitting of libraries with materials such as books, computers, educational resources, desks, chairs, and shelving units;

k) Outfitting of administration offices with desks, chairs, blackboard or whiteboard and other resources;

l) Outfitting of teachers' accommodations with bathrooms, kitchen, and bedroom;

m) Delivery and installation of solar panels to some school properties;

14

n)  Mobilization of volunteer-based community participation in the construction of education projects;

o)  Development, execution and monitoring of educational programming such as school pride program, headmaster groups, and school management committees;

p)  Relationship and partnership building with local government, education stakeholders and community leaders;

q)  Program and resource development, delivery, monitoring of leadership programming and training for teachers;

r)  Community education on the importance of primary school education, particularly for the girl child;

s)  Development, delivery and monitoring of extracurricular school clubs such as health and environment clubs;

t)  Development and delivery of summer student leadership programs where youth learn about leadership and teambuilding, photography, community values, storytelling, public speaking, computers, and presentations;

u)  Provision of school supplies and pedagogical materials to students and teachers; and

v)  Participation in regional educational assessments and planning groups.

ii.  <u>WE Charity Teaches Its Donors About Its Five-Pillar Model, Including by Bringing Tens of Thousands of Visitors to See Its Work First-Hand</u>

55.     WE Charity teaches its donors about its five-pillar development model through a variety of means.  The charity has a website that includes detailed information about the model, provides disclosures in connection with donations, communicates directly with donors including in donor gift agreements, and provides teaching materials to schools so that students can understand the model.

56.     The WE Organization, through its social enterprise affiliate ME to WE, also has hosted more than 40,000 visitors to its projects, primarily in Kenya.  Through such visits, individuals learn first-hand about WE Charity's sustainable development model and see how the charity puts donor dollars to work.  These visits also create local employment and bring tourism income to the communities and boost awareness among donors (and potential donors) of the need in Kenya, driving additional charitable donations to help the communities.

57.     WE Charity explains to its donors that their donations will be pooled with other donations to achieve the greatest impact.  WE Charity has included disclosures and explanations to this effect on its website for well over a decade.  For example, in 2011, WE Charity (then called "Free the Children") explained on its website:

> In cases where donations exceed what is needed or local conditions prevent program implementation, Free The Children will redirect funds to similar activities to help people in need. If additional funding is required because of specific project requirements or challenging local conditions, Free The Children may provide additional funding to complete the project to meet our commitment to our beneficiaries.

58.     WE Charity likewise makes clear that donations towards a development project will be used to purchase infrastructure such as a school *and* to provide the programming necessary to improve education: *e.g.*, teachers, supplies, books, and community engagement to ensure children attend school, among other things.  WE Charity has included disclosures and explanations to this effect on its website for well over a decade.  Again, as explained on WE Charity's (Free the Children's) website in 2011:

> When a donation is made to build a school, depending on the needs on the ground, it is used to help build a school, support education projects and/or towards the overall development and long term sustainability of the village. As a valued donor to the work of Free The Children, you will be assigned to a school community which you have helped to support and be provided with updates from the field.

16

59.     Like its peer charities, WE Charity's website includes a catalog of "Gifts of Impact," through which donors can give in amounts that WE Charity discloses are "***symbolic*** of projects or programming in the countries where WE Villages is implemented, and are associated with specific Pillars of Impact."

60.     WE Charity is clear that while it will respect a donor's selection of a particular Gift of Impact, it reserves the right to allocate the donated funds in a manner that best serves the communities it helps.  Specifically, WE Charity discloses:

> Funds from Gift of Impact items will be used to purchase the selected item where locally appropriate, or will be put toward an associated project or program within the pillar, ensuring a sustainable and holistic impact that takes into consideration the specific needs of the communities we work with.

61.     The WE Charity website further provides a helpful example of how Gifts of Impact work:

> For example: When a donation is made toward the purchase of a goat, depending on the needs on the ground and the local culture, the funds can be used to purchase goats, or they will be used for similar support in animal husbandry and other income-generating projects within our Opportunity Pillar. These funds will also go to support programming like ensuring regular veterinary visits and training on proper animal husbandry management (e.g., identifying disease and ensuring proper nutrition).[4]

62.     WE Charity explains that the "gift prices are based on average costs in the nine countries in which we operate."  Individual projects, including the cost of building schoolrooms, necessarily fall both above and below the average.  Local conditions, currency fluctuations, availability of raw materials, and cost of labor, among other things, vary greatly from country to country, and from one month to the next.  Weather and location accessibility also impact total

---

[4]   *See* https://www.we.org/en-US/about-we/we-charity/governance/financial-faq ("When a Gift of Impact is purchased online from our donation catalog, where does the money go?")

cost.  Furthermore, the full scope of a project required to sustain change may not be known at the outset.

63.     This approach and WE Charity's disclosure to its donors are similar to that of other peer charities. The approach is, moreover, reflective of the holistic model that WE Charity explains to its donors.  Donors who choose to give to WE Charity expect the charity to use their funds wisely, not to build empty or unneeded structures.

iii.  WE Charity's Development in Kenya

64.     The foreign country in which WE Charity funds the most charitable works is Kenya.

65.     In Kenya, the WE Villages school and education projects fall into two operational categories: (1) projects supported by WE Charity in partnership with the Kenyan government; and (2) projects directly carried out by WE Charity's Kenyan affiliates.

66.     Projects funded by WE Charity in partnership with the Kenyan government are generally primary and secondary schools.  After they are constructed or restored, the schools are owned and run by the local government and local community.  The WE Organization nonetheless assists with the operation for a period of 5-7 years after construction by providing school supplies, maintenance and student support programs.  Moreover, although the school teachers are employed by and are generally funded by the Kenyan Ministry of Education, WE Charity funds additional teacher training, teacher incentive programs, teacher exchange programs, educational resources, and other assistance for hundreds of government teachers. WE Charity also has supported community teachers for nursery school educators at select government schools.

67.     The WE Organization directly runs projects in Kenya including the WE College, Baraka Hospital, several high schools, a Women's Empowerment Center, and a large farm,

among other projects.   Dozens of full and part time faculty and staff at Kisaruni Milimani Girls

Boarding Secondary School, Kisaruni Ngulot Boys Boarding Secondary School, and WE

College are employed and funded by the WE Organization.  In addition, WE Charity funds

dozens of support staff employed in operations, accounting, finance, procurement, operations,

human relations, and various levels of management.  WE Charity also funds partial or full

scholarships for every student at Kisaruni Secondary School and WE College.

68.     Through these two models of construction and operation, the WE Organization

has funded the construction or renovation of 852 schoolrooms in Kenya.  These structures, which

WE Charity refers to as "schoolrooms", include primary classrooms, high school classrooms, a

college, libraries, dorms for schools, science labs, teacher housing in areas where necessary to

ensure teacher attendance and safety, school kitchens, and school administration offices.

69.     More than 12,000 students attend WE-funded schools in Kenya.

**C.  WE Charity's Fundraising is Subject to Careful Oversight.**

70.     WE Charity's fundraising is subjected to strong internal and external controls.

71.     The WE Charity Board of Directors is made up of experts with diverse

professional backgrounds and experiences, including a CPA as Chair of the Board. The Board is

a group of committed volunteers who bring a wealth of knowledge in the fields of business,

finance, governance, media, branding, law, and social justice.  Their cumulative experience

provides informed and responsible guidance and oversight to the charity, ensuring the highest

levels of integrity in their work.

72.     WE Charity also has a qualified and experienced financial staff. At least five staff

members are certified CPAs.  WE Charity uses professional accounting software to manage its

books and it is designed to track restricted and unrestricted funding, along with how such funds

are spent. The structure of the system is approved by independent auditors.

73.     As a registered charity, WE Charity also is subject to annual audits by an independent professional firm. Its Audited Financial Statements are reviewed and approved by the Board of Directors and are posted online, submitted to the regulatory authorities and available to the public.

74.     WE Charity has received over 20 years of unqualified audits.

75.     WE Charity has met all filing and regulatory requirements of the U.S. Internal Revenue Service.

76.     In 2020, WE Charity underwent a rigorous and ongoing vetting process and achieved a four-star score and rating on Charity Navigator, with a total score of 93.98 (out of 100), scoring 92.5 on financials and 96 on accountability and transparency.

## II.     2020: WE CHARITY CANADA ANNOUNCES WIND DOWN FOLLOWING A POLITICAL SCANDAL UNRELATED TO ITS OPERATIONS

77.     In early 2020, after the spread of COVID 19 resulted in massive shutdowns in Canada, the Canadian government decided to award a federal contract to WE Charity's Canadian affiliate ("WE Charity Canada") to administer a program called the "Canada Student Summer Grant program" ("CSSG"), which would have paid students to provide community service to Canadians adversely affected by COVID.

78.     Unbeknownst to WE Charity Canada, neither Prime Minister Trudeau nor then-Finance Minister Bill Morneau recused themselves from the decision to award WE Charity Canada with the CSSG contract despite the fact that Canadian Prime Minister Justin Trudeau and members of his family had appeared at WE Days in Canada and in endorsements for WE Charity Canada and the Prime Minister's family members had been paid professional fees for certain appearances. Former Canadian Finance Minister Bill Morneau's daughter also worked for WE Charity Canada at one time.

79. This failure of government officials to recuse themselves led to Parliamentary inquiries into the politicians' conduct. Prime Minister Trudeau was exonerated in the scandal by Canada's independent Ethics' Commissioner.

80. No WE Organization entity (including WE Charity Canada) was ever under investigation with respect to these officials' actions, nor were they found to have had any knowledge of impropriety with respect to Canadian government's selection process.

81. Nonetheless, due to the political controversy, WE Charity Canada backed out of the CSSG program in July 2020 and returned all funds advanced by the government – at a loss to the charity.

82. In September 2021, because the political scandal led to a loss of some corporate sponsorships and COVID 19-related shutdowns caused other financial losses, WE Charity Canada announced that it would wind down its operations and establish a foundation to provide sustainable ongoing funding for existing overseas projects and programs.

83. Since announcing WE Charity Canada's closing in Canada, the WE Organization has increased its focus on its ongoing operations and fundraising in the United States.

III.    **EARLY FEBRUARY 2021:  THE CBC AIRS ITS FIRST FALSE *THE FIFTH ESTATE* EPISODE ABOUT WE CHARITY**

84. The CBC's false and defamatory coverage of WE Charity was produced and reported by CBC journalists working for its long-form investigative news program, *The Fifth Estate*.

85. As set forth below, WE Charity repeatedly demonstrated to the CBC throughout 2021 that reporting by *The Fifth Estate* journalists included false and defamatory allegations. Despite this knowledge, the CBC permitted these journalists to continue pursuing the same false, preconceived narrative about WE Charity.

21

**A.** ***The Fifth Estate* is the CBC's Premier, Long-form Investigative News Program**

86.     The television arm of the CBC broadcasts a weekly, hour-long investigative news program called *The Fifth Estate* that is similar in content to the *60 Minutes* program aired by CBS in the United States. The CBC describes *The Fifth Estate* as "Canada's premier investigative documentary program," that "exposes wrongdoing in all corners of Canada and holds those responsible to account."

87.     Prior to *The Fifth Estate's* broadcasts, the CBC frequently takes out substantial numbers of billboard, bus, taxi, and other advertising spots and covers *The Fifth Estate's* broadcasts as news stories on CBC's *The National* (a nightly news program), as well as on local news shows in the days immediately before and after *The Fifth Estate* airs.  The CBC engaged in all of these practices with respect to its coverage of WE Charity.

88.     *The Fifth Estate* is viewed by millions throughout Canada.

89.     *The Fifth Estate* is viewed in the United States through several means: (1) U.S. residents near the border of Canada can receive the CBC's signal through standard antenna reception; (2) cable companies in the Northern United States offer CBC as a channel option; (3) online streaming via a Virtual Private Network; ("VPN"); (4) through various devices and platforms, including Apple TV; and (5) through YouTube.

90.     *The Fifth Estate* airs commercials during its broadcasts and did so during its broadcasts about WE Charity.

91.     *The Fifth Estate* has, to date, aired two episodes about WE Charity, the first on February 4, 2021 ("February Episode"), and the second, which is the subject of this lawsuit, on November 18, 2021 ("November Episode"). The November Episode is attached hereto as Exhibit D. Both have been rebroadcast multiple times.

92.     Both episodes were hosted by Mark Kelley and produced by investigative reporter

Harvey Cashore.

93.    On information and belief, Mr. Cashore had no prior experience reporting on international development charities.  Mr. Cashore told a source that his reporting on WE Charity was his first time reporting on an international development charity.   Mr. Cashore told another source that prior to one trip to Kenya in September 2021, his only visits to developing countries were a vacation at a resort in the Dominican Republic and attendance at a conference in South Africa.

**B.   Facing Declining Viewership for *The Fifth Estate*, the CBC Devised a Strategy to Boost Ratings by Publishing "Clusters" of Stories about Already-Covered Topics with "Dramatic Twists and Turns" to Create "Social Buzz"**

94.    On July 17, 2019, an article in *The Globe and Mail* – Canada's newspaper of record - reported that the CBC's *The Fifth Estate* team was "under pressure to boost ratings after its overall viewership declined 16 per cent last season, according to an internal strategy document seen by the paper. The average audience for any given minute of the weekly one-hour show, broadcast on Sundays at 9 p.m., fell to 326,000, with average viewing time dropping by two minutes from the previous season, to 20 minutes."

95.    The Globe and Mail reported on an internal CBC strategy document that "outlines how the program would attempt to rejuvenate its ratings."  The key to the strategy was to report on subjects already in the news so that the CBC could ride a social media wave of interest by adding its own "dramatic twists + turns" in a "cluster of stories" on the topic.

96.    According to *The Globe and Mail*,

> The document outlines a three-step process to build appointment viewing: a challenging task as audiences gravitate from scheduled broadcasts to on-demand. "Step 1: *We find engaged viewers through social media who are already deep in conversation*. Step 2: Instead of joining it with one story, *we promise a cluster of stories from different angles that expand the conversation*. Step 3: 'Investigative' directs the conversation, *creating news – and*

23

*social buzz* by taking it where few media go, to accountability."

Another page of the document notes that Sunday at 9 p.m. is known for premium television, and that luring viewers away from services such as HBO requires "HIGH QUALITY, *DRAMATIC TWISTS + TURNS*."[5]

97.     Unfortunately for WE Charity, it found itself in the Canadian news in 2020 because of the political scandal about the Canada Student Service Grant. In late 2020, the CBC's reporters at *The Fifth Estate* set their eyes on WE Charity as their next subject to sensationalize. But the CBC needed a previously unreported "twist" to fit its strategy.

**C.  On February 4, 2021, the CBC's *Fifth Estate* Falsely Reported that Multiple Donors Each Fully Funded the Same "Borehole" Project in Kenya**

98.     On February 4, 2021, the CBC aired an hour-long episode of *The Fifth Estate* hosted by Mr. Kelley and produced by Mr. Cashore titled "The Price WE Paid" (the "February Episode").

99.     The February Episode falsely asserted that WE Charity told four donors they each had funded the "entire" cost of the same "borehole"[6] constructed during 2015 and 2016 in Kipsongol, Kenya (the "Kipsongol Borehole").  The CBC stated that it based its claim on social media and other internet postings by or about four donors. The CBC claimed these postings showed that each donor believed it was the exclusive funder of the Kipsongol Borehole.

100.    In fact, none of the online postings said anything of the sort.  Only one of the postings even referred to a borehole, and none stated the donations were the sole funding for the project.

---

5   All emphasis herein is added unless otherwise noted.

6   A borehole is a deep, narrow hole drilled in the ground generally to locate water or oil.  WE Charity constructed numerous boreholes in Kenya to provide clean water to communities as part of broader water projects that include other infrastructure, maintenance, programming and education.

101.     WE Charity explained to the CBC, "WE expressly told funders that their donations were for water projects that included more than a borehole, the donations collected did not exceed the cost of the water project, the donors were never told they were the sole funders of the water project; and none of the donors claim to be the sole funders of the water project or any part of it."  The charity provided the CBC with extensive documentation supporting its positions.

102.     WE Charity asked the CBC's reporters if they had actually spoken with any of the donors to confirm their allegations. The CBC reporters said they had *not* spoken with any donors.  As discussed below, the CBC subsequently contacted one (and only one) of the donors. That donor had in fact written to WE Charity years earlier expressly confirming he knew that he did not fund the entire borehole.

103.     It was reckless at best for the CBC to report that any of the four donors it identified were "confused" about whether they exclusively funded the Kipsongol Borehole. Those donors were: (1) Whistler Water, a bottler of glacial spring water; (2) an anonymous donor that since has identified itself as Nicola Wealth Private Capital ("Nicola"), the private capital division of Nicola Wealth; (3) a student group from the University of British Columbia ("UBC"); and (4) Unilever, the global consumer goods company.

i.     Whistler Water Never Stated It Fully Funded the Kipsongol Borehole

104.     As would become a pattern in its coverage of WE Charity, in the CBC's February Episode, the CBC misquoted and mischaracterized third parties' and donors' statements to change their meaning and fit the CBC's predetermined narrative.

105.     For example, while quickly flashing across the screen a report from North Shore News dated June 9, 2015 describing Whistler Water's "***effort to raise funds for*** a clean drinking water project," the CBC misquoted it, saying, "This group from Whistler said ***they paid for*** a clean drinking water project in Kipsongol, Kenya."

25

106.    Viewers had no chance to read the actual words for themselves, nor observe that they were not authored by (or purporting to quote) Whistler Water.  Moreover, the CBC's description of the document was not reasonable. Indeed, in connection with CBC's own fundraising efforts, the CBC has had no problem interpreting "an effort to raise funds for" a charitable goal as a *non-exclusive* effort to do so.[7]

107.    After the broadcast, on March 2, 2021, Stuart McLaughlin, the President of Whistler Water during the time period relevant to the CBC's reporting, wrote to the CBC.  He confirmed that his company had understood that its donations to WE Charity would be pooled with those of other donors.  He said, in relevant part:

> I'm contacting you to ensure that our experience is properly represented. I have been overseas to see WE's work. Whistler Water and/or Grouse Mountain was involved in a fundraising initiative for WE Charity eight years ago..…
>
> Whistler Water contributed to the village of Kipsongol. Many donors contributed to the fundraising success of the Whistler Water One Climb held at Grouse Mountain. Broad participation was the fundamental basis for community engagement around this initiative.  Undoubtedly many individuals and organizations rightly took pride in sharing their participation. This web link explains the entire program https://www.grousemountain.com/events/whistler-water-one-climb-2013. By comparison the same format was used to raise funds for the Alzheimer's Society, BC Children's Hospital, Outward Bound only to name a few.
>
> ***We fully understood that our participation in the fundraising was part of a larger initiative.***  It was the nature of our business and personal experience that drew us to find a way to facilitate this infrastructure project.

ii.    <u>Nicola Told the CBC That It Never Understood Its Donation to be the Sole Funding Source for the Kipsongol Borehole Project</u>

---

[7]    *E.g.*, https://www.cbc.ca/news/canada/newfoundland-labrador/holy-heart-choir-sing-feed-nl-downtown-1.3905301 ("Live Christmas carols graced the hustle and bustle of downtown St. John's Tuesday, in a musical ***effort to raise funds for*** CBC's Feed N.L. campaign.").

108.    In the February Episode, the CBC described Nicola as an anonymous donor.  WE Charity confirmed that the donor was Nicola.

109.    Regarding Nicola, the CBC reported:

> Another donor told us she was sent an email that said her group's donation is actually enough money *to implement a clean water system for a community*.

110.    This statement on its face does not support the inference that CBC sought to draw from it, as donating "enough money to implement a clean water system for a community" is not the same thing being the sole funder of the Kipsongol Borehole.

111.    Moreover, the email that the donor purportedly gave to the CBC provided no support for CBC's assertions.  As CBC reported, it flashed an email from WE Charity to the donor group across the screen too quickly for viewers to read.  That email says only: "$5,000 is actually enough money to implement a clean water system for a community, so perhaps we can allocate the funds towards that?"  It made no mention of a borehole, which costs well over $200,000 to build, outfit, connect underground piping and maintain as part of a water program for a community.  Nor did the email state that the donor's group would be the exclusive funder of *any* project.

112.    In a letter dated March 10, 2021, WE Charity's counsel explained to the CBC that WE's website in 2014 described the effect of a $5,000 donation to the water pillar as follows, and makes no mention of boreholes:

> $5,000 builds a community well. Building an accessible community well means that women and girls, who typically spend hours fetching water, have free time instead to work and attend school. It also provides a safe and secure source of water for a community.

113.    In 2015, WE Charity's online gift catalog in fact stated that a gift of US$5,000 would pay for a *well*, not a borehole:

> Imagine a community with flourishing farms, healthy families and
> every child in school instead of walking long distances to fetch
> water? It all begins with **the gift of a well** with the tools to break
> the cycle of poverty and build a brighter future for their families
> and communities.

114.    In the February Episode, the CBC said in a voiceover, "The charity sent them a photo of what the donor sponsored. It was labeled 'Kipsongol borehole'" and showed a photograph that WE Charity purportedly sent to the donor.  The photograph shown by CBC had a prominent label, "Kipsongol Borehole."  But to WE Charity's knowledge, it never sent any such photograph to the Nicola donor group.

115.    To the contrary, as WE Charity showed the CBC, WE Charity made plain to Nicola that it was not the only organization providing funding for water projects in Kipsongol. On September 9, 2015, WE Charity emailed Nicola as follows (in relevant part):

> I wanted to reach out and share an update on the generous donation
> you made to us last month. **We wanted to put the funds toward an
> impactful clean water project in Kenya and so it was allocated to
> the community of Kipsongol, <u>where we have been raising funds
> for a borehole over the last couple of years</u>.**
>
> **I'm happy to share that we <u>finally</u> reached our fundraising goal
> thanks to your support**, and we have began [sic] drilling for clean
> water!

116.    WE Charity enclosed with that email photos of members of a community collecting clean water from a pipe.  The charity never told Nicola it had paid for the Kipsongol borehole.

117.    A quick review of the Nicola website by CBC would have shown the error of CBC's reporting, as Nicola's website describes its donation to WE:

> **Our donation was <u>put towards</u> an impactful clean water project**
> in a Kenyan community called Kipsongol. The Adopt A Village
> program has been working with Kipsongol to raise money for a
> borehole which creates a clean, sustainable source of water this,
> and other, communities.  **With the <u>help</u> of our donation**, the

program successfully raised enough money to move forward with the borehole project.

118.   The CBC thus had sufficient information to know that its reporting on Nicola (which CBC did not name) was incorrect.  The email it cited as proof does not mention a borehole nor does it say that the donor was the exclusive funder of any project.  The photo WE Charity supposedly sent the donor of the borehole was not sent by WE Charity, nor was any photo sent in a context that could be taken to convey that the borehole was solely funded by the donor.  And even the most cursory online investigation would have confirmed that the donor knew it was not singlehandedly financing a borehole in Kenya.

119.   After the broadcast, the founder and Chairman of Nicola signed a letter to the CBC, confirming his and Nicola's prior understanding that they were not the sole funders of the borehole project and objecting to the CBC's coverage. That letter explained:

> WE's Charity development **model** is holistic.  **It takes funding from multiple donors to ensure** schools and school rooms are built and can deliver education to children over the long term, or for **a borehole to be drilled and succeed as part of a full community water system**.

iii.   <u>The UBC Student Group's Emails Made Clear That the Group Understood It Did Not Fully Fund the Kipsongol Borehole</u>

120.   When WE Charity learned of CBC's theory regarding the Kipsongol borehole, WE Charity contacted the CBC and urged it to contact the donors that the CBC said believed they had "fully funded" the Kipsongol borehole.

121.   The CBC reported in the February Episode that in response to WE Charity's request, it spoke with Mr. Cohen, the head of the student group.  The CBC said "the WE organization told him his group paid for the entire borehole in Kipsongol." With the words flashing across the screen, the CBC quoted Mr. Cohen saying he was "…a hundred per cent sure that's what they said."

29

122.    The CBC did not confirm Mr. Cohen's reported recollection with WE Charity before going to air.

123.    In fact, there was clear documentary proof that Mr. Cohen had known that his group did not pay for the entire borehole. After the broadcast, WE Charity provided the CBC with emails with Mr. Cohen from the time of his donor group's donation in 2015.  Those emails confirmed that Mr. Cohen understood that his group's donation of $5,000 would be pooled with others, could not possibly fully fund a borehole and at most represented the cost of a water kiosk.

124.    Specifically, on September 15, 2015, Mr. Cohen asked WE Charity how his group's $5,000 donation fit into the context of WE Charity's water projects, stating, "My understanding is that the borehole costed [sic] a lot more than $5,000 but the distribution kiosk was about $5000, is that right?"  WE Charity responded to Mr. Cohen: "You are correct, a borehole does cost a lot more than $5,000. On average the general cost of a borehole is $250,000."  These emails clearly contradicted the CBC's reporting, but it refused to issue a correction.

125.    For years afterwards, Mr. Cohen remained an active supporter of WE Charity— not an aggrieved donor, as CBC falsely presented him.

126.    With respect to this single source, CBC included a short note in an online-only article stating: "In a letter, [WE Charity] pointed to emails where Cohen later understood he was paying for a water kiosk and not the entire borehole."[8] But CBC refused to properly correct its reporting.

---

[8]    Kate McKenna & Harvey Cashore, *MP Joins Former Donor In Calling For RCMP Investigation Into WE Charity Following Testimony*, CBC (Feb. 28, 2021, 3:55 PM), https://www.cbc.ca/news/canada/rcmp-investigation-we-charity-1.5931253.

iv.  Unilever Never Purported to Fund a Borehole and To WE Charity's Knowledge, Never Confirmed CBC's Interpretation of Unilever's Campaign

127.    Finally, with respect to Unilever, although Unilever organized a fundraising campaign with Walgreens for "sustainable clean water in a remote Kenyan village," that campaign never asserted that it was the sole funder for the Kipsongol Borehole.  Rather, an August 18, 2015 article by the *Chicago Tribune* titled "Walgreens, Unilever campaign aims to bring clean water to Kenya," reported on "a new charitable campaign" between Unilever and WE Charity in which:

> For every purchase of TRESemme, Suave and Caress products at Walgreens through Sept. 30, Unilever will donate 6 cents *toward a project building a sustainable clean water source* in a remote Kenyan village." The article went on to report that The promotion, which began in late July, *has already donated the equivalent of 5 million gallons, on the way toward a goal of 15 million gallons*," and that "[t]he actual donation goal is $200,000, *essentially the cost of a borehole project underway to tap an underground reservoir in Kipsongol …*

128.    This report (which did not come from Unilever) speaks only of fundraising "goals" and makes no pretense of Unilever being the sole funder of a project that was already "underway" at the time.  CBC nevertheless misrepresented that report as a claim by Unilever that it was the sole funder of the Kipsongol Borehole. Upon information and belief, Unilever did not confirm with CBC its misinterpretation of the *Chicago Tribune* report.

v.  Other Donors Told the CBC That It Was Wrong, But CBC Kept That Fact from Its Viewers

129.    CBC also contacted other donors who informed CBC that its theory was incorrect, but the CBC nonetheless chose not to inform its viewers of that fact.  As would become a pattern, the CBC's reporter reached out to a WE Charity donor and attempted to convince her she had been deceived by falsely claiming WE Charity had confirmed the CBC's thesis. Specifically, Mr. Cashore wrote to the donor,

> We have reached out to WE Charity. They have indicated that
> another organization "essentially" paid for the costs of the
> borehole. This is one of the reasons we are reaching out to you, to
> best understand your perspective.
>
> Our program "The Fifth Estate" has found several examples of
> various organizations indicating they believed they were involved
> in the funding of the same borehole project.

130. Of course, WE Charity had *not* indicated that any one organization paid for the

borehole project, as the CBC falsely told the donor.

131. Putting words in the donor's mouth, Mr. Cashore wrote, "How did you come to

understand that [your organization] had funded the borehole project?" The donor wrote back and

rejected the CBC's misreading of her online postings about helping to support a water project in

Kenya.

> ***Our understanding was that multiple donors funded the*** **[sic]**
> ***Kipsongol's water system***, in addition to other pillars that were
> implemented in that community.
>
> Because ***funds were pooled from multiple sources***, we understood
> that our donation would help bring these much-needed projects (5
> pillars) to fruition and that we were never the sole funder of any
> pillar – including the water pillar for Kipsongol.
>
> We celebrated the construction of the borehole project in our
> reports because it was a part of the clean water project.

132. The CBC did not tell its viewers about this donor or others who refuted the CBC's

predetermined narrative.

     vi.  <u>The CBC Knew the Facts Demonstrating That the February Episode Was Wrong,
But Never Corrected Its False Reporting</u>

133. WE Charity informed the CBC of the errors in its reporting, including all the

forgoing facts, in correspondence before and after the February Episode aired. WE Charity's

U.S. legal counsel wrote to the CBC on January 27, 2021, January 31, 2021, and February 8,

2021.

134.    On February 10, 2021, the CBC responded to WE Charity's counsel, "CBC is satisfied with the accuracy of the Broadcast and related reporting, and has adhered to our obligations under the law and CBC's Journalistic Standards and Practices. We will not make any corrections."

135.    On February 11, 2021, WE Charity's counsel responded:

> We are frankly surprised the CBC could be satisfied with the accuracy of the Broadcast.
>
> - How was it accurate to report that WE told James Cohen his group "paid for the entire borehole in Kipsongol" when Mr. Cohen said in an email, "my understanding is that the borehole cost[] a lot more than $5,000" his group donated, and WE confirmed that understanding in writing?
>
> - How was it accurate to report that WE sent a donor a photograph the CBC displayed on screen when in fact WE did not send it to the donor?
>
> - How was it accurate to report that a donor was misled to think it paid for an entire clean water project when WE told the donor, "we have been raising funds for a borehole over the last couple of years" and the donor wrote on its website that it only "help[ed]" fund the project?
>
> - How was it accurate to report that documents claimed sole credit for funding a borehole when the documents do not even mention, much less claim to have solely funded, the borehole?
>
> We are also surprised that the CBC considers it within its journalistic and legal obligations.  How did the CBC comply with those obligations when it (1) denied the target of its reporting an opportunity to respond to new allegations, (2) falsely told sources that WE agreed with disputed allegations, and (3) failed to tell its viewers about facts inconsistent with its story?
>
> We have engaged with the CBC in good faith, provided you with facts and law, and have been met with near silence in return.  If the CBC has responses to these questions, we would appreciate the courtesy of you sharing those answers with us so that we can engage in a more productive dialogue.

136.    The CBC never answered any of these questions and rejected WE Charity's

request for a dialogue, responding the same day, "We have said everything we have to say on this point."

137.     Despite the clear evidence that the CBC's coverage of WE Charity with regards to the Kipsongol borehole was wrong, the CBC proceeded to rebroadcast the story on at least five more occasions.  The CBC rebroadcast the February Episode to a new audience on its cable news network, CBC News Network, on February 6, 2021, February 7, 2021, April 24, 2021, April 25, 2021, July 10, 2021 and July 11, 2021.

138.     The February Episode, with its false and defamatory statements, also continues to be available to view on YouTube and on the CBC's website.

## IV.     LATE FEBRUARY 2021: THE CBC RELIES ON A DISCREDITED SOURCE TO INITIATE ITS INVESTIGATION INTO WE CHARITY SCHOOLS IN KENYA

139.     After being shown to be wrong with respect to a borehole, the CBC decided to allow the same reporters to apply the same flawed methodology to falsely report on WE's funding of schools in Kenya.

140.     According to the CBC's own coverage, the network was inspired to investigate WE Charity's school funding after a former donor, Reed Cowan, publicly alleged that WE Charity had removed a plaque from one of the schools he funded. For example, Mr. Kelley said in a November 24, 2021 podcast published by the CBC called *Frontburner* (the "Podcast") that Reed Cowan "sort of got us rolling on all this."  Attached hereto as Exhibit E.

141.     Mr. Cowan's allegations came to light when opposition party politicians who control the Canadian Parliament's Ethics Committee invited Mr. Cowan, an American TV news anchor from Las Vegas, to testify before the committee.

142.     On February 26, 2021, Reed Cowan, an American news anchor from Las Vegas's Sinclair-owned television station, KSNV, appeared before a Canadian Parliamentary Committee.

Mr. Cowan testified that a plaque bearing his son's name had been removed from a school in

Kenya he helped fund through WE Charity back in 2007, before it fully implemented its five-

pillar model. *See* Canada, Parliament, House of Commons, Standing Committee on Access to

Information, Privacy, and Ethics, Evidence, 43d Parl., 2d Sess., No. 22 (26 February 2021) at

14:00.

143.    WE Charity apologized, privately and publicly, for the unfortunate error

concerning Mr. Cowan's plaque.  But the political theater surrounding opposition politicians'

attacks on WE Charity as a proxy for Mr. Trudeau put a spotlight on a donor complaint about a

plaque that, while unfortunate, would normally not be front-page news.  And Mr. Cowan's

unfortunate experience proved to be very unusual.

144.    Mr. Cowan claimed that he had video proof – in the form of footage from another

WE Charity donor group – that WE Charity had placed a plaque for that donor group on the

school Mr. Cowan had funded weeks before he arrived in Kenya to place a plaque on the same

building.  WE Charity provided clear proof that Mr. Cowan had misunderstood the other donors'

footage of a plaque, which had been placed on a different school.  Among other things, the walls

and the concrete used in the school in the video were entirely different.

145.    Mr. Cowan's allegation of fraud never made any sense; virtually none of the

schools WE Charity built in Kenya ever had plaques on them. There was no need to swap

plaques as another could simply be placed one of the other buildings in Kenya without a plaque.

**A.  Reed Cowan Claimed He Raised Millions of Dollars That Should Have Funded
     More Schools Than WE Charity Built, Then Admitted He Greatly Exaggerated His
     Donations**

146.    Mr. Cowan falsely testified that he was a major WE Charity donor, asserting: "All

in, I believe I am connected to what I presume are millions of dollars raised." *Id*. at 11.

147.    Mr. Cowan's references to massive fundraising for schools in Kenya caught the

attention of the CBC.  Two days after Mr. Cowan's testimony, the CBC reported:

> WE Charity also said on Friday that Cowan's fundraising paid for four schools. Cowan said he was told each school cost between $10,000 and $12,000 and that **his fundraising ought to have paid for 24 schools**.

https://www.cbc.ca/news/canada/rcmp-investigation-we-charity-1.5931253.

148.    This publication was the first time the CBC reported that WE Charity was "missing" schools in Kenya.

149.    Not long after his Parliamentary testimony, on March 4, 2021, **Mr. Cowan conceded to WE Charity that he did not raise enough funds to pay for anything close to 24 schools**. Mr. Cowan admitted that he had claimed as his own the fundraising accomplishments of double-amputee Spencer West, who worked for five years as a motivational speaker employed by WE Charity.  Mr. Cowan acknowledged to Ms. Wiszowaty in a March 4, 2021 email, "as it relates to me saying I'm connected to a 'presumption of millions of dollars raised.' What I mean by that is Spencer West."  In fact, WE Charity's records reflect that the organization received only approximately $70,000 in donations associated with Mr. Cowan's "Wesley Smiles Coalition" fundraising efforts, the majority of which came from individuals other than Mr. Cowan.

150.    WE Charity told the CBC the facts about Mr. Cowan's donations and his admission to having greatly exaggerated his donations no later than June 2, 2021 in a letter from its legal counsel to the CBC's counsel.

### B.  Reed Cowan's Public Attacks on WE Charity Were a Prelude to an Extortionate Demand for $40 Million, Threatening to Make WE Charity "Infamous"

151.    On April 2, 2021, the *Washington Post* broke the story that Mr. Cowan was building on his high-profile attacks on WE Charity to extort the organization for at least $20 million (nearly a thousand times what he donated). He demanded a total of $40 million unless all

of his demands were met—nearly all of which would be for his own personal use.[9]

152.    Backed by a threat to use his position as a well-connected TV news anchor in a large U.S. city employed by Sinclair Broadcasting, the demand letter threatened, "You have a rare chance to avoid additional heights of public infamy."

153.    The demand letter named Mr. Cowan's current and former media employers as outlets he would use to impose that "public infamy" if his demands were not met.  And if WE Charity did pay, Mr. Cowan would delete the public attacks on the charity that had set the stage for his demand:

> Should you accept these demands, Mr. Cowan is willing to delete all social media posts connected to this scandal and decline television interviews with Dateline NBC, CBS News, Sinclair Broadcasting, Nextar Broadcasting, CBC, and all print interviews with Vanity Fair, The New Yorker, The New York Times, The New York Post and Bloomberg, and any other press outlet who requests interviews and end this painful period…

154.    After Mr. Cowan's actions became public, Journalism professor and media ethics specialist Mary Hausch of the University of Nevada, Las Vegas, opined in an article in the *Las Vegas Review Journal* that Cowan's threats breached established standards requiring journalists to avoid conflicts of interest.

155.    The CBC knew all of these facts by, at the latest, early June 2021, but did not update its coverage concerning Mr. Cowan to disclose these important facts.  For example, in a June 2, 2021 letter, WE Charity's counsel wrote to the CBC and provided it with links to media coverage concerning Mr. Cowan's attempted extortion of the charity.  The CBC nevertheless continued to repeat Mr. Cowan's accusations against WE Charity in its publications and in

---

[9]    Mr. Cowan noted that he "*may*" share the funds with a charity in his own name: the "Reed Cowan Philanthropy Fund."

conversations with sources without disclosing his misconduct.

**V.    MARCH 2021: AFTER THE CBC AGAIN PUBLISHES FALSE CLAIMS ABOUT WE CHARITY'S PROJECTS IN KENYA, THE DONORS IN THE CBC'S COVERAGE REFUTE THE STORY AND EXPOSE THE CBC'S MISCONDUCT**

156.    On March 7, 2021, the CBC aired a news segment on its nightly news show, *The National*, and published an online news article on March 8, 2021 titled "Multiple WE Charity donors raised money for the same borehole well in Kenyan Village." These reports reasserted CBC's debunked theory regarding fundraising for the Kipsongol Borehole, but for a different village in Kenya, named Osenetoi.

157.    This story too was false and misleading and the persons quoted in it complained to the CBC regarding its distortions of their views.

158.    Donna McFarlane, a WE Charity donor, was interviewed by Mr. Kelley and Mr. Cashore for the story.  Prior to the CBC's November 2021 coverage of WE Charity, Ms. McFarlane was the only WE Charity donor interviewed on-screen in any CBC coverage.

159.    Ms. McFarlane complained to the CBC after the March 7, 2021 segment aired:

> … I clearly shared with both Mark and Harvey that I understood where the funds donated to WE Charity were directed. The story, instead, made it sound like I either did not know what happened with the funds or I was questioning what happened with the funds. ***If you review the unedited footage, you will see this is not the case.  In my conversations with Harvey and in the interview itself, I made it clear that I understood where the funds were going to help people. …*** My comments were taken out of context … I feel misrepresented in the coverage based on the quotes used and the information omitted. I engaged with the CBC in good faith. I agreed to participate in what I know is a controversial topic because I trusted the journalistic ethics from the CBC 5th estate team. ***Watching the piece go to air, and reading about it online the next day, showed me that that trust was not reciprocated in their reporting.*** I understand someone from the CBC also called my Minister at our local church. Our Minister feels this phone conversation was also distorted, in how the facts were being presented in this phone call. ***It feels like the CBC was out to tell a negative story with a pre-determined outcome as opposed to first***

> *getting the facts from its interview subjects. I also feel the CBC misrepresented how WE Charity operates*. … I am not the only person who feels this way. Another person from our community group who fundraised for WE Charity is Barb Cowan. She was also present at the filming at my house and feels the facts, as presented, were distorted in both the TV and the on-line article. Other WE Charity donors who were cited directly or indirectly in the cbc.ca story also feel this way. *We have all signed an open letter to this effect.*

160.    Ms. McFarlane enclosed with her communication to the CBC an open letter she

and seven other donors signed claiming they each were misrepresented by the CBC with respect

to the Osenetoi borehole story.  That open letter read:

> We are donors in the March 8th CBC article, *Multiple WE Charity donors raised money for same borehole well in Kenyan village*.
>
> **CBC did not fairly represent our responses to their questions.**
>
> We write this letter to express our frustration and disappointment in the CBC's reporting. We are concerned that this misinformation will continue to circulate.
>
> We want to ensure that Canadians understand the facts:
>
> > 1. WE Charity is transparent with us about the use of our donations. Each of us has travelled overseas to visit WE Charity's development programs. We have seen the impact and know that our donations are being used to help those who need it most.
> >
> > 2. The article does not properly describe how and why we supported WE Charity. It is not simply about building a schoolhouse or drilling a borehole. It is about so much more; it's about working with the communities to help end poverty.
>
> Many people fundraise for the same program in a village *because their funds all go to helping provide water or education in that village*.
>
> It is not only about building a schoolhouse. It is about providing high-quality education. It is about training teachers, providing school lunches, helping families prioritize education, and supplying student inoculations.
>
> A borehole is more than what you might think. For it to truly

39

benefit a community, it needs years of funding fuel to keep it
running, costly repairs, and educating the community on long-term
sustainability.

A schoolhouse or borehole does not succeed without these other
program elements.

We are proud to support WE Charity's holistic model with "5
pillars" of education, healthcare, food security, clean water and
sanitation, and alternative income programs.

We support WE Charity because this model best helps people.

Attached hereto as Exhibit H (Emphasis in original).

161.    Among the signatories to the open letter were Stuart McLaughlin and his

wife.  As discussed above and as the CBC knew, Mr. McLaughlin was the President of Whistler

Water in 2015. The CBC had falsely claimed in the February Episode Whistler Water was misled

by WE Charity to believe it fully funded the 2015 borehole project in Kipsongol, Kenya.  The

open letter therefore further showed that the CBC's February Episode had been wrong, but the

CBC continued to refuse to correct or retract its reporting.

162.    In addition to sending the letter, Ms. McFarlane asked the CBC's Ombudsman,

Jack Nagler, to review the CBC's conduct with regard to her interview concerning WE Charity.

In his response months later, Mr. Nagler acknowledged,

CBC could have presented your view more fully in the television
version of its story. That part of your interview was immediately
preceded by that clip from the New Democratic MP suggesting
that WE's conduct was "highly problematic." Then Mark Kelley
said this to introduce your statement:

*Donna McFarlane says wherever her money went, she wants to
believe that it was well spent.*

**It would have been better for CBC to include the fact that you
said WE had provided you with clear information about where
your money would be going.** Doing so would not have undermined
CBC's reporting. It would have made clear that not only were you
addressing the question of whether money was spent properly, you
were also challenging the claims by others that WE had not been

40

transparent.

*Further, that CBC said you "want to believe" money was well spent rather than stating simply that you "believe" money was well spent could be interpreted as a subtle implication that you were going on hope rather than knowledge.* Given that, while it is my view that CBC's use of your interview adhered to journalistic standards, I empathize with your fear that people might construe you as a victim rather than a knowledgeable person who remained resolute in her conviction that criticism of WE was unfair. Just a few extra words in the script could have made that problem go away.

VI.   **MARCH 2021:  THE CBC DOES NOT PUBLISH A STORY ABOUT WE CHARITY AFTER IT LEARNS ITS REPORTERS AGAIN MISREPRESENTED WHAT THE CHARITY TOLD ITS DONORS**

163.   Despite the clear evidence that its thesis was wrong, the CBC continued to pursue its debunked theory that WE Charity told multiple donors they each fully funded the same borehole in Kenya.

164.   On March 10, Mr. Cashore and another producer at the CBC, Kate McKenna, sent WE Charity an email seeking comment on an upcoming story about a donor whom the CBC claimed was told his group's $5,000 donation had funded the entire Kipsongol borehole.

165.   The CBC's reporter said that the network's planned reporting was based on the following April 2, 2014 email from WE to the head of the donor group that stated as follows:

As with many of our large scale projects, *the borehole in Kenya will be supported by a community of donors* who are committed improving access to clean water for Kipsongol. The $5,000 benchmark reflects the average cost of a water project, but each project varies depending on the country. The scale of the borehole in Kenya will create access to a safe source of drinking water for thousands of community members in the region. Normally, we wait until the donation is received before sending out the community matching information. However, to support the onboarding process at Mara Community Church, I'm happy to provide the information ahead of time: Kipsongol, Kenya: http://reports.freethechildren.com/community/kipsongol/

166.   The reporter's email to WE Charity said that the organization's 2014 email to the

41

donor group "described the $5,000 as being the "average cost of a water project" including the

borehole."  Ms. McKenna indicated that the CBC would be reporting that this wording led the

donor to believe "they had funded the borehole," apparently in its entirety, with their $5,000

donation.

167.    WE Charity's counsel wrote the CBC's in-house counsel the same day:

> No reasonable person could construe WE's email to the donor representative, Paul Cox, in the manner advanced by Ms. McKenna.  The email on its face refutes her assertion that Mr. Cox's group's $5,000 donation would fully fund the Kipsongol water project.  WE's representative wrote, "As with many of our **large scale** projects, the borehole in Kenya will be **supported by a *community* of donors** who are committed improving access to clean water for Kipsongol."  The email expressly states that Mr. Cox's group would not be the only funder.

> The reference to $5,000 in WE's email does not say "including a borehole" as Ms. McKenna falsely states.  WE clearly explained to the potential donor that $5,000 represents the average cost of a water project but "each project varies depending on the country."  The email goes on to elaborate on how this project is on a much larger scale than a typical project—and therefore obviously more than $5,000—as it will be serving "thousands of community members in the region."

168.    As WE Charity's counsel explained to the CBC, a portion of the email not quoted

by CBC in its request to WE Charity for comment stated as follows:

> Currently the greatest need for clean water is in Kenya, specifically the community of Kipsongol where *a large scale water project* is about to begin and ***final funding is coming together***. The project is a large borehole that will bring water to the surface from an aquifer underground and distributed to a number of villages in the area. The best way to picture a borehole is *a system of wells* connected to a central aquifer in the region.

169.    WE Charity's counsel asked the CBC, "How could it be that 'final funding [was]

coming together' for a project that Mr. Cox's group was going to solely fund?"

170.    In addition, WE Charity's counsel explained to the CBC that WE's website at the

relevant time (2014) makes no mention of boreholes and described the effect of a $5,000

donation to the water pillar as follows:

> $5,000 builds a community well. Building an accessible
> community well means that women and girls, who typically spend
> hours fetching water, have free time instead to work and attend
> school. It also provides a safe and secure source of water for a
> community.

171.    The CBC did not follow through on publishing its story.

172.    The CBC knew that its lead reporters on WE Charity, Mr. Cashore and Ms.

McKenna, were deliberately misrepresenting WE Charity's communications with donors in

order to prop up a false narrative about the charity.

## VII.    JUNE-SEPTEMBER 2021:  THE CBC PRESENTS FALSE FACTS TO SOURCES IN AN ATTEMPT TO PERSUADE THEM OF A PREDETERMINED NARRATIVE WHILE DISREGARDING INCONSISTENT FACTS.

173.    Even after the CBC knew that its reporters were misrepresenting facts to claim

that WE Charity deceived donors about "fully funding" projects in Kenya, the CBC allowed

those reporters to continue and expand this practice.

174.    In late spring or early summer of 2021, WE Charity learned that Mr. Kelley and

Mr. Cashore were developing a new segment or series of segments for *The Fifth Estate.* WE

Charity notably did not learn of this from the CBC, but from donors and former employees who

shared with WE Charity their interactions with the CBC.

175.    From these sources, WE Charity learned that the CBC was asking questions that

made clear the CBC was again pursuing the discredited theory that WE Charity told multiple

donors that each was the sole funder of particular infrastructure, this time in the context of

educational structures in Kenya.  Given the thorough debunking of each of CBC's prior efforts to

prove this theory, CBC only can have pursued this theory with knowledge of its falsity.

176.    In its outreach to sources, the CBC's reporters knowingly or recklessly presented

false and defamatory facts of and concerning WE Charity to those sources in an attempt to elicit a negative reaction about the charity. These engagements were intended to persuade sources that WE Charity was engaged in wrongdoing, not to verify planned reporting.

177.   Notwithstanding the CBC's reporters' efforts to persuade sources of their predetermined narrative, many sources told the CBC that its thesis was wrong. Sources who refuted the CBC's thesis on the record included over a hundred donors who collectively were responsible for most of the funding for WE Charity's projects in Kenya. The CBC could not have persisted in reporting that such donors were deceived by WE Charity except with knowledge, or reckless disregard, of the falsity of such allegations.

**A.   The CBC Requested Information Regarding WE Charity-Funded Schoolrooms in Kenya**

178.   On June 19, 2021, CBC's Harvey Cashore wrote to WE Charity's Robin Wiszowaty and asked, "WE Charity has told the House of Commons Ethics Committee that Free the Children/WE Charity built 360 schools in Kenya. Could you please break down that number by village?"

179.   Ms. Wiszowaty responded on June 24, 2021 to ask for the context of Mr. Cashore's request, asking "What is the focus of the story you are working on?" As to the 360 figure, Ms. Wiszowaty explained:

> The information that WE Charity/Free the Children provided to the House of Commons Ethics Committee regarding the school houses built over the past 25 years was accurate, but ***the report made clear the numbers were not exhaustive. The document was meant to provide an overview of our school and school room construction globally.***
>
> As you seem to be looking for specifics, it is important for you to note that the numbers in our report focused on our newly constructed primary schools. It did not reflect, for example, our high schools and college educational structures, primary school structures which were renovated or re-built by WE Charity, or the

44

ongoing construction that was delayed over the past year because of COVID-19, so ***the actual number of structures for Kenya is substantially higher***.

180.    As Mr. Cashore knew, WE Charity's submission to a Parliamentary committee said it was "an overview of the breadth and depth of WE Charity's school and school room construction globally over the last 25 years."  It stated, "This photo list is not exhaustive but provides hundreds of sample programs." An accompanying document describing the charity's development model likewise said, "For the sake of clarity, this list and document is not exhaustive."

181.    Mr. Cashore's response ignored the content of Ms. Wiszowaty's message and made clear that the CBC was not interested in an accurate count of the schoolrooms WE Charity funded in Kenya.  Responding to Ms. Wiszowaty's statement that the charity built substantially more than 360 schoolrooms in Kenya, Mr. Cashore said, "To be clear, we are simply asking for the breakdown by village of the 360 classrooms that WE Charity indicates it has built in Kenya."

182.    Mr. Cashore's email was concerning to WE Charity because it indicated that the CBC was not interested in a complete count of WE Charity's schoolrooms in Kenya. Ms. Wiszowaty responded:

> It seems from your email that you are not interested in the significant number of school structures WE has built in Kenya that are not included in the 360 figure you mention. Can you help me understand why?
>
> If you are hoping to learn how many classrooms were funded and built in each village, how does excluding the classrooms and other education structures I referenced help you do that?...
>
> As you know from your previous reporting about WE, we readily shared with you lots of information, documents, and gave hours of interviews. But given the concerns we had with the accuracy of the last stories, I think it's in everyone's best interest to make sure we specifically understand what information is germane to your planned reporting. So again, can you please let me know the focus

of the story you're working on?

183.    In his response, Mr. Cashore assured WE Charity, "We are indeed interested in all the structures and projects that you have been involved with in Kenya."  With regards to the focus of CBC's planned story, Mr. Cashore said, "generally, we are interested in comparing donations made to WE Charity's projects in Kenya with the projects that were constructed in Kenya through WE Charity."

184.    At the same time, however, Mr. Cashore continued to fixate on a figure of 360 that he knew was not exhaustive and therefore not germane to the comparison he was undertaking: "We are asking you to provide a breakdown of those 360 Schools & School Rooms into their locations by village."

**B.  The CBC Falsely Informed Sources That WE Charity Deceived Donors Despite Knowing It Lacked the Data on Which to Base Such an Allegation**

185.    To WE Charity's knowledge, prior to September 2021, the CBC did not go to Kenya to report on WE Charity's projects there.  Instead, it asked WE Charity itself to provide data regarding a "breakdown" of its schools and schoolrooms in Kenya "by village."

186.    WE Charity learned, however, that without this information, the CBC had misinformed sources about the extent of WE Charity's educational projects in Kenya.  Multiple donors and former charity employees contacted WE Charity and recounted discussions with CBC reporters.  In those conversations, the reporters said that their research showed that there was a discrepancy between the number of schoolrooms donors funded and the number that WE Charity built in Kenya.

187.    On July 12, 2021, WE Charity's executive director, Dalal Al-Waheidi, wrote to Mr. Cashore:

> We understand from your email to Robin that you are interested in comparing donations made to WE Charity's projects in Kenya with

46

the projects that were constructed in Kenya through WE Charity/Free the Children.

As you will recall, WE's chief objection to your previous story concerned your false reporting that donors funded more "boreholes" in Kipsongol, Kenya than the charity in fact constructed. You appear to be on a path towards making the same mistake again. The error was inexcusable the first time, given the information that you had, but to use the same flawed process and misunderstanding of our five pillar model again would be a knowing and intentional falsehood.

The scale of WE Charity's development in Kenya is extensive, including many hundreds of educational structures. As Robin explained serval times to you, the total number of educational structures WE Charity has developed in Kenya is substantially higher than the figure reflected in the report to the House of Commons Ethics Committee, which focused on newly constructed primary schools. The report we provided to the committee expressly stated, "this list and document is not exhaustive."

***Multiple donors have made us aware of your communications with them in which you said that there are far fewer WE Charity educational structures in certain Kenyan communities than there actually are. You have asked us for the data because you do not have it. Why then are you providing our donors with unverified data-data that you know is not reliable? In doing so, you are seeking reactions to something that is not true.***

We are prepared to provide you with the per-community data you have requested. Given the previous inaccuracies in your reporting where you concluded to not trust our answers and instead published inaccurate information, we will provide you a comprehensive package with supporting materials. We are targeting the end of this month to provide it to you. We will be providing you with accurate and verifiable information. In the meantime, we trust that you will stop misinforming people.

After you have had the opportunity to review the school data, we hope you will conclude that there is nothing to report. But should you nevertheless plan a story, we expect that you will tell us what specific allegations you intend to report so that we may respond.

188.    Mr. Cashore responded on July 13, 2021 and again asked for information only about 360 schoolrooms, asking, "We would like to know in what villages ***those particular 360 schools and school rooms*** are located."  It was clear that this figure was necessary to the story

that CBC wanted to tell, whether the story was true or not.

189.    WE Charity's executive director responded on July 26, 2021 and again asked Mr. Cashore to explain why the CBC was only interested in 360 schools when WE Charity had agreed to provide CBC with the information it requested for the significantly greater number of schoolrooms it had built.

> I hope you can help clarify a few points. You told Robin, "generally, we are interested in comparing donations made to WE Charity's projects in Kenya with the projects that were constructed in Kenya through WE Charity." In response, we agreed to provide you with detailed, specific, per-community information about our Kenya-based education projects.
>
> We have told you that we do not understand 360 to be a relevant figure for your reporting as you have described it to us. Robin explained to you that the numbers in our report to FINA focused on our newly constructed primary schools. It did not reflect, for example, our high schools and college educational structures, primary school structures which were renovated or re-built by WE Charity, or the ongoing construction that was delayed over the past year because of COVID-19, so the actual number of structures for Kenya is substantially higher. Can you please help us understand why you ask about the 360 figure below? If there's an aspect of your story that makes this specific number relevant, could you please share that with us?

190.    Mr. Cashore answered the following day that he was interested in only 360 of WE Charity's schoolrooms in Kenya because that figure was submitted to Parliament.  He said, "I am simply asking for the breakdown by village of *those specific 360 schools* that WE Charity, through its legal counsel, referenced in your submission to the Ethics Committee."  Mr. Cashore again disregarded the fact that it was provided to Parliament as an expressly non-exhaustive sample of WE Charity's global impact.

191.    Mr. Cashore's lack of data did not stop him from falsely telling donors that WE Charity was missing schools in Kenya.

192.    For example, on July 6, 2021, a WE Charity donor responded to an inquiry from

48

Mr. Cashore.  The donor was the former Chief Operating Officer of Research in Motion

("RIM"), a large Canadian technology company best known for making the Blackberry line of

devices.  In response to Mr. Cashore's inquiry about RIM's donations to WE Charity, Mr.

Morrison wrote, "To be helpful for you, I want you to know that I never considered that RIM

was the only funding source for this work, nor did I/we ask for any recognition in any manner. It

was the work that mattered and the result of that work that positively impacted the lives of that

Narok County community."

193.    Despite not yet having the data he had told WE Charity he needed regarding

school counts in Kenya, Mr. Cashore responded to Mr. Morrison on July 29, 2021, "We plan to

report on several donations that were made to Eor Ewuaso, including from RIM Blackberry, and

what the various groups were told about what the money was to be used for. I am really hoping

we might have a chance to talk on the phone, so I can better explain and go through the research

with you."

194.    As WE Charity's counsel would subsequently explain in a September 3, 2021

letter to the CBC's counsel,

> Mr. Cashore evidently implied that donated money was not used in
> the way donors expected that it would be. That Mr. Cashore would
> attempt to bring Mr. Morrison around to his point of view is quite
> troubling having regard to the assurances which he was given
> about the Morrison/RIM understanding of the purposes to which
> its donations were put. Mr. Cashore further ought to have waited
> until he had the correct information in hand from WE before
> raising this matter with Mr. Morrison, who is an important donor.
> Of note as well, Mr. Cashore expressed no interest in hearing more
> about Mr. Morrison's perspective.

**C.  WE Charity Provided the CBC With Detailed Information, Including Photographic
Evidence and Maps, Showing That It Funded 852 Schoolrooms in Kenya**

195.    On August 16, 2021, Ms. Al-Waheidi wrote to Mr. Cashore and *The Fifth*

*Estate*'s executive producer, Diana Swain, and explained that "The total number of schools or

school rooms built and renovated by WE Charity in Kenya is 852." She directed the CBC to

information posted online containing photos of every single schoolroom and information about

the villages in which they located.  Ms. Al-Waheidi further informed CBC that "Parliament is

aware of all of these facts, and they received the information that WE Charity has now posted

online."

196.    This count of 852 schoolrooms is the *only* comprehensive accounting of

schoolrooms in Kenya that WE Charity provided to Canada's Parliament.

197.    In addition to the photographs of every schoolroom funded by WE Charity, on

September 11, 2021, the organization also provided the CBC with maps of each village and

indicated the location of every schoolroom so that the CBC could confirm WE Charity's count

for itself.  Those maps too were later put online for public access.

198.    In her August 16, 2021 email to the CBC, Ms. Al-Waheidi implored the CBC to

stop misinforming sources with an incorrect school count and to tell WE Charity if it disagreed

that 852 is the correct number of schoolrooms the charity funded in Kenya.

> As you know, WE Charity is in the final stages of winding down
> its Canadian operations and creating a sustainability fund to
> support large scale development programs in Kenya, including a
> hospital, a college, two boarding high schools and an
> empowerment center for women.
>
> As part of this wind-down process, WE Charity undertook a
> thorough review of school infrastructure in Kenya funded by the
> charity over the past twenty years. That review produced a
> comprehensive picture of WE's school infrastructure in Kenya.
> We believe the information gathered in this process should satisfy
> your request for information about educational structures funded
> by WE Charity in Kenya.
>
> **The total number of schools or school rooms built and renovated
> by WE Charity in Kenya is 852.** These educational spaces may
> include a classroom, a library, teachers' accommodations, an
> administrative office, a science lab, a student dormitory or a school
> kitchen, which are all key elements of WE Charity's education

programs.  This information is publicly available at the
wecharity.org website, including a breakdown by either the
specific region or large-scale educational project (for example, the
college and high schools). The region breakdown is organized by
village, consistent with your request.  As you know from your
research, a village can include several nearby communities within
the same region that are collectively referred to by village name
(e.g., "Irkaat") but include buildings that may be separated by
several miles. Think of the Greater Toronto Area or CMA but on a
much smaller scale.

***WE Charity has provided on the website supporting photos of
each of the 852 schools and school rooms it has funded
constructing or renovating.*** Where noted, each photograph is of a
unique school room.  As stated on the website, some of the rooms
are in multi-room structures (such photos are marked accordingly).
We have noted too on the website the structures that were
renovated.  As the website explains, such renovations are
sometimes more expensive than starting from scratch with new
construction, but WE values preserving local structures when
possible out of respect for the local community.

You have previously noted that WE Charity in its first submission
to Parliament had identified 360 schools and school rooms as being
representative of educational structures funded by WE Charity in
Kenya.  As we explained to you multiple times that number did not
include, for example, high schools and college educational
structures, other educational spaces which were renovated or re-
built by WE Charity, or current construction projects which were
delayed over the past year because of COVID-19, but have been
recently concluded. Parliament is aware of all of these facts, and
they received the information that WE Charity has now posted
online.

As you also know, the structures that WE Charity has funded
building in Kenya constitute only one piece of the organization's
holistic model of development for the "education pillar".  In
additional to the structures we have listed, WE Charity's donors
help pay for other building costs such as latrines, solar panels,
connection of educational structures to utilities, school grounds,
and other such construction expenses.  WE Charity donations
furthermore pay for supplies, furniture (desks, chairs, etc.) school
lunches for children, mobile medical check-ups, secondary level
teacher and school administration salaries, community education to
encourage participation in education and more.  In short, WE does
not merely build empty schoolhouses; it provides everything
needed for an education tailored to the unique needs and

circumstances of each community. All of this information is clearly available online and communicated to supporters.

Education, moreover, is only one of the five pillars of development to which WE Charity has directed charitable resources over the past twenty years. The WE Villages model's pillars—education, health, water, food security and opportunity—each interrelate. Food and water are needed for health; health, water and food are needed for education; education is needed for opportunity; and so on. The importance of holistic development has been an essential aspect of WE Charity's development model and donor messaging for decades.

We trust this information is useful to you and assume that you will come to us with any questions you have, or with any reporting you plan to publish well in advance of its planned publication.

We understand from our donors that you have been contacting donors and telling them information, including specific figures about WE Charity's Kenyan construction, that is inconsistent with the data we have provided you here. That information is wrong. You knew that you did not have accurate data when you provided it and chose not to wait to receive the information we promised and have now provided. If you intend to continue providing data to our donors in your communications, please use the correct information you now have.

***If you believe the data we have given you is incorrect or incomplete; tell us—do not misinform our donors without giving us an opportunity to first correct your misimpression. And of course, it should go without saying that newsgathering procured through misinforming WE Charity's donors, regardless of your intentions, cannot responsibly be used in any reporting. If you disagree, please tell us why.***

199.    The CBC never told WE Charity it believed this information was incorrect,

although it would later falsely report that the figure was "inflated" by including latrines that the

CBC knew were not included in the count of 852 schoolrooms.

### D. Over a Hundred of WE Charity's Donors, Including Donors Responsible for the Majority of Funding for Kenya, Told the CBC That It Misunderstood the Donors' Expectations

200.    When CBC reporters told sources that it had "research" showing a large

discrepancy between the number of schools constructed by WE Charity and the funds raised for

that purpose, dozens of those sources expressed their disagreement with the CBC regarding how they believed their donations for Kenya were to be allocated and used.  Donors shared these discussions with WE Charity.

201.    The donors informed the CBC they had understood their donations were put towards "pillars" of development, would be pooled with other donors' funds, and would be used for more than just construction of infrastructure.

202.    For example, in July, one donor wrote to Mr. Cashore after speaking with him:

> I feel it's important to share that I was aware with the WE Charity development model [sic] it clear that all the monies we donated for this project went to the pillar of education and not a physical structure. Please make sure that this is reflected in your potential recording.

203.    Mr. Cashore responded to this donor and asked, "If the money was not for a physical structure, and not to build a school, what was your understanding of where the money would be going and what it was used for?"  The donor responded, "The funds are given to educate kids in Kenya. It takes a lot of aspects to educate children."

204.    Another donor, Gaby Ghorbani, wrote to Mr. Cashore after speaking with him,

> You were asking me about Irakaat, and if I minded that others also funded education in the village. Who would get upset about that? There is so much need in that community; it requires the generosity of many donors to fund and sustain the educational programs that are so desperately needed. The more people who support these children, the better…

> You were talking about educational structures / school rooms. It is important that you understand that providing an education is beyond building a school room. It's about creating the right environment. You need supplies, furniture, lunches, libraries, and accommodations for teachers for the project to happen. Without those elements, the school rooms will not function. As donors, our goal is to create long term change as more and more kids receive access to education, and benefit from everyone's efforts to help the students.

205.    Then, on September 16, 2021, Dave Richardson, President and CEO of Octaform

Systems Inc., emailed CBC, enclosing a letter signed by 77 of WE Charity's largest donors[10] that

together, comprise the majority of the financial support for the WE Villages programs in Kenya.

In his cover email, Mr. Richardson stated:

> … [T]he Fifth Estate…is misrepresenting how WE Charity works.
> In addition, the CBC is mispresenting the support of donors like
> myself, with a false story about WE Charity's development
> work… ***CBC is wrong to say that donors gave to WE Charity
> with the expectation that their monies went only to physical
> infrastructure and, that they did so with the belief that they were
> each the sole funder, who "fully funded" the construction costs.***
>
> ***The vast majority of the signatories of this letter have visited the
> projects in Kenya and affirm that they understood the charity's
> holistic development model before, and after their travels*** to
> verify the projects.
>
> ***They confirm that they were clearly informed about how their
> funding was deployed***. ***All are aware that multiple funders
> support village programs, pooling funds together for both
> infrastructure, programming, and capacity building.***

---

[10]  The signatories include individuals such as the Right Honourable Kim Campbell (former
Prime Minister of Canada whose family has donated for WE Villages Kenya), John Peller,
CEO of Peller Estates, Jennifer Tory, former Chief Administrative Officer of RBC, Craig
Kreeger, former CEO of Virgin Atlantic, Thomas Lundgred, owner of The ONE, Jon and
Karyn Levy, founders of Mastermind Toys, Mathew Corrin, CEO of Freshii, Chip Wilson,
founder of Lululemon, Lane Merrifield, philanthropist and former "Dragon" on CBC's
Dragon's Den, Gail Asper, founder of the Canadian Museum for Human Rights, Greg Yuel,
Lead Governor to the CFL, Andrea Farris, former VP of Walgreens, Gerry Connelly, former
Director of the Toronto District School Board, Brett Tollman, founder of TreadRight
Foundation, and many others. The signatories also represent the leadership of grass-roots
community organizations that fundraise for WE Village programs in Kenya, engaging
thousands of Canadians donors, such as Lori Adams, founder of Sudbury Minga for Massai,
Rosanne Leddy, Chair of MAD for Maddie, Taylor Conroy, founder of ChangeHeroes,
Richard Abboud, member of Team Blue fundraising, and several other philanthropists and
educators across the country. It also includes American donors who donated significantly to
WE Villages programs in Kenya, such Susan Hughes, founder of the Baby Girl Project, Andy
Stillman, founder of the Stillman Family Foundation, and Gaby Ghorbani, founder of Pledge
to Humanity.

The individual and collective contributions of these individuals demonstrates that the CBC's planned reporting on this issue, as we understand it, is incorrect.

As the donors who are the subject of this reporting, *we would like to state, on the record, that the Fifth Estate's narrative is false and grossly misleading.*"

Attached hereto as Exhibit I.

206.   In the joint letter attached to Mr. Richardson's email, the donors stated:

Together we represent the donors who have made the most substantive financial contributions to the WE Villages program in Kenya….

*WE Charity's development model is holistic. It takes funding from multiple donors to ensure schools and school rooms are built and can deliver education to children over the long term… This multi-faceted approach often requires multiple supporters to contribute to a community development initiative.* For example:

WE Charity's "education pillar" builds, repairs and renovates primary and secondary school rooms including classrooms, libraries, teacher accommodations and teacher administration spaces. The education pillar also delivers multi-year programming that includes student lunches, teacher training and community education initiatives….

As you know, WE Charity has been the subject of … two features by the Fifth Estate. Following those stories, several featured donors published a public letter expressing serious concerns about how they were represented, pointing to inaccuracies in the reporting (available here). Since then, many other significant donors have expressed their concerns and pointed to their on-going and continued support of WE Charity and its model.

Nonetheless, the CBC has continued down an ill-informed path…. *We do not agree with their thesis that we, as donors, were misled about the projects in Kenya*. We supported WE Charity precisely because of its holistic model that welcomes many supporters. The vast majority of us have been to Kenya and have witnessed first-hand the impact our donations have made in the country."

Exhibit I.

207.   Barb Cowen described why she signed the September 16, 2021 donor letter in a

September 29, 2021 letter to CBC's Head of English Language Programming Barbara Williams. As a retired teacher of law and business ethics with thirty years of experience, she described her experience with Mark Kelley and Harvey Cashore as "troubling" and said she was "shocked" by the "extremely biased manner" in which they conducted their interview of her and a fellow teacher, Donna McFarlane.

208.    Presented with what Ms. Cowen described as a "ludicrous" allegation about WE Charity, she said that she and Ms. McFarlane made it "very clear" that they disagreed.  Mr. Kelley and Mr. Cashore "seemed dissatisfied" with the donors' responses as they "did not support their desired, yet false, storyline of WE Charity deceiving donors." Nonetheless, the CBC edited the video to support their predetermined narrative. Ms. Cowen described her shock at viewing the highly edited interview:

> When we watched the highly edited video of this interview televised on *The National*, we were shocked at how **Donna's message was misrepresented and her comments were manipulated through selective editing**. What was aired in the CBC broadcast was taken out of context, was unfair and was not representative of Donna's comments and view of WE Charity. We were very upset with how our efforts to support WE projects in Kenya would be negatively perceived by our small community.
>
> I personally witnessed the conduct of the CBC firsthand in its reporting on WE Charity and was present throughout the entire interview with Donna McFarlane. I observed how Mark Kelley and Harvey Cashore from the 5th Estate initially presented themselves and explained that the basis of their interview which was to learn about Donna's positive experience with WE Charity. I very quickly realized that they had misrepresented their real focus and desired story. Harvey Cashore, the CBC producer, continuously applied pressure to Donna to say negative things about WE Charity so he could prove "his story", rather than listen to the interviewee's experience and perspective. **Overall, their conduct was disingenuous, dishonest and deceptive. I am appalled that the CBC, our public broadcaster supported by tax-payer dollars, would behave in this way.**

Attached hereto as Exhibit K.

209.    As another example, on September 21, 2021, Mark Burke emailed the CBC on

behalf of over 50 educators who have been donors or fundraisers for WE through their schools.

Mr. Burke stated in his cover letter:

> We are current or former Directors of Education of some of Canada's largest school boards, current or former elected school trustees, or current or retired educators…
>
> … [W]e have serious concerns about the planned upcoming reporting of the 5th Estate on WE Charity. We also have serious concerns about the conduct of the 5th Estate team in its past reporting on this issue.
>
> …It is notable that throughout the "WE Charity scandal" no educators were included in the reporting of the CBC or elsewhere. This is telling and troubling, considering WE Charity was active in over 7,000 schools across Canada.
>
> ***Many educators tried to raise their voices, including several who asked the CBC to be interviewed for the first episode of the 5th Estate on WE Charity. However, when such individuals spoke highly of the organization in the CBC pre-interviews, their voices were not included…***
>
> ***We have all fundraised for WE Charity or been donors to its programs. Many of us have traveled to Kenya itself. As evidenced in this letter, we all understand how the organization's fundraising model works. We understand that multiple donors support physical structures such as schools, because we all know what it takes to educate children. …***
>
> We anticipate the story you are trying to tell, how you will tell it, and we all know the narrative runs the considerable risk of being misleading and false. ***We know how the fundraising and community projects work. We are not confused.*** I would anticipate the school community or educators you might be profiling in your upcoming coverage would also not be confused if they had been afforded a complete and accurate set of facts by your team.
>
> ***Over the past months, many of us, our colleagues, and our schools, churches or community representatives, have been contacted by Mr. Cashore. We are now familiar with his standard tactics, trying to get people on the phone, to go through his "research". Presenting his "research" as "meticulous" and as "fact based" and then asking our reactions, eagerly awaiting our shock and surprise to be used in his story.*** Of course, he will also

use highly selective evidence to "prove" his points and hope to get us on side, to support the story he wants to tell to drive viewers and clicks for you.

Attached hereto as Exhibit J.

210.    The joint letter from over 50 educators Mr. Burke enclosed stated:

Over the past many years, we are among the donors who have supported the WE Villages program by helping to fund a "pillar" of development …

…What always appealed to us was that our support was not just about building empty school rooms; it was about ensuring the schools and educators had the resources to ensure children can thrive.

***We understand that multiple donors may support the same school or school room because such an undertaking is not only about construction but also providing furniture, school supplies, teacher materials, professional development for educators, school lunches, vaccines for students, and much more***.

Individually and collectively, we have raised funds to build, repair, and support the operations of primary and secondary school rooms consisting of classes, kitchens, libraries, school offices, teacher accommodation, and other structures which meet the needs of teachers. Whether it be building a new school room or renovating an existing one, what we have always known is that our collective contributions have made an important and lasting impact on the children in these communities.

Attached hereto as Exhibit J.

211.    On September 24, 2021, CBC reporter Matthew Pierce wrote to WE Charity

donor Mark Quattrocchi and asked:

In a post to a WE fundraising page in 2014 you said "It is $10,000.00 dollars to build a schoolhouse or classroom, with Free the Children." Further down in the comments section you said "We have now surpassed the goal for the 4th schoolhouse in Shuid, Ecuador. Well over $40,000 raised". We also know from your blog that you funded a school in Esinoni, Kenya. I'm wondering if you have any documents or emails which **explain how WE came to choose the school in Esinoni as one of those that you *fully funded*?**

212.    The blog Mr. Pierce referenced did not say Mr. Quattrocchi "fully funded"—the CBC was again trying to manufacture a false record that donors who helped contribute funding towards WE Charity's education pillar, which included funding for schoolrooms, had instead "fully funded" those schoolrooms. On September 26, 2021, Mr. Quattrocchi responded to Mr. Pierce's email:

> *You ask how WE chose the schools I that I had "fully funded". I think you may have the wrong idea (did I say I fully funded them? I don't believe I said that – can you please show me where I said that?*…My donations helped to fund those schools. I don't think the schools could have been built without those donations, but I don't think that no one else helped too.  Other people were on the ground donating their time and labour to help build schools, and I wouldn't be surprised if others donated money too (I hope they did—the more involved the better, right?)…
>
> I've seen with my own eyes the wonderful work that WE has done and I've been proud to be a part of the community that's helped bring that work to life.

213.    None of these donors' views would be fairly reflected in the CBC's false and defamatory coverage in November of 2021.

**E.  The CBC Told a High-Level Kenyan Public Official That WE Charity Misused Donor Funds**

214.    The highest-ranking government official in the county where most of WE Charity's Kenyan projects are located is the Governor of Narok County, Samuel Tunai. A county in Kenya is roughly equivalent to a state in the United States.  Narok County has a population of approximately 1.2 million residents.

215.    In September 2021, Governor Tunai shared with WE Charity that in an interview with the CBC, Mr. Kelley had indicated to the governor multiple times that WE Charity received more donations earmarked for Kenya than the charity spent in Kenya.

216.    On September 10, 2021, WE Charity's counsel wrote to the CBC objecting to the

allegations the network had shared with a high-level foreign official despite:

> CBC's new allegation that WE Charity received more donor dollars earmarked for Kenya than it spent there constitutes an overt allegation that the charity misallocated or misappropriated donor funds. Today, CBC accused WE Charity of fraud.
>
> ***We are aware of no factual basis CBC could have for its claim that there is a discrepancy between donations to Kenya compared with WE Charity's expenditures in that country. There is nothing in WE's financial reports that could support such a claim.*** And if CBC is conflating structures with expenditures, it has lost sight of the significant portion of WE Charity's budget in Kenya that pays for goods and services other than empty buildings…
>
> ***CBC is hiding the ball in an increasingly irresponsible manner….*** Surely you must entertain the possibility that with the aid of WE Charity's knowledge and records, some of CBC's allegations could turn out to be wrong. At a minimum, if CBC delays putting its allegations to WE Charity, your news organization could find itself needing to travel *back* to Kenya to get additional coverage and speak with sources whose statements were not tainted by false information…
>
> ***[W]e ask again for CBC to disclose its allegations and share its research with WE Charity to verify its reporting.*** Our client has been clear it does not think any story alleging wrongdoing by WE Charity is appropriate, but given that CBC appears to have committed itself to a story, it would be reckless for your organization to further delay confirming its facts with the party in the best position to know.

217.    The CBC's counsel Ms. Germani simply responded on September 14, 2021, "I've received your letter and have shared it with the journalists and their supervisors. As I've reassured you before, the team conducting the investigation is adhering to the law and to the relevant journalistic standards and practices."

## VIII.    SEPTEMBER 2021:  THE CBC CONDUCTS A SHAM INVESTIGATION IN KENYA THAT BY DESIGN COULD NOT VERIFY ITS REPORTING AND ENGAGES IN UNLAWFUL NEWSGATHERING CONDUCT

218.    When WE Charity learned that the CBC planned to report on WE Charity's educational structures in Kenya, WE Charity invited Mr. Cashore and Mr. Kelley to visit Kenya

to verify first-hand WE Charity's construction of educational structures and witness the impact of WE's charitable projects.  WE Charity did so confident in the belief that, were a CBC team to visit Kenya, the allegations under consideration would be refuted.

219.    WE Charity has welcomed over 40,000 visitors to its projects in Kenya.  Despite this extraordinary level of transparency and access WE Charity has demonstrated for years, the CBC had chosen to report on WE Charity's Kenya projects throughout the first half of 2021 without going to Kenya.

220.    WE Charity had been asking the CBC to visit Kenya since at least January 2021, prior to the February Episode.  For example, on January 13, 2021, Ms. Wiszowaty wrote to Mr. Cashore and Mr. Kelley about the risks the CBC was taking by reporting on WE Charity's projects in Kenya without visiting the country and learning about it:

> *I hope that you'll consider visiting Kenya in the future.* It's a beautiful country to call home. It's culturally very different than the United States or Canada. I think that the cultural differences are at the root of much of the various beliefs/impressions that you're hearing from fly-in facilitators. People have assumptions about "what is a finished rural Kenyan kitchen", or "why health[y] people go to a hospital" or "why don't rural Kenyans have bank accounts and why pay people in cash". Politely, I'm concerned some of the people giving you information don't understand what they saw or heard, and they are jumping to North American conclusion on the current bandwagon of negativity. I hope that my comments help to clear things up.

221.    WE Charity was optimistic, therefore, when it learned that the CBC would finally visit Kenya in September 2021.  But as discussed below, the CBC's visit to Kenya was a sham investigation that by design could not verify the facts the CBC intended to report.

**A.  The CBC Knew That It Had to Visit Kenya to Verify Its Allegations and Understood That to Do So, It Needed to Obtain Government Permission to Visit Government-Run Schools Funded by WE Charity**

222.    On September 3, 2021, Mr. Cashore emailed Ms. Wiszowaty to inform her that

the CBC would be traveling to Kenya the following week and wanted to "visit and see first-hand WE Charity's projects there":

> We wanted to get in touch to let you know that we have made plans to travel to Kenya next week – ***taking up your suggestion, and so many others, that we should visit and see first-hand WE Charity's projects there.***

223.     Many educational structures the WE Organization built or renovated with funding from WE Charity (including all primary schoolrooms) are owned and run by the Kenyan government.  As would typically be the case in North America, the CBC could not film at those schools without prior government permission—especially during a deadly pandemic.

224.     WE Charity was aware from its correspondence with the CBC and the CBC's communications with donors that the CBC had been asking questions regarding primary schools, so it was important to WE Charity that the reporters be able to meaningfully visit the primary schools to see the work funded by the organization.

225.     Accordingly, on September 9, 2021, Ms. Wiszowaty reminded Mr. Cashore that the CBC would need government permission to visit schools in Kenya and offered to assist the CBC in obtaining approvals to the extent possible.  She cautioned the CBC,

> [T]here are strict rules set out by the Ministry of Education around journalists visiting the primary and secondary schools. The rules have been further tightened as a result of COVID 19.  It would be important to follow proper process.  Please let me know if you would like any assistance in this regard.

226.     Mr. Cashore's response that day did not acknowledge the issue of government permission.  Ms. Wiszowaty responded the same day, September 9, 2021, to reiterate the need for permissions:

> You're asking about visiting a primary school on Monday. ***I want to reiterate yesterday's message about government regulations. I assume that you have pre-planned your trip to get government permission to visit and film at government schools.*** WE Village

partner communities are government-run, as you know. ***Schools require specific permissions from the Ministry of Education in order for journalists to enter school grounds***. It's similar to Canada, where a journalist cannot simply enter and film at a school without permission.

***Please confirm you have coordinated with the Ministry of Education and/or that you'll have your team make the arrangements***. We've received outreach from the regional government about your visit (apparently you've been in touch with Governor Tunai), and that likely means that other government departments are aware and, based on past experience, would be likely reminding subordinates of protocols. This could make this situation more complicated. ***We are really hoping you are properly organized. Can you please confirm***?

***We're proud of our work. We've been encouraging you to come to Kenya for months and we want to ensure that you can see the projects and show them to Canadians. We've helped other journalists arrange permission, but it typically takes weeks and your trip is a surprise to us. Depending on your reply, we can certainly do our best to help, but there's only one business day until you want to film.***

227.   Mr. Cashore responded later that day to assure WE Charity that the CBC had made the necessary arrangements to visit primary schools, saying, "Thanks for all this, much appreciated. ***We are working with a local colleague in Nairobi who has been reaching out and coordinating our schedule and making the appropriate arrangements***."

228.   The following day, on Friday, September 10, 2021, Ms. Wiszowaty acknowledged Mr. Cashore's confirmation that the CBC was making the arrangements to visit primary schools:

***I am glad to hear that you have everything you need to ensure you are able to visit the schools, communities, and projects while you are in Kenya.*** I sincerely hope you are planning to visit the various primary schools and high schools when school is in session (ie not on the weekend) so that you can experience an accurate representation of our work and see the children and the facilities in a meaningful way.

229.   Notwithstanding its false assurances to WE Charity, the CBC in fact did not

obtain government authorization to visit and film at schools in Kenya.

230.     The CBC further hampered its own ability to conduct a fair and accurate investigation by scheduling its visits mostly on a weekend when no students would be present and no teaching occurring.  It made these arrangements despite Mr. Cashore telling Ms. Wiszowaty on September 3, 2021 that the purpose of its trip was to "visit and see first-hand WE Charity's projects" in Kenya. As WE Charity explained to the CBC, a weekend visit would prevent the CBC from speaking with educators and students or see the types of programs that WE Charity and its donors support that go far beyond bare infrastructure.

231.     The CBC would later mislead its audience by stating in its coverage that it had conducted a "fact-finding mission" in Kenya.  In fact, the visit was a sham investigation that resulted in footage of the CBC's reporters' inability to fully access school property—*i.e.*, due to the CBC's own knowing lack of preparations.  The CBC then used such footage to falsely claim that WE Charity had interfered with its investigation.

## B. The CBC Entered Schools in Kenya Without Government Permission During a Pandemic and Was Asked to Leave by Community Members

232.     On Friday, September 10, 2021, the CBC arrived during a global pandemic, in an area with exceedingly low vaccination rates, at a primary school in the Kenyan village of Motony.  Unsurprisingly, they were denied access.

233.     Later the same day, Mr. Cashore emailed Ms. Wiszowaty to ask:

> How would we go about arranging permission to do some filming at the locations you mention? (Eg Baraka, Oleleshwa). *As it turns out, after getting permission a week ago to film the exterior of school rooms at Motony, we were told "calls were made" and the permission was retracted. Wondering if Carol or you could help reverse that decision?* Of course we would like to film inside a classroom with permission as you suggested, but we weren't even allowed to film the outside of these Motony schools, after receiving permission last week. Can you help us out with this?

64

234.   Mr. Cashore did not provide evidence of the purported permissions he claimed to have obtained earlier in the week.  Nor did he provide details of who told him that such permission had allegedly been retracted.

235.   In its reply to Mr. Cashore on the same day, Ms. Wiszowaty stated:

> It sounds like you are suggesting that WE caused the permissions you received from the Ministry of Education to be revoked. Nothing could be further from the truth …
>
> **WE has been imploring the CBC to visit our projects for months … we devoted significant resources to preparing maps of every community to help assist you with your visits, which we will be sending in a couple hours.**
>
> Please send me the permission you obtained a week ago so that we can immediately raise this issue with the ministry. **We cannot help address the purported reversal of a government approval without being able to demonstrate to the government that the position they took in denying you access was, in fact, a reversal.**
>
> **I'm concerned too that you only obtained permission to film the exterior of the schools. Did you try to get permission to film the interiors?**
>
> I understand that your crew was turned away at Motony because they did not produce any evidence of having the required government permission to be there. **If you have evidence to the contrary, I ask that you share it with us immediately. We have been told as well that the CBC's crews told the school employees that they were with WE. There may be some broken telephone here, but we hope that your crews are being forthright as to their identity.**
>
> As for access to WE-owned facilities such as Baraka, WE College and Oleleshwa, just let me know when you want to go and we will ensure that you have access. We will get back to you regarding interview times for Carol but would like to expeditiously resolve your access issues first."

236.   As Ms. Wiszowaty promised, WE Charity then provided the CBC with photographs of the educational buildings it constructed, along with detailed maps showing where to find them.

65

237.    In his reply the same day, Mr. Cashore assured Ms. Wiszowaty that the CBC had

no basis for accusing the charity of interfering, saying, "***there was no accusation made or***

***insinuated in my email***. We wanted you to know what happened and are hoping you can help."

Mr. Cashore continued:

> Initially we were told we could film the exteriors of the schools,
> which was confirmed again today when we arrived. That
> permission was then reversed shortly after someone else arrived in
> a vehicle and stopped the process…. We don't know who he was,
> but respected his decision and left. It sounds like something is
> getting broken down in the process, but those details aside, we're
> simply trying to find a way to get permission to film the exteriors
> of the schools.

238.    Mr. Cashore did not share any proof the CBC had obtained the required

permission.  WE Charity was also concerned that Mr. Cashore suggested the CBC had only

obtained permission to film the *exteriors* of the primary schools, which would be insufficient to

actually see WE Charity's education projects in the country.  Education occurs *inside* schools.

239.    WE Charity replied the same day:

> … I am happy to hear you had no reason to think WE interfered.

> We will certainly do everything in our power to help, but we are
> now all in a very unfortunate situation given it is Friday evening
> and the Ministry as well as the government employees (teachers,
> headmasters…) have processes and protocols that they are required
> to follow which explains your experience today. ***One thing that
> would be immensely helpful is if you can please share asap the
> permission that you said you initially received. I assume it was in
> writing. With that in hand we can do our best to clarify the
> situation.***

> I realize it is too late now***, but I so wish you had asked for our
> assistance with this when you were planning your visit. I
> assumed you would have known that gaining access to school
> property always requires official permissions.***

> ***Also of great concern to me is that you only seem interested in
> filming exteriors.*** WE Charity and our donors have worked so hard
> to make a meaningful impact on communities – to suggest that the

66

exterior of a building tells that story is wrong. When people work to create change they are focused on lives, not buildings. ***If you only wanted to show your viewers exterior shots of buildings, you could have done that from Canada. Our sincere hope was that you were interested in seeing the programming and meeting the children and the community leaders that our donors have all been focused on helping. You are missing the most important part of the story here – the people whose lives have been impacted***."

240.    To this, Mr. Cashore again did not provide any evidence of the permission the CBC had supposedly received to film the exterior of schools.  He wrote, "we'll do our best to get access to the school exteriors".

## C. Kenyan Government Officials Complained About the CBC's Illegal Newsgathering Conduct

241.    Without permission to film at government-run schools in Kenya, WE Charity personnel came to learn that the CBC film crew was seeking to film at schools through improper means.  On hearing of these incidents, Ms. Wiszowaty emailed Mr. Cashore and Mr. Kelley on September 12, 2021:

> ***We have been receiving calls from the Governor, from Head Teachers and senior members of the communities who are deeply upset and concerned by your team's behaviour***…
>
> As we told you many times, ***you need permission from the Ministry of Education to enter government school property. I find it difficult to understand how you did not prepare for this and how instead you think it is ok to arrive in the community and disregard the rules and the people who are trying to enforce them*** (I am sure you understand that they are the ones who will perhaps face repercussions). ***We have been told that you are arriving places and you and/or someone from your team is suggesting you are there with the Governor's permission, you are with WE, you are donors, or you are government representatives from the Ministry of Education….***
>
> We understand you have also been flying drones (which, from our understanding, is against the law in Kenya).

I want to say again that we wanted you to come to Kenya. I wanted you to meet the wonderful people. I wanted you to have an opportunity to see and understand what we do here. I wanted you to engage with the place and gain an appreciation and hopefully some understanding.

*I struggle to understand how racing in and out of communities against their wishes to take exterior pictures of buildings for a few minutes can possibly accomplish any kind of editorial understanding or fairness. Please re-evaluate your actions until you have the permissions. And once you do have them, please take the time to see really what is there.*

The community is extremely upset."

242.    CBC did not respond to this email or deny any of the facts Mr. Wiszowaty had set forth.

243.    The CBC's misconduct raised sufficient concern that it caused the Kenyan Ministry of Interior and Co-Ordination of National Government to write to the CBC the next day.  In a letter to the CBC dated September 13, 2021 (copied to the Governor of Narok County, the Deputy County Commissioner of Narok West and WE Charity), the Ministry stated:

*We wish to express our condemnation of the misconduct and illegal actions of representatives of the Canadian Broadcasting Corporation.*

We wish to bring to your attention that the following actions are criminal offenses in Kenya.

• Misrepresenting government officials is a criminal offence.

• Trespassing on government land is a criminal offence.

• Flying a drone in Kenya without a license is a criminal offence.

*There is no record of the Ministry of Education issuing permission to the Canadian Broadcasting Corporation to film in schools in September 2021. Please be politely advised that permission is always required to visit or film at Ministry of Education schools…*

We object in the strongest terms the actions of the Canadian Broadcasting Corporation. We reserve the right to take additional action.

**Cease your activities as described above immediately**.

Attached hereto as Exhibit L.

244.    To WE Charity's knowledge, the CBC did not respond to the Ministry's letter.

245.    Then, on September 24, 2021, the Hon. Samuel K. Tunai, Governor of Narok County, Kenya, wrote to the CBC to complain of improper attempts by the CBC to induce him to participate in its coverage:

I write to raise concerns I have with the actions of the CBC's agent in Kenya, Mr. John Njiru. I understand that the Office of the President, through the Ministry of the Interior, has raised complaints with the CBC concerning its reporters' conduct in Kenya so I will not address those points here.

Mr. Njiru sent me the email that I enclose here to persuade me to agree to provide an interview to the CBC. The email described the interview as an opportunity to showcase Narok County as "an investment haven for the wealthy". That was certainly not the focus of the CBC questions when I was interviewed by your other representative.

**Mr. Njiru offered in his email to talk to me about "how we can swing this interview in your favor."** This offer obviously concerned me and I did not call him back. In view of the activities that ensued after the interview and in particular the unethical conduct of the said CBC reporters**, I am of the reasonable view that Mr. Njiru's request to me was in bad faith and entailed an ulterior motive and purpose**. I find this totally unacceptable.

Attached hereto as Exhibit M.

246.    Governor Tunai attached the email he had received from the CBC's Kenya-based reporter:

Gov. Tonui [sic],

Dear Governor, my name is John Njiru, and I am the local handler for the Canadian Broadcasting Corporation team. Kindly accord them an interview with them on Friday at your county headquarters

69

and make it an opportunity and platform to market the County of
Narok.

Showcase Narok County as an Investment Haven for the wealthy,
and the go-to investment destination for those that want to be in the
Tourism Sector. I can recommend we even tag along one or two
top tier investors in the country to display their success courtesy of
Narok County government regime.

This piece of documentary has a global viewership of over 12
million, which is a very rich platform for the County to market
itself.

If you further need on how we can swing this interview in your
favour, get in touch with me through +254 [PHONE NUMBER
REDACTED]

Best Regards,

John

Exhibit M.

247.    To WE Charity's knowledge, the CBC did not respond to Governor Tunai's letter.

**D.  The CBC's Senior Leadership Was Aware of Its Journalists' Misconduct**

248.    In the wake of the CBC journalists' misconduct in Kenya, WE Charity sought to
appeal to higher authorities at the CBC to provide oversight and judgment that was clearly
lacking.

249.    To that end, WE Charity leadership shared the Kenyan government's
communication with the CBC with a longtime donor, Ambassador Ross Hynes.  Ambassador
Hynes was Canada's former High Commissioner to Kenya, Uganda, and Pakistan, and
Ambassador to Rwanda, Burundi, Eritrea, Somalia, U.N. Environment Program, U.N. Habitat,
and the U.N. Commission on Human Rights.

250.    On September 26, 2021, Ambassador Hynes wrote to the CBC's President,
Catherine Tait, and the CBC's Executive Vice-President English Services, Barbara Williams,
and enclosed the September 13, 2021 letter to the CBC from Kenya's Ministry of Interior:

> *Over the past year and more, the quality of CBC's reporting on Canada's WE Charity, particularly that of The Fifth Estate (TFE), has struck me as seriously at odds with the network's oft-claimed standing as "Canada's most trusted brand"* -- and with several principles of its code of *Journalistic Standards and Practice (JSP)*: accuracy, fairness, balance, impartiality, integrity.

> One of many troubling aspects of that coverage has been the unsubstantiated and misleading narrative promoted by *TFE* regarding WE's programming in Kenya.

251.   Ambassador Hynes explained his first-hand experience with WE Charity and his

basis for knowing that the CBC's reporting on the charity was wrong:

> *As Canada's High Commissioner to Kenya from 2006 to 2010, I and my wife, Vanessa, gained extensive exposure to WE's work and remarkable impact on communities -- both the physical infrastructure built (hospitals, school rooms, boreholes etc.) and local capacity created.* We also witnessed first-hand the professionalism and integrity of the people responsible for these achievements, particularly Marc Kielburger and Roxanne Joyal.   Indeed, *in my 35 years as a Canadian public servant, government executive and representative in some of the world's most challenging developmental environments, I can't say I've encountered any more dedicated or effective ambassadors for our country and its values*.

> In a recent message to Mr. Brodie Fenlon, Dave Richardson and over 75 other major WE donors outlined their specific concerns about *TFE*'s coverage of the charity's work in Kenya.  There's no need to repeat those details here; I'll just note that the one thing said in *TFE*'s February 5 episode with which I fully agree  -- and the only justifiable conclusion arising from that segment of the episode  -- is that "There is no question the WE Charity has had a huge impact on the lives of thousands of Kenyans."  *So it is puzzling that TFE's producers seem bent on pursuing an "exposé" to try and tear all of that accomplishment down*.

252.   Finally, Ambassador Hynes apprised the CBC's leadership of its journalists'

misconduct in Kenya:

> In this regard, *I have been advised that two CBC journalists and their agents recently visited Kenya's Maasai Mara region where they reportedly misrepresented their identities (in multiple versions), employed a drone without legal permission, and*

71

*committed other forms of trespass in an effort to gain unauthorized after-hours access to a WE-funded community school*. I understand these individuals escaped being arrested only due to an appeal by WE Charity representatives to Kenyan authorities. (I also understand the journalists involved and CBC's legal department have received the attached letter from Kenyan officials itemizing the objectionable conduct, characterized as "criminal offences".)

I appreciate that, quite properly, it is not your role to provide editorial oversight of news operations in the CBC. However, I trust senior management is committed to upholding the values and principles contained in the corporation's Code of Conduct and the JSP. The latter document provides detailed guidance governing all the above-noted methods alleged to have been used by *TFE*'s people in Kenya -- concealment of identity, trespass, use of drones and lawful methods in general. *Given all the foregoing, I urge that senior management review TFE's actions and approach to its WE/Kenya reportage through that lens.*

253. Neither Ms. Tait nor Ms. Williams responded to Ambassador Hynes. Instead, he received a form response from *The Fifth Estate*'s executive producer, Diana Swain. As Ambassador Hynes subsequently explained it, the form response said "that TFE's work on this file is in the public interest and being conducted in a balanced manner, fully in keeping with CBC's code of Journalism Standards and Practices (JSP). Evidently, this reply was essentially identical to that received by number of Canadians who have expressed other concerns about TFE's approach to this topic."

254. Ambassador Hynes wrote back to Ms. Tait and Ms. Williams on October 3, 2021 and this time also copied Diana Swain and five members of the CBC's board of directors. He enclosed again his prior message, the September 13, 2021 letter from the Kenyan Ministry of Interior, Governor Tunai's September 24, 2021 letter to the CBC, and Barb Cowen's September 29, 2021 letter to Ms. Williams in which she described her experience with *The Fifth Estate*'s false reporting on WE Charity.

255.    In addition to noting that the CBC clearly was not complying with its JSPs,

Ambassador Hynes said,

> I know the CEO and Board cannot involve themselves
> in programming or news content decisions, and I agree this is
> essential to preserve the independence and objectivity of CBC
> News.  I trust however that these principles do not signify a lack of
> interest or responsibility on the part of senior management in
> ensuring that all CBC units, employees and agents are held
> accountable for the propriety of their comportment and the
> integrity of any programming arising therefrom.
>
> Given all of this, I am resubmitting (with copies to other CBC
> Board members) my original message along with the above-noted
> additional correspondence.  I have no standing or desire to receive
> a detailed response to the allegations.  But as a Canadian citizen
> with a belief in the importance of the CBC and a stake in its
> integrity, I do hope the very specific concerns that have been raised
> will be taken seriously, and addressed in appropriate fashion, in the
> appropriate quarter of the Corporation.

256.    On October 8, 2021, Ms. Swain responded to this email, stating in part,

> In your email you expressed concern over The Fifth Estate's past
> and future reporting and made allegations about our coverage and
> the conduct of our staff.
>
> I would like to assure you that your concerns, and the allegations
> made about the conduct of our journalists while in Kenya are
> unfounded. We have every confidence that CBC's journalists have
> acted professionally in conducting their research into WE Charity.
> Our team follows the principles of CBC's code of Journalistic
> Standards and Practices. (JSP)

## IX.    SEPTEMBER – NOVEMBER 2021:  BACK IN NORTH AMERICA, THE CBC CONTINUES TO PURSUE A PREDETERMINED FALSE NARRATIVE WHILE PURPOSEFULLY AVOIDING THE TRUTH

257.    Upon its return to North America, the CBC sought to avoid the truth that its donor

deception story was false. Throughout this period and through broadcast, the CBC continued to

deny WE Charity an opportunity to respond to the CBC's allegations in violation of the CBC's

own "responsible communication" journalistic standards and practices.

### A. The CBC Cancelled a Promised On-Air Opportunity for WE Charity to Respond to Financial Allegations After WE Charity Performed Its Side of the Bargain

258.     In early September 2021, when the CBC's Harvey Cashore reached out to confirm that the CBC had decided to finally visit Kenya, Mr. Cashore agreed to conduct an interview with Carol Moraa, WE Charity's Director of WE Villages Projects in East Africa.

259.     On-camera footage interviewing WE Charity personnel was important to the CBC because it would give the appearance of the CBC having engaged with WE Charity.  But the CBC knew that Ms. Moraa is not responsible for many financial aspects of WE Charity's work in Kenya, and she would therefore not have the information necessary to address allegations of such nature.

260.     The following day, on September 10, 2021, Ms. Wiszowaty responded to a request by Mr. Cashore to interview Ms. Moraa.  Ms. Wiszowaty explained,

> In her role Carol is best positioned to talk about the projects, the community, the needs assessments, her interaction with students and their families, her interaction with donors, and the impact of the development model. ***If you have questions specifically related to our budgets, our decision-making process, or our allocation of funding you should reserve those questions for when you interview me***.

261.     Mr. Cashore confirmed that, in addition to an on-camera interview of Ms. Moraa, "We would want to interview you [Ms. Wiszowaty] as country director as well."  Mr. Cashore further confirmed, "***yes we understand that Carol would not be the person to ask about financials as you point out.  We are looking forward to hearing from you on this when you are available***."

262.     In reliance on Mr. Cashore's representations regarding Ms. Wiszowaty, WE Charity and Ms. Moraa agreed for her to be interviewed by Mr. Kelley on camera, thereby giving the CBC footage that it needed to appear as though it engaged with the subject of its reporting,

WE Charity.

263.    During that interview on September 13, 2021, when Mr. Kelley asked financial

questions that were more appropriate for Ms. Wiszowaty, Ms. Moraa made clear that Mr. Kelley

would need to speak to Ms. Wiszowaty regarding such questions.  Mr. Kelley agreed.

264.    But then, for almost two months, CBC did not contact Ms. Wiszowaty to follow

up on the interview.

265.    On November 4, 2021, Mr. Cashore contacted Marc and Craig Kielburger and

said that the CBC planned publish its coverage without interviewing Ms. Wiszowaty or obtaining

any information from WE Charity regarding its financing of the construction of educational

structures in Kenya.

266.    On November 5, 2021, Marc Kielburger replied to Mr. Cashore to remind the

CBC that it promised to interview Ms. Wiszowaty and provide WE Charity an opportunity to

respond to allegations regarding finances, use of donor funds and related topics:

> On September 9th in an email exchange regarding your visit to
> Kenya, ***Robin Wiszowaty asked for assurance that in addition to
> interviewing Carol, you would also interview her*** to ensure the
> organization was able to fully address and respond, on camera, to
> any questions you might have. ***You provided that assurance.***
> Robin was clear that Carol would not be in a position to answer
> questions regarding the financial operations of WE Charity/Free
> the Children. Later that day you confirmed saying "*we would want
> to interview you as country director as well*". ***We trust that is still
> the case. Can we discuss timing for such an interview?***

267.    Mr. Cashore's response later that day ignored Marc Kielburger's question.  The

CBC was apparently reneging on its promise.

268.    To confirm the CBC's position, on November 9, 2021, Marc Kielburger wrote to

Harvey Cashore and Diana Swain, in relevant part:

> I thought it would be a good idea to level set to ensure I am
> understanding you.

1.  You have concluded that you do not need to include WE
Charity's perspective on financial matters, budgets, WE Charity's
decision-making process or its allocation of funding, given that
you agreed (in writing) that interview questions on these topics
would be raised in Robin's interview.

269.   Two days later, the CBC committed to take its story public.  On November 11, it

published a teaser ("Teaser") and aired the first promo ("First Promo") to advertise its planned

November 18, 2021 story regarding WE Charity.  The story had been finalized without ever

speaking to WE Charity about its finances, funding, donor allocations, or any of the other topics

reserved for Ms. Wiszowaty.

270.   Finally, *after* committing to its accusations of fraudulent fundraising and misuse

of donor funds, the CBC responded to WE Charity that it would agree to a last-second (and too

late) interview of Ms. Wiszowaty.  But it was not the interview the CBC had promised.  Mr.

Cashore wrote:

We agree it's always helpful to level set.

We interviewed Carol Moraa in Kenya on September 13.  As you
know, WE Charity taped the interview and has its own
transcript.  As recently as November 10, in correspondence sent to
us by your lawyer, Ms Moraa is referred to as "a Senior WE
Charity Executive in Kenya."

While we didn't anticipate that she would be discussing financial
matters, and believed those would be answered at a later time by
Robin Wiszowaty, Carol offered WE's perspective on a wide range
of issues, including in a prepared statement she read to us on
camera.  In our view, given our other substantial and frequent
correspondence with WE Charity both before and after the
interview, we did not need to additionally interview Robin
Wiszowaty.

***But, if you're concerned that Carol made errors in her
comments, we of course are happy to know about those
corrections.***

***If Robin is available to do an interview tomorrow, we are happy
to accommodate that.***

76

If not, written clarifications are also fine.

271.     The CBC demanded the scope of the interview be limited to topics that Ms.

Wiszowaty wanted to *clarify or correct* regarding Ms. Moraa's interview.  WE Charity had never

said it wanted to clarify or correct anything Ms. Moraa said.

272.     Moreover, as Ms. Moraa's interview had expressly placed off limits financial

issues reserved for Ms. Wiszowaty, an interview of Ms. Wiszowaty limited to "correcting" Ms.

Moraa would not touch upon those reserved financial points.  And the CBC demanded that the

interview take place on less than 24 hours' notice.

273.     Ms. Wiszowaty lives in Michigan but was already in Toronto for business the

next day, Friday. She agreed to make herself available in Toronto the following day, on Saturday

November 13:

> Hi Harvey,
>
> I hear you have decided to interview me ahead of your story
> airing.  Thank you. I hope you will allow yourself the time to fully
> reflect the information and views I can provide.
>
> ***I can make myself available in Toronto for an in person
> interview on Saturday if that works for you.***
>
> ***To the extent that you have questions about specific donors or
> specific projects, I want to reiterate our request that you send
> those in writing.  WE Charity has extensive records that it can
> reference to respond to your specific questions.  Needless to say, I
> won't have those materials at my fingertips when we talk.***

274.     On November 12, Mr. Cashore and Mr. Kelley responded to Ms. Wiszowaty that

CBC refused to: (1) do the interview on Saturday; (2) do the interview in person; and (3) insisted

on limiting the scope of the interview to "correcting or clarifying" Ms. Moraa's interview that

expressly did not cover any financial topics:

Hello Robin,

Thank you for your quick response.

As written in our correspondence yesterday, *our available time for an interview is today.*

There is no reason for you to come to Toronto on our behalf. *We will conduct the interview via video chat.*

We suggest a roll-time for the interview of 2 pm EST. We will need approximately 30 minutes of your time.

*We appreciate that you may be correcting or clarifying aspects of the interview we did with senior WE charity executive Carol Moraa.   We look forward to hearing what those might be.*

*If you have anything else you wish to offer about how much money was raised to build primary school houses in Kenya and how many were built, we would be keen to hear any additional details from you on this.*

We can send you a Zoom link for 1:45 EST to prepare for today's 2 pm EST on-camera interview.

Best,

Harvey and Mark

275.     Ms. Wiszowaty responded, explaining that she would be available the next day for an in-person interview, which was appropriate given the severity of the accusations. She further made clear that she never agreed to limit the subject matter of her interview, and that the interview CBC was belatedly offering was not the one previously agreed upon:

Harvey and Mark,

I received your email. *I am in fact in Toronto (not related to doing an interview with you), but am unfortunately not available at 2:15 today. As I mentioned, I would be available to do an in-person interview tomorrow.* Please advise the time and location.

*You are reporting on an organization I have worked with for 20 years. You are making some very serious accusations. It seems only fair that you provide me the opportunity for a proper sit-down interview.*

78

I would like to clarify that in asking to be interviewed, *I have never suggested that the purpose was to clarify or correct aspects of Carol's interview* (though I believe she did send you some follow up information after she met with you). *The purpose of my request months ago to be interviewed was to share my experience, inform your reporting and directly respond to any claims you might be making*.

*Having watched the promo last night you seem set on a narrative that I fundamentally believe is incorrect and unfair.* While I am available to be interviewed, *I want to be clear that an interview now, after you have committed yourself to a narrative on air, is not what we agreed to back in September*.

Please let me know if this works for you.

With thanks,

Robin

276.    Despite the fact that the CBC had worked on the segment for months without fulfilling its agreement to interview Robin, the CBC refused to conduct a proper, in-person interview of the Ms. Wiszowaty regarding the topics in CBC's report that the parties had mutually agreed she would be given an opportunity to address:

Hello Robin,

As we expressed yesterday and will say again, *if you feel Ms. Moraa's comments as a Senior WE Charity Executive in Kenya on behalf of WE Charity needs correction or clarification, we are happy to proceed with an interview with you as well*.

We are available to do an interview with you at 4pm today, or at 10 am tomorrow (November 13) if that timing works better for you.  Please confirm no later than 3pm today so that we have ample time to set up the video links.

*There is no requirement for an in-person interview.*  In fact, many of the interviews we currently conduct are via video chat.  We are offering you the same.

Indeed we do have an email dated September 22 from Ms. Moraa that provides further extensive response on behalf of WE Charity.

Harvey and Mark

277.   Ms. Wiszowaty responded to Mr. Cashore and Mr. Kelley regarding the CBC's

unreasonable conditions:

> Dear Harvey and Mark,
>
> I appreciate your email but ***I am concerned by the conditions you are placing on this interview.  Your terms are very different than what we agreed on back in September and what would be fair under the circumstances.***
>
> First, you say that you will only interview me via video chat.  I am in Toronto, minutes away from the CBC offices. ***You have interviewed other people in-person, as last night's promo showed.  You interviewed Carol on camera and gave no indication that my interview would be given a compromised format***.
>
> ***This is my life's work. Your story impacts the life's work of hundreds of team members in Kenya who are like family to me. I am available tomorrow at the CBC offices or wherever you choose for a 10am interview before I return home to Michigan***.
>
> Second, you say that you will interview me only to correct or clarify Carol's interview.  As I told you, I do not believe that I need to correct or clarify anything Carol said.  ***When CBC agreed in September to interview me, the purpose was to complement Carol's interview, not replace or correct it.***  The scope you described for my interview was different than Carol's: "we understand that Carol would not be the person to ask about financials as you point out. We are looking forward to hearing from you on this when you are available." ***Based on the promo, financial issues you agreed to discuss with me appear to be at the heart of your story, and have not been raised with WE Charity***.
>
> I also do not understand your reference to Carol's email on September 22.  Carol's email followed up on questions you raised during her interview—questions you agreed would not be about the topics you planned to raise with me.  How then can it be that Carol's email was a substitute for interviewing me?  That doesn't make sense and isn't what we agreed on.
>
> ***I am further concerned that your message indicates that if I am interviewed, then my participation would be taking away airtime from Carol by supposedly correcting her. I would never want to take time away from a local leader such as Carol who spoke***

> *accurately and eloquently on the limited topics CBC raised with*
> *her.*
>
> I hope you reconsider.
>
> With thanks,
>
> Robin

278.   Mr. Cashore responded with a brief, take-it-or-leave-it response that failed to

address most of Ms. Wiszowaty's stated concerns.  CBC blamed the pandemic for its refusal to

interview Ms. Wiszowaty in person:

> Hi Robin,
>
>  Great to hear you can do the interview at 10 am.
>
> *Due to circumstances related to pandemic protocols, we are*
> *required to do this by video link.*
>
> Please confirm you are able to do this tomorrow.  We will send
> you a link at 9:45 AM tomorrow.
>
> Harvey and Mark

279.   These supposed "pandemic protocols" were obviously a pretext. The CBC

conducted numerous in-person interviews for its coverage of WE Charity during the height of the

pandemic.  In a U.S. interview, CBC reporters did not even wear masks.  For example, the

November Episode included the following face-to-face interviews with Mr. Kelley:







280.    Ms. Wiszowaty declined to accept the CBC's repudiation of its promise:

Dear Harvey and Mark,

**Given your reply doesn't address any of the comments in my previous note, it is clear that the interview, as it was intended when we spoke in September, is not what you are offering.** As disappointing as it is, it looks like we will not be talking tomorrow.

Robin

281.    It was clear to WE Charity and Ms. Wiszowaty that the CBC's "offer" to interview her was radically different than what the parties had agreed upon.  The CBC had agreed to give WE Charity an opportunity to inform its reporting and respond to allegations at the heart of its upcoming reporting concerning finances and uses of donor funds.  By placing such topics off limits, Ms. Wiszowaty's interview could not give WE Charity an actual opportunity to respond.

282.    Moreover, the CBC had already publicly committed to its narrative in

promotional content that included financial allegations, demonstrating that it was too late for WE Charity to inform the CBC's reporting. And the CBC had indicated that it would substitute footage of Ms. Wiszowaty for Ms. Moraa, which meant the interview would not help balance the coverage and would replace Ms. Moraa's important voice.

283.    Had WE Charity known that the CBC would not comply with its promise to interview Ms. Wiszowaty, WE Charity would not have permitted the CBC to conduct on on-air interview of Ms. Moraa that would not address financial allegations the CBC would later publish. The CBC extracted an interview with WE Charity that expressly placed off limit the crux of the CBC's allegations. In doing so, the CBC manufactured the illusion for its viewers that it had provided WE Charity an opportunity to respond to and rebut its allegations.

**B.   The CBC Refused to Wait to Review a Forensic Accounting Report on WE Charity's Financials**

284.    Ken Froese of Froese Forensic in Toronto is a highly respected forensic accountant. The CBC trusts Mr. Froese and uses him for its own investigative reports.

285.    In 2020, to address politically motivated questions relating to the Canadian Student Service Grant, Mr. Froese was engaged to conduct an independent forensic accounting review to determine whether Marc Kielburger, Craig Kielburger or their families received personal benefits from their involvement with the WE Organization. Mr. Froese's team was provided unrestricted access to charity, social enterprise and the Kielburgers' personal records, including bank accounts, credit cards, real estate transactions, computer, phone and email access and more. As the CBC knows, Mr. Froese concluded, "We found no evidence of improper financial benefits to the Kielburgers from WE Charity/Free the Children, [ME to WE] or any WE Canada entity."

286.    During the Summer of 2021, Mr. Cashore approached Mr. Froese to enlist his

expertise in reviewing the CBC's ongoing reporting on WE Charity's fundraising for schoolrooms in Kenya.  Mr. Froese declined.

287.    Mr. Cashore again approached Mr. Froese in October 2021 to ask him to verify some of the CBC's reporting regarding WE's work in Kenya. Mr. Froese explained that he already was analyzing those same issues for WE Charity.

288.    A few weeks earlier, WE Charity had hired Mr. Froese to conduct an independent investigative and forensic accounting review of the flow of funds to WE Charity's Kenyan projects.  WE Charity undertook this engagement so that the organization could provide the CBC with independent verification of the propriety of its fundraising and charitable works in Kenya. Although the CBC refused to disclose to WE Charity the allegations it intended to publish concerning the charity, WE Charity had heard from donors and other sources that CBC journalists had indicated that WE Charity had misused funds donated for use in Kenya.

289.    At WE Charity's instruction, Mr. Froese offered to Mr. Cashore that WE Charity would permit the CBC to review his report when complete.  Mr. Cashore at that time agreed to consider Mr. Froese's work once complete and represented in an email that the CBC had no firm broadcast date.

290.    On November 5, 2021, after it became clear that the CBC would soon air its segment regarding WE Charity, Marc Kielburger reminded the CBC of this promise:

> We are aware that you personally approached Ken Froese to verify some of your reporting and assumptions. He explained to you that he was in the process of undertaking detailed work to: trace funds that were transferred from WE Charity Canada to WE Kenya charitable entities, confirm the amount of money sent from WE Charity Canada to WE Kenya charitable entities, evaluate the breakdown of "Africa expenses" in the WE Charity Canada audited financial statements, and look at project funds/donations from receipt to deployment on Africa/Kenya related projects. His work will also outline how funds directed to international projects

are "restricted" and have not and cannot be deployed for alternate activities, including activities such as WE Day (which you seem to be suggesting). *You indicated to Ken that you would consider his work and that you had no firm broadcast date.*

*We are prepared and willing to share the results of his independent findings with you.* If you are going to suggest impropriety (as you have countless times to our donors who have in turn, rejected the premise) you must share with us the details and basis for that assumption. *If you are indeed seeking the truth, given Ken has been an expert and trusted source of the CBC/ yours in the past, we assume you will consider his findings before you continue your reporting.*

291. The CBC did not respond.

292. Accordingly, on November 9, 2021, Marc Kielburger again wrote to Mr. Cashore confirming the following:

You won't wait to receive the findings of a further forensic review that is being undertaken by one of your chosen editorial experts to address the central thesis of your reporting.

293. In a response Mr. Cashore sent on November 11, 2021, he addressed other subjects addressed in the November 9, 2021 email, but ignored Mr. Kielburger's mention of the CBC's representation that it would review Mr. Froese's report.

294. Later that day, CBC published the Tweet and the First Promo, both of which made clear that the subject of the November Episode would be WE Charity's financials.

**C. WE Charity Provided the CBC with a Preliminary Forensic Audit Report Showing That Money Donated for Kenya Was Used by WE Charity for Kenya**

295. Fortunately, despite the CBC's rush to publication, Mr. Froese was able to complete a preliminary report that stated key findings germane to the CBC's upcoming coverage.

296. The same day the CBC published the Tweet and First Promo, November 17, 2021, Ms. Wiszowaty sent an email to Mr. Cashore, Mr. Kelley, and Ms. Swain attaching Mr. Froese's "Preliminary Reporting Letter." That Preliminary Report addressed questions relating

to the Defamatory Publications.

297.    First, Mr. Froese was asked to address whether there was a disparity between contributions received for Kenya and funds used for Kenya.  Mr. Froese concluded that there was not:

> Question 1: *In your opinion, based on work performed to date, have contributions recorded in WE Canada's financial records as funds designated for projects in Kenya, including funds received from WE Charity USA, been used for projects in Kenya?*
>
> **We conclude that, over the period of review, WE Canada reported more funds spent on Kenya projects and related administrative costs than it received in contributions designated, including funds received from WE Charity USA. …**

298.    Second, Mr. Froese was asked to address whether contributions designated by donors to Kenya projects were used for other purposes.  Again, he concluded that this was unlikely to have occurred:

> Question 2: *What work have you performed to address whether contributions designated by donors to Kenya projects were instead used for other purposes?*
>
> **We obtained a sufficient understanding of the accounting processes to conclude that it is unlikely that contributions designated for Kenya were instead recorded for other purposes or recorded improperly as undesignated funds…**

299.    The CBC did not respond to Ms. Wiszowaty's email enclosing the report.

300.    The report directly contradicts the central thesis of CBC's Defamatory Publications.  Despite having the report, the CBC made a centerpiece of its reporting on WE Charity an allegation of theft: "Where did the money go?"  The CBC knew where the money went—to help children in Kenya.

301.    None of the CBC's broadcast coverage of WE Charity even mentioned Mr. Froese's conclusions and as discussed below, the CBC falsely reported in a November 18, 2021

website article (the "Article") that the report reached the opposite of its actual conclusion. The Article is attached hereto as Exhibit A.

## X.   NOVEMBER 2021 – JANUARY 2022:  THE CBC PUBLISHES FALSE AND DEFAMATORY STATEMENTS CONCERNING WE CHARITY

302.   Between November 2021 and January 2022, CBC published the following coverage, each of which was false and defamatory in full.  Collectively, these publications constitute the "Defamatory Publications:"

 a.   The November 11, 2021 Teaser, which appeared online to advertise the planned news coverage to a global audience, including to significant numbers of United States viewers.

 b.   The November 11, 2021 First Promo, which also was aired on CBC's television network to a global audience, including to significant numbers of United States viewers.

 c.   The November 14, 2021 second promo ("Second Promo"), which also was aired on CBC's television network to a global audience, including to significant numbers of United States viewers.

 d.   The November 15, 2021 website postings ("Website Postings"), which were posted on *The Fifth Estate's* website (www.cbc.ca/fifth) and accessible globally, including to persons in the United States.

 e.   The November 15, 2021 Tweet ("Tweet"), which was posted on *The Fifth Estate's* Twitter account (@cbcfifth) to a global audience, including to the millions of Twitter users in the United States.

 f.   The November 18, 2021 Article, which was posted on *The Fifth Estate's* website (www.cbc.ca/fifth) and accessible globally, including to persons in the United

States.

g.   The November 18, 2021 Newsletter ("Newsletter"), which was e-mailed to all
subscribers to weekly newsletters from *The Fifth Estate.* Attached hereto as
Exhibit B.

h.   The November 18, 2021 CBC Radio Broadcast on *The Current* ("*The Current*"),
an approximately twenty minute audio segment on Canada's most listened to
radio program, accessible in the United States. Attached hereto as Exhibit C.

i.   The November 18, 2021 November Episode, an episode of *The Fifth Estate*
focusing on WE Charity's fundraising for Kenyan schools, broadcast over CBC's
television network to a global audience, including to United States viewers.  The
November Episode also remains available on *CBC's* website and on YouTube.

j.   The November 24, 2021 Podcast, made available on Apple podcasts, Spotify, and
other podcasting services to a global audience including listeners in the United
States.

k.   The January 27, 2022 French-language episode of CBC's primetime investigative
journalism show, *Enquête*, about WE Charity ("*Enquête* Episode"), which aired
throughout Canada on CBC's Radio Canada, and remains available to viewers on
*Enquête*'s website and YouTube, including to significant numbers of viewers in
the United States.  A French Transcript of the *Enquête* Episode is attached hereto
as Exhibit F; an English Translation of Exhibit F is attached hereto as Exhibit G.

303.    The CBC further defamed WE Charity each time it re-published the Defamatory
Publications, and advertised, promoted, and cross-promoted their content.  This includes, but is
not limited to, all of the advertisements in which the CBC used the tag line: "WE Charity's

89

Donor Deception in Kenya."

304.    Each of the Defamatory Publications is quoted in full within the text of the

Complaint or is attached hereto as an Exhibit.

### A. The Teaser

305.    On the morning of November 11, 2021, CBC published the Teaser for *The Fifth*

*Estate*, Season 47, Episode 6, which read:



306.    In the context of a teaser for an investigative news report, this statement would be

understood by reasonable readers to mean that WE Charity did *not* build hundreds of schools in

Kenya with donors' money, that WE Charity misused donors' money, and that WE lied to a

parliamentary committee.

### B. The First Promo

     i.   <u>The First Promo for the November Episode Falsely Accused WE Charity of Fraud and Deceit</u>

307.    Later in the day on November 11, 2021, the CBC broadcast at the end of that

week's episode of *The Fifth Estate* the First Promo:

[Drone footage of schools built by WE in Kenya]

**Mark Kelley**:  I'm Mark Kelley. Today we are starting from a feel-good charity

[Footage of Marc and Craig Kielburger speaking to a crowd]

**Mark Kelley:** to a full-blown controversy.

[Footage of Reed Cowan speaking]

**Reed Cowan:** I feel like my son was the victim of fraud.

[Footage of WE fundraising event]

**Mark Kelley:** Millions were raised for kids in Kenya.

[Footage of Mark Kelley in Kenya]

**Mark Kelley:** All the money that was collected for this village. It doesn't add up.

**[**More footage of Mark Kelley in Kenya]

**Mark Kelley:** Let's go. We need to go. And now insiders reveal what the charity tried to keep quiet.

[Footage of Mark Kelley on telephone while in Kenya]

**Mark Kelley:** Why are you concerned about protecting your identity? What are you afraid of?

[Footage of unknown man]

**Unknown Man:** At the end, you know, I've been deceived.

[Footage of WE headquarters]

**Mark Kelley** That's coming soon on *The Fifth Estate*.

[The Fifth Estate logo]

**Mark Kelley:** For more about our investigations, sign up to get *The Fifth Estate's* weekly newsletter. We'll keep you posted on stories we've brought you and share some behind the scenes details. Head to our website, CBC.ca and subscribe there.

308.   The First Promo falsely stated, both directly and indirectly, that WE Charity had

engaged in fraud and deceit in its fundraising for children in Kenya.

309.    The First Promo also falsely stated, both directly and indirectly, that WE Charity attempted to obstruct CBC's investigation.  Among other ways, this defamatory meaning is conveyed by CBC's juxtaposition of: (1) CBC's drone footage from Kenya; (2) CBC's efforts to enter schools in Kenya; (3) Mark Kelley's urgent statement into a cell phone: "Let's go. We need to go"; and (4) the statement "And now insiders reveal what the charity tried to keep quiet."

310.    The First Promo also falsely stated both directly and indirectly that WE Charity threatens individuals that speak against the charity.  This defamatory meaning is confirmed by Mr. Kelley asking a source "Why are you concerned about protecting your identity? What are you afraid of?"  It also is confirmed by the Second Promo and the November Episode.

   ii.    WE Charity Informed the CBC of the Errors in the First Promo

311.    On the night of November 11, 2021, CBC published the Tweet and the First Promo.

312.    On November 14, 2021, CBC further elaborated on its upcoming episode, detailing on its website that "The Fifth Estate compiled its own list of money raised and travelled to Kenya to see first-hand if it matches the number of schools actually built, all in the face of an aggressive campaign orchestrated by the charity to block the scrutiny." This statement, in the context of previewing an investigative report, falsely stated that WE Charity had engaged in fraud and deceit in its fundraising, and falsely stated that WE Charity had attempted to obstruct the CBC's inquiry into its fundraising.

313.    That same day, on November 14, 2021, Ms. Wiszowaty wrote to Harvey Cashore, Mark Kelley, and Diana Swain at the CBC, identifying falsities in the First Promo.

314.    Ms. Wiszowaty first reminded them that the reason the CBC's reporters were not able to visit any of the WE Charity schools in Kenya was because of the CBC's own lack of

planning and failure to adhere to local laws—not any effort by WE Charity to prevent it from

accessing them:

> ***You appear to be suggesting you are running away from
> something when you say "we have to go, we have to go" that
> paints a picture that WE Charity is trying to hide something and
> that WE is trying to prevent you from being at the primary
> schools***.  I sincerely hope you will be honest with the audience that
> WE Charity wanted you to come to Kenya and visit the schools,
> meet the students and the community members.  We asked you to
> be sure to get the necessary government permissions and offered to
> help in whatever way we could to ensure that could happen. You
> told us in writing that you had made the necessary arrangements,
> when, in fact, you had not. ***Your lack of planning and adherence
> to local laws is why you were turned away at the schools and we
> have extensive documentation to show this. To give the audience
> any impression that suggests otherwise would be wrong. If you
> had "to go" it was only because you were on government
> property filming when you had explicitly been asked by members
> of the community to come back when you had the necessary
> documents***. In this specific case, we understand that you were at
> the primary school of Irkaat. You told the askari that you had to
> use the bathroom. They graciously agreed. You then started to film
> without permission.
>
> We wanted you to come to Kenya because we are immensely
> proud of the work that we have done with the communities in
> Narok county. ***We have nothing to hide and only wish you had
> been able to experience the school communities as they should be
> experienced.*** We trust you will not present a false narrative,
> whether it be regarding your visit to Irkaat or any other schools,
> that WE Charity was trying to prevent you from seeing the
> projects. Please be honest with the audience about that.

315.    Ms. Wiszowaty pointed out that the CBC's claims of "math" "not adding up" was

false and defamatory, and asked the CBC to explain how it reached its conclusion so that WE

Charity could respond.  She stated,

> You have said that "millions" were raised for Kenya and said that
> the "math" in the community of Irkaat does not add up.  Please
> help us understand how you came to this conclusion so that we can
> provide clarity before you leave a false and damaging impression
> with your viewers.

316.     Ms. Wiszowaty also informed Mr. Cashore, Mr. Kelley, and Ms. Swain that Mr.

Kelley's statement "the math does not add up" could not be true with respect to the funder whose

email Mr. Kelley was holding:

> In the promo when Mark is in the community of Irkaat, holding up
> a photo sent to one of our funders, called "SLO".  It is here you say
> the "*math does not add up*" and Mark shakes his head*.  **I have
> attached to this note the specific e-mail from WE Charity to the
> SLO funder which shares this photo to them.  At no point, does
> this e-mail reference that the specific school in the background
> was solely that of the SLO.**  You cannot reasonably infer that SLO
> solely built this specific school from the note itself.  Quite the
> opposite, in fact. The e-mail says "*This picture was taken just
> recently and is with **some students** in Irkaat in front
> of **their** classroom.*" Are you inferring from this document or
> others like it that SLO was told it was the only donor to this
> school?  ***We also have generic community-based impact reports
> we have sent to SLO if you wish to receive one to further prove
> my point. If so, you are making an unfounded accusation, with
> not only no evidence, but documentation which actually shows
> the contrary.*** Please adjust your reporting or let us know if there is
> anything else that we can provide to clarify the situation for you.

317.     Finally, although the CBC had never informed WE Charity of its specific

allegations, because the First Promo referenced the village of Irkaat, Ms. Wiszowaty provided

the CBC with extensive information concerning the scope and scale of its work there:

> We would like to provide some information with respect to the
> scope and scale of the work in Irkaat and the community of donors
> who supported the delivery of projects and programs. Over the
> course of the partnership, we have delivered extensive
> infrastructure and programming across the five pillars of our
> development model. Within the education pillar we delivered the
> following infrastructure to support an improved educational
> environment and better academic outcomes.  In the community of
> Irkaat we completed the following:
>
> - 28 new classrooms, 2 new libraries, 1 new kitchen, 10 new teacher
>   accommodations, and one new administrative block for the
>   teachers.  Additionally, we renovated one of the existing classrooms.
>
> In the Irkaat regional high schools, we completed the following:

- 4 new classrooms and 4 new teacher accommodations.  Additionally, we renovated 13 classrooms, 1 dining hall, and 1 dormitory.

In total, 66 school rooms were built or renovated as part of the education pillar.

This community of donors includes (i) Pinball Clemons Foundation, (ii) Change Heroes, (iii) Pledge to Humanity, and (iv) Mastermind who have all signed an open letter against the CBC and the Fifth Estate's representation of WE Charity.  Two other funders, the (v) Unstoppable Foundation and (vi) Jeunesse Kids, did not sign the open letter, but they have communicated to WE Charity their support of its contents, their full understanding of our development model, and they have confirmed that we may share those facts with you.  Apart from SLO, there is one other notable donor who has asked to remain anonymous.

 You say that the "*math does not add up*". I take great exception to this, as you have not even asked us how the funds were spent. I would like to pro-actively directly answer this question. In addition to expenditures on infrastructure, funds would have been spent, in part, on activities such as those outlined below for Irkaat. When donors donate to education, their funds are used to construct buildings but also to cover the additional costs listed above all of which are necessary and essential parts of creating and sustaining our educational programs.

- Construction of new schools and school rooms, inclusive of materials, material transportation, professional labor, general labor and storage of materials.

- Design and planning of school layout, based on surrounding environment and available space and resources

- Community and government documented engagement for all buildings to ensure all new structures have the proper designation, location, size, and usage.

- School landscaping inclusive of safe walkways, levelling of land as needed and beautification of school grounds

- Rebuilding or refurbishing existing schools and school rooms, inclusive of materials, material transportation, foreman, labour and storage of materials.

- Outfitting of classrooms with books, desks, chairs, educational resources, blackboard and initial basic supplies for classroom

- Construction of libraries, administration offices and teacher accommodations.

- Outfitting of libraries with materials such as books, educational resources, desks, chairs etc.

- Technical supervision and architectural planning and oversight of all construction work

- Engagement of students within the community to the Kisaruni high school programs to allow select students to further their education.

- On-going professional development programs and training and school pride initiatives

- Summer programs for the primary students

- Program management, M&E, and regular reporting

- 5-7+ year commitment of significant staff time and resources from Nairobi and Toronto to support the community development model, interventions and coordination. There is a significant undertaking of human capital to bring sustainable development to this region.

- Mobilization of volunteer-based community participation in the construction of education projects.

- Execution and monitoring of educational programming including the School Pride Program,

- Headmaster engagement, and School Management Committees Relationship and partnership building with local government, education stakeholders and community leaders

- Program and resource development, delivery, monitoring of programming and training for teachers.

- Participation in regional educational assessments and planning groups

Moreover, we would provide additional support to ensure children are able to go to school, including, but limited to the following:

- Testing of water sources for contamination, potability and size of water supply

- Construction of new clean water systems, including materials, material transportation, professional labour, general labour and storage of materials.

- Technical supervision and architectural planning and oversight of all construction work

- Approvals for all water projects

- Community education on the Importance of effectively using and maintaining clean water systems

- Community education and sensitization on safe and effective hygiene practices

- Completion of hydrological studies before the start of any drilling or irrigation system, at the site where a water system is going to be implemented. A hydrological study will test and study the groundwater, where the best place to install a borehole will be, and how far down the drilling needs to go.

- Create and train Water Management Committees on management of water sources. Essential to the sustainability of any water project, FTC implements a community training system on how the borehole works and how to maintain and repair it and maintain ownership over activities.

- Construction of gender-segregated latrines at schools, inclusive of materials, material transportation, professional labor, general labor and storage of materials.

- Community and student education on the Importance of effectively using and maintaining the latrines for their ongoing use and sustainability.

- Construction of hand washing stations at schools, inclusive of materials, material transportation, professional labor, general labor and storage of materials.

97

- Community education on the Importance of effectively using and maintaining the handwashing stations in order to prevent illness amongst students.

- Work with local health care practitioners to align our health care practices with the government's national priorities, and in most cases partner with the government to administer health care in communities where we work.

- Research, design and develop health education resources to provide tailored health programming specific to the environment, culture and health practices of the communities we partner with.

- Provide extensive health education programs, which empower community members to recognize and understand common illnesses, seek medical attention, and take preventative action to improve health outcomes. Programming is targeted towards community members and students.

- Train community health workers to ensure that knowledge is accessible within communities and will be passed to students and children.

- Implement school nutrition programs

- Mobile health clinics to provide direct health care services to students and community members.

- Educate and connect community members with available government health services and benefits, which may include nutritional supplementation, pre- and post-natal care, and vaccinations, among other things.

318.   Ms. Wiszowaty concluded:

As you can see, our engagement and contribution of funds to the communities extends far beyond the buildings. ***I do not understand why you will not share with WE the numbers you are trying to 'add up'.  How could doing so not help the accuracy of your reporting?*** I look forward to hearing from you.

319.   The CBC did not respond and reflected none of the information sent by Ms.

Wiszowaty in its coverage of WE Charity.

### C. The Second Promo

    i.   The Second Promo Again Accused WE Charity of Fraud and Deceit

320.    On November 14, 2021, the CBC published the Second Promo:

[Footage of a WE Day event]

**Announcer**: New, startling revelations in the story that rocked the country!

[Footage of Mr. Kelley talking to an off-camera source, followed by a photograph of two persons standing in front of a school, then three similar photographs]

**Mr. Kelley**: Your school was sold multiple times to multiple donors.

**Announcer:**   Damning details!

[Footage of Mr. Kelley on a cell phone]

**Mr. Kelley:** What are you afraid of?

[Footage of WE's [former?] Canadian headquarters]

**Announcer:** Shocking disclosures!

[Footage of a WE Day event]

[Footage of donor Watson Jordan]

**Mr. Watson:** I've been deceived

[The Fifth Estate Logo]

**Announcer:** An exclusive Fifth Estate investigation! Thursday at nine.

321.    The Second Promo falsely stated, both directly and indirectly, that WE Charity had engaged in fraud and deceit in its fundraising for children in Kenya.  This defamatory meaning is confirmed by the other Defamatory Publications.

322.    The Second Promo also falsely stated, both directly and indirectly, that WE Charity threatens donors that speak out against the charity.  This defamatory meaning is

confirmed by CBC's juxtaposition of: (1) Mr. Kelley's statement, "Your school was sold

multiple times to multiple donors" with (2) Mr. Kelley on the phone asking, "what are you afraid

of?" It also is confirmed by the other Defamatory Publications.

  ii. <u>WE Charity Informed the CBC of the Errors in the Second Promo</u>

323. On November 17, 2021, Ms. Wiszowaty wrote to the CBC again. In an email to

Mr. Cashore, Mr. Kelley, and Ms. Swain, Ms. Wiszowaty first addressed the CBC's reliance on

the donor depicted in the Second Promo, Watson Jordon. Ms. Wiszowaty explained:

> **1. Mr. Watson Jordan was not deceived by WE Charity**
>
> You have not asked us to comment on any planned reporting
> concerning Watson Jordan, but it appears that you are planning to
> report that Mr. Jordan believed he fully funded Schoolhouse #4 in
> Irkaat. Do you have information or documentation that says he was
> told that? If so please share it with us. ***Do you have a basis for
> accusing WE Charity of deceiving him? That is a serious
> allegation and one that we dispute.*** As you know, deception is by
> definition intentional. How have you concluded that WE Charity
> intended to deceive Mr. Jordan?
>
> Mr. Jordan has, as you know, been a supporter of WE Charity's
> work in Kenya and both WE and the local community are
> extremely grateful for his support. Over the years we exchanged
> well over a hundred emails with him as his plans evolved from
> wanting to raise funds towards supporting a schoolhouse to
> wanting to support all five pillars in the community of
> Irkaat. ***Emails show that Mr. Jordan was aware of development
> funded by other donors to Irkaat whose donations predated Mr.
> Jordan's contributions to the community. Mr. Jordan also knew
> there was an anonymous donor who matched his donation and
> together they both contributed to the five pillars of development
> in Irkaat.*** In line with Mr. Jordan's instructions, these funds, along
> with those from other donors, were used to support the
> construction of a schoolhouse and the five pillars in Irkaat.
>
> We exchanged many communications with Mr. Jordan – ***based on
> what we have been able to find, at no time did we tell him he was
> the funder of classroom #4 in particular. Do you have
> documentation that suggests otherwise?***
>
> Our many communications with Mr. Jordan confirm that he:

- helped support the construction of a schoolhouse in Irkaat (WE has funded 66 schoolrooms in Irkaat, as detailed here: https://www.wecharity.org/irkaat)

- was aware that other donors were involved in supporting education in Irkaat

- understood that donor funds contribute to the construction of schoolrooms, outfitting of school rooms, and funding of programs to support learning

- was aware of the ongoing development of the five pillars in the community using funds from other donors

- understood and supported WE's five pillar approach to development

If there was any misunderstanding, we regret that, but we believe that our team did their best to explain our model and the meaningful impact Mr. Jordan made with his contributions.

324.   Ms. Wiszowaty then emphasized: "To suggest to your viewers that WE "deceived" him is not grounded in fact.  WE's communications with Mr. Jordan do not support CBC's accusation that WE Charity intentionally misled him.  It is reckless for you to report on WE's communications with a donor without asking WE Charity any questions about the topic."

325.   Ms. Wiszowaty next turned to the CBC's comparison of a photo to a schoolroom in Irkaat and took issue with the CBC's methodology as expressed in the promo:

**2. Schoolhouses depicted in WE's donor impact and thank you communications are not said to be specifically or fully funded by the donor.**

 When Mark claimed in the promo that *"All the money that was collected for this village … doesn't add up",* he is shown comparing a photo of a schoolhouse to a physical schoolhouse behind him in Irkaat. ***The visuals, supported by Mark's comments, suggest serious wrongdoing or fraud by WE based on an out of context comparison of a photo to a physical schoolhouse. (This is especially so considering moments earlier the CBC shows Reed Cowan alleging "fraud" in Parliament).*** If the CBC's methodology is, in part, simply based on comparing photos in communications sent to donors with physical structures, there is a serious misunderstanding in that approach.

101

326.    Ms. Wiszowaty then explained to the CBC that it was misleading to portray

photos in thank-you notes as promises that the donors had fully funded whatever was shown in

the photos.  The communications said nothing of the sort and would not reasonably be

understood that way:

> Thanking donors and recognizing the impact of their donations on
> the local community as a whole has always been very important to
> us. Like many charities, we have created many "thank you" style
> communications over the years. Some of these communications
> contain photos that have signs with children in communities that
> received all or part of the donors' funding dollars thanking the
> donor (like the SLO photo you showed in your promo clip).  *As
> you must know from any research on charitable fundraising best
> practices, personalized communications like this are standard in
> the nonprofit world.*
>
>  In order to keep disruptions to students' learning time to a
> minimum, we take a few different photos with the same kids with
> the same background, thanking the various donors who have
> supported that specific community. We do not move students
> around the region for hours simply to pose in front of different
> schoolhouses for the purpose of ongoing donor reporting.  This is
> especially so in a region like Irkaat where structures housing 66
> educational rooms have been funded by a combination of donors.
>
> *As previously explained, donors typically fund villages (or even
> countries or regions) rather than particular schoolhouses. The
> background of a photo contained in a donor communication
> often features one or more schoolhouses to demonstrate that we
> were in that specific village. But, of course, this does <u>not</u> mean
> the photo was taken in front of an individual schoolhouse that
> any donor uniquely built. The communication says nothing of
> the sort.* (This same approach was also done with individual thank
> you videos which were provided to donors. It is the same concept.
> We send "thank you" videos to individual donors who supported
> the community, with the speaker standing in front of the same
> background.)

327.    Finally, Ms. Wiszowaty reminded the CBC of the email she previously sent to

CBC concerning the specific donor identified in the First Promo:

> The SLO e-mail which we have provided to the CBC is a good
> example. *In the e-mail, the WE Charity staff member clearly says*

*the photo of "students" in "Irkaat" is taken in front of "their school". It does __not__ say the photo was taken in front of a school uniquely or specifically funded by the donor*.

328.     Ms. Wiszowaty then took on the CBC's reporting that WE Charity does not use

money donated to education in Kenya to fund education in Kenya.  Ms. Wiszowaty reminded the

CBC that it failed to conduct a proper visit in Kenya and had never informed WE Charity of the

factual basis for its allegations:

> 3. **The money raised to support education in Kenya has been deployed to support education in Kenya.**
>
> I am the country director in Kenya and have worked for WE Charity for over 20 years. I can say with certainty, that the money raised to support education in Kenya did just that. The CBC says in its promo that it "*travelled to Kenya to see first-hand if it matches the number of schools actually built*".
>
>  I have already set out above some of my concerns regarding the CBC's failure to properly see our work first-hand.
>
>  In addition, the CBC has not told us on what basis it is questioning how funds are deployed. WE Charity has financial systems and strong financial governance. It supported the construction and renovation of over 850 school rooms in Kenya, and it supported the infrastructure, programming, and long-term operating costs necessary to leave a sustainable and meaningful impact.

329.     Ms. Wiszowaty further objected to the CBC's claim that WE Charity prevented

the CBC from visiting its schools in Kenya, an accusation she already had addressed with respect

to the First Promo:

> 4. **WE has __never__ prevented CBC from visiting schools in Kenya**
>
>  *We wanted the CBC to visit. We asked how we could help facilitate the visit, we offered interviews with team members on the ground and we offered to help with the necessary government permissions.*
>
> We asked repeatedly before you visited if you had the proper government permissions to visit the schools. You assured us you did. *We did everything we could to assist you when it became*

*clear that in fact you had not obtained any governmental permissions. To suggest otherwise in the broadcast would be false and unfair.* We would have no reason to limit your ability to visit and film the projects that we are so proud of.

When I felt as though the CBC was suggesting that we had something to do with it not receiving permission from the Kenyan Ministry of Education Harvey confirmed that was not the case, stating, "*there is no accusation made or insinuated*". So to insinuate otherwise now is plainly disingenuous.

As an organization, inviting donors and others to see the projects has always been a fundamental aspect of our model. *We fundamentally believe that seeing the work first hand leads to understanding the work, which is why we wanted the CBC to have the opportunity. It is unfortunate that you chose not to do so, but WE is not to blame for that decision.*

330.     Finally, Ms. Wiszowaty rejected the CBC's assertion that WE Charity conducted

an "aggressive campaign" to prevent the CBC's reporting:

One of the promos alleges "*an aggressive campaign orchestrated by the charity to block the scrutiny*". I am unsure what is meant by this. Can you please clarify? To the extent it refers to letters and statements from many of WE's key donors and educators submitted to the CBC, I do not see how they can be characterized as an "aggressive" campaign. Especially given that the promo last week included a scene in which a source is asked "what are you afraid of?", the CBC's audience will reasonably understand the CBC to be stating that the "aggressive campaign" involves fearful, threatening, conduct.

*In light of the unbalanced reporting and inaccuracies in the CBC's prior reporting and newsgathering, WE Charity's concerned donors wrote to CBC to confirm that they understand how donor dollars are spent, that they have not been misled, and that they support WE. These donors are among Canada's foremost leaders in politics, business, and community affairs.  CBC has no basis to doubt that the donors' decisions to write to the CBC were their own.* As the donors who represent the majority of funds donated to Kenya, these people are the subjects of your reporting, who simply want their voices heard.

Are you saying that the CBC does not want to hear from the public?

104

331.    The CBC did not respond to this email and reflected none of the information sent by Ms. Wiszowaty in its coverage of WE Charity.

    iii.    <u>WE Charity Reminded the CBC That Its False and Defamatory Reporting Would Be Targeting WE Charity in the United States, And the CBC Did Not Disagree</u>

332.    Also on November 17, 2021, WE Charity's U.S.-based legal counsel wrote the CBC and reminded its legal team that the false and defamatory coverage it appeared poised to publish "would cause direct harm to WE Charity's recognizable and reputable brand in the United States" and elsewhere.

333.    In this letter, WE Charity's counsel reminded the CBC that as early as January 2021, WE Charity had told the CBC, "WE's American operations are clearly in the crosshairs of the CBC's reporting. WE Charity engages with school districts, teachers and other organizations in the United States. A significant portion of its funding comes from corporate sponsorship and donations from the United States."

334.    The letter continued to explain,

> WE Charity is a not-for-profit corporation established under the laws of New York and registered as a 501(c)(3) charity in the United States since 1997. It is registered in thirty-eight states including the District of Columbia and has a U.S.-based board of directors. Its donations come from the United States and represent a majority of WE Charity's worldwide donations. WE Charity implements more domestic programming in the United States than anywhere else in the world (including Canada).

335.    WE Charity's counsel noted that the upcoming coverage appeared to particularly focus on WE Charity's U.S. fundraising and U.S.-based individuals:

> The Upcoming Broadcast appears to center around fundraising for WE Charity's operations in Kenya and WE Charity's resulting charitable works in that country. As you know, Robin Wiszowaty is the Kenya Country Director who oversees WE's operations in Kenya. Ms. Wiszowaty is a U.S. citizen residing in the U.S. and is employed by WE Charity's U.S. entity.

The Upcoming Broadcast concerns donations by at least one individual, Watson Jordan, who is featured in promotional material that the CBC has aired. To our knowledge, Mr. Jordan is also a U.S. citizen residing in the United States whose donations would have been made to WE Charity's U.S. entity.

CBC's unlawful conduct during its newsgathering has already caused our clients direct harm in the United States. By airing a false and defamatory Upcoming Broadcast, the CBC will cause further direct harm to our clients in the United States.

336.     Over the course of nearly an entire year's correspondence with WE Charity's U.S.-based counsel, the CBC never disagreed that its reporting would target and cause direct damage to WE Charity in the United States.

337.     Despite the CBC's consistent refusal to discuss its coverage, WE Charity's counsel again asked the CBC to engage in a good faith dialogue.

You have declined every previous invitation we have extended to engage in a substantive discussion regarding the CBC's coverage of WE Charity. Notwithstanding this, we request that the CBC give us an opportunity to review any evidence that you or your reporters and editors believe support the allegations we understand will be included in the story, and provide us with an opportunity to persuade you that those allegations are without merit.

338.     The CBC's response to this letter the same day read, "Received. I assure you that CBC is governed by legislation and this broadcast abides by the relevant law and journalistic standards."

339.     Thus, once again, the CBC had declined to engage in any substantive discussions to prevent false broadcasting and avoid potential litigation, but did not disagree that its reporting was targeting WE Charity in the United States.

**D.  The Website Postings**

340.     On November 15, 2021, the CBC posted to its website at www.cbc.ca/fifth a banner promoting its upcoming episode of *The Fifth Estate* concerning WE Charity's projects in

106

Kenya.

341.     The banner was place prominently on the website and in bold text, announced,

"**Finding School No. 4: WE Charity's donor deception in Kenya**."  This text was

superimposed over a photograph of a WE Charity schoolroom in Kenya and photographs of

Craig and Marc Kielburger.  The banner directed readers to watch the upcoming episode on

"Thursday at 9 pm November 18."

342.     Underneath the banner, the web posting continued, "WE Charity told a

parliamentary committee it had built hundreds of schools in Kenya with donors' money.  The

Fifth Estate travelled to Kenya to see first-hand if the money raised matched the schools actually

built."

343.     The banner falsely stated, expressed and implied that WE Charity deceived its

donors because it had not built hundreds of schools in Kenya."  That statement was false.



344.     Clicking on the banner linked to a landing page for the episode with lengthier

false and defamatory text that reads as follows:

> WE Charity told a parliamentary ethics committee it had built hundreds of schools in Kenya with donors' money, but an unhappy donor told MPs he felt defrauded because ***another donor funded the same school he was told he had paid for***.

> The Fifth Estate compiled its own list of money raised and travelled to Kenya to see first-hand if it matches the number of schools actually built, all ***in the face of an aggressive campaign orchestrated by the charity to block the scrutiny***.

### E. The Tweet

345.    On November 15, 2021, CBC published the Tweet from its *The Fifth Estate*

Twitter account:



346.    In the context of a teaser for an investigative news report, this statement would be understood by reasonable readers to mean that WE Charity did not build hundreds of schools in Kenya with donors' money, that WE Charity misused donors' money, and that WE Charity lied

to a parliamentary committee.

**F. The Article Accused WE Charity of "Routinely" Misleading Donors**

347.     On November 18, 2021, the CBC published the Article titled "WE Charity mislead donors about building schools in Kenya, records show."  Attached hereto as  The Article's byline lists CBC reporters Matthew Pierce, Harvey Cashore, Mark Kelley, and Kate McKenna.

348.     The Article falsely stated, both directly and indirectly, that WE Charity "routinely" engaged in fraud and deceit in its fundraising for projects in Kenya.

349.     The Article begins,

> Marc and Craig Kielburger's WE Charity routinely misled school-aged children and wealthy philanthropists across North America for years as it solicited millions for schoolhouses in Kenya and other projects in its Adopt-A-Village program, an investigation by CBC's The Fifth Estate has found.
>
> Slick marketing videos, congratulatory social media posts and crowdfunding websites across the internet tell the story of two brothers on a mission to change the world, but under closer scrutiny those digital crumbs lead down a trail of contradictions and deception.

350.     The Article falsely accused WE Charity of misleading donor Iroquois Ridge High School and a former student there, Rukshan de Silva.  The Article states,

> Years after Rukshan de Silva and his high school classmates in Oakville, Ont., raised money for WE to build a one-room schoolhouse in Kenya, he travelled there to see the fruits of their labour.
>
> What he didn't know during his 2013 visit was that four small blue letters displayed prominently above the schoolhouse doorway were a clue that he and the students from Iroquois Ridge High School had been deceived.
>
> In fact, the letters were a dedication to another group which, online records show, indicated that they, too, had fully funded the schoolhouse.

WE Charity, then known as Free the Children, had collected donations to build two schools. Instead, they built one and told both donors they had paid for it.

351.    The Article falsely stated that WE Charity deliberately deceived donors and failed

to build schools funded by donors:

Now, a months-long *Fifth Estate* investigation into WE Charity's Kenyan operations reveals that far fewer schools were built than were funded by donors, a fact that leaked internal WE documents show was co-ordinated at the highest levels of the organization.

There was "a strategic decision by senior leaders" to deliberately overfund projects, a former WE employee said.

The deception resulted in multiple donor groups paying for the same schoolhouses many times over.

352.    The Article falsely claimed that, not only did WE Charity allegedly engage in

deception and fraud, but that such misconduct was widespread:

The internal WE Charity records, coupled with internet archives, newspaper articles and social media posts, show that de Silva and Cowan were not the only donors deceived.

Such activities were common practice and part of a multi-faceted strategy that brought in funding for more than 900 primary schoolhouses in Kenya, where WE records show only 360 have actually been built since its work began in 2003.

353.    The Article falsely stated, both directly and indirectly, that the CBC sought and

received WE Charity's comment on the allegations in the Article, stating, for example, "In a

statement to The Fifth Estate, WE Charity said: 'Donors understand that the funds [they give] are

not simply going to be used to construct buildings. Donors are told that their donations will be

pooled with others to do the most good in a given region or village.'"  This statement was in fact

from a letter to the CBC sent on November 10, 2021 by WE Charity's legal counsel—a letter

that complains the CBC had been "deliberately keeping WE Charity in the dark".

354.    The Article further misrepresented the contents of WE Charity's own documents,

falsely claiming, for example, "The documents show that schoolhouses were routinely double-, triple- and quadruple-matched to large donors…In one example, eight major donors are stated to have funded the same schoolhouse."

355.   The Article falsely stated that WE Charity told donor Watson Jordan that he had personally funded schoolhouse No. 4 in Irkaat and that "[i]nternal documents show that the same schoolhouse was paid for at least four times over by some of WE's largest donors."

356.    The Article misquoted and misrepresented the contents of an auditor report (the Preliminary Report by Mr. Froese, discussed in Section IX.C, above) to falsely claim that WE Charity spent $29 million on "costs for WE Canada" when the report in fact said those expenditures were for Kenya (*i.e.*, the exact *opposite* of what the CBC stated):

> On Wednesday afternoon, WE Charity released preliminary findings of a forensic accountant it hired to compare contributions made to WE designated for Kenya and spending in Kenya.
>
> The preliminary findings said in part that all donations to Kenya between April 1, 2012, and August 31, 2020, total $74 million. At the same time, costs for projects in Kenya were $54.8 million, while costs for WE Canada, including administration, were $29 million. The total costs were "$83.8 million or $9.8 million more" than donations designated for Kenya.

357.   The false and defamatory meaning of the Article – and the CBC's intent to convey such meaning – is further reinforced by all of the Defamatory Publications.

## G. The Newsletter

358.   On November 18, 2021, CBC emailed its subscribers the Newsletter announcing its upcoming November Episode of *The Fifth Estate* titled "Finding School No. 4: WE Charity's donor deception in Kenya."

359.   The Newsletter falsely stated, both directly and indirectly, that WE Charity had engaged in fraud and deceit in its fundraising for Kenya.  For example, the Newsletter stated,

"We spoke to donors who believed they had fully funded classrooms, only to learn other donors were told the same thing about the same school."

360.    The Newsletter also stated,

> At the same time, we noticed WE Charity sent photos of the exact same schoolhouses to different donors multiple times — and that each was told this was the school their funds had built. We also heard from insiders who said overfunding classrooms was part of a strategic decision at WE Charity.

> After weeks of research we had our answer. According to our records, donors had raised money to fully fund more than 900 one-room schoolhouses in Kenya. That was far more than the number WE Charity had provided to Parliament of 360 schoolhouses.

> What accounted for the discrepancy?

> We decided to go to Kenya to see for ourselves. Our documentary, airing tonight at 9 p.m. on CBC-TV, details what happened next, and the challenges we faced discovering the truth.

361.    The Newsletter falsely stated, directly and indirectly, that WE Charity had interfered with the CBC's investigation and newsgathering in Kenya.

362.    The false and defamatory meaning of the Newsletter – and the CBC's intent to convey such meaning – is further reinforced by all of the Defamatory Publications.

**H. CBC Radio: *The Current* episode with Matt Galloway**

363.    On November 18, 2021, CBC Radio broadcast and streamed an approximate 20-minute audio clip episode of *The Current*.

364.    In its broadcast of *The Current*, CBC's Mr. Matt Galloway and Mr. Kelley, falsely stated, both directly and indirectly, that WE Charity had engaged in fraud and deceit in its fundraising for children in Kenya.

365.    *The Current* began with a vignette from Mr. Kelley's interview of Mr. Jordan (the donor discussed at paragraph 323 above).  In his lead-in, Mr. Galloway made, adopted and endorse false accusations of donor fraud:

> JORDAN: … behalf, it doesn't seem like an awesome group of people to lie to.

> GALLOWAY:  Lying to the parents of children who had died is exactly what WE Charity has been accused of by donor Watson Jordan and others…

366. Mr. Galloway interviewed Mr. Kelley, who proceeded to repeat, endorse, and adopt false accusations of donor fraud made by Mr. Cowan and unnamed former WE Charity employees:

> KELLEY: … it really wasn't just Reed Cowan who had funded a school and later learned that others had funded it. There was some reporting that was done by Bloomberg News in the U.S. and it also talked about how -- how some of the staffers, WE Charity staffers in Kenya, joked that they should have put Velcro on 11 donors' plaques because they were being changed so often, put up one day for when one donor came to visit, put up – another one would be put up another day when another donor came to visit saying that they had fund -- funded that very same schoolhouse. We approached some former WE Charity employees. We asked them: Is this true? Was there a pattern of double-matching, triple-matching, quadruple-matching donors to one single structure? We were told in fact that that was the case…

367. Mr. Kelley falsely stated that WE Charity built a lesser number of schoolhouses than for which it had allegedly raised funds:

> KELLEY: …Our records show that donors had fully funded 70 one-room schoolhouses in this village. The number we counted that were actually built in that village, 28. And that was the pattern that we started to discover as we went from village to village.

368. *The Current* referred to an excerpt from the CBC's interview with Ms. Moraa. Messrs.' Kelley and Galloway stated that WE Charity misused donor funds. Mr. Galloway endorsed and adopted Mr. Kelley's false accusations of donor fraud:

> KELLEY: …There is a big, big difference, Matt, in saying let's get a - measure the impact and let's actually follow donors' money to see what it was spent on.

> MATT GALLOWAY:  And so when you do that, the numbers
> don't add up.

369.    Mr. Kelley wrongly claimed that WE Charity had misstated the total number of

educational structures it had built, including by allegedly including latrines in its calculations:

> KELLEY: … What is "an educational structure"? And that
> includes primary schoolhouses, which we were counting, but
> secondary schools, high schools, it included libraries, it included
> kitchens that the kids may be using for -- for a lunchroom.  It
> included latrines that the kids were -- were using at school and it
> was this largely-inflated number that already got us a little curious
> of why this number had suddenly, once we started counting, that
> number grew.

370.    Mr. Kelley repeated his accusation of donor fraud and that WE Charity had

misrepresented its funding model:

> KELLEY: they wanted to say was how their -- funding model
> works is that money is pooled into projects, so donors are never
> told that your – your money will build a schoolhouse. It'll go for an
> educational pillar. It'll go to help support teachers' salaries. It'll
> help su -- go to support teachers' accommodations. But we had
> already accounted for those donations, those specific donations.
> What we were talking about, primary schoolhouses. And once
> again, their numbers and our numbers did not add up."

371.    Mr. Galloway made, endorsed and adopted the false statement that WE Charity

could, or would, improperly threaten the CBC's sources:

> GALLOWAY: You spoke with a couple of people who worked for
> WE and CBC is protecting their identity based on their fear of
> legal reprisal

372.    Mr. Kelley made, endorsed and adopted the following false statements alleging

that WE Charity had misinformed donors and misrepresented its fundraising. These statements

misstated the contents of certain communications sent by WE Charity to donors.

> KELLEY: We have these donors who have received a -- a picture
> of the schoolhouse saying: This is the schoolhouse you funded. We
> have videos that they were sent saying this -- I'm standing in front
> of the schoolhouse that you funded. So what our -- the insiders

114

were saying is: Yes. This was a marketing strata -- strategy. Yes, it was well-known that schools were already built, were being double-matched, triple-matched; and more importantly, that this had been brought to the attention of Marc and Craig Kielburger, the -- the co-founders of the charity; and they were told, quote, "You were playing with fire here."  That was the message that we got from both current and former WE employees.

…

...if you are asking for money for unspecified projects in Kenya. Just give us money to help kids in Kenya, you can spend that money to help kids in Kenya. However, if you are raising money to build a schoolhouse, then you have an ethical and sometimes legal obligation to fulfill that promise.

These are targeted donations.  This is what they wanted. Sometimes they did, like in Reed Cowan's case and in another donor's case, they did this in memory of a son that had passed away.  And that was the commitment that they were making; and they were sent a picture saying, "Here's the schoolhouse that you built."

373.    Mr. Kelley made the following statements falsely accusing, *inter alia*, WE

Charity of acting improperly including influencing foreign public officials and obstructing the

CBC's investigations. Mr. Galloway endorsed and adopted those statements.

KELLEY: We went to meet the governor of Narok County, the Honorable Samuel Tunai, a huge fan of WE Charity.  …He's very, very grateful for their work.  And so grateful that he recorded our interview.  We did an interview with him.  He had three cameramen in the room with us. Shortly after that interview, we got a lawyer's letter from WE Charity here in Toronto directly quoting my questions and -- and the Governor's answers.  Soon after we had done that interview, that interview was sent back -- or transcript of that interview was sent to Toronto so that they could use that against us saying that we -- that we had libeled the good reputation, the good name of WE Charity in our interview.

So in many cases, Matt, to – short answer is we weren't very welcome in some of the places where we went.  And we –

GALLOWAY: Once word gets out that you are looking into the school efforts of WE Charity, efforts to stop you have gone all the

way up the food chain to the Ministry of the Interior of that country?

KELLEY:  Yeah.  At one point we were given a -- It almost looked like a rap sheet of criminal allegations against us saying that we misrepresented ourselves to gain access to the villages and that we were trespassing on government property. And the CBC took these allegations quite seriously.  We were contacted.  We were told to essentially get on a plane and come home.  Our fact-finding mission in Kenya was over. But that gave you the tone.  Because not only was that -- that rap sheet as I'm calling it sent to the CBC, a copy of it was also sent to WE Charity.  Another reminder just about how closely connected the institutions and the charity are there, which -- which obviously made our -- our work there sensitive.

374.  *The Current* adopted and endorsed a false claim by Ms. Laurie Styron, executive director of Chicago-based CharityWatch, reacting to false and misleading information that CBC provided to her, and concluding from that false information that WE Charity carried out an improper scheme to deliberately misled donors.  Messrs. Galloway and Kelley adopted and endorsed these false claims and misstated the contents of WE Charity's internal documents:

STYRON: That's highly problematic because it doesn't look like it was a mistake.  It looks like it was a strategy, a fund-raising strategy to compel donors to give more money on the promise that they would be accomplishing something very, very specific with their donation. The donors and the general public really needs to, you know, demand that this is investigated.

GALLOWAY:  You've hinted at this, but what's she's talking about there?

KELLEY:  We contacted former employees; and not only were they providing us with information, Matt, but they were encouraging us to dig in with our investigation to see what was going on with what they thought were some accounting practices that just didn't add up. So one thing that they did is we were actually leaked internal documents from WE Charity itself.  So while our own numbers had shown that -- that projects like schoolhouses being double-matched, triple-matched, quadruple-matched to donors, their own internal documents actually proved that as well.  They -- We could see how both large donors and small donors would be assigned to a specific schoolhouse project.

116

It was there in black and white. But more interesting than that,
Matt, there were notes in the margin about for -- what WE staffers
were saying about particular donors. So one donor was described
as being, quote, "tricky," because she wants to make sure that the
money she has donated will build the project it was donated for.
So this was marked in -- in the margin. Another generous donor
was not --determined not to be a problem because they don't track
line by line on projects that they funded.  It was a calculus about
what needs to be built now and what could be kicked down the
road for later if ever built. And when I showed that to Laurie
Styron, she said:  Well, there goes plausible deniability.

375.     *The Current* repeated, adopted and endorsed a false accusation of deception by

WE Charity donor, Watson Jordan, based on false and misleading information that CBC

provided to him:

JORDAN:  At the end, you know, I've been deceived.  Lying to
people who have lost children about doing something good on their
behalf, it doesn't seem like an awesome group of people to lie to.

376.     Mr. Kelley misstated the contents of WE Charity's communications to Mr. Jordan

and falsely accused WE Charity of raising duplicative funds for the same school from different

donors:

KELLEY: He was sent a picture of the schoolhouse by the charity.
They said, "Here is the schoolhouse built in memory of your son."
We learned at least four other donors funded that very same
schoolhouse, and we shared that information with him.

…

He wanted to build a school and he was told he did.  And that's
why he feels betrayed.

377.     Mr. Kelley falsely accused WE Charity's donors of participating in an aggressive

campaign intended to obstruct the CBC's investigation and failed to truthfully report on the facts

of donor disagreement with CBC's narrative:

KELLEY: … There were 60 significant major donors who were
involved in an orchestrated letter, an aggressive campaign, saying
that we were wrong, that they were never misled as donors, that

117

> they always understood that their donations would be pooled. But
> it was interesting because there was one e-mail that was sent to
> Catherine Tait, the president of the CBC, and – and when we
> looked at the e-mail thread, we noticed at one point that the e-mail
> had been first sent to Craig Kielburger, co-founder of -- of WE
> Charity to be proofread and -- and approved before it was sent on
> to the president of the CBC. So it was an orchestrated campaign,
> an aggressive campaign, and interesting because our reporting isn't
> even out yet and already we're being told we're wrong.

378.     Mr. Kelley falsely stated that a report being prepared by an independent forensic

accountant would not speak to the false and defamatory allegations CBC published of and

concerning WE Charity.  Mr. Kelley claimed that CBC's reporting did not concern whether "all

the money donated to Kenya was spent in Kenya," despite its coverage addressing precisely that

issue:

> KELLEY: We have been in touch with Marc -- Marc Kielburger
> for months now via e-mail back and forth with him. To be clear,
> they say our methodology is flawed.  And to prove it, they've now
> hired a forensic accountant to see if all the money donated to
> Kenya was spent in Kenya, which is all well and fine, but it doesn't
> answer our -- our core question: How many primary schoolhouses
> were fully funded?  How many were actually built? That's the
> question we tried to answer.

**I.   The November Episode of The Fifth Estate**

379.     On November 18, 2021, CBC aired the November Episode of *The Fifth Estate*,

featuring Mr. Kelley. This approximately 60-minute program (including commercials), made,

endorsed, and adopted both directly and indirectly statements that WE Charity fraudulently

informed multiple donors that each was the sole funder for of specific educational structures in

Kenya. This included the statements below.

380.     The November Episode was broadcast as a terrestrial and cable television

broadcast and available to be watched online through the CBC's own streaming platform as well

as through YouTube.

381.    The November Episode began with a vignette depicting WE Charity's purported

fall from grace:

> KELLEY:  On this edition of The Fifth Estate...
>
> VIDEO CLIP OF KIELBURGERS:  Today we are starting action.
>
> KELLEY:  From a feel-good charity...
>
> VIDEO CLIP OF KIELBURGERS:  We are WE Day!
>
> KELLEY:  ...to a full-blown controversy.
>
> COWAN:  I feel like my son was the victim of fraud.
>
> KELLEY:  WE Charity raised millions to build schoolhouses in Africa.
>
> JORDAN:  I went to three WE Days; and at the first one I heard, "Yeah, and you could build a school in Kenya."
>
> KELLEY:  So, we went to Kenya to see how many were actually built.
>
> KELLEY:  [Male] All the money that was collected for this village doesn't add up.
>
> STYRON: The logical question is: Where's the money?  Where did the money go?
>
> KELLEY: Why are you concerned about protecting your identity? What are you afraid of?

382.    The November Episode showed Mr. Kelley accusing WE Charity of

misappropriating donor funds:

> KELLEY: … Canada's WE Charity raised millions in donations to help people in this country.  But where did all that money go?

383.    Mr. Kelley proceeded to misstate the contents of WE Charity's communications

to donors:

> KELLEY: The charity told kids when they raised enough money, a schoolhouse would be built in rural Kenya.

…

> And when you raised enough money to build a schoolhouse, you
> might even get a video thanking you for your generosity.

384.   The November Episode repeated and endorsed incorrect allegations that a

particular schoolroom was fully funded by Rukshan de Silva's high school:

> DE SILVA: I met with the teacher, and he kind of gave me a tour
> of the old school, and then they showed me the new school as well
> that was constructed with the funds that we'd donated; and I was
> really proud to see everything that we had spent four years
> fundraising for, just to see the – the fruits of our labor.

385.   Mr. Kelley adopted and endorsed the false and defamatory allegations of donor

fraud made by Mr. Cowan:

> COWAN: Wesley's name, Wesley's face, Wesley's life of four
> years, and his legacy, were used to make money for Free The
> Children and WE Charities.

> KELLEY:  This is video of Cowan visiting the schoolhouse in
> Kenya he fully funded in memory of his son Wesley, who died in a
> tragic accident.

> COWAN: Today I want to tell you that in giving you this school, I
> am giving you my son.

> MARK KELLEY:  Cowan says he raised more than $160,000 with
> other donors, cheered on by Craig Kielburger.

> COWAN: He told all of our donors, during a well-televised
> fundraising, that they would be building schools; and that between
> 10 and -- for every $10,000 and $12,000 raised, a school would be
> built.

> MARK KELLEY:  Cowan says he later learned his son's plaque
> was taken down and replaced by the plaque of another donor who
> funded the very same schoolhouse.

> COWAN: I feel like my son was the victim of fraud.

386.   Mr. Kelley made, adopted and endorsed allegations that WE Charity had misled

its donors and committed fraud. Mr. Kelley also misstated the contents and meaning of alleged

social media and other online posts as evidence of such fraud:

> KELLEY: But MPs wanted to know, where were those 1,500 schools located?  Four weeks later parliament got a response.  At the top of the list, Kenya, where WE Charity said it had built 360 primary schoolhouses.  The Fifth Estate decided to put that number, 360, to the test.  Like with Cowan, were different donors told they had funded the very same schoolhouse?

> …

> We searched social media posts, we found old websites, and created spreadsheets for 30 villages they were involved with in Kenya. It became clear donors believed they had fully funded more than 900 primary schoolhouses in Kenya, far higher than the 360 schoolhouses the charity said it has built. And that doesn't account for donations that weren't made public. Our research was revealing even more. WE Charity sent this picture of a school to a donor who had fully funded it.  But take a look.  They sent that same picture to another donor who was told the same thing.  And then we noticed the same thing happened again. The Fifth Estate also found photos of the same schools but from different angles, also sent to multiple donors.

> …

> There were non-profit groups like Unstoppable.  The American foundation said they raised enough money to build 158 primary schoolhouses in Kenya for WE Charity.

> …

> KELLEY:  Our research shows a group called Change Heroes raised money to build dozens of schoolhouses in Kenya.

> …

> Taylor Conroy was the founder and a WE Day ambassador.

> …

> Conroy traveled to Kenya standing in front of those WE Charity schools to thank the donors directly.

> 6   VIDEO CLIP:  [Taylor Conroy] Mrs. Whytfield and the Vaughan Road Academy, this is Taylor Conroy and Philip the Maasai warrior here to say thank you for your massive contribution.  Behind us is a schoolhouse...

KELLEY:  But our research turned up another curious find.

…

VIDEO CLIP [Taylor Conroy] Hi.  It's Taylor from Change Heroes.  Today...

KELLEY:  Footage posted on YouTube of Conroy thanking multiple donors in front of the same schoolhouse.

VIDEO CLIP:  [Taylor Conroy] Thank you to Miss Pelletier and all of Margaret Jenkins Elementary School...

MARK KELLEY:  And again.

VIDEO CLIP:  [Taylor Conroy] ...Elton, it's Taylor, and this is one of the happiest days of my life.

KELLEY:  And again.

VIDEO CLIP:  [Taylor Conroy] ...Corrie.  This is as huge day for me, because I'm finally getting to show you what you and your friends got together to build....projects...

387.    The CBC made, adopted and endorsed false allegations that WE Charity had misled donors such as Messrs Cowan, Jordan and de Silva, and committed fraud:

KELLEY:  Watson Jordan felt the same way when he was sent a picture of the schoolhouse, he believed his money built.

VIDEO CLIP:  [Watson Jordan] … I am quite determined, at least go to the village.

KELLEY:  And if he went there, what would he find?  He was sent a photo of Schoolhouse Number 4 in Irkaat, in memory of his son. Like Reed Cowan, would he discover a schoolhouse that was funded by other donors or would a schoolhouse be there at all? So we decided to go to Kenya and look for Watson Jordan's schoolhouse and Rukshan de Silva's and others.

…

VIDEO CLIP: [Male] This is a village that we've been following closely. We want to find out how many schools actually exist in this community.

KELLEY: Rural Kenya has long been the focus of Canada's WE Charity.  It says it's built 360 primary school houses here with donors' money, but our research shows donors had given enough money to build more than 900 schoolhouses here.  Unable to square the charity's numbers with our own, we came to Kenya to see for ourselves. WE Charity schools are located in the Maasai Mara region in southwest Kenya.

VIDEO CLIP: [Male] We're approaching Irkaat. You can see it on the horizon.

[Male] We are just near it, the village of Irkaat. It's a village that we've been following closely, looking at the number of schools that we have found in our database, and now we want to find out how many schools actually exist in this community.

388.    Mr. Kelley made the following statements falsely accusing, *inter alia*, WE Charity and its supporters of deceiving donors, misappropriating donor funds and orchestrating an improper campaign to obstruct the CBC's investigations:

KELLEY:  And around here there's no bigger supporter of the charity than the governor of Narok County, the Honorable Samuel Tunai.

VIDEO CLIP:  [Governor Tunai] Hi, good morning, everyone.  Hi, good morning.

KELLEY:  That's his camera crew filming us as we filmed him.

VIDEO CLIP:  [Governor Tunai] I'm here as a great promoter and supporter of WE, because I've seen the impact and the transformation which they have done in the villages.  You must -- As a government you must always have to look for money elsewhere to meet some deficit in terms of your budgets.

KELLEY:  And he made it clear if I doubted the good work done by the charity, I was wrong.

VIDEO CLIP:  [Governor Tunai] Why are you going to tell me to say WE are doing a wrong job? The people who are employed there, the secondary schools which are built, why are you going to tell me to say they are not doing a good job?

KELLEY: Your excellency, what would you say if more money was raised for Kenya and Narok County than was actually spent in Narok county?

TUNAI: No.  Let me not comment about that.

KELLEY: What we've seen is -- with the WE Charity is that when donors will donate to build a classroom in Kenya, they'll be sent a picture and they'll be told, for example, "In Osenatoi, you have built a school," and they were sent that picture saying, "You have fully funded a classroom in Osenatoi."

TUNAI: Hmm.

KELLEY: But we've also noticed is another group will have funded that classroom; but when we look, we see it's the same classroom.  And they've both been told that they fully funded it, and that doesn't seem to add up.

TUNAI: Okay.  I don't -- No comment on that. Well, okay, enjoy Kenya.

KELLEY:  With that we were told our interview was over.

TUNAI: Thank you.

…

Our colleague, journalist John Njiru, who has reported on WE Charity in Kenya tells us we're no longer welcome.

VIDEO CLIP:  [Mark Kelley] We've been told that we should come back another time, so we'll come back another time.

[Male] He's saying that he had received some phone calls.

[Mark Kelley] So -- so we are not welcome.

[Male] Your presence is not welcome.

KELLEY:  As we wrapped up for the evening, we learn a lawyer for WE Charity in Toronto had sent an e-mail to the Fifth Estate. It contained direct quotes from our conversation with Governor Tunai just hours after our interview.

WE's lawyer said, "It is clear that CBC has been presenting as 'fact' inaccurate information.  CBC slandered WE Charity today."

We didn't know then this would be just one part of an escalating campaign by the charity and its supporters to stop our investigation.

389.   Mr. Kelley made, endorsed and adopted the following statements that misstated

WE Charity's communications with donors and falsely accused WE Charity of defrauding

donors. Mr. Kelley made further statements falsely accusing WE Charity of improperly

influencing foreign public officials and orchestrating an improper campaign to obstruct the

CBC's investigations.

> KELLEY:  We arrive on a Saturday when school is out.  We're hoping to find School Number 4.  It's the schoolhouse Watson Jordan was sent a picture of in memory of his son.
>
> Our spreadsheets show every schoolhouse here has a story, but donors may not know the full story.
>
> VIDEO CLIP:  [Male] Here it is.  School Number 4, School Number 4.  This was the one that was funded by Watson Jordan; but as we now know it was also funded by several other donors.
>
> KELLEY:  Our research shows School Number 4 was fully funded at least four times over. And it wasn't just School Number 4.  We have a picture of another schoolhouse that turned up in our online searches over and over again.
>
> VIDEO CLIP:  [Male] This school was also being funded by multiple other groups.
>
> [Male] Absolutely.
>
> [Male] Pledge to Humanity, this was funded by them, as it was Unstoppable, Mattamy Homes, Gilgan Family.
>
> KELLEY:  In all, our research showed WE Charity told donors they had fully funded 70 primary schoolhouses here.  The total number on the ground, 28. But, again, our visit is cut short. John tells us we must leave.
>
> VIDEO CLIP:  [John] Right now, you need to go because calls have been made and things are really bad.
>
> KELLEY:  It turns out the calls are coming from the governor's office.
>
> VIDEO CLIP:  [Male] It was Governor Tunai who just called.
>
> [Male] Oh, really?  Why would the governor be calling us?

KELLEY:  John believed the governor was sending a message for us to stop visiting villages in his county. We travel from Irkaat to the village of Rongena. We're looking for the school that 9-year-old Avery Skog funded from his home in Morris, Manitoba.

…

[Male 2] This is the school funded by Roots Canada, RBC, and this is a school that was funded by Avery Skog.

KELLEY:  And the schoolhouses are pretty basic, desks, chairs, and a blackboard.  An aerial view puts this village into perspective. Our research revealed donors were told they had fully funded 55 schoolhouses here.  In fact, there were only 12 schoolhouses and a library.

VIDEO CLIP:  [Mark Kelley] It just doesn't add up, all the money that was collected for this village, it doesn't add up.

390.    Mr. Kelley made, repeated and endorsed further false and defamatory allegations accusing WE Charity of donor fraud, including by passing off alleged statements in certain donors' social media posts regarding WE Charity as verified and accurate research and claiming that WE Charity had misstated the total number of schoolrooms it funded, including by allegedly including latrines in its calculations:

KELLEY: … I sat down for our interview with Carol at the WE college, just across the road; and she tells me our quest to count schools is misguided.

VIDEO CLIP:  [Carol Moraa] You have a spreadsheet where you're counting the number of buildings, but it's not about the infrastructure.  It's about the impact, the lives that are touched every single day.

KELLEY: Do you think it's wrong for us to be coming to -- to count the buildings, to see what has been done on the ground?

MORAA That's the wrong approach, Mark.  That clearly shows that you don't understand our model.

KELLEY:  Carol says the WE Charity model has donors fund what they call pillars, such as access to clean water, healthcare, or in this case, education.  Money for education would build schoolhouses,

and libraries and kitchens and teachers' accommodations; but our research accounted for those donations, too

…

KELLEY:  But after telling us we shouldn't be counting schools, it turned out that's exactly what WE Charity had been doing all spring and summer, ever since The Fifth Estate began our investigation; and it was no longer 360, the number provided to Parliament, far from it.

…

A closer look at that new number includes high schools, kitchens, even latrines which inflated the total count. But the charity's own count confirms the number of primary schoolhouses built in Kenya, 360. Still the charity insists all the money donated to Kenya was spent in Kenya. And for those villages that have benefited, loyalty to WE is unconditional.

391.    Mr. Kelley, made, endorsed and adopted false and defamatory allegations that

WE Charity had misled donors in its communications and committed donor fraud:

KELLEY:  Did Rukshan know the schoolhouse his classmates called their own was paid for by others?  In Pimbiniet, we counted schoolhouses.  Our spreadsheet shows WE Charity had received donations to fully fund 48. And on it went, using our spreadsheet count to compare with WE Charity's count in village after village after village. So were all donors told their money would be pooled with others to build other projects as Carol Moraa had told us? Back in Nairobi we called Rukshan de Silva to ask.

VIDEO CLIP:  [Kelley] Were you told that there were other donors who had funded that very same school?

DE SILVA: No.

KELLEY: That you were part of something bigger, that your money was going into a big pot?

DE SILVA: No.  We were told that that would be Iroquois Ridge's school that we had funded.

KELLEY:  In fact, what Rukshan didn't know is the picture he took of that schoolhouse when he visited Pimbiniet contained a clue that it was credited to another group.

VIDEO CLIP:  [Kelley] I saw a picture that you took over there that you would post of your school.  On the top right from the door there are letters over that door, MPCF and a number.  Did you know what the -- what that stood for?

DE SILVA: No.

KELLEY: That's Michael "Pinball" Clemons' Foundation.  He'd already fully funded that school.  Were you aware of that?

DE SILVA: No.  I wasn't aware of that.  If what you're saying is true, that's really disappointing.  It's a shame.

392.    Mr. Kelley made, endorsed and adopted allegations that WE Charity had committed donor fraud, that it could, or would, improperly threaten the CBC's sources and that it had orchestrated a campaign to obstruct the CBC's investigation in Kenya:

KELLEY:  Later that evening we were contacted by a former WE employee who wanted to talk.

VIDEO CLIP:  [Kelley] Why are you concerned about protecting your identity?  Like what are you afraid of?

KELLEY:  They said they feared legal reprisals from the charity. The source said it was common practice to overfund projects in Kenya, not just the schoolhouses.

VIDEO CLIP:  [Speaker's voice distorted.  Text on screen: "This was done over and over again."]

[Kelley] Over and over again.

[Speaker's voice distorted. Text on screen: "This was the norm."]

[Kelley] But why was it the norm?

[Speaker's voice distorted. Text on screen: "It was to make money."]

[Kelley] It was making money.

[Speaker's voice distorted. Text on screen: "It was like free money."]

[Kelley] Who was calling the shots?  Who was making this happen?  Was the -- Was this the people on the ground in Kenya who decided that this was a good idea?

[Speaker's voice distorted. Text on screen "It was Marc and Craig. It's the brothers who are the ones doing this."]

KELLEY:  The source said the practice had gone on for years.

VIDEO CLIP:  [Mark Kelley] You witnessed it.  He said this was part of the business model. As he said, basically it was free money to the charity to sell the same school room over and over again.

KELLEY:  Less than an hour after that call, we had a text from our team in Toronto.  The CBC had received a letter from Kenya's Ministry of the Interior.  It contained unfounded allegations we had committed criminal acts in Kenya, including trespassing on government property.  For some reason, the letter was cc'd to the WE organization. Concerned for our safety, CBC instructed us to head to the airport immediately.  Our fact-finding mission in Kenya was over….

VIDEO CLIP:  [Styron] What happened?  Why were these donors being misled about how their money was being spent?  It's just wrong.

…

13   MARK KELLEY:  But what was happening behind the scenes, as donor money came pouring in? The Fifth Estate spoke with dozens of people formerly and currently connected to the organization. One former staffer agreed to chat by WhatsApp.  I asked:  Why are you concerned about keeping your identity hidden? Legal but also knowing how powerful the Kielbrothers are. The source told me:  Overfunding of schoolhouses was a strategic decision by senior leaders.  The brothers were aware of all of this and would be the ones to accept the risk of doing project funding this way.  It was always about the ends, the overall goal, if that was ambitious and inherently good, the means didn't seem to matter. But I wondered:  How is that inherently good? The response?  What they wanted to achieve was more important than how they went about it. Others we spoke to said they raised concerns money was being donated for projects that were already paid for. You know, the Kielburgers were warned: You're playing with fire here. I don't know how they thought they could get away with it for so long.  They were very, very good at having people have an experience that they will never question. Rumblings of

129

troubles at WE Charity made their way to the United States, where the charity has raised nearly $200 million in donations in the last decade. In Chicago the group CharityWatch rates charities for prospective donors. In 2020, the watchdog suspended its rating of WE Charity citing concerns about governance.  Executive director Laurie Styron is an accountant with 15 years experience in the charitable sector.

VIDEO CLIP:  [Kelley] Here's one group called H.O.P.E.

KELLEY:  I showed her the duplicate photos WE Charity sent to multiple donors.

VIDEO CLIP:  [Kelley] Well, here's another organization and said, "You have funded that school room."

[Styron] Right.  So it looks like the same school; doesn't it?

[Kelley] It certainly does.

[Styron] Yeah.

[Kelley] I mean, when you put them side by side.

[Styron] Okay.  Right.  Okay. Yeah.  Same clouds and everything.

[Kelley] Um-hum.

[Styron] Okay.  Yeah.  I mean, that's -- that's highly problematic because it doesn't look like it was a mistake.  It looks like it was a strategy, a fundraising strategy, to compel donors to give more money on the promise that they would be accomplishing something very, very specific with their donation. The donors and the general public really need to, you know, demand that this is investigated.

KELLEY:  But that's not what all donors wanted. Prompted by our investigation, a group of donors, many of whom said they'd been to Kenya to see WE Charity's projects, launched an aggressive campaign to stop our investigation. "We do not agree with their thesis that we as donors were misled." E-mails sent to the editor-in-chief of CBC News saying the charity used their money for good works in Kenya and our reporting would undermine that. "We are asking you to prevent further damage to the communities in Kenya." E-mails signed by the former COO of Blackberry; the founder of Lululemon; Michael "Pinball" Clemons; Change Heroes' Taylor Conroy; a former executive of the Royal Bank of Canada; and even the former prime minister, Kim Campbell. "We

do not see any public interest in this kind of journalism." The e-mails arrived for days, then a clue as to who was involved in the campaign at the bottom of an e-mail thread with the heading "draft for consideration" a high-profile donor got approval from Craig Kielburger before sending it to the president of the CBC. By then a source aware of the charity's denials of wrongdoing wanted us to know what was happening inside the charity and provided us with some of the charity's own internal spreadsheets, records of donations from WE Charity's wealthiest and most prized donors. In the village of Rongena, the records show eight high net worth donors paid for the exact same schoolhouse. In Irkaat, seven major donors and foundations paid for the same three schoolhouses. The leaked documents also show the same $10,000 schoolhouse in Irkaat was also sold to other donors for 12,000, even 15,000 dollars. In Esinoni, it states another donor was charged 22,500 U.S. for a single schoolhouse. And then there are the comments in the margins, about how to handle those wealthy philanthropists who might be asking questions. Richard Branson's Virgin Atlantic wasn't a problem as "they have not asked us the status of the project." A California philanthropist, Gaby Ghorbani, was "tricky." So our project not yet built "will likely be something we have to commit to. Another wealthy family seemed easier to deal with as they "don't seem to be tracking items line for line." We showed those documents to Laurie Styron.

VIDEO CLIP:  [Kelley] How does it strike you when you see the comments in the margins talking about the donors?  This one's going to be asking questions.  That one doesn't ask questions, so we don't have to worry about that.

STYRON: There's a few choice words I have to --  It's incredibly condescending to say we're going to rely on the, you know, ignorance.  I don't mean that in a negative connotation. The average donor doesn't have a background to be able to root all of this out.

KELLEY: Yeah.  And I guess part of me is just surprised that they would put it in writing.

STYRON: Right.  They don't really have plausible deniability here. It's in writing.  I mean, it's in black and white.  It really isn't just a – just an error.  Right?  It's not just that they got in over their heads on one school.

KELLEY: Uh-huh.

STYRON: It looks to be an active strategy to raise a lot of money. And then they're relying on donors not asking questions in order to continue to operate this way.  And it's just -- it's just wrong.

393.    Mr. Kelley repeated, adopted and endorsed false and defamatory allegations that WE Charity had committed donor fraud and misappropriated funds. Mr. Kelley also misstated the contents of WE charity's communications with its donors.

KELLEY: … Over the years hundreds of schools were built.  Our investigation has revealed far more schools were funded than were actually built, leading to an inevitable question from the executive director of CharityWatch.

VIDEO CLIP:  [Styron] The logical question is:  Where's the money?  Where did the money go?

… even if it did go to good programmatic activities, charities still have an ethical obligation, in some cases a legal obligation, to carry out the specific programs that they promised the donor they would carry out with that donation.

KELLEY:  Days before this broadcast, another lawyer's letter from WE Charity. The charity has hired a forensic accountant to "review the flow of funds involved in it Kenyan projects."  The charity insists our research into donor funding is "flawed" saying donor claims social media are "inaccurate" and "imprecise" while offering no proof of that claim. The charity continues to claim donors are not told they are funding a schoolhouse.  "Donors are told that their donations will be pooled with others to do the most good in a given region or village." So how then to explain this?

VIDEO CLIP:  [C Kielburger] We are happy to announce, da-da-daaa!  We have Classroom Number 2.

[Males from MPCF] This shirt built a school in Africa.

KELLEY:  So was this a promise to kids or nothing more than a marketing strategy? If donors did not fully fund schools, why are there so many videos telling them their money would do just that?

VIDEO CLIP:  [Male] That $10,000 will fully construct a schoolhouse in Kenya to empower hundreds and hundreds of children.

[Female] 57 million children around the world dream of going to school.

132

KELLEY:  Videos produced by WE Charity itself and its major partners.

VIDEO CLIP:  [Female] $20 provides one brick.  500 bricks build a school.  Go to freethechildren.com/wecreatechange.

STYRON: Charities are really good at telling stories.  Any non-profit organization can point to a handful of good deeds that they've done, and donors need to be very careful to not be overly impressed by that.

KELLEY:  The public too, deserves answers, says Laurie Styron.

VIDEO CLIP:  [Styron] These are public resources.  Charities are subsidized by the rest of us.  They don't pay tax on their income.  They're here by our collective grace that they exist. Things get investigated when the public demands it.  If you want to know what happened to those schools, you want to know what happened to that money? Demand it.

KELLEY:  And that's precisely what Reed Cowan urged donors to do.

VIDEO CLIP:  [Cowan] I have a request for the rich, and the powerful and the well-connected, the celebrity and the corporate set who lent their power to the elevation of Free the Children and WE Charities.  I'm asking that you come out of hiding on this matter and go on the record, as I have had to do today.

[M Kielburger] We Day! [Cheering]

[Cowan] To all of the kids, I would say to them that they have every right to seek answers and transparency and accountability of Free the Children and WE Charities.

KELLEY:  Cowan demanded $20 million in damages from the charity in exchange for his silence on the issue of donor financing. The charity called his demands extortion. In 2020, WE Charity announced it was winding down its Canadian operations.  The consequences of COVID, political scandal, and dwindling donations. The charity recently sold its head office in Toronto.  It says it wants to concentrate its efforts on projects in Kenya, like building schoolhouses. So where does this leave Watson Jordan? He was told he paid for a schoolhouse in Irkaat and was sent this photo of School Number 4 in memory of his son.

VIDEO CLIP:  [Watson Jordan] At the end, you know, I've been deceived.  Lying to people who've lost children about doing

133

something good on their behalf, that doesn't seem like an awesome group of people to lie to.

KELLEY:  School Number 4 sits atop a hill in the village of Irkaat, fully funded by at least 4 other donors.  The question is: How many more people were sold a promise but whose schoolhouses were never built? It's a question we tried to answer.

394.    As of the date of this filing, the YouTube posting of the November Episode had approximately 802,000 views.

395.    The most popular comment on the YouTube posting of the November Episode with over one thousand likes reads, "As a Kenyan, it is so disheartening to learn that some people can exploit the poor and weak for their own greed.  Thankfully, everything done in darkness eventually comes to the light."

396.    On June 15, 2021 and November 1, 2021, CBC editor-in-chief Brodie Fenlon posted about CBC's decision to disable public commenting on content posted on social media, noting in the latter article that, "We hope to make online spaces safer by minimizing harassment and abuse of our story subjects, commenters."

397.    When sharing the November Episode on social media, the CBC disabled comments on Facebook.  However, the CBC did not follow its policy and did not disable public comments when it published the November Episode on YouTube.

398.    On February 2, 2022, WE Charity's counsel wrote to the CBC regarding its failure to follow its own policy:

On YouTube, however, comments are open and clearly unmoderated. **There are currently 4,095 comments, including the kinds of direct threats that led to the CBC's policy to turn off unmoderated comments:** e.g., "The WE guys should get the death penalty, the governor is clearly in on it!" and "They are- the scum of society that needs to be removed."

**Since Mr. Fenlon's November 1, 2021 statement, the CBC has disabled YouTube comments on stories that are critical of private citizens and organizations**, including its November 11, 2021 story, "Ontario school

134

with history of abuse linked to U.S.-based cult," its January 6, 2022 story, "He infiltrated a neo-Nazi hate group and knows how they recruit," and its January 13, 2022 story, "Kamloops residential school survivors recall students going missing, digging graves in orchard."

**We would like to understand why the CBC made the decision to turn YouTube comments on for its coverage of WE Charity.**

399.     On February 3, 2022, CBC counsel Ms. Germani replied "Received."  Yet, as of the date of this filing, over 4,100 comments were still live on YouTube.

## J.   The Podcast

400.     On November 24, 2021, the CBC published the Podcast on Apple podcasts, Spotify, and other podcasting services such as Stitcher, interviewing CBC reporter Mark Kelley about the CBC's recent coverage of WE Charity and his experience reporting on the matter.

401.     The Podcast was available for download in the United States.

402.     In the Podcast, the CBC falsely claimed that WE Charity told Canada's Parliament that it only funded 360 schoolrooms in Kenya.  The CBC further falsely claimed that WE Charity misled Parliament with regard to the 360 figure.  For example, Mark Kelley said:

> We wanted to put that number, 360 to the test. And we spent months doing this. Scouring the internet for anyone who publicly said they fully funded a primary schoolhouse in Kenya. So this could be social media posts, these could be websites that church groups had put up. So we got all the publicly available information and we gathered it. We created a spreadsheet for the 30 villages that WE Charities involved with in Kenya, and we started plotting in these schoolhouses that people said they funded for village after village after village.

403.     The CBC claimed that WE Charity misled donors about the number of schoolrooms it funded in Kenya:

> ANGELA STERRITT: As you compiled all this publicly available information, what did you find?
>
> MARK KELLEY: Well, when we looked at that number -- we started at that number, 360. That's the number that WE Charity had

135

given Parliament when they were asked how many schoolhouses had you built around the world. They said 360 in Kenya. It became clear to us that donors believed they fully funded more than 900 primary schoolhouses in Kenya. And remember, that doesn't account for donations that weren't made public. We were just going with publicly available information.

…

MARK KELLEY: Another thing that we found was interesting along the way, that you see pictures on websites, donor's websites, that would say here's the -- here's the schoolhouse in the village of, say, Pimbiniet, that our group has funded. Then we look on a different donor's website and say, here's the schoolhouse we funded in Pimbiniet. And then you compare the two pictures and lo and behold they're the same picture.  So clearly we were wondering, was there a pattern here at play? And with the more evidence we found, the more it appeared that, yes, indeed that was the case.

404.    Mr. Kelley claimed that WE Charity deceived donor Watson Jordan and purported to quote or paraphrase WE Charity's communications with Mr. Jordan:

So Watson did the very same thing, went out in his community, raised money, exceeded his goal once again, to build that schoolhouse and he was able to fund even more on top of that schoolhouse. And he was sent a picture. This is your schoolhouse, schoolhouse number four in the Village of Irkaat. And that was a point of pride for him because he saw his son. The memory of his son, was alive in that house.

405.    Mr. Kelley claimed that the CBC's reporters went to communities in Kenya and counted far fewer schools in those villages than the CBC contended donors had fully funded.

406.    Mr. Kelley repeated the CBC's false allegations regarding Rukshan de Silva and Iroquois Ridge High School, falsely claiming that WE Charity deceived these donors.

407.    Mr. Kelley claimed that the CBC collected voluminous evidence of WE Charity donors who were told they fully funded specific schoolhouses: "[W]e have speech after speech, video after video, website testimonial after website testimonial of people saying exactly opposite, that they were told they had funded a schoolhouse. They were provided a picture of that

136

schoolhouse. They were told the location of that schoolhouse."

408.     Mr. Kelley also claimed that even after WE Charity told the CBC that it had

funded 852 schoolrooms in Kenya, the charity conceded that it only funded 360 primary

schoolhouses, stating, "The number they provided had many, many other buildings thrown in,

but when it came down to the number of primary schoolhouses in Kenya, it was 360."

409.     Mr. Kelley mischaracterized WE Charity documents and misstated their contents,

claiming the CBC received,

> …internal spreadsheets from WE Charity that, you know, in
> essence had confirmed our spreadsheets. They leaked documents
> that would show the donations from some of the high net worth
> donors, the biggest prize donors, that would confirm donations
> from eight high net worth donors were applied to the exact same
> schoolhouse in one village.
>
> In another Village, seven major donors and foundations paid for
> the same three schoolhouses. And then you'd look at this sort of
> accordion of how much does a schoolhouse cost? Well, according
> to leaked documents, one donor was told it's ten thousand dollars
> for a schoolhouse, another one was told it was $12,000, another
> one was told it was $15,000. And then there was another striking
> thing, Angela. And this was the notes in the margins about how to
> handle the questions and concerns from donors, who want to
> follow up on their projects.  Richard Branson, you know, from
> Virgin Atlantic. We looked at him, he said he wasn't a problem.
> Says, they have not asked us the status of the project. And another
> family, a generous donation family, said they, quote, don't seem to
> be tracking items line for line.

410.     Mr. Kelley claimed the CBC was surprised and confused by its inability to access

schools in Kenya and omitted the material fact that the CBC had failed to receive government

permission to film:

> And as we found as we went from village to village that we would
> be there for a while, and some villages, we were told me couldn't
> come in, which we found to be kind of odd. Then we got this letter
> saying that because we had gone to some of these villages that we
> had been, quote, trespassing on – on government property, and that
> we'd been using false pretenses to gain access to these villages. So

this was -- these were criminal allegations that were there and coming to us, what they called criminal allegations, what we believed to be baseless that were provided in a letter sent to the CBC here in Toronto while we were over there. From the Ministry of the Interior suggesting that we had broken the law. And there was real concern that we could be arrested and could be detained. So we were given the advice to get back on the plane and come home and our fact finding mission to Kenya had ended abruptly.

### K. The Enquête Episode

411.    On January 27, 2022, WE Charity learned from public sources that the CBC, under its Radio-Canada brand, intended to publish the Enquête Episode.  The CBC had not informed WE Charity of its plans or asked for its comments.

412.    *Enquête* is the CBC's French-language equivalent of *The Fifth Estate* and, on information and belief, at times collaborates with *The Fifth Estate*'s reporters to co-produce episodes.  The show is anchored by Marie-Maude Denis and airs at 9pm Eastern on Thursdays on the CBC, which is referred to in French as Ici Radio-Canada Télé, and through other broadcasting and online streaming avenues.

413.    On information and belief, *Enquête*'s editorial team is independent of *The Fifth Estate*.

414.    At approximately 12:53pm EST on January 27, 2021, counsel for WE Charity wrote to the CBC's in-house counsel, Ms. Germani:

> I write in connection with the CBC's coverage of WE Charity and in reference to our prior correspondence. We understand that CBC-Radio Canada intends to broadcast tonight an episode of its television program, *Enquête*, in which the CBC will publish the false and defamatory allegations concerning WE Charity that it previously published on *The Fifth Estate* and elsewhere in November 2021.
>
> In its communications with the CBC and its reporters, WE Charity and its legal counsel has demonstrated to the CBC that its coverage of the charity was false and defamatory. The CBC has never provided any substantive response contending otherwise. ***We ask***

138

> *that you share the parties' correspondence and full documentary record with the Enquête editorial team to the extent you have not already done so.*
>
> The *Enquête* publication will expose a new audience to the CBC's false allegations and cause additional harm to WE Charity. As you are aware, such continued publication constitutes grounds for awarding WE Charity punitive damages.

415.    Ms. Germani responded only, "Received, thank you."

416.    The Enquête Episode aired in the Eastern time zone approximately eight hours later at 9pm EST.  The CBC subsequently published the Enquête Episode on YouTube as well.

417.    While most of the Enquête Episode was a French translation of the original November Episode, there were several important differences.

418.    The CBC began the broadcast with a short introduction by *Enquête*'s host, Ms. Denis, the English translation of which is:

> Narrator Marie-Maude Denis: [00:04] For months, you may remember, Justin Trudeau was caught up in the so-called WE Charity scandal, around an organization founded by the Kielburger brothers.
>
> Marc Kielburger: [00:14] We remain steady in our aims while the benefits of our organization are destroyed by a political war.
>
> Narrator: [00:22] Until 2020, WE Charity succeeded in galvanizing masses of people, especially the young, to raise funds intended in particular for building schools in Africa.
>
> Female celebrity: [00:32] [In English] WE Day, do you feel the power?
>
> Narrator: [00:36] But how many schools were funded, and by whom, exactly?
>
> Rukshan de Silva: [00:41] He showed me the new school that had been constructed with our donations. I was really proud to see what our four years of fundraising had produced. It was fantastic. [In English] It was incredible.
>
> Narrator: [00:52] Our CBC colleagues investigated on the ground in Kenya.

139

Reporter Mark Kelley: [00:57] [In English] School Number 4.

Narrator: [00:59] And what they discovered did not please WE Charity, which multiplied its attempts to put the brakes on their investigation.

John Njiru: [01:06] You must leave now because calls have been made. This isn't good at all.

Narrator: [01:12] I'm Marie-Maude Denis. Welcome to Enquête.

419.    Notably, the Enquête Episode removed content from the original November Episode. Without commercials, the YouTube video of the November Episode is 44:19 long; the equivalent YouTube video of the Enquête Episode is only 38:13 long.  Even accounting for Ms. Denis' introduction quoted in full above, which was not posted on YouTube, the *Enquête* team removed content from the November Episode.

420.    Among other changes, *Enquête*'s editors removed the following from *The Fifth Estate* team's November Episode:

a.   All instances of Mr. Kelley asking, "where did the money go?"

b.   All instances of Mr. Kelley saying, "All the money that was collected for this village doesn't add up."

c.   All references to WE Charity having "raised millions to build schoolhouses in Africa."

d.   Mr. Kelley summarizing a garbled confidential source's statement, saying, "You witnessed it. He said this was part of the business model. As he said, basically it was free money to the charity to sell the same school room over and over again."

e.   Mr. Kelley summarizing the alleged content of leaked WE Charity documents and stating, "I guess part of me is just surprised that they would put it in writing."

140

421.     Despite these edits, the Enquête Episode was false and defamatory for the reasons that such content in the original November Episode was false and defamatory, allegations of which are hereby incorporated by reference with respect to the same statements in the Enquête Episode.

422.     The Enquête Episode published the CBC's false and defamatory allegations concerning WE Charity to a new, French-speaking audience around the world.

423.     The following day, Craig Kielburger received a one-word email from a stranger: "Voleur."  *Voleur* is French for "thief."

## XI.     THE CBC PUBLISHED THE CORE ALLEGATIONS IN THE DEFAMATORY PUBLICATIONS WITH KNOWLEDGE OF OR IN RECKLESS DISREGARD OF THEIR FALSITY

424.     The Defamatory Publications contain multiple Core Allegations, each of which is false and defamatory on its own and collectively.

425.     Through the publication of the Defamatory Publications, the CBC made, endorsed, and adopted the following false and defamatory Core Allegations:

a.   CORE ALLEGATION:  WE Charity diverted funds donated for use in Kenya to other purposes.

- TRUTH:  WE Charity spent *more* money on charitable causes in Kenya than was donated specifically for that purpose.

b.   CORE ALLEGATION:  WE Charity's forensic auditor confirmed that the charity diverted $29 million raised for Kenya to use for Canada instead.

- TRUTH:  The auditor report said the opposite of what the CBC reported. The auditor's report confirmed that the $29 million was spent on medical supplies and other expenditures *for Kenya*.

c.   CORE ALLEGATION:  WE Charity said it funded *only 360* schoolrooms in Kenya.

- TRUTH:  WE Charity never said that.  It funded 852 schoolrooms in Kenya.

d.   CORE ALLEGATION:  WE Charity inflated its count of schoolrooms in Kenya by counting latrines as schoolrooms

- TRUTH:  WE Charity did not count latrines as schoolrooms.

e.   CORE ALLEGATION:  In each of six communities they visited in Kenya, CBC reporters found only small numbers of schoolrooms on the ground.

- TRUTH:  There are more schoolrooms in each of the communities than the CBC reported; the CBC reporters had maps and photos showing the location of each schoolroom.

f.   CORE ALLEGATION:  In public statements on social media, WE Charity donors said that they believed they fully funded over 900 primary schoolrooms in Kenya.

- TRUTH:  The CBC misrepresented the contents of social media postings and counted posts by donors who told the CBC they were wrong to include them in their count.

g.   CORE ALLEGATION:  WE Charity told two donors interviewed in the November Episode that they each fully funded a specific schoolhouse in Kenya but made the same representation to multiple other donors.

- TRUTH:  WE Charity did not tell the donors interviewed that they fully funded the schoolhouses identified by the CBC.

142

h.   CORE ALLEGATION:  Internal WE Charity documents leaked to the CBC

show that the charity double-funded projects and reneged on promises to build

infrastructure in Kenya when it believed that donors would not notice.

- TRUTH:  The document The CBC doctored quotes from the documents

about *scheduling* to make WE Charity appear as if it was considering

whether to build the structures at all. In fact, WE Charity built all of the

structures identified in the documents.

i.   CORE ALLEGATION:  WE Charity obstructed the CBC's investigation in

Kenya, preventing it from seeing the schools funded by WE Charity.

- TRUTH:  The CBC did not obtain the government permissions the CBC

knew it needed to visit schools. WE Charity had nothing to do with the

CBC's self-imposed difficulties.

j.   CORE ALLEGATION:  WE Charity had no response to most of the

allegations in the Defamatory Publications.

- TRUTH:  In violation of its own policies, the CBC refused to provide

WE Charity an opportunity to respond to many specific allegations.

426.   The CBC published these false allegations to third parties including through

online and over-the-air broadcast, online and email publication, social media, and direct

communication with individual donors in locations including North Carolina and a representative

of a charity watchdog organization in Chicago, Illinois.

427.   As explained below, the evidence demonstrates that when the CBC published the

Core Allegations, it did so with actual knowledge of their falsity or, at a minimum, with reckless

disregard for whether the statements were false.

A. **The CBC Falsely Accused WE Charity of Defrauding Its Donors by Diverting Funds Donated for Use in Kenya.**

   i. The CBC Intended to Tell Its Audience That WE Charity Defrauded Donors by Diverting Funds Donated for Kenya

428.    Throughout the Defamatory Publications, the CBC intentionally alleged, expressly and implicitly, that WE Charity defrauded its donors by diverting funds donated for use in Kenya to other purposes instead.

429.    The November Episode, for example, begins with accusations of fraud.  Cutting from Mr. Cowan saying "fraud," Mark Kelley's voiceover says, "WE Charity raised millions to build schoolhouses in Africa, so we went to Kenya to see how many were actually built."  It shows Mr. Kelley standing in front of a close-cropped shot of a few school buildings as he shakes his head and says, "All the money that was collected for this village doesn't add up," then cut to a woman asking, "The logical question is: Where's the money? Where did the money go?" Reinforcing the criminal nature of the CBC's accusation, the intro then cuts to Mr. Kelley standing on a dark street corner, hunched over a cellphone saying, "Why are you concerned about protecting your identity? What are you afraid of?"

430.    The CBC captured its allegation in an obviously rhetorical question as Mr. Kelley says, "I'm here in Kenya, a country of natural beauty, but plagued by crushing poverty. Canada's WE Charity raised millions in donations to help people in this country. ***But where did all that money go?***"

431.    The gist is clear: WE Charity accepted millions of dollars of donations given to help people in Kenya, but the money is gone; WE Charity defrauded its donors.

432.    CBC's other Defamatory Publications likewise accused WE Charity of misappropriating donor funds intended to help alleviate poverty in Kenya.  For example, the Article begins:

Marc and Craig Kielburger's WE Charity routinely misled school-aged children and wealthy philanthropists across North America for years as it solicited millions for schoolhouses in Kenya and other projects in its Adopt-A-Village program, an investigation by CBC's The Fifth Estate has found.

Slick marketing videos, congratulatory social media posts and crowdfunding websites across the internet tell the story of two brothers on a mission to change the world, but under closer scrutiny those digital crumbs lead down a trail of contradictions and deception.

433.    During the November Episode, the CBC's Mark Kelley asked the governor of Narok County, Kenya—where most of WE Charity's Kenyan projects are located—the following question: "Your excellency, what would you say if more money was raised for Kenya and Narok County than was actually spent in Narok county?"  The factual statement embedded in this question is clear: WE Charity has been misappropriating money intended for Kenya.

434.    In part of his interview with Governor Tunai that the CBC omitted from the November Episode, Mr. Kelley was even more overt in conceding that the thrust of the CBC's reporting was to show that WE Charity defrauded its donors by diverting funds from Kenya.  Mr. Kelley said to Governor Tunai:

Your Excellency, Canadian donors, Canadian citizens recognize the needs that there are in Kenya. They have been very generous with donating money to the WE Charity. What would you say, and I'm asking you just to think about this for a second, if more money was raised for Kenya and Narok County than was actually spent in Narok County, what would you say in that situation if more money was given to Kenya to be spent in Kenya than was actually spent in Kenya? ... Because that's what we're looking at, the money that has been raised to spend on classrooms, on very important needs in Narok County, and to see if the money that Canadians have given has actually been spent in your county on the very, very important needs that you have here.

435.    Even the initial promotion for the November Episode was phrased to indicate to readers that WE Charity had misappropriated donor funds.  The Website Postings read, "The

Fifth Estate compiled its own list of money raised and travelled to Kenya to see first-hand if it matches the number of schools actually built."  The First Promo read, "Millions were raised for kids in Kenya.  All the money that was collected for this village.  It doesn't add up." The Tweet read, "WE Charity told a parliamentary committee it had built hundreds of schools in Kenya with donors' money. The Fifth Estate traveled to Kenya to see first-hand if the money raised built actual schools."

436.     The CBC knew and intended to convey to its audience the false allegation that WE Charity diverted money from Kenya.  As WE Charity's counsel told the CBC on September 10, 2021, the CBC's "that WE Charity received more donor dollars earmarked for Kenya than it spent there constitutes an overt allegation that the charity misallocated or misappropriated donor funds."  He explained, "CBC accused WE Charity of fraud."

437.     In its response letter on September 14, 2021, the CBC did not disagree that it had accused WE Charity of fraud.  The response simply stated, "I've received your letter and have shared it with the journalists and their supervisors. As I've reassured you before, the team conducting the investigation is adhering to the law and to the relevant journalistic standards and practices."

     ii.   The CBC Knew That It Was False to Report that WE Charity Diverted Funds Donated for Use in Kenya to Other Purposes

438.     The CBC knew or was reckless in not knowing that it was false for it to report that WE Charity diverted funds donated for use in Kenya to other purposes.

439.     WE Charity explained to the CBC on September 10, 2021:

> We are aware of no factual basis CBC could have for its claim that there is a discrepancy between donations to Kenya compared with WE Charity's expenditures in that country. There is nothing in WE's financial reports that could support such a claim. And if CBC is conflating structures with expenditures, it has lost sight of the significant portion of WE Charity's budget in Kenya that pays

for goods and services other than empty buildings.

440.    As set forth in detail elsewhere in this Complaint, the CBC refused to verify its reporting with WE Charity, including any basis to allege that WE Charity diverted funds donated for Kenya.

441.    The CBC was especially secretive with regard to allegations of a financial nature, refusing to verify its reporting with WE Charity and reneging on a promised interview on financial topics with Ms. Wiszowaty.

442.    The CBC knew that WE Charity has received 25 years of unqualified audits.

443.    The CBC furthermore knew that WE Charity had engaged the CBC's own preferred forensic auditor and had agreed (before seeing the results) to provide the result of his work to the CBC.  As WE Charity's counsel explained to the CBC in a November 10, 2021 letter:

> WE Charity engaged Ken Froese, a leading forensic accountant, to review the flow of funds involved in its Kenyan projects. It is difficult to see how The Fifth can dispute the relevance or importance of Mr. Froese's work – after WE had engaged him, Mr. Cashore contacted Mr. Froese to see whether he would be able to help verify the allegations CBC intended to make. Following Mr. Froese's discussions with Mr. Cashore, our client approved a change in scope of his review to address Mr. Cashore's apparent concerns in reliance on Mr. Cashore's representation that he would consider results he knew to be a month or two away, for an episode he said had "no firm date set." How can Mr. Cashore now deny that it is vital to wait for Mr. Froese to complete the work he is now doing, and which he will share with CBC?

444.    WE Charity's counsel also explained and offered to the CBC in his November 10, 2021 letter, "WE could better target Mr. Froese's investigation towards specific facts CBC seeks to understand if it shares with our client the allegations it plans to report."  But the CBC refused to share its allegations with WE Charity in a deliberate effort to avoid the truth.

445.    As set forth in detail elsewhere in this Complaint, prior to publication of the

Defamatory Publications, WE Charity provided the CBC with Mr. Froese's preliminary forensic audit report confirming that WE Charity had spent more money on Kenya than the funds that had been specifically donated for use in Kenya.  There could therefore be no factual basis for the CBC to contend, as it did in the Defamatory Publications, that WE Charity defrauded donors by diverting funds donated for Kenya.  The CBC knew its allegations were false and published them with knowledge of their falsity.

      iii.   <u>The CBC Reported that WE Charity Hired a Forensic Auditor but Misleadingly Omitted the Content of His Report to Falsely Indicate That WE Charity Saw Merit in the CBC's Claims</u>

446.    In the Defamatory Publications other than the Article, the CBC indicated that even WE Charity could not explain where the money it raised for Kenya went, stating at the end of the November Episode: "The charity has hired a forensic accountant to 'review the flow of funds involved in it Kenyan projects.'"

447.    The CBC misled its audience, however, by omitting from those publications the fact that Mr. Froese had confirmed that the funds donated for Kenya were used in Kenya.  The CBC did not tell its audience about evidence that contradicted its defamatory narrative.  This material omission misled viewers.

448.    Instead, the CBC falsely claimed WE Charity had *questions* when in fact it had provided the CBC with *answers*. The CBC left its audience believing that WE Charity's hiring of Mr. Froese validated the CBC's concerns when it knew this was the opposite of the truth.

**B.  The CBC Falsely Reported That WE Charity's Own Forensic Auditor Confirmed That WE Charity Diverted $29 Million Raised for Kenya to Use for Canada Instead**

449.    In the Article, the CBC stated, directly and indirectly, the false factual assertion that WE Charity's own forensic auditor confirmed that WE Charity diverted funds intended for Kenya.

450.     The CBC's false reporting on the contents of Mr. Froese's reports was defamatory because it accused WE Charity of defrauding donors and depriving children in Kenya of charitable funds.

451.     WE Charity provided the CBC with a preliminary forensic audit report signed by Kenneth Froese, Senior Managing Director of Froese Forensic Partners which stated the exact opposite.  The report concluded, "We conclude that, over the period of review, WE Canada reported more funds spent on Kenya projects and related administrative costs than it received in contributions designated, including funds received from WE Charity USA."  The audit report further concluded,

> We reviewed the overall funds designated to projects in Kenya over the period from April 1, 2012 to August 31, 2020 (to align with WE Canada fiscal periods). Designated donor funds, donations in kind, funds from WE Charity USA, and private and government grants totaled approximately $74.0 million. ***Costs recorded for projects in Kenya were $54.8 million and costs recorded in WE Canada, including payments to third party suppliers to support Kenyan operations and a share of administrative costs, were $29.0 million, for total costs of $83.8 million, or $9.8 million more than designated contributions***.

452.     The report explains that the referenced "costs recorded in Canada" were for the direct benefit of Kenya, such as purchasing medical supplies in Canada to send to Kenya. Mr. Froese's report states that WE Charity's Canadian entity "recorded three streams of expenditures related to WE Kenya (operating in Kenya as Free the Children and WE Education for Children Limited):

> 1.  Wire transfers and funds advanced directly from WE Canada to WE Kenya;
>
> 2.  Funds advanced by WE Canada to third parties for goods and services provided for the benefit of WE Kenya and donated goods and services contributed directly by third parties for the benefit of WE Kenya; and

3.   Costs incurred in WE Canada for the benefit of WE Kenya.

453.     The CBC knew that the Froese Forensic audit report contradicted its preconceived narrative planned for the Defamatory Publications and deliberately misquoted the report in the Article to say the *opposite* of what it in fact concluded.

454.     The CBC reported that Mr. Froese found that WE Charity spent a large portion of the money it raised for Kenya to benefit Canada instead.  This was the opposite of the truth.

455.     Specifically, the CBC wrote in the Article:

> The preliminary findings said in part that all donations to Kenya between April 1, 2012, and August 31, 2020, total $74 million. At the same time, costs for projects in Kenya were $54.8 million, while ***costs for WE Canada, including administration, were $29 million***. The total costs were "$83.8 million or $9.8 million more" than donations designated for Kenya.

456.     Thus, the CBC reported that $29 million that the audit report concluded was spent in Canada *for Kenya* was instead spent *for Canada*.  This meant that $29 million donated for Kenya was not spent on Kenya, which the CBC knew was not true.

457.     As the CBC intended, the public understood its false description of Mr. Froese's report to confirm the CBC's allegations of financial wrongdoing.  For example, in a posting responding to Ms. McKenna's link to the Article, one Twitter user wrote, "Those are some outrageous administrative costs (in the last paragraph)!"  Another user responded, "Yes, it seems that the Kielburger brothers required a considerable amount of money to maintain and sustain their 'comfortable' lifestyles…"

458.     After the Article was published with the false description of the audit report on the morning of November 18, 2021, Ms. Wiszowaty contacted Mr. Cashore, Mr. Kelley, and Ms. Swain at the CBC at 9:54am in an email with the subject "Urgent Correction Needed."  Ms. Wiszowaty referenced the portion of the Article that references Mr. Froese's report and said:

This is wrong and misstates the content of Ken Froese's preliminary report. Your story incorrectly tells readers that a significant amount of funds donated for Kenya were spent on Canada instead. The $29 million referenced in your article was not spent on WE Canada, as you reported. It was spent on Kenya.

You may attribute the following statement to Ken Froese: *"WE's audit report states that WE Canada spent $83.8m on Kenya, including $29m spent by WE Canada on Kenyan costs."*

459. At 12:12pm, Ms. Swain responded,

Hello Robin,

Thank you for your email drawing attention to a line in the online story published today, that concerns you.

I've reviewed the paragraph, and I'm confident that we make appropriate reference to Kenya. In fact, the story as a whole is about money raised for and spent in Kenya. The country is referenced in each of the three lines in the paragraph you cited.

Diana.

460. Ms. Wiszowaty quickly called out Ms. Swain's non-answer:

Thank you for your quick reply Diana. The problem is not that CBC did not reference Kenya enough; the problem with CBC's reporting is that it described the audit report as saying the inverse of its actual contents. ***Ken Froese confirmed with us that he believes CBC's description of his report is inaccurate***.

The audit report states: "We reviewed the overall funds designated to projects in Kenya over the period from April 1, 2012 to August 31, 2020 (to align with WE Canada fiscal periods)…Costs recorded for projects in Kenya were $54.8 million and **costs recorded in WE Canada, including payments to third party suppliers to support Kenyan operations and a share of administrative costs, were $29.0 million**, for total costs of $83.8 million, or $9.8 million more than designated contributions."

The CBC reported, "costs for projects in Kenya were $54.8 million, while **costs for WE Canada, including administration, were $29 million**." A reasonable reader will understand this to mean that the $29 million referenced was spent in Canada for Canada. That is wrong.

As the report states, the $29 million was spent on "payments to third party suppliers to support Kenyan operations and a share of

administration costs," i.e., the share of such administration costs properly apportioned to Kenyan operations. These are expenditures for costs in Kenya recorded on WE's Canadian books for the reasons stated in the report. They are not "costs for WE Canada", as the CBC wrote.

It is important for CBC and your readers to know that WE Charity Canada directly supports Kenyan projects by paying substantial things such as: Kenyan building contractors and medical equipment and supplies that are shipped to Kenya, etc. The $29 million Ken Froese references was not spent on costs for Canada.

(emphasis in original)

461. Neither Ms. Swain nor anyone else at the CBC responded to WE Charity.

462. The Article was updated on November 21, 2021, but the CBC did not correct the false reporting on Mr. Froese's report.

463. As of the date of filing, the Article still falsely claims that WE Charity spent $29 million intended for Kenya on costs for Canada instead.

**C. The CBC Falsely Claimed That WE Charity's Own Count Showed That It Funded Only 360 Schoolrooms in Kenya When the CBC Knew the Correct Figure Was 852**

464. The CBC based its false claims that WE Charity built too few schools on its assertion that WE Charity *itself said* it built a total of 360 schoolrooms in Kenya. This was false. In fact, WE Charity told the CBC, Parliament, and the public that it built 852 schoolrooms in Kenya.

465. Examples of the CBC's false statements include, but are not limited to, the following:

a. "WE Charity said it had built 360 primary schoolhouses. The Fifth Estate decided to put that number, 360, to the test." Exhibit D.

b. "the 360 schoolhouses the charity said it has built." *Id*.

c. "Rural Kenya has long been the focus of Canada's WE Charity. It says it's

152

built 360 primary school houses here with donors' money." *Id.*

d.  "the charity's own count confirms the number of primary schoolhouses built in Kenya, 360." *Id.*

e.  "WE records show only 360 have actually been built since its work began in 2003". Exhibit A.

466.  The only source the CBC cites as its basis for claiming that WE Charity itself claims to have built only 360 schools is a submission WE Charity made to a parliamentary committee in April 2021.

467.  CBC knew that WE Charity's April 2021 submission expressly stated multiple times that the figures within were "***not exhaustive***."  The submission stated that its purpose was to provide "an overview of the breadth and depth of WE Charity's school and school room construction globally over the last 25 years."  It continued, "[t]his photo list is ***not exhaustive but provides hundreds of sample programs***."  The submission further stated, "***For the sake of clarity, this list and document is not exhaustive***."

468.  It was therefore false for the CBC to claim that WE Charity had at any time stated that it only built 360 schoolrooms in Kenya when it knew that the April 2021 submission was not an exhaustive count of WE-funded schoolrooms in Kenya.

469.  Indeed, one of the *only* allegations the CBC verified with WE Charity prior to publishing the Defamatory Publications was its assertion that WE Charity had built only 360 schools in Kenya.  WE Charity told the CBC *every time* that it was wrong to present this figure as a comprehensive count of all of WE's schoolrooms in Kenya.

470.  CBC knew many months prior to its publication of the Defamatory Publications that WE Charity had in fact built and renovated substantially more than 360 schoolrooms in

153

Kenya.  On August 16, 2021, WE Charity explained to Mr. Cashore and *The Fifth Estate*'s

executive producer, Diana Swain, that "The total number of schools or school rooms built and

renovated by WE Charity in Kenya is 852" and directed the CBC to information posted online

containing photos of every single schoolroom and information about the villages in which they

located.

471.    The organization further informed the CBC that "Parliament is aware of all of

these facts, and they received the information that WE Charity has now posted online."  This

count of 852 schoolrooms is the only comprehensive accounting of schoolrooms in Kenya that

WE Charity provided to Parliament.

472.    WE Charity implored the CBC to stop misinforming sources with an incorrect

school count and to tell WE Charity if it disagreed that 852 is correct.  The CBC never provided

the charity any basis for disagreeing with WE Charity's 852 count.

473.    By sourcing its incorrect figure of "360" to WE Charity, the CBC knowingly

misquoted and misattributed statements to WE Charity to provide its statements in the

Defamatory Publications with a false appearance of credibility.  The CBC falsely claimed that

WE Charity *agreed* with the allegation that it only funded 360 schoolrooms.

474.    The CBC knew this was false and misleading.  To ensure viewers did not know

the truth, the CBC edited Mr. Kelley's interview with Ms. Moraa to exclude where she points out

during the interview that WE Charity's April submission to Parliament said that any counts were

"not exhaustive."   In the broadcast edit, the CBC instead cut to Ms. Moraa's next sentence in the

interview to avoid this crucial fact.  This editing demonstrates that the CBC knew it was false for

it to report that WE Charity itself said it only built 360 schools in Kenya.

475.    The CBC also misled its audience by selectively showing parts of WE Charity's

April 2021 parliamentary submission.  In the November Episode, the CBC showed an excerpt of WE Charity's April 2021 submission to Parliament showing the figure "360" but excluded all of the places in the document stating that the figure is expressly not an exhaustive count of WE's schoolrooms in Kenya.  Instead, the CBC presented the figure as exactly what it knew it was *not*: "the charity's own count" of all of its schoolrooms in Kenya.

476.    And the CBC did not stop there.  In the Podcast, Mr. Kelley falsely claimed that *even after* WE Charity told the CBC that it had funded 852 schoolrooms in Kenya, the charity conceded that it only built 360 primary schoolhouses, stating, "The number they provided had many, many other buildings thrown in, but when it came down to the number of primary schoolhouses in Kenya, it was 360."   The CBC simply made this up.  The CBC knew it was wrong or, at a minimum, was reckless in not knowing of its falsity.

**D.  The CBC Falsely Claimed That WE Charity "Inflated" Its School Count by Counting Latrines as Schoolrooms**

477.    Email correspondence shows that from the outset of its reporting, WE Charity consistently told the CBC that it funded 852 schoolrooms in Kenya.  Because WE Charity's figure did not fit the CBC's narrative that the charity was "missing" schools, the CBC falsely claimed that WE Charity counted latrines as schools to discredit WE Charity's figures.

478.     Multiple emails with the CBC's reporters show they knew that was not true. WE even gave the CBC photographs of every one of the 852 schoolrooms—none were latrines.

479.    In an email from Ms. Wiszowaty to Mr. Cashore on September 11, 2021, WE Charity provided the CBC with maps of the schoolrooms it built and renovated in Kenya.  In that email, Ms. Wiszowaty wrote,

> I am attaching a collection of maps our team prepared of all the WE Villages communities that are on our updated website. They show all the educational structures (***Totals are at the bottom right-hand corner, plus latrines which are <u>not</u> included in any school***

*counts*.). I hope they are helpful. As always, if you have any
questions, don't hesitate to ask.

480.     The fact that WE Charity had not counted latrines as schoolrooms could be

further verified by simply counting structures on the maps the charity provided to the CBC or by

counting photographs of schoolrooms that were all plainly not latrines.

481.     Despite this clear statement and evidence that latrines were not included in the

count of 852 schoolrooms, CBC's Mark Kelley asked Ms. Moraa during her September

interview if WE Charity's count of 852 schools included latrines, asking, "so that doesn't include

latrines?" to which Ms. Moraa responded, "no."

482.     WE Charity was concerned that Mr. Kelley said during Ms. Moraa's interview

that he believed WE Charity's count of 852 schools included latrines.  As a result, Ms. Moraa

wrote to Mr. Cashore and Mr. Kelley on September 22, 2021, and explained, "***Please note that***

***latrines, for example, are not included in these numbers*** (you had shared you were unsure of

that in our interview and I want to be clear on this fact)."

483.     CBC did not let facts get in the way of its reporting.  CBC's Mark Kelley said on

*The Current* on November 18, 2021 that WE Charity's count of 852 schoolrooms was inflated

because it "***included latrines*** that the kids were – were using at school and it was this largely-

inflated number that already got us a little curious of why this number had suddenly, once we

started counting, that number grew."

484.     After *The Current* aired, at 1:51pm EST on November 18, 2021, Ms. Wiszowaty

wrote to Mr. Cashore, Mr. Kelley, and Ms. Swain:

> ***During the interview on The Current Mark said that we included***
> ***latrines in the counting of the structures. We have made it clear***
> ***in all of our communications with you that is not the case and***
> ***Carol further confirmed that with you when you met in Kenya.*** If
> that is mentioned in the broadcast we ask that you please remove
> it.

485.     Remarkably, however, that evening during the November Episode, ***the CBC edited its interview of Ms. Moraa to remove Ms. Moraa's statement that latrines were not counted***.  Instead, in its broadcast edit of the interview, after Ms. Moraa says WE's count is 852, the CBC cuts to a voiceover saying this figure included "***even latrines, which inflated the total count***."

486.     The CBC's false claim that WE Charity counted schoolrooms as latrines was defamatory because it described WE Charity as engaging in fraudulent and deceptive conduct. The CBC furthermore undermined the charity's credibility and bolstered its own false claim that WE Charity had built far fewer schools than was in fact true.

487.     The CBC could have no conceivable basis for contending that it thought WE Charity counted latrines as schoolrooms.  It knew this allegation was false.

### E.   The CBC Falsely Underreported the Number of Schoolrooms in Each of Six Kenyan Communities That Its Reporters Visited

488.     In the November Episode, the CBC's reporters visited the Kenyan communities of Pimbiniet, Irkaat, Rongena, Sikirar, Eor Ewuaso and Mwangaza.

489.     In each of these communities, the CBC claimed that it counted far fewer schoolrooms[11] on the ground than WE Charity received donations to fully fund.  These statements were defamatory because: (1) they accused WE Charity of deceiving and defrauding its donors, and (2) they accused WE Charity of diverting resources away from charitable uses in Kenya.

490.     The CBC knew that the number of schoolrooms it claimed to find on the ground

---

[11]   In the Defamatory publications, the CBC uses the terms "school room," "schoolhouse," and "school" interchangeably.  As discussed above, WE Charity generally uses the term "schoolroom."  The CBC provided no basis in its coverage or communications with WE Charity to suggest that it views the terms differently.

in each of these communities was incorrect.

491.    As stated above, in August 2021, WE Charity provided the CBC with photos of each of the 852 schoolrooms WE Charity funded in each of 30 communities in Kenya. Ms. Wiszowaty then emailed maps of these communities to Mr. Cashore on September 11, 2021 while the CBC journalists were in Kenya. In that email, Ms. Wiszowaty wrote,

> I am attaching a collection of maps our team prepared of all the WE Villages communities that are on our updated website. They show all the educational structures (Totals are at the bottom right-hand corner, plus latrines which are not included in any school counts.). I hope they are helpful. As always, if you have any questions, don't hesitate to ask.

492.    The CBC did not tell its viewers that WE Charity provided it with photos and maps identifying all 852 schoolrooms in 30 communities and did not include WE Charity's per-community counts in its coverage.

493.    The CBC chose not to verify with WE Charity the CBC's count of schoolrooms it found on the ground in an effort to purposefully avoid the truth.  The CBC knew that had it engaged with WE Charity, the organization would demonstrate to the CBC that its reporters had not counted all of the schoolrooms that WE Charity funded in each of the communities that the reporters visited.

494.    For the reasons stated elsewhere in this Complaint, the CBC knew or was reckless in not knowing that the number of schoolrooms the CBC contended donors had publicly stated they fully funded in each Kenyan community was wrong.

    i.    <u>The CBC Misrepresented the Number of Schoolrooms in Pimbiniet</u>

In the November Episode, the CBC falsely stated, "In Pimbiniet, we counted 20 schoolhouses.  Our spreadsheet shows WE Charity had received donations to fully fund 48."  The following graphic illustration of this alleged discrepancy appeared on-screen:



495.    In fact, WE Charity has funded the construction or renovation of 56 schoolrooms

in Pimbiniet and provided the CBC with the following map of its schoolrooms in the region (As

the CBC knew, government construction and latrines are not counted in totals):



496.    The CBC knew it was false to claim that it found only 20 schoolrooms in

159

Pimbiniet.  Prior to the publication of the Defamatory Publications, WE Charity provided the

CBC with photographs of each of the 56 schoolrooms that WE Charity funded in Pimbiniet and

gave the CBC a map of the region showing the location of each schoolroom in Pimbiniet.

    ii.  <u>The CBC Misrepresented the Number of Schoolrooms in Irkaat</u>



    498.   In fact, WE Charity has funded the construction or renovation of 66 schoolrooms

in Irkaat and provided the CBC with the following map of its schoolrooms in the region:



499.    The CBC knew it was false to claim that it found only 28 schoolrooms in Irkaat. Prior to the publication of the Defamatory Publications, WE Charity provided the CBC with photographs of each of the 66 schoolrooms that WE Charity funded in Irkaat and gave the CBC a map of the region showing the location of each schoolroom in Irkaat.

   iii. <u>The CBC Misrepresented the Number of Schoolrooms in Rongena</u>

500.    In the November Episode, while in the community of Rongena, Kenya, the CBC's Mark Kelley stated, "our research revealed donors were told they had fully funded 55 schoolhouses here.  In fact, there were only 12 schoolhouses and a library."

501.    In fact, WE Charity has funded the construction or renovation of 23 schoolrooms in Rongena including two libraries: one at the primary school and one at the community's secondary school.

161

502.    The CBC knew it was false to claim that it found only 12 schoolrooms and one library in Rongena.  Prior to the publication of the Defamatory Publications, WE Charity provided the CBC with photographs of each of the 66 schoolrooms that WE Charity funded in Rongena and gave the CBC a map of the region showing the location of each schoolroom in Rongena.

      iv.    <u>The CBC Misrepresented the Number of Schoolrooms in Sikirar</u>

503.    In the November Episode, after falsely stating that it counted far fewer schools in Pimbiniet than the CBC's research showed "WE Charity received donations to fully fund," Mr. Kelley continues, "And on it went, using our spreadsheet count to compare with WE Charity's count in village after village."



505.    In fact, WE Charity has funded the construction or renovation of 24 schoolrooms in Sikirar and provided the CBC with the following map of its schoolrooms in the region:

162



506.   The CBC knew it was false to claim that it found only 8 schoolrooms in Sikirar.

Prior to the publication of the Defamatory Publications, WE Charity provided the CBC with

photographs of each of the 24 schoolrooms that WE Charity funded in Sikirar and gave the CBC

a map of the region showing the location of each schoolroom in Sikirar.

v.   <u>The CBC Misrepresented the Number of Schoolrooms in Eor Ewuaso</u>

In the November Episode, the CBC showed a graphic on screen labeled "Eor
Ewuaso," which is the name of a community in Kenya.  The graphic said, "63
schoolhouses funded" and "13 built," with an image of 63 schoolhouse
outlines in which only 13 were shaded in.



507.    In fact, WE Charity has funded the construction or renovation of 34 schoolrooms

in Eor Ewuaso and provided the CBC with the following map of its schoolrooms in the region:



508.    The CBC knew it was false to claim that it found only 13 schoolrooms in Eor

164

Ewuaso.  Prior to the publication of the Defamatory Publications, WE Charity provided the CBC

with photographs of each of the 34 schoolrooms that WE Charity funded in Eor Ewuaso and

gave the CBC a map of the region showing the location of each schoolroom in Eor Ewuaso.

      vi.  <u>The CBC Misrepresented the Number of Schoolrooms in Mwangaza</u>



    510.    In fact, WE Charity has funded the construction or renovation of 32 schoolrooms

in Mwangaza and provided the CBC with the following map of its schoolrooms in the region:



511.    The CBC knew it was false to claim that it found only 13 schoolrooms in

Mwangaza.  Prior to the publication of the Defamatory Publications, WE Charity provided the

CBC with photographs of each of the 32 schoolrooms that WE Charity funded in Mwangaza and

gave the CBC a map of the region showing the location of each schoolroom in Mwangaza.

vii.    The CBC Fabricated a WE Charity Response to the CBC's Counts of Schoolrooms
        in Kenyan Communities

512.    In the November Episode, after stating that the CBC found "in village after

village" that there were far fewer schoolrooms on the ground than donors publicly said they fully

funded, Mr. Kelley asked, "So were all donors told their money would be pooled with others to

build other projects as Carol Moraa had told us?"

513.    The CBC thereby falsely stated that it had presented its count of schoolrooms in

Pimbinet to WE Charity, WE Charity had confirmed the CBC's count, and WE Charity's Carol

166

Moraa had explained that funds donated for schoolrooms in Pimbiniet had been used to "build other projects."

514.    As the CBC knew, none of this was true.

515.    The CBC knew that WE Charity did not confirm its counts and in fact had provided the CBC with substantially higher counts of its schoolroom construction in each community.  And the CBC knew that it never presented its counts of schools to Ms. Moraa, much less received the response the CBC falsely reported.

516.    The CBC misled viewers by presenting a false WE Charity response to its counts of schools instead of reporting the truth: WE Charity told the CBC the correct counts for each community and gave the CBC photos of each schoolroom and maps showing where to find them.

**F.  The CBC Misrepresented WE Charity's Donors as Publicly Stating That They "Fully Funded" Over 900 Primary Schools in Kenya**

517.    In the Defamatory Publications, the CBC claimed that WE Charity's donors publicly stated they "fully funded" over 900 primary schoolrooms in Kenya.

518.    For example, in the November Episode, the CBC said,

> *[W]e scoured the internet for anybody who had publicly said they had fully funded a primary schoolhouse in Kenya.* We searched social media posts, we found old websites, and created spreadsheets for 30 villages they were involved with in Kenya. *It became clear donors believed they had fully funded more than 900 primary schoolhouses in Kenya*, far higher than the 360 schoolhouses the charity said it has built.

519.    In the Podcast, the CBC stated, "It became clear to us that donors believed they had fully funded more than 900 primary schoolhouses in Kenya," and "I understand you actually went to Kenya to try to square the numbers, the 360 primary schools, that WE Charity told Parliament about, and the more than 900 primary schools that you found people believed they had fully funded."

520.    In the Newsletter, the CBC stated, "According to our records, donors had raised money to fully fund more than 900 one-room schoolhouses in Kenya. That was far more than the number WE Charity had provided to Parliament of 360 schoolhouses."

521.    In the Article, the CBC stated, "Such activities were common practice and part of a multi-faceted strategy that brought in funding for more than 900 primary schoolhouses in Kenya, where WE records show only 360 have actually been built since its work began in 2003."

522.    These statements were defamatory because they meant that WE Charity led donors to believe that their donations had "fully funded" at least 540 more schoolrooms in Kenya than the CBC claimed WE Charity actually funded.  The statements accused WE Charity of deceiving and defrauding its donors by not building the schoolrooms the donors believed they fully funded and/or by using multiple donors' funds to build structures.  The statements also meant that WE Charity had deprived children in Kenya of schoolrooms that its donors stated they believed they fully funded.

i.    The CBC Knew from Prior Experience That It Would be Reckless at Best to Rely on Online Postings to Accuse WE Charity of Double-Funding Projects in Kenya

523.    During the November Episode, the CBC described the methodology it employed to arrive at its conclusion that WE's donors publicly stated that they fully funded over 900 schools in Kenya.  The CBC said:

> [W]e scoured the internet for anybody who had publicly said they had fully funded a primary schoolhouse in Kenya. We searched social media posts, we found old websites, and created spreadsheets for 30 villages they were involved with in Kenya. It became clear donors believed they had fully funded more than 900 primary schoolhouses in Kenya, far higher than the 360 schoolhouses the charity said it has built.

524.    The CBC knew from its prior reporting on WE Charity that social media posts regarding donations to WE Charity were—at best—a reckless basis for alleging that donors

believed they alone fully funded structures in Kenya.

525.    The CBC knew that with respect to its prior reporting on WE Charity, donors whom the CBC had reported were deceived had told the CBC that its reporters' characterization of online postings were incorrect, and that they were not deceived.

526.    The CBC furthermore knew that its reporters had previously attempted to misrepresent the contents of WE Charity communications with donors to falsely allege that donors were deceived by the charity.

527.    Given this background, the CBC at best recklessly disregarded the truth by relying on social media posts as the basis for *again* alleging that WE Charity's donors believed they fully funded particular school structures in Kenya.  The CBC knew this was a recipe for false reporting and proceeded anyhow.

ii.    <u>The CBC Knew That Social Media Postings Were Inherently Unreliable and Easily Misinterpreted but Refused to Verify Its Allegations with WE Charity</u>

528.    Prior to publication of the Defamatory Publications, WE Charity repeatedly asked the CBC to verify with WE Charity its assertions regarding how many schoolrooms donors publicly stated they had fully funded in Kenya.

529.    WE Charity explained to the CBC the many obvious flaws in its approach, including, for example, in a November 10, 2021 letter to the CBC from WE Charity's legal counsel:

> Communication on social media is often written quickly and in short form. For this reason, it is replete with inaccurate statements, or statements which are imprecise…
>
> WE is in a position to provide context for statements by donors critical to understanding what can be taken from individual messages. To offer some examples:
>
> (i)    Some donors have described online their plans to donate to WE Charity, but in the end have not made donations.

These postings are not always clear in disclosing an intention to give in the future rather than a gift which has been made. For example, one Australia and Middle East-based donor announced in 2008 a plan to donate nearly two million dollars to WE Charity. Because of personal financial issues, the donor ultimately gave a significantly smaller gift than had been originally contemplated. WE Charity has records it can share with CBC to allow it to confirm that numerous donations described online were not ultimately funded;

(ii) Donors who participate in group charitable activity often post about their donations under individual social media profiles. Sometimes each member of an individual group posts about the same charitable giving on their individual profiles. CBC's review of these postings without context might significantly overstate the amount given by individual donors. WE Charity has access to records with which it could help identify such instances to ensure the CBC's reporting is accurate;

(iii) Some donors changed their plans after posting their original plans online, and never revised the original posts. WE Charity is in a position to identify cases where this has happened and to provide the supporting documentation showing the donors' involvement in, and approval of, such decisions.

530.    WE Charity further explained that by withholding information from the organization and failing to seek WE Charity's comment, CBC was denying itself access to information that WE Charity could provide.  WE Charity offered a few examples:

Should CBC identify for WE Charity the donors or donations it contends were to be used solely for school construction, WE Charity could consult its extensive records, including contracts and written communications with the donors (e.g., WE Charity's contract with Change Heroes) and provide CBC with access to such information. CBC could then verify the accuracy (or inaccuracy) of its allegations before reporting;

Should CBC identify for our clients the specific statements that it contends misled donors, they will likely be able to identify authoritative sources showing that these statements follow best practices of the international development charitable sector. They could direct CBC's reporters, and Mr. Cashore, none of whom are experts in this area, to other charities which follow similar best

practices. And WE Charity could provide to CBC pertinent employee training material that address specific allegations concerning WE Charity employees' purported communications with donors.

531.     And WE Charity also flagged for the CBC additional questions it would be

reckless not to address when verifying its planned reporting based on social media postings.  For

example:

> (1) why count only "primary" schoolhouses?

> (2) on whose statements does CBC rely?

> (3) do these statements refer specifically to "primary" schoolhouses?

> (4) by "constructed", does CBC intend to exclude renovations of schoolhouses and if so, why?

> (5) what is the number of donations CBC contends "were stated to have funded primary schoolhouses in Kenya"?

> (6) what methodology did CBC employ to compare donations to schoolhouses given that many donations may fund one schoolhouse or one donation may fund many schoolhouses (or none)?

> (7) How did CBC determine the cost of a schoolhouse, and did it include costs necessary to run schoolhouses such as personnel, supplies, maintenance, and community outreach per WE Charity's widely publicized holistic development model?

> (8) how did CBC account for the high rate of cost inflation in Kenya over the years in its comparison?" citing, "For example, $10,000 CAD in 2013 is equivalent to nearly $20,000 CAD today based on the Kenyan central bank's official inflation rates and historical exchange rates.

> (9) how has CBC complied with the principles governing its use of social media content set forth in CBC's JSPs, including CBC's policy of verifying information sourced from social media with at least one other source?

532.     WE Charity asked: "Allegations about WE Charity's representations to its donors

must concern statements by WE Charity. What basis could CBC have for not verifying those

statements with the charity?" The charity never received answers to any of these questions.

533. During the CBC's newsgathering process, donors told reporters facts regarding their own online postings that caused the CBC to know it was wrong to rely on such postings to count how many schoolrooms WE Charity should have funded in Kenya.

534. For example, one donor who oversees a group of donors told Mr. Cashore in August 2021 that multiple group members would post on social media about the same donations, which could result in duplicative counts under the CBC's methodology. The donor told the CBC,

> I took many people over the years on trips to Kenya. Many who came with me would happily post on social media celebrating the trip and that each of us, collectively as a community, helped fund education in the same villages. Their donations were actually counted in our donations, as any fundraiser would involving many people. All of us collectively donated to the same project. The pictures can be the same school or project because we were part of the same fundraiser.

535. Multiple other donors expressly told the CBC's reporters in writing and verbally that they were wrong to read their online statements as evidencing a belief by the donor that they fully funded a schoolroom in Kenya.

536. The CBC has furthermore publicly acknowledged that social media postings are unreliable. On November 1, 2021, CBC News Editor in Chief Brodie Fenlon announced on the CBC's website that it would be permanently closing its Facebook postings of CBC news coverage to comments. According to Mr. Brodie, "[m]isinformation and disinformation were rife" on the social media platform. Yet Mr. Brodie permitted CBC journalists to rely on information from that same source to accuse WE Charity of defrauding its donors.

537. The CBC refused to verify its planned reporting on donor expectations with WE Charity. It did so despite well-established CBC policies grounded in its JSPs and Canadian law that require it to present to the target of its reporting the factual allegations it intends to publish to

seek the target's comment and fairly present its position in the publication.

538.    In its JSPs, the CBC states, "Our commitment to accuracy and integrity means we try where possible to verify the information with a second source. And there may be times when more than two sources are required."

539.    The CBC's JSPs also state:

> ***Our stories are based on information we have verified.*** Wherever possible, our stories use first-hand, identifiable sources – participants in an event or authenticated documents.
>
> The importance of second sourcing is influenced by the nature and quality of the primary source.

540.    The CBC says that its standards apply equally to social media sources:

> Newsgathering, whether investigative or routine, lives and dies based on the quality of its sources of information. The more controversial the story, the more critical the credibility of sources becomes.
>
> ***Our standards apply to all types of sources, including those coming via social media, when they are used for news gathering purposes.***

541.    In particular, the CBC is aware of the risks inherent in relying on user-generated content such as social media sources.  To that end, one of the CBC's JSPs within the category of "Use of Social Media" is titled, "Verification of User Generated Content (UGC) in News Stories," and reads:

> CBC is responsible for all content on its news sites. This policy covers text, image, video or audio contributions from the public which are incorporated into news coverage on any platform.
>
> Material that originates from a non-CBC source is clearly identified as such.
>
> Before text, image, video or audio is published, we try to verify the information with a second source. There may be times when a third source is required.
>
> We are clear with the audience about what we do and do not know.

This could include explaining the user's relationship to the events.

In exceptional circumstances, it may be difficult to authenticate a contribution. There may be times where because of timeliness or as a matter of public interest, we decide to publish without full verification. The decision to publish material without full authentication must be referred to the Managing Editor. We should disclose such decisions to the audience.

542.    On information and belief, the CBC did not verify the information it sourced from user-generated online content to allege that "donors believed they had fully funded more than 900 primary schoolhouses in Kenya."

543.    The CBC did not disclose to its audience that it did not verify this information.

544.    The CBC's reporters implicitly acknowledged that the CBC's policies required it to verify the 900-plus school count underlying many of the CBC's allegations.

545.    Shortly before publication on November 4, 2021, Harvey Cashore wrote to WE Charity copying Diana Swain, *The Fifth Estate*'s executive producer, and stated that CBC planned on publishing reporting content regarding WE Charity comparing the schools it built to "the number of donations that were stated to have funded primary schoolhouses in Kenya."  Mr. Cashore falsely stated, "We have been reaching out to WE Charity and yourselves on this topic since early this year."  He further claimed, "WE Charity has provided numerous responses over the course of several months, and we are relying on those answers to inform our understanding of the research."

546.    WE Charity quickly corrected CBC's false claim that it had sought comment from WE Charity on "the number of donations that were stated to have funded primary schoolhouses in Kenya"—a phrase so vaguely worded that it appeared designed to confuse.  WE Charity responded on November 5, 2021:

In your email you have indicated that you are relying on "answers we have provided to you to inform your understanding of your

174

research". We would like to be <u>very clear</u> that from our perspective, throughout the many months you have been working on this story, you have never provided us with any specific details about your reporting or how and why you have come to the conclusions you have come to.  You have not provided us the fair opportunity to respond and counter what appears to be the very flawed fundamental premise of your story focus.

Please provide us with the questions/answers that you say you are using to inform your reporting. If you are planning to make allegations that suggest wrongdoing on the part of WE Charity/Free the Children you most certainly owe us the right to clearly address those allegations.

547.    The CBC did not disagree that it had failed to verify its social media-based data with WE Charity, and it persisted in refusing to do so.

  iii.  <u>The CBC Claimed that Donors Believed They Fully Funded Schoolrooms Even When the Donors Told Them That Was Wrong</u>

548.    The CBC knew it was false and misleading to report that donors believed they fully funded schoolrooms in Kenya when those same donors told the CBC that they did *not* harbor any such belief.

549.    As stated above, at least 125 donors expressly told the CBC that they understood their donations to WE Charity were not fully funding specific school structures.  Those donors account for the majority of the funding for WE Charity's project in Kenya.

550.    Based on footage shown in the November Episode, the CBC appears to have included in its "spreadsheets" a significant number of schools purportedly "fully funded" by donors who told the CBC they did not believe they had fully funded specific school structures through WE Charity.

551.    In the November Episode, the CBC shows multiple computer screen shots where the CBC journalists are working on spreadsheets counting the schoolrooms the CBC contends donors believed they fully funded in Kenya.  In this footage, the following donor names are

shown and, on information and belief, were included in the CBC's counts:

      a.     "MPCF," standing for Michael Pinball Clemons Foundation, is shown many times;

      b.     Mastermind;

      c.     Unstoppable'

      d.     Change Heroes; and

      e.     Pledge to Humanity (Gaby Ghorbani).

552.    All of these organizations' leaders signed a letter to the CBC stating,

> WE Charity's development model is holistic. It takes funding from multiple donors to ensure schools and school rooms are built and can deliver education to children over the long term… We do not agree with their thesis that we, as donors, were misled about the projects in Kenya. We supported WE Charity precisely because of its holistic model that welcomes many supporters.

553.    The CBC reported on March 8, 2021 that Unstoppable had rejected the CBC's assertions that it believed it fully funded particular projects in Kenya. In that report, the CBC also cited information WE Charity flagged showing that "Unstoppable understood the organization's financial model and [] said that there is no confusion on their part."

554.    Additionally, as alleged above, Ms. Ghorbani wrote to Mr. Cashore, rejected the CBC's thesis, and explained why its approach to counting schools was wrong.  Yet the CBC appears to have still included in its counts at least 12 schools as "fully funded" by Ms. Ghorbani.

555.    The CBC knew it was false to report that donors believed they fully funded schoolrooms in Kenya when those donors told the CBC the opposite.

556.    Furthermore, to the extent the CBC included in its counts figures based on social media postings where the CBC *did not verify with the donor* it actually believed it "fully funded" specific schoolrooms, the CBC knew or was reckless in not knowing that its count was incorrect.

Given than many donors told the CBC its interpretation of social media postings was wrong, the CBC could have no factual basis for assuming that silent donors agreed with its debunked thesis.

>    iv.  <u>The CBC Knew of Specific Instances in Which It Had Misinterpreted Online and Social Media Postings Regarding WE Charity's Education Projects in Kenya</u>

557.    The CBC failed to learn from its experience in producing the February Episode, where it staked its story on unreliable online postings.  The CBC furthermore learned from its newsgathering for the Defamatory Publications that its interpretation of online postings was wrong.

558.    In the second paragraph of its November 18, 2021 Article, the CBC referred to "crowdfunding websites" as "digital crumbs" that "lead down a trail of contradictions and deceptions."  On information and belief, that reference to "crowdfunding websites" refers to one of the sources CBC relied on as part of its tally of "more than 900 primary schools" it contends WE Charity donors publicly stated they fully funded in Kenya.  That source is a posting on a Germany-based crowdfunding website called "betterplace.org."

559.    The CBC knew that it was wrong to include any schools in its count based on the betterplace.org posting.  Moreover, the CBC's deeply flawed newsgathering concerning betterplace.org must have caused the CBC to—at a minimum—seriously doubt the reliability of any online source that it failed to verify with WE Charity prior to publication.

560.    On September 3, 2021, Mr. Cashore wrote to WE Charity's former director of donor relations, Kim Plewes, and asked "to see if you could help us with some things that have come up in our research for our upcoming documentary about Free the Children/WE Charity, including its projects in Kenya.  Mr. Cashore continued,

>    We plan to report on funding and donations to several villages in Kenya, including some of the villages and projects that you were involved with in raising money for as well.

> ***One particular aspect has to do with Rongena, and your written statement that you collected 362,000 Euros, from two donations in Germany, that "100 % funded" that village.*** I was hoping to talk to you about this, as well as other donations outside of this funding that were also made to Rongena through Free the Children.

561.    Mr. Cashore did not share with Ms. Plewes the "written statement" to which he referred, but had made clear he believed that Ms. Plewes' writing was inconsistent with the truth.

562.    Ms. Plewes responded to Mr. Cashore on September 11, 2021, saying, "Harvey, Your message is not honest."  She continued,

> Are you referring to the betterplace.org funding site? You must understand, I hope, that the fact that a "fully funded" online fundraising project (in this case, 362,000 Euros) does not mean that the cause will never need further fundraising.

> If you're looking at the betterplace.org site, you also know that the funding was directed to two distinct projects – the community of Rongena as well as a vocational training centre that is not in that community. Both of those projects are referenced on the website, as is the fact that the bulk of the funds raised were going towards the training centre, not Rongena.F

> As I am no longer working at WE, I'm copying Dalal, the Executive Director of WE, as I think it is important for WE to know what you're doing. I hope you will re-consider any reporting that is clearly misrepresenting facts.

> There are very important issues in Canada that merit the media's time and attention right now and this couldn't be further from them.

563.    Ms. Plewes had guessed correctly that Mr. Cashore's reference to Plewes' "written statement" referred to a posting on a crowdfunding website called betterplace.org, which is similar to sites like Go Fund Me.  When an individual fundraising goal is met on betterplace.org, the site marks the fundraising campaign "100% funded," even if that individual goal was just to contribute a certain amount to a larger fundraiser.



564.    WE Charity's executive director, Ms. Al-Waheidi followed up with Mr. Cashore

and *The Fifth Estate* executive producer Diana Swain to further explain the facts and why the

CBC was incorrect to assert that the statements on the betterplace.org site were inconsistent with

additional fundraising for the village of Rongena by other WE Charity donors.

565.    First, Ms. Al-Waheidi pointed out that the betterplace.org website's description

made clear that the funds to be raised were going to many different causes, none of which would

be "fully funded" with the funds raised:

> The website's description notes two planned uses of the donated
> funds: (1) allowing WE Charity to "***begin work*** in a brand new
> rural community in Kenya, Rongena" and (2) making it possible to
> "***break ground*** on the new campus and prepare to welcome our
> first year of students as soon as January" to WE's vocational
> training center, which became the foundation for the future WE
> College.  The website includes, in euro-denominated increments, a
> list of the needs for which "a donation amount of €362,000.00 was
> requested."  ***The bulk of the funds are earmarked for a
> "Vocational Training Center."  The remainder are roughly
> evenly divided into what you will recognize as WE Charity's five
> pillars of development: "Agriculture & Food Security",
> "Alternative Income," "Health Care", "Clean Water &
> Sanitation," and "Education."***

566.    On its face, these funds were not all earmarked for Rongena; the vocational
training center that became WE College is not, and never was expected to be, located in
Rongena.  Nor does the statement that WE Charity will be able to "begin work in a brand new
rural community" indicate that these will be the *last* funds ever raised to support the community
of Rongena.

567.    Second, Ms. Al-Waheidi explained the commonly understood language of
fundraising websites:

> When Kim—or, to our knowledge, anyone referring to a
> fundraising drive—says that the fundraising project is fully funded,
> she of course means that the fundraising goal has been reached, not
> that the cause is solved and will never need more funds.  ***For
> example, the website says that €20,600 of the funds raised would
> be used for healthcare.  Do you contend that donors believed that
> healthcare for the village of Rongena was "fully funded" with
> this sum—that no further funds would ever be needed for
> healthcare in that community?***
>
> Your email portrays charity as a grim, transactional affair in which
> donors bid for the right to exclude others from giving.  The donors
> who funded a donation to initiate helping Rongena were not told
> that they would be the only ones to give, did not believe they
> would be the only ones to give, and—based on our experience with
> individuals who give to charity—would not have *wanted* to
> exclude others from giving to Rongena.  That is not how charity
> works.

568.    Third, Ms. Al-Waheidi pointed to contemporaneous emails from the donor family
making clear their understanding of the use of their donations:

> This is to say nothing of the fact that you are taking the website out
> of its actual context.  ***First and foremost, the donor family who
> "fully funded" the [betterplace.org](betterplace.org) amount knew that they were
> not the only donors to contribute to Rongena.  We have
> contemporaneous emails that make this perfectly clear.***  For
> example, one email from WE to the donor family (preceding their
> donation) reads, "As an update, [different donor family] have
> moved forward with their contribution for Rongena.  We are so
> thrilled and grateful for the impact this will have on the
> community. You were so generous to mention that you might be

interested in doing the same, so I wanted to follow up on that point and to ask if there is any chance we might be able to move forward."

A representative of the donor family had responded to WE:

We are thrilled to be part of your adopt the village program and you can rest assured that all the commitments I made will be honored.

569.   Fourth, Ms. Al-Waheidi explained the particular reason the donor had for using a

funding website rather than just write a check:

Next, the donor flagged an issue: *they needed a mechanism for making a donation that would be tax-deductible in Germany.  The donor proposed that they use betterplace.org to transfer the funds to WE as a solution to this German tax deduction issue.*  At the donor's suggestion, WE set up the site to raise the amount of money the donor had agreed to provide, and the donor "fully funded" the amount of money the donor had decided to give.  All of this is set forth in contemporaneous emails.

570.   Undeterred, Mr. Cashore responded to Ms. Al-Waheidi by asking further

questions that again embedded false assumptions about the website content and asserted it as

fact.  Mr. Cashore asked:

There appear to be 29 separate references to "Vocational Training Center."  One of those vocational training centers is costed at €6,967.00.  The other 28 are each costed at €9,000.00.  What is the reason the first vocational training center was costed less than the other training centers?  *Where exactly are these 28 vocational training centers located at WE College?*

571.   Ms. Al-Waheidi explained in her response,

*There are not 28 or 29 vocational centers.… Betterplace.org's website required that you fundraise for "needs" and had a cap on the amount you can raise per need.*  As a betterplace.org employee explained to WE in 2013, "We do have a maximum of 9.999 Euro per single need on our platform." She continued, "we need to duplicate them" and offered, "We will do this for you." The employee further explained that they needed descriptions for the needs and proposed using each "area of development" for a community (i.e., WE's pillars of development) as descriptions.

572.    Ms. Al-Waheidi expressed further concern by how Mr. Cashore had posed his question:

> You assumed that there should be 28 or 29 vocational centers and asked me where they are. *I really hope this isn't how you're approaching your other research: making wrong assumptions about what facilities 'should' exist and then asking where those facilities are."*

573.    On information and belief, the CBC included in its count of schools that WE Charity was allegedly missing multiple schools based on the betterplace.org posting.  This constitutes publication by the CBC of information it knew to be false.

574.    Moreover, by learning in the course of its communications with Ms. Al-Waheidi and Ms. Plewes that the CBC had made multiple serious errors in its reading of the betterplace.org posting, the CBC must have harbored serious doubts about its ability to rely on other online postings without first verifying its understanding of the postings with WE Charity.

> v.    The CBC's Failure to Show Its Readers and Viewers the Social Media Statements on Which It Allegedly Relied Is Evidence of the CBC's Actual Malice

575.    In its coverage, the CBC claimed that donors' publicly available social media postings made "clear donors believed they had fully funded more than 900 primary schoolhouses in Kenya."

576.    Despite purporting to rely on public information for which the CBC could have no concerns about confidentiality, the CBC did not show in its coverage a single example of such public statements.

577.    The CBC's decision to deny its viewers and readers the ability to judge for themselves the evidence its reporters relied on shows that the CBC knew that the alleged evidence would not stand up to scrutiny.

**G. The CBC Falsely Claimed That WE Charity Told Multiple Donors They Each Fully Funded the Same Schoolrooms in Kenya**

578.    The CBC falsely accused WE Charity of purposefully deceiving two named donors who were interviewed for the November Episode:  Watson Jordan and Rukshan de Silva. The CBC claimed that WE Charity told these two donors that they had fully funded specific schoolrooms in Kenya but had also told multiple other donors the same thing.

579.    For example, in the Newsletter, the CBC falsely stated, "We spoke to donors who believed they had fully funded classrooms, only to learn other donors were told the same thing about the same school."

580.    These statements and similar statements set forth below and elsewhere in the Defamatory Publications are defamatory. The CBC's claim that WE Charity told multiple donors they were each solely responsible for paying for the same structures would be reasonably understood to mean that WE Charity deceived and defrauded the donors.

581.    The CBC knew, or was reckless in not knowing, that these allegations were false.

    i.    <u>The CBC Falsely Accused WE Charity of Deceiving Donor Watson Jordan</u>

582.    The CBC titled its November Episode of *The Fifth Estate*, "Finding School No. 4: WE Charity's donor deception in Kenya."  The title is a reference to the CBC's allegation that WE Charity promised multiple donors that they fully funded the same schoolhouse in Irkaat, Kenya—specifically, the fourth schoolroom WE Charity built in that community. One of those purportedly deceived donors, North Carolina resident Watson Jordan, was featured in the November Episode.

583.    The CBC stated, implied, and adopted false statements that WE Charity told multiple donors, including Watson Jordan, that they each fully funded the construction of the exact same structure: Schoolhouse Number Four in Irkaat, Kenya.

584.   For example, these false statements appear in the following publications:

a.   *The Current*: "He was sent a picture of the schoolhouse by the charity. They said, 'Here is the schoolhouse built in memory of your son.' We learned at least four other donors funded that very same schoolhouse, and we shared that information with him."  (pt 2 at 8-9)

b.   In the November Episode, the CBC claimed that Mr. Jordan "was sent a photo of Schoolhouse Number 4 in Irkaat, in memory of his son. Like Reed Cowan, would he discover a schoolhouse that was funded by other donors or would a schoolhouse be there at all? So we decided to go to Kenya and look for Watson Jordan's schoolhouse and Rukshan de Silva's and others."

c.   Also in the November Episode, the CBC stated, "We're hoping to find School Number 4. It's the schoolhouse Watson Jordan was sent a picture of in memory of his son. Our spreadsheets show every schoolhouse here has a story, but donors may not know the full story.

MARK KELLEY: Here it is. School Number 4, School Number 4. This was the one that was funded by Watson Jordan; but as we now know it was also funded by several other donors. Our research shows School Number 4 was fully funded at least four times over. And it wasn't just School Number 4. We have a picture of another schoolhouse that turned up in our online searches over and over again.

MARK KELLEY: This school was also being funded by multiple other groups.

HARVEY CASHORE: Absolutely.

HARVEY CASHORE: Pledge to Humanity, this was funded by them, as it was Unstoppable, Mattamy Homes, Gilgan Family."

d. November Episode: "He was told he paid for a schoolhouse in Irkaat and was sent this photo of School Number 4 in memory of his son."

e. Podcast: "School number four, we wanted to find school number four, the one that Watson Jordan fully funded, though he's never seen with his own eyes. We found that school, and our spreadsheets indicate that schoolhouse, that very same schoolhouse, was fully funded four times over."

f. Article: "Multiple donors were sent photos of same schoolhouses WE Charity said each had fully funded."

585.    In the Defamatory Publications, the CBC fabricated quotations and hid from its audience the true contents of the documents it purported to describe, which are shown on screen too quickly and incompletely for viewers to read for themselves.

586.    It is clear from the face of the documents that WE Charity did not tell Mr. Jordan that he fully funded Schoolhouse Number Four in Irkaat.

587.    The document that the CBC mischaracterizes and misquotes is a community impact report labeled "2017 Irkaat Report for the Jordan Family."  The 2017 report is attached hereto as Exhibit O.  The document is addressed to the "Jordan Family" and provides an overview of the updates on each of WE Charity's five pillars of development in Irkaat: education, water, health, food and opportunity.  The report includes descriptions and pictures of recent impacts in these categories including the completion of a fourth school, a new water kiosk and borehole, a child being treated at a hospital, and a women's group for leadership and agribusiness training.

588. The community impact report never says Mr. Jordan fully funded any particular structure in the village of Irkaat. It says he supported the community. Moreover, it does *not* say, as the CBC falsely reported, "Here is the schoolhouse built in memory of your son."

589. In covering each of the five pillars of development in Irkaat, the community impact report describes and includes photos of multiple projects other than the school, none of which the CBC alleged Mr. Jordan thought he fully funded.

590. WE Charity personally told Mr. Jordan that the report was an update on the *community*. A WE Charity donor relations employee told Mr. Jordan in an email before sending the report that it would be a "detailed and quite extensive report on the communities [sic] progress over the past year."

591. WE Charity also explained community impact reports on its website in its Adopt a Village FAQ as follows:

> **How can I see the results of my contributions?**
>
> One of our core values at Free The Children is "honouring every stakeholder" and, among other ways, we adhere to that value by being fully transparent in all our operations. If you choose to donate to our international projects, ***you'll receive an update twice a year on the progress of the community you support*** and access to our community blogs.
>
> These reports and blogs include:
>
> - ***Photos from the community you're supporting***.
>
> - ***An update on <u>all</u> the programs Free The Children is implementing in that community*** (education, water and sanitation, health care, alternative income, agriculture and food security).
>
> - Stories about the direct beneficiaries of your donation and a preview of what our next priorities are in that region.

592. Other donors contributing towards development in the community of Irkaat likewise received copies of the 2017 Irkaat Report. On information and belief, the CBC relied

on the fact that WE Charity sent community impact reports to other donors as the basis for

claiming that WE Charity told other donors they fully funded the same schoolhouse as Mr.

Jordan.  The CBC knew or was reckless in not knowing this was false and misleading.

593.    The 2017 report was not the only update Mr. Jordan received describing

schoolhouses in Irkaat.  In 2016, prior to the update described above, WE Charity's donor

relations employee sent Mr. Jordan email saying, "Last week, we received updates from the team

on the ground in Kenya about what has been going on in Irkaat! The team has informed us that

we've completed construction of three classrooms but have not broken ground on the fourth

classroom just yet."

594.    And in the 2018 Irkaat report that WE Charity sent to Mr. Jordan, it included

among other impact points a photo of another recently completed school and said,

> We have constructed eight new classrooms in Irkaat. The school
> now has a new classroom for each grade of primary education. We
> are also excited to share that we have begun construction on two
> additional classrooms in Irkaat.
>
> Thanks to your support, children in the community now have a
> safe and conducive environment to learn, play and succeed.

Attached hereto as Exhibit P.

595.    The three community updates Mr. Jordan received from WE Charity describe a

total of eight schoolrooms constructed in Irkaat.  The CBC had no basis for claiming that one

schoolroom pictured in one of the reports was fully funded by Mr. Jordan.

596.    On information and belief, the CBC had access to emails that WE Charity sent to

Mr. Jordan containing the 2016 and 2018 Irkaat community impact reports.[12] At a minimum, the

CBC knew that WE Charity had access to such communications, it knew that the charity would

---

[12]  The 2016 Irkaat community impact report is attached hereto as Exhibit N.

share such documents with the CBC's reporters, and it purposefully avoided these documents—and the truth—by refusing to verify its allegations regarding Mr. Jordan prior to publishing the Defamatory Statements.

597.    Mr. Jordan wrote a book in 2019 called *Mine, Ours, and Yours: A Father's Journey through the Life and Death of a Child*.  He refers to his donation to WE Charity and says, "They asked us how we wanted to apply the funding. We decided to focus on a single village and fund all five pillars."  He never mentions Schoolhouse Number Four.  Instead, he says, "in the end, we financed an entire village in Kenya. The name of the village is Irkaat."

598.    In his book, Mr. Jordan also refers to a "matching grant" through which another donor also contributed funds to the projects Mr. Jordan supported.  Emails likewise demonstrate that Mr. Jordan was well aware of the matching grant and that he was not the only donor supporting the projects in Irkaat.

599.    On information and belief, the CBC's reporters were aware of and read Mr. Jordan's book, or at least relevant portions thereof, prior to publishing the Defamatory Publications.

600.    WE Charity has funded a total of 66 schoolrooms in Irkaat.  The CBC's baseless identification of one of those schoolrooms as "fully funded" by Mr. Jordan was the false predicate for accusing WE Charity of fraud.  The CBC knew it was false to claim that WE Charity told Mr. Jordan he fully funded Schoolhouse Number Four in Irkaat, Kenya.  The CBC furthermore acted recklessly in not verifying allegations with WE Charity as to the truth of which the CBC must have harbored serious doubts.

    ii.    <u>The CBC Falsely Accused WE Charity of Deceiving Donors Rukshan de Silva and Iroquois Ridge High School</u>

601.    The CBC also falsely claimed that WE Charity deceived donor Rukshan de Silva,

a young man who had in 2008 raised money with the rest of his high school, Iroquois Ridge
High School, to help fund a schoolroom in the community of Pimbiniet, Kenya.

602.     In its coverage, the CBC falsely alleged that WE Charity told Mr. de Silva that he
funded a *specific* school that he photographed in 2013 when he visited the community while
traveling.

603.     The identity of this particular school was essential to the CBC's allegation that
WE Charity deceived Mr. de Silva and his high school. WE Charity has built or renovated a total
of 56 schoolrooms in Pimbiniet.

604.     While standing in Pimbiniet, Kenya during the November Episode, the CBC's
reporter, Mark Kelley, says, "Here we wanted to find one particular schoolhouse.  This is it! This
is the – the classroom that was funded by Rukshan de Silva.  Did Rukshan know the schoolhouse
his classmates called their own was paid for by others?"

605.     Mark Kelley is shown talking with Mr. de Silva via videoconference, who on
information and belief resides in Sydney, Australia:

> [Mark Kelley] Were you told that there were other donors who had
> funded that very same school?
>
> [Rukshan de Silva] No.
>
> [Mark Kelley] That you were part of something bigger, that your
> money was going into a big pot?
>
> [Rukshan de Silva] No. We were told that that would be Iroquois
> Ridge's school that we had funded.

606.     Then, resuming his role as narrator, Mr. Kelley adds, "In fact, what Rukshan
didn't know is the picture he took of that schoolhouse when he visited Pimbiniet contained a clue
that it was credited to another group."

607.     To Mr. de Silva, Mr. Kelley then says, "I saw a picture that you took over there
that you would post of your school. On the top right from the door there are letters over that

door, MPCF and a number. Did you know what the – what that stood for?"  Mr. de Silva replies, "No."

608.   Mr. Kelley continues, "That's Michael 'Pinball' Clemons' foundation. He'd already fully funded that school. Were you aware of that?"  Mr. de Silva responds, "No. I wasn't aware of that. If what you're saying is true, that's really disappointing. It's a shame."

609.   There are schoolrooms in Pimbiniet that never bore an "MPCF" symbol.  The CBC's reporting that Mr. de Silva's high school funded a schoolroom that did bear such a symbol was its basis for alleging that WE Charity deceived him.

610.   The CBC's coverage with respect to Mr. de Silva was false and defamatory because WE Charity did not tell Mr. de Silva that he fully funded the schoolroom identified in the Defamatory Publications—the one with the MPCF symbol.

611.   When Mr. de Silva visited Pimbiniet village on a personal trip in 2013, there were no staff from WE Charity's Toronto or Nairobi offices present for Mr. de Silva's visit.  Two villagers, a local WE Charity mobilizer who ensures girls attend school and a community-paid teacher, showed him the village. These individuals would not have been aware of the specifics of the financial support of Iroquois Ridge High School.

612.   In the November Episode, the CBC shows Mr. de Silva describing his basis for identifying a particular schoolroom in Pimbiniet, Kenya, as the structure funded by Iroquois Ridge High School in 2008, stating that when his visited in 2013,

> *I met with the teacher*, and he kind of gave me a tour of the old school, and then they showed me the new school as well that was constructed with the funds that we'd donated; and I was really proud to see everything that we had spent four years fundraising for, just to see the – the fruits of our labor. It was really incredible.

613.   The teacher Mr. de Silva met with in 2013, however, did not work for WE Charity and could not know which schoolroom structures were funded by which particular donors.

614.    The CBC knew from its correspondence with WE Charity that the teachers at WE Charity-funded primary schools in Kenya are not WE Charity employees.  For example, on September 9, 2021, Ms. Wiszowaty wrote to Mr. Cashore, "WE Village partner communities are government-run, as you know."   Mr. Cashore also mentioned the fact that the teachers are not WE Charity employees in discussions with former WE employees.

615.    Furthermore, in Pimbiniet (and elsewhere in the region), all of the individual schoolrooms are typically referred to collectively as "Pimbiniet Primary School" just as all the rooms in Iroquois Ridge High School are referred to as one "school."  From the point of view of a Kenyan teacher answering the question, "is this the school my high school in Canada helped support?" the answer would likely be "yes" regardless of the room they were standing in.

616.    The CBC knew that all of the individual schoolrooms in Pimbiniet were collectively referred to as "Pimbiniet Primary School."

617.    Mr. de Silva kept an online blog about his travels in 2013, including his visit to Pimbiniet (the "Blog"). The CBC had access to this blog and used photographs from the Blog in the November Episode.

618.    From the Blog, the CBC knew that references to a singular primary "school" in Pimbiniet encompassed *multiple* schoolrooms in the village.  Mr. de Silva wrote in his Blog, "There are currently 680 students at Pimbiniet Primary School (342 girls, 338 boys)" and "There are currently 6 stand-alone classrooms with 3 more under construction."  The Blog contained external photographs showing the exteriors of multiple, completed schoolrooms, and it included a photograph of a freestanding sign near all those buildings: "Pimbiniet Primary School."

619.    From the Blog, the CBC knew that when Mr. de Silva visited Pimbiniet, he visited multiple different WE Charity-funded schoolrooms.  The photographs on the Blog

include interior shots of several different classrooms with different decorations and contents.  At

no point during the November Episode does the CBC explain its basis for asserting that Mr. de

Silva believed that one particular schoolroom shown in one of the many photographs he took

was specifically funded by Iroquois Ridge High School.

620.    The CBC knew or was reckless in not knowing that it was false to claim that

Iroquois Ridge High School fully funded the specific schoolroom the CBC identified in its

Defamatory Publications.  The CBC's identification of the specific schoolroom referenced in its

coverage formed the basis for falsely alleging that WE Charity deceived Mr. de Silva. It was

reckless at best for the CBC not to contact WE Charity to verify its reporting before publishing.

### H. The CBC Falsely Claimed that WE Charity's Internal Documents Showed That Multiple Donors Fully Funded the Same Structures in Kenya and that WE Charity Did Not Build Structures If It Believed Donors Would Not Notice

621.    To prove its false thesis that WE Charity intentionally deceived donors, the CBC

relied on "leaked" internal spreadsheet documents from WE Charity that it misquoted and

mischaracterized to support its false narrative.

622.    Showing one spreadsheet in the broadcast, the CBC reported, "In the village of

Rongena, the records show eight high net worth donors paid for the exact same schoolhouse. In

Irkaat, seven major donors and foundations paid for the same three schoolhouses."

623.    The CBC described its allegations on *The Current*:

> So while our own numbers had shown that – that projects like
> schoolhouses being double-matched, triple-matched, quadruple-
> matched to donors, their own internal documents actually proved
> that as well. They – We could see how both large donors and small
> donors would be assigned to a specific schoolhouse project. It was
> there in black and white. But more interesting than that, Matt, there
> were notes in the margin about for – what WE staffers were saying
> about particular donors. So one donor was described as being,
> quote, "tricky," because she wants to make sure that the money she
> has donated will build the project it was donated for. So this was
> marked in – in the margin. Another generous donor was not –

> determined not to be a problem because they don't track line by
> line on projects that they funded. It was a calculus about what
> needs to be built now and what could be kicked down the road for
> later if ever built.

624.     In the Podcast, the CBC reiterated this allegation, "And this was the notes in the

margins about how to handle the questions and concerns from donors who want to follow up on

their projects. Richard Branson, you know, from Virgin Atlantic. We looked at him, he said he

wasn't a problem. Says, they have not asked us the status of the project. And another family, a

generous donation family, said they, quote, don't seem to be tracking items line for line."

625.     But the spreadsheets the CBC reference here do not show which donors paid for

what structures.  The documents describe two things: (1) WE's prioritization of *when* (not

whether) structures will be built; and (2) certain donors' expectations regarding construction

priorities so that WE Charity could best coordinate communications with those donors.

626.     When multiple donors are listed next to a given structure, the notation reflects that

multiple donors gave towards the pillars of development in that village or expressed interest in a

project and should therefore receive updates—not that they each *fully funded* that project.  It was

reckless at best for the CBC to claim that the documents were evidence of fraud, especially when

the CBC did not check with WE Charity before publishing the Defamatory Publications.

627.     Donors listed in the documents, moreover, had told the CBC that they were wrong

to contend they had fully funded specific structures in Kenya.  For example, the CBC claimed

"[i]n Irkaat, seven major donors and foundations paid for the same three schoolhouses." At least

one of those donors, however, had written to Mr. Cashore months earlier and rejected the CBC's

thesis:

> You were asking me about Irkaat, and if I minded that others also
> funded education in the village. Who would get upset about that?
> There is so much need in that community; it requires the
> generosity of many donors to fund and sustain the educational

193

programs that are so desperately needed. The more people who
support these children, the better.

628.    The CBC also falsely indicated that WE Charity's internal documents showed that

WE Charity would not build projects if donors would not notice their absence.  Especially in the

context of coverage alleging that WE Charity did not build schoolrooms, a viewer would

understand the CBC to have claimed that the leaked WE documents demonstrated that the

charity did not build many of the structures described within.

629.    For example, the November Episode stated:

> [Laurie Styron] Right. They don't really have plausible deniability
> here. It's in writing. I mean, it's in black and white. It really isn't
> just a -- just an error. Right? It's not just that they got in over their
> heads on one school.

> [Mark Kelley] Uh-huh.

> [Laurie Styron] It looks to be an active strategy to raise a lot of
> money. And then they're relying on donors not asking questions in
> order to continue to operate this way. And it's just -- it's just wrong.

630.    First and foremost, *all of the projects listed in the documents have been built.*

631.    The CBC did not even ask WE Charity whether the projects were built.

632.    Secondly, the document makes clear that the WE Charity personnel drafting the

document were discussing whether a project should be prioritized for construction in 2016 or

could be pushed to 2017—not whether to build the project at all.

633.    *The CBC misquoted the document* to make it appear as though statements

discussing scheduling were instead contemplating whether a structure should be built at all.

634.    For example, in the November Episode, the CBC stated, a "wealthy family

seemed easier to deal with as they 'don't seem to be tracking items line for line.'"  The full quote

that the CBC *excluded* goes on, however, to say, "As long as we move forward with this in 2017,

we should be fine."

635.    In another example, the CBC stated during the November Episode, "A California philanthropist, Gaby Ghorbani, was 'tricky.' So our project not yet built 'will likely be something we have to commit to.'"

636.    In fact, the spreadsheet the CBC purported to be quoting does not say "tricky." More important, the latter part of the quote was cut off by the CBC; it actually says, "From what I have on file, it does not seem we have a specific timeline for this commitment to Gaby Ghorbhani, but she has been asking about this, so it will likely be something we have to commit to *in 2017*."

637.    The CBC excluded "in 2017" from the quote to mislead its audience about the content and meaning of the documents, transforming a statement about *scheduling* into one contemplating whether a project should be built *at all*.

638.    The CBC's misquoting of the documents was necessary to support the CBC's preconceived—and false—narrative that WE Charity had *never* built much of the infrastructure in Kenya that donors had funded.

639.    The CBC knew or was reckless in not knowing it was false to report that WE Charity's documents showed that the organization never built projects when it believed donors would not notice.  The very fact that the CBC felt it necessary to doctor quotes from the documents demonstrates the CBC's knowledge that what it was reporting was false.

640.    Furthermore, the CBC's decision not to verify its reporting regarding the documents prior to airing the November Episode constitutes purposeful avoidance of the truth. The CBC showed the documents, including filenames, on air during the November Episode and could have no confidentiality basis for withholding this information prior to going to air.  The CBC acted with reckless disregard of the truth in not verifying its planned reporting concerning

these documents prior to publishing.

**I.    The CBC Falsely Claimed That WE Charity Blocked the CBC from Filming at Primary Schools in Kenya**

641.    Throughout the Defamatory Publications, the CBC states, implies and adopts the false factual assertion that WE Charity was responsible for the CBC's inability to visit and film at the schools it funded in Kenya.

642.    In fact, the CBC failed to obtain government permission to visit and film at government-run schools and then falsely blamed WE Charity.

643.    As stated above, since at least January 2021, WE Charity had asked the CBC to visit its projects in Kenya.

644.    The CBC's false claims of obstruction were important to its preconceived narrative.  The CBC could not claim that WE Charity built only 360 schoolrooms in Kenya when it was capable of seeing for itself that it had in fact built far more than this.  The CBC needed an excuse for not counting the schoolrooms that WE Charity funded, and so falsely claimed that WE Charity blocked it from doing so.

645.    The CBC's false obstruction claim also reinforced its preconceived narrative that WE Charity had something to hide.  The CBC misled its audience to believe WE Charity acted in a manner evidencing guilt.

646.    CBC alleged that WE Charity engaged in a cover-up to "block the scrutiny" of the CBC's investigation.  CBC made this false statement in the following publications:

        a.    On CBC's website, CBC published a summary of the November Episode stating, "*The Fifth Estate* compiled its own list of money raised and travelled to Kenya to see first-hand if it matches the number of schools actually built, ***all in the face of an aggressive campaign orchestrated by the charity to***

*block the scrutiny*."

b.   In the November Episode, CBC stated, "Before arriving in Kenya, we had

arranged for a visit to the village of Motony with the school's headmaster. But

moments after we arrived, an unidentified man showed up and spoke to the

headmaster… Our colleague, journalist John Njiru, who has reported on WE

Charity in Kenya tells us we're no longer welcome."  Then a clip on the

ground in a village in Kenya shows a brief exchange between Mr. Kelley and

Mr. Njiru: "KELLEY: We've been told that we should come back another

time, so we'll come back another time. NJIRU:  He's saying that he

had received some phone calls.  KELLEY: So – so we are

not welcome. NJIRU: Your presence is not welcome."

c.   As CBC is filming in the community of Irkaat in Kenya during the November

Episode, in voiceover, Mr. Kelley says, "But, again, our visit is cut short. John

tells us we must leave."  Another exchange is shown between Mr. Kelley and

Mr. Njiru in Kenya.  Mr. Njiru says to Mr. Kelley, "Right now, you need to go

because calls have been made and things are really bad." In voiceover, Mr.

Kelley says, "It turns out the calls are coming from the governor's office."

Now in their car in Kenya, Mr. Njiru briefly holds up his phone, showing it to

Mr. Kelley, and says, "It was Governor Tunai who just called."  Mr. Kelley

responds, "Oh, really? Why would the governor be calling us?" In voiceover,

Mr. Kelley concludes, "John believed the governor was sending a message for

us to stop visiting villages in his county."

d.   Also, during the November Episode, CBC aired a scene in which its team is

shown fleeing Kenya due to self-described fear for its safety.  Mr. Kelley says,
"we had a text from our team in Toronto. The CBC had received a letter from
Kenya's Ministry of the Interior. It contained unfounded allegations we had
committed criminal acts in Kenya, including trespassing on government
property. For some reason, the letter was cc'd to the WE organization.
Concerned for our safety, CBC instructed us to head to the airport
immediately.  Our fact-finding mission in Kenya was over."

e.   During Mark Kelley's interview on *The Current*, the show's host asked,
"Once word gets out that you are looking into the school efforts of WE
Charity, efforts to stop you have gone all the way up the food chain to the
Ministry of the Interior of that country?"  Mr. Kelley responded, "Yeah. At
one point we were given a – It almost looked like a rap sheet of criminal
allegations against us saying that we misrepresented ourselves to gain access
to the villages and that we were trespassing on government property.  And the
CBC took these allegations quite seriously. We were contacted. We were told
to essentially get on a plane and come home. Our fact-finding mission in
Kenya was over.  But that gave you the tone. Because not only was that – that
rap sheet as I'm calling it sent to the CBC, a copy of it was also sent to WE
Charity. Another reminder just about how closely connected the institutions
and the charity are there, which – which obviously made our – our work there
sensitive."

f.   On the Podcast, Mark Kelley stated: "And as we found as we went from
village to village that we would be there for a while, and some villages, we

were told we couldn't come in, which we found to be kind of odd. Then we got this letter saying that because we had gone to some of these villages that we had been, quote, trespassing on -- on government property, and that we'd been using false pretenses to gain access to these villages. So this was -- these were criminal allegations that were  coming to us, what they called criminal allegations, what we believed to be baseless that were provided in a letter sent to the CBC here in Toronto while we were over there. From the ministry of the interior suggesting that we had broken the law. And there was real concern that we could be arrested and could be detained. So we were given the advice to get back on the plane and come home and our fact finding mission to Kenya had ended abruptly."

g.   On the French broadcast of *Enquete*, the narrator stated in the introduction: "Less than an hour after that call, the team received a text from Toronto. CBC had received a letter from the Kenyan Ministry of Interior. It contained unfounded allegations that the team of journalists had committed criminal acts in Kenya, including an intrusion on government property. For an unknown reason, WE Charity had been copied on this letter. Concerned for their safety, CBC ordered the journalists to go to the airport immediately. It was the end of the Kenya assignment."

647.   The CBC knew that its allegations that WE Charity blocked its investigation in Kenya were false.  Indeed, ***the CBC told WE Charity in writing that it did not blame the organization for its difficulties in Kenya***.

648.   The reason the CBC was unable to access and film school grounds was, as it

knows, because the CBC failed to obtain permission from the Kenyan government to do so.  The

CBC obstructed its own investigation.

       i.   <u>The CBC Did Not Get Government Permission It Knew It Needed to Access and
Film at the Government-Run Schools Funded by WE Charity</u>

649.    The primary schools funded by WE Charity are owned and operated by the

Kenyan government.  The CBC knew well in advance of its visit to Kenya that, as in the U.S. or

Canada, the CBC could not film at a school without government permission.

650.    On September 3, 2021, Mr. Cashore emailed Ms. Wiszowaty to inform her that

the CBC would be traveling to Kenya the following week and wanted to "visit and see first-hand

WE Charity's projects there."

651.    Ms. Wiszowaty emailed Mr. Cashore on September 8, 2021, and asked him to

confirm, among other things, that the CBC had made the necessary arrangements to visit

government-run schools:

> I am not sure if you are aware, but there are strict rules set out by
> the Ministry of Education around journalists visiting the primary
> and secondary schools. The rules have been further tightened as a
> result of COVID 19. It would be important to follow proper
> process. Please let me know if you would like any assistance in
> this regard.

652.    Mr. Cashore did not provide the requested confirmation, prompting Ms.

Wiszowaty to write again the following day:

> You're asking about visiting a primary school on Monday. I want
> to reiterate yesterday's message about government regulations. I
> assume that you have pre-planned your trip to get government
> permission to visit and film at government schools. WE Village
> partner communities are government-run, as you know. ***Schools
> require specific permissions from the Ministry of Education in
> order for journalists to enter school grounds.*** It's similar to
> Canada, where a journalist cannot simply enter and film at a school
> without permission.
>
> ***Please confirm you have coordinated with the Ministry of***

*Education and/or that you'll have your team make the arrangements.* We've received outreach from the regional government about your visit (apparently you've been in touch with Governor Tunai), and that likely means that other government departments are aware and, based on past experience, would be likely reminding subordinates of protocols.

We're proud of our work. We've been encouraging you to come to Kenya for months and we want to ensure that you can see the projects and show them to Canadians. *We've helped other journalists arrange permission, but it typically takes weeks and your trip is a surprise to us. Depending on your reply, we can certainly do our best to help, but there's only one business day until you want to film.*

653.   Mr. Cashore responded the same day and confirmed the CBC had obtained the

necessary permissions, stating,

Thanks for all this, much appreciated.   *We are working with a local colleague in Nairobi who has been reaching out and coordinating our schedule and making the appropriate arrangements*.

654.   On September 10, 2021, Ms. Wiszowaty responded to Mr. Cashore's reassurance

that CBC had obtained permission to film at schools:

I am glad to hear that you have everything you need to ensure you are able to visit the schools, communities, and projects while you are in Kenya. I sincerely hope you are planning to visit the various primary schools and high schools when school is in session (ie not on the weekend) so that you can experience an accurate representation of our work and see the children and the facilities in a meaningful way.

655.   Yet later that day, Mr. Cashore wrote to Ms. Wiszowaty to say that the permission

they had received was revoked, ominously stating that "calls were made" and CBC's

"permission was retracted."

656.   Concerned that Mr. Cashore's email could be read to suggest that WE Charity had

played a role in retracting CBC's permission to visit schools, Ms. Wiszowaty wrote to Mr.

Cashore:

201

It sounds like you are suggesting that WE caused the permissions you received from the Ministry of Education to be revoked.  Nothing could be further from the truth and your accusation is not well taken.

WE has been imploring the CBC to visit our projects for months; what possible reason would we have for interfering in you doing precisely what we asked you to do?  In fact, we devoted significant resources to preparing maps of every community to help assist you with your visits, which we will be sending in a couple hours.

**Please send me the permission you obtained a week ago so that we can immediately raise this issue with the ministry.**  We cannot help address the purported reversal of a government approval without being able to demonstrate to the government that the position they took in denying you access was, in fact, a reversal.

I'm concerned too that you only obtained permission to film the exterior of the schools.   Did you try to get permission to film the interiors?

I understand that your crew was turned away at Motony because they did not produce any evidence of having the required government permission to be there.  If you have evidence to the contrary, I ask that you share it with us immediately.  We have been told as well that the CBC's crews told the school employees that they were with WE. There may be some broken telephone here, but we hope that your crews are being forthright as to their identity.  (emphasis in original)

657.    Mr. Cashore promptly replied and represented that no, the CBC did not believe

WE Charity had caused its purported permission to be retracted:

Speaking of broken telephone, *there was no accusation made or insinuated in my email*.

We wanted you to know what happened and are hoping you can help.

Initially we were told we could film the exteriors of the schools, which was confirmed again today when we arrived.  That permission was then reversed shortly after someone else arrived in a vehicle and stopped the process.

We don't know who he was, but respected his decision and left.

It sounds like something is getting broken down in the process, but

202

those details aside, we're simply trying to find a way to get permission to film the exteriors of the schools.

We'll keep on trying.

658.    Ms. Wiszowaty wrote back within hours and offered to help but again stated that to do so, WE Charity needed a copy of the permission CBC claimed it had received a week earlier.  Ms. Wiszowaty wrote to Mr. Cashore:

> Thanks, Harvey, *I am happy to hear you had no reason to think WE interfered*.
>
> We will certainly do everything in our power to help, but we are now all in a very unfortunate situation given it is Friday evening and the Ministry as well as the government employees (teachers, headmasters…) have processes and protocols that they are required to follow which explains your experience today. *One thing that would be immensely helpful is if you can please share asap the permission that you said you initially received. I assume it was in writing. With that in hand we can do our best to clarify the situation.*
>
> I realize it is too late now, but I so wish you had asked for our assistance with this when you were planning your visit. I assumed you would have known that gaining access to school property always requires official permissions…
>
> I'll check regarding timing of visits and get back to you ASAP. In the case of the WE owned properties (WE College, Baraka…) you can of course have access to the inside of the facilities. In the meantime, however, *please send me the info I need to help you.*

659.    Neither Mr. Cashore nor anyone else from the CBC ever sent WE Charity a copy of the permission Mr. Cashore had repeatedly claimed that CBC procured prior to its visit to Kenya.  That was because the CBC never got permission.

660.     Days later, the Kenyan federal government would confirm that "There is no record of the Ministry of Education issuing permission to the Canadian Broadcasting Corporation to film in schools in September 2021."

661.    The CBC was turned away from visiting or filming at government-run schools in

203

Kenya because, as the Kenyan government told the CBC, "permission is always required to visit or film at Ministry of Education schools."

662.    The CBC knew that it was not allowed to film at government-run schools because it did not get permission, not because of any obstruction or interference by WE Charity.

ii.    <u>Instead of Getting Permission, the CBC Attempted to Gain Entry to Schools Through Illegal Means, Prompting the Kenyan Government's Response that the CBC Falsely Portrayed as Obstruction by WE Charity</u>

663.    When community members in Kenya followed the law and told the CBC that it needed permission to film, the CBC disregarded them.  According to correspondence from the Kenyan government to the CBC, its reporters violated the law.

664.    Community members complained to WE Charity personnel in Kenya about the CBC's actions.  The CBC had made it no secret they were reporting on WE Charity.

665.    As the CBC flouted Kenyan law and policies, Ms. Wiszowaty wrote to Mr. Cashore and Mr. Kelley on September 12, 2021:

> We have been receiving calls from the Governor, from Head Teachers and senior members of the communities who are deeply upset and concerned by your team's behaviour. I am reaching out to provide you context from what we have been hearing.
>
> As we told you many times, you need permission from the Ministry of Education to enter government school property. I find it difficult to understand how you did not prepare for this and how instead you think it is ok to arrive in the community and disregard the rules and the people who are trying to enforce them (I am sure you understand that they are the ones who will perhaps face repercussions).
>
> We have been told that you are arriving places and you and/or someone from your team is suggesting you are there with the Governor's permission, you are with WE, you are donors, or you are government representatives from the Ministry of Education. That is dishonest and disrespectful and the community is extremely troubled by it. That is not the way people conduct themselves here.
>
> We understand you have also been flying drones (which, from our

understanding, is against the law in Kenya).

I want to say again that we wanted you to come to Kenya. I wanted you to meet the wonderful people. I wanted you to have an opportunity to see and understand what we do here. I wanted you to engage with the place and gain an appreciation and hopefully some understanding.

I struggle to understand how racing in and out of communities against their wishes to take exterior pictures of buildings for a few minutes can possibly accomplish any kind of editorial understanding or fairness.

Please re-evaluate your actions until you have the permissions. And once you do have them, please take the time to see really what is there.

The community is extremely upset.

666.    The CBC's misrepresentations, trespass on government property and disregard for

local laws raised sufficient concern that it caused the Kenyan Ministry of Interior and Co-

Ordination of National Government to condemn the CBC's unlawful conduct in writing.  In a

letter to the CBC dated September 13, 2021, the Ministry stated:

> ***We wish to express our condemnation of the misconduct and illegal actions of representatives of the Canadian Broadcasting Corporation.***
>
> We wish to bring to your attention that the following actions are criminal offenses in Kenya.
>
> • Misrepresenting government officials is a criminal offence.
>
> • Trespassing on government land is a criminal offence.
>
> • Flying a drone in Kenya without a license is a criminal offence.
>
> ***There is no record of the Ministry of Education issuing permission to the Canadian Broadcasting Corporation to film in schools in September 2021. Please be politely advised that permission is always required to visit or film at Ministry of Education schools…***

> ***We object in the strongest terms the actions of the Canadian Broadcasting Corporation.*** We reserve the right to take additional action.
>
> ***Cease your activities as described above immediately***.

667.   The CBC knowingly misled its audience during the November Episode by stating that the Ministry of Interior's letter "contained unfounded allegations we had committed criminal acts in Kenya, including trespassing on government property." As portrayed in the November Episode, this letter came out of the blue and was so suspicious, it prompted the CBC to fear for its journalists' safety and rushed them back to Canada.

668.   The November Episode itself shows that the Ministry's allegations were well founded. The CBC's footage shows Mark Kelley standing on school grounds in multiple villages where Kenya's Ministry of Interior has confirmed the CBC did not have permission to visit or film. Aerial footage of schools in the broadcast appears to have been taken by a drone that the Ministry's letter indicates the CBC did not have authorization to fly. The CBC lied about the Ministry's "unfounded allegations" to cover up its own wrongdoing in Kenya and fuel a false narrative that WE Charity blocked its investigation.

   iii.   <u>The CBC Concealed the True Reason Why It Encountered Difficulties Filming at Government-Run Schools in Kenya and Instead Falsely Blamed WE Charity</u>

669.   The CBC did not disclose in any of the Defamatory Publications that it failed to get government permission to film at schools in Kenya. Instead, it falsely portrayed the obstacles it encountered as mysterious and blamed WE Charity for what it knew were its own logistical failures.

670.   In the Podcast, for example, Mr. Kelley describes the CBC team's difficulties filming at schools in Kenya as follows:

> [A]s we found as we went from village to village that we would be there for a while, and some villages, ***we were told me couldn't***

206

*come in, which we found to be kind of odd*.

671.     Mr. Kelley knew why his film crew couldn't go onto school grounds—the CBC did not get permission to do so from Kenya's government.  But the CBC concealed this fact from its audience.

672.     On *The Current*, Mr. Kelley said, "we weren't very welcome in some of the places where we went."  Mr. Galloway, his CBC interviewer, interjected, "Once word gets out that you are looking into the school efforts of WE Charity, efforts to stop you have gone all the way up the food chain to the Ministry of the Interior of that country?"  Mr. Kelley agreed, "Yeah."

673.     Throughout the Defamatory Publications, the CBC falsely claimed that its difficulties in Kenya were WE Charity's fault and part of a scheme by the charity to "block scrutiny" of its projects in that country.

674.     The CBC knowingly misled its audience to believe that WE Charity obstructed its investigation in Kenya when it knew the real reason was its own failure to get government permission in advance of its visit.

**J.   The CBC Misled Its Audience to Believe That WE Charity Had No Response to Many of Its Allegations**

675.     The CBC has cultivated a reputation for reporting both sides of a story, including the positions of the targets of their investigative journalism.  It also publishes its Journalistic Standards and Practices online.

676.     On information and belief, it is the CBC's practice and policy to provide reporting targets prior to publication with detailed questions and allegations to verify reporting and ensure the CBC can report the target's side of the story.  The CBC calls this process of obtaining and reporting the target's side of the story "responsible communication."

677.     In a letter from the editor in chief of CBC News, Brodie Fenlon, entitled "What happened behind the scenes of our WE Charity investigation" published on November 20, 2021, the CBC touted its commitment to "some of the highest journalistic standards in the industry" in its reporting on WE Charity.  Mr. Fenlon stated that prior to publication of the Defamatory Statements, the CBC assured WE Charity donors concerned about the network's incorrect reporting on the charity that it would include their views and "WE Charity's answers to our questions" in the final coverage.

678.     Mr. Fenlon's statement meant that the CBC would follow its standard policy and practice of presenting the specific allegations it planned to publish to WE Charity and publish the organization's responses—*i.e.*, "responsible communication."

679.     Readers of Mr. Fenlon's November 20, 2021 publication would reasonably believe that the CBC engaged in its responsible communication process in preparing its November coverage of WE Charity.

680.     Irrespective of Mr. Fenlon's article, the CBC falsely stated, directly and indirectly, that it had sought out, obtained, and reported on WE Charity's responses to its allegations in a manner consistent with the CBC's practices and policies.

681.     On *The Current*, there was the following exchange:

> MATT GALLOWAY: How have the co-founders of WE Charity, Marc and Craig Kielburger, responded to all of this?

> MARK KELLEY: We have been in touch with Marc -- Marc Kielburger for months now via e-mail back and forth with him.

> To be clear, they say our methodology is flawed. And to prove it, they've now hired a forensic accountant to see if all the money donated to Kenya was spent in Kenya, which is all well and fine, but it doesn't answer our -- our core question: How many primary schoolhouses were fully funded? How many were actually built? That's the question we tried to answer.

682.    The CBC had not been emailing back and forth with Marc Kielburger for months regarding the November Episode.  The first email exchanges between the CBC and Mr. Kielburger regarding that coverage were in November 2021, as set forth above.

683.    The CBC likewise made statements in its other Defamatory Publications, including the November Episode and Podcast, indicating that the CBC had provided WE Charity with an opportunity to respond to the allegations the CBC published, and that the CBC's coverage included the charity's responses—or lack thereof.

684.    For example, in the November Episode, Mr. Kelley states,

> Days before this broadcast, another lawyer's letter from WE Charity. The charity has hired a forensic accountant to "review the flow of funds involved in it Kenyan projects." The charity insists our research into donor funding is "flawed" saying donor claims social media are "inaccurate" and "imprecise" while offering no proof of that claim. The charity continues to claim donors are not told they are funding a schoolhouse. "Donors are told that their donations will be pooled with others to do the most good in a given region or village."

685.    In fact, the CBC *never* provided WE Charity with an opportunity to respond to many of the allegations in the Defamatory Publications.

686.    For example, the CBC did not seek WE Charity's comment on, or provide it any opportunity to respond to, the following:

a.    All allegations concerning finances or use of donor funds;

b.    All social media statements by donors purportedly stating that they believed they fully funded over 900 primary schoolrooms in Kenya;

c.    All allegations regarding Watson Jordan;

d.    All allegations regarding Rukshan de Silva or Iroquois Ridge High School;

e.    All allegations regarding WE Charity's documents, budgets, spreadsheets, and

209

donor communications;

    f.   All of the CBC's counts of schoolrooms in Kenyan villages;

    g.   All allegations that WE Charity interfered with the CBC's investigation in

       Kenya;

687.    WE Charity learned of these allegations along with the rest of the world when the CBC published its false and defamatory coverage.

688.    The CBC refused to provide WE Charity an opportunity to respond to its reporting despite the charity's repeated requests that the CBC do so.  For example, on July 12, 2021, WE Charity's executive director wrote to the CBC, "After you have had the opportunity to review the school data, we hope you will conclude that there is nothing to report. But should you nevertheless plan a story, *we expect that you will tell us what specific allegations you intend to report so that we may respond*."

689.    On September 3, 2021, WE Charity's counsel wrote to the CBC,

> *[D]espite repeated requests by our client, Mr. Cashore has not even shared his "research" with WE Charity*, notwithstanding the ongoing damage caused by his inquiries. He has not even had the courtesy to respond to WE Charity's note from mid August providing documented evidence of the 850+ schools and school rooms which have been built or renovated in Kenya. Given the considerable efforts our client undertook to answer his inquiries, fairness demands that Mr. Cashore share the information which he has gathered to date, and mentioned repeatedly to donors. *What facts has he gathered that justify his repeated harassment of WE Charity's donors? We must insist on this information being provided to WE Charity now.*

690.    On September 10, 2021, WE Charity's counsel wrote to the CBC,

> *CBC is hiding the ball in an increasingly irresponsible manner.* We understand that CBC has latitude to determine when to put to WE Charity the allegations it intends to publish. Your organization, however, has now invested considerable resources flying its team to Kenya to film a documentary. Surely you must entertain the possibility that with the aid of WE Charity's

knowledge and records, some of CBC's allegations could turn out to be wrong. At a minimum, if CBC delays putting its allegations to WE Charity, your news organization could find itself needing to travel *back* to Kenya to get additional coverage and speak with sources whose statements were not tainted by false information.

What concerns us is that we are skeptical that CBC will be willing to take the necessary steps to fix the mistakes we believe it is making. We know that budgets can be tight and timelines short. That is why we ask again for CBC to disclose its allegations and share its research with WE Charity to verify its reporting. Our client has been clear it does not think any story alleging wrongdoing by WE Charity is appropriate, but ***given that CBC appears to have committed itself to a story, it would be reckless for your organization to further delay confirming its facts with the party in the best position to know.***

691.    On September 13, 2021, the CBC falsely assured WE Charity that it would provide the organization with questions consistent with its normal practice of "responsible communication."  The CBC promised WE Charity, "***We will continue to ask questions, as we have in the past, and moving forward. We look forward to fulsome responses from you and others at WE in this regard***."

692.    On November 4, 2021, Mr. Cashore wrote to Marc and Craig Kielburger to inform them that "in the near future, we plan to broadcast our documentary on The Fifth Estate, as well as publish and broadcast stories on other CBC News platforms including cbcnews.ca."

693.    Despite having sent ***zero questions*** to WE Charity after making its September 13, 2021 promise to "continue to ask questions," Mr. Cashore falsely asserted in his November 4, 2021 email that the CBC had been doing so.  Essentially gaslighting the charity, Mr. Cashore stated, "WE Charity has provided numerous responses over the course of several months, and we are relying on those answers to inform our understanding of the research."

694.    The following day, on November 5, 2021, Marc Kielburger responded, stating,

In your email you have indicated that you are relying on "answers we have provided to you to inform your understanding of your

211

research". ***We would like to be <u>very clear</u> that from our perspective, throughout the many months you have been working on this story, you have never provided us with any specific details about your reporting or how and why you have come to the conclusions you have come to.  You have not provided us the fair opportunity to respond and counter what appears to be the very flawed fundamental premise of your story focus***.

***Please provide us with the questions/answers that you say you are using to inform your reporting.*** If you are planning to make allegations that suggest wrong doing on the part of WE Charity/Free the Children you most certainly owe us the right to clearly address those allegations.

(underlining in original.)

695.     Mr. Cashore did not identify any of the questions and answers from exchanges between the CBC and WE Charity that he knew did not exist.

696.     On November 9, 2021, Marc Kielburger wrote to Mr. Cashore and Ms. Swain to confirm that having stated that it planned to imminently publish its coverage of WE Charity, the CBC had concluded that it "won't provide us with questions/allegations as is required as part of standard JSP (which you always ensured us you would)."  In its responses, the CBC did not disagree that it had decided to forgo providing WE Charity an opportunity to respond to its reporting.

697.     Also, as described above, the CBC specifically promised WE Charity that it would give WE Charity an opportunity to respond to financial allegations by interviewing Ms. Wiszowaty, and then broke that promise.

698.     On November 10, 2021, WE Charity's counsel wrote to the CBC,

***CBC appears to have been working on this reporting for at least a year while deliberately keeping WE Charity in the dark.*** There is no defensible need to rush to report allegations about WE Charity before sharing its understanding of the facts with the organization….

Finally, it is possible that The Fifth team, to whom this letter is copied may say, "that is not at all what we are going to report; WE

212

Charity and its lawyers have it all wrong". But this is precisely the problem. ***As counsel, we are guessing at what The Fifth team may say in the program; CBC has not told WE Charity with anything approaching the requisite level of detail what it plans to report***.

699.    And on November 14, 2021, Ms. Wiszowaty wrote to the CBC, "I do not understand why you will not share with WE the numbers you are trying to 'add up'.  How could doing so not help the accuracy of your reporting? I look forward to hearing from you."  She received no response.

700.    Ultimately, WE Charity was forced to guess at the CBC's planned reporting by relying on clues it received from donors and other sources contacted by the CBC who shared with WE Charity the concerning narrative CBC reporters were peddling.  Yet, even when WE Charity was able to provide the CBC a partial response to its reporting by anticipating its coverage, the CBC excluded such responses from its coverage.

701.    For example, as set forth above, WE Charity provided the CBC with numerous *specific* reasons why its social media-based investigation was flawed.  *Supra* at § XI.F.ii.  The CBC excluded those responses from its coverage and instead misleadingly stated in the November Episode, "The charity insists our research into donor funding is 'flawed' saying donor claims social media are 'inaccurate' and 'imprecise' *while offering no proof of that claim*."

702.    This statement misrepresented WE Charity's positions regarding social media reliability. But the statement also misled CBC viewers to believe the network provided WE Charity an opportunity to *prove* the unreliability of social media statements that the CBC in fact had refused to share with WE Charity.

703.    Thus, in the Defamatory Publications, the CBC misled its audience and readers to believe that WE Charity had no response to many of the allegations included in the publications. The CBC did so by: (1) intentionally cultivating a reputation for obtaining and reporting both

sides of a story knowing that the public would expect the CBC to adhere to such standards; (2)

stating that it obtained WE Charity's side of the story in the Defamatory Publications and in Mr.

Fenlon's November 20, 2021 publication; (3) not providing WE Charity an opportunity to

respond to many allegations it published; and (4) not including in its reporting WE Charity's

responses where the organization managed to anticipate some of the CBC's reporting and

provided it with a response.

## XII.   WE CHARITY HAS BEEN HARMED BY AND WILL CONTINUE TO SUFFER HARM FROM THE CBC'S PUBLICATION OF THE DEFAMATORY PUBLICATIONS AND ITS UNLAWFUL NEWSGATHERING CONDUCT

704.    WE Charity is a globally recognized charity and is dependent on its fundraising to

finance charitable works.

705.    WE Charity is dependent upon its reputation to successfully fundraise.

706.    All of WE Charity's funding comes from corporate sponsorship and donations

from the United States.

707.    Donations to WE Charity from the United States comprise a majority of the WE

Organization's global funding.

708.    Since at least January 2021, WE Charity has told the CBC that its fundraising

focus is on the United States.  For example, in a letter to the CBC on January 27, 2021, WE

Charity's counsel wrote,

> While WE has been caught in the crossfire of a political battle in
> Canada, it still has a recognizable and reputable brand in the
> United States, Kenya and elsewhere… WE's American operations
> are clearly in the crosshairs of the CBC's reporting. WE engages
> with school districts, teachers and other organizations in the United
> States. A significant portion of its funding comes from corporate
> sponsorship and donations from the United States. In short, our
> client has a reputation to protect in the United States and it reserves
> all rights to do so as well as in Canada.

709.    And on November 17, 2021, WE Charity's counsel again reminded the CBC of

214

these facts, stating, "We told you in January that false and defamatory coverage of WE Charity would cause direct harm to WE Charity's recognizable and reputable brand in the United States, Kenya and elsewhere."  The letter continued,

> CBC's unlawful conduct during its newsgathering has already caused our clients direct harm in the United States. By airing a false and defamatory Upcoming Broadcast, the CBC will cause further direct harm to our clients in the United States.

710.    Over the course of months of correspondence with WE Charity, the CBC never disputed that its reporting would harm WE Charity chiefly in the United States.

711.    The CBC's accusations, including but not limited to those of donor fraud and theft of donated funds, charge WE Charity with a serious crime, and injure WE Charity in its charitable operations business.  The Defamatory Statements thus constitute defamation per se, and general damages are presumed.

712.    The Defamatory Statements also have caused special damages, including in the form of lost and reduced donations to WE Charity's charitable operations, as explained herein.

713.    The Defamatory Statements have harmed and will continue to harm WE Charity's reputation in the United States, and specifically with WE Charity's donors located in this Country.

714.    For example, on January 31, 2022, a U.S.-based donor wrote an email to Craig Kielburger with the subject line, "Received a troubling (and disheartening) link from a Canadian colleague who knew of my work in Kenya and Kisaruni , to a news report produced by the Fifth Estate in Canada a …and a copy of a caricature of you and Mark , ostensibly as mother Theresa…"  In part, the donor wrote,

> As you know so very well,trust is essential for any human relationship to proper and the success of FTC and WE was due largely to the trust that donors had in you and Mark — here I speak for myself ..

I am not familiar with the Fifth Estate but my colleague called the report "rock solid" and described the production as " the equivalent of 60 minutes  in Canada ".

In our last conversation , we had only discussed the enormous debacle of the summer program that you did not seek,  but were asked to create by the government  ,and I had understood that you and WE had been exonerated ,  .. but the Fifth Estate Report/ investigation was scathing and went far far broader and deeper than the Trudeau debacle ….

I now have several questions regarding the safety,  and long term security of my Endowment investment over several years ,how it may connect to other named Endowments dedicated to the same purpose .. and whether or not I can sustain it , in good faith . I am also requesting a complete financial reporting of my contributions since inception .

715.    As a direct and proximate result of the CBC's intentional and malicious misconduct, WE Charity suffered substantial damage to its reputation.  That damage is continuing in nature and will be suffered in the future.  WE Charity is entitled to recover for these harms, as well as damages for the cost of repairing its reputation.

716.    WE Charity has lost, and continues to lose, donor funds within the United States as a result direct and proximate of the defamatory statements.

717.    Donors who previously pledged funds for future donation have not followed through on those commitments as a result of the false and defamatory statements published by the CBC.

718.    The CBC's Defamatory Publications have also interfered with WE Charity's existing and/or prospective business relationships.  For example, the CBC's Defamatory Publications interfered with WE Charity's planned partnership with another charity to help support international development projects.

719.    The CBC's Defamatory Publications also interfered with WE Charity's relationships with charity oversight organizations.  For example, after the November Episode and

Article were published, Chicago-based CharityWatch added links to the CBC's Defamatory Publications to its ratings for WE Charity and wrote blog posts repeating the CBC's false allegations. WE Charity has also been forced to expend resources responding to inquiries from other charity oversight organizations to demonstrate the falsity of the CBC's allegations.

720.    WE Charity will need to expend considerable resources to counter the damage to its reputation. The cost of buying television, radio, podcast, and online airtime sufficient to counter the falsehoods that the CBC published will be enormous.

721.    In order to repair its reputation, WE Charity will need to devote substantial employee time to production of appropriate corrective media, at great expense to the organization.

722.    In order to repair its reputation, WE Charity may need to engage outside experts, accountants, or other impartial evaluators.

723.    WE Charity will also need to devote time and resources to engaging with charity oversight organizations to repair the harm the CBC has caused to its reputation with such groups.

724.    WE Charity has also been forced to devote additional staff and resources to preparing materials for existing donors and responding to donor inquiries caused by the CBC's falsehoods.

725.    The republication of the defamatory statements, as well as the dissemination of the story through social media, caused WE Charity to suffer additional damages, all of which were the direct consequence of the CBC's actions and foreseeable by the CBC.

726.    The CBC was aware of the harm that social media comments can cause to the target of an investigation, and nonetheless chose to keep comments turned on for the November Episode on YouTube.

727.   WE Charity is in the business of creating positive social impact.  For every donor dollar WE Charity does not receive as a result of the false and defamatory statements made by the CBC, far more than one dollar's worth of positive social impact is lost.

728.   As a direct and proximate result of CBC's intentional and malicious misconduct, the CBC was unjustly enriched. CBC reaped profits from internet clicks on the defamatory press, as well as advertising revenue from the airtime sold during the program and advertising revenue from online advertising space associated with the story, which it should not be permitted to retain.

729.   The CBC's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm WE Charity, or in blatant disregard of the substantial likelihood of causing it harm, thereby entitling WE Charity to an award of punitive damages in an amount to be determined at trial.  Given the repeated—indeed, relentless—nature of the CBC's misconduct here, a substantial award is warranted in order to deter the CBC from future defamatory conduct.

730.   As a direct and proximate result of CBC's misconduct, WE Charity is entitled to compensatory, special, exemplary, punitive, and other damages in an amount to be proven at trial.  WE Charity is also entitled to an award of costs associated with this action, including but not limited to reasonable attorneys' fees, expenses, and pre- and post- judgment interest.

## **CAUSES OF ACTION**

### **Count I**
### **(Defamation)**

731.   WE Charity re-alleges and incorporates by reference paragraphs 1 through 730.

732.   The CBC published the Defamatory Publications and the Core Allegations contained therein.

733.    The Core Allegations were made orally, in writing, and by way of electronic and social media, including audio and visual recordings that were aired on television radio, podcast, and the internet.  CBC intentionally distributed its news broadcast widely, cross-promoted *Fifth Estate* through its other media channels, and repeatedly re-published the material to third parties.

734.    The Core Allegations are of and concerning WE Charity, and the audience reasonably understood the Core Allegations to concern WE Charity.

735.    The Core Allegations contained in each of the Defamatory Publications are defamatory *per se* because they accuse WE Charity of fraud, deception, theft, and obstruction and expose WE Charity to public hatred, contempt, ridicule, and disgrace.

736.    The CBC published each of the Core Allegations without privilege.

737.    The Core Allegations are false.

738.    The CBC knowingly, intentionally, and maliciously made false and defamatory statements concerning WE Charity.  The CBC published each of the Core Allegations with actual knowledge that the statement was false or with reckless disregard of whether it was false or not.  As a result, WE Charity is entitled to punitive damages.

739.    The CBC has injured WE Charity's reputation by publishing the Core Allegations, and exposed WE Charity to public hatred, contempt, ridicule, and disgrace.  The Core Allegations induced an evil opinion of WE Charity in the minds of reasonable persons.

740.    As a direct and proximate result of CBC's misconduct, WE Charity has suffered and will continue to suffer economic damage.  WE Charity is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

741.    Despite repeated requests, CBC failed to issue a retraction or take any action to ensure that WE Charity did not suffer further damage.

**Count II**
**(Breach of Contract)**

742.    WE Charity re-alleges and incorporates by reference paragraphs 1 through 741

743.    WE Charity and the CBC had a valid contract that, if WE Charity permitted the CBC to conduct an on-air interview of Ms. Carol Moraa as a representative of WE Charity, the CBC would also conduct an on-air interview of Ms. Wiszowaty in which she would be given a fair opportunity to address the CBC's planned reporting concerning WE Charity's finances, fundraising, and use of donor funds.

744.    WE Charity performed under this contract when Ms. Moraa sat for her on-air interview as a representative of WE Charity.

745.    The CBC breached the contract by then failing to conduct the promised on-air interview of Ms. Wiszowaty on the terms agreed upon by the parties.

746.    WE Charity was damaged by this breach.

**Count III**
**(Promissory Estoppel)**

747.    WE Charity re-alleges and incorporates by reference paragraphs 1 through 746

748.    The CBC promised WE Charity that if WE Charity permitted the CBC to conduct an on-air interview of Ms. Carol Moraa as a representative of WE Charity, the CBC would also conduct an on-air interview of Ms. Wiszowaty in which she would be given a fair opportunity to address the CBC's planned reporting concerning WE Charity's finances, fundraising, and use of donor funds.

749.    WE Charity reasonably relied on that promise and permitted the CBC to interview Ms. Moraa on camera as a representative of WE Charity.  Such reliance was both reasonable and foreseeable by the CBC.

750.    The CBC's promise induced WE Charity to permit Ms. Moraa to be interviewed

on camera as a representative of WE Charity.

751.    The CBC failed to interview Ms. Wiszowaty on air.

752.    WE Charity's reliance on CBC's promise was detrimental to WE Charity.

**Count IV**
**(Negligent Misrepresentation)**

753.    WE Charity re-alleges and incorporates by reference paragraphs 1 through 752.

754.    The CBC falsely represented to WE Charity that if the charity permitted the CBC to conduct an on-air interview of Ms. Carol Moraa as a representative of WE Charity, the CBC would also conduct an on-air interview of Ms. Wiszowaty in which she would be given a fair opportunity to address the CBC's planned reporting concerning WE Charity's finances, fundraising, and use of donor funds.

755.    The CBC had an obligation to disclose to WE Charity that it in fact would not interview Ms. Wiszowaty on air.

756.    That representation was material to WE Charity's decision whether to provide the CBC with access to Ms. Moraa as a representative of WE Charity.

757.    The CBC expected that in making the false representation, WE Charity would rely on it.

758.    The CBC's false representation induced WE Charity to permit Ms. Moraa to be interviewed on camera as a representative of WE Charity.

759.    WE Charity acted in reliance on that representation by permitting the CBC an on-air interview of Ms. Moraa as a representative of WE Charity.

760.    WE Charity was harmed by the CBC's negligent misrepresentation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff WE Charity respectfully requests this Court to enter judgment in his favor and against Defendant Canadian Broadcasting Corporation and issue an Order:

1) Granting injunctive relief, including but not limited to, ordering the CBC to cease publication of the Core Allegations;

2) awarding compensatory damages in an amount to be proven at trial;

3) awarding punitive, special, and/or exemplary damages against CBC in an amount to be proven at trial, sufficient to prevent CBC from continuing its willful, wanton, intentional and malicious conduct;

4) awarding pre- and post- judgment interest;

5) assessing costs and fees, including but not limited to reasonable attorneys' fees and expenses incurred in the prosecution of this action; and

6) granting such other and further relief as this Court may deem just and proper.

February 8, 2022                                Respectfully submitted,

By: /s/ *Jonathan Sherman*
BOIES SCHILLER FLEXNER LLP

Jonathan Sherman (Bar No. 468539)
Amy L. Neuhardt (Bar No. 996791)
1401 New York Ave NW
Washington, DC 20005
Tel: (202) 237-2727
jsherman@bsfllp.com
aneuhardt@bsfllp.com

Joseph F. Kroetsch (*pro hac vice* pending)
Brooke A. Alexander (*pro hac vice* pending)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
jkroetsch@bsfllp.com
balexander@bsfllp.com

222