IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WE CHARITY,**<br><br>                    **Plaintiff**,<br><br>**v.**<br><br>**CANADIAN BROADCASTING CORPORATION,**<br><br>                    **Defendant**. | Civil Action No. 1:22-cv-00340<br><br><br>ORAL HEARING REQUESTED |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS* AND TO DISMISS COUNTS II-IV OF THE COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION**

Nathan Siegel (DC Bar No. 446253)
Rachel Strom (*pro hac vice* application pending)
Courtney DeThomas (DC Bar No. 888304075)

DAVIS WRIGHT TREMAINE LLP

1301 K Street N.W., Suite 500 East
Washington, DC  20005
(202) 973-4200
(202) 973-4499 (fax)
nathansiegel@dwt.com
rachelstrom@dwt.com
courtneydethomas@dwt.com

*Attorneys for Defendant*
*Canadian Broadcasting Corporation*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF RELEVANT FACTS .................................................................................... 4

I.      THE COMPLAINT ......................................................................................................... 4

      A.      The Defamation Claim................................................................................. 5

      B.      The Contract-Related Claims...................................................................... 6

II.     THE PARTIES AND THEIR NEXUS TO CANADA ................................................... 6

      A.      CBC................................................................................................................ 6

      B.      Plaintiff "WE Charity".................................................................................. 8

III.    THE "WE ORGANIZATION'S" KENYA PROJECTS ................................................ 10

IV.   THE WE ORGANIZATION'S REPEATED SERVICE ON CBC BY ONTARIO COUNSEL OF THE SAME ALLEGED DEFAMATION CLAIMS PURSUANT TO ONTARIO PROCEDURE THAT IT NOW ASSERTS IN THIS LAWSUIT ...................................................................................... 15

V.    THE LOCATIONS OF WITNESSES AND SOURCES OF PROOF ARE OVERWHELMINGLY IN CANADA, AND PRINCIPALLY IN ONTARIO............. 17

ARGUMENT ............................................................................................................................ 20

I.      THE COMPLAINT SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS* ................................................................................................................ 20

      A.      Ontario, Canada Is An Available And Adequate Forum For WE Charity's Claims Against CBC.................................................................. 21

      B.      The Balance Of Public And Private Interest Factors Weighs Heavily In Favor Of Dismissal ............................................................... 24

            1.      Plaintiff's Choice of Forum Deserves Less Deference........................... 24

            2.      The Private Factors Favor Dismissal. ..................................................... 27

            3.      The Public Factors Favor Dismissal. ...................................................... 33

II.     COUNTS II-IV SHOUD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE CBC HAS SOVEREIGN IMMUNITY................................................................................................................ 36

           A.      Plaintiff's Non-Defamation Claims Are Not Based Upon An Act CBC Performed In The United States.................................................... 38

           B.      Plaintiff's Claims Are Not Based Upon An Act Defendant Performed in the United States In Connection With Its Commercial Activity Elsewhere .............................................................. 41

i

C.      Plaintiff's Claims Are Not Based Upon Defendant's Foreign
         Activities That Caused A Direct Effect In The United States ................. 43

CONCLUSION ........................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allianz Global Risks v. U.S. Ins. Co. v. Ershigs, Inc.*,
  138 F. Supp. 3d 1183 (W.D. Wash. 2015)............................................................23

*Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*,
  199 F. 3d 1078 (9th Cir. 1999), *withdrawn on other grounds*, 237 F.3d 1007
  (9th Cir. 2001).........................................................................................................38

*Antares Aircraft v. Federal Republic of Nigeria*,
  999 F.2d 33 (2d Cir. 1993)......................................................................................43

*Argoquest Holdings, LLC v. Israel Disc. Bank Ltd.*,
  No. CV0410292GAF(RNBX), 2005 WL 6070168 (C.D. Cal. Apr. 8, 2005) .........25

*Atl. Tele–Network Inc. v. Inter–Am. Dev. Bank*,
  251 F. Supp. 2d 126 (D.D.C. 2003) .......................................................................44

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016)......................................................................................43

*BCCI Holdings (Luxembourg), S.A. v. Mahfouz*,
  828 F. Supp. 92 (D.D.C. 1993) ..............................................................................35

*BPA Int'l, Inc. v. Kingdom of Sweden*,
  281 F. Supp. 2d 73 (D.D.C. 2003) .........................................................................24

*Can-Am Int'l v. Republic of Trinidad & Tobago*,
  169 F. App'x 396 (5th Cir. 1996) ...........................................................................40

*Capital Currency Exchange, N.V. v. National Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998)....................................................................................21

*Capital Keys LLC v. Democratic Republic of Congo*,
  No. 15-cv-2019 (KBJ), 2021 WL 2255362 (D.D.C. June 3, 2021)...................39, 40

*Carl's Jr. Restaurants LLC v. 6Points Food Services Ltd.*,
  No. CV-15-9827-GHK, 2016 WL 3671116 (C.D. Cal. July 7, 2016).........22, 28, 31

*Clerides v. Boeing Co.*,
  534 F.3d 623 (7th Cir. 2008) ..................................................................................32

*Croesus EMTS Master Fund L.P. v. Federative Republic of Brazil*,
  212 F. Supp. 2d 30 (D.D.C. 2002) ................................................................. *passim*

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*,
  600 F.3d 661 (D.C. Cir. 2010) .................................................................45

*Cruise Connections Charter Mgmt. v. Attorney Gen. of Canada*,
  764 F. Supp. 2d 155 (D.D.C. 2011) .........................................................20

*D & S Consulting, Inc. v. Kingdom of Saudi Arabia*,
  322 F. Supp. 3d 45 (D.D.C. 2018), *aff'd*, 961 F.3d 1209 (D.C. Cir. 2020) ..........................21

*D'Onofrio v. Il Corriere Della Sera*,
  373 F. Supp. 2d 555 (E.D. Pa. 2005) .......................................................32

*Do Rosario Veiga v. World Meteorological Org.*,
  486 F. Supp. 2d 297 (S.D.N.Y. 2007) ...................................................3, 34

*Etaliq, Inc. v. Cisco Sys., Inc.*,
  No. CV113672GAFFFMX, 2011 WL 13220445 (C.D. Cal. July 20, 2011) .........................23

*Fagan v. Deutsche Bundesbank*,
  438 F. Supp. 2d 376 (S.D.N.Y. 2006) .......................................................32

*Florian v. Danaher Corp.*,
  No. CIV.A. 300CV897(CFD), 2001 WL 1504493 (D. Conn. Nov. 20, 2001),
  *aff'd*, 69 F. App'x 473 (2d Cir. 2003) ...................................................28

*Global Index, Inc. v. Mkapa*,
  290 F. Supp. 2d 108 (D.D.C. 2003) .........................................................44

*Goodman Holdings v. Rafidain Bank*,
  26 F.3d 1143 (D.C. Cir. 1994) ...............................................................44

*Grape Stars Int'l, Inc. v. nVentive, Inc.*,
  No. 20-20634-CIV, 2020 WL 4586123 (S.D. Fla. Aug. 10, 2020) .........................22

*Heroth v. Kingdom of Saudi Arabia*,
  565 F. Supp. 2d 59 (D.D.C. 2008) ...........................................................41

*Hyewoong Woo v. Seyeon Lee*,
  433 F. Supp. 3d 18 (D. Mass. 2019) ....................................................22, 38

*In re Air Crash Over S. Indian Ocean*,
  352 F. Supp. 3d 19 (D.D.C. 2018), *aff'd sub nom. In re Air Crash over the S.
  Indian Ocean on Mar. 8, 2014*, 946 F.3d 607 (D.C. Cir. 2020) ...................... *passim*

*Intercontinental Indus. Corp. v. Quo*,
  No. CV10-04174- JAK, 2016 WL 11757610 (C.D. Cal. Sept. 27, 2016) .........................41, 45

*Iragorri v. United Techs. Corp.,
   274 F.3d 65 (2d Cir. 2001)................................................................................3, 25, 33

Irwin v. World Wildlife Fund, Inc.,
   448 F. Supp. 2d 29 (D.D.C. 2006) ...........................................................................23, 35

Israel Disc. Bank Ltd. v. Schapp,
   505 F. Supp. 2d 651 (C.D. Cal. 2007), aff'd sub nom. Israel Disc. Bank, Ltd.
   v. Schnapp, 321 F. App'x 700 (9th Cir. 2009).........................................................33

J VictoriaTea.com, Inc. v. Cott Beverages, Canada,
   239 F. Supp. 2d 377 (S.D.N.Y. 2003)......................................................................22

Jam v. Int'l Fin. Corp.,
   139 S. Ct. 759 (2019)................................................................................................37

Jankovic v. Int'l Crisis Grp.,
   822 F.3d 576 (D.C. Cir. 2016)..................................................................................34

Juniper Networks, Inc. v. Andrade,
   2021 WL 3514103 (N.D. Cal. Aug. 10, 2021 ..........................................................23

*Kettey v. Saudi Ministry of Educ.,
   53 F. Supp. 3d 40 (D.D.C. 2014)........................................................................37, 40, 42

*Lempert v. Republic of Kazakstan, Ministry of Justice,
   223 F. Supp. 2d 200 (D.D.C. 2002), aff'd, 62 F. App'x 355 (D.C Cir. 2003)..................40, 42

Lueck v. Sundstrand Corp.,
   236 F.3d 1137 (9th Cir. 2001) ..................................................................................22

Maritime Int'l Nominess Establishment v. Republic of Guinea,
   693 F.2d 1094 (D.C. Cir. 1982)................................................................................42

*MBI Grp. v. Credit Focier Du Cameroun,
   616 F.3d 568 (D.C. Cir. 2010)............................................................................27, 33, 35

Millicom Int'l Cellular v. Republic of Costa Rica,
   995 F. Supp. 14 (D.D.C. 1998).................................................................................45

*OBB Personenverkehr AG v. Sachs,
   577 U.S. 27 (2015)..............................................................................................37, 39

*Odhiambo v. Republic of Kenya,
   764 F.3d 31 (D.C. Cir. 2014) ........................................................................... passim

Peterson v. Royal Kingdom of Saudi Arabia,
   416 F.3d 83 (D.C. Cir. 2005)....................................................................................36

*Phoenix Consulting, Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ............................................... 36

*\*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ............................................... *passim*

*Princz v. Federal Republic of Germany*,
  26 F.3d 1166 (D.C. Cir. 1994) ............................................... 43

*Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*,
  No. 11-CV-05801 DLI VVP, 2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012) ............... 31

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ............................................... 43, 44

*\*Rodriguez v. Pan Am. Health Org.*,
  29 F.4th 706 (D.C. Cir. Mar. 29, 2022) ............................................... 37, 38, 39

*Sarkar v. Petroleum Co. of Trinidad & Tobago Ltd.*,
  No. H-15-2372, 2016 WL 3568114 (S.D. Tex. June 23, 2016) ............................... 40

*Simon v. Republic of Hungary*,
  812 F.3d 127 (D.C. Cir. 2016), *abrogated on other grounds*, 141 S. Ct. 703
  (2021) ............................................... 37

*Simon v. Republic of Hungary*,
  911 F.3d 1172 (D.C. Cir. 2018), *vacated on other grounds and remanded*, 141
  S. Ct. 691 (2021) ............................................... 27

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ............................................... 20, 21

*Stena Rederi A.B. v. Comision de Contratos*,
  923 F.2d 380 (5th Cir. 1991) ............................................... 42

*Stromberg v. Marriott Int'l, Inc.*,
  256 F. App'x 359 (D.C. Cir. 2007) ............................................... 23

*\*Stromberg v. Marriott Int'l, Inc.*,
  474 F. Supp. 2d 57 (D.D.C.), *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007) ............... *passim*

*Sussman v. Bank of Israel*,
  801 F. Supp. 1068 (S.D.N.Y. 1992) ............................................... 25

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
  33 F.3d 1232 (10th Cir. 1994) ............................................... 43

*Valambhia v. United Republic of Tanzania,*
   964 F. 3d 1135 (D.C. Cir. 2020) ......................................................................43, 45

*Van Cauwenberghe v. Biard,*
   486 U.S. 517 (1988)...........................................................................................21

*Wye Oak Tech. Inc. v. Republic of Iraq,*
   24 F.4th 686 (D.C. Cir. 2022)...........................................................................41

*Zedan v. Kingdom of Saudi Arabia,*
   849 F.2d 1511 (D.C. Cir. 1988).....................................................................39, 41

## Federal Statutes

28 U.S.C.A. § 1602.................................................................................... *passim*

28 U.S.C.A. § 1603...............................................................................31, 36

28 U.S.C.A. § 1604..............................................................................................36

28 U.S.C.A. § 1605...........................................................................36, 37, 41, 43

S.C. 1991, c. 11 (Broadcasting Act) ......................................................................6

## Constitutional Provisions

U.S. Const. amend I. .........................................................................................34

## Other Authorities

*Libel and Slander Act*, R.S.O. 1990, c.L.12............................................................17

Defendant Canadian Broadcasting Corporation ("CBC") respectfully submits this memorandum of points and authorities in support of its motion to dismiss the Complaint for *forum non conveniens* and Counts II-IV for lack of subject-matter jurisdiction.

