# EXHIBIT 21

# REPORT FOR
# WE CHARITY

Rosen & Associates Limited
October 27, 2020

49327024.2

# Rosen & Associates Limited
LITIGATION AND INVESTIGATIVE ACCOUNTANTS

Forensic Accounting
Business Valuation
Public Company Analysis
Quantification of Damages
Public Accountants' Negligence

2500-120 Adelaide Street West
Toronto, Ontario M5H 1T1
Tel 416-363-4515
www.rosen-associates.com

October 27, 2020

## EXECUTIVE SUMMARY

Our firm, being independent investigative accountants, was engaged by Miller Thomson LLP on behalf of donors to WE Charity (WE). The donors for this analysis are the Stillman Family Foundation. Our firm was asked to evaluate and address suggestions that the organization was not in sound financial condition prior to being selected by the Government of Canada to operate its Canada Student Service Grant (CSSG) program, as well as to evaluate other questions about its finances and decision making.

Our standard procedure for such investigations involves assessing the various allegations and criticisms to ascertain their foundations and determine whether they have commonalities, central themes, strengths, weaknesses, and above all, merit.

Our detailed investigation determined the following:

1. WE's decisions in response to the COVID-19 pandemic and the related economic downturn were reasonable and aligned with similar actions taken by other organizations at the time. Its management took the necessary steps to reduce its payroll to maintain its financial viability.

2. As a result of these decisions, WE was financially viable at the time of the signing of the CSSG Funding Agreement with the Federal Government and was not in any financial peril in the Spring of 2020.

3. The CSSG program was taken on by WE to support Canadian students and assist the Government of Canada in deploying a national student service program. It was not a means to generate revenue or "bail out" the organization, as has been frequently alleged.

4. Under the Funding Agreement WE was eligible for reimbursement only for defined Eligible Expenditures. Allegations that WE was in violation of its financial borrowing covenants resulting in danger of mortgage default are without merit.

5. WE's real estate acquisitions were well aligned with – and necessary for the delivery of – the organization's social mission. All real estate owned by the organization was put to full use or purchased to facilitate the future establishment of a learning centre. The previous years' decisions to acquire real estate were appropriate and wise given the continually rising real estate values in Toronto, and the need to increase operating cash flows.

6. The CSSG program reimbursed only incurred expenses, and was not entitled to or able to receive a profit.

7. It was prudent for WE in Canada to wind down, and to contemplate creating an endowment fund to facilitate continued support of key International projects and domestic programs. It was a sound decision given the economic circumstances and the likely projected long-term impacts of COVID-19.

These financial findings stand in stark contrast to many public allegations launched against the organization by Members of Parliament, Canadian media, and select critics.

The primary difference between these findings and the assertions made by the organization's critics is that ours were developed following a detailed financial investigation into the organization's cash flows before, and since, the onset of the Pandemic.

One of the most perplexing themes in the external criticisms of the organization relates to its long-term strategy of acquiring real estate from which to conduct its operations. WE's real estate, acquired over several years to meet its charitable objectives, including the establishment of a learning centre, helped to provide long-term financial stability for the organization. This approach would have been logical in most Canadian cities, but was particularly effective given that real estate values in Toronto have consistently increased over several consecutive decades.

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | OPINION | 3 |
| III. | LOAN COVENANT | 6 |
| IV. | COVID-19 EFFECTS | 7 |
| V. | FINANCIAL STATUS PRIOR TO FUNDING AGREEMENT | 8 |
| VI. | INTERNATIONAL DEVELOPMENT PROJECTS | 9 |
| VII. | OTHER FINANCIAL ANALYSIS | 11 |

APPENDICES:

| | | |
|---|---|---|
| A. | C.V. OF L.S. ROSEN; INDEPENDENCE FORM | A1 |
| B. | FUNDING AGREEMENT BETWEEN HER MAJESTY THE QUEEN IN RIGHT OF CANADA AND WE CHARITY | B1 |

# Rosen & Associates Limited
LITIGATION AND INVESTIGATIVE ACCOUNTANTS

Forensic Accounting
Business Valuation
Public Company Analysis
Quantification of Damages
Public Accountants' Negligence

2500-120 Adelaide Street West
Toronto, Ontario M5H 1T1
Tel 416-363-4515
www.rosen-associates.com

October 27, 2020

Miller Thomson LLP
Scotia Plaza, Suite 5800
40 King Street West
Toronto, Ontario, Canada
M5H 3S1

**Attention:    Steven L. Wesfield**

### Re:  WE Charity

## I.    INTRODUCTION.

Miller Thomson LLP has engaged our firm of independent investigative accountants, on behalf of the Stillman Family Foundation, to examine large quantities of documents and analyze financial data primarily related to events arising from WE Charity ("WE") and its 2020 Funding Agreement ("Agreement") with the Government of Canada.  The "Agreement" was signed on June 23, 2020, but was agreed to be terminated on July 3, 2020 (technically, the Agreement was finally terminated September 26, 2020).  Several consequences arose and merit comment.

You have also asked us to address several assertions of a financial nature raised mainly by Members of Parliament and the media.  For example, the financial viability of WE in early 2020, and specific decisions made by its Board of Directors and Officers, have been questioned.

Our contracted role has largely involved reviewing WE's financial information, the available documents and evidence, as well as asking extensive applicable questions, primarily of WE senior employees.  Then, we as investigative accountants, would have to evaluate the validity and likely relevance of these previously-raised, primarily financial

1

questions and their implications.  What we determined is that the overall public commentary so far is not based on readily available facts, but rather, a "group think" type of behaviour where the same misleading statements are made over and over such that they are improperly assumed to be fact.  One strong example of this was the value of the Agreement itself.  It was erroneously stated hundreds of times by media and politicians alike, that WE was given a contract of $900 million, or a "billion dollar" contract. However, the actual value of the contract was $543M, as stated in the Agreement.  Above all, the contract was limited to reimbursement of expenses incurred by WE.  A "profit" element was not included.

Our topics for analysis and our findings are described on a topic-by-topic basis on the following pages.  The C.V. for the principal investigator (L.S. Rosen) is located in an Appendix, along with the conventional Independence Form.  [Rosen has not previously been engaged by WE Charity or the Kielburger family.]

The general and consequential main topic titles that we address from a financial perspective surround the federal Government's CSSG Funding Agreement ("Agreement") with WE for 2020, and include:

1.  Was WE financially viable as of April 30, 2020 (this being the month-end closest to the designated funding commencement date of about May 5, 2020)?

2.  Was WE's financial response to the COVID-19 Pandemic complications, including having to preserve cash and liquidity by reducing payrolls, harsh or unreasonable? Was it more drastic than what most Canadian employers were forced to undertake due to the supposed, but false, "financial instability" of the organization?

3.  Was the now-terminated Funding Agreement between the Government of Canada and WE some form of open-ended subsidy or 'bail-out' for WE?  And, was there an ability for WE to earn a "profit" from the Agreement, or was it restricted to "reimbursement" for costs incurred in compliance with restricted contractual clauses?

4.  Is a financial covenant violation in 2018 and 2019 of concern when the lender has essentially acknowledged its tolerance of the matter?

5. Is it reasonable and prudent for WE Canada to proceed with creating an Endowment Fund in support of its International development projects?

It is important to note that our analysis took into account the unique and unprecedented nature of the economic times of 2020, in which management would have been forced to navigate a completely new or different set of consequences, where historically successful management responses would have been incomplete or inadequate.

## II.    **OPINION**

Our detailed investigation determined the following:

1.      WE's decisions in response to the COVID-19 Pandemic and the related economic downturn were reasonable and aligned with similar actions taken by other organizations at the time.  Its management took difficult but necessary steps to reduce its payroll to maintain its cash financial viability.

2.      As a result of these decisions, WE was financially viable at the time of the signing of the CSSG Funding Agreement with the Federal Government and was not in any financial peril.

3.      Allegations that WE was in violation of its financial covenants and, as a result, in danger of mortgage default, are without merit.

4.      WE's real estate acquisitions were well aligned with – and necessary for the delivery of – the organization's social mission. All real estate owned by the organization was put to logical use, or had been purchased to facilitate the establishment of a learning centre, and the decision to acquire real estate was not inappropriate.

5.      The CSSG program was taken on by WE primarily to support Canadian students and assist the Government of Canada in deploying a national student service program, and not as a means to generate revenue or "bail out" the organization, as has been frequently alleged.  Any "revenue" was really an offset to incurred, permitted expenses. (But, no "revenue" arose, because of the contract cancellation.)

6.    Under the CSSG Funding Agreement WE was eligible for reimbursement of "Eligible Expenditures", but not to receive a profit.

7.    It was prudent for WE Canada to wind down its Canadian operations and consider creating an endowment fund to facilitate continued support of key International projects and domestic programs.  It was a reasonable decision given the circumstances related to the termination of the CSSG reimbursement agreement and the probable projected long-term impacts of COVID-19 on donations.

These findings stand in stark contrast to many public allegations launched against the organization by Members of Parliament, Canadian media, and select critics.

In coming to these conclusions, we reviewed a large number of financial statements and documents (audited financial statements, banking information, real estate transaction records, etc.) and held many meetings with WE management personnel.

The primary difference between our findings and the assertions made by the organization's critics is that ours were developed as a result of a detailed investigation into the organization's finances before, and since, the onset of the Pandemic. Conversely, the allegations and narrative asserted by critics often appear to be largely based on conjecture, and have not been substantiated in any convincing way by documentation or other evidence.

