EXHIBIT 23

**Stephen T. Goudge Professional Corporation**
155 Wellington Street West, 35th Floor
Toronto, ON M5V 3H1

**Tel.: 416.646.7401 / Fax: 416.646.4301**
**email: stephen.goudge@stephengoudge.com**

File: 96183

May 23, 2019

WE Charity
339 Queen St E,
Toronto, ON
M5A 1S9

Dear Sirs:

**Re: Independent Assessment of WE's Co-Founders' Compensation, WE's Reporting Protocols, and Relationship with Theresa and Fred Kielburger**

<u>Introduction</u>

You have asked me to conduct an independent assessment of certain topics relating to WE Charity and ME to WE Social Enterprises Inc. ("ME to WE"). I will generally refer to the organizations collectively as "WE", and distinguish which entity I am referring to where appropriate.  I have been asked to review the following topics:

- WE's compensation of Craig and Marc Kielburger
- WE's relationship with Theresa and Fred Kielburger, and specifically whether there is anything improper in Fred and Theresa Kielburger's business relationship with WE Charity;
- Whether there are reasonable protocols in place to generate, verify, and evaluate WE's budgets;
- Whether there are reasonable protocols in place to generate, verify, and evaluate WE's reporting; and,
- Whether WE has used credible third-party organizations to conduct independent reviews of its programs.

My assessment is based on the documents provided to me by WE.

I have been ably assisted in my task by Elizabeth Rathbone of Paliare Roland Rosenberg Rothstein LLP.  However, I have conducted my review on a completely independent basis.  The conclusions I have drawn are entirely my own.

## Discussion

### A.    *WE's compensation of Craig and Marc Kielburger*

I have reviewed a statement from the Chair of WE Charity's board of directors, a statement from members of WE Charity's board, a statement from the CFO of WE Charity and ME to WE, a letter from ME to WE's accountants, and Craig and Marc Kielburger's 2017 and 2018 T4 statements of remuneration.

Craig and Marc Kielburger's T4 slips show that they each received an income of $125,173.02 from ME to WE in 2018, and that they each received an income of $113,461.54 from ME to WE in 2017.  The CFO of ME to WE and WE Charity certifies that these amounts represent the full extent of any payments which the Kielburgers received from ME to WE in these years.  WE's CFO also certifies that neither Craig nor Marc Kielburger has ever received any form of salary from WE Charity or its predecessor, Free the Children.  This is also the collective understanding of WE Charity's board of directors.

WE's CFO further certifies that neither Craig nor Marc Kielburger have ever received dividends from ME to WE.  Moreover, ME to WE's accountants state that ME to WE has never distributed dividends.

Based on the above, I conclude that Marc and Craig Kielburgers' global salaries from all WE entities were $125,173.02 for 2018, and $113,461.54 for 2017, respectively. Moreover, neither Marc nor Craig Kielburger have received any form of salary from WE Charity or its predecessor, Free the Children.

### B.    *WE's relationship with Theresa and Fred Kielburger*

I have reviewed statements from a number of WE's executives, including WE's past and present executive directors, WE's CFO, and the chair of WE's board regarding WE's use of certain office buildings owned by Theresa and Fred Kielburger.  I have also reviewed a report prepared by Sotheby's International Realty regarding the commercial value of WE's use of these office buildings.

Theresa and Fred Kielburger are the parents of WE's co-founders, Craig and Marc Kielburger.  Fred and Theresa Kielburger own various pieces of real estate in Toronto, including office buildings at 231 Carlton Street and 233 Carlton Street.  Fred and Theresa own each building indirectly, through two numbered companies, of which Fred and Theresa are each shareholders.  Theresa is the sole director of both numbered companies.  Each company holds one of the office buildings as its sole asset.  I understand this to be a common business arrangement in real estate.

From June, 2004 to September, 2018, WE Charity operated out of the office building at 233 Carlton Street.  Fred and Theresa did not charge WE any rent for use of this building.  ME to WE paid the carrying costs associated with the building, including property taxes and interest on the building's mortgage, through a targeted donation to WE Charity which was specifically earmarked for this purpose.

From August, 2010 to September, 2018, WE Charity also operated out of the neighbouring office building at 231 Carlton Street, which is also owned by Fred and Theresa indirectly.  Fred and Theresa did not charge WE any rent for use of the space, and paid all carrying costs associated with this building.

Sotheby's has valued the rent-free use of these office buildings at a $5,396,372 value, which represents a very significant saving in overhead and administrative costs for WE Charity.  I also understand that Fred and Theresa elected not to receive a tax benefit for this charitable donation.

Based on the above, I conclude there is nothing improper in Fred and Theresa Kielburger's business relationship with WE Charity.  Like many parents who have the means to do so, Fred and Theresa Kielburger have provided financial support for their children; in this case, they have financially supported their children's work.  I do not believe that the business arrangements used to effect this generosity are inappropriate or indicative of any untoward dealings between Fred and Theresa and WE.

### C.      WE protocols to verify and evaluate its budget numbers

WE has provided me with an overview of the protocols it has put in place to generate, verify, and evaluate the budgets WE generates in connection with specific projects and donations.

Based on the protocols detailed in this overview, I conclude that WE has extensive protocols in place to draft and approve the budgets WE generates for specific projects. When developing the budget for specific project, WE engages staff from various departments who are familiar with the type of project, benchmarks the anticipated costs of the project against historical data for similar projects, and conducts internal reviews to ensure all costs have been captured.  The budget is then submitted to a WE executive, or several executives depending on the size of the budget, for verification and approval.

### D.      WE protocols to verify and evaluate its reporting numbers

WE has provided me with an overview of the protocols it has put in place to generate, verify, and evaluate the reports WE generates (i) in connection with financial reporting on specific projects and donations, and (ii) in connection with reporting on the success and outcomes of WE's programs.

Some of WE's donors require financial reporting, beyond development of the budget, on the specific project.  Where such reporting is required, WE's finance team produces a report which is then approved and co-signed by either WE's Chief Development Officer or Executive Director, as the case may be.  Depending on the size of the project, additional validation and approval is required.  WE also produces reports for its donors summarizing the success or impact of the partnership.  WE has protocols in place to produce and verify the accuracy of these reports.

WE also produces a number of reports on its programs and operations, including reports on WE's engagement with schools, its WE days, and its speaking tours.  WE has protocols in place to produce and verify the accuracy of these reports.

***E.      Credibility of third-party organizations which review WE's programs***

Over the years, WE has engaged Mission Measurement, LLC to conduct reviews of its programs, including an in-depth review of WE Charity's international development programming in 2012.   Based on my review of documents provided by WE, Mission Measurement appears to be a credible, well-respected organization within the social innovation sphere.

ME to WE is also a certified "B Corporation" by B Corp.   The B Corporation certification is issued to private, for-profit companies which satisfy B Corp's requirements for social and environmental performance.   The certification process involves an extensive online assessment which requires the applicants to submit significant information about their business and operations, as well as supporting documentation where necessary. Based on my review of documents provided by WE, B Corp also appears to be a credible, well-respected organization within the social innovation sphere.   Both B Corp and Mission Measurement are also utilized by well-known, Fortune 500 companies to assess their social and environmental performance.

Yours very truly,

Hon. Stephen Goudge, Q.C.
SG/sb