EXHIBIT 25



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

43rd PARLIAMENT, 2nd SESSION

# Standing Committee on Access to Information, Privacy and Ethics

EVIDENCE

**NUMBER 022**

Friday, February 26, 2021



Chair:  Mr. Chris Warkentin

# Standing Committee on Access to Information, Privacy and Ethics

**Friday, February 26, 2021**

● (1300)

[*English*]

**The Chair (Mr. Chris Warkentin (Grande Prairie—Mackenzie, CPC)):** I call this meeting to order.

It is now one o'clock, Ottawa time. This the 22nd meeting of the House of Commons Standing Committee on Access to Information, Privacy and Ethics. We are resuming the study today with regard to the questions of conflict of interest and lobbying in relation to pandemic spending.

I would like to remind members and witnesses that today's meeting will be made available through the House of Commons website and will be webcast.

This afternoon, our first witness is Sofia Marquez. Ms. Marquez is a former staff member of government and stakeholder relations with WE Charity. Thank you, Ms. Marquez, for joining us this morning. We'll turn to you for your opening statement. Then, as you know, we'll have some questions for you.

Thanks again for joining us. We'll be interested to hear what you have to say.

**Ms. Sofia Marquez (Former Staff Member, Government and Stakeholder Relations, WE Charity, As an Individual):** Good afternoon. My name is Sofia Marquez. Thank you so much for the opportunity to provide some opening remarks before addressing your questions.

As members of the committee know, I am appearing before you today after being issued a summons on Monday, February 22. Before the summons was issued, I respectfully declined two invitations by written correspondence through counsel.

My refusal may have left the committee members or other Canadians with the impression that I am a reluctant witness or that I represent WE Charity in an attempt to refuse the committee's questions about the organization's activities. Let me correct that misconception at this time. I'm happily appearing before you as a private citizen to answer your questions honestly and to the best of my ability. I'm very proud of the way I've conducted myself throughout my professional career and I have nothing to hide.

I would like to share for the record some background about my role at WE Charity and the limitations on my ability to assist this committee in its study.

Prior to working for WE Charity, I obtained a master's in public and international affairs in 2014 from the University of Ottawa. After graduation, I worked in policy analysis, project management, and proposal development roles in both the non-profit and private sectors. I have never been a consultant lobbyist or worked in a role in which lobbying formed the core of my responsibilities within an organization.

I began my employment with WE Charity in July 2017 as an associate director of strategy. In this role, I managed a team that supported the efforts of other departments and the executives in the development of specialized proposals across all sectors. This included the private, public and non-profit sectors.

I wasn't initially hired to be a liaison for government or other stakeholders. In July of 2018, WE Charity recognized that my work had gradually and naturally evolved to focus more on external engagement, and I took on the newly created title of director of government and stakeholder relations, along with a shift in my duties. In this role, I was responsible for engagement with all levels of government, as well as with strategic stakeholders across the non-profit sector and private sector in relation to domestic programs run by WE Charity in Canada. This included securing funding, project management to support the successful implementation of funded programs, and fulfilling reporting requirements on existing initiatives.

All of this work was focused on helping to advance opportunities for Canadian youth to engage in service and education, a goal I cared passionately about then and still do today.

The scope of my responsibilities did not include, however, the stewardship of donations or the management of specific donor relationships, the securing and management of talent for WE Day or ancillary events around it, or any involvement in WE Charity's international projects. I also don't have information on WE Charity's corporate or financial operational structure.

To be clear, if you're imagining me as a full-time in-house lobbyist, that would be a mischaracterization of my role. I wore many hats, and lobbying was occasionally one of them. My government engagement at all levels included all kinds of activities and communications, including overseeing project management, reporting on existing government-funded programs, or even understanding—broadly speaking—youth policies that were in place. I was not by any stretch a full-time lobbyist or even a regular lobbyist for the federal government.

I am aware of the Lobbying Act and code and I was aware of them while working for WE Charity. As members of the committee will know, the responsibility for registration for in-house lobbyists under the Lobbying Act lies with the executive director of an organization. However, in support of WE Charity's response to the lobbying commissioner's inquiries and other requests from the federal government, I provided all my calendar and records to my former employer to facilitate an estimate of my actual time spent engaging with the federal government in any capacity.

I am aware that WE Charity has completed a registration under the act, dated back to January 2019, which includes my name as an in-house lobbyist during my employment with the organization. I was not involved in that process, which took place after my departure from WE Charity, and I cannot offer the committee any information about it.

I can, of course, tell you what I remember about my role in developing the proposal of the Canada student service grant in April and May 2020, as I already did for the finance committee back in August. I can only do this from memory, since my records belong to my former employer.

● (1305)

I can tell you that before the Canada student service grant was conceived, WE Charity made an unsolicited proposal to government for a student entrepreneurship program, which we hoped would be a way to support Canadian youth during and after the first wave of the pandemic. This proposal was shared with Minister Ng and Minister Chagger in the first half of April 2020. This proposal was in no way related to what eventually would become the Canada student service grant, and focused on a different type of youth engagement, from a scale perspective and a model perspective.

I can also tell you that I was aware that Rachel Wernick contacted Craig Kielburger and identified the government's interest in developing a student service program on a much wider scale on April 19. In response to that information, I was deeply engaged, and dedicated most of my time to mobilizing my colleagues at WE Charity to draft a proposal to ESDC, which was ultimately provided to government as a formal proposal on April 22.

The service proposal was shared widely within government after April 22, as I understand it, though I would have no knowledge of internal communications within government. To confirm, I did participate in a briefing call with Craig Kielburger, Michelle Kovacevic and Rachel Wernick on April 24 as well, as the record has shown.

After this point, I received and responded to many requests from ESDC for further information between May 8 and May 22 as part of the proposal development process. As of May 22, however, I was no longer involved in any activity regarding the Canada student service grant. All responsibility for dealing with the proposal or agreement negotiations were led by the executive level within WE Charity, and I had no further involvement in or knowledge of engagement with government at that point.

My role as director of government and stakeholder relations at WE Charity ended on July 31 of last year, as you all know, and I have moved on in my own career from that work. I remain committed to promoting youth education and engagement in Canada, and I'm very proud of our team's hard work to advance these issues at WE Charity, particularly during a pandemic. It has been truly disappointing for me to watch these efforts being undermined and ultimately undone over the past several months.

I welcome the opportunity to answer any questions the committee may have for me at this time.

**The Chair:** Thank you for the statement.

Mr. Barrett, we'll turn to you for the first round of questions.

**Mr. Michael Barrett (Leeds—Grenville—Thousand Islands and Rideau Lakes, CPC):** Thanks very much.

Ms. Marquez, thanks for joining us today. My first question is with respect to contact between you and the lobbying commissioner. Have you been directly contacted by the federal lobbying commissioner? If so, what was the nature of that communication?

**Ms. Sofia Marquez:** No, I have not been contacted.

**Mr. Michael Barrett:** Have you been contacted by the RCMP regarding lobbying activity at the WE organization?

**Ms. Sofia Marquez:** No, I have not been contacted by the RCMP at this time.

● (1310)

**Mr. Michael Barrett:** Are you aware of any contacting by the RCMP of your now former colleagues at the WE organization with respect to the Canada student service grant proposal or other iterations of that proposal in 2020?

**Ms. Sofia Marquez:** I have no direct knowledge of that at all.

**Mr. Michael Barrett:** Are you able to share with us how many meetings with ministers any staff at the WE organization had per month in 2019? My follow-up question is going to be how that contrasts with the number of meetings in 2020.

**Ms. Sofia Marquez:** My understanding is that WE Charity has been tasked and has already registered for lobbying and has a detailed record of all the meetings of these interactions involving me or my colleagues. I don't have that at hand, and as I mentioned in my opening statement, the information I had I provided at the time I left the organization.

**Mr. Michael Barrett:** Have you reviewed the publicly available records with the lobbying commissioner that were provided by the WE organization? Have you had the opportunity to take a look at those?

**Ms. Sofia Marquez:** In preparation for this meeting, I took a look at publicly available information. It included the registry for the lobbying for WE Charity. It does reflect, to the best of my ability and memory, the meetings that I held with different government officials or public officials, whichever those were, but I don't have the details at hand with me right now.

**Mr. Michael Barrett:** It's your assessment, based on your recollection, that the reported information is accurate.

**Ms. Sofia Marquez:** That's correct. As I mentioned, before leaving the organization on July 31, 2020, I went through my records, my calendar and my activities, everything that had to do with my engagement with all levels of government as well as with stakeholders, and my former employer would have this detailed information.

**Mr. Michael Barrett:** Considering your knowledge of the information you reviewed in preparation for attending today—and I appreciate your taking the time to do that, since it makes this exchange easier—and knowing about the federal Lobbying Act and the requirements for organizations to comply with it, would you say that interacting with people would add up to a significant portion of one person's duties at the WE organization?

**Ms. Sofia Marquez:** Based on my review of publicly available information and based on my knowledge as part of my tenure as director of government and stakeholder relations, I wouldn't be able to assess that and give you that answer, as I didn't have a full view or full understanding of other people's work and time.

**Mr. Michael Barrett:** Which individual would you say did the most lobbying, interacting or advocacy with the federal government for the WE organization, since you have said that it was not you?

**Ms. Sofia Marquez:** I would not be in a position to be able to assess that, as it was not within my purview to have access to information on the number of hours other employees or my previous colleagues would have spent within what would be considered lobbying activities.

**Mr. Michael Barrett:** Did you have any communication with the office of former finance minister Bill Morneau regarding the $3-million grant that the WE organization received just prior to the federal election in 2019?

**Ms. Sofia Marquez:** I'm sorry to interrupt you, but would you mind repeating that? It cut off a little bit.

**Mr. Michael Barrett:** That's no problem at all.

In 2019, the WE organization received a $3-million grant from the Government of Canada. Did you have any communication with the office of former finance minister Bill Morneau regarding that agreement?

**Ms. Sofia Marquez:** From what I can remember, I was part of the WE Charity team that engaged with different agencies at the federal government, which would have included the ministry of finance as well as their staff, in order to ensure that there was alignment in policy objectives as well.

**Mr. Michael Barrett:** Do you recall who your point of contact would have been for the team at the ministry of finance?

● (1315)

**Ms. Sofia Marquez:** I can't seem to recall for that specific contract.

**Mr. Michael Barrett:** Are you aware of contact between the WE organization and the Government of Canada with respect to the Canada 150 activities that the WE organization participated in on Parliament Hill?

**Ms. Sofia Marquez:** As I stated in my opening statement, I started with WE Charity in 2017. I believe the Canada 150 event

was prior to my starting date at WE, so I would have no direct knowledge or involvement with that contract, per se, either.

**Mr. Michael Barrett:** Ms. Marquez, I think that's my time. Thanks very much for answering my questions. I appreciate it.

**Ms. Sofia Marquez:** Thank you so much.

**The Chair:** Thank you.

I'll turn to Mr. Fergus now for his first round of questions.

[Translation]

**Mr. Greg Fergus (Hull—Aylmer, Lib.):** Thank you very much, Mr. Chair.

Ms. Marquez, thank you very much for the comment you made at the beginning of your presentation.

It's unusual for the committee to require a witness to appear. However, we decided to do it because you refused to appear twice. It's unfortunate that it had to come to this, but thank you for being here today.

Ms. Marquez, do you have any information you could share with the committee today that you have not shared with other parliamentary committees in your past appearances?

[English]

**Ms. Sofia Marquez:** Thank you for your acknowledgement at the beginning of your question.

Since my appearance the first time around before Parliament in August of last year to this point, I have no direct knowledge of any information that has come up whereby I would be helpful in providing any additional information.

