# EXHIBIT 28




January 27, 2021

**BY EMAIL**

Sylvie Gadoury, Esq.
General Counsel
Canadian Broadcasting Corporation
P.O. Box 500, Stn. "A"
Toronto, Ontario M5W 1E6
Canada
(Email: sylvie.gadoury@cbc.ca)

Re: False and Defamatory Statements Concerning WE Charity

Dear Ms. Gadoury:

This firm represents WE Charity ("WE"), including its ongoing operations in the United States. We have been informed that the Canadian Broadcasting Corporation ("CBC") plans to air, at a date to be determined, a report on WE.

As we understand the gist of your story (the "Story"), the CBC intends to assert, in substance, that after press scrutiny fell on WE due to a political scandal, the CBC learned that WE has a track record of prioritizing money over its principles and ethics. We understand that the CBC will report that (i) WE disregarded its progressive principles in fundraising and its events; (ii) WE deceived donors about the need for and use of donor funds; (iii) WE faked or embellished its charitable works to mislead donors; and (iv) WE engaged in improper or illegal accounting practices. These allegations (the "Core Allegations") will lead a reasonable viewer to conclude that WE has committed fraud.

Our understanding of the Core Allegations is based on (i) statements made and questions posed by Mark Kelley during an on-camera, on-the-record interview on December 22, 2020 with Marc Kielburger and Craig Kielburger (ii) statements made in a January 7, 2021 on-background discussion between Harvey Cashore and Marc Kielburger, Craig Kielburger, and Dalal Al-Waheidi and subsequent written continuations of this discussion; (iii) statements made in email correspondence between Harvey Cashore and WE's representative between January 9-23, 2021; (iv) statements made in and questions posed by Harvey Cashore in an on-background discussion with Scott Baker on January 16, 2021 and subsequent written continuations of this discussion; and (v) statements made and questions posed in on-camera, on-the-record interviews of Robin Wiszowaty and Carolyn Moraa on January 17, 2021.

WE has provided the CBC with facts demonstrating that the Core Allegations are false and defamatory and, if published, injurious to WE and the thousands of people around the world who rely on WE for their schooling, water, health, employment, and many other vital services.

We are confident that when you have reviewed the outline enclosed as Exhibit 1 you will





conclude that the Core Allegations are false and defamatory and that it would not be possible for the CBC to publish those allegations without publishing false and defamatory statements concerning WE as to which the CBC would harbor serious doubts about their truth. In proceeding with the Story, moreover, the CBC would be acting contrary to the fundamental principles of "*Accuracy. Fairness. Balance. Impartiality. And integrity*" that form the "*very core*" of its Journalistic Standards and Practices ("JSP")[1].

The CBC would be the first mainstream news organization to falsely report the Core Allegations. As some of the glamour of the Trudeau/WE political story has faded, we have seen interest from other media outlets in other angles on WE. They have not found what the CBC appears to be trying to insinuate because it is not there to be found.

There is much that can truthfully be said about WE, and some of it may be unflattering. WE understands that and believes strongly in the importance of the free press in Canada and the United States. But there is no truth in the Core Allegations; airing them serve the public no purpose except to deceive it. The shortcuts and tactics the CBC has sought to employ here—to make serious allegations of fraud in a *story about Kenya without going to Kenya*—and the attempts to exclude WE's voice will serve only to harm a children's charity that *continues* to do great good around the world.

### A. Based on the Information WE Possesses About the Core Allegations, They Are False and Defamatory and Any Publication of Them Will Recklessly Disregard the Truth.

We understand that the scope of the planned Story is broad and is likely to include elements concerning WE's founding, political issues concerning the Prime Minister and future plans for the charity. WE does not object to such coverage, even if critical, so long as it is truthful and fair. WE does, however, object to the inclusion of the Core Allegations because they are false and defamatory and, as set forth below and in the enclosed outline, the CBC possesses facts proving that they are false:

[1] https://www.cbc.ca/news/editorsblog/mcguire-journalistic-standards-practices-1.4623060





| | CBC Allegation | The Truth Is |
|---|---|---|
| i | Craig Kielburger falsely told a donor group touring a Kenyan village that the village's school floods and would need to be relocated as a false pretence for soliciting unneeded donations. (see Section 1, Exhibit 1). | The donors expressly agreed to donate money for a school in a village with a river that does flood blocking students from accessing a school, the funds were needed, and the donors knew that the funds they were donating would fund a school in a different village than the one they visited. |
| ii | WE "sold" the same borehole project in Kenya to multiple donors, each of whom was told it was the sole funder. (see Section 2, Exhibit 1). | WE expressly told funders that their donations were for water projects that included more than a borehole, the donations collected did not exceed the cost of the water project, the donors were never told they were the sole funders of the water project; and none of the donors claim to be the sole funders of the water project or any part of it. |
| iii | WE gathered healthy individuals to pose for donors as patients at a hospital WE built in Kenya. (see Section 3, Exhibit 1) | Patients at the hospital are real; WE sought to obtain such patients' permission to meet with donors. Healthy individuals also visit the hospital for training programs regardless of whether donors are present. |
| iv | WE built a fake kitchen in Kenya overnight to show to a donor. (see Section 4, Exhibit 1). | The kitchen and dining hall was a stone structure which was not capable of being built overnight, and the donor witnessed the decorating that the CBC's source falsely describes as building the kitchen. |
| v | WE does not have proper financial controls and does not track restricted funding, including for Kenya projects. (see Section 14, Exhibit 1). | WE has a robust accounting system that tracks restricted funding and such accounting is audited annually by independent auditors. |
| vi | WE bribed Kenyan government officials. (see Section 8, Exhibit 1). | The former WE employee who invented the bribery story recanted his allegations and admitted he stole the money he had falsely claimed was paid as bribes, and he returned the money.[2] The recording on which this allegation is based is of Marc Kielburger's efforts assisting police, and which helped lead to the former employee's arrest. The police charged the employee for filing a false police report—he was not charged with bribery. And the NGO board has never accused WE of bribery.[3] |

