IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WE CHARITY,

               **Plaintiff,**

v.

CANADIAN BROADCASTING
CORPORATION,

               **Defendant**.

Civil Action No. 1:22-cv-00340

## DECLARATION OF BRIAN MACLEOD ROGERS

1.　　My name is Brian MacLeod Rogers.  I make this Declaration from personal and professional knowledge and am competent to testify to the facts and information stated herein.

### A.　Introduction and Qualifications

2.　　I am a lawyer currently practicing law in the Province of Ontario. I was called to the Ontario bar in 1979 and have practiced law for more than 40 years. Over the course of my career, I have specialized primarily in media and defamation law and related litigation. I have represented writers, producers, newspapers, magazines, book publishers, broadcasters, and electronic media companies.  I have also practiced general litigation in cases involving contract, tort and related equitable claims.

3.　　I have appeared before all levels of courts in Canada and have represented interveners in several of the leading media law cases before the Supreme Court of Canada over the past 30 years.

4.　　Between 1998 and 2000, I was founding president of the organization now known as the Canadian Media Lawyers Association. I was also the first Canadian member of the Defense Counsel Section of the Media Law Resource Center ("MLRC"), a United States-based international non-profit organization that provides resources and information on media law to media lawyers, members of the media and the public. I currently co-author annual surveys for the MLRC on Canadian libel and privacy law as part of volumes published by Lexis Nexis.

2

5.      I am also the author of the Canadian chapter in the *International Libel & Privacy Handbook*, a legal text that compiles relevant libel and privacy legislation and case law from countries across Europe, Asia, the Middle East and the Americas that is also published by Lexis Nexis.[1]

6.      In 2010, the Attorney General of Ontario appointed me as one of three members of the Advisory Panel on Legislation Against SLAPPs (Strategic Litigation Against Public Participation).  As I discuss below, this panel was responsible for a report that laid the foundation for what would become Ontario's anti-SLAPP legislation, the *Protection of Public Participation Act*, which came into force in 2015.

7.      I have been retained by the Canadian Broadcasting Corporation to provide information about the following aspects of Ontario law and procedure. In providing this information, I do not intend to comment on the merits of any claim or defence that may be asserted by either party in this case:

> a.      Certain aspects of Ontario defamation law, including notice requirements for libel actions against newspapers or broadcasters and the related statute of limitations;
>
> b.      Anti-SLAPP proceedings in Ontario;
>
> c.      Summoning witnesses living in Ontario, other Canadian provinces, or foreign countries to give evidence at an Ontario trial; and
>
> d.      The availability of bilingual proceedings in both French and English in Ontario.

### B.      Legislative Powers in Canada

8.      Canada is a federal state with two orders of government: the federal government, and provincial and territorial governments, including Ontario.  The Canadian constitution sets out areas of law over which either the federal government or the provincial governments have exclusive jurisdiction to legislate. The matters I discuss in this affidavit primarily relate to the administration of justice and property and civil rights, which are both matters of provincial legislative authority.

---

[1] Charles J. Glasser Jr., *International Libel & Privacy Handbook*, 2020-2021 edition (New York: Lexis Nexis, 2020).

### C. Notice and Limitation Periods for Defamation Claims Against Newspapers and Broadcasters

9.      In Ontario, defamation actions against "newspapers" or "broadcasters" are subject to the provincial *Libel and Slander Act* ("*LSA*"), a copy of which is attached as Exhibit 1.

10.     The elements of a claim for defamation in Ontario are that: (1) the impugned words were defamatory, in the sense that they would tend to lower the plaintiff's reputation in the eyes of a reasonable person; (2) the words in fact would be understood to refer to the plaintiff; (3) the words were published, meaning that they were communicated to at least one person other than the plaintiff;[2] and (4) the defendant was responsible for the publication. Ontario defamation law does not include an element of "fault" that a plaintiff has the burden of establishing as an element of a cause of action.  Among other defences, Ontario law recognizes an affirmative defense of responsible communication on matters of public interest, as established by the Supreme Court of Canada in *Grant v. Torstar Corp.*, 2009 SCC 61.

11.     This defence is available to anyone who publishes material of public interest in any medium, including online.[3]  The defence has two essential elements. First, the publication must be on a matter of public interest. Second, the defendant must show that the publication was responsible, in that he or she was appropriately diligent in trying to verify the allegations, having regard to all the relevant circumstances.[4]

12.     Ontario law recognizes special limitation periods for statements published in newspapers or broadcasts.  In these cases, there are two time-based limitations on filing a lawsuit for defamation.  Section 5(1) of the *LSA* states that no action for libel stemming from a statement made in a newspaper or broadcast can be commenced unless the plaintiff has served the defendant with notice of the alleged libel within six weeks after the libel has come to the plaintiff's knowledge. The notice must be in writing and must specify the nature of the plaintiff's complaint.[5]

13.     Section 6 of the *LSA* requires that an action for libel stemming from a statement made in a newspaper or broadcast must be commenced within three months after the libel has come to the knowledge of the person defamed.[6]  The expiry of a limitation period under the *LSA*

---

[2] *Grant v. Torstar Corp.*, 2009 SCC 61, at para 28.
[3] *Grant v. Torstar Corp.*, 2009 SCC 61, at para 96.
[4] *Grant v. Torstar Corp.*, 2009 SCC 61, at para 98.
[5] *Libel and Slander Act*, R.S.O. 1990, c. L.12, s. 5(1).
[6] *Libel and Slander Act*, R.S.O. 1990, c. L.12, s. 6.

does not automatically render a cause of action a nullity, but is rather an affirmative defense under Ontario law that must be pled by the defendant.[7]

### D.    Ontario's Anti-SLAPP Legislation

14.     As mentioned above, in 2010 I was appointed to the Anti-SLAPP Advisory Panel (the "Advisory Panel") by the Attorney General of Ontario. The purpose of the panel was to advise the Attorney General whether legislation was needed in the province to control SLAPP suits and, if so, what it should contain.

15.     After broad consultations with various stakeholders and public hearings, the Advisory Panel published the Anti-SLAPP Advisory Panel Report to the Attorney General (the "Report"). A copy of the Report is attached as Exhibit 2.

16.     The recommendations in the Report were largely adopted in a legislative bill (Bill 52), which came into force in 2015 as the *Protection of Public Participation Act*, amending the provincial *Courts of Justice Act* ("*CJA*") and other legislation not applicable here. The *CJA* establishes the legal framework for Ontario's court structure and judicial proceedings.

17.     A copy of the relevant portions of Ontario's anti-SLAPP legislation, sections 137.1 through 137.5 of the *CJA*, is attached as Exhibit 3.

18.     As per the Advisory Panel's recommendation, the protections afforded free expression under section 137.1 of the *CJA* are broad. A defendant is permitted to move to dismiss a proceeding, and a multi-prong process is provided to adjudicate the motion.

19.     First, the defendant must satisfy the judge that the proceeding arises from an expression made by the defendant that relates to a matter of public interest.[8] Relying on the Report,  the Supreme Court of Canada noted in the leading case of *1704604 Ontario Ltd.* v *Pointes Protection Association*, "…in light of the legislative purpose and background of section 137.1, it is important to interpret an 'expression' that 'relates to a matter of public interest' in a generous and expansive fashion".[9]

20.     As a practical matter, defendants bringing motions to dismiss claims under section 137.1 almost always satisfy the court that the claim relates to expression on matters of public interest.

---

[7] *Abrahamovitz v. Berens*, 2018 ONCA 252, at para 30.

[8] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 137.1(3).

[9] *704604 Ontario Ltd. v. Pointes Protection Association*, 2020 SCC 22, at paras 11-15, 30.

21.     Once a defendant has persuaded the court that the claim relates to expression on a matter of public interest, the onus shifts to the plaintiff to satisfy the court that the action should continue because it meets both a merits-based hurdle and a public interest hurdle.  If the plaintiff is not able to meet both these hurdles, the claim is dismissed.

22.     Under the merits-based hurdle, the plaintiff must show that there are "grounds to believe" that the claim has "substantial merit" and that the defendant has "no valid defence" to the claim.  If the court is not satisfied that each of these prongs is met, the action is dismissed.[10]

23.     If the plaintiff satisfies the merits-based hurdle, the court will still dismiss the claim unless the plaintiff also satisfies the public interest hurdle. To satisfy this hurdle, the plaintiff must convince the court that the harm likely to be or have been suffered by the plaintiff as a result of the defendant's expression is "sufficiently serious that the public interest in permitting the proceeding to continue outweighs the public interest in protecting that expression".[11]

24.     Ontario's anti-SLAPP regime also includes cost incentives to encourage defendants in cases involving freedom of expression to move to have actions dismissed.  It does so by modifying the presumption under Ontario law that a party that prevails in litigation recovers only a portion of its costs (usually in the range of 40-60%).[12] Instead, the presumption on a section 137.1 motion is that, if the defendant wins, it recovers full indemnity costs and, even if the defendant loses, it does not have to pay any costs to the plaintiff.[13]

### E.     Summoning Canadian Witnesses to Testify In Person at Trial

25.     Ontario provides procedures for summoning any resident of any Canadian province to testify in person at a trial in Ontario.

26.     The procedures governing the introduction of evidence at trial in Ontario are set out in Rule 53 of the *Rules of Civil Procedure*. Rule 53.04 governs the procedures for summoning an Ontario resident to testify at trial.  A copy of the rule is attached as Exhibit 4.

27.     Rule 53.04 permits parties to summon any Ontario resident to testify at trial and to produce at trial documents and other materials.  Rule 53.04(1) states:

---

[10] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 137.1(4)(a).

[11] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 137.1(4)(b).

[12] R.R.O. 1990, Reg. 194, rule 57.

[13] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 137.1(7)-(8).

A party who requires the attendance of a person in Ontario as a witness at a trial may serve the person with a summons to witness…requiring him or her to attend the trial at the time and place stated in the summons, and the summons may also require the person to produce at the trial the documents or other things in his or her possession, control or power relating to the matters in question in the action that are specified in the summons.[14]

28.     If a witness fails to attend at a trial after being served with a summons and provided with attendance money, the presiding judge can issue a warrant for the witness's arrest.[15]

29.     The power to compel a witness who resides in another Canadian province to testify in Ontario is governed by the *Interprovincial Summonses Act* ("*ISA*"). A copy of the *ISA* is attached as Exhibit 5.

30.     Section 5(1) of the *ISA* sets out the test that must be satisfied for a court to grant an interprovincial summons:

Where a party to a proceeding in Ontario causes a summons to be issued for service in another province, the party may attend upon a judge of the Superior Court of Justice, who shall hear and examine the party or the party's counsel if any, and, upon being satisfied that the attendance in Ontario of the person required in Ontario as a witness,

(a) is necessary for the due adjudication of the proceeding in which the summons or other document has been issued; and

(b) in relation to the nature and importance of the proceeding, is reasonable and essential to the due administration of justice in Ontario,

shall sign a certificate which may be in the form prescribed…and shall cause the certificate to be impressed with the seal of the court.[16]

31.     The determination of whether to make an order under section 5(1) is a matter of judicial discretion based on the factual circumstances of the case. The interests sought to be protected by the conditions in section 5(1) include fairness to both parties as well as protecting witnesses from unreasonable attempts to be examined.[17]

---

[14] R.R.O. 1990, Reg. 194, rule 53.04(1).
[15] R.R.O. 1990, Reg. 194, rule 53.04(7)
[16] *Interprovincial Summonses Act*, R.S.O. 1990, c. I.12, s. 5(1).
[17] *Flying E Ranche Ltd. v. Canada (Attorney General)*, 2020 ONSC 8094, at para. 5.

32.    Where the information that would be included in the out-of-province witness's testimony is available from another source within the province, the evidence of the out-of-province witness can be viewed as neither necessary for the adjudication of the proceeding, nor essential to the due administration of justice in Ontario, and an interprovincial summons refused.[18]

33.    Section 2(1) of the *ISA* identifies the circumstances under which an Ontario court will recognize an interprovincial summons from another province:

A court in Ontario shall receive and adopt as an order of the court a summons issued in another province if,

> (a)  the summons is accompanied by a certificate signed by a judge of a superior, county or district court of the issuing province and impressed with the seal of that court, signifying that, upon hearing and examining the applicant, the judge is satisfied that the attendance in the issuing province of the person subpoenaed,
>
>> (i)  is necessary for the due adjudication of the proceeding in which the summons is issued, and
>>
>> (ii)  in relation to the nature and importance of the cause or proceeding, is reasonable and essential to the due administration of justice in that province; and
>
> (b)  the summons is accompanied by the witness fees and travelling expenses in accordance with Schedule 1.[19]

34.    Each province and territory, except Quebec, provides for a nearly reciprocal provision in their corresponding legislation.[20] Although Quebec, which is the only civil law jurisdiction in Canada, does not have reciprocating legislation, a Quebec resident can also be compelled to testify in Ontario. Under the *Civil Code of Quebec*, a Quebec court will approve a subpoena issued by another province or territory if it is accompanied by the appropriate fees and a certificate stating that the witness's attendance is necessary to resolve the matter.[21]

---

[18] *CanWest Media Works Inc. v. Canada (Attorney General)*, 2007 ONCA 567, at para. 15.

[19] *Interprovincial Summonses Act*, R.S.O. 1990, c. I.12, s. 2(1).

[20] *Interprovincial Subpoena Act*, RSA 2000, c. I-9, s. 2; *Subpoena (Interprovincial) Act*, RSBC 1996, c. 442, s. 2(1); *The Interprovincial Subpoena Act*, CCSM 1988, c. S212, s. 2(1); *Interprovincial Subpoena Act*, RSNB 2011, c. 180, s. 2; *Interprovincial Subpoena Act*, RSNL 1990, c. I-20, s. 3; *Interprovincial Subpoena Act,* RSNWT 1988, c. I-9, s. 3(1); *Interprovincial Subpoena Act*, SNS 1996, c. 1, s. 4(1); *Interprovincial Subpoenas Act*, RSNWT (Nu) 1988, c. I-9, s. 3(1); *Interprovincial Subpoena Act*, SPEI 1987, c. 36, s. 2; *The Interprovincial Subpoena Act*, RSS 1978, c. I-12.1, s. 3(1); *Interprovincial Subpoena Act*, RSY 2002, c. 94, s. 2(1).

[21] *Code of Civil Procedure,* CQLR, c. C-25.01, article 498.

### F.   Summoning Witnesses to Be Examined for Use at Trial, Including Witnesses Outside of Canada

35.    As an alternative to summoning witnesses to testify in person at trial, witnesses may also be summoned to be examined under oath or affirmation prior to trial so that their testimony may be offered as evidence at trial. The procedures for taking evidence before trial for use at trial are set out in Rule 36 of the *Rules of Civil Procedure.* A copy of this Rule is attached as Exhibit 6. This procedure is distinct from the examination of witnesses for discovery, which is governed by Rule 31 of the *Rules of Civil Procedure.* A copy of this Rule is attached as Exhibit 7.

36.    Rule 36.01(2) allows a party, with leave of the court or consent of the parties, to examine a person on oath or affirmation before trial for the purpose of having the person's testimony available at trial.[22] In deciding whether to grant leave, the court considers the factors listed in Rule 36.01(3):

a.    the convenience of the person whom the party seeks to examine;

b.    the possibility that the person will be unavailable to testify at the trial by reason of death, infirmity or sickness;

c.    the possibility that the person will be beyond the jurisdiction of the court at the time of the trial;

d.    the expense of bringing the person to the trial;

e.    whether the witness ought to give evidence in person at the trial; and

f.    any other relevant consideration.[23]

37.    Rule 36.03 states that where an order is made under Rule 36.01 for the examination of a witness outside of Ontario, the order shall, if the moving party requests it, provide for the issuing of a commission and letter of request.[24] Commissions and letters of request are governed by Rule 34.07(2) & (3) of the *Rules of Civil Procedure*, a copy of which is attached as Exhibit 8.

38.    The commission will identify an individual who has been authorized to commission the evidence of the out-of-province witness. If the witness resides in a Canadian province outside of Ontario, the letter of request will ask a court in the province that has

---

[22] R.R.O. 1990, Reg. 194, rule 36.01(2).
[23] R.R.O. 1990, Reg. 194, rule 36.01(3).
[24] R.R.O. 1990, Reg. 194, rule 36.03.

jurisdiction over the witness to compel the witness to attend an examination before the authorized commissioner.

39.    Witnesses residing outside of Canada cannot be compelled to testify in person at a trial in Ontario. However, their evidence can be obtained for use at trial by the court issuing a commission and letter of request to a foreign court pursuant to the same procedure in Rules 36 and 34 of the *Rules of Civil Procedure*.

40.    In addition to examining witnesses outside of Canada prior to trial for use of their evidence at trial, under recent caselaw there is now also a possibility of seeking the testimony of a foreign witness at a trial by remote two-way video.

41.    The leading case on the question of whether a foreign witness can be compelled to testify at an Ontario trial is *Moore v. Bertuzzi*, a copy of which is attached as Exhibit 9.  As this case explains, although a foreign national cannot be compelled to testify in person at an Ontario trial, an Ontario court can issue an order for a commission and letter of request asking a court in the foreign jurisdiction to order the witness to give video evidence at the trial.[25]

### G.    Availability of Bilingual Proceedings in Ontario

42.    Section 126 of the *CJA* guarantees the right of participants in Ontario's civil litigation process to receive certain services in either English or French. A copy of this section of the *CJA* is attached as Exhibit 10.

43.    Pursuant to section 126(4) of the *CJA*, any party to a proceeding who speaks French has the right to require that the proceeding be conducted as a bilingual proceeding.[26] Corporations which are parties to a proceeding have the same right to request a bilingual proceeding under section 126(4) as a natural person unless the court orders otherwise.[27]

44.    Once a proceeding is designated as bilingual, the following rules apply:

    a. Hearings designated by the party as bilingual must be presided over by a judge or officer who speaks English and French.

    b. If the proceedings involve a jury and are being held in certain designated regions of Ontario, the jury must speak both English and French and all evidence given and submissions made in English or French must be received, recorded and transcribed in the same language in which the evidence or submissions were given. These areas include Ontario's largest cities such as

---

[25] *Moore v. Bertuzzi*, 2014 ONSC 1318 at paras. 68-91; see also *Haaretz.com v. Goldhar*, 2018 SCC 28, at para. 64.
[26] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(4).
[27] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(8).

Toronto and Ottawa as well as areas of the province with a higher percentage of French-speaking residents.

c. If the proceedings do not involve a jury, all evidence given and submissions made in English or French must be received, recorded and transcribed in the same language in which the evidence or submissions were given.

d. Any part of the hearing can be conducted in French if, in the opinion of the presiding judge or officer, it is feasible to do so.

e. Oral evidence given in English or French at an examination out of court must be received, recorded and transcribed in the same language in which the evidence was given.

f. If a party or their counsel speaks only one of French or English, the court must provide interpretation services to the other language for any oral evidence whether the evidence was given in court or out of court.

g. The reasons for a decision can be written in English or French but the court must provide a translation to the other language on the request of a party.[28]

45.    The above rules also apply to any appeal of a decision that was reached via a bilingual proceeding, if requested by the party who speaks French. If the appeal is heard by more than one judge, all judges must be able to speak English and French.[29]

46.    Participants in an Ontario proceeding also maintain certain rights to bilingual services even where the proceedings have not formally been designated as bilingual proceedings.

47.    In non-bilingual proceedings, pleadings, originating process documents and any other documents filed by a party can be written and submitted in French.[30] On a party's request, the court must also provide an English or French translation of any of the abovementioned documents that is written in the other language.[31] Finally, if a party makes submissions in French or a witness gives oral evidence in French, the court must provide interpretation of the submissions or evidence into English.[32]

---

[28] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(4) (1)-(7).

[29] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(7).

[30] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(1).

[31] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(2).

[32] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 126(3).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge.

Brian MacLeod Rogers

# EXHIBIT 1

Français

# Libel and Slander Act

## R.S.O. 1990, CHAPTER L.12

**Consolidation Period:** From November 3, 2015 to the e-Laws currency date.

Last amendment: 2015, c. 23, s. 4.

Legislative History: 2015, c. 23, s. 4.

**Definitions**

**1** (1)  In this Act,

"broadcasting" means the dissemination of writing, signs, signals, pictures and sounds of all kinds, intended to be received by the public either directly or through the medium of relay stations, by means of,

    (a)  any form of wireless radioelectric communication utilizing Hertzian waves, including radiotelegraph and radiotelephone, or

    (b)  cables, wires, fibre-optic linkages or laser beams,

and "broadcast" has a corresponding meaning; ("radiodiffusion ou télédiffusion", "radiodiffuser ou télédiffuser")

"newspaper" means a paper containing public news, intelligence, or occurrences, or remarks or observations thereon, or containing only, or principally, advertisements, printed for distribution to the public and published periodically, or in parts or numbers, at least twelve times a year. ("journal")  R.S.O. 1990, c. L.12, s. 1 (1).

**Meaning of words extended**

(2)  Any reference to words in this Act shall be construed as including a reference to pictures, visual images, gestures and other methods of signifying meaning.  R.S.O. 1990, c. L.12, s. 1 (2).

LIBEL

**What constitutes libel**

**2** Defamatory words in a newspaper or in a broadcast shall be deemed to be published and to constitute libel.  R.S.O. 1990, c. L.12, s. 2.

**Privileged reports**

**3** (1)  A fair and accurate report in a newspaper or in a broadcast of any of the following proceedings that are open to the public is privileged, unless it is proved that the publication thereof was made maliciously:

    1.  The proceedings of any legislative body or any part or committee thereof in the British Commonwealth that may exercise any sovereign power acquired by delegation or otherwise.

    2.  The proceedings of any administrative body that is constituted by any public authority in Canada.

    3.  The proceedings of any commission of inquiry that is constituted by any public authority in the Commonwealth.

    4.  The proceedings of any organization whose members, in whole or in part, represent any public authority in Canada.  R.S.O. 1990, c. L.12, s. 3 (1).

**Idem**

(2)  A fair and accurate report in a newspaper or in a broadcast of the proceedings of a meeting lawfully held for a lawful purpose and for the furtherance of discussion of any matter of public concern, whether the admission thereto is general or restricted, is privileged, unless it is proved that the publication thereof was made maliciously.  R.S.O. 1990, c. L.12, s. 3 (2).

**Publicity releases**

(3)  The whole or a part of a fair and accurate synopsis in a newspaper or in a broadcast of any report, bulletin, notice or other document issued for the information of the public by or on behalf of any body, commission or organization mentioned in subsection (1) or any meeting mentioned in subsection (2) is privileged, unless it is proved that the publication thereof was made maliciously.  R.S.O. 1990, c. L.12, s. 3 (3).

**Decisions, etc., of certain types of association**

(4)  A fair and accurate report in a newspaper or in a broadcast of the findings or decision of any of the following associations, or any part or committee thereof, being a finding or decision relating to a person who is a member of or is subject, by virtue of any contract, to the control of the association, is privileged, unless it is proved that the publication thereof was made maliciously:

1.  An association formed in Canada for the purpose of promoting or encouraging the exercise of or interest in any art, science, religion or learning, and empowered by its constitution to exercise control over or adjudicate upon matters of interest or concern to the association, or the actions or conduct of any persons subject to such control or adjudication.

2.  An association formed in Canada for the purpose of promoting or safeguarding the interests of any trade, business, industry or profession, or of the persons carrying on or engaged in any trade, business, industry or profession, and empowered by its constitution to exercise control over or adjudicate upon matters connected with the trade, business, industry or profession.

3.  An association formed in Canada for the purpose of promoting or safeguarding the interests of any game, sport or pastime to the playing or exercising of which members of the public are invited or admitted, and empowered by its constitution to exercise control over or adjudicate upon persons connected with or taking part in the game, sport or pastime.  R.S.O. 1990, c. L.12, s. 3 (4).

**Improper matter**

(5)  Nothing in this section authorizes any blasphemous, seditious or indecent matter in a newspaper or in a broadcast. R.S.O. 1990, c. L.12, s. 3 (5).

**Saving**

(6)  Nothing in this section limits or abridges any privilege now by law existing or protects the publication of any matter not of public concern or the publication of which is not for the public benefit.  R.S.O. 1990, c. L.12, s. 3 (6).

**When defendant refuses to publish explanation**

(7)  The protection afforded by this section is not available as a defence in an action for libel if the plaintiff shows that the defendant refused to insert in the newspaper or to broadcast, as the case may be, a reasonable statement of explanation or contradiction by or on behalf of the plaintiff.  R.S.O. 1990, c. L.12, s. 3 (7).

