**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WE CHARITY, | |
| *Plaintiff,* | Civil Action No.  22-00340-RDM |
| vs. | |
| THE CANADIAN BROADCASTING CORPORATION, | ORAL HEARING REQUESTED |
| *Defendant.* | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FORUM NON CONVENIENS AND TO DISMISS COUNTS II-IV OF THE COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION

Joseph F. Kroetsch (*pro hac vice*)
Brooke A. Alexander (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749 8200
jkoetsch@bsfllp.com
balexander@bsfllp.com

Jonathan Sherman (Bar No. 468539)
Amy L. Neuhardt (Bar. No. 996791)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW
Washington, DC 20005
Tel: (202) 237 2727
jsherman@bsfllp.com
aneuhardt@bsfllp.com

Sabina Mariella (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel: (212) 446 2300
smariella@bsfllp.com

Rodney Smolla (*pro hac vice* to be filed)
4601 Concord Pike
Wilmington, DE 19803
Tel: (864) 373 3882
rodsmolla@gmail.com

*Attorneys for Plaintiff WE Charity*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF RELEVANT FACTS ..................................................................... 3

    I.      The Complaint: CBC's False and Defamatory Coverage of WE Charity's
           Fundraising for Kenyan Education. ...................................................................... 5

    II.     WE Charity is an American Charity: Its Donors and Charitable Programming
           Partners Are in the United States. ..................................................................... 10

    III.    How WE Charity Helps Children in Kenya......................................................... 11

    IV.   Caught in the Crossfire of a Political Scandal, WE Canada Announced Its Closure
           and Is Now Awaiting Government Approval to Dissolve. ................................... 12

ARGUMENT ................................................................................................................ 13

    I.      The Court Should Deny CBC's Motion to Dismiss for Forum Non Conveniens. 13

         A.    Ontario Is Not an Available or Adequate Alternative Forum for This
              Matter. ..................................................................................................... 15

             1.     Plaintiff's Claims Would Be Barred from Proceeding in Ontario. 15

             2.     CBC's Promise to Waive a Notice Requirement in Ontario Is
                    Ineffective Under Ontario Law and Does Not Render Ontario an
                    Available and Adequate Alternative Forum. ............................... 16

         B.    CBC Has Failed to Meet Its Burden of Justifying Dismissal Under the
              Private and Public Interest Factors. ......................................................... 19

             1.     Plaintiff's Choice of Forum is Entitled to Substantial Deference. 19

             2.     The Private Factors Do Not Favor Dismissal. ............................. 23

                  a.     CBC Does Not Explain How Obtaining Documentary
                         Sources of Proof Would Be Burdensome. ........................ 24

                  b.     The Majority of Material Non-Party Witnesses Are Subject
                          to Compulsory Process in the United States or Are Not
                          Subject to Compulsory Process in Either Forum. ............. 25

                  c.     CBC Has Not Identified Material Non-Party Witnesses
                          Residing in Canada Who Would Not Voluntarily Appear
                          for Trial in this Court. ...................................................... 29

d.      The Cost of Obtaining Attendance of Willing Witnesses in Washington, D.C., Does Not Strongly Favor Dismissal... 30

e.      A U.S. Forum is Necessary for WE Charity to Obtain a Judgement Enforceable and Recognizable in Its Home Country ........................................................................... 32

3.      The Public Factors Do Not Favor Dismissal. .............................. 34

a.      United States Substantive Law Will Apply to This Dispute. ........................................................................... 35

b.      Administrative Difficulties Do Not Warrant Dismissal.... 36

c.      There is No Burden of Jury Duty in This Dispute. ........... 37

d.      This Dispute is Not A "Localized" Canadian Controversy....................................................................... 37

II.     The Court Has Subject-Matter Jurisdiction Over All of Plaintiff's Claims.......... 38

A.      CBC Contracted with WE Charity to Interview Ms. Wiszowaty in Michigan in Exchange for an Interview of Ms. Moraa in Kenya. ............ 38

B.      Plaintiff's Claims Fall Within the Commercial Activity Exception to the FSIA.................................................................................................... 41

1.      WE Charity's Non-Defamation Claims Are Based on CBC's Foreign Activities that Caused a Direct Effect in the U.S. ........... 41

a.      Course of Action Can Demonstrate What the Parties "Necessarily Contemplated"............................................. 42

b.      Performance in the U.S. is not the Sole Means of Determining "Direct Effects" Under FSIA ....................... 43

2.      WE Charity's Claims Are Based Upon an Act to Be Performed in the U.S........................................................................................ 44

3.      WE Charity's Claims Are Based Upon an Act Defendant Performed in the U.S. in Connection with its Commercial Activity Elsewhere ................................................................................... 44

4.      This Court Also Has FSIA Jurisdiction over WE Charity's Causes of Action for Promissory Estoppel and Negligent Misrepresentation........................................................................ 45

CONCLUSION.................................................................................................... 45

TABLE OF AUTHORITIES

<u>**Cases**</u>

*Afro-American Publ'g Co. v. Jaffe,*
    366 F.2d 649 (D.C. Cir. 1966) ............................................................... 34

*Attias v. CareFirst, Inc.,*
    865 F.3d 620 (D.C. Cir. 2017) ............................................................... 39

*\*Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan,*
    273 F.3d 241 (2d Cir. 2001) ................................................................... 15

*Base Metal Trading S.A. v. Russian Aluminum,*
    253 F. Supp. 2d 681 (S.D.N.Y 2003) .................................................... 20

*Bos. Telecomms. Grp., Inc. v. Wood,*
    588 F.3d 1201 (9th Cir. 2009) .......................................................... 27, 38

*Bryks v. Canadian Broadcasting Corp.,*
    928 F. Supp. 381 (S.D.N.Y 1996) ......................................................... 34

*Byrne v. Brock,*
    2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ....................................... 39

*Byrne v. Clinton,*
    410 F. Supp. 3d 109 (D.D.C. 2019) ....................................................... 39

*Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV,*
    569 F.3d 189 (4th Cir. 2009) ................................................................. 15

*Cont'l Airlines, Inc. v. Am. Airlines, Inc.,*
    805 F. Supp. 1392 (S.D. Tex. 1992) ..................................................... 27

*Crane v. N.Y. Zoological Soc.,*
    894 F.2d 454 (D.C. Cir. 1990) ............................................................... 35

*Croesus EMTR Master Fund L.P. v. Brazil,*
    212 F. Supp.2d 30 (D.D.C. 2002) .................................................... 23, 42

*Cromer Fin. Ltd. v. Berger,*
    158 F.Supp.2d 347 (S.D.N.Y. 2001) ..................................................... 31

*\*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada,*
    764 F. Supp. 2d 155 (D.D.C. 2011) ...................................................... 38

*\*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada,*
    600 F.3d 661 (D.C. Cir. 2010) ............................................................... 43

*CSX Transp., Inc. v. Com. Union Ins. Co.*,
   82 F.3d 478 (D.C. Cir. 1996) ........................................................... 36

*DiRienzo v. Philip Servs. Corp.*,
   294 F.3d 21 (2nd Cir. 2002) ........................................................ 25, 31

*D'Onofrio v. Il Corriere Della Sera*,
   373 F. Supp. 2d 555 (E.D. Pa. 2005) ................................................ 23

*DRFP, LLC v. Republica Bolivariana De Venezuela*,
   2012 WL 5252306 (S.D. Ohio 2012) .............................................. 22, 30

*Duha v. Agrium, Inc.*,
   448 F.3d 867 (6th Cir. 2006) ........................................................... 29

*El-Fadl v. Central Bank of Jordan*,
   75 F.3d 668 (D.C. Cir. 1996) ........................................................... 19

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ....................................................................... 34

*Global Index Inc. v. Mkapa*,
   290 F. Supp. 2d 108 (D.D.C. 2010) ................................................. 43

*Goldfarb v. Channel One Russia*,
   442 F. Supp. 3d 649 (S.D.N.Y. 2020) .......................................... 21, 28

*Goodman Holdings v. Rafidain Bank*,
   26 F.3d 1143 (D.C. Cir. 1994) ........................................................ 42

*Guidi v. Inter-Continental Hotels Corp*,
   224 F.3d 142 (2d Cir. 2000) ........................................................... 21

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ....................................................................... 14

*In re Air Crash Over S. Indian Ocean*,
   352 F. Supp. 3d 19 (D.D.C. 2018) ............................................... 22, 30

*In re Optimal U.S. Litig.*,
   837 F. Supp. 2d 244 (S.D.N.Y. 2011) .......................................... 28, 31

*Israel Disc. Bank Ltd. v. Schapp*,
   505 F. Supp. 2d 651 (C.D. Cal. 2007) .............................................. 23

*Jones v. Mukasey*,
   565 F. Supp. 2d 68 (D.D.C. 2008) ................................................... 36

*Kettey v. Saudi Ministry of Educ.*,
　　53 F. Supp. 3d 40 (D.D.C. 2014) ........................................... 44

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
　　313 U.S. 487 (1941) ............................................................ 35

*Kontoulas v. A.H. Robins Co.*,
　　745 F.2d 312 (4th Cir. 1984) ......................................... 16, 18

*Lake v. Richardson-Merrell, Inc.*,
　　538 F. Supp. 262 (N.D. Ohio 1982) ................................... 18

*Lempert v. Republic of Kazakstan, Ministry of Justice*,
　　223 F. Supp. 2d 200 (D.D.C. 2002) ................................... 44

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
　　558 F. Supp. 2d 21 (D.D.C. 2008) ..................................... 23

*Neelon v. Krueger*,
　　63 F. Supp. 3d 165 (D. Mass. 2014) ........................... passim

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
　　416 F.3d 146 (2d Cir. 2005) ............................................. 17

*OBB Personenverkehr AG v. Sachs*,
　　136 S. Ct. 390 (2015) ........................................................ 41

*Odhiambo v. Republic of Kenya*,
　　764 F.3d 31 (D.C. Cir. 2014) ....................................... 41, 44

*Otto Candies LLC v. Citigroup, Inc.*,
　　963 F.3d 1331 (11th Cir. 2020) ................................... passim

*Piper Aircraft Co. v. Reyno*,
　　454 U.S. 235 (1981) ....................................................... passim

*Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*,
　　2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012) ..................... 30

*Reid-Walen v. Hansen*,
　　933 F.2d 1390 (8th Cir. 1991) .......................................... 21

*Republic of Argentina v. Weltover, Inc.*,
　　504 U.S. 607 (1992) ......................................................... 42

*Sacks v. Four Seasons Hotel Ltd.*,
　　2006 WL 783441 (E.D. Tex. Mar. 24, 2006) ...................... 17

*Shi v. New Mighty U.S. Tr.*,
    918 F.3d 944 (D.C. Cir. 2019) .................................................................... passim

*Simon v. Republic of Hungary*,
    911 F.3d 1172 (D.C. Cir. 2018) ....................................................... 19, 22, 24, 37

Stromberg v. Marriott Int'l, Inc.,
    474 F. Supp. 2d 57 (D.D.C. 2007) ......................................................... 23

*Trout Point Lodge, Ltd. v. Handshoe*,
    729 F.3d 481 (5th Cir. 2013).................................................................. 33

Weyrich v. New Republic, Inc.,
    235 F.3d 617 (D.C. Cir. 2001) ............................................................... 35

Yueh-Lan Wang v. New Mighty U.S. Tr.,
    322 F.R.D. 11 (D.D.C. 2017) .................................................................. 16

*Zedan v. Kingdom of Saudi Arabia*,
    849 F.2d 1511 (D.C. Cir. 1988) ....................................................... 44, 45

## <u>Statutes</u>

28 U.S.C. § 1605 ........................................................................................ 41

28 U.S.C. §§ 4101 ...................................................................................... 32

28 U.S.C. § 4102 ........................................................................................ 32

Plaintiff WE Charity submits this memorandum in opposition to Defendant Canadian Broadcasting Corporation's ("CBC") motion to dismiss for forum non conveniens and to dismiss Counts II-IV for lack of subject-matter jurisdiction (the "Motion").  ECF No. 16.

## PRELIMINARY STATEMENT

In the defamatory news coverage at the heart of this lawsuit, CBC travelled to Chicago, North Carolina, and multiple regions of Kenya and Australia to falsely claim that a New York nonprofit, WE Charity, deceived its American donors about its projects in Kenya.  Virtually none of the defamatory coverage takes place in Canada, none of the interviews are with Canadian residents, and CBC does not cite a single Canadian source for its challenged reporting.  As a U.S. non-profit corporation, WE Charity raises charitable funds exclusively in the United States and partners with school districts across the country to bring programming to hundreds of thousands of American schoolchildren.  WE Charity filed this lawsuit in its home forum where it suffered its harm as a result of CBC's falsehoods.

