# Exhibit A

# INTERNATIONAL LIBEL & PRIVACY HANDBOOK

A Global Reference for Journalists, Publishers, Webmasters, and Lawyers

THIRD EDITION

Charles J. Glasser, Jr., Esq.
Global Media Counsel
Bloomberg News

Cover Design: Jeff Faust

Copyright © 2013 by Bloomberg L.P. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
First and second editions published by Bloomberg L.P.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at http://www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books. For more information about Wiley products, visit our web site at www.wiley.com.

***Library of Congress Cataloging-in-Publication Data:***

International libel and privacy handbook : a global reference for journalists, publishers, webmasters, and lawyers / Edited by: Charles J. Glasser Jr. —3rd ed.
p. cm.
Includes bibliographical references and index.
ISBN 978-1-118-35705-7 (cloth); ISBN 978-1-118-41689-1 (ebk);
ISBN 978-1-118-42049-2 (ebk); ISBN 978-1-118-51821-2 (ebk)
1. Libel and slander. 2. Privacy, Right of. 3. Freedom of speech. 4. Mass media—Law and legislation. I. Glasser, Charles J., Jr.
K930.I58 2013
346.03'4–dc23

2012036593

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

# International Libel and Privacy Handbook

## *A Global Reference for Journalists, Publishers, Webmasters, and Lawyers*

**THIRD EDITION**

Edited by

**CHARLES J. GLASSER JR., ESQ.**
Global Media Counsel
Bloomberg News

**BLOOMBERG PRESS**
An Imprint of
**WILEY**

CHAPTER 3

# Canada

Brian MacLeod Rogers
*Rogers Law Firm, Toronto, Ontario Canada*

Rogers Law Firm
401 Bay Street, Suite 2104
Toronto, Ontario Canada M5H 2Y4
Phone: 416-593-2486
Fax: 416-593-8494
brian@bmrlaw.ca

## Introduction to the Canadian Legal System

Every province in Canada uses a common-law system except Quebec, which follows civil law. Quebec's system is based on a provincial Civil Code enacted in 1991 and is distinctly different in its approach from common law. Unless otherwise identified, the discussion below concerns applicable common law.

Canada is a federal country, with legislative jurisdiction divided between the federal government and governments of the 10 provinces and three northern territories. Although the Canadian Charter of Rights and Freedoms is a constitutional document that applies to all levels of government, there can be considerable variation between provinces and their courts in legislation and application of laws. Attention must be paid to the jurisdiction where the legal issue arises. In particular, defamation and privacy laws can vary considerably by provincial or territorial jurisdiction.

There are four basic levels to the Canadian court system: The first level is the provincial courts; the second level includes the provincial and territorial superior courts and the federal court, trial division; the third level is the provincial and territorial courts of appeal and the federal court of appeal; and the highest level is the Supreme Court of Canada.

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 6 of 23

Provincial courts are located in each province and territory throughout Canada. The provincial court is the court of first resort for most criminal offenses, claims over smaller amounts of money (limit varies in the various provinces), and family law issues. There are also several provincial courts designated for specific types of crimes—domestic violence, for example. The most serious criminal offenses and many appeals from provincial courts are heard in the provincial superior court, which bear different names in various jurisdictions (e.g., British Columbia Supreme Court, Alberta Court of Queen's Bench, Ontario Superior Court of Justice). The superior court has inherent jurisdiction at common law and can deal with every legal matter in its province except those specifically reserved for provincial courts. Superior courts handle most serious civil cases and, in some provinces, may be organized by subject, such as family law or commercial claims. Appeals from superior courts are heard in the provincial courts of appeal. This court generally sits in panels of three judges who hear and adjudicate cases.

The Federal Court of Canada (FCC) only has statutory jurisdiction that is limited to claims against the federal government and those arising from federal statutes, such as intellectual property, immigration, and appeals from federal tribunals. The FCC is similar in hierarchy to a superior court, but with solely civil jurisdiction. The FCC is divided into a trial division and an appeal division; its jurisdiction is shared with provincial superior courts.

The Supreme Court of Canada is the court of last resort and grants leave to appeal to a small proportion of cases each year that raise issues of national or public importance. Its decisions apply across all jurisdictions.

## 1. What is the locally accepted definition of libel?

Libel is defamation in written or other material form, including a broadcast (as confirmed by statute). A defamatory statement "tends to lower a person in the estimation of right-thinking members of society" and should be judged from the perspective of a "reasonably thoughtful and well-informed person who has a degree of common sense."

Examples of defamatory statements include a taxi driver and owner alleged to be "trafficking in licenses";[1] a lawyer acting for a real estate developer said to have engaged in a "serious breach of faith" and to have been "practicing deception";[2] a lawyer said to have improperly paid himself legal fees from funds belonging to a community organization;[3] a politician said to be part of "the Jewish Mafia";[4] a politician said to be racist;[5] an engineer said to be lacking integrity and not competent to design certain facilities;[6] a doctor on a government-appointed committee said to have been in a conflict of interest.[7]

## 2. Is libel by implication recognized, or, in the alternative, must the complained-of words alone defame the plaintiff?

