## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WE CHARITY,** <br><br>                 **Plaintiff**, <br><br> **v.** <br><br> **CANADIAN BROADCASTING** <br> **CORPORATION,** <br><br>                 **Defendant**. | Civil Action No. 1:22-cv-00340 <br><br><br> ORAL HEARING <br> REQUESTED |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS* AND TO DISMISS COUNTS II-IV OF THE COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION**

Nathan Siegel (DC Bar No. 446253)
Rachel Strom (*pro hac vice*)
Courtney DeThomas (DC Bar No. 888304075)

DAVIS WRIGHT TREMAINE LLP

1301 K Street N.W., Suite 500 East
Washington, DC  20005
(202) 973-4200
(202) 973-4499 (fax)
nathansiegel@dwt.com
rachelstrom@dwt.com
courtneydethomas@dwt.com

*Attorneys for Defendant*
*Canadian Broadcasting Corporation*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................... 1

ARGUMENT ............................................................................... 2

I.    THE CASE SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS* ........... 2

    A.    Ontario Is An Available And Adequate Forum ........................... 2

        1.    Ontario's Libel Notice Requirement Presents No Barrier. ............. 2

        2.    Ontario Would Be an Adequate Alternative Forum Even if Some of the Secondary Publications Could Not Be Asserted. ............. 3

    B.    The Deference Owed Plaintiff's Choice of Forum Is Reduced ............. 4

    C.    The Private Factors Favor Dismissal ....................................... 12

    D.    The Public Factors Favor Dismissal. ....................................... 18

II.    COUNTS II-IV SHOUD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE CBC HAS SOVEREIGN IMMUNITY ........... 21

    A.    No Agreement "Necessarily Contemplated" that Ms. Wiszowaty Would be Interviewed in the United States ............................... 21

    B.    The Court Should Deny Plaintiff's Request to Replead these Allegations ............................................................. 25

CONCLUSION .......................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Brokerwood Intern (U.S.), Inc. v. Cuisine Crotone, Inc.*,
   104 F. App'x. 376 (5th Cir. 2004) ...........................................................................12

*Bryks v. Canadian Broadcasting Corp.*,
   906 F. Supp. 204 (S.D.N.Y. 1995) ..........................................................................18

*Chateau des Charmes Wines, Ltd. v. Sabate USA, Inc.*,
   No. C-01-4203 MMC, 2003 WL 22682483 (N.D. Cal. Nov. 10, 2003) .................16

*City of Harper Woods Emps' Retirement Sys. v. Olver*,
   589 F.3d 1292 (D.C. Cir. 2009)................................................................................25

*Croesus EMTS Master Fund L.P. v. Federative Republic of Brazil*,
   212 F. Supp. 2d 30 (D.D.C. 2002) ...........................................................................23

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*,
   600 F.3d 661 (D.C. Cir. 2010) .................................................................................24

*Deripaska v. Associated Press*,
   282 F. Supp. 3d 133 (D.D.C. 2017) .........................................................................15

*DiRienzo v. Phillips Services*, *Corp.*,
   294 F.3d 21 (2d Cir. 2002).......................................................................................12

*El-Hadad v. United Arab Emirates*,
   216 F.3d 29 (D.C. Cir. 2000) ...................................................................................18

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) .................................................................................25

*Florian v. Danaher Corp.*
   69 F. App'x 473 (2d Cir. 2003) ...............................................................................14

*Foman v. Davis*,
   371 U.S. 178 (1962).................................................................................................25

*Global Index, Inc. v. Mkapa*,
   290 F. Supp. 2d 108 (D.D.C. 2003) ...................................................................23, 24

*Goodman Holdings v. Rafidain Bank*,
   26 F.3d 1143 (D.C. Cir. 1994) .................................................................................23

*Gund v. Philbrook's Boatyard*,
    374 F. Supp.2d 909 (W.D. Wash. 2005) ..................................................................12

*Howe v. Goldberg Investments, Ltd.*,
    946 F.2d 944 (1st Cir. 1991) ..................................................................................16

*Huhtamaki Co. Mfg. v. CKF, Inc.*,
    648 F. Supp.2d 167 (D. Maine 2009) ......................................................................12

*In re Air Crash Over the S. Indian Ocean*,
    352 F. Supp. 3d 19 (D.D.C. 2018) ............................................................................4

*In re Lac Megantic Train Derailment Litigation*,
    210 F. Supp. 3d 219 (D. Maine 2016) ....................................................................19

*Kontoulas v. A.H. Robins Co.*,
    745 F.2d 312 (4th Cir. 1984) ....................................................................................4

*Ledingham v. Parke-Davis Div. Of Warner-Lambert Co.*
    628 F. Supp. 1447 (E.D.N.Y. 1986) ......................................................................16

*Logan Intern. Inc. v. 1556311 Alberta Ltd.*,
    929 F. Supp. 2d 625 (S.D. Tex. 2012) .............................................................12, 19

*Odhiambo v. Republic of Kenya*,
    764 F.3d 31 (D.C. Cir. 2014) ..................................................................................21

*Piper Aircraft Co. v. Reno*,
    454 U.S. 235 (1981) ......................................................................................5, 11, 14

*Saunders v. Davis*,
    No. 15-cv-2026 (RC), 2016 WL 4921418 (D.D.C. Sept. 15, 2016) ........................25

*Shi v. New Mighty U.S. Tr.*,
    918 F.3d 944 (D.C. Cir. 2019) ......................................................................5, 16, 18

*Simon v. Republic of Hungary*,
    911 F.3d 1172 (D.C. Cir. 2018) ..............................................................................15

*Trout Point Lodge, Ltd. v. Handshoe*,
    729 F.3d 481 (5th Cir. 2013) ..................................................................................17

**Federal Statutes**

28 U.S.C. § 4102 ..........................................................................................................1, 17

**Other Authorities**

*The Fifth Estate* (November 2021) ...................................................................................1

https://www.linkedin.com/in/patfinelli/?originalSubdomain=ca...................................................13

https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf........................16

*https://www.youtube.com/watch?v=TaTTdQhF7Rg* ....................................................................6

R. Wiszowaty, *My Maasai Life: From Suburbia to Savannah* (Me to WE, Sept. 7,
2010) ...................................................................................................................................9

## PRELIMINARY STATEMENT

The November 2021 *The Fifth Estate* documentary opened with Canada's public broadcaster telling viewers that "Canada's We Charity raised millions in donations to help people in this country" and "a Canadian charity was drawn here by a different force, an overwhelming need to help in this rural and rugged region."  Yet in response to CBC's motion, Plaintiff maintains that CBC was really speaking to Americans about a New York charity that supposedly built 852 structures in Kenya.  While Plaintiff acknowledges there is a Canadian charity with the same name, Plaintiff portrays it as a mere distant cousin that has no relationship to this case and it claims there is no one in Canada with any knowledge relevant to this case.

Plaintiff's efforts to re-invent WE Charity to justify maintaining this case here do not comport with the facts.  But they also serve to distract from the primary issue presented by the *forum non conveniens* inquiry:  whether convenience dictates that this motion should be granted. With respect to that Plaintiff does not point to any reason why it would be convenient for *anyone* – be it either party, any witness or this Court – to litigate this case in the District of Columbia.

