# EXHIBIT 3

≡ Navigation

📷 Audience enjoying a concert on a music festival.

NOVEMBER DECEMBER 2020

# WE Answered The Call

The Editor — December 2, 2020      ♥ 0   💬 0   f 🐦 g+ P



*By Scott Baker*



I have been with WE Charity since 2004 and I'm immensely proud of the team we've built, and the impact our programs have had both domestically and internationally. Recently, I served as Executive Director from December, 2010, to January, 2019, working with the WE Charity Board of Directors to develop and execute the very strategies that have often been criticized within this recent political tsunami.

Much has been written about WE Charity in past months and, in my opinion, not much of it has been fair, balanced or accurate. WE Charity finds itself in the middle of political battles and, as a result, the subject of extensive misinformation. Although WE Charity is apolitical and has worked with politicians from all parties, in the current discourse the charity has become associated with Prime Minister Justin Trudeau and former Finance Minister Bill Morneau. The past months brought the country within inches of an election. Various politicians, pundits and some media have sought to disparage the charity in order to fulfill political objectives.

In this hyper-partisan environment, so much inaccurate information has circulated in social media and even mainstream media. Since July, our team has received over 6,000 media questions and worked hard to provide complete answers to each one. For a period of time on a near daily basis we were issuing correction notices to various journalists. Many stories were more fiction than fact.

It has certainly been a trying time for all of us, particularly given our announcement in September that we will be winding down WE Charity in Canada. Like so many of my colleagues, after spending nearly twenty years with this charity, I hoped it would continue to function in its present form. Yet, we made the difficult choice to wind down because our financial modeling showed us that by acting now, we could sell our real estate and establish an endowment to support our most critical global development programs and digital-education resources in Canada.

What has made this so challenging to accept is the misinformation spread about us leading up to closure. There has been little attempt to discern the truth. I appreciate you taking the time to read this detailed article in which I will address some of the most significant misconceptions about the charity.

In the spring, a civil servant from the federal government reached out asking us to submit a proposal about how to implement their idea for the Canada Student Service Grant (CSSG). WE Charity did not make first contact, despite contrary reports. In fact, we thought about saying no. We knew it would be an incredible amount of work while we also navigated the effects of the pandemic. But our purpose is to help young Canadians with volunteer service, and we felt a responsibility to do our best to fulfill this important project.

No one could have predicted the devastating outcome of accepting the government's request was the shuttering of WE Charity. Still, if all other things were equal, we probably would have said 'yes' again. That's the nature of non-profit work. We say 'yes' when others ask for help.

The sector is needed now more than ever. I would like to express my sincere appreciation to the wonderful people and organizations working in this space, especially at this difficult time. COVID-19 has increased the need for programs, while economic contractions thwart fundraising efforts. To have WE Charity bring any negative attention to the sector is truly painful.

In this article, I will share facts about a few major areas of contention. In the sections below, I hope to help readers understand the decisions and directions taken by the leadership of WE Charity. Each decision was made in full partnership with our highly-qualified Board of Directors, senior staff, and regional leadership around the world.

1. Why WE Charity chose to do the CSSG
2. WE Structure and Governance
3. Social Enterprise
4. Owning Real Estate
5. Reporting and Transparency
6. WE Charity's Canadian work: WE Schools
7. WE Charity's Global Work: WE Villages
8. Compensation of Founders
9. Government Funding
10. WE Charity is apolitical
11. WE Charity Employees and Workplace Culture
12. Addressing Inaccuracies

When the political fracas is over and the dust settles, researchers and academics will have time to conduct comprehensive reviews of the past months and wider history. When they do, I am confident they will come to a far different conclusion about our organization and its work than what has been portrayed in the media and shared by several politicians and pundits. Until then, I hope this article can shed some light on a few of the major misconceptions.

**1. Why WE Charity chose to do the Canadian Student Service Grant (CSSG)**
In April, WE Charity was approached by the Government of Canada about delivering the CSSG program to support post-secondary students during the COVID-19 pandemic. Specifically, on Sunday, April 19, 2020, Rachel Wernick (the Senior Assistant Deputy Minister at Employment and Social Development Canada), called Craig Kielburger to ask for a proposal on how to implement an emergency student support program.

I recall the debate amongst our senior leadership team. The scope and scale were aggressive, and it would require a herculean effort. We knew it would be 24-7 of work. Our families knew it, too. Several of my colleagues talked about how they would have benefited from a program like the CSSG to help pay for university or college expenses. We consulted a dozen other non-profits to ask if they needed volunteer help by post-secondary students to support with fundraising or program delivery. The need was clear. Ultimately, our desire to support Canadian youth won out.

