# EXHIBIT 9



**BACKGROUNDER**

**1) What is the purpose of WE Charity's real estate?**
WE Charity owns its offices, similar to many other not-for-profits. The WE Global Learning Centre represents the majority of its real estate holdings at a value of $30 million. The Centre welcomes school groups in-person and uses its digital classrooms and production studios to reach 18,000+ schools.

WE Charity's domestic programs support youth to be social entrepreneurs. As part of WE Charity's 25th anniversary plans, the organization purchased real estate within in a single block within Moss Park in Toronto to develop a collective of free and discount office space, similar to MaRS, for youth-driven start-up charities and social enterprises. (LINK). These efforts are on-pause due to COVID-19.

All transactions follow careful processes and have been approved by auditors. No youth or project funds have ever been used for these purchases. Owning property saves the charity $1.2 million a year in rent.

**2) What are the details regarding the as the status of WE Charity "breached bank covenants"?**
It is inaccurate to portray the matter of bank covenants as a significant matter. WE Charity has mortgages, and one of the covenants of the mortgage provisions is that WE Charity generates positive EBITDA to cover 1.3 times the mortgage payments in the fiscal year. In 2017 WE Charity shifted its fiscal year from January-December, to instead September-August to align with the academic year how the organization operates.

In according with accounting principles, the change in the fiscal year-end resulted in a change of how several large annual donations and associated costs were recognized. A number of charitable programs were now split over two fiscal years. This is an accounting principle "on paper only" and the charity lender recognized the situation and willingly waived the respective requirements without any issue or concern on their part.

WE Charity operates with 8-months of operating cashflow in cash and investments. There is no difficulty with WE Charity credit. It would inaccurate to link any of these matters to the CSSG process or as the reason why WE Charity assisted in the delivery of the program. As previously noted, through the CSSG contribution agreement WE Charity would only be reimbursed for expenses to deliver the CSSG.

**3) What was the state of the WE Charity Board of Directors in April when conversations started regarding the CSSG?**
In anticipation of WE Charity's 25th anniversary, the organization determined in the fall of 2019 to start a Board renewal process to help plan for the organization's future. Included **here** is statement from Board co-Chairs on the subject. This process occurred prior to conversations regarding the CSSG and there was no connection on the matters.

WE Charity operates with a North American Board of Directors. This is a common practice for organizations with operations that span Canada and the US. This has been the practice for over a decade. There are four Canadian members and four US members.

The Board put into place in March 2020 contains (i) CGA formerly of Deloitte/Blackrock* (ii) partner at a major law firm* (iii) former Director of Education of Toronto District School Board* (iv) tech entrepreneur (v) medical doctor at BC Children's Hospital (vi) Chief Operating Officer of a social enterprise (vii) respected educational leader (viii) former senior leader of Inglewood School District. Statements during the committee



that the entire board resigned were not correct, as members noted with an asterix have served 3+ years on the Board of Directors. See **here** for current member list.

### 4) What financial controls were there in the agreement?

The contribution agreement identifies in detail the eligible expenditures that would be reimbursed by the government in support of the program. Any funds provided by the government that were not used for eligible expenditures would be returned to the government.

There are 13 references in the agreement that note that agreement would be subject to audits and financial review in order to verify all expenditures. The audits would range from the provision of basic audited financial statements up to, and including, the right of the government to audit the project, and a requirement to provide records and information to Canada's Auditor General on request.

Financial transparency requirements included preparing an audited annual financial statement covering the Project Period, biweekly reports on specific project data, record-keeping requirements and a requirement to make books and records related the project available for review by the government at any time on reasonable notice, and a Final Report, which would include a detailing of spending on eligible expenditures and a description of the results achieved.

### 5) Why was WE Charity an appropriate administrative partner for the CSSG?

WE Charity has a 25-year track record of delivering cause-inclusive youth service program. Its inclusive, bilingual programs engage 7,000 schools and educational institutions across Canada to support 3000+ causes. Through WE Schools and WE Day youth logged over 70 million hours of service.

WE Charity has previously helped create and/or deliver large-scale service programs, such as assisting in the delivery of Ontario's 40 Hours of Service program, co-created the U.S. College Board's *AP with WE Service* program.

The Clerk noted: "What WE was able to provide… was the full range of services that would go to the heart of this matching program that would put young people in contact with not for profits so they could gain the relevant experience; their ability to promote the program with a massive social media following; experience in other situations of matching young people to service opportunities;… existing database information; representation right across the country with partnerships with other charities. These were all features that gave the onboarding and the matching and capacity to be delivered. What we're dealing with now demonstrates that WE was going to be able to provide a level of service that that public service could not do by itself notwithstanding its best efforts and experience."