# EXHIBIT 11

# FOUNDATION
### The Business & Spirit of Philanthropy in Canada

≡ Navigation

NOVEMBER DECEMBER 2020

## A Personal View: WE Charity On The Front Lines In Africa

 The Editor — December 2, 2020                              ♥ 0    💬 0    f    🐦    g+    p



*By Robin Wiszowaty*

For more than a decade, I have worked side-by-side women artisans who have earned a living through a social enterprise. This has empowered these women not only to pay debts, provide three meals a day to their children, advance their children's education, and pay for their shoes— it has also given them a voice and a sense of pride. Being a part of a social enterprise has changed these women's lives, including Mama Toti.

When I first met her in 2002 in rural Kenya, Mata Toti (her formal name is Lorna Saoei Pulei) told me she had a dream to one day own a goat. If she owned a goat, she believed she could provide nutritious milk for her children before school. She would also sleep better at night knowing she had a safety net in case of emergencies. But above all, Mama Toti, who is a single mother of four, felt that owning a goat would make her children proud of her.

Mama Toti was among the hundreds of women from her Maasai community who joined ME to WE Artisans — a social enterprise that enabled them to earn four times more income from their cultural beadwork practices, styled for Western consumers. As the elected Chair Lady of her beading group, Mama Toti received orders, sampled designs and distributed beading materials to beaders so each could earn an income from an order.

Upon receiving her first paycheck, Mama Toti called me to boast. 'Guess what I bought at the market today!! Two goats!'

I'll never forget how proud and hopeful she was.

Through the social enterprise, she purchased several more goats, and then sold them to replace her home made of mud, cow dung and sticks, with a home more in line with her status as a successful businesswoman. When her family moved into the new three-bedroom house with wooden walls, a tin roof and a cement floor, they celebrated. Mama Toti, like hundreds of her artisan colleagues, had transformed her life through a social enterprise.

My name is Robin Wiszowaty. I grew up in the suburbs of Chicago, where I was longing to burst through my high school hallways and participate in the greater global community. At 21, I moved to rural East Africa and was taken in by an indigenous community known as the Maasai people. Over the next year, my 'adoptive' family taught me Swahili, how to fetch water and firewood on my back, and cook over a fire. They introduced me to an entirely new life path.

For the last 15 years I have lived in Kenya, Ghana, the Dominican Republic and Ecuador, where I've worked for WE Charity in rural communities that lack basic human rights: clean water, opportunity for education, enough food. I have held leadership positions implementing sustainable development interventions in community partnership, and I have also seen the community benefit from ME to WE Social Enterprises — both from hosting international volunteer trips and producing artisans products sold internationally.

**Can't survive on donations alone**
ME to WE has donated almost 100 percent of net profits to WE Charity, with the rest reinvested in the social enterprise. I stand firmly behind this model.

Charities cannot survive on peoples' donations, alone. The percentage of Canadians giving to charity has been in decline for the last 30 years and is at an all-time low. Some people are philosophically opposed to social enterprise because they believe the solution will weaken the case for more government support for charities. Others have personal vested interests, as social enterprise threatens to disrupt the fundraising consultants, advertising executives, and charity lawyers whose personal livelihoods rely on the traditional models. But I believe that it is not a question of philanthropy or social enterprise. There is space and benefit for both models at WE. We approached the need for a sustainable funding source as entrepreneurs. We sought to find an innovative solution to create stable funding.

ME to WE Social Enterprises was established and grew in response to the Canada Revenue Agency's restrictive regulatory environment that limits the ability of charities to run unrelated businesses for social purposes. This was true back in 1995 when Free The Children was founded by a group of middle school students, and unfortunately, not enough has changed in that regard in the 25 years since.

# EXHIBIT 11

6/14/22, 2:06 PM
A Personal View: WE Charity on the Front Lines in Africa | foundation Magazine
Case 1:22-cv-00340-RDM   Document 22-12   Filed 06/24/22   Page 4 of 6

WE Charity (formerly known as Free The Children) founded its first social enterprise in 1999 and it was called Leaders Today. Leaders Today established international volunteer opportunities to introduce young people from different countries to one another.

