# EXHIBIT 13



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

43rd PARLIAMENT, 1st SESSION

# Standing Committee on Finance

EVIDENCE

**NUMBER 051**

Thursday, August 13, 2020

Chair:  The Honourable Wayne Easter

# Standing Committee on Finance

**Thursday, August 13, 2020**

● (1500)

[*English*]

**The Chair (Hon. Wayne Easter (Malpeque, Lib.)):** I call the meeting to order. Welcome to meeting number 51, panel one of the House of Commons Standing Committee on Finance. We are meeting on government spending, WE Charity and the Canada student service grant. Today's meeting is taking place by video conference, and the proceedings will be made available on the House of Commons website.

Mr. Poilievre, I believe you have a point of order.

**Hon. Pierre Poilievre (Carleton, CPC):** Yes, one hour will be insufficient time for the witnesses. I don't want to waste any of that hour debating the amount of time. This is just to give you notice that Conservatives will be moving to invite these witnesses back for an additional three hours after this hearing is over, unless, of course, this meeting can be extended.

**The Chair:** We'll say it's a point of information. I knew there would be a bit of controversy around the one hour, because we had talked about it previously.

We did initially invite the witnesses for one hour. They agreed to come as of Tuesday. A schedule of the committee went out, I believe it was last Friday, which indicated there would be one hour with these witnesses.

The clerk did talk to them this morning to see if it was possible for two hours, but they had one hour available, so we will stick with that. Maybe we'll get all the answers in half an hour, you never know. People in the private sector have businesses to run, so their time is very valuable as well.

With that, we will start with the witnesses. I want to welcome the witnesses, and thank them for coming. We have, from WE Charity, Mrs. Al-Waheidi, executive director; and Mr. Baker, chief operations officer. As an individual, we have Ms. Marquez, former staff member, government and stakeholder relations, WE Charity.

Mrs. Al-Waheidi, the floor is yours.

**Ms. Dalal Al-Waheidi (Executive Director, WE Charity):** Thank you, Mr. Chair. Thank you to the committee.

Good afternoon. My name is Dalal Al-Waheidi, and I serve as the executive director for WE Charity.

I've spent 18 years in various roles at WE Charity, and I work alongside an exceptional team. I'm proud of the impact we make in helping young people at home by engaging them in service, and around the world helping children and families lift themselves out of extreme poverty. Our work is so important to me.

I'm a Palestinian Canadian and a refugee by birth. Growing up, I was affected by war twice: First, my family was in Kuwait during the 1990 Gulf War, and second, while living in the Gaza Strip. As a child and a teenager, I experienced first-hand the terrible impact of war, political instability, violence and systematic racism of young children because of identity, nationality and religion. However, I held on to a faint hope that my education would unlock doors for my future.

These experiences of political and cultural divisiveness have come to define my life and my professional career at WE Charity, from advocating for young people, advancing education, working on diversity and inclusion, and championing the rights of girls and women.

In 1998, I arrived in Canada on my own to study international development, on a full scholarship, at Trent University. After graduation, I was proud to join a Canadian-founded not-for-profit, then called Free the Children and now known as WE Charity.

I have been lucky to build an entrepreneurial career with WE Charity, progressing from a youth coordinator to a program builder, overseeing our international development programs, leading WE Day, and now as its executive director. My story is only one of the many stories of people who have helped build this organization with staff and volunteers, many of whom have worked for 25 years to build WE Charity into what it is today.

I was directly involved in shaping and growing it, alongside passionate and dedicated team members for WE Days across Canada. It was our dream to make it cool for kids to care and to contribute. WE Day is a celebration of their service to their communities. Imagine the young person who volunteers for the first time in life, who cares about poverty or homelessness or racial injustice, who takes a stand on an issue, raises their voice for our cause or organizes a campaign, and then gets to celebrate with other youth who want to change the world too.

Through WE Day, more than one million Canadians have been inspired to give back and volunteer for the first time. We have worked with 7,000 schools. Students have volunteered 70 million hours for more than 3,000 causes, creating compassionate people who know they can make a difference. Studies have shown that our alumni are more likely to join, volunteer and look for careers in the social sector.

In addition to our local work, we also do international development, which makes us different. Through our development projects, we have built 1,500 schools and classrooms where more than 200,000 children have been educated and 30,000 women have been supported by our alternative income projects. I have had the honour to meet hundreds and hundreds of children in developing countries who attend schools built by WE Charity, many of whom are girls.

WE Charity is different from most groups, and that can be a source of confusion. As we grew beyond the small charity, it required a better model to sustain itself and its good work. ME to WE social enterprise creates jobs overseas, especially for women entrepreneurs, and it chose volunteers and donors at all of our global development sites so that they can transparently see the impact of our development projects.

Since the ME to WE social enterprise was founded in 2008, 100% of its profit—every penny—has been annually donated to WE Charity or reinvested to grow the social mission. At a time when charitable donations in Canada are at a 30-year low, the support of the social enterprise means that we do not have to plead for money from an ever-dwindling group of donors.

● (1505)

WE Charity is not perfect, especially when pulling apart every choice over the past 25 years, but I hope Canadians are willing to give us a second look. Under additional lights, outside of the political controversy we find ourselves in, our programs should be seen as innovative and entrepreneurial and delivering meaningful impact, benefiting children across Canada and around the world.

One of the greatest privileges of my life has been helping to bring service opportunities to young people. It was with great optimism that I worked alongside a talented team to make the Canada service grant a reality. A lot has been lost with its cancellation. This summer tens of thousands of students, over 65% from the visible minority population, lost their service opportunities. I could never have imagined that the combination of COVID-19 and the political fallout of agreeing to partner on the CSSG could be so devastating for WE Charity, our staff and the communities we serve.

A lot has happened. This week we had to release staff in Canada and say good-bye to talented and passionate members who came to WE because of their commitment to service. This is incredibly difficult and emotional. We have proactively suspended many of our philanthropic partnerships and school board partnerships in Canada. The organization is examining every aspect of what it does, including streamlining its organizational structure, conducting a governance review, simplifying its brand and closing certain programs.

It is easy to tear things down, but I can tell you from personal experience that it's not easy to build. Twenty-five years were invested by thousands of current and former staff, board members,

teachers, schools, donors, students and advisers to create a unique platform for youth engagement and international development. I want to take a moment to share my gratitude and thanks for each one of them for believing in our mission. Regardless of the firestorm we are facing, nothing can erase the pride I feel for the impact of WE Charity and the dedication of our team. I know what has been achieved. I've seen it. I've seen its magical impact. It is worth saving.

As a child who fled war twice, Canada has given me everything. I've tried and worked very hard to give something back. I hope my two daughters, Zeina and Leila, first-generation Canadians, will one day participate in service programs, give back to this country and be celebrated for their service. I want to do my part to always ensure that Canada continues to be a good country with good people who have good hearts.

Thank you. *Meegwetch. Merci. Shukran.*

● (1510)

**The Chair:** Thank you.

Ms. Marquez and Mr. Baker, I don't believe you have opening statements. Is that right? Okay. You're here as a group.

The first round will be a six-minute round. We'll start with Mr. Poilievre and then go to Ms. Koutrakis, Mr. Fortin and Mr. Julian.

Mr. Poilievre, the floor is yours.

**Hon. Pierre Poilievre:** WE Charity Foundation received $30 million from the Government of Canada. Unfortunately, you've only repaid $22 million. Where is the rest?

**Mr. Scott Baker (Chief Operations Officer, WE Charity):** Yes, on June 30 we did receive $30 million. We have returned $22 million of those funds. We are in the process of working with the government—

**Hon. Pierre Poilievre:** Sorry, the question was where is the rest? Where is it? In what account is it being held?

**The Chair:** Mr. Poilievre, these are witnesses from the community. Let's give them a little time, even if we go a little over.

**Mr. Scott Baker:** We're in the process right now of working as quickly as we can with the government to return it. They're driving the process.

The funds are currently in bank accounts, not earning any interest and not accessed in any way.

**Hon. Pierre Poilievre:** Was the money originally transferred to WE Charity or the WE Charity Foundation?

**Mr. Scott Baker:** The agreement was with the WE Charity Foundation. As a result, the transfer was to the WE Charity Foundation.

**Hon. Pierre Poilievre:** Did it remain there or did any of it get transferred over to WE Charity?

**Mr. Scott Baker:** Since receiving the money on June 30, it has not been touched.

**Hon. Pierre Poilievre:** Thank you.

My next question is for you, Ms. Marquez. You do government relations work for WE. Since March 1 have you been in contact with anyone in the Prime Minister's Office?

**Ms. Sofia Marquez (Former Staff Member, Government and Stakeholder Relations, WE Charity, As an Individual):** No, I have not.

**Hon. Pierre Poilievre:** Anyone in the office of Minister Morneau?

**Ms. Sofia Marquez:** Would you repeat the date?

**Hon. Pierre Poilievre:** The date is March 1.

**Ms. Sofia Marquez:** Yes, I have.

**Hon. Pierre Poilievre:** Who?

**Ms. Sofia Marquez:** I have been in contact with staffers at Minister Morneau's office.

**Hon. Pierre Poilievre:** What are the names?

**Ms. Sofia Marquez:** They are Amit Singh, a political staffer, as well as...she's been a witness, Michelle Kovacevic. I think that's her last name.

**The Chair:** Yes, she's with the public service.

**Hon. Pierre Poilievre:** She's a public servant.

Again, just to make sure, have you communicated with anybody in the Prime Minister's Office since March 1?

**Ms. Sofia Marquez:** Since March 1, I was only in communication with two people at the Prime Minister's Office. Allow me to make sure that I'm very clear. It was on May 5, with a staffer, a director of policy. His name is Rick Theis. I emailed as well another person. Her name is Laura Lebel.

**Hon. Pierre Poilievre:** On what date?

**Ms. Sofia Marquez:** That was on May....

● (1515)

**Hon. Pierre Poilievre:** Come back to it later in the meeting. We don't have time.

How long was your conversation with the PMO policy director on May 5?

**Ms. Sofia Marquez:** It was very brief. It was a very high-level conversation of about half an hour. It was a debrief of the current state of the proposal that had already been in the works with ESDC. We provided context as to latest development on the proposal.

**Hon. Pierre Poilievre:** Did you get any assurance that WE Charity could begin implementing the proposal on May 5?

**Ms. Sofia Marquez:** Not at all.

**Hon. Pierre Poilievre:** How did WE think it was authorized to start implementing a government program if no one in the government had authorized you to do so on the 5th?

**Ms. Sofia Marquez:** That's a question that I cannot respond to. I was not involved in the contribution agreement negotiation process.

**Hon. Pierre Poilievre:** Okay, but there was no contribution agreement for another month and a half, so somebody told you over at WE that you could go and start spending money, hiring people and implementing the program. Who told you that?

**Ms. Sofia Marquez:** Again, I was not involved in those conversations. It would have been the executives at WE Charity who would have had.... I have no idea.

**Hon. Pierre Poilievre:** Was it Mrs. Al-Waheidi who told you that you could start implementing the program? Just the name, please.

**Ms. Dalal Al-Waheidi:** We have worked with a few individuals within ESDC on the contribution agreement—

**Hon. Pierre Poilievre:** No, that's not my question. I'm sorry, I do have to cut you off. I'm not asking about the contribution agreement.

**Ms. Dalal Al-Waheidi:** [*Technical difficulty—Editor*]

**Hon. Pierre Poilievre:** I have a point of order, Mr. Chair.

**The Chair:** What's your point of order?

**Hon. Pierre Poilievre:** We are limited in time because the witnesses are planning to skedaddle out the door early. My question is not about the contribution agreement. It would not be concluded for another six weeks. My question is about who authorized them to start on the 5th.

**The Chair:** That's not a point of order. It's a matter of debate. I don't think it's fair to say that the witnesses are skedaddling out the door. I'll not take the time away from you. They agreed to be here for an hour, and it's unfair to imply that.

Mrs. Al-Waheidi, complete your response, and we'll move on to Mr. Poilievre.

**Ms. Dalal Al-Waheidi:** Thank you, Mr. Chair.

We started a conversation with ESDC about the contribution agreement and on the program design as of May 5. During that time it is not uncommon for contribution agreement negotiations for organizations to claim—

**The Chair:** Okay. We'll go to Mr. Poilievre now.

**Hon. Pierre Poilievre:** Who told you that you could start implementing the program and spending money on May 5?

**Ms. Dalal Al-Waheidi:** We were in negotiation about the program at that time.

**Hon. Pierre Poilievre:** I know that, but you began implementing the program on May 5. Somebody ought to have told you that you could do that. Who was it?

