# EXHIBIT 15



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA



43rd PARLIAMENT, 2nd SESSION

# Standing Committee on Access to Information, Privacy and Ethics

EVIDENCE

**NUMBER 024**
**PUBLIC PART ONLY - PARTIE PUBLIQUE SEULEMENT**
Monday, March 15, 2021

Chair: Mr. Chris Warkentin

# Standing Committee on Access to Information, Privacy and Ethics

**Monday, March 15, 2021**

● (1430)

[*English*]

**The Chair (Mr. Chris Warkentin (Grande Prairie—Mackenzie, CPC)):** I'd like to call this meeting to order.

This is meeting 24 of the Standing Committee on Access to Information, Privacy and Ethics.

We continue the current study of questions of conflict of interest and lobbying in relation to pandemic spending.

I'd like to remind you that today's meeting is webcast and will be available via the House of Commons website.

Today we have as witnesses Craig and Marc Kielburger. They are the founders of WE Charity. There are here by parliamentary summons.

They are accompanied by their lawyer, Mr. William McDowell. Mr. McDowell has asked to attend today's meeting to be with his clients. This request has been agreed to by the members of this committee.

Mr. McDowell has also requested standing to deliver an opening statement and to intervene on behalf of his clients. This would be unprecedented. It is not the practice of parliamentary committees, nor has it ever occurred, in my understanding, to allow counsel to speak on behalf of their clients or to be granted permission to raise concerns or objections to questions during the parliamentary proceedings. Of course, there are plenty of examples of counsel being present and being allowed to speak, if, in fact, they are an invited witness. This is not a court of law, and the Kielburgers are not here on trial. Our mandate is to inquire into public policy issues. Today's case is the question of conflict of interest and lobbying in relation to pandemic spending.

Furthermore, testimony before the committee is protected by the privilege of freedom of speech. Nothing said before this committee may be used in court. As participants in the proceedings of Parliament, the Kielburgers enjoy the same privileges that members do.

Having said that, I am prepared to allow counsel to communicate with his clients off the record, either by text or by a separate phone line, or however they choose to communicate. I see they're all in the same room. The committee has agreed that would be the case.

We will be prepared to suspend the meeting, if necessary, so the Kielburger brothers can consult with their lawyer. We will also be prepared to suspend the meeting if these guidelines are not respected.

Mr. Kielburger and Mr. Kielburger, you both now have seven minutes to make your opening statements, and then we'll have some questions for you.

The floor is yours.

**Mrs. Brenda Shanahan (Châteauguay—Lacolle, Lib.):** Chair, excuse me, I have a point of order.

**The Chair:** On a point of order, I recognize Ms. Shanahan.

**Mrs. Brenda Shanahan:** Thank you, Chair.

Thank you for clarifying those guidelines.

In that same vein, given that we have not had this study in front of us for some time, could you or the clerk read out the motion outlining the study we have before us?

**The Chair:** I believe that's been circulated to all members, as well as to the witnesses today. I know members have taken the time to read that, and so we will proceed with the meeting.

● (1435)

**Mr. Michael Barrett (Leeds—Grenville—Thousand Islands and Rideau Lakes, CPC):** Chair.

**The Chair:** Yes, Mr. Barrett.

**Mr. Michael Barrett:** I just ask that, in keeping with previous practice, the witnesses be sworn in.

**The Chair:** We do have the ability to do that.

Madam Clerk, I wonder if that has been emailed to the witnesses.

I'd ask the witnesses, if they have it handy there, to read it into the record.

Maybe we'll begin with Mr. Craig Kielburger followed by Mr. Marc Kielburger

**Mr. Marc Kielburger (Founder, WE Charity):** Mr. Chair, that was not provided to us.

**The Chair:** I believe it was provided to your lawyer, but we will do that now.

**Mr. Marc Kielburger:** Mr. Chair, it was not provided earlier.

**The Clerk of the Committee (Ms. Miriam Burke):** It's been sent, Mr. Chair, just now.

**Mr. Craig Kielburger (Founder, WE Charity):** Are you suggesting that we both check our emails, if it was just sent right now?

**The Chair:** That would be probably the most efficient way to do this.

**Mr. Craig Kielburger:** Excuse us.

**Mr. Charlie Angus (Timmins—James Bay, NDP):** On a point of order, just for clarification here, because I know our clerk is always very much on the ball in terms of her obligations, did she say she did send them the statement they need to read for swearing in?

**The Chair:** It has been sent now. I can confirm that. I didn't verify whether or not it had been done before. We'll verify now.

Mr. Marc Kielburger and Mr. Craig Kielburger, do you have a copy of the text?

**Mr. Marc Kielburger:** At 2:36 p.m. it was received.

**The Chair:** Okay, good.

Could we have you read that into the record now, gentlemen?

**Mr. Marc Kielburger:** I, Marc Kielburger, do swear the evidence I shall give on this examination shall be the truth, the whole truth, nothing but the truth, so help me God.

**Mr. Craig Kielburger:** I, Craig Kielburger, do swear that the evidence I shall give on this examination shall be the truth, the whole truth and nothing but the truth, so help me God.

**The Chair:** Thank you, gentlemen.

The floor is now yours to begin with your opening statement.

**Mr. Marc Kielburger:** Mr. Chair, I will speak for the full 14 minutes.

We grew up in Thornhill, Ontario. We were taught by our family, like countless young people being taught by their families, [*Inaudible-Editor*] good for others. Craig was 12 years old when he heard how a young child slave in Pakistan was killed for trying to end child labour. It was a tragic lesson but precious...good is fragile, and those in positions of power can easily hurt others for their own benefit.

When we started a Canadian charity 25 years ago, we were just two teenagers who wanted to do good. Once we launched Free the Children—now WE Charity—we found millions of Canadian kids who also just wanted to do good, to help make the world a little bit better. The charity's mission statement is simple: WE makes doing good doable. For the last nine months, we've sought to be measured in our comments, but the good of a children's charity has been destroyed by political crossfire.

Today, we are taking a stand. We have been disappointed in the conduct of all—

[*Translation*]

**Mr. Rhéal Fortin (Rivière-du-Nord, BQ):** I have a point of order, Mr. Chair. The interpretation has stopped.

[*English*]

**The Chair:** Pardon me, we have a point of order.

I'll respond to the point of order of Monsieur Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** The interpretation has stopped. The interpreter signalled they can't interpret what the witness is saying.

Perhaps the clerk could check with the interpretation people.

[*English*]

**The Chair:** Thank you.

This was highlighted before and the request was given to the Kielburgers through their lawyer that they be provided with headsets so that translation would be possible. I would ask the witnesses if it is possible to hook up your headset or some mechanism by which you would provide less echo.

**Mr. Marc Kielburger:** We will speak closer to the mike, sir, we do not have our headsets.

● (1440)

**The Chair:** It would be very helpful if you could move closer to the device you're using. Let's try that.

**Mr. Marc Kielburger:** Of course.

For the last nine months, we have sought to be measured in our comments, but the good of a children's charity has been destroyed by political crossfire. Today, we are taking a stance. We have been disappointed in the conduct of all political parties in this matter.

What was accomplished by educators and students in 7,000 schools is remarkable and deserves to be protected. It's been 25 years of helping to build over 1,500 schools and schoolhouses around the world; educating 200,000 children; improving access to health care and clean water for one million people and, here in Canada, running the nation's largest annual one-day collection for food banks, creating a mental health curriculum for Canadian students, and through WE schools and WE Day, supporting more than 5,000 charities and communities across Canada logging 70 million hours of service.

Committee members will likely pay lip service to these achievements. They may claim not to be attacking these good works, but their political games have cancelled many of these impacts, and they're jeopardizing the rest.

In the drive to do good, to do better, we confronted outdated models and prohibitions. Canada's charitable sector is in a crisis. There is a 30-year steady decline in the percentage of Canadians who give, yet federal law restricts how Canadian charities earn income. In response, we incorporated ME to WE Social Enterprises, to create empowering jobs in poor communities around the world and to generate revenue that helps to be donated 100% to WE Charity.

It's the same model as Newman's Own, the salad dressing, a true company that donates 100% of its after-tax profits, totalling hundreds of millions of dollars, to the Newman's Own Foundation. The company was owned by Paul Newman until his death.

Until recent politics, ME to WE Social Enterprises was celebrated as a new model of how to do good. Since it's founding, as mentioned, 100% of all profits have been donated to WE Charity, where we invest it to grow its social mission.

Craig and I started young. We grew, and we learned along the way that doing good is not simple. Not just for teenagers but for anyone of any age who wants to build something, who thinks differently, who tries to innovate for good, he's going to make mistakes, and we've made our share. We've apologized.

In the future, we'll surely make more mistakes, and we'll apologize again.

We heard the American journalist, Mr. Reed Cowan speak here two weeks ago. The death of a child is beyond words, and our hearts sincerely go out to him. Fifteen years ago, he said he wanted to help children in Kenya, and he did just that. He directly raised about $70,000 USD, and those donations supported four schoolhouses in Kenya. Two had plaques honouring his son, and one plaque was removed. Mr. Cowan is right to be upset, and no words are sufficient to erase the grief that this error has compounded.

Last month, when we first learned about the mistake, Craig called over to Mr. Cowan apologizing on behalf of the charity. They spoke for about 90 minutes. We immediately mounted the second plaque honouring his son Wesley. We're checking our records, as a second donor to the same Kenyan village about the same time—15 years ago—also had a problem with a plaque. We again immediately apologized and are working to properly recognize her generous support.

Working in developing countries is not easy. Ending extreme poverty is not simple. The African proverb is true—it takes a village to raise a child. That village requires schools, water projects, medical care and more. We fundraised more than the cost of building a schoolhouse because [*Technical difficulty—Editor*] school lunches and student vaccines. We fundraised more than the actual cost of simply drilling a [*Technical difficulty—Editor*] fuelled repairs to keep community projects going for years. WE Charity and most charities provide catalogues of goats, schoolhouses and wells, which are representative uses of funds, to help donors visualize the impacts in a community.

WE Charity and most charities clearly explain that if more funds are collected than needed for a particular catalogue item, those funds will be redirected to similar activities to help end poverty. This is to ensure that all essential programs receive the necessary support.

WE Charity, like most global organizations, pools funds to help the entire village, and our notice of pooling funds for the village and directing funds to the greatest need is clear and transparent. Hundreds of donors have shared with us that they understand this model, and they agree that this is the responsible approach to community development.

● (1445)

Donors give, because the models have proven to end poverty in villages, and all the money goes to help children. However, perhaps for a lack of experience in giving to WE Charity, we are bewildered

that one member of this committee irresponsibly compared this near-universal charitable practice to fraud.

Certain members of this committee have also advanced a false narrative that WE Charity was trying to avoid answering questions. The truth is that months earlier, we had confirmed our willingness to come voluntarily to this committee to answer all questions. This was in addition to voluntary testimony before the finance committee on the same issue for a record four hours, more than anyone who has testified, for example, even about COVID.

A week prior to our appearance, Mr. Angus wrote on member of Parliament letterhead demanding police and income tax investigations of WE Charity. Clearly, showing the political purpose of his actions, he announced this on Twitter, and his letter was immediately leaked to the press to generate headlines.

Imagine, the NDP calling in the police for clearly political purposes on a children's charity. Craig and I wanted nothing more than to come to talk to you to prove to you that such allegations are wrong. If this was about us, as individuals, we would have come here right away to refute some of the very personal attacks on our integrity, but it's not that simple.

This charity is more important than us. WE Charity's work must be carefully protected. You see, even as WE Charity winds down its Canadian activities, because of politics, it continues to operate life-saving humanitarian programs, such as a hospital in Kenya that is the only safe place for miles for women to give birth. By requesting a law enforcement investigation of WE Charity for political reasons in the middle of these proceedings, even before hearing from us, Mr. Angus knew he'd get headlines, while making it hard for WE Charity to defend itself.

Let's be clear, Mr. Warkentin, with respect, this forum doesn't give WE Charity, or us, the legal protections guaranteed to Canadians. Politicians are not impartial. Without recognizing our right to present our own evidence, this committee is trying WE Charity in the courts of public opinion and forcing testimony.

One member of Parliament, Mr. Poilievre, even threatened us with imprisonment before a summons was issued. Members of Parliament often speak of their privileges, and you just did a few moments ago. So that all Canadians will understand what you're referring to, the legal term, absolute privilege, means members of Parliament can say anything they want no matter how malicious and false. Canadians are powerless to hold members of Parliament accountable for a falsehood on social media, and on conventional media, it will share these statements and false accusations.

Over the past nine months, many falsehoods have circulated about WE Charity and those associated with it. Lies and innuendo have been spread about me, my brother, and our families. Not even our 80 year-old parents have been spared.

Trying to respond to the tsunami of misinformation, we have asked leading Canadians forensic accountants to conduct a thorough review to determine if there was anything improper arising from our relationship between us, our families or [*Technical difficulty—Editor*].

To be clear, no one asked us to do this, and we welcomed this inquiry from non-political experts. We provided everything the auditor asked for, from our personal finances to real estate. The forensic accountants concluded:

> We did not identify any concerns in relation to interactions between WE Charity and M2WSE. We found no evidence of improper transactions which benefited the Kielburgers personally.

MPs have now demanded or initiated nine different inquiries relating to WE Charity with the Standing Committee on Finance; the Standing Committee on Procedure and House Affairs; the Standing Committee on Access to Information, Privacy and Ethics; the Commissioner of Official Languages, the Conflict of Interest and Ethics Commissioner, the Privacy Commissioner and the Commissioner of Lobbying.

Thanks to Mr. Angus, and now potentially, the RCMP and the CRA.

WE Charity believes in fairness, accountability and transparency. It will work with any non-political agency investigating legal matters. To Canadians who are watching, I say, "If partisan politicians can use their powers irresponsibly, then they can do it to any organization or business."

Consider what the politicians did to a Canadian-owned small business named Speakers' Spotlight which was [*Technical difficulty—Editor*] part of these proceedings. It pressured the owners to break privacy laws.

● (1450)

When that failed, they mounted a public relations campaign against the small business, a reckless, mean-spirited attack that resulted in doxing, online hate, harassment and threats of violence.

The Conservatives, the party of small business and free enterprise, initiated that, and to this day, no Conservative member of Parliament has apologized for the hate or the harm they have caused. When your sole talking point is that you have the power, you betray indifference to using it responsibly.

At the request of WE Charity's board of directors, joining us today is Will McDowell, a former associate deputy minister of justice who served under both Paul Martin and Stephen Harper. For context as well, we had our COVID tests this morning.

The charity is entitled to fairness and respect for its rights. If Mr. Angus had not changed the rules at the last minute, Craig and I would be here on our own as originally planned. Mr. McDowell is here to protect the interests of the charity because of Mr. Angus' actions.

Although Canadian politics have cancelled WE Charity in Canada, in countries like Kenya, the endowment we set up will continue to help children for generations. It will help operate Baraka Hospital where, in December, 158 babies were safely born. It will help run secondary schools, delivering education to help hundreds of girls, many avoiding the slavery of early, childhood marriage. Many good people are delivering these projects. They do not deserve to be political pawns.

The stated mandate of this committee is to investigate pandemic spending. Here's a simple fact. Given the chance to do good for 100,000 students and other charities during the pandemic, WE Charity agreed to help. That's what charities do. They help where that is needed.

We didn't advise the Prime Minister and Mr. Morneau not to recuse themselves. We never prorogued Parliament. We were not involved in the decision to filibuster the committee this fall. This is a political scandal for the government, not WE Charity.

The government hid behind a children's charity by letting it take the fall for the government's political decisions, and the opposition allowed it. Not a single member of Parliament has spoken up for the millions of Canadian children around the world who benefited from this organization. As MPs, of course, you have the power to summon who you please. Let me ask you this: After a year of political games, what has been the result? What have you accomplished?

March is the one-year anniversary of the WHO declaring a pandemic. Hundreds of thousands of Canadian kids will once again need employment this summer. Where's the replacement program for youth opportunity? Who among you has developed a better plan to match non-profits in the volunteer sector they so desperately need? How are Canadian youth...? How has any of this made them, as young people in Canada, more likely to serve or more likely one day to go into politics?

It's easy to tear down irresponsibly. It's, however, difficult to build and much more difficult to replace what you destroy. WE Charity wasn't perfect, but Canadian youth, Canadian young people, were better off because of it.

Winston Churchill warned that some people's idea of free speech is that they are free to say what they like but that if anyone else says anything back, that is an outrage. Just as Churchill predicted, some of you may be outraged that we point out the politics at the root of all this. If today is anything like our committee appearance nine months ago, you will make your speeches, denounce us, ask your questions, answer them yourself and then ignore our answers. As you do, we will think of the remaining dedicated staff pouring heart and soul into doing good, like operating a hospital and a secondary school in Kenya.

Today will be another day of bombardment from you, but tomorrow we will return to the good work of helping children.

Thank you, Mr. Chair. Mr. McDowell would like to say a few words.

**The Chair:** Pardon me. That completes the 14 minutes. Of course, Mr. McDowell hasn't been given permission by this committee to speak.

We will turn to Mr. Barrett now for the first round of questions.

[*Translation*]

**Mr. Rhéal Fortin:** Mr. Chair, before we get started—

[*English*]

**The Chair:** We have a point of order.

Mr. Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

I didn't want to interrupt Mr. Barrett when he was asking his questions, so I thought it better to do it now.

The witnesses' equipment—headsets, mikes and such—should have been tested before the meeting.

Where they provided with the right equipment? Was the testing done?

● (1455)

[*English*]

**The Chair:** Their lawyer was advised with regard to what the technical requirements were for preparing for this committee hearing. The decision was made by them not to comply with those requests and those requirements. It has made it very difficult for the staff and the interpreters for this committee, but I think we've been able to work with it.

We would ask that the witnesses speak slowly and clearly, as the interpreters require the ability to interpret the words that you speak.

Mr. Barrett, we'll—

[*Translation*]

**Mr. Rhéal Fortin:** Mr. Chair, can we know—

[*English*]

**The Chair:** Mr. Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Can we know why the witnesses [*Inaudible—Editor*] something that should have been fixed? I assume it's not just to make life difficult for the interpreters. There must be a reason.

[*English*]

**The Chair:** We haven't been provided with that.

Mr. Barrett, we'll turn to you now for your first questions.

**Mr. Michael Barrett:** Thank you, Chair.

Through you to the witnesses, have you been contacted by an officer of Parliament regarding the Canada student service grant or lobbying?

**Mr. Craig Kielburger:** Can someone define an "officer of Parliament", please?

**Mr. Michael Barrett:** Have you been contacted by the Ethics Commissioner, the lobbying commissioner or any commissioners who report to Parliament?

**Mr. Craig Kielburger:** We can confirm that we've worked with multiple commissioners to provide information requested.

**Mr. Michael Barrett:** When was that, and what was the nature of the communication?

**Mr. Craig Kielburger:** We want to be respectful of those non-political groups—the processes—so we will defer to them in their requests. If they ask us to share that with you, we'd be happy to, but they're the non-political branch of government.

**Mr. Michael Barrett:** Well, Chair, the witnesses are required to answer the questions that are asked, but I have more.

Have you been contacted by the Royal Canadian Mounted Police regarding any events surrounding the Canada student service grant?

**Mr. Craig Kielburger:** We understand...and, of course, Mr. Angus put a letter out to the RCMP, but we haven't been contacted in response to that matter.

