# EXHIBIT 3



Harvey Cashore <harvey.cashore@cbc.ca>

# 5th Estate reporting: an important note from WE Charity
1 message

**Dalal Al-Waheidi** <dalal@we.org> 12 January 2021 at 20:17
To: "harvey.cashore@cbc.ca" <harvey.cashore@cbc.ca>, "mark.kelley@cbc.ca" <mark.kelley@cbc.ca>
Cc: "Cecil.rosner@cbc.ca" <Cecil.rosner@cbc.ca>, Craig Kielburger <craig@we.org>, Marc Kielburger <marc@we.org>

Hi Harvey and Mark,

We wanted to formally follow up on the meeting with Harvey on January 7th, 2021 at the WE Charity office.

In this meeting, we provided extensive documentation and evidence countering 12 concerning questions and claims which were posed in the on-camera interview of December 22nd 2020.

We have tried to be specific and thoughtful to focus on a small number of questions where we are most concerned about accuracy, fairness, and important context. In the span of a 4.5-hour interview, although we may have a difference of opinion on multiple aspects, we only chose to take issue with a small fraction of the content raised. However, these issues are very important.

As a result, we would like to formally follow-up on the following points below.

1. **We are troubled that there has not been any additional on-camera interview(s) with someone from the WE organization, other than Marc and Craig Kielburger.** There are key WE senior leaders who were involved in the cited events, able to provide an important counterpoint to your current sources, and are often more knowledgeable than Marc and Craig Kielburger on the cited matters. We have pro-actively provided Harvey with the names and contact details of three key staff members (Robin Wiszowaty, Carol Moraa and Scott Baker) who would be willing to do *on-camera* interviews who have direct knowledge of the relevant issues.

2. **You raise very serious allegations regarding WE Charity's work in Kenya, including suggestions of donor "fraud".** We understand that if not for COVID-19 travel to Kenya would likely have been deemed essential in order to verify the facts and truly appreciate the scope of our work there.
    a. For example, there has been much discussion on whether a "kitchen/ dining room" was built at the women's empowerment center in Kenya. If you travelled to Kenya to see firsthand, we could definitively demonstrate that a structurally impressive kitchen/ dining hall *was* fully completed well prior to opening. We could also easily show you the precise location where the minor decorations were hung by your source, Joey Millici. We could easily

demonstrate that the request to decorate the kitchen could not be reasonably considered misleading in any way. It could be shown that WE Charity did not "make a kitchen" the day before the donor arrived, as this would have been structurally impossible to do so. You could also speak to the builders, engineers and government representatives to confirm the true facts.

    b. Similarly, we easily could take the CBC to see the seasonal river which, in fact, does flood between the communities of Ilmadeketa and Enoosoito. We could clearly demonstrate that the community of Enoosoito is more visually resource poor than that of Ilmadeketa. As such, there would be no conceivable reason to bring donors to Ilmedeketa, or be deceitful with donors on where to allocate their funds. Such a trip would also allow you to meet with the local Kenyan team who were present at the planning meetings and meetings with the donors to confirm that no inaccuracies were voiced, including Carol who led the tour of the village and answered the questions of the prospective donors, and Justus who met the donors and discussed the various regional needs with them. They would be able to explain *why* we brought donors to Ilmedeketa and not Enoosoito, namely because of the significant level of disruption a donor visit can sometimes bring to a small community (and how such a disruption had recently taken place in prior weeks in Enossoito, and the Kenyan team decided to give this community a break, before hosting another donor trip so soon). Given the aspects outlined above, WE Charity can clearly and easily demonstrate that Craig Kielburger did not "make up" a story when bringing donors to the village, as your sources have suggested, and most important, the donors were presented with full and accurate information.

    c. Similarly, if you were to visit Kenya, you would see Baraka Hospital is active in delivering essential medical care to a large population. As we have mentioned the hospital also provides public health programs that bring together large numbers of "healthy people" for education and regular treatments (deworming, vaccinations, health check-ups etc.) These regular programs clearly benefit the local community.

    d. We fully realize that travel is challenging during COVID-19, however, we would like to formally extend this invitation, once again, to you. Robin Wiszowaty, who is the Kenyan Country Director, is available to host you at *any point* in January should you wish to send a camera crew and/or a producer. She is currently in Kenya (as she has been otherwise residing in the United States during COVID). Should you wish to instead travel in the spring, we would be happy to host you at that time.