## PRELIMINARY STATEMENT

This is an action that is nominally brought in the name of the U.S. affiliate of a charity that for years has been headquartered in and directed from Ontario, Canada, against Canada's national public broadcaster, involving news programs about how the Canadian charity spent funds on projects in Kenya. The vast majority of the Complaint concerns eleven allegedly defamatory publications reported by CBC, including two nearly hour-long news documentaries, one in English and the other in French. As the Complaint itself underscores, almost all of the principals and key employees on both sides of this dispute reside in Canada, primarily in the Toronto area. And as the Complaint also makes plain, the vast majority of other potential witnesses are also Canadian.

Indeed, the connections between the parties, the publications, and Canada are numerous. WE Charity itself was founded in Canada in 1995 by Canadians Marc and Craig Kielburger, headquartered in downtown Toronto. WE Charity also has affiliates in the United States and the United Kingdom, including the U.S. entity that is nominally the Plaintiff here, but those affiliates have always been directed by the same executive team in Toronto. And most importantly, the funds for the organization's educational projects in Kenya that are at issue in this case flowed to and from the Canadian "WE Charity" entity. For that purpose, the U.S. and U.K. affiliates act primarily as sources of donor funds that are transferred to Canada before being directed to or for Kenya.

As the Complaint also makes plain, WE Charity has been taking issue with CBC's reporting about it throughout 2021. Its Canadian counsel, on behalf of the Canadian WE Charity

1

and its affiliates (including the putative Plaintiff here), even took the first formal steps to initiate intended defamation proceedings in Ontario over the same CBC news reports that are the focal point of the Complaint.  Yet just six weeks after the last Ontario legal notice was served on CBC, this action was filed in this Court, ostensibly in the name of only the U.S. affiliate of WE Charity.  But that is an artifice of pleading strategy.  In reality when the name "WE Charity" is used in the Complaint, most of the facts alleged refer partly or often entirely to the acts attributable to the Canadian entity, including to Canadian employees and/or donors.

Whatever the motives for this peculiar exercise in international forum-hedging may be, this case warrants dismissal.  First, the entire Complaint should be dismissed on the grounds of *forum non conveniens*.  The central purpose of that inquiry is to ensure that the litigation is in a convenient location.  In this case, it will be significantly more convenient to litigate this case in Ontario, where the parties conduct business and witnesses are centered and from where the speech at issue emanated.

First, there can be little dispute that Canada provides an "available and adequate alternative forum" for WE Charity's claims against CBC.  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 37-38 (D.D.C. 2018), *aff'd sub nom. In re Air Crash over the S. Indian Ocean on Mar. 8, 2014*, 946 F.3d 607 (D.C. Cir. 2020).  Not only have U.S. courts consistently regarded Canadian courts as an adequate alternative forum, here WE Charity repeatedly asserted to CBC that it has viable claims under Canadian law and actually took the first requisite steps to initiate proceedings in Ontario courts before it filed suit here.

Second, the private and public factors that must be considered in any *forum non conveniens* analysis weigh strongly in favor of dismissal.  Preliminarily, the decision to ostensibly bring this action solely in the name of the U.S. affiliate of a Canadian organization is

entitled to limited deference.  The real parties in interest are partly Canadian and the cross-border

litigation this case would entail will only serve to impose "inconvenience and expense" on CBC

and the Court.  *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001).  As to the

private interest factors, here "the ease of access to proof, the availability of compulsory process

to obtain the attendance of hostile witnesses, costs of transporting witnesses, and other expenses

or inefficiencies" all point to Ontario as the more convenient forum.  *See Stromberg v. Marriott

Int'l, Inc.*, 474 F. Supp. 2d 57, 62-63 (D.D.C.), *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007).  The

party-witnesses are almost all located there, as are a large majority of potential witnesses that are

non-parties, including former employees of the Canadian WE Charity.  Few, if any non-party

witnesses could be compelled to appear at any trial in the District of Columbia, but most could

be compelled to appear at a trial in Ontario.

Finally, with respect to the public interest factors there is a significant local interest in

having this case heard in Ontario.  Not only is that province the center of gravity of this dispute,

but as the Complaint makes plain its origins lie in a uniquely Canadian political scandal that

nearly toppled the current Canadian government.  There is "a significant interest in having

localized matters decided in the local forum in accordance with domestic law governing the

case."  *Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 307 (S.D.N.Y.

2007).  Moreover, one of the two hour-long news reports at issue here is in French, as are

documents related to the preparation of that report.  Unlike this Court, Canadian courts are

bilingual.  For all these reasons, CBC respectfully submits that this case should be dismissed on

the grounds of *forum non conveniens*.

In addition, whether or not the Court dismisses the case for reasons of *forum non

conveniens*, it should dismiss Counts II-IV for lack of subject-matter jurisdiction because CBC

has sovereign immunity with respect to those claims.  In addition to the primary defamation

claim, the Complaint also asserts claims for breach of contract, promissory estoppel and

negligent misrepresentation, all based on an alleged failure to interview a representative of the

charity in person in Toronto.  Because the alleged failure to perform that purported "agreement"

took place outside the United States, this Court lacks subject-matter jurisdiction over those

claims under the Foreign Sovereign Immunities Act ("FSIA").

## STATEMENT OF RELEVANT FACTS

This lawsuit is ostensibly brought in the name of the single Plaintiff "WE Charity",

which is identified as a domestic New York corporation.  ECF 1, ¶¶ 2, 19 ("Compl.").  In reality

there are three affiliated nonprofit organizations that are all named "We Charity" – one each in

Canada, the United States and the United Kingdom.  Declaration of Nathan Siegel ("Siegel

Decl.") Exs. 1-3.  The Complaint occasionally acknowledges that reality by referring to those

entities collectively (along with other related entities) as the "WE Organization."  Compl. ¶ 68.

But the Complaint then proceeds to use the terms "WE Organization" or "WE Charity"

interchangeably with the name of the nominal U.S.-based Plaintiff, as if they were one and the

same.  *See, e.g.*, ¶ 68 ("the WE Organization has funded the construction or renovation of more

than 852 schoolrooms in Kenya.  These structures, which WE Charity refers to as "schoolrooms"

. . .).  In fact, as set forth below the nerve center of all the constituent members of the "WE

Organization," including the U.S. affiliate that is the Plaintiff here, has always been in Ontario,

Canada.  Moreover, it is the Canadian "WE Charity" that disbursed funds for the construction of

schoolrooms and other projects in Kenya, which is the principal subject of this lawsuit.

## I.     THE COMPLAINT

The Complaint asserts causes of action for defamation, breach of contract, promissory

estoppel, and negligent misrepresentation.  Compl. ¶¶ 731-760, Counts I-IV.

A.       The Defamation Claim

Almost all of the Complaint's 230 pages focus on the defamation claim.  Most of the defamatory statements it alleges are in two long-form news reports: a roughly 45-minute report aired on November 18, 2021 on CBC's English-language investigative news program *The Fifth Estate*, and a 38-minute similar report in French on a CBC French-language news program, *Enquête*.  *Id.* ¶¶ 379-393; 411-422.  The Complaint also challenges similar statements made in "Promos," website postings, a tweet, a web article, a newsletter, a radio broadcast, a "Teaser," and a podcast connected to the same *Fifth Estate* program.  Collectively, those eleven CBC publications are referred to as the "Defamatory Publications" that are the subject of the defamation claim in Count I.  Compl. ¶¶ 302(a-k), 732.

What the Complaint characterizes as its "Core Allegations" of defamation within those allegedly "Defamatory Publications" all relate to the funding of projects in Kenya.  The Core Allegations include allegedly falsely accusing Plaintiff of not spending in Kenya funds donated for Kenya; misrepresenting a forensic audit of funds spent by We Charity Canada for Kenya; misstating the total number of schoolrooms funded in Kenya and the number within each Kenyan community; falsely reporting that donors were told and believed they "fully funded" schools in Kenya; accusing Plaintiff of blocking CBC from filming schools in Kenya; and allegedly misrepresenting the charity's opportunity to respond to those allegations.  *Id.* ¶¶ 424-425.

The Complaint also alleges that in two news reports in February and March 2021 CBC falsely accused Plaintiff of telling multiple donors they funded two borehole well projects in Kenya in communities called Kipsongol and Osenetoi.  *Id.* ¶¶ 98-103, 156-157.  However, those reports are not among the "Defamatory Publications" for which Plaintiff seeks damages. *Id.* ¶¶ 302, 732-735.  Finally, the Complaint reflects that the time frame for the fundraising and construction activities at issue extends back a decade or more prior to the onset of the COVID-19

5

pandemic.  *See, e.g.*, *id.* ¶ 107 (discussing 2013 fundraising project related to Kipsongol borehole

in British Columbia); ¶¶ 249-252 (quoting letter from former Canadian Ambassador Hynes

describing Kenya projects from 2006-2010); ¶ 214 (2014 post to a WE fundraising page by a

Canadian donor about a school in Kenya); ¶ 350, 612 (Rukshan de Silva's school in Oakville,

Ontario raised money in 2008 and de Silva visited Kenya in 2013); ¶¶ 356 (audit of WE Charity

Canada expenditures in Kenya covered the period April 2012 to August 2020).

### B.        The Contract-Related Claims

The Complaint also alleges that on September 10, 2021 Plaintiff and Defendant entered

into an agreement whereby if Plaintiff permitted Defendant to interview Ms. Carol Moraa on

camera in Kenya, then Defendant would also interview Ms. Robin Wiszowaty to discuss

financial issues.  Compl. ¶¶ 256-262, 745.  It alleges that on or about September 13, 2021

Plaintiff acted in reliance on those representations and performed its obligations when Ms.

Moraa was interviewed on camera in Kenya.  *Id.* ¶¶ 263, 744, 749-750.  It further alleges that on

or about November 12, 2021, when Ms. Wiszowaty was already "in Toronto for business", CBC

breached this agreement by declining to interview Ms. Wiszowaty in-person at CBC in Toronto

about matters related to WE Charity's finances.  *Id.* ¶¶ 273-276, 280.  Based on those allegations

the Complaint asserts claims for breach of contract (Count II), promissory estoppel (Count III)

and negligent misrepresentation (Count IV).  *Id.* ¶¶ 749-760.

## II.    THE PARTIES AND THEIR NEXUS TO CANADA

### A.        CBC

CBC is Canada's "national public broadcaster," founded in 1936 and governed by federal

Canadian statutes.  Pursuant to the federal *Broadcasting Act*, CBC is mandated to: "be

predominantly and distinctively Canadian, reflect Canada and its regions to national and regional

audiences, while serving the special needs of those regions"; "contribute to shared national

consciousness and identity"; "be made available throughout Canada"; and "reflect the multicultural and multiracial nature of Canada."[1]  CBC is headquartered in Ottawa, Ontario. Declaration of Catherine Perry ("Perry Decl.") ¶ 3.