Frankly, we as financial investigators have not been able to identify what "evidence" critics of WE could have seen before launching several of their allegations.  Thus, we had consequential difficulty knowing which steps in the critics' reasoning processes required our attention.  It is difficult to respond to allegations that are unsupported by evidence. The root of some allegations can simply be misunderstandings of the nature of WE events, and actual decisions.

As a specific example, surely it should be common knowledge that it cannot be an easy task to establish an annually-steady stream of donations for International development projects.  How might executives minimize a noticeable possible lowering of donations

when economic conditions in the world might become depressed?  Then, add-in a Worldwide Pandemic as requiring a further re-evaluation of policies.

Next, consider what the Directors and Officers of an organization might do as early as possible to lessen likely financial impacts.  In WE's case, building some repetitive investment or income-generating or expense-reduction assets like securities was one of their choices, all being consistent with meeting its charitable objectives.  Obtaining multiple-year commitments from donors was another.  Both actions are evidence of their years of strong planning.

Given what has happened in 2020, WE's earlier decisions, were actually taken years beforehand which has proven to have been sound and wise. Real estate acquisitions by WE to fulfill its mandate and support its charitable programming, such as establishing a learning centre, have certainly turned out to add to its financial stability due to rising real estate values in Toronto and rental cost increases.  Real estate holdings should not be an issue being debated.

Consequently, as financial investigators, given the lack of evidence presented by critics, and our detailed review of WE's balance sheet and operating statements, we found minimal merit to allegations of WE's falsely assumed financial difficulties.  Hiring staff for the CSSG project, which was quickly cancelled, obviously would require staff terminations.  This should have been another non-issue; yet, criticisms arose.

Critics cannot seriously complain about some hypothetical financial free-fall, and ignore the fact that what prevented such a fall, at least in large part, was the existence of these other assets, such as stock market holdings and real estate.  It is precisely these assets, when sold, that are likely to enable WE to build Endowment Funds for some or all of its International Projects, including medical facilities.

Another example of an unsupported allegation was that the Agreement with the Federal Government was a means of "bailing out" WE from alleged financial difficulties (which we have already asserted did not exist) in the Spring of 2020.  This false theory persisted despite the fact that the Agreement allowed for no profit to be taken by WE, but rather,

was restricted to the reimbursement only, of eligible costs related to the delivery of the CSSG program. This payment fact is addressed in over 20 locations in the Government's contract wording. Auditing rights for multiple future years was also specified, including the ability of the Auditor General of Canada to carry out his/her separate audit.

Next, we considered the alleged financial covenant issue, which was minor dollars, technical in nature, short-lived and, waived/tolerated by WE's bank. In our view this matter was too immaterial to have ever been raised by critics. Minor covenant violations often occur across Canada, and typically are waived by lenders, as was the case in this instance.

The following pages analyze some of the above in greater depth. In providing our "Opinion", we acknowledge that we generally did not encounter worthy substance that could support many of the critics' allegations.

For all issues and possibilities that were raised by us with WE, satisfactory financial information, documents and responses were received. In our long experience with many Canadian Court cases, what we saw with the WE case allegations were criticisms and allegations too often unsupported by evidence.

## III.   **LOAN COVENANT.**

Some critics have mentioned a temporary bank loan covenant violation in 2018-2019 as being significant and evidence that WE was in a poor financial condition in early 2020. Our firm does not agree with such an assessment.

In 2019, WE changed its financial year end from December 31 to August 31, commencing with 2019. The change was approved so as to coincide with school years for North America. The effect in 2019 was for WE to have an eight-month year instead of the previous choice of 12 months. Bank covenant tabulations often are measured once per year at financial year ends, which would otherwise have been December 31, 2019.

WE's main banker sent them a letter signed by their "Commercial Account Manager" pointing out that as of August 31, 2019 (being an eight-month year instead of the

previous 12 months) that WE failed to maintain a "Debt Service Coverage of not less than 1.25:1".

The bank sent letters to WE, such as on February 26, 2019, stating:  We acknowledge the default...and we agree to tolerate the default".

Subsequently, WE's external auditor signed-off its standard form "clear" audit report for the August 31, 2019 year-end on February 29, 2020.

In short, critics' conclusions were reached without sufficient facts having been gathered and evaluated.  The large investment by WE in real estate was plentiful, in our opinion, to regard the technical covenant violation as being largely insignificant.

## IV.    COVID-19 EFFECTS.

Questions have been raised at different dates about the 2020 timing of WE staff lay-offs, their extent, and whether or not Directors and Officers of WE responded appropriately to the financial challenges presented by COVID-19, which ultimately led to employee lay-offs and other measures taken.

In our analysis, we did not observe any personnel financial activity that required our special attention, such as having created needless liabilities. In essence, WE's reduction of its staff and its decisions are not unlike what appeared to have happened for hundreds or thousands of similar Canadian employer-employee situations.

Accordingly, WE took, as did most Canadian employers, concrete steps to manage the business effects of COVID 19.  Payroll was a significant cost in WE's operations.  The choice for cash retention, in our view, was obvious.  Make the difficult decision to lay-off employees to ensure the longer-term ongoing viability of the organization's finances, and its charitable objectives.

## V.    FINANCIAL STATUS PRIOR TO FUNDING AGREEMENT

As financial investigators, we are somewhat puzzled as to why WE's financial viability prior to its signing of the CSSG Funding Agreement has been repeatedly called into question.  At issue seems to be whether a possibly dubious government "bail-out" was given to WE or that WE was in financial difficulty and was reliant on the Funding Agreement to continue maintaining its charitable operations.  Our analyses do not support such assertions of financial instability.

In the April-May 2020 period WE had well over $50 million dollars of net assets that were in cash, marketable investments or real estate.  These essential reserves existed for financial stability reasons, as mentioned above.  Bank loans at May 31, 2020 were about $15 million and were obviously more than adequately secured by the above-noted assets.

Given year-to-year variations in donation levels that are inherent in the Charitable sector, over several years WE chose to ensure its long-term financial stability by acquiring income-producing or expense-reduction assets to help minimize probable year-to-year variations in funding.  These included the acquisition of real estate (that aligned with delivering on its social mission) or being negotiable dividend or interest-paying investments.  Funding for these stabilizing longer-lived assets was independently solicited, and kept separate from annual donations in support of its annual charitable projects.

In short, given the existence of net assets of WE, the Canadian public appears to have been unaware, or was seriously misinformed, about WE somehow promptly requiring some form of immediate Government "bail-out", in the April-May 2020 period.  The organization's net assets clearly existed to help provide necessary financial stability to WE.  It had to function annually in a typically-difficult environment, where donation levels could change dramatically, especially when any economic uncertainty commenced.  WE's financial circumstances in 2020 were simply similar to what many Canadian entities were experiencing.  The matters received the necessary governance attention.

Moreover, there was never any profit, or surplus cash, to be made by signing the Federal Government funding Agreement in the first place.  The Agreement clearly states that "…funding is provided for a specific project and can only be used for specific eligible expenditures."  Further, "Eligible expenditures" are defined in the Agreement and concrete examples of items that are not eligible for reimbursement are specified.

Further, a "Right To Audit" by Canada is clearly specified in the document, allowing an audit for within a subsequent six-year period under the federal *Auditor General Act*.  The Agreement also stated that "for profit" organizations that might be associated with WE were not eligible for funding.  In short, the Agreement contained many protections for the Government of Canada, including rights to terminate the contract on short notice.

Unfortunately, unsupported speculation can compound itself and could eventually cause serious liquidity problems in organizations.  A Pandemic obviously can escalate financial problems because its time horizon and duration may not be clear.

## VI.   INTERNATIONAL DEVELOPMENT PROJECTS AND ENDOWMENT.

With the ceasing of much of WE's operations in Canada in 2020 due to COVID-19 and the precipitous decline in donations resulting from the dubious political scandal, the long-term viability of WE's International development projects in Kenya, Ecuador and elsewhere became in jeopardy.  WE estimated that the core ongoing support for these activities could be continued for annual costs of under $1,500,000, and perhaps closer to $1,000,000.

After deliberation, the decision was then taken by WE to wind down its Canadian operations and channel the available money into an Endowment Fund for its International charity projects.

Our firm requested and received responses from WE that validate that the Endowment concept is a reasonable plan going forward under the difficult circumstances.  The responses and documentation provided demonstrate, in our opinion, that the plan is reasonable and sound.

As part of its deliberations, Management of WE investigated what its net assets such as real estate could provide on sale. After repaying debts, such as bank loan requirements, finalizing payments for projects, and associated wind-down costs, its estimates were expected to net around $20,000,000 to $25,000,000. At an average interest rate of say 4 to 5%, $1,000,000 to $1,250,000 of cash would thus be available annually. Summed up, the concept of liquidating assets and organizing an Endowment Fund was a reasonable choice.

The money that was required to purchase the real estate some years ago was obtained in the context that it was a form of "reserve fund" to be used as economic conditions dictated. No restrictions on resale existed.

At this stage, the details related to the structure and scope of the Endowment Fund are still being finalized. For example, proceeds on sales of real estate now can only be estimated; hence, final available dollars for possible Endowment Funds are not known. As well, U.S.-based contributions and annual yield opportunities are not yet finalized. Possibilities of funding "in perpetuity" require considerable dollars. Accordingly, WE is currently working on a comprehensive planning process to identify what would be required in liquidating previously-acquired WE assets.

A next important step in arranging Endowment Funds for the International projects by WE involves the acquisition of reliable dividend-paying stocks, or interest on bonds, that can generate sufficient annual yields to provide the needed dollars to maintain each operating facility. Investment specialists have been, and more likely will be, consulted to build the necessary income portfolio as cash proceeds become available.