My testimony before Parliament last year and here today is my recollection, to the best of my ability and memory, of what I went through and how I experienced working for WE Charity, so I have no other comment.

[Translation]

**Mr. Greg Fergus:** Do you not have anything new to add to your testimony?

[English]

**Ms. Sofia Marquez:** The only thing that I can provide to you is what I already stated in my opening statement. The scope of my job, as I described it, was very well defined, and anything new that would have come up through any other means.... I have no direct knowledge or additional information to provide to this committee, unfortunately, as much as I would like to be helpful.

[Translation]

**Mr. Greg Fergus:** Ms. Marquez, can you tell us why you think we summoned you to appear here today?

[English]

**Ms. Sofia Marquez:** I'm sorry; can you repeat that question?

*[Translation]*

**Mr. Greg Fergus:** Can you tell us why you think we summoned you to appear here today?

*[English]*

**Ms. Sofia Marquez:** As a former member of WE Charity, acknowledging the title of director of government and stakeholder relations that I held and the communications in which I was obviously involved during the Canada student service grant program, I was deeply involved in those conversations. To me, that's evidence that you may have interest in understanding my involvement, and I'm here to answer any questions that you may have about that particular project.

*[Translation]*

**Mr. Greg Fergus:** Thank you.

We met Mr. Perelmuter from Speakers' Spotlight a few months ago. He explained to us how his life had been turned completely upside down due to all the media attention around his company and his ties with WE Charity. He believes he has been a victim of "abuse", if I may use the term figuratively, because he feels the opposition parties publicly harassed him.

Can you tell us if you have had a similar experience?

Could you share with us your experience as someone who is now in the public eye?

● (1320)

*[English]*

**Ms. Sofia Marquez:** Thank you for your question.

I can't speak to any other individual's experiences and the very personal comment brought to light, but I can speak as it pertains to my involvement and how I feel around being brought to this committee or any other committee to bring forward my perspective and my part in everything that had to do with the Canada student service grant.

I'm happy to provide any information possible, and at no time did I feel that any MP or anybody had harassed me or did I have any type of qualification of that sort.

*[Translation]*

**Mr. Greg Fergus:** I wasn't saying you were harassed by any members of Parliament.

*[English]*

**Ms. Sofia Marquez:** I'm sorry; maybe that's what I misheard from the translation. My bad, if that was the case.

**The Chair:** Thank you so much, Mr. Fergus.

We'll turn to Madame Gaudreau now for her first round of questions.

*[Translation]*

**Ms. Marie-Hélène Gaudreau (Laurentides—Labelle, BQ):** Thank you, Mr. Chair.

Ms. Marquez, I'm going to speak slowly, even though every second counts for me.

Thank you for being here today.

I attended the Standing Committee on Finance meeting, and I'd like to check a few things with you so that we can shed some light on certain facts. I know you had some research to do as well, about your telephone calls, for example.

I have a few questions for you, about April 20, among other things.

On August 13, you said that you needed to check your call log to see if there had been a call on April 20. Did you do that, and did you verify that information?

It's a crucial date, in our opinion. We're talking about a call on April 20 with the Department of Employment and Social Development and the Department of Finance.

*[English]*

**Ms. Sofia Marquez:** From what I can best recall, I can't seem to recall that there was a specific meeting on the 20th that I can confirm. If you have that information at hand or an email that you can share, perhaps I can shed some light into what I can remember, but I don't seem to recall that.

*[Translation]*

**Ms. Marie-Hélène Gaudreau:** Okay, I'll move on to my other questions.

On May 5, you were in contact with the Prime Minister's Office, on a 30-minute telephone call with Ms. Lebel and Mr. Theis.

Could you reconfirm that?

*[English]*

**Ms. Sofia Marquez:** What I can confirm is that I was only on a phone call with Mr. Theis. I can't recall the other person's name. I haven't met that person, as a matter of fact.

*[Translation]*

**Ms. Marie-Hélène Gaudreau:** Earlier, when we asked you if you had been in contact with staff in Mr. Morneau's office since March 1, you said that you had been in contact with Mr. Amit Singh and Ms. Michelle Kovacevic. Is that correct?

● (1325)

*[English]*

**Ms. Sofia Marquez:** That is correct.

*[Translation]*

**Ms. Marie-Hélène Gaudreau:** All right.

I'm going to ask you a question with a slightly broader scope.

You were director of government and stakeholder relations. You have expertise in that area. With all due respect, am I right in thinking that it's important for lobbyists to be vigilant so that they can be transparent and remain neutral? In concrete terms, should lobbyists ensure that they are registered with the federal Registry of Lobbyists?

Although it was not your main task, can you tell us what percentage of your duties were devoted to lobbying?

Am I being overly vigilant in asking the question? Should you have done that to ensure that you would not end up here today?

[*English*]

**Ms. Sofia Marquez:** To answer your question, the only way to truly estimate how much time I spent on activities that would then also be classified under the Lobbying Act would be for me to reconstruct my activities based on my calendar. As I stated before, that information is with my previous employer.

If you're asking about my estimation, I would say that I would not ever have exceeded more than 20% of my time at any point of time—during some periods as little as 5%—as it pertains specifically to the federal government. I would like to—

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Mr. Chair, I know I'm losing time to allow for interpreting, so I feel I can ask one last question.

Ms. Marquez, you may not consider 20%—or 5%—of your time to be a high percentage, but would it not have been appropriate to ensure that you were in the Registry and report your lobbying activities to be fully transparent about your communications and conversations?

[*English*]

**Ms. Sofia Marquez:** As I mentioned, my role evolved naturally, as I was doing it. Through that natural job transition, I wouldn't have tracked specifically and thoroughly. In hindsight, I would see how that could have been helpful, but as I mentioned, at the end of my tenure in July of last year, I did provide all of my activities and the time spent on lobbying, and in general in other activities, to my employer. They would have been tasked, and responsible, to submit and register for lobbying, as they have already.

**The Chair:** Thank you.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** They did not do that.

[*English*]

**Ms. Sofia Marquez:** Sorry; is that a question?

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** It was my last question. Did they register you or not?

[*English*]

**Ms. Sofia Marquez:** I wouldn't be able to assess and say whether WE Charity recorded or not my time. I provided all the information to WE Charity. That should be appropriately reflected in the lobbying registration, to my understanding.

**The Chair:** Thank you.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you.

[*English*]

**The Chair:** We'll turn to Mr. Angus now for his first round.

**Mr. Charlie Angus (Timmins—James Bay, NDP):** Thank you, Madam Marquez, for participating in these discussions. I just want to say very clearly that our issuing a summons for you was not

about our saying you've broken any laws or done anything wrong. You worked for an organization that had the duty, the obligation, to follow the Lobbying Act. Our questions for you are very much about just clarifying some issues so that we can get a better picture. I thank you very much for coming today.

The moment the WE group did register to lobby was after questions became very public about whether or not it had engaged in illegal lobbying by not registering. It lists, I think, 65 meetings and engagements with government during that time, when you were the director of government relations. A number of people were involved in that. It seems that it was a busy enough portfolio.

I note that prior to the pandemic, the group was looking to hire a manager of government relations. You would have been director of government relations. They were looking to hire a manager of government relations. Would that person have worked under you or under Craig and Marc Kielburger, or under both?

● (1330)

**Ms. Sofia Marquez:** That is correct. That person would have worked under me.

**Mr. Charlie Angus:** Then WE would have had a director and a manager, which again suggests to me that this was a pretty serious part of the operation.

What I notice about the meetings is that none of the contacts with Minister Qualtrough or Minister Chagger to confirm their participation in the WE Day events are mentioned in the lobbying, nor are any of the events that Mr. Morneau engaged in with the Kielburger group. They are not listed under the Lobbying Act.

Was it your responsibility to reach out to public officials like Minister Chagger when she was going to be asked to be a WE Day participant? Was that your responsibility or Marc Kielburger's?

**Ms. Sofia Marquez:** Thank you for your question.

I wouldn't be tasked to draft or to send out official invitations for WE Days directly. That would have come from one of the cofounders, Marc or Craig Kielburger.

**Mr. Charlie Angus:** Right.

I know that Marc and Craig had chiefs of staff paid for by the WE Charity who were paid over $100,000 a year. It would have been, say, Marc's chief of staff who would have reached out, and it was not just an invitation to WE Day, but they would have had to arrange for Minister Chagger to be there and Minister Qualtrough to be there. My understanding—you can correct me if I'm wrong—is that it would have been done under Marc's purview.

**Ms. Sofia Marquez:** That could have been under Marc's or Craig's purview, to my understanding.

**Mr. Charlie Angus:** Thank you for that. Neither of them is registered to lobby, but I think that's again part of the issue that we're dealing with here.

On April 9, Craig Kielburger reached out directly to Minister Morneau on the $12-million youth entrepreneurship grant you talked about: "Hi Bill, I hope this finds you, Nancy, Henry, Claire, Edward and Grace enjoying some well-deserved downtime over Easter together." That was the beginning of the discussion of the $12-million grant. Would it have been common for Craig to have reached out himself when you were actually the director of government relations? Wouldn't it have been you to reach out to Minister Morneau first?

**Ms. Sofia Marquez:** Thank you for your question.

I don't have a recollection of being part of that conversation. Can you confirm whether that was only solely sent by Craig, or was I involved?

**Mr. Charlie Angus:** Well, this is what we're trying to figure out. If Craig sent it to Minister Morneau and Minister Morneau signed off on it 11 days later, it strikes me as an extremely quick turnaround time. In those 11 days between Craig's sending a request for $12 million and it being mentioned in the April 22 announcement and Minister Morneau verbally signing off on it, were you involved in those discussions?

**Ms. Sofia Marquez:** I was not involved, nor was I aware that Minister Morneau had approved that proposal to move forward, and if I wasn't part of the email you're mentioning, then I probably wasn't in the loop on that specific item.

**Mr. Charlie Angus:** Okay. Then when Minister Morneau speaks to Craig on this, and Craig can confirm that they talked about this entrepreneurship on, I think, April 26, you wouldn't have been part of that either.

**Ms. Sofia Marquez:** I'm sorry. Are you referring to the April—

**Mr. Charlie Angus:** Craig said that in the April 26 phone call with Minister Bill Morneau, they discussed the entrepreneurship grant. In this moving of the $12 million, which is listed as the $900 million plus $12 million—it's the $912 million that they announced—would that have all been Craig handling that himself and not you as a director of government relations?

**Ms. Sofia Marquez:** The call that you're specifically alluding to I was not part of.

**Mr. Charlie Angus:** Okay. I have to move on.

With regard to the April 17 meeting with Minister Chagger and Craig Kielburger, you were at that meeting, correct?

**Ms. Sofia Marquez:** I was.

**Mr. Charlie Angus:** In your email of April 20—this is what my colleague Madame Gaudreau was referring to—you state that Minister Chagger suggested that we should "include a service component" and "consider opening a service-stream". This is to switch the entrepreneurship grant into what became the Canada summer student service grant. She mentioned that separate service stream in that meeting, correct?

**Ms. Sofia Marquez:** I don't recall the minister mentioning anything specific to the Canada student service grant at that call—

**Mr. Charlie Angus:** I'm just going to quote. You said, "Minister Chagger expressed interest in exploring ways to adapt the entrepreneurship proposal we submitted to Min. Ng and include a service component to it. She suggested that we should consider opening a service-stream...." Those are your words from April 20.

On April 22, Craig Kielburger repeats the same thing, so I believe this comes from your notes. She did talk about this service stream being opened through working with you guys...?

● (1335)

**Ms. Sofia Marquez:** From what I recall from that meeting with Minister Chagger, within the mandate of her office she was tasked with overseeing and ensuring that the Canada Service Corps program, which has nothing to do with the Canada student service grant, which later became a program—or it didn't.... That program was something we were deeply interested in better understanding and supporting the federal government in scaling, so as such—

**Mr. Charlie Angus:** Sorry, but I'm running out of time here. That was because you met her about the entrepreneurship grant.