[2] The CBC's stated view (Cashore/M. Kielburger, January 7, 2021) that broadcasting the recording is in the "*public interest*" is incorrect—it is assuredly not in the public interest to falsely accuse a children's charity of





The examples above are drawn from a larger list of false and defamatory allegations imparted to WE by the CBC and addressed in the outline enclosed as Exhibit 1.

**B. The CBC's Newsgathering Process Has Not Complied with Responsible Reporting Under Canadian Law and Demonstrates a Reckless Disregard for the Truth**

The CBC's actions suggest a desire not to learn the truth, but rather to publish a story with a pre-packaged theme supported by information that is twisted out-of-context, and some of which is undisclosed. This conduct is actionable when it leads to a defamatory publication.

**1. The CBC Has Revised Its Allegations Since the December 22 Interview to Fit Its Pre-Conceived Narrative**

WE agreed to participate in a lengthy on-camera, on-the-record interview with your reporter, Mark Kelley, on December 22, 2020. For more than four hours, Mr. Kelley asked WE founders Marc and Craig Kielburger about a wide range of topics from the organization's founding, to issues concerning Prime Minister Trudeau, to the founders' plans for WE's future. Of particular concern to WE, however, were a number of questions that Mr. Kelley asked regarding WE's fundraising activities, events, and WE's charitable works in Kenya. These questions embedded demonstrably false statements of fact.

WE explained at the December 22 interview that the allegations the CBC was asserting were false. In many cases, they simply did not make sense. Rather than drop the allegations, however, the CBC revised them to fit its narrative.

On January 7, 2021, the CBC followed up with WE in an on-background conversation with Harvey Cashore. In this discussion, Mr. Cashore conceded that a number of the CBC's December 22 interview questions had been wrong. For example, four pages of transcripts disclose attempts by our client simply to understand the question being asked by the CBC regarding the village of Enoosoito (see further at Section 1, Exhibit 1). The details of this allegation have now changed three times:

(a) During the interview, the CBC gave the wrong name for the village visited. WE subsequently cross-referenced the dates that our client's representatives visited the village in question and provided the correct name to the CBC.

---

bribery when in fact it helped local police catch a criminal. Under Canadian law, "*the public interest is not synonymous with what interests the public. The public's appetite for information on a given subject — say, the private lives of well-known people — is not on its own sufficient to render an essentially private matter public for the purposes of defamation law*". Grant v. Torstar Corp., 2009 SCC 61, [2009] 3 S.C.R. 640. at ¶102.

[3] The former head of Kenya's Directorate of Criminal Investigations (Kenya's FBI), Joseph M. Kamau, reviewed WE's actions and in a November 2019 report noted that WE's experience being robbed was unfortunately not uncommon for NGOs in Kenya. Please let us know if you would like to speak with Mr. Kamau so that he can provide you necessary context for your reporting.





(b) Initially, the CBC's allegation was that Craig Kielburger had a day before the tour announced his intention to peddle a false "*story*" to the donors. The CBC has now stated that the false "story" was in fact a spur-of-the-moment occurrence.

(c) The location of the meeting where this matter was said to have been discussed has shifted from a nightly trip planning meeting at the Bogani camp to an apparently clandestine meeting behind a collection of cars at the now-correctly named village.

The supposedly "correct facts" were only put to WE in writing by the CBC after the on-camera interview on December 22.

Nor was this an isolated instance of changing allegations. At the December 22 interview, the CBC asserted that a US-based manager "had serious concerns about money that was being raised in the States that was targeted for overseas, Kenya." Messrs. Kielburger responded on camera to the allegation raised—about Kenya. On January 7, however, it became clear that the allegation had nothing to do with Kenya.

Similarly, at the December 22 interview, the CBC referred to former employee Matthew Cimone and asked WE about whether it engaged in a practice of reading Cimone's and other employees' emails. On January 7, the CBC clarified that what they really wanted to know was whether WE sent donors "stock photos" of schools, insinuating that WE was lying to its donors about the schools built with their donations.[4] But WE was denied an opportunity to respond on camera to that allegation.