**Report of proceedings in court**

**4**  (1)  A fair and accurate report without comment in a newspaper or in a broadcast of proceedings publicly heard before a court of justice, if published in the newspaper or broadcast contemporaneously with such proceedings, is absolutely privileged unless the defendant has refused or neglected to insert in the newspaper in which the report complained of appeared or to broadcast, as the case may be, a reasonable statement of explanation or contradiction by or on behalf of the plaintiff.  R.S.O. 1990, c. L.12, s. 4 (1).

**Improper matter**

(2)  Nothing in this section authorizes any blasphemous, seditious or indecent matter in a newspaper or in a broadcast. R.S.O. 1990, c. L.12, s. 4 (2).

**Notice of action**

**5**  (1)  No action for libel in a newspaper or in a broadcast lies unless the plaintiff has, within six weeks after the alleged libel has come to the plaintiff's knowledge, given to the defendant notice in writing, specifying the matter complained of, which shall be served in the same manner as a statement of claim or by delivering it to a grown-up person at the chief office of the defendant.  R.S.O. 1990, c. L.12, s. 5 (1).

**Where plaintiff to recover only actual damages**

(2)  The plaintiff shall recover only actual damages if it appears on the trial,

(a)  that the alleged libel was published in good faith;

(b)  that the alleged libel did not involve a criminal charge;

(c)  that the publication of the alleged libel took place in mistake or misapprehension of the facts; and

(d)  that a full and fair retraction of any matter therein alleged to be erroneous,

  (i)  was published either in the next regular issue of the newspaper or in any regular issue thereof published within three days after the receipt of the notice mentioned in subsection (1) and was so published in as conspicuous a place and type as was the alleged libel, or

  (ii)  was broadcast either within a reasonable time or within three days after the receipt of the notice mentioned in subsection (1) and was so broadcast as conspicuously as was the alleged libel.  R.S.O. 1990, c. L.12, s. 5 (2).

**Case of candidate for public office**

(3)  This section does not apply to the case of a libel against any candidate for public office unless the retraction of the charge is made in a conspicuous manner at least five days before the election.  R.S.O. 1990, c. L.12, s. 5 (3).

**Limitation of action**

**6**  An action for a libel in a newspaper or in a broadcast shall be commenced within three months after the libel has come to the knowledge of the person defamed, but, where such an action is brought within that period, the action may include a claim for any other libel against the plaintiff by the defendant in the same newspaper or the same broadcasting station within a period of one year before the commencement of the action.  R.S.O. 1990, c. L.12, s. 6.

**Application of ss. 5 (1), 6**

**7**  Subsection 5  (1) and section 6 apply only to newspapers printed and published in Ontario and to broadcasts from a station in Ontario.  R.S.O. 1990, c. L.12, s. 7.

**Publication of name of publisher, etc.**

**8**  (1)  No defendant in an action for a libel in a newspaper is entitled to the benefit of sections 5 and 6 unless the names of the proprietor and publisher and the address of publication are stated either at the head of the editorials or on the front page of the newspaper.  R.S.O. 1990, c. L.12, s. 8 (1).

**Copy of newspaper to be admissible evidence**

(2)  The production of a printed copy of a newspaper is admissible in evidence as proof, in the absence of evidence to the contrary, of the publication of the printed copy and of the truth of the statements mentioned in subsection (1).  R.S.O. 1990, c. L.12, s. 8 (2).

**Where ss. 5, 6 not to apply**

(3)  Where a person, by registered letter containing the person's address and addressed to a broadcasting station, alleges that a libel against the person has been broadcast from the station and requests the name and address of the owner or operator of the station or the names and addresses of the owner and the operator of the station, sections 5 and 6 do not apply with respect to an action by such person against such owner or operator for the alleged libel unless the person whose name and address are so requested delivers the requested information to the first-mentioned person, or mails it by registered letter addressed to the person, within ten days from the date on which the first-mentioned registered letter is received at the broadcasting station. R.S.O. 1990, c. L.12, s. 8 (3).

**Newspaper libel, plea in mitigation of damages**

**9**  (1)  In an action for a libel in a newspaper, the defendant may plead in mitigation of damages that the libel was inserted therein without actual malice and without gross negligence and that before the commencement of the action, or at the earliest opportunity afterwards, the defendant inserted in such newspaper a full apology for the libel or, if the newspaper in which the libel appeared is one ordinarily published at intervals exceeding one week, that the defendant offered to publish the apology in any newspaper to be selected by the plaintiff.  R.S.O. 1990, c. L.12, s. 9 (1).

**Broadcast libel, plea in mitigation of damages**

(2)  In an action for a libel in a broadcast, the defendant may plead in mitigation of damages that the libel was broadcast without actual malice and without gross negligence and that before the commencement of the action, or at the earliest opportunity afterwards, the defendant broadcast a full apology for the libel.  R.S.O. 1990, c. L.12, s. 9 (2).

**Evidence in mitigation of damages**

**10**  In an action for a libel in a newspaper or in a broadcast, the defendant may prove in mitigation of damages that the plaintiff has already brought action for, or has recovered damages, or has received or agreed to receive compensation in respect of a libel or libels to the same purport or effect as that for which such action is brought.  R.S.O. 1990, c. L.12, s. 10.

**Consolidation of different actions for same libel**

**11** (1)  The court, upon an application by two or more defendants in any two or more actions for the same or substantially the same libel, or for a libel or libels the same or substantially the same in different newspapers or broadcasts, brought by the same person or persons, may make an order for the consolidation of such actions so that they will be tried together, and, after such order has been made and before the trial of such actions, the defendants in any new actions instituted by the same person or persons in respect of any such libel or libels are also entitled to be joined in the common action upon a joint application being made by such new defendants and the defendants in the actions already consolidated.  R.S.O. 1990, c. L.12, s. 11 (1).

**Assessment of damages and apportionment of damages and costs**

(2)  In a consolidated action under this section, the jury shall assess the whole amount of the damages, if any, in one sum, but a separate verdict shall be taken for or against each defendant in the same way as if the actions consolidated had been tried separately, and, if the jury finds a verdict against the defendant or defendants in more than one of the actions so consolidated, the jury shall apportion the amount of the damages between and against the last-mentioned defendants, and the judge at the trial, in the event of the plaintiff being awarded the costs of the action, shall thereupon make such order as he or she considers just for the apportionment of the costs between and against such defendants.  R.S.O. 1990, c. L.12, s. 11 (2).

**Application**

(3)  This section does not apply where the libel or libels were contained in an advertisement.  R.S.O. 1990, c. L.12, s. 11 (3).

**Security for costs**

**12** (1)  In an action for a libel in a newspaper or in a broadcast, the defendant may, at any time after the delivery of the statement of claim or the expiry of the time within which it should have been delivered, apply to the court for security for costs, upon notice and an affidavit by the defendant or the defendant's agent showing the nature of the action and of the defence, that the plaintiff is not possessed of property sufficient to answer the costs of the action in case judgment is given in favour of the defendant, that the defendant has a good defence on the merits and that the statements complained of were made in good faith, or that the grounds of action are trivial or frivolous, and the court may make an order for the plaintiff to give security for costs, which shall be given in accordance with the practice in cases where a plaintiff resides out of Ontario, and the order is a stay of proceedings until the security is given.  R.S.O. 1990, c. L.12, s. 12 (1).

**Where libel involves a criminal charge**

(2)  Where the alleged libel involves a criminal charge, the defendant is not entitled to security for costs under this section unless the defendant satisfies the court that the action is trivial or frivolous, or that the circumstances which under section 5 entitle the defendant at the trial to have the damages restricted to actual damages appear to exist, except the circumstances that the matter complained of involves a criminal charge.  R.S.O. 1990, c. L.12, s. 12 (2).

**Examination of parties**

(3)  For the purpose of this section, the plaintiff or the defendant or their agents may be examined upon oath at any time after the delivery of the statement of claim.  R.S.O. 1990, c. L.12, s. 12 (3).

**Order of judge respecting security final**

**13** An order made under section 12 is final and is not subject to appeal.  R.S.O. 1990, c. L.12, s. 13.

**Verdicts**

**14** On the trial of an action for libel, the jury may give a general verdict upon the whole matter in issue in the action and shall not be required or directed to find for the plaintiff merely on proof of publication by the defendant of the alleged libel and of the sense ascribed to it in the action, but the court shall, according to its discretion, give its opinion and directions to the jury on the matter in issue as in other cases, and the jury may on such issue find a special verdict, if they think fit so to do, and the proceedings after verdict, whether general or special, shall be the same as in other cases.  R.S.O. 1990, c. L.12, s. 14.

**Agreements for indemnity**

**15** An agreement for indemnifying any person against civil liability for libel is not unlawful.  R.S.O. 1990, c. L.12, s. 15.

SLANDER

**Slander affecting official, professional or business reputation**

**16** In an action for slander for words calculated to disparage the plaintiff in any office, profession, calling, trade or business held or carried on by the plaintiff at the time of the publication thereof, it is not necessary to allege or prove special damage, whether or not the words are spoken of the plaintiff in the way of the plaintiff's office, profession, calling, trade or business, and the plaintiff may recover damages without averment or proof of special damage.  R.S.O. 1990, c. L.12, s. 16.

3

**Slander of title, etc.**

**17** In an action for slander of title, slander of goods or other malicious falsehood, it is not necessary to allege or prove special damage,

(a) if the words upon which the action is founded are calculated to cause pecuniary damage to the plaintiff and are published in writing or other permanent form; or

(b) if the words upon which the action is founded are calculated to cause pecuniary damage to the plaintiff in respect of any office, profession, calling, trade or business held or carried on by the plaintiff at the time of the publication,

and the plaintiff may recover damages without averment or proof of special damage.  R.S.O. 1990, c. L.12, s. 17.

**Security for costs**

**18** (1)  In an action for slander, the defendant may, at any time after the delivery of the statement of claim or the expiry of the time within which it should have been delivered, apply to the court for security for costs, upon notice and an affidavit by the defendant or the defendant's agent showing the nature of the action and of the defence, that the plaintiff is not possessed of property sufficient to answer the costs of the action in case judgment is given in favour of the defendant, that the defendant has a good defence on the merits, or that the grounds of action are trivial or frivolous, and the court may make an order for the plaintiff to give security for costs, which shall be given in accordance with the practice in cases where a plaintiff resides out of Ontario, and the order is a stay of proceedings until the security is given.  R.S.O. 1990, c. L.12, s. 18 (1).

**Examination of parties**

(2)  For the purpose of this section, the plaintiff or the defendant may be examined upon oath at any time after the delivery of the statement of claim.  R.S.O. 1990, c. L.12, s. 18 (2).

LIBEL AND SLANDER

**Averments**

**19** In an action for libel or slander, the plaintiff may aver that the words complained of were used in a defamatory sense, specifying the defamatory sense without any prefatory averment to show how the words were used in that sense, and the averment shall be put in issue by the denial of the alleged libel or slander, and, where the words set forth, with or without the alleged meaning, show a cause of action, the statement of claim is sufficient.  R.S.O. 1990, c. L.12, s. 19.

**Apologies**

**20** In an action for libel or slander where the defendant has pleaded a denial of the alleged libel or slander only, or has suffered judgment by default, or judgment has been given against the defendant on motion for judgment on the pleadings, the defendant may give in evidence, in mitigation of damages, that the defendant made or offered a written apology to the plaintiff for such libel or slander before the commencement of the action, or, if the action was commenced before there was an opportunity of making or offering such apology, that the defendant did so as soon afterwards as the defendant had an opportunity.  R.S.O. 1990, c. L.12, s. 20.

**Plaintiff's character or circumstances of publication**

**21** In an action for libel or slander, where the statement of defence does not assert the truth of the statement complained of, the defendant may not give evidence in chief at trial, in mitigation of damages, concerning the plaintiff's character or the circumstances of publication of the statement, except,

(a) where the defendant provides particulars to the plaintiff of the matters on which the defendant intends to give evidence, in the statement of defence or in a notice served at least seven days before trial; or

(b) with leave of the court.  R.S.O. 1990, c. L.12, s. 21.

**Justification**

**22** In an action for libel or slander for words containing two or more distinct charges against the plaintiff, a defence of justification shall not fail by reason only that the truth of every charge is not proved if the words not proved to be true do not materially injure the plaintiff's reputation having regard to the truth of the remaining charges.  R.S.O. 1990, c. L.12, s. 22.

**Fair comment**

**23** In an action for libel or slander for words consisting partly of allegations of fact and partly of expression of opinion, a defence of fair comment shall not fail by reason only that the truth of every allegation of fact is not proved if the expression of opinion is fair comment having regard to such of the facts alleged or referred to in the words complained of as are proved. R.S.O. 1990, c. L.12, s. 23.

**Fair comment**

**24** Where the defendant published defamatory matter that is an opinion expressed by another person, a defence of fair comment by the defendant shall not fail for the reason only that the defendant or the person who expressed the opinion, or both, did not hold the opinion, if a person could honestly hold the opinion.  R.S.O. 1990, c. L.12, s. 24.

COMMUNICATIONS ON PUBLIC INTEREST MATTERS

**Application of qualified privilege**

**25** Any qualified privilege that applies in respect of an oral or written communication on a matter of public interest between two or more persons who have a direct interest in the matter applies regardless of whether the communication is witnessed or reported on by media representatives or other persons. 2015, c. 23, s. 4.

**Section Amendments with date in force (d/m/y)**

2015, c. 23, s. 4 - 03/11/2015

_____

Français

Back to top

# EXHIBIT 2

**Ministry of the Attorney General**

# Anti-Slapp Advisory Panel Report To The Attorney General

Report to the Attorney General

October 28, 2010

 

Ontario

# Table of Contents

Introduction

                The Anti-SLAPP Pane

                The need for legislation

                Content of protective legislation

Issue 1: A test for quick recognition

                A new right?

                A narrow or a broad right?

                Purpose or effect?

                Balancing interests

Issue 2: Appropriate remedies

                Procedure

                Remedies

                Proposals not adopted

Issue 3: Appropriate limits

Issue 4: Appropriate parties

Issue 5: Methods to prevent abuse

Additional Issues

                Qualified privilege

                Administrative proceedings

                Corporations' right to sue

                Deducting litigation costs

                Politicians' right to sue

Conclusion

# Summary of Recommendations

1. Ontario should adopt "anti-SLAPP" legislation. [paragraph 10]

2. The legislation should include a purpose clause for the benefit of judicial interpretation.

3. The language of the legislation should not include the term "SLAPP" but rather emphasize the importance of (a) protecting expression on matters of public interest from undue interference, and (b) promoting the freedom of the public to participate in matters of public interest through expression.

## Issue 1: A test for courts to quickly recognize a SLAPP

4. Protection of public participation does not require the creation of a new 'right'

5. Instead, new legislation should broadly define a sphere of activity to be protected by a special procedure. The protected activity should include all communications on matters of public interest, and not be limited to communications directed to a public body.

6. The lawsuits to be subjected to remedies should be judged by their effect, not their purpose or the motive of the plaintiff.

7. The test has several steps:

   a. Defendant has to show that the case involves the protected activity of public participation.

   b. Burden then shifts to plaintiff to show that:

      i. The case has substantial merit

      ii. There are substantial grounds to believe that no valid defence exists, and

      iii. The harm it has suffered outweighs the harm done to the public interest (especially in freedom of expression) by allowing the action to continue.

## Issue 2: Appropriate remedies for SLAPP suits

8. A motion for a remedy for a suit against public participation should be heard within 60 days of filing.

    a. No further steps in the proceeding may be taken until the motion is decided.

    b. A fast track appeal should be provided.

9. If a suit fails to meet the test, the case should be dismissed.

10. If the case is dismissed, full indemnity costs should be awarded to the defendant.

    a. If the case is not dismissed, the court should in its discretion consider whether costs should be awarded in favour of the plaintiff, whether an award of costs should await the outcome of the proceeding, or whether there should be no award of costs.

    b. If the case is dismissed, there should be a presumption that the pleadings may not be amended.

11. If the court finds bad faith or improper motive on the part of the plaintiff, the court should award damages to the defendant in such amount as is just.

12. While the motion is pending, related proceedings before public bodies involving the plaintiff should be suspended.

    a. This rule is subject to the discretion of the court to relieve against this provision to avoid substantial hardship in a particular case.

13. The Panel makes no recommendation about funding for defendants.

14. There should be no special rules about advance cost orders.

15. There should be no special rules about case management.

16. There should be no special remedies against directors and officers.

17. There should be no special remedies against lawyers for plaintiffs. [54, 55]

## Issue 3: Appropriate limits to the protection of anti-SLAPP legislation

18. There should be no prescribed statutory limitations on the expression on matters of public interest protected by the legislation. The limits of freedom of expression on matters of public interest are already the subject of extensive Canadian jurisprudence. The specific limits of expression on matters of public interest should continue to be a matter for the courts, to be determined on a case by case basis. [57, 59]

## Issue 4: Appropriate parties to benefit from the protection of anti-SLAPP legislation

19. No one should be excluded automatically from the protection of the legislation.

   a. Any party seeking protection of the legislation will have to show that its communication in issue has been on a matter of public interest.

# Issue 5: Methods to prevent abuse of anti-SLAPP legislation

20. There should be no special safeguards to prevent abuse. The balancing of interests at the heart of the remedy will allow appropriate disposition of cases. Cost sanctions against parties who bring frivolous motions for protection will be available to provide a remedy against any such abuse, and to deter it.

# Other related matters

21. Qualified privilege should be extended to persons with a direct interest in a matter of public interest communicating to others with a direct interest, even if media are present or report on it.

22. Although there is a wide variety of administrative tribunals, the general cost rules in the Statutory Powers Procedure Act already reflect appropriate principles.

23. The SPPA should provide that applications for costs must be in writing, unless this would cause significant prejudice to a party.

24. An unsuccessful applicant for costs before an administrative tribunal should pay to intervenors a full indemnity for the costs relating to the application.

25. Corporations' right to sue for defamation should not be limited at this time.

26. Corporations' right to deduct litigation costs from taxable revenue should not be affected at this time.

27. Politicians' right to sue for defamation should not be further restricted at this time.

# Introduction

## The Anti-SLAPP Panel

1. Strategic litigation against public participation (SLAPP) [1] has been defined as a lawsuit initiated against one or more individuals or groups that speak out or take a position on an issue of public interest. SLAPPs use the court system to limit the effectiveness of the opposing party's speech or conduct. SLAPPs can intimidate opponents, deplete their resources, reduce their ability to participate in public affairs, and deter others from participating in discussion on matters of public interest. [2]

2. The Attorney General created an Advisory Panel on Anti-SLAPP legislation to advise him as to how the Ontario justice system may prevent the misuse of our courts and other agencies of justice, without depriving anyone of appropriate remedies for expression that actually causes significant harm. [3] The Panel was chaired by Dean Mayo Moran of the Faculty of Law, University of Toronto, and was also composed of Peter Downard, a partner of the Fasken Martineau law firm, and Brian MacLeod Rogers, a media lawyer in Toronto. This document is the report of the Advisory Panel.

3. At the outset of its work, the Panel considered a collection of material assembled by the Ministry of the Attorney General, consisting of legal articles, relevant statutes from other jurisdictions and advocacy documents. [4] The creation of the Panel was announced by a press release and background document [5] that invited the public to make submissions to the Panel. In addition, the Panel created a list of individuals and organizations likely to have views on the topic and invited them to make submissions. The Panel received written submissions from 31 groups and individuals. It heard oral presentations from eight groups or individuals. A list of those who expressed their views appears at the end of this Report.

4. Participation by members of the community in matters of public interest is fundamental for democratic society. The very fabric of democracy is woven daily from the acts of citizens who engage in public discussion and contribute in countless ways to creating a civil society alive to the interests and rights of its members. It will always be important to recognize and protect these activities, but more than ever it seems crucial to encourage public participation as voter turnouts decline, society's needs become ever more complex and individuals feel increasingly powerless to effect meaningful change. If anything, public activities by individuals and groups within the

community are even more essential in the face of such realities, and yet undertaking them has never been more challenging.

5. The issues the Panel was asked to consider raise important concerns about the impact of law and procedure on those engaged in public participation. Free expression on matters of public interest is key to such participation, as repeatedly recognized by the Supreme Court of Canada. The principal goal must be to encourage such activities and expression as far as possible within the appropriate confines of our laws and legal system. Our efforts represent only one small but important aspect in which such encouragement can be offered.

# The need for legislation

6. Most of the submissions (27 out of 31) supported the introduction of special legislation against SLAPPs. Many of the submitters had been sued themselves for their activities speaking out on matters of public interest. Many also knew of others who had been sued, or who had refrained from participating in public questions either because they had received a warning that they risked being sued if they did speak out, or because they were afraid of being sued in any event.

7. Besides the lawsuits and other actions, including threatening letters, within the personal knowledge of the submitters, the Panel was referred to the 2008 report of the Environmental Commissioner of Ontario, which stressed the need for legislation to end strategic litigation against public participation.[6] One submission in favour of anti-SLAPP legislation was signed by some 46 organizations and individuals involved in a wide variety of community matters and referred to resolutions in favour of such legislation by some sixty- four Ontario municipalities.

8. Most recently, a bulletin from the Lawyer's Professional Indemnity Company (LawPRO) cautioned lawyers engaged in public advocacy work that they might need supplementary liability insurance because of the increasing risk of SLAPP litigation.[7] The Panel found it noteworthy that the organization devoted to reducing negligence claims against Ontario lawyers considered SLAPP suits sufficiently significant as to require additional insurance.

9. Those who opposed special legislation against SLAPP suits made five main points:

   - There is no firm evidence that there is a problem with abusive lawsuits in the province;

   - Current law offers satisfactory remedies against abusive lawsuits that may be brought;

   - The law already offers many opportunities to make submissions to government on matters of public interest, so additional protection for public participation is not needed;

- Legislation to curb alleged abuse would deprive plaintiffs of legitimate remedies for real harm caused by advocates purporting to act in the public interest;

- In particular, the law of defamation represents a careful balance between freedom of expression and protection of reputation, and legislation protecting more 'expression' under the name of 'public participation' would distort that balance and create undue harm to reputation.

10. On consideration, the Panel has concluded that it is desirable for Ontario to enact legislation against the use of legal processes that affect people's ability or willingness to express views or take action on matters of public interest. While the value of freedom of expression is the principal one at stake, it is also important that the public resources of the court system not be expended on litigation that is not of substantial merit and is contrary to the public interest.

11. There is no question that, in principle, the current law offers remedies against abuses of process, including protection from frivolous or vexatious lawsuits and those brought for an improper motive. Such remedies are found in the common law, the *Courts of Justice Act*[8] and the Rules of Civil Procedure.[9] However, the Panel agreed with the analysis of the Uniform Law Conference that, in practice, these remedies are not effective.[10] Courts are often reluctant to dismiss cases on preliminary motions based on affidavit evidence and oral argument. Traditionally, a trial with *viva voce* evidence has been the preferred procedure for determining questions of law or fact which are complex or novel. If it is necessary to decide a disputed issue as to the motive or intent of a party, a court may appropriately consider the issue to require the hearing of *viva voce* evidence. Going on to discovery and trial can be very expensive and time-consuming. Imposing the expense and time of a lawsuit on a defendant, quite apart from whether the claim is successful, has been identified as a central purpose of a SLAPP.

12. The Rules of Civil Procedure have been amended as of January 1, 2010, to give judges more power to hear evidence at a preliminary stage, in order to preserve court resources for cases that need trials. The Panel is concerned that these changes may not make a significant difference to the fate of abusive suits relating to expression on matters of public interest. In particular, the provision for the conduct of 'mini-trials' has been adopted in Ontario, following rules in British Columbia. Evidence from that province provided to the Uniform Law Conference indicated that these rules, while useful in ordinary cases, were not helpful in combating abuse in the SLAPP context.

13. The 2010 Rules amendments also stressed the principle of 'proportionality' in civil litigation: the means devoted to a case should be proportional to the stakes for the parties. It is not clear that this principle will operate as an effective shield against abuse in the cases of interest to the Panel. Although it provides a useful direction for use of the courts' resources in abusive litigation, the Panel believes that a more

focused remedy is needed to protect public participation than this general principle, however desirable it may be for other purposes.

14. For these reasons, it is important that the new legislation should be distinct from the existing rules. This will help to encourage courts to apply its remedies in the spirit of the statute.

15. The Land Use Council and the Building Industry and Land Development Association (BILD) pointed out the number of opportunities that the land planning process offers for community input to development decisions. Nevertheless when citizens' groups are sued or threatened with suits for organizing or speaking out on such occasions, it is not clear that such procedures provide a genuine opportunity for public participation. Anti-SLAPP legislation can help make these processes more useful for their intended purpose.