CBC asks the Court to dismiss this action on grounds that it would be more convenient to litigate in Ontario, Canada.  That is not the standard of course—CBC must show, at a minimum, that litigation in the U.S. is so vexatious and harassing as to be the *rare* case where the plaintiff's choice of forum is disturbed.  And that is the standard for a foreign plaintiff.  Here, where the plaintiff is an American charity operating in 37 states and this District for more than 25 years, the standard is even higher—CBC must show that the "oppressiveness" of this forum is "out of all proportion to plaintiff's convenience."  *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (1981).

Seeking to lower the bar for itself, CBC's motion hinges upon the false notion that WE Charity is a fake plaintiff, a "nominal" or "ostensible" or "putative" plaintiff stand-in for a "real party in interest" that CBC never identifies.  CBC pretends that WE Charity has initiated parallel litigation in Canada when in fact it has done nothing of the sort.  Citing WE Charity's decision to

centralize its finance department in Canada, CBC raises a red herring to deny the key role of American donors in this lawsuit. CBC also claims that the lawsuit is rooted in a 2020 Canadian political scandal that is not implicated in any of the claims, and which concerns a different entity than the plaintiff. And CBC greatly overstates the role of French language in this action about reporting conducted entirely by English-speaking reporters in English-speaking countries.

The forum non conveniens motion fails at the first step of analysis: there is no adequate alternative forum in Ontario where this action may proceed. CBC concedes that where a claim is time-barred in a foreign jurisdiction, no adequate alternative forum exists. CBC further concedes that Ontario has a short, six-week notice deadline for defamation actions that WE Charity did not meet for ten out of the eleven Defamatory Publications identified in the Complaint. CBC purports to waive its defense that WE Charity missed the six-week deadline, but Ontario law does not recognize such waivers. As WE Charity's Canadian law expert explains, the six-week deadline is a non-waivable jurisdictional condition precedent to an action. CBC's own Canadian law expert declaration is silent on this point, but he has written in a treatise that failure to provide the notice in time is an "absolute bar to bringing an action" for defamation in Ontario. Because CBC bears a heavy burden to show that an adequate alternative forum exists, even the *risk* that the Ontario courts would not hear the merits of WE Charity's claims is ample reason to deny CBC's motion. Here, it is clear CBC's motion would deny WE Charity its day in court.

Even with an adequate forum in Canada, CBC's Motion would not meet the high bar the law erects to protect a plaintiff's choice of forum. CBC does not identify a single Canadian resident it claims would be a material witness, much less explain why their testimony would be needed. CBC does not claim any witness in Canada (or elsewhere) would not voluntarily testify at trial in this Court. CBC cites no barriers to obtaining documents, which are likely all digital and

accessible anywhere.  Despite submitting two declarations from CBC employees, CBC does not contend that it would be inconvenient for CBC to appear for trial in this District, mere miles from its own Washington, D.C. bureau.  CBC does not contend Ontario law will apply in this action, and indeed under this District's conflict of law principles, U.S. law will apply—a factor CBC has previously conceded weighs heavily against dismissal.

CBC also does not address the fact that a defamation judgment by an Ontario court will not be enforced or recognized by any U.S. court.  In passing the SPEECH Act in 2010, Congress prohibited American courts from enforcing or affording any preclusive effect to a foreign defamation judgment that does not meet First Amendment standards.  U.S. courts are clear that Canada's speech protections fall short of the First Amendment as interpreted in *New York Times v. Sullivan* and its progeny.  For WE Charity, suing in the United States is not merely convenient, it is *necessary* for this American charity to obtain a judgment not found by Congress to be repugnant to the Constitution and without any force of law.

CBC's Motion also seeks to dismiss on sovereign immunity grounds WE Charity's claims for breach of contract, promissory estoppel, and negligent misrepresentation.  These claims arise out of CBC's broken promise to provide WE Charity an opportunity to respond to allegations of financial wrongdoing in an interview of its U.S.-based head of Kenya operations.  CBC's motion misstates the allegations of the complaint by claiming that the parties expected the interview to take place in Toronto, which was never contemplated.  The Motion also does not address that the purpose of the interview was to include WE Charity's response to CBC's allegations in the broadcast, which undisputedly occurred in the United States.  These allegations are sufficient to overcome CBC's claim of sovereign immunity.

## STATEMENT OF RELEVANT FACTS

The plaintiff in this action, WE Charity, is a registered 501(c)(3) nonprofit incorporated in

New York twenty-five years ago.  WE Charity has longstanding, deep roots across the United States.  All of WE Charity's donors are in the United States.[1]  WE Charity provides programming for hundreds of thousands of American schoolchildren through partnerships with school districts such as Chicago, Los Angeles and Montgomery County, Maryland, and the College Board.  WE Charity has filled stadiums of schoolchildren across the U.S. for WE Day celebrations, which have been nationally televised on ABC and CBS.

WE Charity has its origins in the Canadian entity of the same name that raises funds from Canadian donors, referred to herein as "WE Canada."  For pleading efficiency, the Complaint collectively refers to these entities, a smaller United Kingdom-based entity, and entities in developing countries such as Kenya that implement international development programming, as the "WE Organization," but there is no "WE Organization" entity.  These related entities chose to centralize common functions (such as IT and accounting) in Canada.  Certain WE Organization entities have also chosen to share common officers to manage day-to-day operations, but each entity, including the plaintiff in this action, has its own separate Board of Directors ultimately responsible for selecting officers, directing each organization, and approving financials.

WE Canada announced it was closing in 2020, caught in the crossfire of a Canadian political scandal, prior to any of the newsgathering and reporting challenged in this lawsuit. Despite the closure in Canada, WE Charity in the United States continued raising funds in the U.S. and partnering with U.S. school districts.  Marketing research in late 2020 showed that Americans continued to think highly of WE Charity despite the politics in Canada.  WE Charity's U.S. counsel wrote to CBC in January 2021, "While WE has been caught in the crossfire of a political battle in Canada, it still has a recognizable and reputable brand in the United States, Kenya and elsewhere

---

[1]       Canadian donors gave to the Canadian WE Charity entity that is not a party to this action.

. . . WE's American operations are clearly in the crosshairs of the CBC's reporting." Complaint ("Compl.") ¶ 708, ECF No. 1.

With WE's American operations uniquely vulnerable to the reputational harm CBC could inflict, CBC published false coverage that took pains to focus on the U.S. The coverage claimed that WE Charity deceived donors about how their donated funds would be used in Kenya to build schoolrooms. The coverage challenged in this action was filmed in Kenya, North Carolina, Chicago and Australia—not Canada. The donors interviewed in the episode were in the US and Australia. CBC made the narrative focus of its episode the experience of North Carolina donor Watson Jordan, who like all American donors, gave to WE Charity in the U.S., not WE Canada. Throughout the reporting process, the overwhelming majority of CBC's engagement with WE Charity was with its head of Kenyan operations, a U.S. citizen living in Michigan, whose life's work CBC portrayed as a fraud.

## I.   The Complaint: CBC's False and Defamatory Coverage of WE Charity's Fundraising for Kenyan Education.

In November 2021, more than a year after WE Canada announced it was closing, CBC published false and defamatory allegations accusing WE Charity of "routinely deceiving" its donors regarding how their money would be used to support education in Kenya. Compl. ¶ 3. CBC's coverage was the product of reporting by its flagship English-language investigatory news program, *The Fifth Estate*, and was broadcast on television, radio, the web, a podcast, social media, and an email newsletter. *Id.* ¶ 302. Then, in January 2022, CBC's French-language investigatory news program, *Enquête*, aired its take, adding footage from *Enquête*'s host while removing several minutes of the original *Fifth* episode that it translated to French. *Id.* CBC's coverage was widely available to millions throughout the United States through television and radio broadcasts, U.S. cable services who offer CBC, CBC's website, CBC's email, and U.S.-based platforms where

CBC published its content, including YouTube, Apple Podcasts, Facebook, and Twitter.  *Id.*

The *Fifth*'s November episode that is at the heart of this lawsuit is titled, "Finding School No. 4: WE Charity's donor deception in Kenya."  *Id.* ¶ 341.  The episode is filmed primarily in Kenya with several significant on-location segments in the United States.  *Id.* ¶ 426.  None of the challenged coverage aside from a brief montage of CBC's own office is in Canada.  ECF No. 1-4. "School No. 4" in the title refers to CBC's narrative focus on Watson Jordan.  Compl. ¶ 582.  The episode includes interviews with donors in North Carolina (Mr. Jordan) and Australia (Rukshan de Silva[2]) and includes footage of testimony by donor Reed Cowan, who lives in California.  *Id.* ¶¶ 384–85; *see also* Declaration of Nathan Siegel ("Siegel Decl.") Ex. 38 at 8, 9, ECF Nos. 16-41. The episode also includes an interview in Chicago with a U.S.-based charity watchdog organization.[3]  Compl. ¶ 426; Siegel Decl. Ex. 38 at 9.  CBC did not identify a single non-party source in Canada for any of its false and defamatory coverage.  *See* ECF No. 1-4.

American donors to WE Charity appear throughout the defamatory *Fifth* episode.  The episode opens with footage of Watson Jordan and Reed Cowan.  ECF No. 1-4 at 2.  Early on, CBC refers to donors in Ft. Lauderdale and shows a school class in Plantation, Florida holding an oversized U.S. ten-thousand-dollar bill.  *Id.* at 6.  California's Unstoppable Foundation, referred to as an "American foundation" comes up multiple times, and California-based Change Heroes and its founder, Taylor Conroy are discussed at some length.  *Id.* at 14–16.  CBC also discusses donations by organization Pledge to Humanity and its founder, Gaby Ghorbani in California, as well as Georgia-based Jeunesse Global.  *Id.* at 40.  Donor names scroll by, including Oprah

---

[2]      Mr. De Silva grew up in Canada but according to his LinkedIn profile, he lives in in Sydney, Australia.  Compl. ¶ 605; Siegel Decl. Ex. 39 at 10 & Ex. QQ.

[3]      The organization, Charity Watch, rates WE Charity, not WE Canada.  *See* https://www.charitywatch.org/charities/we-charity (listing WE Charity's New York address).

Ambassadors, Virginia-based Baby Girl project, and individuals in Salt Lake City, Utah and Dallas, Texas.  As a lead-in for a segment filmed in Chicago, host Mark Kelley says, "rumbling of troubles at WE Charity made their way to the United States, where the charity has raised nearly $200 million dollars in donations in the last decade."  *Id.* at 36.

This is not to say that CBC's coverage was silent as to Canada.  Setting the stage for the purported motivation for its investigation, the *Fifth* episode briefly summarizes the history of WE Canada's rise and then fall as a casualty of political crossfire.  *Id.* at 8–9.  This was old news, a prelude to CBC's investigation, and it is not challenged in this lawsuit.  In addition to American donors, CBC named donors in Canada and briefly aired a few of their online postings. No Canadian residents were interviewed or identified as sources for CBC's defamatory allegations.

WE Charity communicated with CBC about its planned coverage since at least January 2021 in an effort to persuade it that it was pursuing a false, preconceived narrative.  Compl. ¶ 113. WE Charity repeatedly reminded CBC that with WE Canada shutting down, the harm its coverage stood to cause would be predominantly in the United States.  Siegel Decl. Ex. 28 at 17; Compl. ¶¶ 704–10.  For example, on January 27, 2021, WE Charity's U.S. counsel wrote to CBC that:

> [t]he Story will cause great harm to [WE Charity's] assets, especially in the United States, which is the home of many of WE's donors (including some poised to be mentioned in the Story). WE's American operations are clearly in the crosshairs of the CBC's reporting. WE engages with school districts, teachers and other organizations in the United States. A significant portion of its funding comes from corporate sponsorship and donations from the United States. In short, our client has a reputation to protect in the United States and it reserves all rights to do so as well as in Canada.

Siegel Decl. Ex. 28 at 17; Compl. ¶¶ 333–35.

Again, on November 17, 2021, WE Charity's U.S. counsel reminded CBC that WE Charity is a New York non-profit, its donations come from the U.S., it implements more domestic programming in the United States than anywhere else in the world (including Canada), and that

7

CBC's upcoming broadcast focused on Kenyan operations overseen by an American and donations by American residents. Compl. ¶ 709.  Thus, WE Charity made clear that the "[b]y airing a false and defamatory Upcoming Broadcast, the CBC will cause further direct harm to our clients in the United States."  *Id.*  CBC never disagreed.  Compl. ¶ 336.