Libel may arise by implication, as a form of the "natural and ordinary meaning" of what was published; this may occur by an inference drawn from the published words alone, in their context. Alternatively, libel may also arise through "legal or true innuendo," where unpublished facts known to some readers affect their understanding of what was published and produce a defamatory meaning that would not arise from the published words alone.

## 3. May corporations sue for libel?

Yes. While damages are presumed for all individual plaintiffs, corporations can't have "hurt feelings" and will generally recover limited damages, unless they can prove economic injury.[8]

## 4. Is product disparagement recognized, and, if so, how does that differ from libel?

A separate tort for malicious falsehood exists and deals with disparagement of a product. It requires the plaintiff to prove that the defendant published a false statement about the product with malice, or the intention to cause injury, and that actual financial injury occurred as a consequence. Therefore, unlike libel, the plaintiff must prove falsity, malice, and actual injury flowing from the statement in question; damage to reputation is not required. A libel claim may be included where the disparagement also reflects on the individuals or company producing, distributing, or selling the product, affecting their reputations.

## 5. Must an individual be clearly identified (by name or photograph) to sue for libel? Can a group of persons sue for libel, even though not named?

An individual must be identifiable, but need not be named or have his photograph published, in order to sue for libel. In these cases, the issue will be whether the published information serves to identify the plaintiff and give rise to a personal cause of action based on harm to reputation.

An unnamed group of persons cannot sue for libel as a group although Quebec has allowed a class action to be brought.[9] However, insofar as individual members of the group are identifiable and have personally been

defamed by what was published, each such individual has a cause of action in libel. This approach generally imposes a limit on the size of groups that may be involved, but no clear line has been drawn on what size is too large.[10]

## 6. What fault standards are applied to libel?

At common law, the plaintiff need not prove any fault on the part of the defendant. Libel is a strict liability tort, and once the defendant is shown to have published a defamatory statement, falsity and damage are presumed. The onus then lies on the defendant to establish a valid defense, and the type and degree of fault will depend on the defenses at issue, as will be discussed below in relation to each. Proof of malice—an improper purpose or motive—will defeat defenses of fair comment and qualified privilege but is irrelevant to the defense of justification (or truth). The new defense of "public interest responsible communication" turns on defendants' proving they acted responsibly in all the circumstances.

The approach is different in Quebec, where the Civil Code requires the plaintiff to show that the defendants committed a "fault" by publishing what they did. Even when they have truth and public interest on their side, defendants will not avoid liability if the court is convinced they failed to meet the appropriate standard of care in the circumstances; this can arise either through intentional harm or because of negligence or carelessness.[11]

### a. Does the fault standard depend on the fame or notoriety of the plaintiff?

Since libel is a strict liability tort, the plaintiff need not prove any degree of fault on the part of the defendants. This does not depend on the position, fame, or notoriety of the plaintiff. While some defenses only apply to matters of "public interest," and therefore are more likely to involve someone of public note, what counts is the nature of the subject matter, rather than the plaintiff's status.

### b. Is there a heightened fault standard or privilege for reporting on matters of public concern or public interest?

In its 2009 decision in *Grant v. Torstar*,[12] the Supreme Court of Canada introduced a new defense called "public interest responsible communication" (PIRC), similar to the English House of Lords' "responsible journalism" defense.[13] Publishers now have an alternative to proving truth for defending defamatory statements of fact. As long as the publication involves a matter of public interest, the defendants need only show that they acted responsibly and were sufficiently diligent in trying to verify the defamatory allegation. The Court recognized the value of protecting statements on matters of public interest even if they cannot be proven true: "To insist on court-established

certainty in reporting on matters of public interest may have the effect of preventing communication of facts which a reasonable person would accept as reliable and which are relevant and important to public debate."[14]

Without limiting what a court could take into account, the Court outlined some of the factors that might aid in applying the PIRC defense:

1. The publication is on a matter of public interest (to be decided by the judge);
2. The publisher was diligent in trying to verify the allegation (to be determined by the jury), having regard to:
   a. seriousness of the allegation,
   b. public importance of the matter,
   c. urgency of the matter,
   d. status and reliability of the source,
   e. whether the plaintiff's side of the story was sought and accurately reported,
   f. whether inclusion of the defamatory statement was justifiable,
   g. whether the defamatory statement's public interest lay in the fact that it was made rather than its truth ("reportage"), and
   h. any other relevant circumstances.[15]

Each of these factors affects the reasonableness of the defendants' decision to publish. Essentially, the publisher should have a sound basis for believing the defamatory statement to be true and important to report to the public. As much as possible, the reader should be put into the same position as the publisher in evaluating the allegation, with context and sources described. Most importantly, a serious effort must have been made to contact those adversely affected, particularly where they can be expected to know facts that might otherwise be missing, and to include their side of the story. Malice is not a distinct element used to defeat this defense but is subsumed in the test for responsibility. The Court explicitly made the defense available not just to "journalists" but to "anyone who publishes material of public interest in any medium." It also discounted any role for an article's "tone": "the defence of responsible communication ought not to hold writers to a standard of stylistic blandness."