Instead Plaintiff emphasizes several legal arguments – about Ontario's libel notice statute, the impact of the SPEECH Act on the enforceability of a judgment, and choice of law – that as a matter of law are simply wrong.   Otherwise Plaintiff mostly argues that CBC has not shown that Ontario would be more convenient, but the record is to the contrary.  The record shows there are more than 15 party witnesses in Canada and one who resides part-time in the United States.  It shows there are a few non-party Americans who in any event could not be compelled to testify at any trial here, while there are several categories of non-party witnesses who reside in Canada and could be summoned there.  It confirms that a bilingual forum would be more convenient, and that the issues raised by this case are far more germane to Canadians.

Finally, Plaintiff's Opposition further confirms why Counts II-IV should also be dismissed for lack of subject-matter jurisdiction. It concedes there was never any actual alleged agreement about where to interview Ms. Wiszowaty, but maintains that the parties necessarily contemplated that she would be interviewed in Michigan. That argument is plainly an *ex post facto* attempt to rescue these claims by floating a theory that is nowhere to be found in the pleadings, not supported by the evidence Plaintiff now submits, and relies on facts within *The Fifth Estate* documentary that could not possibly have been contemplated at the time of this supposed "agreement" because the program was broadcast more than two months later.

## ARGUMENT

I.     **THE CASE SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS***

A.     **Ontario Is An Available And Adequate Forum**

1.     **Ontario's Libel Notice Requirement Presents No Barrier.**

Plaintiff concedes that Ontario would be an adequate forum for its defamation claim as it applies to the *Fifth Estate* documentary because it served a Libel Notice. However, Plaintiff asserts that other Defamatory Publications might be barred notwithstanding CBC's promise of a waiver. It asserts that "even if a defendant in Ontario fails to raise the notice defense, an Ontario court could dismiss claims for which the defendant was not provided notice within six weeks". Opp. at 17. To support that proposition Plaintiff provides a declaration from Douglas F. Harrison, but Mr. Harrison *never* actually says that – only Plaintiff's brief does. Nor does Mr. Harrison cite a single case in which any Canadian court ever *sua sponte* dismissed a libel action for failure to comply with the notice provision, nor does he specifically assert that such a scenario is even possible. In fact, black-letter Ontario law is clear that it is not.

CBC has no quarrel with Mr. Harrison's points that if the requirements of the statute apply to the publication in question, notice is a condition precedent and an absolute bar to

maintaining a defamation action.  *See* Reply Declaration of Brian Rogers ¶ 3.  But Mr. Harrison never addresses the only relevant issue here, which is who has the burden of raising whether this (or any other) "condition precedent" applies and was satisfied?  As Mr. Rogers explains, Ontario's rules of procedure explicitly place that burden on the *defendant*.  *Id.* ¶ 5.  And several of the cases Mr. Harrison cites which construe that rule, as well as many others, confirm that a plaintiff has no obligation to plead compliance with the libel notice requirement.  Rather, the defendant has the burden of pleading and then proving that it applies, and if the defendant does raise the issue there is no bar to the case proceeding.  *Id.* ¶¶ 6-9.

Consistent with that basic principle, in all the cases Mr. Harrison cites it was the *defendant* that raised the lack of notice.  *Id.* ¶¶ 15-18.  The significance of the notice requirement being an "absolute bar" is that if the defendant demonstrates a failure to comply, a court has no ability to excuse or permit the plaintiff to cure non-compliance.  *Id.* ¶ 19.  Thus, since CBC has undertaken not to assert any failure to comply with the notice requirement, Ontario is an available forum with respect to all of the allegedly Defamatory Publications.[1]

> **2.     Ontario Would Be an Adequate Alternative Forum Even if Some of the Secondary Publications Could Not Be Asserted.**

While CBC's undertaking eliminates any issue, it would make no difference even if it did not.  *The Fifth Estate* program "is at the heart of this lawsuit" and is the "primary Defamatory Publication."  Opp. at 6, 37.  The Complaint served in this action also put CBC on notice with respect to the *Enquête* program, and Plaintiff does not dispute that Ontario is an adequate forum

---

[1] To be absolutely clear, what CBC means by "waiving" the notice requirement is that should Plaintiff and/or any of its affiliates file any action in Ontario within 60 days of the final dismissal of this case, CBC will not assert in any pleading, motion, or otherwise that Plaintiff and/or any affiliate has failed to comply with the requirement with respect to any of the allegedly Defamatory Publications.

for the other three causes of action it pleads.[2]  It is well-settled that "[a] foreign forum is available and adequate when it 'provide[s] the plaintiff with 'some' remedy[,]' … even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized."  *In re Air Crash Over the S. Indian Ocean*, 352 F. Supp. 3d 19, 36 (D.D.C. 2018) (internal citation omitted).  Only where a court "could not award any relief to a plaintiff at all" is a forum inadequate.  *Id.* at 38.  Thus, even if Count I were narrowed to the two documentaries (or just the primary *Fifth Estate* program), the absence of tertiary material like a few tweets, promos, and teasers would hardly deprive Plaintiff of a remedy for defamation.  It is telling that other than to claim Ontario is inadequate, Plaintiff never mentions those tertiary publications in its Opposition.  Plaintiff cites *Kontoulas v. A.H. Robins Co*., 745 F.2d 312, 313 (4th Cir. 1984) for the proposition that *forum non conveniens* requires precise parity of claims, but that case says nothing of the kind.  Opp. at 16, 18.  The "individual actions" *Kontoulas* refers to were separate product liability suits, not individual causes of action within one suit, let alone a few tertiary publications that are merely a subset of a single cause of action for defamation.

## B.     The Deference Owed Plaintiff's Choice of Forum Is Reduced

There appears to be little real disagreement about the applicable standard for the next step in the inquiry.  Plaintiff's choice of forum is entitled to a presumption of deference, but the weight of that presumption may be affected by factors such as whether any real parties in interest are foreign, whether there is evidence of forum-shopping, and any other factors specific to the

---

[2] The statute requires that prior to filing a statement of claim the plaintiff must within six weeks give "the defendant notice in writing, specifying the matter complained of, which shall be served in the same manner as a statement of claim . . ."  Rogers Decl., Dkt. No. 16-48, Ex. 1.  The Complaint was served three weeks after the *Enquête* broadcast and it is not a Canadian statement of claim (Dkt. 1), so should Plaintiff subsequently file a claim in Ontario it would in any event likely satisfy that requirement, and obviously does since CBC deems it to be notice.

case. *See Piper Aircraft Co. v. Reno*, 454 U.S. 235, 256 n.23 (1981); *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 950 (D.C. Cir. 2019).  Plaintiff cites *Shi* to argue that even foreign plaintiffs' choice of forum deserves *some* deference.  Opp. at 20.  But CBC has never argued otherwise, and in any case *Shi* presented unusual circumstances where the plaintiff "had no choice but to sue the D.C.-based entities here because they did not appear to be subject to jurisdiction anywhere other than in the United States." *Shi*, 918 F.3d at 950.  That is not the case here.[3]