Following approval from WE Charity's Board of Directors, we signed a contribution agreement that contains 26 references to the fact that WE Charity would only be reimbursed for "eligible expenditures," specifically identified in the agreement. As everyone in the sector knows, to be eligible, the expenditures must be "directly related to the carrying out of the Project." The total value of the contribution agreement was $543.5M, not the $900M to $1 billion that has been widely and incorrectly reported. The agreement would provide $500M to the students participating in the program, $8.75M to other partnering not-for-profits, with WE Charity eligible to receive $14.5M up to a maximum of $34.78M, to administer all aspects of the program including its design, delivery, disbursement of grants, hiring of hundreds of support staff to mentor the up to 100,000 students, technology bursaries for at-risk youth participants, etc.

I led the team responsible for building relationships with our peers in the not-for-profit community. We began outreach with very positive conversations across the sector. I am extremely grateful to the 83+ not-for-profit partners who signed up to support student volunteer placements through the CSSG. By July 6, 2020, over 40,000 post-secondary students from across Canada had signed up to participate with over 60 per cent from a visible minority population.

Despite the clear demand and positive movement within the sector for the program, it was immediately embroiled in divisive politics and controversy.

**2. WE Structure and Governance**
There has been much written about how WE is "complex". Allow me to provide clarity. WE is comprised of two components: WE Charity and ME to WE Social Enterprises.

Within these two entities are various sub-entities established over the past 25-years for various purposes. For example, there is ME to WE Trips and ME to WE Chocolate — which are legally incorporated as separate entities for operating purposes, but all the financials and decisions roll-up to ME to WE Social Enterprises.

Similarly, WE Charity has charitable affiliates established in North America and around the world. In each country where WE Charity operates (Kenya, India, etc.) there is a local incorporated affiliate to adhere to local regulations. In Canada, over the past 25-years our charitable programs have also expanded. The ME to WE Foundation facilitates donations to WE Charity. WE Well-Being was established as a stand-alone youth mental health charity, as per the wishes of the founding anchor donor. Finally, the WE Charity Foundation was formed following a review with the WE Charity Board of Directors to limit potential risk and liability to the primary charity. Prior to the spring of 2020, the WE Charity Foundation was never in operation. At that time, and with the full support of the WE Charity Board of Directors, it was repositioned to manage liability from the CSSG.

What many do not realize is that WE Charity is the "sole" or "founding member" of these related charities. What this means is that WE Charity's Board of Directors has significant authority over each of these charitable affiliates. This structure was established at the advice of our legal counsel. To further ensure accountability to WE Charity, the charity placed senior staff of WE Charity, including myself, as Officers or Directors of these charity affiliates. This was done to facilitate coordination and to ensure an accountability line to the WE Charity Board. The relationships between these entities were always fully disclosed in our audited financial statements, and we believe that this was a smart and efficient operating structure for a multi-purpose global organization.

It has been suggested that there was not a strong Board of Directors in place for an organization the size of WE Charity. This simply is not true and has never been the case. WE Charity has always been fortunate to have a dedicated and experienced Board of Directors. As Executive Director for almost a decade, I worked very closely with this talented group of people and appreciated their expertise in the non-profit sector, academia, education, law, finance, government, private enterprise and social enterprise.

WE Charity and its board had in place all the necessary structures with respect to governance and oversight. These included regular financial reporting to the board, signing off on the audited financial statements, board approval for all major transactions and any transaction related to real estate, assessing any risks to the organization, and providing strategic guidance on the direction of the charity. On average there were five to eight board meetings per year, and an annual multi-day strategic retreat.

The current North American board is composed of eight individuals, who are experts in law, finance, education, technology and operations, respectively. Of these eight Directors, three have served for 5+ years, including a partner at one of the largest law firms in North America; a former Deloitte and Blackrock financial expert; and the former Director of the Toronto District School Board. We are grateful to current and past Board members for their service.

There have been questions raised with respect to a board transition in the spring of 2020. As part of WE Charity's 25th anniversary in 2020, the organization launched a year-long strategic review of the Board of Directors, including external advisors, to address renewal, sharpen the focus on future priorities, and address issues such as diversity and inclusion. That process was accelerated in the spring to better address the COVID-19 pandemic, including welcoming a medical expert onto the Board of Directors.

Our former chair of the Canadian Board, resigned in March 2020, at the outset of the pandemic. Unfortunately, there was a difference of opinion between our former chair and WE Charity senior management regarding pandemic-related staff reductions. In March there were 14 briefing calls with Board members, a full Board meeting, and multi-scenario financial modelling. It was a trying time for everyone, and the outcome is regrettable. I have known and worked with this individual since 2010 and have nothing but the greatest respect for her. She provided strong leadership as Chair of the Board of WE Charity for almost a decade.

It has pained me when people have questioned the qualifications or dedication of the WE Charity Board of Directors. I have never encountered a harder working group of people. For the past six months, the Board has often met on a weekly basis and participated in multiple sub-committees to help steer the organization. As a volunteer board, the eight individuals have shown a remarkable commitment despite unfounded personal criticism, and I am personally grateful to each of them for their service.