The founders, Craig and Marc Kielburger, have frequently stated that if they could have established Leaders Today as a charity back then, they would have done so. But, at the time, Canadian charitable laws would not allow for that. There was no legal definition of a social venture or enterprise in Canada. Two of Canada's top law firms, Torys LLP and Miller Thomson, offered pro bono legal services in creating the governing documents of the partnership. They worked with a wide variety of professional bodies and experts to create an organization that operated with the utmost transparency in pursuit of its social purpose, including publishing statements from the auditors on profits, donations, and any interactions with the charity, achieving Fairtrade certification, and scoring in the top five per cent of BCorps in Canada. Formally launched in 2009, ME to WE Social Enterprises supports the mission of WE Charity through three principle avenues:
1. Creating empowering jobs in underserved rural WE Village regions around the world in eco-travel, artisan products, and Fairtrade consumables to help families lift themselves out of poverty. Traditional philanthropy will give a handout, but social enterprise can create jobs in communities without traditional sources of employment.
2. Providing services to assist the charity, such as introducing the charity to new supporters and establishing programs to encourage donations to the charity. For example, ME to WE built infrastructure in rural areas of developing countries to host donors to directly see the impact of charitable programs. Every international development organization dreams of being able to bring donors to see first-hand the impact of their donation, and this led to tens of millions of dollars of additional donations to WE Charity.
3. Since its founding 100 percent of all ME to WE profits have either been donated to the charity or reinvested in the social mission.

ME to WE Social Enterprise established production with "mamas" like Mama Toti in rural Kenya, using traditional glass beads, and coordinates the logistics of sourcing supplies, transportation, payment, and quality control. This created empowering jobs for the women. The production was coupled with educational programs on health, savings, women's empowerment, financial literacy and job skills.

Over the years many of the mamas were able to save sufficient income to purchase farmland, engage in animal husbandry, launch additional small businesses, contribute to village savings and loan circles.

ME to WE was never designed to maximize profitability. Many ME to WE donor trips were run at or below costs. ME to WE coffee and chocolate were never formally profitable, but they provided jobs for the local community. In addition, the funds that were donated from ME to WE to WE Charity were often earmarked for programs that other donors did not want to fund – including funding the completion of development programs when the principle donor could no longer fund the program, allocating funds to countries or programs without substantial donor interest, higher risk innovation or charity programs that were in a pilot stage. Moreover, funds donated from ME to WE to WE Charity would help with traditional areas such as the charity administration costs. Anyone reading this with experience in running a non-profit knows that these type of unrestricted donations are critical to meeting the greatest need.

Under Canada's charitable laws, which prohibit charities from operating unrelated businesses to advance a social mission, the Grameen Bank, founded by Nobel Prize winning Muhummad Yunus, likely could have never started in Canada. These legal limits are very traditional and best suited for organizations that rely on traditional fundraising methods, like telemarketing, direct-mail campaigns and street canvassers. As a result, the vast majority of Canadian charities — and the industry of academics and charity evaluators that back them — are rooted in these very limited charity models.

**Hopefully, change is coming**
Unfortunately, founding ME to WE Social Enterprises to create a sustainable funding source for our charitable programs is sometimes portrayed as suspicious. Also, critics have stated that the structure is "complex" and "numerous" because each ME to WE entity is separately incorporated — chocolate is its own entity, same with global service trips, Fairtrade coffee, etc. This is normal practice to minimize any challenges with one entity affecting the whole. Overall, the structure was the best possible solution working within Canada's antiquated and constrained regulatory environment.

Hopefully, change is coming. The Special Senate Committee on the Charitable Sector has been examining these issues and in June 2019 issued a report (Catalyst for Change: A Roadmap to a Stronger Charitable Sector) with 23 recommendations designed to modernize Canada's outdated regulatory model for charities. We strongly endorse creating more formal structures for social enterprises in Canada.