**Ms. Dalal Al-Waheidi:** We had conversations with various members of ESDC whereby we had to implement the program design. It was implemented in such a short period of time—

**Hon. Pierre Poilievre:** Just give me the name, just the person. Who told you?

**Ms. Dalal Al-Waheidi:** We had different conversations with different people who were part of the negotiation process for the contract—

**Hon. Pierre Poilievre:** Okay, so you're either—

**The Chair:** This is your last question. The last couple...Pierre.

**Hon. Pierre Poilievre:** When you come back for your next testimony you'll have to answer this question. You would not, as an organization, have begun spending large sums of money on this program if someone in the government had not told you, before May 5, that you could start doing so on that date.

I'm asking you again—this will be the fourth time. Somebody would have to have told you. Who was it?

**Ms. Dalal Al-Waheidi:** Nobody told us we could spend money before. I wish to remind the committee that these were eligible expenditures that were allowed to be reimbursed. I am trying to answer the question, with all due respect, if you can give me the courtesy to answer the question.

Nobody told us from ESDC, or any other parties, before May 5 that we could spend the money. They were only eligible expenditures as per the process of our contribution agreement. We were asked by the government to work on this project in view of COVID-19, and with short timelines we had to be ready.

**The Chair:** We will have to move on to Madame Koutrakis, followed by Mr. Fortin.

[*Translation*]

**Ms. Annie Koutrakis (Vimy, Lib.):** Thank you, Mr. Chair.

My question is for Mrs. Al-Waheidi.

Mrs. Al-Waheidi, it has been insinuated by the opposition and reported in the media that WE Charity wasn't able to provide services in both official languages in Quebec. I understand that you have an office in Montreal and that you work with many schools in the province.

Could you tell us about that?

● (1520)

[*English*]

**Ms. Dalal Al-Waheidi:** WE Charity is a national organization. You are correct. We do have an office and staff in Montreal. We have worked with over 400 schools across the province of Quebec. We have also worked in various provinces with high speaking French communities. We have implemented 11 WE Days, and we engage hundreds and thousands of students as part of this process. We have bilingual activities and partnerships. We have formulated partnerships with school boards, and with other local organizations to help us in the process.

**Ms. Annie Koutrakis:** There also appear to be misleading statements in the media primarily perpetuated by the opposition. Maybe

you can clear the record for us. What was National's role? How and why was National chosen?

**Ms. Dalal Al-Waheidi:** National PR was hired to assist us in the process to reach out to francophone and Quebec organizations especially in the area of engagement of not-for-profit organizations. We were really excited about the opportunity that CSSG would provide in helping us to support communities in Quebec and francophone areas. That was the role for which it was hired.

**Ms. Annie Koutrakis:** Also, part of your role involved overseeing organizational governance at WE Charity. How involved were you with the decision-making process with regard to the CSSG program? Were you aware of all the decisions that were being made?

**Ms. Dalal Al-Waheidi:** As the executive director for the organization, part of my role is to manage team members to operationalize the program. My role was to bring this program to life in such a short period of time from an operational level.

**Ms. Annie Koutrakis:** How often did you work directly or indirectly with Ms. Marquez? Were you aware that there were no registrations by Ms. Marquez or anyone representing WE Charity in the federal lobbying registry?

**Ms. Dalal Al-Waheidi:** We have registered as lobbyists, but I want to provide context, which I think is really important.

For the past years, our engagement with the government was about 1% to 3% of our overall budget, and we found that it was minimal. If I thought that registration was required, we would have done it, and we would have had an accord. That's something I would like to share from a context perspective.

**Ms. Annie Koutrakis:** My next question is for Mr. Scott Baker.

Has WE Charity's board of directors ever voiced any concern over the organization's decision not to register and report lobbying activities?

**Mr. Scott Baker:** We do have a very active board of directors that is engaged in the organization, and we meet on a regular basis. At no point, over our history, has the board of directors raised any concerns about the registration as lobbyists.

**Ms. Annie Koutrakis:** My next question is for Ms. Sofia Marquez.

How much of your time, each month, would you say you spent lobbying the federal government? Does this include time spent preparing for communications with public officer holders?

**Ms. Sofia Marquez:** As director of government and stakeholder relations at WE, I helped the organization achieve its goals through identifying funding, pools of funding and opportunities privately or publicly available. As part of that, indeed, I would engage the federal government as part of my portfolio, but I also had other responsibilities, including the oversight and project implementation of contribution agreements.

Within that context, I would like to clarify that the tracking of hours and how my position actually evolved did not allow to have very detailed track records. Also, that varied as well quite significantly depending on the period of time where that happened.

**The Chair:** You can have a very quick question, Annie.

**Ms. Annie Koutrakis:** Okay.

This is my final question, Ms. Marquez. Why did you leave WE Charity in July?

**Ms. Sofia Marquez:** I actually was laid off at the end of March of 2020. After that I was engaged by WE in the same role as an independent contractor, and that contract ended on July 31. I felt it was the right time for me to move on to better and brighter opportunities, and I am incredibly grateful for the opportunities and the growth that I have had throughout my time at WE.

● (1525)

**The Chair:** Thanks, both of you.

We're a little ahead of time there, with just 10 seconds, Annie. We will go to Mr. Fortin, who will be followed by Mr. Julian.

Rhéal.

[*Translation*]

**Mr. Rhéal Fortin (Rivière-du-Nord, BQ):** Thank you, Mr. Chair.

Mrs. Marquez, I'm going to address you first. Excuse me, I'm going to start with Mrs. Al-Waheidi instead. I'm sorry, there are too many witnesses at the same time.

You told us that there were staff and offices in Montreal. How long has that been the case, Mrs. Al-Waheidi? I'm sorry, but I may have mispronounced your name.

[*English*]

**Ms. Dalal Al-Waheidi:** No. Thank you. You did a really good job at pronouncing my name. I appreciate it.

WE started working in Montreal in 2007—

[*Translation*]

**Mr. Rhéal Fortin:** When did the office open?

[*English*]

**Ms. Dalal Al-Waheidi:** It was at some time between 2007 and 2008. I don't have the exact date in front of me, but I have the year. I'm happy to provide this information.

[*Translation*]

**Mr. Rhéal Fortin:** Okay.

Are you aware that this office is closed right now, as we speak?

[*English*]

**Ms. Dalal Al-Waheidi:** Sorry?

[*Translation*]

**Mr. Rhéal Fortin:** Mrs. Al-Waheidi, are you aware that your office on Saint-Hubert Street in Montreal is closed as we speak?

[*English*]

**Ms. Dalal Al-Waheidi:** As part of our activities, because of the pandemic, at this point all of the staff are working from home.

[*Translation*]

**Mr. Rhéal Fortin:** Mrs. Al-Waheidi, your office is closed, the lease has been terminated and Hydro-Québec was going to disconnect the power this week. There hasn't been anybody there for a few months. Did you know that?

[*English*]

**Ms. Dalal Al-Waheidi:** Mr. Chair, I'm trying to answer the question. When the pandemic hit, because of the safety of our team we decided to make the decision that they needed to work from home. Like many other charities and many other organizations, we made this decision.

[*Translation*]

**Mr. Rhéal Fortin:** All right.

How many employees does the WE Charity Foundation have in Montreal?

[*English*]

**Mr. Scott Baker:** The WE Charity Foundation does not have any employees anywhere in Canada.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Baker.

How many employees does WE Charity have in Montreal?

[*English*]

**Ms. Dalal Al-Waheidi:** We'll have to [*Technical difficulty—Editor*]

**Mr. Scott Baker:** We don't have this information readily in front of us at this point. We're happy to take this away and provide that number.

[*Translation*]

**Mr. Rhéal Fortin:** In all of Quebec, how many employees work for WE Charity or any related corporation or entity?

[*English*]

**Mr. Scott Baker:** What I can share is that throughout our history as an organization we've often had 12 to 15.

As a result of the pandemic, we have had to realize that decrease that includes our offices in Vancouver and Montreal—

[*Translation*]

**Mr. Rhéal Fortin:** I'm sorry to interrupt you, Mr. Baker, but we don't have a lot of time. Could you name one Quebec employee who works for WE Charity?

[*English*]

**Ms. Dalal Al-Waheidi:** Yes, we can. We have many employees. We've had their presence. The number is...this is full-time employees, but we also hire contractors, so I believe, Mr. Chair, that we've answered the question.

[*Translation*]

**Mr. Rhéal Fortin:** Could you send us a list of the names and contact information of the employees of WE Charity or any other related entity working in Quebec?

[*English*]

**Ms. Dalal Al-Waheidi:** We will need to check with our HR department because we're sharing private information of employees. We are happy to provide you with the number of employees, but we need to check with HR.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you.

Mrs. Marquez, are you registered with the federal government's registry of lobbyists?

[*English*]

**Ms. Sofia Marquez:** No, I have not.

[*Translation*]

**Mr. Rhéal Fortin:** Why? Haven't you ever felt the need to do so?

[*English*]

**Ms. Sofia Marquez:** I understood that I was not the person responsible for the compliance of the act at WE Charity.

● (1530)

[*Translation*]

**Mr. Rhéal Fortin:** Wasn't your job specifically to maintain relations with the federal government, among others, and other governments?

[*English*]

**Ms. Sofia Marquez:** As director of government and stakeholder relations, developing and understanding funding opportunities at various levels of government was part of my job.

[*Translation*]

**Mr. Rhéal Fortin:** Have you been registered as a lobbyist outside of the federal government, in a province or a municipality?

[*English*]

**Ms. Sofia Marquez:** No, I am not.

[*Translation*]

**Mr. Rhéal Fortin:** Okay.

Approximately what percentage of your time is spent lobbying with federal, provincial or municipal governments?

[*English*]

**Ms. Sofia Marquez:** The amount of time that I spent on either level of government and the type of work that I would be doing varied with time, and I'm not in a position to right now provide you a specific number. However, if you'll allow me—

[*Translation*]

**Mr. Rhéal Fortin:** Approximately—

[*English*]

**The Chair:** I'll give you a little more time, Mr. Fortin, to allow for translation.

Answer the question, and we'll go to Mr. Fortin's last question.

**Ms. Sofia Marquez:** Thank you. If you'd allow me, my understanding is that this is a compliance issue, and WE Charity is right now dealing with that matter.

[*Translation*]

**Mr. Rhéal Fortin:** I didn't get an answer to my question, but I'll move on to another one.

Mr. Baker, you told us earlier that $22 million had been returned to the federal government and that the balance of about $8 million is apparently in a bank account.

At what point are you going to return the missing $8 million to the federal government?

[*English*]

**Mr. Scott Baker:** The process of returning those funds is being guided by the government. In all honesty, if we could send it back tomorrow, we would, but we have to follow the process as outlined by ESDC, given that there was an agreement in place, and we're going through the process of finalizing a termination agreement in partnership with them.

[*Translation*]

**Mr. Rhéal Fortin:** There's no process, but we're talking about returning money that doesn't belong to you.

[*English*]

**The Chair:** Mr. Fortin, that was your last question, but I do believe, on this process business, a similar answer was given by somebody in previous testimony. There is a process they had to follow in returning the money.

Mr. Julian is next, and you'll be followed by Mr. Poilievre in the second round.

Go ahead, Mr. Julian.

**Mr. Peter Julian (New Westminster—Burnaby, NDP):** Thanks, Mr. Chair.

Thanks to our witnesses for being here. We hope you stay safe and healthy during this pandemic, and we appreciate your providing some answers, because there have been a lot of contradictions through this saga.

Ms. Marquez, I have a number of questions for you around meetings, if you don't mind. The first is, we've had testimony at this committee from Minister Chagger testifying that on April 17 she had a meeting with Craig Kielburger and a WE official.

Did you arrange that meeting and were you the other person on that call?

**Ms. Sofia Marquez:** I can confirm that I was on that call, indeed.

**Mr. Peter Julian:** Did you arrange the meeting as well?

Could you let us know if the minister at that point informed you and Mr. Kielburger about any details about what became the CSSG?

**Ms. Sofia Marquez:** Pardon me, could you repeat the question? I couldn't hear it.

**Mr. Peter Julian:** Did the minister give you details about what was to become the CSSG?

**Ms. Sofia Marquez:** Not at all. There was no mention of the Canada student service grant.

**Mr. Peter Julian:** The conversation was focused on what, then?

**Ms. Sofia Marquez:** The conversation at that point was within the context of having already shared our social entrepreneurship proposal. We had the opportunity to talk to the minister about the current state of affairs of how WE as an organization was pivoting many of its programs into a virtual setting and what we were seeing on the ground in real time because of the pandemic. It was a combination of both of those things.