**Mr. Michael Barrett:** Have you been contacted by auditors or investigators from the Canada Revenue Agency about any of WE organization's operations or organizational structure?

**Mr. Marc Kielburger:** Mr. Angus, once again, for political reasons, put that letter out recently to the CRA, and we've yet to be contacted by them.

**Mr. Michael Barrett:** Are there any investigations that you're aware of that are ongoing with respect to the events arising from...or the Canada student service grant that I haven't covered?

**Mr. Craig Kielburger:** Well, yes. Of course, there's the Privacy Commissioner, the Ethics Commissioner, the lobbying commissioner, the official languages commissioner, the RCMP, the CRA, the FINA committee, the ethics committee, the procedure and House affairs committee—the nine different groups that these MPs have triggered.

We will co-operate fully with all of the various apolitical groups referenced.

**Mr. Michael Barrett:** Thanks for answering the question. Initially, in the letter from your lawyer posted on Twitter, it said that you wouldn't answer questions with respect to those...but we have that answer.

At your July 28 finance committee appearance, you gave many undertakings to follow up, but there wasn't a prompt reply. A few weeks later, Parliament was prorogued and then we didn't receive those responses from your organization, your having felt that you were relieved from that commitment or undertaking.

Was there any reason for the delay in that response?

**Mr. Marc Kielburger:** Mr. Barrett, we conducted ourselves by providing all undertakings in a reasonable time frame. You'd have to go ask parliamentary staff, but your parliamentary staff has had these undertakings now, sir, for months.

**Mr. Craig Kielburger:** To be clear, sir, parliamentary staff.... Once the committee was dissolved, we were told not to direct it until prorogation stopped. We weren't the ones who prorogued government. As soon as government came back and we had a clerk to engage with, we handed over the undertakings.

**Mr. Michael Barrett:** When was the first time that you were aware that Parliament would be prorogued?

**Mr. Craig Kielburger:** When we read it in the news—same as everybody else.

To be very clear, prorogation did no favours to our organization; it somehow made this seem like a larger issue than it is. We were very happy to hand over all the materials within the time frame originally outlined.

● (1500)

**Mr. Michael Barrett:** Mr. Marc Kielburger, you testified at the finance committee that you did not have contact with Ms. Katie Telford.

Is that correct?

**Mr. Marc Kielburger:** That's correct.

**Mr. Michael Barrett:** On April 13, 2020, is it not true that you did in fact have contact with Ms. Telford by way of an email?

**Mr. Marc Kielburger:** Yes. As I said, she didn't reply to my email, but I did just send her an email congratulating the general government on the fact that there was a lot of work going on for the pandemic. I never received a reply.

**Mr. Michael Barrett:** Why didn't you feel that it was germane to provide that detail to parliamentarians when asked about communication with this senior official in the Prime Minister's Office?

**Mr. Marc Kielburger:** Mr. Barrett, if you check the transcripts, it was shared proactively by members of Parliament that the email had already been shared. The conversation we had is part of the FINA testimony.

**Mr. Michael Barrett:** What other communications have you had with Ms. Telford?

**Mr. Craig Kielburger:** Are you thinking of a time frame, sir?

**Mr. Michael Barrett:** From the date of that email to which you say you did not receive a response, what other communications have you had with Ms. Telford after that point?

**Mr. Marc Kielburger:** None.

**Mr. Michael Barrett:** What communications did you have with Ms. Telford prior to that point?

**Mr. Marc Kielburger:** We'd have to go back and look at our records.

**Mr. Michael Barrett:** Will you undertake to provide that information to the committee in a written form?

**Mr. Marc Kielburger:** We'll consider that.

**Mr. Michael Barrett:** Chair, I would like it to be a request of the committee that the witnesses do undertake to provide that information in written form.

**Mr. Craig Kielburger:** Just so we're clear on the nature of your request, are you asking about before she was in the civil service? Are you asking us to go all the way back to any communications we've ever had with her? Is there a time frame you could put to this?

**Mr. Michael Barrett:** I'm looking for communications that you had with her in your official capacity as the founders of the WE organization.

**Mr. Nathaniel Erskine-Smith (Beaches—East York, Lib.):** I have a point of order, Mr. Chair.

**The Chair:** I'm recognizing a point of order from Mr. Erskine-Smith.

**Mr. Nathaniel Erskine-Smith:** If it's to be a request of the committee, I would like some clarity as to scope and relevance. What dates are we talking about and in relation to what kinds of interactions? That's just for my own clarity.

**Mr. Michael Barrett:** Chair, I'll come back with a motion after we've completed the witnesses' testimony. Should it be the will of the committee, we can provide that request to them then.

**The Chair:** That would be helpful.

Mr. Barrett, we'll return to you for your final questions.

**Mr. Craig Kielburger:** There's nothing that we're concerned about. Candidly, we're more confused by the request than anything else.

**Mr. Michael Barrett:** Mr. Marc Kielburger, last spring you did speak about a phone call with the PMO on April 23, which was the day after the Canada student service grant was announced. That video was published. You later said that it was not, in fact, a member of the Prime Minister's Office with whom you spoke. When asked, you simply said you didn't have the right date.

Why doesn't this sound right?

**Mr. Marc Kielburger:** Mr. Barrett, we spoke about that extensively in the last FINA testimony. I misspoke. I apologize. The initial point of contact was with Craig with Rachel Wernick.

**Mr. Michael Barrett:** On which date did the—

**The Chair:** Thank you, Mr. Barrett. Your time is up.

We will now move to Mr. Sorbara.

**Mr. Francesco Sorbara (Vaughan—Woodbridge, Lib.):** Thank you, Mr. Chair. Thank you, everyone, for being here this afternoon.

To the Kielburgers, welcome to the ethics committee. Thank you for availing yourselves. I've been part of the ethics committee and prior to that, I was on the finance committee, where we welcomed you both. I thank you for coming to that.

I've followed along very well the last couple of months on what has gone on and how our government's helped and worked through COVID-19.

In your opening statement today...I understood where you're coming from. There seemed to be a lot of blame that you folks wanted to put on everyone else but yourselves for any responsibility of why you're here and what has transpired. I was rather disappointed. At the same time, you want to throw blame on everyone else and not take responsibility for things that have happened within your control. So be it; that is your right.

This is a parliamentary committee. We are protected by parliamentary privilege. As someone who has spent the last few weeks—and actually the last few years—working on committees and understanding the roles of committees.... We are here to look at many sorts of issues. Committees have powers. They have the power to obtain documents if they need to and the power to summon individuals to appear before a committee. Those powers need to be utilized responsibly, but they also need to be respected, so I thank you for being here today. It maybe took a little arm-twisting, but you're here. I thank you for that.

I want to focus because I want to make sure we're on the same page. Even though some individuals may wish for your organization to be investigated by the RCMP or whichever agency—the Canada Revenue Agency—and they may openly call for that, you do understand that no individual, whether a member of Parliament or not, has that power to dictate to an agency to undertake that. Are we clear on that?

● (1505)

**Mr. Craig Kielburger:** Mr. Sorbara, allow me to take one second.

**Mr. Francesco Sorbara:** I just would like you to answer yes or no, please, because my time is limited. Are we clear on that?

**Mr. Craig Kielburger:** You made a very serious and strong statement, sir. I just want to make it very clear that we willingly agreed to come when the request came from this committee. We were scheduled months ago to be here. It was a week prior when Mr. Angus sent, on member of Parliament letterhead.... Are we clear that this is a serious issue? When an elected official, a member of Parliament, openly calls...puts it out on Twitter and shares it with the press, that's a very serious matter. As for what the RCMP will do with that, we trust they will take it seriously, sir. Beyond that, it's up to the RCMP.

**Mr. Francesco Sorbara:** I need to make it clear that while we all understand that it is not a member of Parliament's duty to tell—we do not live in a society like that—the RCMP or the Canada Revenue Agency to investigate an entity or an individual. I want to make sure that that's on record. Unlike, say, for example, when the prior government was in power and how they used the hammer of the CRA, if I can use that word, to look at charities, we do not do that and we would not do that, whether it's questioning political activity, audits and so forth.

I need to make sure that you folks understand. You folks are here, having parliamentary privilege, which we all enjoy on this committee. It gives us the ability to say what we think, what we want to say, without any prejudice. I thank you for being here, but please understand that you being here, despite what other members of Parliament say, does not prejudice you to any organization. Is that clear?

**Mr. Craig Kielburger:** Sir, I appreciate the words. What I would say is that the former assistant deputy minister perhaps has an alternative view on that matter, but I appreciate that.

**Mr. Francesco Sorbara:** I'll ask it in this way. Do you think it is appropriate for politicians to try to direct the police or the CRA to target individuals or organizations?

**Mr. Craig Kielburger:** Absolutely not.

**Mr. Francesco Sorbara:** Okay, thank you.

I will follow up with a question, changing tangents.

You have provided documents, annotations, agreements and information on WE Charity's operations, finances and programs, as well as responded to presumably hundreds of media questions. Is there anything additional on the Canada student service grant that isn't in the public sphere that you would like to share at this time?

**Mr. Craig Kielburger:** We're here to answer the questions the committee may have, sir.

**Mr. Francesco Sorbara:** I am trying to stay within the sphere of the motion that we adopted on November 16 towards this study. I am not here as the member of Parliament from my riding to talk about the testimony of Mr. Reed Cowan, to talk about anything referenced in the Bloomberg articles. You folks will need to read those, and you probably already have. You folks will need to take responsibility for what has been written, whether rightly or wrongly, in those and respond to those articles. I, as a member of Parliament, am here to look at our government's programs.

Have WE and you, Marc and Craig, had contracts with the federal government in the past prior to the CSSG?

**Mr. Craig Kielburger:** Yes.

**Mr. Francesco Sorbara:** How have those contracts been undertaken, and have they been fulfilled?

**Mr. Craig Kielburger:** They were undertaken as one would suspect. They were done in appropriate manners. They were fulfilled per requests, and the civil service would be the group to direct it to, but based on the good work of the organization, that's why I suspect the civil service approached the organization to ask for its help with the CSSG.

● (1510)

**The Chair:** Thank you. Your time is up.

We'll now turn to Monsieur Fortin for your first round of questions.

[Translation]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

My question is for either Craig or Marc Kielburger.

I believe it was Marc Kielburger who said, back in July, that the WE Charity Foundation—the foundation, not the charity—signed the contract with the federal government to limit liability on the recommendation of the charity's lawyers.

Did government officials inquire about that? Did they ask any questions about the entity known as the WE foundation?

[*English*]

**Mr. Marc Kielburger:** Mr. Fortin, that request was made because at the last minute during the contract negotiations we were requested to take full liability for 40,000 young people as part of the program, during a pandemic. The Government of Canada asked us to take full liability for that program.

We expressed our concern, which was a last-minute negotiation piece that had not been brought up previously, and as a result we worked with our board of directors and our counsel to suggest that WE Charity Foundation—which is a foundation, to be really clear—take on the project. We explained that clearly to ESDC, the government agency, and they accepted.

[*Translation*]

**Mr. Rhéal Fortin:** To your knowledge, did the federal government make any inquiries into the WE foundation's financial situation?

[*English*]

**Mr. Marc Kielburger:** You'd have to ask that question, sir, to ESDC. We were very clear with ESDC why we felt it was necessary to put the contract in that foundation body because of the request to take on the liability for 40,000 young people during the pandemic, and it was a last-moment request during the contract negotiations.

[*Translation*]

**Mr. Rhéal Fortin:** Is it fair to say that the WE foundation had no financial history when it signed the contract with the federal government?

[*English*]

**Mr. Marc Kielburger:** The contract was with the WE Charity Foundation specifically because of liability, but it was going to be WE Charity that was going to implement the program and of course had very significant—

[*Translation*]

**Mr. Rhéal Fortin:** Sorry, Mr. Kielburger. I don't mean to cut you off, but I have a limited amount of time.

I asked whether it was fair to say that the WE foundation had no financial history when it signed the contract with the federal government.

[*English*]

**Mr. Marc Kielburger:** Sir, that's correct, but the reason—again—we signed the contract with that entity is because of the request from ESDC to take on liability, but—

[*Translation*]

**Mr. Rhéal Fortin:** I see. Thank you. You explained that, and I understood.

Did the WE foundation go on to have contracts or dealings with any organization other than the federal government for the purposes of the Canada student service grant program?

[*English*]

**Mr. Marc Kielburger:** Yes, we ensured that there was proper insurance that would be part of the program, of course, as we shared

in our FINA testimony, and I believe you were part of that FINA conversation that we had back in July. In addition, of course, we were also working in partnership, before the politics ended this amazing initiative, with about 80 non-profits.

[*Translation*]

**Mr. Rhéal Fortin:** All right.

What is the WE foundation's financial situation today?

[*English*]

**Mr. Marc Kielburger:** Are you inquiring about WE Charity or the WE Charity Foundation?

[*Translation*]

**Mr. Rhéal Fortin:** I'm talking about the WE foundation.

[*English*]

**Mr. Marc Kielburger:** Sir, there seems to be a problem with the translation. Are you requesting this regarding the WE Charity or the WE Charity Foundation?

[*Translation*]

**Mr. Rhéal Fortin:** Mr. Chair, I can't be any clearer. I am talking about the WE foundation. Is there an issue with the interpretation?

[*English*]

**Mr. Craig Kielburger:** My apologies. We can hear you clearly now. Thank you.

The WE Charity Foundation returned in total all the funds transferred to it from the federal government, and WE Charity absorbed the $5-million loss—

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Kielburger, but that wasn't my question.

Is the WE foundation still operating today? Where do things stand with the foundation?

[*English*]

**Mr. Craig Kielburger:** It is in the process of closing down in Canada, but it is still legally operational until it's closed.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you.

I gather, then, that no member of the federal public service did any due diligence on the WE foundation's financial situation before the contract was signed, to your knowledge.

● (1515)

[*English*]

**Mr. Marc Kielburger:** Again, I understand your question. Please feel free to ask ESDC that question. We were very transparent with them.

[*Translation*]

**Mr. Rhéal Fortin:** All right, but in your opinion, to your knowledge, were any inquiries made? Did they ask you any questions about it?

[*English*]

**Mr. Marc Kielburger:** To my knowledge [*Technical difficulty—Editor*].

**Mr. Rhéal Fortin:** To your knowledge, "no"...?

[*Translation*]

Is that correct?

[*English*]

**Mr. Craig Kielburger:** All that we know is we answered every question asked of us by ESDC, and it depends on your definition, because we don't know what they did on their own, separately, what research or background researching was done.

[*Translation*]

**Mr. Rhéal Fortin:** Did they ask you any questions about the WE foundation's financial situation?

Did anyone in the federal government, either an official or an employee, ask you how much the WE foundation had in funding and what its financial history was?

[*English*]

**Mr. Marc Kielburger:** We created proper insurance and we were very clear with that, for ESDC. It was in the tens of millions of dollars.

**The Chair:** Thank you, Mr. Fortin. Your time is up.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

I have a point of order.

It is customary in committees to give members a bit more time when they ask English-speaking witnesses questions in French because the interpretation causes significant delays—through no fault of the interpreters, who do an excellent job.

I just wanted to bring that to your attention and see whether you might be a bit more flexible with time given the interpretation delays when members ask questions in French.

Thank you, Mr. Chair.

[*English*]

**The Chair:** Thank you.

Witnesses, interpretation has asked that you not place your water glasses near the mike. It's causing some additional noise for them.

We're going to turn to Mr. Angus for his first round of questions.

**Mr. Charlie Angus:** Thank you, Chair.

Thank you, gentlemen, for coming to our hearing so we can finally get this report to Parliament.

We learned today that you are not under investigation by the RCMP and the CRA. Is that correct?

**Mr. Craig Kielburger:** Sir, we don't know the answer to that question. We know that a week ago you put on letterhead and made your call public.

**Mr. Charlie Angus:** Okay, so you don't know if you are under investigation.

**Mr. Craig Kielburger:** Sir, the RCMP has not contacted us on the matter you wrote about.

**Mr. Charlie Angus:** Okay. Are you being investigated by the IRS?

**Mr. Craig Kielburger:** No one from the IRS has contacted us, sir.

**Mr. Charlie Angus:** Okay, what about the lobbying commissioner?

**Mr. Craig Kielburger:** We provided all the information when we did our retroactive filing and completed all the paperwork from the lobbying commissioner. In an abundance of caution, we chose to fulfill that.

**Mr. Charlie Angus:** Thank you so much for that. Because of what we are reading in the media about what we couldn't and could ask, I am glad you could clarify that.

You came to our committee last July. You insisted on coming, on swearing under oath. We were not investigating WE Charity at all. You insisted on coming at a time when one of my Conservative colleagues had already written to the RCMP asking for an investigation, so that's that.

What's different between then and now is we didn't have access to the 5,000 pages of documents. Back then we could believe you or not believe you. We had to trust because we didn't have documents.

A number of things in there are serious inconsistencies. You said a number of times Canada called you, that you were responding to Canada's call. We now know that's not true.

Craig, you called Canada. You called Bill Morneau. You said, "Hi Bill, I hope this finds you, Nancy, Henry, Clare, Edward, and Grace enjoying some well-deserved downtime over Easter together." You were pitching for $12 million. You contacted Minister Ng, Minister Chagger. You had that meeting with her on April 17.

I ask because you were not registered to lobby and you say that out of an abundance of caution your group registered after it became a big issue. Don't you think you would have saved yourselves a lot of grief if you had just followed the rules like other charities do?

**Mr. Craig Kielburger:** Sir, in your statement there are a multitude of falsehoods. We did not push to come back in the summer. We were asked, and we came voluntarily.

**Mr. Charlie Angus:** No, you asked—

**Mr. Craig Kielburger:** I do not...volunteer. No, that's the fact.

**Mr. Charlie Angus:** That's not the fact.

Anyway, the question is about lobbying, so let's get to lobbying.

**Mr. Craig Kielburger:** As a volunteer for the charity, and as you are aware, volunteers are not required to register for lobbying, and most importantly is the false characterization of what took place. On April 19 I was contacted—

**Mr. Charlie Angus:** No, sorry, on April 17 you met but I'm asking about lobbying. The fact that you're a volunteer—come on, Craig. We're not dummies here. You guys run this organization. You're a volunteer who has a chief of staff who is paid for by the charity. That's ridiculous.

The fact is you have a director of government relations who wasn't registered to lobby. You were hiring a manager of government relations. I guess that person wasn't going to be registered to lobby, and you handled all the negotiations.

The idea that you are just this gung-ho volunteer with your own chief of staff paid for by the charity with all the meetings in advance—why didn't you just register to lobby, and we wouldn't be wasting our time with this?

● (1520)

**Mr. Craig Kielburger:** Sir, it is literally not possible for a volunteer to register to lobby. If you would like to change the law, I invite you to do so.

**Mr. Charlie Angus:** I guess that's why you got Guy Giorno. I was trying to figure out why you guys got Guy Giorno, of all things, and I looked up his web page and he deals with corruption and he deals with lobbying.

So, Craig, you are the voice of the charity. You and your brother run everything. You fired the head of the board of directors of the charity. Now you're telling me it's impossible for you to even legally register to lobby.

Come on, guys. If you had only registered, you would not have been in this issue.

**Mr. Craig Kielburger:** It is not possible for a volunteer to lobby. I invite you to change the law should you as a member of Parliament choose.

As to the number of false statements, we did not fire the board of directors, to be very clear. These are the types of false statements that we've identified.