3. **We are troubled that there has not yet been an effort made to arrange an on-camera interview with someone from Kenya who has specific knowledge of the relevant issues and specific events referenced by CBC, especially as there seems to be a lack of cultural understanding about rural life in Africa in a number of questions and claims.** If any aspects from Kenya are part of this documentary, CBC should have a local Kenyan WE staff expert speaking and providing key context to each claim. We would be pleased to organize to have someone of your choosing interviewed from video link from Nairobi if that makes it easier.

    a. Whether it's a conversation about what constitutes a "kitchen" in rural Africa, why healthy people go to a hospital for public health education, or the strain on a village to welcome visitors etc., It is clear that the sources are North American commenting on these African event with a Western lens. It is very easy for foreigners to reach erroneous conclusions or create memories with faulty assumptions when North American biases shape an understanding of event. We are respectfully concerned about CBC assessing the veracity of each claim with the same North American bias and lack of local understanding. As cultural sensitivity is so important in this context, we ask the CBC to reconsider any possible cultural basis in the story regarding white visitors and/or white journalists reaching inaccurate conclusions.

    b. In order to understand the needs and demands of rural life in Kenya and the nature of WE Charity's development projects, it requires cultural context and experience. When considering the question of the Women's Empowerment Centre seeking evidence of a "refrigerator" as proof of a "kitchen" is a prime example considering most rural Kenyans do not have electricity let alone refrigerators. Including WE staff based in Kenya is essential to both ensure accuracy and to ensure that CBC includes representation and voices of people from Africa commenting on matters in Africa.

        i. For example, regarding the Women's Empowerment Centre: Kenyan staff can provide commentary that women in these traditional communities would not use refrigerators, microwaves, oven stoves or other appliances typically associated with a North American kitchen. Instead, a Kenyan kitchen in a rural area often simply consists of plumbing with clean water, sink for washing dishes, countertop for preparing meals, outdoor portable coal-based cooking appliances known as "jikos" etc. In short, the Women Empowerment Center kitchen and dinning hall was fully built and outfitted to local preferences.

        ii. For example, regarding Baraka Hospital: Kenyan staff can provide commentary about the significant lack of proper health facilities in rural Africa, how WE's Bakara Hospital is often overstrained with need, and how because of a lack of TV, internet etc. a hospital delivers essential information to "healthy people" through public health campaigns.

Case 1:22-cv-00340-RDM Document 22-21 Filed 06/24/22 Page 4 of 7

      iii. For example, regarding the funding to Enosooito: Kenyan staff can provide commentary that when rural Kenyan villages welcome visitors, the local custom is that the majority of the village (often in excess of a hundred local villagers) greet the visitors, including the chief. This requires that villagers walk far distances, interrupt their day of farming, etc. so Free The Children Kenya staff rotate the prospect villages visited to avoid placing a strain on any one village, even if that village is the priority for funding. The July 9-14th 2018 group of donors referenced in your question visited Ilmedeketa, but offered to fund the village of greatest need, which was transparently communicated to be the neighbouring village of Enoosioto. Moreover, the Kenyan team know the local topography, including the fact that Enoosioto's school only went to grade-2 and when the river floods it becomes very difficult to cross and students cannot access education in neighbouring villages. The Kenyan leadership team led the tour with the donors, answered the donor questions, and transparently presented all information with the highest of integrity.

      iv. For example regarding Kipsongol water project: Kenyan staff can explain the requirements to provide access to clean water in vast rural areas of Africa, and how this complex infrastructure often requires hundreds of thousands of dollars per village and multiple funds matched to the "water pillar".