The Complaint identifies at least nine *Fifth Estate* journalists and related CBC news personnel; all but one resides in Ontario, with the other residing in Montreal.  *Id.* ¶ 4.[2]  There were also other CBC journalists who worked on the program, also in Ontario.  *Id.* ¶ 5.  In addition, one of the allegedly Defamatory Publications is an interview on CBC radio program *The Current*.  Compl. ¶ 302(h).  *The Current* describes itself as "Canada's [m]ost [l]istened-to [r]adio [p]rogram" that provides "a fresh look at issues affecting Canadians."[3]  It is also produced and broadcast out of Toronto, and its host Matt Galloway (Compl. ¶¶ 363-374) resides in Ontario.  Perry Decl. ¶ 6.  The podcast is also produced in Toronto, and it was hosted that week by Angela Sterritt who resides in Vancouver (Compl. ¶ 403).  Perry Decl. ¶ 6.  *Enquête*, which the Complaint characterizes as "CBC's French-language equivalent of *The Fifth Estate*," has a separate news staff, including anchor Marie-Maude Denis, which is based in Montreal, Quebec.  *Id.* ¶ 8.  Its staff typically communicates in French, so most of the documents related to the production of the *Enquête* program at issue are in French.  *Id.*

*The Fifth Estate*'s November 18, 2021 program began with footage of Kenya while reporter Mark Kelley reported that "Canada's We Charity raised millions in donations to help people in this country" and "[]a Canadian charity was drawn here by a different force, an

---

[1] https://cbc.radio-canada.ca/en/vision/mandate
[2] They are Mark Kelley (correspondent); Harvey Cashore (producer); Kate McKenna (associate producer); Matthew Pierce (associate producer); Diana Swain (executive producer); Brodie Fenlon (news editor); Catherine Tait (CBC President); Barbara Williams (head of CBC English Language Programming); Jack Nagler (CBC Ombudsman).
[3] https://www.cbc.ca/radio/thecurrent/about-the-current-1.4348036.

overwhelming need to help in this rural and rugged region."  Siegel Decl. Ex. 39 at 0:54-57, 1:27-35; Compl. Ex. D (ECF 1-4) at 3:5-7, 13-15.  The *Enquête* program also reported "Mais un organisme caritatif canadien …"  ECF 1-6 at 2; ECG 1-7 at 2 ("But a Canadian charitable organization …").  And the February 4, 2021 *Fifth Estate* documentary (Compl. ¶¶ 98-103) began with Mr. Kelley reporting "[i]t was Canada's political scandal of the summer, involving the Prime Minister, a pandemic and a children's charity."  Siegel Decl. Ex. 41 at 0:01-07.

  **B.**  **Plaintiff "WE Charity"**

  "The original WE Charity entity was founded in Canada in 1995," by high-profile Canadians Marc and Craig Kielburger.  Compl. ¶¶ 17-18.  The two brothers are bestselling authors who have been awarded the "Order of Canada."  Marc has also "been inducted into Canada's Walk of Fame."  *Id*. ¶¶ 28-29.  While what the Complaint refers to as the "WE Organization" maintains separate boards of directors for each of its Canadian, U.S., and U.K. "WE Charity" entities "according to local regulation," the professional executive team for all "WE Charity" entities is wholly Canadian and has always directed  all WE-related entities from the charity's global headquarters in Toronto.

  Up until a few weeks ago, Plaintiff's website listed five persons as members of its "Executive Team" – Executive Director Dalal Al-Waheidi, CFO Victor Li, COO Scott Baker, and Founders Marc and Craig Kielburger.  Siegel Decl. Ex. 4.  *See also* Compl. ¶ 187 (identifying Ms. Al-Waheidi as Plaintiff's Executive Director when the Complaint was filed). Ms. Al-Waheidi's LinkedIn profile identifies her place of work as Toronto.[4]  Siegel Decl. Ex. 7. Ms. Al-Waheidi corresponded with CBC's Harvey Cashore, the lead producer for *The Fifth Estate*, on numerous occasions in 2021 about CBC's reporting.  Compl. ¶¶ 187-90, 195-98.

---

[4] Ms. Al-Waheidi apparently recently left the organization in or around March 2022, after the Complaint was filed.  *See* https://www.linkedin.com/in/dalal-al-waheidi/.

According to then COO (and now Executive Director) Scott Baker's bio on Plaintiff's website, he "returned to Canada in 2010 [from Ecuador] to assume his role of Executive Director for WE Charity," during which time he "was responsible for the leadership and management of staff across North America, the United Kingdom, and our international offices."  Siegel Decl. Ex. 5.  Mr. Baker moved into the role of Chief Operations Director in 2019, "where he was dedicated to the oversight of WE Charity's international work", and is now once again the Executive Director (and according to press reports will also be working in Ecuador).  *Id*.  And Victor Li, Plaintiff's CFO, is a "long-standing team member and professionally certified in accounting in Canada" who Plaintiff credits with "establish[ing] the financial resources and processes that enabled the charity to expand and grow."  *Id.*

As the Complaint also notes, the WE Organization includes two inter-related and affiliated non-profit and for-profit components.  The for-profit "social enterprise" affiliate is called "ME to WE" and the Organization says it donates most of its profits to the charitable arm. Compl. ¶ 56.  ME to WE was also run out of Ontario and its CEO has been Roxanne Joyal (Compl. ¶ 251), who received the Order of Canada and is credited as a co-founder of the WE Organization.  Siegel Decl. Ex. 8.  For many years the other professional leaders of ME to WE were its former COO Russ McLeod and its CFO Dave Berney, both in Ontario.  *Id.* Exs. 9-10.

And while the Complaint notes that Plaintiff (the U.S. "WE Charity") is registered in 37 U.S. states and posts its own Audited Financial Statements, those documents likewise reflect the reality that as a member of the "WE Organization" Plaintiff has been operationally directed from Ontario.  For example, Plaintiff's most recent regulatory filing in its "home" state, New York, filed in July 2021, was signed by Ms. Al-Waheidi as Executive Director and Mr. Li as CFO. Siegel Decl. Ex. 3 at pp. 1, 4.  It identifies Plaintiff's mailing address as 339 Queen Street East,

Toronto, Ontario M5A 1S9, which until recently was the address of WE's global headquarters in Toronto that is pictured numerous times in the November *Fifth Estate* documentary.[5]  Plaintiff's regulatory filings in some other states are similar.[6]

Nor is this a recent or isolated phenomena.  For example, Plaintiff's New York filing in 2015 is also signed by Mr. Baker and Mr. Li.  Siegel Decl. Ex. 14 at 1.  And while that filing includes as Plaintiff's mailing address (as does the Complaint) the address of what is actually a four-member Buffalo-area law firm (William Moran & Associates) located 15 miles from the Canadian border that serves as Plaintiff's agent for service of process (*id.*), the phone number listed for Plaintiff is the same one as the Toronto headquarters.  Similarly, Plaintiff's Audited Financial Statements are actually addressed to "The Board of Directors, We Charity, Toronto, Ontario, Canada."  Siegel Decl. Exs. 15-19.[7]  For many years Plaintiff's Audited Financial Statements were also posted under a cover letter from Mr. Baker, the Organization's Canadian Executive Director, on the Toronto global headquarters letterhead.  *Id.*

## III.     THE "WE ORGANIZATION'S" KENYA PROJECTS

The Complaint alleges that the "centerpiece" of CBC's reporting was posing the question "where did the money go?" that was donated for the construction of primary schools in Kenya (Compl. ¶¶ 3, 300).  The "WE Organization's" various public filings and other documents the Complaint references make clear that the answer to that question overwhelmingly lies in Canada,

---

[5] https://www.we.org/en-US/about-we/get-in-touch/contact-us.  The current address in Toronto is 336 Queen St. E.

[6] For example, Plaintiff's most recent filing in North Carolina was signed by Mr. Li and notarized in Toronto, identifies Ms. Al-Waheidi as its officer in charge of solicitations, and lists the Toronto headquarters as Plaintiff's mailing address and phone number.  Siegel Decl. Ex. 11 at 1, 3.  Plaintiff's filing by Mr. Li in Alaska in July 2021 contains the same information.  Siegel Decl. Ex. 12 at 1.

[7] In 2015, the name of the organization was changed from "Free the Children" to "We Charity," so audited statements up to that point were directed to "The Board of Directors, Free the Children, Toronto, Ontario, Canada."  Siegel Decl. Ex. 15.

and then perhaps additionally in Kenya.  That is because WE Charity Canada (and very recently its affiliated Canadian foundation) is the entity that principally receives and then disburses funds to Kenya (and elsewhere) for projects in Kenya.  Funds donated to Plaintiff and other WE Organization affiliates for use in Kenya (as well as some other places) are largely sent to Canada before they impact Kenya.

For example, the most recent Financial Statement of Plaintiff's affiliate in the United Kingdom includes the "WE Organization's own description of this process:

> In Asia, Africa, and Latin America, WE Charity (Canada) has implemented the WE Villages program, a holistic, effective five-pillar model built on 25 years of experience collaborating with dedicated community members and international development experts to find solutions that work … WE Charity makes grants to WE Charity (Canada), a partner charity, in order to fulfil the objectives of the WE Villages programme.

Siegel Decl. Ex. 20 at 8, 14.  Likewise, Plaintiff's 2019 Audited Financial Statement states that Plaintiff paid $18.8 million to WE Charity Canada over a 20-month period starting in 2018 (almost two-thirds of the total funds Plaintiff raised), and statements from other years are similar. Siegel Decl. Ex. 19 at 14.[8]  The same information in reverse is reflected in the audited financial statements posted by WE Charity Canada.  For example, WE Canada's 2019 statement states that WE Canada received $20.9 million "from the charity in the United States and $1.2 million from the UK, "towards the organization's international and domestic programming."  Siegel Decl. Ex. 37 at 24.  *See also id.* Ex. 36 at 26 (stating funds received from the US and UK charities in 2018).  The allegations of the Complaint only obliquely refer to the reality that Plaintiff sent

---

[8] *See, e.g.*, Siegel Decl. Ex. 17 at 14 (in 2017 $16.5 million was paid to WE Charity Canada); in 2016 approximately $15 million was paid to WE Charity Canada).

funds to WE Charity Canada, which actually remitted the funds for the structures in Kenya that are the focus of this lawsuit.[9]

That process is even more clearly reflected in the document that the Complaint alleges to be the most relevant to this case – a six-page "Preliminary Reporting Letter" prepared for a Toronto law firm by a Toronto forensic accounting firm concerning the WE Organization's expenditures for Kenya that the Complaint refers to as the "Froese Report."  Compl. ¶¶ 284-301, 356, 443-463; Declaration of Harvey Cashore ("Cashore Decl.") ¶ 6, Ex. 1 (attaching Preliminary Reporting Letter).  The Complaint alleges that the "Froese Report" "directly contradicts the central thesis of CBC's Defamatory Publications."  Compl. ¶ 300.  Setting aside the merits of that assertion about a self-described "preliminary" letter that on its face raises more questions than it even purports to try to tentatively answer, the "Froese Report" makes clear that Plaintiff's relation to the questions it addresses is primarily as one of several sources of funds paid to WE Canada – specifically, "designated donor funds, donations in kind, funds from WE Charity USA, and private and government grants" to WE Canada.  Cashore Decl. Ex. 1 at 2.

Specifically, the letter considered whether "contributions recorded in *WE Canada's financial records* as funds designated for projects in Kenya, including funds *received from WE Charity USA*, [had] been used for projects in Kenya."  Compl. ¶ 297; Cashore Decl. Ex. 1 at 1 (emphasis added).  The letter states that all of the "three streams of expenditures" that Mr. Froese characterized as "related to" Kenya were reported and recorded by "WE Canada."  Compl. ¶ 297.  Also, for donations "specific to a village, a project, a project within a village, or a category of

---

[9] *See, e.g.*, Compl. ¶ 16 ("WE Charity is the largest *funding source* for *an international charitable organization* . . ."); ¶ 37 ("WE Charity is the primary *source of funding* for the entire *WE Organization*.") (emphasis added).

expense," "[f]or these types of projects, WE Canada maintained budgets and monitored direct expenditures, with some costs incurred in Canada and some in Kenya …." *Id*. at 3.