Overall, the WE Endowment plan process seems credible to us. Clearly, having had the WE-owned real estate in place over the years has proven to be a wise strategy to support the long-term viability of WE's key International projects. Hence, those critics of the existence of real estate and other types of investments within WE may want to reconsider the validity of their commentary.

What some critics of WE might also need to re-think is how separate charities have to be capitalized in various types of assets to be able to survive economic fluctuations over a longer term.  Several-year pledges certainly add credibility and charitable longevity.  But, more ideas seem essential.

## VII.   OTHER FINANCIAL ANALYSIS

Our firm was not engaged to analyze "non-arm's-length" or "related party" transactions involving the Kielburger family.  Such analysis was already undertaken by Froese Forensic partners ltd. ("Froese") on whom our firm relied for all such transactions.

In a letter dated September 18, 2020 to Marc and Craig Kielburger, the Froese firm concluded, in part, under "Summary of Our Findings":

- *"We found no evidence of improper financial benefits to the Kielburgers from WE Charity, M2WSE or any WE Canada entity."*
- *"We found no evidence of improper transactions which benefited the Kielburgers personally."*

The Froese Report also stated, as follows:

"The examination addressed real estate transactions, annual reconciliations and cost allocations between the entities, and payments between the entities. We did not identify any concerns in relation to interactions between WE Charity and M2WSE."

"In preparing our review we have been provided with unrestricted access to the financial records of WE Canada entities and the Kielburgers. This unrestricted access included, but was not limited to, copies of relevant financial statements, general ledgers, and corporate records. It included both bank records and real estate transactions for WE Charity (Canada), as well as the Kielburgers. The review also included imaging the full contents of your computers, cell phones, and digital transmission apps as well as your and your partners' corporate and personal credit cards and personal tax returns."

"We found no evidence of improper financial benefits to the Kielburgers from WE Charity, M2WSE or any WE Canada entity. We found no evidence of improper transactions which benefited the Kielburgers personally. Compensation paid to the Kielburgers from WE entities was not inconsistent with their positions or qualifications."

"We examined real estate transactions in WE Canada and real estate held privately by the Kielburgers. Our examination included a review of real estate transaction records for Canadian properties owned by WE Canada entities and closing documentation from the real estate files of legal counsel for real estate transactions of the Kielburgers. We also reviewed property related expenses in the WE Canada entities for possible misallocated revenues or expenditures. We did not identify any inappropriate dealings between the WE Canada entities and the Kielburgers in relation to real estate or any financial benefits to the Kielburgers".

For the few situations where our mandate partially overlapped that of Froese, we did not observe any differences from what Froese's letter of September 18, 2020 stated. However, for the issues that we analyzed, the nature of the tasks, and documents seen, typically our processes would have been different from what Froese undertook.

Respectfully submitted.

**ROSEN & ASSOCIATES LIMITED**

L.S. Rosen

# APPENDIX A

## C.V. OF L.S. ROSEN

## INDEPENDENCE FORM

## C.V. OF LAWRENCE S. ROSEN

Personal Data

**EDUCATION**

M.B.A. (1964, University of Washington; focus: financial accounting); Ph.D. (1966, University of Washington; multiple fields; thesis focus: cash flows and financial reporting)

B. Com. (1957, University of British Columbia)

Chartered Accountant (1960, British Columbia), Alberta and Ontario; Certified Management Accountant (Registered Industrial Accountant, 1970)

**DESIGNATIONS**

FCA, Ontario; FCPA, Ontario
FCA, Alberta; FCPA, Alberta
FCPA, British Columbia
FCMA, Canada
CGA, (Ontario and Canada)
CFE, (Certified Fraud Examiner and Life Member) Canada and U.S.A. CIP, (Chartered Insurance Professional)
CPA (Certified Public Accountant, Illinois)
CA•IFA (Specialist, Investigative and Forensic Accounting)
CPA/CFF (Certified in Financial Forensics)
FCPA (Fellow of the Hong Kong Society of Certified Public Accountants)

**EMPLOYMENT**

Professor, York University, Toronto, Canada (Professor 1972 – 2001, Professor Emeritus 2001 to present; teaching focused on accounting, auditing and the integration of a professional accounting programme; Director, MBA Program (1992-1994)

Principal, Rosen & Associates Limited, (2000 – present)
Principal, Rosen & Vettese Limited, (1990 – 2000)
Partner or Associate, Mintz & Partners, (1986 – 1990)
Technical advisor to three Auditors' General of Canada, (1978 – 1993)

Consultant to Clarkson Gordon, (Accounting principles, litigation, education), (1972 – 1986) (Now called Ernst & Young)

Manager, Accounting Standards and Research group, Clarkson Gordon, Toronto, (1970 – 1972)

Lecturer, (part-time), Faculty of Administrative Studies, York University, Toronto, (1970 – 1972)

Professor and Associate Professor, University of Alberta, (1966 – 1970)

Predoctoral Instructor, University of Washington, (1964 – 1966)

Instructor, University of British Columbia, 1961 - 1963 (part-time, 1960 - 1961)

Chartered Accountant and Student, Peat, Marwick Mitchell & Co., (1957 – 1961) (Now called KPMG)

## LITIGATION AND RELATED CASES

2019 – 2010:

Sino-Forest Corporation Shareholders (in liquidation) vs. Poyry Corporation et al, High Court of Singapore; 2014 – 2020.

Toronto-Dominion Bank et al v. Poseidon Concepts et al; Canadian case, 2015.

Shareholders of Sino-Forest Corporation v. Ernst & Young LLP, and BDO Hong Kong, et al, Canadian case, 2013 – 2020.

Multiple plaintiffs v. Coopers & Lybrand et al (Castor Holdings Case), 1992 – 2010. (Montreal trial)

Various other smaller cases.

2009 – 1985:

Bellan v. Curtis, PriceWaterhouseCoopers LLP, Nesbitt Burns Inc., Wellington West Capital Inc., Crocus Capital Inc., The Manitoba Securities Commission and The Crocus Investment Fund, et al. (Class action suit in which Dr. Rosen was retained to represent the class against all defendants. The issues involved financial statement presentation, share valuation and statement of asset values. Status: Settled out of Court.)

General Refrigeration of Canada Ltd. v. Finnpower Canada Ltd. (Dr. Rosen was retained by the defendants. The issues involved financial statement presentation and damages. Status: Settled.)

Refrigerated Construction & Services Inc. v. Coldmatic Refrigeration of Canada Ltd. (Dr. Rosen was retained by the defendants. The issues involved the purchase and sale of a business, financial statement presentation, fair presentation. Status: Settled.)

Saskferco Products Inc. v. Her Majesty the Queen (Dr. Rosen was retained by the Crown in a tax case and the application of hedge accounting principles. Status: Judgment for the Crown, upheld on appeal.)

Silver and Cohen v. IMAX Corporation et al. (Dr. Rosen was retained by the Class in a class action case. The issues involve GAAP and whether the financial information was false and misleading. Status: Ongoing.)

Kingsway Insurance v. PriceWaterhouseCoopers (Dr. Rosen was retained by the plaintiff in a case involving US GAAS and GAAP, including issue of whether the liabilities were misstated and whether there was fraud. Status: Ongoing.)

Kingsway Insurance v. 118997 Canada Inc., Mr. Raymond David, and Mr. Michel Gauthier (Dr. Rosen was retained by the plaintiff in an arbitration case involving issues related to fraud, financial statement presentation. Status: Arbitrator's decision for the plaintiff.)

Kingsway Insurance v. Ernst & Young (Dr. Rosen was retained by the plaintiff and has written reports for the Court. Status: Ongoing.)

Other Cases:

Waxman v. Waxman (Dr. Rosen was retained by the plaintiff and gave evidence relevant to materiality and the obligation to disclose related party transactions. Status: Judgment rendered for the plaintiff, and upheld on appeal.)

Sherman v. Orenstein & Partners (Dr. Rosen was retained by the CA firm (defendants). The issue involved the standard of care required in the performance of a review engagement. Status: Judgment for defendant, upheld on appeal.)

A-1 Floor & Wall v. Partridge Pelissero Iggulden (Dr. Rosen was retained by the CA firm (defendants) in a case involving GAAP and fair presentation. Status: Judgment for defendants.)

Pineridge Capital Corp. v. BDO Dunwoody (Dr. Rosen was retained by the CA firm (defendants) and gave evidence on GAAS, GAAP, fair presentation and, more particularly, sufficient appropriate audit evidence, bank confirmations, professional judgment and contingent liabilities. Status: Judgment in part for the defendant.)

Kripps v. Touche Ross & Co. [Dr. Rosen was retained by the plaintiffs and gave evidence on GAAS and GAAP, fair presentation. Prepared an affidavit submitted by the Plaintiffs / Respondents to the Supreme Court of Canada. (Leave to Appeal was denied.) Status: Judgment for plaintiffs.]

Hercules Managements Ltd. v. Ernst & Young (Dr. Rosen was retained by Hercules Management on issues related to auditor's negligence and damages. Status: Judgment.) [Case was eventually heard by the Supreme Court of Canada.]

Bloor Italian Gifts Ltd. v. Dixon (Dr. Rosen acted for the CA firm (defendants) in a case involving review engagement standards. Status: Judgment in part for defendant.)

QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Revenue (Dr. Rosen was retained by the Crown on the meaning of "accounts payable" in a tax case. Status: Judgment.)