**Ms. Sofia Marquez:** That's correct.

**Mr. Charlie Angus:** You said she suggested adding this service stream—that's what it says—and then Craig said the same thing on April 22, so did she talk about adding a service stream, as you state in your notes?

**The Chair:** Ms. Marquez, I'll get you to answer that question, and then we'll turn it over to Mr. Carrie.

**Ms. Sofia Marquez:** I can't recall word for word what Minister Chagger said regarding the service piece, but I do remember it was focused mainly on the social entrepreneurship proposal that we had at hand.

**Mr. Charlie Angus:** She suggested we should consider opening a service stream and including a service component, and that became the Canada student service grant.

Thank you for that.

**The Chair:** Mr. Carrie, we'll turn to you now for our next round of questions.

**Mr. Colin Carrie (Oshawa, CPC):** Thank you, Mr. Chair.

Thank you, Ms. Marquez, for being here today.

Have you had any contact with any member of the government or any representative of WE Charity between your previous appearance at committee and this meeting today?

**Ms. Sofia Marquez:** I've been in contact with previous employees of WE Charity. I built a number of meaningful relationships with previous colleagues, so I would say, broadly speaking, yes.

**Mr. Colin Carrie:** Do you have anybody at the government?

**Ms. Sofia Marquez:** At the government, I haven't engaged with public officials or elected officials at all.

**Mr. Colin Carrie:** Would you feel comfortable sharing the names of the people at WE Charity you were in contact with?

**Ms. Sofia Marquez:** I find it unnecessary to name all my personal friends in public at this point in time, if that's okay.

**Mr. Colin Carrie:** That's fair.

I want to go back to a few things. You were director of government and stakeholder relationships from January 2018 to July 2020. In that role, was avoiding conflicts of interest and potential appearance of conflicts of interest part of your duty, yes or no?

**Ms. Sofia Marquez:** No.

**Mr. Colin Carrie:** Really? Okay.

Was it your responsibility to communicate with members of the cabinet to help benefit WE Charity?

**Ms. Sofia Marquez:** Can you repeat the question?

**Mr. Colin Carrie:** In your role as director of government and stakeholder relations, would you say it was your responsibility to communicate with members of the cabinet to help benefit WE Charity, yes or no?

**Ms. Sofia Marquez:** Yes.

**Mr. Colin Carrie:** It was, yes.

I want to go back to a question my colleague asked you about the $3-million grant from the Canadian government just before the 2019 election. Did you or any of your colleagues communicate with the office of former finance minister Bill Morneau with regard to that $3-million grant?

**Ms. Sofia Marquez:** I can't recall specifics, but I wouldn't be surprised if that would have been the case at some point. We would have to check the records.

**Mr. Colin Carrie:** I would appreciate firm clarification on that, because at that time, Minister Morneau—I don't know if you were aware—still owed $41,366 in unreimbursed travel expenses for his 2017 trips to Kenya and Ecuador for WE Charity, which the organization had paid for. Is that something you would have been aware of at the time?

● (1340)

**Ms. Sofia Marquez:** As I mentioned in my opening statement, the scope of the job that I had did not include the stewardship of donations or the management of donor engagement directly for international projects or any of that. I had no knowledge of that happening.

**Mr. Colin Carrie:** Ms. Marquez, I hope you don't mind, but it just makes absolutely no sense to me that the director of government and stakeholder relations wouldn't be aware of the unreimbursed expenses before receiving a $3-million grant.

WE charity was clearly organized, so the only explanation I could have for that is that you weren't told because of incompetence within the organization or because of wilful ignorance, and the appearance of this is horrible.

Forty-one thousand dollars is a lot of money. I would say most Canadians would agree that it's a lot of money, and it could be perceived as an attempted bribe or one of those oversights that would affect his decisions.

What was it in your organization? Was it that somebody was incompetent in not informing you of this extremely important reimbursement that hadn't been done, or do you think it was wilful that they didn't tell you about this?

**Ms. Sofia Marquez:** What I can bring to this committee is the confirmation that I had no direct knowledge of any payments or outstanding payments that any minister or donor would or would not have made at any point in time.

The scope of my responsibility did not include that, and therefore—

**Mr. Colin Carrie:** Well, somebody would have known.

**Ms. Sofia Marquez:** —my due diligence did not include engaging with other departments to ensure whether or not that was the case.

**Mr. Colin Carrie:** Well, unfortunately, Madam Marquez, I think my time is up, but thank you for that.

**The Chair:** Thank you, Mr. Carrie.

We'll turn to Mr. Sorbara now for the next round of questions.

**Mr. Francesco Sorbara (Vaughan—Woodbridge, Lib.):** Thank you, Chair.

Good afternoon, everyone.

Welcome, Ms. Marquez, and thank you for your testimony today. I'd like to just go over a few facts with you.

How long was your employment at WE Charity?

**Ms. Sofia Marquez:** In total I worked for WE Charity for about three years.

**Mr. Francesco Sorbara:** When you began your career there, at what level or in what role as defined within the organization was it?

**Ms. Sofia Marquez:** When I first started at WE Charity in 2017, my role was associate director for strategy.

**Mr. Francesco Sorbara:** It was associate director for strategy.

What were the two or three responsibilities that consumed your time in that role?

**Ms. Sofia Marquez:** In that role, I would be overseeing preparation of specialized proposals for governments, for non-profits and for donors, and I oversaw a team as well.

**Mr. Francesco Sorbara:** How large was the team?

**Ms. Sofia Marquez:** It varied, depending on the point in time, but it was as small as four people and as big as nine people.

**Mr. Francesco Sorbara:** How did your role evolve during your three-year period there?

**Ms. Sofia Marquez:** Given my academic background in social policy and my work for other non-profits prior to starting at WE Charity, it became evident that I was very helpful in crafting specialized proposals and in identifying good avenues for WE Charity to advance important youth programs across Canada. Therefore, eventually my role evolved to include a bit more forefront engagement with individuals instead of simply focusing on the creation of documentation and proposals as such.

**Mr. Francesco Sorbara:** You mentioned two words—social policy.

Can you tell the committee members what your background is? If you're interested in social policy, obviously social justice is very important to ensuring an inclusive society, but can you describe your background in terms of social policy, please?

**Ms. Sofia Marquez:** Yes, of course.

I did a bachelor's in international relations and I also did a master's in public policy and international relations. Within that, I focused almost exclusively on youth education and equity in access to services so that society at large wouldn't be discriminated against.

To be completely frank, social policy programs are at the heart of what I do, and they are what have driven me to work for the not-profit sector.

● (1345)

**Mr. Francesco Sorbara:** Okay, and you do also understand why you're here at the committee today? You get why you've been called here. To be frank, obviously, I wish the scenario were that we didn't have to issue a summons and we could have heard this testimony at a different time, because I think what you're providing.... Even with one of my colleagues questioning you today, you weren't even in the emails that were mentioned. You were not in that loop at all in those discussions, if I'm correct.

I just want to make sure we're getting the facts. To your understanding, in your time there, the three years there, you weren't in the loop on a lot of contacts that occurred.

**Ms. Sofia Marquez:** If I can answer your question very directly, there were some initiatives and some engagements in which I wasn't part of the conversation. Sometimes the executives would lead those conversations and sometimes I would.

**Mr. Francesco Sorbara:** Okay.

On the organizational structure at WE—because every organization has their own corporate structure, their own culture and brand—how would you describe their organizational structure? It seems that WE was headed by two very strong individuals, if I can use that term, two founders, and entrepreneurs tend to lead in that manner. How would you describe the organizational structure at WE?

**Ms. Sofia Marquez:** I believe that WE Charity had a very strong executive team that oversaw a very large organization. The co-founders' role was one that became truly inspiring, to be completely frank, to many of us as employees, and the board of directors always had, to my understanding, an involvement in every single decision and program that came in hand.

**Mr. Francesco Sorbara:** Okay. Fast-forward to today, to the end of February 2021 or thereabouts. What's your current engagement with the co-founders of WE Charity?

**Ms. Sofia Marquez:** After the end of my position as director of government and stakeholder relations at WE on July 31, I have not talked to either one of them.

**Mr. Francesco Sorbara:** I want to ask a somewhat pointed question, because this matter was raised today. We've just heard some of my honourable colleagues characterize some of your past work as a "bribe". Do you agree, Ms. Marquez, with that characterization?

**Mr. Colin Carrie:** I have a point of order, Mr. Chair.

**The Chair:** On a point of order, I recognize Mr. Carrie.

**Mr. Colin Carrie:** To be very clear, I did not characterize it as a bribe. What I did say quite clearly is that the fact that the Minister of Finance still owed over $41,000 to WE Charity "could be perceived" as a bribe.

**The Chair:** Thank you, gentlemen. I don't think that's a point of order, but simply a matter of debate.

I will now turn to Madame Gaudreau for her round of questions.

**Mr. Francesco Sorbara:** Thank you, Ms. Marquez, for your testimony.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you, Mr. Chair.

Ms. Marquez, you talked about due diligence. It is understandable that the duties you performed, as well as your education prior to that, led you to be very vigilant in that regard.

As I also understand it, it was the Kielburger brothers who promoted you.

Why were you appointed director of government relations?

[*English*]

**Ms. Sofia Marquez:** I had the educational background and the understanding on educational policy and youth policy that helped the organization understand how to engage best with these individuals.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Okay.

You were familiar with the principle of due diligence. You also knew that the potential for conflict of interest was there and that you had to consider that key factor.

Did you get a chance to explain to the Kielburger brothers that they needed to be aware of these issues to avoid any conflict of interest or appearance of conflict of interest, particularly in the event of a contract being awarded?

● (1350)

[*English*]

**Ms. Sofia Marquez:** I did not have a conversation with Craig Kielburger around that theme of information, no.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Do you feel the Kielburger brothers kept some information from you, despite the fact that you were the director of government relations?

[*English*]

**Ms. Sofia Marquez:** I can't answer that question. Only they can answer that question.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Do you feel that your position reflected your true value when you were director of government relations?

[*English*]

**Ms. Sofia Marquez:** Fulfilled...? Sorry.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Do you feel that your position reflected your true value when you were director of government relations?

[*English*]

**Ms. Sofia Marquez:** I think I worked with a team of incredible individuals, including the co-founders, on a number of initiatives. What I can speak to is my willingness and ability to do my best every time.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Did you get the opportunity to ask these questions to ensure that WE Charity would avoid a conflict of interest? Did you approach your superiors, the Kielburger brothers, to ensure that they were engaging in good practices in that regard?

[*English*]

**Ms. Sofia Marquez:** Are you referring to any specific practice? I'm sorry; it's just a very broad question.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** It includes registering the organization in the Registry of Lobbyists and ensuring compliance with government grant regulations.

[*English*]

**Ms. Sofia Marquez:** Again, as I mentioned and explained in my opening statement, within the role I held, I believed that everything around lobbying and my activities did not reach a point where I felt the need to bring it up several times or at all with the executives, particularly because I understood that the responsibility lay with the executive level at the organization.

**The Chair:** Thank you, Madam Gaudreau.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you, Ms. Marquez.

[*English*]

**Ms. Sofia Marquez:** Thank you.

**The Chair:** We will turn to Mr. Angus now for the final questions.

**Mr. Charlie Angus:** Well, thank you, Madam Marquez. This has been very helpful. I hope your new career is very successful for you.

Some of the reasons we had to ask these questions are that the issue here is $912 million and whether or not that was obtained through illegal lobbying, because the failure to register to lobby.... What makes it a toxic issue is that if we can't track how people discuss and meet with government, deals can go down. That's why I wanted to ask you that initial set of questions about the April 9 email that Craig Kielburger wrote directly to Minister Morneau. It was to see if you were involved, and you weren't.