The CBC cannot use the responses that WE provided to these questions and others that were presented in an undisputedly misleading manner. They do not actually respond to the allegations that the CBC intends to air. The CBC could not meet the requirements of Canada's responsible reporting defense to a defamation case having never put to WE on camera the allegations it plans to report.

**2. The CBC Has Repeatedly Refused to Confirm It Will Give WE A Fair Chance to Respond to Allegations Raised On Background**

After the December 22, 2020 interview, the CBC also raised with WE many new allegations, but without giving it a fair opportunity to respond.

WE agreed to participate in the January 7 discussion and communications flowing therefrom subject to such discussion being "on background," meaning that the information from the meeting was not to be quoted or attributed to WE. During these discussions, the CBC revised old allegations (as discussed above) and raised multiple new allegations to which WE

[4] For some questions, we still are not certain precisely what the CBC is alleging. For example, the CBC's questions at the December 22 interview concerning the kitchen at the Women's Empowerment Centre in Kenya were framed in such a confusing and muddled manner that Craig Kielburger incorrectly said WE had heard (and refuted) the "overnight kitchen" allegation before when in fact it was new—and false for the reasons stated elsewhere in this letter and Exhibit 1.





had not been given any chance to respond during the on-record December 22 interview.

To date, the CBC has never given WE a fair opportunity to respond to these new allegations on the record and on camera. In the on-background discussions, WE explained to the CBC that its reporting was incorrect. When the CBC did not follow up with WE to tell it if it still intended to publish these allegations, WE asked the CBC to confirm that if it was including these new allegations, it would be afforded an opportunity to respond:

1. On January 19, 2021, a WE representative emailed the CBC's Harvey Cashore. She asked, "A number of new topics and allegations were discussed during the on-background meeting in January. Can you ***please confirm that if you are planning to address any of those things in your story you will provide them ample opportunity to respond?***"

2. On January 20, 2021, Mr. Cashore responded to the email but ***avoided answering***, instead asking about Ms. Moraa's email to the CBC concerning cultural bias in its reporting: "Were you not involved in the emails that came yesterday? Also, have you been briefed on the conversations we've had with WE officials since that meeting?"

3. On January 20, 2021, Mr. Cashore sent WE a further email raising a new question embedding a factual assertion that WE instructed its WE Day performers not to mention "oil" at an event so as to please donors.

4. On January 22, 2021, WE asked Mr. Cashore via email, "***Is there anything else you need an on the record response to?*** There are a number of things that came up in the on background conversations with Craig, Marc, Scott and Robin - ***we want to be sure we have an opportunity to answer properly***.

5. The same day, Mr. Cashore responded, ***again dodging the question***: "We believe we've had a fulsome discussion with WE on the issues to date, but if there is more you want to add to what you have already provided us we would be pleased to review any additional materials. We also appreciate the opportunity to continue to be in touch on any additional research that may arise."

6. On January 23, 2021, WE's representative responded, "***I have asked a few times for you to confirm*** that you will get WE's on-the-record response to any of the allegations from the on-background conversations (or anything else you may have). I know you wouldn't report an allegation about WE without seeking its comment and including its response which is why I am asking. All of the communications WE has had regarding the allegations you raised (or revised) in your discussions with Marc and Craig on January 7th have been on background, which leads me to conclude that you are not including those allegations in your story. Please let me know if you disagree, or if I am missing something so that we can sort this out. ***WE wants a chance to respond to every allegation and does not agree to have its on-background comments aired. Can you please confirm that my understanding is correct and that the additional allegations you raised during the on-background discussions are not***





***going to be part of the story?***

7. Later that day, Mr. Cashore replied, adding Mark Kelley and Kate McKenna: "Adding Mark and Kate on this and we'll get back to you as a group."

8. On January 25, 2021, Mr. Cashore wrote to WE and ***again refused to confirm the CBC would give WE a chance to respond***, writing, "The WE organization has provided responses to our questions, which we appreciate. As new questions or topics may arise we also appreciate the opportunity to continue to dialogue with the WE organization. Thanks again to you and the WE organization for the time you have taken."

The CBC's conduct in engaging with WE since the December 22 interview can only lead to one of two logical conclusions: either the CBC plans to air defamatory allegations about WE without giving it a fair opportunity to respond on camera and on the record, or it plans to publish WE's on-background communications in violation of its promise.

**3. At a Minimum, The CBC Is Required to Give WE an Opportunity to Respond to New or Revised Allegations on Camera**

Canadian law requires the CBC to afford WE a full and fair opportunity to respond to allegations against it. *Grant v. Torstar*, 2009 SCC 61. Canadian courts have held that failing to give a target of untruthful allegations an opportunity to respond is a factor that will support a finding of malice and increase an award of general damages. *See Hodgson v. Canadian Newspapers Co. Ltd.*, (2000) 49 O.R. (3d) 161 (C.A.) ¶ 56-57, *aff'g* (1998) 39 O.R. (3d) 235 (Gen. Div.).