16. As a result of these considerations, the Panel was persuaded that threats of lawsuits for speaking out on matters of public interest, combined with a number of actual lawsuits, deter significant numbers of people from participating in discussions on such matters. The Panel believes that the value of public participation, as mentioned in its opening comments, is sufficiently weighty that the government should take active steps to promote it by enacting targeted legislation. The characteristics of the legislation fall within the Panel's terms of reference and are dealt with in detail in the next sections of this Report.

## Content of protective legislation

17. It is important to the effective functioning of the legislation that its purpose be expressly stated in the text. This statement will give notice to potential and actual litigants, as well as to the courts. Clear identification of the key elements of legal actions that may require an expedited review should help to discourage the commencement of actions that would not meet the applicable standard. It may also help distinguish these actions from the traditional range of civil actions which have been subject to relatively limited remedies in their early stages.

18. The legislation should therefore state that the purpose of the statute is to expand the democratic benefits of broad participation in public affairs and to reduce the risk that such participation will be unduly hampered by fear of legal action. It would seek to accomplish these purposes by encouraging the responsible exercise of free expression by members of the public on matters of public interest and by discouraging litigation and related legal conduct that interferes unduly with such expression.

19. How should the legislation be designed to achieve this purpose? Advocates of legislation who made submissions to the Panel tended to agree on its main characteristics:

- It should provide a speedy and cheap method to stop lawsuits if those suits were brought for an improper purpose, namely to harass or intimidate the defendants;

- It should put the onus on plaintiffs to prove that their lawsuits were not improper;

- It should help rebalance an inequality of financial resources between the parties, possibly by an order that the plaintiff should pay the defendants' costs at the outset of the litigation;

- It should provide stronger legal protection for citizens engaged in public participation, such as through special defences;

- It should deter people from bringing such suits in the first place, by exposing plaintiffs, and possibly their directors and officers, and lawyers, to awards of damages or even punitive damages.

- Its principles should apply to the actions of administrative tribunals as well as to lawsuits in court. The recent application to the Ontario Municipal Board for a very large costs award in a planning matter was frequently cited as having had an intimidating effect well beyond that one case, even though the Board ultimately declined to award costs after a lengthy hearing.

20. Some of the more technical aspects of the various submissions and the Panel's response to them are described later in this Report as part of the discussion of the specific Terms of Reference.

21. The Panel was referred to the Uniform Prevention of Abuse of Process Act adopted by the Uniform Law Conference of Canada in 2010, the British Columbia *Protection of Public Participation Act* of 2001 and the Ontario private member's Bill 138 that drew on the B.C. Act, as well as Quebec's amendments to its Code of Civil Procedure of 2009.[11] The Panel also reviewed relevant American and Australian legislation, which showed quite varied approaches to the subject, rather than a clear path to a 'right' solution.

22. The Panel intends that the new legislation will be effective and balanced. It recognizes that persons may properly seek legal protection from harm to reputations and to economic and other personal interests that may result from wrongful communications. As a consequence, the Panel is inclined to avoid using the acronym "SLAPP" in the new statute, as its pejorative tone may seem to prejudge the merits of cases subject to review under it. This is especially the case because the Panel recommends, below, that the key evaluation should be the effect, and not the purpose, of the legal action under review. The value of public participation, however, and the early disposition of litigation which inappropriately hampers it, remain essential to the discussion.

23. The Panel believes that the importance of the legislative message in favour of public participation supports a free-standing statute, with a title such as the "Protection of Public Participation Act". It may be, however, that the content of that statute consists of amendments to the *Courts of Justice Act*, the *Statutory Powers Procedure Act* and the *Libel and Slander Act* to make the changes proposed in this Report.

24. With this background in mind, the Report now turns to the terms of reference that the Panel received from the Attorney General.

# Issue 1: A test for courts to quickly recognize a SLAPP suit

25. Devising a test for identifying litigation that will unduly hamper public participation for which the protection of the statute may be invoked raises two issues. First, it must be right in principle. Second, it must be easy to recognize, both for the parties who are considering launching, or who are faced with defending, such a suit (i.e. potential plaintiffs and actual defendants), and for the judges who are called on to decide if the statutory remedy applies.

## A new right?

26. Some groups proposed to the Panel that the law should create a new legal right to public participation that would be protected by the new statute. Some of the impetus for this submission lay in the structure of several American anti-SLAPP laws that expressly protect the exercise of the (U.S.) constitutional right of citizens to petition government. Since Canadian law has no direct equivalent to this right, it is said that the new statute should create a counterpart.

27. The Panel firmly supports the right of public participation, subject to limits of responsible behaviour. However, the Panel does not recommend the creation of a new legal right. In the Panel's view, Canadians' constitutional freedom of expression, and the recognized importance of constitutional values for the development of the law applicable in civil litigation, provide a firm foundation for the procedural remedy recommended in this Report. The Panel proposes a new procedure to better enforce a body of existing rights, which will better protect and promote freedom of expression on matters of public interest while having regard to the values at stake on both sides of cases involving such expression.

## A narrow or a broad definition?

28. Even without creating a new 'right', it is necessary to decide how much activity and what kinds of activity should be protected by the new remedy. As mentioned, some American statutes limit their protection to petitions to government. Some of the submissions to the Panel, such as that of the Ontario Bar Association, recommended

creating a relatively narrow right such as 'communications made, in good faith, to influence actual or possible government action', in order to assist the speedy disposition of the appropriate cases. In contrast, other submissions, such as that of the Canadian Civil Liberties Association, recommended a very broad definition of the protected activity.

29. The Panel prefers a broad scope of protection. It does not consider it wise to distinguish between 'public' and 'private' forums of discussion. A conversation among neighbours about a new development and a communication made to influence government both involve expression on matters of public interest. Protecting only communication that targets government is likely to be too narrow. A better test, in the Panel's view, is whether expression is on a matter of public interest. The law has many rules that depend on an evaluation of the public interest, and therefore, the term has a meaning that is traditionally ascertainable in law. This scope of protection is also consistent with recent Supreme Court of Canada case law. For instance, in 2009, the Supreme Court created a defence against defamation actions that applies to 'responsible communication on matters of public interest'.[12] In 2008, the Supreme Court clarified the defence of fair comment, so as to protect comment on a matter of public interest where a person could honestly express the comment in the circumstances. [13]

30. It seems likely that these particular defences may not apply to all situations in which the new remedy should be available. The communications that need protection from a SLAPP suit may be in the nature of advocacy, which is by definition one-sided. The defence of 'responsible communication' most clearly applies to balanced and verified factual accounts. Similarly, not all suits alleged to be SLAPPs involve comment, fair or otherwise. Further, not all such suits are based on defamation.

31. While a narrower test may be easier to apply, it could also create significant problems in deciding where to draw the line. Further, the broader test will ensure that the full scope of legitimate participation in public matters is made subject to the special procedure the Panel recommends. In the light of the variety of instances in which legitimate public participation may arise, an appropriate protection of public participation should be established on a broad foundation.

## Purpose or effect?

32. Many submissions to the Panel focused on improper motives a plaintiff may have for bringing an action. These may include attempts to punish the defendant for speaking out, to make the defendant stop its criticism, to intimidate others into silence, to give credibility to threats of suit against critics and, more broadly, to silence public debate on matters of public interest.

33. For example, the British Columbia statute provided for a remedy "if a principal purpose for which the proceeding or claim was brought or maintained is an improper purpose."[14] The stated purpose of the British Columbia statute is to encourage public participation and to discourage persons from bringing or maintaining proceedings or claims for an improper purpose.[15] It contains a number of indicators of an improper purpose. The Uniform Prevention of Abuse of Process Act includes in its notion of abuse of process "an attempt to restrict public participation by any person."[16] Quebec's *Code of Civil Procedure* provides a power to impose sanctions for improper use of procedure, which includes "an attempt to defeat the ends of justice, in particular if it restricts freedom of expression in public debate."[17]

34. The Panel does not believe that the special procedure it recommends should focus on the purpose of the litigation. Judging the motive of a plaintiff is likely to be difficult, and often impossible, in an expedited proceeding. In the Panel's view, a finding of bad faith or improper motive should not be necessary to dismiss an action without substantive merit brought against expression on a matter of public interest. In addition, the need for expedited review of such actions has led the Panel to recommend (in the next section of this Report) that the review be conducted on the basis of a paper record and oral argument. In the Panel's view, a focus upon the presence or absence of bad faith or an improper motive, in addition to being unnecessary, is not well suited to expedited adjudication.

35. The Panel prefers to make the threshold test for application of the special procedure a consideration of the effect that the action is likely to have on expression on matters of public interest. If the action is likely to have an adverse effect on the ability of the defendant or others to participate in discussions on matters of public interest, the special procedure should apply. This question does not require the judge to read anyone's mind; it is more readily supported by evidence.

# Balancing interests

36. The fact that a legal action may have an adverse effect on the ability of persons to participate in discussion on matters of public interest should not be sufficient to prevent the plaintiff's action from proceeding. The protection and promotion of such expression should not be a cover for expression that wrongfully harms reputational, business or personal interests of others.

37. Conversely, the fact that a plaintiff's claim may have only technical validity should not be sufficient to allow the action to proceed. If an action against expression on a matter of public interest is based on a technically valid cause of action but seeks a remedy for only insignificant harm to reputation, business or personal interests, the action's negative impact on freedom of expression may be clearly disproportionate to any valid purpose the litigation might serve. The value of public participation would

make any remedy granted to the plaintiff an unwarranted incursion into the domain of protected expression. In such circumstances, the action may also be properly regarded as seeking an inappropriate expenditure of the public resources of the court system. Where these considerations clearly apply, the court should have the power to dismiss the action on this basis.

38. As a result, the Panel proposes a test with several steps:

    i. Does the expression that is the subject of the lawsuit involve a communication on a matter of public interest? The defendant should have the burden of proving this to the court on the balance of probabilities, failing which the special procedure will have no application.

    ii. If the subject matter of the action is shown by the defendant on a balance of probabilities to be communication on a matter of public interest, the onus should shift to the plaintiff to show that:

        a. On the factual record before the court, the plaintiff's claim has substantial merit; and

        b. There are substantial grounds to believe that the defendant has no valid defence.

    iii. If the plaintiff meets these tests, the court should also consider whether, in all the circumstances, the action seeks a remedy for only insignificant harm to reputation, business or personal interests. Where this is so in the court's view, and permitting the action to proceed would have a clearly disproportionate impact on freedom of expression on a matter of public interest, the court should dismiss the action.

# Issue 2: Appropriate remedies for SLAPP suits

39. Two questions arise in considering remedies for litigation that has an inappropriate adverse effect on public participation: the process by which a remedy may be obtained, and the substance of the remedies that should be available. The Panel repeats its recommendation that the remedial scheme should be distinct from that now available under the Rules of Civil Procedure, in order to ensure that effective recourse is made to the new scheme.

## Procedure

40. It is essential that remedies against inappropriate litigation affecting public participation be available quickly. The defendant may have few resources and little expertise in legal matters. The intimidation effect of a lawsuit for a large amount and the actual costs of fighting it should be minimized.

41. The defendant should be able to serve on the plaintiff notice of a motion for relief under the special procedure, together with affidavit evidence, at any time after service of a statement of claim. The plaintiff should be required to file responding affidavit evidence within 14 days. Subject to the filing of any additional affidavits within seven days after the delivery of the plaintiff's affidavit evidence, the parties should be entitled to conduct cross-examinations out of court on the affidavit material. The cross-examinations should not exceed more than one day for each side. The parties should be required to deliver factums at least three days prior to the hearing of the motion. Most importantly, the motion should be required to be heard within 60 days of filing of the notice of motion.

42. Until the motion for a remedy is decided, no other step in the action may be taken except possibly an injunction in the discretion of the court where the plaintiff can establish the fact or serious threat of irreparable harm, and the established special tests for injunctions restraining communicative activity are met.[18] The suspension of other interlocutory proceedings is required to ensure that the efficiency of the special procedure is not undermined by extraneous tactical steps pending the motion's disposition.

43. After disposition of the motion, the unsuccessful party should have a right to appeal directly to the Court of Appeal. The Court of Appeal is the most appropriate forum in

which to resolve any legal issues arising in the special procedure. The appeal process should also be expedited. The efficient adjudication of matters to which the special procedure may apply remains as important at the appellate level as at first instance. An expedited appeal procedure will minimize the burden on the defendant in the litigation pending the disposition of the appeal, while also minimizing the adverse impact a defendant's unmeritorious appeal may have on the plaintiff's prosecution of a legitimate claim.

## Remedies

44. If the plaintiff fails to satisfy the court as to the substantive merit of the plaintiff's case, the action should be dismissed with costs on a full indemnity basis. It is important that the special procedure provide for full indemnification of the successful defendant's costs to reduce the adverse impact on constitutional values of unmeritorious litigation, and to deter the commencement of such actions. The prospect of a full indemnity award should also encourage counsel to represent defendants on a contingency fee basis, where the defendants may otherwise not have sufficient means to retain counsel. Where the defendant's motion is dismissed, the usual rule of costs following the event should not automatically apply, but the court should exercise discretion to make an award of costs that it considers just in the circumstances.

45. In the normal course, the order to dismiss should be with prejudice. As a general rule, a plaintiff who has brought an unmeritorious civil action against expression on a matter of public interest should not be allowed to amend its statement of claim in order to try again. The court should have the discretion to allow an amendment only if in the court's view the interests of justice require it in the circumstances.

46. As stated above, the court should not be required to make findings as to bad faith or improper motive on the part of the plaintiff in deciding a motion under the special procedure. If in a particular case, however, the court is satisfied on the record before it that an action has been brought in bad faith or for an improper motive, such as punishing, silencing or intimidating the defendant rather than any legitimate pursuit of a legal remedy, an additional remedy should be available for this improper conduct. In such circumstances, the court should have the power to award damages to the defendant in such amount as is just.

47. If the plaintiff is engaged in any administrative or policy proceeding in which it is seeking permission to do something, and that proceeding is connected with the defendant's expressive activity, the proceeding should be suspended from the time the motion is filed until the motion is finally decided (however it is decided.) A delay in achieving a potential plaintiff's other goals should help ensure that an action having an adverse impact on public participation will only be commenced where it is important to do so to protect the plaintiff's legitimate interests. A provision to this

effect appears in the private member's Bill 138 in Ontario,[19] and also in the Uniform Act. A copy of the defendant's notice of motion could be served on the tribunal to trigger this suspension.

48. If the suspension of other proceedings causes undue hardship the court should have the power to lift the suspension. The prospect of undue hardship should be limited, however, by the creation of the expedited procedure recommended by the Panel. Under that expedited procedure the suspension would last only sixty days, plus the time required by the court to decide the motion. In the event of an appeal, the appellate court should be empowered to decide on motion whether the suspension should continue pending the disposition of the appeal.

# Discussion of Additional Proposals

49. A number of the submissions to the Panel proposed additional remedies for inappropriate litigation. While the Panel does not recommend their adoption at this time, it does consider it useful to set out some of these proposals.

50. It was suggested that the Panel should recommend a fund to help defendants pay the costs of fighting actions brought against public participation. Such a recommendation was made by the Macdonald Committee that reported to the Quebec government in 2007, though the Quebec changes to the *Code of Civil Procedure* that flowed from that report did not create such a fund. The Panel finds the idea of resources for impecunious defendants attractive, but recognizes that public money is scarce. The government can decide better than the Panel if it wishes to devote resources to such a fund. The Panel hopes that the expedited determination of the nature of the case and the remedies proposed above (notably the full indemnity for costs that may attract *pro bono* lawyers who can seek compensation for their efforts and expenses) will reduce the need for such special financing. Ontario's Class Proceedings Fund might be made available for fighting lawsuits about public participation, but the Panel does not have enough information about its operation or source of funds to know if that would be possible. Legal Aid Ontario does not currently fund defamation actions, and other demands on its resources make the Panel wary of recommending any expansion of Legal Aid's mandate in this respect.

51. A number of submissions suggested that the defendants should be entitled to advance orders for costs, so that plaintiffs would have to fund all or part of the defendants' legal costs while the action is proceeding. This would help alleviate any punitive element of such proceedings in which there is a significant imbalance in financial resources between the parties. The Panel notes that advance cost orders are available now in matters of public interest, though admittedly they are very rare. The Panel is of the view that the most effective remedy for the imbalance of

resources is the speed with which the motion to dismiss must be heard, combined with the full indemnity for costs if the defendant succeeds.

52. The Panel was also asked to provide special case management rules for actions that are allowed to continue after the motion. The Panel believes that the current powers of the court to control its processes provide all the protection necessary. The judge hearing the motion may make any order specific to that case if he or she thinks it appropriate.

53. Some submissions suggested that the Panel should make directors and officers of a plaintiff corporation personally liable for the defendant's costs, and possibly for damages, if any. The Uniform Act has such a provision.[20] Presumably such a rule would also have to prohibit the corporation from indemnifying the directors and officers, unless it applied only where the corporation was judgment-proof. Some method might have to be found to record directors' dissent from the decision to sue, to avoid penalizing those who have opposed the commencement of the action found to have been unmeritorious. The Panel considers these calculations unduly complex and unnecessary to provide a full remedy for the defendant. If problems arise over judgment-proof corporations, then some such approach may be worth considering, but this was not raised as an issue in submissions to the Panel. It is worth noting that Rule 56.01(1)(d) provides that security for costs can be ordered against a corporation without sufficient assets in Ontario to pay costs.

54. It was also suggested that the Panel should recommend making lawyers for plaintiffs personally liable for their clients' costs of bringing an action that is dismissed. Lawyers can already be held personally liable for costs if their conduct is improper. No separate rule is needed.

55. Similarly, it was suggested that the Panel should subject lawyers who assist their clients to bring abusive lawsuits to professional discipline, or encourage the court to bring their conduct to the attention of the Law Society. Lawyers already have a duty under the Rules of Professional Conduct not to abuse the processes of the court. A complaint to the Law Society can be made if a lawyer has acted improperly. No special rule is required to enforce that duty. The attention of the Law Society could be drawn to the lawyers' conduct now. It must also be appreciated that lawyers have a professional duty to be fearless advocates for their clients' interests. That is not a role that should be lightly interfered with. The mere dismissal of an action should not in itself be sufficient to trigger adverse professional consequences for a lawyer.

# Issue 3: Appropriate limits to the protection of anti-SLAPP legislation

56. As noted earlier, the Panel recommends a balanced remedy for responsible public participation. The limits are essentially that the expressive activity must be directed to a matter of public interest and must not cause the plaintiff substantial harm that outweighs the public interest in free expression on such matters.

57. The Panel does not favour setting out other limits on protected expression. The Uniform Act refers to 'lawful communication or conduct'.[21] The Panel notes that the existence of the lawsuit itself suggests that the communication or conduct may not be lawful because it is a civil wrong (tort). Presumably the Uniform Act means to say 'otherwise lawful', apart from the allegations of the action.

58. The B.C. Act excluded from protection communication or conduct that was considered undesirable for a number of reasons.[22] It did not apply to communication:

   ○ in respect of which an information has been laid or an indictment has been preferred in a public prosecution;

   ○ that constitutes a breach of the *Human Rights Code*;

   ○ that contravenes any order of any court;

   ○ that cause damage to or destruction of real property or personal property;

   ○ that constitutes trespass to real or personal property;

   ○ that is otherwise considered by the court to be unlawful or an unwarranted interference by the defendant with the rights or property of a person.

59. The Panel prefers a more flexible approach to the harm that may be caused by the communication. Its test requires the plaintiff to show that it has suffered significant harm from the communication. A technical trespass or even nominal property damage may not require a halt to public participation. The technical lawfulness of the activity is not the key point. It should be up to the court in each case to weigh the competing interests of the parties and the public interest, as courts are often called to do in other cases. Courts by definition are devoted to the rule of law, and can be trusted to ensure that truly harmful lawless behaviour is not encouraged in the name of public participation.

# Issue 4: Appropriate parties to benefit from the protection of anti-SLAPP legislation

60. The standard image of a lawsuit directed against public participation in the literature, and among most of the submissions to the Panel, involved a small group of concerned citizens wishing to express views on a land development project that would affect their interests, and finding themselves sued by a rich developer. Other scenarios of similar imbalance of resources and sophistication were mentioned as well. The question is whether the new legislation could apply only to such situations, or whether the remedies would also apply more broadly.

61. This question has come up under the American statutes. For example, can media organizations already protected by special defences against defamation actions also fight a lawsuit by using a law protecting public participation rights? Can business competitors of a company applying for a land development permit criticize the application and defend against a suit for interference with economic interests on the basis of the anti-SLAPP law? For that matter, can well-off individuals maintain a not-in-my-backyard (NIMBY) opposition to a development proposal (which may itself involve the public interest, such as the construction of new power transmission lines to serve the public) and defend their own attacks on the development by use of the anti-SLAPP law?

62. The Panel is of the view that the proposed scheme should apply to anyone in any civil litigation. The value of public participation is not restricted to the poor or to individuals. The courts have held that commercial speech is entitled to Charter protection. It will be up to the defendant in each case to show that its expressive activity was conducted in respect of a matter of public interest, failing which the special procedure will not be available. It will also be open to the plaintiff to show that it has substantial grounds upon which to proceed with the action. Costs orders against unsuccessful defendants will be available where appropriate. It should be recalled that many of these doubtful suits have arisen in the United States, where an unsuccessful litigant does not usually run the risk of a costs order. In our system, the exposure to costs may deter more speculative use of the proposed mechanism, notwithstanding that the courts may have regard to the position of impecunious public interest groups in appropriate cases.

63. In particular, media defendants may be channels for public communications by interest groups that otherwise would have trouble getting public attention or even communicating with others in the community. Thus it may be undesirable to exclude

the media from access to the new remedies simply because they may have other defences some of the time. The Panel considered whether small or local media should have opportunities for the proposed remedy that larger, more sophisticated (or better legally advised) media would not. In the Panel's view this distinction is untenable. In principle, the size of an organization should not be determinative of its access to a legal procedure intended to protect legal values important to all. The practical significance of providing special protection to smaller or local media outlets may also in many instances be modest, given the widespread ownership of such Ontario media outlets by large corporate conglomerates.

64. A defendant media organization may have difficulty in arguing that a plaintiff's action should be dismissed on the basis that the action involves insignificant harm to the plaintiff, where the plaintiff's claim is based on a publication that the media organization has disseminated widely. Nonetheless the Panel believes that if the media defendant's publication relates to a matter of public interest, it should have the opportunity of pursuing a remedy through the proposed special procedure where appropriate.

# Issue 5: Methods to prevent abuse of anti-SLAPP legislation

65. A number of the anti-SLAPP statutes in the United States have been used in cases that were not anticipated by their drafters. For example, corporations sued by public interest organizations for violating privacy rules have defended on the ground that their right to communicate was being infringed, and thus that the suit was subject to the statutory remedies. Even governments have tried to use such laws to defeat lawsuits aimed at making them comply with other legislation, on the ground that they (the governments) were acting in the public interest.

66. As a result, some legislation has had to be amended over time, in a kind of contest between the legislatures trying to protect public interest groups on one side, and on the other, counsel for corporate and other institutional interests seeking loopholes or opportunities in the statutes. California's statute has been amended four times in the past decade.[23]

67. Here too the Panel does not recommend special measures to prevent abuse. As under Issue 4 above, it believes that the limits to the application of the new remedies – that the defendant has to prove that it is communicating on a matter of public interest, and that the action may continue after review – will suffice to keep abuse to a minimum. The legislation will include a clear statement of its purpose, and latitude will be provided to the sound judgement of the courts, including the costs regime discussed above.

# Additional Issues

68. The submissions made to the Panel and the reading material provided to it raised several issues that do not fall neatly within the terms of reference but that also merit some attention here. Most focused on reforms to the law of defamation. One dealt with proceedings before administrative tribunals.

## Qualified privilege for certain aspects of public participation

69. At the heart of many lawsuits brought against those involved in public participation is the tort of defamation, which is the key civil cause of action over harmful expression. It may be argued that this tort is uniquely suited to SLAPPs since it imposes strict liability. Once the plaintiff establishes that defamatory words were published by the defendant to others, both falsity and damage are presumed; the plaintiff is not required to prove an intention to harm or even negligence. The onus then shifts to the defendant to establish a defence in order to escape liability.[24] The scope of defences thus lies at the heart of defamation law. They draw the actual boundaries between lawful and unlawful speech, and have evolved over time.