Throughout the reporting process in the summer and fall of 2021, the overwhelming majority of CBC's engagement with WE Charity was with its head of Kenyan operations, Robin Wiszowaty, a U.S. citizen living in Michigan.  *Id.* ¶¶ 30, 179–84, 220–41, 273–80, 313–19, 323–31, 458–60, 479, 484, 614, 650–658, 665, 699; Declaration of Scott Baker ("Baker Decl.") ¶ 57.  Then, after the false and defamatory coverage aired in November, WE Charity requested a retraction in a letter providing notice of libel under Ontario law.  Siegel Ex. 32.  A libel notice does not initiate litigation in Ontario, but WE Charity hoped it would prompt corrective action by CBC.  Declaration of Douglas Harrison ("Harrison Decl.") ¶ 13.  CBC refused to correct or retract its false coverage and showed WE Charity that such efforts at persuasion were futile.  Compl. ¶ 741.  After CBC subsequently aired the *Enquête* episode in January 2022, WE Charity filed this lawsuit in its home forum.  *Id.* ¶ 416.  This lawsuit is the first and only legal action WE Charity has ever taken against CBC (or any other media defendant).  Baker Decl. ¶ 16.

The Complaint sets forth ten specific false statements of fact defined as "Core Allegations" that are challenged as defamatory in this lawsuit.  *E.g.*, Compl. ¶ 425 (enumerating Core Allegations lettered "a" through "j").  Many of the falsehoods concern statements of fact that CBC falsely attributed to WE Charity or its agents, typically by misquoting documents.  *E.g.*, Core Allegation b (misquoting WE forensic auditor's preliminary report), c (misquoting a WE document), d (misquoting WE's statements to CBC), g (misquoting a WE email to Mr. Jordan), h (misquoting WE spreadsheets), j (falsely claiming WE provided no response to CBC's

allegations). *Id.* Other allegations concern the content of documents in CBC's possession that speak for themselves, such as CBC's claim that it found "social media posts" and "websites" by WE Charity donors claiming to have "fully funded over 900 primary schoolhouses in Kenya."[4] Core Allegation f. Yet other Core Allegations concern facts on the ground in Kenya. Core Allegations e (number of schoolrooms in Kenyan villages) and i (falsely reporting as a WE cover-up the results of CBC's own failure to get Kenyan government permission to visit schools during a pandemic). And WE Charity's books and records have been digitized for many years and are equally accessible in the U.S. as Canada. Core Allegation a (falsely claiming WE diverted funds donated for use in Kenya); Baker Decl. ¶ 64.

CBC's falsehoods set forth in the Complaint are too numerous to detail in this motion. For example, WE Charity alleges that CBC faked a cover-up rather than admit to viewers that it failed to get Kenyan government clearance to film at schools. Compl. ¶ 646. The Complaint quotes email correspondence showing that prior to its visit to Kenya, CBC knew it needed Kenyan government permission to film at WE Charity-funded schools, which are run by the government. *Id.* ¶¶ 647–62. But CBC did not get permission, despite telling WE Charity in writing that it had done so, and was denied access. *Id.* ¶ 653. In a letter to CBC protesting its reporters' misconduct in Kenya, the Kenyan government confirmed, "There is no record of the Ministry of Education issuing permission to the Canadian Broadcasting Corporation to film in schools in September 2021." *Id.* ¶ 660. In its news coverage, however, CBC hid the real reason it was denied access and feigned surprise: "we were told we couldn't come in, ***which we found to be kind of odd.***" Instead, CBC falsely claimed that WE Charity obstructed its investigation. *Id.* ¶¶ 669, 672.

---

[4] To the extent CBC actually communicated with such donors, CBC will have in its possession the emails or, as we understand is its practice, recordings of phone calls.

The key nonparty witnesses identified in the Complaint are in the U.S.  Because WE Charity's donors are in the U.S., so is this evidence of damages.  Baker Decl. ¶ 50.  Watson Jordan, the former WE Charity donor at the heart of CBC's reporting, is in the U.S.  Siegel Decl. Ex. 38 at 9.  Reed Cowan, a former donor whom CBC credits in its coverage as inspiring its reporting, is in the U.S.  *Id.* at 8.  Laurie Styron, the executive director of Chicago-based Charity Watch interviewed by CBC, is in the U.S.  *Id.* at 9.  One of the two donors whom CBC identifies as being mentioned in the "leaked documents" it obtained is California resident Gaby Ghorbani (the other donor is in the British Virgin Islands).  *Id.* at 8.  Other witnesses are in countries that are at least as convenient from United States as Canada.  Witnesses from Kenya must fly to the United States or a third country before continuing on to Canada.  *Id.* at 10.  Mr. de Silva, in Australia, could hardly be said to be conveniently located for a trial in Ontario.  *Id.*

## II.   WE Charity is an American Charity: Its Donors and Charitable Programming Partners Are in the United States.

WE Charity is a registered 501(c)(3) nonprofit charitable organization incorporated in New York in 1997 and licensed to operate in 37 states and the District of Columbia.  Baker Decl. ¶¶ 8–10.  WE Charity raises money exclusively in the United States from donors including thousands of individuals across the country, and has partnered with iconic American corporations like Microsoft, Hershey's, Allstate, Walgreens, and Dow Chemical.  *Id.* ¶¶ 48–49.

WE Charity's U.S. operations are significant.  Through its WE Schools program, WE Charity has partnered with school districts across the U.S.—including those in Chicago, Los Angeles, and Montgomery County—to run programming aimed at encouraging hundreds of thousands of students to participate in community service.  *Id.* ¶¶ 28–31.  Thousands of teachers from all fifty states participate in the WE Teachers program, and WE Charity is an official provider of continuing education for teachers in states including Texas and Washington.  *Id.* ¶ 36.

More than a hundred thousand American students have attended WE Day events in the U.S. celebrating their public service.  *Id.* ¶ 45.  These events have taken place across the country in venues such as New York's Radio City Music Hall, Brooklyn's Barclay's Center, Chicago's Allstate Arena, Baltimore's Hippodrome and Minneapolis's Xcel Energy Center, among others. *Id.*  WE Day events have been nationally televised on ABC and CBS and reported on by the U.S. mainstream media.  *Id.* ¶¶ 46–47.

WE Charity is managed by its Board of Directors, most of whom are U.S. residents.  *Id.* ¶ 18; Declaration of Kannan Arasaratnam ("Arasaratnam Decl.") ¶ 3.  The Board actively manages WE Charity and meets at least several times per year, and has met at least 40 times since January 2019.  Baker Decl. ¶ 19; Arasaratnam Decl. ¶ 9.  Over the course of its decades of existence, WE Charity has filed many American regulatory filings in the jurisdictions in which it operates[5], retains the services of New York-based auditors to prepare its audited financials, and engages the services of multiple U.S. law firms to ensure legal compliance.[6]  *Id*. ¶¶ 12–15.

### III.  <u>How WE Charity Helps Children in Kenya.</u>

In addition to supporting WE Charity's extensive domestic charitable work in the U.S., WE Charity donors give funds to support international development work in Kenya, Ecuador, Sierra Leone, Ethiopia, Tanzania, India, Haiti, Nicaragua, China, and other countries.  Compl. ¶ 37.  WE Charity supports international development programming through related charitable organizations in developing countries.  Baker Decl. ¶ 53.  In Kenya, that organization is Free the

---

[5]    In its Motion, CBC cherry-picks several U.S. regulatory filings erroneously containing a Toronto address but never explains why these filings are relevant.  *See* Baker Decl. ¶¶ 14-15.  They are not.

[6]    CBC cites (at 13) transparency reports that WE Canada commissioned during the 2020 political scandal.  They are not about Plaintiff or Kenyan donations and are irrelevant.

Children Kenya.  *Id.* ¶ 56.

For efficiency, most of the funds that WE Charity raises from donors in the U.S. historically flowed through WE Canada before being transferred to Kenya.[7]  Baker Decl. ¶ 61; *see also* Declaration of Harvey Cashore ("Cashore Decl.") Ex. 1 at 1–3, ECF No. 16-46.  By centralizing donor funds in one location before distributing them to donee organizations such as Free the Children Kenya, WE Charity is able to best maintain proper controls over the flow of funds by minimizing the total number of transfers.  Baker Decl. ¶ 60.  The U.S.-based WE Charity Board of Directors authorizes such grants from WE Charity and exercises careful oversight over the charity's financials.  Arasaratnam Decl. ¶¶ 13–14.  Among other things, WE Charity's Board of Directors is responsible for signing off on audits regarding WE Charity's compliance with its obligation to track funds donated for a restricted purpose (such as for Kenya).  *Id.* ¶ 14.

WE Canada then transfers such funds and resources to Free the Children Kenya.  Baker Decl. ¶ 59.  The charitable work is executed in Kenya, where it is overseen by WE Charity's Country Director for Kenya, Robin Wiszowaty, a U.S. citizen who resides in Michigan and is employed and paid by WE Charity.  *Id.* ¶ 57; Compl. ¶ 30.  More than 100 employees work for Free the Children Kenya, all of whom are Kenyan.  *Id.* ¶ 58.  Ms. Wiszowaty, together with Scott Baker (WE Charity's Executive Director who lives in Ecuador), make the final determination as to when schools are built in Kenya.  *Id.* ¶ 61.

## IV.   Caught in the Crossfire of a Political Scandal, WE Canada Announced Its Closure and Is Now Awaiting Government Approval to Dissolve.

Two years ago, WE Canada became collateral damage of a Canadian political controversy arising out of Prime Minister Trudeau's failure to recuse himself from the selection of WE Canada

---

[7]     This will be changing upon the final dissolution of WE Canada. Baker Decl. ¶ 65.

to administer a COVID relief program.  Compl. ¶ 78.  Certain of Mr. Trudeau's family members carry out paid speaking engagements, including for WE Canada.  *Id.*  Unbeknownst to WE Canada, Mr. Trudeau did not recuse himself from the selection of WE Charity to administer a COVID relief grant program in 2020.  *Id.* WE Canada was never investigated with respect to these officials' actions, nor was it found to have known of problems with the government's selection process.  *Id.* ¶ 80. Mr. Trudeau was exonerated in the scandal by Canada's independent Ethics' Commissioner. *Id.* ¶ 79. Nonetheless, the controversy resulted in WE Canada announcing in September 2020 that it was shutting down, ending all fundraising activity and programming in Canada.  *Id.* ¶ 82.

WE Canada is currently awaiting government approval to dissolve.  Baker Decl. ¶ 65.  CBC states in the November *Fifth* Episode, "The Charity recently sold its head office in Toronto." ECF No. 1-4 at 46.  WE Canada's remaining assets will be run off through a new WE Charity Foundation ("WCF"), whose funds help contribute towards development work in Kenya.  Baker Decl. ¶¶ 67–68.  WCF is led by a Board of Directors with three members from Kenya, and four from Canada.  *Id.* ¶ 69.  The two volunteer officers managing WCF are an American and a Kenyan. *Id.* ¶ 70.  Unlike WE Canada, WCF engages in no fundraising, runs no Canadian programming, supports only Kenya, and has less than one percent of the staff previously employed by WE Canada.  *Id.* ¶¶ 68, 71.

While WE Canada was shutting down, WE Charity remained strong in the U.S.  In October 2020, WE Charity commissioned a comprehensive brand study and market survey from Ipsos, which concluded that Americans maintained a positive view of WE Charity.  *Id.* ¶ 42 & Ex. C.

## ARGUMENT

### I.  The Court Should Deny CBC's Motion to Dismiss for Forum Non Conveniens.

Under the doctrine of forum non conveniens*, the Court must decide: "(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private

13

and public interest factors strongly favors dismissal . . . in light of the degree of deference the plaintiff's choice of forum deserves." *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 947–48 (D.C. Cir. 2019). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Defendant must carry its burden on both prongs.

CBC has failed to meet its heavy burden under the forum non conveniens doctrine. ***First***, CBC has failed to demonstrate that Ontario is an available and adequate forum for this matter because most of WE Charity's claims would be time-barred in Ontario and CBC cannot waive this limitation under Ontario law.