*Public interest* is defined very broadly to include any matter on which "some segment of the community would have a genuine interest in receiving information" and is based on the same test as the defense of fair comment: "The public has a genuine stake in knowing about many matters, ranging from science and the arts to the environment, religion and morality." However, the degree of public interest and importance, as well as its urgency, can be expected to have a real impact on what steps might be reasonably expected of the defendants before publishing an allegation.

The "reportage" defense appears to be distinct, essentially protecting a balanced report of a dispute, so that the public can be informed. The

dispute itself must be a matter of public interest; the statements should be attributed; both sides should be set out fairly; the context for the statements should be provided; and the report should contain some indication, expressly or implicitly, that its truth has not been verified.[16]

## 7. Is financial news about publicly traded companies, or companies involved with a government contract, considered a matter of public interest or otherwise privileged?

While no statute or case law has established that financial news about public companies or those with government contracts necessarily amounts to a matter of public interest, this is the type of information that the new PIRC defense should protect, provided the relevant factors have been met. Further, if publication was based on information contained in a report or other document released to the public by government or a related agency, a statutory qualified privilege would be available (see section 10b below).

## 8. Is there a recognized protection for opinion or "fair comment" on matters of public concern?

In a 2008 decision, *WIC Radio v. Simpson*,[17] the Supreme Court of Canada clarified and strengthened the traditional defense of "fair comment." The test for this defense is:

1. the comment must be on a matter of public interest,
2. the comment must be based on fact,
3. the comment, though it can include inferences of fact, must be recognizable as comment,
4. the comment must satisfy the following objective test: Could any person honestly express that opinion on the proven facts?
5. even though the comment satisfies the objective test, the defense can be defeated if the plaintiff proves that the defendant was subjectively actuated by express malice.

A generous approach is taken to the first three factors. Public interest is very broadly defined. The notion of comment can include a "deduction, inference, conclusion, criticism, judgment, remark or observation which is generally incapable of proof." By way of factual foundation, "the comment must explicitly or implicitly indicate, at least in general terms, what are the facts on which the comment is being made"; it is enough that facts may be

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 11 of 23

sufficiently "notorious" that the audience already understands them. However, the defendants bear the onus of proving the facts are true.

The objective test for "honest belief" requires some nexus or relationship between the comment and the underlying facts. The opinion need not be "fair minded," nor do the facts have to "support" the opinion. The critical question is: "Could any man honestly express that opinion on the proved facts... however prejudiced he may be, however exaggerated or obstinate in his views?" "People have as much right to express outrageous and ridiculous opinions as moderate ones... chilling false and defamatory speech is not a bad thing in itself, but chilling debate on matters of legitimate public interest raises issues of inappropriate censorship and self-censorship. Public controversy can be a rough trade, and the law needs to accommodate its requirements."[18]

To defeat the defense, the plaintiff must prove subjective malice, or some indirect or improper motive, as the dominant reason for the defendant's remarks. The Court did not have to deal with this issue on the facts of the case but added "proof of malice on the part of the media is generally very difficult."

## 9. Are there any requirements upon a plaintiff, such as demand for retraction or right of reply, and if so, what impact do they have?

The rules vary among provinces and turn on whether the libel was published or broadcast in the media— generally any publication that comes out at least 12 times a year or a broadcast by radio, television, or cable.

Media are given additional defenses by statute, such as a qualified privilege to publish fair and accurate reports of certain public proceedings or meetings and of official reports or other documents issued for the information of the public. These defenses can be lost if the defendant refused to publish or broadcast "a reasonable statement of explanation or contradiction by or on behalf of the plaintiff."[19] In effect, this creates a form of statutory right of reply.

As well, special statutory rules for media libel mean that prior notice must be given by plaintiffs, and a timely retraction can limit a plaintiff's claim. However, the time periods involved can be very tight, and action must be taken quickly. For a libel published or broadcast by the media in Ontario, a plaintiff must serve written notice to all prospective defendants specifying the matter complained of within six weeks of the alleged libel coming to his or her knowledge. This extends to online versions of the publication as well, but there has not yet been a court ruling on whether purely Internet publications are covered.

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 12 of 23

A failure to give the required notice is an absolute bar to bringing an action, and there is also a three-month limitation period for media libel in Ontario. Further, the notice triggers a period of time (three days in Ontario) within which the defendant can publish a "full and fair retraction in as conspicuous a place and type as the alleged libel." Provided certain conditions are met (e.g., publication was made in good faith, without negligence and in mistake of the facts, and did not involve a criminal charge), the plaintiff can only recover actual damages, namely actual losses directly attributable to the libel.[20]

Other provinces have similar rules; they generally require written notice to be given—at least to a media defendant and its employees—five days or more before the commencement of an action.[21] If a retraction is published before an action is started and certain conditions are met, the plaintiff's claim is again limited to "special" damages. Most provinces have six-month limitation periods. However, British Columbia has no notice requirement, and B.C., Alberta, and Manitoba have two-year limitation periods. In the event that a libel notice or demand for retraction is received, publishers are advised to contact local counsel immediately.