Plaintiff's primary argument is no foreign entities have any interest in this case because WE Charity Canada (and even the country itself) has nothing to do with the facts at issue here. Much of Plaintiff's argument amounts to the proposition that even *de jure* there has never been any "WE Organization" based in and directed from Canada – indeed, Plaintiff dismisses that term as a mere "pleading efficiency." Opp. at 4.  Rather, Plaintiff paints a portrait of entirely separate and independent entities that as a matter of mere convenience share a few accountants and IT staff, and a few executive staff that merely "manage day to day operations." *Id.* at 4, 11-12.  It further maintains that it is really Plaintiff that is responsible for operations in Kenya and that WE Charity in Canada is little more than the incidental locus of a cooperative checking account to bundle disbursements to Kenya. *Id.*

To support that narrative, Plaintiff submits a couple of declarations that set out facts that may (at least for the most part) be literally accurate in the most legalistic sense, combined with vague aphorisms that explain little about how the charity actually operates.  Some examples of

---

[3] *Shi* is distinguishable for many other reasons as well.  The Court emphasized that the defendants waited seven years to bring their *forum non conveniens* motion, which weighed heavily against any claim of inconvenience; there was no suggestion of forum shopping; concerns about foreign language were likely to be worse in Taiwan than in the U.S.; Taiwan does not participate in the Hague Convention or have a reliable method of compelling testimony domestically; any judgment would have to be enforced in the U.S.; and the defendants were objecting to litigating in their home forum.  None of those circumstances are presented here.

such facts include statements that Plaintiff has "no corporate affiliates, parents or subsidiaries"; that its Board "meets at least several times a year" and "40 times since January 2019"; and that WE Charity Canada and Plaintiff have always been "separate" entities with "separate" Boards. *See* Baker Decl. ¶¶ 10, 15, 19, 62; Arasaratnam Decl. ¶¶ 6, 9.  And a few examples of statements that serve more to obscure than enlighten include that Plaintiff had staff "that included [unidentified] senior management roles and functions"; that it works "in partnership with the Kenyan government", "assists in the operation of schools" and transfers "funds to WE Charity Canada as a best practice to ensure effective and efficient controls over transfers to developing countries"; and shares common officers with WE Charity Canada merely as a "practice" that is "efficient and strategically advantageous."  *See* Baker Decl. ¶¶ 54, 60; Arasaratnam ¶¶ 8, 11.

At bottom, the narrative Plaintiff then constructs in its brief flies in the face of 25 years of the charity's public statements, publications, regulatory filings, sworn testimony and even communications to the CBC.  That record makes clear that it is the conduct of WE Charity in Canada that is at "the heart of this lawsuit" (Opp. at 20-21).  Specifically:

\*   The Structure of the WE Organization.  WE Charity is a Canadian charity which operates globally, and entities are incorporated in other countries (including Plaintiff) simply because local laws require the charity to do that to operate in other countries. *See, e.g,* *https://www.youtube.com/watch?v=TaTTdQhF7Rg* (WE charity video entitled "What is the WE Organization and How Does it Help the World?").[4]

---

[4] *See, e.g.*, Siegel Reply Decl. Ex. 1 at 20 (CFO Victor Li told Parliament that "I can confirm that all WE entities around the world ultimately are part of WE Charity or ME to WE Social Enterprises.  Similar to many multi-national organizations, WE Charity and ME to WE Social Enterprises legally incorporates when necessary in countries of operations." ); Ex. 2 at 2 (Report by Governor Scott McCallum explaining that "WE Charity is a Canadian non-profit charity . . . Today it is an international charity and educational partner, which operates several charitable operations across North America and the UK, and several other countries around the world.");

* <u>The Management of the WE Organization</u>.   WE Charity senior management has always directed its global operations from Canada.  For example, Plaintiff's website contains a 2018 human resources study of "The WE Organization".  It identifies the Kielburgers and ten other specific staff members who at the time occupied the organization's "most senior leadership positions."  Siegel Reply Decl. Ex. 6 at 5.  All worked in Toronto, including the Director of WE Villages, the international development program at issue in this case.  *Id.*[5]

* <u>The Governance of the WE Organization</u>.  Plaintiff's Declarations refer to separate Boards and Board "meetings", but they never specify who participates in those meetings or where they typically took place.  That is because the charity maintains legally distinct Boards for the same reason there are separately incorporated entities – it is legally required to do so by local laws.  Functionally, WE Charity has long been governed by a single North American Board.[6]

---

Exs. 3 at 2 & 4 at 3 (article by Scott Baker in a Canadian journal posted on Plaintiff's website explaining that "WE Charity has charitable affiliates established in North America and around the world. In each country where WE Charity operates (Kenya, India, etc.) there is a local incorporated affiliate to adhere to local regulations."); Ex. 5 at 1 (Statement on Plaintiff's website:  "What is We Charity? We charity is an international charity and education partner. Our organization is unique among Canadian charities in that it operates collaborative programs both domestically and international"); Reply Declaration of Harvey Cashore, Ex.1 at 3 (Document provided by WE's management to the CBC in Toronto: "There are two overall structures: WE Charity and ME to WE Social Enterprise. There have been ongoing questions about sub-entities, which exist for three principle reasons: [1] WE operates globally and often local laws require incorporation in respective countries. For example, WE Charity is incorporated in Canada, the U.K., U.S., etc.").

[5] Similarly, the point of the various U.S. regulatory filings CBC submitted is that they were all executed by Canadian management.  That was no mistake, and it illustrates how Plaintiff has always been functionally managed as an affiliate of a global organization based in Canada.  CBC has no doubt that using a Toronto address may be a technical mistake (Opp. at 11 n.5), but the fact that those executives at times do not even remember to use the address of a storefront law practice outside Buffalo further underscores that point.

[6] *See, e.g.*, Siegel Decl. Ex. 7 (Plaintiff's website explains that "WE Charity is incorporated in Canada, US, and UK and must according to local regulation have a Board of Directors in each country.  However, as a global organization with global operations, the Boards of Directors work

For example, while Mr. Arasaratnam's Declaration states that he joined Plaintiff's Board in 2018, WE Charity's management in Toronto provided the CBC with a document he co-authored during the political scandal defending the charity's Canadian real estate holdings and stating that the charity's work is now mostly "focused in Canada."  Cashore Decl. Ex. 2 at 1.  Likewise, while for legal reasons each local affiliate has its own financial statements, Plaintiff's statements have always been addressed to the "Board of Directors" in Toronto.  Siegel Decl. Exs. 15-19.