**3. Social Enterprise**
With respect to the relationship between the ME to WE Social Enterprises and WE Charity, we worked hard to communicate the details consistently. It is clear now that we could have done a better job, given recent questions from within the sector and from everyday Canadians. Sadly, it was too late for us to try to explain our purpose and systems within the recent political cloud, when so many forces benefited from casting doubt on the organization.

To put it simply, the social enterprise was created to support the charity and to keep its projects sustainable. We didn't want to send direct mailers, pay for costly TV ads, or canvass in the street. ME to WE offered an innovative model.

Specifically, ME to WE was launched in 2009 to support the mission of WE Charity through three primary avenues:
• Creating jobs in the underserved rural regions where WE Charity works by supporting its eco-travel, artisan products and Fairtrade consumables (organic coffee and chocolate). Boosting economies and providing sustainable income is the best way to help communities lift themselves from poverty. In addition to benefitting from our projects, we could offer beneficiaries employment with ME to WE.
• 100 per cent of the profits from those products and services were either donated to the charity or reinvested in the social enterprise. This point was often misunderstood. Although by charter a minimum of 50 per cent of the profits must be donated each year, it has averaged 90 per cent over the past five years. Again, the balance simply helps to launch the next social purpose project. Over the years, ME to WE Social Enterprises has donated in excess of $24M in cash and cost-offsetting in-kind services to WE Charity.

• Providing services to assist the charity, especially hosting WE Charity donors at ME to WE Trips accommodations when they visited projects. Those life-changing trips resulted in tens of millions of dollars donated by these funders to WE Charity.

The simple fact is that it is not easy to establish a social enterprise in Canada due to the CRA regulations limiting the ability of a charity to operate an unrelated business. Is the ME to WE structure perfect? Likely not. But we certainly did our best. When designing the structure in 2009 we sought legal advice from Torys and Miller Thompson. We engaged the Public Guardian and Trustee, a branch of the Ontario government's Ministry of the Attorney General, to do a full assessment. It approved our structure. We asked the Honourable Peter Cordy, C.C., CD, a retired Justice of the Supreme Court of Canada, to perform a comprehensive review of all governance and operations between the charity and social enterprise. He, too, delivered a positive report. We asked the same of former Canadian Prime Minister John Turner, through his law firm, and were issued another unqualified laudatory report.

For an updated review, in 2019, we asked the Honourable Stephen T. Goudge, a Justice of the Court of Appeal of Ontario, to do a full review of the governance and oversight. The findings of Justice Goudge were also very positive. We have made all of those reports available on our website.

There is also misunderstanding of why WE Charity purchases products from ME to WE. Historically, WE Charity has purchased deeply discounted ME to WE Trips for donors or youth on scholarships. Critics often reference only half of the story, neglecting to clarify that ME to WE has provided these services to the charity, AND donated back to WE Charity the equivalent of the full purchase costs, and provided additional donations. When looking at the whole picture, the benefit is clearly to WE Charity. Furthermore, since 2009, these trips have resulted in tens of millions in donations from trip participants to support WE Charity's international work. We put in place a thorough and documented review of these trips, assessing travellers, costs and the impact. Each required a Board motion to be passed before any funds were sent to ME to WE. These transactions were annually reviewed by auditors with no concerns expressed.

## 4. Owning Real Estate

In 2015, WE Charity launched its 20th anniversary campaign, which included our first-ever capital campaign. The vision was for a Global Learning Centre to serve as WE's international headquarters and to create a hub for social justice education and empowerment—a destination for students and teachers from across Canada to visit, be inspired and take action. I often explained it as a science centre for social change. When we opened our doors in 2017, we made the first floor of the WE Global Learning Centre (WE GLC) an open community space. I remember fondly events such as hosting an Indigenous graduation ceremony, a new Canadian citizen swearing-in, mental health workshops for the community, and much more. Since it's opening, we've welcomed over a hundred other non-profits to benefit from the space.

The greatest beneficiaries were the students we served. With our Skype-equipped Global Classrooms, our team could deliver programming digitally to both students and teachers, expanding our reach to the most remote corners of Canada. We launched an online monthly program for youth and were thrilled when students joined from our WE Villages communities for shared learning and a shared cultural experience.

It has been difficult to see such significant misrepresentations of the purpose and value of WE's real estate "holdings". The WE GLC accounts for about $30M of these "holdings," but far from an investment vessel, it is a global hub for youth-led social change.

For our 25th anniversary this year, we were working to expand with the WE Social Enterprise Centre (WE SEC). We planned to create a nexus of innovation, a "campus for good" that would bring together youth-led non-profits, social enterprises, and community services, all in one location, akin to MaRS but for youth-led social mission groups. Through the generosity of supporters, WE purchased multiple adjoining properties on Toronto's Queen Street East, right beside the WE GLC, to provide youth with the physical space for mentorship and networking. Each of these purchases required the passing of a separate motion from the Board to ensure proper diligence. The plan was widely discussed in the media — all laudatory prior to the recent politics — and on our website and with donors and stakeholders for several years.