The simple fact is that social enterprise is a worthy tool to help improve lives. It is worth taking a look at the findings of respected forensic auditor, Al Rosen, who reviewed the operations and finances of WE Charity and ME to WE. Here is what he found:
1. There is a clear social purpose behind ME to WE Social Enterprises. ME to WE has existed to benefit WE Charity. There is a clear social purpose behind ME to WE Social Enterprises. Since its inception, it has given 100 percent of its profits to the Charity or re-invested to grow the social enterprise. No dividends have ever been paid. All expenses and salaries are reasonable. There is no undue benefit to any individual or group, other than WE Charity.
2. Interactions are for the benefit of WE Charity. Similarly, critics' allegations related to "backwashing" of funds between ME to WE Social Enterprises and WE Charity are not based on supported factual information. What is, in fact, supported by facts arising from review of the financial data is that social enterprise provides valuable services to the charity in a transaction, such as the social enterprise hosting donors on a trip, and then the social enterprise donates the entire amount, and more, back to the charity. Thus, the charity has the benefit of the services, return of capital, and excess capital.
3. Critical financial information regarding ME to WE and its social purpose is readily available to the public (I.e., on ME to WE's public facing website). This information includes auditor statements that confirm all donations are directed to WE Charity, the fact that no dividends have ever been paid, and financial details about all interactions between WE Charity and ME to WE (through WE Charity annual reports). Multiple third-party reviews etc.

Mama Toti bought her goats. And then a house. This is just one of the reasons why I believe so much in the power of social enterprise.

*Robin Wiszowaty is the Regional Head of East Africa, WE. Robin has 15 years of field experience in community development and is a motivational speaker and best-selling author.*

PREVIOUS POST
**WHY GRASSROOTS EFFORTS IN KENYA ARE WHERE MY IMPACT MATTERS**

NEXT POST
**CHARITY: THE PROBLEM OR SOLUTION?**





## THE EDITOR

 

## RELATED POSTS

NOVEMBER DECEMBER 2020

### THE SECRET OF BETTER HIRING AND EMPLOYEE SATISFACTION?

NOVEMBER DECEMBER 2020

### WORLD AROUND US

NOVEMBER DECEMBER 2020

### C.K. HUI

NOVEMBER DECEMBER 2020

### HOW A CHARITY ADAPTS TO A VIRTUAL WORLD

Search 

## RECENT NEWS



**MARINA GLOGOVAC APPOINTED CEO, PRESIDENT OF TORONTO STAR**
April 14, 2022

**JEAN LUMB FOUNDATION TORONTO, ONTARIO**


April 13, 2022


### PART 2–CRA CHARITABLE SECTOR DATA 2020-2021
March 12, 2022


### CAGP CONFERENCE COMES BACK LIVE IN JUNE; NO VIRTUAL SESSIONS
February 22, 2022


### CHARITY INTELLIGENCE RELEASES ITS 2021 TOP IMPACT CHARITIES
November 10, 2021

## FEATURED ARTICLES


### RAISING FUNDS & CONSCIOUSNESS IN 2020
October 5, 2020


### THE CELEBRITY EDGE: CHRISTINE SINCLAIR & THE MS SOCIETY SCORE BIG
February 9, 2020


### A GIVING LIFE
February 9, 2020


### KPMG'S SOCIAL IMPACT OFFICER OFFERS FIVE TIPS FOR HOLIDAY GIVING
December 13, 2019

## CONTENT CATEGORIES

CONTENT CATEGORIES　Select Category

## HAVE A QUESTION?

**Address:** 137 Main St N, 3rd Floor,
Markham, ON. L3P 1Y2
**Editor:** Steve Lloyd
905-201-6600 x 225
**Main telephone:** (905) 201-6600
**Toll free:** (800) 668-1838
**Fax:** (905) 201-6601
**Email:** steve.lloyd@lloydmedia.ca

CONTACT　　VIEW MAP

Copyright © 2019, Lloydmedia Inc. All Rights Reserved.