**Mr. Peter Julian:** On April 20 there was a call between WE and finance department officials. Did you arrange that call and were you present on that call?

**Ms. Sofia Marquez:** I'm not sure which call you're referring to.

**Mr. Peter Julian:** It was on April 20, with the finance department.

● (1535)

**Ms. Sofia Marquez:** I'm sorry, but I'm not entirely sure which call you're referring to.

**Mr. Peter Julian:** I'm referring to the call on April 20. It was between WE and finance department officials. Were you aware of that call at all? Were you briefed on it, if you weren't present on the call?

**Ms. Sofia Marquez:** I'm not entirely sure at this point which call you're referring to. My apologies.

**Mr. Peter Julian:** Okay, so in your call log you have nothing for April 20.

**Ms. Sofia Marquez:** I would have to go back to my records to make sure that my answer is accurate.

**Mr. Peter Julian:** Okay, thank you. If you could get back to us on this, that would be great.

The second proposal from WE, submitted on April 21, was on the CSSG. Do you know who drafted that proposal?

**Ms. Sofia Marquez:** The initial proposal for the Canada student service grant was led and drafted by me and the team of strategists at WE.

**Mr. Peter Julian:** Would it be fair to say.... If you're saying that the call with Ms. Chagger didn't actually involve the CSSG, who provided the information for drafting the submission of April 21?

**Ms. Sofia Marquez:** Following the conversation that Craig Kielburger and Rachel Wernick had on, I believe.... They had a conversation, and following that conversation, Craig Kielburger called me and provided me with very broad program parameters and guidelines on some of the questions and ideas he had received directly from Rachel Wernick. They were looking for advice and guidance as to how to implement a program of such a scale. Given the cur-

rent pandemic, it was very challenging to understand how they could implement it potentially well.

**Mr. Peter Julian:** So you drafted that. It was sent to whom, on April 21, in the federal government?

**Ms. Sofia Marquez:** That proposal was shared with various government departments.

**Mr. Peter Julian:** Do you recall exactly which ones, or did you just send it in to one person and they shared it with other ministry officials?

**Ms. Sofia Marquez:** We definitely would have shared it, as public record has shown, with Minister Ng, Minister Chagger's office and ESDC, as part of this whole conversation, as well as with the Ministry of Finance.

**Mr. Peter Julian:** Would you be aware, as the head of government relations, of all the times that Craig and Marc Kielburger spoke with federal government officials and ministers? Was this compiled somewhere within WE? Was that tracked?

**Ms. Sofia Marquez:** What I would be aware of is any conversations and meetings that Craig and I would have led at any point in time. If the co-founders or any executive had any additional meetings, I wouldn't necessarily be abreast of that information, but eventually, with the way we would worked at WE, we would communicate effectively the latest and greatest information and activities that had been led by WE.

**The Chair:** You're a little over your time, Peter, but ask another question.

**Mr. Peter Julian:** Thank you very much, Ms. Marquez.

My final question is for Ms. Al-Waheidi and Mr. Baker. Just to follow up on two points you made earlier, who gave you the green light for funding to start the process—you haven't answered that question yet—and when did you register WE in the lobbyist registry?

**Ms. Dalal Al-Waheidi:** In terms of the registration for the Lobbying Act, we did that. It was submitted today. That was done.

Again, I just want to say that if we had thought that was necessary before, we would have done it. It would have occurred. I wanted to share that from a context perspective.

**Mr. Peter Julian:** What about the other question about the green light?

**Mr. Scott Baker:** In all honestly, we never felt we had a full green light until we had an agreement signed. However, we understood that to deliver a program launched in mid-June would require us to build that program in the months of May and June. We undertook those efforts. When the contribution agreement was signed, which is very standard, we did that.

● (1540)

**The Chair:** Okay. We will have to leave it there and go to Mr. Poilievre, who will be followed by Ms. Dzerowicz. We're into five-minute rounds.

Mr. Poilievre.

**Hon. Pierre Poilievre:** What was the total amount that WE paid for Ms. Sophie Grégoire Trudeau's accommodations and other expenses in London this year?

**Ms. Dalal Al-Waheidi:** It is my understanding that this information will be provided as part of the undertaking by Marc and Craig Kielburger.

**Hon. Pierre Poilievre:** Did anyone in your organization have communication with Ms. Sophie Grégoire Trudeau after March 15?

**Ms. Dalal Al-Waheidi:** No. We have not.

**Hon. Pierre Poilievre:** No one.

**Ms. Dalal Al-Waheidi:** To the best of my knowledge, no one has had communication.

**Hon. Pierre Poilievre:** What about with Nancy McCain?

**Ms. Dalal Al-Waheidi:** To the best of my knowledge, based on my knowledge, I don't know.

**Hon. Pierre Poilievre:** Ms. Marquez, are you aware of any communications with those persons from the WE organization?

**Ms. Sofia Marquez:** To the best of my knowledge, I do not know of any communication directly with Sophie Grégoire Trudeau.

**Hon. Pierre Poilievre:** What about with Nancy McCain?

**Ms. Sofia Marquez:** With regard to Nancy McCain, no.

**Hon. Pierre Poilievre:** Okay.

Ms. Marquez, you had a call with PMO policy director Rick Theis on March 5, which coincidentally was the same day that WE began implementing the program. When you indicated that WE was going to begin implementing the program on that day, did he tell you that it was inappropriate because it had not yet been approved by cabinet?

**Ms. Sofia Marquez:** Truthfully, I wasn't aware at the time that the contribution agreement or the contract was starting to be implemented at that time. At no point in time did we ever have a conversation about the implementation of the project. It was solely based on understanding the current state of affairs of the proposal as it was at that time, just briefing them on that.

**Hon. Pierre Poilievre:** However, at that time, you, as an organization, were implementing the proposal—on that day, in fact. You spoke for 30 minutes with the PMO and nothing came up about that implementation.

**Ms. Sofia Marquez:** Again, allow me to clarify and specifically address your question. I was not aware of the contract's being implemented at that time. The conversation was not around the implementation of such a project.

**Hon. Pierre Poilievre:** Okay, so, this would become a $500-million contribution agreement. Your organization is implementing it on that day. You're talking with the Prime Minister's Office, the office of the head of government, and nothing came up in that call about the fact that your organization was beginning to implement it that day.

**Ms. Sofia Marquez:** From what I recall from that conversation, again, we walked him through the latest proposal development and all the details behind what would have become the Canada student service grant, but there were no specific conversations about starting the project. I know that within the context of the pandemic, honestly, in every single conversation there was this urge to try to

get this program moving forward, to be up and ready as soon as possible. Now, that was it.

**Hon. Pierre Poilievre:** You didn't mention to him and he didn't mention to you that you guys were beginning to implement the program at that time. Okay.

Mr. Baker, did you, as an organization, conclude an agreement with National Public Relations?

**Ms. Dalal Al-Waheidi:** To the best of my knowledge, we have concluded that work because of the—

**Hon. Pierre Poilievre:** No, I mean, was there ever a deal signed or put in place between WE and National Public Relations?

**Ms. Dalal Al-Waheidi:** I will have to get back to you on this one, because my role with the National PR—

**Hon. Pierre Poilievre:** Mr. Baker, do you know?

**Mr. Scott Baker:** Thank you for the question.

I don't know if there was an agreement signed. I do know that National PR was one of the many vendors that we were looking to engage to be able to scale the program across the country.

**Hon. Pierre Poilievre:** You had not finalized anything with them?

**Mr. Scott Baker:** I was not part of the conversation with National, so I can't comment on that.

**The Chair:** You're down to 30 seconds, Pierre.

**Hon. Pierre Poilievre:** We'll need you to follow up with that information.

Who was the highest-paid speaker that you engaged as WE between 2015 and 2019?

● (1545)

**Ms. Dalal Al-Waheidi:** As shared in the testimonies by the co-founders before, and as we pay for speaker—

**Hon. Pierre Poilievre:** Yes, just the highest-paid person.

**Ms. Dalal Al-Waheidi:** Mr. Chair, I'm trying hard to answer the question if he can give me the courtesy of just [*Technical difficulty—Editor*]

**The Chair:** Go ahead and answer.

**Ms. Dalal Al-Waheidi:** Thank you.

We pay for ancillary events for some of these speakers. It is my understanding that we need to look through our files. I'm not going to be able to provide you any of them at this point because there is privacy with these contracts.

**The Chair:** You can have a very quick question, Mr. Poilievre.

**Hon. Pierre Poilievre:** Was Margaret Trudeau paid in any way, shape or form in relation to the 2017 Canada 150 celebration or for any ancillary event approximately around the same date?

**The Chair:** That wasn't exactly a short one—

**Hon. Pierre Poilievre:** Yes or no?

**The Chair:** —but go ahead, Ms. Al-Waheidi.

**Ms. Dalal Al-Waheidi:** Yes, I am going to answer you. No, she was not.

**The Chair:** Thanks, all of you.

Ms. Dzerowicz, you're next.

**Ms. Julie Dzerowicz (Davenport, Lib.):** Thank you so much, Mr. Chair.

I want to say a huge thank you to all three of you for presenting today.

Thank you so much for sharing your story, Ms. Al-Waheidi.

I want to thank all of you for all the work you do to inspire and engage youth across Canada and around the world.

The May 5th.... I just want to remind everybody on the committee that I specifically asked the Kielburgers this question. Why was work started? They have very clearly indicated that there was no agreement. There was no one who told them to start the agreement. They had taken it as a risk upon themselves because they wanted to help students. They understood that there was no agreement, but they decided to go ahead and start working on it. They were very clear with this committee. I want to make sure that is reiterated to everyone here.

My first question is about the WE Charity Foundation. There was some testimony THAT indicated that the reason there was an agreement not with WE Charity but with the WE Charity Foundation was that the government had asked the WE Charity to take on all the liability of this program. It was the lawyers of WE Charity who said that in order for WE Charity to be able to do that, they recommended that the agreement be signed with WE Charity Foundation.

My understanding is that this is a very typical thing that is done to cover liabilities, within both the public and private industry. Can you please comment? Is that what your understanding is as well?

**Ms. Dalal Al-Waheidi:** Yes. This is correct in terms of how we were asked by the government to take the liability of up to 40,000 volunteers during a pandemic. In consultation with experts in the area and including our board of directors, we had discussions with our board of directors in terms of the liability that the organization would take, and it was also their recommendation and their approval that the contract be with WE Charity Foundation.

**The Chair:** Julie, I'll just interrupt for a second on the next two people on the question list. We will have Mr. Poilievre again, and then we'll wrap up with Mr. McLeod. I'm sorry. Go ahead.

**Ms. Julie Dzerowicz:** My next question is about the board of directors. We did hear that there was a changeover, a significant one. I believe it was in March. to what extent did that impact your operations and/or your ability to deliver on the CSSG program?

**Ms. Dalal Al-Waheidi:** There was no negative implication, because we've always had competent, dedicated board members who govern the organization. A third of our board continued their service. Within the organization, we have eight individuals who are from a variety of backgrounds, from accounting, to legal, to education. There was no impact. Their governance was really important in the process and to the extent about the conversation with WE Charity Foundation.... I just wanted to share that. Their oversight continued, and we're very proud of our board members.

**Ms. Julie Dzerowicz:** Was this mentioned, the sort of changeover in the board? Was it mentioned at any point to the bureaucrats as you were negotiating the contribution agreement?

**Ms. Dalal Al-Waheidi:** We answered in a transparent way every question that was asked of us, and we provided the information.

● (1550)

**Ms. Julie Dzerowicz:** Did you feel you had to give that information about the change in the board, or did you feel, because there was no impact on operations, that you didn't have to offer that information?

**Ms. Dalal Al-Waheidi:** We had competent board members, and we're thankful to all the board members for their contributions, but there was no impact. We answered all the questions that were asked of us. All the information pertaining to our board members and their bios is on our website; it's publicly available.

**Ms. Julie Dzerowicz:** We heard from Rachel Wernick and from ESDC that the department's recommendation was that a contribution agreement be signed with WE Charity to mobilize other not-for-profit partners as the best available option, given the requirement for speed, scope and scale, and to reach a broad diversity of youth. What was the extent of your knowledge as to why the department entered into a contribution agreement with WE?

**Mr. Scott Baker:** In terms of the process determining that it should be a contribution agreement, I would have to refer it to the government. We were proud to be asked. As a Canadian organization, born and raised, with experience coast to coast, engaging 7,000 schools, we wanted to be helpful in the middle of a global pandemic and support students, many of whom had participated in our programs, who were struggling to find jobs, to pay rent, to pay tuition, etc. So we said yes, we would do this.