**Mr. Charlie Angus:** We had Michelle Douglas as a witness, and she said that Marc got mad at her and hung up because she asked about the finances.

Volunteers don't get to do that, Craig. Nobody is buying this.

**Mrs. Brenda Shanahan:** Chair, I have a point of order.

**The Chair:** I recognize the point of order, Ms. Shanahan.

**Mrs. Brenda Shanahan:** I appreciate the spirited exchange here, but is it not the usual practice that the witness addresses us through you, Chair, and the same for the members? I don't know, I'm not comfortable with the first-name basis and that kind of exchange.

**The Chair:** That is a helpful practice. I would encourage members to undertake to direct their questions and their answers to the chair.

**Mr. Charlie Angus:** Okay, so I'll just simply ask: Don't you think you would have saved yourselves a lot of trouble if you had simply registered to lobby with your director of government relations, with the manager of government relations and with you, Craig, handling all the negotiations with your chief of staff paid for

by WE Charity? Don't you think, through the Chair, that it would have been just a lot better to register to lobby?

**Mr. Marc Kielburger:** Mr. Chair, we've shared with Mr. Angus that WE would have been open to registering to lobby at any point, but volunteers cannot register to lobby.

Mr. Chair, the challenge we have here is that Mr. Angus has said many false statements during his remarks. For the context of the committee, to help Mr. Angus with his false statements, we've posted 101 false statements that Mr. Angus has shared on our website, and we invite you—

**Mr. Charlie Angus:** Sorry, Chair. I know they get very upset when anyone else uses Twitter, but the fact that they made all their claims on their website is irrelevant to the question, which is about the Lobbying Act and the fact that they've set this organization up, that it was Bill Morneau who Craig Kielburger contacted and that it was Bill Morneau's daughter they hired. They promoted the other daughter with her book on their stage. They paid $41,000 to fly them around the world.

These were personal connections, so when they needed money, he does not deal with the Finance Department, he goes directly to the finance minister of a G7 country and calls him by his first name. That is lobbying. It's lobbying. They might think they're besties, but it's lobbying, and I want [*Technical difficulty—Editor*] that they're just these volunteers of an organization, that they make all the decisions and that they handle.... In fact, the director of lobbying for WE said that she wasn't even involved in the negotiations with Bill Morneau; it was Craig Kielburger.

So come on, Craig, why didn't you register to lobby, because you are the main lobbyist for the group?

**Mr. Craig Kielburger:** Mr. Angus, I won't even seek to correct the number of inaccurate statements you've made there.

I will simply point out again that it is literally not legally possible for me as a volunteer to register.

**Mr. Charlie Angus:** Because you've set yourself up through ME to WE—

**Mr. Craig Kielburger:** [*Inaudible—Editor*]

**Mr. Charlie Angus:** The charity pays your chief of staff but because you're on the ME to WE side, you're saying that means you're not legally able to lobby.

I don't know where you guys come up with these laws. They're fascinating, but maybe Guy Giorno knows all the loopholes. Maybe that's why you've got him on retainer. Maybe he'll help you, but come on, it doesn't pass the smell test.

**The Vice-Chair (Mrs. Brenda Shanahan):** I'm sorry to interrupt, Mr. Angus. Apparently we have lost the chair.

I just want to check with the clerk as to what time we are operating at. If the clerk can text me, then I will be on the same page. As members know, as the vice-chair, I must take on this role.

Clerk?

● (1525)

**Mr. Craig Kielburger:** Allow me to offer, sir, because we can't register ourselves, we have proactively put on—

**The Vice-Chair (Mrs. Brenda Shanahan):** I'm sorry, your time is up, Mr. Kielburger.

**Mr. Charlie Angus:** Thank you.

**The Vice-Chair (Mrs. Brenda Shanahan):** Now it's Mr. Poilievre for five minutes.

**Hon. Pierre Poilievre (Carleton, CPC):** Have either of you been contacted by the RCMP?

**Mr. Craig Kielburger:** Again, as we said, we do understand Mr. Angus' letter, and we anticipate—

**Hon. Pierre Poilievre:** No. I want my question. Have either of you been contacted by the RCMP?

**Mr. Craig Kielburger:** We've previously spoken on this matter. You can keep asking as often as you like.

**Hon. Pierre Poilievre:** Have either of you been contacted by the RCMP?

**Mr. Craig Kielburger:** We've previously spoken on this question.

**Hon. Pierre Poilievre:** No, you haven't. You said you hadn't been contacted about Mr. Angus' letter. Have you been contacted by the RCMP for any other purpose? Yes or no?

**Mr. Craig Kielburger:** Neither of us...have not been contacted by the RCMP.

**Hon. Pierre Poilievre:** Period?

**Mr. Craig Kielburger:** We have not been contacted by the RCMP. We understand Mr. Angus has put a letter in the public domain.

**Hon. Pierre Poilievre:** Have you been contacted by the Office of the Ethics Commissioner?

**Mr. Craig Kielburger:** Yes.

**Hon. Pierre Poilievre:** Has he or have any of his staff questioned you?

**Mr. Craig Kielburger:** I have no problem answering this question, but by statute of the government apparently we're not allowed to answer your question.

**Hon. Pierre Poilievre:** Which section is that?

**Mr. Craig Kielburger:** Again, this is a former assistant deputy minister of justice.

**Hon. Pierre Poilievre:** Then he should know.

I'm not asking him to speak. Sorry.

**The Vice-Chair (Mrs. Brenda Shanahan):** Yes, I'm sorry—

**Mr. Craig Kielburger:** I am not aware of which statute you're asking for specifically, but I trust that the comments of an assistant deputy minister of justice would be accurate.

**Hon. Pierre Poilievre:** All right. We'll just assume you're hiding that.

The next question is this. Have you been contacted by any member of the lobbying commissioner's office?

**Mr. Marc Kielburger:** Mr. Poilievre, you're not even officially a member of this committee and you're answering your own questions, so feel free to answer your own questions.

**Hon. Pierre Poilievre:** The question was can you tell me if anyone in the lobbying commissioner's office has been in contact with you, yes or no?

**Mr. Craig Kielburger:** We have proactively reached out to the lobbying commissioner to provide disclosures and information and, of course, as part of that there's always an exchange back and forth.

**Hon. Pierre Poilievre:** Have they questioned you?

**Mr. Craig Kielburger:** We have not been questioned.

**Hon. Pierre Poilievre:** Are you under investigation by the lobbying commissioner?

**Mr. Craig Kielburger:** We are not to our knowledge.

**Hon. Pierre Poilievre:** Have you been contacted by the Commissioner of Canada Elections for any reason?

**Mr. Craig Kielburger:** We have not, that we're aware of.

**Hon. Pierre Poilievre:** What is the total dollar value of all of the fees and expenses, both cash and in kind, that you or any of your organizations have paid to members of the Trudeau family?

**Mr. Craig Kielburger:** Margaret Trudeau received $180,000 for a total of 28 events. Alexandre Trudeau received $36,000 for a total of eight events. Sophie Trudeau was paid $1,500 for an event prior to her husband becoming the Prime Minister. All of that was previously provided to the standing committee, sir.

**Hon. Pierre Poilievre:** What is the total dollar value of all the fees and expenses you've paid to the Trudeau family?

**Mr. Craig Kielburger:** The total is $217,500.

**Hon. Pierre Poilievre:** By Trudeau family, I mean his brother, his mother, his spouse and himself.

**Mr. Craig Kielburger:** Those are the fees. If you're asking about expenses, I'd need a calculator for a minute.

**Hon. Pierre Poilievre:** You can come back to it. You're going to get this number on the record and you're going to testify it into the record under oath because I want the total. I want nothing left out. I want you to tell us what the total value is that you have paid to Mr. Trudeau, his wife, his brother and his mother, the total of everything.

**Mr. Craig Kielburger:** We previously gave this to you nine months ago. It's also on our website.

**Hon. Pierre Poilievre:** I'm asking you to put it into the record. Get to it—

**Mr. Craig Kielburger:** Yes.

**Hon. Pierre Poilievre:** —or you're going to be brought back to do it.

**The Vice-Chair (Mrs. Brenda Shanahan):** Thank you very much, everyone.

Your time's up, Mr. Poilievre and—

**Hon. Pierre Poilievre:** On a point of order, Madam Vice-Chair, you're quite wrong. Because you were in the chair, we decided to run the timer. I still have a minute and 25 seconds left. Nice try, but I'll keep going.

**The Vice-Chair (Mrs. Brenda Shanahan):** No, Mr. Poilievre. I am being directed by the clerk.

**Hon. Pierre Poilievre:** Nice try. I have the clock right here.

**The Vice-Chair (Mrs. Brenda Shanahan):** It is now time for Ms. Lattanzio.

Please mute, Mr. Poilievre.

**Hon. Pierre Poilievre:** The clerk has just confirmed to me that I do have more than a minute left. She's just said it herself.

**The Vice-Chair (Mrs. Brenda Shanahan):** All right then; I stand corrected. Thank you very much.

**Hon. Pierre Poilievre:** It's very strange—

● (1530)

**The Vice-Chair (Mrs. Brenda Shanahan):** I'm sorry. I'm taking the direction from the clerk as far as the time goes. Thank you for your understanding. Please go ahead, Mr. Poilievre. You have one more minute.

**Hon. Pierre Poilievre:** What is the total dollar value that you've paid Mr. Trudeau, his wife, his brother and his mother?

**Mr. Craig Kielburger:** That I can give you. That's what I said, $217,500.

**Hon. Pierre Poilievre:** I want the dollar value including expenses.

**Mr. Craig Kielburger:** We paid those expenses directly, of course.

**Hon. Pierre Poilievre:** Right, you did that for them.

**Mr. Craig Kielburger:** We paid the hotel bill when they stayed or the—

**Hon. Pierre Poilievre:** That's right.

**Mr. Craig Kielburger:** Expenses would have been over, roughly—

**Hon. Pierre Poilievre:** It's so much money, you can't even keep track of it all.

**Mr. Craig Kielburger:** There were 42 events. It was a total of $209,620.16 for the expenses for the individuals, which works out to roughly—

[Translation]

**The Vice-Chair (Mrs. Brenda Shanahan):** I think the chair is back now.

Mr. Chair, there is a point of order. Also, the member's time is up.

[English]

**Hon. Pierre Poilievre:** Actually, it's not.

A point of order, Mr. Chair.

**The Chair:** Yes. I recognize the point of order, Mr. Poilievre.

**Hon. Pierre Poilievre:** On two separate occasions the Liberal vice-chair has tried to interrupt my testimony by falsely claiming that I was out of time even though I kept time and can show definitively that my time has not expired. I'd ask that I be granted the opportunity to get an answer to a very simple and straightforward question that the Kielburger brothers seem to have a lot of difficulty answering, which is this. What is the total value of all the cash and in-kind benefits that have been paid for fees or expenses to the Trudeau family, including Mr. Trudeau, his wife, his mother and his brother? It is a simple question. I've been trying to get an answer for two minutes, but have been regularly interrupted by the vice-chair.

**The Chair:** We'll allow for an answer. Then your time will be up, Mr. Poilievre, and we'll move on to the next questioner.

We'll give some time for the answer.

**Mr. Craig Kielburger:** Again, we never, of course, paid any expenses or honorariums to Mr. Trudeau, but to Margaret Trudeau, Alexandre Trudeau and Sophie Trudeau over the past, whatever, 10-plus years of various speaking events—

**Hon. Pierre Poilievre:** Just the total, please. Get to it.

**Mr. Craig Kielburger:** Yes. Under the quickest math that I can here, adding it together, it's roughly $216,000 in honorariums and roughly $209,000 in expenses, which of course was not paid to them. We just pay it directly—the hotel or a flight. If you add that together it's a little over $400,000. That would have been all the expenses over the past decade for 42 different events where they attended and spoke on the stage.

**The Chair:** Thank you, Mr. Poilievre.

We're going to turn to Ms. Lattanzio.

**Ms. Patricia Lattanzio (Saint-Léonard—Saint-Michel, Lib.):** Thank you, Mr. Chairman.

Thank you, gentlemen, for being here today. I'm glad you were willing to come and testify before us today.

I'm also a member of the language committee, another standing committee. We had also discussed the program. We spoke a lot about the CSSG program there, too. The question there was on providing the program in both official languages, so I'd like to hear you today on the subject of hiring a firm, NATIONAL PR, to promote the program in Quebec and other francophone communities. Why did you bring on a firm to help deliver the program in French?

[Translation]

**Mr. Craig Kielburger:** The organization is fully bilingual. The speaking tours, the website and the programs are all bilingual. We have an office in Montreal to help students and engage schools in the province, but because the program was so large in scale and grew so quickly, we had to hire many groups to help us all over the country, even in Quebec.

[*English*]

We'll give you a little more information about our programs.

**Mr. Marc Kielburger:** Prior to this political situation, we had about 400 schools active in Quebec with us.

Prior to the CSSG, we had about 12 full-time staff in our Montreal office and about 16 when the program was launched; but we were asked to turn ourselves into a pretzel to help the government run this program as quickly as possible and, sincerely, we needed all the help we could get.

**Ms. Patricia Lattanzio:** There was talk that the office you had in Montreal was actually closed. Is that correct? Is that a [*Technical difficulty—Editor*]?

● (1535)

**Mr. Marc Kielburger:** [*Technical difficulty—Editor*] before the pandemic, and 16, of course, when the program began. The only thing that closed it was the politics.

**Ms. Patricia Lattanzio:** Does the WE Charity frequently outsource work to other organizations for French initiatives?

**Mr. Marc Kielburger:** We worked with NATIONAL PR for years with our WE Days in Montreal—l'Organisme UNIS. We have had WE Days for many years, and NATIONAL PR was involved with those WE Days.

**Mr. Craig Kielburger:** To answer your question, we also engaged with English-language equivalent firms in other parts of Canada. It wasn't unusual for us.

**Ms. Patricia Lattanzio:** What would be the costs and fees associated with outsourcing translation or having bilingual staff or resources to have this program in either English or French, but more particularly in French in Quebec?

**Mr. Marc Kielburger:** It was in the hundreds of thousands of dollars. We're happy to look into that.

**Ms. Patricia Lattanzio:** Would you be able to provide us with that information?

**Mr. Marc Kielburger:** Absolutely. We're happy to provide an overview.

**Ms. Patricia Lattanzio:** Okay.

[*Technical difficulty—Editor*] ask you about WE's ability to deliver the program in both official languages on the onset, were you asked that specific question?

**Mr. Marc Kielburger:** We were.

**Ms. Patricia Lattanzio:** Can you tell us if any concerns were raised with respect to the ability to do so?

**Mr. Marc Kielburger:** No concerns were raised.

**Ms. Patricia Lattanzio:** Okay. So you had already executed this type of work in the past.

**Mr. Marc Kielburger:** That's correct.

**Ms. Patricia Lattanzio:** Can you give us some examples?

**Mr. Craig Kielburger:** Sure. For context, we did 12 WE Days, which are celebrations that bring youth together from all across the province for service and volunteer programs. We helped engage 400 schools in the province of Quebec and had partnerships with school districts and post-secondary non-profit partners across the province. We've had a full-time presence in the province for a decade, engaging students. We delivered on government programs previously in Quebec that had received supports. For example, we were running a program for youth social entrepreneurship that ESDC had previously funded. We put that out for Quebec students to join.

Before all this, we were proud to have been the largest youth service organization in the country and fully bilingual, engaging young people from coast to coast to coast.

**Ms. Patricia Lattanzio:** Were there any documents or contractual obligations between you and the government with regard to providing this service in French in Quebec? If so, would you be able to provide us a copy of the said contract?

**Mr. Craig Kielburger:** Yes, absolutely. We would be happy to provide that to you. In fact, we previously did, to the FINA committee, but we're happy to provide it again.

**Ms. Patricia Lattanzio:** We did not receive it, so for the record, I ask that you to provide it to this committee.

Can you tell us what the state of the WE Charity's operations is in Canada today? I'm not too sure if my colleague Monsieur Fortin asked you that question, but for the record, I would like to hear you on WE Charity's operation in Canada and Quebec today.

**Mr. Craig Kielburger:** To answer your question, it is a tragedy what is happening. In September, we made the hardest choice we've ever had to make. We announced the wind down of 25 years of work in this country. The people who lost their jobs had been with us since the beginning just trying to help youth, and 7,000 schools in Canada are going to be impacted as a result of this. We are doing our best to try to move resources online in perpetuity, but the impact is devastating for youth in Quebec and across Canada.

**Mr. Marc Kielburger:** There are so many schools. We used to work in 7,000 schools across the country, and we will not be able to do that. We were providing amazing things like mental health resources. These are schools in Leeds—Grenville—Thousand Islands, for example. We will not be able to work with Thousand Islands Secondary School anymore, nor with Brockville Collegiate Institute; Westminster Public School; Wellington Elementary School, in Prescott; schools in James Bay; Kirkland Lake District Composite School; and the Northern Collegiate Institute & Vocational School. They were very active in promoting the CSSG to their students. Moose Factory—

**The Chair:** Thank you, Mr. Kielburger. The time for those questions is now up.

We will turn to Monsieur Fortin for the next round of questions.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

Mr. Kielburger, you were just listing off schools where you were no longer able to work.

Quickly, can you tell us why you are no longer able to work in those schools?

[*English*]

**Mr. Craig Kielburger:** It is because WE Charity in Canada is closing, sir, because of the politics.

[*Translation*]

**Mr. Rhéal Fortin:** I see. Thank you.

My question is for either Craig or Marc Kielburger. To your knowledge, did the federal government do its due diligence on the WE group before signing the contract last spring?

● (1540)

[*English*]

**Mr. Craig Kielburger:** The Clerk of the Privy Council would be best able to speak to that and he said, yes, they did. We trust him and wouldn't have.... All we know is that we answered every question asked of us.

[*Translation*]

**Mr. Rhéal Fortin:** Who asked you the questions that you answered?

[*English*]

**Mr. Craig Kielburger:** Of course, multiple individuals at ESDC asked questions during the vetting process.

[*Translation*]

**Mr. Rhéal Fortin:** What did they ask you about?

[*English*]

**Mr. Craig Kielburger:** It's important to provide context to this. In 2017, Rachel Wernick, from ESDC, came to visit our offices. In 2018, they gave us an $800,000 grant to test—

[*Translation*]

**Mr. Rhéal Fortin:** I know that, Mr. Kielburger. Thank you.

In the spring of 2020, when you were awarded the $43-million contract to administer the student grants, were you asked any questions about the WE group's financial situation?

[*English*]

**Mr. Craig Kielburger:** I would be happy to answer your question, but I think it's important, to your previous question, to understand that this didn't come out of the blue. In 2017—

[*Translation*]

**Mr. Rhéal Fortin:** I'm talking about 2020 only.

[*English*]

**Mr. Craig Kielburger:** They asked us questions—

[*Translation*]

**Mr. Rhéal Fortin:** I have a minute left, Mr. Kielburger. I wish I had all day to talk to you, but I don't.

I am asking you about 2020.

[*English*]

**Mr. Craig Kielburger:** I understand. My apologies. We gave the financial documents, including our audits, and the various documents you'd imagine WE Charity would offer to provide.

[*Translation*]

**Mr. Rhéal Fortin:** What financial documents relating to WE Charity did you provide the government, at its request?

[*English*]

**Mr. Marc Kielburger:** All of our documents[*Technical difficulty—Editor*].

[*Translation*]

**Mr. Rhéal Fortin:** In May 2020, the minister told us that an additional due diligence process would be carried out.

Were you aware that WE Charity was apparently scrutinized twice?