4. **One of the main themes of your piece is the perceived "lack of transparency" of donors and financials and "donor confusion".** *We take great exception to this narrative*. **We also take issue with the lack of specific evidence which has been produced for us and the fact that you have not spoken to any donors who have actually confirmed this narrative. We also note a review of annual WE Charity audits available on our website refutes any suggestion of a lack of transparency in relation to donor funding.**
   a. In the meeting on January 7th, 2021, Harvey confirmed this was a theme which may be a part of your reporting. WE have provided CBC evidence showing WE's clear commitment to transparency for donors. WE Charity makes a commitment that is almost unprecedented among international development organizations. Donors can visit their *specific funded program/ "pillar" of development* -- and tens of thousands of individuals have travelled overseas to see the projects. Furthermore, the question about "accountability and transparency" has been assessed by experts in the field. Charity Navigator is by far the largest and most well-respected group rating charities in North America on this question, and Charity Navigator has ranked WE Charity 96% on "accountability and transparency" – which places WE Charity as one of the top charities in North America for donor transparency.
   b. We have now provided to the CBC extensive written evidence firmly debunking the specific anecdotes which have been provided to us for commentary on this issue. For the sake of clarity, in each case we feel we have unequivocally provided you documented evidence that each claim is untrue, and additional commentary from other staff who participated in these key events who have a different memory of events. If there remain specific claims which we have not adequately addressed to convince a reasonable reviewer that the claim is untrue, we ask for those claims and any supporting evidence to be presented to us prior to airing.
   c. One of the sub-themes of the "lack of transparency" narrative which has been shared is that of "donor confusion". We take great exception to this sub-theme considering, in the January 7th 2021 meeting, Harvey *confirmed* that the CBC has actually *not* spoken to any donors to WE Charity and/or specifically any donors who have *actually* voiced this concern. Tens of thousands of people have fundraised and donated to WE Charity programs – and there is no evidence of a critical mass of donors expressing concerns, or even a single donor expressing this concern. Furthermore, there is no evidence of donors being "confused" or "angry" while visiting projects overseas; in fact, the opposite is true. WE Charity transparently hosted tens of thousands of visitors overseas providing an unprecedented level of transparency. In other words, we find this very difficult to understand how this could conceivably be part of a sub-theme of your reporting when there are no donors you have spoken to who have expressed this as an issue.
   d. Based on the details from the January 7th meeting, you are relying on former staff who have provided this narrative to you. Based on the questions being posed, and the incidents which you have asked us about, it is clear that the staff you have spoken to are not involved in finance nor matters such as tracking "restricted" vs. "unrestricted donations", allocating and transferring funds from donors to specific development programs, setting budgets for programs, and making meaningful financial decisions. It does not appear that CBC has spoken with any of the more than 100+ current and former staff from the Accounting or Finance team and C-suite level, who are the individuals who are sufficiently qualified to speak on financial matters or related issues.. For example:

      i. Matthew Cimone was an entry level employee, who served as a "motivational speaker" touring various schools in 2007. He was employed for only a year with the organization. He had no reason to be aware of financial issues nor was he qualified to speak to them. He was not involved in donor matching. Most importantly, we have been told that Mr. Cimone is basing his commentary on

a "memory" from 13-years ago, but he cannot identify the name of a specific Canadian school that was provided inaccurate information, nor does he have any so-called duplicate images of donor schools overseas. There are multiple potential explanations for his memory on this matter that do not involve any form of misconduct by WE Charity. The most likely explanation is that many Canadian schools fundraised only a portion of the total costs to build a classroom overseas and their partial support would be combined with other supporters to build a school - and both funders would receive the same picture because both combined their partial funds to fully support the same project. However, there was never any question what school and/or project they were supporting and the teachers were always involved in the decision making processes. Another potential explanation is that WE Charity has built 1500+ schoolrooms overseas. A village requires multiple schoolrooms, many classrooms in developing countries look very similar, and thus it is understandable that Mr. Cimone could be mistaken in assuming they were duplicate photos. Mr. Cimone is incorrect in both his assertion about a general pool of funds and the idea of duplicate photos. We want to be very clear – we are always open and transparent with the schools we work with - it is a cornerstone of what we do