The centrality of Ontario to any examination of the "WE Organization's" finances is likewise reflected in several previous reports released about financial transparency that have been commissioned and released by the "WE Organization."  In late 2020, another Toronto accounting firm, Al Rosen & Associates, was commissioned to examine "questions about [WE Charity's] finances and decision making" at the time of the pandemic, including its plan to transfer responsibility for international development projects from WE Canada to another Canadian foundation (discussed in more detail below).  Siegel Decl. Ex. 21 at 1.  Plaintiff's website also states that "we have subjected every aspect of our organization – from program impacts and finances to our workplace culture and the co-founders – to rigorous examination by the Honourable Stephen Goudge, a respected Canadian jurist who served on the Ontario Court of Appeal from 1996 to 2014", and posts reports addressed to its Toronto headquarters from the Canadian jurist.  Siegel Decl. Exs. 22-23.  Those reports by Canadian experts also address transparency issues concerning the relationship between the non-profit and for-profit ME to WE components of the organization.  *Id.*  Even a report authored by an American, former Wisconsin Governor Scott McCallum, evaluated aspects of ME to WE which it described as "a certified B Corporation in Canada as of 2015" that is "headquartered in Toronto, Canada," and the report bases its conclusions on multiple Canadian documents and sources.  Siegel Decl. Ex. 24 at 2.

And while perhaps less fundamental given that the time frame of the conduct at issue in the Complaint pre-dates the pandemic, to this day financial support for the Organization's Kenya projects continues to primarily flow from Ontario.  As the Complaint alludes to, in 2020 what became known as the "WE Charity scandal" was front-page news throughout Canada.  The

13

controversy erupted after a government contract was awarded to WE Charity Canada to administer over half a billion dollars in public expenditures to run volunteer programs for students during the pandemic.  Shortly after the contract was announced, questions were raised about WE Charity's relationship to high-ranking members of the Canadian government, including Prime Minister Justin Trudeau and his family and then-Finance Minister Bill Morneau. It was then widely  reported that WE had paid over $400,000 (Canadian) in speaking fees and expenses to the Prime Minister's mother and brother for speaking at WE events and had paid for trips to Kenya and Ecuador for Finance Minister Morneau, who ultimately resigned in response to the scandal.  *Id.* ¶¶ 77-83.[10]  Two Canadian Parliamentary committees spent almost a year holding hearings about the controversy.  The footage of one American donor (Reed Cowan) in the November 2021 *Fifth Estate* report who alleged that "WE Charity had removed a plaque from one of the schools he funded" actually comes from Cowan's recorded, virtual testimony before a Parliamentary Committee in March 2021.  *Id.* ¶¶ 140-42; Siegel Decl. Ex. 25 at 12.

As a result of the impact of the scandal, WE Charity Canada decided to "wind down its operations and establish a foundation to provide sustainable ongoing funding for existing overseas projects and programs."  Compl. ¶ 82.  That foundation is called WE Charity Foundation, and as its website explains, "WE Charity Foundation (WCF) has been established to carry on the work started by WE Charity Canada. Our mandate is to ensure the continued support of impactful regional projects in Kenya those that will ensure transformational change for

---

[10] *See, e.g.*, https://nationalpost.com/news/politics/we-organization-paid-hundreds-of-thousands-of-dollars-in-speaking-fees-to-trudeaus-mother-and-brother-report; https://www.theglobeandmail.com/politics/article-trudeau-praises-excellent-work-of-we-charity-despite-recent/; https://www.thestar.com/news/canada/2020/07/13/opposition-aim-to-recall-ethics-committee-to-study-trudeaus-connections-to-we-charity.html; https://www.ctvnews.ca/politics/finance-minister-bill-morneau-resigns-will-not-seek-re-election-1.5068128.

generations."  Siegel Decl. Ex. 26 at 5.  As it also notes, "WE Charity Foundation is a public

foundation registered in Canada."  *Id.* Ex. 27 at 1.  WE Charity Canada's most recent audited

financial statements indicate that as part of its winding-down process it transferred $10 million in

fiscal year 2021 to WE Charity Foundation.  Cashore Decl. Ex. 14 at 13.

       Finally, of the nine executives and other personnel the Complaint identifies by name as

currently or formerly working for "WE Charity", just one (Robin Wiszowaty) is alleged even as

a formal matter to be "employed directly by and receive[] her paychecks from" Plaintiff.  Compl.

¶ 30.  Even so, to the public the WE Organization currently holds Ms. Wiszowaty out to be the

professional Director of the Canadian charity that is currently responsible for projects in Kenya:

she is identified on the WE Charity Foundation's website as the "WE Charity Foundation

Director."  Siegel Decl. Ex. 26 at 3.  In fact, the process of transitioning funding for Kenya from

WE Charity Canada to that foundation is summarized by Ms. Wiszowaty in an email curiously

sent to Watson Jordan, an American donor interviewed by CBC, a couple of months before the

November 2021 *The Fifth Estate* broadcast.  Cashore Decl. Ex. 13.

## IV.    THE WE ORGANIZATION'S REPEATED SERVICE ON CBC BY ONTARIO COUNSEL OF THE SAME ALLEGED DEFAMATION CLAIMS PURSUANT TO ONTARIO PROCEDURE THAT IT NOW ASSERTS IN THIS LAWSUIT

       Throughout 2021 as CBC was investigating the news reports discussed in the Complaint,

counsel for the WE Organization in both Ontario and the United States sent more than a dozen

letters to CBC's in-house counsel, excerpts from which are frequently quoted in the Complaint.

*See, e.g.*, Compl. ¶¶ 112, 135, 167, 194, 216, 334.  A repeated theme of the letters from both

sides of the border was that "WE Charity" claimed to have viable defamation claims in Canada.

Moreover, prior to filing this lawsuit WE actually took the first formal step under Ontario law to

initiate defamation lawsuits in Ontario over the same news reports.

Between January and March 2021, the same U.S. counsel that filed this lawsuit submitted several letters to CBC related to its reporting about the Kipsongol borehole in the February 4, 2021 *The Fifth Estate* report (Compl. ¶¶ 98-99). Excerpts from some of those letters are quoted in the Complaint. *See, e.g.*, Compl. ¶¶ 112, 135. Tellingly, those letters were not submitted solely on behalf of Plaintiff – rather they were submitted on behalf of the collective "WE Charity, *including* its ongoing operations in the United States." Siegel Decl. Ex. 28 at 1. The thrust of the legal claims U.S. counsel made in its letters was that Canadian law affords the collective "WE Charity" at least as viable a claim for defamation as would U.S. law. Those letters even repeatedly cited Canadian case law to support that proposition. *See, e.g.*, *id.* at 7 ("Canadian courts have held that failing to give a target of untruthful allegations an opportunity to respond is a factor that will support a finding of malice and increase an award of damages [citation to Canadian case omitted]. Although couched in different law, the same is effectively true for the United States."); *id.* at 16 ("the legal rule of libel in Canada and the United States is the same [citations to both Canadian and U.S. cases omitted]; *see also* Ex. 29 at 6 ("This requirement is required by Canadian law . . . ").

However, beginning in June 2021 the WE Organization then turned exclusively to its Ontario counsel to send numerous letters to CBC for the next six months, which were likewise not submitted solely on behalf of the Plaintiff here. Rather, they were also sent collectively on behalf of "WE Charity, []its co-founders Mark and Craig Kielburger, together with related entities." *Id*. Ex. 30 at 1. Many of the letters referred to or quoted from in the Complaint are from that Ontario counsel. *See, e.g.*, Compl. ¶¶ 155, 194, 216, 353.

In addition, the WE Organization's Ontario counsel also served three formal "Libel Notice[s]" on CBC with several of those letters. As Canadian law expert Brian Rogers explains

in his Declaration submitted with this motion, under Ontario law one of the time-related limitations on defamation actions is the service of a Notice specifying the allegedly defamatory statements complained of within six weeks of becoming aware of them.  Rogers Decl. ¶ 12; § 5(1) of the *Libel and Slander Act*, R.S.O. 1990, c.L.12.  On June 2, 2021, CBC was served with a Libel Notice of an Intended Action pursuant to Ontario statutes by "WE Charity, on behalf of itself, its affiliates and its representatives" against CBC and several of its journalists.  Siegel Decl. Ex. 30.  All the allegedly defamatory statements identified by the Notice concerned the funding of the borehole in Kipsongol, Kenya.  *Id.  See also* Compl. ¶¶ 98-99.  A second Libel Notice was served on July 22, 2021, concerning the same statements in re-broadcasts of this same program.  Siegel Decl. Ex. 31.

Finally, on December 22, 2021, Ontario counsel served a Libel Notice of an Intended Action concerning the November 18, 2021 *The Fifth Estate* program, which was served on behalf of "WE Charity, its affiliated entities and Founders Marc Kielburger and Craig Kielburger (together "WE Charity") …").  *Id.* Ex. 32.  But about six weeks later, the instant lawsuit was filed ostensibly only on behalf of "WE Charity" as a purely domestic U.S. corporation, alleging materially the same allegedly defamatory statements identified in the Ontario Libel Notice that had been served on behalf of the collective "WE Charity."  *Id.*

## V.   THE LOCATIONS OF WITNESSES AND SOURCES OF PROOF ARE OVERWHELMINGLY IN CANADA, AND PRINCIPALLY IN ONTARIO

Consistent with who the real parties in interest are in this case, the Complaint  makes clear that the large majority of likely potential witnesses in this case reside in Canada, and primarily in the Toronto area.  Specifically:

- The Complaint identifies 21 persons who allegedly are or were employed by or acted on behalf of either Plaintiff or Defendant.  19 of them reside in Canada (all but one appear

to reside in Ontario), one is in Kenya, while one (Scott Baker) may also be residing in Ecuador.[11]  The only alleged U.S. citizen is Robin Wiszowaty, who is the Director of the Canadian WE Charity Foundation and splits her time in Kenya.  In addition, the two-member ME to WE executive team (Russ McLeod and Dave Berney) were also based in Ontario.

- The Complaint identifies by name dozens of non-party individuals who are donors or have allegedly relevant knowledge.  Of those persons, based on the Complaint's allegations and Defendant's efforts to identify them approximately 35-40 are Canadian residents[12], about 10 reside in the United States, and another half-dozen are scattered around the world.  Siegel Decl. Ex. 38.

- In addition to those names, the Complaint also attaches a list of 50 Canadian educators who signed a letter to CBC related to the reporting at issue.  Exhibit J.

- The time frame for the events at issue stretches back many years.  As a result, document discovery between the parties is likely to reveal the names of more former WE Canada

---

[11]  They persons identified with WE Charity are Craig Kielburger, Marc Kielburger, Dalal Al-Waheidi, Kim Plewes, Roxanne Joyal, Scott Baker, Spencer West, and Carol Moraa (who is in Kenya).  *See* Siegel Decl. Ex. 38 (listing likely residences).  For Defendant they include Mark Kelley, Harvey Cashore, Kate McKenna, Matthew Pierce, Diana Swain, Brodie Fenlon, Catherine Tait, Barbara Williams, Jack Nagler, Matt Galloway, Angela Sterritt and Marie-Maude Denis.  *See* Perry Decl. ¶¶ 4-6, 8.

[12] The Canadians include Bill Morneau, Stuart McLaughlin, Della McLaughlin, John Nicola and Nicola Capital, Barb Cowan, Tom Cowan, Donna McFarlane, Bob McFarlane, James Cohen, Don Morrison (former COO Research in Motion), Kim Campbell (former Canadian PM), John Peller (CEO of Peller Estates), Dave Richardson (Octaform Systems Inc.); Jennifer Tory (former Chief Administrative Officer of RBC), Jon and Karyn Levy (founders of Mastermind Toys), Mathew Corrin (CEO of Freshii), Chip Wilson (founder of Lululemon), Lane Merrifield, Gail Asper (founder of the Canadian Museum for Human Rights), Greg Yuel (Lead Governor to the CFL); Gerry Connelly (former Director of the Toronto District School Board); Lori Adams (founder of Sudbury Minga for Massai); Rosanne Leddy; Richard Abboud; Mark Burke; Mark Quattrocchi; Ambassador Ross Hynes; Avery Skog; Michael Clemons and his Foundation; Kim Plewes; Koren and Dr. Aubrey Kassirer, Ken Froese and Froese Forensic Partners.  Siegel Decl. Ex. 38.

employees with knowledge that is relevant to this case (and who are not otherwise confidential sources for these news reports), but who have long left their employment with WE Charity Canada. Indeed, the Complaint already alludes to other former employees, some of whom are known to the parties and are actually or likely Canadian.