Tucci Construction v. Lockwood (Dr. Rosen was retained by the CA firm (defendants) in a case involving financial statement presentation. Status: Judgment.)

Surrey Credit Union v. Willson et al. (Dr. Rosen was retained by the plaintiff against the two accounting firms in the "Northland Bank" case. The issues include GAAS & GAAP. Status: Settled.)

National Business Systems (Dr. Rosen was retained by the CA firm (defendants) in a case involving the alleged negligence of auditors. Status: Settled.)

Hyundai Motor Co. (Dr. Rosen was retained by the company in a case involving financial analysis before the Canadian Import Tribunal. Status: Judgment for the company.)

Teacher s' Investment & Housing Co-operative (Dr. Rosen was retained by the Attorney-General for British Columbia in a case involving alleged negligence of lawyers and public accountants. Status: Settled.)

Ontario Ministry of Labour v. Massey Ferguson (Dr. Rosen was retained by the union workers in connection with an investigation involving asset and liability distributions among segments of Varity Corporation. Status: Settled.)

Calgroup Graphics and PriceWaterhouse (Dr. Rosen was retained by the Ontario Securities Commission in a case involving alleged Securities Act violations. Status: Disciplinary action against the auditor; cease-trading order issued.)

Miscellaneous Cases:

Many cases are currently in progress.

Several other cases re professional negligence and preparation of expert reports could be listed; most were settled prior to a Court Judgment.

Testimony before courts in Ontario, British Columbia and Quebec (as well as other countries) re contract disputes, competition legislation, matrimonial, alleged frauds, automobile accidents and other litigation.

Forensic accounting; patent infringements; insurance claims before Tribunals or Commissions. Preparation of pre-trial reports, and expert witness appearances with respect to:

- accounting and auditing principles and policies
- loss of profits, and valuation
- patent infringements
- predatory pricing
- contract disputes

## PROFESSIONAL AND ACADEMIC ASSOCIATIONS

Memberships:

Institute of Chartered Accountants and Chartered Professional Accountants (CPA) of Alberta, Ontario, and British Columbia (FCA, FCPA, Ontario; FCA, FCPA, Alberta; FCPA, British Columbia).

Society of Management Accountants of Ontario (FCMA, Canada)

Certified General Accountants of Ontario, and of Canada

Canadian Comprehensive Auditing Foundation

American Institute of Certified Public Accountants

American Accounting Association

Hong Kong Society of Certified Public Accountants

Canadian Academic Accounting Association

Association of Certified Fraud Examiners

Chartered Insurance Professional

Positions Held:

Elected to the Board of Directors of the Canadian Justice Review Board (2006 – present)

Co-founder of Accountability Research Corporation (from 2001 to present) (Research for mutual funds, pension funds and money managers)

Elected to the Council of the Institute of Chartered Accountants of Ontario (3 years, early 1990s, governance issues affecting the profession)

Director of the MBA Program, York University

Member, Senate, York University

Area Coordinator, Accounting Area, York University

Chairman, Senate Appeal Committee, York University

Advisory Board, Comprehensive Auditing, Society of Management Accountants of Canada

Editor, "Education Research", The Accounting Review, 1979 – 1984

Board of Directors, Society of Management Accountants of Canada, 1980 – 1983

Governor, Canadian Comprehensive Auditing Foundation, 1980 – 1983

Director and President, The Canadian Academic Accounting Association, 1976 –1978

Editorial Board, The Accounting Review, 1975 – 1978

Executive, Canadian Region, American Accounting Association (3 years) Chairman (1 year) and member (3 years), Manuscript Awards Committee, American Accounting Association

Editor "Education", CA Magazine, 1972 – 1977

Member of numerous committees of professional associations or academic bodies

## PUBLICATIONS

Articles:

Many articles for Advisor.ca and Canadian Accountant.

Monthly columnist for Canadian Business magazine (2000 – 2010) and the National Post newspaper (2004 – 2009)

Boardroom, various articles published in 2000s

"CICA Exposure Draft: A Comment", The Philanthropist (Summer 1992)
"Restoring the Importance of Accounting Education", CA Magazine (September 1982)

"An Empirical Study of Materiality Judgments by Auditors, Bankers and Analysts", In S. Basu and J. Alex Milburn, Proceedings of the 1981 Clarkson Gordon Foundation Research Symposium (Toronto, 1982)

"Dialogue on Accounting Education", (with R. Denham), CA Magazine (September 1981)

"Accounting Education: A Grim Report Card", CA Magazine (June 1978)

"New Auditing Concepts for Current Value Accounting?", in Auditing Research Symposium - 1977 (Toronto: CICA, 1978)

"Accounting for Inflation in Canada" in Accounting For Changes In The Value of Money, (Munich: 11th International Congress of Accountants, 1977)

"Autumn of Our Discontent", CA Magazine, (October 1976). (Granted the W.J. MacDonald Memorial Award for the best article in 1976-77)

"Alternatives to Historic Cost: An Introductory Analysis", CA Magazine, (July 1976)

"Professional Judgment and Multi-Subject Accounting", CA Magazine, (May 1976)

"Comprehensive Problem - Philosophy and Technique", Cost and Management, (March - April 1976)

"Current Practitioner - Academic Relations", CA Magazine, (September 1975)

"Comprehensive Case Examinations", CA Magazine, (March 1975)

"Funds Statements", CA Magazine, (July 1974)

"Tailoring Accounting Techniques to Management Decisions", CA Magazine, (March 1974)

"Accountancy Examinations", Canadian Chartered Accountant, (July 1972)

"Chartered Accountancy Education and Examinations", <u>Canadian Chartered Accountant</u>, (July 1971)

"A Framework for Studies in Accountancy", <u>Canadian Chartered Accountant</u>, (July 1971)

"Accounting and the Behavioral Sciences", (with C.J. McMillan), <u>Canadian Chartered Accountant</u>, (October 1970)

"Alternatives to Historical Cost", <u>Canadian Chartered Accountant</u>, (March 1970)

"General Price-Level Restated Reports", <u>Canadian Chartered Accountant</u>, (January and February 1970)

"Funds Statements: A Historical Perspective", (with Don T. DeCoster), <u>The Accounting Review</u>, (January 1969)

Series on "Funds" Statement Concepts, <u>Canadian Chartered Accountant</u>, (October, November, December, 1968). One article in three-part series reproduced in T.J. Burns and H.S. Hendrickson, The Accounting Sampler, second edition, (New York, McGraw-Hill Book Company, 1972)

"Some Behavioral Consequences of Accounting Measurement Systems", (with R.E. Schneck) <u>Cost and Management</u>, (October 1967). Reprinted in W. Bruns, Jr. and Don T. DeCoster (editors), <u>Accounting and Its Behavioral Implications</u>, (New York: McGraw-Hill Book Company, 1969)

"On the Conflict between Custodial and Operational Accounting", <u>Cost and Management</u>, (June and July – August 1967)

"Replacement Value Accounting", <u>The Accounting Review</u>, (January 1967)

"Historical Cost and Replacement Value Accounting", <u>The Illinois C.P.A.</u>, (Spring 1966)

"Operations Research", (with C. Rosen), <u>Certified General Accountant</u>, (November – December 1964)

"Price-Level Adjustments and Cost Systems", <u>Cost and Management</u>, (October 1964)

Books:

<u>Easy Prey Investors</u>, Al Rosen and Mark Rosen (McGill-Queen's University Press), 2017, 380 pages.

Swindlers, Al Rosen and Mark Rosen (Madison Press), 2010, 260 pages.

Understanding Accounting – The Lawyers' Guide, Lawrence S. Rosen, Frank M. Vettese, Jim Muccilli, (Canada Law Book Inc., 1999), 272 pages.

Accounting: A Decision Approach, (Toronto: Prentice-Hall, 1986). Also accompanying instructors' manual.

Study Guide for Accounting: A Decision Approach, (Toronto: Prentice-Hall, 1986)

Topics in Managerial Accounting, (Third Edition, Editor), Toronto: McGraw-Hill Ryerson Limited, 1984

Financial Accounting: A Canadian Casebook with Multiple Subject Cases, (Toronto: Prentice- Hall, 1982). Also accompanying instructors' manual.

An Introduction to Accounting Case Analysis, Second Edition, (Toronto: McGraw-Hill, 1981). Also accompanying instructors' manual.

Canadian Financial Accounting, (with M. Granof) (Toronto: Prentice-Hall, 1980).

Self-Study Problems for Canadian Financial Accounting, (with G. Richardson) (Toronto: Prentice-Hall, 1980)

An Introduction to Accounting Case Analysis, (Toronto: McGraw-Hill Ryerson Limited, 1975), 195 pages.

Topics in Managerial Accounting, (Second Edition Editor), (Toronto: McGraw-Hill Ryerson Limited, 1974), 412 pages.

Instructors' Manual for Topics in Managerial Accounting, (Second Edition, 1974), 32 pages.

Valeurs Actuelles Et Indexation Des Etats Financiers, (Toronto: Canadian Institute of Chartered Accountants, 1973), 150 pages. French Translation of 1972 book.

Current Value Accounting and Price-Level Restatements, (Toronto: Canadian Institute of Chartered Accountants, 1972), 143 pages.

Topics in Managerial Accounting, (Editor), (Toronto: McGraw-Hill Company of Canada Ltd., 1970), 365 pages.

Cas De Compatibilite Et D'Administration, (Montreal: McGraw-Hill Company of Canada Ltd., 1970), 475 pages. French translation of 1968 book.