We're talking about a $12-million grant that was verbally approved by the minister. We have Craig Kielburger personally reaching out to the finance minister of a G7 country about that. You, as director of government relations, were not involved at all. This was Craig calling Bill, his bestie. You were not involved in those discussions. Is that correct?

**Ms. Sofia Marquez:** As it pertains to the email you're alluding to, no, I was not involved in that conversation.

**Mr. Charlie Angus:** Thank you.

I want to go back to the April 17 meeting, just to be clear, because I have an April 22 email from Craig Kielburger to Minister Chagger. He says:

> Thank you again for your time Friday.
>
> We appreciate your thoughtful offer to connect us with relevant members of your Ministry. Over the weekend our team has also been hard at work to adapt your suggestion of a second stream focused on a summer service opportunity.

Would you say that was correct, that she had suggested this second stream?

**Ms. Sofia Marquez:** I can't recall specifically the minister saying word for word that there was a specific service stream that we should have been building.

**Mr. Charlie Angus:** Okay. In your email you specifically mentioned that Craig specifically mentioned it.

Let's go through the timeline. This is the reason it's so important.

On Friday, April 17, you and Craig meet Madam Chagger. We have you on the record as saying that he said she talked about a second service stream. That Sunday, Rachel Wernick contacts Craig Kielburger to discuss launching a youth service program. Monday morning, you're contacting Ritu Banerjee, the executive director of the Canada Service Corps, who works for Chagger. Then there's a full briefing given to you that day by the Department of Finance about what they're looking for. By that night, at midnight, you had proposed to them what becomes the Canada service grant. Two days later it's announced, the $900 million plus the $12 million. That's an extraordinary turnaround time.

I need to go back to April 17, when you were meeting with Minister Chagger about one thing, but she talked about the separate service stream. Within a couple of days, over that weekend, you guys got that planned. You must have been up all night on the weekend getting that service component together, *n'est-ce pas*?

● (1355)

**Ms. Sofia Marquez:** Thank you so much for bringing that up.

I want to make it very clear that the call on April 19 from Rachel Wernick to Craig Kielburger to discuss the broad parameters of what would become the Canada student service grant program was what really triggered us, including me in my particular full-time attention and work, in building a proposal based on those broad policy directives. I think there are a number of people who have gone on record to confirm that—and yes, we spent many hours working on many versions and editing that proposal in a very short time window.

**Mr. Charlie Angus:** Well, I can imagine, and I'm going to end it here. This is nothing to take away from the extraordinary work you did. I mean, you turned around something huge in just a couple of days. For me, the issue is that when we asked Minister Chagger, she said she had no recollection of talking to you about the separate service stream at all on April 17. She did not talk about that meeting, but it becomes the germinal moment that becomes this whole program.

I want to thank you so much for your testimony. It's been very helpful.

**The Chair:** Thank you, Mr. Angus. Thank you, Ms. Marquez. We thank you for joining us this afternoon.

Colleagues, we're going to suspend the meeting for just a few minutes so that we're able to set up the next witness.

The meeting is suspended.

● (1355)

_____(Pause)_____

● (1355)

**The Chair:** I call this meeting back to order.

Colleagues, it's our second hour of this meeting. In this hour this afternoon we have Mr. Reed Cowan, who is a donor and fundraiser with Wesley Smiles Coalition, with Free the Children. I believe that it was an organization that was founded by Mr. Cowan to raise funds for the Free the Children organization.

Mr. Cowan, we want to thank you so much for joining us. We'll turn it over to you for your opening statement, after which we will definitely have some questions for you.

The floor is yours.

● (1400)

**Mr. Reed Cowan (Donor and Fundraiser, Wesley Smiles Coalition, Free The Children, As an Individual):** I'm here today to speak for and on behalf of this little guy right here. This is Wesley Cowan.

When I talk today, I hope you will receive what I say as the words of a dad who's here to speak on behalf of his son. I am the proud father of Wesley Cowan, the little boy whose April 23, 2006, fall from a swing set claimed his life and thrust those of us who love him into a years-long effort to turn pain into purpose by building schools in Kenya on the assurances of Dalal Al-Waheidi, Craig Kielburger, Marc Kielburger and Roxanne Kielburger that those schools that we built, that we engaged donors to help us build, would be named after him, would have his name on them on a plaque on each school, to give Wesley a legacy and to serve the children in Kenya.

I know that all of you got up this morning and you likely prepared for this hearing by going through routines and procedure. I want to assert to you that routines and procedure are really never a good way to understand what I hope to convey in this hearing, which is this: That, to me, learning that WE Charity and Free The Children are embroiled in a scandal and that assurances made to donors are now in question feels like returning to my son's grave to find it broken open, defiled and empty. It feels like the place that you thought was safe and secure for the body of your child has somehow been made unsafe and not secure. Standing there, you don't know exactly how it happened. You don't know exactly who did it, but you know something is not right. That sense of safety, security and solace is damaged, and the damage is done. That's how if feels to be here today.

I want to let you know, with respect to your process, that I really did not want to be here for this hearing this morning, but from my perspective, when members of Parliament request your truth, you have to oblige. I also right off the top want to say in fairness to Craig Kielburger and Robin Wiszowaty and board member David Stillman with Free The Children and WE Charity that they indeed have blown up my phone, emails, text messages, voice mails and phone calls after I gave Craig hell over what the Bloomberg article claimed about Free The Children and WE Charity, with staff telling reporters that there were often jokes that plaques should be made of Velcro because they were so often swapped out, once the donors had left, from schools that donors thought they had built.

I also want to say and acknowledge here, because I know the media are watching, that I've had a lot of media inquiries, and for very good reasons I've held back going on the record about this situation. I'm a member of the press myself. I don't want to do this. I don't like the amount of press that could likely come about for a U.S. donor who is connected, as I am, to a presumption of millions of dollars raised, all tied back to my son and our efforts, and I have not wanted to participate in the process of selling papers or helping bloggers get web clicks for outlets or boosting ratings on the back of my beautiful son.

I want to be clear about something: Wesley's name, Wesley's face, Wesley's life of four years and his legacy were used to make money for Free the Children and WE Charity, and somehow letting media outlets make money using the same has been painful and just too much.

Before I answer your questions, I ask each of you that I can see on this screen and those that I can't to search your souls in this moment, because frankly, I don't know who the bad guys are. If there are any of you in this meeting who are seeking to use Wesley's face or name or life or legacy as a political card to play in something other than finding truth on behalf of donors, I ask, with respect, that you call off my portion of the hearing now.

That said, to frame your understanding briefly, I formed the Wesley Smiles Coalition fundraiser in the days after we left Wesley inside his mausoleum. Our group—we—paid Free The Children and WE Charity out of our own pockets, none of us with a great deal of money, to travel to Kenya three times. We were given unlimited access to Kenyan operations and staff for interviews, using documentary crews that I hired and paid for.

In Salt Lake City, I believe in 2006, our efforts raised just short of $100,000. In Florida, when I partnered with one of the largest school districts in the United States of America, our fundraising brought in more than $100,000, as I believe and have been told.

● (1405)

I'm also aware that over the years large cheques have come in to Free the Children and to WE Charity via my speaking around the United States and people who saw my TED Talk. All in, I believe I am connected to what I presume are millions of dollars raised. In fact, as WE Charity board member or Free the Children board member David Stillman told me on a phone call recently, quote, "Because you did this for your son, Reed, people saw that. That got groups like welders, like Walgreens, like Unilever, like Allstate, to join. So many people went over who told us, wow, if one guy did this for his son, what can we do for our company, and they adopted villages because of you."

I want you to know something, because I believe in seeing facts on paper, and I've tried to get some of the facts on paper: I've repeatedly asked for an accounting of all monies raised connected to Wesley Cowan's legacy, and as of this date I have not been provided that accounting. I'd like it. I've repeatedly asked for an accounting of how much money our group and our groups paid to Free the Children and WE to travel to Kenya to stay in their facilities and be on their program, and so far I have not been provided with that accounting.

As a result of the scandal, and to my great mortification, I have had to contact members of the Broward school district in Florida and those who led our Salt Lake City, Utah, efforts to tell them about the reports, about my discovery, and they're horrible phone calls to have to make.

Now, also, to the bloggers and tweeters who are out there watching right now, I saw your tweets this morning. I want you to know something clearly: I'm not in a campaign against the Kielburgers or their organization. I do not wish them harm. I do not wish their families harm. I do not wish to harm any of the good work that may have been done. Very clearly, I am not, as board member David Stillman said to me on a well-transcribed phone call, out to harm the legacy of his late brother Howie, whose name is on some of the schools in Kenya. What I am doing is speaking for a child who cannot speak for himself. I'm here as Wesley Cowan's father to guard his legacy, and I want to know why his legacy feels robbed.

Finally, before I take your questions—and I know eyeballs are on this—I have a request for the rich, the powerful and well connected, the celebrity and the corporate set who lent their power to the elevation of Free the Children and WE Charity: I'm asking that you come out of hiding on this matter and go on the record, as I have had to do today.

Come out to vouch for Free the Children and WE Charity and Marc and Craig Kielburger. Come out to open all of your records and communications with them, and let people like me and other donors know that you believe Free the Children and WE Charity are indeed on the up and up. Prove it. Prove it with your brand and your big names. Let kids in Canada and kids in the United States know it, and be done with this.

With respect, that means you, Prime Minister Justin Trudeau, and your family. That means every corporation that engaged with Free the Children—Walgreens and others. That means Oprah Winfrey and the members of the Oprah's Angel Network and affiliates. That means pop star Demi Lovato and Nelly Furtado and Madonna, who sent her daughter Lourdes. That means Prince Harry. That means the Dalai Lama. That means Mia Farrow. That means Nate Berkus. That means Malala and any other big name whose profile, credibility and power brought Free the Children and the WE charities to being that mega-million-dollar powerhouse on the backs of children and on the back of my late son.

I'm asking all of you whom I have named and anybody out there who might fall in those categories to do it within seven days, because hear me now: None of you have lost anything. I lost a child, and here I am in front of a camera not wanting to be here. By stepping forward and telling the world that you vouch for Craig and Marc, WE Charity and Free the Children, you've lost nothing, and this is an opportunity now, when the spotlight is on this issue, for anyone who is involved with them to use their truth, their light and their power for advocacy, if there is any to be had. If you don't, your silence says everything, and people like me and my donors and legacies like Wesley Cowan's, Howie Stillman's and countless others are hanging in the balance—people like me, who stand feeling like the graves of their children have been robbed.

I appreciate you hearing me and I am ready to take your questions.

**The Chair:** Thank you, Mr. Cowan, for your testimony in your opening statement.

Mr. Barrett, we'll turn to you for the first round of questions.

**Mr. Michael Barrett:** Mr. Cowan, thank you for joining us today and for your very powerful opening remarks.

I want to start by offering you my sincere sympathies on the loss of your son Wesley 15 years ago. I want to thank you for using the 15 years since then to build a legacy in your son's name. I can't imagine the difficulty with which you had to undertake that and the daily reminders of the loss of your son in turning it into such a legacy for your son. I want to say his name again, because the transcripts of this committee will be preserved in perpetuity—Wesley Cowan. Thank you, sir.

With respect to the Bloomberg article you referenced and the comment made by staff, the reported comment about how donor plaques ought to be made of Velcro, how does that relate to your fundraising efforts in your son Wesley's name for a school in Kenya?

● (1410)

**Mr. Reed Cowan:** That was the starting point to doing a lot of investigation on my part.

Forgive me....