Although couched in different law, the same is effectively true in the United States. Given that WE has been able to disprove many of the allegations put to it thus far, it would be reckless, at a minimum, for the CBC not to afford WE the same opportunity to comment upon any other facts that the CBC intends to publish about WE. *See Alioto v. Cowles Commc'ns, Inc.*, 430 F. Supp. 1363, 1371 (N.D. Cal. 1977), *aff'd*, 623 F.2d 616 (9th Cir. 1980); *see also Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977) ("It is of some significance that [defendant] did not question the plaintiff about the defamatory statements when he interviewed the plaintiff before publication of the article."); *Southern Air Transp., Inc. v. Post-Newsweek Stations, Fla., Inc.*, 568 So. 2d 927, 928 (Fla. Dist. Ct. App. 1990).

For the CBC to fulfill its obligation to equally show both sides of the argument, the CBC must give WE a fair chance to respond to all allegations on-camera, including any new or revised allegations. It would not be fair to only allow WE to respond by way of on-background quotes aired by text or voiceover while its accusers are shown on-camera. Furthermore, allegations that are not equally answered by WE on camera will create the false impression that WE was asked the question but had no answer. *See* Leenen vs CBC (2000) 48 O.R. (3d)656; aff'd (2000) 54 O.R. (3d) 612 (C.A.) (considering audio-visual context of Fifth Estate program in holding that defendant was liable for defamation).





Similar principles are enshrined in the CBC's JSP, which requires it to proceed with:

(a) ***"Fairness"***, ensuring that in its *"information gathering and reporting,* [the CBC] *treat*[s] ... *organizations with openness and respect.... mindful of their rights"* and "*even-handedly*". "*To achieve fairness*," the JSP further requires the CBC to "*diligently attempt to present the point of view of the person or institution being investigated*", "*respect the meaning of an interviewee's statement*" and "*present what the interviewee said fairly and without distortion*"; and

(b) ***"Balance"*** in order to "*ensure that divergent views are reflected respectfully*".

Given that the CBC presumably intends to use on background interview footage of WE staff rebutting certain allegations, it cannot broadcast the Story in a balanced and fair manner while not giving WE an opportunity to respond to all of the allegations on camera.

**C. The CBC's Sources Are Unreliable and Lack Necessary Knowledge and Experience to Speak to The Allegations They Have Asserted**

**1. The CBC Is Relying on Former Employee Sources Who Did Not Have Relevant Experience or Knowledge to Speak to the Allegations**

The CBC is founding its allegations on sources who do not have specific knowledge of the subject matter. To our knowledge, the CBC is relying on:





| | CBC Source | Allegations Exceeding Source's Knowledge |
|---|---|---|
| i | Karen Alexander: source for allegation that WE did not track restricted donations for works, including in Kenya | Ms. Alexander worked in Baltimore in a job that had nothing to do with financials, accounting or Kenya. She was in her job for only a year, was not responsible for any accounting roles, and had access to financials relevant to her role. |
| ii | Joey Milicii: source for allegations about WE building a makeshift kitchen overnight in Kenya | Mr. Milicii was a 24-year-old recent college graduate from Canada; he had never been to Kenya before and had no idea what constitutes a kitchen in rural Kenya. He had no way to know that the donor was aware of what preceded him, saw the decorating work he did, and was in no way deceived. |
| iii | Unidentified WE fly-in facilitator: source for allegation that Craig Kielburger lied to donors about needing funds to build a school in Kenya because a river flooded | Fly-in facilitators are young, with no experience in Kenya and no substantive responsibilities. They have no way of knowing WE's funding needs, the topography of the land, or anything about the villages. They had no access to the written communications and contracts with donors that evidence what donors were told. |
| iv | Matthew Cimone: source for allegation that WE used "stock photos" to deceive donors | Mr. Cimone was a recent college graduate from Canada employed as a motivational speaker. He had no role in sending photos to donors nor has he been able to provide the alleged stock photos, describe the purportedly deceived donor or name the school. Having, to our knowledge, never visited Kenya, he may not have known that all of WE's school buildings across Kenya look alike. |

It should be apparent to the CBC on its face that its sources are not in a position to have knowledge or experience sufficient to substantiate the serious allegations of donor fraud and financial wrongdoing that the CBC appears poised to assert in its Story. Would the CBC even consider reporting that a leading corporation was committing tax fraud based *solely* on the angry resignation letter of a regional sales manager? Yet, Ms. Alexander is no better positioned to accuse WE of tax fraud—because that *is* what she is saying—when she was clearly angry at the company for unrelated reasons[5], was not in any significant financial role and the overwhelming evidence of accounting systems and audits shows her to be wrong. These are not cases of "he said/she said"; these are facts vs. fictions.

Similarly, the CBC would likely not report on government corruption in a foreign country based on allegations by someone who visited the country for a few days, had no experience in

[5] In her resignation letter, Ms. Alexander complained that, among other things, WE did not express sufficient concern for her "feelings" or "wellbeing."





that country, and did not even know the rules that were supposedly violated. Yet, the CBC is seemingly ready to claim that WE deceived its donors based on accusations by North Americans who flew to Kenya for a short period of time, had no experience there, and had no way of knowing what donors were told when learning about the need for funding and at the time of their donations.