70. The defence of fair comment, as recently clarified by the Supreme Court of Canada,[25] provides significant protection for vigorous public debate on matters of public interest. However, this defence is only available for statements of opinion, or inherently debatable inferences from facts. In addition, the underlying facts have to be proven true in court. The difficulty of proving such facts at trial has been acknowledged by the Supreme Court.[26] In its recent decision in *Grant v. Torstar Corp.*,[27] the Supreme Court has also recognized a defence of "responsible communication" for defamatory statements of fact published in mass media, by professional journalists or others, on matters of public interest. Although this decision has also broadened the scope of defences available in civil litigation involving communications on matters of public interest, this new defence may also involve complicated factual inquiries into whether a defendant has acted 'responsibly' in a particular case.

71. The common law has long recognized the need for an even more robust defence in certain situations. For the "common convenience and welfare of society",[28] the common law has recognized the need to protect defamatory statements made

pursuant to some form of duty or interest – social, moral or legal – at least when made, without malice, to others who have a legitimate interest in receiving them. This defence of qualified privilege is not limited to certain categories but is based on principles applicable to a range of circumstances that may evolve over time. The defence focuses on the overall benefit to society of candid communication, safe from civil liability, where these principles apply. Such communications have been protected in cases involving, for example, condominium owners, company shareholders, ratepayers, electors and union members.

72. An absolute privilege is given to those participating in proceedings in various public institutions, such as legislatures and courts, to encourage candid communication without any fear of liability; the rules of those bodies help constrain what can be said in the course of their proceedings. Where the defence of qualified privilege applies, the defence is lost if it can be shown that the speaker acted with malice – that is, for an improper or dishonest purpose, abusing the protection for some other, undesirable end.

73. In contemporary Ontario, democratic discourse is not limited to legislative institutions, courts and mass media, nor to those who most readily have access to them. Democratic discourse is something very visceral and real to many of those who appeared before the Panel. It can take place over the fence, in living rooms and at public meetings or other gatherings, wherever and whenever people are addressing matters important to the community.

74. In this Report, the Panel recommends that civil actions based on communications on matters of public interest should generally be subject to a special procedure providing for an expedited preliminary review. In addition, in the Panel's view, a subset of such communications should be provided with additional substantive protection in recognition of the importance of public participation and the need to encourage it in our society. In particular, the Panel recommends that there be statutory protection where a person with a direct interest in a subject of public interest makes statements on that subject to persons who also have a direct interest in that subject. In those circumstances such statements should be privileged in the absence of proof of malice in the legal sense.

75. This is consistent with the long-established principles underlying the defence of qualified privilege at common law. The scope for freedom of expression recognized by the proposed defence would be balanced by the fact that it would only be available to persons with a direct interest in a matter of public interest when speaking to others with a direct interest in that matter. As stated above, the defence would also be defeated by proof of malice.

76. In the Panel's view, this defence should not be automatically lost for participants legitimately communicating with others with a direct interest in the public matters at hand merely because the media may be present to cover the event. In modern life, mass media in their various forms are ubiquitous. If the proposed privilege may be

lost on the sole basis that media representatives are present, the result could be that the defence may be available only when persons are speaking on matters of insufficient public significance to attract media attention, or when media are specifically excluded.[29]

77. Again, the Panel seeks a balanced approach. On the one hand, the defence should continue to apply even if the media are present or if what is said is reported in the mass media. On the other hand, the defence should not be available to persons who do not have a direct interest in the subject matter or who are speaking directly to the media or, in some other fashion, to the public at large. It is only available to persons speaking without malice on a matter in which they have a direct interest, to persons who also have a direct interest in the subject. Thus the rule should exclude persons or groups whose interest in the issue is only policy-based: for example, an Environmental Non-Governmental Organization (NGO) speaking about a project in Town X not because it is particularly involved in what happens in Town X but because Town X has an environmental issue and the NGO is interested in environmental issues generally; or, similarly, a Business NGO speaking about the levying of a municipal tax in Town X when the Business NGO or its members would not pay the tax but it does not like the precedent the Town is setting for the purpose of the possible future enactment of similar taxes in other municipalities.

78. Further balance is provided by considering factors bearing on any media reports of these communications. Under Ontario law, media reports in such circumstances will only have the benefit of a statutory defence of privilege if the media report is fair and accurate; the report must accurately report the impugned statement and also include other qualifying or contradictory statements made by the speaker or by others on the occasion. Where a statutory privilege is inapplicable, the common law defence of "responsible communication" will require the media to show they acted responsibly in publishing the statement. "Responsibility" in this sense will often require considerations of verification and balance on the part of the media.

## Application to administrative proceedings

79. A number of submissions to the Panel expressly referred to administrative tribunals and the need for an expeditious remedy to proceedings before such bodies. Particular reference was frequently made to an application for costs of the hearing of the Ontario Municipal Board (OMB) in the case of a development at Big Bay Point at Innisfil. While the OMB ultimately dismissed the application for costs, argument on that point alone lasted some seventeen days of hearing. The application for costs took more time than that spent on the substantive request for a permit and zoning exemption. [30]

80. The Panel notes the wide variety of such agencies: in Ontario there are perhaps between 250 and 350 of them, depending on one's definition. They have as well very

diverse mandates: some of them adjudicate among competing private interests; others give permissions that will affect the environment, built or natural; others oversee members of a regulated occupation. The Panel does not believe that tribunals willingly lend themselves to proceedings that have the effect of suppressing public participation. The issue arises primarily with respect to applications for cost awards against public interest intervenors.

81. The *Statutory Powers Procedure Act* (SPPA) provides a rule on costs for all bodies with statutory powers of decision in Ontario: powers to decide that are given by statute and that affect the rights and obligations of people in the province. That provision says that a tribunal (the generic term in the SPPA) may set costs rules or order a party to pay another party's costs. However, this power is limited as follows:

> 17.1 (2) A tribunal shall not make an order to pay costs under this section unless,
>
> > a. the conduct or course of conduct of a party has been unreasonable, frivolous or vexatious or a party has acted in bad faith; and
> >
> > b. the tribunal has made rules under subsection (4) [respecting costs].

There is an exception to this provision for cost rules made before the limit was legislated in 2000. For example, most professional regulatory bodies have rules to allow the imposition of costs of discipline proceedings on members who are the subject of discipline.

82. In addition, the SPPA yields to specific provisions in other statutes if the other statute expressly claims priority. Section 97 of the *Ontario Municipal Board Act* confers a general power to make costs awards, although the OMB Act does not override the SPPA on this point. The OMB has rules on costs that comply with the SPPA's limits. [31]

83. The OMB made remarks to the Standing Committee on Government Agencies in September 2009 that are consistent with these principles:

> "costs" awards are very rare. The board has made that clear: A proponent that's successful should not expect their costs. The board has written a number of decisions in that regard over the years that have stated over and over again that parties with legitimate points of view should be welcome to come to the board and present their case. A successful party, simply because they were successful in the end, should not expect a cost award. Costs are based on conduct, and the conduct

has to be unreasonable. The board, through its *Ontario Municipal Board Act*, has broad discretion to award costs, but through its rules and practices has really limited that discretion for the members that are presiding at these hearings.[32]

84. Two options for a rule on public participation before administrative tribunals were discussed with some submitters to the Panel.

- First, an application might be brought to a court, resembling the motion to be made in a lawsuit begun in the court, for an order that the cost application not proceed, or that the parties go through a process similar to that demanded of parties to a lawsuit, to allow for a judgment based on the public interest.

- Second, a power might be given to administrative bodies, in the SPPA or otherwise, to receive such applications directly as part of their proceeding. Some tailoring to special cases might be necessary as has been done about the costs power generally.[33]

85. The Panel has reservations about both these approaches. A court may not be in a position to apply the expertise that a specialized tribunal may have for the purpose of estimating the merits of the costs application. The Panel also believes that the general SPPA rule on costs is motivated by the same considerations as the Panel's views on litigation against public participation. The standards of abuse of process are spelled out in s. 17.1(2) of the SPPA. In other words, most of the second option above already appears in the SPPA. The OMB considered those factors in the Big Bay Point case and made its decision accordingly. The question in that context is whether there is a way to ensure that these decisions do not take so much time, and cost so much money.

86. The Panel makes two recommendations, both constituting amendments to the SPPA:

- Require that applications for an order for costs under s. 17.1 be made in writing, unless such a procedure would cause significant prejudice to a party. The tribunal has after all already heard the debate on the merits. It should have a good idea whether any of the participants were acting inappropriately. Their attention can be fully directed at the relevant considerations by written submissions. Making written submissions would be considerably less costly than oral proceedings spread over many days.

- Provide that an unsuccessful applicant for an order for costs should provide a full indemnity to those against whom the cost order was sought, for their costs in the application (not in the proceeding on the merits). Again, the tribunal might be given a power to relieve against that rule if it were likely to cause significant prejudice to the applicant.

87. The Panel believes that these changes would help ensure that the trying experience of so many groups that made submissions to it would not be repeated.

# Corporations' right to sue for defamation

88. Australian defamation law prohibits for-profit corporations with more than ten employees from suing in defamation.[34] Such corporations may be able to sue to recover for harm done to them, but not with the usual procedural advantages of a defamation action, such as that defamatory statements are presumed to be false and the plaintiff is assumed to have suffered damages, which can be assessed at large. The result of this law is to narrow the field of possible litigation against public participation, or to make the terms of combat more even.

89. The Panel does not recommend a similar rule in Ontario at this time. Its implications are too broad to be part of a focused measure to address litigation based on communications on matters of public interest. The extent of corporations' rights to pursue remedies in the law of defamation may appropriately be the subject of a broader study of the law of defamation generally.

# Corporations' right to deduct litigation costs as a business expense

90. It was pointed out to the Panel that the financial imbalance between plaintiffs and defendants can be exacerbated because corporations may write off the costs of their litigation as a business expense, while defendants, notably ratepayer groups or individuals, are unable to get such tax relief. However, some not-for-profit advocacy groups may not pay taxes and thus have no reason to write off anything. The impact of this difference may be open to greater scrutiny. The Panel regards this issue as calling for appropriate study by experts on tax policy, having regard to the constitutional limits of provincial jurisdiction to legislate on the subject of taxation.

# Politicians' right to sue in defamation

91. In Ontario, municipal governments do not have the right to sue in defamation.[35] However, there are several recent cases in which municipal councillors have sued someone for criticisms aimed at the municipality or municipal interests generally.[36] Sometimes municipalities pay the expenses of these suits. The question arises whether this is a way of avoiding the general prohibition against municipal libel actions. The cases almost by definition involve matters of public interest, and the resources of an individual or ratepayers' group against a municipal government funding an individual politician's lawsuit are likely to be unequal.

92. The Panel is not prepared to recommend a blanket prohibition on such suits as part of the law of defamation, however. It is prepared to leave such suits to its general remedy for public participation.

# Conclusion

93. The Panel believes that its recommendations can provide a useful and economical way to reduce the incidence of lawsuits which have an undue adverse impact on public participation. The measures the Panel proposes should encourage freedom of expression on matters of public interest, and discourage use of the courts in ways that unduly limit that freedom. The recommendations are straightforward and are readily applicable to many different situations involving a variety of parties.

94. The Panel thanks the Attorney General for the opportunity to engage with this fascinating and important topic. It especially thanks the many individuals and groups that took the time to make submissions on all sides of the issues. They took an opportunity to engage in public participation and did so constructively and very helpfully.

---

[1]

An overview of the phenomenon, with case examples, along with a legal analysis, was published by the Public Interest Advocacy Centre in 2004: "Corporate Retaliation Against Consumers", http://www.piac.ca/consumers/corporate_retaliation_against_consumers.

[2] Uniform Law Conference of Canada, "Strategic Lawsuits against Public Participation (SLAPPs) (and other abusive lawsuits)" (2008) at 1, online: http://www.ulcc.ca/en/poam2/SLAPP%20Report.pdf. ("ULCC Report")

[3] Ministry of the Attorney General, *Anti-SLAPP Advisory Panel*, online: http://www.attorneygeneral.jus.gov.on.ca/english/anti_slapp/ ("Ministry web site")

[4] Ministry web site, note 3. See the background material and the terms of reference.

[5] Ministry web site, note 3. See the Ministry's backgrounder document for terms of reference and information about Panel members.

[6] Environmental Commissioner of Ontario, "Building Resilience: Annual Report 2008 – 2009," 2009, http://www.eco.on.ca/eng/uploads/eng_pdfs/2009/ar2008.pdf at 24.

[7] Lawyers' Professional Indemnity Company (LawPRO), "Risky business: Pitfalls in practice today" (2010) 9:2 LawPRO Magazine 1 at 3-4, online: http://www.practicepro.ca/LAWPROMag/LawPROmagazine9_2_Sep2010.pdf.

[8] *Courts of Justice Act,* R.S.O. 1990, c. C.43 s. 33.1(2), enacted by S.O. 1994, c. 12, s. 13; s. 140(1), enacted by S. O. 1990, c. C.43, s. 140 (1); s. 140(5), enacted by S. O 1990, c. C.43, s. 140 (4, 5); s. 106, enacted by S. O 1990, c. C.43, s. 106.

[9] *Rules of Civil Procedure,* R.R.O. 1990, Reg. 194, Rule 20, enacted by R.O. 284/01, s. 6; Rule 21, enacted by R.O. 1990, Reg. 194, r. 21.01 (3); Rule 25, enacted by R. O. 1990, Reg. 194, r. 25.11. Rule 20.04 provides that the court shall grant summary judgment if "the court is satisfied that there is no genuine issue requiring a trial with respect to a claim or defence." Rule 21.01(3)(d) provides that a defendant may move to have an action stayed or dismissed on the ground that "the action is frivolous or vexatious or is otherwise an abuse of the process of the court, and the judge may make an order or grant judgment accordingly." Rule 25.11 provides that the court may strike out a pleading or other document if the pleading or other document is "scandalous, frivolous, or vexatious" or "an abuse of the process of the court."

[10] ULCC Report, note 2, at 4.

[11] Ministry web site, note 3. Citations of and links to these statutes appear on the site.

[12] *Grant v. Torstar Corp.,* 2009 SCC 61 (CanLII); *Quan v. Cusson,* 2009 SCC 62 (CanLII).

[13] *WIC Radio v Simpson*, 2008 SCC 40 (CanLII). The Court here underlined the need for the common law to respect Charter values of freedom of expression, but also of reputation.

[14] *Protection of Public Participation Act*, S.B.C. 2001, c. 19, s. 5(1)(b) ("the B.C. Act") , repealed by the *Miscellaneous Statutes Amendment Act, 2001,* S.B.C. 2001, c. 32, s. 28 on August 16, 2001.

[15] The B.C. Act, subsections 1(2) (definition) and 2(a) (purpose).

[16] Uniform Law Conference of Canada, *Uniform Prevention of Abuse of Process Act*, 2010, s. 2, definition, clause (e), online: http://www.attorneygeneral.jus.gov.on.ca/english/anti_slapp/uniform_abuse_of_process_act.asp ("Uniform Act").

[17] *Code of Civil Procedure*, R.S.Q. c. C-25 s. 54.1, enacted by S.Q. 2009 c. 12, s.2.

[18] See, for example, *Bonnard v. Perryman,* [1891-94] All E.R. Rep. 965 at 968 (C.A.), *per* Lord Coleridge C.J.; *Canada Metal Co. Ltd. v. Canadian Broadcasting Corp.*, [1975] O.J. No. 539, 7 O.R. (2d) 261 at 261-262 (Ont. Div. Ct.), *per* Stark J.; *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] S.C.J. No. 31, [1998] 1 S.C.R. 626 at paras. 48-49 (S.C.C.), *per* Bastarache J.; *Rapp. v. McClelland & Stewart Ltd.*, [1981] O.J. No. 3145, 34 O.R. (2d) 452 at 456 (Ont. H.C.J.), *per* Griffiths J.; *Chevalier Chrysler v. Hastings-James*, [2003] O.J. No. 5049, 2003 CanLII 27672 (Ont. S.C.J.).

[19] Bill 138, *Protection of Public Participation Act,* 1st session, 39th Leg, Ontario, 2008.

[20] Uniform Act, s. 5(2)(3).

[21] Uniform Act, s. 2 (definition of 'public participation').

[22] B.C. Act s. 1(1) (definition of 'public participation').

[23] *Code of Civil Procedure,* California, s. 425.16-18. See Jerome I. Braun, "California's Anti-SLAPP Remedy After Eleven Years" (2002) 34 McGeorge L. Rev. 731 at 735.

[24] *Grant v. Torstar Corporation*, above, note 12 at paras. 28-29, per McLachlin C.J.C.

[25] See *WIC Radio Ltd. v. Simpson,* 2008 SCC 40.

[26] Above, note 12, at para. 33, per McLachlin C.J.C

[27] Above, note 12.

[28] See *Grant v. Torstar Corp*., above, note 12, at para. 30, per McLachlin C.J.C.: "Both statements of opinion and statements of fact may attract the defence of privilege, depending on the occasion on which they were made. Some 'occasions', like Parliamentary and legal proceedings, are absolutely privileged. Others, like reference letters or credit reports, enjoy 'qualified' privilege, meaning that the privilege can be defeated by proof that the defendant acted with malice…. The defences of absolute and qualified privilege reflect the fact that 'common convenience and welfare of society' sometimes requires untrammelled communications…. The law acknowledges through recognition of privileged occasions that false and defamatory expression may sometimes contribute to desirable social ends."

[29] In a series of decisions made some 50 years ago, however, the Supreme Court of Canada held that publication in the media was "publication to the world" that would invalidate any defence of qualified privilege. As observed in *Grant v. Torstar Corp*., supra fn. 23, this approach reflected "the conservative stance of early decisions, which struck a balance that preferred reputation over freedom of expression" (per McLachlin C.J.C., at para. 34).

[30] See the decision of the OMB in the Big Bay Point case: *In the matter of s. 97(1) of the* Ontario Municipal Board Act *… in respect to applications for costs…*, Order PL050290, January 30, 2009, online: http://www.omb.gov.on.ca/e-decisions/pl050290-Jan-30-2009.pdf. ("OMB Decision")

[31] OMB decision, note 24, at 4.

[32] See http://www.ontla.on.ca, Committees, Committee Transcripts, Standing Committee on Government Agencies, 2009. Agency Review: Ontario Municipal Board. 2009-Sep-08. Response to question by Mr Stan Floras at approximately 10:20 a.m.

[33] For example, it might not be appropriate to allow the subject of a professional discipline decision to resist a costs award on the ground that his or her public participation might be affected.

[34] *Defamation Act,* 2005, Australia (Qld.), Act No. 55. This Act is a version of a Uniform Act that is in force widely in Australia.

[35] *Halton Hills (Town) v. Kerouac*, (2006), 80 O.R. (3d) 577 and *Montague (Township) v. Page,* (2006), 79 O.R. (3d) 515.

[36] For example, "Maybe You Heard About The Lawsuit", Aurora Citizen, October 15, 2010: http://auroracitizen.ca/2010/10/15/maybe-you-heard-about-the-lawsuit/.

**Submissions**

Environmental Groups

- Ecojustice and the Canadian Environmental Law Association
- Greenpeace
- Environmental Defence and multiple groups
- Environmental Defence
- Environmental Commissioner of Ontario

Development Groups

- Building Industry and Land Development Association
- Land Use Council
- Durham Region Federation of Agriculture

Community Associations

- Hintonburg Community Association
- Non-Smokers' Rights Association
- Stoneybrook Heights/Uplands Residents Association
- Federation of North Toronto Residents' Association
- One other residents association

Public Interest Groups

- Canadian Civil Liberties Association
- Public Interest Advocacy Centre
- Registered Nurses' Association of Ontario
- Institute of Canadian Justice

Legal Groups and Law Firms

- Ontario Bar Association

- Ontario Trial Lawyers Association

- ADR Institute of Ontario

- Davies Ward Phillips & Vineberg LLP

Individuals

- Andrea Horwarth. MPP (re Protection of Public Participation Act, 2010)

- Richard Delaney – Delaney and Associates Inc.

- Henry Freitag

- 9 other individuals

Petition

- University professors

# EXHIBIT 3

**Courts of Justice Act**

R.S.O. 1990, CHAPTER C.43

[…]

PREVENTION OF PROCEEDINGS THAT LIMIT FREEDOM OF EXPRESSION ON
MATTERS OF PUBLIC INTEREST (GAG PROCEEDINGS)

**Dismissal of proceeding that limits debate**
**Purposes**

**137.1** (1) The purposes of this section and sections 137.2 to 137.5 are,

    (a)  to encourage individuals to express themselves on matters of public interest;

    (b)  to promote broad participation in debates on matters of public interest;

    (c)  to discourage the use of litigation as a means of unduly limiting expression on matters of public interest; and

    (d)  to reduce the risk that participation by the public in debates on matters of public interest will be hampered by fear of legal action. 2015, c. 23, s. 3.

**Definition, "expression"**

(2) In this section,

    "expression" means any communication, regardless of whether it is made verbally or non-verbally, whether it is made publicly or privately, and whether or not it is directed at a person or entity. 2015, c. 23, s. 3.

**Order to dismiss**

(3) On motion by a person against whom a proceeding is brought, a judge shall, subject to subsection (4), dismiss the proceeding against the person if the person satisfies the judge that the proceeding arises from an expression made by the person that relates to a matter of public interest. 2015, c. 23, s. 3.

**No dismissal**

(4) A judge shall not dismiss a proceeding under subsection (3) if the responding party satisfies the judge that,

    (a)  there are grounds to believe that,

(i)  the proceeding has substantial merit, and

(ii)  the moving party has no valid defence in the proceeding; and

    (b)  the harm likely to be or have been suffered by the responding party as a result of the moving party's expression is sufficiently serious that the public interest in permitting the proceeding to continue outweighs the public interest in protecting that expression. 2015, c. 23, s. 3.

**No further steps in proceeding**

(5) Once a motion under this section is made, no further steps may be taken in the proceeding by any party until the motion, including any appeal of the motion, has been finally disposed of. 2015, c. 23, s. 3.

**No amendment to pleadings**

(6) Unless a judge orders otherwise, the responding party shall not be permitted to amend his or her pleadings in the proceeding,

    (a)  in order to prevent or avoid an order under this section dismissing the proceeding; or

    (b)  if the proceeding is dismissed under this section, in order to continue the proceeding. 2015, c. 23, s. 3.

**Costs on dismissal**

(7) If a judge dismisses a proceeding under this section, the moving party is entitled to costs on the motion and in the proceeding on a full indemnity basis, unless the judge determines that such an award is not appropriate in the circumstances. 2015, c. 23, s. 3.

**Costs if motion to dismiss denied**

(8) If a judge does not dismiss a proceeding under this section, the responding party is not entitled to costs on the motion, unless the judge determines that such an award is appropriate in the circumstances. 2015, c. 23, s. 3.

**Damages**

(9) If, in dismissing a proceeding under this section, the judge finds that the responding party brought the proceeding in bad faith or for an improper purpose, the judge may award the moving party such damages as the judge considers appropriate. 2015, c. 23, s. 3.

**Section Amendments with date in force (d/m/y)**

**Procedural matters**
**Commencement**

**137.2** (1) A motion to dismiss a proceeding under section 137.1 shall be made in accordance with the rules of court, subject to the rules set out in this section, and may be made at any time after the proceeding has commenced. 2015, c. 23, s. 3.

**Motion to be heard within 60 days**

(2) A motion under section 137.1 shall be heard no later than 60 days after notice of the motion is filed with the court. 2015, c. 23, s. 3.

**Hearing date to be obtained in advance**

(3) The moving party shall obtain the hearing date for the motion from the court before notice of the motion is served. 2015, c. 23, s. 3.

**Limit on cross-examinations**

(4) Subject to subsection (5), cross-examination on any documentary evidence filed by the parties shall not exceed a total of seven hours for all plaintiffs in the proceeding and seven hours for all defendants. 2015, c. 23, s. 3.

**Same, extension of time**

(5) A judge may extend the time permitted for cross-examination on documentary evidence if it is necessary to do so in the interests of justice. 2015, c. 23, s. 3.

**Section Amendments with date in force (d/m/y)**

**Appeal to be heard as soon as practicable**

**137.3** An appeal of an order under section 137.1 shall be heard as soon as practicable after the appellant perfects the appeal. 2015, c. 23, s. 3.

**Section Amendments with date in force (d/m/y)**

**Stay of related tribunal proceeding**

**137.4** (1) If the responding party has begun a proceeding before a tribunal, within the meaning of the *Statutory Powers Procedure Act*, and the moving party believes that the proceeding relates to the same matter of public interest that the moving party alleges is the basis of the proceeding that is the subject of his or her motion under section 137.1, the moving party may file with the tribunal a copy of the notice of the motion that was filed with the court and, on its filing, the tribunal proceeding is deemed to have been stayed by the tribunal. 2015, c. 23, s. 3.