***Second***, the balance of private and public interest factors do not weigh in favor of dismissal at all, let alone "strongly" in favor of dismissal. This dispute centers on Defamatory Publications about WE Charity's operations in Kenya (not Canada), which are overseen by a U.S. resident, and WE Charity's communications with various U.S.-based donors. The Canadian witnesses that may actually be *material* to this dispute are current employees of CBC or WE Charity, and are thus within the parties' control. CBC does not even contend it would be inconvenient for its employees to travel to Washington, D.C. for trial. CBC identifies no witnesses in Canada who will not voluntarily appear for trial here in the U.S. Furthermore, only by proceeding in the United States may WE Charity obtain a defamation judgment that may be recognized in a U.S. court, whereas an American judgment will be easily enforceable in Canada.

The public interest factors weigh likewise strongly in favor of resolving this matter in an American court. American substantive law will apply to the dispute and this is not a localized Canadian dispute—the harm to WE Charity's reputation was felt in the U.S. where *all* of its donors and programming partners are located.

### A.   Ontario Is Not an Available or Adequate Alternative Forum for This Matter.

An available and adequate alternative forum is an absolute prerequisite to granting any forum non conveniens motion.  *See Shi*, 918 F.3d at 947.  As with all factors to be considered on a forum non conveniens motion, CBC bears the burden of proving that Ontario is an available and adequate alternative forum.  *See Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 248 (2d Cir. 2001).  Here, CBC failed to meet that burden because the time to satisfy a non-waivable condition precedent to a defamation claim in Ontario has expired for multiple publications subject to the defamation claim.

### 1.   Plaintiff's Claims Would Be Barred from Proceeding in Ontario.

As CBC's expert explains in his declaration, Ontario law imposes two time-based limitations on defamation claims.  Declaration of Brian Rogers ("Rogers Decl.") ¶ 12, ECF No. 16-48.  First, Ontario law requires a plaintiff to give a defendant notice of a libel in a broadcast or newspaper within six weeks after the libel has come to the plaintiff's knowledge.  *Id*.  Second, actions for libel or slander must be commenced within three months of publication.  *Id*. ¶ 13.  Federal courts consistently hold that "if the statute of limitations has expired in the alternative forum, the forum is not available, and the motion to dismiss based on forum non conveniens would not be appropriate."  *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 202 (4th Cir. 2009); *see also Bank of Credit,* 273 F.3d at 246 ("[A]n adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum.").

Application of the six-week notice provision will bar WE Charity from bringing any claim against CBC arising from the *Enquête* broadcast because that broadcast aired on January 27, 2022 and WE Charity did not send a libel notice to CBC as to that broadcast within six weeks. Compl. ¶¶ 302(k), 414–16.  Likewise, the libel notice sent to CBC prior to the broadcast of *Enquête* on December 22, 2021, provided notice only as to false statements in the *Fifth* episode and did not

include many of the other Defamatory Publications challenged in this lawsuit. *See* Siegel Decl. Ex. 32, ECF No. 16-35. Further, all of WE Charity's defamation claims would be time-barred in Ontario under the statute of limitations period, as CBC published all of the Defamatory Publications at issue between November 2021 and January 2022. Compl. ¶ 302. "This alone dooms [CBC's] forum non conveniens argument for now." *Yueh-Lan Wang v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 26 (D.D.C. 2017). The possibility that WE Charity's action against CBC could be barred in whole or in part means that CBC's motion must fail. *See Kontoulas v. A.H. Robins Co.*, 745 F.2d 312, 316 (4th Cir. 1984) (defendant must meet "heavy burden of showing for *each individual action* that no statute of limitations in the plaintiff's home state renders that state ineligible to serve as an alternative forum" (emphasis in original)).

### 2. CBC's Promise to Waive a Notice Requirement in Ontario Is Ineffective Under Ontario Law and Does Not Render Ontario an Available and Adequate Alternative Forum.

CBC does not dispute that Plaintiff's defamation claims would be barred in Ontario under both Ontario's notice requirement and statute of limitations, and it does not contend that the expiration of these short periods should be imputed against WE Charity. CBC Mem. at 23. Instead, CBC states that it is willing to waive all time-related defenses if this action is re-filed in Ontario. *Id.* CBC states that WE Charity has already satisfied the notice requirement for the November 18, 2021, *Fifth Estate* Episode, but purports to waive the requirement for the ten other Defamatory Publications identified in the complaint for which notice was not provided. CBC Mem. at 23 n.13. But Ontario law is clear that the notice requirement is a jurisdictional condition precedent to bringing an action, and it is thus non-waivable. CBC's attempted waiver therefore does not render Ontario an adequate or available alternative forum.

As explained by WE Charity's Canadian law expert, the notice requirement in the Ontario Libel and Slander Act is ***not*** an affirmative defense that can be waived in Ontario. Harrison Decl.

¶¶ 14–26. The six-week notice provision is a "condition precedent" to the existence of a cause of action and renders a "nullity" a cause of action when the required notice has not been timely sought. *Id.* ¶ 14–20. Thus, even if a defendant in Ontario fails to raise a notice defense, an Ontario court could dismiss claims for which the defendant was not provided notice within six weeks. *Id.* CBC's promise of waiver fails to make Ontario an adequate and available alternative forum because an Ontario court may still find that WE Charity's claims are barred.[8] *Sacks v. Four Seasons Hotel Ltd.*, No. 5:04CV73, 2006 WL 783441, at *7 (E.D. Tex. Mar. 24, 2006) (holding that Mexico was not an adequate forum because "stipulations made before a United States court to waive the Mexican statute of limitations are meaningless in Mexico").

CBC's own proffered expert, Brian Rogers, is in accord that failure to satisfy Ontario's six-week notice requirement is an "absolute bar to bringing an action" in Ontario.  Mr. Rogers wrote in the *International Libel & Privacy Handbook* treatise (referenced in ¶ 5 of his Declaration):

> For a libel published or broadcast by the media in Ontario, a plaintiff must serve written notice to all prospective defendants specifying the matter complained of within six weeks of the alleged libel coming to his or her knowledge…. ***A failure to give the required notice is an absolute bar to bringing an action***, and there is also a three-month limitation period for media libel in Ontario.

Harrison Decl. ¶ 25; Declaration of Joseph F. Kroetsch ("Kroetsch Decl.") Ex. A at 45–46 (emphasis added).  While Mr. Rogers states in his Declaration that the Libel and Slander Act's three-month limitations period may be waived, he does not contend that the six-week notice period can be waived.  Rogers Decl. ¶¶ 12–13.

---

[8]    It is irrelevant that the present unavailability of the Canadian forum is the result of WE Charity's own decision not to bring suit within Ontario's short deadlines.  "The second step of *forum non conveniens* analysis does not concern itself with the reason why an alternative foreign forum is no longer available; its singular concern is the fact of present availability." *Norex Petroleum Ltd. v. Access Indus., Inc*., 416 F.3d 146, 159 (2d Cir. 2005).

Where, as here, a time-based limitation is an "absolute . . . bar to a cause of action," there exists no adequate alternative forum and the defendant's forum non conveniens motion must be denied. *See Lake v. Richardson-Merrell, Inc.*, 538 F. Supp. 262, 262 (N.D. Ohio 1982) (holding that Quebec was not adequate forum because claims would be untimely and "[t]he prescription in Quebec . . . is an *absolute substantive bar* to a cause of action" (emphasis added)).  This alone means CBC's *entire* forum non conveniens motion must fail, because if any *one* of WE Charity's defamation claims will be time-barred, the Ontario forum is deemed not "available" in its entirety. *See Kontoulas*, 745 F.2d at 316.

Even were the law in Ontario less clear than it is here, the *possibility* that an Ontario court might dismiss WE Charity's claims as untimely despite a waiver constitutes grounds to deny CBC's motion.  The D.C. Circuit has cautioned that courts should be particularly wary of declaring a foreign forum "available" when doubt exists as to whether a defendant's proffered waiver would be accepted or enforceable in the alternative forum.  *See Shi*, 918 F.3d at 950.  Similarly, even were CBC's promised waiver effective at the Ontario trial court level, an appellate court could reverse that finding years later, leaving WE Charity without an available forum.  *See* Harrison Decl. ¶ 26; *Bank of Credit*, 273 F.3d at 248 ("a condition [for dismissal] that the foreign forum not refuse to hear the case on statute of limitations grounds might well be considerably less protective, if a decision by a trial court to accept the case were sufficiently vulnerable to being overturned on appeal").

Because Ontario is not an available or adequate alternative forum, CBC's motion should be denied, and the Court need not proceed to analyze the private and public interest factors.

**B.   CBC Has Failed to Meet Its Burden of Justifying Dismissal Under the Private and Public Interest Factors.**

### 1.   Plaintiff's Choice of Forum is Entitled to Substantial Deference.

CBC's motion reads out of forum non conveniens the central proposition that a "degree of deference" must accorded plaintiff's choice to litigate in the United States.  *See, e.g.*, *Shi*, 918 F.3d at 948 ("The court must balance the relevant private and public interest factors *in light of the degree of deference the plaintiff's choice of forum deserves*." (emphasis added)); *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C. Cir. 1996) (after finding an adequate alternative forum, the "court then weigh[s] the relative conveniences to the parties *against the presumption of the plaintiff's forum selection*."), *abrogated on other grounds,* 560 U.S. 305 (2010).

Despite the clarity of the law, CBC repeatedly describes the burden it must meet as a simple question of balancing of conveniences—untethered to any presumption.  Ontario, it claims, is "by far the most convenient forum to litigate this case."  CBC Mem. at 20.  CBC declares the "central purpose of the *forum non conveniens* inquiry is to ensure the litigation is in a convenient location."  But the forum non conveniens doctrine is not a free-floating "balancing" analysis.  "The initial presumption is an important mooring for an otherwise flexible doctrine." *Otto Candies LLC v. Citigroup, Inc.,* 963 F.3d 1331, 1339 n.2 (11th Cir. 2020); *see also Simon v. Republic of Hungary,* 911 F.3d 1172, 1182 (D.C. Cir. 2018) ("The starting point is a strong presumption in favor of the plaintiff's choice of the forum in which to press her suit." (internal quotation marks omitted)), *vacated on other grounds*, 141 S. Ct. 691 (2021).  The strongest presumption, which applies when the plaintiff is—like WE Charity—a U.S. resident, requires that "a plaintiff's choice of forum should *rarely be disturbed*" and that a court may only dismiss the case "[w]hen trial in the [alternative forum] *would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience*."  *Piper,* 454 U.S. at 241–42 (emphasis added) (internal

quotation marks omitted).

The federal courts, including the D.C. Circuit, also have articulated the level of deference accorded to a foreign plaintiff's forum choice.  Under it, dismissal still occurs "only in rare cases"; but where the moving defendant "show[s] that suit in *the United States is **so inconvenient as to be harassing, vexing, or oppressive**.*"  *See, e.g., Shi*, 918 F.3d at 953 (reversing dismissal on the grounds that "minimal deference" was insufficient to permit correct balancing of conveniences) (emphasis added).  The lower level of deference derives not from "any prejudice to foreign plaintiffs," *Base Metal Trading S.A. v. Russian Aluminum*, 253 F. Supp. 2d 681, 693 (S.D.N.Y 2003), but because when a U.S. resident files in the U.S., "it is reasonable for the court to assume that this choice is convenient."  *Piper,* 454 U.S. at 256.   But, as the D.C. Circuit (along with the Second, Third, Sixth, Ninth and Eleventh Circuits), has expressly ruled: "[T]he conclusion that a foreign plaintiff's choice deserves less deference, is a matter of degree.  *Deference may be appropriate, and certain considerations may make litigation in a U.S. court **the most convenient choice even for foreign plaintiffs**.*"  *Shi,* 918 F.3d at 949 (emphasis added) (citations omitted); *accord, e.g., Otto Candies,* 963 F.3d at 1339 ("Reduced deference is not an invitation to accord a foreign plaintiff's selection of an American forum no deference since dismissal for *forum non conveniens* is the exception rather than the rule." (emphasis added) (quotation marks omitted)).

The Plaintiff, WE Charity is an American non-profit that has been registered as a 501(c)(3) charity in the United States for *25 years* in *37 states* (and D.C.).   Baker Decl. ¶¶ 8, 11.  CBC nowhere disputes these allegations—which alone required it to meet the highest level of deference. *See Piper,* 454 U.S. at 255–56.  Resorting to misdirection, CBC calls WE Charity a "nominal" entity, suing for an unidentified "real party in interest" that has its "nerve center" in Canada.  CBC Mem. at 1, 25–26.  But CBC never identifies that real party in interest—it cannot be WE Canada,

which in the final stages of winding down.[9]  WCF, which CBC also references with little explanation, is a fund for managing WE Canada's remaining assets after its closure, and it does not fundraise or run any programming.  Baker Decl. ¶¶ 67–68.