## 10. Is there a privilege for quoting or reporting on:

### a. Papers filed in court?

A common-law qualified privilege is available for fair and accurate reports of documents and records in court files that are publicly available.[22]

### b. Government-issued documents?

As long as the documents were issued by the government for the information of the public, a statutory qualified privilege is available for any fair and accurate report in the media of all or part of such a document, or a synopsis of it. This defense is established by provincial defamation legislation and varies to some extent among jurisdictions.[23] Arguably, there would also be a common-law qualified privilege for fair and accurate reports of such publicly available information, issued for the public's benefit. The PIRC defense could also apply (see Section 6b above).

### c. Quasi-governmental proceedings?

There is a qualified privilege available for fair and accurate reports of public proceedings of administrative tribunals. In Ontario, disciplinary proceedings for legal and health professionals are governed by legislation, and fair and

accurate reports of their proceedings are protected by statutory qualified privilege, as they are in other provinces. Such a privilege also applies to other nonstatutory bodies that govern their members, such as "an association formed in Canada for the purpose of promoting or safeguarding the interests of any trade, business, industry or profession, or persons carrying on or engaged in them" (or "any game, sport or pastime open to the public") where its constitution provides such disciplinary powers. Fair and accurate reports in the media of their disciplinary decisions (or findings) are protected by statutory qualified privilege.[24]

As noted above (9), the statutory privilege can be lost if the defendant refuses to publish a "reasonable statement of explanation or contradiction" on behalf of the plaintiff.[25] This may be considered a modified right of reply but can often be provided by inviting a response from the person affected for the initial publication or a follow-up article. Again, the PIRC defense could apply if the technical requirements for the statutory defense cannot be met.

## 11.  Is there a privilege for republishing statements made earlier by other, bona fide, reliable publications or wire services?

There is no such privilege. Each republisher is liable for whatever is published and must be able to establish one of the available defenses.

## 12.  Are there any restrictions regarding reporting on:

### a.  Ongoing criminal investigations?

Apart from the general law of libel, there is no restriction on reporting on ongoing criminal investigations. Insofar as an article reports on an investigation, without imputing guilt, it can be defended as true merely by proving the fact of the police investigation. However, if serious criminal charges are already outstanding against those being investigated, attention should be paid to Section 12b below.

### b.  Ongoing criminal prosecutions?

The traditional common law of contempt of court continues to apply in Canada.[26] A publication that causes a serious risk of prejudice to a fair trial can lead to a contempt citation against the publisher and all those involved. This is a criminal proceeding. Over the past 20 years, strict enforcement of law of contempt has waned, and a more considered approach is taken

as to whether the publication actually poses a serious risk of prejudice.[27] Previously, any publication of an accused's prior criminal record or bad character would be strictly prohibited after arrest. This is no longer the case, but enforcement varies from province to province, with Ontario, British Columbia, and Quebec generally being the most lenient. As a result, a precise test can no longer be given. A number of factors need to be considered, such as the time intervening before trial, the size of the community involved, the potential impact of the information, and the public interest being served by publishing it now.[28] At all times, disclosing a confession or other admission by an accused is the most risky since it is highly prejudicial and yet may be inadmissible as evidence at trial.

However, it has been deemed almost impossible to prejudice a judge sitting alone in a criminal case, and even in jury trials, publication well in advance of trial, depending on all of the circumstances, should not give rise to a real risk of prejudice.[29] Change of venue, challenges for cause, and strict jury instructions can be used to minimize any such risk. Simply put, this is a gray area of the law, and it requires close judgment calls based on the facts at hand.

In addition to the law of contempt, the Criminal Code provides for various statutory publication bans, so that reports of bail hearings and preliminary inquiries are severely restricted, and bans on identifying sexual complainants and certain other witnesses can be obtained as a matter of course.[30] There is also a discretionary right for the court to impose broader publication bans on identifying witnesses, but normally notice must be given to the media when such orders are being sought.[31] The constitutionality of the limit on publishing reports of bail hearings has recently been upheld by the Supreme Court of Canada on the basis of safeguarding fair trial rights and ensuring expeditious bail hearings.[32]

During jury trials, nothing can be reported about what occurs when the jury is not present since they are not sequestered. Such information can only be published when the jury retires to render its verdict, but jurors cannot disclose any information about their deliberations at any time.[33] In general terms, the Criminal Code statutory publication bans are purportedly intended to protect the fair trial process, acting as a specific means of enforcing the more general law of contempt since it does not apply to reports of public judicial proceedings. Anonymity orders are based on the risk of possible harm to the person in question and the societal interest of encouraging victims and witnesses to come forward, especially in underreported crimes such as sexual assault.[34]

Federal legislation imposes restrictions on reporting on criminal cases where a youth (aged 12–17) is charged and dealt with in Youth Court. These prohibit identifying the accused, as well as any witness or victim under 18 years of age (even if dead), subject to certain conditions.[35]

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 15 of 23

### c. Ongoing regulatory investigations?

No, other than the general law of libel.