　　　　*  <u>WE Charity's Funding and Supervision of Kenya Programs</u>.  Far from being a mere clearinghouse to disburse funds, WE Charity in Canada lauds what it says is its tight and direct supervision of all programs in Kenya.  That was emphasized to CBC in written statements by Robin Wiszowaty and other Kenya-based employees and contractors.[7]  WE Charity also

---

together to provide global governance."); *id.* Ex. 8 (Public statement posted on Plaintiff's website stating "The Canadian WE Charity Board of Directors and US WE Charity Board of Directors govern each two separate legal entities; however, both boards meet together in meetings and engage in collective conversations and we refer to it as the North American Board of Directors."); *id.* Ex. 9 (Statement on Plaintiff's website stating:  "WE Charity operates with a North American Board of Directors.  This is a common practice for organizations with operations that span Canada and the U.S.  This has been the practice for over a decade."); *id.* Ex. 3 at 2 (Canadian journal article by Scott Baker, also posted on Plaintiff's website, stating "The current North American board is composed of eight individuals . . . .")

[7] Cashore Reply Decl. Ex. 4 at 3 (Letter from Ms. Wiszowaty:  Kenyan operations maintain "[c]lear lines of accountability with WE Charity Canada, and ensure the governance expectations of WE Charity Canada, *as Free The Children's primary funder*, were met . . . We have strong financial records and oversight. Within this effort, I work together with WE Charity Canada's Chief Operations Officer, the Group Chief Accountant, and Directors who oversee a budget . . . I also work directly with WE Charity Canada's Chief Operations Officer in all areas related to finance, financial tracking, control systems, and governance."); *id.* Ex. 5 at 1 (Letter from Kenyan accountant: "There exists a clear quarterly project and milestone review between Free The Children Kenya and WE Charity Canada, which includes a review of donations received in Canada, the USA and the intentions of those donations . . . WE Charity Canada funds Free The Children Kenya to deliver the WE Villages program."); *id.* Ex. 6 (Letter from Kenyan director: "I have been part of literally hundreds of senior planning meetings with our teams from Canada and Kenya, including with Marc and Craig Kielburger, in preparation to showcase visiting donors and potential funders our work and the daily services we offer.").

highlights that when questions about employee misfeasance in Kenya have arisen, WE Charity

Canada intervened and ultimately assumed direct ownership of several primary properties there.[8]

     \*   <u>Robin Wiszowaty's Role within the WE Organization</u>.   It is telling that nowhere in

Plaintiff's 230-page Complaint and hundreds of pages of materials does it identify a single

American who has *ever* been on WE Charity's executive staff, and other than Ms. Wiszowaty it

identifies no Americans important to this case.  Perhaps as a result, Plaintiff implies that Ms.

Wiszowaty works or worked solely as *Plaintiff's* "head of Kenya operations" and "Country

Director", and dismisses the only position she is currently held out to have (Canada's "WE

Foundation Director – Staff") as a mere "volunteer" task.  Baker Decl. ¶¶ 57, 70; Opp. at 8, 12.

     But that too contradicts more than a decade of how the WE Organization and Ms.

Wiszowaty hold her out to the public.  Her life story is detailed in an autobiography published by

ME to WE, describing how she spent a year in Kenya as a student and it ultimately became her

adoptive home working for Free the Children.  *See* R. Wiszowaty, *My Maasai Life:  From

Suburbia to Savannah* (Me to WE, Sept. 7, 2010).  As she explained in a 2020 essay in a

Canadian philanthropy journal, "[f]or the last 15 years I have lived in Kenya, Ghana, the

Dominican Republic, Ecuador where I've worked for WE Charity", and her essay is a defense of

how the "WE Charity" she works for and ME to WE are structured under Canadian non-profit

laws.  Siegel Reply Decl. Ex. 11 at 1.  ME to WE promoted her for speaking engagements as

---

[8]  *See, e.g.*, Cashore Reply Decl. Ex. 7 at 1 (Statement by Kenyan private investigator that "WE Charity Canada proactively requested that I perform an independent assessment of Free the Children Kenya . . . I reviewed the internal investigation led by We Charity Canada's senior management, the findings of the investigation and the response by WE Charity Canada and Free the Children Kenya to those findings."); Siegel Reply Decl. Ex. 10 at 2 (Report of former Ontario Deputy Solicitor General Matt Torigian stating: "This report is an independent review of WE Charity Canada's response upon learning of alleged fraudulent criminal activity by a senior director at Free the Children Kenya, an independent affiliate of WE Charity Canada.").

someone "[b]orn and raised in Schaumberg, Illinois, Robin Wiszowaty currently splits her time

between Toronto, her adoptive home in Kenya and her work in Ghana" and in a 2011 interview

with a Canadian magazine Ms. Wiszowaty emphasized how she looks up to "the other team

members of Free the Children and Me to We, both in Kenya and Toronto."  Siegel Reply Decl.

Exs. 12 at 4 and Ex. 16 at 2.  Currently the organization holds her out to be the Canadian WCF's

Director.  Siegel Decl., Dkt. 16-9 at 4.[9]  If anything, the fact that Ms. Wiszowaty may receive her

paychecks from Plaintiff, but functioned and was held out to be the Kenya Director of a

Canadian charity (and now a foundation), underscores how the locus of this case is in Canada.

At bottom, the very fact that an organization that has long and proudly held itself out to

be, in Mr. Baker's words to Canada's Parliament, fundamentally "a Canadian charity, born and

raised in Canada" (Siegel Reply Decl. Ex. 13 at 9, 11) is now going to such extraordinary lengths

to re-invent its history and structure suggests there is something other than convenience that is

motivating Plaintiff's choice of forum.  That conclusion is reinforced by Plaintiff's efforts to try

to explain away the Libel Notice the collective "WE Charity" served in December 2021.

Plaintiff claims that it  "requested a retraction in a letter providing notice of libel under Ontario

law" and "WE Charity hoped it would prompt corrective action by the CBC."  Opp. at 8.  But the

letter served with that Notice said nothing of the kind.  Rather, it said the Notice was being

served for "protective" reasons (i.e., to protect its right to sue in Ontario), never mentioned a

retraction and it specifically told CBC that no response was necessary.  Dkt. 16-35 at 2.  Thus,

---

[9] Like many American expats Ms. Wiszowaty and her family returned to the U.S. at the outset of
the pandemic.  According to her bio on WCF's website she "currently splits her time between
Michigan, U.S. and her adoptive home in Kenya."  Siegel Decl., Dkt. 16-29 at 4-5.

under the specific circumstances of this case, it is "much less reasonable" to presume that

Plaintiff's forum choice is convenient.  *See Piper*, 454 U.S. at 255-56.[10]

Finally, Plaintiff says "CBC never identifies [who] that real party in interest" might be.

Opp. at 20.  That is an ironic claim given the organizational shell game Plaintiff is playing; all

the "WE Charity" and "its affiliated entities" that served the Libel Notices are presumably real

parties in interest.  Likewise, Plaintiff's statement that WE Charity Canada is "in the process of

winding down" (Opp. at 21) is a red herring.  The entity still exists and nothing would have

precluded it from joining a suit when this one was filed or joining one now in Ontario.  Plaintiff

seems to imply that the WE Organization thinks it better serves its strategic interests to proceed

with the eventual dissolution of WE Charity Canada while filing this case in the name of a

different entity in a different country.  But such strategic decisions do not change who the real

parties in interest are and indeed are common motives for forum-shopping.  And even if after

dismissal WE Charity were to elect to proceed in Ontario in Plaintiff's name only, that would not

change any of the factors that make it more convenient to litigate this case there.