To those who suggested that funding from youth or schools went into "real estate holdings," I simply state this is not true. Despite our real estate holdings becoming heavily criticized in the media and by some non-profit consultants, the senior leadership often voices that they wouldn't have done anything differently, as the sale of our holdings will now become an endowment to buffer the organization from the devastating impacts of politics. The proceeds from the real estate sale is our saving grace to continue our essential development programs overseas, such as WE College in Kenya educating the next generation of community leaders, WE's Baraka Hospital in Kenya with its maternal wing, and the Agricultural Learning Centre in Ecuador helping to teach farmers how to increase their yields.

## 5. Reporting and Transparency

Over the years, numerous third-party experts have reviewed WE Charity's operations, studying everything from workplace culture, to child protection policies, to social impact metrics, and much more. We invite all to read WE's 2019 Transparency Report, always available on our website, which provides an in-depth overview of these reviews, unvarnished findings, and specific commitments to continuous improvement.

We undergo this scrutiny in the spirit of always learning, recognizing the limits of self-evaluation. External firms have the arms-length perspective needed to identify opportunities for growth and improvement.

WE's program delivery undergoes extensive third-party evaluation. For example, our youth mental health curriculum is currently involved in a multi-year study tracking student behaviour modification and bio-chemical markers, such as cortisol levels secreted through saliva to indicate stress levels, in order to determine what elements of our curriculum and program deliver the greatest benefits.

The assessment of our global programs is equally robust. Mission Measurement has conducted reviews of our global development programs to analyze and track datapoints and inform the organization development models on aspects from increasing gender parity in graduation, improve economic self-sufficiency, and long-term community engagement.

Every year our finances are subjected to rigorous audit. We are proud of our record of unqualified financial statements every year to date. Our annual report and audited financials are always made accessible to the public.

Additionally, auditors have confirmed that no dividends have ever been paid by ME to WE Social Enterprises. Meaning, since founding, all profits have either been donated to WE Charity for social impact programs or reinvested to grow ME to WE Social Enterprises and its social mission. ME to WE Social Enterprises clearly exists for social impact.

Recently, in light of the politically motivated scrutiny, additional third-party experts studied WE Charity's role in the CSSG program, and to address questions about the organization's financial health.

Matt Torigian, former Deputy Solicitor General for the province of Ontario, reviewed the awarding of the CSSG program to WE Charity. He examined over 5,000 pages of emails, documents and other relevant material released by the federal government to the Standing Committee on Finance and by WE Charity. His reports states, "To be clear, the CSSG Program was not pre-determined for WE Charity to implement; the government approached WE Charity through the proper channels, requesting that the charity submit a proposal."

To address inaccurate claims that the CSSG was a "financial bail-out" of the charity and to bolster our financial health, Dr. Al Rosen, forensic accountant, conducted a review of WE's finances. Dr. Rosen confirmed that WE Charity was in sound financial condition prior to being selected by the Government of Canada for the CSSG program, despite contrary statements by less informed sources. In his findings, he also stated clearly that the Government of Canada contribution agreement would only reimburse eligible expenses. WE Charity was not able to receive profit.

Dr. Rosen wrote the following in his report: "The primary difference between our findings and the assertions made by the organization's critics is that ours were developed as a result of a detailed investigation into the organization's finances before, and since, the onset of the Pandemic. Conversely, the allegations and narrative asserted by critics often appear to be largely based on conjecture, and have not been substantiated in any convincing way by documentation or other evidence."

The reports by Mr. Torigian and Dr. Rosen were commissioned by the US-based Stillman Family Foundation. The foundation had previously funded the charity and sought to make an evidence-based decision on whether to continue to provide financial support. The Stillman Family Foundation has made the full reports publicly available on we.org.

## 6. WE Charity Canada's work: WE Schools

Free The Children started as a club of twelve Grade 7 students in a school north of Toronto. In the years that followed, WE Charity established WE Schools and WE Day to empower youth to take action for

causes that resonated with them, leading many to volunteer for the first time in their lives. WE Schools helped students turn the tide on declining civic engagement by supporting the next generation to fundraise and volunteer with more than 5,000 charities and causes and log 79 million hours of service. WE Charity had a unique mission to mentor youth to help any cause. When the charity started in 1995, youth were the least likely demographic to volunteer. Today, they are among the most likely to give their time. This is certainly due to many factors, but we hope that WE Charity's programs in 7,000 Canadian schools played a role in helping to inspire the next generation of change-makers.