**The Chair:** Mr. Poilievre, for five minutes, and then Mr. McLeod to wrap it up.

**Hon. Pierre Poilievre:** It's an incredible coincidence that your organization has suddenly registered to lobby all of these months after all the lobbying happened. We look forward to examining the dozens of meetings that you had, including with high-level political officials close to Justin Trudeau. Your organization had paid his family half a million dollars.

Specifically, I want to speak about Laura Lebel. Ms. Marquez, you said you communicated with Ms. Laura Lebel. Was it an email you sent?

**Ms. Sofia Marquez:** Yes, that's correct. It was a simple email asking for a brief call. I've never met Ms. Lebel before.

**Hon. Pierre Poilievre:** Did she grant that call?

**Ms. Sofia Marquez:** No, she didn't. She directed me to Rick Theis.

**Hon. Pierre Poilievre:** That's how this 30-minute phone call happened with Rick on the day that WE began implementing the program, is that correct?

**Ms. Sofia Marquez:** That's correct.

**Hon. Pierre Poilievre:** Did you mention the possibility of a contribution agreement, or some sort of contract that WE could sign with the government?

**Ms. Sofia Marquez:** Are you asking if I implied that there was a contract in the works?

**Hon. Pierre Poilievre:** Did that come up in the conversation at all?

**Ms. Sofia Marquez:** We just discussed the current proposal as it was. There was no conversation about a contract itself.

**Hon. Pierre Poilievre:** What about a start date, did that ever come up?

**Ms. Sofia Marquez:** The start date was something that was continuously being pushed. The government was trying to get it up and running as soon as possible. On the WE side, we were doing our best to also gear up toward whatever timeline was necessary from government. There was no exact start date, to my understanding of anything.

**Hon. Pierre Poilievre:** You did discuss the issue of a start date with the policy director?

**Ms. Sofia Marquez:** No, we did not discuss any start date, per se.

**Hon. Pierre Poilievre:** You said you were discussing the need to get it up and running fast, and your organization was launching the same day.

**Ms. Sofia Marquez:** The context, again, is that we shared the latest proposal, which we had been working very closely with ESDC public servants. It was a briefing on the state of affairs of the current state of the proposal itself. There was no communication, nor details—

**Hon. Pierre Poilievre:** Did he ask you for the briefing?

**The Chair:** Just let her finish her answer, because she has time left, Mr. Poilievre.

Mrs. Marquez.

**Ms. Sofia Marquez:** There was no communication or specificity being discussed around contract details whatsoever, or dates.

**Hon. Pierre Poilievre:** Did he ask for this briefing from you?

● (1555)

**Ms. Sofia Marquez:** No, like I mentioned, this was by introduction through Laura Lebel.

**Hon. Pierre Poilievre:** So you just started shopping around a briefing to the PMO, saying, "I'd like to brief someone in the Prime Minister's Office. Can someone take my call?" Is that right?

**Ms. Sofia Marquez:** No, that is not an accurate representation of what happened. As part of the conversations that we were having at the time with ESDC as well as all the proposal development phases that we were under, it was suggested to me by a political staffer at the Ministry of Finance that I connect with the PMO along with other ministries to make sure that everyone was abreast of the latest and greatest version of the proposal as, again, the context was COVID-19. It needed to be up and running as soon as possible, and they wanted to make sure that everyone was well aware of—

**Hon. Pierre Poilievre:** So, the finance department sent you to the PMO. Who in the finance department told you to call the PMO?

**Ms. Sofia Marquez:** It was suggested to me by Amit Singh.

**Hon. Pierre Poilievre:** It was Amit Singh. Okay.

How much time do I have, Chair?

**The Chair:** You have about 40 seconds.

**Hon. Pierre Poilievre:** Did you have any information about the communications that WE had directly with Bill Morneau?

**Ms. Sofia Marquez:** What communication are you referring to? I'm sorry.

**Hon. Pierre Poilievre:** Mr. Kielburger and Mr. Morneau spoke.

**Ms. Sofia Marquez:** I didn't have that context, no.

**Hon. Pierre Poilievre:** You didn't know that had happened?

**Ms. Sofia Marquez:** No, I did not have that context.

**Hon. Pierre Poilievre:** Finally, back to Mr. Baker, can you tell me why the contribution agreement was backdated specifically to May 5? I'm not interested in knowing why it was backdated generally; I know how that works, but why was that specific date, May 5, picked for the backdating?

**Ms. Dalal Al-Waheidi:** I'm just going to jump in here, if I may.

During this week, there were multiple conversations about program design, and WE, as an organization, had taken the risk to start working on this because the scope of the project kept on changing.

**Hon. Pierre Poilievre:** Why was it May 5?

**The Chair:** You're done, Pierre. We're going to have an answer to the question, because you're well over time, and then Mr. McLeod will wrap it up. I hope the guests will stay for three more minutes.

Go ahead, Ms. Al-Waheidi.

**Ms. Dalal Al-Waheidi:** Yes, I answered the question. I'm finished, Mr. Chair.

**Hon. Pierre Poilievre:** I have a point of order, Mr. Chair.

**The Chair:** What's your point of order?

**Hon. Pierre Poilievre:** The question was: Why May 5? I'm just wondering if you can ask the witness to answer that question. Why was it that date?

**The Chair:** It's not a point of order, but if you could further expand on why it was May 5, go ahead, Ms. Al-Waheidi.

**Ms. Dalal Al-Waheidi:** It's the same answer. We had started generally that week to work on the program design, the operation and what would that look like. The scope kept on changing. Timelines were aggressive. That week, we started mobilizing to work, and we took, as an organization, the risk because we wanted to help students, and we believed in the essence of the program.

**The Chair:** Thank you, all.

Mr. McLeod, you'll wrap it up.

For our witnesses, we will go about four minutes over your hour.

Go ahead, Mr. McLeod.

**Mr. Michael McLeod (Northwest Territories, Lib.):** Thank you, Mr. Chairman.

Thank you to the witnesses. I appreciate all the responses to the questions that have been provided. A lot of the questions are starting to become repetitive.

My concern continues to be that this program was created to deliver $900 million to support students. The future of those funds is unclear, now that the program has not been implemented, and it's a huge loss of opportunity for the youth across our country.

My first question is about a July 3, 2020 news article. The editor-in-chief of The Charity Report stated that WE Charity has connections to "18,000 schools in Canada, the U.S. and the UK" making it "Canada's largest youth" network; however, "WE does not have those kinds of relationships with other non-profit organizations and charities" necessary to find placements for youth.

How effective would a charitable or non-profit organization such as WE Charity have been in recruiting and finding placements for student volunteers?

**Mr. Scott Baker:** As shared, we do have a national presence. We've worked with schools and the educational community across the country. In addition to that, we've been able to form partnerships with other not-for-profits because our program is actually very inclusive. The students in our program, in the WE schools and WE Day program, actually support other organizations. As a result of that, we have been able to form partnerships, over our history, with a number of not-for-profits.

That being said, we also recognized that to be able to place up to 40,000 students, we needed to build a strong community. We built a team that began having those conversations so that when the program launched, we would be able to place them in not-for-profits in a smooth way that would be a good experience for the volunteer and an impactful, positive experience for the not-for-profit.

● (1600)

**Mr. Michael McLeod:** Thank you.

My next question is in regard to the $8 million that remains outstanding and is to be reimbursed. Could you tell us why this has not been paid? Why wasn't this paid along with the other portion of money you reimbursed? I'm sure there are people from ESDC watching, and maybe they need to hear this.

**Mr. Scott Baker:** In the same way that the contribution agreement was a process that took time, the ending of the contract is a process that takes time. That is being governed primarily by the government, and we are following that process. I can assure you and all Canadians that those funds are in a bank institution. They will be returned as soon as possible as long as we have all the agreements in place so that there are no issues.

**Ms. Dalal Al-Waheidi:** If I may add to that, we have waived, as an organization, all of our eligible expenditures, which is part of the contribution agreement, because we want to return all the money as soon as possible. We are taking the risk and we're taking the hit as an organization.

I just wanted to share that as a point of context.

**The Chair:** Michael, obviously ESDC isn't as quick to take money as the CRA is. We know that experience.

Go ahead, Mr. McLeod.

**Mr. Michael McLeod:** I have one more question. This has been asked before, but I think it's important that everybody is clear on this situation.

I want you to confirm that the expenses incurred before the CA was signed were at WE's own risk. Can you tell us a little bit about why you would take that risk? It's a lot of money.

**Mr. Scott Baker:** You are correct; we had an intentional conversation and understood that there would be some risk in the process.

The truth is that we believed deeply in the program and we wanted to play a role in a very difficult time for Canadians. We were excited about the challenge. We were very proud of the program that launched. We were very proud of the fact that 35,000 students registered within the first 10 days, as Ms. Al-Waheidi shared, 65% of whom were from visible minorities.

We were asked to do this. It's a Canadian charity, born and raised in Canada. We proudly took that step and moved forward with it.

**The Chair:** We will have to end it there.

On behalf of the committee—

**Hon. Pierre Poilievre:** I have a point of order, Mr. Chair.

**The Chair:** I want to release the witnesses, but I will allow a point of order.

**Hon. Pierre Poilievre:** I'm just wondering if the witnesses might volunteer to give us another half an hour of their time.

**The Chair:** I will ask the witnesses. The clerk had asked them earlier, and they were limited to the one hour, but we'll ask the witnesses what their opinion is here.

Go ahead, Ms. Al-Waheidi.

**Ms. Dalal Al-Waheidi:** I do appreciate the request. We wanted to come here to be helpful and provide answers. We have child care duties, and I hope you understand that. I need to attend to those. I hope you understand this.

Thank you.

**The Chair:** We understand. We had one of our members on here originally starting off the meeting with child care duties.

With that, I want to thank you for appearing before the committee and answering our questions. Just personally, I do want to wish you well in what I know are very stressful times. It doesn't matter if you're a business, a charity, a farm or a fisherman; when you're going through strenuous times on the financial end, sometimes due to things beyond your control, it's very stressful. We understand that and we wish you well in that regard.

With that, we will—

● (1605)

[Translation]

**Mr. Rhéal Fortin:** A point of order, Mr. Chair.

[English]

**The Chair:** Go ahead, Mr. Fortin.

[Translation]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

Before the witnesses leave, could you ask them when they are going to meet the commitments they made during this meeting?

I noted, among others things that I had to obtain the names of employees in Quebec and the percentage of time spent lobbying. I'm wondering when they are going to meet those commitments.

[English]

**The Chair:** There were several items that were noted that they committed to get back to us on, so the more haste to get back to us on that information the better, if I could say that to the witnesses. We need that information as soon as possible. We have a document that we're waiting to be translated and redacted right now, and we would like all that information as quickly as possible.

[Translation]

**Mr. Rhéal Fortin:** Can a deadline be set or the witnesses asked how soon they think they can provide us with the information?

[English]

**The Chair:** Mrs. Al-Waheidi.

**Ms. Dalal Al-Waheidi:** I'm writing down all the requests, and we will do this as soon as possible. I can't give you a timeline right now, but we're committed to this process in order to provide this information as soon as possible.

**The Chair:** We will also ask the analysts to make a note of the request for information that you were asked. I made a note of a few, and we'll get that to you as well, so nothing is missed on your end. We don't expect you to keep tight notes of all the requests.

Thank you very much for your presentation.

We will suspend for three or four minutes to bring on our next panel.

● (1605)

_____(Pause)_____

● (1610)

**The Chair:** I recall the meeting to order.

Welcome to meeting number 51, panel two of the House of Commons Standing Committee on Finance. We're meeting on government spending, WE Charity and the Canada student service grant.

With us this afternoon for the next hour, we have John-Frederick Cameron, chief executive officer at Katimavik. We've had you before as a witness. I believe you have an opening statement, and we will go from there.

**Mr. John-Frederick Cameron (Chief Executive Officer, Katimavik):** Thank you, Mr. Chairman and honourable members.

Upon receipt of your request to participate in your inquiry and to attend today's hearing, though I do not have any direct knowledge of some aspects of your inquiry, our organization, Katimavik, takes the view that a publicly funded organization, as we are, and a recipient of taxpayer dollars, should respect the request of any parliamentary committee. In that spirit, I am pleased to be here with you today, albeit virtually.

Our organization brings a very unique perspective to what has become a meaningful and important national conversation. Katimavik has been at the very centre of that spirit of youth volunteerism since its founding in 1977. Through a model based on experiential learning and through our flagship program, the Katimavik national experience, young Canadians are encouraged to embrace diversity, become active and engaged citizens and evolve into leaders and change-makers in their communities.