[*English*]

**Mr. Craig Kielburger:** We were not aware of that, but would defer to the civil service if that's what they did.

[*Translation*]

**Mr. Rhéal Fortin:** As far as your ability to deliver the program in Quebec was concerned, I understand you hired the public relations firm NATIONAL to handle that.

In the past, had WE Charity delivered similar programs in French in Quebec?

[*English*]

**Mr. Craig Kielburger:** Yes.

[*Translation*]

**Mr. Rhéal Fortin:** What programs?

[*English*]

**Mr. Craig Kielburger:** For example, the previous member asked us this, and I repeat the same example. We ran one of the largest service programs in the province, engaging 400 schools—

[*Translation*]

**Mr. Rhéal Fortin:** Was that in French?

**Mr. Craig Kielburger:** Yes, it was fully bilingual.

The office [*Technical difficulty—Editor*]—

[*English*]

**The Chair:** Please continue.

[*Translation*]

**Mr. Craig Kielburger:** —WE Day events were held entirely in French. The purpose was to celebrate all the students who had volunteered in their communities for a year.

Our team did [*Inaudible—Editor*] tours in schools in Quebec and created resources for educators. Events for youth were conducted in French all over the province.

**Mr. Rhéal Fortin:** Why, then, did you hire the PR firm NATIONAL?

[*English*]

**The Chair:** Pardon me, Mr. Fortin, we've given you some extended grace in terms of time frame.

We're going to move to Mr. Angus.

**Mr. Charlie Angus:** Thank you, Chair.

One of the things that's been difficult for everyone is trying to get a sense of how you operate. Because of the multitude of companies, the multitude of side holdings, and the vast real estate empire, it has certainly drawn a lot of attention through numbered companies and your personal holdings. We're not really sure.

I was really interested, because the other day I saw an article in the National Post. It said that one of the reasons you do this is "a deliberate strategy to operate efficiently and avoid office leasing and rental costs", and that's the reason to have such a vast real estate empire.

When you signed the deal with the federal government, in the budget that you brought forward, you wrote in $590,000 in rent. Over the course of the 100 days for that period of the cohort in the budget, that would have been about $200,000 a month in rent. That's pretty extraordinary.

Why should we be paying rent to your organization, when you say you have control of the buildings?

**Mr. Craig Kielburger:** To be clear, it wasn't necessarily for our organization. To remind the member, at that point, back a year ago, no one knew whether we needed special filtration systems and plexiglass to separate people. We were putting a potential line item. If I could also share, there were 13 different references to audit in that document, and those were the only ones used to deliver to [*Inaudible—Editor*].

● (1545)

**Mr. Charlie Angus:** The idea of $200,000 a month in rent is extraordinary. The reason I ask is, again, when you guys came here last July, you insisted on testifying under oath, and you made it very clear that no money was going to your organization. It was all going to programming. You made a big deal that there were no administration fees.

My Liberal colleagues were geared up to ask you that a couple of times, and you said there were no administration fees. I look into the budget, and I see $590,000 for rent for you guys. It's not for other charities, because the other charitable programming is separate. On top of that, it says 15% administration fee for WE Charity.

Why didn't you guys just say, yes, of course, there's an administration fee, which is reasonable? Instead, you swore under oath that you were not taking any administration fees, so we're paying you nearly $600,000 for three months for rent. We're paying for the phones plus the administration fee.

Why didn't you tell us there was an administration fee?

**Mr. Craig Kielburger:** With respect, you're misrepresenting us. We said there was no profit that was going to be kept—

**Mr. Charlie Angus:** No, no, you actually said administration fee. I've got it in the records. You used the words "administration fee", and it struck me as odd at the time. That's why, when we finally got a copy of the budget, I checked, and there is a 15% administration fee. That's separate from all the other things.

Wouldn't it be easier just to say these things, then we wouldn't be asking, and feel so mistrustful of you?

**Mr. Craig Kielburger:** We don't hide the fact that to run a program it costs administration. Of course it does.

**Mr. Charlie Angus:** I know, but why did you tell the committee that you weren't taking any administration fees? Why didn't you tell us you were getting $200,000 a month rent on your buildings in Toronto?

That's a whack of public money paying your ME to WE operation.

**Mr. Craig Kielburger:** Your statement is not correct.

What we said was that every program has administration, because it requires administration to deliver it. That administration was solely to deliver the program. It's a reasonable—

**Mr. Charlie Angus:** That's not what you said.

Our friend, Mr. Fraser, from Nova Scotia asked whether you were telling him there were no administration fees, and you said it was all going to programming.

However, when we look at the budget....I'm not trying to be a hard guy here, but if I got straight answers last July, we wouldn't be here now. It was a simple question.

Programming is separate. It's a line item. The rent is a line item. The telephones are a line item, and your 15% administration fees, about which you could have just said, yes, it's 15%, but you said, no, it was all going to programming.

I don't know why this misrepresentation always happens. You wouldn't be so under fire now if you had said, yes, 15% administration fees, but under oath you said there were none.

**Mr. Marc Kielburger:** Mr. Angus, with respect, I don't feel you know how to read the budget properly. It's an administration fee for the program. We said all the money was going to the program, and as a result, we were not going to make a profit, because we were asked by the Government of Canada, in record time, to help—

**Mr. Charlie Angus:** Perhaps I can't read a budget, but I can read that we're spending $600,000 on rent on your downtown Toronto properties.

**The Chair:** Thank you, Mr. Angus.

We're going to turn to Mr. Gourde for his round of questions.

[*Translation*]

**Mr. Jacques Gourde (Lévis—Lotbinière, CPC):** Thank you, Mr. Chair.

Mr. Kielburger, the Government of Canada contacted you to administer the Canada student service grant program for 40,000 students. Is that true or false?

[*English*]

**Mr. Craig Kielburger:** Was the question, did the federal government contact us to deliver the program? Yes, it contacted us.

[*Translation*]

**Mr. Jacques Gourde:** The government contacted you to administer the program to help 40,000 students. Is that correct?

[*English*]

**Mr. Craig Kielburger:** Originally, the government asked us to deliver it to 20,000 students. We told the government it would cost $50 million. Over time, it increased the number, so exponentially, it grew to $543 million and 100,000 students, but it contacted us originally for 20,000.

Does that answer your question?

[*Translation*]

**Mr. Jacques Gourde:** Initially, it was 20,000 students, and it grew to 40,000. Did the government reveal the total amount to be distributed?

We were told the program was valued at $957 million. Can you confirm the amount published by the Government of Canada for the Canada student service grant program was $957 million?

[*English*]

**Mr. Marc Kielburger:** The program kept on changing at the request of ESDC, and it kept on getting bigger and bigger at the request of the government. This was not being requested by us, it was being requested by ESDC.

Secondly, regarding this whole initiative in terms of this $912 million that keeps on being shared, especially by Mr. Angus incorrectly, we never heard of this figure until it was shared in a public forum.

We looked at ourselves, and were dumbfounded, because it was only up to $543 million. I say only, because it's still very significantly important to recognize that if all 100,000 youth did the maximum hours of service, it would have equated to the maximum threshold. The real value of this program, still a very significant sum, would have been a couple of hundred million dollars.

● (1550)

[*Translation*]

**Mr. Jacques Gourde:** It was $543 million, then. That's about $11,000 per student for 40,000 students. If memory serves

me correctly, the government said the grants ranged from $1,000 to $5,000 per student. If we assume all 40,000 students received the maximum $5,000, the program would have cost $200 million. You're saying the value of the program was $543 million, so where did the difference of $343 million go?

[*English*]

**Mr. Marc Kielburger:** Mr. Chair, the honourable member has incorrect numbers. It's up to 100,000 students, up to $5,000 per student if the maximum number were reached, so 100,000 times $5,000 is $500 million.

The remaining amount was up to that amount if all 100,000 students participated in the running of the program. This is why I was sharing that this could potentially be much lower, because this is how ESDC decided to do the budget.

**Mr. Craig Kielburger:** If I may also add for the clarity of the member, it was funds for students, administration costs to deliver the program and funds that we were to disburse to other non-profits.

[*Translation*]

**Mr. Jacques Gourde:** Thank you for clarifying that it was 100,000 students. A moment ago, you referred to 20,000 students and, then, 40,000 students. If you are saying it's 100,000, the numbers add up, but that should have been made clear from the beginning.

You received two phone calls. You said you received a call from the government to set up the program. The Clerk of the Privy Council told us that he called you to discuss the program architecture and ideas. Can you confirm whether your organization was involved in developing the program criteria?

[*English*]

**Mr. Craig Kielburger:** No. If I may gently clarify, the Clerk of the Privy Council did not contact us. Members of the senior civil service, led by assistant deputy minister Rachel Wernick, first contacted us. She asked us to submit a proposal, based on the government requirements, for how the charity could assist in implementing this for the civil service.

[*Translation*]

**Mr. Jacques Gourde:** You are challenging what the Clerk of the Privy Council told this committee, then. He told us that people from your organization helped develop the program. That means the Clerk of the Privy Council lied to the committee.

[*English*]

**Mr. Craig Kielburger:** I appreciate this opportunity.

To provide context, I think people think there was a call to us completely out of the blue. In 2017, we started to work with ESDC delivering youth programs. In 2018, they awarded $800,000 to us to start testing service programs. In 2019, ESDC asked us to build a white paper for the government on how service could happen. In 2020, [*Technical difficulty—Editor*].

It was not sudden or out of the blue that we had a call from ES-DC [*Technical difficulty—Editor*]. It is incredibly important to understand that we had been working with Rachel Wernick and ESDC for years to develop service frameworks and service programs.

**The Chair:** Thank you very much.

We'll now turn to Mr. Dong.

● (1555)

**Mr. Han Dong (Don Valley North, Lib.):** Thank you very much, Chair.

First of all, I've been waiting patiently for my turn. I've been listening carefully, and I'm sure many members of the public and media are watching these questions and answers as well. This is not a political debate. I think, although it may be entertaining, we still need to conduct the business of the standing committee properly and respectfully. With that, I would like to thank both witnesses for coming to our committee meeting today.

I will first ask a question that we've heard in previous testimonies. The owner of Speakers' Spotlight, Mr. Perelmuter, said that their lives have been affected by having to deal with threats of violence against them. He can no longer guarantee the safety of his own family.

Have you or your staff had any similar experiences?

**Mr. Craig Kielburger:** Yes. It has been terrible for our staff. The death threats come into the office. On a personal note, my youngest isn't even one year old and he's already received death threats. Two journalists and newspapers in Canada felt they could publish our home addresses in those newspapers. We've had the police come multiple times to our home. My three-and-a-half-year-old can't play outside anymore.

On the day we announced the charity was closing, when certain members of Parliament got on their social media accounts to inflame people, someone showed up at my house. This person felt they had the right to intimidate my wife. We called the police to address the matter that evening. Then our 80-year-old parents got dragged into it, as we previously shared.

This has been beyond words.

**Mr. Marc Kielburger:** Mr. Chair, I appreciate—

**Mr. Han Dong:** I'm sorry to hear that.

We have heard testimonies from various public servants, as well as the minister responsible for the file, that the public service first reached out to your organization in regard to administering the CSSG. Ms. Wernick said that the pitch sent by your organization was designed to meet the new parameters set out by the government.

Could you indicate that that was in fact the case?

**Mr. Craig Kielburger:** Ms. Wernick reached out and asked for our help. ESDC, in the months that followed, evolved the program requirements, and we did our best to meet the program requirements.

**Mr. Han Dong:** All right.

Mr. Angus keeps on saying that, despite the public service saying that this wasn't a case where your $12-million proposed social entrepreneurship program was accepted and received funding.... Was it accepted, or was it just pitched? Did you ever receive funding for that proposal?

**Mr. Charlie Angus:** Sorry, I have a point of order.

**The Chair:** I recognize your point of order, Mr. Angus.

**Mr. Charlie Angus:** Thank you.

I'm sure Mr. Dong wouldn't want to bring down the quality. I have never said that they received funding. I said that it was verbally approved by Minister Morneau, and it is in his notes. I don't think he should try to misrepresent what I said.

**The Chair:** This sounds like a matter of debate. I'm sure that Mr. Angus will have an opportunity to correct the record if he thinks that this is required.

Mr. Dong, we'll turn back to you.

**Mr. Han Dong:** Thank you, Mr. Chair.

If you could answer this question.

**Mr. Craig Kielburger:** The question is not...accepted, and we actually have the verbatim quotes of Mr. Angus on that 101 list where he says it was.

**Mr. Han Dong:** Okay.

Now, though, there are important issues before this committee and other committees to study as they relate to CSSG [*Technical difficulty—Editor*] and you believe that some members of Parliament, including some on this committee, could say.... Well, you said that, literally, they can say whatever they want or that it's like a "surreal political boxing match"—that's the term, I think, you used—and you haven't been given the opportunity to defend yourself. This is your opportunity. What would you like to say to those MPs?

**Mr. Craig Kielburger:** I appreciate that, sir. Thank you.

WE Charity was asked to be of service during a national pandemic. That was what we sought to do for 100,000 young people. The program launched successfully, and 35,000 youth signed up in the first week—over 60% minority youth, English, French, coast to coast. We built the program, and it should have served youth and families. Not only did those youth lose out, but now 7,000 schools in Canada are losing out on having this program because of politics.

This charity is not perfect, and we have learned a lot along our journey, but this didn't have to end this way. This is because of the tidal wave, the tsunami of politics, that came at us. The people who lost the most are the children in the ridings of each of you, my own kids, Marc's kids, and really good staff.

We need a little more compassion in this country, a little more patience, just a little more looking—

● (1600)

**Mr. Han Dong:** Thank you.

I think Mr. Marc Kielburger also tried to answer my first question, which had to do with the impact on your family and your staff's families.

Please go ahead.

**Mr. Marc Kielburger:** I appreciate the opportunity.

It's been absolutely devastating. We've dedicated 25 years of our lives to helping young people in Canada and around the world. We're certainly not perfect, Mr. Sorbara. We've apologized, and we'll continue to apologize for our errors. We've certainly made a lot along the way, but I think everybody here on this Zoom call would feel the same way: that we've all made mistakes. I just want to say that this has been the most devastating year for our organization but also for our staff and the kids.

I just feel that we've lost sight of what this should have been all about. It should have been about Canadian kids being helped during a pandemic. I ask again.... I ask you to come through bipartisan lines to help Canadian kids this summer, to help students this summer; just put down the politics for a moment and help students this summer get what they need through employment opportunities. Do this together as parliamentarians coming together to help the young people in your constituencies.

**Mr. Han Dong:** Thank you.

**The Chair:** Now, as I promised, I said that we would break for a health break at this point in time, so we will do that. We will convene back here in five minutes, so we would be back here at 4:06, according to my clock.

The meeting is suspended.

● (1600)

_____(Pause)_____

● (1605)

**The Chair:** Colleagues, I'll call this meeting back to order.

I'll turn to Mr. Carrie now for the next round of questions.

**Mr. Colin Carrie (Oshawa, CPC):** Thank you very much, Mr. Chair.

Thank you to the witnesses for being here today.

If I'm the bank and I want to soften my image by donating to you, I can be seen on stage with you. You can say some nice things about me, take some photos with celebrities, and give me the opportunity to literally address tens of thousands of young kids—as well as their teachers—my future customers. All in all, I would say that is very valuable.

Now, how much would I have to contribute in order to get that red-carpet treatment?

**Mr. Craig Kielburger:** I'm assuming you're talking about WE schools and WE Days. It depends, but it would be a very generous contribution to the organization, absolutely. We're very proud of that and we state that.

**Mr. Colin Carrie:** You don't have to give me an exact amount but for somebody like KPMG or RBC, in order to get that experience for that company, what would they donate approximately? Just give me a ballpark figure, please.

**Mr. Craig Kielburger:** Those are our former partners and, obviously, to be respectful to them we can't state dollar amounts, but allow me to state that they would be very generous to the organization. I'm sorry, I think I know where you're going on this. I don't think we need to name the specifics about some of our former partners, who are just—

**Mr. Colin Carrie:** No, no. I'm just saying is it less than $100,000? Less than $1 million? Where would you put it?

**Mr. Craig Kielburger:** It would certainly be in excess of $100,000.

**Mr. Colin Carrie:** Okay, good. That's fine.

I'm not a company, I'm a politician, but I can tell you if you allowed me to go up on stage and repeat the exact same thing where I get to be photographed, you compliment me on stage, you let me address tens of thousands of future voters who know that you've already vetted me, man, that would be super valuable to me.

Just out of curiosity, what did you charge Mr. Trudeau for that when he appeared at WE events?

**Mr. Craig Kielburger:** I respect the question. I understand what you're getting at.

WE Charity [_Technical difficulty—Editor_] always invites the Prime Minister, no matter who the Prime Minister is, including Prime Minister Harper. The Prime Minister and the Governor General, the premier and the mayor of every city were always invited in every case. That same invitation went to Prime Minister Harper as went to Prime Minister Trudeau.

We did it, frankly, not for the politicians. We did it because we believe that young people should have a chance to interact with the politicians, to see this as a chance to learn more about how government works.

I understand the question. I sincerely do. When, frankly, we were popular we had politicians of every...premiers, mayors and prime ministers running there. We know it doesn't take a lot of courage to give us a kick now, we understand that, but we were grateful to welcome them from every province, from every stripe of political office, whether it be the after-party that Laureen Harper held for us and Erin O'Toole was there, to the celebration with Wab Kinew with the NDP, to you name it.

● (1610)

**Mr. Colin Carrie:** I'm just trying to put a value on it because there seem to be different criteria for WE endorsements. Companies will pay a certain amount but if the recipient of all this attention on stage is a politician, for example, that can look a little bit different. If the Prime Minister gets a certain treatment similar to big companies but big companies may be paying half a million dollars for it, people will ask the question, what is this charity, this WE Day event, expecting in return? You said you gave the same opportunity to all other political parties.

**Mr. Craig Kielburger:** Yes.

**Mr. Marc Kielburger:** We did. We invited, as Craig mentioned, Mr. Harper many times to come to WE Day and he declined. We've had support from all political parties in the past.

**Mr. Colin Carrie:** I see.

I noticed too, before the last election, that WE produced a video that featured [*Technical difficulty—Editor*] where the Prime Minister [*Technical difficulty—Editor*] and invest in our youngest leaders. I saw that video. It was very well done, but it looked exactly like a campaign ad. If you're non-partisan, how many similar videos were made starring Andrew Scheer, Jagmeet Singh or Elizabeth May? Can you give me an answer to that?

**Mr. Craig Kielburger:** Sure.

We had 50 people featured in the campaign. The Prime Minister was invited as the Prime Minister for an event celebrating Canada. With respect to other MPs, we didn't direct it to him as an individual, we directed it to the Prime Minister of Canada for an event on Canada's 150th anniversary. It certainly wasn't a campaign ad. The whole message of the campaign was encouraging youth to volunteer. We put that call out across Canada. We thought it appropriate for the Prime Minister to be one of the people calling on youth to volunteer.

**Mr. Colin Carrie:** I saw that video and it was extremely well produced. Exactly how much did you pay Door Knocker Media to produce that video?

**Mr. Craig Kielburger:** I wouldn't have that number off the top of my head but you're right. It was a substantial campaign. We had 50 people. We had photographers. We had videographers. We had a curriculum that we pushed out on the environment and volunteerism. I'm sure hundreds of thousands of dollars were spent on that whole program in total.