    ii. Karen Alexander worked with a couple staff members in a small "regional office" for one year. She was hired to fundraise, and as such does not, nor was she required to, have any qualifications or background in accounting or finance. She would have had minimal, if any, interactions with the accounting department. Her commentary about WE not tracking restricted donations vs. unrestricted donations is contradicted by the 20+ years of unqualified audits of WE Charity that reflect this specific tracking. In her exit letter Ms. Alexander wrote that she grossly misunderstood the financials of her region until a few weeks prior to her resignation (a 10x error of $150k vs. $1.5M), and given this erroneous interpretation, it is understandable that she was often confused or frustrated about financial matters. Given her relatively junior level within the organization she did not authority to create a regional budget, and she had very limited spending authority. Although emails which will be provided to you in a follow-up submission from WE Charity demonstrate that she was not accurate in her statement that she was not provided a program budget.

5. **The question about the kitchen at the women's empowerment center is fraught with challenges. The question states that there is a claim that a "kitchen didn't exist" and the employee was tasked to "make a kitchen".**
    a. Based on the extensive documentation provided on the January 7th, 2021 meeting, it is clear that this claim is completely unfounded. Namely a kitchen and dining area did "exist". The Women's Empowerment Center consists of multiple buildings constructed with stone bricks and complex masonry on a campus which were built over several months, and completed weeks before the donor trip. As shown by the photos of the opening, the kitchen and dining area was fully built, and similar to all rooms, they had painted walls, curtains on the windows, and furniture in the room well prior to the opening. Your source (Joey Milicii) was asked to help further *decorate* the kitchen by hanging a small number of cooking items decoratively on the walls and placing utensils and similar items in the room. This is even proven by Mr. Milicii's *own photos* of his actions (merely adding decorations consisting of a small number of hanging pots on the walls and placing utensils and cutlery in the room. Prior to Mr. Milicii's involvement the kitchen was already completed and outfitted to local preferences (detailed description provided 01-10-20 with jikos, outdoor sinks etc.), further showing that it is fraught to rely on foreign visitors to provide commentary on African matters. There was no last-minute construction or similar significant changes to the fully built kitchen and dining room. This is fundamentally different than saying that an employee was tasked to "make a kitchen". We have provided CBC with photographic evidence of the completed buildings, painted walls and painted murals, outfitted furniture, architectural drawings showing the buildings were completed to specification, certified letters under oath from witnesses that the kitchen / dining hall was complete well prior to the opening, and exchanges in "what's app" showing a kitchen/ dinning structure was, indeed, formally built for the use of the women. Most notably, the Head of the Donor's personal foundation was present, on the ground and at the Women's Empowerment Center, in advance of the donor arriving. She and her team were well aware that Mr. Milicii and others were doing the decorations.
    b. The line from your source that "Craig committed fraud that day" is totally incorrect and is clearly not proportional or accurate. Based on the circumstances, we cannot imagine how this anecdote could be considered credible as part of your story. That being said, if it somehow was even considered part of the CBC story – which would require significant context about Mr. Milicii merely adding minor decorations to the kitchen -- we ask that the allegation of "fraud" be fully removed based on the overwhelming evidence to the contrary.
    c. Finally, in the question posted by Mark Kelly, the name of the donor for the women's empowerment project was referenced, namely, the US based philanthropist, Jolene McCaw. It is not responsible for her to be named on national TV as she is a private citizen. There is no public recognition of her support of the Women's Empowerment Center in any manner on the WE Charity website or other public materials. We ask that her name to be removed.