For example, the Complaint makes vague references to unidentified "WE Charity donor relations employee[s]" who corresponded with Watson Jordan, an American donor interviewed on the November 2021 *The Fifth Estate* report, and also refers to other unspecified "WE Charity" "emails" sent to Mr. Jordan. Compl. ¶¶ 590-597; *see* Compl. Ex. D (ECF 1-4) at 4-5. Plaintiff relies on those communications to allege that Mr. Jordan was not misled. Compl. ¶¶ 590-597. In fact, Mr. Jordan shared emails that he exchanged with WE personnel with CBC. The emails he shared indicate there were at least *six* donor relations and other employees who corresponded with Mr. Watson over a period of several years. *See* Cashore Decl. ¶ 7 Exs. 2-3. Those emails list WE Canada's Toronto office and phone number for all six of those employees. *Id.*

In fact, one of the earliest emails that Mr. Jordan shared was from a ME to WE employee in Toronto who told him that "Andrea Diamond will be your point of contact at Free The Children, working out of our Toronto office." Cashore Decl. Ex. 4 at 5. Another email from Toronto even directed Mr. Jordan to send donor checks directly to "our office in Toronto." *Id.* Ex. 6 at 5. Only after Mr. Jordan inquired whether it might be possible to mail checks within the U.S. did WE offer him that alternative, "if you are more comfortable mailing within the U.S. and not to Canada." *Id.*

•       Finally, the first news organization to report extensively that the WE Organization represented to multiple donors that they funded the same school was not CBC, but rather was *Bloomberg*. On December 28, 2020, Bloomberg published an investigative report entitled "How

a Charity Superstar Innovated Its Way to Political Scandal", which reported that at one point "[a] running joke among staff was that donor plaques hanging on buildings should be made of Velcro because they were swapped so frequently."  Siegel Decl. Ex. 33.  Then on March 5, 2021, Bloomberg published another article entitled "WE Charity's Actions Leave a Trail of Enraged, Grieving Donors" which reported multiple, on the record examples of donors who said they were told they funded the same Kenyan schoolroom.  Most of the donors identified by name in that article are also identified as Canadian.  *Id.* Ex. 34.

**ARGUMENT**

Because this motion challenges both subject-matter jurisdiction in part and seeks dismissal of the entire case on the grounds of *forum non conveniens*, this Court may proceed in either of two ways.  It may elect to first determine whether it has subject-matter jurisdiction over the three challenged counts of the Complaint, and then determine whether the Complaint as it then stands should be dismissed for *forum non conveniens*.  Or it may elect to proceed directly to assessing the appropriate forum, and only address subject-matter jurisdiction if it determines that the case should remain here.  *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007); *In re Air Crash Over S. Indian Ocean*, 946 F.3d at 614-15.  Because *forum non conveniens* is fully dispositive, we address that issue first.

**I.     THE COMPLAINT SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS***

The allegations of the Complaint, and the facts and witnesses they implicate, make clear that Ontario, Canada is by far the most convenient forum to litigate this case.

The general principle behind any *forum non conveniens* inquiry is that "a court may resist imposition upon its jurisdiction even when jurisdiction is authorized" based on "a balancing of factors related to the convenience of the parties as well as factors related to the convenience of the forum."  *Cruise Connections Charter Mgmt. v. Attorney Gen. of Canada*, 764 F. Supp. 2d

20

155, 160 (D.D.C. 2011).  "Whether to dismiss a case on the ground of *forum non conveniens* 'is committed to the sound discretion of the trial court.'"  *D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 322 F. Supp. 3d 45, 49 (D.D.C. 2018), *aff'd*, 961 F.3d 1209 (D.C. Cir. 2020). District Courts are given "substantial flexibility" in evaluating *forum non conveniens* motions, and "'[e]ach case turns on its facts.'"  *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988) (alteration in original).

"Because the doctrine applies in federal courts 'only in cases where the alternative forum is abroad,' the appropriate remedy is dismissal rather than transfer."  *D & S Consulting, Inc.*, 322 F. Supp. 3d at 49 (quoting *Sinochem*, 549 U.S. at 429).  "The standard used to evaluate a motion seeking dismissal based on the doctrine of *forum non conveniens* is clear beyond cavil. The movant bears the burden of showing that (1) there is an available and adequate alternative forum, and (2) the balance of various public and private interest factors indicates that maintaining the case in the current forum is comparatively inconvenient."  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 35.  Each of these factors weigh strongly in favor of dismissing this action.

### A.    Ontario, Canada Is An Available And Adequate Forum For WE Charity's Claims Against CBC.

With respect to the first threshold element, there can be no serious dispute that Ontario provides an available and adequate forum for WE Charity's claims against CBC – whether "WE Charity" is deemed to be the Plaintiff here or the entire "WE Organization".  The threshold for finding an available and adequate alternative forum is low.  An alternative forum is  adequate if the defendant is amenable to process there and the forum permits litigation of the subject matter of the dispute.  *See Capital Currency Exchange, N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 & n.22 (1981)).  "A foreign forum is available and adequate when it 'provide[s] the plaintiff with 'some'

remedy[,]' … even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized." *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 36 (internal citation omitted). Indeed, "[i]t is only in "rare circumstances where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory[ ] that it is no remedy at all, that this requirement is not met." *Id.* at 38 (quoting *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001)).

Since CBC is a Canadian Crown Corporation, there is no question it is amenable to service of process. Perry Decl. ¶ 22. Nor can there be any question that Canadian courts afford remedies for alleged defamation and claims in the nature of breach of contract. Indeed, the collective "WE Charity" has already actually served multiple Libel Notices on CBC in Ontario. *See Hyewoong Woo v. Seyeon Lee*, 433 F. Supp. 3d 18, 26 (D. Mass. 2019) (where plaintiff had also initiated a civil defamation action in South Korea, that was "proof that there is an alternative forum" for those claims). Moreover, the Complaint refers to correspondence from Plaintiff's counsel which asserts that both Canadian and United States law affords "WE Charity" a remedy for defamation. Siegel Decl. Ex. 28 at 4-7, 16. In any event, Canadian courts have consistently been regarded as an adequate alternative forum by United States courts, including with respect to the causes of action alleged by WE Charity. *See, e.g.*, *Grape Stars Int'l, Inc. v. nVentive, Inc.*, No. 20-20634-CIV, 2020 WL 4586123, at *12 (S.D. Fla. Aug. 10, 2020) (Quebec was an available and adequate forum in case involving claims of defamation and breach of contract); *Carl's Jr. Restaurants LLC v. 6Points Food Services Ltd.*, No. CV-15-9827-GHK (ASx), 2016 WL 3671116, at *4-5 (C.D. Cal. July 7, 2016) (Ontario was an adequate alternative forum for litigation of breach of contract and promissory estoppel claims); *J VictoriaTea.com, Inc. v. Cott Beverages, Canada*, 239 F. Supp. 2d 377, 383 (S.D.N.Y. 2003) ("[C]ourts in this District have

consistently recognized Canada as an adequate forum …"); No. 20-cv-02360-BLF, *Juniper Networks, Inc. v. Andrade*, 2021 WL 3514103 at *4 (N.D. Cal. Aug. 10, 2021) (Ontario is an adequate forum for litigating breach of contract and negligent misrepresentation claims).

Finally, Ontario is an available forum. An alternative forum may be considered inadequate if it "could not award any relief to a plaintiff at all" – for instance, if the claims would be time-barred. *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 36. While the statute of limitations for defamation in Ontario is three months, Rogers Decl. ¶ 13, Defendant is undertaking to waive any statute of limitations or notice defense in Ontario with respect to any or all of the Defamatory Publications and the other causes of action identified in the Complaint, as well as any notice requirements, for up to 60 days following the dismissal of this case.[13] Siegel Decl. ¶ 34. It is well established that such a waiver suffices to make Ontario an available forum.[14] Accordingly, CBC has met its burden to satisfy the first requirement for dismissal on *forum non conveniens* grounds.

---

[13] As previously noted, WE Charity already served a Libel Notice with respect to the November 18, 2021 *Fifth Estate* long-form news report. Specifically, the "Defamatory Publications" alleged in the Complaint and to which this waiver is applicable are those identified in paragraph 302(a-k) of the Complaint. Siegel Decl. Ex. 32.

[14] *See, e.g.*, *Stromberg v. Marriott Int'l, Inc.*, 256 F. App'x 359, 360 (D.C. Cir. 2007) (affirming dismissal on grounds of *forum non conveniens* where "Appellees agreed to accept service in Mexico and waived any statute of limitations defenses"); *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 31 (D.D.C. 2006) (granting motion to dismiss for *forum non conveniens* "subject to defendant's assurances that it will waive any procedural obstacles in the plaintiffs' bringing of a lawsuit against defendant in Gabon."); *Allianz Global Risks v. U.S. Ins. Co. v. Ershigs, Inc.*, 138 F. Supp. 3d 1183, 1190-91 (W.D. Wash. 2015) (dismissing for *forum non conveniens* subject to waiver of limitations period in Ontario for 30 days following dismissal); *Etaliq, Inc. v. Cisco Sys., Inc.*, No. CV113672GAFFFMX, 2011 WL 13220445, at *2-3 (C.D. Cal. July 20, 2011) (holding that defendant's agreement to condition dismissal on waiver of statute of limitations defense made Canada an adequate alternative forum).

**B.     The Balance Of Public And Private Interest Factors Weighs Heavily In
        Favor Of Dismissal**

With respect to the second element of the *forum non conveniens* inquiry, "the court looks
to a series of public and private factors to determine whether, when balanced against the
presumption in favor of the plaintiff's choice of forum, those factors favor dismissal."
*Stromberg*, 474 F. Supp. 2d at 60.  "The weight of either the private interest factors or the public
interest factors alone may be cause for dismissal."  *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F.
Supp. 2d 73, 85 (D.D.C. 2003).  The private factors include "the ease of access to proof, the
availability of compulsory process to obtain the attendance of hostile witnesses, costs of
transporting witnesses, and other expenses or inefficiencies."  *Stromberg*, 474 F. Supp. 2d at 62
(citing *Piper*, 454 U.S. at n.6).  Public factors to be considered include "the desirability of
clearing foreign controversies from congested dockets, the extent of any local interest in the
dispute, the ease with which the present forum will be able to apply foreign law, avoiding
unnecessary problems with the conflict of laws, and the burden to the local jury pool in hearing a
foreign controversy."  *Stromberg*, 474 F. Supp. 2d at 63 (citing *Piper*, 454 U.S. at 241 n.6).
These factors weigh strongly in favor of dismissal.

**1.     Plaintiff's Choice of Forum Deserves Less Deference.**

As a general matter, a *forum non conveniens* analysis starts with a strong presumption in
favor of the plaintiff's choice of forum.  *In re Air Crash Over S. Indian Ocean*, 946 F.3d at 613.
However, several factors influence the degree of deference to which that choice is entitled in any
particular case.  The Supreme Court specifically noted in *Piper* that "the presumption applies
with less force when the plaintiff *or real parties in interest* are foreign."  454 U.S. at 255
(emphasis added).  Thus, where the plaintiff and/or the real parties in interest are both domestic
and foreign, that may affect the degree of deference accorded.  *In re Air Crash*, 352 F. Supp. 3d

24

at 44 (presence of several American plaintiffs was not in itself sufficient to avoid dismissal on

forum non conveniens grounds). *See also Argoquest Holdings, LLC v. Israel Disc. Bank Ltd.*,

No. CV0410292GAF(RNBX), 2005 WL 6070168, at *3 (C.D. Cal. Apr. 8, 2005) (stating "[t]he

deference due to plaintiffs … is far from absolute" and granting motion to dismiss

notwithstanding plaintiff's domestic residence); *Sussman v. Bank of Israel*, 801 F. Supp. 1068,

1072-74 (S.D.N.Y. 1992) (same).  Moreover, "[t]he more it appears that the plaintiff's choice of

a U.S. forum was motivated by forum-shopping reasons" – such as "the plaintiff's popularity or

the defendant's unpopularity in the region, or the inconvenience and expense to the defendant

resulting from litigation in that forum" – then "the easier it becomes for the defendant to succeed

on a *forum non conveniens* motion by showing that convenience would be better served by

litigating in another country's courts." *Iragorri*, 274 F.3d at 72.