Cases in Accounting and Business Administration, (Toronto: McGraw-Hill
Company of Canada Ltd., 1968), 405 pages, and companion book, Instructors'
Notes for Cases in Accounting and Business Administration, (Toronto: McGraw-
Hill Company of Canada Ltd., 1969), 385 pages.

Several other book and article reviews, lesson manuals and papers.

Chapters written for books that were edited by others.

### INDEPENDENCE FORM

1. My name is Lawrence S. Rosen.  I live in the City of Toronto in the Province of Ontario.

2. I have been engaged by Miller Thomson LLP on behalf of the Stillman Family Foundation to provide research and evidence in relation to this assignment involving WE Charity.

3. I acknowledge that it is my duty to provide evidence in relation to this assignment as follows:

   a)  to provide opinion evidence that is fair, objective and non-partisan;

   b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and,

   c)  to provide such additional assistance as the Court or attorneys may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.


_October 27, 2020_
Date

_L. S Rosen_

L.S. Rosen

49327024.2

A11

# **APPENDIX B**

## **FUNDING AGREEMENT**

## **BETWEEN**

## **HER MAJESTY THE QUEEN**

## **IN RIGHT OF CANADA**

## **AND**

## **WE CHARITY**



Employment and
Social Development Canada

Emploi et
Développement social Canada

Agreement #: 00000000
Amendment #: 0

### CANADA'S COVID-19
### ECONOMIC RESPONSE PLAN

#### Support for students and recent graduates

#### FUNDING AGREEMENT

#### BETWEEN

**Her Majesty the Queen in Right of Canada as represented by the Minister of State (Diversity and Inclusion and Youth) styled as the Minister of Diversity and Inclusion and Youth (hereinafter referred to as "Canada")**

#### AND

#### WE Charity Foundation of Canada

#### (hereinafter referred to as "the Recipient")

#### Hereinafter collectively referred to as "the Parties"

### ARTICLES OF AGREEMENT

**Whereas** Canada has established the Youth Service Initiative also known as "Canada Service Corps" (hereinafter referred to as "the Program") to support projects that create, promote and facilitate access to volunteer service opportunities that are meaningful to youth, that support lasting civic engagement, and that provide youth with life and work skills;

**Whereas** Canada has taken strong and quick action to protect its economy, the health, safety, and jobs of all Canadian during the global COVID-19 outbreak;

**Whereas** Canada's COVID-19 Economic Response Plan provides targeted support for students and recent graduates;

**Whereas** Canada has determined that the Recipient is eligible to receive funding under Canada's COVID-19 Economic Response Plan to Support Students and Recent Graduates; and

**Whereas** Canada has agreed to provide funding to the Recipient towards the costs of the Project;

**Now, therefore, Canada and the Recipient agree as follows:**

#### 1.0 INTERPRETATION

1.1 Unless the context requires otherwise, the expressions listed below have the following meanings for the purposes of this Agreement:

"**Agreement**" means this agreement, including all schedules, and all amendments or restatements as permitted.

"**Cohort 1**" means up to 20,000 Project Participants, and a minimum of 50 Not-for-Profits, engaged in or offering volunteer service opportunities, respectively, as outlined in Schedule A.

"**Cohort 2**" means up to 20,000 Project Participants, and a minimum of 50 Not-for-Profits, engaged in or

49327024.2

B1



Employment and                 Emploi et
Social Development Canada       Développement social Canada

| | |
|---|---|
| Agreement #: | |
| Amendment #: | |

"**Force Majeure**" means an event, condition or circumstance (and the effects thereof)which is not within the reasonable control of the Party claiming Force Majeure and which the Party claiming Force Majeure is unable to prevent or overcome, including events in the nature of acts of God, pandemic, epidemic, quarantine, illness outbreak, fire, explosion, civil disturbance, war, riot, insurrection, military or guerrilla action, terrorist activity, economic sanction, blockade or embargo, sabotage, flooding, earthquake, drought and action or restraint by the order of any governmental authority.

"**Not-for-profit**" means organizations under that are established for purposes other than financial gain for their members. This category includes:

- (a) community, charitable or voluntary organizations, including faith-based organizations (for example, churches, synagogues, temples, mosques);
- (b) organizations that are tax exempt under paragraph 149(1)(l) of the *Income Tax Act*; and
- (c) non-governmental organizations.

"**Project**" means the project described in Schedule A.

"**Program Costs**" means the expenditures incurred by the Recipient or Sub-Agreement Holder in the course of its regular operations that, though indirectly related to the delivery of the Project activities under section 3.0 enable the Recipient or Sub-Agreement Holder to manage the delivery of the Project activities under section 3.0 successfully.

"**Project Participant**" means an eligible student as specified in Schedule A and includes all students of Cohort 1 and 2 and the Supplementary Cohort

"**Project Period**" means the period beginning on the Project Start Date specified in Schedule A and ending on the Project End Date specified in Schedule A.

"**Sub-Agreement**" means a written agreement between the Recipient and an organization under which the Recipient further distributes a portion of the funding received by the Recipient under this Agreement to the organization and delegates all or part of its responsibilities relating to the delivery of eligible activities under this Agreement to the organization.

"**Sub-Agreement Holder**" means an organization other than the Recipient, to whom a portion of the funding received by the Recipient under this Agreement is further distributed to enable the organization to carry out a Sub-Agreement.

"**Supplementary Cohort**" means up to 60,000 Project Participants engaged in volunteer service opportunities as part of the Supplementary CSSG Program (as defined in Schedule A), and who are not part of Cohort 1 or Cohort 2;

"**Working Day**" means Monday through Friday except statutory holidays.

## 2.0 EFFECTIVE DATE AND DURATION

This Agreement shall come into effect on May 5th, 2020, and shall expire at the end of the Project Period unless the Agreement is terminated on a prior date in accordance with the terms of this Agreement.

All obligations of the Parties shall expressly or by their nature survive termination or expiry of this Agreement and shall continue in full force subsequent to and notwithstanding such termination or expiry until and unless they are satisfied or by their nature expire.

## 3.0 PURPOSE OF THE CONTRIBUTION

The purpose of Canada's funding is to enable the Recipient to carry out the Project. The funding provided by Canada shall be used by the Recipient solely for the purpose of paying the Eligible Expenditures.

The Project's objective is to provide opportunities for Project Participants to take part in meaningful volunteer service activities and gain labour market and skills development experiences while giving back to their communities during the global COVID-19 outbreak through the implementation of Project activities as specified in Schedule A



| Employment and Social Development Canada | Emploi et Développement social Canada | Agreement #: Amendment #: |

    (i)    Up to $ 100,000,000 (one hundred million dollars) to provide for the award of up to $5,000 to each Project Participant who volunteers as per the conditions specified in Schedule A for Cohort 1 and is eligible to receive an award;

    (ii)    Up to $ 100,000,000 (one hundred million dollars) to provide for the award of up to $5,000 to each Project Participant who volunteers as per the conditions specified in Schedule A for Cohort 2 and is eligible to receive an award; and

    (iii)    Up to $ 300,000,000 (three hundred million dollars) to provide for the award of up to $5,000 to each Project Participant who volunteers as per the conditions specified in Schedule A for the Supplementary Cohort and is eligible to receive an award;

b.  **Cohort 1 Program Design, Implementation and Delivery:** The following amounts, to be paid as per section 4.3(a), shall be allocated for the design, implementation and delivery of the activities described in Schedule A in respect of Cohort 1:

    (i)    $18,350,000 (eighteen million three hundred and fifty thousand dollars), which funds are intended to be allocated as follows, though the Recipient may reallocate amounts between any of subsections (A) to (C) below as the Recipient sees fit:

        (A)    $5,000,000 (five million dollars) in funding to Not-For-Profit partners (as defined in Schedule A) for Eligible Expenditures;

        (B)    $300,000 (three hundred thousand dollars) for Eligible Expenditures to program participants to help support accessibility to the program with focus on vulnerable populations;

        (C)    $13,050,000 (thirteen million and fifty thousand dollars) for Eligible Expenditures which are required to set up and deliver activities in respect of Cohort 1 as specified in Schedule A, and for related Program Costs;

    (ii)    $1,150,000 (one million one hundred fifty thousand dollars) for Eligible Expenditures to pay for the management and administration of the award for eligible youth for Cohort 1, including to verify the eligibility of Project Participants and volunteer hours, and to disburse awards to eligible Project Participants (including the issuance of tax slips or other documents).

c.  **Cohort 2 Program Design, Implementation and Delivery:** The following amounts shall be allocated for the design, implementation and delivery of the activities described in Schedule A in respect of Cohort 2:

    (i)    $12,380,000 (twelve million three hundred and eighty thousand dollars), paid as per section 4.3(b) or (c) as applicable, which funds are intended to be allocated as follows, though the Recipient may reallocate amounts between any of subsections (A) to (C) below as the Recipient sees fit:

        (A)    $3,750,000 (three million seven hundred and fifty thousand dollars) in funding to Not-For-Profits partners (as defined in Schedule A) for Eligible Expenditures;

        (B)    $300,000 (three hundred thousand dollars) for Eligible Expenditures to program participants to help support accessibility to the program.

        (C)    $8,330,000 (eight million three hundred and thirty thousand dollars) for Eligible Expenditures which are required to set up and deliver activities in respect of Cohort 2 as specified in Schedule A, and for related Program Costs;

    (ii)    Up to $1,150,000 (one million one hundred fifty thousand dollars) for Eligible Expenditures, which shall be included in the payment under section 4.3(b), if

 Employment and        Emploi et                          Agreement #:
Social Development Canada   Développement social Canada              Amendment #:

delivery of the activities in Schedule A associated with the Supplementary Cohort shall constitute Eligible Expenditures.