Of all that I read in the Bloomberg article, that was the most important touchpoint for me to investigate. I received, not long after the article, photos that were taken, I presume within recent months, of every door on every school at every campus in Kenya. I noticed that the door to the school building we had opened on the one-year anniversary of Wesley's tragedy....

We had made a goal. We had said that on the one-year anniversary of what happened to Wesley—I still can't say the D word—we'll be in Kenya and we'll be opening a school.

After I read the Bloomberg article and acquired photos of every door of every school of every campus in Kenya, I saw that the school we had opened and put our plaque on, with Wesley's name and his motto, "Be Happy Every Day", which I wear on a bracelet—we gave away thousands of these bracelets—was no longer on his school. Instead, it had the name Esther Grodnik and, then, in a smaller font, the Howie Stillman Foundation.

I thought, "Who's Esther Grodnik and who's the Howie Stillman Foundation?" I went to the foundation's website. I don't know if their videos are still up, but I followed the link to videos. I saw a video—I have it, but it may have been taken down now—and there was a time-stamp for an opening celebration where they opened the very same building less than two weeks before we arrived there. We went to Kenya thinking we were opening that building for Wesley, but their video, with the time-stamp on it....

I've matched it. I've matched it frame for frame, because I have extensive documentary footage. It shows, or suggests damningly, that what the Stillmans celebrated in their video was the same one that I think 13 days later we opened. The ceremony was re-cued for us with the same people, same songs and same everything, but with different plaques.

It's pretty devastating. As I told Craig Kielburger....

You know, you mentioned 15 years, but I have PTSD. I still walk these floors at night. On the hardest nights, I close my eyes and go back to Enelerai campus and the school building we opened, believing that was Wesley's campus, and that the sun was coming up in Kenya and kids were in his desks. That got me through lots of nights, so you can imagine that when I saw the time-stamp on the Howie Stillman Foundation's building that bore the name of Esther Grodnik on the building that we thought our plaque was on, it raised a lot of questions and felt pretty damned devastating.

**Mr. Michael Barrett:** Thank you, sir.

Chair, how much time do I have?

**The Chair:** You have two and a half minutes.

**Mr. Michael Barrett:** Thanks.

**Mr. Reed Cowan:** Sorry.

**Mr. Michael Barrett:** No, no, I appreciate your answer, sir.

You mentioned that you have spoken with Mr. Craig Kielburger since you made this discovery. Would you be able to share with us Mr. Kielburger's explanation or his comments on your finding?

**Mr. Reed Cowan:** I sent Craig an email after this discovery and let him have it pretty good. I told him that I had pretty clear and solid evidence. He responded a couple of times by email, and I felt a kind of a bit of a defensive tone in the emails. He then passed me off up to board member David Stillman. That conversation, I still feel, went down in flames, so then Craig called me. Craig has repeatedly engaged me to try to talk to me. Finally, I agreed to a phone call, and we talked for I think about two hours.

The explanation that Craig gave me, to the best of my memory—and I can go back and look at the notes of the conversation—was that there was a little bit of a *mea culpa*. You have to know that when we went there, we were told by Roxanne Kielburger that "Over there is Dr. Atkins' school, and over there is the Oprah's Angel Network library, and Wesley's school is going to be right between those."

The explanation Craig gave me, again to the best of my memory—I'd want to go back to the notes to be specific—was that at some point the Stillman foundation wanted to come in and adopt Enelerai campus lock, stock and barrel, and that they reached out to members of Oprah's Angel Network, they reached out to Oprah, they reached out to the Atkins family and they got their permission to take their plaques down so the Stillman plaques could go up, but they failed to reach out to me to ask for my permission. He apologized for that.

● (1415)

**The Chair:** Thank you, Mr. Barrett.

We'll turn to Ms. Lattanzio now for her round of questions.

**Ms. Patricia Lattanzio (Saint-Léonard—Saint-Michel, Lib.):** Thank you, Mr. Chairman.

First things first, Mr. Cowan: Thank you so much for being with us today. I too want to offer my condolences for the tragic loss of your son.

I want to talk more about the advocacy and fundraising work you've done since to honour his memory. Can you tell us a bit more about Wesley and how you came to the decision that it was time to turn your grief into action? Let's hear you on that.

**Mr. Reed Cowan:** Thank you. This is out there on my TED Talk, so I'll be brief.

In the days after we lost Wesley, we saw Craig Kielburger on *The Oprah Winfrey Show*. It was at a time when I was being monitored. Nobody would leave me because they were afraid I'd harm myself, frankly. My partner Gregory said to me, "You know, we can do something with this. We can give Wesley a legacy and we can help these kids. Let's get in touch with Free the Children."

Very quickly, we called Dalal Al-Waheidi at Free the Children. I explained to her that I'd been on TV in Salt Lake City for seven years, that I had launched the Power tour with Governor and Mrs. Huntsman, former ambassadors to China and former ambassadors to Russia. He was the son of billionaire Huntsman chemical founder, Jon Huntsman Sr. They quickly latched on to helping me build the Wesley Smiles Coalition fundraiser. Dalal said, "Don't do a 501(c)(3). You can become a fundraiser. We'll always track every donation that comes in under Wesley's name. Have them just send the cheque to us."

Craig Kielburger told me that he cancelled a trip with President Bill Clinton and instead diverted himself to Salt Lake City for the first fundraiser, where we raised quite a bit of money. I think the rest is in my opening statement, and in the interest of condensing time, I'll say it continued.

**Ms. Patricia Lattanzio:** Okay. Continuing on in that realm of your involvement in the Smiles coalition and Free the Children,

what did that mean for you and how has that helped you get through your grief?

**Mr. Reed Cowan:** Well, it's kind of like I said. It gave me the enormous blessing of engaging angels in my communities that I served as a journalist and of knowing that people are good and that when the chips are down, people forget differences of religion, politics and sexuality and all of that, and they just see a father who's hurting. It meant so much to me to see that so many people wanted to be engaged in a good cause in the name of the little boy who will not get to grow up, get the scholarship letter, run the ball, get married, etc.

When we went to Kenya and we opened the school—that later I saw on the Stillman foundation they actually had opened 13 days before—it gave me a place to say.... In fact, I said at the opening of the school, "In giving you this school, I am giving you my son." I don't know what more I need to say about that.

● (1420)

**Ms. Patricia Lattanzio:** I hear you.

Would you recommend to others, Mr. Cowan, that they contribute to international charitable organizations if they are looking for ways to get more involved? Would you recommend that today in 2021?

**Mr. Reed Cowan:** Would I recommend WE Charity and Free the Children?

**Ms. Patricia Lattanzio:** Would you recommend that people contribute to international charitable organizations if they're looking for ways to help. Would you recommend that to people as a way of—

**Mr. Reed Cowan:** You know, that's the sad thing about this for me and all the kids who sat in those stadium events. Do you feel burned enough that you never give again? Do you feel burned enough that you just distrust activities overseas and across borders, and just get involved in your own community? I know that for me personally, I will serve the communities I live in and I won't engage across borders, because now I feel burned.

I don't know. I don't know. As I said in my opening statement, I don't know who the bad guys are, and in absence of that, people's time, assets and advocacy are too sacred to roll the dice on.

**Ms. Patricia Lattanzio:** What would you say was the most fulfilling part of your work to honour your son's memory?

**Mr. Reed Cowan:** It's that I get to have conversations with him at night when my eyes are closed and say, "You can see me, but you can also see the kids in Kenya. Send them a little rain. Send them a little sunshine, and maybe help the one who feels bullied at the back of the classroom to feel confident. Maybe save a life." But the most fulfilling is that I gave my child a legacy—at least, I thought I did.

**Ms. Patricia Lattanzio:** I'm sure you did.

Would you say that you coming before us today has served a purpose?

**Mr. Reed Cowan:** I have fulfilled the obligations of the request to be here, and I hope that others who donated, who are in power to clear things up, will see a father who did not want to be here.

You know, my son's birthday is coming up. And six weeks after that is the day he left us. This is a dark time of year for me anyway, so if I had to be here, then the people who are in power—as I said in my opening statement—should be here, and I hope they will be.

**The Chair:** Thank you, Ms. Lattanzio.

We'll turn to Madame Gaudreau now for her rounds of questions.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Good afternoon, Mr. Cowan.

You are very brave, and I want to point it out.

I have a few questions to help me go over what I have just heard. It's shocking, it's disturbing, and it makes me very worried about the future.

First, I would like to know if you have seen an episode—I believe it was episode 5—in season 46 of *The Fifth Estate*. It was a report entitled "The Price WE Paid". Have you watched it?

Yes? Okay.

I'd like you to tell us how you felt watching it and talk about the content of the report. Then I have a few more questions to ask you.

[*English*]

**Mr. Reed Cowan:** Thank you for the question.

I'm a journalist, so obviously I look at how stories are laid out and how stories are told. I felt like it was a softball. I felt like it gave viewers no sense of how much money has been raised last year, the year before or in the last 10 or 15 years. I think viewers need to know the magnitude of money that was raised, and I didn't get that in the report.

The part that hurt me the very most was, I believe, between the 20- and 30-minute mark. It talked about the water treatment facility that another group thought they had built. It is similar to how I felt about the buildings in Kenya that I don't know if we built.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you.

I may have misunderstood the interpreting on this, but I'd like to know, for the whole process and your great generosity in that regard, whether you had any contracts or agreements in place?

● (1425)

[*English*]

**Mr. Reed Cowan:** If the question is whether I had any contracts, signed agreements or written agreements, then the answer is no.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** When a charity gets this big, do you feel it could lose control? I always look at these issues from a lawmaker's perspective. What can we do to prevent or clamp down?

Do you believe we have a very important role to play as elected officials, particularly with respect to financial assistance when organizations of this size are involved?

[*English*]

**Mr. Reed Cowan:** I'm a big believer in line-by-line transparency, line-by-line accounting—when the money came in, what the money was intended to do, what agreements were tied to the money that came in and whether those agreements were met. It's just a matter of good faith, right?

I don't know Canadian law. I don't know your processes and procedures, but if they do not mandate line-by-line accountability—not only how much came in but also how much went out and whether what exists in the world matches the magnitude of the funds that came in, and whether the buildings on the ground match the money—and if you don't have laws and procedures for that, then I hope you do someday.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Mr. Cowan, we are looking into the issues of due diligence and conflict of interest, given that gaps have clearly been identified in that respect. I'd like you to know how important it is for me, and for all of us, I hope, to do whatever it takes to ensure that no one else has to face this kind of deadlock. It's an unacceptable situation.

To restore people's trust, we need to know about public funds and how they are spent. You mentioned reasonable confidence. We are humanity. We can save generosity and solidarity, and in that sense, I believe your testimony is very striking. I also believe that it's above the partisan games governments will play. With 338 members of Parliament, it's very hard to get a ship to change course as quickly as we would like.

Thank you so much for your testimony. Please note that we will work to correct the situation. That's why we're taking all this time to get to the bottom of this situation, which is costing taxpayers millions of dollars. It's being confirmed, and we're waiting for a report on it.

If you have any information—various documents and agreements—that could help us supplement your testimony, we would be very grateful if you could send it to us.

[*English*]

**The Chair:** Thank you, Madame Gaudreau.

We're going to turn to Mr. Angus now.

**Mr. Charlie Angus:** Thank you, Mr. Chair.

Thank you, Mr. Cowan, for coming forward. Again, I think all of us are pretty shaken up, especially for you as a father, as someone who wants young people to believe and to make change, given the incredible energy that you tapped into. We have to honour that. I thank you for your testimony.

I also recognize that you are an Emmy Award-winning journalist, so you're probably not used to having to answer questions. You're probably more comfortable asking the questions, but you'll have to bear with us for a minute.