The CBC should consider as well how it is possible that if employees in entry-level positions, often with no relevant responsibilities or experience, were able to identify donor fraud and criminal accounting malfeasance, and why they are the only ones who noticed. Over 2,500 employees have worked for WE—many, if not most, in positions of greater authority and access than the CBC's sources.[6] It is inconceivable that they all missed or failed to report such supposedly obvious wrongdoing that entry-level sources were apparently able to discover.

It is of course possible to imagine any number of explanations for the CBC's sources' ability to spot fraud in plain sight, or to explain away the sources' lack of any corroborating evidence. But that is not enough—the mere possibility of wrongdoing is not enough to warrant publishing potentially fatal accusations against a children's charity in the hope that ordinary public viewers will somehow spot the significant gaps in the CBC's evidence for themselves. Nor is the fact that more than one person is similarly confused—or agrees on a lie—a sufficient basis for making such accusations against WE, especially when there are many other more reliable avenues for verifying the CBC's story (*e.g.*, primary source documents WE has provided or has in its possession and are described in Exhibit 1[7]).

By misleading its viewers, the CBC will cause damage to WE. The CBC is well aware of its impact on its audiences[8] and its viewers will reasonably expect that the Fifth Estate would never rely on entry-level employees with no corroborating evidence to accuse a charity of fraud. "*Of course*," they will think, "*there must be other things the CBC isn't showing us*." Viewers will expect that the CBC received powerful evidence from deceived donors and injured beneficiaries. But to our knowledge, the CBC has none of that support for its Story, and it is *because* of the Fifth Estate's reputation for integrity that its audience will be deceived.

### 2. The CBC Has Acknowledged That Its Sources Are Unreliable

As noted at section B.1 above, after WE demonstrated to the CBC that certain of the allegations raised in the December 22, 2020 interview could not possibly be true, the CBC

---

[6] Over 500 North American WE employees travelled to Kenya for short-term visits and program participation such as acting as trip hosts. Mr. Cashore has advised of his intention to rely on "50 former staff or people associated with WE Charity. On the face of this it is an impressive number of sources, but some context is important. Even if all 50 people were former staff, that would represent just 2% of the 2,500 current and former employees of WE.

[7] *See Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 873 (W.D. Va. 2016) (citing as evidence of actual malice journalist's failure to obtain corroborative documents that she had been told existed).

[8] "We are aware of the impact of our work and are honest with our audiences." The CBC's Journalistic Standards and Practices (https://cbc.radio-canada.ca/en/vision/governance/journalistic-standards-and-practices)





revised those allegations, changing key facts. These changes show that the CBC knew that its sources were unreliable, yet it continued to rely on them.

Having discovered that its sources are unreliable, the CBC cannot continue to rely on them without harboring "serious doubts" as to the truth of the allegations. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("*Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice*."); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 284 (D.D.C. 2017) (stating facts could support a finding that defendants entertained "serious doubts" as to source's credibility) (citing *St. Amant*, 390 U.S. at 732).

**3. The Actions of Those with Actual First-Hand Knowledge Show the Allegations to Be False**

The CBC alleges that the parties with first-hand knowledge of the supposed donor fraud—other than the alleged perpetrators—are the donors and the beneficiaries who were supposedly given only fake charitable works. The conduct of these parties, however, has been inconsistent with allegations:

i. No donor has contacted WE concerning the Core Allegations;

ii. No beneficiary of WE's charitable works, whether in Kenya or elsewhere, has contacted WE or spoken publicly to claim that WE's public works projects (e.g., buildings, hospitals) are fake;

iii. No law enforcement agency has contacted WE about any alleged donor fraud.

The absence of any criticism in this regard by WE's donors and beneficiaries against WE casts serious doubt on any CBC story that such donors were defrauded or that the beneficiaries were not truly helped.

Similarly, as to allegations of financial wrongdoing, WE's independent auditors have approved its financials each year of its operation. WE has never been accused by any government authority of wrongdoing in connection with its tax and accounting practices.

Finally, as to the allegation that WE bribed Kenyan officials, the supposed payer of the bribe signed an affidavit recanting his false allegation and admitting he stole the money at issue from WE. Although he was charged by Kenyan authorities with theft and filing a false police report, he was not charged with bribery because it did not happen. Not only was WE never been charged in connection with any bribery, WE played a key role in bringing to justice the individual who stole money and invented these false charges.

**4. The CBC Appears to Have No Positive Sources in Its Planned Story through Whom to Tell WE's Side of the Story**

Although we are reluctant to speculate as to the final content of the CBC's planned Story, from what we can tell, it is likely to be a one-sided attack on WE with only limited rebuttals from





WE itself (replete with all of the problems described above). To our knowledge, the CBC does not intend to include any of the many thousands of donors pleased with their experience with WE, any of the tens of thousands of children, women and others helped by WE, or any of the thousands of WE employees who never witnessed any of the wrongdoing a few disgruntled former employees claim to have seen.

It is of course not sufficient for the CBC to attempt to balance its coverage by airing its critical sources saying a few positive things about WE. Indeed, such coverage serves only to create a veneer of credibility to their critical statements.