**Notice**

(2) The tribunal shall give to each party to a tribunal proceeding stayed under subsection (1),

    (a)  notice of the stay; and

    (b)  a copy of the notice of motion that was filed with the tribunal. 2015, c. 23, s. 3.

**Duration**

(3) A stay of a tribunal proceeding under subsection (1) remains in effect until the motion, including any appeal of the motion, has been finally disposed of, subject to subsection (4). 2015, c. 23, s. 3.

**Stay may be lifted**

(4) A judge may, on motion, order that the stay is lifted at an earlier time if, in his or her opinion,

    (a)  the stay is causing or would likely cause undue hardship to a party to the tribunal proceeding; or

    (b)  the proceeding that is the subject of the motion under section 137.1 and the tribunal proceeding that was stayed under subsection (1) are not sufficiently related to warrant the stay. 2015, c. 23, s. 3.

**Same**

(5) A motion under subsection (4) shall be brought before a judge of the Superior Court of Justice or, if the decision made on the motion under section 137.1 is under appeal, a judge of the Court of Appeal. 2015, c. 23, s. 3.

***Statutory Powers Procedure Act***

(6) This section applies despite anything to the contrary in the *Statutory Powers Procedure Act*. 2015, c. 23, s. 3.

**Section Amendments with date in force (d/m/y)**

**Application**

**137.5** Sections 137.1 to 137.4 apply in respect of proceedings commenced on or after the day the *Protection of Public Participation Act, 2015* received first reading. 2015, c. 23, s. 3.

**Section Amendments with date in force (d/m/y)**

# EXHIBIT 4

**Courts of Justice Act**

**R.R.O. 1990, REGULATION 194**

**RULES OF CIVIL PROCEDURE**

**[…]**

# RULE 53  EVIDENCE AT TRIAL

[…]

**Compelling Attendance at Trial**
***By Summons to Witness***

**53.04** (1) A party who requires the attendance of a person in Ontario as a witness at a trial may serve the person with a summons to witness (Form 53A) requiring him or her to attend the trial at the time and place stated in the summons, and the summons may also require the person to produce at the trial the documents or other things in his or her possession, control or power relating to the matters in question in the action that are specified in the summons.  R.R.O. 1990, Reg. 194, r. 53.04 (1).

***Summons may be Issued in Blank***

(2) On the request of a party or a lawyer and on payment of the prescribed fee, a registrar shall sign, seal and issue a blank summons to witness and the party or lawyer may complete the summons and insert the names of any number of witnesses.  R.R.O. 1990, Reg. 194, r. 53.04 (2); O. Reg. 575/07, s. 1.

***Where Document may be Proved by Certified Copy***

(3) No summons to witness for the production of an original record or document that may be proved by a certified copy shall be served without leave of the court.  R.R.O. 1990, Reg. 194, r. 53.04 (3).

***Summons to be Served Personally***

(4) A summons to witness shall be served on the witness personally and not by an alternative to personal service and, at the same time, attendance money calculated in accordance with Tariff A shall be paid or tendered to the witness.  R.R.O. 1990, Reg. 194, r. 53.04 (4).

(5) Service of a summons to witness and the payment or tender of attendance money may be proved by affidavit.  R.R.O. 1990, Reg. 194, r. 53.04 (5).

***Summons in Effect until Attendance No Longer Required***

(6) A summons to witness continues to have effect until the attendance of the witness is no longer required.  R.R.O. 1990, Reg. 194, r. 53.04 (6).

***Sanctions for Failure to Obey Summons***

(7) Where a witness whose evidence is material to an action is served with a summons to witness and the proper attendance money is paid or tendered to him or her, and the witness fails to attend at the trial or to remain in attendance in accordance with the requirements of the summons, the presiding judge may by a warrant for arrest (Form 53B) cause the witness to be apprehended anywhere within Ontario and forthwith brought before the court.  R.R.O. 1990, Reg. 194, r. 53.04 (7).

(8) On being apprehended, the witness may be detained in custody until his or her presence is no longer required, or released on such terms as are just, and the witness may be ordered to pay the costs arising out of the failure to attend or remain in attendance.  R.R.O. 1990, Reg. 194, r. 53.04 (8).

# EXHIBIT 5

Français

# Interprovincial Summonses Act

## R.S.O. 1990, CHAPTER I.12

**Consolidation Period:** From January 1, 2022 to the e-Laws currency date.

Last amendment: 2017, c. 20, Sched. 11, s. 13-15.

Legislative History: 1993, c. 27, Sched.; 1999, c. 12, Sched. B, s. 11; 2000, c. 26, Sched. A, s. 10; 2009, c. 33, Sched. 2, s. 37; 2017, c. 20, Sched. 11, s. 13-15.

**Definitions**

**1** In this Act,

"court" means any court in a province; ("tribunal")

"province" means a province of Canada and includes each of the territories of Canada; ("province")

"summons" means a summons or other document issued by a court, an agency, board or commission, or another person authorized to issue summonses, requiring a person within a province other than the one where the document is issued to attend as a witness at a trial, hearing or examination, to produce documents or other things or to testify before the issuing body or person. ("assignation")  R.S.O. 1990, c. I.12, s. 1; 1993, c. 27, Sched.; 1999, c. 12, Sched. B, s. 11; 2000, c. 26, Sched. A, s. 10 (1).

**Section Amendments with date in force (d/m/y)**

1999, c. 12, Sched. B, s. 11 - 22/12/1999

2000, c. 26, Sched. A, s. 10 (1) - 06/12/2000

**Adoption of interprovincial summons**

**2** (1)  A court in Ontario shall receive and adopt as an order of the court a summons issued in another province if,

(a)  the summons is accompanied by a certificate signed by a judge of a superior, county or district court of the issuing province and impressed with the seal of that court, signifying that, upon hearing and examining the applicant, the judge is satisfied that the attendance in the issuing province of the person subpoenaed,

(i)  is necessary for the due adjudication of the proceeding in which the summons is issued, and

(ii)  in relation to the nature and importance of the cause or proceeding, is reasonable and essential to the due administration of justice in that province; and

(b)  the summons is accompanied by the witness fees and travelling expenses in accordance with Schedule 1.  R.S.O. 1990, c. I.12, s. 2 (1); 2000, c. 26, Sched. A, s. 10 (2).

**Form of certificate**

(2)  The certificate to which reference is made in clause (1)  (a) may be in the form prescribed by regulation under subsection (3) or in a form to the like effect.  R.S.O. 1990, c. I.12, s. 2 (2); 2017, c. 20, Sched. 11, s. 13 (1).

**Regulations, form of certificate**

(3)  The Minister responsible for the administration of this Act may make regulations prescribing a form of the certificate for the purposes of subsection (2). 2017, c. 20, Sched. 11, s. 13 (2).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (2) - 06/12/2000

2017, c. 20, Sched. 11, s. 13 (1, 2) - 01/01/2022

**Immunity by law of other province**

**3** A court in Ontario shall not receive a summons from another province under section 2 unless the law of that other province has a provision similar to section 6 providing absolute immunity to a person in Ontario who is required to attend as a witness in the other province from all proceedings of the nature set out in section 6 and within the jurisdiction of the Legislature of that other province except only those proceedings grounded on events occurring during or after the required attendance of the person in the other province.  R.S.O. 1990, c. I.12, s. 3.

**Failure to comply with adopted summons**

**4** Where a person who has been served with a summons adopted under section 2 and given the witness fees and travelling expenses in accordance with Schedule 1 not less than ten days, or such shorter period as the judge of the court in the issuing province may indicate in his or her certificate, before the date the person is required to attend before the issuing body or person, fails without lawful excuse to comply with the order, the party is in contempt of the adopting court and subject to such penalty as that court may impose.  R.S.O. 1990, c. I.12, s. 4; 2000, c. 26, Sched. A, s. 10 (3).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (3) - 06/12/2000

## Proceedings in Ontario

**5** (1)  Where a party to a proceeding in Ontario causes a summons to be issued for service in another province, the party may attend upon a judge of the Superior Court of Justice, who shall hear and examine the party or the party's counsel if any, and, upon being satisfied that the attendance in Ontario of the person required in Ontario as a witness,

   (a)  is necessary for the due adjudication of the proceeding in which the summons or other document has been issued; and

   (b)  in relation to the nature and importance of the proceeding, is reasonable and essential to the due administration of justice in Ontario,

shall sign a certificate which may be in the form prescribed under subsection 2 (3) and shall cause the certificate to be impressed with the seal of the court.  R.S.O. 1990, c. I.12, s. 5 (1); 2000, c. 26, Sched. A, s. 10 (4); 2009, c. 33, Sched. 2, s. 37; 2017, c. 20, Sched. 11, s. 14.

**Certificate**

(2)  The certificate shall be either attached to or endorsed on the summons.  R.S.O. 1990, c. I.12, s. 5 (2).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (4) - 06/12/2000

2009, c. 33, Sched. 2, s. 37 (1, 2) - 15/12/2009

2017, c. 20, Sched. 11, s. 14 - 01/01/2022

**No submission to jurisdiction**

**6** (1)  A person required, by a summons adopted by a court outside Ontario, to attend in Ontario before a court, an agency, board or commission, or another person authorized to issue summonses shall be deemed, while within Ontario for the purposes for which the summons was issued, not to have submitted to the jurisdiction of the issuing body or person in Ontario other than as a witness in the proceedings in which the person is summonsed.  2000, c. 26, Sched. A, s. 10 (5).

**Immunity**

(2)  A person required to attend under subsection (1) shall be absolutely immune from seizure of goods, service of process, execution of judgment, garnishment, imprisonment or molestation of any kind relating to a legal or judicial right, cause, action, proceeding or process within the jurisdiction of the Legislature of Ontario except only those proceedings grounded on events occurring during or after the required attendance of the person in Ontario.  2000, c. 26, Sched. A, s. 10 (5).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (5) - 06/12/2000

**Order for additional witness fees and expenses**

**7** (1)  A person who is required, by a summons adopted by a court outside Ontario, to attend in Ontario before a court, an agency, board or commission, or another person authorized to issue summonses, may request the issuing body or person in Ontario to order additional fees and expenses to be paid for attendance as a witness.  2000, c. 26, Sched. A, s. 10 (5).

**Disbursements in the cause**

(2)  If the issuing body or person in Ontario is satisfied that the amount of fees and expenses previously paid to the person required to attend for the attendance is insufficient, it may order the party who obtained the summons to pay forthwith to the person required to attend those additional fees and expenses that it considers sufficient and amounts paid pursuant to an order made under this section are disbursements in the cause.  2000, c. 26, Sched. A, s. 10 (5).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (5) - 06/12/2000

**Non-application of Act**

**8** This Act does not apply to a summons that is issued with respect to a criminal offence under an Act of the Parliament of Canada.  R.S.O. 1990, c. I.12, s. 8.

SCHEDULE 1
WITNESS FEES AND TRAVELLING EXPENSES

The witness fees and travelling expenses required to be given to the witness upon service of an interprovincial subpoena shall be a sum of money, or a sum of money together with valid travel warrants, sufficient to satisfy the following requirements:

1.  The fare for transportation by the most direct route via public commercial passenger carrier between the witness's place of residence and the place at which the witness is required to attend, in accordance with the following rules:

    If the journey or part of it can be made by air, rail or bus, that portion of the journey shall be by airline, rail or bus by tourist class or equivalent class via carriers on which the witness can complete his or her total journey to the place where he or she is required to attend on the day before his or her attendance is required.

    If railway transportation is necessary for part of the journey and sleeping accommodation would normally be obtained for such a journey, the fare for sleeping accommodation shall be included.

    In the calculation of the fare for transportation, the most rapid form of transportation by regularly scheduled carrier shall be accorded priority over all other forms.

    If the material which the witness is required to produce is of such weight or size as to attract extra fares or charges, the amount so required shall be included.

2.  The cost of hotel accommodation for not less than three days at the place where the witness is required to attend, in an amount not less than $60.

3.  The cost of meals for the total journey and for not less than three days at the place where the witness is required to attend, in an amount not less than $48.

4.  In addition to the amounts described above, an allowance of $20 for each day of absence from the ordinary residence of the witness, and the witness shall be paid on account of this allowance not less than $60.

R.S.O. 1990, c. I.12, Sched. 1; 2000, c. 26, Sched. A, s. 10 (6).

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (6) - 06/12/2000

SCHEDULE 2 REPEALED: 2017, C. 20, SCHED. 11, S. 15.

**Section Amendments with date in force (d/m/y)**

2000, c. 26, Sched. A, s. 10 (7) - 06/12/2000

2017, c. 20, Sched. 11, s. 15 - 01/01/2022

_____

Français

Back to top

# EXHIBIT 6

**Courts of Justice Act**

**R.R.O. 1990, REGULATION 194**

**RULES OF CIVIL PROCEDURE**

[...]

# RULE 36  TAKING EVIDENCE BEFORE TRIAL

**Where Available**

*Definition*

**36.01** (1) In this rule,

"party" includes a party to a pending or intended proceeding.  O. Reg. 8/07, s. 1.

*By Consent or by Order*

(2) A party who intends to introduce the evidence of a person at trial may, with leave of the court or the consent of the parties, examine the person on oath or affirmation before trial for the purpose of having the person's testimony available to be tendered as evidence at the trial.  O. Reg. 8/07, s. 1.

*Discretion of Court*

(3) In exercising its discretion to order an examination under subrule (2), the court shall take into account,

   (a) the convenience of the person whom the party seeks to examine;

   (b) the possibility that the person will be unavailable to testify at the trial by reason of death, infirmity or sickness;

   (c) the possibility that the person will be beyond the jurisdiction of the court at the time of the trial;

   (d) the expense of bringing the person to the trial;

   (e) whether the witness ought to give evidence in person at the trial; and

   (f) any other relevant consideration.  O. Reg. 8/07, s. 1.

*Expert Witness*

(4) Before moving for leave to examine an expert witness under subrule (2), the moving party shall serve on every other party the report of the expert witness referred to in subrule 53.03 (1) (calling expert witness at trial) unless the court orders otherwise.  O. Reg. 8/07, s. 1.

***Interim Costs, Pending or Intended Proceeding***

(5) Where an order is made under subrule (2) for the examination of a witness in respect of a matter that is or will be the subject of a pending or intended proceeding, the court may, if it considers it appropriate to do so, order the moving party to pay to any other party, in advance of the examination, any or all of the costs reasonably expected to arise for the other party from the examination and any related cross-examination or re-examination.  O. Reg. 8/07, s. 1.

**Procedure**

**36.02** (1) Subject to subrule (2), Rule 34 applies to the examination of a witness under rule 36.01, unless the court orders otherwise, and, for the purpose, a reference in Rule 34 to a party includes a reference to a party to a pending or intended proceeding.  O. Reg. 8/07, s. 2.

(2) A witness examined under rule 36.01 may be examined, cross-examined and re-examined in the same manner as a witness at trial.  R.R.O. 1990, Reg. 194, r. 36.02 (2).

**Examinations outside Ontario**

**36.03** Where an order is made under rule 36.01 for the examination of a witness outside Ontario, the order shall, if the moving party requests it, provide for the issuing of a commission and letter of request under subrules 34.07 (2) and (3) for the taking of the evidence of the witness and, on consent of the parties, any other witness in the same jurisdiction, and the order shall be in Form 34E.  R.R.O. 1990, Reg. 194, r. 36.03.

**Use at Trial**

**36.04** (1) In subrules (2) to (7), where an action,

   (a) is brought by or against a corporation, "party" includes an officer, director or employee of the corporation;

   (b) is brought by or against a partnership or a sole proprietorship using the firm name, "party" includes each person who was, or is alleged to have been, a partner or the sole proprietor, as the case may be;

   (c) is brought by or against a party under disability, "party" includes the litigation guardian;

   (d) is brought by or against an assignee, "party" includes the assignor;

   (e) is brought by or against a trustee of the estate of a bankrupt, "party" includes the bankrupt;

   (f) is brought or defended for the immediate benefit of a person who is not a party, "party" includes the person for whose immediate benefit the action is brought or defended.  R.R.O. 1990, Reg. 194, r. 36.04 (1); O. Reg. 69/95, s. 18.

(2) At trial any party may use the transcript and videotape or other recording of an examination under rule 36.01 or 36.03 of a witness who is not a party as the evidence of the witness, unless the court orders otherwise on the ground that the witness ought to give evidence at trial or for any other sufficient reason.  R.R.O. 1990, Reg. 194, r. 36.04 (2).

(3) A witness who is not a party and whose evidence has been taken under rule 36.01 or 36.03 shall not be called to give evidence at the trial, except with leave of the trial judge.  R.R.O. 1990, Reg. 194, r. 36.04 (3).

(4) With leave of the trial judge or the consent of the parties, a party may use at trial the transcript and a videotape or other recording of an examination under rule 36.01 of a witness who is a party as the evidence of the witness.  R.R.O. 1990, Reg. 194, r. 36.04 (4).

(5) In exercising its discretion under subrule (4), the court shall take into account,

   (a) whether the party is unavailable to testify by reason of death, infirmity or sickness;

   (b) whether the party ought to give evidence in person at the trial; and

   (c) any other relevant consideration.  R.R.O. 1990, Reg. 194, r. 36.04 (5).

(6) Use of evidence taken under rule 36.01 or 36.03 is subject to any ruling by the trial judge respecting its admissibility.  R.R.O. 1990, Reg. 194, r. 36.04 (6).

(7) The transcript and a videotape or other recording may be filed with the court at trial and need not be read or played at trial unless a party or the trial judge requires it.  R.R.O. 1990, Reg. 194, r. 36.04 (7).

EXHIBIT 7

**Courts of Justice Act**

**R.R.O. 1990, REGULATION 194**

**RULES OF CIVIL PROCEDURE**

[...]

# RULE 31  EXAMINATION FOR DISCOVERY

**Definition**

**31.01** In rules 31.02 to 31.11,

"document" has the same meaning as in clause 30.01 (1) (a).  R.R.O. 1990, Reg. 194, r. 31.01.

**Form of Examination**

**31.02** (1) Subject to subrule (2), an examination for discovery may take the form of an oral examination or, at the option of the examining party, an examination by written questions and answers, but the examining party is not entitled to subject a person to both forms of examination except with leave of the court.  R.R.O. 1990, Reg. 194, r. 31.02 (1).

(2) Where more than one party is entitled to examine a person, the examination for discovery shall take the form of an oral examination, unless all the parties entitled to examine the person agree otherwise.  R.R.O. 1990, Reg. 194, r. 31.02 (2).

**Who may Examine and be Examined**
*Generally*

**31.03** (1) A party to an action may examine for discovery any other party adverse in interest, once, and may examine that party more than once only with leave of the court, but a party may examine more than one person as permitted by subrules (2) to (8).  R.R.O. 1990, Reg. 194, r. 31.03 (1); O. Reg. 438/08, s. 28 (1).

*On Behalf of Corporation*

(2) Where a corporation may be examined for discovery,

(a) the examining party may examine any officer, director or employee on behalf of the corporation, but the court on motion of the corporation before the examination may order the examining party to examine another officer, director or employee; and

(b) the examining party may examine more than one officer, director or employee only with the consent of the parties or the leave of the court.  O. Reg. 132/04, s. 7.

***On Behalf of Partnership or Sole Proprietorship***

(3) Where an action is brought by or against a partnership or a sole proprietorship using the firm name,

(a) each person who was, or is alleged to have been, a partner or the sole proprietor, as the case may be, at a material time, may be examined on behalf of the partnership or sole proprietorship; and

(b) the examining party may examine one or more employees of the partnership or sole proprietorship only with the consent of the parties or the leave of the court.  O. Reg. 132/04, s. 7.

***Requirements for Leave***

(4) Before making an order under clause (2) (b) or (3) (b), the court shall satisfy itself that,

(a) satisfactory answers respecting all of the issues raised cannot be obtained from only one person without undue expense and inconvenience; and

(b) examination of more than one person would likely expedite the conduct of the action.  O. Reg. 438/08, s. 28 (2).

***In Place of Person under Disability***

(5) Where an action is brought by or against a party under disability,

(a) the litigation guardian may be examined in place of the person under disability; or

(b) at the option of the examining party, the person under disability may be examined if he or she is competent to give evidence,

but where the litigation guardian is the Children's Lawyer or the Public Guardian and Trustee, the litigation guardian may be examined only with leave of the court.  R.R.O. 1990, Reg. 194, r. 31.03 (5); O. Reg. 69/95, ss. 18-20.

***Assignee***

(6) Where an action is brought by or against an assignee, the assignor may be examined in addition to the assignee.  R.R.O. 1990, Reg. 194, r. 31.03 (6).

***Trustee in Bankruptcy***

(7) Where an action is brought by or against a trustee of the estate of a bankrupt, the bankrupt may be examined in addition to the trustee.  R.R.O. 1990, Reg. 194, r. 31.03 (7).

### Nominal Party

(8) Where an action is brought or defended for the immediate benefit of a person who is not a party, the person may be examined in addition to the party bringing or defending the action.  R.R.O. 1990, Reg. 194, r. 31.03 (8).

### Limiting Multiple Examinations

(9) Where a party is entitled to examine for discovery,

    (a) more than one person under this rule; or

    (b) multiple parties who are in the same interest,

but the court is satisfied that multiple examinations would be oppressive, vexatious or unnecessary, the court may impose such limits on the right of discovery as are just.  R.R.O. 1990, Reg. 194, r. 31.03 (9).

## When Examination may be Initiated
### Examination of Plaintiff

**31.04** (1) A party who seeks to examine a plaintiff for discovery may serve a notice of examination under rule 34.04 or written questions under rule 35.01 only after delivering a statement of defence and, unless the parties agree otherwise, serving an affidavit of documents.  R.R.O. 1990, Reg. 194, r. 31.04 (1).

### Examination of Defendant

(2) A party who seeks to examine a defendant for discovery may serve a notice of examination under rule 34.04 or written questions under rule 35.01 only after,

    (a) the defendant has delivered a statement of defence and, unless the parties agree otherwise, the examining party has served an affidavit of documents; or

    (b) the defendant has been noted in default.  R.R.O. 1990, Reg. 194, r. 31.04 (2).

### Completion of Examination

(3) The party who first serves on another party a notice of examination under rule 34.04 or written questions under rule 35.01 may examine first and may complete the examination before being examined by another party, unless the court orders otherwise.  R.R.O. 1990, Reg. 194, r. 31.04 (3).

**Oral Examination by more than one Party**

**31.05** Unless the court orders or the parties agree otherwise, where more than one party is entitled to examine a party or other person for discovery without leave, there shall be only one oral examination, which may be initiated by any party adverse to the party,

(a) who is to be examined; or

(b) on behalf or in place of whom, or in addition to whom, a person is to be examined.  R.R.O. 1990, Reg. 194, r. 31.05; O. Reg. 260/05, s. 6.

**Time Limit**
***Not to Exceed Seven Hours***

**31.05.1** (1) No party shall, in conducting oral examinations for discovery, exceed a total of seven hours of examination, regardless of the number of parties or other persons to be examined, except with the consent of the parties or with leave of the court.  O. Reg. 438/08, s. 29.

***Considerations for Leave***

(2) In determining whether leave should be granted under subrule (1), the court shall consider,

(a) the amount of money in issue;

(b) the complexity of the issues of fact or law;

(c) the amount of time that ought reasonably to be required in the action for oral examinations;

(d) the financial position of each party;

(e) the conduct of any party, including a party's unresponsiveness in any examinations for discovery held previously in the action, such as failure to answer questions on grounds other than privilege or the questions being obviously irrelevant, failure to provide complete answers to questions, or providing answers that are evasive, irrelevant, unresponsive or unduly lengthy;

(f) a party's denial or refusal to admit anything that should have been admitted; and

(g) any other reason that should be considered in the interest of justice.  O. Reg. 438/08, s. 29.

**Scope of Examination**
***General***

**31.06** (1) A person examined for discovery shall answer, to the best of his or her knowledge, information and belief, any proper question relevant to any matter in issue in

the action or to any matter made discoverable by subrules (2) to (4) and no question may be objected to on the ground that,

(a) the information sought is evidence;

(b) the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness; or

(c) the question constitutes cross-examination on the affidavit of documents of the party being examined.  R.R.O. 1990, Reg. 194, r. 31.06 (1); O. Reg. 438/08, s. 30 (1).