WE Charity and its U.S. operations are at the heart of this lawsuit.  The *Fifth* episode's title references "School No. 4," a schoolroom in Kenya that CBC contends was "fully funded" by a WE Charity donor residing in North Carolina, Watson Jordan.  Compl. ¶¶ 355, 582; ECF No. 1-4 at 4:19–23.  The money Mr. Jordan donated was approved for use in Kenya by WE Charity's Board of Directors, most of whom reside in the U.S.  Baker Decl. ¶¶ 20, 21, 59; Arasaratnam Decl. ¶¶ 3, 5.  Funding deployment in Kenya is overseen by a U.S. citizen residing in the U.S. and employed by WE Charity.  Baker Decl. ¶ 57; Compl. ¶¶ 30, 49.

WE Charity sued in its home forum.[10]  WE Charity told CBC before it published the Defamatory Publications that WE Charity in the U.S. stood to bear the harm caused by CBC's falsehoods, and CBC did not disagree.  *See, e.g.*, Compl. ¶¶ 332–39.  WE Charity was harmed in the U.S. because, among other reasons, it fundraises exclusively in the U.S.  *Id.* ¶ 706; Baker Decl. ¶ 49.  WE Charity relies on its reputation in the U.S. to partner with various U.S. entities to

---

[9]     Throughout the controversy between WE Charity and CBC, it was well known to both parties that WE Canada was in the process of winding down its operations.  Compl. ¶¶ 198, 393.  Indeed, CBC's own broadcasts proclaimed that WE Canada was winding down.  *Id.* ¶ 393; ECF No. 1-4 at 46.  WE Charity's Canadian law expert explains that in Canada, a dissolved company may not sue, nor may a defamation plaintiff assign its claims.  Harrison Decl. ¶¶ 27–28.

[10]     When federal courts refer to a "home" forum in forum non conveniens cases, they are referring *only* to whether the *United States* is the plaintiff's home *country*.  *See, e.g.*, *Guidi v. Inter-Continental Hotels Corp*, 224 F.3d 142, 146 (2d Cir. 2000) (the "home forum" of an American citizen for forum non conveniens purposes is any "United States court"); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991) ("[T]he 'home' forum for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives."); *see also Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 658 (S.D.N.Y. 2020) (Southern District of New York was plaintiff's "home forum" for purposes of forum non conveniens motion seeking transfer to Russia, even though New Jersey, not New York was the plaintiff's home state).

implement its domestic charitable work.  *See* Baker Decl. ¶¶ 24–52.

While not identifying the supposed "real parties in interest" in this action, CBC refers to them as "***partly*** Canadian" (CBC Mem. at 3) and "***not purely*** domestic" (at 25) and "***both domestic and foreign***" (at 24) (emphases added).  Even if such unnamed parties in interest were additional parties to this action, "the addition of foreign plaintiffs does not render for naught the weighty interest of Americans seeking justice in their own courts."  *Simon*, 911 F.3d at 1183.  And if WE Charity had sued to recover only in part for itself, that would be sufficient to warrant the highest level of deference to its choice of forum.  *See DRFP, LLC v. Republica Bolivariana De Venezuela*, 2012 WL 5252306, at *4 (S.D. Ohio 2012) (finding "that Plaintiff has a significant interest in this suit, and is not merely representing foreign parties" because it was entitled to 33% of recovery).

These facts all easily distinguish this case from those cited by CBC in which the real "party in interest" was not the U.S. plaintiff.  In *Piper*, the plaintiff was a representative of the estates of citizens and residents of Scotland, the real parties in interest.  *See Piper*, 454 U.S. at 235.  The same is true of *In re Air Crash*, where the plaintiffs represented the interests of decedents in various different countries.  *See In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 44 (D.D.C. 2018).  In those cases, the U.S. plaintiffs were truly parties asserting claims on another's behalf. Here, WE Charity brings this lawsuit on its own behalf to protect and recover for injury to its own reputation in the U.S., which it leverages to raise funds and run charitable programming in the U.S. Compl. ¶¶ 38–49, 706–730; Baker Decl. ¶¶ 24–52.[11]

---

[11]     CBC's reliance on air crash disaster cases is categorically misplaced. Of course, a plane crash of a Malaysian airliner in the South Indian Ocean resulting in the deaths of passengers who were almost entirely foreign nationals would auger strongly in favor of a Malaysian forum.  *In re Air Crash*, 352 F. Supp. 3d at 44.  Similarly, *Piper* involved a foreign air crash in Scotland.  454 U.S. 235. These foreign air disaster cases bear scant resemblance to the defamation action here.

## 2.  The Private Factors Do Not Favor Dismissal.

The considerations governing the private interest analysis include:

> the relative ease of access to sources of proof; availability of
> compulsory process for attendance of unwilling, and the cost of
> obtaining attendance of willing, witnesses; possibility of view of
> premises, if view would be appropriate to the action; and all other
> practical problems that make trial of a case easy, expeditious and
> inexpensive, such as enforceability of a judgment if one is obtained
> and relative advantages and obstacles to fair trial.

*Id.* at 950.  CBC's principal argument is to point to individuals who reside in Canada, some

mentioned in the Complaint, some speculated to exist, without demonstrating, as it must, that the

individuals are material witnesses who would not voluntarily appear for trial.  *See* Siegel Decl. Ex.

38, ECF Nos. 16-41 & 16-42.  Because of its heavy burden, "a defendant must come forward with

positive evidence of unusually extreme circumstances such that the district court is thoroughly

convinced that material injustice is manifest before exercising any such discretion as may exist to

deny a United States citizen access to the courts of this country."  *Otto Candies*, 963 F.3d at 1347

(internal quotation marks omitted).  CBC has not met its burden.

---

Indeed, CBC does not contend that any of the cases they rely on are factually analogous to this action, and with good reason.  *See, e.g.*, *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 32–36 (D.D.C. 2008), *aff'd*, 616 F.3d 568, 576 (D.C. Cir. 2010)  (action against Cameroon government under Cameroonian law, all events happened in Cameroon, nearly all documents were in French, seven necessary witnesses in Cameroon required translators); *Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 63 (D.D.C. 2007), *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007) (plaintiff was a Norwegian tourist suing about a car crash in Mexico involving Mexican law); *Israel Disc. Bank Ltd. v. Schapp*, 505 F. Supp. 2d 651, 661 (C.D. Cal. 2007), *aff'd sub nom. Israel Disc. Bank, Ltd. v. Schnapp*, 321 F. App'x 700 (9th Cir. 2009) (contract action regarding transactions in Israel with Israeli forum selection clause; pre-existing Israeli court judgments on the matter); *D'Onofrio v. Il Corriere Della Sera*, 373 F. Supp. 2d 555, 558 (E.D. Pa. 2005) (alleged former CIA agent sued Italian media over Italian-language press about events in Italy while he lived there; plaintiff opposed solely on grounds that Italy was a "hostile" forum); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30 (D.D.C. 2002) (material facts all in Brazil, governed by Brazilian law, mostly Portuguese-language documents).

### a. CBC Does Not Explain How Obtaining Documentary Sources of Proof Would Be Burdensome.

CBC has failed to show that the first factor—access to sources of proof—makes litigating in this forum harassing, vexing, or oppressive. CBC summarily contends that "the vast majority of . . . documentary evidence will be located in Canada" (CBC Mem. at 28), but it nowhere identifies this "documentary evidence", nor does it explain why evidence would be unavailable for use at trial in D.C., or why it would be unduly burdensome for CBC to obtain. *See Neelon v. Krueger*, 63 F. Supp. 3d 165, 175 (D. Mass. 2014) (denying forum non conveniens motion when "Defendants have not identified any documentary evidence they believe is located in Mongolia and unavailable to them"). The moving party must identify documentary sources of proof and explain their inconvenience. Here, CBC has simply failed to do so.

The only documents CBC identifies located in Canada are WE Charity's emails with American donor Watson Jordan. CBC Mem. at 29–31. But these communications show that litigating in this forum is *not* inconvenient. WE Charity's emails and other potentially relevant documents and data are stored electronically and can be requested through party discovery or subpoenaed from Mr. Jordan in North Carolina. *See* Compl. ¶ 582; Cashore Decl. Exs. 2–13, ECF No. 16-46 at 11–85; Baker Decl. ¶ 64. *See Shi*, 918 F.3d at 951 (considering "technological advances" relating to obtaining evidence in reversing dismissal based on forum non conveniens); *Simon*, 911 F.3d at 1186 ("Digitization, moreover, has eased the burden of transcontinental document production and has increasingly become the norm in global litigation."). In fact, Mr. Jordan *voluntarily* provided CBC with these communications. CBC Mem. at 19 ("Mr. Jordan shared emails that he exchanged with WE personnel with the CBC.").[12]

---

[12]     Similarly, in arguing that Ontario is central to "any examination of the WE Organization's finances," CBC highlights, for example, that the Froese Report considered "WE Canada's financial

Even if relevant documents were physically located in Toronto in only hard copy, which CBC does not suggest (and is not the case), that fact alone would not demonstrate a burden sufficient to justify dismissal of this action—CBC would still have to explain why obtaining those documents for use in this case would be extraordinarily burdensome. *See, e.g.*, *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) ("The defendants have failed to explain how transporting the documents or copies of them [from Ontario] would be 'oppressive' or 'vexatious.'"). CBC has failed to meet its heavy burden of demonstrating that accessing documentary proof strongly weighs in favor of dismissal.

> ### b. The Majority of Material Non-Party Witnesses Are Subject to Compulsory Process in the United States or Are Not Subject to Compulsory Process in Either Forum.

The availability of compulsory process in Ontario versus Washington, D.C., does not strongly weigh in favor of dismissing this action in favor of proceedings in Ontario. CBC contends the vast majority of potential non-party witnesses are located in Canada, but its sole support is that the Complaint mentions individuals, which CBC nakedly asserts makes them witnesses at trial. CBC Mem. at 17–18. But, in reality and as a matter of law, the non-parties who foreseeably may be *material witnesses* do not reside in Canada and are within this Court's Rule 45 subpoena power or are not within either the U.S. *or* Ontario's subpoena power.

The Defamatory Publications challenged in this lawsuit were the product of newsgathering for the November 18, 2021, *Fifth Estate* episode. It was filmed primarily in Kenya and the U.S, and includes interviews of: (1) Mr. Jordan, a donor in North Carolina; (2) Rukshan de Silva, a

---

records" and that funds raised by WE Charity were sent to WE Canada. CBC Mem. at 12–13. But CBC does not explain why it would encounter any difficulty obtaining these "financial records," wherever they are located. Those records are electronically stored and are within WE Charity's control. If they are properly within the scope of discovery, it will pose no burden to CBC to obtain those documents through normal party discovery.

donor in Australia; (3) Laurie Styron, the executive director of U.S.-based Charity Watch in Chicago; (4) Carol Moraa, a Free The Children Kenya employee in Kenya, and (5) Samuel Tunai, the Governor of Narok County, Kenya.  Siegel Decl. Ex. 38 at 8–10; ECF No. 1-4 at 4–5, 7–8, 18–20, 25–29, 37–45.  The episode also includes footage from Reed Cowan, who lives and works in the San Francisco area.  Siegel Decl. Ex. 38 at 8; ECF No. 1-4 at 8–10, 45–46.[13]  CBC does not cite a single source in Canada for its reporting challenged in the Complaint as false and defamatory.

CBC identifies two categories of non-party witnesses in Canada whom it *hypothesizes* would be witnesses.  First, CBC points to email communications with Mr. Jordan in North Carolina to speculate that some of WE Charity's donor relations employees who sent the emails may no longer work for WE Charity and may reside in Canada.  But there is no reason, and CBC provides none, to conclude these are material witnesses.  The allegations concerning Mr. Jordan's emails concern CBC's mischaracterization of the contents of an email, which is true or false from the face of the document.  CBC argues that its journalists hold a different view of the email (CBC Mem. at 29–30), but offers no reason why the defamation claim relating to Mr. Jordan will turn on testimony from the donor relations employee who sent the email. If CBC's reporters harbor their own view of the emails, they may testify to that interpretation themselves.[14]  And, furthermore, CBC fails to contend any former employees would not voluntarily appear at trial in this Court.