### d. Ongoing civil litigation or other judicial proceedings?

The law of contempt may be applied where a civil jury trial is being conducted, and nothing should be published during a trial about what occurs in the jury's absence. In particular, publication of the damages being sought in a statement of claim can lead to a mistrial since jurors are not advised of these amounts. There can also be specific publication bans (including anonymity orders) in civil proceedings, but they are more unusual than in criminal cases.[36] Otherwise, there are no restrictions on reporting on publicly conducted proceedings, and the defense of qualified privilege is available for fair and accurate reports of them.

Provincial legislation dealing with court proceedings for protection of children imposes limits on covering these cases, including statutory prohibitions on identifying the children and their families.[37]

## 13. Are prior restraints or other prepublication injunctions available on the basis of libel or privacy, and, if so, what are the standards for obtaining such relief?

No prepublication injunctions have been awarded in the past 20 years on the basis of allegations of libel alone. Since free expression is at risk, only the "clearest cases" qualify. To succeed, the plaintiff would first have to meet the usual requirements for an interlocutory injunction in these circumstances: There is a serious issue to be tried and a real risk of irreparable harm (damages would not suffice). The plaintiff would also have to counter any defenses that might be raised by the defendants. Essentially, any bona fide defendant should be able to defeat a motion for such an injunction by asserting a willingness to defend the publication on the basis of a legally permissible defense.[38]

Certain provinces (British Columbia, Saskatchewan, Manitoba, Quebec, and Newfoundland) have privacy statutes that create statutory torts for invasion of privacy. With the exception of Quebec, these have been very little used against the media. Until recently, other provinces have not recognized such a tort. As discussed below (see Section 14), the Ontario Court of Appeal has recently recognized a privacy tort for "intrusion upon seclusion," and an injunction to stop a publication based on such an intrusion could be sought.[39] However, public disclosure of embarrassing private facts has not yet been recognized as a distinct tort.

As in England, the tort of breach of confidence has been used against the media to obtain prepublication injunctions with some success.[40] In these cases, the traditional test for injunctions is applied, and the plaintiff need only show that confidential information is about to be published, causing irreparable harm. The media have often been successful in subsequently setting aside these preliminary injunctions, and the significant additional publicity garnered for the broadcast or publication in question has made plaintiff counsel more wary of using such tactics.[41] The Supreme Court of Canada has even allowed publication where the sources leaking the information may have acted illegally.[42]

## 14. Is a right of privacy recognized (either civilly or criminally)?

Apart from provincial privacy legislation (British Columbia, Saskatchewan, Manitoba, Quebec, and Newfoundland),[43] there is federal legislation that restricts the use of third-party information by private organizations, the Personal Information Protection and Electronic Documents Act.[44] It applies not only within the federal jurisdiction but also provincially, where a province, such as Ontario, does not have its own legislation. All privacy legislation has an exception for newsworthiness or for journalists.

In Quebec, privacy rights are much more established and are even given specific protection in its provincial Charter of Human Rights and Freedoms. For example, publication of a photograph should not take place without the subject's permission unless he or she is simply part of some public event or a public figure.[45]

At common law, the only tort of invasion of privacy recognized until recently was commercial misappropriation of personality. It generally requires some unauthorized suggestion that a known personality endorses a particular product or company. However, the Ontario Court of Appeal recently reviewed privacy jurisprudence and recognized the privacy tort of "intrusion upon seclusion," in a case where a bank employee had improperly accessed another's personal banking information, apparently for personal reasons. The Court adopted the approach taken in the U.S. *Restatement (Second) of Torts* and required that the intrusion be intentional, without lawful justification, and into private affairs in a fashion that would be regarded by a reasonable person as "highly offensive." The Court also explicitly recognized that competing claims, such as free expression, may outweigh protection of privacy in some circumstances.[46] In the case, there was no attempt to disclose the confidential information, and consideration of a tort for public disclosure of embarrassing private facts was left for another day.

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 17 of 23

### a. What is the definition of "private fact"?

There is no definition of "private fact" at present that has any broad application. Generally, the courts have focused on whether there was a reasonable expectation of privacy in the information involved. Examples include publishing the identity of a complainant in a criminal sexual assault case where her identity was protected by court-ordered publication ban;[47] broadcasting without consent a videotape of hair transplant surgery;[48] concealed videotaping by a landlord of a woman using a washroom;[49] and in Quebec, publishing without consent a photograph of a young woman sitting in a doorway beside a public thoroughfare.[50]

### b. Is there a public interest or newsworthiness exception?

Provincial privacy legislation recognizes a form of newsworthiness exemption where the matter published was of public interest, was fair comment on a matter of public interest, or would be protected by privilege under defamation law (with some variation among provinces).[51] In Quebec, public interest is also cited as a defense, recognizing newsworthiness in articles about public issues and public figures. The federal Personal Information Protection and Electronic Documents Act specifically exempts organizations collecting, using, and disclosing personal information for "journalistic, artistic or literary purposes."[52]

### c. Is the right of privacy based in common law, statute, or constitution?

Privacy rights are defined by provincial and federal statutes, and limited recognition has arisen at common law, as discussed above.