For all these reasons, Plaintiff's choice of forum merits reduced deference.  But

regardless, "if the balance of conveniences suggests that trial in the chosen forum would be

unnecessarily burdensome for the defendant or the court, dismissal is proper."  *Piper*, 454 U.S. at

255 n. 23.  That balance of private and public factors merits dismissal here.

---

[10] Plaintiff also points to a letter its U.S. counsel wrote to CBC the day before the documentary aired.  Opp. at 8.  If anything, that letter supports the points made here.  The letter reads like a rather transparent effort to anticipate this motion so that if, as would be expected, CBC did not engage in a debate with its counsel over the locus of a hypothetical lawsuit, Plaintiff could later assert that CBC did not "disagree" with the letter.  Compl. ¶ 336; Opp. at 8. The very fact that it was written signals recognition that there would be a genuine issue if a case was filed here.  Moreover, the letter actually contradicts what Plaintiff now claims about itself.  It is written on behalf of a "WE Charity" which has "ongoing operations in the United States" and a "reputable brand" in many countries, not a stand-alone, domestic American charity.

C.      **The Private Factors Favor Dismissal**

1.      Party Witnesses.  This factor merits particular weight here because the locale of all party witnesses so extraordinarily favors Canada and is all but entirely disconnected to the United States.  The Complaint alone demonstrates there are at least a dozen of CBC's employees who are material to its defense, all of whom are in Canada (Br. at 7 n.2 & 18 n.11). By contrast, other than Ms. Wiszowaty, Plaintiff does not identify *any* American party-witnesses.

Indeed, given Plaintiff's insistence that it is a "different entity", it is not even clear how it would define a "party" witness.  But even assuming current WE Charity Canada executives and co-founders including CFO Victor Li, Co-founders Craig and Mark Kielburger, and Executive Director Scott Baker would qualify (and CBC certainly considers them to be material witnesses), at least three of them are in Ontario and none are in the United States.  U.S. courts have regularly granted dismissal for *forum non conveniens* in favor of Canada on that basis alone, including where the balance of party witnesses was far less extreme than it is here and the relevant distances were closer than Toronto is to Washington, D.C.[11]  By contrast, in *DiRienzo v. Phillips Services*, *Corp.,* 294 F.3d 21 (2d Cir. 2002), cited by Plaintiff (Opp. at 31), four of fourteen individual defendants (and thus party-witnesses) and all the individual plaintiffs were American.

---

[11] *See, e.g., Brokerwood Intern (U.S.), Inc. v. Cuisine Crotone, Inc.*, 104 F. App'x. 376, 385 (5th Cir. 2004) (private factors favored dismissal where defendants' employee-witnesses were all in Canada and plaintiff's  party witnesses were split between the U.S. and Canada);  *Logan Intern. Inc. v. 1556311 Alberta Ltd.*, 929 F. Supp. 2d 625, 634 (S.D. Tex. 2012) ("The cost of willing witnesses' attendance weighs in favor of trial in Canada. Although it is likely to be as expensive to travel from Canada to Houston as it is to travel from Houston to Canada, it appears from the evidence that there are significantly more material witnesses in Canada than in Houston."); *Huhtamaki Co. Mfg. v. CKF, Inc.,* 648 F. Supp.2d 167, 169 (D. Maine 2009) (Private factors favored dismissal where the defendant and all its employees were in Nova Scotia, and most of the plaintiff's U.S. employees would need to travel from elsewhere in the United States to Maine anyway); *Gund v. Philbrook's Boatyard*, 374 F. Supp.2d 909, 913 (W.D. Wash. 2005) (where defendant's party-witnesses "all reside in Canada", private factors favored British Columbia even though Seattle was slightly more convenient to plaintiff).

Finally, Plaintiff asserts that CBC does not contend it would be inconvenient for it or its employees to participate in long legal proceedings near their homes. Opp. at 31. That of course is the very point made by bringing this motion. Thus, this factor overwhelmingly favors CBC.

        2.     <u>Non-Party Witnesses</u>. Plaintiff asserts that all material non-party witnesses are in the U.S. or Kenya. Opp. at 25-27. It contends that is so because it says *The Fifth Estate* documentary was "filmed" primarily in Kenya and the U.S.; the five persons interviewed on-camera were in the U.S., Australia and Kenya; and it claims "CBC did not identify a single non-party source in Canada." *Id.* at 6. It further contends the Core Allegations of defamation do not concern Canada. *Id.* at 7-9. Those arguments too are simply inaccurate, and in any event most of them have little relevance to the locale of non-party witnesses.

For example, while significant amounts of video included in the program were "filmed" in Canada (several minutes each of Parliamentary hearings and WE Day footage being just two examples), that is beside the point because this is not a dispute over rights to video footage based on where it was filmed. What is relevant is the substance of what the program conveyed and witnesses with knowledge relevant to that. For example, when Mark Kelley opened the program standing in Kenya he explained that "*Canada's* We Charity raised millions in donations to help people in this country." Siegel Decl. Ex. 39 at 00:53-0:58. Similarly, when Mr. Kelley interviewed Governor Tunai he questioned him about two pictures of the same schoolhouse: one from the website of the Canadian Michael Pinball Clemons Foundation attributed to a donor named Pat Finelli from Ontario[12], and the other posted by a group called H.O.P.E. Calgary. *Id.* at 16:38-16:49. And as those pictures illustrate, the claim that the program never identified any non-party Canadian sources is simply false. Attached as Exhibit 14 to the Siegel Reply

---

[12] *See* https://www.linkedin.com/in/patfinelli/?originalSubdomain=ca.

Declaration is a chart identifying all non-party sources (both persons and organizations) shown in the documentary, be it through video footage, documents or interviews.  Most are donors, and in total they reflect roughly 45 Canadian sources, 11 American, and a half dozen from elsewhere.

As for the Complaint's "Core Allegations", they all pertain to Canada.  Plaintiff points to several allegedly "misquoted documents" as fundamental to its claim.  Opp. at 8-9.  Those documents are:  Mr. Froese's audit of WE Charity Canada (allegation b); the documents provided by WE Charity Canada to Canada's Parliament claiming 360 primary schools (allegation c); the village maps now posted on WE Charity Foundation's website (allegation d); e-mails sent by a former WE Charity Canada donor relations employee to Watson Jordan (allegation g); internal spreadsheets the program identifies as coming from WE's Toronto global headquarters (allegation h); and the social media and other donor posts the program displays (allegation f), more than 80% of which were from Canadians.  Siegel Reply Decl. Ex. 14.