Our Canadian work grew internationally, including partnering with the U.S.-based College Board to launch AP with WE Service. It is one of the largest U.S. service programs deeply imbedding service learning into the fabric of the U.S. education system. Students learn computer science by coding for non-profits, and learn art by using their skills to raise awareness on mental health issues. Upon completing these courses, students earn the first and only on-transcript verified recognition of service when applying to U.S. post-secondary institutions.

While WE Day received more public attention, those events were simply the celebration of the year-long WE Schools program. WE Schools empower students with the skills, knowledge and motivation to bring positive change in themselves and the world through experiential service learning. Along the way, they gain social and emotional learning skills such as resiliency, empathy and problem-solving.

The social impact firm Mission Measurement conducted an alumni study of WE Schools students and found that participating youth experienced long-term behavioural change. Notably, 83 per cent of alumni reported their volunteer service had continued into the future, while 80 per cent reported continued donations to charity. Over the years, WE Schools delivered service-learning programs to 18,000 schools in Canada, the U.S. and the United Kingdom, empowering youth to help more than 5,000 causes.

We also wanted to connect students with the global community. International travel and service impacted many of our staff prior to joining WE. For me, it was the opportunity to volunteer for eight months with Mother Teresa's organization in Kolkata, India, that resulted in my commitment to a career with purpose. It was Craig's trip in 1995, at age 12, to South East Asia that ignited his commitment to international development. ME to WE Trips was established with a deep respect for the communities and people we partner with, and an emphasis on sustainability. Through meaningful, immersive experiences in partnership with communities, travellers gained perspective and an understanding of social and environmental issues.

ME to WE Trips help guests discover more about WE Charity's global projects and often subsequently donate to WE Charity programs. This solved a challenge faced by the charity in how to create a meaningful connection between donors and projects halfway around the world.

## 7. WE Charity's International work: WE Villages

WE Charity's international work is primarily delivered through WE Villages, a holistic development model with five pillars: education, healthcare, clean water and sanitation, food security, and alternative income programs. WE Charity started in international development in 1995, first funding schools and then launching the WE Villages model in 2004. Like so many in the sector, we have talented local teams everywhere we work. Our country teams partner with local communities and regional governments to support, teach and empower people to lift themselves out of poverty. As is customary, we set up local entities to deliver the projects and programs in full compliance with local laws and WE Charity's global policies.

The outcome of the WE Villages model of community development is to empower people to break the cycle of poverty. The issues faced by marginalized populations are complex and requires a holistic model to realize change. Our model is such that the communities we partner with take over full ownership of the projects in approximately five years, at which point WE Charity exits and turns the project over to the community.

We recognize that we could have been more engaged in the international development community in Canada. Our staff would often participate in forums, but more of the senior leadership team, including myself, should have been more active. We recognize this. But this oversight does not diminish the quality and impact of our international work or the work of our team. We are proud of the impact of our projects and are happy to provide anyone more detailed information.

In our history, WE has had over 2,500 current and former employees around the world, and we have not been immune to employee malfeasance. Given the recent months of intense political scrutiny, a past case of employee malfeasance in Kenya has received significant attention.

Recently questions were raised about our operations in Kenya based on unfounded, and later recanted statements by two former WE Charity employees in Kenya. In short, these two individuals attempted to steal from the charity. The issue was predatively identified through an internal spot audit. It was managed by a Board special committee, the hiring of local experts, and in cooperation with Kenyan authorities. The two individuals were dismissed, both signed confessions, and restitutions were paid. Both are currently facing criminal charges in Kenya.

As part of our commitment to transparency, we asked an independent expert to review WE Charity's handling of the matter. Former Deputy Solicitor General for Ontario, Matt Torigian, reviewed the investigation process into the theft and fraud committed by two former employees, and concluded:
• "WE Charity Canada sought legal advice and was advised that more work was required to prove fraud. The recommendation was that a full investigation be performed by a third-party agency. WE Charity Canada notified the Board of Directors and retained the services of a qualified and respected independent investigative agency, with qualified legal and financial teams supporting."
• "Most victims of similar crimes wish to move quickly, especially when dismissing the alleged perpetrator seems a simple task. WE Charity executives were wisely cautious."
• "In keeping with Canadian standards, WE Charity … addressed these matters appropriately by keeping the Board and local authorities apprised. They took every reasonable step consistent with expectations in Canada and most developing countries."
• "Importantly, the delicate balance of protecting the mission of the charity, the welfare of innocent victims and witnesses, and the integrity of the criminal justice system is an accomplishment not often realized in environments such as Kenya yet was certainly accomplished in this case."

We now teach this as a case study to our staff. It was a difficult situation, but we are proud of how our Board of Directors and leadership team handled the reality. Unfortunately, in the current political environment, this matter was presented without all of the facts in an attempt to cast the organization in a negative light. This was the first instance of such behaviour by WE Charity employees in our 25 years. We ask to be judged not by the fact that an issue emerged, but by our process to properly address the matter.