As this program did in the seventies, eighties, nineties and today, we bring young Canadians together who may not yet have found their fit in society. From a diversity of backgrounds and experiences, we introduce them to their country and their country to them. They explore parts of our great country that they likely have not seen before, and they form a collective in a sense.

Katimavik today has evolved from being primarily a bridge between what was referred to at the time of its founding as "the two solitudes", referencing the divide between English and French Canadians at that time. Today, the diversity among our youth is broad, with some representing different religions and cultural backgrounds, some from the LGBTQ2+ community, and very importantly, some youth from indigenous communities. They live together, learn together, play together, serve together and they bond together.

In doing so, the differences and prejudices they had perceived between each other prior to the program disappear and they form lifelong friendships. They become advocates for truth and reconciliation with indigenous communities. As importantly, they develop life skills and employment skills through this program.

We place these phenomenal youth in communities where they volunteer with non-profits and charitable community organizations and thereby contribute to building those communities. They learn about and embrace the priorities of the different regions of our country as youth from the east travel to western communities and vice versa. Through that journey, they very often find themselves and become active and engaged citizens.

They come into our program often not being very confident, and some not so sure what to do with their lives and how to contribute. They leave our program with a renewed sense of confidence, self-aware and committed to becoming contributing members of society. Their love for this great country is enhanced, and we are better off as a result.

I am so very proud to be able to share with you that despite the COVID-19 pandemic, our participants volunteered with local organizations across the country. In fact, for decades, Canada's young people have enthusiastically and wholeheartedly volunteered their time and effort for the betterment of the greater society.

The fact remains that Canadian youth were undeterred by the obstacles brought forth by a global pandemic, instead focusing on how they could give back to the country while strictly adhering to all health guidelines and protocols. In so doing, they demonstrated tremendous bravery. Their contributions through our program included activities such as picking up garbage in their neighbourhoods, making artwork for their communities, contributing to food security initiatives, talking to socially isolated seniors and delivering groceries to Canadians in need.

We saw this first-hand, since in just the first two months of the pandemic, young Canadians participating in Katimavik's national experience program volunteered nearly 7,000 hours in total. They also inspired hundreds of others to follow their lead and make an impact of their own.

● (1615)

Furthermore, the degree of their enthusiasm and commitment was demonstrated when, this summer, Katimavik received almost four times more applications than opportunities available for the national experience cohort that began in July. We were both stunned and elated that so many fearless and inspiring young Canadians from around the country responded and applied to volunteer with community organizations from coast to coast to coast.

As Canadians face our new realities as a result of COVID-19 and its longer term implications, we have come to terms with the fact that our world has experienced transformative changes. Some of these changes have already created division among us as we debate how to confront these new challenges. Every aspect of our lives, from how we eat to where we work, to what we wear, looks different. While many aspects of our country seem unrecognizable from a few short months ago, and as so many things we took for granted disappear, it is truly inspiring to remember that one constant has prevailed: Canadian youth and their commitment to building a better country.

In our opinion, the proposed Canada student service grant program was and is an innovative way to assist students who were facing the elimination of job opportunities. At the same time, this program sought to leverage the tremendous spirit of volunteerism in support of non-profits across the country. The opportunity provided by the proposed program to mobilize even more young Canadians to volunteer for many causes, some directly affected by COVID-19, and thereby simultaneously contribute to their education, is, in our view, an honourable and valuable goal.

Given our organization's commitment to youth empowerment, it would not surprise me that we were and remain strong supporters of the proposed program. We were therefore delighted to be asked to contribute to the program by doing simply what is in our Katimavik DNA: connecting Canadian youth with non-profit and charitable organization placements across our great country.

Through this pandemic, Canadian youth have led and will continue to lead the way, if we continue to provide them the opportunities to do so. Katimavik can attest to the fact that they have already demonstrated the capacity, courage and bravery necessary. Our hope is that Canadians will continue to support, encourage and empower them.

In closing, on behalf of Katimavik's board of directors and our staff team, we thank Canadians for their ongoing support and are grateful for the support provided through the federal government, and to all members of Parliament who have supported this important work since our founding in 1977 and up to today. It is an honour to sit before you today.

We appreciate the opportunity to share this information with you. Thank you.

● (1620)

**The Chair:** Thank you very much, Mr. Cameron. I had neglected to give the speaking order before you started. We're starting with Mr. Cooper, followed by Mr. Fragiskatos, then Mr. Fortin, and then Mr. Julian.

Mr. Cooper, you're up.

**Mr. Michael Cooper (St. Albert—Edmonton, CPC):** Thank you, Mr. Chair. I will be splitting my time with Mr. Morantz. When three minutes come up, cut me off.

**The Chair:** All right.

**Mr. Michael Cooper:** Thank you, Mr. Cameron, for being here.

Did I hear you correctly that Katimavik is involved in or was involved in the administration of the CSSG?

**Mr. John-Frederick Cameron:** We were invited to participate through a partnership arrangement.

**Mr. Michael Cooper:** Could you provide some details of what that arrangement was?

**Mr. John-Frederick Cameron:** It was a fairly detailed agreement, which I'm happy to share with the committee if you'd like. Essentially, it mapped out our role. It was provided to us through a telephone conversation with WE Charity executives. We were asked to participate in attracting some of our alumni, some of our youth cohorts that we had run and were running, who happened to be students and who might be eligible for the program. The partnership agreement spelled out, for lack of a better word, the terms of how we would do that and what we needed to provide to WE Charity.

**Mr. Michael Cooper:** The agreement was entered into. There was a formal agreement that had been entered into.

**Mr. John-Frederick Cameron:** There was a formal agreement that had been presented to us. We asked for a number of amendments. We were back and forth quite a few times on the amendments. In fact, by the time we got to the signing day, it was announced that the program would not be forthcoming.

**Mr. Michael Cooper:** When were you contacted by WE, or when was Katimavik contacted?

**Mr. John-Frederick Cameron:** I would say it was towards the end of May, around May 26.

**Mr. Michael Cooper:** Your agreement had been more or less finalized by when?

**Mr. John-Frederick Cameron:** It was by the end of June.

**Mr. Michael Cooper:** If you could undertake to provide the committee with a copy of that agreement, it would be helpful.

Could you elaborate on the scope of the activities that Katimavik would be involved in?

**Mr. John-Frederick Cameron:** Yes. Essentially, as you know, we link youth volunteers with charitable placements across the country. When were invited to participate through this partnership, it was said at the time that, because we had access to a number of placements across Canada in non-profit and charitable organizations, and also had access to youth volunteers, this was essentially the nature of our work. It was about using those opportunities and names.

**The Chair:** This is your last question, Michael.

**Mr. Michael Cooper:** Was Katimavik at any time invited to make a proposal to administer the CSSG?

**Mr. John-Frederick Cameron:** No, we were not.

**The Chair:** Mr. Morantz.

**Mr. Marty Morantz (Charleswood—St. James—Assiniboia—Headingley, CPC):** Thank you, Mr. Chair.

I'll just follow up on that line of questioning.

Your organization is part of the Canada service corps. Is that correct?

**Mr. John-Frederick Cameron:** That's correct.

**Mr. Marty Morantz:** Did ESDC ever reach out to your organization to discuss what you could do in terms of programming in the COVID context?

**Mr. John-Frederick Cameron:** I recall a phone conversation, although I don't remember the date exactly, during which ESDC indicated that they were going to be using a third party to launch a program in support of students and that various organizations within the CSC would be contacted to play a role. At that time, in that call, I wasn't aware or told what organization it was. I learned that later.

**Mr. Marty Morantz:** I have a record of that call. It was on April 15. What did you say they told you? Was it that different organizations in CSC would be contacted to assist in providing the CSSG? Is that what you said?

**Mr. John-Frederick Cameron:** I said it was in supporting the work of the CSSG and participating in different ways. The plan only became clear to me when we were contacted by WE Charity directly, essentially.

● (1625)

**Mr. Marty Morantz:** That call, though, being on April 15, would have been seven days before the Prime Minister announced the CSSG and several weeks before it came to cabinet. Was the CSSG explicitly mentioned in that call to you by ESDC?

**Mr. John-Frederick Cameron:** No. I should say, Mr. Morantz, that I'm not sure the date you referenced is the date of the call that I'm recalling. I'm sorry, but I don't remember the date of the call that I was on.

**Mr. Marty Morantz:** Could you check that and get back to the committee?

**Mr. John-Frederick Cameron:** Sure. Did I answer your second question?

**Mr. Marty Morantz:** Sure.

Just out of curiosity, do you believe that the WE organization was the only organization in Canada, outside of the public service, that could have provided the CSSG, given the number of really large and impressive charities in Canada, like, for example, the YMCA and others?

**Mr. John-Frederick Cameron:** I've heard comments made that WE Charity was the only charity that had the capacity to deliver it. I think I would create a distinction with respect to capacity versus infrastructure. A number of charities across Canada.... I mean, at Katimavik this is what we do. We place volunteers with charitable organizations.

**Mr. Marty Morantz:** I have limited time. I have one quick last question.

**The Chair:** Make it the last question.

**Mr. Marty Morantz:** I'll go back to the subcontract that you were negotiating and almost got signed. What was the dollar amount of the contract that you would have entered into with WE Charity or WE Charity Foundation?

**Mr. John-Frederick Cameron:** At the time we were told that it would be $25,000 for the first 100 youth entered into the program through Katimavik. It was up to a maximum of $50,000 if we were able to provide another 100.

**Mr. Marty Morantz:** Okay. Thank you.

**The Chair:** Thank you. I believe you're on the list for a little later, Marty.

We'll have Mr. Fragiskatos, followed by Mr. Fortin.

Peter.

**Mr. Peter Fragiskatos (London North Centre, Lib.):** Thank you, Chair.

Thank you, Mr. Cameron, for your testimony.

In your experience and the experience of the organization, certainly running large programs.... As I think you put it, this is what you do as an organization. You connect volunteers with opportunities that are available. I want to know about administration costs in the public domain. Because of what happened with WE, they would have been paid, as you know, a maximum of $43.5 million to build and administer the program.

On the face of it, I think the average Canadian hears that and might have some questions about why programs cost so much to build and administer. Do you have any thoughts on that?

**Mr. John-Frederick Cameron:** It's an expensive activity at times to safely engineer a program where you're moving young people from community to community, and the cost attached to that through travel and through housing is expensive. It can be expensive.

On the program's specific cost, I have no comment to make on whether that was an appropriate amount of money. I would have to—

**Mr. Peter Fragiskatos:** I'm not asking you that. No, it would be unfair to ask you that. I'm asking a general question about administrative costs that are incurred by organizations such as yours to build up programs and oversee them. It's not an inexpensive thing. You're saying that it's very costly.

**Mr. John-Frederick Cameron:** Yes, and administrative costs as a percentage of program costs in the sector usually run anywhere between 10% to 20%, given the charity, to answer your question.

**Mr. Peter Fragiskatos:** Okay, thank you very much.

The Canada student service grant program as envisioned—and I agree with you—was innovative on paper. There was a great deal of promise and potential there. It does not look like it will go ahead. There is money on the table as a result, up to $500 million. In your view, as someone whose life's work is focused on youth, do you have thoughts or ideas on what government should do with respect to that money and how it can invest it in youth or in other areas? Do you have any perspectives on that?

**Mr. John-Frederick Cameron:** The scope and the focus of this particular program, as I said in my opening, is something that we very much believe in, because obviously students have been displaced from jobs that they would need to continue their education.

First of all, I would say that it's unfortunate, because I think we don't want to see an entire generation of youth delay their post-secondary education and, therefore, delay unnecessarily their entry into the job market for a year or two.

Katimavik did write the minister a letter to say that one of the things that we were proposing we consider, as a country, going forward, is that some people might argue that university-educated youth or post-secondary education students are somewhat privileged. They can afford to go to school, they have some benefits to help them to do that, or they are eligible for grants. However, there's a whole subset of other youth for whom I think this was a wonderful opportunity to enter into training, those who, otherwise, would not have had the chance or have conceived that they had the opportunity to do that. Therefore, we could more broadly serve a larger segment of young people.

That is what I would say around doing a better job in terms of this particular initiative.

● (1630)

**Mr. Peter Fragiskatos:** Thank you very much.

I have a couple of minutes remaining, but I'll leave it with one question. I think it's a very important one.