**Mr. Colin Carrie:** Maybe you could get me the approximate amount you spent on that video. For me, it seems to be very much a political video.

Out of curiosity, I guess the Liberal Party or the Prime Minister didn't reimburse you for any of the production of that video.

**Mr. Craig Kielburger:** No, they didn't, nor would we have expected them to.

**Mr. Colin Carrie:** I see.

Could you tell me how many WE events Prime Minister Harper spoke at? Did you ever make a video with him?

**Mr. Craig Kielburger:** We invited Prime Minister Harper many times to come to WE events. We did the pitch to him and invited his wife, who came to the WE Days. His kids came to the WE Days, but we couldn't get him to come, unfortunately. We tried our best. It was a full-court press. He came to none of the WE Days, unfortunately, but we do appreciate that they hosted the celebration after WE Day at the official residence. It was very nice of Prime Minister Harper to do so and it was very nice of his wife.

Sincerely, I know this has become political somehow. I understand some people may question the number of times that the Prime Minister was on the stage, but it really was our intention just to try to get youth to serve in this country.

**The Vice-Chair (Mrs. Brenda Shanahan):** Thank you very much.

I am back as chair because we've lost our regular chair.

We now go to Mr. Erskine-Smith for five minutes.

**Mr. Nathaniel Erskine-Smith:** Thanks, Madam Chair.

I want to start with Mr. Reed Cowan's testimony. I've not been a member of this committee for the entire duration. By the way, I'm very sorry for the threats to your family in the course of all this. No one should endure that.

I did sit through Reed Cowan's testimony. He obviously was a significant donor, but—I just want to get this right—he was a former member of the WE Charity advisory board. Is that right?

● (1615)

**Mr. Marc Kielburger:** Yes, we had an honorary advisory board about 15 years ago. We had him and others participate in an honorary capacity.

**Mr. Nathaniel Erskine-Smith:** Was what he told this committee true?

**Mr. Marc Kielburger:** As we shared in our opening remarks, first of all, we're heartbroken about what happened 15 years ago. A plaque was changed, very unfortunately. It was one of two plaques for a school that was built in Kenya. Four schools in total were built. Two had plaques and one was, unfortunately, changed. We are looking into it. We've actually created a board committee to find out what happened. We're taking this very seriously. We really would like to understand and to make sure that he has all the information on this topic.

We were able to reach [*Technical difficulty—Editor*] and apologize, but we of course have much more to do.

**Mr. Nathaniel Erskine-Smith:** What do you make now of the December article in Bloomberg where staff joked that WE plaques should be made of velcro because they were swapped so frequently? I know that initially the response was that that's never happened. What do you make of staff saying that now?

**Mr. Craig Kielburger:** We understand that two cases have been identified in that same village at that same time, which was about 15 years ago. We want to research it. We want to get the bottom of it. It shouldn't have happened. We apologize for those two cases. We're going to continue to look in case there's anyone else that this has happened to.

There's context to give. One thing that sometimes.... I'm not saying this happened in this particular case because, again, it was 15 years ago. We're trying to figure out our records.

**Mr. Nathaniel Erskine-Smith:** Rather than speculate.... How would this have happened? Who is responsible for moving these plaques?

**Mr. Craig Kielburger:** It would have been in Kenya. It would have been a member of the Kenya team, theoretically. The thought that comes to mind, potentially, is that—and again, I'm not going to speculate about Mr. Cowan, but generally—we have funding to build schools, but funding also comes in to provide teacher training, lunches for kids and vaccinations. The funding to actually run a school is exponentially more than the cost to build a school, as you can imagine. Sometimes multiple plaques are placed on a project because it takes multiple donors to run the project.

**Mr. Nathaniel Erskine-Smith:** Why would a plaque ever be taken down? I guess that's the part I've tried to think through. I just can't really figure out the answer to that.

**Mr. Craig Kielburger:** I agree with you. It should never have happened. We made a mistake. A mistake was made in the organization involving that man's plaque. One of those two plaques should not have been taken down. You're absolutely right.

That's why I called him and I apologized. We publicly apologized. We know we need to get to the bottom of that.

**Mr. Nathaniel Erskine-Smith:** As I say, I haven't gone down the rabbit hole like some of my colleagues on this. I was a bit skeptical about the contract to begin with because I thought the Canada summer jobs program was the better place for it. I didn't really go down the rabbit hole of who was ultimately to blame in all of this, but it does concern me.

I take your point. This can be a partisan place, but your staff aren't partisan. To have staff joke that WE plaques should be made

of velcro.... Then *The Fifth Estate* spoke to more than a dozen former employees who had concerns that the organization was not always transparent with donors.

What's a member of the public like me to make of this? It's not partisan actors like Mr. Angus—whom I happen to like—but dozens of staff.

**Mr. Craig Kielburger:** And thousands of staff over time were pleased. Many of them loved their experience with the organization.

Specifically on *The Fifth Estate*, they had one example of an individual they said was confused on whether they had funded the entirety of a water project. It's subsequently been clarified that this individual was not confused, but unfortunately that piece went into the public domain and has been repeated and that creates a real difficulty for us as an organization. Later, CBC put a piece on the air involving boreholes. Eight of the donors who were featured on that signed an open letter stating they were misrepresented. But they were very clear and knew they were funding maintenance and drilling the borehole.

I'm happy to have this conversation with you. I know it's obviously out of the scope, and I appreciate that people have stayed within the scope of pandemic spending, but with WE, as an organization, the money goes to help kids. We are transparent with our donors. We're not perfect. We make errors. We absolutely make errors, like Mr. Cowan's plaque, and we try to own those errors to the best of our ability and fix them when we can.

**Mr. Nathaniel Erskine-Smith:** What's the name of the individual who would be—

**The Vice-Chair (Mrs. Brenda Shanahan):** That's time. Thank you, Mr. Erskine-Smith.

**Mr. Nathaniel Erskine-Smith:** Thanks very much.

[*Translation*]

**The Vice-Chair (Mrs. Brenda Shanahan):** Mr. Fortin, we now go to you, for two and a half minutes. You can have a few extra seconds on account of the interpretation delays.

● (1620)

**Mr. Rhéal Fortin:** Thank you, Madam Chair.

Mr. Kielburger, in recent years, you've paid a little over $400,000 to members of Mr. Trudeau's family, from his wife and his mother, Margaret, to his brother, Alexandre. You actually paid between $400,000 and $500,000 in speaking fees, as well as hotel, restaurant, airfare and other expenses. That's already been established.

When you received the contract from the federal government, did you inquire as to whether there were any ethical concerns given your ties to the Trudeau family?

[*English*]

**Mr. Craig Kielburger:** Margaret Trudeau, for example, was booked through a speaking bureau. If you go on that same speaking bureau website you'll see—

[*Translation*]

**Mr. Rhéal Fortin:** Mr. Kielburger, sorry to cut you off. I don't mean to be rude, but I only have two and a half minutes.

Did you raise the issue of ethics or a conflict of interest with government officials?

[*English*]

**Mr. Craig Kielburger:** To answer your question, other non-profits booked Madam Trudeau. Banks book her. Dozens of groups book her every year. They also receive federal funding. They work with the government. If that's inappropriate in any manner we trust the government should change the rules and not allow her to have speaking bureaus and work for non-profits. We're one of countless groups that do.

[*Translation*]

**Mr. Rhéal Fortin:** If I understood you correctly, you did not raise the issue of ethics and assumed the government would do it.

Is that correct?

[*English*]

**Mr. Craig Kielburger:** That is correct.

[*Translation*]

**Mr. Rhéal Fortin:** All right.

To your mind, was there not, at the very least, the appearance of a conflict of interest, or did you see the situation as normal and irrelevant?

[*English*]

**Mr. Craig Kielburger:** Again, allow me to point out the obvious: many non-profits book.... Madam Chair, you can see them online on the speaking bureau website. She's one of Canada's most famous mental health speakers. I respect the question, and frankly I wish we never had, obviously, in light of all that has transpired. But that conflict of interest is the responsibility of the government. We're very transparent in how we engage. The Prime Minister said he knew his mother was doing this for us. Others in government knew. Again, anyone can book her through a website to come to an event. That's what we did, and she spoke on mental health. Many non-profits that also get government funding arrange for Madam Trudeau to speak. Banks—

[*Translation*]

**Mr. Rhéal Fortin:** At any point, did a government official tell you they would have to look into the ethical implications? Were you ever told there might be a conflict of interest? Was that discussed with you?

[*English*]

**Mr. Craig Kielburger:** I assumed the government process would work properly.

[*Translation*]

**Mr. Rhéal Fortin:** I see.

To your mind, it wasn't really an issue. You didn't think there was a conflict of interest.

[*English*]

**Mr. Craig Kielburger:** We were very open and very transparent. It is not...appropriate to book someone through a speaking bureau website to come to an event. We didn't do it for the sake of seeking government grants. We did a decade with her because she was a mental health advocate. She raised millions of dollars for us, ironically, as a speaker at these charitable events—

**Mrs. Brenda Shanahan:** I'm sorry, that's time for Mr. Fortin.

[*Translation*]

We now go to Mr. Angus.

[*English*]

I see that the chair has returned.

**Mr. Charlie Angus:** Madam Shanahan, thank you so much. Before I begin, I just want to clarify how much time I have. Do I ask you or do I ask the chair?

**The Chair:** You have two and a half minutes, Mr. Angus.

**Mr. Charlie Angus:** It's a two-and-a-half minute round? Okay.

**The Chair:** That's correct. Yes.

**Mr. Charlie Angus:** Thank you.

This is March 15. This is the anniversary of Wesley Cowan's death.

I think we were all pretty moved when we heard Reed Cowan, because you realize that you don't get over a loss like that. That's why memorials are so important. That's why they have to be treated with such sacred trust.

This, then, is also the anniversary of when you dedicated that school to this son, and that trust was broken. I want to ask, how soon after Reed Cowan left was that plaque taken down?

**Mr. Craig Kielburger:** Mr. Angus, this is the one thing that we do agree with you on, and fully. It should never have happened.

**Mr. Charlie Angus:** How soon after?

**Mr. Craig Kielburger:** It was 15 years ago. People are looking at the records. I don't know the answer to that question. We've [*Technical difficulty—Editor*] our standing committee to find the answer, and we should have that answer, and he is owed that answer. We are looking into that—

● (1625)

**Mr. Charlie Angus:** He is owed that answer, because the issue is that you didn't take the plaque down once. You took it down twice. He went back in 2008 and wanted to see the building. We have the TV footage. Your staff did everything they could to keep him from getting to that building, and finally he insisted, because it was his son's school. He went back and it was a different plaque. You had thrown out the first plaque and you put a second plaque up, so then you took that plaque down and put somebody else's plaque up.

To follow up on Mr. Erskine-Smith's comments about staff—your staff—joking about this, we have articles in Bloomberg about this. We've had *The Fifth Estate*. The fact that you took that plaque down twice shows this wasn't an accident. This was wilful. You sold and you got Mr. Cowan to take his son's death and legacy and build a story across America, and then, when he was gone, you gave that school to someone else.

How do you justify that?

**Mr. Craig Kielburger:** Sir, firstly, what you describe was not accurate, but here's where I agree with you—

**Mr. Charlie Angus:** That was accurate. He has footage of it. We've seen the pictures of the plaque.

I know you have a hundred-and-some things about all the wrong stuff I've said. It's actually quite.... I love it. I'm reposting your gaslighting, but I have the photos of the plaques. You had to go out and buy a cheap knock-off plaque because you threw the first one out. That's two plaques.

These are the allegations that are against you. You need to answer that.

**Mr. Craig Kielburger:** That's why we are looking into them. I am with you on this. I am not fighting you on this. I agree with you. This is serious. This is why even though it's years ago—

**Mr. Charlie Angus:** I spoke to many of your former staff who say that you guys put on a show for donors. It was about selling them on that emotional tag. They talk about these jokes about velcro donor plaques.

It was Mr. Cowan who has asked for a police investigation. I just forwarded his concerns to the RCMP. It was Mr. Cowan who believed he was defrauded. He is a member of your advisory board, for crying out loud. He was a big fundraiser.

For you to say this was a one-off.... We've seen the articles in Bloomberg, as my colleague said. You keep saying there are mistakes. You keep saying things are wrong in *The Fifth Estate*. It's like everybody...? I know that Charlie Angus is being mean to you, but is everyone else as well?

**The Chair:** Mr. Angus, you are out of time, but we will allow for an answer.

**Mr. Charlie Angus:** Thank you.

**Hon. Pierre Poilievre:** A point of order.

**The Chair:** On a point of order, Mr. Poilievre.

**Hon. Pierre Poilievre:** Yes, Mr. Chair. This point of order is to give notice to the committee that at the end of the proceedings the Conservatives will be putting forward a motion to recall the Kielburger brothers unless they provide, before the end of these hearings, the total amount that they and their affiliated organizations have paid the Trudeau family. They have not yet done so.

There will be a motion to that effect. That is notice to the Kielburger brothers and their lawyer that they should get their calculators sharpened so that they can get that answer before the end of these proceedings or they will be back again to testify.

Thank you.

**The Chair:** We'll allow for a short answer to Mr. Angus's question.

Then we will go to Mr. Barrett.

**Mr. Charlie Angus:** Thank you.

**Mr. Craig Kielburger:** I would love to say.... I appreciate the point of order. We will get you the information, and actually I appreciate that you stayed on this. Ironically, I'm with you, Mr. Poilievre, and clearly I say this, you have stayed on the mission of looking at the CSSG, so I appreciate your focus on protecting Canadian taxpayers. I understand—

**Mr. Charlie Angus:** I bet you don't want to answer about what you're doing with your Kenyan donors. I understand that too.

**The Chair:** Let's answer Mr. Angus's question if that's possible. Then we'll turn to Mr. Barrett.

Mr. Kielburger, we'll turn to you for a short answer with regard to Mr. Angus's question.

**Mr. Craig Kielburger:** Mr. Cowan gave help to children in Kenya. That's exactly what he did. That school continues to operate. With all those schools, thousands of children have graduated. We are deeply grateful to him. We're looking through records from 15 years ago to find out what happened.

You are absolutely right, sir. Mr. Cowan is absolutely right. It never should have happened. We are upset, frankly, more than you, Mr. Angus. We're upset about this, because it should not have happened. We agree with you.

**The Chair:** We'll turn to Mr. Barrett for his next round of questions.

**Mr. Michael Barrett:** Staying focused on the CSSG, I want to be very clear that my question is with respect to the Canada student service grant.

Have you or has anyone in your organization been contacted by the RCMP with respect to the CSSG?

**Mr. Craig Kielburger:** We've now answered this question from three different people.

**Mr. Michael Barrett:** Could you actually answer the question that's asked, instead of carrying on with your lawyer? You responded to me, previously, that you had not been contacted by the RCMP with respect to Mr. Angus's letter. That is not my question.

My question is, have you or has anyone in your organization been contacted by the RCMP with respect to the CSSG? Not if you or your brother, I'm asking about you or anyone in your organization, or affiliated with your organization.

● (1630)

**Mr. Craig Kielburger:** Apparently, I have no problems actually answering your question. I think we already did.

**Mr. Michael Barrett:** You didn't. You didn't answer it.

**Mr. Craig Kielburger:** [*Inaudible—Editor*] integrity investigations....We're supposed to leave this to the RCMP to actually comment and disclose on such matters according to the assistant deputy minister. I feel we've answered, but that is out of respect for the RCMP, even though—

**Mr. Michael Barrett:** Sorry, is the gentleman sitting next to you a serving assistant deputy minister in a government here?

**Mr. Craig Kielburger:** He served under Prime Minister Harper, and he served under Prime Minister Martin as associate deputy minister.

Please feel free to contact the RCMP if you'd like, but I feel we gave our—

**Mr. Michael Barrett:** At this time, are you prepared to provide in writing authorization for the RCMP to disclose to this committee whether or not an investigation is ongoing, or if it has initiated any contact with you or anyone in your organization with respect to the Canada student service grant? Will you undertake to provide that authorization in writing?

**Mr. Craig Kielburger:** I'm actually somewhat befuddled by this entire exchange. The letter went in last week. The RCMP hasn't contacted us.

That being said—

**Mr. Michael Barrett:** I'm not asking about Mr. Angus's letter.

I'm asking for you to undertake to provide to this committee, in writing, authorization to be forwarded to the RCMP to disclose if it has contacted you or anyone in your organization with respect to the Canada student service grant. Yes or no?

**Mr. Craig Kielburger:** I will consult the RCMP on that very question. We're happy to circle back as soon as the RCMP gives us direction on this. This is an apolitical body of the RCMP. We're just stuck in the middle.

**Mr. Michael Barrett:** Did you have any communications or conversations with anyone in government or in the Prime Minister's Office prior to your appearance at the parliamentary committee in the summer?

**Mr. Craig Kielburger:** No.

**Mr. Michael Barrett:** At that committee meeting, you said that none of your conversations with Minister Chagger were with respect to grants. Is that correct?

**Mr. Craig Kielburger:** No, no, no. That's actually not correct. No, no, no. Nothing regarding the Canada student service grant, but we spoke to Minister Chagger about the proposal that we had been talking about regarding unemployment. I absolutely brought that up with her.

**Mr. Marc Kielburger:** And entrepreneurship.

**Mr. Craig Kielburger:** And youth entrepreneurship. Yes, youth social entrepreneurship is what it was titled.

**Mr. Michael Barrett:** Why was your lobbying notice modified with respect to the disclosure with respect to which staff were present at that meeting?

**Mr. Craig Kielburger:** Because we would do our best the first time we submitted it, and we then learned that a mistake was made, so we clarified the line item.

**Mr. Michael Barrett:** How many communications did the WE organization have with the government in April 2020?

**Mr. Craig Kielburger:** I don't have a number off the top of my head, but we submitted it to the FINA committee, and we'll submit it to you again, if you like.

**Mr. Michael Barrett:** Would it be accurate to say that the collective communications with the government were the equivalent to a significant part of the duties for one employee?

**Mr. Craig Kielburger:** It would actually be a [*Technical difficulty—Editor*].

The challenge that you are attempting here is that you're counting two volunteers. I understand that Mr. Angus keeps saying.... It is literally not possible for us as volunteers to register, so I understand the concern. If any member of Parliament wants to change the legislation, we put proactively everything out on the Internet, so you could see our engagement on this.

The public, the Ethics Commissioner, the lobbying commissioner, any member of Parliament can see our engagement on this as volunteers, even though we were not captured under the official reporting requirements.

**Mr. Michael Barrett:** Last year, you laid off your government relations director, and then immediately brought her back into your employ. What was the reason for that?

**Mr. Craig Kielburger:** You're referring to the director of government relations and stakeholder engagements, just to clarify. It was a small part of her time on government—the rest was foundations and corporate events—and the reason was that we shifted her into a contracting role.

**Mr. Michael Barrett:** Ms. Marquez—

**The Chair:** Pardon me, Mr. Barrett, but your time is up.

We'll turn to Mr. Fergus now for his round of questions.

[*Translation*]

**Mr. Greg Fergus (Hull—Aylmer, Lib.):** Thank you, Mr. Chair.

Could you please tell me how much time I have?

● (1635)

[*English*]

**The Chair:** You have five minutes.

[*Translation*]

**Mr. Greg Fergus:** Thank you, Mr. Chair.

Craig and Marc Kielburger, thank you for being here. Your participation is appreciated.