6. **The question about the flooding river is fraught with challenges. The sources named the wrong village visited (Ilmedeketa vs. Enoosoito). As evident that the sources are further confused, Enoosoito does have a river that floods limiting access to education. All briefing notes were prepared by Kenyans, who led the donor tour and answered questions. There was no "story" created by Craig Kielburger. The donors were presented with the full and accurate information.**
   a. It is clear that (i) the *wrong name* of the visited village was quoted in the question in on-camera interview as well as (ii) the *wrong date* of the meeting, and (iii) the *wrong location* of the meeting. This was one of the principal reasons for the inability to answer this question clearly during the interview.

      The Kenyan village which was visited, on the dates provided in the question of July 9-14th 2020, was that of Ilmedeketa, *not* Enoosoito. It is telling that your sources are so confused that they cannot name the proper village and other related details.
   b. As noted, Free The Children Kenya rotates the village visited to minimize the level of isruption that a prospective donor visit can bring to a small farming community where tradition dictates elaborate welcomes. The visitors visited Ilmedeketa. WE Charity could have accepted a donation to that village, as WE Charity was fundraising for it (and continued to fundraise for another year), and public proof of this fact was provided to Harvey, further contradicting the narrative of the sources and removing any motive to create the alleged "story" for prospective donors. The visitors expressed an interest to fund the village of greatest need, and they were transparently matched to the neighbouring much poorer Enoosoito. Harvey was presented with email exchanges and donor contracts showing that the donors were transparently aware of these facts in emails and signed donor contracts.
   c. We also provided evidence that the description of a river flooding was not "story", as there is factually a river between Ilmedeketa and Enoosoito that floods during the rainy season, and a new school is required because the school in Enoosoito only serves student to grade-2, and students struggle to cross a river to access the nearest school that provides a full primary education. We also provided evidence that the explanation about these facts did not originate from Craig, but rather Carol, who is a senior WE Kenyan leader, who led the tour of the village and accurately presented this information to the donors. Carol, Robin, and Justus were privy to the donor conversations and presentation of information. They will confirm that the donors were always presented the full and accurate information. They can confirm that Craig did not mislead any donors. Your sources are clearly westerners who seem to be confused about the name of the village, topography of the region, the local cultural practices informing why villages are rotated to visit, and the briefing explanation provided to them on these subjects. They are also potentially confused on the date, time and location of the conversation. Foreign trip facilitators working and living together may result in faulty groupthink reinforcing each other's misunderstanding of key facts. This is further reason why it is concerning to rely on foreigners to provide commentary about African matters. At worst, it could be said that Craig Kielburger did not clearly communicate with staff during an impromptu rushed meeting among foreign fly-in facilitators. But the facts are clear that the evidence overwhelming shows that donors were never misled.

7. **Finally, we would like to comment regarding the question on the Kipsingol Borehole, and the allegation that multiple people on social media have said they have sponsored the Kipsingol Borehole.** We would like to formally share that we checked our records and none of the donors donated the full amount for the borehole itself. For the sake of clarity, we needed to raise the amount from multiple donors who contributed smaller amounts to allow for the completion of the borehole *and* its extensive infrastructure.
   a. Donors were supporting distinct aspects of the water pillar, including drilling the borehole, water holding tank, pumping station and engine, piping to various regions of the village, water distribution kiosks, hand-washing stations, and often solar panels for an energy source for the pumping station. This is *vastly different* than saying the same borehole was "sold" four times, whereby WE Charity would conceivably receive four times the amount of necessary money (namely up to $250,000 x 4 donors = up to $1M) which would have otherwise been allocated to the specific project.
   b. Moreover, this is not how we raise money for water projects. We have provided CBC a standard "pitch" document which we use for donors for water projects which clearly outlines that water programs are "sold" by way of a "water pillar" where people can contribute to this overall project.

Finally, we want to confirm that we will have the opportunity to respond, in full, to any and all allegations which will be shared in your reporting. We also seek the opportunity to respond to any allegations which will be part of your program that have been shared by individuals as part of their testimony before the Finance Committee or similar interviews.

Thank you. We appreciate your continued willingness to hear our perspective as you develop the narrative of your report.

Best wishes,

Dalal


**Dalal Al-Waheidi** | Executive Director | WE Charity