Here, the record strongly suggests that at a minimum the "real parties in interest" are not

purely domestic.  If anything, throughout the events alleged in the Complaint the "WE

Organization" is clearly most at home in Canada, the nerve center for all WE Charity affiliates.

Moreover, as set forth above, WE Charity Canada actually was responsible for remitting and

recording the costs for Kenya projects, and a forensic audit involved Ontario accountants

auditing primarily WE Charity Canada's financial records.  And even the Plaintiff here has

always been directed by a Canadian executive team and its compliance with some of its

formalities in the United States is often handled by Canadians.

Consistent with those facts, all three Libel Notices served in Ontario complaining about

the same allegedly false and/or defamatory statements were served on behalf of the collective

"WE Charity," of which Plaintiff is simply one constituent member.  And multiple letters to

CBC sent by both U.S. and Canadian counsel concerning the same statements were also sent on

behalf of the collective "WE Charity."  Yet when it came to filing this lawsuit, suddenly the only "WE Charity" to appear as the Plaintiff is a single entity incorporated in the United States.

However, many if not most of the allegations of the Complaint referring to "We Charity" clearly do not relate solely to the domestic Plaintiff.  To note just a couple of examples, the Complaint alleges that "[a] few weeks earlier, WE Charity had hired Mr. Froese to conduct an independent investigative and forensic accounting review of the flow of funds to WE Charity's Kenyan projects," and also alleges that "Mr. Froese's preliminary forensic audit report confirm[ed] that WE Charity had spent more money on Kenya than the funds that had been specifically donated for use in Kenya."  Compl. ¶¶ 288, 445.  But Mr. Froese's preliminary letter actually states that he was hired by Canadian counsel for WE Charity Canada and USA, and that the actual entity that "spent" money on Kenya was WE Charity Canada.  Cashore Decl. Ex. 1.

That is not to suggest that "WE Charity US" as it is sometimes called has an insignificant interest in this case, or that Canadian entities have the only interest.  While Canada has clearly been the nexus of the raising, administration and spending of funds for projects in Kenya, American donors are the largest source of its donations, those donations are typically contributed through WE Charity US, the Organization has leased office space in the United States, going forward as the Canadian entities close responsibility for some projects may be shifted to the United States (though not WE Charity Foundation's activity for Kenya), and collectively "WE Charity" has a reputation in multiple countries including the U.S.  *See* Compl. ¶ 13.  But as the Supreme Court explained in *Piper*, the reason deference is given to a domestic plaintiff's choice of their home forum is because "it is reasonable to assume that this choice is convenient."  454 U.S. at 255-56.  Where a plaintiff or real parties in interest are foreign, "this assumption is much less reasonable."  *Id.* at 256.  Here, the fact that Canada has always been the  nerve center of WE

Charity and its executive leadership and especially so for projects related to Kenya, combined with the gamesmanship that is evident with the same defamation claims being asserted in different jurisdictions by different manifestations of foreign and domestic "WE Charit[ies]," reasonably suggests that this suit was filed here for reasons other than convenience.  Thus, this is a case in which less deference should be accorded the domestic Plaintiff's choice of forum.  *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1183 (D.C. Cir. 2018) (where a domestic plaintiff may have been chosen in part to "manipulate the forum choice," less deference may be warranted), *vacated on other grounds and remanded*, 141 S. Ct. 691 (2021).

Moreover, even ignoring all of those case-specific circumstances, "[a] citizen's forum choice should not be given dispositive weight, however."  *Piper*, 454 U.S. at 256 n.23.  Rather, while "citizens or residents deserve more deference than foreign plaintiffs, [] dismissal should not be automatically barred when a plaintiff has filed suit in his home forum."  As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper.  *Id.  See also MBI Grp. v. Credit Focier Du Cameroun*, 616 F.3d 568, 575-76 (D.C. Cir. 2010) (affirming dismissal for forum non conveniens of suit brought by U.S. plaintiff); *Croesus EMTS Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 38 (D.D.C. 2002) (same).  Here, the balance of conveniences clearly favors the litigation of this dispute in Ontario.

## 2.    The Private Factors Favor Dismissal.

The private factors weigh heavily in favor of dismissing this action because "the ease of access to proof, the availability of compulsory process to obtain the attendance of hostile witnesses, costs of transporting witnesses, and other expenses or inefficiencies" all point to Ontario as easily the more convenient forum.  *Stromberg*, 474 F. Supp. 2d at 62.

First, it is clear that the vast majority of potential witnesses and documentary evidence will be located in Canada, and specifically in Ontario.  As set forth above, all but a few of the 21 persons identified in the Complaint with either party reside in Canada, and almost all in Ontario. *See Florian v. Danaher Corp.*, No. CIV.A. 300CV897(CFD), 2001 WL 1504493, at *2 (D. Conn. Nov. 20, 2001), *aff'd*, 69 F. App'x 473 (2d Cir. 2003) (granting motion to dismiss for *forum non conveniens* where "[t]he cost for 'willing witnesses' to attend trial will be more significant" in Connecticut and "given the number of potential witnesses who are residents of Canada, this second factor points towards litigation of this dispute in Canada.").  Moreover, as the scores of other names in the Complaint indicate, it is highly probable that the large majority of potential non-party witnesses also reside in Canada and primarily in Ontario, including accountants, donors and former WE Charity Canada employees responsible for donor relations and/or spending funds in Kenya.[15]  *See, e.g.*, *Carl's Jr. Rests. LLC*, 2016 WL 3671116, at *3 (significance of testimony from professional accountant who resides in Ontario favors dismissal).

Moreover, it is important to note that the time frame for the events at issue stretches back well over a decade prior to the pandemic.  As a result, discovery between the parties is likely to reveal the names of more persons such as former WE Canada employees with knowledge that is highly relevant to this case (and who are not otherwise confidential sources for these news reports), but who have long left their employment with WE Charity Canada.  And to the extent

---

[15] Defendants seeking dismissal on *forum non conveniens* grounds, such as CBC, need not "submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum" because such a requirement "would defeat the purpose of their motion."  All that is required is that the defendants "provide enough information to enable the District Court to balance the parties' interests."  *Piper*, 454 U.S. at 258. *See also Florian*, 69 F. App'x at 475.

there are additional CBC personnel whom either party deems to be relevant witnesses, they too will very likely reside in Ontario or, to a lesser extent, Quebec.

By contrast, while there will likely also be some witnesses who reside in the United States, such as Watson Jordan, perhaps Reed Cowan, and some other American donors to WE Charity, their number is dwarfed by the sheer number of witnesses residing in Canada. And even as to many if not all of those American donors, the witnesses who have the most knowledge about how the WE Organization solicited and/or handled their donations are overwhelmingly Canadian. The facts related to Watson Jordan, the American donor whose on-camera interview (via Zoom) was excerpted in the November 2021 *The Fifth Estate* report, exemplify why Ontario is the more convenient forum.

With respect to Mr. Jordan, as discussed in the Statement of Facts, the Complaint relies heavily on a few snippets from emails between Mr. Jordan and unidentified "donor relations employee[s]" to allege that CBC falsely reported that Plaintiff misled Mr. Jordan to believe that he had fully funded a schoolhouse. *Id.* The Complaint also quotes isolated snippets from a book Mr. Jordan wrote in 2019 to assert the same point. Compl. ¶¶ 597-599. As set forth in the Statement of Facts, the emails the Complaint references indicate that all of the half dozen employees who communicated with Mr. Jordan were based in Toronto.

But the parties clearly have very different views about what those communications show. In CBC's view those communications to and from Ontario confirm what it reported about Mr. Jordan.[16] Mr. Jordan's book does as well. Siegel Decl. Ex. 35 at 60 ("I was going to fund a

---

[16] *See, e.g.*, Cashore Decl. Ex. 4 at 5 (12/12/13 email to Mr. Jordan: "We have spoken a few times about your interest in building a school with Free The Children with your family", followed by multiple follow-up emails with the subject line, "Building a School"); *id.* Ex. 5 at 1 (5/13/2014 – "I wanted to reach out to see how your efforts are going towards building a school and check if you need any support."); *id.* Ex. 4 at 1 (1/23/2014 – Mr. Jordan's asks, "Not sure

schoolhouse in Kenya in William's memory."). In fact, in CBC's view the book and emails

show how Mr. Jordan, his family, and donors who answered Mr. Jordan's call came to be misled

more broadly than the single issue of the school that was the focus of *The Fifth Estate* program.

   In his book, Mr. Jordan explains that after he succeeded in raising more than he was told

that the school would cost, he understood that (along with a single anonymous donor who was

matching his gift) with the rest of the money he was responsible for funding all the pillars in the

village of Irkaat. *See* Compl. ¶ 597 ("So in the end, we financed an entire village. The name of

the village is Irkaat."); *see also* Siegel Decl. Ex. 35 at 59-63. The emails even show that just as

Mr. Jordan had thought he had built a school in honor of his son, he understood that he was

naming each of the other pillars in Irkaat after four other specific family members or friends,

both living and deceased – and that WE Charity Canada even sent out donors cards contributing

to his understanding.[17] In CBC's view, the emails show that it was within that context that WE

Charity Canada sent Mr. Jordan various updates and other correspondence about Irkaat, all

packaged as updates addressed specifically to the Jordan family for the work they had

supposedly funded.[18] *See* Compl. Exs. N-P.

---

how to confirm that the system knows I am building a school"?, and response is "On the back
end, our system is aware that you are registered as fundraising for a school").

[17] *See, e.g.*, Cashore Decl. Ex. 7 at 1 (1/4/16 email from Mr. Jordan confirming that "certainly,
we want people to know that the naming selections came from the Jordan family"; *id.* 1/14/2016
email to Mr. Jordan promising to send cards from Free the Children to his donors saying "In
honour of Margaret Jordan the gift of clean water has been given to a community in Kenya").

[18] *See, e.g.*, Cashore Decl. Ex. 11 at 2 ("As promised, attached to this email is a comprehensive
report from Irkaat which highlights some of the amazing work happening in the community
thanks to you, your friends, and family"); *id.* Ex. 8 at 1 ("Attached you will find a few highlights
of the impacts of your donations so far this year"); *id.* Ex. 8 at 5 ("If you want to your network of
donors, your welcome to send the email updates I've shared with you because they'll be the most
up to date and tailored to Irkaat"); *id.* Ex. 8 at 7 ("Thanks to the tireless efforts of your family,
friends and extended network, the school has been able to expand the agriculture and food
security pillar.").

The Complaint makes clear that Plaintiff takes a different view of those communications between Mr. Jordan and multiple WE Charity Canada employees.  And for purposes of resolving this motion the Court is of course not called on to address the merits.  Rather, what is relevant here is that Mr. Jordan's situation exemplifies how regardless of where a particular donor may reside, almost all witnesses with knowledge relevant to disputes about how the WE Organization communicated with donors reside or likely reside in Canada.  But were this action to remain in this forum and go to trial, neither party will have the ability to summon witnesses from Canada for live testimony.  And the parties' ability to subpoena witnesses for depositions will be cumbersome, unpredictable, and time consuming, since it will require use of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention") or letters rogatory on a witness-by-witness basis.  *See, e.g.*, *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 43 ("Courts regularly find that the inability to compel witnesses and evidence except through letters rogatory is a compelling factor that weighs in favor of dismissal based on *forum non conveniens*."); *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-CV-05801 DLI VVP, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012) ("obtaining evidence through the Hague Convention and letters rogatory are cumbersome and inefficient, and hardly make litigation in the United States convenient").