4.2     The Recipient may reallocate surplus funds without prior approval by Canada from activities specified in Schedule A between 4.1(b), (c) and (d) or to activities under 4.1 (a). The Recipient will report reallocations under section 4.2 in the final report provided for in section 12.0.

4.3     Canada will pay the funding to the Recipient in the following series of payments:

   a.  one payment of $ 19,500,000 (nineteen million five hundred thousand dollars) upon the signature of this Agreement for expenditures under section 4.1(b);

   b.  unless either Party has given written notice before July 1, 2020 that it will not proceed with the activities described in Schedule A in respect of Cohort 2, one payment of $13,530,000 (thirteen million five hundred and thirty thousand dollars) on July 2, 2020, for expenditures under section 4.1(c);

   c.  if either Party has given notice prior to July 1, 2020 that it will not proceed with the activities described in Schedule A in respect of Cohort 2, one payment shall be made to reimburse the Recipient for all Eligible Expenditures related to Cohort 2 incurred up to the date of such notice, and all Eligible Expenditures related to Cohort 2 in respect of which the Recipient has, up to the date of notice, entered into binding commitments to pay to third parties, which amount shall be paid within ten (10) days of a delivery by the Recipient of a report setting out all Eligible Expenditures incurred in respect of Cohort 2 up to the date of notice;

   d.  one or more payments, with the last payment request to be submitted by the Recipient no later than September 23rd, 2020, to support awards to eligible Project Participants, up to an aggregate maximum of $500,000,000 (five hundred million dollars), with each payment to be paid to the Recipient in the amount requested by the Recipient within five (5) business days of the submission by the Recipient and acceptance by Canada of a request for payment, which shall include the requested payment amount as well as the anticipated number of awards to be covered by the payment along with the values of such awards. Total payments under this section 4.3(d) shall not exceed the maximum combined total amount identified in sections 4.1(a)(i), 4.1(a)(iii), and, if neither Party has given notice that it will not proceed with Cohort 2, section 4.1(a)(ii); and

   e.  For the administration of the Supplementary Cohort one payment of $10,500,000 (ten million five hundred thousand dollars) upon the signature of this Agreement for expenditures under section 4.1(d)

## 5.0 CONDITIONS GOVERNING THE ELIGIBILITY OF EXPENDITURES

5.1 To qualify as Eligible Expenditures, expenditures are subject to the following conditions:

   (a)  subject to section 14.2, expenditures must be incurred during the Project Period;

   (b)  expenditures must be reasonable;

   (c)  the portion of the cost of any travel, meals and accommodation costs that exceeds the rates for public servants set out in the National Joint Council of Canada's Travel Directive is not eligible;

   (d)  the portion of hospitality costs that exceed the rates set out in Appendix B of Canada's Treasury Board Directive on Travel, Hospitality, Conferences and Event Expenditures, is not eligible;

   (e)  the portion of the cost of any goods and services purchased by the Recipient for which the Recipient may claim a tax credit (other than an input tax credit as defined by the Excise Tax Act) or reimbursement is not eligible;

   (f)  depreciation of capital assets is not eligible;



| | |
|---|---|
| Employment and Social Development Canada | Emploi et Développement social Canada |

| Agreement #: |
|---|
| Amendment #: |

reasonable portion of their salary as an Eligible Expenditure and shall not be required to maintain timesheets in respect of such allocation.

## 6.0 INTEREST EARNED FROM ADVANCES

6.1 If the total interest earned by the Recipient on the advance payment provided by Canada, as set out in Section 4.0, is in excess of one hundred dollars ($100), the Recipient may use the earned interest for Eligible Expenditures to advance the projects set out in this Agreement. All interest earned in excess of one hundred ($100) remaining at the end of the Project Period will be subject to Section 19, and as such, shall be a debt due and owing to the Crown.

## 7.0 RECIPIENT DECLARATIONS

7.1 The Recipient declares that any person who has been lobbying on its behalf to obtain the contribution that is the subject of this Agreement was in compliance with the provisions of the *Lobbying Act (R.S.C., 1985, c. 44 (4th Supp.))*, as amended from time to time, at the time the lobbying occurred and that any such person to whom the aforementioned act applies has received, or will receive, no payment, directly or indirectly, from the Recipient that is in whole or in part contingent on obtaining this Agreement.

## 8.0 PROJECT RECORDS

8.1 -The Recipient shall keep proper books and records, in accordance with generally accepted accounting principles, of all expenditures, costs and revenues relating to this Agreement, including:

    (a)   Agreement-related contracts and agreements;
    (b)   All invoices, receipts, vouchers, electronic payment requisitions and records relating to
          Eligible Expenditures;
    (c)   Bank records including bank statements and cancelled cheques; and,
    (d)   Agreement-related activity, progress and evaluation reports and reports of agreement
          reviews or audits carried out for, by, or on behalf of the Recipient.

8.2 The Recipient shall retain the books and records referred to in section 8.1 for a period of six (6) years following the Project Period.

## 9.0 OBLIGATIONS OF THE RECIPIENT REGARDING COLLECTION AND PROTECTION OF INFORMATION

9.1 Personal information may be collected and used by the Recipient in carrying out the Project and to provide aggregate data to Canada as per section 10.0.

9.2 The Recipient is solely responsible for personal information collected as part of this Agreement and will take all security measures reasonably necessary for the protection of same against unauthorized release or disclosure, as required by law in the jurisdiction of operation.

9.3 The Recipient must notify ESDC as soon as possible in the event of a privacy breach.  This notification is for information purposes and may be considered in relation to the overall management of this Agreement. The Recipient remains solely responsible for the management of the privacy breach.

9.4 .  For greater certainty, any personal information about identifiable individuals that is contained in the Recipient's books and records may be excluded from disclosure or redacted as necessary to enable the Recipient to comply with its obligations under applicable law when providing Canada with copies of or access to the Recipient's books and records under this Agreement..

## 10.0 REPORTING

10.1 The Recipient will provide to Canada bi-weekly report on project data as outlined in Schedule A.

49327024.2

B5



Employment and         Emploi et
Social Development Canada   Développement social Canada

Agreement #:
Amendment #:

## 11.0 FINANCIAL AND ACTIVITY MONITORING

11.1 The Recipient shall also, upon request, provide representatives of Canada with copies and extracts of all Project-related books and records referred to in section 8.0 at all reasonable times on reasonable notice for the purpose of conducting financial and activity monitoring reviews of the Project.

## 12.0 CANADA'S RIGHT TO AUDIT

12.1 During the Project Period and for a period of six (6) years thereafter, the Recipient shall, upon request, grant representatives of Canada access to the books and records referred to in section 8.0 for the purpose of conducting an audit to verify compliance with the terms and conditions of this Agreement and verify expenses claimed by the Recipient as Eligible Expenditures. The Recipient shall permit Canada's representative(s) to take copies and extracts from such accounts and records. The Recipient shall also provide Canada with such additional information as Canada may require with reference to such books and records.

## 13.0 INQUIRY BY THE AUDITOR GENERAL OF CANADA

13.1 If, during the Project Period or within a period of six years thereafter, the Auditor General of Canada, in relation to an inquiry conducted under subsection 7.1(1) of the *Auditor General Act (R.S.C., 1985, c. A-17)*, requests that the Recipient provide him or her with any records, documents or other information pertaining to the utilization of the funding provided under this Agreement, the Recipient shall provide the records, documents or other information within such period of time as may be reasonably requested in writing by the Auditor General of Canada.

## 14.0 FINAL REPORT

14.1 The Recipient shall provide Canada with a final report as specified in Schedule A that summarizes the project scope and includes Eligible Expenditures, description of the results achieved, an explanation of any discrepancies between the results and the planned or expected results and also contains such other information as Canada may specify in writing to the Recipient as well as a summary of the reports provided under section 10. The Recipient shall provide Canada with the final report no later than ninety (90) days following the Project Period in a form and fashion acceptable by Canada.

14.2 The Recipient will provide to Canada their audited annual financial statement covering the Project Period. Where the Recipient's annual audited financial statement does not provide sufficient project detail to satisfy Canada's auditing requirements, Canada may request that an additional, more detailed audit be undertaken, and, the cost of preparing such report shall remain an Eligible Expenditure notwithstanding that it is incurred outside the Project Period.

## 15.0 SUB-AGREEMENTS

15.1 The Recipient will establish its own service delivery structure to accomplish the Project's objective by delegating its responsibilities for the delivery of some of its activities under this Agreement to Sub-Agreement Holders. The Recipient may authorize Sub-Agreement Holders to further sub-delegate responsibilities that have been delegated under a Sub-Agreement. Any persons to which such responsibilities are sub-delegated shall be made subject to the same obligations, *mutatis mutandis*, as apply to Sub-Agreement Holders.

15.2 Any Sub-Agreement with a Sub-Agreement Holder will include the necessary obligations, as specified in section 15.4, to allow the Recipient to fully report to and to provide Canada with information under the terms of this Agreement.

15.3 When the Recipient provides a portion of the funding provided by Canada to a Sub-Agreement Holder to carry out the Project, the Recipient must enter into a Sub-Agreement. The Sub-Agreement must respect the terms and conditions under which the Recipient is receiving the funding from Canada such that the Recipient is able to fulfill its obligations as set out in this Agreement, including reporting and evaluation obligations. The Sub-Agreement can only be entered into on or after the date of signature of this Agreement, but may be effective as of May 5, 2020.