I want to go to Mr. Kielburger's response to you that this was a mistake. It is possible that a mistake was made, that in their excitement about getting more funds they forgot to contact you. What does concern me is what we saw in the Bloomberg article, in which they talked about having Velcro on plaques and how this was a tactic and how staff seemed to think it was kind of funny. That was shocking. Then we had *The Fifth Estate* documentary that said this was being done with the water wells, the same kind of tactic of having multiple donors pay for the same waterhole.

We've had staff at WE tell us stuff was going on in the schools, but you have confirmed it. This looks to me like a pattern, a pattern of duplicitous relations with donors. When you see this pattern laid out, how do you feel that this organization can carry on doing this kind of work?

● (1430)

**Mr. Reed Cowan:** I have to be honest with you. When I left my conversation with Craig Kielburger, until hearing from all of you to appear, I had become confused enough that I just wanted to put it away.

That said, to answer your question about whether there is a pattern of duplicitous relations with donors, I feel as though there is, at least from comparing the Stillman foundation work and video with mine. How do I feel about it? I feel as though my son has been the victim of fraud.

**Mr. Charlie Angus:** David Stillman was your contact person, trying to talk you through this when you raised these concerns. You dealt with Craig, but you also talked to David Stillman. What did David Stillman have to say to you?

**Mr. Reed Cowan:** I think David Stillman, board member Stillman, left the conversation feeling as though we had left amicably, but I felt that the conversation was like engaging with a dog barking at the mouth of a dark cave. I couldn't get a word in edgewise, and that dog didn't want me to go into the cave and turn on the lights.

I left disturbed, because I felt that what was said on the phone call and in the well-documented exchange was directly contradicted by an email that followed the next day.

Just to characterize why I felt that I was talking to somebody who I didn't feel I trusted, he said to me—and he's on their board, and I will take out the full use of the profanity—"Would I ever work again with Craig Kielburger? Eff, no. Would I ever want to work with Marc Kielburger again? Eff, no. But I'm here to protect my brother's legacy and to protect the work in Kenya, and that's what I'm doing."

The next day I followed up with an email, saying that it was my understanding from our conversation that there was no love lost between him and the Kielburger brothers, so if his goal, in his role as a board member, was to protect the legacy of his brother and protect the work in Kenya, as he said, he could put me on the board. He could put me on the board and let me have a say, because I'm invested. He replied—and I'm paraphrasing here—that oh no, he loved Craig and Marc; and he didn't seem really excited about the idea of my being a decision-maker on the board.

When somebody says something one day and the next day contradicts it directly, trust is lost.

**Mr. Charlie Angus:** I ask this because when the scandal began to break in Canada, the Stillman foundation stepped up big time. They paid for supposedly independent audits, saying that everything was perfect at the Kielburgers' operation, although we don't seem to have anything on what happened internationally. It all seems to be very.... We get a small picture, and that picture tells us everything is fine.

The Stillmans took out full-page ads in Canadian newspapers, which isn't cheap. I'm just surprised that they were then the point person with a school named after their family, which was your family's school, and they were dealing with you.

In your talks with Mr. Stillman, did he raise any concerns about whether money had been moved around inappropriately? In their ads, they said that everything was fine and that there was nothing to worry about. Was that the message he gave to you?

● (1435)

**Mr. Reed Cowan:** He insisted there was nothing there. "You can do all you want. You can be ugly." He used the word "ugly". Again, I had a hard time getting a word in edgewise. I felt as if I had to repeat myself over and over. I felt that it was I who was on the defensive.

Can you repeat the question? I'm sorry. Did I feel that he had any concern about money?

He just kept insisting that there was nothing there. "There's nothing there. You're not going to find it. Craig and Marc Kielburger are done. They're done. Nobody will answer their phone calls. They're done. So what are you even doing here? This is just ugly. You're just ruining your son's legacy. You're ruining my brother's legacy."

**Mr. Charlie Angus:** But he took out the full-page ads. That's why I'm just trying to clarify. In response to our investigation, the Stillman family took out full-page ads. They paid for independent audits. I'm just wondering if he said he had any concerns about money not being there or that it should have been there.

**Mr. Reed Cowan:** No. I mean, I said to him, "If I showed you proof, would you believe me?" He said, "Nope. No, I wouldn't believe you. I wouldn't believe you even if you showed me proof."

It makes sense that they would take out full-page ads. They have a whole campus at Enelerai with all of their names on it. They have a lot to defend here. They're just choosing to defend it one way; I'm choosing to defend my son's legacy in another.

**Mr. Charlie Angus:** Thank you very much.

**The Chair:** Thank you, Mr. Angus.

We'll turn to Monsieur Gourde for five minutes, please.

[*Translation*]

**Mr. Jacques Gourde (Lévis—Lotbinière, CPC):** Thank you for your very touching testimony, Mr. Cowan. I would also like to extend my sincere sympathies to you.

I was also troubled by your testimony because I believe your trust was abused. It makes me very sad. People like you are really very important to society. You have put a lot of energy into your son's memory, and probably spent a lot of money on it too. It has no doubt helped other children. I hope, for your sake, that all the funds you managed to raise and the money you have yourself provided will bring hope and a better life to other children, something you were unfortunately unable to give your son.

Do you have any advice for us or for future donors? We need people like you for this kind of work and this kind of donation. Unfortunately, when people are exploited as you have been, thousands who would like to donate to worthy causes lose confidence. They fear that the money will not go where it should go.

We might need your advice, at least to give hope to those who still want to make such donations.

[*English*]

**Mr. Reed Cowan:** I don't feel I have any advice that could be of use. I felt that I vetted the charity. I mean, when Craig Kielburger appears on *The Oprah Winfrey Show*, you feel like the charity has been vetted, right? When Craig Kielburger and Marc Kielburger and Roxanne are mixing with the Prime Minister of Canada, a royal in the U.K., the Dalai Lama, and Malala, you feel that the charity is on the up-and-up. That's why I said in my opening statement that all these people should come forward and say it.

I don't have any advice. I will say that going forward I will look at the needs of my neighbour across the street and next to me and in my community. I see my neighbour every day. I can track what any generosity I extend does in my own community.

I wish this hadn't happened to me, where even vetting somebody through the cachet of Oprah Winfrey and all of the big names I mentioned is not enough of a barrier to insulate from scrutiny and scandal. That's sad.

[*Translation*]

**Mr. Jacques Gourde:** I believe that will be all for me. With regard to this whole experience, I hope that the other people hear your call and come forward to share their experience, and that you will find some peace of mind in the future.

● (1440)

[*English*]

**Mr. Reed Cowan:** Thank you.

[*Translation*]

**Mr. Jacques Gourde:** Thank you very much.

[*English*]

**The Chair:** Thank you, Mr. Gourde.

Mr. Sorbara, we'll turn to you.

**Mr. Francesco Sorbara:** Good afternoon, everyone.

Welcome, Reed, this Friday afternoon. Thank you for availing yourself and joining us.

I don't really consider myself to be philosophical in any sense. I'm just a grunt, just a grit. There was a former ice hockey player

named John Tonelli who was on the New York Islanders. He was just one of those grinders. That was his success: You work hard, you play by the rules, you get some balls that bounce your way, you do what you do in life, and you just be good. I believe in karma and so forth. Just make your way in this world, do what you can and contribute at all levels. I view life as being one long continuum. You never know where it's going to go, not with breaks but with a continuum. We each have a chosen path.

Your path, from what I've read today, has been very interesting, and obviously heartbreaking to a certain extent, absolutely. I'm a parent of two young daughters, so I can only imagine. My heartfelt condolences go to you and your family for what you've gone through.

I'm also here to learn, and to learn about a witness like you who comes to this committee. You got into charity, or helping kids, because you wanted to do this. This meant a lot to you. Where are you today? Where were you when you were doing these initiatives? Where do you want to go forward in helping kids? Excuse me for making it so broad, but listening to the testimony, I have a lot of questions.

I'd like to turn the floor over to you now, Reed. Thank you for coming.

**Mr. Reed Cowan:** Where was I? I was near death, quite literally. Through the process of serving the amazing people of Kenya and through the process of working to give my son a legacy, I found a modicum of healing, and it gave me rungs on a ladder to hang onto when I feel like I'm falling.

Where would I like to go? I would like, if it worked for my professional life, to have a part and a say in all of the monies that I hope are somewhere earmarked for Kenya through Free the Children, as I asked. I would like to make sure that I'm a servant of that legacy once the house is clean and the money-changers are thrown out of the temple, so to speak.

**Mr. Francesco Sorbara:** Okay. Those comments are quite strong.

When you were involved, how many children were being assisted in Kenya, if I can get to some of the details or some of the broad strokes? Was it your idea entirely to go to that specific country? Can you provide some details there, Reed?

**Mr. Reed Cowan:** No, it was a joint venture with the hearts that beat under my roof. I only know what I saw on our trips to Kenya by way of numbers and how many children were served, and oftentimes those numbers and narratives were shaped by what Free the Children told us. When I characterize it for you, know that what I say to you is what I was told. I was told that in excess of 400 to 500 kids per campus benefited from an education, clean drinking water, alternative sources of income, places for their cattle to graze, etc., and that each campus served these ends.

**Mr. Francesco Sorbara:** This is going to be tough for me to even ask.

In memory of your son Wesley, you took on your shoulders these initiatives, plus many others. How fulfilling was this for you? Obviously, from what I sense, there's an air of disappointment now, but obviously you want this to still go forward in terms of assisting other children, specifically in Kenya.

**Mr. Reed Cowan:** Well, it was healing, it was fulfilling and it was life-changing, and it was so huge that to feel now like maybe the magnitude of what I advocated, accomplished and did wasn't reflected in Kenya is just as devastating, right?

For those of you who are parents, think of what it was like to hold your child for the first time. How do you say how fulfilling that was? It just defies words. I have held Kenya, the people of Kenya and the kids who go to Wesley's school in my heart with that kind of wonder that defies words.

● (1445)

**Mr. Francesco Sorbara:** I'm going to close here. I think my time is running out in a second.

I called you "Reed" and I do want to apologize. I don't know you personally, but I feel like I do—

**Mr. Reed Cowan:** That's fine.

**Mr. Francesco Sorbara:** —Mr. Cowan, and again, my heartfelt condolences. Also, I want to wish you much success, health and productivity in the remainder of your journey in this life, which I look at as a continuum. If we ever do cross paths, I hope it's in a different venue and a different format, but again I thank you for coming here today.

**Mr. Reed Cowan:** Thank you.

**The Chair:** Thank you.

We'll now turn to Madame Gaudreau for the next round of questions.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you, Mr. Chair.

Mr. Cowan, I told you earlier how brave I think you are. I hope that the whole process, including the discovery and announcements, will help you through this ordeal. I really understand the problems you faced and all the good faith and trust that you had. I also understand that it's clearly our duty to ensure that everything is done properly and transparently.

That's why I would like us to keep in touch with you over the next few weeks. That way, we could show you how far we've come. The money donated to these organizations helps them get off the ground, but it has a huge impact on people, given what you've been through.

Because your right to speak is very important today, I would like to know what you, as a major donor, parent and bereaved person, would like to say to the people who are now skittish, concerned, and a little disillusioned. What's your message to them? We can finish this conversation later. I also wish you all the best.

Thank you.

[*English*]

**Mr. Reed Cowan:** Thank you.

I would like to talk to those who trusted me on behalf of the Wesley Smiles Coalition. I'll speak to those donors.

For all of the kids, I would say to them that they have every right to seek answers, transparency and accountability of Free the Children and the WE charities. They have every right to do that, to ask for documentation, as I have done, to ask for an accounting. I would say that in the absence of that, remember that the spirit of Kenya can be shared in our own communities in the absence of answers, in the absence of transparency.