WE has identified for the CBC many individuals who have studied WE, including with regard to some of the topics that we understand will be part of the Story. The CBC has chosen not to speak with any of them on camera. Such one-sided coverage will prevent the CBC from sustaining a responsible reporting defense.

**5. The CBC Has a Duty to Confirm That Its Sources' Recollections Are Correct**

The CBC has consistently appeared undeterred by overwhelming evidence that its allegations are false so long as a source purports to remember the alleged facts. This approach is inconsistent with the law and the CBC's own journalistic standards. The CBC must verify that what the source claims to recall is *actually true*.

The CBC cannot escape liability for defamation by merely reporting that a third party like a former WE employee—as opposed to the CBC itself—has accused WE of wrongdoing.[9] *See Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980) (noting the "widely recognized" rule that a party that republishes a libel is subject to liability even if it attributes the libelous statement to the original publisher and expressly disavows the truth of the statement).[10] *See also Grant v. Torstar* 2009 SCC 61 (2009) ¶ 119 ("one should not be able to freely publish a scurrilous libel simply by purporting to attribute the allegation to someone else.").

The CBC's conduct is, moreover, contrary to the JSP's requirement that the CBC fact

[9] *Martin v. Wilson*, 497 A.2d 322 (R.I. 1985) is particularly instructive on this point. In that case, a newspaper published statements that townsfolk were speculating that plaintiff was connected to a rash of local fires, while also noting that local fire officials believed others were responsible. *Id.* at 325. The lower court charged the jury that plaintiff must prove that there were no such rumors. *Id.* at 325. The Supreme Court of Rhode Island reversed, stating that the appropriate inquiry was not whether such rumors existed, but whether the rumors were based upon fact or were false. *Id.* at 327. In other words, where a newspaper publishes third-party statements that speculatively accuse someone of wrongdoing, the fact that the publisher attributes them to a third party and qualifies those statements by stating that they were only speculative is not a defense to liability.

[10] *See also Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969) ("The law affords no protection to those who couch their libel in the form of reports or repetition. . . . [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement."), *cited in Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1248 (D.C. 2016); *see also Zimmerman v. Al Jazeera Am.*, LLC, 246 F. Supp. 3d 257, 264 (D.D.C. 2017) (holding that producers of documentary could themselves be liable for defamation where they aired a third party's false accusation of criminal activity).





check its stories to a high standard:

> *"*[the CBC's] *stories are based on information* [that the CBC has] *verified. Wherever possible,* [the CBC's] *stories use first-hand, identifiable sources – participants in an event or authenticated documents".*
>
> "*Before text, image, video or audio is published, [the CBC] tr[ies] to verify the information with a second source. There may be times when a third source is required. [The CBC is] clear with the audience about what [the CBC] do[es] and do[es] not know. This could include explaining the user's relationship to the events.*" [emphasis added]
>
> "*CBC takes responsibility for the consequences of its decision to publish a person's statements in the context it chooses. When* [the CBC] *present*[s] *a person's statements in support of* [its] *reporting of facts,* [it} *ensure*[s] *that the statements have been diligently checked. In the case of comments made by a person expressing an honest opinion,* [the CBC] *ensure*[s] *that the opinion is grounded in facts bearing on a matter of public interest*"

These standards do not permit the CBC to print an accusation merely because WE is unable to meet the impossible standard of disproving a memory. The issue is not whether a source remembers a fact; what the source remembers must be true.

**D. The CBC's Reporting Has Impermissibly Relied on Cultural Assumptions and Stereotypes**

Many of the CBC's allegations concerning Kenya appear to be based on incorrect assumptions by North Americans who are not familiar with Africa. From what we can tell, the CBC has chosen at every opportunity to believe North American sources over African sources—even about Africa. As the CBC is now aware of these errors in its reporting and its conclusions, it must harbor serious doubts as to the truthfulness of its reporting.

By way of example, the CBC alleges that WE made a fake kitchen at a Women's Empowerment Centre in Kenya in order to deceive its donor. CBC claims there was no kitchen as "*there's no fridge*" shown in a picture the CBC has obtained (Cashore/ C. Keilburger, 7 January 2021). However, WE built a kitchen and dining area according to local needs, customs and requirements, complete with benches and tables for serving food, a water station for washing dishes, two concrete *jikos* (traditional charcoal stoves, located outside for proper ventilation), sinks and food preparation stations. WE has provided pictures of the kitchen and dining area together with testimonials from relevant individuals who witnessed the completed and outfitted kitchen. The donor's representative inspected it and did not express any concerns (*see* further at Section 4, Exhibit 1).