***Identity of Persons Having Knowledge***

(2) A party may on an examination for discovery obtain disclosure of the names and addresses of persons who might reasonably be expected to have knowledge of transactions or occurrences in issue in the action, unless the court orders otherwise.  R.R.O. 1990, Reg. 194, r. 31.06 (2).

***Expert Opinions***

(3) A party may on an examination for discovery obtain disclosure of the findings, opinions and conclusions of an expert engaged by or on behalf of the party being examined that are relevant to a matter in issue in the action and of the expert's name and address, but the party being examined need not disclose the information or the name and address of the expert where,

(a) the findings, opinions and conclusions of the expert relevant to any matter in issue in the action were made or formed in preparation for contemplated or pending litigation and for no other purpose; and

(b) the party being examined undertakes not to call the expert as a witness at the trial.  R.R.O. 1990, Reg. 194, r. 31.06 (3); O. Reg. 438/08, s. 30 (2); O. Reg. 453/09, s. 1.

***Insurance Policies***

(4) A party may on an examination for discovery obtain disclosure of,

(a) the existence and contents of any insurance policy under which an insurer may be liable to satisfy all or part of a judgment in the action or to indemnify or reimburse a party for money paid in satisfaction of all or part of the judgment; and

(b) the amount of money available under the policy, and any conditions affecting its availability.  R.R.O. 1990, Reg. 194, r. 31.06 (4).

(5) No information concerning the insurance policy is admissible in evidence unless it is relevant to an issue in the action.  R.R.O. 1990, Reg. 194, r. 31.06 (5).

*Divided Discovery*

(6) Where information may become relevant only after the determination of an issue in the action and the disclosure of the information before the issue is determined would seriously prejudice a party, the court on the party's motion may grant leave to withhold the information until after the issue has been determined.  R.R.O. 1990, Reg. 194, r. 31.06 (6).

**Failure to Answer on Discovery**
*Failure to Answer Questions*

**31.07** (1) A party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question if,

   (a) the party or other person refuses to answer the question, whether on the grounds of privilege or otherwise;

   (b) the party or other person indicates that the question will be considered or taken under advisement, but no answer is provided within 60 days after the response; or

   (c) the party or other person undertakes to answer the question, but no answer is provided within 60 days after the response.  O. Reg. 260/05, s. 7.

*Effect of Failure to Answer*

(2) If a party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question as described in subrule (1), the party may not introduce at the trial the information that was not provided, except with leave of the trial judge.  O. Reg. 260/05, s. 7.

*Additional Sanction*

(3) The sanction provided by subrule (2) is in addition to the sanctions provided by rule 34.15 (sanctions for default in examination).  O. Reg. 260/05, s. 7.

*Obligatory Status of Undertakings*

(4) For greater certainty, nothing in these rules relieves a party or other person who undertakes to answer a question from the obligation to honour the undertaking.  O. Reg. 260/05, s. 7.

**Effect of Lawyer Answering**

**31.08** Questions on an oral examination for discovery shall be answered by the person being examined but, where there is no objection, the question may be answered by his or her lawyer and the answer shall be deemed to be the answer of the person being

examined unless, before the conclusion of the examination, the person repudiates, contradicts or qualifies the answer.  R.R.O. 1990, Reg. 194, r. 31.08; O. Reg. 575/07, s. 4.

### Information Subsequently Obtained
*Duty to Correct Answers*

**31.09** (1) Where a party has been examined for discovery or a person has been examined for discovery on behalf or in place of, or in addition to the party, and the party subsequently discovers that the answer to a question on the examination,

(a) was incorrect or incomplete when made; or

(b) is no longer correct and complete,

the party shall forthwith provide the information in writing to every other party.  R.R.O. 1990, Reg. 194, r. 31.09 (1).

*Consequences of Correcting Answers*

(2) Where a party provides information in writing under subrule (1),

(a) the writing may be treated at a hearing as if it formed part of the original examination of the person examined; and

(b) any adverse party may require that the information be verified by affidavit of the party or be the subject of further examination for discovery.  R.R.O. 1990, Reg. 194, r. 31.09 (2).

*Sanction for Failing to Correct Answers*

(3) Where a party has failed to comply with subrule (1) or a requirement under clause (2) (b), and the information subsequently discovered is,

(a) favourable to the party's case, the party may not introduce the information at the trial, except with leave of the trial judge; or

(b) not favourable to the party's case, the court may make such order as is just.  R.R.O. 1990, Reg. 194, r. 31.09 (3).

### Discovery of Non-Parties with Leave
*General*

**31.10** (1) The court may grant leave, on such terms respecting costs and other matters as are just, to examine for discovery any person who there is reason to believe has information relevant to a material issue in the action, other than an expert engaged by or on behalf of a party in preparation for contemplated or pending litigation.  R.R.O. 1990, Reg. 194, r. 31.10 (1).

***Test for Granting Leave***

(2) An order under subrule (1) shall not be made unless the court is satisfied that,

   (a) the moving party has been unable to obtain the information from other persons whom the moving party is entitled to examine for discovery, or from the person the party seeks to examine;

   (b) it would be unfair to require the moving party to proceed to trial without having the opportunity of examining the person; and

   (c) the examination will not,

        (i) unduly delay the commencement of the trial of the action,

        (ii) entail unreasonable expense for other parties, or

        (iii) result in unfairness to the person the moving party seeks to examine.  R.R.O. 1990, Reg. 194, r. 31.10 (2).

***Costs Consequences for Examining Party***

(3) A party who examines a person orally under this rule shall serve every party who attended or was represented on the examination with the transcript free of charge, unless the court orders otherwise.  R.R.O. 1990, Reg. 194, r. 31.10 (3).

(4) The examining party is not entitled to recover the costs of the examination from another party unless the court expressly orders otherwise.  R.R.O. 1990, Reg. 194, r. 31.10 (4).

***Limitation on Use at Trial***

(5) The evidence of a person examined under this rule may not be read into evidence at trial under subrule 31.11 (1).  R.R.O. 1990, Reg. 194, r. 31.10 (5).

**Use of Examination for Discovery at Trial**
***Reading in Examination of Party***

**31.11** (1) At the trial of an action, a party may read into evidence as part of the party's own case against an adverse party any part of the evidence given on the examination for discovery of,

   (a) the adverse party; or

   (b) a person examined for discovery on behalf or in place of, or in addition to the adverse party, unless the trial judge orders otherwise,

if the evidence is otherwise admissible, whether the party or other person has already given evidence or not.  R.R.O. 1990, Reg. 194, r. 31.11 (1); O. Reg. 260/05, s. 8.

***Impeachment***

(2) The evidence given on an examination for discovery may be used for the purpose of impeaching the testimony of the deponent as a witness in the same manner as any previous inconsistent statement by that witness.  R.R.O. 1990, Reg. 194, r. 31.11 (2).

***Qualifying Answers***

(3) Where only part of the evidence given on an examination for discovery is read into or used in evidence, at the request of an adverse party the trial judge may direct the introduction of any other part of the evidence that qualifies or explains the part first introduced.  R.R.O. 1990, Reg. 194, r. 31.11 (3).

***Rebuttal***

(4) A party who reads into evidence as part of the party's own case evidence given on an examination for discovery of an adverse party, or a person examined for discovery on behalf or in place of or in addition to an adverse party, may rebut that evidence by introducing any other admissible evidence.  R.R.O. 1990, Reg. 194, r. 31.11 (4).

***Party under Disability***

(5) The evidence given on the examination for discovery of a party under disability may be read into or used in evidence at the trial only with leave of the trial judge.  R.R.O. 1990, Reg. 194, r. 31.11 (5).

***Unavailability of Deponent***

(6) Where a person examined for discovery,

    (a) has died;

    (b) is unable to testify because of infirmity or illness;

    (c) for any other sufficient reason cannot be compelled to attend at the trial; or

    (d) refuses to take an oath or make an affirmation or to answer any proper question,

any party may, with leave of the trial judge, read into evidence all or part of the evidence given on the examination for discovery as the evidence of the person examined, to the extent that it would be admissible if the person were testifying in court.  R.R.O. 1990, Reg. 194, r. 31.11 (6).

(7) In deciding whether to grant leave under subrule (6), the trial judge shall consider,

    (a) the extent to which the person was cross-examined on the examination for discovery;

(b) the importance of the evidence in the proceeding;

(c) the general principle that evidence should be presented orally in court; and

(d) any other relevant factor.  R.R.O. 1990, Reg. 194, r. 31.11 (7).

### *Subsequent Action*

(8) Where an action has been discontinued or dismissed and another action involving the same subject matter is subsequently brought between the same parties or their representatives or successors in interest, the evidence given on an examination for discovery taken in the former action may be read into or used in evidence at the trial of the subsequent action as if it had been taken in the subsequent action.  R.R.O. 1990, Reg. 194, r. 31.11 (8).

EXHIBIT 8

**Courts of Justice Act**

**R.R.O. 1990, REGULATION 194**

**RULES OF CIVIL PROCEDURE**

**[…]**

EXAMINATIONS OUT OF COURT

# RULE 34  PROCEDURE ON ORAL EXAMINATIONS

**[…]**

**Where Person to be Examined Resides outside Ontario**
*Contents of Order for Examination*

**34.07** (1) Where the person to be examined resides outside Ontario, the court may determine,

(a) whether the examination is to take place in or outside Ontario;

(b) the time and place of the examination;

(c) the minimum notice period;

(d) the person before whom the examination is to be conducted;

(e) the amount of attendance money to be paid to the person to be examined; and

(f) any other matter respecting the holding of the examination.  R.R.O. 1990, Reg. 194, r. 34.07 (1).

*Commission and Letter of Request*

(2) Where the person is to be examined outside Ontario, the order under subrule (1) shall be in Form 34E and shall, if the moving party requests it, provide for the issuing of,

(a) a commission (Form 34C) authorizing the taking of evidence before a named commissioner; and

(b) a letter of request (Form 34D) directed to the judicial authorities of the jurisdiction in which the person is to be found, requesting the issuing of such process as is necessary to compel the person to attend and be examined before the commissioner.  R.R.O. 1990, Reg. 194, r. 34.07 (2).

(3) The commission and letter of request shall be prepared and issued by the registrar.  R.R.O. 1990, Reg. 194, r. 34.07 (3).

EXHIBIT 9

**CITATION:** Moore v. Bertuzzi,  2014 ONSC 1318
**COURT FILE NO.:** 06-CV-306081
**DATE HEARD:** February 27, 2014
**ENDORSEMENT RELEASED:**  March 24, 2014

**SUPERIOR COURT OF JUSTICE - ONTARIO**

**RE:**  STEVE MOORE, JACK MOORE and ANNA MOORE v. TODD BERTUZZI, ORCA BAY HOCKEY LIMITED PARTNERSHIP, ORCA BAY HOCKEY, INC. dba THE VANCOUVER CANUCKS HOCKEY CLUB, VANCOUVER CANUCKS LIMITED PARTNERSHIP and VANCOUVER HOCKEY GENERAL PARTNERS INC.

**BEFORE:**  Master R. Dash

**COUNSEL:**  Timothy Danson and Marjan Delavar, for the plaintiffs

Steven Frankel, for the non-party John McCaw Jr.

<u>**REASONS FOR DECISION**</u>  **(AMENDED)**

[1]    This is a motion by the plaintiffs to issue a commission and letter of request to the judicial authorities in the State of Washington to compel John McCaw Jr. ("McCaw"), the former owner and CEO of the Orca Bay defendants, to give evidence as a witness in this action by attendance at trial in person in Toronto, or alternatively to attend at a location in Seattle to give evidence live at trial by videoconferencing or alternatively to attend for examination under oath prior to trial. McCaw is an American citizen and resident of Seattle, Washington.

[2]    McCaw opposes the granting of any relief. He asserts that there is no lawful basis for the first two alternatives and that the third alternative should be refused as the plaintiffs have failed to satisfy the court that McCaw has material evidence to give that is not merely corroborative of evidence obtainable from other witnesses. McCaw has delivered a factum but has served no affidavits or other materials in response to the motion. I therefore accept the facts as set out in the evidence of the plaintiffs.

[3]    None of the defendants take a position on the motion.

BACKGROUND

[4]    The action by the plaintiff Steve Moore ("Moore") and his parents arises out of an assault committed by the defendant Todd Bertuzzi ("Bertuzzi") on Moore during a National Hockey

2014 ONSC 1318 (CanLII)

League ("NHL") game on March 8, 2004. The facts as relevant to the motion before me commence with an earlier NHL game on February 16, 2004 when Moore, a hockey player with the Colorado Avalanche, checked Markus Naslund, the team captain of the Vancouver Canucks and the league's then leading scorer, resulting in injuries to Naslund. There was no penalty or disciplinary action taken. Between those two games, remarks were made in the media by several Canucks' players, including Bertuzzi, as well as by the Canucks' then general manager and coach that suggested, according to the plaintiffs' allegations, that there was a bounty on Moore and that the Canucks would retaliate against Moore in a future game. Two games later on March 8, 2004 Bertuzzi, a player with the Canucks, struck Moore from behind and drove his face into the ice causing Moore to suffer severe injuries. Bertuzzi received a multi-game suspension and pleaded guilty to criminal charges of assault causing bodily harm.

[5]     In this action Moore has named as defendants Bertuzzi and the Orca Bay corporations, who are the corporate owners of the Canucks (collectively "Orca Bay").

[6]     The plaintiffs' claims against Orca Bay were originally pled in vicarious liability but by order made on February 1, 2008 I permitted amendments to the statement of claim to include allegations of direct negligence. The amendments specifically plead that the Orca Bay defendants are directly liable as a result of persons in a position of management encouraging players to effect retribution against and failing to take reasonable measures to prevent violence against Moore. In particular it is pled that then Canuck president and general manager Brian Burke ("Burke") and then head coach Marc Crawford ("Crawford") made comments following the February 16, 2004 game that constituted a "calling out" to Canucks' players to take retaliatory action and effect "payback" against Moore – in effect putting a "bounty" on Moore. It is also pled that between the second and third period of the March 8, 2004 game Crawford told Canuck players that Moore had to "pay the price".

[7]     The amended claim alleges that Orca Bay knew of and condoned threats made by players and the "calling out" by management. It alleges that "they" knew it was likely that Bertuzzi would, given the control Burke and Crawford had over the players and the circumstances of the March 8 game, act on threats he had made following the earlier game. It is alleged that Orca Bay made no effort to "turn down the temperature" and prevent retribution. They allege that "by failing to take control of a clearly escalating problem" the Orca Bay defendants gave Bertuzzi "their approval to exact revenge" on Moore when an opportunity presented itself. The amendments allege that Orca Bay owed a duty of care to Moore and the failure of Canuck ownership or management to take positive action to prevent a retaliatory payback against Moore despite concerns expressed by NHL executives constituted negligence of Orca Bay.

[8]     A particularly salient plea of negligence as against the Orca Bay corporations for purposes of this motion is set out as follows (emphasis added): "Had *ownership* and/or management instructed all Canuck players, and in particular those players who had threatened some sort of 'payback' against Moore, not to fight or otherwise assault Moore, no retaliation would have occurred".

2014 ONSC 1318 (CanLII)

- 3 -

[9]     In subsequent amendments made in June 2008, the plaintiffs plead that Orca Bay was "wholly owned by John McCaw Jr. through various entities" and that in 2006 and 2007 McCaw sold his interest in Orca Bay to the Aquilini Investment Group. In evidence presented on this motion it is alleged that despite the sale, McCaw retains a financial interest in this action since his sale price to the Aquilinis will be reduced by 50% of any settlement or judgment that Orca Bay must pay to Moore and that McCaw must approve any settlement. None of these allegations are denied. No motion was ever made by Orca Bay to strike these pleadings as scandalous or irrelevant to the causes of action pled.

[10]     The plaintiffs examined David Nonis ("Nonis"), the Vice-President of the Canucks, for discovery as the representative of Orca Bay. From having case managed this action for over six years and having heard and determined numerous motions, I am aware that part of his examination involved undertakings to obtain information from Crawford, but there is little evidence on this motion as to the questions asked or answered by Nonis on his examination as to the knowledge or actions of ownership or other members of management.

THE ISSUES ON THIS MOTION

[11]     The plaintiffs claim that the evidence of McCaw is material and essential for a fair trial of this action on issues of both vicarious liability and direct negligence of Orca Bay as a corporate entity as well as punitive damages. The plaintiffs are of the view that McCaw should be compelled to give testimony as a witness in this action which is scheduled to be heard by a jury. They prefer he give his testimony in person at the trial in Toronto, or alternatively by videoconference live from Seattle during the trial. Only if the court is unable or unwilling to provide such order, the plaintiffs seek to take his testimony before trial and to have a videotape available to play at trial.

[12]     If McCaw lived in Ontario he could be served with a summons to witness pursuant to rule 53.04 and he would be required to attend at the trial. No grounds are required to support the issuing of a summons. If he failed to attend, the rule provides that the presiding judge could cause his apprehension by warrant of arrest. If McCaw lived elsewhere in Canada his attendance at trial could be compelled pursuant to section 5 of the *Interprovincial Summonses Act*[1] where the party issuing the summons satisfies an Ontario judge that the witness's attendance is reasonable and is necessary for the due adjudication of the proceeding and the due administration of justice in Ontario. The judge could then sign a certificate to attach to the summons, and the court in the reciprocating province would be required to receive and adopt the summons as an order of the reciprocating court.

[13]     Mr. McCaw however is an American citizen residing in the State of Washington. He is beyond the reach of both rule 53.04 and the *Interprovincial Summonses Act*. His attendance, whether before trial, or if permitted, at trial, can be compelled only by a Washington court providing assistance by giving effect to a letter of request issued by an Ontario court.

---

[1] *Interprovincial Summonses Act*, R.S.O. 1990, Chapter I.12

2014 ONSC 1318 (CanLII)

- 4 -

[14]    Three questions must be asked. First, does McCaw have material evidence to give at or for the trial of this action that meets the test in the jurisprudence for commission evidence? Secondly, what are the limitations on the assistance I can ask a Washington court to provide? Am I limited to commission evidence taken under oath in Washington prior to trial and videotaped for replay during the trial of this action or do I have authority to seek assistance to compel McCaw to give his evidence live during the trial either in Toronto or alternatively in Washington through videoconferencing facilities? Thirdly, if more than one option is available, which is most appropriate in the circumstances of this case?

THE RULES FOR TAKING COMMISSION EVIDENCE

[15]    I start with the rules respecting the taking of commission evidence for use of trial.

[16]    Rule 36 governs the taking of evidence before trial. Rule 36.02 provides:

> A party who intends to introduce the evidence of a person at trial may, with leave of the court or the consent of the parties, examine the person on oath or affirmation before trial for the purpose of having the person's testimony available to be tendered as evidence at the trial.

[17]    Rule 36.01(3) sets out the considerations for the exercise of the court's discretion to order the taking of evidence before trial:

> In exercising its discretion to order an examination under subrule (2), the court shall take into account,
>   (a) the convenience of the person whom the party seeks to examine;
>   (b) the possibility that the person will be unavailable to testify at the trial by reason of death, infirmity or sickness;
>   (c) the possibility that the person will be beyond the jurisdiction of the court at the time of the trial;
>   (d) the expense of bringing the person to the trial;
>   (e) whether the witness ought to give evidence in person at the trial; and
>   (f) any other relevant consideration.

[18]    Clearly subrule 36.01(3)(c) applies since McCaw resides outside the jurisdiction of the court and has indicated he will not voluntarily come into the jurisdiction at the time of trial. This favours the granting of an order for the taking of evidence. Also subparagraphs (a) and (d) would favour taking evidence before trial, since McCaw will not attend the trial in Toronto and it would be more convenient to him and less expensive for him to be examined in Washington. While (e) favours McCaw coming to Toronto, he will not do so voluntarily and there is no means to compel him to do so. The test under rule 36.01 is satisfied.

[19]    That however does not end the matter since McCaw does not reside in Ontario. Rule 36.03 provides as follows:

> Where an order is made under rule 36.01 for the examination of a witness outside Ontario, the order shall, if the moving party requests it, provide for the issuing of a commission and letter of request under subrules 34.07 (2) and (3) for the taking of the evidence of the witness and, on

2014 ONSC 1318 (CanLII)

- 5 -

consent of the parties, any other witness in the same jurisdiction, and the order shall be in Form 34E.

[20]   Rule 34.07 governs the taking of evidence for examinations where the person to be examined resides outside of Ontario. Rule 34.01 sets out the types of examinations to which rule 34.07 applies. They include examinations for discovery, cross-examinations on an affidavit, examinations of witnesses before the hearing of a motion, examinations in aid of execution and applicable to the matter before me:

> (b) the taking of evidence before trial under rule 36.01, subject to rule 36.02

[21]   Clearly Rule 34 applies to the taking of evidence under oath of Mr. McCaw in the State of Washington *before* trial. It is obvious, as Mr. Frankel points out, that Rule 34 does not speak to the examination of Mr. McCaw in the State of Washington *during* the trial, by videoconference or otherwise. I will have more to say about that later in these reasons.

[22]   Rule 34.07(1) governs terms for an order for conducting an examination where the person resides outside Ontario:

> Where the person to be examined resides outside Ontario, the court may determine,
>   (a) whether the examination is to take place in or outside Ontario;
>   (b) the time and place of the examination;
>   (c) the minimum notice period;
>   (d) the person before whom the examination is to be conducted;
>   (e) the amount of attendance money to be paid to the person to be examined; and
>   (f) any other matter respecting the holding of the examination.

[23]   The court may order the examination in Ontario of a non-Ontario resident only if the person is a party to the action or an officer, director or employee of a corporate party and typically only for the examination for discovery of the party or for cross-examination on an affidavit proffered by a party. While McCaw was once the owner and officer of the Orca Bay defendants he is not at this time. The plaintiffs chose or agreed to accept David Nonis as the corporate representative of Orca Bay for examination for discovery. Therefore, if I order McCaw to attend for examination as a witness before trial, I would order that the examination be conducted in the State of Washington in a judicial centre convenient to Mr. McCaw.

[24]   The process for compelling the attendance of the non-resident witness to give evidence before trial is to grant an order for the issue of a commission and letter of request for the issuance of process by judicial authorities in the jurisdiction where the witness resides, in this case the State of Washington. Rule 34.07(2) provides:

> Where the person is to be examined outside Ontario, the order under subrule (1) shall be in Form 34E and shall, if the moving party requests it, provide for the issuing of,
>
>   (a) a commission (Form 34C) authorizing the taking of evidence before a named commissioner; and

2014 ONSC 1318 (CanLII)

- 6 -

(b) a letter of request (Form 34D) directed to the judicial authorities of the jurisdiction in which the person is to be found, requesting the issuing of such process as is necessary to compel the person to attend and be examined before the commissioner.

[25]    Rules 34.07(3) to (7) provide for the registrar issuing the commission and letter of request, the fixing of any attendance money to be paid, the duties of the commissioner conducting the examination (in Washington) in accordance with Ontario rules and law of evidence and preparation and service of a transcript.

## THE TEST FOR COMMISSION EVIDENCE

[26]    I have been directed by the lawyers for McCaw to several Ontario authorities setting out the evidentiary requirement for the granting of a letter of request to obtain commission evidence. In a 1947 decision Master Conant stated: "It is well-settled law that a commission will not be granted unless the Court is satisfied, among other things, that the witness to be examined can give evidence material to the issue…It is not enough to say that possibly it may be of some use on some collateral matter – that it may be useful for the purpose of corroborating a witness, or something of that kind; it must have a closer bearing on the issue."[2] The master goes on to say that there must be "proper evidence before the Court that the proposed witness will, or may be expected to, give the evidence indicated". He adds that the moving party's deponent must state his belief as to what the proposed witness will say, and the grounds for his belief, and not simply state that the deponent "desires" to obtain such evidence from the proposed witness.[3] (This of course is consistent with our current rule 39.01(4)).

[27]    In a 1985 decision Pennell J. stated: "The granting of a commission is a matter of judicial discretion to be exercised according to the circumstances of each case…The main consideration is a fair and full trial. The evidence sought must be material to the issue…and not merely corroborative."[4]  The last reference was to the above decision of Master Conant.