The second category of purported witnesses residing in Canada is comprised of donors who

---

[13]    While WE Charity's witnesses are not relevant to this analysis, it bears noting that WE Charity's Country Director for Kenya, Robin Wiszowaty, resides in Michigan.  Compl. ¶¶ 30, 31. She can testify as to the core allegations relating to WE Charity's operations in Kenya, such as how many schools WE Charity funded there.  *See id.* ¶ 425.  Ms. Wiszowaty was also the primary point of contact for WE Charity in communications with CBC.  *See id.* ¶¶ 179–84, 220–41, 273–80, 313–19, 323–31, 458–60, 479, 484, 614, 650–658, 665, 699.

[14]    CBC does not contend its journalists ever spoke with any of the WE donor relations employees it claims would be witnesses.

signed two different group letters to CBC complaining that its planned coverage of WE Charity falsely portrayed them as deceived about matters they in fact understood.  CBC Mem. at 18; Compl. ¶¶ 200–13.[15]  CBC does not contend that these individuals are material witnesses, much less explain why that is so.  The Complaint alleges that CBC ignored these donors' complaints; the witnesses who can speak to the journalists' decision will be the journalists themselves.  CBC does not even contend that its journalists ever spoke with these donors.

CBC may not meet its burden by simply theorizing about individuals residing in Canada, along with those mentioned in passing in the Complaint.  CBC's failure to explain why Canadian non-party witnesses will be material is fatal:  CBC, "in asking for the extraordinary measure of dismissal on forum non conveniens grounds, needed to provide not simply the numbers of witnesses in each locale, but information sufficient to assist the court in assessing the 'materiality and importance' of each witness."  *See Bos. Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1210 (9th Cir. 2009); *see also Cont'l Airlines, Inc. v. Am. Airlines, Inc*., 805 F. Supp. 1392, 1396 (S.D. Tex. 1992) ("Where, as here, the moving party has merely made a general allegation that certain witnesses are necessary, without identifying them or the substance of their testimony, the motion must be denied.").[16]  Nor, as it must, does CBC focus on the issues to be tried in pointing to its list

---

[15]   As CBC notes, many of the donors who wrote to CBC were American.  CBC Mem. at 18.

[16]   CBC cites *Piper* for the proposition that it need not identify the witnesses it would call and their expected testimony, and that it need only "provide enough information to enable the District Court to balance the parties' interests." CBC Mem. at 28 n. 15 (quoting *Piper*, 454 U.S. at 258). But the record in *Piper* demonstrates that the defendant in that case provided far more than CBC has here.  The district court in *Piper* relied on an affidavit that offered general categories of witnesses as well as some expected topics of testimony.  *Piper*, 454 U.S. at 259 & n.27.  On that record, the Supreme Court held that "sufficient information was provided" to allow the district court to assess the relevant interests. *Id*. at 258–59; *see also Otto Candies*, 963 F.3d at 1346–47 ("We . . . do not read *Piper Aircraft* as holding that any less information would have sufficed under the circumstances."). Here, CBC has merely tallied up the number of individuals mentioned in the Complaint who live in various countries, without explaining at all why those individuals are

of purported Canadian witnesses.  *See Shi*, 918 F.3d at 951 ("[T]he court should focus on the precise issues that are likely to be actually tried.").

In reality, the majority of the Core Allegations challenged as defamatory in the Defamatory Publications can be disproven with easily accessible documents stored electronically, rather than live witnesses, and with testimony from the parties' own employees and non-party witnesses residing within the U.S., like Mr. Jordan, or in Kenya, like Free The Children Kenya's employees. *See, e.g.*, *Goldfarb*, 442 F. Supp. 3d at 660 (denying motion where, "[a]lthough certain key witnesses and relevant documents are undoubtedly located in Russia, . . . this is not a case in which all the witnesses are abroad"); *Neelon*, 63 F. Supp. 3d at 172 ("Given the disparate location of relevant witnesses, litigating in Canada would not significantly increase the parties' ability to ensure production of evidence or witnesses.").  When witnesses are not within this Court's trial subpoena power, U.S. witnesses can all be subpoenaed for a deposition, which testimony can be used in lieu of live trial testimony under Rule 32(a)(4) of the Federal Rules of Civil Procedure.

Current employees of the parties who are also witnesses are within the parties' control and should not be considered under the compulsory process factor.  CBC Mem. at 17–18; *see, e.g.*, *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 258 (S.D.N.Y. 2011) (finding that private interest factors did not strongly weigh in favor of dismissal where "many Swiss witnesses are current OIS employees and, therefore, under the control of defendants").  Any argument about witnesses who are *former* employees living in Canada is entirely speculative.  CBC does not explain who these individuals are or how they are relevant, let alone material, witnesses.  *See* CBC Mem. at 18–19. CBC does not suggest that *any* CBC journalists or personnel who actually worked on the

---

relevant, let alone material, to this lawsuit.  Indeed, the only witness whose relevance CBC has explained is Watson Jordan, an American living in North Carolina.  *See* CBC Mem. at 29.

Defamatory Publications at issue are former employees.  *See* CBC Mem. at 7 & n.2, 17–18; Declaration of Catherine Perry ("Perry Decl."), ECF No. 16-47.  The Court therefore should not consider unnamed, speculative former employees, who may or may not reside outside of the U.S., in conducting its private interest analysis.  *See, e.g.*, *Otto Candies*, 963 F.3d at 1347–48 (reversing forum non conveniens dismissal where defendant argued that "key individuals identified in the [complaint] that would be critical to Citigroup's defense include former Banamex employees located in Mexico," but "did not identify any of the former Banamex employees by name or position, attest to their residence in Mexico with affidavits, anticipate the basic topics of their testimony, or explain how these unidentified witnesses would be critical to its case").

### c.  CBC Has Not Identified Material Non-Party Witnesses Residing in Canada Who Would Not Voluntarily Appear for Trial in this Court.

Even had CBC met its burden to show that the Canadians it identified would be material witnesses, CBC does not point to any non-party witnesses in Canada (or elsewhere) who would not voluntarily appear for trial in this District.  CBC's failure to allege, much less show, that Canadian witnesses will not voluntarily appear in a U.S. court weighs heavily against its Motion. *See, e.g.*, *Shi*, 918 F.3d at 951 ("The Trusts do not suggest they will be unlikely to persuade their proposed witnesses located abroad . . . to appear voluntarily in a U.S. court, weighing against dismissal."); *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) (defendant "did not allege, much less carry its burden to show, that any witness was unwilling to testify and that compulsory process was consequently needed"); *Neelon*, 63 F. Supp. 3d at 176 ("The inability to compel the participation of some or all of the twenty-three Mongolian witnesses . . . is given little weight where . . . Defendants have made no showing that they asked these witnesses to appear voluntarily."); *Lans*, 786 F. Supp. 2d at 295 ("[T]he defendants have not demonstrated that these witnesses would actually be unwilling to testify in the District.").

The only Canadian resident referenced in the Motion who is a foreseeable witness in this action, forensic auditor Kenneth Froese, has provided a sworn declaration submitted with this filing in which he agrees to appear for trial in Washington, D.C. if asked.  Declaration of Kenneth Froese ¶ 3; *see DRFP*, 2012 WL 5252306, at *7 (considering the fact that "one of the non-party witnesses . . . has explicitly provided that he is willing to testify in the United States").

Had CBC shown that Canadian non-parties will not cooperate and are material to this case, the parties could use the Hague Convention on the Taking of Evidence Abroad to obtain deposition testimony from foreign witnesses that can be used at trial in place of live testimony.  CBC points to the availability of the Hague Convention as weighing in favor of dismissal.  CBC Mem. at 31. But the D.C. Circuit has found that the availability of the Hague Convention weighs *against* dismissal.  *See Shi*, 918 F.3d at 951 (denying forum non conveniens motion where "U.S. witnesses are subject to subpoena by U.S. courts, and those courts can reach foreign non-party witnesses through the Hague Evidence Convention and letters rogatory").  CBC's citation (at 31) to *In re Air Crash* for the proposition that the availability of the Hague Convention is inadequate is misleading. In that case, the court dismissed the matter in favor of litigation in Malaysia, which is *not a party to the Hague Convention*.  *In re Air Crash*, 352 F. Supp. 3d at 42–43.[17]  In any event, if the action proceeds in Ontario, the parties would need to use the Hague Convention to obtain testimony and documents from U.S. non-party witnesses.

### d.  The Cost of Obtaining Attendance of Willing Witnesses in Washington, D.C., Does Not Strongly Favor Dismissal.

The cost of obtaining the attendance of willing witnesses and CBC's employees does not

---

[17]      In the only other case CBC cites on this point, *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-CV-05801, 2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012), the parties *did not dispute* that "[v]irtually all of the evidence and witnesses" were in Ireland or England and would all be within England's subpoena power.  *Id*. at *7–8.

make litigating in Washington, D.C., harassing, vexing, or oppressive.  First, CBC emphasizes that various employees of CBC and WE Charity live in Ontario in arguing that litigating in Washington, D.C., would be inconvenient.  But CBC does not acknowledge that Toronto and Washington, D.C., are less than 500 miles apart.  *See* CBC Mem. at 1 (stating that its "key employees" reside "primarily in the Toronto area").  This is not the extraordinary case where the plaintiff's forum would require all of the witnesses to travel thousands of miles.  There are direct flights between Toronto and Washington, D.C., and the flight is approximately 90 minutes.  Kroetsch Decl. Ex. B.  Travel between Toronto and this forum thus poses no real inconvenience.  *See, e.g.*, *DiRienzo*, 294 F.3d at 30 (finding no burden where "[w]illing witnesses can easily travel from Toronto to New York by a direct 90 minute flight"); *Cromer Fin. Ltd. v. Berger*, 158 F.Supp.2d 347, 360 (S.D.N.Y. 2001) (finding "no serious inconvenience" because "New York and Bermuda are less than 1000 miles apart and no more than two or three hours by direct flight").  Most locations in Canada are further from Toronto than the short trip to this District.

Second, CBC does not even contend it will be inconvenient for its employees to travel to Washington, let alone harassing, vexing, or oppressive.  *See* ECF Nos. 16-46, 16-47 (declarations from CBC employees not stating that it would be inconvenient to travel to Washington, D.C.).  CBC could hardly contend otherwise given that its journalists traveled from Canada to rural Kenya and multiple locations in the United States in the midst of a pandemic to film the Defamatory Publications.  *See, e.g.*, Compl. ¶¶ 435, 650; Cashore Decl. ¶ 9, ECF No. 16-46; ECF No. 1-4 at 2:16–17; *see, e.g.*, *In re Optimal*, 837 F. Supp. 2d at 258 ("Defendants were not inconvenienced to visit New York for business purposes; any inconvenience caused by travel to New York for this litigation will not be oppressive."); *Cromer*, 158 F.Supp.2d at 362 (explaining that "any fair evaluation of the extent of that burden [of traveling from Bermuda to New York] must also take

into account that these defendants . . . expressed a desire to perform on a global stage when it was in their interest to do so"). Plus, CBC maintains an office here in Washington, D.C. Compl. ¶ 24.

Finally, CBC fails to recognize that for various core witnesses in this matter who do not reside in Ontario or the U.S., travel to the U.S. will be *at least* as convenient as travel to Ontario. Whether this case is in Ontario or the United States, certain core witnesses will have to travel long distances, weighing against transfer. *See Lans*, 786 F. Supp. 2d at 295 (denying forum non conveniens motion because, among other things, "no matter which forum is used, half of the witnesses may have to travel long distances to testify"). CBC has not met its burden of demonstrating any hardship in asking witnesses to travel to Washington, D.C. instead of Ontario, which are not far apart enough to justify the extraordinary and rare measure of dismissal.

### e. A U.S. Forum is Necessary for WE Charity to Obtain a Judgement Enforceable and Recognizable in Its Home Country.

Aside from any questions of inconvenience, a U.S. forum is *necessary* for WE Charity to obtain a defamation judgment that is legally recognized and enforceable in the United States. As an American charity that suffered its reputational harm in the United States, WE Charity should not be compelled to litigate in Ontario when U.S. law has declared a Canadian defamation judgment repugnant to the Constitution, and when the judgment would have no preclusive effect or force of law in this country. CBC does not even address the question of enforceability despite courts identifying it as a private factor for forum non conveniens analysis. *See Shi*, 918 F.3d at 952.

The Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub. L. No. 111-223, § 1, 124 Stat. 2380 (codified as 28 U.S.C. §§ 4101-4105), commonly referred to as the "SPEECH Act," prohibits any federal or state court in the United States from recognizing or enforcing a foreign judgment for defamation unless "the foreign court's adjudication provided

at least as much protection for freedom of speech and press in that case as would be provided by the first amendment" or "the party opposing recognition or enforcement of that foreign judgment would have been found liable for defamation by a domestic court applying the first amendment." 28 U.S.C. § 4102(a)(1)(A), (B).