## 15. May reporters tape-record their own telephone conversations for note-taking purposes (not rebroadcast) without the consent of the other party?

Yes, and a full transcript can be published in newspapers or online.

## 16. If permissible to record such tapes, may they be broadcast without permission?

Under Canadian Radio-television and Telecommunications Commission regulations that apply to radio and television, such interviews cannot be broadcast without consent, but Internet transmission is not explicitly covered.

## 17.  Is there a recognized evidentiary privilege preventing the disclosure of confidential sources relied upon by reporters?

In two 2010 decisions,[53] the Supreme Court of Canada recognized that journalists have a case-by-case privilege to protect their confidential sources but held that it was "very context specific," with an onus on the journalist to overcome the presumption that disclosure was required. The Court adopted the traditional *Wigmore* test for confidentiality. Its four criteria require that: (1) an explicit commitment of confidentiality was made and was (2) essential to the relationship involved; (3) the relationship was one deserving of society's protection and encouragement (in general, the Court agreed that the relationship between a professional journalist and a confidential source qualified); and (4) the court must then balance and weigh the different rights and interests involved, giving due weight to public interest in free expression and the special position of the media. While explicit constitutional protection was ruled out, the Court accepted that use of confidential sources is an important element for newsgathering and is deserving of protection that can outweigh other competing public interests, even criminal investigations. The seriousness of the crime and nature of the evidence can be determining factors, as they were in one case where actual evidence of an alleged forgery was being sought.[54]

In civil proceedings, a careful procedure must be followed by the court to determine whether the evidence being sought is not otherwise available and is so important to the case that protection of the source must give way. Before being cited for contempt, the journalist must be given an opportunity to consider his or her position and, potentially, to consult the source because circumstances may have changed since the commitment was made.[55]

In Ontario, the "newspaper rule" applies in libel cases to prevent disclosure of journalists' confidential sources at the discovery stage of litigation. However, this rule does not apply in British Columbia and a number of other provinces.

## 18.  In the event that legal papers are served upon the newsroom (such as a civil complaint), are there any particular warnings about accepting service of which we should be aware?

No, except that consent should be obtained if service is to be accepted for individuals. However, the very short time periods for responding to libel notices (which need not follow any particular form) mean that a lawyer should be immediately contacted if anyone on staff receives a document complaining of damage to reputation (see Section 9 earlier). Service of other

legal documents, such as statement of claim, may also trigger limited time periods for response.

## 19. Has your jurisdiction applied established media law to Internet publishers?

In general, the existing common law of libel and privacy applies to all communications media, including the Internet in its various forms. However, thus far there have been few cases to reach trial involving Internet libel or privacy concerns.

The Ontario Court of Appeal has pointed to the "ubiquity, universality, and utility" of the Internet and its potential as "a medium of virtually limitless international defamation."[56] This breadth of potential dissemination has an impact on defenses such as common-law qualified privilege, as well as on damages, unless website access has been limited to those to whom publication is properly directed.[57]

## 20. If established media law has been applied to Internet publishers, are there any ways in which Internet publishers (including chat room operators) have to meet different standards?

To date, neither the courts nor the legislatures have developed special standards or laws for Internet publishers in the areas of libel and privacy. However, aspects of common law have been useful in developing protection for Internet publishers and ISPs.

The defense of "innocent dissemination" may be relied on by those involved in publishing an alleged libel who were not aware of it and bore no responsibility. Traditionally, this defense helped those peripherally involved, such as news agents, book sellers, and printers, to escape liability for defamation, and the passive involvement of an Internet service provider will likely fall within this defense—at least before any notice.[58] This defense may also be available to bulletin board or chat room operators where they had no knowledge, nor ought to have had knowledge, of the alleged libel.[59] This is beneficial to these operators where no attempt is made to monitor postings. However, once notice is received of an alleged libel, a decision will have to be made whether to remove the offending posting. At that point, the operator may no longer be able rely on its "innocence." As a result, it is useful to publish on the website clear notice that the chat room

is not being monitored but the operator will respond to complaints that made in a prescribed fashion.

In a 2011 decision,[60] the Supreme Court of Canada ruled that mer providing a hyperlink to an alleged defamatory article on another webs does not amount to publication, at least where the defamatory content not repeated by the person providing the hyperlink. This ruling and oth suggest that the Court is well aware of the distinct nature of the Internet a will be sensitive to these differences.[61]

There also remains an issue as to whether a website or online pub cation qualifies for the special provisions for newspapers and broadcaste under provincial legislation (see Section 9). It has, however, been ruled th the online version of a magazine otherwise qualifying as a "newspaper" do not lose that benefit.[62] However, one appeal court has rejected a "single pu lication" rule with respect to Internet publication, and ongoing accessibili may extend limitation periods.[63] Differences in legislative definitions fro province to province could well produce different results.

## 21. Are there any cases where the courts enforced a judgment in libel from another jurisdiction against a publisher in your jurisdiction?