Non-party witnesses with knowledge about any of those subjects would be material, as would any related documents they might possess.  Nonetheless, Plaintiff maintains that CBC must submit a complete pre-trial witness list with affidavits from each witness.  Opp. at 2, 23, 25-27, 29.  But *Piper* squarely rejected that argument.  *Piper*, 454 U.S. at 258.  *See also Florian v. Danaher Corp.* 69 F. App'x 473, 475 (2d Cir. 2003).  Moreover, the information CBC has provided is similar to what was submitted in *Piper*:  categories of the types of persons it intends to call (e.g. donors, former WE Charity Canada employees, donors interviewed in other similar news reports, and multiple experts hired to conduct audits), along with information to show the vast majority are located in Canada.  *See Piper*, 454 U.S. at 259 n.27.  Those persons are the principal sources of information regarding the *truth* of the allegations of donor deception at issue, and for that purpose it is irrelevant whether they ever spoke to CBC journalists.

14

But at this "pre-discovery" stage, it is neither necessary nor possible to conduct an "extensive investigation" to identify who all of the most important witnesses within those categories are. *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1186 n. 4 (D.C. Cir. 2018). For example, about a dozen of the website and related photos of schoolrooms are attributed to the Ontario-based Clemons Foundation and its donors, by far the largest single source in the program. *See* Siegel Reply Decl. Ex. 14. The persons with knowledge about how each of those schoolrooms came to be identified as funded by each of those donors include former WE Charity donor relations employees who interacted with the Clemons Foundation, the (likely former) Foundation employees with whom they communicated, and possibly the donors themselves. Party discovery will be necessary to identify who many of those persons are, but as WE Charity Canada's e-mails with Watson Jordan's illustrate, what is clear is that all those persons worked in Canada. *See* Cashore Decl., Dkt. 16-46, Exs. 2-13.

In fact, Plaintiff's claims about its organizational structure only underscore why it is important that this case be litigated in a jurisdiction where Canadians, including former WE Charity Canada employees, are subject to compulsory process. Plaintiff states that anything about WE Charity Canada "concerns a different entity than the Plaintiff." Opp. at 2. But under both U.S. and Ontario law, a foundational element of any defamation claim is that the allegedly defamatory statement be "*of and concerning" the Plaintiff. See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 144 (D.D.C. 2017) ("a plaintiff who alleges defamation must show that the statement was published 'of and concerning' him."); Rogers Decl. ¶ 10. *The Fifth Estate* told viewers it was reporting about "a Canadian charity", and an important part of CBC's defense will be to further establish that WE Charity Canada (and perhaps local entities in Kenya as well) was responsible for the subject-matter of this case. That evidence will involve former Canadian

employees whose identities are presently unknown.  None are party-witnesses because no one can control the appearance of former employees of any WE Charity entity.  *See, e.g., Howe v. Goldberg Investments, Ltd.,* 946 F.2d 944, 951 (1st Cir. 1991) (granting dismissal where "most of the witnesses are in Canada" and "only Canadian courts, not courts within the United States, have the legal power to compel the testimony of twelve Canadian potential witnesses who are not under the control of either party."); *Chateau des Charmes Wines, Ltd. v. Sabate USA, Inc.,* No. C-01-4203 MMC,  2003 WL 22682483, *7 (N.D. Cal. Nov. 10, 2003) (where former employees of a party are located in Canada, Canada was the more convenient forum).[13]

Finally, Plaintiff contends *Shi* held that generally "the availability of the Hague Convention weighs against dismissal".  Opp. at 30.  *Shi* held nothing of the kind.  Rather, it found that on its specific facts utilizing the Convention in this forum was more convenient than litigating in Taiwan because Taiwan has no "reliable mechanisms of compulsory process at all." *Shi*, 918 F.3d at 351-52.  Here Ontario has such reliable mechanisms, and in fact its courts have more ability to seek to compel witnesses to travel from other Canadian provinces than this Court does with respect to citizens of other states.  *See* Rogers Decl. ¶¶ 25-41.  In such circumstances courts have consistently held that resorting to letters rogatory (which Canada requires) is more inconvenient.  *See, e.g., Ledingham v. Parke-Davis Div. Of Warner-Lambert Co.* 628 F. Supp.

---

[13] The Declaration of Kenneth Froese submitted by Plaintiff further illustrates why it is not only inconvenient, but potentially prejudicial to CBC to litigate this case in a country other than where the vast majority of witnesses are located. His Declaration acknowledges that there are likely other employees of his firm who are material witnesses. Dkt. 21-12 ¶ 4.  We do not question the sincerity of his intentions, but if this case were to go to trial here, it would take, on average, about four years.  *See* https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf.  By that time the odds are that some of those witnesses will be working elsewhere in Ontario.

1447, 1451 (E.D.N.Y. 1986) ("Although defendants could depose the witnesses in Canada, depositions are an inadequate substitute for live testimony.").

In short, most material non-party witnesses are in Canada, while even the few that are in the U.S. could not be compelled to travel here.  This factor weighs in favor of dismissal.

3.    Enforcement of Judgments.   Plaintiff relies on the SPEECH Act, 28 U.S.C. § 4102 to contend that this factor weighs against dismissal.  But Plaintiff has that statute backwards.  The SPEECH Act addresses the opposite scenario:  a foreign plaintiff that sues an American defendant in a foreign jurisdiction, and then tries to domesticate a foreign judgment in a U.S. court.  *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2013) (SPEECH Act addresses defamation suits by foreign plaintiffs "suing United States authors or publishers in those foreign jurisdictions.").  But if Plaintiff and/or its affiliates were to obtain a judgment in Ontario against CBC  there would be no need to domesticate it in the United States, because the judgment would be enforceable there.  So this factor actually weighs in favor of dismissal.  If Plaintiff was to obtain a judgment here, to enforce it would likely require the extra step of bringing an action in Canada to domesticate it there.  That would be more inconvenient.[14]

At bottom, Plaintiff does not make any showing that it would be more convenient to litigate in this forum, while CBC has met its burden of showing the contrary.  Rather, Plaintiff's only actual "private" argument has nothing to do with convenience and has never been recognized to be relevant to the forum analysis.  Plaintiff asserts that its U.S. donors would only believe that the allegedly defamatory statements were false if an American court were to say so.  Opp. at 34.  But that is pure speculation.  Plaintiff cannot possibly get into the minds of its

---

[14] Similarly, Plaintiff's argument that other media organizations could re-publish the CBC's reports is also irrelevant.  Opp. at 34.  A judgment against CBC would have no preclusive effect on other media organizations regardless of whether it was obtained here or in Canada.

donors, and the argument also assumes that Plaintiff will win this case. Moreover, no plaintiff has the right to demand that this Court subject a defendant to an inconvenient forum because that might make the plaintiff feel more "vindicated." The private factors all favor dismissal.

      **D.**    **The Public Factors Favor Dismissal.**

      1.    <u>Choice of Law</u>. Plaintiff maintains this factor favors it because 27 years ago CBC argued that in the specific circumstances of a different case applying U.S. law could weigh against dismissal. Opp. at 35-36; *see Bryks v. Canadian Broadcasting Corp.*, 906 F. Supp. 204 (S.D.N.Y. 1995). Plaintiff's argument is too cute by half; if Plaintiff wishes to adopt the arguments CBC made in *Bryks* then this defamation case must be dismissed for lack of subject-matter jurisdiction.[15] Moreover, Ontario's defamation law has changed since *Bryks* considered Manitoba law in 1995. Ontario has since recognized a "responsible communication" defense and enacted an anti-SLAPP statute that in some respects affords potential procedural and substantive protections that are not recognized here. *See* Rogers Decl. ¶ 10.