## 8. Compensation of the Founders
As Canadians I believe that we think we're immune to American-style politics. Yet, as the politics heightened over the past months, the focus became increasingly personal towards WE Charity's co-founders. Their home addresses were published by one newspaper. They received multiple death threats and the police were brought into the matter.

Allow me to correct some of the inaccurate information currently circulating.

Neither Craig nor Marc Kielburger have ever, in the 25-year history of the organization, received a salary from WE Charity (or its predecessor, Free The Children).

It was only with the launch of ME to WE in 2009 that they began to draw a salary; prior to this, they had been fulltime volunteers. In the spirit of full transparency, the co-founders regularly and voluntarily subjected their ME to WE salaries to third-party review.

In 2019, the Honourable Stephen Goudge, former Justice of the Ontario Court of Appeal, examined ME to WE's finances and stated: "I conclude that Marc and Craig Kielburgers' global salaries from all WE entities were $125,173.02 for 2018, and $113,461.54 for 2017, respectively. Moreover, neither Marc nor Craig Kielburger have received any form of salary from WE Charity or its predecessor, Free the Children."

The Kielburger brothers' 80-year old parents were also pulled into this matter with unfounded accusations. They are among the most generous financial supporters of WE Charity, but some less scrupulous groups circulated the untrue claim that they benefited from WE Charity in rental payments.

Justice Goudge reviewed this matter, and concluded the following:

"From June, 2004 to September, 2018, WE Charity operated out of the office building at 233 Carlton Street. Fred and Theresa did not charge WE any rent for use of this building. ME to WE paid the carrying costs associated with the building, including property taxes and interest on the building's mortgage, through a targeted donation to WE Charity which was specifically earmarked for this purpose. From August

2010 to September, 2018, WE Charity also operated out of the neighbouring office building at 231 Carlton Street, which is also owned by Fred and Theresa indirectly. Fred and Theresa did not charge WE any rent for use of the space and paid all carrying costs associated with this building. Sotheby's has valued the rent-free use of these office buildings at a $5,396,372 value, which represents a very significant saving in overhead and administrative costs for WE Charity. I also understand that Fred and Theresa elected not to receive a tax benefit for this charitable donation."

The Kielburger brothers also voluntarily submitted their financials to forensic accountant Froese Forensic Partners during the height of the politics this summer and fall. They provided "unrestricted access", including personal bank records, corporate and personal credit cards, imaging the full contents of their computers and cell phones etc.

The report determined the following:
• "We found no evidence of improper financial benefits to the Kielburgers from WE Charity, M2WSE (ME to WE Social Enterprise) or any WE Canada entity. We found no evidence of improper transactions which benefited the Kielburgers personally."
• "WE also reviewed property related expenses in the WE Canada entities for possible misallocated revenues or expenses. WE did not identify any inappropriate dealings between the WE Canada entities and the Kielburgers in relation to real estate or any financial benefits to the Kielburgers."

### 9. Government Funding
In the last fiscal year, WE Charity received approximately one per cent of its operating budget from the federal government. This tiny share is reflective of our minimal engagement with the federal government. Lobbying has never been a core function of WE Charity. A single employee handled "Government and Stakeholder Relations" at all levels. This role involved engaging both stakeholder groups, including individual donors and foundations, as well as all levels of government — municipal, provincial and federal.

Nevertheless, in response to the government's April 19 request to assist in delivering the CSSG, WE Charity moved quickly to design a program from scratch. Dozens of employees contributed to the initiative.

This is when we learned that the Lobbying Act is rather confusing, and that the federal definition of lobbying is different than that established by many provinces. The federal definition of lobbying includes conversations initiated by the government to ask for something from you. Other ways of answering may mean the simple act of answering the phone when the federal government calls may be considered lobbying.

To ensure full compliance with the Act we filed a federal lobbyist registration and lobbying reports. The vast majority of WE Charity's interactions with the government recently occurred after being contacted by the government to assist with the CSSG.

Media reported that WE Charity had 18 "in-house lobbyists". This is because WE Charity listed all relevant interactions between our staff the federal government. For example, our CSSG team included graphic designers for public materials and coders for the website interface. Others oversaw eligibility criteria for youth, stakeholder engagement with other not-for-profit organizations, and delivery options to reach at-risk youth. Designing the program was a monumental effort during an incredibly compressed time period — not to mention this was all pulled off during the early, chaotic days of the pandemic. Naturally, some of these employees interacted with government officials via email or phone conversations: answering questions, revising scenarios at the federal government's request, and addressing considerations raised by departmental officials. Under the Act, any of these activities could be considering lobbying. Far from professional lobbyists seeking federal contracts, our team of conscientious employees were meeting a government request to deliver a massive program during the most difficult of circumstances.

### 10. WE Charity is Apolitical
WE Charity has always operated as a non-partisan organization, willing to work with political figures of all stripes. Over the years, it has received funding from federal and provincial governments run by Conservatives, Liberals and the NDP. Similarly, we have been joined at WE Day by politicians, local mayors, city councillors and other elected officials with various backgrounds.