Because of some of the challenges that have arisen here.... Let's make no mistake, while the program as envisioned held a great deal of potential, there were mistakes made in the execution. I think that's very fair to say at this point. As a result, for Canadian citizens looking at this and thinking about the government's ability to help fund youth service opportunities in the future, there could be some hesitation on the part of citizens when it comes to that.

Do you have any thoughts on what you would say about the importance of youth service and the need for federal governments, this one and ones in the future, to continue to look to cultivate that, champion it and fund it?

**Mr. John-Frederick Cameron:** Yes, absolutely. What I would say is that the results speak for themselves. As I mentioned in my opening statement, these young people who leave programs like ours were previously unaware as to how they could contribute and find ways to do so. They leave these programs with a tremendous sense of renewed confidence, very self-aware of who they are and committed to the next stage of their journey.

It's up to us, I think, organizations like ours to also provide.... This is where I would say—just to get back to your previous question for a minute—there's an opportunity to do some more with any residual money that is there that could be invested to provide job skills training and employment training.

Take that exercise of investing in them and building up their confidence, building up their self-esteem, confronting whatever issues they have in their life that they're facing...and as you can imagine, there are a lot of mental health challenges. I know you're aware of this in terms of youth in general. As we confront that, the second part of that job is essentially to position them for a working life. The investment, I think, will speak for itself, because we already see that seven out of 10, just broadly speaking, who come from a multitude of these programs, change their lives around in a very successful way and go on to contribute to society.

**The Chair:** We'll have to move to Mr. Fortin, who will be followed by Mr. Julian.

Mr. Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

Good afternoon, Mr. Cameron. Thank you for being here.

I'm not sure I understood your answer to the following question.

Do you think Katimavik could have managed the grant program we're talking about now?

[*English*]

**Mr. John-Frederick Cameron:** I would say to you that we have the knowledge and the capacity to have participated in the management of the program. I believe that for a program like this to succeed, it would have had to have been a collaborative effort, leveraging the expertise that some charities and some non-profits bring in terms of the placement and the development of the cohorts and managing that whole exercise.

The other part of it is that we wouldn't have had an infrastructure like a web portal that could be up and running in two weeks. I'll be a little flippant. I hope you don't mind if I say this. If somebody came to us with a sound investment and said that we had two or three months and they were going to invest a good degree of funds with us, could we have developed that capacity relatively quickly? I would say, yes, we would, but I wouldn't say, even if that were the case, that it would have been a smart, efficient way to do it, rather than bringing together a collaboration of charities that specialize in this area.

● (1635)

[*Translation*]

**Mr. Rhéal Fortin:** It's a bit like what WE Charity wanted to do by subcontracting to Katimavik or other organizations. It's sort of the same thing.

If I understand correctly, you would have done something similar, right?

[*English*]

**Mr. John-Frederick Cameron:** Yes, we would have formed a collaboration, but of course our emphasis would have been on organizations that excel and have the expertise in volunteer placements.

[*Translation*]

**Mr. Rhéal Fortin:** Right.

Do you think Youth Service Canada could have done the same work? Could it have delivered this contract instead of WE Charity?

[*English*]

**Mr. John-Frederick Cameron:** Are you referring to ESDC?

[*Translation*]

**Mr. Rhéal Fortin:** That's right. I'm talking about Youth Service Canada.

[*English*]

**Mr. John-Frederick Cameron:** I'm not sufficiently aware of their capacity, to answer that question.

[*Translation*]

**Mr. Rhéal Fortin:** Do you think organizations other than WE Charity and Katimavik could have carried out this contract?

[*English*]

**Mr. John-Frederick Cameron:** As I said before, I think a number of other charities—and we're blessed as a country to have so many non-profits that are skilled in this area—could have come together and delivered the program, leveraging each other's expertise.

I'll try to speed this up so that I don't take up your time. Not all of us possess necessarily the same infrastructure, but we possess different levels of capacity. On the capacity side, I would say, yes, we could have, but we would have needed an organization that had the infrastructure in place to use the portal in an execution framework.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Cameron.

I don't want to rush you, but you know that the time we have in committee is limited.

Does Katimavik have facilities in Quebec?

[*English*]

**Mr. John-Frederick Cameron:** Our head office is in Quebec, yes, and we run programs in Quebec.

[*Translation*]

**Mr. Rhéal Fortin:** As I understand it, you have employees who speak French, and the entire francophone infrastructure is in place in Quebec.

If you had been asked to manage the grant program in Quebec, would you have been able to do so?

[*English*]

**Mr. John-Frederick Cameron:** Yes, we have the capacity to do that.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you.

To your knowledge, would other organizations with facilities in Quebec have been able to deliver the program in French in Quebec, aside from Katimavik?

[*English*]

**Mr. John-Frederick Cameron:** Yes, there are.

*[Translation]*

**Mr. Rhéal Fortin:** How many do you think there are?

*[English]*

**Mr. John-Frederick Cameron:** I would be happy to provide you a list of the ones that I think have that specialization.

*[Translation]*

**Mr. Rhéal Fortin:** Thank you, Mr. Cameron.

We would be grateful if you could provide us with this list.

You told us earlier that the management fees usually associated with a program are in the range of 10% to 20%.

This would vary greatly depending on the type of administration you need to do. Is that correct?

*[English]*

**Mr. John-Frederick Cameron:** Yes, you're correct.

*[Translation]*

**Mr. Rhéal Fortin:** In this case, if you had to house students, pay for travel, meals and equipment, it would probably cost you a lot more than if your job was just to organize the structure. For example, if your job was just to tell one person that they would go to one place and another person that they would go to a different place, I would imagine that would be much less expensive in terms of administration costs. Is that correct?

*[English]*

**Mr. John-Frederick Cameron:** If you were finding youth to attach to placements in the communities in which they lived, then of course, yes, there would not have been increased costs for housing.

**The Chair:** We will be on to the last question here, Mr. Fortin.

*[Translation]*

**Mr. Rhéal Fortin:** I have one last question for you, Mr. Cameron.

Are you familiar with the communications firm NATIONAL? Did that firm communicate with you in the course of managing the grant program?

*[English]*

**Mr. John-Frederick Cameron:** Did you say the firm was just called National? Is that the name of the firm?

*[Translation]*

**Mr. Rhéal Fortin:** Yes.

*[English]*

**Mr. John-Frederick Cameron:** No, I'm not aware.

*[Translation]*

**Mr. Rhéal Fortin:** You're not familiar with the communications firm NATIONAL?

*[English]*

**The Chair:** Does that answer your question, Mr. Fortin, or do you want clarification?

*[Translation]*

**Mr. Rhéal Fortin:** I don't think the witness understood my question, Mr. Chair. I'm also having computer issues.

WE Charity awarded a contract to the communications firm NATIONAL to handle the Quebec and francophone portion of the program. I'd like to know whether NATIONAL contacted Katimavik to offer to run part of the program.

● (1640)

*[English]*

**Mr. John-Frederick Cameron:** No, we were not.

*[Translation]*

**Mr. Rhéal Fortin:** Thank you, Mr. Cameron.

*[English]*

**The Chair:** Thank you very much.

We will go to Mr. Julian, followed by Mr. Morantz.

Mr. Julian.

**Mr. Peter Julian:** Thanks, Mr. Chair.

Thank you, Mr. Cameron, for being here today. I hope that you and your loved ones are safe and healthy throughout this pandemic.

The first question I want to ask is with regard to one of the most controversial aspects of this scandal: the violation of teachers' codes of ethics. There's a payment that was set up as part of this approach that basically was an incentive for teachers to violate two of the key aspects of the code of ethics. I'll read from the B.C. Teachers' Federation's Code of Ethics. It says that teachers must respect "the confidential nature of information concerning students and [can only] give it...to authorized persons...directly concerned with their welfare", and that teachers must refrain "from exploiting that relationship for material...advantage."

Given the subagreement with WE, are you confident that, in terms of Katimavik students, there wasn't a violation of privacy rights or a violation of any ethical codes? In other words, was there a bit of a firewall in the Katimavik contract that was different from the concerns that had been expressed about the general approach of this scheme?

**Mr. John-Frederick Cameron:** Yes. Mr. Julian, Thank you.

In fact, one of the amendments that we requested through those negotiations was to build that firewall. We wanted to ensure that the information of our youth, our stakeholders, our alumni and others remained confidential, and that we could develop a path through which we could protect that confidentiality as it was delivered through the program.

**Mr. Peter Julian:** Thank you for that. I'm glad you stepped forward to at least carve off that portion of the program.

Second, you've indicated that the incentive, or the administrative fee, was $25,000 for the first hundred youth and $50,000 if you recruited 200 youth. Was it based on a $250 payment per student, or was it like the program itself. Basically, if you didn't hit that threshold, you didn't get any of the funding underneath, which people have raised concerns about in terms of violating labour standards and also minimum wage laws?

**Mr. John-Frederick Cameron:** I don't think the formula was shared with us at that time. Essentially, we were basically offered this: If we could deliver a hundred youth into the program, we would be able to access $25,000.

By the way, that wasn't necessarily articulated as an administrative fee, but it was certainly a project expense fee. In order for Katimavik to do that work, that would be the fee that it would benefit from. Then, if we were able to get up to 200 more, it would be to a maximum of $50,000.

However, I don't know that we ever talked about if we had 150, for instance, whether that was a sliding scale in terms of what the charity would benefit from in terms of that amount.

**Mr. Peter Julian:** You'll be able to share the contract with us. Is that right?

**Mr. John-Frederick Cameron:** Yes.

**Mr. Peter Julian:** It may be in the wording throughout that contract. It may be in the "lawyer language".

**Mr. John-Frederick Cameron:** Very true.

**Mr. Peter Julian:** You mentioned in response to questions from Mr. Fortin that you are unaware of National's being involved. Were you aware.... I know Katimavik. I have worked with Katimavik students. There's a fierce adherence to bilingualism across the country. Were you aware that the WE scheme actually didn't provide services in Quebec and wasn't going to provide bilingual services for francophones?

**Mr. John-Frederick Cameron:** No, I was not aware of that. Although Katimavik, if the program had been executed, certainly would have been attracting our cohort members from within and without Quebec. No one ever had a conversation with me to say that wasn't going to be permitted. It was basically that if you have the placements, you have the youth and you can link them together, then those youth would benefit as long as they fit the criteria.

● (1645)

**Mr. Peter Julian:** Was there nothing in the contract that carved out Katimavik in Quebec from Katimavik elsewhere in the country? It's a very complex organization, it seems. It's been a surprise to everybody that National was actually given this contract. It seems to be something that has escaped any sort of due diligence.

You saw Katimavik contributing right across the country, including in Quebec, and were unaware of the fact that its services weren't being provided by WE in Quebec.

**Mr. John-Frederick Cameron:** That's correct. We would certainly have provided services in Quebec, in both languages, in our part of the role.

**Mr. Peter Julian:** Can I ask you about Katimavik as a whole and your board of directors? I assume that if the chair of your board of

directors asked for financial statements, they would be provided to the chair. We heard very important testimony from Michelle Douglas, who was the former chair of WE. She was basically sidelined and asked to resign after she endeavoured for weeks to get copies of financial statements.

I come out of the non-profit sector myself. I've never heard of a chair of a board of directors being refused financial statements. I assume it's a matter of course that board members are automatically provided with financial statements at every board meeting. Is that not true?

**Mr. John-Frederick Cameron:** In our case, Katimavik provides a financial report at every board meeting, which are monthly. The board of directors is given a hard copy cash flow statement and budget actuals report every quarter.

**Mr. Peter Julian:** My last question is with regard to Canada summer jobs. Canada summer jobs, in my part of the country and right across the country, has been underfunded. In fact, the number of positions was reduced because the terms were extended, so we actually have fewer students employed this year during the pandemic than we do normally.

Do you believe that an important investment should have been made in Canada summer jobs, which has an impact, of course, on Katimavik students, but also on students right across the country?

**Mr. John-Frederick Cameron:** In my role as a youth advocate for a youth empowerment organization I would say, and I don't mean to be flippant, there's never enough support to do the work we want to do. As much as it's responsible and affordable for governments, yes, we would welcome that investment.

**The Chair:** Next is Mr. Cumming, followed by Mr. Fraser.

**Mr. James Cumming (Edmonton Centre, CPC):** Thank you, Mr. Cameron, for appearing today and for the very important work you do in this sector. I very much appreciate it, and I appreciate the work of the not-for-profits in Canada, particularly the work that your organization is doing. It sounds very intriguing.

**Mr. John-Frederick Cameron:** Thank you.

**Mr. James Cumming:** Had you ever worked with WE before this specific contract came up?

**Mr. John-Frederick Cameron:** No, we had not.

**Mr. James Cumming:** Do you know with which WE organization you were going to have the agreement? Did WE share which one of its groups you'd be contracted with?