In your remarks, you talked about the people who had attended events organized by the WE Organization. Members of the opposition asked you how many high-ranking Liberals had attended the events.

Can you name high-ranking individuals who were not Liberals who attended the events?

[*English*]

**Mr. Craig Kielburger:** Sure. The Prime Minister obviously comes to mind, the premiers of provinces, when we held WE Day.

I imagine that Premier Wynne.... Did she ever attend?

**Mr. Marc Kielburger:** Yes. Premier Wynne attended in the past.

We're happy to look into it. We just don't have it off the top of our heads.

**Mr. Craig Kielburger:** We've had key people—

**Mr. Marc Kielburger:** We've had members of Parliament and high-ranking officials from all parts—

**Mr. Craig Kielburger:** We'll happily give you a list. We'll look at some of the names and share a few names.

[*Translation*]

**Mr. Greg Fergus:** Could you clarify something, please? Did people who were not Liberals attend the events?

[*English*]

**Mr. Craig Kielburger:** Yes, of course. It represented Canada, so whoever was in power in Alberta or in Saskatchewan or in B.C.... The premiers would come. The mayors would come. The Prime Minister would come. The Governor General would come. Yes.

[*Translation*]

**Mr. Greg Fergus:** Thank you.

In the past, the WE Organization had received funding from other levels of government in Canada. You just said you interacted with mayors, provincial premiers and the governor general.

What other levels of government provided you with funding?

When did you receive the funding?

[*English*]

**Mr. Marc Kielburger:** You will remember that we've received funding over the course of the organization's history, especially the last 10 years.

To answer your question specifically, it was at the provincial level—at times the municipal level, but more so at the provincial level—where we were working with ministries of education to help bring the WE schools and WE Day program directly to the provinces. Again, it was in 7,000 schools. Again, all political parties, from the NDP to the Conservatives to the Liberals, have been, in the past, supportive.

[*Translation*]

**Mr. Greg Fergus:** Thank you.

In the fall, we received information from Mr. Perelmuter on all the events put on by the WE Organization that Mr. Trudeau and Mrs. Grégoire Trudeau appeared at. The expenses for airplane tickets, hotel accommodations, taxis and so on were also covered.

Did the payments for those expenses go to Mr. Trudeau or Mrs. Grégoire Trudeau, or did you pay the suppliers directly?

[*English*]

**Mr. Craig Kielburger:** It was directly to the suppliers.

[*Translation*]

**Mr. Greg Fergus:** It's not accurate to say that the Trudeaus received that money, then. Is that correct?

[*English*]

**Mr. Craig Kielburger:** Correct.

[*Translation*]

**Mr. Greg Fergus:** The honourable member would like to hear you say that nearly half those payments were made to the Trudeau family. Is that something you can say, in all honesty?

[*English*]

**Mr. Craig Kielburger:** To be very clear, we never paid any expenses for Mr. Trudeau and we never provided any honorarium to Mr. Trudeau.

[*Translation*]

**Mr. Greg Fergus:** I see.

As for Mrs. Grégoire Trudeau and members of her family, those expenses were not—

[*English*]

**Mr. Craig Kielburger:** Correct. All the expenses were paid directly to the providers and never to those individuals.

[*Translation*]

**Mr. Greg Fergus:** I think that's all my time, Mr. Chair.

Thank you.

[*English*]

**The Chair:** Thank you, Mr. Fergus.

We'll turn to Mr. Poilievre for the next five minutes.

● (1640)

**Hon. Pierre Poilievre:** We'll take it that Mr. Fergus thinks there's nothing wrong with an organization paying a politician's mortgage and saying that they're not giving that politician any money by virtue of that logic.

Messrs. Kielburger, you could not tell me the total value of all of the in-kind and monetary payments of expenses and fees you'd given the Trudeau family. I've tried to add it all up—it's a lot of money. What I have here is $566,345. Is that the total amount of cash and in-kind fees and expenses your organization paid for Mr. Trudeau, his wife, his mother and his brother? Yes or no.

**Mr. Craig Kielburger:** By the end of our time together we'll have that answer for you. They're adding it.... We thought we had until the end of the session, but I promise—

**Hon. Pierre Poilievre:** You've had almost a year. It looks incredibly suspicious. You still haven't been able to do the arithmetic. It does show the sordid relationship your organization has with the Trudeau family, that you can't even add up all the benefits and cash that you've paid them, so we'll move on to my next question.

What was the role, exactly, of Mr. Chin, senior adviser to the Prime Minister, in setting up this program?

**Mr. Craig Kielburger:** I don't think he had any role in it.

**Hon. Pierre Poilievre:** Is that the answer for both of you?

**Mr. Marc Kielburger:** Yes, that's correct.

Who are you referring to, sir? Can you repeat this, please?

**Hon. Pierre Poilievre:** Ben Chin.

**Mr. Marc Kielburger:** There was no role.

**Hon. Pierre Poilievre:** Craig, no role?

**Mr. Craig Kielburger:** Not that I'm aware of.

**Hon. Pierre Poilievre:** Then why did you send him a message on LinkedIn on June 27 saying, "Hello Ben, Thank you for your kindness in helping shape our latest program with the go'vt. Warmly, Craig."

**Mr. Craig Kielburger:** Sure. I sent a hundred messages because I only had seven or eight people on LinkedIn before that, so that day a hundred messages went out. My EA sent them to people to join my LinkedIn page, and he was one of them. I actually didn't...but my EA did.

**Hon. Pierre Poilievre:** Sorry, Craig, this is your message. It's signed by you. If I could be clear—

**Mr. Craig Kielburger:** Yes.

**Hon. Pierre Poilievre:** —it doesn't just say I wish you well. It says Ben—

**Mr. Craig Kielburger:** Yes—

**Hon. Pierre Poilievre:** —Excuse me. It says, "Thank you for your kindness in helping shape our latest program with the gov't. Warmly, Craig."

You sent that, did you not?

**Mr. Craig Kielburger:** I don't dispute that it was sent, but....

**Hon. Pierre Poilievre:** I'm sorry, you've got yourself in a lot of trouble here. You just said a moment ago you thought that the Prime Minister's senior adviser, Mr. Chin, had no role in the establishment of the program, but I have correspondence where you thanked him for helping shape that very program.

Why did you thank him for shaping the program, when now you claim you didn't know he played any role in the program?

**Mr. Craig Kielburger:** My EA wanted to personalize it and very kindly, as a great EA, wrote a few lines to a hundred different LinkedIn requests that went that same day to different people to join my LinkedIn page.

**Hon. Pierre Poilievre:** Excuse me, Craig.

Craig, you're in a lot of trouble here, my friend. You're under oath. Perjury is a crime.

**Mr. Craig Kielburger:** Sir, [*Technical difficulty—Editor*]—

**Hon. Pierre Poilievre:** Excuse me. You said a moment ago that you thought the Prime Minister's chief adviser had no role in establishing this program. Your message to him did not say, thank you for joining me on LinkedIn. It said, "Thank you for your kindness in helping shape our latest program with the gov't. Warmly, Craig."

**Mr. Craig Kielburger:** [*Inaudible—Editor*]—

**Hon. Pierre Poilievre:** So, which is it? I want to ask you clearly. Did you know that Mr. Chin was playing a role in establishing this program? Yes or no.

**Mr. Craig Kielburger:** No.

**Hon. Pierre Poilievre:** You sent a message to someone thanking him for helping shape your latest program even though you had no knowledge of his involvement in the program.

**Mr. Craig Kielburger:** A hundred messages went out to my LinkedIn people, and my EA kindly drafted them.

**Hon. Pierre Poilievre:** Right. Okay. Did you send a hundred messages out to random people thanking them for establishing a government program?

**Mr. Craig Kielburger:** No. Each had a personalized LinkedIn request. That was his LinkedIn request.

**Hon. Pierre Poilievre:** Did his LinkedIn request ask you to thank him for establishing this program?

**Mr. Craig Kielburger:** No, that was my LinkedIn request to him.

**Hon. Pierre Poilievre:** Okay. Your story is shifting here, my friend.

This is important because you've until now claimed the Prime Minister's Office wasn't involved in shaping the program, it was just the bureaucratic ESDC. You've tried to distance the Prime Minister, who your organization has paid off, and now we find out that you corresponded with his top adviser thanking him for shaping the program.

**Mr. Craig Kielburger:** Allow me to phrase it this way: that was the only correspondence I had in the course of two years with him, a three-line LinkedIn request to join.

**Hon. Pierre Poilievre:** This isn't a LinkedIn request, my friend; this is you thanking him for establishing a program. You did not say, "Thank you for joining me on LinkedIn"; you said, "Thank you for your kindness in helping shape our latest program with the go'vt." You said that. I appreciate that your lawyer's trying to help you out here. He looks extremely uncomfortable, and I don't blame him. I hope he's being paid well for this, and I think he'll be in your employ for a very long time, because lying to a parliamentary committee is, in fact, an offence. You have not explained why, a moment ago, you told us—

● (1645)

**Mr. Han Dong:** Point of order, Chair.

**The Chair:** Mr. Poilievre—

**Hon. Pierre Poilievre:** —that Mr. Chin did not have any involvement in the program and yet you actually sent a message to him thanking him for that involvement.

**The Chair:** Mr. Poilievre, I'm going to recognize Mr. Dong's point of order.

**Mr. Han Dong:** Thank you, Chair.

My point of order is that I think the question was put; the answer was given, and then a comment was put towards the lawyer, who has no place to speak or respond, and I think that—

**The Chair:** Thank you. I don't think that's a point of order; I think that's a point of debate.

Mr. Poilievre, we'll get you to finish that question; we'll give the Kielburgers an opportunity to answer, and then we'll move on to the next questioner.

**Hon. Pierre Poilievre:** Mr. Chin actually responded to your message. He said, "Great to hear from you Craig. Let's get our young working!" so obviously, in direct reference to the program, not "Thank you for agreeing to add me on LinkedIn", as you're now claiming. Are you testifying that you never spoke or communicated in any way, shape or form with Mr. Chin outside of this message, before or after?

**Mr. Craig Kielburger:** In two years, that is correct.

**Hon. Pierre Poilievre:** No, I mean ever.

**Mr. Craig Kielburger:** We're going to have a hard time getting LinkedIn followers after this.

**Mr. Marc Kielburger:** Mr. Poilievre, we'd love you to follow us on LinkedIn. That would be awesome.

**The Chair:** Thank you [*Technical difficulty—Editor*].

Ms. Lattanzio.

**Ms. Patricia Lattanzio:** Thank you, Mr. Chair.

Matthew Torigian, in his October 2020 report, found different things. He reported that:

> The Government of Canada, not WE Charity, first proposed that WE Charity might be suitable to administer the Canada Student Services Grant.....

> The Government of Canada considered other organizations and entities that might be capable of administering the Canada Student Services Grant.

and that:

> The Government did not predetermine and, in particular, the Prime Minister's Office did not predetermine that WE Charity would be selected to administer the Canada Student Services Grant.

Mr. Torigian's report states that in addition to documents provided to the parliamentary committee and parliamentary testimony, that WE "provided clarification and additional information where requested."

**Mr. Marc Kielburger:** There are a few things I'd like to highlight. One, Matthew Torigian is a former police chief from Waterloo. He's a member of the Munk centre advisory board as a fellow. He's somebody who served as assistant deputy minister—

**Mr. Craig Kielburger:** He was a solicitor general.

**Mr. Marc Kielburger:** —and solicitor general, specifically, for the Province of Ontario. He's extremely well respected and apolitical. He reviewed all 5,000 pages of documents. We've had many conversations with him, and in his independent report he found that all information that you shared is just that, and it is correct.

**Ms. Patricia Lattanzio:** This is another open-ended question giving you the opportunity to provide us with the most up-to-date information or documents. I understand that [*Technical difficulty—Editor*] a breakdown of expenses, which I understand you are working on and that you will diligently provide to us today. You should feel no threat and not feel bullied. We are just here to collect as much information as we possibly can. You've provided, in previous testimonies, documents, annotations, agreements and information, and you're going to be providing a copy of the contract with regard to NATIONAL PR and making sure that those services would also have been in French in Quebec.

Is there any other additional information that isn't public, that you haven't made public with regard to the CSSG program, that isn't in the public sphere that you would like to share with us?

**Mr. Craig Kielburger:** No. However, if I may take your time, I have an answer to Mr. Poilievre's request. The total in speaking fees worked out to $217,500. The total in expenses worked out to $210,250.92; therefore adding together what Margaret Trudeau, Sophie Grégoire Trudeau and Sacha Trudeau received over that decade or so plus the expenses works out to $427,750.92.

● (1650)

**Mr. Marc Kielburger:** It is—

**Ms. Patricia Lattanzio:** I'm sorry. So it is not $566,345.

**Mr. Craig Kielburger:** Yes, because 20% goes to Speakers' Spotlight as part of the booking, even [*Technical difficulty—Editor*].

**Mr. Marc Kielburger:** Because of Mr. Poilievre's comments, we want to be explicitly clear that we reserve the right to double-check to ensure that every single [*Technical difficulty—Editor*] was paid directly by us as suppliers to others. We don't want to be [*Inaudible—Editor*] in any way, because we're here, of course, being put on the spot. However, that is the total number and it's the correct information.

**Mr. Craig Kielburger:** I apologize, but to add, you mentioned the report by the former deputy solicitor general, who identified that there were not any inappropriate dealings with WE Charity in engaging the government. There was an independent review by forensic auditors who looked at the financial soundness of the charity at the time, and you corrected the record and said the charity was in a financially sound position, contrary to the narrative of a bailout, which some people have phrased this as. I wanted to put that on the public record.

**Ms. Patricia Lattanzio:** Thank you for that.

Again, is there any other public document that has not been shared in the public sphere or domain that you would like to share with us before you leave?

**Mr. Craig Kielburger:** This has been going on for nine months. It's going to be seven hours that we've testified. We've spoken to a total of five senior reps. We've given literally thousands of pages on this matter over to various government groups. We've offered to co-operate. We know there are nine investigations going on. I think this has to be the most well-studied matter that I've ever seen, period.

**Ms. Patricia Lattanzio:** Okay.

I'll go back to the question I asked you before with regard to engaging and concluding a contract with the NATIONAL PR firm to ensure that services would be done in both official languages, and specifically French in Quebec.

Your prior experiences included providing services, to my understanding, to English schools, and more specifically the EMSB schools in Montreal. Why did you feel it necessary to engage the NATIONAL PR firm if you had prior experience doing this?

**Mr. Marc Kielburger:** We were given a matter of weeks to deliver this program in both official languages coast to coast.

It was all hands on deck. We needed to ensure that not only as many students in Quebec as possible could engage, but also as many non-profits in Quebec as possible could engage. Part of NATIONAL PR's activities were to help identify non-profit organizations in the province that we could potentially partner with. Dozens of organizations, if I'm not mistaken, in the province of Quebec put up their hands, and we're grateful for that.

**Ms. Patricia Lattanzio:** You also said that putting up this program was not just the [*Technical difficulty—Editor*], if I can say it as such. This program was being worked in previous years, correct?

**Mr. Marc Kielburger:** That's correct. We've had the opportunity to work with young people all across the country in 7,000 schools—at least, again, until the political fallout of the situation—and 400 of those schools were in the province of Quebec.

**The Chair:** Thank you. Your time is up, Ms. Lattanzio.

We're going to turn to Monsieur Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

Mr. Kielburger, I gather that your relationships with the Trudeau family carried on until at least last summer, when the scandal broke. I am referring to the Prime Minister's mother, brother and wife, as well as anyone else who may have been in the family's circle.

Have those relationships continued since last summer?

Do they still give talks for the WE Organization?

[*English*]

**Mr. Craig Kielburger:** No.

[*Translation*]

**Mr. Rhéal Fortin:** Very well.

I listened to the exchange between you and Mr. Poilievre about the infamous thank you message on LinkedIn. You didn't really have to thank the individual because, according to your testimony, he never played a part in shaping the program.

How many people like that did you thank for nothing—people who had no involvement in shaping the program?

[*English*]

**Mr. Craig Kielburger:** We, as a charity, always seek to personalize correspondence. Even for a LinkedIn request we get a line or two of personalization. We, as a charity, try to make people engage with us because that's what [*Technical difficulty—Editor*].

[*Translation*]

**Mr. Rhéal Fortin:** That doesn't answer my question. I don't remember the name of the individual whom Mr. Poilievre was telling you about. However, I gather from your comments that you wrote to the individual to thank him for helping you set up the program, even though you're saying that he didn't really help you.

How many people did you thank even though they didn't help you set up the program?

Did you send this message to other people?

● (1655)

[*English*]

**Mr. Craig Kielburger:** To clarify, a staff member wrote that. Every person got a personalized two-liner.... And because the federal government generally was engaging with us, it was a thank you for supporting—I don't even know the wording—for use, whatever—

[*Translation*]

**Mr. Rhéal Fortin:** You sent a number of messages like this one to thank people—

[*English*]

**Mr. Craig Kielburger:** [*Inaudible—Editor*]

[*Translation*]

**Mr. Rhéal Fortin:** —for helping you, even though they didn't help you.

Is that right?

[*English*]

**Mr. Craig Kielburger:** Some messages went out that day or the day before, all thanks for supporting kids, thanks for helping youth volunteers.

[*Translation*]

**Mr. Rhéal Fortin:** We aren't talking about helping children. You thanked someone for helping you set up the program.

How many people did you send a message to in order to thank them for [*Technical difficulty—Editor*] even though they didn't really help you?

[*English*]

**Mr. Craig Kielburger:** I understand. We're not hiding the fact that we engaged with the PMO. We had a conversation with Rick Theis. We had a conversation with the PMO on this. There's no need for us to hide this; it's on the record. We legitimately spoke to them. They had actual questions. We gave the answers to the questions. He wanted options; we gave him options.

[*Translation*]

**Mr. Rhéal Fortin:** Okay.

I didn't receive a thank you message, so if you want to thank me, feel free.

**Voices:** Oh, oh! (laughter)

**Mr. Rhéal Fortin:** That said, Mr. Kielburger—

[*English*]

**The Chair:** Thank you, Mr. Fortin.

Gentlemen, we've gone over time there.

We'll go to Mr. Angus now for the next round of questions.

**Mr. Charlie Angus:** Thank you very much.

Yes, you have testified a number of hours here, but I can never seem to get some straight answers here, so, if you don't mind, I'm going to have to keep going back at it.

The only person I think who has been gaslighted more than me is poor Rachel Wernick. Again today you say it was Rachel Wernick who reached out to you and that you've had this long-standing relationship with Rachel Wernick, but the documents don't show that.

They show an April 17 meeting with you, Craig, Sophia Marquez and Minister Chagger. Your documents then thank her and say that she was the one who suggested establishing the volunteer stream, so that's[*Technical difficulty—Editor*] service stream.

Let's just clarify the record here. You met with Minister Chagger. She suggested the service stream, correct?

**Mr. Craig Kielburger:** Minister Chagger spoke on a different proposal suggesting we incorporate the service stream. That's correct.

**Mr. Charlie Angus:** Yes, okay.

Then she said to make a new stream to add this in, and you then contacted them on the 22nd, thanked them and said that you had been advised by Minister Chagger to add this in, so it wasn't Rachel Wernick who came up with this. Minister Chagger talked to you, and you guys began working on this. Correct?