Moreover, even within the United States there is no significant connection at all between this dispute and the District of Columbia.  The relevance of this forum is that it is available as a potential venue under the FSIA.  28 U.S.C. § 1603(a).  But that does not thereby make it convenient for purposes of the *forum non conveniens* inquiry.  *See Croesus EMTR Master Fund*, 212 F. Supp. 2d at 40 (noting that "[n]one of the events in question occurred in the District of Columbia" in case brought under FSIA).  *See also Carl's Jr. Rests. LLC*, 2016 WL 3671116, at

31

*5-6 (fact that most witnesses resided in Ontario, while the likely U.S. witnesses did not reside in California, favored dismissal); *D'Onofrio v. Il Corriere Della Sera*, 373 F. Supp. 2d 555, 558 (E.D. Pa. 2005) (dismissing defamation case against Italian media outlets for forum non conveniens where "the only connections this case has with the Eastern District of Pennsylvania are that the plaintiff currently resides here and this district is one of countless other jurisdictions throughout the world in which the allegedly defamatory statements were broadcast.").

Because the District of Columbia has no significant connection to this case, it would not be possible to summon even U.S.-based non-party witnesses to testify live at any trial, let alone those residing in Canada. *Clerides v. Boeing Co.*, 534 F.3d 623, 630 (7th Cir. 2008) (affirming *forum non conveniens* dismissal where "the court concluded reasonably that the superiority of live testimony and the inconvenience of taped depositions obtained by letters rogatory favored dismissal"); *Fagan v. Deutsche Bundesbank*, 438 F. Supp. 2d 376, 383 (S.D.N.Y. 2006) (granting motion to dismiss for *forum non conveniens* defamation claim against German bank where "the sources of proof are far more accessible in Germany than in this District"). As a result, the "availability of compulsory process to obtain the attendance of hostile witnesses" at any trial (or even friendly witnesses who may still require a subpoena) strongly favors Ontario. *Stromberg*, 474 F. Supp. 2d at 62. Any witness residing in Ontario may simply be served with a trial subpoena, and Canadian law also provides a process to compel the attendance of witnesses at trial who reside in other Canadian provinces. Rogers Decl. ¶ 29. And even to the extent there may be U.S.-based witnesses who would be willing to travel to testify, it is not likely to be materially more convenient or less costly for them to travel to Washington, D.C. than to Toronto.

For all these reasons, the private factors favor dismissal.  Far from suiting anyone's actual convenience, litigation in this forum would only serve to multiply "the inconvenience and expense to the defendant" as well as many witnesses.  *Iragorri*, 274 F.3d at 72.

### 3. The Public Factors Favor Dismissal.

The public factors also favor dismissal.  Plaintiff does not appear to plead its claims under foreign law, but all the other public factors favor litigation of this controversy in Ontario.

First, "the extent of any local interest in the dispute" strongly favors Canada.  *Stromberg*, 474 F. Supp. 2d at 63.  *See MBI Grp., Inc.*, 558 F. Supp. 2d at 35.  WE Charity is virtually a household name in Canada, and Canada has a clear interest in a dispute about how charitable funds were spent by an international charity headquartered in Ontario.  *Cf. Israel Disc. Bank Ltd. v. Schapp*, 505 F. Supp. 2d 651, 661 (C.D. Cal. 2007), *aff'd sub nom. Israel Disc. Bank, Ltd. v. Schnapp*, 321 F. App'x 700 (9th Cir. 2009) ("Israel has an interest in the integrity of a commercial transaction negotiated within its boundaries …").

Moreover, as the Complaint alleges, media scrutiny of WE Charity arose out of a Canadian political scandal that led to the resignation of a Cabinet minister.  And the Complaint alleges that scrutiny was further prompted by testimony before a Canadian Parliamentary committee charged with investigating that scandal, which Plaintiff maintains was a partisan exercise by opposition parties to embarrass the Trudeau government.  Compl. ¶¶ 80-82, 140-42. Canada has a far greater interest in the resolution of civil disputes relating to those matters of national significance.  In addition, Canada also has a clear interest in adjudicating the conduct of CBC, which is Canada's national public broadcaster governed by Canadian statutes.  By contrast, "[t]here is no allegation that fundamental issues of American policy are implicated by this lawsuit, or that the U.S. government played any role in the events at issue." *See Croesus EMTS*

*Master Fund*, 212 F. Supp. 2d at 40 (Brazil had stronger interest in contract dispute that related to government actions in Brazil).

Moreover, most of the allegedly Defamatory Publications were primarily researched and prepared by a CBC investigative team based in Toronto.  Perry Decl. ¶ 4.  There is therefore a strong local interest in permitting Ontario the opportunity to consider this case in accordance with its recently passed anti-SLAPP legislation, which addresses lawsuits challenging speech about matters of public interest which emanate from that province.  *See Do Rosario Veiga*, 486 F. Supp. 2d at 307 ("There is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case.").  *See* Rogers Decl. ¶¶ 14-24.

Ontario has chosen to approach balancing the interests of free speech and private reputation in a different manner than would be applied by this Court, which reflects its own considered balancing of interests.  Here, the First Amendment would require WE Charity to satisfy the "'daunting'" actual malice standard with respect to their defamation claims, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016), but only after a lengthy process of discovery and perhaps even trial that imposes a substantial financial burden on a defendant even if it ultimately prevails.  By contrast, Ontario law does not include a fault requirement as an element of defamation, and it recognizes an affirmative defense of "responsible communication" that is arguably less protective than the actual malice standard.  Rogers Decl. ¶ 10.  At the same time,  Ontario's law places a greater premium on the opportunity to seek the dismissal of claims challenging speech early in a case, before significant costs are incurred.  *Id.* ¶ 21.  Ontario's localized interest in applying its approach to the protection of free speech and expression to speech emanating from there by Canada's national broadcaster about a charity founded and headquartered there further weighs in favor of dismissal on *forum non conveniens* grounds.

Second, the "administrative difficulties caused by foreign litigation" also weigh in favor of dismissal. *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 35 (D.D.C. 2006).  While any trial in this case would not be before a jury, the interests in reducing "court congestion" would certainly be served. *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d at 36.  The Complaint alone is 230 pages long and the case implicates the donation and use of funds by a large charity over a period of fifteen years.  "It is evident that the final resolution of the matter, including a likely appeal, would take years," and if the case is tried "it is not unlikely that trial alone could consume weeks, if not months." *BCCI Holdings (Luxembourg), S.A. v. Mahfouz*, 828 F. Supp. 92, 99 (D.D.C. 1993).

Finally, one of the allegedly Defamatory Publications is a 38-minute program in French, as are the documents associated with the preparation of that broadcast.  Perry Decl. ¶ 8.  French is not a foreign language in Canada, and so unlike this Court Ontario courts are set up to be bilingual.  Ontario procedure permits litigants to request a bilingual, French-speaking judge and even to sit a bilingual jury.  Rogers Decl. ¶¶ 42-47.  Courts have regularly found that the need to translate documents from a foreign language weighs in favor of dismissal where the foreign forum is better equipped to adjudicate matters in that language. *Id.* (fact that "French is the national language of Gabon and the language of the legal system" favored dismissal where evidence was in French); *MBI Grp., Inc.*, 558 F. Supp. 2d at 33 ("The need for translation [into French] would add a substantial overlay of cost to this proceeding, in addition to consuming large amounts of time and effort that might be unnecessary in Cameroon."); *Croesus EMTS Master Fund*, 212 F. Supp. 2d at 39 (need to translate materials from Portuguese into English weighed against proceeding in the U.S.).

In short, the balance of factors strongly favors dismissal for *forum non conveniens*.

## II.     COUNTS II-IV SHOUD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE CBC HAS SOVEREIGN IMMUNITY

If the Court also reaches any issues of jurisdiction, this Court does not have subject matter jurisdiction over the Complaint's three alleged causes of action other than the defamation claim, which include claims for breach of contract (Count II), Promissory Estoppel (Count III) and Negligent Misrepresentation (Count IV).

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. § 1602 *et seq*., generally immunizes "an agency or instrumentality" of a foreign government from jurisdiction in an American court.  28 U.S.C.A. § 1603(a).  "If no exception applies, a foreign sovereign's immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  While CBC is an independent news organization, as a Canadian Crown Corporation it falls under the definition of "an agency or instrumentality" for purposes of the FSIA.  Compl. ¶ 26.  CBC is therefore presumptively immune from suit unless one of the exceptions to immunity under the FSIA applies.  28 U.S.C.A. § 1604; *Phoenix Consulting, Inc.*, 216 F.3d at 39.  When, as here, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, . . . the district court should take the plaintiff's allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  *Id.* at 40.  But the FSIA "is not a particularly generous" avenue for obtaining jurisdiction over a foreign entity, *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005), and with respect to Counts II-IV there is no exception to sovereign immunity that applies.

Plaintiff's only alleged basis for jurisdiction is the "commercial activity" exception to the FSIA.  Compl. ¶ 34; 28 U.S.C.A. § 1605(a)(2).  Importantly, the D.C. Circuit recently confirmed

that to determine whether that exception applies a court must assess sovereign immunity "on a

claim-by-claim basis", meaning that a court must "review[] the causes of action *separately*" to

determine whether the exception applies to each cause of action distinctly. *Rodriguez v. Pan Am.

Health Org.*, 29 F.4th 706, 714 (D.C. Cir. Mar. 29, 2022) (citing *Simon v. Republic of Hungary*,

812 F.3d 127, 141 (D.C. Cir. 2016), *abrogated on other grounds*, 141 S. Ct. 703 (2021)).  *See

also OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015).  Specifically, each cause of

action must be assessed to determine whether the alleged commercial activity has a sufficient

nexus to the United States. *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019).

The "commercial activity" exception to the FSIA will apply only if one or more of three

conditions are satisfied with respect to a cause of action:

(1)    the action is based upon a commercial activity carried on in the United
       States by the foreign state;

(2)    or upon an act performed in the United States in connection with a
       commercial activity of the foreign state elsewhere;

(3)    or upon an act outside the territory of the United States in connection
       with a commercial activity of the foreign state elsewhere and that act
       causes a direct effect in the United States.

28 U.S.C.A. § 1605(a)(2).

While each of these statutory prongs is addressed below, there is a well-developed body

of case law addressing whether claims premised on an alleged failure to abide by an alleged

agreement or representation have a sufficient nexus to the United States for the commercial

activity exception to apply.  If the alleged place or performance and/or breach was in the United

States, then the requisite nexus will typically exist.  If not, then the commercial activity

exception will not apply.  *See, e.g.*, *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir.

2014); *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 50 (D.D.C. 2014).

Here, Counts II-IV are all premised on the claim that there was an alleged agreement and/or promise that if Plaintiff made Carol Moraa available to be interviewed in Kenya, CBC would interview Robin Wiszowaty about financial issues.  The Complaint asserts that Plaintiff supposedly performed its side of the alleged agreement when Ms. Moraa was interviewed in Kenya, but CBC allegedly breached that agreement and/or its representations by declining to interview Robin Wiszowaty in person in Toronto.  Those allegations are insufficient to support subject-matter jurisdiction.  Indeed, courts have held that subject-matter jurisdiction under the FSIA was lacking pursuant to contract and misrepresentation-based allegations that had far more of an alleged nexus to the United States than do Counts II-IV.[19]  Assessing each prong of the commercial activity exception in turn only underscores that CBC is immune from suit on Plaintiff's three non-defamation claims.

### A.    Plaintiff's Non-Defamation Claims Are Not Based Upon An Act CBC Performed In The United States

"To invoke the district court's jurisdiction under clause one, the plaintiff's claim must be 'based upon some commercial activity by' the foreign state 'that had substantial contact with the United States.'"  *Odhiambo*, 764 F.3d at 40.  Guiding this analysis, the court should look to the "gravamen" or "core" of the claim to ensure the core of claim is "'based upon' commercial activity in the United States."  *Rodriguez*, 29 F.4th at 711 n.1, 712.  By contrast, "the mere fact that" an act performed in the United States "would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [act] for purposes of" the

---

[19] By contrast, courts have generally found that the transmission of a program to viewers in the United States is sufficient to confer jurisdiction over a defamation claim under the commercial activity exception to the FSIA.  *See, e.g.*, *Hyewoong Yoon*, 433 F. Supp. 3d at 25); *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F. 3d 1078, 1086 (9th Cir. 1999), *withdrawn on other grounds*, 237 F.3d 1007 (9th Cir. 2001).  For that reason, Defendant does not dispute that this Court has subject matter jurisdiction over Plaintiff's defamation claim.

commercial-activity exception." *OBB Personenverkehr AG*, 577 U.S. at 34.  In *Rodriguez*, for example, the core of the claim was that the foreign defendant had wrongfully received and maintained money in the United States, so the commercial activity exception applied.  29 F.4th at 712.  But "[i]f the gravamen of [plaintiff's] claim were the forced labor abroad, the commercial activity exception would not apply because the action would not be 'based upon' activity "in the United States."  *Id.* at 711 n.1.