Employment and          Emploi et
Social Development Canada   Développement social Canada

    (c) to the extent that a Sub-Agreement Holder provides funding to a Not-for-Profit, a
        requirement that the Sub-Agreement Holder publicly disclose the name of the funded
        Not-for-profits and the amount of the funding provided to those Not-For-Profit;

    (d) a requirement for the Sub-Agreement Holder to notify the Recipient as soon as
        possible in the event of a privacy breach; and,

    (e) The disclaimer set out in section 16.

15.5 The Recipient must provide Canada with a copy of any Sub-Agreement that Canada requests within ten
(10) business days. By submitting copies of a Sub-Agreement, the Recipient certifies and warrants that the
Sub-Agreement complies with the requirements of this Agreement.

## 16.0 CANADA'S DISCLAIMER RESPECTING SUB-AGREEMENT HOLDERS

16.1 Nothing in this Agreement creates nor is to be interpreted, construed or held out as creating any role,
responsibility, obligation or interest for or in Canada as it pertains to Sub-Agreements. Canada disclaims any
and all responsibility, accountability and liability with respect to Sub-Agreements and the relationships
between the Recipient and Sub-Agreement Holders.

## 17.0 EVALUATION

17.1 The Recipient agrees to cooperate with Canada in the conduct of any evaluation of the Project and/or
the Program that Canada may carry out during the Project Period or within a period of three years thereafter.
Without limiting the generality of the foregoing, if requested by Canada to do so for the purpose of
conducting an evaluation, the Recipient agrees to:

    (a)    participate in any survey, interview, case study or other data collection exercise initiated by
           Canada, and

    (b)    subject to section 17.2, provide Canada with contact information of the Not-for-Profit Project
           partner organizations, if any, who participated in the Project.

17.2 The Recipient shall provide Canada with the contact information of a person (name, address, phone
number and e-mail address) referred to in section 17.1(b) only if the person has given their written consent
to the release of the information to Canada. The Recipient agrees to make all reasonable efforts to secure
such consent during the Project Period. When providing a person's contact information to Canada, the
Recipient shall provide Canada with an accompanying written statement certifying that the person has given
their consent to the sharing of their contact information with Canada.

## 18.0 CONTRACTING PROCEDURES

### Contracting

18.1 The Recipient shall use a fair and accountable process when procuring goods and services from
contractors in relation to the Project. The Recipient shall select the bid or proposal offering a reasonable
value.

### Restrictions Regarding Non Arms-Length Contracts

18.2 (1) Subject to section 18.4, and unless otherwise authorized in writing by Canada, all goods or services
contracts, regardless of their value, entered into in relation to the Project between the Recipient and

    (a)    an officer, director or employee of the Recipient,

    (b)    a member of the immediate family of an officer, director or employee of the Recipient,

    (c)    a business in which an officer, director or employee of the Recipient , or a member of their
           immediate family, has a financial interest, or

    (d)    a business which is related to, or associated or affiliated (as these terms are defined in the



| Employment and | Emploi et | Agreement #: |
| Social Development Canada | Développement social Canada | Amendment #: |

18.3 Subject to section 18.4, the Recipient shall not subcontract the performance of any of its duties or responsibilities in managing the Project to another party without the prior written consent of Canada unless the Recipient has already indicated in the approved Project Description attached as Schedule A to this Agreement that it intends to use a subcontractor or subcontractors to perform those duties or responsibilities.

### Exception

18.4 Notwithstanding section 18.3 the above, the Recipient may enter into contracts to procure goods and services from, and may subcontract the performance of its duties and responsibilities in managing the Project to, WE Charity, WEllbeing Foundation or ME to WE Foundation of Canada without prior written approval by Canada. The Recipient anticipates that it will subcontract with WE Charity for the performance of some or all of its duties under this Agreement.

### 19.0 REPAYMENT REQUIREMENTS

19.1 In the event payments made to the Recipient exceed the amount to which the Recipient is entitled under this Agreement, the amount of the excess is a debt due and owing to Canada and shall be promptly repaid to Canada upon receipt of notice to do so and within the period specified in the notice. Without limiting the generality of the foregoing, amounts to which the Recipient is not entitled include

(a)   the amount of any expenditures paid for with the contribution which are disallowed or determined to be ineligible; and

(b)   any amount paid in error or any amount paid in excess of the amount of the expenditure actually incurred.

19.2 Interest shall be charged on overdue repayments owing under section 19.1 in accordance with the Interest and Administrative Charges Regulations (SOR/96-188) (the "Regulations") made pursuant to the Financial Administration Act (R.S.C., 1985, c. F-11). Interest is calculated and compounded monthly at the "average bank rate", within the meaning of such expression as contained in the Regulations, plus three per cent (3%) during the period beginning on the due date specified in the notice to repay and ending on the day before the day on which payment is received by Canada.

19.3 The Recipient acknowledges that where an instrument tendered in payment or settlement of an amount due to Canada under section 19.1 is, for any reason, dishonoured, an administrative charge of $15 is payable by the Recipient to Canada in accordance with the Regulations.

### 20.0 TERMINATION OF THE FUNDING OR AGREEMENT

### Termination for Default

20.1 (1) The following constitute Events of Default:

(a)   the Recipient becomes bankrupt, has a receiving order made against it, makes an assignment for the benefit of creditors, takes the benefit of a statute relating to bankrupt or insolvent debtors or an order is made or resolution passed for the winding up of the Recipient;

(b)   the Recipient ceases to operate;

(c)   the Recipient is in material breach of the performance of, or compliance with, any provision of this Agreement;

(d)   the Recipient, in support of its application for Canada's contribution or in connection with this Agreement, has made materially false or misleading representations, statements or declarations, or provided materially false or misleading information to Canada; or

(e)   in the opinion of Canada, acting reasonably, there is a material adverse change in risk in the Recipient's ability to complete the Project or to achieve the expected results of the Project set out in Schedule A.

B8



Employment and     Emploi et
Social Development Canada   Développement social Canada

Agreement #:
Amendment #:

(3) In the event Canada gives the Recipient written notice of default pursuant to section (2)(b), Canada may suspend any further payment under this Agreement until the end of the period given to the Recipient to remedy the Event of Default.

(4) The fact that Canada refrains from exercising a remedy it is entitled to exercise under this Agreement shall not be considered to be a waiver of such right and, furthermore, partial or limited exercise of a right conferred upon Canada shall not prevent Canada in any way from later exercising any other right or remedy under this Agreement or other applicable law.

**Termination for Convenience**

20.2 Canada may also terminate this Agreement at any time without cause upon not less than ninety (90) days written notice of intention to terminate.

**Obligations Relating to Termination under section 20.2 and Minimizing Cancellation Costs**

20.3 In the event of a termination notice being given by Canada under section 20.2.

   (a)    the Recipient shall make no further commitments in relation to the Project and shall cancel or otherwise reduce, to the extent possible, the amount of any outstanding commitments in relation thereto, and

   (b)    all Eligible Expenditures incurred by the Recipient up to the date of termination, and all Eligible Expenditures in respect of which the Recipient has, up to the date of termination, entered into binding commitments to pay to third parties, will be paid by Canada, including the Recipient's costs of, and incidental to, the cancellation of obligations incurred by it as a consequence of the termination of the Agreement; provided always that payment and reimbursement under this section shall only be made to the extent that the costs mentioned herein were actually incurred by the Recipient and the same are reasonable and properly attributable to the termination of the Agreement.

20.4 The Recipient shall negotiate all contracts related to the Project, including employment contracts with staff, on terms that will enable the Recipient to cancel same upon conditions and terms that will minimize to the extent possible their cancellation costs in the event of a termination of this Agreement. The Recipient shall cooperate with Canada and do everything reasonably within its power at all times to minimize and reduce the amount of Canada's obligations under section 20.3 in the event of a termination of this Agreement.

**21.0 INDEMNIFICATION**

21.1 The Recipient shall, both during and following the Project Period, indemnify and save Canada harmless from and against all claims, losses, damages, costs, expenses and other actions made, sustained, brought, threatened to be brought or prosecuted, in any manner based upon, occasioned by or attributable to any injury or death of a person, or loss or damage to property caused or alleged to be caused by any wilful or negligent act, omission or delay on the part of the Recipient or its employees or agents, Not-For-Profit partners (as defined in Schedule A) or Project Participants that are participating as part of Cohort 1 or Cohort 2, in connection with anything purported to be or required to be provided by or done by the Recipient pursuant to this Agreement or done otherwise in connection with the implementation of the Project.

21.2 The Recipient will include a provision in each Sub-Agreement requiring the Sub-Agreement Holder to indemnify and save harmless both the Recipient and Canada from each of the matters set out above, and to specifically permit Canada to directly claim indemnification from, and to assert a legal claim to enforce the indemnification against, the Sub-Agreement Holder.

**22.0 INSURANCE**

22.1 The Recipient shall arrange and maintain, during the Project Period, appropriate comprehensive general liability insurance coverage to cover claims for bodily injury or property damage resulting from anything done or omitted by the Recipient or its employees, agents or Project Participants, in carrying out the Project.



| | |
|---|---|
| Employment and Social Development Canada | Emploi et Développement social Canada |

23.2 Nothing in this Agreement creates any undertaking, commitment or obligation by Canada respecting additional or future funding of the Project beyond the Project Period, or that exceeds the maximum contribution specified in section 4.1. Canada shall not be liable for any loan, capital lease or other long-term obligation which the Recipient may enter into in relation to carrying out its responsibilities under this Agreement or for any obligation incurred by the Recipient toward another party in relation to the Project.