To those who donated because they trusted me and they saw my son's picture, I will tell them that I'm also here for them today, because I hope that your process gets all of the answers. I hope to engage those who are in power, who are way more powerful than I am, who are way more—quote, unquote—important in the world than I am, so that they'll come forward and end this once and for all.

Just come forward. Let's see everything. Let's see all the documents. Let's see everything so that people can go back to trusting and get to work, because in Kenya the need is great. Especially during and post the pandemic, the need is going to be even greater.

**The Chair:** Thank you.

Thank you, Madame Gaudreau.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Thank you, Mr. Cowan.

[*English*]

**The Chair:** We'll turn to Mr. Angus now.

**Mr. Charlie Angus:** Thank you, Chair.

This is going to give us a lot to think about this weekend.

I want to speak to the issue raised when you said that it feels like fraud. Under charity laws that I've been looking into, it's possible.... For example, I supported a foster child many years ago. We got her picture and we got her story, but we knew that we weren't actually paying for that one child. We were paying for the village, and we were paying for development projects. That's very clear in the small print. Charities do make announcements of a specific thing, but then the money is spread over other needs.

What concerns me is that you went to raise money for this school. You brought a lot of people to the table, and you were shown what they said was your son's school. That seems to me to be a verbal contract. Did you say that three weeks before that—or was it 13 weeks before that—they had given that school to the Stillman family? What was the difference between when you were told that it was the school you had built and the other family was told that this school had been built for them?

● (1450)

**Mr. Reed Cowan:** There are a couple of points. When Craig Kielburger came to Salt Lake, he told all of our donors during a well-televised fundraising that they would be building schools, and that for every $10,000 and $12,000 raised, a school would be built, right? They were told that this is what it costs to build a school, and you are going to build a school brick by brick. It's part of their branding. When Marc Kielburger came and spoke to a huge group of Broward school students, it was, "You are building schools; $10,000 to $12,000 builds a school."

Donors think, "Okay, if we raise $100,000 here and $120,000 here...." You do the math and you think that on the ground there should be this much, brick by brick. A brick is a physical object that actually takes form to build a school, so you think it will be there. I am beholden to the people I engaged that those schools should be there, right? I have on video many Free the Children staffers saying, "This is Wesley's school—this school", so why, in recent weeks and months, was that school photographed bearing the plaque of Esther Grodnik with the Howie Stillman Foundation?

**Mr. Charlie Angus:** You can't verify all the schools that were built. That's the question.

**Mr. Reed Cowan:** I can't. I can't verify that the promises that were given, which were that for every $10,000 to $12,000 that you help us raise, brick by brick you will build a school in Kenya. Do the math.

**Mr. Charlie Angus:** I just wanted to clarify that, because I guess it's this issue that you were invited and your family was there on the first anniversary after your son's passing, and they opened the school and said, "This is your school." To me, that sounds very much like a verbal contract, a commitment. From that, you fly away, back to the United States, and start to fundraise more. You were a big fundraiser for the WE organization, were you not?

It was based on that verbal commitment that this was the school for your son: "Look, you've seen it with your own eyes." You brought television crews. You documented it. This was the school. Did that not give you the energy and the drive to go and help to bring more people and more corporations into the WE organization in the United States?

**Mr. Reed Cowan:** It did, without question.

In the documentary I did, I literally have Roxanne Kielburger saying, "This is Wesley's school", and then I say that when you give money to an organization a continent away, you wonder if it's real, and then I put my hand on the brick, and it is. It's real. It's in a movie. I got it.

**Mr. Charlie Angus:** Thank you very much for this.

**The Chair:** Thank you, Mr. Angus.

We'll turn to Mr. Carrie now.

**Mr. Colin Carrie:** Thank you very much, Mr. Chair.

Mr. Cowan, if my voice is shaking a little bit it's because I really am struggling a little bit on what to say. I've been a member of Parliament for 17 years, and I don't think I've been moved more by somebody's opening of their heart to a committee before. All I can say is that I feel an extreme sadness for what has happened to you. I want to thank you for your courage and leadership. I'm a new member to this committee, and what you've done today for me, and I want you to know this, is to really explain the importance of the work that we're doing here, following up on and making sure that the legacy of your son Wesley is properly looked after.

What saddens me most is the effect that someone like you being a victim of fraud has on good people, because with the goodness that you wanted to put out into the world, you were able to bring in other people who wanted to do good, who wanted to spend their time and make a difference, and we need more good people in the world. We need more good people to do things and take action, and so I want to thank you for that.

I don't have a lot of questions, but I was wondering—because I'm really starting to feel the effect that this horrible situation is going to have not only on you but also on a lot of other people who have been connected to this charity—if you could you explain to people watching today why it is so important that we do a good job.

You said earlier that you don't know who the bad guys are. We don't know who all the bad guys are either. We're starting to see a picture and a pattern being formed here. Why is it so important that we do find the bad guys in order to restore trust? We need more transparency and trust in the system, as you were saying, because, into the future, we need more of the good work that you have shown you can do.

● (1455)

**Mr. Reed Cowan:** If my understanding of the holdings of Free The Children and WE Charity is correct, it's a huge lot of money. I see this as an opportunity, once things are cleaned by the refiner's fire, to make sure that those monies go.... To speak to the importance of this, there are kids in Kenya right now who have something to teach us, who are wonderful, who are rich in spirit but poor in access to all of the things that Craig and Marc Kielburger have advocated, on mike, that they should have, so it's a great opportunity, if all of you do your job right, to make sure that all of the holdings are accounted for and earmarked, that all of the agreements that have been made are honoured, and that the money that was made, which was not mentioned in the documentary that was referenced today, is reflected in what's on the ground in Kenya.

I don't believe it's there. When you pull the finances and pull the disclosures, I'm not seeing what could have been accomplished with the force of that money, and I'd love to see it being accomplished.

**Mr. Colin Carrie:** I think all of us would.

I don't think I have a lot of time, but I just want to say, sir, that it's been an honour to have you in front of us here today. I know it was extremely difficult, but thank you, and we will do our best to get to the bottom of this.

**The Chair:** Thank you, Mr. Carrie.

We'll turn to Mr. Fergus, if Mr. Fergus has some final questions.

[*Translation*]

**Mr. Greg Fergus:** Thank you very much, Mr. Chair.

Thank you very much for being with us today, Mr. Cowan. Several committee members were deeply touched by your testimony.

My question is quite simple.

You said you are always looking to make things better in Africa, in Kenya. Based on your experience with WE Charity, I'd like to know if you have any advice for people who, like you, want to do good and do their part to help those much less fortunate than them.

What advice can you give them so they can ensure they don't end up in a situation like yours?

[*English*]

**Mr. Reed Cowan:** In addition to what I've already said, I'll tell you a quick story. On our trips I met a Masai warrior named Wilson. Wilson taught me that the first step every morning, in warming up charity and kindness that can spread out to changing and saving lives, was doing this: *Jambo, rafiki. jambo.* I joked back at Wilson that in the gym culture in the United States, we would call that his "kindness calisthenics".

What advice would I have for my donors and all of the kids you see in the WE Day videos who are out and excited, excited to do good for others? In the absence of answers, while you all do your work to find out who the bad guys are, if they are bad guys, do not forget this: *Jambo, rafiki.* Do your kindness calisthenics, because this translates to this translates to this. Those out there who start here and go here and then project it outward to the world can honour not only my son but the beautiful kids who I have felt for years his legacy served.

● (1500)

[*Translation*]

**Mr. Greg Fergus:** Mr. Cowan, I sincerely hope that the memory of your son brings you comfort.

Mr. Chair, I have no further questions.

[*English*]

**The Chair:** Thank you, Mr. Fergus.

Mr. Cowan, thank you so much for coming to our committee today. I thank you for your moving testimony that revealed your heart and your betrayal. As a father, I can only imagine the pain you have endured and then have continued to endure over the last number of weeks. On behalf of all of us, thank you for your testimony.

Colleagues, I will suspend the meeting for just a couple of minutes. We'll let Mr. Cowan leave. Then we'll come back to discuss some committee business.

The meeting is suspended.

● (1500)

_____(Pause)_____

● (1500)

**The Chair:** Colleagues, we'll call the meeting back to order.

We have just a couple of things that I think we need to discuss. We are still in public. This is not an in camera discussion. I want to remind colleagues of that.

There are two points. First, Mr. Victor Li has agreed to our arrangement with regard to the questions we will submit to him. He will supply us with an opening statement.

There are a couple of things with regard to how we would do this. My view would be that we would wait for his opening statement to be provided to us. Then we would supply him with the questions. The questions would then be able to reflect the statement he made or if there are issues that he brings up. That's if this is the appropriate arrangement.

Second, if in fact we agree that this should be the arrangement, then we have to ask him to supply that statement at a specific time. I guess we're just looking for the deadline with regard to those questions to be advanced to Mr. Li.

**Mr. Charlie Angus:** I have a point of order.

**The Chair:** Go ahead, Mr. Angus.

**Mr. Charlie Angus:** I'm sorry. I tried putting my hand up, but I don't have that little icon.

I have two things on this issue. I would rather just get the questions to him. I feel that we really need to get this study done. This is carrying on and on and on. We could end up playing tag with him for another month or so.

I'm sure his opening statement's great. I have a number of specific questions and I think some of what Mr. Cowan raised in terms of finances and getting a picture of them. I would prefer to get my questions in and have them answered so that we can move on. When we get a statement, we can decide whether or not we're going to have him come in person.

I would like to get the questions in soon and I would like to have a bit of a deadline so that we can get them back. The clock is ticking on this study.

**The Chair:** Yes. I'm seeing some nodding heads. There seems to be agreement with that arrangement.

I guess the next point would be the deadline we would make for questions to be submitted to him, if that is the agreement.

Mr. Barrett, we'll turn to you.

**Mr. Michael Barrett:** I would say soonest for questions to be submitted to him, because we want those replies soonest. Today being the 26th of February, I think questions should be transmitted to him or to his representatives for a week from today at the latest—so if I'm saying "latest", then that day, and then I think we would have two weeks or less for a reply.

To Mr. Angus's point about the length of the study, we're going to hear from witnesses on the March 8, so ideally we can wrap this up in March, if possible. That way, we'll have his replies before the end of March, and then we can make a determination as to whether we do in fact need to hear from him in person in April. Perhaps, following his replies, we won't need to do that.

● (1505)

**The Chair:** Thank you.

Madame Gaudreau, we'll turn to you.

[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Given that the Kielburger brothers are appearing before the committee on March 8, we are all prepared to submit our questions to Mr. Li. Considering also that Mr. Li was aware of everything and that he surely keeps his documents close at hand, I believe that one week should be enough to send him our questions. Therefore, I would suggest no more than one week.

The Kielburger brothers will be appearing on Monday. I think Mr. Li should give us the documents a few days after they appear so that we can quickly ascertain whether or not we need him to appear before the committee.

Time is of the essence. We are not rushing things at all. We have been very lenient and patient, but we need to wrap this up. I feel it's very much in order this way.

[*English*]

**The Chair:** What I'm hearing is a growing consensus to have the questions submitted to the clerk so that they can be submitted to Mr. Li's representative for March 5, for a response from him by March 12.

Mr. Dong, we'll turn to you.

**Mr. Han Dong (Don Valley North, Lib.):** I concur with Madame Gaudreau's points.

Now I hear the chair presenting a specific date for receiving questions on the 5th and a response by.... Did you say the 12th?

**The Chair:** I said the 12th. There were some heads nodding.

**Mr. Han Dong:** On a response by the 12th, I'm okay with that.

**The Chair:** Okay. I'm getting some thumbs up and some heads nodding, so that's very helpful in—

Oh, I'm sorry, Charlie. Go ahead.