The CBC's pursuit of this allegation concerning events and communities thousands of miles away displays concerning cultural ignorance. In this regard, Carol Moraa, Director of WE Villages in East Africa and who also oversees the WE College and the Kisaruni Group of Schools, has stated to CBC (19 January 2021):





"*These accusations are based not on fact, but solely on rumor… These individuals saw or heard something within our culture that they did not understand, placed it within their own cultural lens to make sense of what they saw, and formed inaccurate assumptions …[The CBC] seem to believe the rumors because they hold the same North American cultural lens and the rumors easily fit within their cultural lens. It feels that White people in Canada are passing judgement on us from afar, without seeking to understand Kenya or give us a fair opportunity to truly explain and defend our work.*

*We could easily disprove these rumors if someone from CBC simply took the time to visit Kenya, as many of these rumors are so implausible… Westerners do not understand that most of these rural women live in homes of mud and dung, with thatched roofs, and many have never even seen a refrigerator. The charity completed the kitchen and dining area according to local standards and customs…I ate at that kitchen for months with the women after the opening…. Would CBC tell a story that accuses Indigenous leaders of wrong doing, based solely on the rumors of non-Indigenous people who visited Indigenous communities for a short time? …*

*Dozens of Kenyan men built the women's empowerment center and dozens of Kenyan women led the decorations the final 24-hours. Dozens of Kenyan doctors, nurses and clinicians run Baraka hospital, and over one hundred thousand patients have been treated. Hundreds of Kenyan have seen the river flood dividing the villages of Enoosoito and Ilmedeketa, and I personally gave the information to the donors. Why do[es the CBC] ignore these hundreds of Kenyans who can disprove [the CBC's] few Western rumors?*"

The CBC did not even give Ms. Moraa the courtesy of a response.[11]

**E. The CBC Must Take the Time to Verify Its Kenyan Reporting on The Ground**

WE has invited the CBC to inspect its projects in Kenya so that it can verify first-hand our client's statements. Our client is confident that were a CBC team to visit Kenya, the allegations under consideration would be refuted.

In the meantime, there is no urgency to air the intended broadcast given that most of the events at the core of CBC's allegations occurred a number of years ago. As you will be aware, in the recent judgment of Subway v CBC, 2021 ONCA 26, the Court of Appeal ruled:

> "*[71]. Questions were raised about the reliability of the findings and the results* [of the CBC's sources]. *The CBC concedes that a high degree of due diligence was required given the seriousness of the allegations. There was no urgency to the dissemination of the*

[11] In its interactions with WE, the CBC has behaved as though its story is entirely about Marc and Craig Kielburger. However, the Story as it has been conveyed to WE will feature prominently serious allegations of unethical and illegal conduct by WE's personnel in Kenya. Ms. Moraa was personally referenced in questions put to Messrs. Kielburger during the December 22 interview. The CBC's focus on WE's two North American founders has minimized the voices of the many African WE employees whose careers and reputations are threatened by the Story.





> *information. Had more due diligence been conducted before its dissemination, the information could have been verified.*
>
> *[72] There is therefore a basis in the record to support a finding that the defence of responsible communication does not tend to weigh more in CBC's favour…*
>
> *[103] … At the heart of the action is CBC's ability to rely on the defence of responsible communication. The continuation of the action should not deter others from expression, but should deter others from making remarks without first taking reasonable steps to substantiate the veracity of those remarks particularly where, as in this case, there is no urgency to the dissemination of that information: Bent, at para. 167.*"

Several English authorities have also made clear the courts' strong preference for accurate reporting, verification, and the provision of a fair opportunity to respond in the absence of any real urgency:

> "*There may be extreme cases where the urgency of communicating a warning is so great, or the source of the information so reliable, that publication of suspicion or speculation is justified; for example, where there is danger to the public from a suspected terrorist or the distribution of contaminated food or drugs; but there is nothing of that sort here*", Blackshaw v Lord [1984] Q.B. 1;
>
> "*…the urgency from the public point of view cannot be said to be so great as to justify either not giving the Claimant a proper opportunity to comment on the … documents or omitting to carry out any attempt at all at verification*", Galloway v Telegraph Group Ltd [2004] EWHC 2786 (QB);
>
> *"… it is a fundamental principle of the Reynolds defence that one takes reasonable care and, in particular, very often that one gives the other party an opportunity to comment or make observations and takes that into account. …. there is no question here of reasonable care or anything resembling it having been taken by [the publisher]. He may very well be stating his own honestly and strongly held beliefs … about the [target], but his subjectively believing the allegations is not the same as reasonable care having been taken in relation to them. I therefore see no room for any successful defence of privilege in one or other of its forms,"* Harounoff v Baker [2012] EWHC 1443 (QB)

To broadcast the Story without verifying the facts on the ground in Kenya is also contrary to the JSP. One of the JSP's core principles, "*Accuracy*", requires the CBC to "*seek out the truth*", not to "*broadcast an investigative report until* [the CBC has] *ensured that the facts and evidence support the conclusions and judgment*", and *to "ensure that the statements have been diligently checked."* For the reasons explained above, the CBC has not done so here.

None of the CBC's intended allegations are urgent, concern current affairs or risk expiry. Given that the allegations are extremely serious, they require a high degree of verification before they are broadcast. The CBC cannot responsibly publish what it cannot properly verify. To do so would recklessly disregard the truth.