[28]    In a more recent case, on a motion for a commission to examine experts who had given evidence in underlying proceedings in Turkey as to their bias, Gans J. stated that the foreign judgment was final and unimpeachable and there was not a scintilla of evidence as to any improprieties in the experts' appointments or as to a reasonable apprehension of bias. Gans J. stated: "While I recognize that the law with respect to witnesses on a pending motion does not require a party to establish that the examination will yield some helpful evidence, it surely does not eliminate the need to establish, as a minimum, that the inquiry is something more than a fishing expedition."[5]

[29]    Some cases have suggested that before the court orders commission evidence respecting a Rule 36 examination, it should be satisfied that the request is bona fide, that the witness has

---

[2] *Maynard v. Maynard*, [1947] O.W.N. 493 (H.C.J. – Master) at para. 3
[3] *Maynard*, supra, at para. 5.
[4] *Simpson v. Vanderheiden*, [1985] O.J. No. 2426 (H.C.J.) at para.21
[5] *Metalsac Ticdaret Ve Sanayi Ltd. STI v. Taylor Steel Inc.*, [2001] O.J. No. 271 (S.C.J.)

material evidence to give and there is good reason why the witness cannot attend the trial in person.[6]

[30]   In summary, before issuing a commission and letter of request there must be proper evidence before the court of what the moving party believes the evidence will be of the proposed witness such that the proposed examination is not simply a fishing expedition. The anticipated evidence must be material to an issue in the action, as opposed to a collateral matter, and must be more than merely corroborative of evidence of other witnesses. The request must be bona fide and there must be good reason why the witness cannot attend personally at trial. The overriding principle however in the granting of a commission is a fair and full trial. The determination is a matter of judicial discretion to be exercised according to the circumstances of each case.

[31]   There is also authority that "a party should not be dilatory in applying for a commission"[7], but in that case the sittings had already commenced. It may be appropriate to deny an order for commission evidence if it will result in loss of a fixed trial date.[8]

## HAS THE TEST FOR COMMSSION EVIDENCE BEEN MET?

[32]   Dealing with the last point, McCaw points out that the trial is now fixed to proceed on September 8, 2014 for 18 weeks. This is the third fixed trial date. McCaw claims that there is insufficient time between now and the trial date to hear this motion, proceed through levels of appeal in Ontario, move before the courts in Washington to enforce the letter of request and proceed through levels of appeal in Washington, thereby jeopardizing the fixed trial date in Ontario. There are three answers to that. First, the plaintiffs made this request as early as October 25, 2013, two weeks after the trial date was set. Secondly, Mr. Danson has undertaken to the court that the trial will proceed whether or not the matter of enforcing Mr. McCaw's attendance is finally disposed of. He will not seek to adjourn the trial to enforce McCaw's attendance. Third, McCaw has gone to great length to emphasize that he is not a party to this action. As such it is of no concern to him whether the trial proceeds on September 8 or is adjourned. The defendants, who would have a legitimate interest respecting any trial delays, have not opposed this motion. The cases where delay has been raised as an issue involve concerns by the parties to those actions. There is no basis to deny this motion based on delay.

[33]   The plaintiffs have satisfied me that McCaw has material evidence to give both on the issue of Orca Bay's direct negligence causing or contributing to Moore's damages and on the issue of Orca Bay's vicarious liability for the assault on Moore by Bertuzzi as well as on the issue of punitive damages. These are not collateral issues and McCaw's evidence as owner at the relevant times is not "merely" corroborative of other evidence. The areas of anticipated evidence are particularized and it is not simply a fishing expedition.

---

[6] *Wright v. Wasilewski*, [2001] O.J. No. 248, 52 O.R. (3d) 410 (SCJ – Master) at para. 10

[7] *Simpson v. Vanderheiden*, supra, at para. 24

[8] *Proietti v. Raisauda*, [1992] O.J. No. 662 (O.C.G.D.) at p. 4. In that case the defendant wanted to examine one of the plaintiffs by commission evidence as he had left the jurisdiction. In addition to losing a trial date Meehan J. also considered that the defendant had already secured the plaintiff's examination for discovery evidence.

- 8 -

*Corporate Negligence*

[34]     On the issue of corporate negligence, it is not disputed that McCaw was at all material times between the February 16, 2004 Naslund incident and the March 8, 2004 assault by Bertuzzi the owner and chief executive officer of Orca Bay. He was the person at the top of the organization and ultimately responsible for the actions of management and for either setting the corporate culture of the organization or delegating that responsibility to others. He would have been the person who appointed Brian Burke as president and general manager of the Canucks and determined that he was an appropriate person for that position.

[35]     After the February 16 incident, Bertuzzi and at least three other Canucks players made remarks widely reported in the press that suggested that there was a "bounty" on Moore, there was "going to be pay up time" and "absolutely" there would be retaliation and "situations would present themselves". The Canucks' coach Marc Crawford was reported in the media as saying that Moore's "cheap shot" on Naslund "needs to be answered". The Canuck's general manager Brian Burke made remarks in the press that the hit on Naslund was "a marginal player going after a superstar" and the Canucks "cannot afford to have players like that sitting on the sidelines because some grinder decides to rake him out with a cheap shot." (Naslund was out for three games.) He added that players who have the biggest impact on a team's success (Naslund) "have always been protected to a higher level". While not stated in so many words, the plaintiffs suggest that such comments by Burke amount to a "calling out" of Canucks' players to effect retribution.

[36]     I refer to these statements in the media because the evidence of Orca Bay, in response to answers to undertakings, acknowledged that Canucks' public relations people monitored all news and media reports between February 16 and March 8, 2004 which he provided to staff daily "via a company wide email", however "there was no monitoring of the extent to which these emails were read." While there is no evidence (yet) that McCaw read those emails or was otherwise informed about the statements of the players and management or even generally about the escalating situation, it is fair to assume a reasonable likelihood he would have been made aware of the situation. There was no responding evidence provided by McCaw or by anyone else based on information and belief to indicate that McCaw had no knowledge. I do not suggest that McCaw had an onus to provide evidence on the motion – proving that McCaw has relevant evidence for trial is the responsibility of the plaintiffs – but it would not have been difficult for him to have done so and put an end to this enquiry.

[37]     It is also pled that NHL Commissioner Gary Bettman and Executive Vice President of the NHL, Colin Campbell, attended a game between the Avalanche and the Canucks on March 3, 2008, between the Naslund incident on February 16 and the assault on March 8 to discourage retaliation and prior to the start of the game on March 8, 2004 Campbell cautioned Nonis about carrying out continued threats of "payback". It is not (yet) known if Nonis communicated this to McCaw.

[38]     In my view it is material to the issue of Orca Bay's negligence to obtain the evidence of the man "at the top" as to whether he knew about the events of February 16, whether he knew

2014 ONSC 1318 (CanLII)

- 9 -

about the statements by players and management in the media or the concerns of the NHL executive or generally that matters were escalating, what if anything he did about it either personally or by delegation to others and if he did nothing, why not? Did he encourage retribution against Moore? Alternatively, did he take steps to "turn down the temperature" by directing management to take steps to prevent retaliation.

[39]    While the plaintiffs have the discovery evidence of David Nonis on behalf of Orca Bay, and while it is possible that the evidence of Brian Burke and Marc Crawford, neither of whom are current employees of Orca Bay, may be available at the trial of this action if they choose to attend, only McCaw can testify as to what he, as the ultimate owner of the Canucks (through ownership of Orca Bay) did or did not do with respect to whatever information he had about the events between February 18 and March 8, 2004, what he chose to say or not say to management and whether he was indifferent to the risks created by the employees of Orca Bay under his ultimate ownership.

*Vicarious Liability*

[40]    In terms of vicarious liability, it is instructive to note remarks by the Supreme Court of Canada in *Bazley v. Curry*[9] dealing with the vicarious liability of a children's foundation for sexual assaults on children committed by a pedophile they employed in one of their residential homes. The court set out the two alternate bases for vicarious liability as follows:

> [E]mployers are vicariously liable for (1) employee acts authorized by the employer; or (2) unauthorized acts so connected with authorized acts that they may be regarded as modes (albeit improper modes) of doing an authorized act.[10]

[41]    With respect to the second basis for vicarious liability, the court has made remarks that are salient to the examination of McCaw:

> Fixing the employer with responsibility for the employee's wrongful act, even where the employer is not negligent, may have a deterrent effect. Employers are often in a position to reduce accidents and intentional wrongs by efficient organization and supervision.[11]

> Beyond the narrow band of employer conduct that attracts direct liability in negligence lies a vast area where imaginative and efficient administration and supervision can reduce the risk that the employer has introduced into the community. Holding the employer vicariously liable for the wrongs of its employee may encourage the employer to take such steps, and hence, reduce the risk of future harm.[12]

> A wrong that is only coincidentally linked to the activity of the employer and duties of the employee cannot justify the imposition of vicarious liability on the employer…Where vicarious

---

[9] *Bazley v. Curry*, [1999] S.C.J. No. 35, [1999] 2 S.C.R. 534
[10] Ibid, para. 10
[11] Ibid, para. 32
[12] Ibid, para. 33

- 10 -

liability is not closely and materially related to a risk introduced or enhanced by the employer, it serves no deterrent purpose...[13]

Underlying the cases holding employers vicariously liable for the unauthorized acts of employees is the idea that employers may justly be held liable where the act falls within the ambit of the risk that the employer's enterprise creates or exacerbates. Similarly, the policy purposes underlying the imposition of vicarious liability on employers are served only where the wrong is so connected with the employment that it can be said that the employer has introduced the risk of the wrong (and is thereby fairly and usefully charged with its management and minimization). The question in each case is whether there is a connection or nexus between the employment enterprise and that wrong that justifies imposition of vicarious liability on the employer for the wrong, in terms of fair allocation of the consequences of the risk and/or deterrence.[14]

The fundamental question is whether the wrongful act is sufficiently related to conduct authorized by the employer to justify the imposition of vicarious liability. Vicarious liability is generally appropriate where there is a significant connection between the creation or enhancement of a risk and the wrong that accrues therefrom, even if unrelated to the employer's desires…Once engaged in a particular business, it is fair that an employer be made to pay the generally foreseeable costs of that business.[15]

In determining the sufficiency of the connection between the employer's creation or enhancement of the risk and the wrong complained of, subsidiary factors may be considered. These may vary with the nature of the case. When related to intentional torts, the relevant factors may include, but are not limited to, the following:

   (a) the opportunity that the enterprise afforded the employee to abuse his or her power;

   (b) the extent to which the wrongful act may have furthered the employer's aims (and hence be more likely to have been committed by the employee)…[16]

What is required is a material increase in the risk as a consequence of the employer's enterprise and the duties he entrusted to the employee, mindful of the policies behind vicarious liability.[17]

[42]    In summary, to prove vicarious liability for an intentional tort that is not directly authorized by the employer, the plaintiffs must establish that the nature of the employer's enterprise has created or enhanced a risk that the employee would commit the intentional tort such that the tort is closely and materially related to or significantly connected to that risk. This includes an examination of the opportunity that the employer's enterprise has afforded the employee to commit the wrongful act, the extent to which the wrongful act may have furthered the employer's aims and whether the employer has taken steps to reduce intentional wrongs through "efficient organization and supervision."

---

[13] Ibid, para. 36
[14] Ibid, para. 37
[15] Ibid, para. 41(2)
[16] Ibid, para. 41(3)
[17] Ibid, para. 42

- 11 -

[43]    In the context of this action, one of the questions that can legitimately be asked on the issue of vicarious liability, is whether the manner in which Orca Bay organized and supervised its hockey operations created or enhanced the risk that a player would exact violence on the ice that overstepped the boundaries of professional hockey such as to become an assault or other wrongful act. This of course would include retributive violence.

[44]    It would be relevant and material on the issue of vicarious liability to ask Mr. McCaw questions respecting the corporate culture at Orca Bay since he was the owner of that organization. This could include, but not be limited to, questions relating to the promotion or alternatively the control of violence by players for the Canucks, the promotion or alternatively the control of retribution for attacks on Canucks' star players as well as instructions McCaw may have given or not given to management with respect to these issues in general. It would also include steps taken or not taken or instructions given or not given following the Naslund incident that would have created or enhanced the risk, or alternatively reduced the risk that players such as Bertuzzi would have exacted retribution and committed a wrongful act against Moore in a subsequent game.

[45]    Again, although Burke and Crawford may be testifying at the trial, only McCaw can speak directly as the owner, chief executive officer and overall directing mind of the company as to the corporations culture with respect to the promotion of violence.

[46]    The Plaintiffs also wish to examine McCaw about whether violence and retribution by players on his company's payroll was something he believed was financially lucrative for the Canucks, and ultimately himself i.e. does it sell tickets? While it will be up to the trial judge whether to permit this line of enquiry it appears prima facie relevant to issues of vicarious liability (as well as punitive damages), particularly as the Supreme Court of Canada has stated that one of the factors in addressing vicarious liability is "the extent to which the wrongful act may have furthered the employer's aims." Presumably one aim of Orca Bay was to make money.

*Punitive Damages*

[47]    McCaw's evidence is also material to the plea supporting claims for punitive damages in the statement of claim that during the three week period of threats to carry out retribution, "the Orca Bay defendants not only did nothing to stop such conduct, they encouraged it even in the face of warnings and cautions by the NHL."

[48]    In summary, I am satisfied from the plaintiff's evidence that McCaw has material evidence to give at trial on issues of corporate negligence, vicarious liability and punitive damages and McCaw has chosen to provide no evidence on this motion to the contrary.

*Questions Respecting McCaw's Financial Interest in the Action*

[49]    The plaintiffs also wish to examine McCaw on his continuing financial interest in this lawsuit resulting from the contractual requirement that his sale price to the Aquilinis will be reduced by 50% of any judgment or settlement that Orca Bay must pay to Moore. While I am not satisfied this has any direct relevance to the issues in this action as defined by the pleadings, it

2014 ONSC 1318 (CanLII)

- 12 -

may have some relevance to McCaw's credibility, but that may depend on the evidence he gives in response to other questions. That however is for the trial judge to determine and it is not a matter I can address in this endorsement.

[50]   The plaintiffs also want to examine McCaw on the requirement that he approve any settlement by Orca Bay. Consequent upon that, they also want to examine him on his role in the agreement among Orca Bay, Bertuzzi and Crawford to dismiss crossclaims and a third party claim in exchange for a proportional sharing of any damages awarded, referred to by the plaintiffs as a "secret agreement" because it was not immediately disclosed, and which forms the subject matter of endorsements by myself and by Justice Perell.[18]  Prima facie I fail to understand how questions to McCaw about any settlement could meet the test of relevance, but as this is trial evidence, the admissibility of this line of questioning would need to be made by the trial judge.

*Conclusions on Ordering a Commission for the Taking of Evidence before Trial*

[51]   The motion is bona fide and for the purpose of compelling material evidence. The reason such motion is necessary is because McCaw refuses to attend at trial to give his evidence.

[52]   In my view the plaintiffs have met the test for compelling evidence from McCaw on issues of direct negligence of Orca Bay, vicarious liability and punitive damages. At a minimum an order would be made to issue a commission and letter of request to the judicial authorities in the State of Washington to compel Mr. McCaw to attend as a witness for an examination under oath before trial at a convenient location in the State of Washington.

[53]   Pursuant to rule 34.07(1)(f) I would order that the examination be videotaped for replay at the trial of this action in such manner as directed by the trial judge. Indeed "if the credibility of the witness becomes of importance at the trial, the fact that a videotape of the examination is available for the trier of fact, and not just a written transcript of the evidence, should assist the trier of fact in assessing the credibility of the evidence given by the witness on his or examination for discovery. That of course is not available if a videotape of the discovery has not been taken."[19]

JURISDICTION TO ORDER COMMISSION FOR THE GIVING OF EVIDENCE AT TRIAL

[54]   This leads to the question whether there is jurisdiction to grant to the plaintiffs their primary relief requested – to issue a commission and letter of request to Washington judicial authorities to compel Mr. McCaw to attend as a witness at the trial in Toronto or alternatively by attendance at a convenient location in the State of Washington and give live evidence during the trial by videoconference or similar facility.

---

[18] *Moore v. Bertuzzi*, 2012 ONSC 59, [2012] O.J. No. 665, 110 O.R. (3d) 124, affirmed 2012 ONSC 3248, [2012] O.J. No. 2485, 110 O.R. (3d) 611

[19] *Midland Resources Holding Ltd. v. Shtaif*, [2009] O.J. No. 5216, 99 O.R. (3d) 550 (S.C.J.) at para.25. See also paragraph 20 and 27. Although Justice Newbould was discussing the videotaping of an examination for discovery outside of Ontario, the rationale for videotaping applies equally to evidence taken before trial under Rule 36.

2014 ONSC 1318 (CanLII)

- 13 -

[55]   Clearly there is no provision in Rule 34.07 or elsewhere in the rules of civil procedure that specifically authorizes either request.

[56]   Mr. Danson argues that I should consider the application of rules 1.04 (1) and (2) as well as rule 1.08, which I discuss later in these reasons, and the principles of comity.

*Principles of Comity*

[57]   The general principle of comity, as it relates to enforcing foreign letters of request, has been stated as follows by the Supreme Court of Canada in a case dealing with enforcing of letters rogatory from a foreign tribunal pursuant to section 43 (now section 46) of the *Canada Evidence Act*[20] as follows:

> [T]he jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an interchange of good offices with each other.
>
> It is upon this comity of nations that international legal assistance rests. Thus the courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed...[21]

[58]   In that case, the court had noted that in general our courts had ordered examination "for the purpose of gathering evidence to be used at a trial" in a foreign jurisdiction, but decided that there was no reason it could not also be ordered at a pre-trial or discovery stage. While that is not directly relevant to the matter I must decide, the court set out the following broad principle:

> I do not think it would be wise to lay down an inflexible rule that admits of no exceptions. The granting of an order for examination, being discretionary, will depend on the facts and particular circumstances of the individual case.[22]

[59]   The same broad principle has been stated as follows:

> The enforcement of letters rogatory...is based upon international comity or courtesy proceeding from the law of nations...As a matter of principle Courts of justice of different countries are in aid of justice under a mutual obligation consistent with their own jurisdiction to assist each other in obtaining testimony upon which the rights of a cause may depend; so generally are individuals under a duty to give their testimony to Courts of justice in all inquiries where it may be material.

---

[20] *Canada Evidence Act*, R.S.C. 1985, c. C-5. This provision, as well as similar provisions in section 60 of the *Ontario Evidence Act*, R.S.O. 1990, c. E.23, provide the statutory authority for a Canadian court to enforce letters of request from foreign jurisdictions.
[21] *R. v. Zingre*, [1981] S.C.J. No. 89, [1981] 2 S.C.R. 392 at p. 7
[22] Ibid, at p,. 8

- 14 -

> Courts in Canada recognize, and have often said, that, in the interests of comity, judicial
> assistance should whenever possible be given at the request of Courts of other countries.[23]

[60]    Consistent with these broad principles of comity it might be said that absent public policy considerations to the contrary, Ontario should give effect to foreign letters of request for the taking of evidence just as Ontario would expect the foreign jurisdiction to enforce our letters of request.

*Jurisdiction for a Commission to Order Attendance at Trial in Toronto*

[61]    The plaintiffs' request to issue a commission and letter of request to the judicial authorities in Washington to compel Mr. McCaw to attend the trial of this action in Toronto must fail.

[62]    No Ontario court would ever honour a request from a foreign court to require a Canadian citizen, resident in Ontario, to cross an international border to attend as a witness at a civil trial in a foreign country. The plaintiffs have found no case where that relief was ever granted, or for that matter ever refused or even discussed. There is a good reason for that. It would be preposterous for any country to make that request of another country, other than a request for extradition, which is a very different matter. Just as Ontario would not honour such a request, so should Ontario courts decline to make that request of another country. It makes no difference that such request would be made to a friendly country such as the United States, or that it would be to a state that borders Canada.

[63]    It also matters not that McCaw, a U.S. resident, once owned Orca Bay, a corporation that carried on the business of professional hockey in Canada and that was subject to Canadian law or that Orca Bay attorned to the jurisdiction of the Ontario courts while under McCaw's ownership. He also cannot be ordered to cross the border to testify in a civil action in Toronto simply because the team which was then owned by him is a party to this action or because actions taken by a player on that team while "under his watch" caused injury to the plaintiff, whether or not he had a role in promoting those actions.

*The Advantages of Testimony at Trial by Videoconferencing over Testimony before Trial*

[64]    A request to issue a commission for the taking of evidence by videoconference link from the State of Washington live at the trial in Toronto is a more reasonable proposition. Such a request would not require Mr. McCaw to cross an international border. It would require his attendance to give evidence live by videoconference *at* the trial at presumably the same facility in the State of Washington where he would otherwise attend to give videotaped evidence *before* the trial.

[65]    There would be numerous advantages to having McCaw give his evidence during the trial, rather than before trial, in the particular circumstances of this case. In my experience, most cases of taking evidence before trial involve a party examining his own witness, the witness is

---

[23] *Gulf Oil Corp. v. Gulf Canada Ltd.*, [1980] 2 S.C.R. 39 at p. 12

- 15 -

not opposed to the taking of the evidence and there are few if any issues as to the relevance of questions. In this case, McCaw is opposite in interest to the plaintiffs, he is opposed to the taking of his evidence in any form and once at examination, there are bound to be many questions refused on the grounds of relevance, settlement privilege or admissibility.

[66]    There will need to be rulings by the trial judge during the examination of Mr. McCaw. For example:

(a) Mr. Danson intends on cross-examining McCaw, despite the fact that he is a witness called by the plaintiffs, on the basis that he is a hostile witness. That will require a ruling by the trial judge and typically can only made once an evidentiary foundation is set with preliminary questions and may depend on the answers to those questions. It is impossible to make such a ruling in advance for an examination before trial. Even if the examination were interrupted in order to obtain a ruling, I am not convinced that such ruling could made by any judicial officer other than the trial judge.

(b) I have noted that Mr. Danson may wish to examine on issues related to McCaw's continuing financial interest in the outcome of this action. It was my preliminary view that such questions go only to issues of credibility and may depend on answers given to questions asked on substantive issues relating to negligence and vicarious liability. It will require a ruling by the trial judge whether to permit this line of questioning.

(c) It is unknown what direction the trial judge may give on permitting evidence or cross-examining on issues related to the "secret agreement" and as such it may not be possible to know in advance whether questions on that issue may be directed to McCaw.

(d) Given Mr. McCaw's opposition to testifying in any manner at or before the trial of this action, there are bound to be questions refused. If the examination is conducted in advance of the trial there will be further interlocutory motions required in Ontario to determine whether the questions were proper, and even if brought some questions may need to be reserved to the trial judge. While it may be possible to direct questions to be answered but leave admissibility to the trial judge, this may require appropriate splicing and redacting of the videotape by the trial court. It could all be avoided if the examination was conducted by videoconference and the judge could make rulings as the questions were asked and in the context of the trial as a whole.

[67]    I therefore conclude that there is a significant advantage to the fair and orderly conduct of the trial of this action if the examination of McCaw were live at trial by videoconference from the State of Washington. The question therefore is whether there is authority for me to order a commission and letter of request to the courts in Washington to enforce McCaw's live attendance at the trial via videoconference link from Washington.

*Jurisdiction for a Commission and Request to Order Attendance at Trial by Videoconferencing*

[68]    As noted, there is no provision in rule 34.07, or indeed in any of the rules of civil procedure, that permits me to make an order for a commission and letter of request for the taking

2014 ONSC 1318 (CanLII)

- 16 -

of evidence at trial by means of videoconference. Rule 34.01(b) enables a commission and letter of request under rule 34.07(2) only for the taking of evidence before trial under Rule 36.

[69]     Rule 1.08 does however make reference to the giving of evidence by videoconference and rule 1.08(1)4 specifically permits the taking of oral evidence at trial by means of videoconference. Rule 1.08 provides as follows:

> 1.08  (1)  If facilities for a telephone or video conference are available at the court or are provided by a party, all or part of any of the following proceedings or steps in a proceeding may be heard or conducted by telephone or video conference as permitted by subrules (2) to (5).
> …
> 4. At trial, the oral evidence of a witness and the argument.

Other subsections of rule 1.08(1) permit the conduct of a motion, an application, a status hearing, a reference, an appeal, a pre-trial conference or a case conference by videoconference.

[70]     Rule 1.08(3) is a key provision and provides as follows:

> (3)  If the parties do not consent, the court may, on motion or on its own initiative, make an order directing a telephone or video conference on such terms as are just.

[71]     It is therefore clear that the court can order that a party give oral testimony at trial by videoconference, even without the consent of the parties. The court's order that McCaw give his evidence at trial by videoconference however cannot be enforced against McCaw, a resident of the State of Washington, without the assistance of judicial authorities in Washington.