Canada has consistently declined to adopt standards providing for the same protection for freedom of speech as are required under the First Amendment.  The Supreme Court of Canada has repeatedly considered and expressly rejected the "actual malice" standard embraced in *New York Times Co. v. Sullivan*, requiring proof that the defendant published with knowledge of falsity or reckless disregard for truth or falsity.  376 U.S. 254, 280 (1964).  Harrison Decl. ¶ 30.  Canadian law thus does not provide the same protection for freedom of speech as the First Amendment, and no Canadian judgment obtained by WE Charity, an American plaintiff, would be enforceable in the United States under the plain terms of the SPEECH Act without effectively re-litigating the case in the U.S.  *See Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2013) (concluding that under the SPEECH Act a Canadian defamation judgment could not be enforced in the United States).[18]  This cuts strongly against dismissal.

Because of the SPEECH Act, not only would WE Charity be unable to *enforce* a Canadian judgment in the U.S., but it would also be unable to even have that judgment *recognized* in the United States.  A Canadian judgment would thus have no preclusive effect in the U.S., leaving open the risk that this entire dispute could be re-litigated in a U.S. forum even after years of litigation in Canada.  Perhaps more importantly, any media organization may republish the

---

[18]    In *Trout Point Lodge*, the Fifth Circuit observed, "There is no meaningful dispute that the law applied by the Nova Scotia Court provides less protection of speech and press than First Amendment and Mississippi law. Canadian defamation law is derivative of the defamation law of the United Kingdom, which has long been substantially less protective of free speech." 729 F.3d at 481.

Defamatory Publications at any time. This is hardly empty speculation—CNN republished a CBC report alleged to be defamatory. *See Bryks v. Canadian Broadcasting Corp.*, 928 F. Supp. 381 (S.D.N.Y 1996) (Plaintiff sued CBC and individuals for defamatory CBC report and CNN for republication.). In this sense, it was essential for WE Charity to sue in the U.S.

A judgment that is unconstitutional and holds no force of law in the U.S. also would not demonstrate to WE Charity's donors, who are in the U.S., that CBC's statements about WE Charity were false. This would deny WE Charity the "vindicatory function" of a defamation judgment in its home country. *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 660 (D.C. Cir. 1966) ("The allowance of nominal damages performs a vindicatory function by enabling the plaintiff to brand the defamatory publication as false."); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 376 (1974) (White, J., dissenting) (judgment, when awarding nominal damages, lets plaintiff "vindicate his reputation interest by securing a judgment for nominal damages, the practical effect of such a judgment being a judicial declaration that the publication was indeed false").

In contrast, a defamation judgment issued by this Court will be easily enforceable in Canada. Harrison Decl. ¶ 33–34.

### 3. The Public Factors Do Not Favor Dismissal.

All four of the public factors weigh strongly against dismissal of this dispute. The considerations governing the public interest analysis include:

> Administrative difficulties when litigation is piled up in congested centers, the burden of jury duty on a community which has no relation to the litigation, the local interest in having localized controversies decided at home, and the appropriateness of trying a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Shi*, 918 F.3d at 952 (internal quotation marks omitted). Here, CBC addressed only two of these public interest factors—local interest in the dispute and purported administrative burdens—and

failed to address the remainder of the factors.  CBC Mem. at 33–35.  All of the factors demonstrate that CBC has not met its heavy burden of justifying dismissal.

### a.  United States Substantive Law Will Apply to This Dispute.

First, although CBC contends that Ontario law would apply in an Ontario court, it does not dispute that U.S. law will apply to the claims in this Court.  Only the latter point is relevant on this motion because it is the defendant's burden to show that suit in the U.S. is "harassing, vexing, or oppressive," not merely that another forum could also be convenient or have an interest in the dispute.  *See Shi*, 918 F.3d at 953.  Accordingly, although the Court need not conduct a definitive choice of law analysis at this stage, because it is likely that U.S. law will govern this dispute if it remains here, the dispute should be resolved in the U.S.

As a federal court sitting in diversity, this Court must apply the choice of law principles of the jurisdiction in which it sits, the District of Columbia.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Under those principles, "the law to be applied is . . . [that of] the place where the plaintiff suffered injury by reason of his loss of reputation."  *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (alteration in original).  Further, in defamation cases, plaintiffs are presumed to suffer the greatest reputation injury "in the place where the plaintiff lives.  Quite clearly, economic loss resulting from defamation is most likely to be felt in one's place of business whatever the locus of its publication."  *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 457 (D.C. Cir. 1990) (citation omitted).  In this case, U.S. law is likely to apply as WE Charity is a U.S. entity that suffered its reputational harm in its relationships with its donors and charitable programming partners, all of whom are in the U.S.  *See, e.g*., Compl. ¶¶ 19, 38–48.

CBC's brief contains no choice of law analysis, but CBC previously conceded in another forum non conveniens motion that "[CBC] believe[s] that the Court must consider the importance of having a United States court apply American constitutional law.  Thus, **should the Court**

*determine that New York law applies to Plaintiff's claims, defendants concede that this factor should be accorded significant weight in favor of the entire lawsuit remaining in this forum*." Kroetsch Decl. Ex. C at 11 (emphasis added).  Because CBC presented no choice of law analysis in its memorandum of law (despite acknowledging the factor at p. 24 of its brief), it should be precluded from so arguing on reply.  *See CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996) (parties may waive choice-of-law arguments); *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) ("The Court should not address arguments raised for the first time in a party's reply.").

### b. *Administrative Difficulties Do Not Warrant Dismissal.*

Second, the administrative difficulties presented by this case are no different than any other matter, and therefore do not strongly weigh in favor of dismissal.  CBC cites only generalized court congestion, the length of the Complaint, and the potential length of trial.  CBC Mem. at 35. But CBC cites no actual evidence of court congestion in this forum, nor does it cite any evidence of any lesser court congestion in Ontario.  Courts have found general references to court congestion to be insufficient.  *See Neelon*, 63 F. Supp. 3d at 173.  As WE Charity's Canadian law expert observes, Ontario courts are notoriously congested.  Harrison Decl. ¶¶ 36–39.

The only other administrative difficulty CBC cites is the fact that one of the Defamatory Publications at issue is in French.  CBC Mem. at 35.  But the fact that a handful of unspecified documents of unexplained relevance might be in French does not justify dismissal.  First, the French broadcast is only one of 11 Defamatory Publications and was largely a French-language translation of the *Fifth* episode.  Compl. ¶ 417.  Unlike in the cases CBC cites, the vast majority of the evidence of this case is in English, and CBC does not argue otherwise.  Second, WE Charity has *already* translated the French broadcast into English and attached it to the Complaint.  ECF No. 1-7.  Third, CBC does not suggest that a single potential witness does not speak English,

meaning that all trial and deposition testimony will be in English.  CBC Mem. at 25; Perry Decl.

¶ 8, ECF No. 16-47.  And documents in French will need to be translated for English-speaking

witnesses in any forum.  *See Simon*, 911 F.3d at 1186.

### c. There is No Burden of Jury Duty in This Dispute.

Third, the parties will try this case to the Court, not a jury, which CBC concedes.  CBC

Mem. at 35.  This factor does not weigh in favor of dismissal.

### d. This Dispute is Not A "Localized" Canadian Controversy.

Fourth, this is not a "localized" Canadian controversy.  The lawsuit is about a U.S. charity's

education projects in Kenya, not about Canadian politics as CBC contends.

CBC relies heavily on a 2020 political controversy surrounding WE Canada's selection to

administer COVID relief funds.  The "political scandal" that resulted in media scrutiny of WE

Canada is not relevant to the claims at issue, which involve Defamatory Publications well post-

dating that "scandal."  *See* CBC Mem. at 33.  This case will not "resolve" any dispute "relating to

those matters of national significance."  *See id*.  The political backdrop helps explain why the

*Canadian* WE Charity entity is shutting down, but that reinforces why this lawsuit is in the United

States.  With the Canadian entity shuttered, WE Charity's ongoing U.S. fundraising took the

overwhelming brunt of the hit when CBC fabricated claims that the charity deceived its donors.

The subject matter of the Defamatory Publications focuses on (1) WE Charity's operations

in Kenya, which are overseen by a U.S. citizen and resident and (2) several of WE Charity's

donors, none of whom are Canadian residents.  As stated, the primary Defamatory Publication, an

episode of *The Fifth Estate*, is filmed almost entirely in Kenya and the U.S., and the only footage

of Canada is a few stock shots of WE Canada's former headquarters and a brief montage of a CBC

newsroom.  *See* ECF No. 1-4 at 2:16–17.

Accordingly, "[t]his is not the sort of 'localized controversy' best resolved in any particular

forum. Although Canada may have a strong interest in cases involving its citizens, the United States has an equally strong interest in disputes affecting its own citizens."  *See Neelon*, 63 F. Supp. 3d at 173 (finding that dispute "between a resident of Massachusetts and two Canadian defendants regarding statements made in Canada and published to the United States about acts purportedly occurring in Mongolia" was not localized Canadian dispute).  In fact, in one case that CBC cites (at 20) in this District against *the Canadian government itself*, the court found that although "the alleged contract breach occurred there, its laws are implicated, and the conduct of its officials is at issue," yet Canada's interest in the dispute did not justify dismissal because the "dispute has its proper 'location' in both countries."  *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 764 F. Supp. 2d 155, 163 (D.D.C. 2011); *see also Bos. Telecomms.*, 588 F.3d at 1212 ("With this public interest factor, we ask only if there is an identifiable local interest in the controversy, not whether another forum also has an interest.").  Because the U.S. has a strong interest in this litigation, CBC has failed to demonstrate that this is a localized Canadian dispute.

## II.   <u>The Court Has Subject-Matter Jurisdiction Over All of Plaintiff's Claims.</u>

### A.   <u>CBC Contracted with WE Charity to Interview Ms. Wiszowaty in Michigan in Exchange for an Interview of Ms. Moraa in Kenya.</u>

Count II of the Complaint pleads breach of a contract[19] in which WE Charity agreed that it would make available Carol Moraa, WE's Director of WE Villages Projects in East Africa, for an in-person, on-camera interview in Kenya regarding WE Charities' operations in Kenya.  In exchange, CBC agreed to conduct a similar in-person, on-camera interview of WE's Country

---

[19]     Given the absence of a formal written contract, WE also pleaded causes of action for promissory estoppel and negligent misrepresentation based on CBC's promises and representations that it would interview Ms. Wiszowaty in exchange for an interview with Ms. Moraa. Compl. ¶¶ 747–760.

Director for Kenya, Robin Wiszowaty, in Michigan, where she resides.[20] It was understood that both interviews were to be on-camera and for use in any ultimate broadcast by CBC to its Canadian and U.S. audiences. Compl. ¶ 261.  WE Charity performed under the contract by making Ms. Moraa available for interview in Kenya on September 13, 2021.  *Id.* ¶ 262–66.

On November 4, 2021, CBC repudiated its agreement by informing WE Charity it planned to publish its report without interviewing Ms. Wiszowaty or including her input in the broadcast. Compl. ¶ 265. WE Charity wrote to CBC on November 9, 2021 to confirm the breach.  *Id.* ¶ 268. Two days later, CBC published promotions for the *Fifth Estate* episode, publicly committing to a narrative that, contrary to its agreement, did not include WE Charity's response to CBC's financial allegations through Ms. Wiszowaty's interview. CBC thereby rendered its own performance of the agreement impossible.  *Id.* ¶ 269.

CBC does not challenge WE Charity's causes of action on their merits, but argues only that CBC's performance purportedly was to occur in Canada, and that the FSIA commercial activities exception therefore does not apply.  CBC Mem. at 38.  This assertion is not supported by the allegations of the Complaint, which must be assumed to be true for purposes of this motion. *Byrne v. Clinton*, 410 F. Supp. 3d 109, 116 (D.D.C. 2019), *aff'd sub nom. Byrne v. Brock*, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ("In determining whether to grant a motion to dismiss under Rule 12(b)(1), the Court must construe the complaint in plaintiffs' favor and treat all well-pleaded factual allegations as true."); *see Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017).