The leading case on this issue is *Braintech Inc. v. Kostiuk*.[64] The B.C. Cour of Appeal refused to enforce a default judgment obtained in Texas under it long-arm rules over bulletin board postings by a B.C. resident concerning a company with principal operations in British Columbia. As stated by the Court:

> *It would create a crippling effect on freedom of expression if, in every jurisdiction the world over in which access to the Internet could be achieved, a person who posts fair comment on a bulletin board could be hauled before the courts of each of those countries where access to the bulletin could be obtained.*[65]

Because Canadian common law has generally been plaintiff-friendly, it has been seen as a relatively attractive jurisdiction in which to bring libel proceedings. As a result, the focus has not been on enforcing foreign libel judgments against Canadian publishers here, but rather plaintiffs using Canadian courts to obtain favorable judgments against foreign defendants. On the one hand, courts have rejected an attempt by a plaintiff who moved into Ontario three years after publication of the alleged libel in the print version of the *Washington Post*, which was subsequently accessible through the

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 21 of 23

newspaper's paid online archives.[66] It was not reasonably foreseeable that the *Post* would have been sued in Ontario, and it was unfair to assume that a newspaper could be sued anywhere in the world by virtue of publication on the Internet: "To hold otherwise would mean that the defendant could be sued almost anywhere in the world based upon where a plaintiff may decide to establish his or her residence long after publication of defamation." Recognizing the effects of comity and reciprocal enforcement, the Court added that a contrary holding would result in "Ontario publishers and broadcasters being sued anywhere in the world with the prospect that the Ontario courts would be obligated to enforce foreign judgments filed against them." More recently, the Supreme Court of Canada has held that jurisdiction may be found in a province as long as the tort of defamation was committed there—even by so much as circulation of library copies or republication of newspapers.[67] As long as no other "clearly more appropriate" forum could be established by the foreign defendants involved, the libel proceeding should be held in that province although choice of applicable law remains an open question.[68]

## Notes

1. *Ross v. Lamport* (1956), 2 D.L.R. (2d) 225 (S.C.C.).
2. *Sykes v. Fraser* (1973), 39 D.L.R. (3d) 321 (S.C.C.).
3. *Botiuk v. Toronto Free Press Publication Ltd*. (1995), 126 D.L.R. (4th) 609 (S.C.C.).
4. *Snyder v. Montreal Gazette Ltd*. (1982), 49 D.L.R. (4th) 17 (S.C.C.).
5. *Chernesky v. Armadale Publishers Ltd*. (1979), 90 D.L.R. (3d) 321 (S.C.C.).
6. *Hiltz and Seamone Co. v. Nova Scotia* (Attorney General), [1997] N.S.J. No. 530 (S.C.); [1999] N.S.J. No. 47, 172 D.L.R. (4th) 488 (N.S.C.A.).
7. *Leenan v. C.B.C.*, [2000] O.J. No. 1359; aff'd [2001] O.J. No. 2229 (C.A.); leave denied [2002] S.C.C.A. 432.
8. *Walker v. CFTO Ltd*. (1987), 59 O.R. (2d) 104 (C.A.).
9. *Bou Malhab v. Diffusion Metromedia CMR Inc*., 2011 SCC 9.
10. *Gauthier v. Toronto Star*, [2003] O.J. No. 2622 (S.C.); aff'd [2004] O.J. 2686 (C.A.); leave denied [2004] S.C.C.A. No. 411.
11. *Neron v. Chambre des notaires du Quebec*, [2004] 3 S.C.R. 95.
12. 2009 SCC 61.
13. *Reynolds v. Times Newspapers*, [1999] H.L.J. No. 45; *Jameel v. Wall Street Journal Europe Srpl*, [2006] UKHL 44.
14. 2009 SCC 61 para. 53.
15. *Supra*, para. 126.
16. This is similar to *Roberts v. Gable*, [2007] EWCA Civ 721.
17. 2008 SCC 40.
18. *Supra*, paras. 4 & 15.
19. For example, Libel and Slander Act (Ontario), R.S.O. 1990, c.L.12 s. 3(7).
20. *Supra*, s. 5.