      More to the point, the actual "public factor" at issue is "the appropriateness of trying a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Shi*, 918 F.3d at 952. While this is not a diversity case, if anything Plaintiff's arguments seem to point to the application of New York rather than D.C. law, since that is where Plaintiff purports to be domiciled. Opp. at 35-36. If so then this factor would favor dismissal, since no one disputes that Ontario courts would likely apply its forum law.

---

[15] *Bryks* never reached the *forum non conveniens* issue because it dismissed the case for lack of subject-matter jurisdiction, agreeing with CBC that the FSIA should be construed to categorically exempt defamation claims from the same "commercial activity" exception that Plaintiff relies on here. This Circuit, however, subsequently rejected that construction of the FSIA, and so CBC did not raise that argument here. *See El-Hadad v. United Arab Emirates*, 216 F.3d 29, 34-35 (D.C. Cir. 2000).

2.      <u>Administrative Difficulties</u>.  Plaintiff cites Mr. Harrison's Declaration that he reviewed a single day's list of civil trials in the Ontario Superior Court.  Dkt. 21-10 ¶ 37. Apart from the doubtful statistical significance of a single day, even if considered that at most suggests this point is in equipoise since the 4-5 year median time frame it suggests is similar to this jurisdiction.  Moreover, as one court when faced with a similar argument noted, "given the likely discovery problems discussed above in trying to obtain discovery from individuals and companies in Canada, there is little likelihood that the case would reach trial here sooner than it would in Canada."  *Logan Intern.,* 929 F. Supp.2d at 634.

Plaintiff also tries to dismiss the significance of the French language to this case, but its arguments contradict its Complaint.  *Enquête* has its own independent editorial staff and Plaintiff alleges that substantively there are "several important differences" between the two programs, which were six minutes different in length.  Compl.  ¶¶ 413, 417-20.  *Enquête*'s internal editorial processes, all conducted in French, are therefore directly at issue.

Moreover, Plaintiff's arguments about translation actually favor a bilingual forum.  The English translation Plaintiff attached to the Complaint is in parts effectively a translation of a translation – it translates back into English some portions of the *Enquête* program that translated into French corresponding portions of *The Fifth Estate* program.  As a result, the English words attributed to persons in Plaintiff's translation are different than what they actually said in English.  *See, e.g,*, Compl. Ex. D at 8:2-11 & Ex. G at 3:40-42 (Rukshan de Silva's statement in *The Fifth Estate* program and as translated back into English from French).  Given that defamation claims can often turn on the nuances of what words mean or imply, it is more convenient to litigate this case in a bilingual forum.  *In re Lac Megantic Train Derailment*

*Litigation*, 210 F. Supp. 3d 219, 222 (D. Maine 2016) ("It is likely that need for interpretive services will be greater if the case is tried in the United States" than in Quebec).

        3.    <u>Local Interests</u>.  Finally, Plaintiff argues this case has nothing to do with any matters of Canadian national significance, including the political scandal.  Opp. at 37-38.  Both the record here and common sense are to the contrary.  For example, the Complaint alleges that the motive for all of *The Fifth Estate*'s reporting was to improperly take advantage of the political scandal to "sensationalize" WE Charity to boost its ratings – a very serious charge to make against the country's public broadcaster.  Compl. ¶ 97.  Plaintiff also asserts that CBC's investigation was heavily fueled by Reed Cowan's testimony to Parliament, which Plaintiff contends CBC should have recognized was mere "political theater surrounding opposition politicians' attacks on WE Charity."  Compl. ¶¶ 140-45.

        More broadly, fundamental to the scandal was that Canadian politicians and press alike raised questions about the integrity of both the Government *and* WE Charity.  That was why Mr. Cowan was invited to testify, and the Kielburgers subsequently testified and addressed the basic allegations at issue in this case, including:  whether WE Charity donors to schools and other projects understood that funds were to be pooled (Siegel Reply Decl. Ex. 15 at 3); Mr. Cowan's allegations (*id.* at 3, 19-22, 32-33, 35); and specifically the accuracy of *The Fifth Estate* and Bloomberg's reporting about those subjects up to that point, which paragraphs 84-172 of the Complaint specifically address (*id.* at 20, 22, 33).  WE Charity Canada also submitted its count of 360 primary schools in Kenya to Parliament in response to demands for that information by some members of Parliament who raised questions about whether the charity had actually built the number of schools it claimed to donors, and it is that document (and the answers to those questions) that is at the heart of Plaintiff's "Core Allegations."  *See, e.g.* Compl. ¶¶ 178-82.

And in addition to the issues raised by this case that still linger from the political scandal, the Complaint points to multiple statements by Canadian officials, educators and private citizens writing as "a Canadian citizen with a belief in the importance of the CBC and a stake in its integrity" (*id*. ¶ 255) to raise questions about the integrity of "our public broadcaster, supported by tax-payer dollars" (*id*. ¶ 208) and "the conduct of our public broadcaster" (*id*., Ex. J at 2). CBC is fully prepared to address those questions in any lawsuit.  But the mere fact that they are raised reinforces why there is a strong local interest in having this dispute about the integrity of both Canada's only public broadcaster and one of its most famous non-profit organizations resolved there.  The public factors therefore favor dismissal.

## II.   COUNTS II-IV SHOUD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE CBC HAS SOVEREIGN IMMUNITY

Plaintiff's arguments that its claims related to the breach of a purported agreement to interview Ms. Wiszowaty (Counts II-IV) can proceed in this Court fare no better.

### A.   No Agreement "Necessarily Contemplated" that Ms. Wiszowaty Would be Interviewed in the United States

Plaintiff focuses on the third prong of the commercial activities exemption, agreeing that it must prove that the CBC breached an agreement "that establishes or necessarily contemplates the United States as a place of performance" , which causes a direct effect in the United States." Opp. at 41 (citing *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014)).  Plaintiff now argues the parties agreed and/or "necessarily contemplated" that the CBC would interview Ms. Wiszowaty in Michigan.  Opp. at 41-43; *see also* 44-45.  This is a newly-minted argument that is not pled in the Complaint and is wholly undercut by the emails between Ms. Wiszowaty and CBC that Plaintiff now puts before this Court (Kroetsch Decl. Ex. D).

Plaintiff specifically pleads that "the CBC's Harvey Cashore" agreed to interview Ms. Wiszowaty, "as country director" of Kenya at some unspecified later time "when you are

available." Compl. ¶¶ 258-61.  The Complaint contains no allegations about where that interview might take place, and certainly never pleads it would be in the U.S.  The *only* interview locale the Complaint *ever* discusses is that Ms. Wiszowaty ultimately demanded that she be interviewed in-person in Toronto.  Compl. ¶¶ 275, 277, 280.  That alone refutes the proposition that there is anything alleged in the Complaint that it was actually or "*necessarily* contemplated" that an interview be in the U.S, let alone Michigan.