WE Charity would regularly invite the Governor General, Prime Minister, Premier and Mayor of each relevant city to join us at WE Days. Past WE Day speakers include Rachel Notley (former NDP Premier of Alberta) and Brian Pallister (former Conservative Premier of Manitoba). Prime Minister Stephen Harper was invited multiple times to speak at WE Day. In fact, while he was Prime Minister, Laureen Harper hosted an event at 24 Sussex in Ottawa after WE Day.

WE Charity invited Margaret Trudeau to speak not as someone's mother, but as a noted advocate for mental health. One of WE Charity's largest divisions is its youth mental health work. Similar to others, she received an honorarium to participate in multiple "friend-raisers" and "fund-raisers". Between 2015-2020 she received a total of $180,000 for 27 events (plus a 20 per cent speaking bureau commission), for an average of approximately $6,500 per event. The media has often included her travel and expense reimbursement, which made it appear as if she was paid more.

In 2017, WE Charity invited Nancy McCain as a noted philanthropist to visit WE Charity's programs overseas. She was joined by her family, including her children and former Finance Minister Morneau. They paid their international expenses, and WE Charity hosted them in-country at our volunteer center. After the trip they donated $100,000 to the charity. The Ethics Commissioner reviewed the matter, and, on October 29, publicly announced that he closed the matter to his satisfaction.

### 11. WE Charity Employees & Workplace Culture
WE Charity had over one hundred team members with us for ten or more years. Those individuals invested the equivalent of over 1,000 years to building this special culture. WE has twice been awarded Canada's Most Admired Culture and has been named Canada's Top Employer of Young People three times. The reputable HR firm Knightsbridge conducted an in-depth review in 2018, which included staff interviews at all levels and soliciting independent employee data. The study concluded: "Employees of all tenures described WE as having a strong culture with contagious energy stemming from employees' unified passion to make a difference, both in their local community and worldwide."

No organization is perfect, and WE Charity has always committed to innovation and cultural improvement, particularly by listening to our staff. In addition to welcoming regular feedback, WE conducts anonymous and independently-run staff surveys each year.

In the most recent 2019 survey, 91 per cent of our team members said they are personally connected to our organization's mission; 96 per cent believe we are making a difference in the world and 78 per cent of WE team members said they "love their job."

As with many organizations, WE recognized the importance of the anti-Black racism movement that was further highlighted with the murder of George Floyd, and we embraced the long-overdue movement for greater diversity and inclusion. At the time, over one-third of WE's Toronto staff identified as members of the BIPOC community, with many of the most senior roles in the organization held by BIPOC leaders, including its Executive Director and Chief Financial Officer. In addition, the North American Board of Directors is comprised of a majority people of colour.

However, we recognize that diversity is not the same as intentional inclusivity. We looked inward and realized that we could have done better. This moment was a learning opportunity for our entire organization. Our leadership formally apologized to current and former staff for previous instances of unconscious bias causing harm. We also began taking concrete actions to ensure all BIPOC individuals and other underrepresented groups feel included, respected, and valued at WE.

To that end, WE Charity's Board of Directors formed a subcommittee to work with an outside team of talented BIPOC professionals with strong credentials in labour and employment, the education sector, and in anti-racism work, to conduct a workplace review. The review is underway, independent of the management of WE Charity.

### 12. Addressing Inaccuracies
Much of the criticism of WE Charity amplified in the media since July has been driven by relatively few people. Of course, opposition members have led the charge, and to be fair, it is their job to be a watchdog for the governing party. They first criticized Prime Minister Trudeau and former Finance Minister Morneau, but soon that criticism extended to us. When Trudeau and Morneau both publicly apologized for not recusing themselves and Minister Morneau resigned, WE Charity became a proxy target to harm the government.

Similarly, criticism from within the sector has largely been driven by two individuals, Kate Bahen who runs the website Charity Intelligence, and lawyer Mark Blumberg.

We believe it is vital for charities to be transparent and accountable. We have always done our best to cooperate fully with Charity Intelligence, providing information and responding to questions. Despite this, since the CSSG was announced in June, Ms. Bahen has posted dozens of Tweets criticizing us and has become the go-to voice to provide negative commentary about the charity to media. She's appeared on radio, TV, in dozens of print articles and the opposition-dominated Finance Committee. What is troubling is that she continues to restate the same inaccuracies about us despite multiple attempts to address her concerns by presenting her with accurate information.

We have released two open statements addressing dozens of statements by Ms. Bahen that we believe to be incomplete, misleading or simply inaccurate. Neither received a response from Charity Intelligence. While we respect valid criticism, accuracy matters, as does accountability from the critic.