**Mr. John-Frederick Cameron:** We understood it to be WE Charity.

**Mr. James Cumming:** WE Charity, thank you.

When ESDC was calling.... It suggested that it spoke to your organization on April 15 about capacity. Do you recall that conversation it had with you? ESDC has submitted a document that suggests it was speaking to a variety of groups to see what capacity they would have to deliver a program like this.

**Mr. John-Frederick Cameron:** I may not have been on that particular call, but I'd like to clear up that date to see, in fact, if I was. I don't believe I participated in that particular call. To answer your question directly, we didn't have any conversation with ESDC about Katimavik's potential capacity. It wasn't asked of us at any time to determine whether we had the capacity to deliver the program.

**Mr. James Cumming:** Thank you for that.

In your existing programs where the students are involved, are they volunteers? Do they receive some form of funding, or are they strictly volunteering in these programs?

● (1650)

**Mr. John-Frederick Cameron:** They are volunteering.

**Mr. James Cumming:** They're volunteering. This program would be quite a bit different by providing capital to volunteers, so providing grants to them versus the pure volunteerism that your organization does a great job with.

**Mr. John-Frederick Cameron:** Yes, the program would be different in that, but we were very supportive of it because it did a number of things in a very innovative way. I think it addressed the issue of students, particularly, who would be disadvantaged from continuing their education potentially, by providing them with an income that they wouldn't otherwise have had, due to the impact of COVID-19. It also, therefore, benefited more and more non-profits and charities across the country with support and so forth they would otherwise not have had. In that sense we felt that it was an innovative approach to supporting our sector, which had also been very hard-hit by the impacts of COVID.

Also, it introduced students to some involvement with non-profits and community capacity building, and they would be paid something for it. We didn't see a disconnect or anything improper about that. It was the time, in our view, for some innovation like that.

**Mr. James Cumming:** Have you ever applied under the Canada summer jobs program? Has your organization applied under that program?

**Mr. John-Frederick Cameron:** Yes. We apply for and bring on board staff, youth, from Canada summer jobs.

**Mr. James Cumming:** Do you think that could have been expanded, particularly with the programs you have, to have more youth involved with it, if there was the capacity within the program dollar-wise?

**Mr. John-Frederick Cameron:** Yes, there is always room for expansion. We never serve 100% of the youth that we wish to serve, if I could answer it that way. At some point, we understand that governments have budgets of their own and that there is a lot of work to be done. We do the best we can to argue for the dollars we need, and I want to use the word "fight", in a way. We fight for every line item in terms of our negotiations with ESDC and other government departments, but we realize that's the right thing to do and appropriate.

**Mr. James Cumming:** Since this program was cancelled, has anyone reached out to you or picked up the phone to talk to you about a go-forward path and taking advantage of the 40-some years of experience on what's next, what we could do?

**Mr. John-Frederick Cameron:** No, not in that context. We've been told that the government is looking at potentially a different way of doing this. We've essentially been asked to just wait a little longer before they come back to us and let us know what that is.

**The Chair:** Thank you both—unless you have a really quick one, James.

**Mr. James Cumming:** Well, I suggest that hopefully they will pick up the phone and talk to you because we are running out of time. These students want to get back to school. I would encourage my friends across the aisle to pick up the phone and have that dialogue with you.

**The Chair:** All right. Thank you, all.

We have Mr. Fraser, followed by.... I don't have anybody next on my CPC list, so somebody send me a note or be prepared to go.

Mr. Fraser.

**Mr. Sean Fraser (Central Nova, Lib.):** Thank you so much, Mr. Chair. Thank you to our witness for being here and, more importantly, thank you for the work that you do.

I had the opportunity early in my career to take part, not in Katimavik but through a program administered by the Canadian Bar Association, in work for a human rights organization in South Africa. I have to say that kind of service opportunity was life-changing, to say the least. I know you've had a remarkable impact on the lives of other young people.

I see a parallel between the unfortunate circumstances surrounding the Canada student service grant and certain cuts that were made to Katimavik's programming back in 2012. I want to give full credit to my colleague Mr. McLeod, who is on this committee, who repeatedly brings up the well-being and the interests of the students who were hoping to take part in this program.

Building on questions he's asked from previous meetings, I'm wondering if you can describe a little bit what the impact was for the students who had been planning on taking part in the program in 2012, and whether you think that the consequences for the students who were hoping to take part in your programming this summer to be similar. What would be the impact on them? Maybe part B to the question is how we can get things back on track for them.

● (1655)

**Mr. John-Frederick Cameron:** To answer your second question first, just so I can circle back, I think there's a wonderful opportunity here. There are a number of charities within the Canada service corps, very stellar organizations and very good non-profit and charitable organizations as members of the CSC, and I think that's a good source of.... It's almost a de facto advisory committee, if we're called upon to do that, to help navigate some of the more strategic goals of the previous grant program. We could participate in that discussion to help sort it out and come up with some ideas on how best to do that.

I'll have to ask you to repeat your first question. I've forgotten it.

**Mr. Sean Fraser:** Katimavik in 2012 went through a serious budget cut at the time. I know that the impact on students who were planning to take part would have been severe. I'm curious to know whether you can describe what position it would have put the students in and whether students who were hoping to take part this year are facing similar circumstances.

**Mr. John-Frederick Cameron:** As a result of the timeline, we weren't going to actually engage in any activity until that renegotiated agreement was signed. In Katimavik's case, although we had restructured the staffing to be able to support the program, we hadn't executed yet on bringing young people into it. We just felt that wasn't appropriate until we crossed the t's and dotted the i's on the final agreement.

I will say to you that students, as I think all members of Parliament across the board know, are really hard hit in this time related to COVID. I think we should do everything we can to make sure we provide some sort of support to them before it's too late, so that they can continue their education.

**Mr. Sean Fraser:** One of the things I'm interested in, and it's also a point raised with frequency by Mr. Julian, is the compensation model. It was really a tuition credit to inspire more students to take up volunteerism.

I mentioned the opportunity I had near the beginning of my career. One of the reasons I ended up going with that program was that there was some compensation. Although it wasn't enough to really pay off all the student debt I'd built up, it was better than opportunities with other international organizations that were sometimes altogether year-long unpaid internships.

I'm curious to know whether you think that the compensation built into the Canada student service grant would have allowed you to recruit more students and would have helped them with the cost of going to school.

**Mr. John-Frederick Cameron:** Absolutely. I know there's some debate about volunteerism versus remuneration for that, but I think the added benefit in this case is that charities were very hard hit across the board across the country. They needed more help and assistance than necessarily a volunteer corps committed solely to pure volunteerism might have been able to provide them. This would have been access to almost a whole new group of young people who could have stepped up.

Speaking to the experience you referenced, there are other added benefits that come out of that kind of service. They leave those programs committed to community capacity building, with a greater understanding of the various regions of the country. They feel more connected to the country. They build bonds and friendships with Canadians of diversity, which they otherwise would not have had an opportunity to do. I think the net return on the investment would have been more, in fact, than just providing jobs. We would have had a group of young people come out with a far deeper connection to Canada and a commitment to continue.

In 2016, I believe, Katimavik called upon Leger to run a poll. It showed that 88% of Canadians at that time believed in these kinds of programs, understood the benefit to them and wanted them supported. Again, I think this was a creative and innovative way in a particular crisis to solve a number of issues.

**The Chair:** This will be your last question, Mr. Fraser, and then we'll go to Mr. Cooper.

**Mr. Sean Fraser:** Excellent. Thank you very much, Mr. Chair.

I'll just build upon that question. One of the things I found very frustrating when I was finishing up my master's program and looking at these opportunities was that I found that a number of the people who could afford to go for a year, and sometimes two years, in these high-profile unpaid internships with international organizations came from families of significant financial means.

I'm curious to know whether you think the combination of the Canada emergency student benefit, which many of the students would have qualified for, or the Canada emergency response benefit, for that matter, with the additional tuition supplement would have been able to help recruit low-income students who otherwise may not have been able to afford to take part in a program that would have been purely volunteer-based and not compensating them at all.

● (1700)

**Mr. John-Frederick Cameron:** I would agree with that.

As I said in a previous question or in my remarks, we did reach out to the minister to offer one suggestion, which was to maybe look at the potential of not only supporting post-secondary education students, who many believe, rightfully or wrongly, are privileged to begin with.... I'm not arguing that's the case. I'm just saying that can be the perception.

There is a whole segment of youth who don't feel that they have access to higher training and education and skills development. I think there's a real opportunity here to provide them with that kind of support as well. That might encourage them, through training and higher education, to conceive of things they otherwise would not have conceived of. It doesn't have to be post-secondary. There are all sorts of skills training and so forth that they could access.

I think it's an opportunity for all youth, regardless of economic background, to be able to dream a little brighter and step up to get some training that will help achieve their goals.

**Mr. Sean Fraser:** Thank you so much. I sincerely appreciate your advice and feedback.

**The Chair:** Thank you, both.

We have two more five-minute slots. We will start with Mr. Cooper and end the round with Mr. McLeod.

Mr. Cooper.

**Mr. Michael Cooper:** Thank you, Chair.

Mr. Cameron, when was the first time that Katimavik became aware of the CSSG?

**Mr. John-Frederick Cameron:** It would have been in a call, the date of which I don't recall. It would have been in a call I'm going to assume was at some point in April. We were told there was going to be a program specific to students, that the government had partnered with a third party provider, and that we would be brought into the conversation as the program developed to determine what role our organization in particular could play in mapping that out.

**Mr. Michael Cooper:** Who did that call come from?

**Mr. John-Frederick Cameron:** It was on a call with ESDC.

**Mr. Michael Cooper:** Okay.

Other than the call you had on April 15, or thereabouts, with ESDC, there had been no other communications with ESDC about student programming in this particular context, and more specifically the CSSG, until some time after, I presume April 22. That's what you're saying, just in terms of establishing a timeline.

**Mr. John-Frederick Cameron:** I don't remember the April 15 date. That's what I want to check and get back to you on, just to make sure.

**Mr. Michael Cooper:** I apologize. Yes, you qualified that.

**Mr. John-Frederick Cameron:** That's all right.

I believe—and I can look for that as well—that there might have been an email from ESDC at some point with some information about the fact that this program was going to be coming forward and that CSC partners would be engaged in the process by the third party provider.

**Mr. Michael Cooper:** Okay.

In terms of the WE Charity, which you indicated, in your understanding, is the party that Katimavik entered into an agreement with, were you aware of the WE Charity Foundation at any point?

**Mr. John-Frederick Cameron:** No. I didn't know much about WE Charity prior to hearing about them through this exercise.

**Mr. Michael Cooper:** You didn't know anything about WE Charity at all, any of their entities—I mean, other than to have heard of them.

In terms of their involvement in this type of youth programming, or connecting youth in the context of the not-for-profit sector, that would not have been something you would have been familiar with.

**Mr. John-Frederick Cameron:** Exactly.

Of course, we knew about WE Charity, and ME to WE, and WE Days and everything else, but in the context of pairing volunteers with the non-profit and charitable sectors, I was not aware that they were involved in that or had been involved in that.

**Mr. Michael Cooper:** Katimavik is active in all 10 provinces and three territories in Canada.

**Mr. John-Frederick Cameron:** We are currently active in six. The plan just prior to COVID was to grow from eight to 10 by January and 12 by June. Our goal was a bit thwarted by the pandemic, but that is our intention, to get back to the 12 provinces and—

● (1705)

**Mr. Michael Cooper:** Katimavik has a track record and is involved in connecting youth, with approximately how many not-for-

profit organizations at any given time? We're talking, I presume, about hundreds.

**Mr. John-Frederick Cameron:** It is hundreds, and I'm happy to provide you with that list as well. As well, we transparently place that on our website.

**Mr. Michael Cooper:** You have that track record going back to what, 1977? Do I have that right?

**Mr. John-Frederick Cameron:** Yes, it was 1977. You have that right.

**Mr. Michael Cooper:** Okay, and it's in both English and French, in Quebec.

In that regard, in terms of partnering, has Katimavik partnered with other charities or other organizations to deliver a program?

**Mr. John-Frederick Cameron:** We partner with institutions to support some of the program initiatives that we can't fund on our own. We're often asked to create partnerships with other charities, and of course we do consider those based on a values-connection synergy basis, but I wouldn't say that we formalize partnerships necessarily to execute on the volunteer placement side. We've been doing that since 1977 on our own and continue to do that now.