**Mr. Craig Kielburger:** I've submitted the email that says from Ms. Wernick on the 19th, "I am sorry for the 'out of the blue' email on a Sunday morning." She said that she needed to urgently speak to that matter. I wrote back to her saying I was happy to speak. We spoke that same day. In the email we've also submitted, we said we were happy to help and that we would get her some materials right away on this service initiative. It's all documented on paper. Papers don't lie.

**Mr. Charlie Angus:** I know it is, because unlike my Liberal colleagues, I read all the papers. So April 17th, you meet. April 18th, before Wernick reaches out, out of the blue, ESDC is talking to Kovacevich, and Kovacevich says, "Hey, stop looking into Spotify. We have another possibility. And that—

**Mr. Craig Kielburger:** Was Spotify really being considered to deliver a—

**Mr. Charlie Angus:** Well, that's what they keep telling us.

So anyways, I'm looking here, "Happy Monday! Min. Chagger expressed interest in exploring ways to adapt the entrepreneurship proposal we submitted to Min. Ng and include a service component.... She suggested that we should consider opening a service-stream". So that was Sophia Marquez.

Then you wrote and said that Minister Chagger gave you this advice, and this is what you were following up on. So you were following up, and you already had the plan started by the time Rachel Wernick.... Let's just cut to the chase. You met with Chagger, and she gave you this idea, so Wernick didn't come out of the blue. You were meeting with her boss beforehand. Correct?

**Mr. Craig Kielburger:** I agree with you she didn't come out of the blue because she'd funded us two years earlier to test—

**Mr. Charlie Angus:** No, no, no, no, no, no, come on, Craig, come on, Craig. You met on the 17th, two days before. You met the Minister.

**Mr. Craig Kielburger:** [*Inaudible—Editor*]

● (1700)

**Mr. Charlie Angus:** Can't you at least admit you met the minister? Admit it.

**Mr. Craig Kielburger:** Can I answer the question, please?

So again, June 29, they awarded $800,000 to test service programs of 2018.

**Mr. Charlie Angus:** No, no, no.

**The Chair:** Mr. Angus, your time is up. Mr. Angus, we're going to allow for the answering of the question. Then we're going to go to Mr. Gourde.

**Mr. Charlie Angus:** I'm asking about the question on April 17th, and he's going back two years before. It was that meeting. So just tell us—

**The Chair:** Mr. Kielburger, can you answer the question so that we can move on to the next questioner?

**Mr. Charlie Angus:** Yes. Come on—please.

**The Chair:** Mr. Kielburger.

**Mr. Craig Kielburger:** We had worked with ESDC for years, including at the request [*Technical difficulty—Editor*] had funded us previously on service. Ms. Wernick had been deeply involved with us. At her request—she asked our help—we delivered the help to help kids.

**Mr. Charlie Angus:** You didn't mention that. You said Chagger asked you to help on the—

**The Chair:** Mr. Angus, we might get a chance to come back to you.

**Mr. Charlie Angus:** Thank you.

**The Chair:** Monsieur Gourde, we will turn to you.

[*Translation*]

**Mr. Jacques Gourde:** Thank you, Mr. Chair.

I want to know when the first meeting between Justin Trudeau and the witnesses took place.

[*English*]

**Mr. Marc Kielburger:** This was all before he was an elected member of Parliament. He was involved in youth service.

**Mr. Craig Kielburger:** Oh, Katimavik—that's why.

**Mr. Marc Kielburger:** Katimavik, yes; he was involved in youth service programming, as of course we were. This was well

over a decade ago. Our areas around youth leadership and youth programming had intersected. Of course, he was involved with Katimavik, which is a wonderful organization.

**Mr. Craig Kielburger:** He was chair of Katimavik, in fact. That's the conversation.

[*Translation*]

**Mr. Jacques Gourde:** So we're talking about twenty years or more.

[*English*]

**Mr. Marc Kielburger:** I think it was about 10 years or so...?

**Mr. Craig Kielburger:** It was about 10 to 15.

**Mr. Marc Kielburger:** Yes.

It was 10 to 15 years or somewhere in that range. Again, this was before he was an elected official.

[*Translation*]

**Mr. Jacques Gourde:** That's fine.

Over the years, have you developed a friendship? By a friendship, I mean that you have his cellphone number and he has yours, and you have conversations from time to time, maybe once a month or once every two months, about anything.

[*English*]

**Mr. Marc Kielburger:** The answer is no.

We would also share, for Mr. Poilievre, that we weren't friends on LinkedIn with him either.

**Mr. Craig Kielburger:** We never had his cellphone.

**Mr. Marc Kielburger:** No.

**Mr. Craig Kielburger:** I don't know if he ever had ours. We certainly never had his cellphone. We've never had a meal together socially. We've never golfed.

[*Translation*]

**Mr. Jacques Gourde:** So you knew him well and you invited him. He had already participated in WE Charity events.

In what year was the first event that you attended with him?

[*English*]

**Mr. Marc Kielburger:** If I'm not mistaken, it was one of the WE Days about a decade ago or maybe a little longer than that. We shared this information with FINA. We'd be happy to provide the information again. It was well over a decade ago.

**Mr. Craig Kielburger:** I think it was when he was chair of Katimavik—I think it was 2007 he was chair, wrapping up—we invited Katimavik and him in that capacity. I think he didn't come, but maybe the next year he did.

Again, this was before politics, in the Katimavik role.

[*Translation*]

**Mr. Jacques Gourde:** Okay.

Are you aware that there was no bidding process for the program you accessed and that no one else offered their services?

[*English*]

**Mr. Marc Kielburger:** I'm glad you asked that question. We were under the assumption that there were other groups—not Spotify, but actually Shopify—being considered. That's what we were told, so we assumed, perhaps incorrectly, at least at the initial stages, that this was all following regular processes.

**Mr. Craig Kielburger:** To be candid, I wish this had gone to tender. I wish that anyone could have bid on this. Again, to be candid, I wish this had been an open bid, because I still feel we may have been a good contender among many others. I wish there had been a proper recusal in the process. I wish people had done additional diligence that the people here are speaking of if there had been any concerns.

But also, it was a pandemic. It was a different time. People were doing their best.

Again, to Marc's point, we were actually told that multiple organizations were being considered—explicitly.

[*Translation*]

**Mr. Jacques Gourde:** In that committee, we were told that, given the architecture of the program, you were the only ones in Canada with access to over 7,000 schools and that you had the infrastructure to reach as many students as possible in a short amount of time. So the contract was tailor-made for your organization, because you were really the only ones in Canada who could fulfill it. They probably didn't even look elsewhere. You were at the forefront, and you're victims of these circumstances.

I want to talk about the rollout of the program. How would you have selected the students? Were the students supposed to sign up or did you have competitions at each school?

● (1705)

[*English*]

**Mr. Marc Kielburger:** Yes, to the honourable member, we had students participate in the program. Unfortunately, the program didn't actually take place, but an ESDC process was defined for applying online. ESDC defined criteria. We had well over 35,000 students sign up in a matter of days. It was quite remarkable to see. There was a—

[*Translation*]

**Mr. Jacques Gourde:** Sorry.

Could you please send the committee the registration form?

[*English*]

**The Chair:** Monsieur Gourde, that's your last question.

We'll give you an opportunity to answer that.

Mr. Kielburger, please answer.

**Mr. Marc Kielburger:** We're happy to do that.

Mr. Chair, can we also ask for an additional health break at some point?

[*Translation*]

**Mr. Jacques Gourde:** Thank you.

[*English*]

**The Chair:** We can break for five minutes now.

Members, we'll suspend for five minutes.

● (1705)

_____(Pause)_____

● (1710)

**The Chair:** Colleagues, we'll call this meeting back to order.

I'll turn to Mr. Sorbara for the next round of questions.

**Mr. Francesco Sorbara:** Thank you, Chair.

Again, welcome, everyone.

For Marc and Craig, how many hours have you testified in front of two committees in the last few months?

**Mr. Marc Kielburger:** This will be hour seven.

**Mr. Francesco Sorbara:** You have delivered seven hours of testimony to many members, answering many questions.

I do have one question. I know a few of my opposition colleagues have been quick to cut you off on this question, so I do want to give you a moment to answer.

Was April 2020 the first time you talked to the government about running a student program?

**Mr. Craig Kielburger:** Correct.

**Mr. Francesco Sorbara:** To correct the record from my parliamentary colleague, Mr. Angus, the name that was mentioned way back when in the finance testimony was not Spotify. It was Shopify.

**Mr. Charlie Angus:** I have a point of order.

Mr. Sorbara has deeply embarrassed me. I'm showing my age in getting Spotify and Shopify mixed up. I want it stricken from the Hansard record so it never shows that—

**The Chair:** I'm not sure that is a point of order, but I'm sure you're debating with yourself—

**Mr. Charlie Angus:** That's not a point of order? Okay, continue, Mr. Sorbara.

**The Chair:** Thank you, colleagues.

Mr. Sorbara, we'll turn back to you.

**Mr. Francesco Sorbara:** I would like that time given back to me, so I can ask the next question.

I'll go back to my opening remarks with Marc and Craig on having an MP write an agency—the RCMP. I personally feel it is completely wrong for them to say that an investigation should be started toward any individual organization here in Canada. To me, that is just not what we need to be doing politically and it is wrong. I know you folks have commented that it is not appropriate for politicians or public servants to be doing that.

I want to get that on the record because the independence of those agencies is beyond repute and we need to keep it in that light. We shouldn't mix those two things.

I do wish to comment. I take it that the Prime Minister's mother, Margaret Trudeau, came to speak on mental health to young people. Is that correct?

● (1715)

**Mr. Craig Kielburger:** That is correct.

**Mr. Francesco Sorbara:** As I stated in the finance committee hearings, she also came to speak here in the city of Vaughan—which is my riding—in front of 1,000 individuals. It was a Women's Day event. For me, her speech captivated the room and many people listened very attentively and found her story on mental health to be very inspiring.

With regard to charities in Canada, you mentioned the remarks on where charities are today. How do you feel about that situation?

I do want to make another comment. I do want to apologize in a certain sense for what your families have borne through this whole process. You have young children. You have grandparents. Many of us have young children and grandparents as well. It's quite unfair for any witness coming in front of a committee to then feel threatened by individuals because of testimony and questions from opposition members or be it as is. On that level, you have my empathy and my appreciation for coming back.

Do you have any closing remarks, gentlemen?

**Mr. Marc Kielburger:** We appreciate that. As much as we appreciate it for us, we really look to the issue of young people in Canada who, of course, are really the ones who lost out on this.

I would just appeal again with humility and grace to all of you as elected members of Parliament. You have a tremendous amount of power to help young people this coming summer once again through coming together as members of Parliament from all parties to create, as part of your report, some opportunities for those young people.

I also want to thank the members of Parliament thus far for being respectful of this process. Thank you, all members of Parliament, including Mr. Angus. Thank you for staying focused largely on pandemic spending and the mandate of this committee. We really appreciate it.

**Mr. Francesco Sorbara:** Mr. Warkentin, can I get that time made up that Mr. Angus took away?

**The Chair:** We'll always make up that time.

If you have just a short question, we can probably get it in.

**Mr. Francesco Sorbara:** Gentlemen, do you have any quick points on the conversations you had in the prior years, in 2017, 2018 and 2019, with regard to your interactions with the government and how programs were put in place, and so forth?

**Mr. Craig Kielburger:** Thank you.

Again, I know I said it very quickly, but I don't think most people understand how this program came to be.

Rachel Wernick first came to visit our office in October 2017 to see about our capacity.

On June 29, 2018, we were awarded $800,000 for a youth service initiative to test programs to engage youth nationally in service. Of course, this had been a long-standing [*Technical difficulty—Editor*] the government launching a national service program.

On May 19, ESDC asked us to put together a white paper on how the civil service could implement a national service program.

On August 21, 2019, they came to us again to deepen that conversation.

On March 6, they asked us to prepare again a follow-up white paper for their civil service.

These were requests that came to us from the civil service because of our capacity on this. This wasn't out of the blue. This wasn't a sudden pandemic issue. We had been the go-to for the government in helping to support, as were many other charities, so we have a deep relationship with Rachel Wernick and ESDC.

I feel bad that she got dragged into this also. This whole program should have just happened for kids.

**The Chair:** Thanks so much.

We'll turn to Mr. Fortin for the next two and a half minutes.

Monsieur Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you, Mr. Chair.

I have a quick question—

[*English*]

**Mr. Colin Carrie:** Mr. Chair, on a quick point of order, just looking at my notes, I think we're starting at around five o'clock, and that means the Conservatives would go first. Am I correct?

**The Chair:** No, you're not correct—

**Mr. Colin Carrie:** Okay.

**The Chair:** —but thank you. We can touch base.

Monsieur Fortin.

[*Translation*]

**Mr. Rhéal Fortin:** Mr. Chair, I hope that my time doesn't run out, especially given the interpretation during the objections and opening remarks of my colleagues. I'll rely on your good judgment.

In 2017-18, the WE Charity failed to fulfill some financial commitments. We've had people tell us that this wasn't a big deal and that it didn't affect your ability to set up the program when the agreement was made. We've also heard from people who questioned the solvency of the WE Charity.

Mr. Kielburger, my question is the following. Before you were given the student grant contract, did anyone in the federal government investigate these failures to fulfill your financial commitments?

● (1720)

[*English*]

**Mr. Marc Kielburger:** Mr. Fortin, I believe you're speaking about the issue of bank covenants, widely misunderstood in this conversation. It was one line out of 27 pages of audits. There was a technical breach. Our banker, RBC, had no concerns about it. Specifically, we changed our fiscal year and the subsequent year had contracts that were part of the past fiscal year. As a result, we had a technical breach on our bank covenants and [*Technical difficulty—Editor*]—

[*Translation*]

**Mr. Rhéal Fortin:** I don't want to investigate whether or not this has merit.

I just wanted to know whether anyone in the government investigated.

Did any government representative tell you that they had concerns, that they had questions about this matter, and that they wanted to know what was going on?

[*English*]

**Mr. Marc Kielburger:** Our financial audits were online and there were no questions asked specifically on the issue of bank covenants.

[*Translation*]

**Mr. Rhéal Fortin:** Thank you. That's what I wanted to know. So you weren't asked any questions about this matter.

You also said that, when it comes to your conferences, you have no longer been doing business with the Trudeau family since the events of last summer.

Can one of you tell me why Ms. Trudeau will no longer be giving speeches for the WE Charity?

[*English*]

**Mr. Marc Kielburger:** Are you speaking on behalf of Margaret Trudeau? Is that correct, sir?

[*Translation*]

**Mr. Rhéal Fortin:** Yes, for example, why are you no longer inviting Margaret Trudeau to give speeches?

[*English*]

**Mr. Marc Kielburger:** Well, because of the pandemic, we haven't had any conferences since, but also, of course, because of the politics. The pandemic is the principal reason.

**The Chair:** Thank you so much, Mr. Fortin.

We're going to turn to Mr. Angus for the next two and a half minutes.

[*Translation*]

**Mr. Rhéal Fortin:** My two minutes are up already, Mr. Chair?

[*English*]

**The Chair:** The time is up. We certainly—

[*Translation*]

**Mr. Rhéal Fortin:** You took off the—

[*English*]

**The Chair:** It seems shorter than the last one because I gave you so much time in the last one.

Mr. Angus.

**Mr. Charlie Angus:** Thank you, Mr. Chair.

I don't want to be a bug. I'm sure you're already probably putting more misinformation than I'm claiming on Twitter.

I may not be able to read a budget, you would think, but I can certainly read your emails, when you supply them. This idea of dragging Rachel Wernick continually, I find really troublesome. She did not reach out to you. You had already established this.

It says, Craig Kielburger—now I hope we're not going to have another LinkedIn moment—to Minister Chagger:

> Dear Minister Chagger,
>
> Thank you again for your time Friday.

That's April 17.

> We appreciate your thoughtful offer to connect us with relevant members of your Ministry.

That would be Rachel Wernick.

> Over the weekend

—that's the two days before Rachel Wernick reaches out to you—

> our team has also been hard at work to adapt your suggestion of a second stream focused on a summer service opportunity.
>
> We have outlined a 3-month summer service/jobs opportunity engaging 20,000 young people

And you basically list what becomes the Canada summer student grant.

I bet you don't have to register time as a lobbyist for having spent all that time, all weekend, before Rachel Wernick contacted you, because, as you said, you're just a volunteer.

That's the record. All this misinformation that you talked to her three years ago is irrelevant. You talked to the minister on April 17—you don't seem to want to deal with that—and then you contacted her to remind her that you talked to her on the 17th, and she was going to put you in touch—which she did—on the 19th.

That's the record.

But because I only have a few seconds left, I want to go back to Reed Cowan, a member of your advisory board. For you to tell us you're really shocked, and this only ever happened once, even though we know you took down at least two of his plaques.... He has asked for a police investigation. He has asked for the IRS to investigate you. He has raised hundreds of thousands of dollars. Are you telling Reed Cowan, and all the other donors across this country and across North America, that this velcro plaque scheme that your staff bragged about only happened twice?

**Mr. Craig Kielburger:** Sir, we are grateful to every single one of our donors. When a mistake is made, no one is more upset than us, and I am so upset about this, and I—

**Mr. Charlie Angus:** I know. But David Stillman, of the Stillman Foundation, who paid for all the audits that exonerated you, he had a conversation with Mr. Cowan, we were told. Someone who was paying your audits, represents you, calls Mr. Cowan, and he tells him to drop it. He says to just drop it. That's not exactly saying you're sorry, it's like you're making the organization look bad.

Again, are you telling me this only happened twice in all these velcro plaques, that people were lying to Bloomberg, were lying to *The Fifth Estate*, Mr. Cowan just is upset and got it wrong? Is that your position? That's all I need to know, is that your position?

● (1725)

**The Chair:** That will be the last question there on this round, Mr. Angus.

**Mr. Charlie Angus:** Thank you.

**The Chair:** Mr. Kielburger, we'll turn to you.

**Mr. Craig Kielburger:** To our tens of thousands of donors over the years, the projects have gone to where they're supposed to. We have done our best, and we're grateful because the money got to the kids, as it is supposed to. In that, it has changed lives, millions of lives, and we're grateful to each and every one of our donors.

**The Chair:** We'll turn to—

**Mr. Charlie Angus:** And Mr. Cowan's plaque?

**The Chair:** We'll turn to Mr. Carrie, and he'll be splitting his time with Mr. Poilievre.

Mr. Carrie.

**Mr. Colin Carrie:** Thank you, Mr. Chair.

Given the statements made in WEconomy, it's clear that WE Charity conducted a survey that collected data on voting in the 2011 federal election.

My question is, how did you receive the contact information of these WE alumnae, when many of them would have been under-aged kids at the time of the WE Day they attended? I'm curious as to how the data was collected, and by whom. Did you ever contract your data analysis with any third parties that also might do data analysis for political parties, such as Data Sciences, for example?

**Mr. Marc Kielburger:** To the honourable member, the short answer is no on the Data Sciences, or any associated group that would do political data analysis. That was part of [*Technical difficulty—Editor*] university called Mission Measurement. They ask young people if, because of the program, they're more likely to do many things, including vote, volunteer or give to charity. We never discussed it at the time of asking. We never asked who they voted for. We had no interest in that information.

**Mr. Colin Carrie:** All right.

Will you provide to the committee a copy of the report that Mission Measurement, LLC provided to WE Charity on the project, that Free the Children alumni study?