Here, the gravamen of Counts II-IV is that CBC interviewed Ms. Moraa in Kenya, but then allegedly breach an agreement and/or its representations by declining to conduct an in-person interview in Toronto with Ms. Wiszowaty.  Compl. ¶¶ 261, 273-276, 747-760.  Plaintiff does not (and could not) allege that CBC ever promised to interview Ms. Wiszowaty in the United States, or indeed that the supposed agreement required CBC to do anything at all in this country.  The only alleged contact with the United States is that Ms. Wiszowaty was in the U.S. when she exchanged e-mails constituting this supposed agreement with Mr. Cashore while he was in Kenya.  Compl. ¶ 232; Cashore Decl. ¶ 6, Ex. 1.  The caselaw is clear that this falls far short of the kind of "substantial conduct" necessary to establish the first prong (or indeed any prong) of the commercial activity exception.

Rather, only "a contractual arrangement, one part of which is to be *performed* in the United States, constitutes a substantial contact with the United States."  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988) (emphasis added).  *See also Capital Keys LLC v. Democratic Republic of Congo*, No. 15-cv-2019 (KBJ), 2021 WL 2255362, at *14 (D.D.C. June 3, 2021) ("the 'core' or 'gravamen' of breach-of-contract and associated equitable claims is generally the foreign state's breach of its contractual obligations to the plaintiff, since that is the conduct that 'actually injured' the plaintiff.").  Thus, where the defendant's alleged

failure to perform occurred outside the United States, the commercial activity exception does not apply. *Id.*

For example, in *Lempert v. Republic of Kazakstan, Ministry of Justice*, 223 F. Supp. 2d 200, 202 (D.D.C. 2002), *aff'd*, 62 F. App'x 355 (D.C Cir. 2003), the parties negotiated most of the terms of the contract at issue while the plaintiff was in the United States, but the contract called for Kazakhstan to be the place of performance. *Id*.  The court reasoned that "[t]he elements of [plaintiff's] claim that would entitle him to relief are his performance and [defendant's] non-payment, both of which were in Kazakhstan.  The preliminary negotiations between the parties and solicitation of the plaintiff's services were not the 'commercial activity' upon which the claim is based." *Id*. at 203.  Likewise, in *Kettey*, the court dismissed breach of contract and quantum merit claims for lack of jurisdiction because "[a]lthough Plaintiff was interviewed in the United States and signed his contract in the United States, the elements of Plaintiff's breach of contract and quantum meruit claims that would entitle him to relief are his performance and Defendants' non-payment, both of which occurred in Saudi Arabia."  53 F. Supp. 3d at 51.  *See also Odhiambo*, 764 F. 3d at 36 ("mere business meetings in the United States do not suffice to create substantial contact with the United States for these purposes.").

Since none of the interviews at issue took place in the United States, Counts II-IV fail to satisfy prong one of the commercial activity exception.  Moreover, because Plaintiff's claims for promissory estoppel and negligent misrepresentation are premised on the same alleged conduct, the same analysis applies. *See, e.g.*, *Can-Am Int'l v. Republic of Trinidad & Tobago*, 169 F. App'x 396, 408 (5th Cir. 1996) (finding no jurisdiction under the FSIA for claims of breach of contract, negligent misrepresentation and quantum merit where some acts by plaintiff occurred in the United States, but alleged failure to perform occurred abroad); *Sarkar v. Petroleum Co. of*

*Trinidad & Tobago Ltd.*, No. H-15-2372, 2016 WL 3568114 (S.D. Tex. June 23, 2016) (finding

no jurisdiction for claims of breach of contract and negligent misrepresentation where agreement

was reached while plaintiff was in the United States, but alleged failure to abide by it occurred

abroad); *Intercontinental Indus. Corp. v. Quo*, No. CV10-04174- JAK, 2016 WL 11757610, at

*11 (C.D. Cal. Sept. 27, 2016) (fact that alleged representations were made in a meeting in Los

Angeles and in faxes and letters sent to the U.S was insufficient to confer jurisdiction over

breach of contract and fraud claims where alleged failure to perform occurred in China).

### B.    Plaintiff's Claims Are Not Based Upon An Act Defendant Performed in the United States In Connection With Its Commercial Activity Elsewhere

"The second clause of the FSIA—which provides that foreign states are not immune

when the legal action is 'based . . . upon an act performed in the United States in connection with

a commercial activity of the foreign state elsewhere,' § 1605(a)(2)—requires that the act at issue

be one that *the foreign state* has performed in the United States in connection with its

commercial activity elsewhere."  *Wye Oak Tech. Inc. v. Republic of Iraq*, 24 F.4th 686, 700

(D.C. Cir. 2022) (emphasis added).  This exception is especially narrow because "the acts (or

omissions) encompassed in this category are limited to those which in and of themselves are

sufficient to form the basis of a cause of action."  *Zedan*, 849 F.2d at 1514 [citation omitted].

*See also Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 68 (D.D.C. 2008) (prong two

did not apply to alleged claims for negligence and breach of contract where alleged failure to

warn Americans of terrorism risk was not "alone sufficient to sustain a cause of action.").  And

this second clause "of the commercial activities exception can [not] be satisfied for FSIA

purposes based on the various acts that the plaintiff took inside the United States."  *Wye Oak

Tech., Inc.*, 24 F.4th at 702.  Thus, the fact that Ms. Wiszowaty may have been in the United

States in September 2021 when she exchanged emails with Mr. Cashore is also irrelevant to prong two of the exception.  Compl. ¶ 260.

Here too, because CBC allegedly failed to honor the alleged agreement and/or representations by interviewing Ms. Wiszowaty in Toronto, Counts II-IV are not based on any acts CBC allegedly performed in the United States.  *See Odhiambo*, 764 F.3d at 34 (holding that whether an action is "based on" an alleged act means the same thing for prongs one and two of the commercial activity exception); *Maritime Int'l Nominess Establishment v. Republic of Guinea*, 693 F.2d 1094, 1104 n.16 (D.C. Cir. 1982) ("The second clause has no relevance to this case.  The "act" on which this action is "based"—the alleged breach of the SOTRAMAR contract—is not claimed to have been "performed in the United States."); *Kettey*, 53 F. Supp. 3d at 51 (the second prong did not apply to claims for breach of contract and quantum merit where "Plaintiff was interviewed in the United States and signed his contract in the United States" because the alleged breach "occurred in Saudi Arabia"); *Lempert*, 223 F. Supp. 2d at 203 ("The second clause is not applicable to this case" where the "alleged breach of the contract – is not claimed to have been performed in the United States.").

Finally, prong two likewise does not apply to Plaintiff's promissory estoppel and negligent misrepresentation claims, because none of the alleged promises or representations are alleged to have been made by CBC while in the United States.  *Stena Rederi A.B. v. Comision de Contratos*, 923 F.2d 380, 389-390 (5th Cir. 1991) (prong two did not apply to negligent misrepresentations where defendant was not alleged to have made any misrepresentations during the time it was present at a meeting in Texas).  *Cf. Kettey*, 53 F. Supp. 3d at 52 (second prong applied to fraud claim where defendant allegedly made misrepresentations in a face-to-face

meeting in Virginia).  Thus, the second prong of the exception does not empower the Court to exercise jurisdiction over Counts II-IV.

### C.    Plaintiff's Claims Are Not Based Upon Defendant's Foreign Activities That Caused A Direct Effect In The United States

Finally, Plaintiff cannot establish a "direct effect" in the United States stemming from the Defendant's alleged conduct outside the United States.  28 U.S.C.A. § 1605(a)(2).  "[A]n effect is 'direct' if it follows as an immediate consequence of the defendant's activity."  *Odhiambo*, 764 F.3d at 38 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).  A direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994).  Effects which are "speculative" are not direct.  *Odhiambo*, 764 F.3d at 38.  For example, it is well-established that "mere financial loss in the United States caused by commercial activity abroad does not constitute a "direct effect."[20]

In evaluating the direct-effect requirement, the "touchstone" is the Supreme Court's decision in *Weltover*, 504 U.S. 607 (1992), which was a breach of contract case.  *Valambhia v. United Republic of Tanzania*, 964 F. 3d 1135, 1140 (D.C. Cir. 2020).  In *Weltover*, the Supreme Court considered whether Argentina's alleged breach of a contract by unilaterally rescheduling bond payments caused a "direct effect" in the United States.  504 U.S. at 618-19.  After noting

---

[20] *See also United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) ("[plaintiff's] allegation that it lost profits and suffered other harm in the United States as a result of the defendants' actions does not meet the requirements of § 1605(a)(2)"); *Antares Aircraft v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993) ("the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.").  *See also Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 113 (2d Cir. 2016) ("[w]here an American plaintiff is injured abroad, it will often be easy for the plaintiff to cite some downstream financial harm suffered in the United States (where the plaintiff lives or is headquartered), . . . courts must take care to distinguish the initial injury caused by the defendant's allegedly tortious conduct from the less immediate downstream consequences of that injury.").

that the plaintiffs had designated their accounts in New York as the place of payment, the Court concluded, "Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id*. at 619.

Since *Weltover*, this Circuit has "draw[n] a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States." *Odhiambo*, 764 F. 3d at 40. In other words, "the existence or absence of an expressly designated" place of performance "has been decisive." *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 113 (D.D.C. 2003); *see also Atl. Tele–Network Inc. v. Inter–Am. Dev. Bank*, 251 F. Supp. 2d 126, 134 (D.D.C. 2003) ("In this jurisdiction, the direct effect test is interpreted to require a clause in a contract mandating the fulfillment of contractual obligations in the United States.").

Indeed, in case after case in this Circuit the applicability of prong three has turned on whether the alleged agreement and/or representation promised that the defendant's performance would take place in the United States. In *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1144 (D.C. Cir. 1994), the Circuit held that the Iraqi government's failure to honor letters of credit had no direct effect in the United States because "[n]either New York nor any other United States location was designated as the place of performance." *Id*. at 1146 (internal quotations omitted). It was irrelevant that Iraq "might well have paid [plaintiffs] from funds in United States banks," because Iraq "might just as well have done so from accounts located outside the

44

United States"; there was therefore no necessary "immediate consequence" of the breach in the United States. *Id*. at 1146–47. *See also Croesus EMTR Master Fund*, 212 F. Supp. 2d at 37 ("[t]he non-payment could have had no 'immediate consequences'—and thus no 'direct effect'— in the United States where there was never any designation of a place in the United States where payment was to be received …"). *Cf. Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010) (direct effect found where the contract "called for performance in the United States."). The same analysis applies to estoppel and negligent misrepresentation claims premised on the same alleged facts. *See, e.g., Intercontinental Indus. Corp.*, 2016 WL 11757610 at \*13); *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 22 (D.D.C. 1998) ("the plaintiffs' promissory estoppel claim fails to establish 'direct effects' in the United States because the place of fulfillment of the government's assurances and representations . . . would be in Costa Rica and not the United States.").

Here, the parties "had no arrangement that called for" Ms. Wiszowaty's interview to take place in the United States. *Valambhia*, 964 F.3d at 1142. Accordingly, Plaintiff cannot avail itself of the third clause of the commercial activity exception either, and Counts II-IV should be dismissed because CBC is immune from suit in the United States.

## CONCLUSION

For all the foregoing reasons, CBC respectfully requests that Defendant's motion to dismiss be granted.

Respectfully submitted,

_____

Nathan Siegel (DC Bar No. 446253)

45

Rachel Strom (*pro hac vice* application pending)
Courtney DeThomas (DC Bar No. 888304075)

DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, DC  20005
(202) 973-4200
(202) 973-4499 (fax)
nathansiegel@dwt.com
rachelstrom@dwt.com
courtneydethomas@dwt.com

*Attorneys for Defendant*
*Canadian Broadcasting Corporation*

46