## 24.0 CONFLICT OF INTEREST

24.1 No current or former public servant or public office holder to whom the *Conflict of Interest Act* (S.C. 2006, c. 9, s. 2), the *Policy on Conflict of Interest and Post-Employment* or the *Values and Ethics Code for the Public Sector* applies shall derive a direct benefit from the Agreement unless the provision or receipt of such benefit is in compliance with the said legislation or codes.

24.2 No member of the Senate or the House of Commons shall be admitted to any share or part of the Agreement or to any benefit arising from it that is not otherwise available to the general public.

## 25.0 INFORMING CANADIANS OF THE GOVERNMENT OF CANADA'S CONTRIBUTION

25.1 The Recipient and Canada shall cooperate and consult in the communication and promotion of the CSSG and its components across all channels, which may include, but is not limited to social media, Internet, advertising, virtual events, and media relations.

25.2 The Recipient agrees that Canada may, for the purposes of advertising and promoting the CSSG and its components, reproduce, redistribute and otherwise make available to the public or any part of the public materials that they make available via social media or otherwise on the Internet.

25.3 To support Canada's ongoing communications efforts to demonstrate the success of CSSG, the Recipient agrees to identify and provide contact information for CSSG student recipients and/or Not-for-profits willing to share their service story in writing, including photographs and/or in video format, provided that such student recipients and Not-for-profits have provided their written consent to the release of such information. in the manner described in section 17.2

25.4 If the Recipient documents the project or any activity funded under the Project using photographs, videos, audio recordings or written accounts, Canada may request to reproduce, distribute and further use any photograph, video, audio recording or written account or part thereof to promote, advertise and communicate the CSSG.

25.5 The Recipient will endeavour to provide Canada with all permissions, consents, releases and rights considered necessary by Canada for Canada to use the photograph, video, audio recording or written account or part thereof for the purposes set out in this section by signing the document provided by Canada for this purpose.

25.6 The Recipient must contact Canada fifteen (15) business days in advance to provide an opportunity for the Minister to participate in events, virtual or in person.

25.7 In addition to the text, the Recipient must include an approved quote from Canada in all releases that refer to funding sources for Project. The Recipient must contact Canada for the quote at least fifteen (15) business days in advance of issuing the release.

25.8 The Recipient may also provide a quote for any media release that Canada issues.

25.9 The Recipient must acknowledge, orally and/or in writing, Canada's funding contribution for any work which is produced under this Agreement. For written recognition the Recipient must use:

    (a)    « [Recipient to insert name of Project] is funded by the Government of Canada under the Canada Student Service Grant», or,

    (b)    any other statement provided to the Recipient by Canada.

## 26.0 ACCESS TO INFORMATION

 Employment and       Emploi et
Social Development Canada   Développement social Canada

Agreement #:
Amendment #:

## 28.0 DISPOSITION OF CAPITAL ASSETS

28.1 During the Project Period, the Recipient shall preserve any capital asset purchased by the Recipient with the funding provided by Canada and shall not dispose of it unless Canada authorizes its disposition.

28.2 At the end of the Project Period, to the extent that the total value of all Capital Assets purchased by the Recipient exceeds $200,000, Canada reserves the right to direct the Recipient to dispose of any capital asset purchased by the Recipient with the funding provided by Canada by:

(a) selling it at fair market value or otherwise for an amount reasonably obtainable or realizable in the circumstances and applying the funds realized from such sale to offset Canada's funding of the Eligible Expenditures;

(b) turning it over to another organization or to an individual designated or approved by Canada; or

(c) disposing of it in such other manner as may be determined by Canada.

28.3 Where Canada elects to exercise its right under section 28.2, the Recipient agrees to comply with the related direction provided by Canada.

28.4 For the purposes of section 28.0, "capital asset" means any single item, or a collection of items which form one identifiable functional unit, that is not physically incorporated into another product or not fully consumed by the end of the Project, and has a purchase or lease value of more than $1,000 (before taxes).

## 29.0 INTELLECTUAL PROPERTY

29.1 Where in the course of carrying out the Project, the Recipient produces any work using funds provided by Canada, the copyright in the work shall vest in the Recipient. However, the Recipient hereby grants to Canada a non-exclusive, irrevocable and royalty free license to use, translate, adapt, record by any means or reproduce, except for commercial sale in competition with the Recipient, any such work which is produced by the Recipient.

29.2 The license granted under section 29.1 shall be for the duration of the copyright and shall include:

(a) the right to sub-license the use of the work to any contractor engaged by Canada solely for the purpose of performing contracts with Canada, and

(b) the right to distribute the work outside the Department of Employment and Social Development as long as the distribution does not undermine any commercial use of the work intended by the Recipient.

29.3 The Recipient agrees to execute any acknowledgements, agreements, assurances or other documents reasonably deemed necessary by Canada to establish or confirm the license granted under section 29.1.

29.4 Additionally, with respect to any work licensed under section 29.1, the Recipient

(a) warrants that the work shall not infringe on the copyrights of others,

(b) agrees to indemnify and save harmless Canada from all costs, expenses and damages arising from any breach of any such warranty, and

(c) shall include an acknowledgment, in a manner satisfactory to Canada, on any work which is produced by it with funds contributed by Canada under this Agreement, acknowledging that the work was produced with funds contributed by Canada and identifying the Recipient as being solely responsible for the content of such work.

29.5 The Recipient shall include in the final report for the Project, that the Recipient is required to submit to Canada under the terms of this Agreement, a copy of any work licensed under section 29.1.

## 30.0 NOTICES

49327024.2

B11

 Employment and          Emploi et
Social Development Canada   Développement social Canada

Agreement #:
Amendment #:

### 31.0 ASSIGNMENT OF THE AGREEMENT

31.1 The Recipient shall not assign this Agreement or any part thereof without the prior written consent of Canada.

### 32.0 SUCCESSORS AND ASSIGNS

32.1 This Agreement is binding upon and enure to the benefit of the parties and their respective successors and assigns.

### 33.0 COMPLIANCE WITH LAWS

33.1 The Recipient shall carry out the Project in compliance with all applicable federal, provincial and municipal laws, by-laws and regulations, including any environmental legislation and legislation related to protection of information and privacy. The Recipient shall obtain, prior to the commencement of the Project, all permits, licenses, consents and other authorizations that are necessary to the carrying out of the Project.

### 34.0 APPLICABLE LAW

34.1 This Agreement shall be governed by and construed in accordance with the applicable laws of the province of Ontario and the federal laws of Canada applicable therein.

### 35.0 AMENDMENT

35.1 This Agreement may be amended by mutual consent of the parties, as required. To be valid, any amendment to this Agreement shall be in writing and signed by the parties.

### 36.0 FORCE MAJEURE

36.1 During the occurrence of an event of Force Majeure, the obligations of the Party affected by such event of Force Majeure, to the extent that such obligations cannot be performed as a result of such event of Force Majeure, shall be suspended, and such Party shall not be considered to be in breach or default hereunder, for the period of such occurrence. The suspension of performance of the activities or deliverables contemplated by this Agreement or a part thereof shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure condition.

36.2 The non-performing Party shall give the other Party prompt written Notice of the particulars of the event of Force Majeure and its expected duration, shall continue to furnish reasonable reports with respect thereto on a timely basis during the continuance of the event of Force Majeure and shall use its reasonable commercial efforts to remedy its inability to perform.

36.3 Notwithstanding sections 36.1 and 36.2 and the definition of the term "Force Majeure" at section 1.0, the Parties agree that COVID-19's impacts within Canada as of the date of signing of this Agreement do not constitute an event of Force Majeure for the purposes of this Agreement. However, the Parties also agree that COVID-19's impacts may possibly become an event of Force Majeure for the purposes of this Agreement if circumstances were to change significantly. In the event that either Canada or the Recipient decide that COVID-19's impacts may constitute an event of Force Majeure because of a significant change in circumstances, they shall so notify the other Party immediately and the Parties will negotiate in good faith to determine whether the change in circumstances resulted in an event of Force Majeure and what options are available to ensure the performance of the obligations of the Parties.

### 37.0 OFFICIAL LANGUAGES

37.1 Where the Project is to be delivered to members of either language community, the Recipient shall:

(a)   make Project-related documentation and announcements (for the public and prospective Project Participants, if any) in both official languages where applicable;

B12



| Employment and | Emploi et | Agreement #: |
| Social Development Canada | Développement social Canada | Amendment #: |

purposes. Signatures of the parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes

### 39.0 PROJECT PARTICIPANT ELIGIBILITY

39.1 In determining Project Participant eligibility, the Recipient shall be entitled to rely upon information submitted by Project Participants or ESDC. The Recipient shall include a requirement that applicants declare their eligibility and may require the submission of supporting documentation that they determine necessary but will not be required to verify or validate such information and is not liable for any statements or information provided by a Project Participant that are untrue.

### SIGNATURES

Signed this 23rd day of June , 2020

**For the Recipient, by the following authorized officer(s):**

Scott Baker

_____
(Name, please print)

_____
(Signature)

___President, WE Charity Foundation___
(Position)

___Victor Li___
(Name, please print)

_____
(Signature)

___Chief Financial Operations___
(Position)

And signed this 23rd day of June, 2020

**For Canada, by the following authorized officer:**

Hon. Bardish Chagger

_____
(Name, please print)

_____
(Signature)

Minister of Diversity and Inclusion and Youth

_____
(Position)

B13