**Mr. Charlie Angus:** Thank you.

I think it's very important that we stress, whether it's done through an affidavit or just a recognition, that these answers have to be as if they were under oath. We need to make sure that Mr. Li is answering. We know that he's under medical leave, that he's under

stress, but we need these answers to be his answers and we need them to be the absolute truth.

**The Chair:** Yes, absolutely. We will make sure that it is communicated that these would be as if they were presented in live committee, and that all of the requirements for testimony in person before a committee would be the same for this arrangement as well.

**Mr. Michael Barrett:** On that point, Chair, with members not having the opportunity to ask for the witness to be sworn in, we're taking an extraordinary step in allowing this witness to provide written responses instead of attending committee after multiple invitations. I would ask if there is consensus to explore through the clerk what we could do, and whether that is to have an affidavit sworn out or, I'm not sure, have it.... Yes, it would be to have an affidavit or have it sworn out in front of his lawyer and have it stamped accordingly. He's working through counsel.

I do think that there needs to be the full force of it being under oath, because we're giving the gentleman.... Whereas all of our other witnesses have to provide answers off the cuff, these are going to be prepared answers, with a week to respond, instead of a second to provide a contemporaneous answer to questions that are being asked. I think that just beyond the regular step, we need to do something that is equal to asking them to swear an oath.

**The Chair:** We will look into that. I will ask the clerk to work with me to see what arrangement could be established, but at the least, at the bare minimum, we will ensure that it is communicated that this is as it would be before a parliamentary committee with respect to all of the requirements. The repercussions of not being truthful would be intact in the same way they would when one is presenting before committee in person.

Second of all, colleagues, we have a question from the Kielburgers' lawyer with regard to their upcoming appearance. They have asked that we allow them to bring in an additional witness. Her name is Carol Moraa and she is the director of WE Villages in Kenya. She's the senior manager of Free the Children Kenya, and they are asking that she appear with them on March 8.

I'm interested in your perspectives, colleagues, and would be interested in how you would like me to respond to that request.

● (1510)

**Mr. Charlie Angus:** Chair, does that mean that Mr. Spencer Elms, the director of many of their operations in Kenya, has not responded?

**The Chair:** That is correct.

**Mr. Charlie Angus:** Okay. I don't know if it's necessary. I was hoping to get a key financial director, because, again, given the bombshell that we heard today and the fact that the main financial director is off sick, having one of the other key directors of their corporation in Kenya doesn't give us answers. Maybe we need to focus on just the two Mr. Kielburgers. That's my initial gut reaction. I open it up to my colleagues.

**The Chair:** Mr. Barrett, I recognize that your hand is up.

**Mr. Michael Barrett:** Again, we're providing maximum latitude to the witnesses to appear essentially at a date of their choosing many months after our initial request. We have requested a response from Mr. Spencer Elms, which we haven't heard. In lieu of that, we're being offered hearing from a witness on the same panel as theirs, a witness we haven't asked to hear from.

I think that the committee expressed a specific desire to hear from certain people associated with this organization, including both Kielburger gentlemen, Mr. Li, Ms. Marquez and Mr. Spencer Elms. This addition of another person.... I wonder if they could encourage the employee we requested to appear to make himself available and at least offer the courtesy of a response to the committee clerk.

Perhaps a second panel could be convened with the two employees. We could have the founders and then we could have a panel with the individual that they suggest and the other individual who hasn't seen fit to respond to the clerk of a parliamentary committee that is asking for a response, to which I take great exception.

**The Chair:** Madame Gaudreau, we'll turn to you.

*[Translation]*

**Ms. Marie-Hélène Gaudreau:** I'd like to share with you what concerns me.

I heard what you said, colleagues.

Are we minimizing the time we would like to spend on the Kielburger brothers' testimony?

If the answer is maybe, I'd like to tell you that I want to stick to the time we had estimated we would need for our meeting with the Kielburger brothers.

If we want to lump everything together, then I don't agree. If we want to add witnesses, I'm all for it, if we all agree on it.

*[English]*

**The Chair:** I see a consensus developing here. We'll turn to Mr. Dong now, and then Mr. Angus.

**Mr. Han Dong:** I'm sorry about that, Chair.

During today's testimony, I noticed a lot of raised eyebrows and interest in what's really happening with the operation in Kenya. I think it would be fair to hear more testimony and it would give a different perspective, I suppose, on what's happening there.

I also agree with Madame Gaudreau's comment that this shouldn't be a tactic to minimize the chance to question the Kielburger brothers. I would suggest prescribing a specific time for the presentation from the staff that oversees the operation in Kenya.

● (1515)

**The Chair:** Go ahead, Mr. Angus.

**Mr. Charlie Angus:** Thank you.

I certainly agree totally with Madame Gaudreau that we should have the time with the Kielburgers so that we can get answers. I would go back to what Mr. Barrett suggested, if I understood him correctly, which is that if Mr. Spencer Elms is willing to testify,

then we also have the person that the Kielburgers have suggested should testify, and they can testify together.

I would be very uncomfortable having their major director of their Kenyan operations not answer any questions and go to ground, and then having someone else whom we've never asked for, whom we've never heard of, put forward to say "Don't talk to this person." It feels to me like we're being manipulated here. If they are not willing to have Mr. Spencer Elms here, who is a key partner and a secretary of their schools, who helps with all their corporate structure.... If he's not willing to testify, then I say thanks, but no thanks, for anyone else.

If he's willing to testify, then they can bring someone else with them. I think we should be very clear that we're not going to be played here by having them choosing who we get to hear from as witnesses.

**The Chair:** Mr. Erskine-Smith is next.

**Mr. Nathaniel Erskine-Smith (Beaches—East York, Lib.):** Just to follow on that, I'm reasonably comfortable with the idea that if Spencer Elms comes, which was in the purview of the original understanding of the study, we can say that the new witness would go alongside Spencer Elms.

I would say, though, that if Spencer Elms has refused in some way and hasn't gotten back to us—and I don't know what the status of all of that is—I personally have no issue with this witness providing a statement in advance, not taking any time at committee and being alongside the Kielburgers for our committee, so long as there's an understanding that she or whoever it is does not answer unless called upon by one of us specifically to answer one of our questions.

I take no personal issue with that. As long as everyone is on the same page here, we're not spending any time that would otherwise be spent by a member wanting to ask questions of the Kielburgers.

**The Chair:** Ms. Lattanzio, we'll turn to you.

**Ms. Patricia Lattanzio:** Thank you, Mr. Chairman.

I have a question in terms of how I hear colleagues around the table saying that possibly we're going to work on having this other person from Kenya come later on if we deem it necessary. I just wanted to ask committee members how this functions in terms of jurisdiction. Can we compel someone who's out of the country, out of Canada, to come to testify in this committee?

I want to have clarification. Maybe it's because I'm a rookie here, a new member, a new MP, and I probably haven't learned all the functioning yet, but I want to understand this. Can we actually compel someone who is not Canadian or is out of Canada? I know that we've had Americans come here to testify, but that was on their own willingness.

Can we, Mr. Chairman, have the answer to that in clarification of whether this committee has the power to compel a non-Canadian to come and testify before this committee?

**The Chair:** I'm happy to provide clarification. We are not able—we don't have the power—to compel somebody who is not on Canadian soil, but I don't know that anybody was suggesting that we do that in this case. I think there was a suggestion that we request that individual to appear. I think there was a consensus that we simply put forward another request.

I've now heard what is clearly the consensus, which is that this additional individual should not be testifying at the same time as the Kielburgers. As was suggested by Mr. Erskine-Smith, if the member they've suggested wanted to supply us with a brief, that would be something that would be extended to anybody who would want to supply something to our committee. She is well within her rights to do that. That would be something, and if that satisfied committee members, then.... She's well within her right to do that,

and the Kielburgers can ask her to do that. We will accept that, as we would from anybody else.

We'll leave it to committee members to determine additional witnesses, but I think what we got was a consensus that we wouldn't invite her for the meeting at which the Kielburgers would be testifying.

Thank you, colleagues. I think that covers everything I needed to know for this meeting. If there's nothing further, colleagues, I will adjourn the meeting.

● (1520)

**Mr. Charlie Angus:** Thank you.

**The Chair:** The meeting is adjourned.

Published under the authority of the Speaker of
the House of Commons

## SPEAKER'S PERMISSION

The proceedings of the House of Commons and its commit-
tees are hereby made available to provide greater public ac-
cess. The parliamentary privilege of the House of Commons
to control the publication and broadcast of the proceedings of
the House of Commons and its committees is nonetheless re-
served. All copyrights therein are also reserved.

Reproduction of the proceedings of the House of Commons
and its committees, in whole or in part and in any medium,
is hereby permitted provided that the reproduction is accu-
rate and is not presented as official. This permission does not
extend to reproduction, distribution or use for commercial
purpose of financial gain. Reproduction or use outside this
permission or without authorization may be treated as copy-
right infringement in accordance with the Copyright Act. Au-
thorization may be obtained on written application to the Of-
fice of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not
constitute publication under the authority of the House of
Commons. The absolute privilege that applies to the proceed-
ings of the House of Commons does not extend to these per-
mitted reproductions. Where a reproduction includes briefs
to a committee of the House of Commons, authorization for
reproduction may be required from the authors in accor-
dance with the Copyright Act.

Nothing in this permission abrogates or derogates from the
privileges, powers, immunities and rights of the House of
Commons and its committees. For greater certainty, this per-
mission does not affect the prohibition against impeaching or
questioning the proceedings of the House of Commons in
courts or otherwise. The House of Commons retains the right
and privilege to find users in contempt of Parliament if a re-
production or use is not in accordance with this permission.

Also available on the House of Commons website at the
following address: https://www.ourcommons.ca

Publié en conformité de l'autorité
du Président de la Chambre des communes

## PERMISSION DU PRÉSIDENT

Les délibérations de la Chambre des communes et de ses
comités sont mises à la disposition du public pour mieux le
renseigner. La Chambre conserve néanmoins son privilège
parlementaire de contrôler la publication et la diffusion des
délibérations et elle possède tous les droits d'auteur sur
celles-ci.

Il est permis de reproduire les délibérations de la Chambre
et de ses comités, en tout ou en partie, sur n'importe quel sup-
port, pourvu que la reproduction soit exacte et qu'elle ne soit
pas présentée comme version officielle. Il n'est toutefois pas
permis de reproduire, de distribuer ou d'utiliser les délibéra-
tions à des fins commerciales visant la réalisation d'un profit
financier. Toute reproduction ou utilisation non permise ou
non formellement autorisée peut être considérée comme une
violation du droit d'auteur aux termes de la Loi sur le droit
d'auteur. Une autorisation formelle peut être obtenue sur
présentation d'une demande écrite au Bureau du Président
de la Chambre des communes.

La reproduction conforme à la présente permission ne con-
stitue pas une publication sous l'autorité de la Chambre. Le
privilège absolu qui s'applique aux délibérations de la Cham-
bre ne s'étend pas aux reproductions permises. Lorsqu'une
reproduction comprend des mémoires présentés à un comité
de la Chambre, il peut être nécessaire d'obtenir de leurs au-
teurs l'autorisation de les reproduire, conformément à la Loi
sur le droit d'auteur.

La présente permission ne porte pas atteinte aux privilèges,
pouvoirs, immunités et droits de la Chambre et de ses
comités. Il est entendu que cette permission ne touche pas
l'interdiction de contester ou de mettre en cause les délibéra-
tions de la Chambre devant les tribunaux ou autrement. La
Chambre conserve le droit et le privilège de déclarer l'utilisa-
teur coupable d'outrage au Parlement lorsque la reproduc-
tion ou l'utilisation n'est pas conforme à la présente permis-
sion.

Aussi disponible sur le site Web de la Chambre des
communes à l'adresse suivante :
https://www.noscommunes.ca