**F. The CBC's Core Allegations Are Actionable as Defamation in Canada and the U.S.**

The legal rule of libel in Canada and the United States is the same: "The essence of the tort of libel is the publication of a statement about an individual that is both false and defamatory." *Pisello v. Town of Brookhaven*, 933 F. Supp. 202, 217 (E.D.N.Y. 1996) (citation and quotations omitted); *accord Grant v. Torstar* 2009 SCC 61 (2009) at ¶ 28. The key threshold question is the "impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person." *Immuno AG.*, 77 N.Y.2d at 243; *P.G. Restaurant Ltd. v. Northern Interior Regional Health Board,* 2005 BCCA 210 at ¶¶ 42, 62, *leave to SCC refused*, [2005] SCCA No 270.

The same rule applies, as here, where the defamatory message has been characterized by exaggeration, implication or suspicion of wrongdoing. *See, e.g.*, *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 240–41 (11th Cir. 1999); *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1315–17 (3d Cir. 1994); *Botiuk v. Toronto Free Press***,** [1995] 3 SCR 3; *Grassi v. WIC Radio Ltd*. [2000] B.C.J. No. 170 37-38.

The CBC has failed to identify facts or evidence that substantiate the Core Allegations. The CBC has not identified any source with first-hand knowledge who is in any position to contradict the evidence cited in Exhibit 1. As further discussed above, the sources that the CBC has identified were low-level employees. The only documents identified by the CBC in its discussions with WE do not contradict the facts set forth in the outline.

Because the CBC knows facts showing the Core Allegations concerning WE are false, publication of the Story would not be protected by any defense in Canada or the United States. In the course of the CBC's engagement with WE, the CBC has learned facts and reviewed evidence in light of which it must harbor serious doubts as to the truth of the Core Allegations. The CBC knows that its reporting is predicated on unreliable sources and lacks necessary on-the-ground reporting. The CBC could therefore only publish the Core Allegations knowing that they are false or with reckless disregard of their probable falsity—*i.e.*, with actual malice. "A defendant who has acted with malice in publishing defamatory allegations has by definition not acted responsibly." *Grant v. Torstar* 2009 SCC 61 (2009) at ¶ 125; *accord St. Amant*, 390 U.S. 727.[12]

---

[12] In David v Hosany [2017] EWHC 2787 (QB), the English court, which is persuasive authority in Canada, confirmed that no defense of qualified privilege will be available where a publisher publishes with malice. The court explained:

*"5.2 Express malice, such as will rebut a defence of qualified privilege, has been defined by the House of Lords in the leading cases of Horrocks v Lowe [1975] AC 135 and Reynolds v Times Newspapers [2001] 2 AC 12). The applicable principles are summarised at para.19.06 of Duncan & Neill (above) as follows:*

*'... (c) If the defendant did not believe that when he published was true this fact is generally conclusive evidence of express malice, for no sense of duty or desire to protect his own legitimate interest can justify a man in telling deliberate and injurious falsehoods about another.*

*(d) If the defendant made the publication recklessly, being indifferent to the truth of what he published and neither considering nor caring whether it was true or not, he will be treated as if he knew it to be false.'"*





* * * * *

The reputation of our client is its most valuable asset. It is at the core of WE's ability to raise funds to support its social mission and maintain community engagement where its charitable works are performed. While WE has been caught in the crossfire of a political battle in Canada, it still has a recognizable and reputable brand in the United States, Kenya and elsewhere. The Story will cause great harm to those assets, especially in the United States, which is the home of many of WE's donors (including some poised to be mentioned in the Story). WE's American operations are clearly in the crosshairs of the CBC's reporting.

WE engages with school districts, teachers and other organizations in the United States. A significant portion of its funding comes from corporate sponsorship and donations from the United States. In short, our client has a reputation to protect in the United States and it reserves all rights to do so as well as in Canada.

In an article published recently concerning the New York Times' failure to meet its editorial standards in connection with the *Caliphate* podcast, the paper's executive editor observed "good journalism comes from some sort of internal debate over whether or not the stuff that supports the story is more powerful than the stuff that refutes the story. I think this is one of those cases where I think we just didn't listen hard enough to the stuff that challenged the story. And to the signs that maybe our story wasn't as strong as we thought it was."[13]

We ask the CBC to do what the Times' editor regrets not having done: listen to the stuff that challenges your story. And listen to the organization—WE—who is asking you to listen to *all* it has to say before you irreparably harm it and the causes it serves.

We therefore request that the CBC delay publication of the Story to give us time to review any evidence that you or your reporters and editors believe supports the Core Allegations in light of the materials we have provided (and are willing to continue to provide), and to persuade you that the Core Allegations we understand will be included in the Story are without basis.

Sincerely,

Joseph F. Kroetsch

cc: William C. McDowell, Esq. (wmcdowell@litigate.com)
Canadian Counsel to WE Charity
Jonathan Sherman, Esq. (jsherman@bsfllp.com)

[13] Marc Tracy & Katie Robertson, *et al.*, *New York Times Says 'Caliphate' Podcast Fell Short of Standards*, N.Y.T. (Dec. 18, 2020), https://www.nytimes.com/2020/12/18/business/media/new-york-times-caliphate-podcast.html?action=click&module=RelatedLinks&pgtype=Article