[72]     As previously noted, the only rule that provides for the issuing of a commission and letter of request to a foreign judicial authority to enforce this court's order to attend for an examination is rule 34.07(2). Rule 34.01 sets out the types of examinations to which Rule 34, including rule 34.07(2), apply. That includes the taking of evidence *before* trial under Rule 36, but does not include the taking of evidence by videoconference *at* trial. There are no other rules that expressly *permit* an Ontario court to seek the assistance of foreign judicial authorities to enforce an order made under rules 1.08(1)4 and (3) directing the oral evidence of a witness at trial by videoconference.

[73]     There are also no rules (or any statutes brought to my attention) that *prohibit* an Ontario court from seeking the assistance of foreign judicial authorities to enforce an order made under rules 1.08(1)4 and (3) directing the oral evidence of a witness at trial by videoconference.

[74]     Therefore the rules provide for an order directing the taking of oral evidence at trial by videoconference with no means to enforce the rule if the witness to be examined resides outside of Ontario. Simply put, there is a right without a remedy.

[75]     In my view this is precisely the situation that cries out for the application of rule 1.04(2) which reads as follows:

2014 ONSC 1318 (CanLII)

- 17 -

Where matters are not provided for in these rules, the practice shall be determined by analogy to them.

[76]   Where there is a procedure authorized in the rules, in this case the right of the court under rules 1.08(1)4 and 1.08(3) to order that the oral evidence of a witness at trial be given by videoconferencing, but no specified means are set out to enforce that order as against a non-resident witness, and yet means exist to enforce other types of examinations of non-residents (such as examinations before trial by commission and letter of request under rule 34.07(2)), then it would be appropriate to analogize to rule 34.07(2) to provide for the means of enforcing an order for an examination under rule 1.08(1)4.

[77]   That leads inexorably to the conclusion that an order to compel the oral evidence at trial by videoconferencing under rule 1.08 of a non-resident witness may be made by issuing an order for a commission and letter of request to the judicial authorities in the jurisdiction where the witness resides.

[78]   Such order would request that the witness attend in the jurisdiction where he resides to give his evidence during the trial in Ontario by two-way videoconferencing facility.

[79]   I also rely on rule 1.04(1) which provides:

These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

[80]   For reasons set out earlier in this endorsement, and in particular the numerous evidentiary rulings that will have to made during McCaw's testimony in the particular circumstances of this case, it could result in innumerable delays to have the examination, if taken before trial, interrupted for rulings as to relevance, privilege and whether the witness is hostile. Indeed, as stated earlier some of these rulings can only be made by the trial judge and after an evidentiary foundation has been established. Even if some questions are relevant, it should be solely up to the trial judge to rule on admissibility based on the issues that have arisen and evidence given during the trial.

[81]   For these reasons I have liberally construed rules 1.08 and 34.07 to permit a commission and letter of request to issue to compel McCaw to give evidence as a witness at trial by videoconferencing from Seattle in order to provide the most appropriate and expeditious means to present his evidence to the trial court and enhance the determination of this action on its merits.

[82]   That rule 1.08(1)4 applies to witnesses residing outside of Ontario, and indeed outside of Canada, is supported by a number of decisions of our court which have made orders for the taking of live evidence at trial by videoconference from foreign jurisdictions[24]. Those orders however involved witnesses willing to testify at trial by videoconference but who did not want to

---

[24] See for example *Archambault v. Anstalt Kalandi*, [2006] O.J. No. 3428, affirmed [2007] O.J. No. 258 (S.C.J.); *Wright v. Wasilewski*, [2001] O.J. No. 248, 52 O.R. (3d) 410 (SCJ – Master); *Pack All Manufacturing Inc. v. Triad*, [2001] 5882 (S.C.J.);

- 18 -

come to Ontario for the trial. Those motions were opposed, not by the witness, but by adverse parties who wanted the witness to testify in Ontario.

[83]     I take some comfort in making this order by virtue of the wording of section 46 of the *Canada Evidence Act*[25], the provision that permits Canadian courts to enforce letters of request from foreign jurisdictions and in particular section 46(2). Relevant portions of that section are as follows (emphasis added):

> **46.** (1) If, on an application for that purpose, it is made to appear to any court or judge that any court or tribunal outside Canada, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to that matter of a party or witness within the jurisdiction of the first mentioned court... the court or judge may, in its or their discretion, order the examination on oath on interrogatories, *or otherwise*, before any person or persons named in the order, of that party or witness accordingly, and by the same or any subsequent order may command the attendance of that party or witness for the purpose of being examined....
>
> (2) For greater certainty, testimony for the purposes of subsection (1) may be given by means of *technology that permits the virtual presence of the party or witness before the court or tribunal outside Canada* or *that permits that court* or tribunal, and the parties, *to hear and examine the party or witness*.

[84]     The plain reading of the emphasized portion of the *Evidence Act* suggests that an Ontario court could order an Ontario resident to testify by videoconference technology live during a trial in a foreign jurisdiction. If it were otherwise, how could the witness have "virtual presence" in the foreign jurisdiction and even more importantly, without the witness live by videoconference, how could the court "examine...the witness"? This could not be done by a videotape replay. By rules of comity, if an Ontario court could enforce a request from a foreign court, for example the State of Washington, to have a witness in Ontario examined live, by videoconferencing technology, during a trial in Washington, so could an Ontario court request that a court in Washington enforce its request that a witness in Washington testify live during a trial in Ontario.

[85]     An order for a commission and letter of request for evidence live at trial by videoconferencing, while not directly addressed by any Canadian appellate authority brought to my attention, is supported by the broad language of the Supreme Court of Canada previously referenced which addressed the scope of the types of examinations that could be subject to an order for commission evidence and which bears repeating:

---

[25] *Canada Evidence Act*, R.S.C. 1985, c. C-5. A similar provision in section 60 of the *Ontario Evidence Act*, R.S.O. 1990, c. E.23 also provides for the enforcement of foreign letters of request, but without subpargarph 2. It provides that where "the obtaining of the testimony in or in relation to an action…pending in or before such foreign court…of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission…"

2014 ONSC 1318 (CanLII)

- 19 -

I do not think it would be wise to lay down an inflexible rule that admits of no exceptions. The granting of an order for examination, being discretionary, will depend on the facts and particular circumstances of the individual case.[26]

[86]   Mr. Danson also asks that I consider U.S. case law which suggests that American judicial authorities would enforce most foreign orders for a commission and letter of request, presumably including one for videotaped evidence during trial. I agree with Mr. Frankel however that expert evidence would be necessary to prove U.S. laws to determine whether Washington courts would enforce such a request. I do not however believe that it is necessary that I make a determination whether Washington courts would give effect to any order I may make requesting their assistance. That will be a matter for the plaintiffs to contend with when they attend before judicial authorities in Washington. My concern is whether under Ontario law there is jurisdiction to make and whether it is appropriate to make the order requested.

[87]   I do however note that there are both U.S. federal rules and Washington State rules that deal with enforcing foreign letters of request. For example Federal Court rule 28 U.S.C. 1782 provides:

The district court of the district in which a person resides…may order him to give his testimony …for use in a proceeding in a foreign…tribunal.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign…tribunal…and may direct that that the testimony…be given…before a person appointed by the court…The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country…for the taking of testimony…

[88]   While being careful not to interpret U.S. law or to determine what response a U.S. court may make to a letter of request in the circumstances herein, I have been provided with a decision of the U.S. Supreme Court which appears to broadly interpret U.S. Rule 1782. It was acknowledged that while a foreign court has control over the giving of evidence of both resident and non-resident parties to a proceeding, non-participants (for example non-party witnesses such as McCaw) may be beyond the foreign tribunal's jurisdictional reach and would be unobtainable absent rule 1782.[27]

[89]   While I have not been directed to any U.S. jurisprudence considering letters of request for a U.S. resident to give evidence at a foreign trial by videoconferencing, I have been provided with an order issued by a U.S. District Court in California pursuant to 28 U.S.C. 1782. That order requires a named person to appear at the office of named attorneys in California at a specified date and time "or at such other date and time as may be necessary on 48 hours' notice" to "give testimony" during a trial in the High Court of Justice of England and Wales and that his "testimony will at that time and place be transmitted via satellite link to proceedings in the United Kingdom where he will be subject to direct questioning and cross-examination by the

---

[26] *R. v. Zingre*, supra, at p. 8. Although the Supreme Court used this language to expand the use of commission evidence from the giving of evidence before trial to examinations for discovery, the principle stated is quite broad.
[27] *Intel Corporation v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004)

2014 ONSC 1318 (CanLII)

2014 ONSC 1318 (CanLII)

parties to the action and the High Court". The court ordered that the testimony "shall be taken in accordance with the laws and rules prevailing in proceedings before the High Court."[28]

[90]   I have been provided with no context for that order and it appears to have been uncontested. It has no jurisprudential value except as an acknowledgment that 28 U.S.C. 1782 has been used to order testimony by videoconferencing from California during a trial proceeding in England. It provides limited, if any assistance to my determination of this matter.

[91]   I conclude that I have jurisdiction to make an order for a commission and letter of request to the judicial authorities in the State of Washington to order McCaw to give testimony as a witness from the State of Washington by videoconferencing link during the trial in Toronto of this action.

[92]   I also note that even if McCaw gives his evidence live by videoconferencing, the trial judge may at any time set aside that order by virtue of rule 1.08(4) which provides: "The judge or officer presiding at a proceeding or step in a proceeding may set aside or vary an order made under subrule (3)."

SHOULD A COMMISSION BE ORDERED FOR TESTIMONY BY VIDEOCONFERENCE?

[93]   The factors to consider before ordering videoconferencing is set out in rule 1.08(5):

> In deciding whether to permit or to direct a telephone or video conference, the court shall consider,
>
> (a) the general principle that evidence and argument should be presented orally in open court;
>
> (b) the importance of the evidence to the determination of the issues in the case;
>
> (c) the effect of the telephone or video conference on the court's ability to make findings, including determinations about the credibility of witnesses;
>
> (d) the importance in the circumstances of the case of observing the demeanour of a witness;
>
> (e) whether a party, witness or lawyer for a party is unable to attend because of infirmity, illness or any other reason;
>
> (f) the balance of convenience between the party wishing the telephone or video conference and the party or parties opposing; and
>
> (g) any other relevant matter.

[94]   Factors (a) and (b) clearly relate to determining whether evidence should be provided live by videoconferencing rather than by having the witness attend the trial in person. As I cannot order McCaw to attend the trial in Toronto these factors have no relevance to the analysis. Factor

---

[28] Order of the Hon. Victor B. Kenton, United States District Court, Central District of California, *Benfield Greig Limited v. David Kirkpatrick*, May 21, 2003, case no. 03-00047-VBKx.

- 21 -

(d), and to some extent (c), is also directed to a live versus videoconference attendance, however recent authorities have held that while live testimony may be preferable, given advances in videoconferencing technology, the court can still evaluate a witness and make findings of credibility.[29] Factor (e) supports videoconferencing because McCaw's refusal to testify as a witness at trial, and the court's inability to compel him to attend trial in Toronto, constitutes "any other reason" he is unable to attend the trial in person.

[95]    Factor (f) also supports an order for videoconferencing. For the plaintiffs, the inability to compel McCaw to attend the trial in person outweighs any inconvenience to McCaw attending a videoconferencing facility in Washington, near his home. It would be no more inconvenient for McCaw to attend the same facility to give his evidence *during* the trial by videoconference as it would be for him to attend the same facility *before* trial where his evidence would be videotaped. McCaw has given no evidence of inconvenience.

[96]    The benefits of attending live by videoconference has been stated as follows and constitute "other relevant matters" as per factor (g):

> Videoconferencing is an interactive technology. It is conducted in real time. The witnesses, who would attend a video conference site in the United States, would be able to see and hear what is going on in the courtroom. Those in the courtroom in Toronto would be able to see and hear the witnesses "live". Questions could be asked and answered. Examination in chief, cross-examination and redirect examination could be conducted live, though not in person.[30]

[97]    It has been stated:

> Indeed, it seems to me that an order for evidence by video-conference… leaves ample scope to the trial judge to control proceedings at trial in such a way as to ensure that the trial is a fair one and that justice is properly rendered.[31]

[98]    One case has suggested that the test for giving witness testimony at trial by videoconferencing order should include a reference to the test for commission evidence as part of "other relevant factors":

> Add to these factors the test for commission evidence applied by the Court under rule 36, namely that the Court be satisfied that the application is bona fide, the issue is one which the Court ought to try, the witness have material evidence and there is a good reason why the witness cannot attend at trial.[32]

[99]    I have earlier in this endorsement determined that the test for commission evidence has been met. The request is bona fide and McCaw has material evidence to give. I also conclude that the test for requiring McCaw's oral evidence to be given at trial by videoconferencing under rule 1.08 has also been met. The plaintiffs are entitled to a commission and letter of request

2014 ONSC 1318 (CanLII)

---

[29] See *Pack All Manufacturing Inc. v. Triad*, supra at paras. 6 and 7; *Midland Resources Ltd. v. Sharif*, supra, at paras.20, 22, 25 and 26.

[30] *Wright v. Wasilewski*, supra at para. 6

[31] *Pack All Manufacturing Inc. v. Triad*, supra at para. 9

[32] *Wright v. Wasilewski*, supra at para. 10. Also see *Archambault v. Anstalt Kalandi*, supra, at para. 33.

- 22 -

directed to judicial authorities in the State of Washington to compel McCaw to attend a facility in the State of Washington either to be examined under oath before trial and videotaped for replay at trial or to give his evidence orally at trial by means of videoconferencing.

[100]        For reasons stated earlier in this endorsement, and in particular at paragraph 66, the giving of McCaw's evidence live at trial by videoconference is preferable in the circumstances of this case since the witness is adverse to the examining party and rulings will have to made by the trial judge on issues of whether the plaintiffs can cross-examine him as a hostile witness and there are areas of intended examination that will require rulings as to relevance and admissibility depending on the evidence that has developed during the trial to that point and depending on the evidence given by McCaw. It is also the order preferred by the plaintiffs and is the appropriate order to make in all the circumstances.

[101]        Mr. Frankel raises a concern that a commission and letter of request for evidence at trial by videoconference is not specifically provided for in the rules and if I give a liberal interpretation to the rules and make such order by analogy to the rules for a commission for obtaining evidence prior to trial, every litigant would want to take advantage of that procedure. In my view that is not a valid concern to deny the plaintiffs relief herein. The relief granted was specific to the circumstances presented and in particular that it would require rulings by the trial judge whether counsel for the plaintiffs had a right cross-examine McCaw as a hostile witness and whether questions could be asked in certain contentious areas. None of these rulings could be made except in the context of the evidence as developed during the trial. Whether other situations will present themselves as appropriate for requesting a foreign court to order evidence at trial by videoconference is best left for consideration in future cases and in the circumstances specific to each case.

## ANCILLARY TERMS FOR VIDEOCONFERENCING

[102]        Rule 1.08(6) provides as follows with respect to arranging the videoconferencing facility:

> Where the court permits or directs a telephone or video conference, the court may direct a party to make the necessary arrangements and to give notice of those arrangements to the other parties and to the court.

[103]        All arrangements for videoconferencing facilities, both with the trial court in Toronto as well as an examination facility in the State of Washington shall be made by the plaintiffs. All expenses related to the videoconferencing facilities at both ends shall initially be borne by the plaintiffs, subject to such costs disposition as may be made by the trial judge. Also, there is no reason that prescribed conduct money should not be paid to McCaw. He is a non-party that the plaintiffs choose to examine as a trial witness and his wealth should not be a factor.

## COSTS OF MOTION

[104]        The plaintiffs were successful on this motion and are entitled to their costs. Even though they were unsuccessful in obtaining an order to compel McCaw to attend in Toronto to

- 23 -

give evidence at trial, they were successful in obtaining an order to attend by either of the alternate methods – either by examination before trial and videotaped or live at trial by videoconferencing. I do not consider this a division of success. McCaw resisted all proposed methods for giving evidence and made no offer to provide his evidence by any method. While a commission and letter of request for the giving of evidence live by videoconference may have been novel and reasonable to resist, McCaw also resisted the more traditional remedy of giving commission evidence prior to trial.

[105]     The motion was complex because of the requests for a commission and letter of request for evidence at trial in person or by videoconference. Although the plaintiffs' lawyers spent far more time on the motion than McCaw's lawyers, it was the plaintiffs that provided all of the evidence on the motion. The motion was important given the need to obtain the evidence of ownership when the corporation denied liability both for its own negligence and for vicarious liability and the need to establish what corporate culture was set and what actions were taken by ownership.

[106]     The plaintiffs claim that three lawyers spent a total of 92.7 hours in extensive research on Canadian and U.S. law and analysis on the various issues in this action, preparing and amending a notice of motion, affidavits, several motion records, factums and authorities as well as the time of two lawyers at this five hour hearing. Costs shall be on a partial indemnity scale. Costs claimed on a partial indemnity scale consist of $28,230 fees, $2,121 disbursements plus HST for a total of $31,760. The fixing of costs is not a simple mathematical exercise of multiplying hours spent by an hourly rate. I must determine costs that are fair and reasonable in the circumstances and that would be within the reasonable expectation of the losing party. In my view, despite the novelty of two of the heads of relief, the costs as claimed are excessive for a motion of this nature and beyond any reasonable expectation of McCaw. As part of that, there should be some deduction for time spent on the unsuccessful attempt to compel McCaw to attend trial in Toronto. I would also disallow costs of research on issues of "legal theories of negligence, vicarious liability and punitive damages". These issues are important, but the costs of research into those issues are more appropriately considered as costs in the action brought against those parties against whom negligence and vicarious liability are alleged and not costs of a motion to compel evidence of a non-party.

[107]     In my view costs of $15,000, inclusive of disbursements and HST, are fair and reasonable and within what should have been the reasonable expectations of McCaw. Although McCaw's costs are considerably less, all of the evidence on the motion was provided by the plaintiffs.

ORDER

[108]     I hereby order as follows:

    (1) A commission and letter of request to the judicial authorities in the State of Washington shall be issued requesting the issuance of such process as is necessary to compel John McCaw Jr. to attend at a suitable location in the State of Washington to

- 24 -

be examined at the trial of this action by live two-way videoconferencing or other form of satellite transmission on such date after the commencement of the trial of this action on 48 hours' notice.

(2) The plaintiffs shall at first instance be responsible for all costs associated with the videoconferencing facilities in both the State of Washington and at the trial in Toronto.

(3) The plaintiffs shall pay John McCaw Jr. attendance money payable in accordance with section 21 of Part II of Tariff A under the Courts of Justice Act.

(4) The laws of evidence of the Province of Ontario and the Ontario rules of civil procedure shall apply to the examination under the direction of the trial judge, and subject to such further or other order as may be made by the trial judge.

(5) John McCaw Jr. shall pay to the plaintiffs their costs of this motion within 30 days fixed in the sum of $15,000.00

_____

Master R. Dash

**DATE:**        March 24, 2014

2014 ONSC 1318 (CanLII)

# EXHIBIT 10

## Courts of Justice Act

R.S.O. 1990, CHAPTER C.43

**[…]**

**Use of French**
**Documents that may be written in French**

**126** (1) The following documents may be written in French:

1. Pleadings or other documents filed by a party.
2. A process issued in or giving rise to the proceeding. 2021, c. 4, Sched. 3, s. 16.

**Translation of documents**

(2) On a party's request, the court shall provide a translation into English or French of a document described in paragraph 1 or 2 of subsection (1) that is written in the other language. 2021, c. 4, Sched. 3, s. 16.

**Interpretation**

(3) If a party acting in person makes submissions in French or a witness gives oral evidence in French, the court shall provide interpretation of the submissions or evidence into English. This subsection does not apply to a hearing in a bilingual proceeding to which paragraph 3 of subsection (4) applies. 2021, c. 4, Sched. 3, s. 16.

**Bilingual proceedings**

(4) A party to a proceeding who speaks French has the right to require that it be conducted as a bilingual proceeding, and the following rules apply if the party does so:

1. The hearings that the party specifies shall be presided over by a judge or officer who speaks English and French.
2. If a hearing that the party has specified is held before a judge and jury in an area described in subsection (5), the jury shall consist of persons who speak English and French.
3. If a hearing that the party has specified is held without a jury, or with a jury in an area described in subsection (5), evidence given and submissions made in English or French shall be received, recorded and transcribed in the language in which they are given.
4. Any other part of the hearing may be conducted in French if, in the opinion of the presiding judge or officer, it can be so conducted.

5.  Oral evidence given in English or French at an examination out of court shall be received, recorded and transcribed in the language in which it is given.

6.  On the request of a party, if the party or their counsel speaks English or French but not both, the court shall provide interpretation of anything given orally in the other language at hearings referred to in paragraph 3 and at examinations out of court.

7.  The reasons for a decision may be written in English or French, but the court shall provide a translation into the other language on the request of a party. 2021, c. 4, Sched. 3, s. 16.

**Bilingual juries**

(5) The areas referred to in paragraphs 2 and 3 of subsection (4) are the following:

1.  Counties:

    i.  Essex.

    ii.  Middlesex.

    iii.  Prescott and Russell.

    iv.  Renfrew.

    v.  Simcoe.

    vi.  Stormont, Dundas and Glengarry.

2.  Territorial districts:

    i.  Algoma.

    ii.  Cochrane.

    iii.  Kenora.

    iv.  Nipissing.

    v.  Sudbury.

    vi.  Thunder Bay.

    vii.  Timiskaming.

3.  The area of the County of Welland as it existed on December 31, 1969.

4.  The Municipality of Chatham Kent.

5.  The City of Hamilton.

6.  The City of Ottawa.

7.  The Regional Municipality of Peel.

8.  The City of Greater Sudbury.

9.  The City of Toronto.

10.  Such other areas as are prescribed. 2021, c. 4, Sched. 3, s. 16.

**Prosecutions**

(6) If a prosecution under the *Provincial Offences Act* is to be conducted as a bilingual proceeding by a prosecutor referred to in paragraph 1 or 2 of the definition of "prosecutor" in subsection 1 (1) of that Act or an agent acting on behalf of that person, the prosecutor assigned to the case must speak English and French. 2021, c. 4, Sched. 3, s. 16.

**Appeals**

(7) When an appeal is taken in a proceeding that is being conducted as a bilingual proceeding, a party who speaks French has the right to require that the appeal be heard by a judge or judges who speak English and French; in that case subsection (4) applies to the appeal, with necessary modifications. 2021, c. 4, Sched. 3, s. 16.

**Parties who are not natural persons**

(8) A corporation, partnership or sole proprietorship may exercise the rights conferred by this section in the same way as a natural person, unless the court orders otherwise. 2021, c. 4, Sched. 3, s. 16.

**Regulations**

(9) The Lieutenant Governor in Council may make regulations,

(a)  prescribing procedures for the purpose of this section;

(b)  prescribing areas for the purpose of paragraph 10 of subsection (5). 2021, c. 4, Sched. 3, s. 16.

**Transition**

(10) This section, as it read immediately before section 17 of Schedule 3 to the *Accelerating Access to Justice Act, 2021* came into force, continues to apply to proceedings commenced before the day that section came into force. 2021, c. 4, Sched. 3, s. 16.

**Section Amendments with date in force (d/m/y)**

SCHEDULE 1

BILINGUAL JURIES

Paragraphs 2 and 3 of subsection 126 (2)

The following counties:

Essex

Middlesex

Prescott and Russell

Renfrew

Simcoe

Stormont, Dundas and Glengarry

The following territorial districts:

Algoma

Cochrane

Kenora

Nipissing

Sudbury

Thunder Bay

Timiskaming

The area of the County of Welland as it existed on December 31, 1969.

The Municipality of Chatham Kent.

The City of Hamilton.

The City of Ottawa.

The Regional Municipality of Peel.

The City of Greater Sudbury.

The City of Toronto.

1994, c. 12, s. 43 (3); 1997, c. 26, Sched.; O. Reg. 441/97, s. 1; 2002, c. 17, Sched. F, Table.

**Section Amendments with date in force (d/m/y)**

SCHEDULE 2

BILINGUAL DOCUMENTS

Paragraph 6 of subsection 126 (2)

The following counties:

Essex

Middlesex

Prescott and Russell

Renfrew

Simcoe

Stormont, Dundas and Glengarry

The following territorial districts:

Algoma

Cochrane

Kenora

Nipissing

Sudbury

Thunder Bay

Timiskaming

The area of the County of Welland as it existed on December 31, 1969.

The Municipality of Chatham Kent.

The City of Hamilton.

The City of Ottawa.

The Regional Municipality of Peel.

The City of Greater Sudbury.

The City of Toronto.

   1994, c. 12, s. 43 (3); 1997, c. 26, Sched.; O. Reg. 441/97, s. 2; 2002, c. 17, Sched. F, Table.

**Section Amendments with date in force (d/m/y)**