The Complaint does not allege that CBC was to perform in Canada—indeed, it alleges a clear understanding between the parties that Ms. Wiszowaty would be interviewed in Michigan,

---

[20]      Specifically, CBC "promised to interview Ms. Wiszowaty and provide WE Charity an opportunity to respond to allegations regarding finances, use of donor funds and related topics." Compl. ¶ 266; *see also generally id*. ¶¶ 260–62.

where she lives and works, consistent with CBC's practices throughout its reporting on WE Charity at issue in this lawsuit. In the November 28, 2021 *Fifth Estate* episode, it is clear that CBC either traveled to the locations of all on-air sources to conduct their interviews, or at a minimum sent camera-operators and other CBC agents to film the source during its computer-based interview.[21] CBC was aware Ms. Wiszowaty was in Michigan during the period in which the interview could have taken place.  Kroetsch Decl. Ex. D at 13.   Accordingly, consistent with CBC's practices, the parties necessarily contemplated that CBC would interview her in Michigan.

CBC nonetheless now asserts that its performance was to occur in Canada, based solely on post-breach efforts by WE Charity to mitigate its damages from CBC's breach. After being called out on its breach, CBC offered an interview with Ms. Wiszowaty with a materially different scope than originally promised.  Compl. ¶¶ 269–72.  WE Charity made clear that the offer was not what had been agreed upon.  *Id*. ¶ 275 ("an interview now, after you have committed yourself to a narrative on air, is not what we agreed to back in September"); *id.* ¶ 270 (November 11 offer for limited interview was "too late").  WE Charity nonetheless agreed to make Ms. Wiszowaty available for that limited interview, and—because Ms. Wiszowaty happened to be on a rare business trip to Toronto at the time—offered to do it there.  *Id.* ¶ 273.

Contrary to its current assertion that the parties agreed CBC would perform in Canada, CBC urged Ms. Wiszowaty *not* to travel to Toronto for that post-breach interview.  Compl. ¶ 274 ("There is no reason for you to come to Toronto on our behalf.").  Ms. Wiszowaty informed CBC that she already was in Toronto and asked that she be permitted to do it there as a "proper sit-down

---

[21]      *E.g*.: (1) Carol Moraa of WE in Kenya, ECF No. 1-4 at 25:3–10; (2) Laurie Styron of CharityWatch in Chicago, *id.* at 37:1–38:9; (3) WE donor Watson Jordan in North Carolina, *id.* at 4:19–5:21, 17:1–17:09; 46:25–47:4; (4) Governor of Narok County, Kenya, in Kenya, *id.* at 18:12–20:17; (5) and WE donor Rukshan de Silva in Australia, *id.* at 7:1–8:11; 16:16–22.

interview." *Id.* ¶¶ 275–77.  Despite having traveled to other continents to conduct interviews for

its reporting, CBC invoked COVID as an excuse for not conducting a post-breach interview with

Ms. Wiszowaty in person in Toronto.  *See id.* ¶ 278.  Given CBC's refusal to remedy its own

breach, Ms. Wiszowaty rejected CBC's new offer.  *Id.* ¶¶ 280–81.

### B.   Plaintiff's Claims Fall Within the Commercial Activity Exception to the FSIA.

CBC does not contest this Court's jurisdiction under FSIA with respect to WE Charity's

defamation claim, and thus effectively concedes that its newsgathering and reporting on WE

Charity constitute "commercial activity" under FSIA.  Accordingly, the only question before this

court is whether one of FSIA's three "commercial activity" exceptions to sovereign immunity

applies here.[22]  As discussed below, WE Charity's non-defamation claims satisfy all three

exceptions, and CBC's motion to dismiss those claims should be denied.  To the extent the Court

disagrees, WE Charity respectfully seeks leave to re-plead those portions of its Complaint.

### 1.   WE Charity's Non-Defamation Claims Are Based on CBC's Foreign Activities that Caused a Direct Effect in the U.S.

First, the exception for sovereign actions that cause a direct effect in the U.S. applies here.

The D.C. Circuit has explained that, "[f]or purposes of clause three of the FSIA commercial

activity exception, breaching a contract that establishes *or necessarily contemplates* the United

States as a place of performance causes a direct effect in the United States . . . ." *Odhiambo v.*

*Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014) (emphasis added), *abrogated on other*

*grounds by OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015). This exception applies here.

---

[22]     Those exceptions apply where either: (1) the action is based upon a commercial activity carried on in the U.S. by the foreign state; (2) or upon an act performed in the U.S. in connection with a commercial activity of the foreign state elsewhere; (3) or upon an act outside the territory of the U.S. in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the U.S.  28 U.S.C. § 1605(a)(2).

### a. *Course of Action Can Demonstrate What the Parties "Necessarily Contemplated."*

The parties here necessarily contemplated that: 1) CBC would perform in the U.S. where Ms. Wiszowaty lives; and 2) the content of both interviews would be reflected directly or indirectly in any later broadcast into the U.S.  CBC's practice is to interview its on-air sources on-camera at the source's location, and it did here, even traveling to other continents to do so.  CBC knew that Ms. Wiszowaty was in the U.S. and both parties contemplated the interview would be there.  CBC also knew that any report would be published in the U.S. and that WE Charity expected the content of both interviews to be reflected in any such report.  CBC does not point to any facts to the contrary, but instead relies upon its own *rejection* of Canada as the place of performance for a post-breach mitigation interview offered by WE Charity.

CBC suggests that, without a written contract specifying performance in the United States, there can be no FSIA jurisdiction.  But CBC's own cases demonstrate that course of performance has consistently been examined as part of the determination of whether a direct effect in the U.S. exists.  Indeed, in *Republic of Argentina v. Weltover, Inc.*, the Supreme Court considered the fact that Argentina previously had paid interest on the bonds in question to banks in New York City as relevant to holding that a direct effect in the U.S. existed. 504 U.S. 607 at 618–19 (1992).  In *Goodman Holdings v. Rafidain Bank*, the D.C. Circuit found that plaintiff's claim for breach of letters of credit had no direct effect in the U.S. where Ireland had previously paid plaintiff from outside the United States. 26 F.3d 1143, 1147 (D.C. Cir. 1994).  And in *Croesus EMTR Master Fund L.P. v. Brazil*, the court denied discovery on whether a direct effect existed where there was no evidence that Brazil had ever made payments in the U.S. on the bonds at issue.  212 F. Supp. at 36–37.  These cases mean that, even where no written document specifies the place of performance, the defendant's history of performance in the U.S. may satisfy FSIA's direct effect

requirement. *Global Index Inc. v. Mkapa*, 290 F. Supp. 2d 108, 114 n.8 (D.D.C. 2010) ("This suggests that a consistent history of payment in the U.S. by defendant, though without express designation, might have satisfied the direct effect requirement.").[23]

### b. Performance in the U.S. is not the Sole Means of Determining "Direct Effects" Under FSIA.

Contrary to CBC's suggestion, performance in the U.S. is not the sole means by which "direct effects" can be found in a contract case. In *Cruise Connection*, the D.C. Circuit examined allegations of breach of a contract by the Royal Canadian Mounted Police ("RCMP") for plaintiff to provide the RCMP with cruise ships to dock in Vancouver for use at the 2010 Winter Olympic Games. The Court found that the RCMP's breach caused a direct effect in the U.S. because the RCMP knew plaintiff had contracted with U.S. companies to obtain the cruise ships and would suffer loss of U.S. business. The Court rejected the RCMP's argument that it "never agreed to any single aspect of the underlying transaction that would take place in the United States," explaining that "The FSIA, however, *requires only that the effect be direct, not that the foreign sovereign agree that the effect would occur.*" *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010) (alteration in original) (emphasis added). The Court then found that direct effects in the U.S. existed where the termination of the contract "led inexorably to the loss of revenues under the third-party agreements." *Id.*[24] Here, CBC knew that

---

[23]     To be sure, the *Global Index* court also observed that because both the *Goodman* and *Croesus* courts "failed to find sufficient evidence that the payment was 'supposed' to be in the U.S., it is murky what, short of an express designation would fulfill the 'direct effect' requirement." 290 F. Supp. 2d at 114 n.8. Unlike in those cases, which each had written contracts that failed to expressly designate the place of performance, there is an extensive history of CBC conducting its interviews at the location of its source, including two interviews in the U.S.

[24]     The *Cruise Connections* Court also found it relevant that all of plaintiff's efforts to negotiate the relevant agreements occurred in the U.S. 600 F.3d at 665. Here too, Ms. Wiszowaty engaged in many email discussions with CBC from her home in Michigan.

its failure to follow through on its agreement with CBC would result in harm to the U.S.-based WE Charity.

### 2. WE Charity's Claims Are Based Upon an Act to Be Performed in the U.S.

D.C. Circuit precedent concerning the commercial activity exception of FSIA for acts to be performed in the U.S. makes clear that "a contractual arrangement, *one part of which is to be performed in the United States*, constitutes a substantial contact with the United States." *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988) (emphasis added). As discussed above, WE's Complaint does not allege that CBC was to perform its obligations in Canada, but that the clear understanding between the parties was that Ms. Wiszowaty would be interviewed in Michigan, and that the result of her interview would be included in any broadcast to the U.S.

CBC's cases in support of its contrary argument do not apply here, as in each case, the contract at issue specifically provided that the defendant's performance would occur outside the United States. *See Lempert v. Republic of Kazakstan, Ministry of Justice*, 223 F. Supp. 2d 200, 201–02 (D.D.C. 2002), *aff'd*, 62 F. App'x 355 (D.C Cir. 2003) (plaintiff traveled to Kazakhstan to prepare assessment and recommendations regarding legal education and was paid from there; Kazakhstan's only contacts with the U.S. were some correspondence sent to the plaintiff in the U.S. and the wiring of an initial payment to a U.S. bank); *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 51 (D.D.C. 2014) (both plaintiff's performance as an English teacher and defendants' failure to pay occurred abroad); *Odhiambo*, 764 F.3d at 38–40 (plaintiff resided in Kenya, provided information while in Kenya and was paid from Kenya).

### 3. WE Charity's Claims Are Based Upon an Act Defendant Performed in the U.S. in Connection with its Commercial Activity Elsewhere.

Finally, the FSIA also applies to commercial activity where the defendant performed an act in the U.S. in connection with its commercial activity elsewhere. As part of its commercial

activity in Canada, CBC was to perform its portion of the contract in Michigan and did broadcast to the U.S. without benefit of the content of Ms. Wiszowaty's interview.  These failures are the crux of WE Charity's contract claim and therefore satisfy the requirement that the conduct for this exception be sufficient to form the basis of a cause of action.  *See Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988) ("the acts (or omissions) encompassed in this category are limited to those which in and of themselves are sufficient to form the basis of a cause of action.").  CBC again argues that this exception cannot apply because it purportedly was not expected to perform its obligation in the U.S. CBC Mem. at 41–42.  As with its other FSIA arguments, this argument obfuscates the allegations of the Complaint.

### 4. This Court Also Has FSIA Jurisdiction over WE Charity's Causes of Action for Promissory Estoppel and Negligent Misrepresentation.

Although CBC does not challenge the sufficiency of WE Charity's pleading of breach of contract, it is unclear whether CBC intends to challenge at trial the existence of a contract regarding the interviews of Ms. Moraa and Ms. Wiszowaty. WE Charity accordingly also pleaded claims for promissory estoppel and negligent misrepresentation, and CBC does not challenge the sufficiency of pleading for those claims.  As discussed above, the parties necessarily contemplated that CBC would interview Ms. Wiszowaty in the U.S. after it interviewed Ms. Moraa in Kenya and that the content of her interview would be broadcast to the U.S. Whether CBC's liability for its failure to do so arises from contract, promissory estoppel, or a negligent misrepresentation does not change the applicability of the FSIA commercial activity exceptions to sovereign immunity here.

### CONCLUSION

For all of the foregoing reasons, the Court should deny Defendant's motion in its entirety.

Dated: June 10, 2022

Respectfully submitted,


/s/ Joseph F. Kroetsch
Joseph F. Kroetsch (*pro hac vice*)
Brooke A. Alexander (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel:    (914) 749 8200
jkoetsch@bsfllp.com
balexander@bsfllp.com

Jonathan Sherman (Bar No. 468539)
Amy L. Neuhardt (Bar. No. 996791)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW
Washington, DC 20005
Tel:    (202) 237 2727
jsherman@bsfllp.com
aneuhardt@bsfllp.com

Sabina Mariella (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel:    (212) 446 2300
smariella@bsfllp.com

Rodney Smolla (*pro hac vice* to be filed)
4601 Concord Pike
Wilmington, DE 19803
Tel:    (864) 373 3882
rodsmolla@gmail.com

*Attorneys for Plaintiff WE Charity*

46