21. For example, Defamation Act (Alberta), R.S.A. 1980, c. D-6, s. 13; Libel and Slander Act (Saskatchewan) R.S.S. 1978, c. L. 14, s. 15.
22. *Hill v. Scientology*, [1995] 2 S.C.R. 1130.
23. For example, Libel and Slander Act (Ontario), R.S.O. 1990, c.L.12, s. 3(3).
24. *Supra*, s. 3(4).
25. *Supra*, s. 3(7).
26. The common-law power of the court to punish for contempt of court is specifically recognized and preserved by s. 9, Criminal Code of Canada.
27. *Alberta v. Edmonton Sun*, 2003 ABCA 3.
28. *Supra*, paras. 64–65, 119–121.
29. *Phillips v. Nova Scotia* (Commission of Inquiry into the Westray Mine Tragedy), [1995] 2 S.C.R. 97.
30. ss. 276.3, 486.4, 517, 539 and 542, Criminal Code of Canada.
31. s. 486.5, Criminal Code of Canada.
32. *Toronto Star Newspapers Ltd. v. Canada*, 2010 SCC 21.
33. ss. 648 & 649, Criminal Code of Canada.
34. *Canadian Newspapers Co. v. Canada*, [1998] 2 S.C.R. 122.
35. Youth Criminal Justice Act, S.C. 2002, c.1, ss. 110–112.
36. *A.B. v. Bragg Communications Inc.*, 2010 NSSC 215; aff'd 2011 NSCA 26, 2011 NSCA 38; leave to appeal granted [2011] S.C.C.A No. 216 (under reserve).
37. For example, Child and Family Services Act (Ontario), R.S.O. 1990, c.C.11, s. 45; Child, Youth and Family Enhancement Act (Alberta), R.S.A. 2000, as amended, c. C-12, s. 126.2.
38. *Rapp v. McClelland and Stewart Ltd*. (1981), 34 O.R. (2d) 452 (H. Ct.).
39. *Jones v. Tsige*, 2012 ONCA 32.
40. *Amherst (Town) v. Canadian Broadcasting Corp*. [1994] N.S.J. No. 291 (C.A.).
41. *Peat Marwick Thorne v. Canadian Broadcasting Corp*. (1991), 5 O.R. (3d) 759 (Gen. Div.).
42. *Globe and Mail v. Canada*, 2010 SCC 41.
43. For example, Privacy Act (British Columbia), R.S.B.C. 1996, c. 373; Civil Code of Quebec, Art. 35.
44. S.C. 2000, c. 5.
45. *Aubry v. Editions Vice-Versa Inc.*, [1998] 1 S.C.R. 591.
46. *Jones v. Tsige*, 2012 ONCA 32.
47. *J.M.F. v. Chappell and News Publishing Company Ltd.*, [1995] B.C.J. No. 1438 (S.C.); varied [1998] B.C.J. No. 276, 158 D.L.R. (4th) 430 (B.C.C.A.); leave denied [1998] S.C.C.A. No. 154.
48. *Hollinsworth v. BCTV*, [1996] B.C.J. No. 2638 (S.C.); [1998] B.C.J. No. 2451, [1999] 6 W.W.R. 54 (C.A.).
49. *Malcolm v. Fleming*, [2000] B.C.J. No. 2400 (S.C.).
50. *Aubry v. Editions Vice-Versa Inc.*, [1998] 1 S.C.R. 591.
51. For example, Privacy Act, R.S.B.C. 1996, c. 373, s.2(3).
52. S.C. 2000, c. 5, s. 4(2)(c).
53. *R. v. National Post*, 2010 SCC 16; *Globe & Mail v. Canada*, 2010 SCC 41.
54. *R. v. National Post*, *supra* (the original envelope and enclosed document [allegedly forged] received from the source was sought by police for fingerprint and DNA testing).

Case 1:22-cv-00340-RDM Document 21-6 Filed 06/10/22 Page 23 of 23

55. *St. Elizabeth Home Society v. Hamilton (City)* (Citation of Kenneth Peters), 2008 ONCA 182.
56. *Barrick Gold Corp. v. Lopehandia*, [2004] O.J. No. 2329 (C.A.) (undefended claim over Web postings).
57. *Christian Labour Association of Canada v. Retain Wholesale Union*, [2003] B.C.J. No. 3100 (S.C.) (union website available to public).
58. *Carter v. B.C. Federation of Foster Parents Assoc.*, [2005] B.C.J. No. 1720 (C.A.). On a related note, ISPs have escaped liability for copyright infringement: *Society of Composers, Authors and Music Publishers of Canada v. Canadian Association of Internet Providers*, 2004 SCC 45. They have also been ruled not to be broadcasters and, therefore, are not subject to federal broadcasting legislation: Reference re Broadcasting Act, 2012 SCC 4.
59. *Carter v. B.C. Federation of Foster Parents Assoc.*, [2004] B.C.J. No. 192 (S.C.), but on appeal, this defense was ruled to be not available where the operator was negligent in leaving the offending posting on the website long after receiving notice: [2005] B.C.J. No. 1720 (C.A.).
60. *Crookes v. Newton*, 2011 SCC 47.
61. See, e.g., *Éditions Écosociété Inc. v. Banro*, 2012 SCC 18, para. 3.
62. *Weiss v. Sawyer*, [2002] O.J. No. 3570, 61 O.R. (3d) 256 (C.A.).
63. *Carter v. B.C. Federation of Foster Parents Assoc.* [2005] B.C.J. No. 1720 (C.A.).
64. 1999 BCCA 169; leave denied [1999] S.C.C.A. No. 236.
65. *Supra*, at para. 63.
66. *Bangoura v. Washington Post*, [2005] O.J. No. 3849 (C.A.); leave denied [2005] S.C.C.A. No. 497.
67. *Éditions Écosociété Inc. v. Banro*, 2012 SCC 18; *Breeden v. Black*, 2012 SCC 19.
68. *Éditions Écosociété Inc. v. Banro*, *supra*, paras. 49–62.