Moreover, the emails that Plaintiff now puts before this Court confirm that its new "Michigan interview" theory did not exist. They show that Mr. Cashore contacted Ms. Wiszowaty thinking she was in Kenya and asking to interview her there, telling her that the CBC "plan[ed] to be in Kenya by the end of next week and are hoping we can arrange an interview with you at a time that works for you."  Kroetsch Decl. Ex. D at 16.  Three days later, Ms. Wiszowaty responded that she was "*presently* in the United States so an interview on the ground in Kenya *this week* is not possible, but I am open to speaking with you."  *Id.* at 15 (emphasis added).  Ms. Wiszowaty's email signature identifies her as "Kenya Country Director" with a Kenya phone number.  *Id.*  She never tells Mr. Cashore that she was in Michigan, let alone that she lives there or that she would not be in Kenya (or Toronto) at some time after "this week." And, far from demanding that the CBC come to "Michigan" to interview her, on September 9, Ms. Wiszowaty emailed that "[as] the country director, I assume you will be still interviewing me at a later date and *in a different format*?"  *Id.* at 13 (emphasis added).  Michigan is never mentioned, nor did they agree or even discuss when, where, or in what "different format" CBC might interview Ms. Wiszowaty.

Plaintiff also offers yet another new theory that appears nowhere in the Complaint in trying to support this new "Michigan" claim:  that the parties' "course of performance" meant

that it was implied that the interview would take place in "Michigan" because CBC's practice is to interview "its on-air sources on camera at the source's location", pointing to interviews with sources like Watson Jordan, Rukshan de Silva, and Laurie Styron.  Opp. at 40, 42.  The first problem with this argument is that even on its face it is circular.  As discussed above, the Complaint neither pleads nor do the e-mails indicate that it was agreed or necessarily contemplated that Ms. Wiszowaty's "location" at some unspecified future time would be in Michigan. But there are two additional problems with this new theory.

*First*, Plaintiff points to *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 114 n.8 (D.D.C. 2003) to claim that an expressly designated place of performance is not necessary where the defendant has a history of performance in the United States.  Opp. at 42.  But in that case, the court also noted that "[a]s a factual matter, however, in almost every case, in this circuit and others, involving the direct effect exception, the existence or absence of an expressly designated" place of performance "has been decisive."  *Id*. at 113.  The other cases Plaintiff cites for this argument also support CBC.  Opp. at 42.  In *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994), the Circuit held that the Iraqi government's failure to honor letters of credit had no direct effect in the United States because "[n]either New York nor any other United States location *was designated* as the place of performance."  (internal quotations omitted) (emphasis added).  Similarly, in *Croesus EMTS Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 37 (D.D.C. 2002), the court refused to engage in "conjecture" or "speculate" that the defendant was "supposed" to have performed in the United States.  Thus, the absence of an expressly designated place of performance should be decisive.

*Second,* an even more fundamental problem is that this argument is obviously an after-the-fact theory crafted to respond to this motion.  The Complaint pleads that Plaintiff had no idea

that Watson Jordan, Laurie Styron or Rukshan de Silva were making any allegations at all until promos began to air in mid-November 2021. Compl. ¶¶ 686-87. But the agreement was supposedly made in September 2021. So those interviews could not possibly have been relevant to what was agreed or contemplated then, nor are they evidence of any "course of performance" understood by the parties then. To the contrary, the only "course of performance" set forth between these parties was that Mr. Cashore asked to interview Ms. Wiszowaty in Kenya, Ms. Moraa was interviewed in Kenya, and Ms. Wiszowaty ultimately demanded an interview in Toronto. That is far from an agreement that "was, either expressly or impliedly, 'supposed' to be made in the United States." 290 F. Supp. 2d at 116.

As a last ditch effort to save these claims, Plaintiff further contends that performance in the U.S. is not the sole means by which "direct effects" may be found in a contract case. Opp. at 43. The case it cites for this principle, *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010), proves just the opposite. The court observed that the commercial activities exception to FSIA applied because: "[a]ll [plaintiff's] efforts to negotiate the [relevant contracts] occurred in the United States . . . at least one of the ships would have moved through U.S. waters to Vancouver; the termination of the contract thwarted over $40 million (U.S.) worth of cruise-related business in the United States; and *the travel agency agreement was negotiated in and called for performance in the United States.*" *Id.* (emphasis added). Here, unlike in that case, no agreement called for performance in the United States. [16]

---

[16] Plaintiff also briefly attempts to satisfy the other two prongs of the commercial activity exemption: namely that (1) CBC agreed to perform part of its agreement with Ms. Wiszowaty in Michigan and (2) CBC performed an act in the US in connection with commercial activity elsewhere by failing to interview Ms. Wiszowaty in Michigan and it "did broadcast to the U.S. without the benefit of the context of Ms. Wiszowaty's interview. Opp. at 44-45. Because both of these arguments also rest on the misguided theory that the parties agreed to interview Ms. Wiszowaty in Michigan, those arguments fail for the same reasons cited here. Further, Plaintiff

At bottom, Plaintiff has not and cannot plead that there was any agreement that had any real connection to the United States whatsoever. CBC is immune from litigating Plaintiff's non-defamation claims in the United States and the claims must be dismissed.

**B.      The Court Should Deny Plaintiff's Request to Replead these Allegations**

Plaintiff halfheartedly requests leave to re-plead these claims should the Court consider dismissing them. Opp. at 41. But this "brief, nonspecific request to amend included in a memorandum does not constitute a legitimate motion" and should be denied. *Saunders v. Davis*, No. 15-cv-2026 (RC), 2016 WL 4921418, at *16 (D.D.C. Sept. 15, 2016); *see also City of Harper Woods Emps' Retirement Sys. v. Olver*, 589 F.3d 1292, 1304 (D.C. Cir. 2009).

Even on the merits, any request for an amendment should be denied where the amendment is futile *or* the party seeking amendment engaged in undue delay or had a dilatory motive. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). Both circumstances are present here. Plaintiff has long had all of its correspondence with CBC in its possession, and it demonstrates that any amendment would be futile. This Court should dismiss the three non-defamation claims, with prejudice.

## CONCLUSION

For all the foregoing reasons, CBC respectfully requests that its motion be granted.

---

never alleges that CBC ever promised that it would use Ms. Wiszowaty's interview in the program, so it would be pure speculation as to whether it might have. That could have depended on what she said or other editorial decisions by CBC – not whether an interview took place. Similarly, as the cases cited in CBC's opening brief establish, any alleged harm that came from not including Ms. Wiszowaty's interview is exactly the type of speculative, downstream consequences of an alleged breach that is not a "direct effect" under the FSIA. Opening Memo. at 43, n.20.

Respectfully submitted,

_____
Nathan Siegel (DC Bar No. 446253)
Rachel Strom (admitted *pro hac vice*)
Courtney DeThomas (DC Bar No. 888304075)

DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, DC  20005
(202) 973-4200
(202) 973-4499 (fax
courtneydethomas@dwt.com

*Attorneys for Defendant*
*Canadian Broadcasting Corporation*

Dated: June 24, 2022