It is also interesting to note that Charity Intelligence, a boutique firm with just three fulltime employees according to CRA filings, downgraded WE Charity after many years of strong, positive ratings. Conversely, Charity Navigator, the much larger and most-utilized charity evaluator in the U.S., this fall gave WE Charity a Four Star rating (its highest level) and an overall score of 93.98 out of 100. For "Accountability and Transparency" they awarded a score of 96 out of 100.

As for Mr. Blumberg, much of his criticism comes from a long-standing contrast in beliefs about the role of social enterprises and the concept of charities leveraging business principles to generate funds. He has long argued for expanded government funding in lieu of charitable innovation. For example, in 2016 he wrote "I think that much of the discussion about modernizing charity law is a huge distraction from the real issues facing the charitable sector such as stable long-term government funding and foundation funding…"

In an September, 2020, article entitled "Charities seek lifeline by running for-profit businesses" some experts advocated support growth of social enterprise in Canada; however, the journalist noted, as a counter-point, "But lawyer Mark Blumberg with Blumberg Segal LLP, a firm that advises charities, argues that the rules don't need to be revisited and that giving charities more leeway to set up businesses could actually hurt the sector" and "Blumberg said the government should provide more funding for those that are struggling, not change the rules across the board."

While we understand and respect Mr. Blumberg's views and others who hold similar political views regarding the role of government, we simply do not believe that government alone has the ability to fund all causes adequately. WE Charity has always believed in building innovative solutions to social problems. We have worked with some of the most esteemed lawyers in Canada like Torys and Miller Thompson, incorporating their advice as experts in non-profit structures. While we respect Mr. Blumberg's views, these firms are also comprised of highly-qualified experts.

Politics is a tough business, and it's one that charities are not equipped to survive. A media firestorm — the flames of which were continuously fanned by politicians, columnists, and critics from within the sector — is not something a charity can withstand, particularly when underpinned by inaccurate and misleading information.

There is much that we would have done differently, and this has been a deep learning experience. We especially acknowledge our naivety when answering the phone call from government. While we are certainly saddened by how much has been lost, we are grateful to the 2,500 staff members who created a world-changing organization, especially the local staff hired to lead WE Villages projects and create lasting change in their own communities.

We are grateful for all of our partners in the non-profit sector whom we've worked with over the years to create lasting change for youth in Canada. We hope that the millions of young people who grew-up through the past 25-years of WE Schools and WE Days will continue to volunteer and support charities and causes across this country. We appreciate your collaboration and wish you all the best in your support for the important causes that we all care about so much.

*Scott Baker is the chief operations officer for WE Charity and the organization's former Executive Director from 2010 to 2014.*



PREVIOUS POST
PHILANTHROPIC PEOPLE & THEIR WORK: DR. ART MCDONALD

NEXT POST
LOSING WE CHARITY DIDN'T HAVE TO HAPPEN



THE EDITOR

 

## RELATED POSTS

NOVEMBER DECEMBER 2020

THE SECRET OF BETTER HIRING AND EMPLOYEE SATISFACTION?

NOVEMBER DECEMBER 2020

### WORLD AROUND US

NOVEMBER DECEMBER 2020

### C.K. HUI

NOVEMBER DECEMBER 2020

### HOW A CHARITY ADAPTS TO A VIRTUAL WORLD

Search 

## RECENT NEWS


#### MARINA GLOGOVAC APPOINTED CEO, PRESIDENT OF TORONTO STAR
April 14, 2022


#### JEAN LUMB FOUNDATION TORONTO, ONTARIO
April 13, 2022

 
#### PART 2–CRA CHARITABLE SECTOR DATA 2020-2021
March 12, 2022


#### CAGP CONFERENCE COMES BACK LIVE IN JUNE; NO VIRTUAL SESSIONS
February 22, 2022


#### CHARITY INTELLIGENCE RELEASES ITS 2021 TOP IMPACT CHARITIES
November 10, 2021

## FEATURED ARTICLES


#### RAISING FUNDS & CONSCIOUSNESS IN 2020
October 5, 2020


#### THE CELEBRITY EDGE: CHRISTINE SINCLAIR & THE MS SOCIETY SCORE BIG
February 9, 2020


#### A GIVING LIFE
February 9, 2020

KPMG'S SOCIAL IMPACT OFFICER OFFERS FIVE TIPS FOR HOLIDAY GIVING

December 13, 2019

# CONTENT CATEGORIES

CONTENT CATEGORIES   Select Category

# HAVE A QUESTION?

**Address:** 137 Main St N, 3rd Floor,
Markham, ON. L3P 1Y2
**Editor:** Steve Lloyd
905-201-6600 x 225
**Main telephone:** (905) 201-6600
**Toll free:** (800) 668-1838
**Fax:** (905) 201-6601
**Email:** steve.lloyd@lloydmedia.ca

 CONTACT     VIEW MAP

Copyright © 2019, Lloydmedia Inc. All Rights Reserved.