**The Chair:** This is the last question, Mr. Cooper.

**Mr. Michael Cooper:** I think that satisfies the questions that I had.

Thank you, Mr. Cameron, for that.

**The Chair:** Thank you, both, very much.

The last round will go to Mr. McLeod, and then we'll wrap it up.

Go ahead, Mr. McLeod.

**Mr. Michael McLeod:** Thank you, Mr. Chairman.

Thank you to Mr. Cameron for joining us today.

I want to ask about the Katimavik program. It's an Inuit name, an Inuit language name. I see it's located in B.C., Alberta, Manitoba, Ontario and Quebec, but I don't see any projects in the north.

**Mr. John-Frederick Cameron:** No. As I was saying in my previous question, very often we are funded to provide the program and to launch the program in certain regions of the country. We were supposed to—prior to COVID—with the support of ESDC, develop a growth plan into all 12 provinces and northern territories of the country.

That was, I want to say, very temporarily stayed, because we have a very definite commitment to make sure that we grow beyond the provinces and into the northern communities as well.

**Mr. Michael McLeod:** You would have had the capacity to deliver in the Northwest Territories with the CSSG. Is that what you're saying?

**Mr. John-Frederick Cameron:** We have the capacity through alumni and anyone in the current cohorts who would have come from the north. As you know, our organization has made a 50-year commitment for our last strategic plan to the manifestation of the truth and reconciliation commitment with indigenous communities, so we have a very definite interest.

In every house that Katimavik runs of 11 youth, our goal is to engage three of those 11 youth with indigenous youth. We fell short by one in this last cohort, so we're well on our way to achieving that goal and surpassing it.

**Mr. Michael McLeod:** I know historically we saw a lot of people from your organization in the north. We saw a lot of people in different communities, and I don't see that anymore. I don't see anybody from your organization in the communities, and I travel right across the Northwest Territories.

Is that something as a result of the cuts that happened during the Harper government in 2012? You pulled back. You have a Inuit name, but you don't have a strong presence in the north.

**Mr. John-Frederick Cameron:** Yes, as a result of the diversity in funding allotments, let's say, through the years, the organization has had to shrink and expand and be fairly fluid in how we do that, but we do have a large number of alumni from the north who participated in our programs who would have been eligible for the student grants program as a member of our stakeholder group and our alumni base.

We have a number of indigenous community members on our board, and we remain very committed to ensuring that, within the next round of negotiations with the federal government, we retain and regain a presence in the north, for sure.

● (1710)

**Mr. Michael McLeod:** I'm sure the impacts in 2012 affected the Katimavik organization. How have the impacts that happened here for this youth opportunity affected your organization?

I think there are a lot of concerns around missed opportunity for the north, but there are also concerns about the ripple effects that have happened to charities and non-profit organizations that have missed out, including all the individuals who would have served and were served by those organizations from coast to coast to coast. Could you talk about that, including how this has impacted your organization?

**Mr. John-Frederick Cameron:** We were thrilled, as I said earlier, and excited at the opportunity to participate in this program. In advance of the final negotiations on the agreement, we had restructured our staff team to be able to meet the objectives of the program. One direct impact, of course, was that we lost out on the costs associated with that work, and we had to pull back and re-restructure, no longer with the goal of executing on that program.

There were some sort of direct operational challenges that the removal of the program placed on our shoulders, but we were confident that eventually a solution would be found and that we would participate again in some new vision of how that program's objectives could be achieved.

**The Chair:** This is your last question, Michael.

**Mr. Michael McLeod:** I just want to point out that you have a really strong indigenous theme. You have a name that, in the Inuit language, means "meeting place". You strongly support learning of the history of indigenous peoples. You support culture and truth and reconciliation. It would be nice to see some of your criteria go further than just English and French, to maybe use indigenous languages as something you're seeking also for your board members.

**Mr. John-Frederick Cameron:** Yes, absolutely. Our new strategic plan does articulate those goals. I hope you don't mind and don't think it's inappropriate, but I'll definitely be reaching out to you to support us in terms of how we can convince bureaucrats and the government to make sure that we can get the funding required to make that a priority again, because we're very anxious and deliberative in our intent to do so.

**The Chair:** Okay. Thank you both very much.

Mr. Cameron, on behalf of the committee, I certainly want to thank you for your presentation today and for answering our questions. More than that, on behalf of every member of the committee, I thank Katimavik for the work that you do with young people. I have a couple of friends just five houses from where I'm sitting who were in a Katimavik program in the early 1980s. They're up here, have three kids and are still married, so they're doing well. Neither one was from P.E.I., but they came here.

**Mr. John-Frederick Cameron:** Thank you so much.

**The Chair:** Go ahead, Mr. Poilievre.

**Hon. Pierre Poilievre:** I have a motion. Here it is:

> That the Standing Committee on Finance hold an additional meeting on its study into government spending, WE Charity and the Canada Student Service Grant on Wednesday, August, 19, for three hours in length; that each party can submit witnesses; and that the meeting focus on WE contracting NATIONAL Public Relations and the ability to deliver the program in the province of Quebec.

**The Chair:** You better read that again. You're talking about meeting for three hours on Wednesday. It is in order, as it's related to the business we're doing, but could you read it again? People don't have a copy. Take your time.

**Hon. Pierre Poilievre:** It says, "That the Standing Committee—"

[*Translation*]

**Mr. Rhéal Fortin:** I'd just like to suggest a friendly amendment.

August 19 is impossible for us because we'll be in caucus all next week. The motion seems desirable to me, but I don't know if Mr. Poilievre would be somewhat flexible as far as the date is concerned.

● (1715)

**Hon. Pierre Poilievre:** Perhaps we could agree—

[*English*]

**The Chair:** I'll come in for a minute, Mr. Poilievre. It's really the whips, at the end of the day, who have to decide when we meet, in any event. If it was left broad enough, with a three-hour meeting next week, I think that would do it, but the whips have to decide, because of the Zoom business in Parliament.

[*Translation*]

**Hon. Pierre Poilievre:** Mr. Fortin, is it true that you won't be available at all next week?

**Mr. Rhéal Fortin:** Our members will be in the Gaspé until Thursday evening. I'll be on my way back on Friday, and it takes 12 hours to get home. So I won't be able to make myself available.

**Hon. Pierre Poilievre:** All right.

Mr. Chair, could I suggest that next week we have a meeting of our sub-committee with a representative from each party to plan our next steps? It could be by telephone, and it wouldn't be necessary to have a Zoom meeting. The meeting would obviously be in camera to plan the list of future witnesses and upcoming meetings.

[*English*]

**The Chair:** Sure. I think we can agree to that. That's not a problem. We should try to find out where we're at anyway and when we can direct the analysts to start to write a report with the documents coming down.

We'll have to try to plan it. I think it pretty much has to be a video conference because of the interpretation, but we can figure that out. We can commit to having a subcommittee meeting at some point next week, because it will have to be worked out with the various members, along with whether they can attend.

[*Translation*]

**Hon. Pierre Poilievre:** It would just be a planing meeting, not a meeting with witnesses.

Does that work for you, Mr. Fortin?

**Mr. Rhéal Fortin:** Yes, I could free myself up for about 30 minutes for a planning meeting, but not for three hours.

**Hon. Pierre Poilievre:** Okay, I understand. That's great.

**Mr. Peter Julian:** The meeting will last a maximum of an hour.

[*English*]

**The Chair:** Mr. Julian, I can't hear you.

[*Translation*]

**Mr. Peter Julian:** It should work now. My microphone isn't on mute, and I'm on the French channel.

Can you hear me now?

[*English*]

**The Chair:** It's okay, yes. Speak.

[*Translation*]

**Mr. Rhéal Fortin:** It's always better when you speak French, Mr. Julian.

**Mr. Peter Julian:** It's always a pleasure.

Mr. Fortin, I think this committee meeting will last between half an hour and an hour. So I'm going to support Mr. Poilievre's motion and your amendment.

**Mr. Rhéal Fortin:** Thank you.

[*English*]

**The Chair:** Do we need it as a motion, or can I just commit that we'll have a steering committee meeting at some point next week to determine future business related to the ideas in Mr. Poilievre's motion? I don't think we really need a motion to do that. I can accept that as direction, if that's okay.

**Mr. Rhéal Fortin:** It's okay for me.

[*Translation*]

**Hon. Pierre Poilievre:** Yes, absolutely. We accept your commitment to hold a planning meeting. We can schedule other meetings after that.

[*English*]

**Mr. Peter Fragiskatos:** Mr. Chair, I'm just a bit confused here. Is it a call that we're going to be planning out here, or is it a regular meeting? What's the way forward that's being suggested?

**The Chair:** It would be just a steering committee meeting, a sub-committee meeting, for about half an hour at some point next week to plan future business and the point that Mr. Poilievre had in his motion.

Is that okay?

**Mr. Peter Fragiskatos:** Thank you.

**The Chair:** All right. Is there any other business that people need to attend to? Hopefully, you'll soon have a lot of reading to do.

With that, we will adjourn. Thank you very much. Have a great weekend, everyone.

The meeting is adjourned.

Published under the authority of the Speaker of
the House of Commons

### SPEAKER'S PERMISSION

The proceedings of the House of Commons and its commit-
tees are hereby made available to provide greater public ac-
cess. The parliamentary privilege of the House of Commons
to control the publication and broadcast of the proceedings of
the House of Commons and its committees is nonetheless re-
served. All copyrights therein are also reserved.

Reproduction of the proceedings of the House of Commons
and its committees, in whole or in part and in any medium,
is hereby permitted provided that the reproduction is accu-
rate and is not presented as official. This permission does not
extend to reproduction, distribution or use for commercial
purpose of financial gain. Reproduction or use outside this
permission or without authorization may be treated as copy-
right infringement in accordance with the Copyright Act. Au-
thorization may be obtained on written application to the Of-
fice of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not
constitute publication under the authority of the House of
Commons. The absolute privilege that applies to the proceed-
ings of the House of Commons does not extend to these per-
mitted reproductions. Where a reproduction includes briefs
to a committee of the House of Commons, authorization for
reproduction may be required from the authors in accor-
dance with the Copyright Act.

Nothing in this permission abrogates or derogates from the
privileges, powers, immunities and rights of the House of
Commons and its committees. For greater certainty, this per-
mission does not affect the prohibition against impeaching or
questioning the proceedings of the House of Commons in
courts or otherwise. The House of Commons retains the right
and privilege to find users in contempt of Parliament if a re-
production or use is not in accordance with this permission.

Also available on the House of Commons website at the
following address: https://www.ourcommons.ca

Publié en conformité de l'autorité
du Président de la Chambre des communes

### PERMISSION DU PRÉSIDENT

Les délibérations de la Chambre des communes et de ses
comités sont mises à la disposition du public pour mieux le
renseigner. La Chambre conserve néanmoins son privilège
parlementaire de contrôler la publication et la diffusion des
délibérations et elle possède tous les droits d'auteur sur
celles-ci.

Il est permis de reproduire les délibérations de la Chambre
et de ses comités, en tout ou en partie, sur n'importe quel sup-
port, pourvu que la reproduction soit exacte et qu'elle ne soit
pas présentée comme version officielle. Il n'est toutefois pas
permis de reproduire, de distribuer ou d'utiliser les délibéra-
tions à des fins commerciales visant la réalisation d'un profit
financier. Toute reproduction ou utilisation non permise ou
non formellement autorisée peut être considérée comme une
violation du droit d'auteur aux termes de la Loi sur le droit
d'auteur. Une autorisation formelle peut être obtenue sur
présentation d'une demande écrite au Bureau du Président
de la Chambre des communes.

La reproduction conforme à la présente permission ne cons-
titue pas une publication sous l'autorité de la Chambre. Le
privilège absolu qui s'applique aux délibérations de la Cham-
bre ne s'étend pas aux reproductions permises. Lorsqu'une
reproduction comprend des mémoires présentés à un comité
de la Chambre, il peut être nécessaire d'obtenir de leurs au-
teurs l'autorisation de les reproduire, conformément à la Loi
sur le droit d'auteur.

La présente permission ne porte pas atteinte aux privilèges,
pouvoirs, immunités et droits de la Chambre et de ses
comités. Il est entendu que cette permission ne touche pas
l'interdiction de contester ou de mettre en cause les délibéra-
tions de la Chambre devant les tribunaux ou autrement. La
Chambre conserve le droit et le privilège de déclarer l'utilisa-
teur coupable d'outrage au Parlement lorsque la reproduc-
tion ou l'utilisation n'est pas conforme à la présente permis-
sion.

Aussi disponible sur le site Web de la Chambre des
communes à l'adresse suivante :
https://www.noscommunes.ca