**Mr. Craig Kielburger:** Absolutely. In fact, we're very proud of the outcomes. More than 80% of our youth alumni continue to volunteer, 79% voted in the last federal election and I believe 83% continue to give to charity. It's such a shame that's coming to an end, those programs in Canadian schools—

**Mr. Colin Carrie:** Did you share that report with any other third parties?

**Mr. Craig Kielburger:** Yes, absolutely. It's actually on our website, so anyone can look at the report.

**Mr. Colin Carrie:** I was looking for it. I didn't see it.

**Mr. Craig Kielburger:** We'll send it to you.

**Mr. Colin Carrie:** What measures do you use to control the use of WE Charity data and for youth that may have signed up for the WE events, because these WE events, they're looked after by ME to WE, right? Then the charity is a separate thing altogether. How do you control this data that's collected by either the charity or ME to WE?

**Mr. Marc Kielburger:** All the WE Day events were of course part of WE Charity. It was part of that initiative through the WE Charity and the WE schools initiative. We have a very robust system. We haven't shared that data with anybody, including political parties, and followed proper processes and protocols.

**Mr. Colin Carrie:** You can guarantee that data was not shared with any provincial or federal political party?

**Mr. Marc Kielburger:** Correct.

**Mr. Colin Carrie:** You can do that—

**The Chair:** Thank you, Mr. Carrie.

We'll turn to Mr. Poilievre.

**Hon. Pierre Poilievre:** What was the name of the assistant who you claim wrote your e-mail to—through LinkedIn—Mr. Ben Chin?

**Mr. Craig Kielburger:** Mr. Poilievre, I've gotten death threats. Our staff has gotten death threats. The speaking bureau has gotten death threats. I am not naming another employee—especially a former executive assistant—to you, sir.

**Hon. Pierre Poilievre:** We will be asking for it to be handed over to the committee, and we can keep that information from the public, but I want to find out if this person actually exists. Do you commit to giving that person's name to the committee?

**Mr. Craig Kielburger:** With the permission of that person and the conversations that unfold, we'll get back to you on that one. That's a private matter.

**Hon. Pierre Poilievre:** No, it's not a private matter, actually. This is someone you claim is writing correspondence to the Prime Minister's Office on your behalf. We want to confirm that this person actually exists, because the correspondence that has your name on it contradicts the testimony that you've given directly. You will need to provide it to prove that you in fact actually are telling the truth here, because it's very hard to believe.

You said you sent a hundred different e-mails thanking people for their role in setting up the Canada student service grant. Is that what you said?

● (1730)

**Mr. Marc Kielburger:** Mr. Poilievre, does anybody in your office write your correspondence?

**Hon. Pierre Poilievre:** I'm asking.... The question was a hundred people, yes or no? Is that how many people you thanked for setting up your Canada student service grant?

**Mr. Craig Kielburger:** Do you write all your own correspondence, sir? You don't have an assistant who helps you with any of it?

**Hon. Pierre Poilievre:** I can tell you that I didn't send Ben Chin an e-mail thanking him for a program that I didn't think he set up, so back to you. Your smirking and evading might be fun now; it's not going to be fun when we're investigating you for contempt of Parliament.

Did you actually send a hundred different thank-yous to members of the government for their role in helping set up the Canada student service grant? That's the question, and it's a yes or no.

**Mr. Craig Kielburger:** No, because we sent a hundred messages to different individuals across a variety of industries that I was asking to link with me on LinkedIn and each got a personalized two-line "would you link with me?" It was a personalized two-line message to each individual prepared by my EA that came from a hundred lists. We had hundreds of names. The EA short-listed it because I asked her to build my LinkedIn profile.

**Hon. Pierre Poilievre:** Okay. You just randomly somehow or another, in the middle of setting up this program, decided to add Ben Chin, whom you claim you hadn't spoken to in two years, to a list of people to randomly thank about creating a program that you thought he had no role in creating.

**Mr. Craig Kielburger:** It was one of a hundred names that were contacted that day to [Technical difficulty—Editor] LinkedIn. That's the simple fact.

**Hon. Pierre Poilievre:** Next question: How much did you pay for Sophie Trudeau's attendance at the London WE event in March of 2020? How much?

**Mr. Craig Kielburger:** Just to be clear, we've previously given all the—

**Hon. Pierre Poilievre:** No, you haven't, actually. No, sorry. To be clear, again you're giving false testimony. You have not given, sir, the itemized amounts for that event. How much?

**Mr. Craig Kielburger:** [Technical difficulty—Editor]

**Ms. Patricia Lattanzio:** Mr. Chairman?

**The Chair:** Do I see a point of order?

Ms. Lattanzio.

**Ms. Patricia Lattanzio:** Yes.

Mr. Chairman, I'm sorry to interject, but I think that we're supposed to be working in collaboration to try to get the information, as much information as we possibly can—

**The Chair:** Ms. Lattanzio, is there a point of order?

**Ms. Patricia Lattanzio:** Yes, there is.

**The Chair:** Okay, I'll hear your point of order.

**Ms. Patricia Lattanzio:** We ask a question, and then we answer a question, or we assume that we know the answer to the question. I defer to you, Mr. Chairman, and ask you whether this is part of decorum. I need for you to rule on the way we're carrying ourselves in this committee today.

Thank you.

I need for you to rule on that.

**The Chair:** I rule in support of.... I believe that we are undertaking...according to the rules.

Thank you.

Mr. Poilievre, we'll turn to you to finish off the questions.

**Mr. Han Dong:** Mr. Chair, I have a point of order.

**The Chair:** On a point of order, Mr. Dong.

**Mr. Han Dong:** Could you clarify? Is this round a five-minute round or a two-and-a-half-minute round? Your answer to—

**The Chair:** This is a five-minute round. We will get to you next. You are splitting your time.

**Mr. Han Dong:** All right.

**The Chair:** Thank you.

Mr. Poilievre, we'll let you finish that question and get an answer from the Kielburgers. Then we'll move on to the next questioner.

**Hon. Pierre Poilievre:** It's just the total amount that the WE organizations and its affiliates paid in transportation fees, accommodations and any other expenses related to Ms. Sophie Grégoire's attendance at the WE event in March 2020 in London—just the amount, please, for that event.

**Mr. Craig Kielburger:** I don't have that, but we'll get it for you.

I want to clarify that we previously gave FINA the total amounts—

**Hon. Pierre Poilievre:** It was just the total, not the itemized. You have not given the itemized amounts. I know that you don't want it to be public how much you paid for her accommodations and for that sumptuous travel right before you sought government funding from her husband.

My next question is this: Is there another family you paid over $400,000 in fees and expenses to, other than the Trudeaus?

**Mr. Craig Kielburger:** Other—

**The Chair:** Mr. Poilievre, we are out of time now.

We'll turn to Mr. Kielburger—

**Hon. Pierre Poilievre:** Could we just get an answer for that?

**The Chair:** —to answer that question. Absolutely.

**Mr. Craig Kielburger:** For over 25 years we've engaged dozens of speakers, and so that dollar amount would not be out of the norm for our most frequent speakers.

**Hon. Pierre Poilievre:** Can you name one family?

**Mr. Craig Kielburger:** Oh, I'm not going to name those names. There are speakers who have come to multiple events, who have done multiple fundraisers, in excess of 40 events, as they did in fundraisers and awareness raisers for us. We have absolutely paid, because we don't do telemarketers. We don't do street canvassers. This is how we raise funds—

**Hon. Pierre Poilievre:** Over $400,000 to one family—

**The Chair:** Thank you, Mr. Poilievre.

We'll turn to Mr. Erskine-Smith, who is splitting his time with Mr. Dong.

**Mr. Nathaniel Erskine-Smith:** Thanks very much.

I appreciate your time here.

I'm wondering, because I know you said you wanted to get to the [*Technical difficulty—Editor*] and Reed Cowan's concerns, and I appreciate that. How were you able to confirm that the plaques had, in fact, been removed? Who on the ground confirmed that to you?

● (1735)

**Mr. Craig Kielburger:** I'm sorry, but would you repeat the question, please?

**Mr. Nathaniel Erskine-Smith:** Yes. You've confirmed that Reed Cowan's plaque was removed. You confirmed that it happened in one other instance.

**Mr. Craig Kielburger:** Yes.

**Mr. Nathaniel Erskine-Smith:** How did you confirm that? Who on the ground...? I don't need a name. What was the position of the individual who confirmed that to you?

**Mr. Craig Kielburger:** One of the locals [*Technical difficulty—Editor*] a bike and drove out to the school and took a look to make sure that...and found that the plaque wasn't there. That was a serious issue, yes.

**Mr. Nathaniel Erskine-Smith:** You were aware that the plaque for Reed Cowan was associated with that particular school.

**Mr. Craig Kielburger:** Correct. We apologized for this.

In full transparency, in that same village we had found out that around that same time there was a second plaque, that we know of. That's why we're doing a full investigation across the organization, but particularly in that time frame, to try to understand what went wrong.

We phased out plaques about 12 years ago. The local community doesn't want plaques in the schools. They are their schools. They pay. They maintain them. They continue after we hand them over to them. So we stopped doing plaques, again, about a dozen years ago.

But we recognize that this is a very important issue. This is why we're trying to get into this.

**Mr. Nathaniel Erskine-Smith:** I suppose it's not just about the plaque per se. Yes, it's about the plaque and certain representations made to donors, but equally I would say that the concern stems from representations made to donors that their funding is going to a project and that you're not soliciting different funding for that same project.

I recognize what you say about boreholes being required. I recognize that there may be additional expenses that require additional funding.

**Mr. Craig Kielburger:** May I respond to that? Is that possible, because I really—

**Mr. Nathaniel Erskine-Smith:** Yes, but before you do, I guess I'm seeking clarity—and I appreciate you are concerned about this—for how you are going to get to the bottom of this. Who is it you have tasked with getting to the bottom of this, and who is it on the ground who is going to get to the bottom of this for you?

**Mr. Craig Kielburger:** I appreciate the question.

There are two quick things.

Number one, I feel that some people are maybe misunderstanding. Yes, we have funders who fund [*Technical difficulty—Editor*], but that's not just our model. We also have programs in schools for five, seven and sometimes 10 years—again, school lunches, teacher training, school supplies, programs for kids. All of that requires incremental funding. That's why people pool their funding into a village project. They pool it to support all these initiatives so that it can support the kids. It's not just building a building. An empty building does no good. You need all the other programs.

To answer your question, we have a standing committee of the board that has now been formed. Publicly, it is Gerry Connelly, the former director of education of the Toronto District School Board, who is going to lead the standing committee and who's looking at this issue both from Canada.... We also have a team in Kenya that is digging into this.

It will take a while. There are a lot of paper records from 15 years ago in Kenya, where we're trying to figure out the answer to this question. We are committed to finding out the answer to this question, because it is important.

I hear you, and we heard Mr. Cowan. Again, we are not perfect. But in 25 years, thousands of projects, 45 countries [*Technical difficulty—Editor*] water and health, we make mistakes. And we apologize for those mistakes.

**Mr. Nathaniel Erskine-Smith:** The rest of my time I cede to Mr. Dong.

**The Chair:** Mr. Dong.

**Mr. Han Dong:** Thank you, Chair.

I'll make a quick comment. Witness in your opening statement you criticized the government members for hiding behind a children's charity. If you check the blues—and I'm a permanent member of this committee—during numerous debates I pointed out the fact that it's unfortunate that many kids would lose the opportunity to participate in a summer internship or a volunteer long-term program, and the negative impact this whole politically motivated back and forth has had on the entire charitable industry. I welcome you to check the blues.

As you can see today, Mr. Poilievre and especially the Conservative members are having a tough time believing all the information is there. They seem to be conducting a fishing expedition and they want to continue.

Having said that, I respect all members' privilege to ask questions, especially for the opposition—

**Mr. Colin Carrie:** I have a point of order, Mr. Chair.

**The Chair:** I recognize a point of order.

Mr. Carrie.

**Mr. Colin Carrie:** Mr. Dong was saying there's some type of fishing expedition. I think that even the Kielburgers would agree that their corporate structure is very confusing.

● (1740)

**The Chair:** Mr. Carrie, is this a point of order or a point of debate?

**Mr. Colin Carrie:** It's not a fishing expedition.

**The Chair:** That's not a point of order. Thank you, Mr. Carrie.

Mr. Dong.

**Mr. Han Dong:** Although I disagree with them, and I disagree with their motive, too, I do respect and I would defend their right as parliamentarians and their privilege and also their responsibility to make sure the government is accountable.

With that, I have nothing else to ask. I just want to put that on the record. Thank you.

**Mr. Marc Kielburger:** Mr. Chair, can we respond to that quickly?

**The Chair:** Mr. Kielburger.

**Mr. Marc Kielburger:** Thank you.

Sir, we appreciate the fact that you're defending members of Parliament. We respect the fact that you, as members of Parliament, have a very important role to play. We're asking, as well, that people also defend the kids in the process.

**The Chair:** Colleagues, we have now reached the end of our rounds of questions. I know there have been a number of discussions during this hearing with regard to the production of documents. I'm certain your counsel has been taking note of those things that have been requested. I'm certain that will be supplemented by the clarification that will be provided to committee members over the next number of hours as we go through all the things that were not only requested but that you have suggested you would be happy to provide for us. We'll look forward to that correspondence. We'll ensure that happens.

Mr. Dong, I see you're raising your hand.

**Mr. Han Dong:** Yes, I listened to Mr. Poilievre mention that he's going to move a motion. I take it as a threat to our witnesses. I want to be clear. Are we considering that motion? Are we not considering that motion, or was that not a formal motion? I didn't see any motion. I didn't see a notice of motion. I don't know any details.

**The Chair:** We'll turn to Mr. Poilievre. If he does have a motion, obviously he did—

**Mr. Han Dong:** I'm not inviting him to move a motion, Chair. I'm saying I want you to clarify. I want to make sure there is no unanimous consent given to what Mr. Poilievre was saying. If there's no motion on the floor, I'm happy with that. To be clear, I'm not inviting him to make a motion. I'm asking for clarification from the chair.

**The Chair:** I believe there was a suggestion that a motion might have been brought forward. There is no motion being debated at this point. You could probably work with Mr. Poilievre to draft that motion, and we could probably undertake to vote on that, if that's what you'd like, but obviously—

**Mr. Han Dong:** The motion I want to put forward is the adjournment of today's meeting.

**The Chair:** Not seeing any additional members—

**Hon. Pierre Poilievre:** I have a point of order, Mr. Chair.

**The Chair:** Go ahead.

**Hon. Pierre Poilievre:** I understood there was one more round of questioning that had not been completed.

**The Chair:** The members who remained on that round indicated that they were done.

**Hon. Pierre Poilievre:** Mr. Carrie and I split the last round and we were going to split the.... Basically, we took our two rounds and split them each in half, so we had one more to split. That was my understanding of the....

**The Chair:** There is a motion to adjourn.

**Mr. Han Dong:** Yes.

**Hon. Pierre Poilievre:** I know the Liberals are trying to run out of the back door as quickly as possible, but no, we don't grant consent to that.

**The Chair:** Okay, well, it does take unanimous consent to adjourn.

I'm assuming, then, that we'll turn to—

**Mr. Charlie Angus:** I have a point of order.

**The Chair:** Mr. Angus.

**Mr. Charlie Angus:** It's not that I don't want to hear my colleague Mr. Poilievre again, but we had agreed to 5:30. I think it's fair.

I think normally if there's going to be a debate over adjournment, we should actually put it to a vote. Some of us have to carry on to other parliamentary work now.

**The Chair:** You are right. Because it has now been moved as a motion, it is non-debatable. We'll move to a vote.

(Motion agreed to)

**The Chair:** We will move to adjourn.

Thank you, colleagues. Thank you to our witnesses.

**Mr. Charlie Angus:** Thank you, Chair, for handling this is in such a way...and thank you to our witnesses for coming.

**The Chair:** The meeting is adjourned.

Published under the authority of the Speaker of
the House of Commons

## SPEAKER'S PERMISSION

The proceedings of the House of Commons and its commit-
tees are hereby made available to provide greater public ac-
cess. The parliamentary privilege of the House of Commons
to control the publication and broadcast of the proceedings of
the House of Commons and its committees is nonetheless re-
served. All copyrights therein are also reserved.

Reproduction of the proceedings of the House of Commons
and its committees, in whole or in part and in any medium,
is hereby permitted provided that the reproduction is accu-
rate and is not presented as official. This permission does not
extend to reproduction, distribution or use for commercial
purpose of financial gain. Reproduction or use outside this
permission or without authorization may be treated as copy-
right infringement in accordance with the Copyright Act. Au-
thorization may be obtained on written application to the Of-
fice of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not
constitute publication under the authority of the House of
Commons. The absolute privilege that applies to the proceed-
ings of the House of Commons does not extend to these per-
mitted reproductions. Where a reproduction includes briefs
to a committee of the House of Commons, authorization for
reproduction may be required from the authors in accor-
dance with the Copyright Act.

Nothing in this permission abrogates or derogates from the
privileges, powers, immunities and rights of the House of
Commons and its committees. For greater certainty, this per-
mission does not affect the prohibition against impeaching or
questioning the proceedings of the House of Commons in
courts or otherwise. The House of Commons retains the right
and privilege to find users in contempt of Parliament if a re-
production or use is not in accordance with this permission.

Also available on the House of Commons website at the
following address: https://www.ourcommons.ca

Publié en conformité de l'autorité
du Président de la Chambre des communes

## PERMISSION DU PRÉSIDENT

Les délibérations de la Chambre des communes et de ses
comités sont mises à la disposition du public pour mieux le
renseigner. La Chambre conserve néanmoins son privilège
parlementaire de contrôler la publication et la diffusion des
délibérations et elle possède tous les droits d'auteur sur
celles-ci.

Il est permis de reproduire les délibérations de la Chambre
et de ses comités, en tout ou en partie, sur n'importe quel sup-
port, pourvu que la reproduction soit exacte et qu'elle ne soit
pas présentée comme version officielle. Il n'est toutefois pas
permis de reproduire, de distribuer ou d'utiliser les délibéra-
tions à des fins commerciales visant la réalisation d'un profit
financier. Toute reproduction ou utilisation non permise ou
non formellement autorisée peut être considérée comme une
violation du droit d'auteur aux termes de la Loi sur le droit
d'auteur. Une autorisation formelle peut être obtenue sur
présentation d'une demande écrite au Bureau du Président
de la Chambre des communes.

La reproduction conforme à la présente permission ne con-
stitue pas une publication sous l'autorité de la Chambre. Le
privilège absolu qui s'applique aux délibérations de la Cham-
bre ne s'étend pas aux reproductions permises. Lorsqu'une
reproduction comprend des mémoires présentés à un comité
de la Chambre, il peut être nécessaire d'obtenir de leurs au-
teurs l'autorisation de les reproduire, conformément à la Loi
sur le droit d'auteur.

La présente permission ne porte pas atteinte aux privilèges,
pouvoirs, immunités et droits de la Chambre et de ses
comités. Il est entendu que cette permission ne touche pas
l'interdiction de contester ou de mettre en cause les délibéra-
tions de la Chambre devant les tribunaux ou autrement. La
Chambre conserve le droit et le privilège de déclarer l'utilisa-
teur coupable d'outrage au Parlement lorsque la reproduc-
tion ou l'utilisation n'est pas conforme à la présente permis-
sion.

Aussi disponible sur le site Web de la Chambre des
communes à l'adresse suivante :
https://www.noscommunes.ca