```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2


3
     WE CHARITY,
4                                        Civil Action
              Plaintiff,                 No. 1:22-cv-0340
5
         vs.                             Washington, DC
6                                        December 13, 2022
     CANADIAN BROADCASTING
7    CORPORATION,                        10:11 a.m.

8                Defendant.
     _____/
9


10
                  TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
12


13   APPEARANCES:

14   For the Plaintiff:     JOSEPH KROETSCH
                            Boies, Schiller & Flexner
15                          333 Main Street
                            Armonk, NY 10504
16

17                          AMY NEUHARDT
                            Boies, Schiller & Flexner
18                          1401 New York Ave, NW, 11th Floor
                            Washington, DC 20005
19

20                          RODNEY SMOLLA
                            164 Chelsea Street
21                          South Royalton, VT 05068

22
     For the Defendant:     NATHAN SIEGEL
23                          Davis, Wright, Tremaine, LLP
                            1301 K Street, NW, Suite 500-East
24                          Washington, DC 20005

25
```

1    **APPEARANCES CONTINUED:**

2    **For the Defendant:**        **RACHEL STROM**
                                    Davis, Wright, Tremaine, LLP
3                                   1251 Avenue of the Americas
                                    21st Floor
4                                   New York, NY 10020

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **Court Reporter:**          **JEFF M. HOOK**
                                    Official Court Reporter
                                    U.S. District & Bankruptcy Courts
24                                  333 Constitution Avenue, NW
                                    Room 4700-C
25                                  Washington, DC 20001

1              **P R O C E E D I N G S**

2         **DEPUTY CLERK:**  This is civil action 22-340, WE

3    Charity vs. Canadian Broadcasting Corporation.  Counsel,

4    starting with plaintiff, please identify yourself for the

5    record.

6         **MR. KROETSCH:**  Joseph Kroetsch, Boies, Schiller &

7    Flexner, for WE Charity.

8         **THE COURT:**  Good morning.

9         **MR. SMOLLA:**  Rodney Smolla for WE Charity.

10         **THE COURT:**  Good morning.

11         **MS. NEUHARDT:**  Amy Neuhardt, from Boies, Schiller

12    & Flexner, for WE Charity.

13         **THE COURT:**  Good morning.

14         **MR. SIEGEL:**  Good morning, Your Honor.  Nathan

15    Siegel for Canadian Broadcasting Corporation.

16         **THE COURT:**  Good morning to you.

17         **MS. STROM:**  And good morning, Your Honor.  Rachel

18    Strom with Davis, Wright, Tremaine, also for CBC.

19         **THE COURT:**  Good morning to you.  So we're here

20    this morning on the defendant's motion to dismiss for forum

21    non conveniens; and in the alternative, to dismiss counts

22    two through four for lack of subject matter jurisdiction.

23    And since it is the defendant's motion, why don't I start

24    with defendants.  And just so you all know, my policy is

25    that anyone who's talking doesn't have to wear a mask.

1    Otherwise, I ask that you wear a mask.

2         **MR. SIEGEL:**  That's what we were told.  Your

3    Honor, just to start, our thought is that I was going to

4    address the forum non conveniens motion, then Mr. Kroetsch

5    will respond, and then Ms. Strom will address the --

6    obviously this will be whatever Your Honor prefers.

7         **THE COURT:**  No, that's fine with me.

8         **MR. SIEGEL:**  That was sort of the order that we

9    thought we would go.

10        **THE COURT:**  That's fine.

11        **MR. SIEGEL:**  So good morning, Your Honor.  This

12   case, as you know, concerns two documentaries by Canadian

13   journalists about a Canadian charity that was managed almost

14   entirely by Canadians, and that was responsible for raising,

15   budgeting and directing donor funds for Kenya during the

16   time period that this documentary's about, which is roughly

17   2005 to 2020.  And the Supreme Court, in the Piper vs. Reyno

18   case, said:  "When the private and public interest factors

19   clearly point towards trial in the alternative forum, the

20   case may be dismissed."  The bottom line is, Your Honor,

21   there really is no reason at all why it is actually

22   convenient to litigate this case here for anyone.  But there

23   are multiple reasons why Ontario is far more convenient.

24        There are three basic elements of the analysis

25   here, and I'm just planning to go through them in order:

1    Whether Ontario's an available and adequate alternative

2    forum; the degree of deference owed to plaintiff's choice of

3    this forum; and then that gets balanced against the various

4    private and public factors.

5         So on the first issue, that Ontario is an

6    available and adequate alternative forum, the test is can

7    Ontario provide, quote, some remedy to WE Charity.  And it's

8    clear that that's a very low bar.  As the Supreme Court put

9    it in Piper:  "If the remedy provided by the alternative

10   forum is so clearly" --

11        **THE COURT:**  I'm sorry, just for the sake of the

12   court reporter, can you, particularly when you're reading,

13   go a little slower.  It's hard to keep up.

14        **MR. SIEGEL:**  I apologize.  I usually on my

15   outlines put slow down at the very top, but I didn't do

16   that.  That's my mistake.

17        **THE COURT:**  I did the same thing when I was in

18   practice.

19        **MR. SIEGEL:**  So the test is if the remedy provided

20   by the alternative forum is so clearly inadequate or

21   unsatisfactory that it is no remedy at all, that's a very

22   low bar.  And Ontario clearly meets that test.  The only

23   obstacle at all is that it has short limitations and notice

24   periods for defamation, three months on the one hand, six

25   weeks on the other.  We've undertaken to waive all of those.

1    Their only response, their only response to that is that

2    they argue that the notice requirement is jurisdictional and

3    can't be waived.  Well, that's both -- it's both a red

4    herring and it's wrong.  I'll cover first.

5            First, it's a bit of a red herring, because notice

6    is not even arguably required to provide some remedy for WE

7    Charity in Ontario.  Indeed, it has a remedy for all for

8    causes of action.  And number two --

9            **THE COURT:**  Let me pause you on the number one for

10   a second, which is it does strike me as a somewhat novel

11   question of whether you're right about that or how the some

12   remedy applies in a context like this.  And I get it where,

13   in the United States, you might get treble damages and you

14   might get emotional suffering damages, whereas if you sued

15   in the foreign jurisdiction, it's single damages and there's

16   no emotional distress, and the Court says, well, there's

17   still some remedy.

18           Here, I take it, though, the point is a little bit

19   more nuanced than that in that there may be certain

20   statements that were published that -- where there would be

21   no remedy as to those statements.  So the question then is

22   do you think of the case as a whole where there are many,

23   many statements that come together that form essentially one

24   claim or do you think about them as separate claims, and

25   then as to some of the claims there's no remedy at all?

1          **MR. SIEGEL:**  Well, first of all, we don't believe

2     that that's the case.

3          **THE COURT:**  I understand that.

4          **MR. SIEGEL:**  But on the first question, actually,

5     Your Honor, the extent of the claims, if you want to call it

6     that, for which there is clearly -- I mean, there's no even

7     argument on the other side, is the vast majority of it.  I

8     mean, you've got four causes of action in the complaint,

9     right, there's no argument at all about three of them.  And

10    then on the defamation claim, first of all, they themselves

11    make the point that the guts of the claim is the

12    documentary, right, the Fifth Estate documentary.  And

13    there's no question that there was notice that was provided

14    for that.  I think actually on the -- even the Enquete

15    episode, the French version of the documentary, they filed

16    this case within six weeks of the airing of that

17    documentary.  And it certainly states out what their

18    objections are in writing to it, and it's not a statement of

19    claim in Ontario.

20          And in fact, Your Honor, they don't actually

21    argue -- remember, Your Honor, that the notice provision

22    only applies to television broadcasts, right, television and

23    radio broadcasts and newspapers.  Most of the other things

24    that they talk about are things like website postings,

25    tweets.  They don't even try to make the case that the

1    notice provision actually applies to those.  But even if it

2    did, you're talking about a very small subset of what

3    effectively the guts of their defamation claim is that that

4    would be, even arguably under their analysis, barred here.

5            And then going to the notice point, Your Honor.

6    Their argument is in their brief, right.  It's clear what

7    they're trying to say, it's jurisdictional, it can't be

8    waived.  What they actually say is even if a defendant fails

9    to raise it, an Ontario court could essentially do it sua

10   sponte.  I mean, that's what their argument is, right.

11   There isn't an example in more than a hundred years of this

12   statute where that's even potentially happened.  They don't

13   cite a single case.  And the Harrison declaration, if you

14   read it closely, doesn't actually say that, and it's just

15   wrong.  The question that they don't address, but it's the

16   obvious question, is sure, it's a condition precedent, and

17   it's an absolute bar in the sense if it's properly raised

18   there's no discretion, right.

19           **THE COURT:**  Right.

20           **MR. SIEGEL:**  But the question is does either party

21   have the burden of raising it, right.  So does the plaintiff

22   have the burden of pleading it; does the defendant have the

23   burden of raising it as a defense.  And the answer's right

24   there in the Ontario rules of civil procedure:  The

25   plaintiff doesn't have to raise it, it's implied.  The

1    defendant, if it wants to contest, has to raise it in its

2    pleadings.  It's --

3          THE COURT:  Do you know if there is any Canadian

4    law on the question of whether an agreement of that type is

5    enforceable?  In other words, is an agreement not to make an

6    argument in litigation itself enforceable?

7          MR. SIEGEL:  I mean, we've cited numerous cases

8    which -- FNC cases that have been transferred to Canada

9    where there have been statute of limitations waiving the

10   undertaking.  So yes, I mean, the answer is.  And also

11   remember, Your Honor, the order in a case like this would

12   typically be contingent, right.  In other words, the

13   dismissal would be contingent upon essentially the waiver

14   being effective, right.  And we're obviously fine with that.

15         THE COURT:  So another question I had for you is

16   twofold.  One is am I making a finding of fact or am I

17   deciding a question of law in deciding what the Canadian law

18   is with respect to whether the notice requirement is

19   waivable?

20         MR. SIEGEL:  I think it's a question of law.

21         THE COURT:  I guess I'm not sure, I don't know.

22         MR. SIEGEL:  I mean, I think --

23         THE COURT:  It's certainly a legal question.  I

24   don't know if I'm acting as a fact finder or as --

25         MR. SIEGEL:  Oh, I understand what you're saying,

**1**  as an American judge, are you making a -- that's an

**2**  interesting question.  I really haven't thought of it that

**3**  way.  I mean, I think of it as a legal issue, so in a sense

**4**  it's kind of a question of foreign law in the sense that

**5**  questions of foreign law might arise in a variety of ways in

**6**  a case in this jurisdiction.  I don't think it's contingent

**7**  upon any particular facts here.

**8**          **THE COURT:**  The second part of my question was,

**9**  demonstrating that in fact I'm not learned in Canadian law

**10**  or Ontario law, what is the hierarchy of the courts in

**11**  Ontario?  So when I'm looking at these opinions that are

**12**  cited, tell me which are the ones that are controlling.

**13**          **MR. SIEGEL:**  It's actually pretty similar.  The

**14**  trial court level, which I believe is usually called the

**15**  Courts of Justice or the Supreme Court, there's the Ontario

**16**  Court of Appeal and then there's the Supreme Court of

**17**  Canada.  And what's striking here, Your Honor, is the

**18**  Supreme Court of Canada first addressed this issue almost a

**19**  hundred years ago in 1928.  And it said specifically it's

**20**  incumbent upon the party who intends to contest the

**21**  performance of any condition precedent to specify it

**22**  distinctly in his pleading, right.

**23**          And the cases that both sides are citing from the

**24**  Ontario Court of Appeals subsequently, what they're really

**25**  arguing about is, well, yes, the defendant has to do that.

1    And there's a case -- and they argue about does it have to

2    be in the pleading, can it be done by a motion, and does a

3    defendant effectively not waive it if they don't do it the

4    right way.  But there's no question that that's simply the

5    law.  And when you get down to it, the analogy Mr. Harrison

6    tries to make are to due process principles in

7    administrative law, which is about when the government needs

8    to give private citizens notice of a hearing to take some

9    regulatory enforcement action, right.  And if there's no

10   hearing then there may be no jurisdiction.

11           THE COURT:  Do you know if the notice requirement

12   under Canadian law or Ontario law applies to tweets, online

13   articles?

14           MR. SIEGEL:  My best understanding of Canadian law

15   is that it does apply to online articles.  It's disputed

16   whether it applies to tweets or not, and other forms of --

17   and this is actually part of the point about actually why it

18   makes sense that the burden is on the defendant.  Because

19   it's actually not like a statute of limitations in the sense

20   that the notice requirement doesn't apply to the vast

21   majority of defamation claims, right.  It has -- it applies

22   to a very specific technical definition, which in the

23   digital age, as you might imagine, has been the subject of

24   litigation.  So the idea even that a court could sort of sua

25   sponte guess, well, maybe this is a case where the notice

1    requirement -- I mean, it just doesn't work that way.  It's

2    incumbent upon the defendant to raise it.

3            So now if I could move to the guts of the analysis

4    here.  The next issue is the degree of deference to which

5    the plaintiff's choice of forum is entitled.  We start, we

6    all agree, with the presumption that there is a presumption

7    in favor of the plaintiff's choice of forum, and to a U.S.

8    plaintiff's choice.  But the reason for that, Your Honor --

9    and this is very important, is that citizen is assumed to be

10   a proxy for convenience, right.  It's reasonable to assume

11   that this choice is convenient.

12           **THE COURT:**  Well, do you think -- I mean, that's

13   part of the reason for the presumption.  But part of the

14   reason for the presumption also is typically the plaintiff

15   is the master of their complaint.  They typically get to

16   decide where they want to bring the case as long as there's

17   venue in that jurisdiction.  And to be frank about it, both

18   sides in a case may have strategic reasons why they want to

19   be in one or the other jurisdiction, and that's fine.

20   Courts aren't usually privy to that, and that's up to the

21   parties to think about.

22           But typically the plaintiff, even if it's not

23   necessarily the most convenient forum for the plaintiff,

24   gets to decide where they're going to bring the case, how

25   they're going to craft their case, who their plaintiff is

1  going to be and so forth.  Absent good reason, we accept

2  that.

3       **MR. SIEGEL:**  Well, I guess I wouldn't --

4       **THE COURT:**  Otherwise you're going to face in

5  virtually every case that is at least a high dollar -- or a

6  high importance case, there's going to be one forum that is

7  favorable -- more favorable to one party or another.  In

8  virtually every case, then someone is going to come in and

9  say wait a second, you brought this case in D.C., we

10  actually think it should be brought in New York.  And there

11  are seven witnesses in New York and five in D.C., therefore

12  you should move the case to New York.

13       **MR. SIEGEL:**  Well, with respect to international

14  forum non conveniens, I think the case law is a little bit

15  more nuanced than that.  I mean, first of all, it does say

16  convenience is the lodestar of the doctrine.  That's

17  straight out of, for example, the D.C. Circuit's --

18       **THE COURT:**  Well, of course that's the lodestar of

19  the doctrine.

20       **MR. SIEGEL:**  Right.

21       **THE COURT:**  Because it's forum non conveniens,

22  that's the doctrine.  But the question is when the doctrine

23  applies, and it's just really a question of deference.  I'm

24  not sure it's worth pushing too hard on this, because I

25  think we're probably in agreement that the rule is that the

1  plaintiff does get some deference.  But that deference is

2  heightened when the plaintiff actually resides or is a

3  citizen of the local jurisdiction.

4          MR. SIEGEL:  Yes, but it is reduced when -- I

5  mean, it actually is reduced when there may be a sense that

6  it's being done for strategic reasons even though it's

7  clearly more convenient to do it somewhere else.

8          THE COURT:  I have to say, I don't get that at

9  all, because I don't doubt that you both are here for

10  strategic reasons.

11          MR. SIEGEL:  No, no, no, I get that.

12          THE COURT:  And for me to put my finger on the

13  scale and say wait a second --

14          MR. SIEGEL:  Sure, yes, that's fair.  I understand

15  that.  And in a way, that's why -- I mean, the lodestar of

16  the test, in many ways, is it clearly more convenient

17  somewhere else, right.  It's a balancing test, right.

18          THE COURT:  Right, right.

19          MR. SIEGEL:  But there are some -- I do think it

20  is fair to look at, right, and there are circumstances that

21  the Court can look at.  And what we think is critical here,

22  Your Honor -- and obviously there's a lot of facts here, I'm

23  not even going to begin to go through all of them.  But it's

24  very clear how WE Charity has operated for years and years

25  and years, especially for international development

1    projects.  It was founded, headquartered and its global

2    operations were directed out of Canada.  That included

3    global fundraising and budgeting, and especially

4    international development projects like Kenya.

5         All of the executives of the U.S. entity were the

6    same Canadians who have always run the Canadian organization

7    to this day.  To this day, Your Honor, there has never been

8    an executive director, a CFO who's actually based in the

9    United States.  And that alone has substantial relevance to

10   assumptions about convenience, because convenience is

11   ultimately related to people and materials and not

12   intangible entities.

13        **THE COURT:**  So turn to those convenience questions

14   later.  You're talking just here about the deference.  It

15   strikes me on this that the plaintiff in this case is in

16   fact incorporated in the United States.

17        **MR. SIEGEL:**  Yes.

18        **THE COURT:**  And is in fact a U.S. entity.

19        **MR. SIEGEL:**  Yes.

20        **THE COURT:**  And plaintiffs have made their own

21   strategic decision saying that that's who the plaintiff

22   should be in this case rather than a Canadian entity.  And

23   they live with the cost of that in that any damages or

24   remedy they get in the case is going to be limited to that

25   U.S. entity.  And part of the answer to your concern is, you

1   know, any entity in Canada that is not a plaintiff in this

2   case, you're not getting a judgment, it's only the U.S.

3   entity.  So the company does in fact reside -- the plaintiff

4   does in fact reside in the United States for purposes at

5   least of the deference question.

6           **MR. SIEGEL:**  Well, and there are other questions

7   too; for example, whether many of the statements in the

8   program were even of and concerning, right, the domestic --

9           **THE COURT:**  That goes -- that's a defense.

10           **MR. SIEGEL:**  Right.  But nonetheless, ultimately

11   in a test that is supposed to address convenience, it's fair

12   to assess the circumstances under which the case is brought,

13   right.  And here you do have a situation where, first of

14   all, they filed a libel notice in Canada on behalf of the

15   broader entity.  It said literally WE Charity and its

16   affiliate organizations, right.  Six weeks later, they file

17   the same case here solely on behalf of a single entity.

18           But what we think is really most important, Your

19   Honor, is to try to justify that.  Their complaint and their

20   opposition is just replete with sort of organizational shell

21   game statements that are designed as much as possible to

22   just literally white Canada out of their history, structure

23   and governance.  And we think it's relevant to say, well,

24   why are they doing that.  I mean, if it were -- if it was --

25   if it were actually convenient to bring the case here, why

1    would you need to do that, to sort of rationalize.  And

2    just --

3             **THE COURT:**  But I think you're flipping the burden

4    there, though.

5             **MR. SIEGEL:**  What's that?

6             **THE COURT:**  I think you're flipping the burden

7    there.  You're saying if it were actually convenient to

8    bring the case in D.C., they wouldn't have to do this.  And

9    I think it's your burden to show that it's disproportionally

10   inconvenient to bring it here.  They don't have to show that

11   it's convenient to bring it here.

12            **MR. SIEGEL:**  No, I think that's right.  But one of

13   the ways we're making that showing is to say there's this

14   sort of -- I mean, there is this kind of invented plaintiff

15   almost.  Not that it doesn't exist on paper, we agree with

16   that, but the entire history has been whitewashed.  I mean,

17   literally I'm holding here the declaration of Mr. Baker, for

18   example.  And you've got here Mr. Baker's bio on the

19   website.  What they've literally done is, on the website it

20   says he joined the team in 2004 as director of leadership

21   programming helping to inspire and motivate thousands of

22   youth across Canada, right.  In his declaration it says the

23   same thing, but instead of saying youth across Canada it

24   says young people.

25            On the website it says:  "Scott returned to Canada

1    in 2010 to assume his role of executive director of WE

2    Charity."  Here it says:  "In 2010, I returned to North

3    America where I became the executive director."  I mean, the

4    complaint is just replete with that over and over and over

5    again.  The record is replete with that over and over and

6    over again.  I'm obviously not going to go through them all

7    here.  But nonetheless, we certainly think that it is

8    relevant to take that into consideration into assessing

9    whether it's really -- you know, how convenient this really

10   is.

11           So let me go to the private and public factors

12   which address convenience specifically.  And again, the law

13   is clear on this.  Even if you -- even if the plaintiff is

14   entitled to a strong presumption -- which we think is less

15   so here, it may be overcome, quote, when the private and

16   public interest factors clearly point towards trial in the

17   alternative forum.  And so I'm going to look at the private

18   factors first.  There are four, but I'm going to start with

19   the --

20           **THE COURT:**  Can I ask you, just going back to the

21   deference question --

22           **MR. SIEGEL:**  Yes.

23           **THE COURT:**  And this may be one of these questions

24   that's easier for me to ask each of you about what the other

25   side's thinking, because I'm not sure I'm going to get the

1    best answer or the most complete one from asking you

2    directly what you're thinking.  But what is your theory as

3    to how they're engaged in gamesmanship?  Why is it that --

4    why you think why do those guys want to be in D.C. instead

5    of in Canada in your view?  And I'll ask them the flip

6    question.

7          MR. SIEGEL:  Honestly, Your Honor, I can

8    speculate.  I mean, I fully admit I can't read their mind,

9    so I can speculate.  But I'm happy to speculate if Your

10   Honor wants me to.  And I'm sure they will disagree with me.

11         THE COURT:  Well, you've asserted that you think

12   they're engaged in gamesmanship.  I guess my question is

13   what gamesmanship do you think they're involved in?

14         MR. SIEGEL:  Sure.  I can think of a couple of

15   possible reasons, right.  One is they are -- I mean, the WE

16   Charity scandal in Canada was a big deal.  And I think that

17   they are concerned about -- I think they may be concerned

18   about the reception that they'll get in Canada given all of

19   the publicity.  I think that's one possibility, less likely.

20         THE COURT:  Is it a jury trial in Canada?

21         MR. SIEGEL:  It actually is probably not, it's

22   pretty rare.  But even among the judiciary in Canada, they

23   may be more concerned about that.  Number two, to be candid,

24   if you want to use litigation as a tool against a defendant,

25   it's much better to be here.  I mean, discovery is broader.

1    The costs that can be imposed on an entity like the CDC --

2    I'm sorry, the CBC through the American litigation system is

3    broader than it is in Canada, there's no question about

4    that.

5            **THE COURT:**  Although they will face a higher

6    burden in a U.S. court.

7            **MR. SIEGEL:**  They will face a higher burden, yes.

8    They will face a higher burden, although in a Canadian court

9    there will also be the possibility of bringing an anti-SLAPP

10   action which is a bit of a balancing test, even in a way

11   that it isn't here.  That might be another reason that they

12   would be concerned about going to Canada.  So honestly, Your

13   Honor, any or all of those three reasons is purely my

14   speculation.

15           **THE COURT:**  No, that's helpful.  Okay.

16           **MR. SIEGEL:**  So going to the private factors,

17   focusing on what are probably the two most important ones

18   related to witnesses:  The availability of compulsory

19   process to obtain the attendance of unwilling witnesses; the

20   cost and convenience of obtaining the attendance of willing

21   witnesses.  The bottom line is, Your Honor, the overwhelming

22   majority of actual and likely material witnesses in this

23   case are Canadian, and the overwhelming majority of those

24   are Ontario.

25               And there are three primary sets of witnesses

1   here.  I mean, I assume there will be a few here or there,

2   right.  But the three primary sets of witnesses are CBC

3   personnel, right -- journalists, et cetera; personnel

4   associated with WE -- and I would also include consultants

5   in that; and donors.  I think those are the three most

6   important.  So I'll start with what I call witnesses related

7   to either party, right.

8           If you look at just the allegations of the

9   complaint, they identify 12 journalists -- starting with the

10  CBC, okay, they identify 12 journalists as the ones who had

11  the most important roles in these various -- primarily in

12  the Fifth Estate documentary.  And as our affidavits point

13  out, there were others involved in things like promo

14  teasers, et cetera.  But even just looking at those 12, all

15  12 are Canadian, nine of them are Ontario.

16          **THE COURT:**  How many of those still work for the

17  CBC?

18          **MR. SIEGEL:**  Who work for CBC?

19          **THE COURT:**  Yes.  Do they all still work there?

20          **MR. SIEGEL:**  They all still work there.

21          **THE COURT:**  In other words, you presumably

22  wouldn't have difficulty in having your witnesses appear in

23  the United States.  You wouldn't have to worry about

24  compulsory process if they're your witnesses that you want

25  to bring here.

1        **MR. SIEGEL:**  Yes, that's right.  Although the cost

2   and convenience of bringing willing witnesses is a part of

3   the test, and that's part of what I want to get to.  But

4   there's --

5        **THE COURT:**  I have to say, on that one, the

6   distance between Toronto and the United States -- and D.C.

7   is about the same distance as between Boston and D.C.

8        **MR. SIEGEL:**  True.

9        **THE COURT:**  And the air flight -- the flight is

10   really easy, I've done it myself into Toronto.  There's the

11   airport right downtown, so it's just not terribly hard if

12   you don't have to worry about compulsory process for folks

13   to appear for a trial or a hearing if they needed to in the

14   same way that it wouldn't be a terribly big deal if the

15   witnesses lived in Boston to say there's a bunch of witness

16   there's that may have to travel and take the shuttle from

17   Boston to D.C. for the trial.

18        **MR. SIEGEL:**  Yes, although there are a couple of

19   issues there.  First of all, we have no way of knowing --

20   actually on both sides, right, we have no way of knowing

21   whether all of these employees will still be employed two or

22   three years from now at the time of a trial.  And that's a

23   significant issue.  I mean, the odds are, at least in

24   today's world, is that some of them won't be.  And the same

25   thing is true on the other side.  I mean, you look at the

1    core -- what I would call the core executives of WE who are

2    responsible for most of the decision making at issue here.

3    There's still -- six of them are current either founders or

4    I'll call them managers:  The Kielburgers, Scott Baker,

5    Victor Lee, Robin Wiszowaty and Carol Moraa.  And there are

6    four very recent ones who I think are -- I'm not sure

7    whether all of them are -- some of them are no longer with

8    the organization.  So some of those we may control, some of

9    those we may not.

10          In any event, of those 10, seven of them live in

11   Ontario, one is in Ecuador, one is in Kenya and one is in

12   the U.S.  Just that alone, Your Honor -- I mean, if you look

13   at the case law, that alone reflects a balance of private --

14   of factors that so overwhelmingly favors Canada and so

15   clearly disfavors this forum as to have caused many courts

16   to grant forum non conveniens motions in favor of a Canadian

17   forum, including where the distances were less like Seattle

18   and Vancouver or Nova Scotia and Maine.  I think one case in

19   particular that's worth pointing out is the Fifth Circuit

20   case Brokerwood International U.S. vs. Cuisine Crotone, it's

21   104 F. App'x 376.  It's got some similarities, though I

22   think this case is even more extreme, right.  The plaintiff

23   was a Louisiana company that was affiliated with a Canadian

24   company.  In fact, it was similar.  There was a Brokerwood

25   U.S. and Brokerwood Canada.  The actual owners held joint

1    citizenship, joint U.S.-Canadian citizenship, and they split

2    their time between the two countries.  All the defendant's

3    witnesses were in Canada.  The Court said -- you know, the

4    Court transferred the case saying it clearly favors the

5    Canadian forum.  And basically Houston which was -- or

6    Louisiana, I think, wasn't really convenient for anybody.

7    Similarly here, there's literally no one, there is no one

8    for whom the District of Columbia would be convenient.

9              THE COURT:  Although there are at least two

10   important witnesses, as I understand it, who are in the

11   United States.  There is the WE executive who wanted to be

12   interviewed who the CBC ultimately declined to interview --

13   or at least that forms the basis of the breach of contract

14   claim.

15             MR. SIEGEL:  Ms. Wiszowaty, yes.

16             THE COURT:  And then there's the donor --

17             MR. SIEGEL:  Am I pronouncing her name right?

18             MR. KROETSCH:  Wiszowaty.

19             MR. SIEGEL:  Wiszowaty.

20             THE COURT:  So there's Ms. Wiszowaty, and then

21   there is the donor.

22             MR. SIEGEL:  Mr. Jordan, yes.

23             THE COURT:  So there are at least some witnesses

24   at least that are U.S.-based.

25             MR. SIEGEL:  Oh, yeah, they're U.S.-based.  First

1    of all, just in terms of the totality of witnesses here, the

2    overwhelming majority are not.  And secondly, whether you're

3    flying from Michigan or Asheville, North Carolina, there's

4    not much difference between flying here and Toronto.  So my

5    point is that at most, for those two particular witnesses,

6    it's sort of an equipoise, right.

7              THE COURT:  What is the basis for venue in D.C.?

8    Is it a Foreign Sovereign Immunities Act --

9              MR. SIEGEL:  It's the venue provision of the FSIA.

10              THE COURT:  So under the FSIA, for example, could

11    they bring suit in Michigan or would they have to come here?

12              MR. SIEGEL:  I'm not sure if they could have

13    brought a suit, or in New York, for example, where they're

14    headquartered.  But for convenience, it is what it is.  And

15    then there are -- so those are the sort of ultimate party

16    witnesses, right.  There are some important consultants, you

17    know, the accounting firms that have done these various

18    reports or audits.  They included an affidavit from one

19    accountant, right, who says he'll come here for live

20    testimony.  I mean, that's fine.  And he says he will direct

21    his employees to do the same.  But of course, first of all,

22    we have no idea whether those employees will still be

23    employed at the time of trial.  But we know that they'll

24    likely be in Canada where they could be subject to

25    compulsory process.

1          And the affidavit says nothing about what we're

2    really most interested in, which is what are the internal

3    documents of that firm, right, that led them to the -- we

4    don't even know what their conclusions are.  I mean, it was

5    a preliminary report, and we've never seen a final one.  In

6    our view, it raises far more questions than it answers.  But

7    what we're going to be most interested in are the internal

8    workings of that firm, right -- their analysis, their

9    communications, et cetera, to try to understand the

10   communications that they reached.  And there are a couple of

11   accounting firms in Toronto that WE has used to sort of

12   justify the way that they've operated.  And clearly, all of

13   that material would be subject to process in Ontario, it's

14   not subject to process here.

15          And then there's one last category, which to us is

16   also a very important one, which is former Canadian

17   employees of WE Charity who obviously have knowledge of

18   these events.  And this is an example of one where we freely

19   admit, Your Honor, we can't now give you a list of who every

20   single one of these people are.  We'll need to take party

21   discovery to do that, to see who's worked for them over all

22   these years.  But we do know for sure that there are former

23   employee witnesses with knowledge that can refute

24   allegations in the complaint.

25          We gave you one example, which is the e-mails with

1    Mr. Jordan.  And that's really pretty telling, Your Honor.

2    There's allegation after allegation in the complaint, right,

3    that employees of this plaintiff, the American entity,

4    supposedly communicated with Mr. Watson -- Mr. Jordan and

5    explained everything to him, right.  Well, what we actually

6    see is there were six people who were employees of the

7    Canadian entity from Toronto that did that communication

8    with him.  We also think the substance of the communications

9    very much support the -- what the broadcast shows.

10   But what this shows is that there are multiple

11   former WE Charity employees in Canada who have knowledge

12   that we believe can help refute the allegations in the

13   complaint.  You know, their argument is, well, you have the

14   e-mails.  Well, presumably the people who wrote the e-mails

15   know more than just what's in any individual e-mail, so that

16   isn't satisfactory to us.  All of these people are clearly

17   subject to compulsory process in Canada.

18   Moreover, Your Honor, there have been not just the

19   CBC's report, there had been other news organizations that

20   have done investigative reporting on this, all of whom have

21   reported that multiple former employees of WE in Canada have

22   told them things that support the reporting that's at issue

23   here.  Now, obviously we're not going to try to get

24   confidential sources from Bloomberg or a news organization,

25   we don't do that.  We're not going to disclose our own

1    confidential sources.  But certainly the fact that there has

2    been that kind of reporting gives additional reason to

3    believe that there are more people who are exemplified by

4    the Watson Jordan e-mails who have knowledge of the way that

5    WE has operated.  And that's actually really important to

6    us, because they are not subject to process obviously here.

7    And there's good reason to think that many of these people

8    won't be enthusiastic about testifying, it's fair to say.

9         **THE COURT:**  So let me ask you about that.

10   Describe for me how the Hague Convention process works.

11        **MR. SIEGEL:**  Actually, it's funny, I think we both

12   made this mistake in our briefs.

13        **THE COURT:**  It's not the Hague Convention?

14        **MR. SIEGEL:**  It's not the Hague Convention, it's

15   letters rogatory.  Canada actually oddly doesn't participate

16   in the civil procedure side of the Hague Convention.

17        **THE COURT:** So how do the letters --

18        **MR. SIEGEL:**  Basically, as I understand it, an

19   American court obviously here, Your Honor, would issue

20   letters rogatory.  And this would be on a witness-by-witness

21   basis, right.  We would then have to take that to the

22   Canadian court that has jurisdiction over the witness.  In

23   most cases it would be an Ontario court, but if it was

24   another province, it would be another province.  And then

25   there's a proceeding, and it's sort of the old fashioned way

1    almost that interstate or still in the criminal context in

2    state courts it often works, right.  There's a legal

3    proceeding in which a judge in Canada issues an order for an

4    examination, and that examination is conducted there.  And

5    of course, the witness has the right to oppose it.  There

6    are standards about whether it will or will not be issued,

7    et cetera.

8            THE COURT:  And the testimony is taken by

9    deposition then?

10           MR. SIEGEL:  Yes.

11           THE COURT:  Can it be taken by video deposition?

12           MR. SIEGEL:  I think so.

13           THE COURT:  I have to say, I certainly have seen

14   letters rogatory on the receiving side where I've received

15   them from foreign jurisdictions, and it's not a terrible

16   burden on the Court.  And it's a pretty quick process when

17   you are at least a U.S. court receiving letters rogatory, to

18   order that compliance.  The reason I'm asking about this is

19   this isn't going to be -- assuming it stays here, is not

20   going to be a jury trial, it's going to be a bench trial.

21           MR. SIEGEL:  We would hope it may be summary

22   judgment.  Yes, ultimately it's a bench trial.  And I

23   understand one has to approach this motion with the

24   assumption that the case could go to trial.

25           THE COURT:  I can't imagine it would make any

1   difference to me as the fact finder, if we got to that

2   point, viewing a video deposition versus having someone

3   sitting here in the courtroom.  Quite frankly, in many

4   cases, declarations probably would be sufficient or

5   transcripts of depositions.  But a video deposition versus

6   having the witness sit there is probably -- is unlikely to

7   make any difference to me as the fact finder in the case.

8        **MR. SIEGEL:**  I mean, that may be, but certainly in

9   terms of overall convenience -- you know, including to us,

10  the fact that we would have to go through this essentially

11  judicial proceeding every single time in Canada to take a

12  deposition is not insignificant.

13       **THE COURT:**  Again, I don't know the Canadian

14  practice obviously, and maybe it's different than in the

15  United States.  But assuming that it operates similar to the

16  way it does in the United States, admittedly there is

17  paperwork involved in doing it.  But I can imagine that you

18  may have litigation, for example, over confidential sources

19  or things like that with some witnesses that are sensitive

20  witnesses, but you're going to have that here as well.

21       **MR. SIEGEL:**  Well, I think it depends on the

22  witness, right.  It depends on whether the witness wants to

23  raise objections to the letters rogatory or not.

24       **THE COURT:**  The same thing is true here, though.

25  If you have a third party witness, the third party witness

1      can come in to quash the subpoena as well, and you have to

2      go get a subpoena for a third party witness as well.  You

3      know, it's less paperwork, I get that.  Okay.

4           MR. SIEGEL:  Well, that's true.  But

5      nonetheless -- and I understand Your Honor feels the way you

6      feel, and I can't change that.  I mean, there's certainly no

7      question that the courts have generally indicated that we

8      think there's a preference for live testimony where it's

9      possible, and the inability to compel that makes a

10     difference.  And also the difference in part is that this

11     Court has no ability to compel those witnesses for anything.

12     And that's really what the courts are looking at, right.

13     This Court -- it's out of this Court's control ultimately.

14     I mean, the Court can issue letters rogatory, but it doesn't

15     have -- as opposed to having the case in Toronto, right, or

16     Ontario before a judge who would have the authority to

17     actually compel these people and make the decisions in the

18     first instance.  That's what I think is kind of the

19     touchstone of the test.

20          THE COURT:  Although, first of all, I don't mean

21     to suggest that this is a zero on the scale on these points.

22     I just don't think it's a 10 on the scale.  I think it's a

23     one or two on the scale.  But I think the way it still works

24     in the federal system is that if you have a witness who is

25     in Georgia or Boston who's a third party, you need to go to

1    the district court -- I don't think they've amended the rule

2    on this, you need to go to the district court in Boston and

3    get the subpoena issued and then it's enforced there.  And

4    there is a rule in which it can be transferred with the

5    parties' consent.

6         **MR. SIEGEL:**  Not in the federal system anymore.

7         **THE COURT:**  Maybe they very recently changed the

8    rule.

9         **MR. SIEGEL:**  Yeah, yeah, in the last few years the

10   rule's been changed and we can just issue subpoenas.

11        **THE COURT:**  But it may be just in the last couple

12   of years that it's changed in that regard.  So for the

13   hundred or so years preceding that in which the rule was in

14   place, that's how it worked.

15        **MR. SIEGEL:**  But it has been simplified here, but

16   not simplified there.  But even if -- it doesn't change the

17   fact that there is -- you know, I mean, other than a witness

18   that is truly under the control of the parties, right, there

19   is literally no one in this case who could be subject to any

20   compulsory process from this Court.  It's completely outside

21   of this Court's control.  And if you had a litigation --

22        **THE COURT:**  Well, I thought you just told me that

23   that's not true anymore with respect to anyone in the United

24   States, and there are some witnesses --

25        **MR. SIEGEL:**  No, it's actually still true.  That

1    was actually going to be my point.  My point was I can issue

2    a subpoena, but if the witness wants to contest it, right,

3    the witness can go to -- for example, let's just assume it's

4    the Northern District of Georgia, right.  And a judge in

5    Northern District of Georgia decides whether or not the

6    witness is going to testify.

7            **THE COURT:**  That was my point.

8            **MR. SIEGEL:**  And that is why if one were making --

9    you know, if this was an argument about domestic forum non

10   conveniens, right, or a transfer motion, if in fact all the

11   witnesses were spread out around the country and no one was

12   here, that would certainly be something that the Court would

13   and could take into consideration.  And that's essentially

14   what we have here, but on a much grander scale, where most

15   of them are in Canada.

16           And so I've talked about ex employees.  The final

17   category is donors.  I think there's a mix of these.  There

18   are some donors who are in the United States:  Reed Cowan,

19   Watson Jordan, maybe one named Gaby Ghorbani.  There's one

20   who is Canadian but is in Australia.  But there are also

21   likely to be significant numbers of material witnesses in

22   Canada.  One of the most important, for example, is -- and

23   one of the things that was emphasized in the documentary was

24   the Michael "Pinball" Clemons Foundation.  A lot of the -- I

25   can hand this up if you'd like me to because it's

1    illustrative.  This is 16 minutes and 37 seconds of Siegel

2    Exhibit 49.  It's a screenshot of one of the website

3    postings.  This was one that was actually given during the

4    interview of Governor Tunai in Kenya.

5            And what these are and what the story reports is

6    that there are 108 examples of these, right.  These are

7    specific schools that were specifically attributed to

8    specific donors, right.  And this is from the Michael

9    "Pinball" Clemons Foundation.  He's a famous CFL football

10   player in Toronto, right.  And this is, for us, a very

11   important example of where we believe that there are clearly

12   witnesses who will have knowledge of how did these

13   attributions get created, right, how did the schoolhouse get

14   attributed to that particular donor.  And all of that

15   information is in Canada.  And what we're going to need to

16   do is take discovery of WE, figure out who were the people

17   in the Michael Clemons Foundation that they dealt with, and

18   who were the WE employees.  They're all going to be former

19   employees.  They're all likely to be in Ontario.  And again,

20   none of them are going to be subject to compulsory process

21   here at all.

22           **THE COURT:**  How many depositions do you think

23   there are likely to be in this case?

24           **MR. SIEGEL:**  That's something that we're certainly

25   going to have to discuss, but I think there's likely going

1    to be a lot, I mean, several dozen.

2            THE COURT:  You're talking 50ish or something like

3    that?

4            MR. SIEGEL:  It could be.  I mean, we're going to

5    have to negotiate, and I don't want to commit to that.

6            THE COURT:  No, no, I'm just trying to get a sense

7    of what --

8            MR. SIEGEL:  You understand, yes.  I mean, even

9    the party -- this is a case where, obviously even with the

10   parties, there are a significant number of witnesses.  There

11   are certainly a significant number of non-parties, et

12   cetera.  So the bottom line is, Your Honor, we think for the

13   vast majority of likely material witnesses, the vast

14   majority, if they're unwilling, they're going to be subject

15   to process in Toronto but not here, at least from this Court

16   directly.  And if they're willing, it's much more convenient

17   to do this in Toronto than D.C.

18           And finally, I'll just -- because I know my time

19   has probably gone way over, I'll end with the public

20   factors.  We do think that there are a couple here that

21   strongly favor Canada.  One is the extent of any local

22   interest in the dispute.  I mean, their whole theory here,

23   right, is essentially tied back to the political scandal.

24   Their theory is that WE Charity became political roadkill --

25   that's the word they used, essentially sort of the victim of

1    a partisan political smear campaign that was really aimed at

2    Prime Minister Trudeau.  And what their claim is is

3    essentially -- and this is right out of the complaint, it's

4    paragraph 97.  The CBC sort of took advantage of this,

5    right, took a whole bunch of allegations that were made as

6    part of the political scandal, right.  I mean, almost

7    everything that this documentary was about -- how many

8    schools are actually being built, what are the donors

9    actually told, those are issues that were first raised in

10   those parliamentary proceedings.  That's why, for example,

11   we submitted this document with 360 primary schools.  That

12   was given to Parliament, right.

13            Their theory is that essentially the CBC was

14   hurting for ratings, so the national public broadcaster of

15   Canada decided to take advantage essentially of this

16   political scandal, pile on and do this to increase its

17   ratings.  Well, that's clearly a dispute about matters of

18   national significance in Canada.  The Canadian courts have a

19   much stronger interest in adjudicating.  I mean, many of the

20   letters that they attach to the complaint are saying is the

21   CBC fulfilling its statutory mandate, is it acting as we

22   expect our national broadcaster to act.

23            And we've cited multiple cases in situations where

24   cases involve some sort of significant government entity or

25   policy that is a significant domestic issue, a significant

1   issue with a foreign country but not here.  Judge Ketanji

2   Jackson, in the Malaysian Airlines case, right, she said,

3   look, Malaysia clearly has the biggest interest in

4   adjudicating the conduct of its national airlines, right.

5   Another case called Croesus EMTR vs. Federated Republic of

6   Brazil.  That was a bunch of hedge funds suing the Brazilian

7   government over nonpayment of bonds.  The court said, look,

8   this is about the conduct of government and officials in

9   Brazil, the monetary policy of Brazil.  It has a much bigger

10  interest than this court has.

11          The last one I want to talk about is the fact that

12  one of the two documentaries at issue is in French, and all

13  of the party documents related to it are in French.  They

14  sort of tried to dismiss the significance of that, Your

15  Honor, but I would suggest that they can't have it both

16  ways.  I mean, not only did they choose to sue over it, they

17  allege that its editorial team is independent, that there

18  are several important differences between the two versions

19  of the documentaries.  And they specifically allege it is a

20  basis for punitive damages.  Why?  Because it was aired

21  after they sent that libel notice, right, so that they

22  argue, therefore, you have knowledge of it, et cetera.  So

23  it's -- their attempt to dismiss it, I think, doesn't really

24  fit in with the theory of the complaint.  And there's no

25  question that if this was in Toronto, there would be a right

1    to a French speaking judge, a right to have those documents

2    considered in their original, people could testify in

3    French.

4              So the bottom line is, Your Honor, when you look

5    at the totality of the factors, and you look at the actual

6    relationship of the plaintiff to this forum, we submit that

7    this does meet the test that is a case where there is

8    clearly -- the factors clearly point towards Ontario being

9    the more convenience forum, and therefore dismissal is

10   appropriate.

11             THE COURT:  Are there witnesses who are not

12   English speaking witnesses?

13             MR. SIEGEL:  You mean who don't speak English

14   also?

15             THE COURT:  Correct.

16             MR. SIEGEL:  Not that I'm aware of.  I honestly

17   couldn't say that for sure.

18             THE COURT:  And are there documents that are

19   currently only in French and that have not been translated?

20             MR. SIEGEL:  Oh, yes.

21             THE COURT:  And how large --

22             MR. SIEGEL:  -- internal editorial communications

23   within the French side of the CBC are in French.  So those

24   e-mails will be in French, et cetera.

25             THE COURT:  All right, thank you.

1      **MR. KROETSCH:**  Good morning, Your Honor.  We've

2    prepared some materials, if we can approach the Court.

3          **THE COURT:**  Have you given a copy to opposing

4    counsel?

5          **MR. KROETSCH:**  I'm about to.

6          **THE COURT:**  I'll let you know I have an 11:30 in

7    another matter, and the court reporter is going to need a

8    break before the 11:30.  So I think what we may need to do

9    is go for 15 minutes or so now and then take a break, and

10   I'll have to come back to you all after I have my

11   11:30 hearing.

12         **MR. KROETSCH:**  Of course, Your Honor.

13         **THE COURT:**  All right, go ahead.

14         **MR. KROETSCH:**  So I think it's worth stepping back

15   for a moment --

16         **THE COURT:**  By the way, it's up to you if you

17   leave your mask on or off, it's your choice.

18         **MR. KROETSCH:**  I've gotten so used to wearing

19   these over the last couple of years.  So I think it's worth

20   stepping back for a moment and talking very briefly about

21   what this lawsuit is about, because that's one thing I did

22   not hear my friend from the CBC discuss at all.  And the

23   core allegation here -- because there's a lot going on, it's

24   a long complaint, we understand that, is that the CBC

25   falsely claimed that WE Charity's own documents showed it

1    deceived donors by not building schools in Kenya, right.

2    And a good example of that, if you turn to slide five in the

3    deck that we just gave you, you can see an example of an

4    excerpt from the episode -- the Fifth Estate episode where

5    the CBC sort of explains its process.  They say:  "We

6    scoured the internet for anybody who had publicly said that

7    they fully funded a primary schoolhouse in Kenya.  We

8    searched social media posts, we found old websites, created

9    spreadsheets for 30 villages they were involved with in

10   Kenya.  And it became clear donors believed they had fully

11   funded more than 900 primary schoolhouses in Kenya, far

12   higher than the 360 schoolhouses the charity said it has

13   built."

14          So that's the most essential lie as far as we've

15   alleged here.  At the end of the day it's a formula, right.

16   They've said you're missing 540 schools.  There should be at

17   least 900, you've admitted there are only 360.

18          THE COURT:  It's either that there were missing

19   schools or that some people were told -- more than one group

20   of people were told they fully funded the school and that

21   wasn't true.

22          MR. KROETSCH:  Well, fair enough.  But they would

23   be missing in that sense, in that people would expect to

24   have fully funded, and that there would then be all of those

25   schools, right.

1          **THE COURT:**  I'm not sure it matters.

2          **MR. KROETSCH:**  Fair enough, fair enough.  So in

3     terms of like what will the proof look like of this, take

4     the 360 schools.  WE Charity admitted that it only built 360

5     schools.  The proof this -- and the CBC said this in many

6     publications, right.  If you look at slide six, you'll see a

7     few examples that are from the complaint.  Exhibit 8 of the

8     complaint, which is the online article that they published,

9     says:  "WE records show only 360 have actually been built

10    since its work began in 2003."  And this purportedly comes

11    from a document that WE Charity submitted to the Canadian

12    Parliament which says repeatedly within it this is not an

13    exhaustive count.  This is -- it just provides sample

14    programs, and then says again:  "For the sake of clarity,

15    this list and document is not exhaustive."

16          Even in the interview of Ms. Moraa, who is here

17    today from Kenya, she explains during that interview this is

18    not an exhaustive count when Mr. Kelly, the reporter for the

19    CBC, says, "But you only built 360."  She says, "No, no, no,

20    that wasn't exhaustive."  So they just deleted that from her

21    interview when they put it on air.  They did that a few

22    times with explanatory comments that she included, right.

23    Another example is they said, oh, but your count of 852

24    schools, that includes latrines, doesn't it.  She said no.

25    So they just cut that out and then replaced it with a

1    voice-over saying:  But it even included latrines.  So the

2    way that you prove this kind of statement false is with the

3    document itself.  It just does not say what it says.  You

4    don't need hundreds of witnesses for that.

5            So I just wanted to give a sort of brief overview

6    of what those -- what the allegations are that are at issue.

7            **THE COURT:**  How many depositions do you think

8    you're going to want to take in the case?

9            **MR. KROETSCH:**  I would imagine both sides together

10   would have about maybe 15 fact witnesses, not including

11   experts -- of whom I would not expect too many.  I can't

12   imagine have 50 depositions here.  So many of the

13   allegations in this complaint turn on misquotations and

14   misattributions of WE Charity itself saying that a document

15   or an e-mail says something that it just flat out doesn't

16   say.  And we don't think that you need to take a lot of

17   depositions to figure out what a piece of paper says or that

18   it would render substantially true a lie about what WE

19   Charity admitted to, even if you were able to get those

20   people to say, well, I didn't say that, but maybe I might

21   have; perhaps I would have if I had written something

22   differently.

23           So bearing in mind the limitations of time, I want

24   to turn the forum non analysis.

25           **THE COURT:**  I'll give you more time after we

1    break.

2        **MR. KROETSCH:**  No, I appreciate that.  And if Your

3    Honor has any questions about the substantive claims here,

4    we're --

5        **THE COURT:**  I don't have any at this point.

6        **MR. KROETSCH:**  So there are two or three,

7    depending on how you want to look at it, prongs to this

8    test, I agree with Mr. Siegel.  And the first piece of that

9    test is the alternative adequate forum.  We contend that

10   there is no adequate forum in Ontario.  I think the crux of

11   the dispute does turn on whether or not the six-week notice

12   provision under the Libel and Slander Act is waivable,

13   right.  The parties agree it is considered to be an absolute

14   bar by the Supreme Court of Canada.  The way the Libel and

15   Slander Act is worded, no action lies if you haven't

16   provided notice.  The courts have said that this makes it a

17   nullity, right.  And they've held repeatedly that the courts

18   in Ontario have no power to relieve failure to comply with

19   this, they can't do that.  So --

20       **THE COURT:**  But that's -- I mean, I've got to tell

21   you, the number of times every week that I deal with

22   exhaustion issues in administrative matters, and all the

23   time there are mandatory exhaustion requirements, there are

24   non -- the Court cannot provide any relief from them,

25   they're not subject to any estoppel rules, and they're

1   either jurisdictional or non jurisdictional.  It's just an

2   entirely separate inquiry as to whether they're

3   jurisdictional.  And it's only if they're jurisdictional

4   that they're non waivable, at least as a matter of U.S. law.

5          So when I read condition precedent, absolute,

6   mandatory, that the courts are without power to relieve,

7   that doesn't move me much as a U.S. judge.  Because I see

8   that all the time, and I still have to make the separate

9   inquiry as to whether they're jurisdictional or not.  At

10  least as a matter of U.S. law, it's very rare that rules of

11  that type are in fact jurisdictional.

12         But I think, analytically at least, there is a big

13  distinction between something that is a condition

14  precedent -- mandatory, not within the Court's discretion to

15  forgo, and the separate question about whether it's the type

16  of jurisdictional rule or the type of rule that the Court

17  must sua sponte raise on its own and dismiss a case.  And as

18  a matter at least of U.S. law, that's only where it's

19  jurisdictional.  In looking through the materials, maybe I

20  saw one reference to jurisdiction.  I didn't see much in

21  there about jurisdiction, in the materials that have been

22  provided.

23         **MR. KROETSCH:**  Well, I believe the experts, the

24  Canadian law experts that each party respectively provided,

25  disagree on this.  Mr. Harrison provided in his declaration

1    that it is jurisdictional.  I understand that Mr. Rogers,

2    their expert, disagreed as to whether it's jurisdictional.

3    I do think -- and I'm not a Canadian lawyer, but I do think

4    that the conceptions of the lines about jurisdiction may be

5    a little different in the U.S. versus Canada.  They don't

6    have quite as firmly divided up Article III jurisdiction

7    issues as we have here.  But --

8        THE COURT:  Can you cite a single case where a

9    court has ever sua sponte raised this issue?

10       MR. KROETSCH:  I cannot, nor can I cite a single

11   case in which a party has been allowed to waive this notice

12   provision.

13       THE COURT:  Well, has there ever been a case in

14   which it was litigated over whether a party could waive it

15   or not?

16       MR. KROETSCH:  No, not that we've been able to

17   find.  So here's the problem -- and I just want to get to

18   one of the key problems with their proposal.  Their proposal

19   has been this isn't going to be a problem because we won't

20   bring it up, right.  They're saying it's non waivable, the

21   Court has no power to relieve it.  They don't disagree that

22   the cause of action ceases to exist without compliance with

23   the notice requirement.  But their answer is under Ontario

24   rules of civil procedure, it's incumbent upon the defendant

25   to raise the issue, not the plaintiff.

1          And the problem is the why:  Why is it incumbent

2   on the defendant.  There I think it's worth looking at what

3   Mr. Rogers said in his declaration, quoting the Ontario

4   rules of civil procedure.  Because the rule says -- and this

5   is in slide 16 of your book.  It says:  "Allegations of the

6   performance or occurrence of all conditions precedent to the

7   assertion of a claim or defense of a party are implied in

8   the parties' pleadings and need not be set out."  And the

9   treatise that Mr. Rogers cited likewise says you don't need

10  to plead this, because you are implying by virtue of filing

11  a statement of claim that you have provided notice.  We have

12  not provided notice for most of these.  We cannot file a

13  statement of claim that, under Ontario rules of civil

14  procedure, falsely implies that we gave notice that we did

15  not give.  In Ontario, they have the same --

16          **THE COURT:**  I mean, I understand why you wouldn't

17  want to mislead a court.  But why couldn't you simply say in

18  your pleading that the parties have agreed to dispense with

19  any requirements with respect to the notice?

20          **MR. KROETSCH:**  We could do that.  It's never been

21  tried as far as anybody can tell.  I mean, we've looked in

22  vain to find any example of that ever happening.  And so I

23  think the question then is should the CBC -- does the CBC

24  meet its burden to show an adequate forum by asking us to go

25  to Canada and take a novel issue of law that has never been

1    tested before and risk dismissal.  And the courts of appeal

2    that have considered the adequate forum cases have said if

3    there's even a question as to whether you would be time

4    barred, a serious question as to whether you would be time

5    barred, you should not dismiss.  That fails to meet their

6    burden.

7              THE COURT:  The vast bulk of the case here there's

8    not even an argument you're time barred, correct?

9              MR. KROETSCH:  Excuse me?

10             THE COURT:  The vast majority of your case,

11   there's not even an argument that you're time barred because

12   you did provide the notice?

13             MR. KROETSCH:  Oh, it's not the vast majority of

14   the case.  There are 11 different defamatory publications at

15   issue here.  They make light of some of these, but they're

16   very significant defamatory publications that are at issue

17   here that are time barred.  There is a radio interview that

18   broadcasts on CBC Radio.  It broadcasts -- I mean, that's

19   available on Sirius in the United States, it's available

20   nationwide in Canada as well of course.  And that is

21   governed by the notice provision, and we did not provide

22   notice.  There's a podcast that you can download today on

23   Apple Podcast, that likewise is an online broadcast, that

24   our expert said in his declaration that --

25             THE COURT:  If they were so serious, why didn't

1    you provide notice?

2            MR. KROETSCH:  Why didn't we provide notice?

3            THE COURT:  Yes, I mean, if they're serious

4    claims, why didn't you provide the notice?

5            MR. KROETSCH:  Because we didn't intend to sue in

6    Canada, we were suing in the United States.

7            THE COURT:  So why did you provide notice on the

8    others then?

9            MR. KROETSCH:  We provided notice on one, and we

10   provided notice on that in the hopes that they would stop

11   continuing to publish things.  It didn't work.

12           THE COURT:  Let me ask you the same question I

13   asked Mr. Siegel.  Is this a question for me of law or of

14   fact, how do I decide this?

15           MR. KROETSCH:  I believe it's a question of fact.

16   A question of foreign law is a question of fact.  But I

17   believe that what you need to find is that there is clearly

18   an adequate forum, not that there possibly could be if

19   Canadian courts for the very first time decide that this is

20   waivable.

21           THE COURT:  Do you think I need to hear from the

22   witnesses if I'm going to make a fact finding?

23           MR. KROETSCH:  If that is going to be outcome

24   determinative, potentially.  But, again, I don't think you

25   need to resolve an issue of Canadian law.  I think you need

1  to determine that there is a genuine dispute as to the issue

2  of Canadian law.

3          **THE COURT:**  As I sit here now, I'm not yet

4  convinced that's the case just because -- I mean, at least

5  it's not my sense that Canadian law and U.S. law are that

6  different.  Condition precedent -- all the time in all sorts

7  of cases, condition precedent not jurisdictional.  There are

8  all sorts of conditions you have to satisfy before you bring

9  suits in U.S. courts that are just not jurisdictional.  It's

10  very rare that anything -- those types of requirements are

11  jurisdictional.

12          **MR. KROETSCH:**  Right.  I think the question

13  whether it's framed as jurisdictional or not is whether the

14  court has the power in Ontario to enforce the Libel and

15  Slander Act in a context where it is undisputed that under

16  that very law, no action shall lie.  It says in the Libel

17  and Slander Act no action shall lie unless notice is

18  provided within six weeks.  So does the Court have the power

19  to nevertheless permit that action to go forward.

20          I don't think that the hardline of jurisdiction is

21  as clear in Canada as it is here, because I think they are

22  courts of more general jurisdiction than here.  And if that

23  is outcome determinative for Your Honor, we certainly would

24  be happy to ask Mr. Harrison to fly down and have an

25  evidentiary hearing.  But respectfully, we don't believe

**1**    that that is necessary, because the very significant

**2**    questions that exist that could prompt you to hold such a

**3**    hearing in and of themselves are enough that you should

**4**    conclude that it is not clear that there is an adequate

**5**    forum, and that they have not met their burden.

**6**         THE COURT:  I have to say, that argument bothers

**7**    me.  I mean, it basically says:  Judge, if you actually

**8**    think there's something you have to think about here, we

**9**    win.  And I like to think about issues and figure out what

**10**   the right answer is.  I might hear from the witnesses and

**11**   conclude that one witness is just not entirely -- is not in

**12**   the slightest bit credible and the other one is and that

**13**   there's not an issue.  And so telling me that I have to have

**14**   a hearing -- if I think there would have to be a hearing on

**15**   something that you necessarily win, I think, is not a very

**16**   persuasive argument to me.

**17**        MR. KROETSCH:  Understood.  So we'd be happy to

**18**   have the witnesses here.

**19**        THE COURT:  What about the Court appointing

**20**   somebody?  I've got two hired witnesses here, what about the

**21**   parties agree to split the cost and I just appoint someone

**22**   to opine on Canadian law?

**23**        MR. KROETSCH:  We'd want to discuss that with our

**24**   client, but I don't see any objection to that necessarily.

**25**        THE COURT:  That's something worth thinking about.

1    So maybe this is a good time, if you're getting ready to

2    move to the next subject.  Do you have more on adequacy, to

3    start with, of the forum?

4         **MR. KROETSCH:**  On the adequacy of the forum, the

5    other point on the adequacy of the forum I suppose would be

6    the question of whether it is sufficient if we are able to

7    have -- to get a remedy for one or two out of 11 defamatory

8    publications, right.  And there, I think we certainly

9    disagree with the CBC.  Our contention is that you need to

10   have a remedy for every single publication, right.  And this

11   question of what is a sort of separate claim and a separate

12   wrong is something that comes up often in the context of

13   statutes of limitations.

14        So you have the single publication rule, and the

15   line that courts typically draw between different actionable

16   wrongs is the line between whether they reach a different

17   audience or are differently worded.  And a podcast versus a

18   radio show versus an online article versus a TV show versus

19   a TV show in a different language, all those reach different

20   audiences and we submit would be clearly different

21   publications under the single publication rule.  And for

22   each of those independent wrongs, there needs to be a

23   remedy.

24        **THE COURT:**  So why don't we go ahead and just take

25   a break here so that I can give the court reporter a few

1    minutes to break, and then I've got my 11:30.  Let me just

2    look at my calendar here.

3              MR. KROETSCH:  Should we clear out in terms of

4    our --

5              THE COURT:  Let's see here.  I think you will need

6    to step away from the tables and let folks use the tables.

7    As soon as we're done with that, we can reconvene.  Thank

8    you.

9         (Recess taken at 11:19 a.m.)

10        (Back on the record at 11:56 a.m.)

11             THE COURT:  My apologies for the interruption, but

12   you can pick up where you left off.

13             MR. KROETSCH:  Thank you, Your Honor.  So moving

14   to the balancing of the factors under the forum non

15   conveniens test.  I think our -- I want to start with

16   perhaps answering the question that you asked before:  What

17   was the strategy, right.

18             THE COURT:  Yes.

19             MR. KROETSCH:  Why did we sue here I suppose is

20   probably the first question.

21             THE COURT:  Right.

22             MR. KROETSCH:  It certainly wasn't because it

23   would be easier.  As you pointed out, it is a significantly

24   harder standard than anywhere else in the world, including

25   Canada.  We sued here because WE Charity U.S., the party

1    that sued, is an American charity.  All of its donors are in

2    America.  All of its partners, all of the schools are in

3    America.  And the Canadian entity is shut down -- it is in

4    the final processes of shutting down.  Unfortunately as a

5    result of the political issues with the Prime Minister in

6    Canada, the charity shut down -- started shutting down in

7    September of 2020.  So by the time any of this coverage and

8    reporting started, it was already public that it was going

9    to be closed.

10          **THE COURT:**  Are there still schools being operated

11   in Africa?

12          **MR. KROETSCH:**  Yes.

13          **THE COURT:**  Who's doing that?

14          **MR. KROETSCH:**  Well, formally it is Free the

15   children Kenya runs them.  The schools that operate after

16   they open are run by the government of Kenya.  So what

17   happens is.

18          **THE COURT:**  I guess my question is, is there an

19   affiliated charity that is still funneling donations to

20   Kenya for purposes of opening schools?

21          **MR. KROETSCH:**  I believe it's maintaining the

22   existing schools.  I would want to check that, but I think

23   that as a result of this -- because WE Charity U.S., which

24   was the major source of funding, I believe that they've

25   stopped opening new communities.

1          **THE COURT:**  But is WE Charity U.S. still funding

2     the operation of the schools in Kenya?

3          **MR. KROETSCH:**  Yes, it's still raising money.

4          **THE COURT:**  Because you had said, I think, that

5     all the schools were in the United States a second ago.

6          **MR. KROETSCH:**  So let me clarify, I apologize.

7     There are sort of two main types of programming that WE

8     Charity does, right -- whether we're talking about WE

9     Charity Canada or WE Charity U.S.  There are what they call

10    domestic programming -- so in Canada they'll be in Canada,

11    the U.S. would be in the U.S., which is partnering with

12    schools.  Like the Washington, D.C. schools, I know they

13    have a partnership with Montgomery County, Maryland schools,

14    with the LA County schools, the Chicago schools to do

15    service programs.  They've partnered with the AP program.

16          So if you take a look, for example, one of the

17    slides here has a few examples of that.  I believe it's

18    slides 27 and 28 that shows all the schools in the United

19    States with which the charities partnered.  So those are

20    numbers of teachers in every state and the District.  And

21    below that is an example of what students can receive

22    through the AP with WE program on their high school

23    transcript when they're applying for college showing that

24    they participated in this program and get service

25    recognition.  So that's the domestic programming.

1          Then there's money that is contributed

2     internationally to help fund schools in a variety of

3     different countries -- Kenya being the subject of this

4     lawsuit, but also in Ecuador and many other places.

5          **THE COURT:**  I think you also said that all the

6     donors were in the United States as well; is that right?

7          **MR. KROETSCH:**  That's right.

8          **THE COURT:**  So there are no donors outside the

9     outside to this WE Charity entity?

10         **MR. KROETSCH:**  To the plaintiff entity, no.  So as

11    I was saying, we didn't sue because it would be easier, we

12    sued because this is an American plaintiff.  It is the WE

13    Charity that still exists and is operating.

14         **THE COURT:**  I'm not sure that really answers the

15    question.  I mean, why not then say fine; the CBC wants to

16    transfer the case to Canada, it's an easier standard, fine,

17    let's do it.  So why are you opposing the motion then?

18         **MR. KROETSCH:**  There's a few reasons.  One reason

19    has to do with the practicality, the convenience.  If you

20    think about who the witnesses will be, I think I agree with

21    Mr. Siegel that the three main categories are likely to be

22    CBC reporters -- I don't know who the 12 are, but at least

23    three or four of them, WE Charity employees.  And both of

24    those categories are party witnesses.  And for the non-party

25    witnesses, the key people are the donors.  And there are the

1   damages witnesses.  All of the damages witnesses will be

2   American donors.  So it doesn't make any sense to have that

3   lawsuit in Ontario.

4          THE COURT:  How many donors are you talking about

5   as witnesses in the case?

6          MR. KROETSCH:  As witnesses?

7          THE COURT:  Yes.

8          MR. KROETSCH:  Well, I would hope that it wouldn't

9   have to be too many.  Certainly Watson Jordan is one of

10  them.  You would expect Reed Cowan, who's also in the United

11  States, to be one of them.  I would expect Gaby Ghorbani

12  likely to be one of them.  Probably a representative from

13  the Unstoppable Foundation could potentially be one of them.

14  If you look at the different donors who are referenced in

15  the CBC's coverage, there are at least as many Americans as

16  Canadians referenced in a substantive fashion as being major

17  donors.  Change Heroes, the CBC identified Taylor Conroy,

18  the head of Change Heroes, as also being in Los Angeles.  So

19  most of those major donors -- not all of them, but most of

20  them.

21         THE COURT:  Are you going to seek discovery from

22  the third party vendors that are in Canada in this case?

23         MR. KROETSCH:  The third party vendors?

24         THE COURT:  Yes.  Mr. Siegel was talking about

25  accounting firms and others who may have been involved in

1    assisting the CBC but were not -- would not work for the

2    CBC.

3        **MR. KROETSCH:**  I did not understand Mr. Siegel --

4    and I might have misunderstood, I didn't understand him to

5    be saying that there were third party firms that assisted

6    the CBC.  If there are third party firms that assisted the

7    CBC, we could potentially require that.  I understood him to

8    be referring to Froese Forensics, which is an auditing firm

9    that WE Charity hired to help provide information to the

10   CBC.

11       **THE COURT:**  I see.

12       **MR. KROETSCH:**  And Mr. Froese has already provided

13   an affidavit promising to appear.

14       **THE COURT:**  I misunderstood.

15       **MR. KROETSCH:**  They may have also been referring

16   to some work that was done by vendors in connection with the

17   Trudeau scandal, much of which they attached to their

18   motion.  Our view is that that's irrelevant.  So we wouldn't

19   expect there to be third party discovery in those.

20       **THE COURT:**  The thing that is a little bit

21   challenging for the Court on this is that I do think that

22   the core of the issue raised by the motion to dismiss on

23   forum non conveniens grounds is just where the bulk of the

24   litigation and discovery is going to occur, and where the

25   bulk of the witnesses are located.  And you say, well,

1    largely here, some in Canada.  And Mr. Siegel says almost

2    exclusively in Canada, maybe a few here.  It's very hard for

3    the Court to know who is right about that other than to say

4    perhaps that if I keep the case, I'm going to enter an order

5    saying that these are the only people -- I'm not going to

6    let you go and do that then.

7            If you tell me you want to go take a deposition in

8    Canada, I'm going to say no under those circumstances, and

9    just hold people to what they're telling me now.  And at

10   least certainly not allow people to change their theory,

11   sort of their view of what the scope of the discovery is.

12   But it is hard for me to get my head around really where the

13   bulk of the case is, because you have different views on

14   that issue.

15           MR. KROETSCH:  Well, you mentioned earlier that as

16   an American plaintiff, we're going to be held to American

17   damages.  That was always our intention.  WE Charity, in the

18   U.S., has lost tens of millions of dollars per year as a

19   result of this.  So WE Charity U.S. is comfortable with that

20   limitation, that was the plan.

21           THE COURT:  Let me ask you the flip side of the

22   question that I asked Mr. Siegel, which is that if you think

23   that the defendant is engaged in gamesmanship to move the

24   case to Canada, why would they want to engage in that

25   gamesmanship and have to face a lower standard of proof?

1      **MR. KROETSCH:**  I mean, I think it's perhaps

2  dangerous to speculate as to their strategy.  I assume they

3  must see some home turf advantage in litigating in Canada.

4  The difficulty of proving damages in Canada, when all the

5  donors would be in the United States, would potentially be

6  part of it.  If you look at who the key witnesses are, we

7  believe the non-party witnesses, we think there are at least

8  as many in the United States.  That could be a problem.  Or

9  it could just be that Canada's a smaller stage for a trial

10  that is likely to expose a lot of very embarrassing conduct

11  by the CBC.  I don't know.

12      **THE COURT:**  You'd think that they probably would

13  not want that in Canada if you're the CBC.  You're going to

14  suffer greater repercussions with any misconduct exposed in

15  Canada if you're the CBC than in the United States where

16  you'd say, well, that's the United States.

17      **MR. KROETSCH:**  Well, the CBC has a lot of control

18  over the media up there.  I mean, there was literally no

19  reporting on the filing of this lawsuit.  And virtually

20  every single thing that WE Charity does was being reported

21  prior to that.  So they may be more confident in their

22  ability to maintain media up there, but I don't know.  But

23  what I do know is why we sued here.

24          You know, another consideration -- and it is a

25  real consideration, is that if we go to Canada, we will get

1   a judgment that is worthless in the United States.  We can't

2   enforce it, we can't get it recognized.  If CNN were to pick

3   up the story next summer and rebroadcast --

4            THE COURT:  Why do you need it -- I mean, I assume

5   the CBC's assets are all in Canada.  So why would you need

6   it enforced in the United States?  Does the CBC have bank

7   accounts here you'd want to come seize?

8            MR. KROETSCH:  I mean, the CBC could have assets

9   here.

10           THE COURT:  But seriously?

11           MR. KROETSCH:  Realistically, no, that's not the

12  main concern.  The main concern is not that they're going to

13  run out of money in Canada.  The main concern is

14  recognizability.  It's the risk that we would have to redo

15  this lawsuit if this were republished.

16           THE COURT:  I don't get it.  Why would you have to

17  redo the lawsuit?  You can enforce the judgment in Canada,

18  if you get a judgment.  What else is there?

19           MR. KROETSCH:  So let's say it's republished,

20  right -- and this has happened before.  This is why the CBC

21  got sued in New York in --

22           THE COURT:  I mean, it's stale news at this point.

23  Would they really want to just go republish the news at this

24  point and run it again?

25           MR. KROETSCH:  Well, here's an example:  Next

1    summer, WE Charity has partnered with the -- with Martin

2    Luther King, III and the King family to co-organize the 60th

3    anniversary of the I Have a Dream speech event.  They have

4    the National Mall rented, there are going to be events at

5    the White House.  I would not be the least bit surprised to

6    have the CBC stirring up hey, do Americans know the story of

7    all of this horrible fraud these guys did in Kenya who are

8    now associated with Martin Luther King's family.  So I don't

9    think it's farfetched that they will try to stir up what is

10   maybe stale news in Canada.  And we certainly know it's had

11   an enormous impact on --

12           THE COURT:  If they did that, though, you could go

13   back to the Canadian court and get relief there.  They'd be

14   broadcasting it from Canada presumably.  They presumably are

15   not going to just set up a standalone CBC in the District of

16   Columbia.

17           MR. KROETSCH:  No, but what they could do is

18   license it and have it republished.  I mean, that's exactly

19   what happened in the Bryks case, right.  In 1994, what

20   happened was there was a CBC special about somebody that

21   then CNN, through headline news, picked up and rebroadcast

22   in its entirety.  And so the plaintiff in that case sued

23   both CBC and CNN for defamation.

24           THE COURT:  I have to say, this all strikes me as

25   highly speculative that there would be that type of concern

1    down the road in a way that would be prejudicial to the

2    plaintiffs in this case.  I'm more focused on the other

3    arguments.  I think that one doesn't move me.

4         **MR. KROETSCH:**  That's fair, we'll move along.  So

5    in terms of the core question of where are these witnesses,

6    it's worth thinking about in terms of non-party witnesses --

7    which I think are the key here, right.  As I mentioned, the

8    donors who are the damages witnesses are all going to be in

9    the United States.  If you look at the donors or the

10   non-parties who are in the coverage, Watson Jordan is a

11   central figure, arguably the central figure.  He's in the

12   United States.  Reed Cowan is in the United States, and he's

13   cited as the inspiration --

14        **THE COURT:**  Where is Mr. Cowan?

15        **MR. KROETSCH:**  He's in California.  At one point

16   he was in Nevada I think.  Gaby Ghorbani is in California.

17   And Pledge for Humanity is in California.

18        **THE COURT:**  Where's Mr. Cowan?

19        **MR. KROETSCH:**  Mr. Cowan, I believe he's in San

20   Francisco.

21        **THE COURT:**  So these are all California people?

22        **MR. KROETSCH:**  Many of them, but in different

23   areas in California.  So like Unstoppable I believe is in

24   LA.  And then there's also of course Laurie Styron who was

25   the head of the charity -- I'm trying to remember the name

1    exactly, the charity Watchdog Organization -- CharityWatch,

2    that's right.  And she's in Chicago, and the CBC flew to

3    Chicago to meet with her and defame WE Charity to her face.

4    She's going to be an important witness.  I think we'll want

5    to know about what the CBC told her, what they showed her.

6    So these are a lot of American witnesses, and these --

7              THE COURT:  Who else in the U.S., what other U.S.

8    witnesses?

9              MR. KROETSCH:  Excuse me?

10              THE COURT:  Any other U.S. witnesses?

11              MR. KROETSCH:  Other U.S. witnesses?

12              THE COURT:  Yes.

13              MR. KROETSCH:  There may very well be other

14    donors.  One of the challenges is we don't necessarily know

15    what the CBC reports to have relied on in its reporting.  To

16    the extent that they keep that all confidential, there won't

17    be more, but they won't be in Canada either.

18              THE COURT:  What about non third party witnesses?

19              MR. KROETSCH:  Non third party witnesses?

20              THE COURT:  Yes, where are they?  Because, I mean,

21    I understand there are particular problems with respect to

22    third party witnesses, because you have to go through

23    additional process.  But there are burdens still.  And in

24    your traditional forum non conveniens case, you do consider

25    where the witnesses, even party witnesses, are located.

1      **MR. KROETSCH:**  Right.  I take the CBC at its word

2      that its witnesses are in Toronto, which is not an enormous

3      difficulty to get here.

4              **THE COURT:**  How many witnesses are you talking

5      about there?

6              **MR. KROETSCH:**  Of what we know about, we know

7      about Mark Kelly, right.  He was the host of the program.

8      We know about Harvey Cashore, he's the lead producer on the

9      program.  We know about -- I think Kate McKenna is her name,

10     one of the other reporters.  I believe there's one other

11     reporter who we are aware of.  And then Diana Swain who is

12     the executive producer of the Fifth Estate.  That's all we

13     know about.

14             **THE COURT:**  And then what about WE Charity

15     witnesses in Canada?

16             **MR. KROETSCH:**  In Canada, the witnesses that I can

17     think of would be probably Mark and Craig Kielburger.  And

18     then the other key witnesses would be -- and perhaps Victor

19     Lee, the CFO.  And then the other key witnesses would be the

20     executive director of WE Charity, Scott Baker, who's here

21     today from his home in Quito, Ecuador; Carol Moraa, who is

22     the head of the operations in Kenya, and she's here today

23     from Kenya; and Robin Wiszowaty, who runs the African

24     programming and is in Michigan.

25                 One thing I want to highlight is when the CBC says

1   that there are -- the vast majority of the material

2   non-party witnesses are in Canada, they haven't identified

3   who any of those people are.  Now, they've said under Piper,

4   we only have to identify categories.  So they said, well,

5   there are donors and there are former employees.  And the

6   problem is that this is tantamount to saying nothing.  There

7   are 55,000 donors and former employees.  That doesn't tell

8   us anything about who they are.  And the CBC --

9        THE COURT:  I thought you told me all the donors

10  were in the United States, in any event?

11       MR. KROETSCH:  Well, they want to talk with the

12  Canadian donors, too.

13       THE COURT:  What would the relevance of that be?

14       MR. KROETSCH:  I completely agree.  But if they're

15  identifying who they claim are the witnesses in Canada,

16  they're saying, oh, we've got all these donors and they must

17  be in Canada.  If they're only talking about the donors in

18  the United States, then terrific, that makes our point.  But

19  if they are asserting that there are donors in Canada,

20  those --

21       THE COURT:  You're not seeking damages with

22  respect to any lost donations from Canada, correct?

23       MR. KROETSCH:  That is correct.  So those are the

24  main categories.  They haven't provided, though -- bear in

25  mind, they spent over a year doing this investigation prior

1    to publishing their defamatory coverage.  They marshaled all

2    the resources of the Canadian Broadcasting Corporation to do

3    this vast investigative reporting, and now they say it would

4    be premature to identify any Canadian non-party witnesses.

5    They must know who these people are.  So that's a

6    significant problem from our point of view, that they have

7    failed to meet their burden to identify an overwhelming

8    number of witnesses in Canada for whom it would be an

9    enormous burden to come here.

10         And while they do say in their papers that it's a

11   difficulty for the CBC to get to Washington, D.C., they

12   actually don't say that in their affidavits.  I mean, they

13   submitted multiple affidavits from reporters.  Nobody said,

14   oh, this is going to be a huge burden for me to get here.

15   The CBC is litigating a case right now in Calgary, which is

16   a thousand miles further away from Toronto than D.C. is.

17   And they haven't tried to move that case.  It's just not

18   that hard for the CBC to get here.  They traveled

19   36,000 miles roundtrip to do the reporting on this story,

20   right.  They went to Africa and Australia and Chicago and

21   North Carolina, and they can't go here?  It just doesn't

22   make sense.  And for them to have so vastly inconvenienced

23   themselves to defame us, they shouldn't be able to now say,

24   well, it's kind of hard for us to take a 90-minute flight.

25   That doesn't seem to make sense to us.

1          **THE COURT:**  Do you agree that if there were any

2     witnesses in Canada who declined to come to the United

3     States for trial, or perhaps even for deposition, that I

4     could issue letters rogatory and that those individuals

5     could then be deposed in Canada, and if necessary, their

6     video depositions can be taken and simply presented to the

7     Court in lieu of their testimony?

8          **MR. KROETSCH:**  Yes, Your Honor.

9          **THE COURT:**  Would you have any problem with that?

10         **MR. KROETSCH:**  Absolutely not.  I've done many

11    video depositions across the border into Canada in just the

12    last couple of years.  It's a very simple thing to do.

13         **THE COURT:**  Is that right?  I mean, tell me about

14    that.  Tell me about the letters rogatory process from the

15    Canadian perspective.

16         **MR. KROETSCH:**  Well, they were all party witnesses

17    in which I've done that, so we were defending a Canadian

18    insurance company.  There were no obstacles like you

19    encounter, for example, in Germany or in France where there

20    are blocking statutes that make it difficult to do this.

21    It's a simple matter, the parties just agree.

22         **THE COURT:**  That's for party witnesses.

23         **MR. KROETSCH:**  For willing, right.

24         **THE COURT:**  Party witnesses.  Do you have any idea

25    with respect to third parties and really how difficult that

1   really is?

2        **MR. KROETSCH:**  I haven't done that in a few years

3   at least, but I wouldn't expect it to be difficult.  I think

4   last time I did this was probably about six years ago

5   sending a letter rogatory -- well, it was probably 10 years

6   ago, up to Canada.  It's just not that hard.  Especially you

7   work with Canadian counsel.  It's something that courts are

8   familiar with getting.

9        And it would go both ways.  I mean, if we were

10  doing this case in Ontario, we would be sending letters

11  rogatory south of the border to get Watson Jordan, to get

12  Reed Cowan, to get the Unstoppable people, to get Gaby

13  Ghorbani, to get Laurie Styron.  I don't see why -- if you

14  think of the actual plausible non-party witnesses, why the

15  balance would weigh strongly in favor of Canada.  I mean,

16  take a look, if you don't mind, at the examples of

17  sources -- notice they never actually say witnesses, but

18  sources that they identified in their coverage, that they

19  identify in Siegel Exhibit 14 in connection with the reply.

20  They provided --

21        **THE COURT:**  Are you asking me to look at the

22  binder you gave me or the exhibits?

23        **MR. KROETSCH:**  Yeah, so page 38 shows you some

24  examples of the sources that the CBC said are these Canadian

25  sources who they presumably are contending that they would

1     need to have at trial.  And it just doesn't hold water.

2     Take a look at, for example, the plaque, right.  They took a

3     picture of a plaque while they were walking through the WE

4     university -- which isn't even at issue, grounds, and it

5     lists, if you read carefully, a few families:  The Sironsi

6     (phonetic), Romano and I think Francis families.  So they

7     put those on Exhibit 14 and said those are sources, those

8     are -- they never spoke with them, they don't rely on them

9     for any reporting.  These are not plausible witnesses.

10    That's what's making up these large numbers of Canadian

11    witnesses, people like that where they just wrote down their

12    names or they say, oh, here's a school from St. Marys,

13    Ontario who gave money to WE Charity in 2003, we found a

14    picture online.  That's not a witness; that's certainly not

15    a material witness.

16              **THE COURT:**  What about the French language

17    discovery materials?

18              **MR. KROETSCH:**  They haven't quantified them, and I

19    would think that they would probably know.  I mean, from our

20    point of view, the reporting was all done by an English

21    language team, and they haven't denied that.  We argued

22    that --

23              **THE COURT:**  Except for the --

24              **MR. KROETSCH:**  The Enquete adaptation?

25              **THE COURT:**  The Enquete, yes.

1      **MR. KROETSCH:**   There will be some French language

2   documents associated with whatever editorial decisions the

3   Enquete team made in adapting the coverage.  I don't know

4   how many documents that is, but I think it would vastly pale

5   in comparison to the English language documents.  And if we

6   were in Canada, we would have to translate those as well

7   because all the relevant parties speak English.  They

8   haven't argued that any of the witnesses are incapable of

9   speaking English.  There's no reason to think that the

10  testimony would be in French.  So there will be some

11  documents in French, but --

12     **THE COURT:**   I mean, I suppose that the -- to the

13  extent you seek those documents, the CBC can produce them to

14  you in French and you can translate whatever ones you want.

15  And if you don't want to translate them, you don't have to.

16     **MR. KROETSCH:**   I have cases in Portuguese, French,

17  Swahili, Kazakh.  I mean, you translate it.  That's how it

18  works, especially --

19     **THE COURT:**   Let me ask you another question with

20  respect to the public factor.  Is there a comity interest in

21  having a Canadian -- strike that.

22        Is there a comity interest in a U.S. court where

23  possible avoiding opining on the conduct of a Canadian

24  entity?

25     **MR. KROETSCH:**   We would say no.  And I think that

1    that was a theory that the D.C. Court of Appeals -- D.C.

2    Circuit, rather, rejected in the Simon v. Hungary case where

3    Hungary tried to argue that there should be some comity

4    consideration for whether the holocaust victim cases took

5    place in Hungary or in the United States.  I believe that

6    didn't get anywhere.

7         So there are -- the CBC has cited a few cases that

8    Mr. Siegel mentioned earlier.  I think he mentioned the

9    Croesus case that had to do with Brazilian bonds.  But in

10   that case, the court held that it had, under FSIA, no

11   jurisdiction over the case whatsoever.  And the question was

12   whether it would be convenient to nevertheless conduct

13   discovery in the United States on documents that were, I

14   think, all in Portuguese.  And not surprisingly, the court

15   said that makes no sense, just do everything in Brazil.  I

16   believe that Mr. Siegel also mentioned -- oh, the Malaysian

17   Airline cases where I think like 87 out of 90 plaintiffs

18   were non-American.  Everything was in Malaysia.  They had

19   already done all these investigations.  Everything was

20   presumably in Malay or other local languages.  They don't --

21   those are nothing like this.  The CBC does business in the

22   United States, it doesn't disagree.  It doesn't disagree

23   that the commercial exception to the FSIA applies to them.

24   You get CBC on Sirius radio.  You can get CBC over the air

25   in many large cities on the border, right.  Half of my

1    family's from Buffalo, we grew up listening to the CBC.  You

2    can get it on YouTube.  You can get it on Apple Podcast.

3    You can get it so many places.  And for them to say, oh,

4    suddenly we're noncommercial and there has to be some comity

5    deference doesn't to us make sense.  So that's our position

6    on that.

7            Now, they also make -- in terms of the public

8    factors, they make the argument that everything arises out

9    of this political scandal.  And the political scandal is an

10   interesting backdrop.  It may factor into the CBC's

11   motivation for getting involved in reporting on WE Charity

12   in the first place.  But it's not a disputed fact.  Nobody's

13   going to have to prove that the scandal existed.  And it's

14   not going to resolve whether Justin Trudeau -- this case is

15   not going to resolve whether Justin Trudeau should have

16   recused himself from selection for a COVID relief grant.

17   That's just not what this lawsuit is about.  So we

18   respectfully submit that the public factors do not weigh

19   strongly in favor of the CBC here.

20           **THE COURT:**  What about just the greater interests

21   of the Canadian public in this case than the U.S. public,

22   and that that's a form of the public interest factor; and

23   that it's likely to be more closely followed and of greater

24   interest to people living in Canada than in the United

25   States?

1          **MR. KROETSCH:**  Well, I think we have two things to

2    say about that.  I mean, first is that I think we would

3    respectfully submit that that's not quite the right test.

4    It's not who has a greater interest.  The question is

5    whether it is a highly localized test, and whether there is

6    a real interest in the United States.  I believe one of our

7    slides speaks to this issue as well, and I'll pull that up

8    for you in a moment, if you will, please.

9          So slide 48, for example, in the Cruise

10   Connections case, which was against the Attorney General of

11   Canada -- so it was against the government itself, the court

12   held:  "With this public interest factor, we ask only if

13   there is an identifiable local interest in the controversy,

14   not whether another forum also has an interest."  And we

15   would contend that there is clearly a local interest in the

16   United States in WE Charity.  As I mentioned earlier, there

17   are tons of schools in the United States, including many in

18   this area, that partner with WE Charity and rely on WE

19   Charity, and will be very interested in the outcome of this

20   litigation.

21          Furthermore, if you take a look at slide 28, you

22   can see some examples of imagery showing that WE Charity is

23   a much more embedded participant in American life than I

24   believe the CBC has indicated, right.  I mean, you can see

25   First Lady Obama speaking about WE Charity, Al Gore.  It's

1    been at Radio Music City Hall, Times Square.  We've even got

2    Kermit.  So the idea that the American public wouldn't be

3    interested in this I don't think makes sense.  The test is

4    not whether the Canadian public would be more interested,

5    it's not a localized controversy.  And add to that the fact

6    that all of the donors for the plaintiff here are American,

7    and that certainly should create a significant American

8    interest.

9          THE COURT:  Okay.  Anything else?

10          MR. KROETSCH:  Only if you have other questions.

11          THE COURT:  Not at this point.  I may, and I may

12   follow up with a minute order asking for some additional

13   information.  But for now, I think you've addressed my

14   questions.  Let me give Mr. Siegel an opportunity for five

15   minutes or so of rebuttal.

16          MR. SIEGEL:  Yeah, and I want to start with if the

17   Court could turn to page four of the notebook.  And I think

18   a lot of the questions really come down to this as it

19   relates to witnesses.  This is not what a defamation case is

20   about, Your Honor.  Because what's missing here is -- and

21   these are not about misquotations.  And I promise you, Your

22   Honor, I'm not going to get to the merits.  I mean, I'd love

23   to respond to the merits of what he said, but that's not

24   what we're here for, right.

25          So, for example, look at some of these categories.

1    Misquotation and mischaracterization of WE Charity

2    spreadsheets, right.  This case is not simply or even

3    largely about just the specific -- those spreadsheets were

4    shown to exemplify a policy and practice, right, of multiple

5    matching of donors to the same schoolhouse.  The question in

6    the case is, is it substantially true or not that WE Charity

7    engaged in that policy and practice.  That's what this is

8    about, right.

9           And in order to establish that -- and just for

10   example, those spreadsheets I think were from 2016 roughly,

11   something like that.  The people who know about that are

12   going to be the WE Charity employees who were working for WE

13   Charity around 2016, right.  What's missing in his entire

14   characterization of the case --

15        **THE COURT:**  But just pause for a second here,

16   though.  Granted, it's possible that somebody who's working

17   for WE Charity today won't be working for them by the time

18   you go to take their deposition six months from now or a

19   year from now.

20        **MR. SIEGEL:**  I mean, the whole point of this is

21   there's almost nobody left working for WE Charity Canada,

22   right.  So none of those employees -- I mean, it's a virtual

23   certainty that almost none of the employees who were

24   involved in these activities five years ago, seven years,

25   eight years ago are still going to be there.

1          **THE COURT:**  And how many people are we talking

2     about?

3          **MR. SIEGEL:**  I don't know exactly how many people,

4     because we'll need to take the discovery to try to figure

5     this all out.  Also, for example, he talks about the

6     forensic auditor's report.

7          **THE COURT:**  You know, I understand that that is

8     something you're going to certainly want to do in your

9     defense.  But presumably, from your perspective, that's

10    something your client already did before they ran the story,

11    and they did the investigation beforehand and they have

12    whatever evidence they have or not of that.  And I

13    understand why you might want to go back and talk to these

14    witnesses as well for a truth defense.  But presumably your

15    client did the investigation --

16         **MR. SIEGEL:**  Well, it's even more complicated than

17    that, because there are confidential sources involved.  So

18    there may be issues about whether we can't disclose some

19    sources, and we'd need to try to find others, right.  But

20    I've been doing this for many years, Your Honor, and there's

21    a difference between conducting journalistic investigations

22    and conducting a legal defense where you have subpoena power

23    and things like that.  So it is almost always the case, in

24    any defamation case, that as part of a truth defense -- I

25    mean, it's technically their burden to prove falsity.  But

1    as a practical matter, we're obviously going to try to show

2    that they can't meet that burden if we engage in discovery

3    about the underlying circumstances.  I mean, that is a

4    fundamental part -- we're not restricted to --

5            **THE COURT:**  And I'm not suggesting you were, but I

6    was just suggesting that perhaps you were overstating in

7    suggesting that it is all focused on conducting the truth

8    defense to start with today, and that your client hasn't

9    amassed a fair amount of certain information relating to

10   these issues before starting.

11           **MR. SIEGEL:**  But even to the extent that that may

12   be so, it's based on Canadian sources, right.  It's all --

13   even the confidential sources that the program talked

14   about -- I mean, the whole program was about a Canadian

15   charity, right, that's what it said from the very beginning.

16   And so the reason that -- I mean, Your Honor talked about

17   there being differences in perception of witnesses.  That's

18   because they're trying to define the case in a very narrow,

19   self-serving manner, and essentially saying it's just about

20   a document.  For example, misquotation of WE's forensic

21   auditor report.  This isn't about a misquotation of the

22   auditor report, right.  It's about -- what they allege is

23   that the broadcast implies, says that funds were misspent in

24   Kenya, right; that funds that were dedicated for Kenya

25   didn't go to Kenya, right.  That is a question of truth,

1  right.  Either it did or it didn't, regardless of what a

2  preliminary auditor report that was --

3        THE COURT:  Right, no, I take --

4        MR. SIEGEL:  And that's going to require a

5  substantial amount of discovery on all the evidence about

6  that.

7        THE COURT:  Let's -- you've got to let the Court

8  occasionally speak.

9        MR. SIEGEL:  I'm sorry.

10       THE COURT:  I understand that point, and I

11  understand that there's a truth defense.  My point is simply

12  that presumably your client has done a fair amount of work

13  looking into that money trail, because they did so before

14  they ran the story.  And that you have that information to

15  start with.  That's not saying you're precluded from and

16  couldn't also conduct the type of investigation you're

17  talking about as well.  But it also doesn't strike me as

18  super complicated.  I mean, this is not the most complex

19  issue of simply asking people about where the money went and

20  following the money, and what were donors told, where did

21  the money go, how many schools were built.  It's not rocket

22  science.

23       MR. SIEGEL:  I suspect it may be a little bit more

24  complicated than that.  But nonetheless, the answers to all

25  of those questions are in Canada, and they largely reside in

1    people who don't work for any party anymore.  I mean, that's

2    what this case is about.  And I just don't see -- and

3    they're sort of trying to define that out of existence and

4    saying none of that matters, it's just all about this little

5    document here and this little document there, and did you

6    quote it right or did you not.  And I think that's a

7    significant distinction in the case.  And sure, if you

8    define that whole issue out of the case, it seems less

9    significant.  So that's what I --

10            THE COURT:  But you still don't know significant

11   it is, because you don't know how many witnesses that will

12   be.  It could be two witnesses, it could be 20 witnesses,

13   you just don't know.

14            MR. SIEGEL:  I'm pretty sure it's not two.  I

15   mean, if we're going to need to prove what a policy and

16   practice was over multiple years in terms of multiple

17   matching of schools and things like that, I think that's

18   likely to be more than two witnesses and more than two

19   documents.

20            THE COURT:  Certainly not documents, I'm talking

21   about witnesses.  But do you know how many people worked in

22   that area for WE Charity Canada at the time?

23            MR. SIEGEL:  Oh, I think it's dozens at least over

24   time, probably more than that.

25            THE COURT:  Dozens of people who were involved in

1   directing how the funds were used --

2          **MR. SIEGEL:**  How funds were used --

3          **THE COURT:**  I'm sorry, in Kenya.

4          **MR. SIEGEL:**  Over a period of 12 years, something

5   like that, I don't know the exact number; I don't.

6          **THE COURT:**  Maybe WE Charity might.

7          **MR. SIEGEL:**  I know my time is limited, so just a

8   couple more points.  When we're talking about donors, I

9   invite the Court to look at my actual reply declaration, not

10  the little pictures that they showed.  The reply declaration

11  is very clear as to what it says.  And one of the things,

12  again, it does say, it indicates, is that by far, the

13  biggest source of donations that is reflected in the program

14  is this Pinball Clemons foundation, which is all in Canada.

15  And we think it's the most clearly exemplary of -- and

16  again, remember in substantial truth, Your Honor, we have to

17  prove that the gist of something is true, right.  We don't

18  have to prove that it's literally true that the numbers

19  exactly add up in every single respect, right.

20         **THE COURT:**  So you're saying that the bigger

21  sources of donations that were at issue in the broadcasts --

22         **MR. SIEGEL:**  Are Canadian.

23         **THE COURT:**  -- are Canadian?

24         **MR. SIEGEL:**  Yeah.  And in fact, we have a chart

25  in our materials where they talk about the social media

1    postings.  I think about 80 percent of them were Canadian.

2    And so yes.  So I think that's the most important thing I

3    think Your Honor has covered.  I don't know if Your Honor

4    has any more questions about the adequate alternative forum

5    issue.  The only -- one case I would point to, it's

6    Mr. Rogers' reply declaration three, it's the Canadian

7    plasma ferrous case.  I chuckle because it seems to be a

8    case where the CBC was a defendant, and maybe their counsel

9    messed up in the 1970s.

10         But what that case was about was the Ontario Court

11   of Appeal actually said you filed a motion to say that they

12   failed to satisfy this condition precedent.  But you didn't

13   do it right, so we can't consider it.  They said you have to

14   plead it first and you didn't do it.  So the court isn't

15   say, oh, yeah, I guess we can sua sponte -- you know, now

16   that you mentioned it, it's a subject matter jurisdiction

17   issue so we can sua sponte figure this out on -- I mean,

18   it's just nothing like that, it's so far removed from that

19   realm.

20         **THE COURT:**  If I thought that this issue was

21   dispositive, what is your view about whether the Court can

22   and should --

23         **MR. SIEGEL:**  We would have no objection.  The last

24   point I want to make is about the public interest factor.

25   With respect, Your Honor, Mr. Kroetsch, he did misstate that

1  case.  That case is not about whether discovery should --

2  what happened was the court said I think that there isn't

3  subject matter jurisdiction here.  I know the opposing party

4  says we need jurisdictional discovery.  I don't think you

5  do.  But that doesn't matter, because I'm going to dismiss

6  it on forum non conveniens anyway, right.  And what it said

7  specifically was:  "The United States has minimal interest

8  in this litigation other than its general interest in

9  policing its financial markets.  In contrast, the case

10  implicates issues of substantial concern and consequence for

11  Brazil and its citizens."  That is reasoning that appears,

12  you know, in multiple cases, and that's what we think

13  applies here.  That's all I have.

14       THE COURT:  All right, thank you.  So I just have

15  one last question for WE Charity, which is whether you know

16  how many witnesses or former employees of WE Charity were

17  involved in allocation of funding and conferring with donors

18  with respect to funds that were then expended in Kenya?

19       MR. KROETSCH:  I mean, in terms of the key

20  personnel --

21       THE COURT:  No, my question was just how many in

22  general.

23       MR. KROETSCH:  I think we don't know every person

24  who would have touched that.  The leadership of WE Charity

25  is still, I think, largely the same people it's been for 20

1      something years.

2              THE COURT:  And how many people is that?

3              MR. KROETSCH:  So like Mark and Craig Kielburger

4      as the co-founders have been there for 27 years.  Robin

5      Wiszowaty is 15 years, I think, something like that.  Carol,

6      I think maybe 12 years.  Scott, I think 20 years.  Victor, I

7      think 20 something years.  So most people at WE Charity have

8      been there a very long time.  I don't disagree that many --

9      there are thousands of former WE Charity employees, but I

10     don't think that they would be key witnesses here.  I mean,

11     if you were trying to prove in any case some sort of pattern

12     and practice of wrongdoing, you don't get every single

13     employee ever.

14             THE COURT:  All right, thank you.  So we've run

15     short on time with respect to the Foreign Sovereign

16     Immunities Act questions.  I have a 2:00 o'clock.  If you

17     wanted to come back at 4:00 -- Kristin, do you think -- at

18     3:30 we can do it then or I can rely on the papers,

19     whichever you prefer.  3:30, okay, so I'll see you all back

20     at 3:30.  Thank you.

21         (Off the record at 12:39 p.m.)

22         (Back on the record at 3:44 p.m.)

23             THE COURT:  Welcome back, everybody.  I'm ready to

24     hear argument now with respect to the foreign sovereign

25     immunities jurisdictional question posed as to counts two

1    through four.

2         **MS. STROM:**  Thank you so much, Your Honor.  Good

3    afternoon, and thank you so much for taking so much time for

4    us today.  This was a real surprise, and I've delayed my

5    flight home twice now.  I promise not to keep you here long

6    unless you have a lot of questions.  I was tempted almost to

7    go on the papers, but because you're so well-prepared.  As

8    you said, this is about counts two through five which are

9    contract, promissory estoppel and neglect misrepresentation

10   claims.  They're all premised on an alleged agreement that

11   if WE Charity put up Carol Moraa for an interview, the CBC

12   would return to interview Robin Wiszowaty before the

13   documentary premiered.

14        As you said, the problem as we see it is the

15   Foreign Sovereign Immunities Act which until the 1950s

16   absolutely immunized foreign agencies like the CBC from suit

17   once the Foreign Sovereign Immunities Act was amended to

18   allow some narrow exceptions; the exception here is the

19   commercial activity exception.  And I think cutting through

20   it all, it seems to me that the parties agree, and for sure

21   the case law is clear, that when it's a breach of a promise

22   or a breach of agreement, the question is did the promise or

23   the agreement necessarily require some sort of performance

24   in the United States.  And our position is that it clearly

25   did not here.

1               The best showing of that is that the complaint

2      sets forth what they agree -- what they believe the promise

3      is, WE Charity does.  The United States is never mentioned

4      at all, it's just that there would be a subsequent

5      interview.  And then when the alleged agreement was

6      breached, it was breached apparently in Toronto when

7      Robin -- Ms. Wiszowaty said I'm available for an interview

8      in Canada.  So how could it necessarily contemplate an

9      interview in the U.S. if, hey, I'm available in Canada would

10     suffice.  I'm sure they'll say it doesn't suffice, that was

11     our kind of throw out at the end of the day.  But they said

12     here we go, here we are, we're available in Canada.  And

13     more than that, because the USA was never specified, the

14     case law that we cite -- the Zadon case talks about if

15     performance could take place anywhere.  It just says hey, we

16     want an interview or hey, we promise to pay you, but it

17     doesn't specify where.  That is not deficient to invoke the

18     commercial activities exception.  And at the most, that's

19     what we have here.

20              If you look at the e-mails that they've put in in

21     their opposition, Ms. Wiszowaty says:  I assume you'll be

22     interviewing me at some later date in a different format.

23     No discussion of what format that is; no discussion of what

24     place that is; no implication that the USA is the only place

25     that would suffice.  So to us, it's pretty clear cut that

1    there is no requirement that there's any performance in the

2    U.S., and therefore these three claims must be dismissed.

3                **THE COURT:**  Okay, thank you.

4                **MS. STROM:**  Thanks.

5                **THE COURT:**  Let me hear from plaintiffs.

6                **MS. NEUHARDT:**  Good afternoon, Your Honor.  I hope

7    to also be short.  My first point is that there is a little

8    more to the agreement than what counsel describes.  We plead

9    not only that there was an agreement to provide Ms. Moraa

10   for an interview in Kenya in exchange --

11               **MS. STROM:**  Sorry that I misstated her name.

12               **MS. NEUHARDT:**  Oh, that's all right.  I think

13   Joseph did several times.  Not only was there an agreement

14   to provide Ms. Moraa's -- make her available for an

15   interview in Kenya in exchange for Ms. Wiszowaty's

16   interview, but also we knew that the reason that they wanted

17   Ms. Moraa was to get the appearance that we cooperated in

18   the investigation, that we participated in it.  And so we

19   said in exchange for that, we want you to talk to our

20   financial person.  It's very important that you have the

21   benefit of what Ms. Wiszowaty has to say before you air

22   this, okay.

23               Now, it's undisputed that they air into the United

24   States, and they do so significantly.  Also, prior to

25   airing, Mr. Kroetsch actually wrote letters to CBC saying:

1   You're going to injure a U.S. entity in the United States

2   with your broadcast.

3           **THE COURT:**  But do you disagree then with the

4   description of the law, Ms. Strom's description, that for

5   the commercial activity exception to apply with respect to a

6   contract, that the contract has to require performance in

7   the United States?  Is that an incorrect statement of the

8   law?

9           **MS. NEUHARDT:**  That is somewhat correct.  But

10   Cruise Connections, the D.C. Circuit case, does provide a

11   window where it is very obvious that all the harm is going

12   to occur in the United States.  So in that case, the Royal

13   Canadian Mounted Police contracted with the plaintiff to

14   provide cruise ships in Vancouver for use at the Olympics.

15   The Royal Canadian Mounted Police was not perform at all in

16   the United States.  Nonetheless, the D.C. Circuit found that

17   there was jurisdiction under the commercial activities

18   exception, because they knew that the plaintiff had

19   contracted with two cruise lines from the United States,

20   Holland and Viking I want to say.  So they knew the ships

21   were coming through the United States.  They knew the ships

22   would go through U.S. waters.  They knew that the plaintiff

23   had also contracted with a travel agency to use the cruise

24   ship for income on its way to Canada.  And for all those

25   reasons, the court found that the direct effects clause, the

1    third commercial activity exception, applied because they

2    knew that the effects were going to be in the United States

3    even though their performance was not in the United States.

4    I believe that's applicable here.

5              THE COURT:  What is the commercial activity here?

6    Is the commercial activity the contracting or the

7    broadcasting?

8              MS. NEUHARDT:  It's the gathering of news and the

9    broadcast.  So in this case, they were going to perform --

10   well, the news gathering is in all in connection with their

11   commercial activity I guess, because their commercial

12   activity is indeed broadcasting or publishing news in one

13   shape or form.

14             THE COURT:  So with respect to the contract

15   claims, your position is that --

16             MS. NEUHARDT:  Our position is there were two ways

17   to perform.  One was to interview Ms. Wiszowaty, and we'll

18   get into the evidence about the U.S. on that.  The other was

19   that before they broadcast, they would get her input.  And

20   then that input would go in -- perhaps they would ignore it,

21   but they would have the benefit of it before committing to

22   this story that would air into the United States and

23   defame -- you know, negatively impact the plaintiff.

24             So there were two aspects to the contractual

25   performance there.  One of them -- clearly they were

1  informed you're defaming the United States; these things go

2  in the United States; you have commercial contracts to air

3  this in the United States.  The other, there's a dispute

4  about whether or not it was clear that Ms. Wiszowaty was

5  located in the United States.  They also dispute whether

6  there was in fact an understanding that CBC always goes to

7  the place of the interviewee.

8          **THE COURT:**  As I understood the argument that was

9  being made to me before is that it has to actually be a term

10  or a condition of the contract, not just that it's a

11  possibility but that --

12          **MS. NEUHARDT:**  Well, the law says necessarily

13  contemplates, and it does not necessarily have to be in the

14  contract.

15          **THE COURT:**  But necessarily is a strong word.

16          **MS. NEUHARDT:**  Right.  An example would be -- I'm

17  going to butcher the name, but de Csepel v. Republic of

18  Hungary which is not in the briefs, but it's a D.C. Circuit

19  case where they found that the Foreign Sovereign Immunities

20  Act applied to a complaint that Hungary had agreed to return

21  some Nazi looted art to the plaintiff.  And even though the

22  contract didn't say we're going to return it to you in the

23  United States, they knew that the plaintiff was in the

24  United States.  And therefore, the court found that the

25  Foreign Sovereign Immunities Act applied.  So it doesn't

1   have to be --

2          THE COURT:   That sounds to be a somewhat

3   stronger --

4          MS. NEUHARDT:   What's that?

5          THE COURT:   That sounds somewhat stronger than the

6   circumstance you're describing here where if you're

7   returning property to somebody who is in the United States,

8   necessarily you're going to have to come to the United

9   States to return the property versus if you're agreeing to

10  interview somebody and you know the person lives in the

11  United States, and typically you go to that person's place

12  of where that person is when you do an interview, that's not

13  nearly as strong a nexus.

14         MS. NEUHARDT:   Well, they knew she was in the

15  United States, and they did travel everywhere.   And in fact,

16  when she was in Toronto and said, "I'll come to you," they

17  said don't.

18         THE COURT:   Well, they said don't because they

19  wanted to do it by video, they didn't want to do it

20  in-person.

21         MS. NEUHARDT:   Right.   Although even when they do

22  the video chats -- I don't know if you've watched the video

23  of the story, but you can see that even when they do video

24  chats with people say in Australia, they have a camera

25  person who is filming them.   They have an agent there, even

1      if the actual reporter is just there by video.  So they

2      would have sent somebody to Robin.

3              But that's only one part of it.  The other part is

4      that this broadcast to the United States was supposed to

5      include the benefit of her knowledge.  And the breach was

6      not actually when she went to Canada and they couldn't agree

7      on where to interview.  The breach, as stated in our

8      complaint, is that it was when the CBC aired promos on

9      November 11th, 2021 that made clear that they had committed

10     to a story line, and they had not in fact gotten the benefit

11     of Ms. Wiszowaty's information.  She is the person with the

12     most information regarding the subject of their broadcast,

13     which was the use of donors' funds in Kenya.  And they

14     breached the promise to talk to her and include that

15     knowledge in their putting together of the broadcast.

16             **THE COURT:**  You say the breach occurred on

17     November 11th, 2021.  When was it that the e-mail exchange

18     took place when she said:  "I'm in Canada, I'm happy to be

19     interviewed tomorrow"?

20             **MS. NEUHARDT:**  That happened afterwards.  We say

21     that is mitigation, she was there trying to salvage the

22     situation.  But we already believe that they had breached

23     it, because they were advertising these promos that made

24     clear that they were going to accuse WE Charity of fraud.

25     But they hadn't talked to the one person who knew the most

1    about the money, even though they had promised to do so in

2    exchange for us providing Ms. Moraa and access to the WE

3    facilities in Kenya.

4             THE COURT:  What I'm trying to think through here

5    is when you're talking about a tort claim, it's easier to

6    think about where the tort occurs and where the harm occurs.

7    When you're thinking about a contract claim here, I'm trying

8    to conceptualize your second argument.  Your second argument

9    is that the contractual undertaking was to consider

10   Ms. Wiszowaty's input before publishing the story.

11            MS. NEUHARDT:  Before committing to a story line,

12   and that that story line was going to go into the United

13   States.

14            THE COURT:  So what I'm thinking about is where

15   that breach occurred, and then the --

16            MS. NEUHARDT:  Well, in our view, I mean, it

17   occurred by broadcasting this news report into the United

18   States.

19            THE COURT:  I guess what I'm saying is that it

20   seems to my mind almost like conflating a tort and a

21   contract theory here in that the breach of the agreement

22   caused the tort of a story that was not complete to be

23   published somewhere.  I mean, the agreement wasn't that it

24   would include anything in particular in the story, it was

25   that they would consider that information before they

1   finalized it.  And I guess you're saying because they didn't

2   consider that information, that the contract was breached.

3   And perhaps under this theory, it could even be months or

4   years later in which there was a harm caused by the contract

5   breach, which is that a story that is an inaccurate story is

6   ultimately aired in United States.

7           MS. NEUHARDT:  Yes, although it was only a few

8   weeks.

9           THE COURT:  No, I understand.  I'm just trying to

10  conceptualize it, because I'm unclear that it's different

11  steps.

12          MS. NEUHARDT:  They wanted Ms. Moraa on camera,

13  because it gives the appearance that we cooperated in their

14  investigation.  We said okay, but she doesn't know the

15  finances.  Ms. Wiszowaty knows the finances, you have to

16  talk to her.  And they didn't, and then they committed to a

17  story line.  They knew that we wanted them to talk about

18  finances and hear what we had to say about finances.  They

19  chose not to do that while committing to a story line that

20  was essentially WE Charity engaged in fraud.

21          THE COURT:  What word is the word -- what work is

22  the word direct doing in the third prong of the commercial

23  activity exception?  It has to cause a direct effect in the

24  United States.

25          MS. NEUHARDT:  Well, the direct effect is the

1    broadcast in the United States.

2         THE COURT:  But I guess I'm asking more just

3    conceptually or in the case law, what work does the word

4    direct mean?  Because here it's not immediate.  There comes

5    a couple of steps in the process before you have an effect

6    in the United States.  I mean, it could be, for example,

7    that they breached the agreement to consider this additional

8    input, and then they published a story in which they said,

9    you know:  WE Charity is the most fabulous charity we've

10   ever imagined; everything they've done in the existence of

11   this charity has been perfect in every respect; they

12   breached the agreement.

13        MS. NEUHARDT:  But they did not damage us in that

14   situation.

15        THE COURT:  Right.  But it doesn't say where there

16   are some damages that occur in the United States, it's where

17   the direct effect of the breach is in the United States.

18        MS. NEUHARDT:  Right.  Although I think the Cruise

19   Connections case makes clear that direct damages into the

20   United States, when they have knowledge that that is going

21   to occur, is part of the --

22        THE COURT:  So under this theory then, you could

23   have an exception to the commercial -- you could have a

24   commercial activity exception in which a Chinese company in

25   China agrees with Apple that they're going to manufacture

1    iPhones.  A state-owned company in China says we're going to

2    help you manufacture iPhones in China, and there is a breach

3    of that contract.  As a result of the breach of that

4    contract, a thousand fewer iPhones are produced that were

5    destined to be shipped to Sweden.  Because there are fewer

6    iPhones in Sweden as a result of this, a U.S. company that

7    was ordinarily planning on selling iPhones in the United

8    States decides to sell them to Sweden instead.  And there's

9    some financial loss in the United States that results from

10   that breach of that contract -- production contract in

11   China.  What I'm trying to get at -- this is all about what

12   does the word --

13        **MS. NEUHARDT:**  It's not just a damages test, it's

14   not conflating the direct effects test into --

15        **THE COURT:**  Exactly, that's my question.

16        **MS. NEUHARDT:**  So it can't be just damages only,

17   there does have to be more.  But here they did broadcast

18   into the United States, and then there was harm here.  And

19   as in Cruise Connections, where again it was -- essentially

20   they were trying to recover their own damages for the breach

21   of the Royal Canadian Mounted Police.  What made the

22   difference was that they knew that they were going to harm

23   this company with its relations in the United States.  There

24   had been a lot of notice of that.

25             Where the line is between Cruise Connections and a

1       damages only direct effects test, I'm not sure I can tell

2       you that.  But it is clear from Cruise Connections that

3       where there is knowledge that the damages will occur in the

4       United States, the performance does not necessarily have to

5       be in the United States.

6              THE COURT:  But when you're dealing with the world

7       of electronic media and so forth -- I don't know, is BBC a

8       state-owned entity in some way or affiliated with the

9       British government?

10             MS. NEUHARDT:  I don't know the answer.

11             THE COURT:  I mean, assume that the BBC is.  The

12      BBC agrees to thank donors on the BBC for supporting the BBC

13      for a broadcast that is in London intended for --

14      principally for British audiences.  But things get picked up

15      and rebroadcast around the world, and someone listens to

16      this broadcast on YouTube in Arizona.  Can the person whose

17      promotion wasn't included sue in the United States and say,

18      look, we missed a potential customer in the United States

19      who would have heard this broadcast on YouTube mentioning

20      that we're donors, and we didn't get the benefit of that?

21             MS. NEUHARDT:  Right.  So I have two things to say

22      about that.  First of all, this isn't a situation of just

23      the broadcast getting picked up.  CBC has contracts with

24      United States companies where they agree to actually

25      broadcast to U.S. audiences.  So it's not just that people

1    are picking this up on YouTube.

2              **THE COURT:**  With cable casters, cable networks?

3              **MS. NEUHARDT:**  Yes.  And then also what I would

4    add to your hypothetical is where the donor said:  I need

5    this thank you to appear, because then I will have access to

6    whatever contract that gives me money -- I'm having a hard

7    time figuring out what contract you would get for being a

8    donor to the BBC.  But imagine you get the widget contract

9    and it's in the United States.  And they have told the BBC:

10   We need the recognition that we're a donor, because we're

11   going to get our widget contract in the United States.  I

12   think under Cruise Connections, there is jurisdiction.

13             **THE COURT:**  But is there evidence of that here

14   where WE Charity said to the CBC:  Look, this really matters

15   to us, because we have these donors in the United States;

16   and if you don't do this right, it's going to really affect

17   our donors in the United States?

18             **MS. NEUHARDT:**  Yes.  Actually attached to the CBC

19   papers, exhibit -- well, it's ECF 1631, it's a letter from

20   Boies Schiller to the CBC.  And it starts out:  "We

21   represent WE Charity, including its ongoing operations in

22   the United States."  And then later in the letter:  "WE

23   engages with school districts, teachers and other

24   organizations in the United States.  A significant portion

25   of its funding comes from corporate sponsorship and

1    donations from the United States.  In short, our client has

2    a reputation to protect in the United States, and it

3    reserves all rights to do so, as well in Canada."

4              THE COURT:  What's the date of the letter?

5              MS. NEUHARDT:  January 27th, 2021.  And this

6    was -- the engagement between WE Charity and CBC with

7    respect to this broadcast was a long and drawn out process.

8              So do you have any further questions?

9              THE COURT:  Well, I guess I just -- I may have to

10   go dig for this myself, but I just think there must be some

11   case law that tells me what direct effect means in that

12   prong of the commercial activity test.

13             MS. NEUHARDT:  I think Cruise Connections is the

14   best bet on that.

15             THE COURT:  All right, thank you.  Let me provide

16   Ms. Strom with an opportunity to respond to this theory --

17   which I don't think you were -- you weren't really

18   addressing this theory.

19             MS. STROM:  Thank you so much, Your Honor.  First,

20   I would say that this is a new theory that was not pled in

21   the complaint, that the broadcast was the alleged breach

22   here or the basis for the cause of action.  That's not at

23   all part of the complaint.  But so that we don't end up here

24   on an amendment I will address it.  As to your first

25   question about what direct effect means, the Supreme Court

1    has defined that in the Weltover case, which is 504 U.S.

2    607:  "Direct effect means it is an immediate consequence of

3    defendant's actions."  And under that standard, the D.C.

4    Circuit has said that that means, for promises in contract

5    cases, that standard requires some performance in the U.S.

6    by the defendant.  Because the idea of the sovereign

7    immunities act is that there must be some action from the

8    foreign entity in the United States that allows there to be

9    jurisdiction.  And the courts have been very careful saying

10   just because someone that is in the United States and

11   expects payment or expects some sort of performance, that is

12   not sufficient.  And the Global Index case, I think, is

13   really on point here, which is the D.C. Circuit from 2003,

14   290 F.Supp.2d 108.  In that case, there was --

15          THE COURT:  I'm sorry, you said D.C. Circuit and

16   then you said F.Supp?

17          MS. STROM:  Yeah, sorry.  Sorry, it is the United

18   States District Court for the District of Columbia.  I lied,

19   that is a lie, but not an intentional one.

20          THE COURT:  I'd like to think of it as a

21   misstatement.

22          MS. STROM:  Misstatement, misstatement, thank you

23   so much.  They said:  Look, do we need an express provision

24   in a contract that requires performance in the U.S.?  I

25   guess they said:  Look, there may be some instances where

1    maybe not.  But as a factual matter, in almost every case in

2    this circuit involving the direct effect exception, the

3    existence or absence of an expressly designated place of

4    payment has been decisive.  And in that case, they said:

5    Look, here we have a plaintiff who has a promissory note

6    that expressly requires payment in U.S. currency to a U.S.

7    company.  And they said that does not mean that the payment

8    had to be in the U.S.  We have someone waiting for a payment

9    in the U.S.  They knew it was a U.S. company.  They knew it

10   wanted it in U.S. dollars.  They said that alone, the

11   payment could have been made anywhere.

12           So here, we have someone holding herself out to be

13   the Kenya country director.  She has a Kenya phone number.

14   She is talking about information in Kenya.  At no point is

15   USA ever discussed in the discussion about doing a follow up

16   interview.  They talk about having it any format, any place.

17   If you can't imply that U.S. is the place of performance for

18   money owed in U.S. dollars to a U.S. company, I don't see

19   how you can infer that here.  In the Zadon case, which is

20   D.C. Circuit, says in that case someone went to Saudi

21   Arabia, he was owed some money.  A Saudi Arabia agency said:

22   We'll forward it to you.  They negotiated with him in the

23   U.S., they knew he was going back to the U.S.  And they said

24   even that wasn't sufficient to say that we'll forward you

25   the money means that the place of performance necessarily

1     had to be the U.S. under those circumstances.

2             Here, all they've alleged is:  We really promise

3     we're going to interview you.  There's no place of

4     performance.  And what I think you'll see in the cases also

5     is this new idea that the breach was airing the documentary

6     without talking to her.  The courts have all said you can

7     look at Global Index, Weltover, the basis for their claim

8     has to be that breach, that has to be the performance in the

9     U.S., the basis for the claim.  And here, the basis for the

10    claim is that there should have been an interview and there

11    wasn't, and at no time was USA specified for the place of

12    that performance.

13            THE COURT:  I have to admit that I've not

14    committed the entire complaint to memory.

15            MS. STROM:  My goodness, Your Honor, I have.  No,

16    that is also -- that is a lie.

17            THE COURT:  Well, that one might have been a lie.

18    So is there any discussion at all of Ms. Wiszowaty's

19    residence, and any mention that she was in the United States

20    in the complaint itself other than perhaps just in the

21    identification?

22            MS. STROM:  No, Your Honor.  No, Your Honor.  And

23    then if you -- you know, the main allegations that you need

24    to look for this contract claim are from 258 to 280.  But

25    then if you look at the claims themselves -- which are back

1   in the 700s, 743 to 760, not a mention of -- not a mention

2   of the fact that USA is the place of performance, that she

3   was in the U.S. or this new theory that the breach was

4   somehow the defamatory -- allegedly defamatory documentary

5   being aired.  It says quite clearly that the breach was

6   failing to conduct the promised on-air interview.  That is

7   in paragraph 745.  And in every other claim, that is quite

8   clearly the breach, is the failure to do the interview.  And

9   because that was not specified in the U.S., it's to me quite

10  clear.

11          THE COURT:  Let me ask you a question which is

12  entirely off topic.

13          MS. STROM:  I would like it, random.  How many

14  children do I have, how many --

15          THE COURT:  We're getting punchy at this point.

16          MS. STROM:  Getting to know each other, too.

17          THE COURT:  What are the rules of sovereign

18  immunity in Canada with respect to suing the CBC in Canada?

19          MS. STROM:  They get sued all the time.  So do you

20  know if -- I don't -- I will not let you know because I'm

21  not a Canadian lawyer, but there is no issue with --

22          THE COURT:  In this case there is no issue that

23  would be present?

24          MS. STROM:  No, there's libel notices and libel

25  actions all the time in Canada.

1      **THE COURT:**  Okay.  Why don't I go ahead and

2      provide an opportunity for a brief surreply.

3      **MS. NEUHARDT:**  Could I just address her argument

4      that we did not raise this in the complaint?

5      **THE COURT:**  You may.

6      **MS. NEUHARDT:**  If you start at paragraph 259, we

7      allege that on camera footage with Ms. Moraa was important

8      to the CBC because it would given the impression that CBC

9      engaged with WE before airing its story.  262, 266 and 268

10     say WE wanted to be sure before turning over Ms. Moraa --

11     these aren't quotes but paraphrasing, that financial

12     questions would be answered by the right person at WE.  So

13     we conditioned Moraa's interview on CBC conducting a similar

14     interview of Ms. Wiszowaty.  And, of course, on 21, that CBC

15     knew that it's final report, with or without the benefit of

16     Ms. Wiszowaty's interview, would be broadcast into the

17     United States.

18             And I would also like to point out that in their

19     moving papers, on 44 to 45 they say as part of it's

20     commercial activity in Canada, CBC was to perform its

21     portion of the contract in Michigan --

22     **THE COURT:**  I'm sorry, you have to slow down for

23     the court reporter.

24     **MS. NEUHARDT:**  Oh, I'm sorry.  It's their

25     discussion of the defendant performed in the U.S. with the

1    commercial activity elsewhere.  So finally, the FSIA also

2    applies to commercial activity where the defendant performed

3    an act in connection with its commercial activity elsewhere.

4    As part of its commercial activity in Canada, CBC was to

5    perform its portion of the contract in Michigan, and did

6    broadcast to the U.S. without benefit of the content of

7    Ms. Wiszowaty's interview.  That's their characterization of

8    what we were arguing in the complaint.  So this is not a new

9    argument.  And then we discussed it in our opposition, and

10   they addressed it in a footnote in their reply.  So none of

11   this is new.

12        **THE COURT:**  What I'm thinking through is now you

13   seem to be saying that the breach was the broadcast, but I

14   thought you told me before --

15        **MS. NEUHARDT:**  No, there are two breaches.

16        **THE COURT:**  But I thought you told me the two

17   breaches before --

18        **MS. NEUHARDT:**  Right.

19        **THE COURT:**  Let me finish, were, one, airing

20   promos that committed to the story line; and two, not

21   conducting the interview.  Now this is a third,

22   broadcasting.

23        **MS. NEUHARDT:**  Yeah, you're right.  The promo I

24   guess could be more characterized as an anticipatory breach.

25   That's when it became clear that they were going to breach

1    by airing this story that had a conclusion that did not

2    include the benefit of --

3         **THE COURT:**  I think an anticipatory breach is a

4    breach, and the breach has occurred at that point.

5         **MS. NEUHARDT:**  Well, then I guess you're right in

6    that there are three.  On November 11th is when we knew that

7    they had committed to essentially say WE Charity had

8    committed fraud, and they weren't going to talk to

9    Ms. Wiszowaty.  And then they aired it into the United

10   States.

11        **THE COURT:**  Well, thank you all.  I've got a fair

12   amount to think about here.  If there's anything else that I

13   need from you, I'll post a minute order asking for any

14   additional information or if there's any further follow up

15   on this.  There's obviously quite a bit to chew on here, so

16   thank you.

17        (Proceedings adjourned at 4:15 p.m.)

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3              I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9        __January 4, 2023__                    _____

10             **DATE**                              **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**0**

0340 [1]   1/4
05068 [1]   1/21

**1**

10 [3]   23/10 31/22
  68/5
10020 [1]   2/4
104 [1]   23/21
10504 [1]   1/15
108 [2]   34/6 99/14
10:11 [1]   1/7
11 [2]   47/14 51/7
11:19 a.m [1]   52/9
11:30 [2]   39/8 52/1
11:30 hearing [1]
  39/11
11:30 in [1]   39/6
11:56 a.m [1]   52/10
11th [4]   1/18 91/9
  91/17 105/6
12 [7]   21/9 21/10
  21/14 21/15 55/22
  80/4 83/6
1251 [1]   2/3
12:39 p.m [1]   83/21
13 [1]   1/6
1301 [1]   1/23
14 [2]   68/19 69/7
1401 [1]   1/18
15 [3]   39/9 42/10
  83/5
16 [2]   34/1 46/5
1631 [1]   97/19
164 [1]   1/20
1928 [1]   10/19
1950s [1]   84/15
1970s [1]   81/9
1994 [1]   61/19
1:22-cv-0340 [1]
  1/4

**2**

20 [4]   79/12 82/25
  83/6 83/7
20001 [1]   2/25
20005 [2]   1/18 1/24
2003 [3]   41/10
  69/13 99/13
2004 [1]   17/20
2005 [1]   4/17
2010 [2]   18/1 18/2
2016 [2]   75/10
  75/13
2020 [2]   4/17 53/7
2021 [3]   91/9 91/17
  98/5
2022 [1]   1/6
21 [1]   103/14
21st [1]   2/3
22-340 [1]   3/2
258 [1]   101/24
259 [1]   103/6
262 [1]   103/9
266 [1]   103/9
268 [1]   103/9
27 [2]   54/18 83/4
27th [1]   98/5
28 [2]   54/18 73/21

**280** [1]   101/24
290 [1]   99/14
2:00 [1]   83/16

**3**

30 [1]   40/9
333 [2]   1/15 2/24
340 [1]   3/2
36,000 miles [1]
  66/19
360 [7]   36/11 40/12
  40/17 41/4 41/4
  41/9 41/19
37 [1]   34/1
376 [1]   23/21
38 [1]   68/23
3:30 [2]   83/19
  83/20
3:30 we [1]   83/18
3:44 p.m [1]   83/22

**4**

44 [1]   103/19
45 [1]   103/19
4700-C [1]   2/24
48 [1]   73/9
49 [1]   34/2
4:00 [1]   83/17
4:15 p.m [1]   105/17

**5**

50 [1]   42/12
500-East [1]   1/23
504 [1]   99/1
50ish [1]   35/2
540 [1]   40/16
55,000 [1]   65/7

**6**

607 [1]   99/2
60th [1]   61/2

**7**

700s [1]   102/1
743 [1]   102/1
745 [1]   102/7
760 [1]   102/1

**8**

80 percent [1]   81/1
852 [1]   41/23
87 [1]   71/17

**9**

90 [1]   71/17
90-minute [1]   66/24
900 [2]   40/11 40/17
97 [1]   36/4

**A**

a.m [3]   1/7 52/9
  52/10
ability [2]   31/11
  59/22
able [4]   42/19
  45/16 51/6 66/23
above [1]   106/5
above-entitled [1]
  106/5
absence [1]   100/3

Absent [1]   13/1
absolute [3]   8/17
  43/13 44/5
absolutely [2]
  67/10 84/16
accept [1]   13/1
access [2]   92/2
  97/5
accountant [1]
  25/19
accounting [3]
  25/17 26/11 56/25
accounts [1]   60/7
accuse [1]   91/24
across [3]   17/22
  17/23 67/11
act [13]   25/8 36/22
  43/12 43/15 49/15
  49/17 83/16 84/15
  84/17 89/20 89/25
  99/7 104/3
acting [2]   9/24
  36/21
action [13]   1/4 3/2
  6/8 7/8 11/9 20/10
  43/15 45/22 49/16
  49/17 49/19 98/22
  99/7
actionable [1]
  51/15
actions [2]   99/3
  102/25
activities [3]
  75/24 85/18 87/17
activity [15]   84/19
  87/5 88/1 88/5 88/6
  88/11 88/12 93/23
  94/24 98/12 103/20
  104/1 104/2 104/3
  104/4
actual [6]   20/22
  23/25 38/5 68/14
  80/9 91/1
actually [39]   4/21
  7/4 7/14 7/20 8/1
  8/8 8/14 10/13
  11/17 11/17 11/19
  13/10 14/2 14/5
  15/8 16/25 17/7
  19/21 22/20 27/5
  28/5 28/11 28/15
  31/17 32/25 33/1
  34/3 36/8 36/9 41/9
  50/7 66/12 68/17
  81/11 86/25 89/9
  91/6 96/24 97/18
adaptation [1]
  69/24
adapting [1]   70/3
add [3]   74/5 80/19
  97/4
additional [5]   28/2
  63/23 74/12 94/7
  105/14
address [7]   4/4 4/5
  8/15 16/11 18/12
  98/24 103/3
addressed [3]   10/18
  74/13 104/10
addressing [1]

98/18
adequacy [3]   51/2
  51/4 51/5
adequate [9]   5/1
  5/6 43/9 43/10
  46/24 47/2 48/18
  50/4 81/4
adjourned [1]
  105/17
adjudicating [2]
  36/19 37/4
administrative [2]
  11/7 43/22
admit [3]   19/8
  26/19 101/13
admitted [3]   40/17
  41/4 42/19
admittedly [1]
  30/16
advantage [3]   36/4
  36/15 59/3
advertising [1]
  91/23
affect [1]   97/16
affidavit [3]   25/18
  26/1 57/13
affidavits [3]
  21/12 66/12 66/13
affiliate [1]   16/16
affiliated [3]
  23/23 53/19 96/8
Africa [2]   53/11
  66/20
African [1]   64/23
afternoon [2]   84/3
  86/6
afterwards [1]
  91/20
again [11]   18/5
  18/6 18/12 30/13
  34/19 41/14 48/24
  60/24 80/12 80/16
  95/19
against [4]   5/3
  19/24 73/10 73/11
age [1]   11/23
agencies [1]   84/16
agency [2]   87/23
  100/21
agent [1]   90/25
ago [6]   10/19 54/5
  68/4 68/6 75/24
  75/25
agree [13]   12/6
  17/15 43/8 43/13
  50/21 55/20 65/14
  67/1 67/21 84/20
  85/2 91/6 96/24
agreed [2]   46/18
  89/20
agreeing [1]   90/9
agreement [14]   9/4
  9/5 13/25 84/10
  84/22 84/23 85/5
  86/8 86/9 86/13
  92/21 92/23 94/7
  94/12
agrees [2]   94/25
  96/12
ahead [3]   39/13

**A**

ahead... [2]   51/24
103/1
aimed [1]   36/1
air [8]   22/9 41/21
71/24 86/21 86/23
88/22 89/2 102/6
aired [5]   37/20
91/8 93/6 102/5
105/9
airing [6]   7/16
86/25 101/5 103/9
104/19 105/1
Airline [1]   71/17
airlines [2]   37/2
37/4
airport [1]   22/11
Al [1]   73/25
allegation [3]   27/2
27/2 39/23
allegations [8]
21/8 26/24 27/12
36/5 42/6 42/13
46/5 101/23
allege [4]   37/17
37/19 77/22 103/7
alleged [5]   40/15
84/10 85/5 98/21
101/2
allegedly [1]   102/4
allocation [1]
82/17
allow [2]   58/10
84/18
allowed [1]   45/11
allows [1]   99/8
almost [12]   4/13
10/18 17/15 29/1
36/6 58/1 75/21
75/23 76/23 84/6
92/20 100/1
alone [4]   15/9
23/12 23/13 100/10
along [1]   62/4
alternative [9]
3/21 4/19 5/1 5/6
5/9 5/20 18/17 43/9
81/4
although [9]   20/5
20/8 22/1 22/18
24/9 31/20 90/21
93/7 94/18
always [4]   15/6
58/17 76/23 89/6
amassed [1]   77/9
amended [2]   32/1
84/17
amendment [1]   98/24
America [3]   18/3
53/2 53/3
American [15]   10/1
20/2 27/3 28/19
53/1 55/12 56/2
58/16 58/16 63/6
71/18 73/23 74/2
74/6 74/7
Americans [2]   56/15
61/6
Americas [1]   2/3

among [1]   19/22
amount [4]   77/9
78/5 78/12 105/12
AMY [2]   1/17 3/11
analogy [1]   11/5
analysis [5]   4/24
8/4 12/3 26/8 42/24
analytically [1]
44/12
and rebroadcast [1]
60/3
and should [1]
81/22
Angeles [1]   56/18
anniversary [1]
61/3
answer's [1]   8/23
answered [1]   103/12
anti [1]   20/9
anti-SLAPP [1]   20/9
anticipatory [2]
104/24 105/3
anymore [3]   32/6
32/23 79/1
AP [2]   54/15 54/22
apologies [1]   52/11
apologize [2]   5/14
54/6
App'x [1]   23/21
apparently [1]   85/6
appeal [3]   10/16
47/1 81/11
Appeals [2]   10/24
71/1
appear [4]   21/22
22/13 57/13 97/5
appearance [2]
86/17 93/13
APPEARANCES [2]
1/13 2/1
appears [1]   82/11
Apple [3]   47/23
72/2 94/25
applicable [1]   88/4
applied [3]   88/1
89/20 89/25
applies [10]   6/12
7/22 8/1 11/12
11/16 11/21 13/23
71/23 82/13 104/2
apply [3]   11/15
11/20 87/5
applying [1]   54/23
appoint [1]   50/21
appointing [1]
50/19
appreciate [1]   43/2
approach [2]   29/23
39/2
appropriate [1]
38/10
Arabia [2]   100/21
100/21
area [2]   73/18
79/22
areas [1]   62/23
arguably [3]   6/6
8/4 62/11
argue [5]   6/2 7/21
11/1 37/22 71/3

argued [2]   69/21
70/8
arguing [2]   10/25
104/8
argument [18]   7/7
7/9 8/6 8/10 9/6
27/13 33/9 47/8
47/11 50/6 50/16
72/8 83/24 89/8
92/8 92/8 103/3
104/9
arguments [1]   62/3
arise [1]   10/5
arises [1]   72/8
Arizona [1]   96/16
Armonk [1]   1/15
around [4]   33/11
58/12 75/13 96/15
art [1]   89/21
article [3]   41/8
45/6 51/18
articles [2]   11/13
11/15
Asheville [1]   25/3
aspects [1]   88/24
asserted [1]   19/11
asserting [1]   65/19
assertion [1]   46/7
assess [1]   16/12
assessing [1]   18/8
assets [2]   60/5
60/8
assisted [2]   57/5
57/6
assisting [1]   57/1
associated [3]   21/4
61/8 70/2
assume [8]   12/10
18/1 21/1 33/3 59/2
60/4 85/21 96/11
assumed [1]   12/9
assuming [2]   29/19
30/15
assumption [1]
29/24
assumptions [1]
15/10
attach [1]   36/20
attached [2]   57/17
97/18
attempt [1]   37/23
attendance [2]
20/19 20/20
Attorney [1]   73/10
attributed [2]   34/7
34/14
attributions [1]
34/13
audience [1]   51/17
audiences [3]   51/20
96/14 96/25
auditing [1]   57/8
auditor [3]   77/21
77/22 78/2
auditor's [1]   76/6
audits [1]   25/18
Australia [3]   33/20
66/20 90/24
authority [1]   31/16
availability [1]

20/18
available [8]   5/1
5/6 47/19 47/19
85/7 85/9 85/12
86/14
Ave [1]   1/18
Avenue [2]   2/3 2/24
avoiding [1]   70/23
aware [2]   38/16
64/11
away [2]   52/6 66/16

**B**

back [14]   18/20
35/23 39/10 39/14
39/20 52/10 61/13
76/13 83/17 83/19
83/22 83/23 100/23
101/25
backdrop [1]   72/10
Baker [3]   17/17
23/4 64/20
Baker's [1]   17/18
balance [2]   23/13
68/15
balanced [1]   5/3
balancing [3]   14/17
20/10 52/14
bank [1]   60/6
Bankruptcy [1]   2/23
bar [4]   5/8 5/22
8/17 43/14
barred [6]   8/4 47/4
47/5 47/8 47/11
47/17
based [4]   15/8
24/24 24/25 77/12
basic [1]   4/24
basically [3]   24/5
28/18 50/7
basis [8]   24/13
25/7 28/21 37/20
98/22 101/7 101/9
101/9
BBC [7]   96/7 96/11
96/12 96/12 96/12
97/8 97/9
bear [1]   65/24
bearing [1]   42/23
became [4]   18/3
35/24 40/10 104/25
beforehand [1]
76/11
began [1]   41/10
begin [1]   14/23
beginning [1]   77/15
behalf [2]   16/14
16/17
below [1]   54/21
bench [2]   29/20
29/22
benefit [8]   86/21
88/21 91/5 91/10
96/20 103/15 104/6
105/2
best [4]   11/14 19/1
85/1 98/14
bet [1]   98/14
better [1]   19/25
big [3]   19/16 22/14

**B**

big... [1] 44/12
bigger [2] 37/9
80/20
biggest [2] 37/3
80/13
binder [1] 68/22
bio [1] 17/18
bit [9] 6/5 6/18
13/14 20/10 50/12
57/20 61/5 78/23
105/15
blocking [1] 67/20
Bloomberg [1] 27/24
Boies [5] 1/14 1/17
3/6 3/11 97/20
bonds [2] 37/7 71/9
book [1] 46/5
border [3] 67/11
68/11 71/25
Boston [5] 22/7
22/15 22/17 31/25
32/2
both [12] 6/3 6/3
10/23 12/17 14/9
22/20 28/11 37/15
42/9 55/23 61/23
68/9
bothers [1] 50/6
bottom [4] 4/20
20/21 35/12 38/4
Brazil [5] 37/6
37/9 37/9 71/15
82/11
Brazilian [2] 37/6
71/9
breach [26] 24/13
84/21 84/22 91/5
91/7 91/16 92/15
92/21 93/5 94/17
95/2 95/3 95/10
95/20 98/21 101/5
101/8 102/3 102/5
102/8 104/13 104/24
104/25 105/3 105/4
105/4
breached [7] 85/6
85/6 91/14 91/22
93/2 94/7 94/12
breaches [2] 104/15
104/17
break [5] 39/8 39/9
43/1 51/25 52/1
brief [3] 8/6 42/5
103/2
briefly [1] 39/20
briefs [2] 28/12
89/18
bring [10] 12/16
12/24 16/25 17/8
17/10 17/11 21/25
25/11 45/20 49/8
bring it [1] 17/10
bringing [2] 20/9
22/2
British [2] 96/9
96/14
broadcast [21] 27/9
47/23 77/23 87/2

88/9 88/19 91/4
91/12 91/15 94/1
95/17 96/13 96/16
96/19 96/23 96/25
98/7 98/21 103/16
104/6 104/13
broadcaster [2]
36/14 36/22
broadcasting [9]
1/6 3/3 3/15 61/14
66/2 88/7 88/12
92/17 104/22
broadcasts [5] 7/22
7/23 47/18 47/18
80/21
broader [3] 16/15
19/25 20/3
Brokerwood [3]
23/20 23/24 23/25
brought [4] 13/9
13/10 16/12 25/13
Bryks [1] 61/19
budgeting [2] 4/15
15/3
Buffalo [1] 72/1
building [1] 40/1
built [6] 36/8
40/13 41/4 41/9
41/19 78/21
bulk [4] 47/7 57/23
57/25 58/13
bunch [3] 22/15
36/5 37/6
burden [19] 8/21
8/22 8/23 11/18
17/3 17/6 17/9 20/6
20/7 20/8 29/16
46/24 47/6 50/5
66/7 66/9 66/14
76/25 77/2
burdens [1] 63/23
business [1] 71/21
butcher [1] 89/17

**C**

cable [2] 97/2 97/2
calendar [1] 52/2
Calgary [1] 66/15
California [5]
62/15 62/16 62/17
62/21 62/23
call [5] 7/5 21/6
23/1 23/4 54/9
called [2] 10/14
37/5
camera [3] 90/24
93/12 103/7
campaign [1] 36/1
can [51] 5/6 5/12
11/2 14/21 18/20
19/7 19/9 19/14
20/1 26/23 27/12
29/11 30/17 31/1
31/14 32/4 32/10
33/1 33/3 33/25
39/2 40/3 45/8
45/10 46/21 47/22
51/25 52/7 52/12
54/21 60/17 64/16
67/6 70/13 70/14

71/24 72/2 72/2
72/3 73/22 73/24
81/15 81/17 81/21
83/18 83/18 90/23
96/1 96/16 100/19
101/6
Canada [93] 9/8
10/17 10/18 15/2
16/1 16/14 16/22
17/22 17/23 17/25
19/5 19/16 19/18
19/20 19/22 20/3
20/12 23/14 23/25
24/3 25/24 27/11
27/17 27/21 28/15
29/3 30/11 33/15
33/22 34/15 35/21
36/15 36/18 43/14
45/5 46/25 47/20
48/6 49/21 52/25
53/6 54/9 54/10
54/10 55/16 56/22
58/1 58/2 58/8
58/24 59/3 59/4
59/13 59/15 59/25
60/5 60/13 60/17
61/10 61/14 63/17
64/15 64/16 65/2
65/15 65/17 65/19
65/22 66/8 67/2
67/5 67/11 68/6
68/15 70/6 72/24
73/11 75/21 78/25
79/22 80/14 85/8
85/9 85/12 87/24
91/6 91/18 98/3
102/18 102/18
102/25 103/20 104/4
Canada's [1] 59/9
CANADIAN [57] 1/6
3/3 3/15 4/12 4/13
9/3 9/17 10/9 11/12
11/14 15/6 15/22
20/8 20/23 21/15
23/16 23/23 24/1
24/5 26/16 27/7
28/22 30/13 33/20
36/18 41/11 44/24
45/3 48/19 48/25
49/2 49/5 50/22
53/3 61/13 65/12
66/2 66/4 67/15
67/17 68/7 68/24
69/10 70/21 70/23
72/21 74/4 77/12
77/14 80/22 80/23
81/1 81/6 87/13
87/15 95/21 102/21
Canadians [3] 4/14
15/6 56/16
candid [1] 19/23
careful [1] 99/9
carefully [1] 69/5
Carol [4] 23/5
64/21 83/5 84/11
Carolina [2] 25/3
66/21
case [111]
cases [16] 9/7 9/8
10/23 28/23 30/4

36/23 36/24 47/2
49/7 70/16 71/4
71/7 71/17 82/12
99/5 101/4
Cashore [1] 64/8
casters [1] 97/2
categories [5]
55/21 55/24 65/4
65/24 74/25
category [2] 26/15
33/17
cause [3] 45/22
93/23 98/22
caused [3] 23/15
92/22 93/4
causes [2] 6/8 7/8
CBC [75] 3/18 20/2
21/2 21/10 21/17
21/18 24/12 36/4
36/13 36/21 38/23
39/22 39/24 40/5
41/5 41/19 46/23
46/23 47/18 51/9
55/15 55/22 56/17
57/1 57/2 57/6 57/7
57/10 59/11 59/13
59/15 59/17 60/6
60/8 60/20 61/6
61/15 61/20 61/23
63/2 63/5 63/15
64/1 64/25 65/8
66/11 66/15 66/18
68/24 70/13 71/7
71/21 71/24 71/24
72/1 72/19 73/24
81/8 84/11 84/16
86/25 89/6 91/8
96/23 97/14 97/18
97/20 98/6 102/18
103/8 103/8 103/13
103/14 103/20 104/4
CBC's [4] 27/19
56/15 60/5 72/10
CDC [1] 20/1
ceases [1] 45/22
central [2] 62/11
62/11
certain [2] 6/19
77/9
certainly [20] 7/17
9/23 18/7 28/1
29/13 30/8 31/6
33/12 34/24 35/11
49/23 51/8 52/22
56/9 58/10 61/10
69/14 74/7 76/8
79/20
certainty [1] 75/23
certify [1] 106/4
cetera [7] 21/3
21/14 26/9 29/7
35/12 37/22 38/24
CFL [1] 34/9
CFO [2] 15/8 64/19
challenges [1]
63/14
challenging [1]
57/21
change [5] 31/6
32/16 56/17 56/18

change... continued...

**C**

change... **[1]**   58/10
changed **[3]**   32/7
32/10 32/12
characterization **[2]**
75/14 104/7
characterized **[1]**
104/24
charities **[1]**   54/19
charity **[74]**   1/3
3/3 3/7 3/9 3/12
4/13 5/7 6/7 14/24
16/15 18/2 19/16
26/17 27/11 35/24
40/12 41/4 41/11
42/14 42/19 52/25
53/1 53/6 53/19
53/23 54/1 54/8
54/9 54/9 55/9
55/13 55/23 57/9
58/17 58/19 59/20
61/1 62/25 63/1
63/3 64/14 64/20
69/13 72/11 73/16
73/18 73/19 73/22
73/25 75/1 75/6
75/12 75/13 75/17
75/21 77/15 79/22
80/6 82/15 82/16
82/24 83/7 83/9
84/11 85/3 91/24
93/20 94/9 94/9
94/11 97/14 97/21
98/6 105/7
Charity's **[1]**   39/25
CharityWatch **[1]**
63/1
chart **[1]**   80/24
chats **[2]**   90/22
90/24
check **[1]**   53/22
Chelsea **[1]**   1/20
chew **[1]**   105/15
Chicago **[4]**   54/14
63/2 63/3 66/20
children **[2]**   53/15
102/14
China **[4]**   94/25
95/1 95/2 95/11
Chinese **[1]**   94/24
choice **[6]**   5/2 12/5
12/7 12/8 12/11
39/17
choose **[1]**   37/16
chose **[1]**   93/19
chuckle **[1]**   81/7
circuit **[10]**   23/19
71/2 87/10 87/16
89/18 99/4 99/13
99/15 100/2 100/20
Circuit's **[1]**   13/17
circumstance **[1]**
90/6
circumstances **[5]**
14/20 16/12 58/8
77/3 101/1
cite **[4]**   8/13 45/8
45/10 85/14
cited **[6]**   9/7 10/12

36/23 46/9 62/13
71/7
cities **[1]**   71/25
citing **[1]**   10/23
citizen **[2]**   12/9
14/3
citizens **[2]**   11/8
82/11
citizenship **[2]**
24/1 24/1
City **[1]**   74/1
civil **[7]**   1/4 3/2
8/24 28/16 45/24
46/4 46/13
claim **[19]**   6/24
7/10 7/11 7/19 8/3
24/14 36/2 46/7
46/11 46/13 51/11
65/15 92/5 92/7
101/7 101/9 101/10
101/24 102/7
claimed **[1]**   39/25
claims **[10]**   6/24
6/25 7/5 11/21 43/3
48/4 84/10 86/2
88/15 101/25
clarify **[1]**   54/6
clarity **[1]**   41/14
clause **[1]**   87/25
clear **[18]**   5/8 8/6
14/24 18/13 40/10
49/21 50/4 52/3
80/11 84/21 85/25
89/4 91/9 91/24
94/19 96/2 102/10
104/25
clearly **[25]**   4/19
5/10 5/20 5/22 7/6
14/7 14/16 18/16
23/15 24/4 26/12
27/16 34/11 36/17
37/3 38/8 38/8
48/17 51/20 73/15
80/15 84/24 88/25
102/5 102/8
Clemons **[4]**   33/24
34/9 34/17 80/14
client **[6]**   50/24
76/10 76/15 77/8
78/12 98/1
closed **[1]**   53/9
closely **[2]**   8/14
72/23
CNN **[3]**   60/2 61/21
61/23
co **[2]**   61/2 83/4
co-founders **[1]**
83/4
co-organize **[1]**
61/2
college **[1]**   54/23
COLUMBIA **[4]**   1/1
24/8 61/16 99/18
comfortable **[1]**
58/19
coming **[1]**   87/21
comity **[4]**   70/20
70/22 71/3 72/4
comments **[1]**   41/22
commercial **[20]**

71/23 84/19 85/18
87/5 87/17 88/1
88/5 88/6 88/11
88/11 89/2 93/22
94/23 94/24 98/12
103/20 104/1 104/2
104/3 104/4
commit **[1]**   35/5
committed **[6]**   91/9
93/16 101/14 104/20
105/7 105/8
committing **[3]**
88/21 92/11 93/19
communicated **[1]**
27/4
communication **[1]**
27/7
communications **[4]**
26/9 26/10 27/8
38/22
communities **[1]**
53/25
companies **[1]**   96/24
company **[11]**   16/3
23/23 23/24 67/18
94/24 95/1 95/6
95/23 100/7 100/9
100/18
comparison **[1]**   70/5
compel **[3]**   31/9
31/11 31/17
complaint **[24]**   7/8
12/15 16/19 18/4
21/9 26/24 27/2
27/13 36/3 36/20
37/24 39/24 41/7
41/8 42/13 85/1
89/20 91/8 98/21
98/23 101/14 101/20
103/4 104/8
complete **[2]**   19/1
92/22
completely **[2]**
32/20 65/14
complex **[1]**   78/18
compliance **[2]**
29/18 45/22
complicated **[3]**
76/16 78/18 78/24
comply **[1]**   43/18
compulsory **[7]**
20/18 21/24 22/12
25/25 27/17 32/20
34/20
conceptions **[1]**
45/4
conceptualize **[2]**
92/8 93/10
conceptually **[1]**
94/3
concern **[6]**   15/25
60/12 60/12 60/13
61/25 82/10
concerned **[4]**   19/17
19/17 19/23 20/12
concerning **[1]**   16/8
concerns **[1]**   4/12
conclude **[2]**   50/4
50/11
conclusion **[1]**

105/1
conclusion that **[1]**
105/1
conclusions **[1]**
26/4
condition **[8]**   8/16
10/21 44/5 44/13
49/6 49/7 81/12
89/10
conditioned **[1]**
103/13
conditions **[2]**   46/6
49/8
conduct **[7]**   37/4
37/8 59/10 70/23
71/12 78/16 102/6
conducted **[1]**   29/4
conducting **[5]**
76/21 76/22 77/7
103/13 104/21
conferring **[1]**
82/17
confident **[1]**   59/21
confidential **[6]**
27/24 28/1 30/18
63/16 76/17 77/13
conflating **[2]**
92/20 95/14
conflating the **[1]**
95/14
connection **[4]**
57/16 68/19 88/10
104/3
Connections **[8]**
73/10 87/10 94/19
95/19 95/25 96/2
97/12 98/13
Conroy **[1]**   56/17
consent **[1]**   32/5
consequence **[2]**
82/10 99/2
consider **[6]**   63/24
81/13 92/9 92/25
93/2 94/7
consideration **[5]**
18/8 33/13 59/24
59/25 71/4
considered **[3]**   38/2
43/13 47/2
Constitution **[1]**
2/24
consultants **[2]**
21/4 25/16
contemplate **[1]**
85/8
contemplates **[1]**
89/13
contend **[2]**   43/9
73/15
contending **[1]**
68/25
content **[1]**   104/6
contention **[1]**   51/9
contest **[3]**   9/1
10/20 33/2
context **[4]**   6/12
29/1 49/15 51/12
contingent **[3]**   9/12
9/13 10/6
CONTINUED **[1]**   2/1

**C**

continuing [1]
48/11
contract [25]   24/13
84/9 87/6 87/6
88/14 89/10 89/14
89/22 92/7 92/21
93/2 93/4 95/3 95/4
95/10 95/10 97/6
97/7 97/8 97/11
99/4 99/24 101/24
103/21 104/5
contracted [3]
87/13 87/19 87/23
contracting [1]
88/6
contracts [2]   89/2
96/23
contractual [2]
88/24 92/9
contrast [1]   82/9
contributed [1]
55/1
control [5]   23/8
31/13 32/18 32/21
59/17
controlling [1]
10/12
controversy [2]
73/13 74/5
convenience [13]
12/10 13/16 15/10
15/10 15/13 16/11
18/12 20/20 22/2
25/14 30/9 38/9
55/19
conveniens [10]
3/21 4/4 13/14
13/21 23/16 33/10
52/15 57/23 63/24
82/6
convenient [14]
4/22 4/23 12/11
12/23 14/7 14/16
16/25 17/7 17/11
18/9 24/6 24/8
35/16 71/12
Convention [4]
28/10 28/13 28/14
28/16
convinced [1]   49/4
cooperated [2]
86/17 93/13
copy [1]   39/3
core [5]   23/1 23/1
39/23 57/22 62/5
corporate [1]   97/25
CORPORATION [4]   1/7
3/3 3/15 66/2
cost [4]   15/23
20/20 22/1 50/21
costs [1]   20/1
counsel [5]   3/3
39/4 68/7 81/8 86/8
count [3]   41/13
41/18 41/23
countries [2]   24/2
55/3
country [3]   33/11

37/1 100/13
counts [3]   3/21
83/25 84/8
County [2]   54/13
54/14
couple [9]   19/14
22/18 26/10 32/11
35/20 39/19 67/12
80/8 94/5
course [7]   13/18
25/21 29/5 39/12
47/20 62/24 103/14
court [69]   1/1 2/22
2/23 4/17 5/8 5/12
6/16 8/9 10/14
10/15 10/16 10/16
10/18 10/24 11/24
14/21 20/6 20/8
24/3 24/4 28/19
28/22 28/23 29/16
29/17 31/11 31/13
31/14 32/1 32/2
32/20 33/12 35/15
37/7 37/10 39/2
39/7 43/14 43/24
44/16 45/9 45/21
46/17 49/14 49/18
50/19 51/25 57/21
58/3 61/13 67/7
70/22 71/1 71/10
71/14 73/11 74/17
78/7 80/9 81/10
81/14 81/21 82/2
87/25 89/24 98/25
99/18 103/23 106/3
Court's [3]   31/13
32/21 44/14
courtroom [1]   30/3
courts [20]   2/23
10/10 10/15 12/20
23/15 29/2 31/7
31/12 36/18 43/16
43/17 44/6 47/1
48/19 49/9 49/22
51/15 68/7 99/9
101/6
cover [1]   6/4
coverage [6]   53/7
56/15 62/10 66/1
68/18 70/3
covered [1]   81/3
COVID [1]   72/16
Cowan [7]   33/18
56/10 62/12 62/14
62/18 62/19 68/12
craft [1]   12/25
Craig [2]   64/17
83/3
create [1]   74/7
created [2]   34/13
40/8
credible [1]   50/12
criminal [1]   29/1
critical [1]   14/21
Croesus [2]   37/5
71/9
Crotone [1]   23/20
cruise [11]   73/9
87/10 87/14 87/19
87/23 94/18 95/19

95/25 96/2 97/12
98/13
crux [1]   43/10
Csepel [1]   89/17
Cuisine [1]   23/20
currency [1]   100/6
current [1]   23/3
currently [1]   38/19
customer [1]   96/18
cut [2]   41/25 85/25
cutting [1]   84/19
cv [1]   1/4

**D**

D.C [22]   13/9 13/11
13/17 17/8 19/4
22/6 22/7 22/17
25/7 35/17 54/12
66/11 66/16 71/1
71/1 87/10 87/16
89/18 99/3 99/13
99/15 100/20
damage [1]   94/13
damages [18]   6/13
6/14 6/15 15/23
37/20 56/1 56/1
58/17 59/4 62/8
65/21 94/16 94/19
95/13 95/16 95/20
96/1 96/3
dangerous [1]   59/2
date [3]   85/22 98/4
106/10
Davis [3]   1/23 2/2
3/18
day [4]   15/7 15/7
40/15 85/11
DC [4]   1/5 1/18
1/24 2/25
de [1]   89/17
deal [3]   19/16
22/14 43/21
dealing [1]   96/6
dealt [1]   34/17
deceived [1]   40/1
December [1]   1/6
decide [4]   12/16
12/24 48/14 48/19
decided [1]   36/15
decides [2]   33/5
95/8
deciding [2]   9/17
9/17
decision [2]   15/21
23/2
decisions [2]   31/17
70/2
decisive [1]   100/4
deck [1]   40/3
declaration [9]
8/13 17/17 17/22
44/25 46/3 47/24
80/9 80/10 81/6
declarations [1]
30/4
declined [2]   24/12
67/2
dedicated [1]   77/24
defamation [7]   5/24
7/10 8/3 11/21

61/23 74/19 76/24
defamatory [6]
47/14 47/16 51/7
66/1 102/4 102/4
defame [3]   63/3
66/23 88/23
defaming [1]   89/1
defendant [18]   1/8
1/22 2/2 8/8 8/22
9/1 10/25 11/3
11/18 12/2 19/24
45/24 46/2 58/23
81/8 99/6 103/25
104/2
defendant's [4]
3/20 3/23 24/2 99/3
defendants [1]   3/24
defending [1]   67/17
defense [9]   8/23
16/9 46/7 76/9
76/14 76/22 76/24
77/8 78/11
deference [9]   5/2
12/4 13/23 14/1
14/1 15/14 16/5
18/21 72/5
deficient [1]   85/17
define [3]   77/18
79/3 79/8
defined [1]   99/1
definition [1]
11/22
degree [2]   5/2 12/4
delayed [1]   84/4
deleted [1]   41/20
demonstrating [1]
10/9
denied [1]   69/21
depending [1]   43/7
depends [2]   30/21
30/22
deposed [1]   67/5
deposition [8]   29/9
29/11 30/2 30/5
30/12 58/7 67/3
75/18
depositions [7]
30/5 34/22 42/7
42/12 42/17 67/6
67/11
Describe [1]   28/10
describes [1]   86/8
describing [1]   90/6
description [2]
87/4 87/4
designated [1]
100/3
designed [1]   16/21
destined [1]   95/5
determinative [2]
48/24 49/23
determine [1]   49/1
development [2]
14/25 15/4
Diana [1]   64/11
difference [7]   25/4
30/1 30/7 31/10
31/10 76/21 95/22
differences [2]
37/18 77/17

**D**

**different [15]**
30/14 45/5 47/14
49/6 51/15 51/16
51/19 51/19 51/20
55/3 56/14 58/13
62/22 85/22 93/10
**differently [2]**
42/22 51/17
**difficult [3]** 67/20
67/25 68/3
**difficulty [4]**
21/22 59/4 64/3
66/11
**dig [1]** 98/10
**digital [1]** 11/23
**direct [14]** 25/20
87/25 93/22 93/23
93/25 94/4 94/17
94/19 95/14 96/1
98/11 98/25 99/2
100/2
**directed [1]** 15/2
**directing [2]** 4/15
80/1
**directly [2]** 19/2
35/16
**director [6]** 15/8
17/20 18/1 18/3
64/20 100/13
**disagree [8]** 19/10
44/25 45/21 51/9
71/22 71/22 83/8
87/3
**disagreed [1]** 45/2
**disclose [2]** 27/25
76/18
**discovery [14]**
19/25 26/21 34/16
56/21 57/19 57/24
58/11 69/17 71/13
76/4 77/2 78/5 82/1
82/4
**discretion [2]** 8/18
44/14
**discuss [3]** 34/25
39/22 50/23
**discussed [2]**
100/15 104/9
**discussion [5]**
85/23 85/23 100/15
101/18 103/25
**disfavors [1]** 23/15
**dismiss [8]** 3/20
3/21 37/14 37/23
44/17 47/5 57/22
82/5
**dismissal [3]** 9/13
38/9 47/1
**dismissed [2]** 4/20
86/2
**dispense [1]** 46/18
**dispositive [1]**
81/21
**disproportionally [1]**
17/9
**dispute [6]** 35/22
36/17 43/11 49/1
89/3 89/5

**disputed [2]** 11/15
72/12
**distance [2]** 22/6
22/7
**distances [1]** 23/17
**distinction [2]**
44/13 79/7
**distinctly [1]**
10/22
**distress [1]** 6/16
**district [13]** 1/1
1/1 1/11 2/23 24/8
32/1 32/2 33/4 33/5
54/20 61/15 99/18
99/18
**districts [1]** 97/23
**divided [1]** 45/6
**doctrine [4]** 13/16
13/19 13/22 13/22
**document [8]** 36/11
41/11 41/15 42/3
42/14 77/20 79/5
79/5
**documentaries [3]**
4/12 37/12 37/19
**documentary [10]**
7/12 7/12 7/15 7/17
21/12 33/23 36/7
84/13 101/5 102/4
**documentary's [1]**
4/16
**documents [13]** 26/3
37/13 38/1 38/18
39/25 70/2 70/4
70/5 70/11 70/13
71/13 79/19 79/20
**dollar [1]** 13/5
**dollars [3]** 58/18
100/10 100/18
**domestic [5]** 16/8
33/9 36/25 54/10
54/25
**donations [5]** 53/19
65/22 80/13 80/21
98/1
**done [15]** 11/2 14/6
17/19 22/10 25/17
27/20 52/7 57/16
67/10 67/17 68/2
69/20 71/19 78/12
94/10
**donor [7]** 4/15
24/16 24/21 34/14
97/4 97/8 97/10
**donors [36]** 21/5
33/17 33/18 34/8
36/8 40/1 40/10
53/1 55/6 55/8
55/25 56/2 56/4
56/14 56/17 56/19
59/5 62/8 62/9
63/14 65/5 65/7
65/9 65/12 65/16
65/17 65/19 74/6
75/5 78/20 80/8
82/17 96/12 96/20
97/15 97/17
**donors' [1]** 91/13
**doubt [1]** 14/9
**down [11]** 5/15 11/5

49/24 53/3 53/4
53/6 53/6 62/1
69/11 74/18 103/22
**download [1]** 47/22
**downtown [1]** 22/11
**dozen [1]** 35/1
**dozens [2]** 79/23
79/25
**draw [1]** 51/15
**drawn [1]** 98/7
**Dream [1]** 61/3
**due [1]** 11/6
**during [3]** 4/15
34/3 41/17

**E**

**e-mail [3]** 27/15
42/15 91/17
**e-mails [6]** 26/25
27/14 27/14 28/4
38/24 85/20
**earlier [3]** 58/15
71/8 73/16
**easier [5]** 18/24
52/23 55/11 55/16
92/5
**East [1]** 1/23
**easy [1]** 22/10
**ECF [1]** 97/19
**Ecuador [3]** 23/11
55/4 64/21
**editorial [3]** 37/17
38/22 70/2
**effect [8]** 93/23
93/25 94/5 94/17
98/11 98/25 99/2
100/2
**effective [1]** 9/14
**effectively [2]** 8/3
11/3
**effects [4]** 87/25
88/2 95/14 96/1
**eight [1]** 75/25
**either [7]** 8/20
21/7 23/3 40/18
44/1 63/17 78/1
**electronic [1]** 96/7
**elements [1]** 4/24
**else [7]** 14/7 14/17
52/24 60/18 63/7
74/9 105/12
**elsewhere [2]** 104/1
104/3
**embarrassing [1]**
59/10
**embedded [1]** 73/23
**emotional [2]** 6/14
6/16
**emphasized [1]**
33/23
**employed [2]** 22/21
25/23
**employee [2]** 26/23
83/13
**employees [19]**
22/21 25/21 25/22
26/17 27/3 27/6
27/11 27/21 33/16
34/18 34/19 55/23
65/5 65/7 75/12

75/22 75/23 82/16
83/9
**EMTR [1]** 37/5
**encounter [1]** 67/19
**end [4]** 35/19 40/15
85/11 98/23
**enforce [3]** 49/14
60/2 60/17
**enforceable [2]** 9/5
9/6
**enforced [2]** 32/3
60/6
**enforcement [1]**
11/9
**engage [2]** 58/24
77/2
**engaged [6]** 19/3
19/12 58/23 75/7
93/20 103/9
**engagement [1]** 98/6
**engages [1]** 97/23
**English [6]** 38/12
38/13 69/20 70/5
70/7 70/9
**enormous [3]** 61/11
64/2 66/9
**enough [4]** 40/22
41/2 41/2 50/3
**Enquete [4]** 7/14
69/24 69/25 70/3
**enter [1]** 58/4
**enthusiastic [1]**
28/8
**entire [3]** 17/16
75/13 101/14
**entirely [4]** 4/14
44/2 50/11 102/12
**entirety [1]** 61/22
**entities [1]** 15/12
**entitled [3]** 12/5
18/14 106/5
**entity [19]** 15/5
15/18 15/22 15/25
16/1 16/3 16/15
16/17 20/1 27/3
27/7 36/24 53/3
55/9 55/10 70/24
87/1 96/8 99/8
**episode [3]** 7/15
40/4 40/4
**equipoise [1]** 25/6
**especially [4]**
14/25 15/3 68/6
70/18
**essential [1]** 40/14
**essentially [14]**
6/23 8/9 9/13 30/10
33/13 35/23 35/25
36/3 36/13 36/15
77/19 93/20 95/19
105/7
**establish [1]** 75/9
**Estate [4]** 7/12
21/12 40/4 64/12
**estoppel [2]** 43/25
84/9
**et [7]** 21/3 21/14
26/9 29/7 35/11
37/22 38/24
**even [45]** 6/6 7/6

**E**

even... [43]   7/14
7/25 8/1 8/4 8/8
8/12 11/24 12/22
14/6 14/23 16/8
18/13 18/13 19/22
20/10 21/14 23/22
26/4 32/16 35/8
35/9 41/16 42/1
42/19 47/3 47/8
47/11 63/25 67/3
69/4 74/1 75/2
76/16 77/11 77/13
88/3 89/21 90/21
90/23 90/25 92/1
93/3 100/24
event [3]   23/10
61/3 65/10
events [2]   26/18
61/4
everybody [1]   83/23
everywhere [1]
90/15
evidence [4]   76/12
78/5 88/18 97/13
evidentiary [1]
49/25
ex [1]   33/16
exact [1]   80/5
exactly [5]   61/18
63/1 76/3 80/19
95/15
examination [2]
29/4 29/4
example [29]   8/11
13/17 16/7 17/18
25/10 25/13 26/18
26/25 30/18 33/3
33/22 34/11 36/10
40/2 40/3 41/23
46/22 54/16 54/21
60/25 67/19 69/2
73/9 74/25 75/10
76/5 77/20 89/16
94/6
examples [6]   34/6
41/7 54/17 68/16
68/24 73/22
Except [1]   69/23
exception [11]
71/23 84/18 84/19
85/18 87/5 87/18
88/1 93/23 94/23
94/24 100/2
exceptions [1]
84/18
excerpt [1]   40/4
exchange [5]   86/10
86/15 86/19 91/17
92/2
exclusively [1]
58/2
Excuse [2]   47/9
63/9
executive [6]   15/8
18/1 18/3 24/11
64/12 64/20
executives [2]   15/5
23/1

exemplary [1]   80/15
exemplified [1]
28/3
exemplify [1]   75/4
exhaustion [2]
43/22 43/23
exhaustive [4]
41/13 41/15 41/18
41/20
exhibit [5]   34/2
41/7 68/19 69/7
97/19
Exhibit 14 [2]
68/19 69/7
Exhibit 8 [1]   41/7
exhibits [1]   68/22
exist [3]   17/15
45/22 50/2
existed [1]   72/13
existence [3]   79/3
94/10 100/3
existing [1]   53/22
exists [1]   55/13
expect [7]   36/22
40/23 42/11 56/10
56/11 57/19 68/3
expects [2]   99/11
99/11
expended [1]   82/18
expert [2]   45/2
47/24
experts [3]   42/11
44/23 44/24
explained [1]   27/5
explains [2]   40/5
41/17
explanatory [1]
41/22
expose [1]   59/10
exposed [1]   59/14
express [1]   99/23
expressly [2]   100/3
100/6
extent [5]   7/5
35/21 63/16 70/13
77/11
extreme [1]   23/22

**F**

F.Supp [1]   99/16
F.Supp.2d [1]   99/14
fabulous [1]   94/9
face [6]   13/4 20/5
20/7 20/8 58/25
63/3
facilities [1]   92/3
fact [29]   7/20 9/16
9/24 10/9 15/16
15/18 16/3 16/4
23/24 28/1 30/1
30/7 30/10 32/17
33/10 37/11 42/10
44/11 48/14 48/15
48/16 48/22 72/12
74/5 80/24 89/6
90/15 91/10 102/2
factor [5]   70/20
72/10 72/22 73/12
81/24
factors [13]   4/18

5/4 18/11 18/16
18/18 20/16 23/14
35/20 38/5 38/8
52/14 72/8 72/18
facts [2]   10/7
14/22
factual [1]   100/1
failed [2]   66/7
81/12
failing [1]   102/6
fails [2]   8/8 47/5
failure [2]   43/18
102/8
fair [11]   14/14
14/20 16/11 28/8
40/22 41/2 41/2
62/4 77/9 78/12
105/11
false [1]   42/2
falsely [2]   39/25
46/14
falsity [1]   76/25
familiar [1]   68/8
families [2]   69/5
69/6
family [2]   61/2
61/8
family's [1]   72/1
famous [1]   34/9
far [7]   4/23 26/6
40/11 40/14 46/21
80/12 81/18
farfetched [1]   61/9
fashion [1]   56/16
fashioned [1]   28/25
favor [5]   12/7
23/16 35/21 68/15
72/19
favorable [2]   13/7
13/7
favors [2]   23/14
24/4
federal [2]   31/24
32/6
Federated [1]   37/5
feel [1]   31/6
feels [1]   31/5
ferrous [1]   81/7
few [12]   21/1 32/9
41/7 41/21 51/25
54/17 55/18 58/2
68/2 69/5 71/7 93/7
fewer [2]   95/4 95/5
Fifth [5]   7/12
21/12 23/19 40/4
64/12
figure [7]   34/16
42/17 50/9 62/11
62/11 76/4 81/17
figuring [1]   97/7
file [2]   16/16
46/12
filed [3]   7/15
16/14 81/11
filing [2]   46/10
59/19
filming [1]   90/25
final [4]   26/5
33/16 53/4 103/15
finalized [1]   93/1

finally [2]   35/18
104/1
finances [4]   93/15
93/15 93/18 93/18
financial [4]   82/9
86/20 95/9 103/11
find [4]   45/17
46/22 48/17 76/19
finder [3]   9/24
30/1 30/7
finding [1]   9/16
48/22
fine [7]   4/7 4/10
9/14 12/19 25/20
55/15 55/16
finger [1]   14/12
finish [1]   104/19
firm [3]   26/3 26/8
57/8
firmly [1]   45/6
firms [5]   25/17
26/11 56/25 57/5
57/6
first [27]   5/5 6/4
6/5 7/1 7/4 7/10
10/18 13/15 16/13
18/18 22/19 24/25
25/21 31/18 31/20
36/9 43/8 48/19
52/20 72/12 73/2
73/25 81/14 86/7
96/22 98/19 98/24
fit [1]   37/24
five [5]   13/11 40/2
74/14 75/24 84/8
flat [1]   42/15
flew [1]   63/2
Flexner [4]   1/14
1/17 3/7 3/12
flight [4]   22/9
22/9 66/24 84/5
flip [2]   19/5 58/21
flipping [2]   17/3
17/6
Floor [2]   1/18 2/3
fly [1]   49/24
flying [2]   25/3
25/4
FNC [1]   9/8
focused [2]   62/2
77/7
focusing [1]   20/17
folks [2]   22/12
52/6
follow [3]   74/12
100/15 105/14
followed [1]   72/23
following [1]   78/20
footage [1]   103/7
football [1]   34/9
footnote [1]   104/10
For the Defendant [1]
1/22
foregoing [1]   106/4
foreign [15]   6/15
10/4 10/5 25/8
29/15 37/1 48/16
83/15 83/24 84/15
84/16 84/17 89/19
89/25 99/8

**F**

forensic [2]   76/6
77/20
Forensics [1]   57/8
forgo [1]   44/15
form [3]   6/23 72/22
88/13
formally [1]   53/14
format [3]   85/22
85/23 100/16
former [9]   26/16
26/22 27/11 27/21
34/18 65/5 65/7
82/16 83/9
forms [2]   11/16
24/13
formula [1]   40/15
forth [3]   13/1 85/2
96/7
forum [38]   3/20 4/4
4/19 5/2 5/3 5/6
5/10 5/20 12/5 12/7
12/23 13/6 13/14
13/21 18/17 23/15
23/16 23/17 24/5
33/9 38/6 38/9
42/24 43/9 43/10
46/24 47/2 48/18
50/5 51/3 51/4 51/5
52/14 57/23 63/24
73/14 81/4 82/6
forward [3]   49/19
100/22 100/24
found [6]   40/8
69/13 87/16 87/25
89/19 89/24
foundation [5]
33/24 34/9 34/17
56/13 80/14
founded [1]   15/1
founders [2]   23/3
83/4
four [7]   3/22 7/8
18/18 23/6 55/23
74/17 84/1
framed [1]   49/13
France [1]   67/19
Francis [1]   69/6
Francisco [1]   62/20
frank [1]   12/17
frankly [1]   30/3
fraud [4]   61/7
91/24 93/20 105/8
Free [1]   53/14
freely [1]   26/18
French [15]   7/15
37/12 37/13 38/1
38/3 38/19 38/23
38/23 38/24 69/16
70/1 70/10 70/11
70/14 70/16
friend [1]   39/22
Froese [2]   57/8
57/12
FSIA [5]   25/9 25/10
71/10 71/23 104/1
fulfilling [1]
36/21
fully [5]   19/8 40/7

40/10 40/20 40/24
fund [1]   55/2
fundamental [1]
77/4
funded [4]   40/7
40/11 40/20 40/24
funding [4]   53/24
54/1 82/17 97/25
fundraising [1]
15/3
funds [8]   4/15 37/6
77/23 77/24 80/1
80/2 82/18 91/13
funneling [1]   53/19
funny [1]   28/11
further [3]   66/16
98/8 105/14
Furthermore [1]
73/21

**G**

Gaby [4]   33/19
56/11 62/16 68/12
game [1]   16/21
gamesmanship [5]
19/3 19/12 19/13
58/23 58/25
gathering [2]   88/8
88/10
gave [5]   26/25 40/3
46/14 68/22 69/13
general [4]   49/22
73/10 82/8 82/22
generally [1]   31/7
genuine [1]   49/1
Georgia [3]   31/25
33/4 33/5
Germany [1]   67/19
gets [2]   5/3 12/24
Ghorbani [4]   33/19
56/11 62/16 68/13
gist [1]   80/17
given [5]   19/18
34/3 36/12 39/3
103/8
gives [3]   28/2
93/13 97/6
global [4]   15/1
15/3 99/12 101/7
goes [2]   16/9 89/6
good [15]   3/8 3/10
3/13 3/14 3/16 3/17
3/19 4/11 13/1 28/7
39/1 40/2 51/1 84/2
86/6
goodness [1]   101/15
Gore [1]   73/25
governance [1]
16/23
governed [1]   47/21
government [7]   11/7
36/24 37/7 37/8
53/16 73/11 96/9
Governor [1]   34/4
grander [1]   33/14
grant [2]   23/16
72/16
Granted [1]   75/16
greater [4]   59/14
72/20 72/23 73/4

grew [1]   72/1
grounds [2]   57/23
69/4
group [1]   40/19
guess [14]   9/21
11/25 13/3 19/12
53/18 81/15 88/11
92/19 93/1 94/2
98/9 99/25 104/24
105/5
guts [3]   7/11 8/3
12/3
guys [2]   19/4 61/7

**H**

Hague [4]   28/10
28/13 28/14 28/16
Half [1]   71/25
Hall [1]   74/1
hand [2]   5/24 33/25
happened [6]   8/12
60/20 61/19 61/20
82/2 91/20
happening [1]   46/22
happens [1]   53/17
happy [4]   19/9
49/24 50/17 91/18
hard [9]   5/13 13/24
22/11 58/2 58/12
66/18 66/24 68/6
97/6
harder [1]   52/24
hardline [1]   49/20
harm [5]   87/11 92/6
93/4 95/18 95/22
Harrison [4]   8/13
11/5 44/25 49/24
Harvey [1]   64/8
have the [1]   46/15
head [4]   56/18
58/12 62/25 64/22
headline [1]   61/21
headquartered [2]
15/1 25/14
hear [6]   39/22
48/21 50/10 83/24
86/5 93/18
heard [1]   96/19
hearing [9]   1/10
11/8 11/10 22/13
39/11 49/25 50/3
50/14 50/14
hedge [1]   37/6
heightened [1]   14/2
held [5]   23/25
43/17 58/16 71/10
73/12
help [4]   27/12 55/2
57/9 95/2
helpful [1]   20/15
helping [1]   17/21
here's [3]   45/17
60/25 69/12
Heroes [2]   56/17
56/18
herring [2]   6/4 6/5
herself [1]   100/12
hey [4]   61/6 85/9
85/15 85/16
hierarchy [1]   10/10

high [3]   13/5 13/6
54/22
higher [4]   20/5
20/7 20/8 40/12
highlight [1]   64/25
highly [2]   61/25
73/5
himself [1]   72/16
hired [2]   50/20
57/9
history [2]   16/22
17/16
hold [3]   50/2 58/9
69/1
holding [2]   17/17
100/12
Holland [1]   87/20
holocaust [1]   71/4
home [3]   59/3 64/21
84/5
honestly [3]   19/7
20/12 38/16
Honor [49]   3/14
3/17 4/3 4/6 4/11
4/20 7/5 7/20 7/21
8/5 9/11 10/17 12/8
14/22 15/7 16/19
19/7 19/10 20/13
20/21 23/12 26/19
27/1 27/18 28/19
31/5 35/12 37/15
38/4 39/1 39/12
43/3 49/23 52/13
67/8 74/20 74/22
76/20 77/16 80/16
81/3 81/3 81/25
84/2 86/6 98/19
101/15 101/22
101/22
HONORABLE [1]   1/11
HOOK [3]   2/22 106/3
106/10
hope [3]   29/21 56/8
86/6
hopes [1]   48/10
horrible [1]   61/7
host [1]   64/7
House [1]   61/5
Houston [1]   24/5
how difficult [1]
67/25
huge [1]   66/14
Humanity [1]   62/17
hundred [3]   8/11
10/19 32/13
hundreds [1]   42/4
Hungary [5]   71/2
71/3 71/5 89/18
89/20
hurting [1]   36/14
hypothetical [1]
97/4

**I**

idea [6]   11/24
25/22 67/24 74/2
99/6 101/5
identifiable [1]
73/13
identification [1]

**I**

identification... [1]
101/21
identified [3]
56/17 65/2 68/18
identify [7]   3/4
21/9 21/10 65/4
66/4 66/7 68/19
identifying [1]
65/15
ignore [1]   88/20
III [2]   45/6 61/2
illustrative [1]
34/1
imagery [1]   73/22
imagine [6]   11/23
29/25 30/17 42/9
42/12 97/8
imagined [1]   94/10
immediate [2]   94/4
99/2
immunities [8]   25/8
83/16 83/25 84/15
84/17 89/19 89/25
99/7
immunity [1]   102/18
immunized [1]   84/16
impact [2]   61/11
88/23
implicates [1]
82/10
implication [1]
85/24
implied [2]   8/25
46/7
implies [2]   46/14
77/23
imply [1]   100/17
implying [1]   46/10
importance [1]   13/6
important [16]   12/9
16/18 20/17 21/6
21/11 24/10 25/16
26/16 28/5 33/22
34/11 37/18 63/4
81/2 86/20 103/7
imposed [1]   20/1
impression [1]
103/8
in-person [1]   90/20
inability [1]   31/9
inaccurate [1]   93/5
inadequate [1]   5/20
incapable [1]   70/8
include [5]   21/4
91/5 91/14 92/24
105/2
included [5]   15/2
25/18 41/22 42/1
96/17
includes [1]   41/24
including [6]   23/17
30/9 42/10 52/24
73/17 97/21
income [1]   87/24
inconvenienced [1]
66/22
inconvenient [1]
17/10

incorporated [1]
15/16
incorrect [1]   87/7
increase [1]   36/16
incumbent [4]   10/20
12/2 45/24 46/1
indeed [2]   6/7
88/12
independent [2]
37/17 51/22
Index [2]   99/12
101/7
indicated [2]   31/7
73/24
indicates [1]   80/12
individual [1]
27/15
individuals [1]
67/4
infer [1]   100/19
information [11]
34/15 57/9 74/13
77/9 78/14 91/11
91/12 92/25 93/2
100/14 105/14
information relating
77/9
informed [1]   89/1
injure [1]   87/1
input [4]   88/19
88/20 92/10 94/8
inquiry [2]   44/2
44/9
insignificant [1]
30/12
inspiration [1]
62/13
inspire [1]   17/21
instance [1]   31/18
instances [1]   99/25
instead [3]   17/23
19/4 95/8
insurance [1]   67/18
intangible [1]
15/12
intend [1]   48/5
intended [1]   96/13
intends [1]   10/20
intention [1]   58/17
intentional [1]
99/19
interest [20]   4/18
18/16 35/22 36/19
37/3 37/10 70/20
70/22 72/22 72/24
73/4 73/6 73/12
73/13 73/14 37/15
74/8 81/24 82/7
82/8
interested [5]   26/2
26/7 73/19 74/3
74/4
interesting [2]
10/2 72/10
interests [1]   72/20
internal [3]   26/2
26/7 38/22
international [4]
13/13 14/25 15/4
23/20

internationally [1]
55/2
internet [1]   40/6
interruption [1]
52/11
interstate [1]   29/1
interview [29]
24/12 34/4 41/16
41/17 41/21 47/17
84/11 84/12 85/5
85/7 85/9 85/16
86/10 86/15 86/16
88/17 90/10 90/12
91/7 100/16 101/3
101/10 102/6 102/8
103/13 103/14
103/16 104/7 104/21
interviewed [2]
24/12 91/19
interviewed tomorrow
91/19
interviewee [1]
89/7
interviewing [1]
85/22
into [17]   18/8 18/8
22/10 33/13 67/11
72/10 78/13 86/23
88/18 88/22 92/12
92/17 94/19 95/14
95/18 103/16 105/9
invented [1]   17/14
investigation [6]
65/25 76/11 76/15
78/16 86/18 93/14
investigations [2]
71/19 76/21
investigative [2]
27/20 66/3
invite [1]   80/9
invoke [1]   85/17
involve [1]   36/24
involved [10]   19/13
21/13 30/17 40/9
56/25 72/11 75/24
76/17 79/25 82/17
involving [1]   100/2
iPhones [5]   95/1
95/2 95/4 95/6 95/7
irrelevant [1]
57/18
is all [1]   95/11
issue [36]   5/5 10/3
10/18 12/4 22/23
23/2 27/22 28/19
31/14 32/10 33/1
36/25 37/1 37/12
42/6 45/9 45/25
46/25 47/15 47/16
48/25 49/1 50/13
57/22 58/14 67/4
69/4 73/7 78/19
79/8 80/21 81/5
81/17 81/20 102/21
102/22
issued [2]   29/6
32/3
issues [10]   22/19
29/3 36/9 43/22
45/7 50/9 53/5

76/18 77/10 82/10

**J**

Jackson [1]   37/2
January [1]   98/5
January 27th [1]
98/5
JEFF [3]   2/22 106/3
106/10
joined [1]   17/20
joint [2]   23/25
24/1
Jordan [8]   24/22
27/1 27/4 28/4
33/19 56/9 62/10
68/11
JOSEPH [3]   1/14 3/6
86/13
journalistic [1]
16/21
journalists [4]
4/13 21/3 21/9
21/10
judge [9]   1/11 10/1
29/3 31/16 33/4
37/1 38/1 44/7 50/7
judgment [5]   16/2
29/22 60/1 60/17
60/18
judicial [1]   30/11
judiciary [1]   19/22
jurisdiction [20]
3/22 6/15 10/6
11/10 12/17 12/19
14/3 28/22 44/20
44/21 45/4 45/6
49/20 49/22 71/11
81/16 82/3 87/17
97/12 99/9
jurisdictional [18]
6/2 8/7 44/1 44/1
44/3 44/3 44/9
44/11 44/16 44/19
45/1 45/2 49/7 49/9
49/11 49/13 82/4
83/25
jurisdictions [1]
29/15
jury [2]   19/20
29/20
Justice [1]   10/15
justify [2]   16/19
26/12
Justin [2]   72/14
72/15
Justin Trudeau [1]
72/14

**K**

Kate [1]   64/9
Kazakh [1]   70/17
keep [4]   5/13 58/4
63/16 84/5
Kelly [2]   41/18
64/7
Kenya [29]   4/15
15/4 23/11 34/4
40/1 40/7 40/10
40/11 41/17 53/15
53/16 53/20 54/2

**K**

Kenya... **[16]**   55/3
61/7 64/22 64/23
77/24 77/24 77/25
80/3 82/18 86/10
86/15 91/13 92/3
100/13 100/13
100/14
Kenya in **[1]**   86/10
Kermit **[1]**   74/2
Ketanji **[1]**   37/1
key **[8]**   45/18 55/25
59/6 62/7 64/18
64/19 82/19 83/10
Kielburger **[2]**
64/17 83/3
Kielburgers **[1]**
23/4
kind **[7]**   10/4 17/14
28/2 31/18 42/2
66/24 85/11
King **[2]**   61/2 61/2
King's **[1]**   61/8
knew **[16]**   86/16
87/18 87/20 87/21
87/22 88/2 89/23
90/14 91/25 93/17
95/22 100/9 100/9
100/23 103/15 105/6
know if **[1]**   102/20
knowing **[2]**   22/19
22/20
knowledge **[10]**
26/17 26/23 27/11
28/4 34/12 37/22
91/5 91/15 94/20
96/3
knows **[1]**   93/15
Kristin **[1]**   83/17
KROETSCH **[5]**   1/14
3/6 4/4 81/25 86/25

**L**

LA **[2]**   54/14 62/24
lack **[1]**   3/22
Lady **[1]**   73/25
language **[5]**   51/19
69/16 69/21 70/1
70/5
languages **[1]**   71/20
large **[3]**   38/21
69/10 71/25
largely **[4]**   58/1
75/3 78/25 82/25
last **[9]**   26/15 32/9
32/11 37/11 39/19
67/12 68/4 81/23
82/15
later **[5]**   15/14
16/16 85/22 93/4
97/22
latrines **[2]**   41/24
42/1
Laurie **[2]**   62/24
68/13
law **[36]**   9/4 9/17
9/17 9/20 10/4 10/5
10/9 10/10 11/5
11/7 11/12 11/12

11/14 13/14 18/12
23/13 44/4 44/10
44/18 44/24 46/25
48/13 48/16 48/25
49/2 49/5 49/5
49/16 50/22 84/21
85/14 87/4 87/8
89/12 94/3 98/11
lawsuit **[7]**   39/21
55/4 56/3 59/19
60/15 60/17 72/17
lawyer **[2]**   45/3
102/21
lead **[1]**   64/8
leadership **[2]**
17/20 82/24
learned **[1]**   10/9
least **[22]**   13/5
16/5 22/23 24/9
24/13 24/23 24/24
29/17 35/15 40/17
44/4 44/10 44/12
44/18 49/4 55/22
56/15 58/10 59/7
61/5 68/3 79/23
leave **[1]**   39/17
led **[1]**   26/3
Lee **[2]**   23/5 64/19
left **[2]**   52/12
75/21
legal **[4]**   9/23 10/3
29/2 76/22
less **[5]**   18/14
19/19 23/17 31/3
79/8
letter **[4]**   68/5
97/19 97/22 98/4
letters **[12]**   28/15
28/17 28/20 29/14
29/17 30/23 31/14
36/20 67/4 67/14
68/10 86/25
level **[1]**   10/14
libel **[8]**   16/14
37/21 43/12 43/14
49/14 49/16 102/24
102/24
license **[1]**   61/18
lie **[7]**   40/14 42/18
49/16 49/17 99/19
101/16 101/17
lied **[1]**   99/18
lies **[1]**   43/15
lieu **[1]**   67/7
life **[1]**   73/23
light **[1]**   47/15
likely **[13]**   19/19
20/22 25/24 33/21
34/19 34/23 34/25
35/13 55/21 56/12
59/10 72/23 79/18
likewise **[2]**   46/9
47/23
limitation **[1]**
58/20
limitations **[5]**
5/23 9/9 11/19
42/23 51/13
limited **[2]**   15/24
80/7

line **[13]**   4/20
20/21 35/12 38/4
51/15 51/16 91/10
92/11 92/12 93/17
93/19 95/25 104/20
lines **[2]**   45/4
87/19
list **[2]**   26/19
41/15
listening **[1]**   72/1
listens **[1]**   96/15
lists **[1]**   69/5
literally **[8]**   16/15
16/22 17/17 17/19
24/7 32/19 59/18
80/18
litigate **[1]**   4/22
litigated **[1]**   45/14
litigating **[2]**   59/3
66/15
litigation **[9]**   9/6
11/24 19/24 20/2
30/18 32/21 57/24
73/20 82/8
little **[10]**   5/13
6/18 13/14 45/5
57/20 78/23 79/4
79/5 80/10 86/7
live **[4]**   15/23
23/10 25/19 31/8
lived **[1]**   22/15
lives **[1]**   90/10
living **[1]**   72/24
LLP **[2]**   1/23 2/2
local **[5]**   14/3
35/21 71/20 73/13
73/15
localized **[2]**   73/5
74/5
located **[3]**   57/25
63/25 89/5
lodestar **[3]**   13/16
13/18 14/15
London **[1]**   96/13
long **[5]**   12/16
39/24 83/8 84/5
98/7
longer **[1]**   23/7
look **[33]**   14/20
14/21 18/17 21/8
22/25 23/12 37/3
37/7 38/4 38/5 41/3
41/6 43/7 52/2
54/16 56/14 59/6
62/9 68/16 68/21
69/2 73/21 74/25
80/9 85/20 96/18
97/14 99/23 99/25
100/5 101/7 101/24
101/25
looked **[1]**   46/21
looking **[6]**   10/11
21/14 31/12 44/19
46/2 78/13
looted **[1]**   89/21
Los **[1]**   56/18
loss **[1]**   95/9
lost **[2]**   58/18
65/22
lot **[11]**   14/22

33/24 35/1 39/23
42/16 59/10 59/17
63/6 74/18 84/6
95/24
Louisiana **[2]**   23/23
24/6
love **[1]**   74/22
low **[2]**   5/8 5/22
lower **[1]**   58/25
Luther **[2]**   61/2
61/8

**M**

mail **[3]**   27/15
42/15 91/17
mails **[6]**   26/25
27/14 27/14 28/4
38/24 85/20
main **[8]**   1/15 54/7
55/21 60/12 60/12
60/13 65/24 101/23
Maine **[1]**   23/18
maintain **[1]**   59/22
maintaining **[1]**
53/21
major **[3]**   53/24
56/16 56/19
majority **[10]**   7/7
11/21 20/22 20/23
25/2 35/13 35/14
47/10 47/13 65/1
makes **[7]**   11/18
31/9 43/16 65/18
71/15 74/3 94/19
making **[6]**   9/16
10/1 17/13 23/2
33/8 69/10
making a **[1]**   10/1
Malay **[1]**   71/20
Malaysia **[2]**   37/3
71/18
Malaysian **[2]**   37/2
71/16
Mall **[1]**   61/4
managed **[1]**   4/13
managers **[1]**   23/4
mandate **[1]**   36/21
mandatory **[3]**   43/23
44/6 44/14
manner **[1]**   77/19
manufacture **[2]**
94/25 95/2
many **[39]**   6/22 6/23
14/16 16/7 21/16
23/15 28/7 30/3
34/22 36/7 36/19
41/5 42/7 42/11
42/12 55/4 56/4
56/9 56/15 59/8
62/22 64/4 67/10
70/4 71/25 72/3
73/17 76/1 76/3
76/20 78/21 79/11
79/21 82/16 82/21
83/2 83/8 102/13
102/14
Mark **[3]**   64/7 64/17
83/3
markets **[1]**   82/9
marshaled **[1]**   66/1

**M**

Martin [2]   61/1
61/8
Maryland [1]   54/13
Marys [1]   69/12
mask [3]   3/25 4/1
39/17
master [1]   12/15
matching [2]   75/5
79/17
material [6]   20/22
26/13 33/21 35/13
65/1 69/15
materials [6]   15/11
39/2 44/19 44/21
69/17 80/25
matter [12]   3/22
39/7 44/4 44/10
44/18 67/21 77/1
81/16 82/3 82/5
100/1 106/5
matters [5]   36/17
41/1 43/22 79/4
97/14
may [31]   4/20 6/19
11/10 12/18 14/5
18/15 18/23 19/17
19/23 22/16 23/8
23/9 29/21 30/8
30/18 32/11 39/8
45/4 56/25 57/15
59/21 63/13 72/10
74/11 74/11 76/18
77/11 78/23 98/9
99/25 103/5
maybe [14]   11/25
30/14 32/7 33/19
42/10 42/20 44/19
51/1 58/2 61/10
80/6 81/8 83/6
100/1
McKenna [1]   64/9
mean [81]   7/6 7/8
8/10 9/7 9/10 9/22
10/3 12/1 12/12
13/15 14/5 14/15
16/24 17/14 17/16
18/3 19/8 19/15
19/25 21/1 22/23
22/25 23/12 25/20
26/4 30/8 31/6
31/14 31/20 32/17
35/1 35/4 35/8
35/22 36/6 36/19
37/16 38/13 43/20
46/16 46/21 47/18
48/3 49/4 50/7
55/15 59/1 59/18
60/4 60/8 60/22
61/18 63/20 66/12
67/13 68/9 68/15
69/19 70/12 70/17
73/2 73/24 74/22
75/20 75/22 76/25
77/3 77/14 77/16
78/18 79/1 79/15
81/17 82/19 83/10
92/16 92/23 94/4
94/6 96/11 100/7

means [5]   98/11
98/25 99/2 99/4
100/25
media [5]   40/8
59/18 59/22 80/25
96/7
meet [6]   38/7 46/24
47/5 63/3 66/7 77/2
meets [1]   5/22
memory [1]   101/14
mention [3]   101/19
102/1 102/1
mentioned [8]   58/15
62/7 71/8 71/8
71/16 73/16 81/16
85/3
mentioning [1]
96/19
merits [2]   74/22
74/23
messed [1]   81/9
met [1]   50/5
Michael [3]   33/24
34/8 34/17
Michigan [5]   25/3
25/11 64/24 103/21
104/5
might [11]   6/13
6/14 10/5 11/23
20/11 42/20 50/10
57/4 76/13 80/6
101/17
miles [2]   66/16
66/19
millions [1]   58/18
mind [5]   19/8 42/23
65/25 68/16 92/20
minimal [1]   82/7
Minister [2]   36/2
53/5
minute [3]   66/24
74/12 105/13
minutes [4]   34/1
39/9 52/1 74/15
misattributions [1]
42/14
mischaracterization [1]
75/1
misconduct [1]
59/14
mislead [1]   46/17
misquotation [3]
75/1 77/20 77/21
misquotations [2]
42/13 74/21
misrepresentation [1]
84/9
missed [1]   96/18
missing [5]   40/16
40/18 40/23 74/20
75/13
misspent [1]   77/23
misstate [1]   81/25
misstated [1]   86/11
misstatement [3]
99/21 99/22 99/22
mistake [2]   5/16
28/12
misunderstood [2]
57/4 57/14

mitigation [1]
91/21
mix [1]   33/17
moment [3]   39/15
39/20 73/8
monetary [1]   37/9
money [13]   54/3
55/1 60/13 69/13
78/13 78/19 78/20
78/21 92/1 97/6
100/18 100/21
100/25
Montgomery [1]
54/13
months [3]   5/24
75/18 93/3
Moraa [10]   23/5
41/16 64/21 84/11
86/9 86/17 92/2
93/12 103/7 103/10
Moraa's [2]   86/14
103/13
more [37]   4/23 6/19
8/11 13/7 13/15
14/7 14/16 19/23
23/22 26/6 27/15
28/3 35/16 38/9
40/11 40/19 42/25
49/22 51/2 59/21
62/2 63/17 72/23
73/23 74/4 76/16
78/23 79/18 79/18
79/24 80/8 81/4
85/13 86/8 94/2
95/17 104/24
Moreover [1]   27/18
morning [10]   3/8
3/10 3/13 3/14 3/16
3/17 3/19 3/20 4/11
39/1
MOSS [1]   1/11
most [26]   7/23
12/23 16/18 19/1
20/17 21/5 21/11
23/2 25/5 26/2 26/7
28/23 33/14 33/22
40/14 46/12 56/19
56/19 78/18 80/15
81/2 83/7 85/18
91/12 91/25 94/9
motion [11]   1/10
3/20 3/23 4/4 11/2
29/23 33/10 55/17
57/18 57/22 81/11
motions [1]   23/16
motivate [1]   17/21
motivation [1]
72/11
Mounted [3]   87/13
87/15 95/21
move [8]   12/3 13/12
44/7 51/2 58/23
62/3 62/4 66/17
moving [2]   52/13
103/19
Mr. [31]   4/4 11/5
17/17 17/18 24/22
27/1 27/4 27/4
41/18 43/8 44/25
45/1 46/3 46/9

48/13 49/24 55/21
56/24 57/3 57/12
58/1 58/22 62/14
62/18 62/19 71/8
71/16 74/14 81/6
81/25 86/25
Mr. Baker [1]   17/17
Mr. Baker's [1]
17/18
Mr. Cowan [2]   62/14
62/18 62/19
Mr. Froese [1]
57/12
Mr. Harrison [3]
11/5 44/25 49/24
Mr. Jordan [3]
24/22 27/1 27/4
Mr. Kelly [1]   41/18
Mr. Kroetsch [3]
4/4 81/25 86/25
Mr. Rogers [3]   45/1
46/3 46/9
Mr. Rogers' [1]
81/6
Mr. Siegel [10]
43/8 48/13 55/21
56/24 57/3 58/1
58/22 71/8 71/16
74/14
Mr. Watson [1]   27/4
Ms. [25]   4/5 24/20
41/16 85/7 85/21
86/9 86/14 86/15
86/17 86/21 87/4
88/17 89/4 91/11
92/10 93/12 93/15
98/16 101/18 103/7
103/10 103/14
103/16 104/7 105/9
Ms. Moraa [6]   41/16
86/9 86/17 93/12
103/7 103/10
Ms. Moraa's [1]
86/14
Ms. Strom [2]   4/5
98/16
Ms. Strom's [1]
87/4
Ms. Wiszowaty [9]
24/20 85/7 85/21
86/21 88/17 89/4
93/15 103/14 105/9
Ms. Wiszowaty's [6]
86/15 91/11 92/10
101/18 103/16 104/7
much [17]   16/21
19/25 25/4 27/9
33/14 35/16 36/19
37/9 44/7 44/20
57/17 73/23 84/2
84/3 84/3 98/19
99/23
multiple [9]   4/23
27/10 27/21 36/23
66/13 75/4 79/16
79/16 82/12
Music [1]   74/1
must [7]   44/17 59/3
65/16 66/5 86/2
98/10 99/7

**M**

myself [2]   22/10
98/10

**N**

name [5]   24/17
62/25 64/9 86/11
89/17
named [1]   33/19
names [1]   69/12
narrow [2]   77/18
84/18
NATHAN [1]   1/22
3/14
national [5]   36/14
36/18 36/22 37/4
61/4
nationwide [1]
47/20
Nazi [1]   89/21
nearly [1]   90/13
necessarily [12]
12/23 50/15 50/24
63/14 84/23 85/8
89/12 89/13 89/15
90/8 96/4 100/25
necessary [2]   50/1
67/5
need [29]   17/1
26/20 31/25 32/2
34/15 39/7 39/8
42/4 42/16 46/8
46/9 48/17 48/21
48/25 48/25 51/9
52/5 60/4 60/5 69/1
76/4 76/19 79/15
82/4 97/4 97/10
99/23 101/23 105/13
needed [1]   22/13
needs [2]   11/7
51/22
negatively [1]
88/23
neglect [1]   84/9
negotiate [1]   35/5
negotiated [1]
100/22
networks [1]   97/2
NEUHARDT [2]   1/17
3/11
Nevada [1]   62/16
nevertheless [2]
49/19 71/12
new [13]   1/18 2/4
13/10 13/11 13/12
25/13 53/25 60/21
98/20 101/5 102/3
104/8 104/11
news [10]   27/19
27/24 60/22 60/23
61/10 61/21 88/8
88/10 88/12 92/17
newspapers [1]   7/23
next [4]   12/4 51/2
60/3 60/25
nexus [1]   90/13
nine [1]   21/15
nobody [2]   66/13
75/21

Nobody's [1]   72/12
non [26]   3/21 4/4
13/14 13/21 23/16
33/9 35/11 42/24
43/24 44/1 44/4
45/20 52/14 55/24
57/23 59/7 62/6
62/10 63/18 63/19
63/24 65/2 66/4
68/14 71/18 82/6
non-American [1]
71/18
non-parties [2]
35/11 62/10
non-party [6]   55/24
59/7 62/6 65/2 66/4
68/14
noncommercial [1]
72/4
none [5]   34/20
75/22 75/23 79/4
104/10
nonetheless [5]
16/10 18/7 31/5
78/24 87/16
nonpayment [1]   37/7
nor [1]   45/10
North [3]   18/2 25/3
66/21
Northern [2]   33/4
33/5
not the [1]   28/13
note [1]   100/5
notebook [1]   74/17
notice [34]   5/23
6/2 6/5 7/13 7/21
8/1 8/5 9/18 11/8
11/11 11/20 11/25
16/14 37/21 43/11
43/16 45/11 45/23
46/11 46/12 46/14
46/19 47/12 47/21
47/22 48/1 48/2
48/4 48/7 48/9
48/10 49/17 68/17
95/24
notices [1]   102/24
Nova [1]   23/18
novel [2]   6/10
46/25
November [3]   91/9
91/17 105/6
November 11th [3]
91/9 91/17 105/6
nuanced [2]   6/19
13/15
nullity [1]   43/17
number [9]   6/8 6/9
19/23 35/10 35/11
43/21 66/8 80/5
100/13
numbers [4]   33/21
54/20 69/10 80/18
numerous [1]   9/7
NW [3]   1/18 1/23
2/24
NY [2]   1/15 2/4

**O**

o'clock [1]   83/16

Obama [1]   73/25
objection [2]   50/24
81/23
objections [2]   7/18
30/23
obstacle [1]   5/23
obstacles [1]   67/18
obtain [1]   20/19
obtaining [1]   20/20
obvious [2]   8/16
87/11
obviously [12]   4/6
9/14 14/22 18/6
26/17 27/23 28/6
28/19 30/14 35/9
77/1 105/15
occasionally [1]
78/8
occur [5]   57/24
87/12 94/16 94/21
96/3
occurred [4]   91/16
92/15 92/17 105/4
occurrence [1]   46/6
occurs [2]   92/6
92/6
oddly [1]   28/15
odds [1]   22/23
of American [1]
63/6
off [4]   39/17 52/12
83/21 102/12
Official [2]   2/23
106/3
officials [1]   37/8
often [2]   29/2
51/12
old [2]   28/25 40/8
Olympics [1]   87/14
on-air [1]   102/6
once [1]   84/17
one [72]   5/24 6/9
6/23 9/16 12/19
13/6 13/7 17/12
18/23 19/1 19/15
19/19 22/5 23/11
23/11 23/11 23/18
24/7 24/7 25/18
26/5 26/15 26/16
26/18 26/20 26/25
29/23 31/23 32/19
33/8 33/11 33/19
33/19 33/22 33/23
34/2 34/3 35/21
37/11 37/12 39/21
40/19 44/20 45/18
48/9 50/11 50/12
51/7 54/16 55/18
56/9 56/11 56/12
56/13 62/3 62/15
63/14 64/10 64/10
64/25 73/6 80/11
81/5 82/15 88/12
88/17 88/25 91/3
91/25 99/19 101/17
104/19
ones [5]   10/12
20/17 21/10 23/6
70/14
ongoing [1]   97/21

online [6]   11/12
11/15 41/8 47/23
51/18 69/14
only [26]   5/22 6/1
6/1 7/22 16/2 37/16
38/19 40/17 41/4
41/9 41/19 44/3
44/18 58/5 65/4
65/17 73/12 74/10
81/5 85/24 86/9
86/13 91/3 93/7
95/16 96/1
Ontario [32]   4/23
5/5 5/7 5/22 6/7
7/19 8/9 8/24 10/10
10/11 10/15 10/24
11/12 20/24 21/15
23/11 26/13 28/23
31/16 34/19 38/8
43/10 43/18 45/23
46/3 46/13 46/15
49/14 56/3 68/10
69/13 81/10
Ontario's [1]   5/1
open [1]   53/16
opening [2]   53/20
53/25
operate [1]   53/15
operated [4]   14/24
26/12 28/5 53/10
operates [1]   30/15
operating [1]   55/13
operation [1]   54/2
operations [3]   15/2
64/22 97/21
opine [1]   50/22
opining [1]   70/23
opinions [1]   10/11
opportunity [3]
74/14 98/16 103/2
oppose [1]   29/5
opposed [1]   31/15
opposing [3]   39/3
55/17 82/3
opposition [3]
16/20 85/21 104/9
order [9]   4/8 4/25
9/11 29/3 29/18
58/4 74/12 75/9
105/13
ordinarily [1]   95/7
organization [4]
15/6 23/8 27/24
63/1
organizational [1]
16/20
organizations [3]
16/16 27/19 97/24
organize [1]   61/2
original [1]   38/2
others [4]   21/13
48/8 56/25 76/19
Otherwise [2]   4/1
13/4
out [31]   7/17 13/17
15/2 16/22 21/13
23/19 31/13 33/11
34/16 36/3 41/25
42/15 42/17 46/8
50/9 51/7 52/3

**O**

out... [14]   52/23
60/13 71/17 72/8
76/5 79/3 79/8
81/17 85/11 97/7
97/20 98/7 100/12
103/18
outcome [3]   48/23
49/23 73/19
outlines [1]   5/15
outside [3]   32/20
55/8 55/9
over [23]   18/4 18/4
18/4 18/5 18/5 18/6
26/21 28/22 30/18
35/19 37/7 37/16
39/19 42/1 45/14
59/18 65/25 71/11
71/24 79/16 79/23
80/4 103/10
overall [1]   30/9
overcome [1]   18/15
overstating [1]
77/6
overview [1]   42/5
overwhelming [4]
20/21 20/23 25/2
66/7
overwhelmingly [1]
23/14
owed [3]   5/2 100/18
100/21
own [5]   15/20 27/25
39/25 44/17 95/20
owned [2]   95/1 96/8
owners [1]   23/25

**P**

p.m [3]   83/21 83/22
105/17
page [2]   68/23
74/17
pale [1]   70/4
paper [2]   17/15
42/17
papers [5]   66/10
83/18 84/7 97/19
103/19
paperwork [2]   30/17
31/3
paragraph [3]   36/4
102/7 103/6
paraphrasing [1]
103/11
Parliament [2]
36/12 41/12
parliamentary [1]
36/10
part [18]   10/8
11/17 12/13 12/13
15/25 22/2 22/3
31/10 36/6 59/6
76/24 77/4 91/3
91/3 94/21 98/23
103/19 104/4
part of [2]   22/3
94/21
participant [1]
73/23

participate [1]
28/15
participated [2]
54/24 86/18
particular [6]   10/7
23/19 25/5 34/14
63/21 92/24
particularly [1]
5/12
parties [12]   12/21
32/18 35/10 35/11
43/13 46/18 50/21
62/10 67/21 67/25
70/7 84/20
parties' [2]   32/5
46/8
partisan [1]   36/1
partner [1]   73/18
partnered [3]   54/15
54/19 61/1
partnering [1]
54/11
partners [1]   53/2
partnership [1]
54/13
party [38]   8/20
10/20 13/7 21/7
25/15 26/20 30/25
30/25 31/2 31/25
35/9 37/13 44/24
45/11 45/14 46/7
52/25 55/24 55/24
56/22 56/23 57/5
57/6 57/19 59/7
62/6 63/18 63/19
63/22 63/25 65/2
66/4 67/16 67/22
67/24 68/14 79/1
82/3
pattern [1]   83/11
pause [2]   6/9 75/15
pay [1]   85/16
payment [6]   99/11
100/4 100/6 100/7
100/8 100/11
people [37]   15/11
17/24 26/20 27/6
27/14 27/16 28/3
28/7 31/17 34/16
38/2 40/19 40/20
40/23 42/20 55/25
58/5 58/9 58/10
62/21 65/3 66/5
68/12 69/11 72/24
75/11 76/1 76/3
78/19 79/1 79/21
79/25 82/25 83/2
83/7 90/24 96/25
per [1]   58/18
percent [1]   81/1
perception [1]
77/17
perfect [1]   94/11
perform [5]   87/15
88/9 88/17 103/20
104/5
performance [18]
10/21 46/6 84/23
85/15 86/1 87/6
88/3 88/25 96/4

99/5 99/11 99/24
100/17 100/25 101/4
101/8 101/12 102/2
performed [2]
103/25 104/2
perhaps [10]   42/21
52/16 58/4 59/1
64/18 67/3 77/6
88/20 93/3 101/20
period [2]   4/16
80/4
periods [1]   5/24
permit [1]   49/19
person [10]   82/23
86/20 90/10 90/12
90/20 90/25 91/11
91/25 96/16 103/12
person's [1]   90/11
personnel [3]   21/3
21/3 82/20
perspective [2]
67/15 76/9
persuasive [1]
50/16
phone [1]   100/13
phonetic [1]   69/6
pick [2]   52/12 60/2
picked [3]   61/21
96/14 96/23
picking [1]   97/1
picture [2]   69/3
69/14
pictures [1]   80/10
piece [2]   42/17
43/8
pile [1]   36/16
Pinball [3]   33/24
34/9 80/14
Piper [3]   4/17 5/9
65/3
place [16]   32/14
71/5 72/12 85/15
85/24 85/24 89/7
90/11 91/18 100/3
100/16 100/17
100/25 101/3 101/11
102/2
places [2]   55/4
72/3
plaintiff [33]   1/4
1/14 3/4 8/21 8/25
12/14 12/22 12/23
12/25 14/1 14/2
15/15 15/21 16/1
16/3 17/14 18/13
23/22 27/3 38/6
45/25 55/10 55/12
58/16 61/22 74/6
87/13 87/18 87/22
88/23 89/21 89/23
100/5
plaintiff's [4]   5/2
12/5 12/7 12/8
plaintiffs [1]
15/20 62/1 71/17
86/5
plan [1]   58/20
planning [2]   4/25
95/7
plaque [2]   69/2

69/3
plasma [1]   81/7
plausible [2]   68/14
69/9
player [1]   34/10
plead [3]   46/10
81/14 86/8
pleading [4]   8/22
10/22 11/2 46/18
pleadings [2]   9/2
46/8
please [2]   3/4 73/8
pled [1]   98/20
Pledge [1]   62/17
podcast [4]   47/22
47/23 51/17 72/2
point [33]   4/19
6/18 7/11 8/5 11/17
18/16 21/12 25/5
30/2 33/1 33/1 33/7
38/8 43/5 51/5
60/22 60/24 62/15
65/18 66/6 69/20
74/11 75/20 78/10
78/11 81/5 81/24
86/7 99/13 100/14
102/15 103/18 105/4
pointed [1]   52/23
pointing [1]   23/19
points [2]   31/21
80/8
Police [3]   87/13
87/15 95/21
policing [1]   82/9
policy [6]   3/24
36/25 37/9 75/4
75/7 79/15
political [8]   35/23
35/24 36/1 36/6
36/16 53/5 72/9
72/9
portion [3]   97/24
103/21 104/5
Portuguese [2]
70/16 71/14
posed [1]   83/25
position [4]   72/5
84/24 88/15 88/16
possibility [3]
19/19 20/9 89/11
possible [5]   16/21
19/15 31/9 70/23
75/16
possibly [1]   48/18
post [1]   105/13
postings [3]   7/24
34/3 81/1
posts [1]   40/8
potential [1]   96/18
potentially [5]
8/12 48/24 56/13
57/7 59/5
power [6]   43/18
44/6 45/21 49/14
49/18 76/22
practical [1]   77/1
practicality [1]
55/19
practice [6]   5/18
30/14 75/4 75/7

**P**

practice... [2] 79/16 83/12
precedent [8] 8/16 10/21 44/5 44/14 46/6 49/6 49/7 81/12
preceding [1] 32/13
preceding that [1] 32/13
precluded [1] 78/15
prefer [1] 83/19
preference [1] 31/8
prefers [1] 4/6
prejudicial [1] 62/1
preliminary [2] 26/5 78/2
premature [1] 66/4
premiered [1] 84/13
premised [1] 84/10
prepared [2] 39/2 84/7
present [1] 102/23
presented [1] 67/6
presumably [9] 21/21 27/14 61/14 61/14 68/25 71/20 76/9 76/14 78/12
presumption [5] 12/6 12/6 12/13 12/14 18/14
pretty [6] 10/13 19/22 27/1 29/16 79/14 85/25
primarily [1] 21/11
primary [5] 20/25 21/2 36/11 40/7 40/11
Prime [2] 36/2 53/5
principally [1] 96/14
principles [1] 11/6
prior [3] 59/21 65/25 86/24
private [8] 4/18 5/4 11/8 18/11 18/15 18/17 20/16 23/13
privy [1] 12/20
probably [14] 13/25 19/21 20/17 30/4 30/6 35/19 52/20 56/12 59/12 64/17 68/4 68/5 69/19 79/24
problem [8] 45/17 45/19 46/1 59/8 65/6 66/6 67/9 84/14
problems [2] 45/18 63/21
procedure [5] 8/24 28/16 45/24 46/4 46/14
proceeding [3] 28/25 29/3 30/11
proceedings [3] 36/10 105/17 106/5

process [19] 11/6 20/19 21/24 22/12 25/25 26/13 26/14 27/17 28/6 28/10 29/16 32/20 34/20 35/15 40/5 63/23 67/14 94/5 98/7
process works [1] 28/10
processes [1] 53/4
produce [1] 70/13
produced [1] 95/4
producer [2] 64/8 64/12
production [1] 95/10
program [9] 16/8 54/15 54/22 54/24 64/7 64/9 77/13 77/14 80/13
programming [5] 17/21 54/7 54/10 54/25 64/24
programs [2] 41/14 54/15
projects [2] 15/1 15/4
promise [8] 74/21 84/5 84/21 84/22 85/2 85/16 91/14 101/2
promised [2] 92/1 102/6
promises [1] 99/4
promising [1] 57/13
promissory [2] 84/9 100/5
promo [2] 21/13 104/23
promos [3] 91/8 91/23 104/20
promotion [1] 96/17
prompt [1] 50/2
prong [2] 93/22 98/12
prongs [1] 43/7
pronouncing [1] 24/17
proof [3] 41/3 41/5 58/25
properly [1] 8/17
property [2] 90/7 90/9
proposal [2] 45/18 45/18
protect [1] 98/2
prove [7] 42/2 72/13 76/25 79/15 80/17 80/18 83/11
provide [16] 5/7 6/6 43/24 47/12 47/21 48/1 48/2 48/4 48/7 57/9 86/9 86/14 87/10 87/14 98/15 103/2
provided [15] 5/9 5/19 7/13 43/16 44/22 44/24 44/25 46/11 46/12 48/9 48/10 49/18 57/12

65/24 68/20
provides [1] 41/13
providing [1] 92/2
province [2] 28/24 28/24
proving [1] 59/4
provision [7] 7/21 8/1 25/9 43/12 45/12 47/21 99/23
proxy [1] 12/10
public [17] 4/18 5/4 18/11 18/16 35/19 36/14 53/8 70/20 72/7 72/18 72/21 72/21 72/22 73/12 74/2 74/4 81/24
publication [3] 51/10 51/14 51/21
publications [5] 41/6 47/14 47/16 51/8 51/21
publicity [1] 19/19
publicly [1] 40/6
publish [1] 48/11
published [4] 6/20 41/8 92/23 94/8
publishing [3] 66/1 88/12 92/10
pull [1] 73/7
punchy [1] 102/15
punitive [1] 37/20
purely [1] 20/13
purportedly [1] 41/10
purposes [2] 16/4 53/20
pushing [1] 13/24
put [7] 5/8 5/15 14/12 41/21 69/7 84/11 85/20
putting [1] 91/15

**Q**

quantified [1] 69/18
quash [1] 31/1
quick [1] 29/16
quite [7] 30/3 45/6 73/3 102/5 102/7 102/9 105/15
Quito [1] 64/21
quote [3] 5/7 18/15 79/6
quotes [1] 103/11
quoting [1] 46/3

**R**

RACHEL [2] 2/2 3/17
radio [6] 7/23 47/17 47/18 51/18 71/24 74/1
raise [8] 8/9 8/25 9/1 12/2 30/23 44/17 45/25 103/4
raised [4] 8/17 36/9 45/9 57/22
raises [1] 26/6
raising [4] 4/14 8/21 8/23 54/3

ran [2] 76/10 78/14
RANDOLPH [1] 1/11
random [1] 102/13
rare [3] 19/22 44/10 49/10
rather [2] 15/22 71/2
ratings [2] 36/14 36/17
rationalize [1] 17/1
reach [2] 51/16 51/19
reached [1] 26/10
read [4] 8/14 19/8 44/5 69/5
reading [1] 5/12
ready [2] 51/1 83/23
real [3] 59/25 73/6 84/4
Realistically [1] 60/11
really [26] 4/21 10/2 10/24 13/23 16/18 18/9 18/9 22/10 24/6 26/2 27/1 28/5 31/12 36/1 37/23 55/14 58/12 60/23 67/25 68/1 74/18 97/14 97/16 98/17 99/13 101/2
realm [1] 81/19
reason [13] 4/21 12/8 12/13 12/14 13/1 20/11 28/2 28/7 29/18 55/18 70/9 77/16 86/16
reasonable [1] 12/10
reasoning [1] 82/11
reasons [8] 4/23 12/18 14/6 14/10 19/15 20/13 55/18 87/25
rebroadcast [3] 60/3 61/21 96/15
rebuttal [1] 74/15
receive [1] 54/21
received [1] 29/14
receiving [2] 29/14 29/17
recent [1] 23/6
recently [1] 32/7
reception [1] 19/18
Recess [1] 52/9
recognition [2] 54/25 97/10
recognizability [1] 60/14
recognized [1] 60/2
reconvene [1] 52/7
record [6] 3/5 18/5 52/10 83/21 83/22 106/5
records [1] 41/9
recover [1] 95/20
recused [1] 72/16
red [2] 6/3 6/5

**R**

redo [2]   60/14
60/17
reduced [2]   14/4
14/5
Reed [4]   33/18
56/10 62/12 68/12
reference [1]   44/20
referenced [2]
56/14 56/16
referring [2]   57/8
57/15
reflected [1]   80/13
reflects [1]   23/13
refute [2]   26/23
27/12
regard [1]   32/12
regarding [1]   91/12
regardless [1]   78/1
regulatory [1]   11/9
rejected [1]   71/2
related [4]   15/11
20/18 21/6 37/13
relates [1]   74/19
relating [1]   77/9
relations [1]   95/23
relationship [1]
38/6
relevance [2]   15/9
65/13
relevant [3]   16/23
18/8 70/7
relied [1]   63/15
relief [3]   43/24
61/13 72/16
relieve [3]   43/18
44/6 45/21
rely [3]   69/8 73/18
83/18
remedy [14]   5/7 5/9
5/19 5/21 6/6 6/7
6/12 6/17 6/21 6/25
15/24 51/7 51/10
51/23
remember [4]   7/21
9/11 62/25 80/16
removed [1]   81/18
render [1]   42/18
rented [1]   61/4
repeatedly [2]
41/12 43/17
repercussions [1]
59/14
replaced [1]   41/25
replete [3]   16/20
18/4 18/5
reply [5]   68/19
80/9 80/10 81/6
104/10
report [8]   26/5
27/19 76/6 77/21
77/22 78/2 92/17
103/15
reported [2]   27/21
59/20
reporter [10]   2/22
2/23 5/12 39/7
41/18 51/25 64/11
91/1 103/23 106/3

reporters [3]   55/22
64/10 66/13
reporting [11]
27/20 27/22 28/2
53/8 59/19 63/15
66/3 66/19 69/9
69/20 72/11
reports [3]   25/18
34/5 63/15
represent [1]   97/21
representative [1]
56/12
Republic [2]   37/5
89/17
republish [1]   60/23
republished [3]
60/15 60/19 61/18
reputation [1]   98/2
require [4]   57/7
78/4 84/23 87/6
required [1]   6/6
requirement [7]   6/2
9/18 11/11 11/20
12/1 45/23 86/1
requirements [3]
43/23 46/19 49/10
requires [3]   99/5
99/24 100/6
reserves [1]   98/3
reside [3]   16/3
16/4 78/25
residence [1]
101/19
resides [1]   14/2
resolve [3]   48/25
72/14 72/15
resources [1]   66/2
respect [18]   9/18
13/13 32/23 46/19
63/21 65/22 67/25
70/20 80/19 81/25
82/18 83/15 83/24
87/5 88/14 94/11
98/7 102/18
respectfully [3]
49/25 72/18 73/3
respectively [1]
44/24
respond [3]   4/5
74/23 98/16
response [2]   6/1
6/1
responsible [2]
4/14 23/2
restricted [1]   77/4
result [5]   53/5
53/23 58/19 95/3
95/6
results [1]   95/9
return [4]   84/12
89/20 89/22 90/9
returned [2]   17/25
18/2
returning [1]   90/7
Reyno [1]   4/17
right [136]
rights [1]   98/3
risk [2]   47/1 60/14
road [1]   62/1
roadkill [1]   35/24

Robin [6]   23/5
64/23 83/4 84/12
85/7 91/2
rocket [1]   78/21
RODNEY [2]   1/20 3/9
rogatory [10]   28/15
28/20 29/14 29/17
30/23 31/14 67/4
67/14 68/5 68/11
Rogers [3]   45/1
46/3 46/9
Rogers' [1]   81/6
role [1]   18/1
roles [1]   21/11
Romano [1]   69/6
Room [1]   2/24
roughly [2]   4/16
75/10
roundtrip [1]   66/19
Royal [3]   87/12
87/15 95/21
Royalton [1]   1/21
rule [10]   13/25
32/1 32/4 32/8
32/13 44/16 44/16
46/4 51/14 51/21
rule's [1]   32/10
rules [7]   8/24
43/25 44/10 45/24
46/4 46/13 102/17
run [5]   15/6 53/16
60/13 60/24 83/14
runs [2]   53/15
64/23

**S**

sake [2]   5/11 41/14
salvage [1]   91/21
same [13]   5/17 15/6
16/17 17/23 22/7
22/14 22/24 25/21
30/24 46/15 48/12
75/5 82/25
sample [1]   41/13
San [1]   62/19
satisfactory [1]
27/16
satisfy [2]   49/8
81/12
Saudi [2]   100/20
100/21
saw [1]   44/20
saying [23]   9/25
15/21 17/7 17/23
24/4 36/20 42/1
42/14 45/20 55/11
57/5 58/5 65/6
65/16 77/19 78/15
79/4 80/20 86/25
92/19 93/1 99/9
104/13
scale [5]   14/13
31/21 31/22 31/23
33/14
scandal [8]   19/16
35/23 36/6 36/16
57/17 72/9 72/9
72/22
Schiller [5]   1/14
1/17 3/6 3/11 97/20

school [4]   40/20
54/22 69/12 97/23
schoolhouse [3]
34/13 40/7 75/5
schoolhouses [2]
40/11 40/12
schools [27]   34/7
36/8 36/11 40/1
40/16 40/19 40/25
41/4 41/5 41/24
53/2 53/10 53/15
53/20 53/22 54/2
54/5 54/12 54/12
54/13 54/14 54/14
54/18 55/2 73/17
78/21 79/17
science [1]   78/22
scope [1]   58/11
Scotia [1]   23/18
Scott [4]   17/25
23/4 64/20 83/6
scoured [1]   40/6
screenshot [1]   34/2
searched [1]   40/8
Seattle [1]   23/17
second [8]   6/10
10/8 13/9 14/13
54/5 75/15 92/8
92/8
secondly [1]   25/2
seconds [1]   34/1
seek [2]   56/21
70/13
seeking [1]   65/21
seem [2]   66/25
104/13
seems [4]   79/8 81/7
84/20 92/20
seize [1]   60/7
selection [1]   72/16
self [1]   77/19
self-serving [1]
77/19
sell [1]   95/8
selling [1]   95/7
sending [2]   68/5
68/10
sense [15]   8/17
10/3 10/4 11/18
11/19 14/5 35/6
40/23 49/5 56/2
66/22 66/25 71/15
72/5 74/3
sensitive [1]   30/19
sent [2]   37/21 91/2
separate [6]   6/24
44/2 44/8 44/15
51/11 51/11
September [1]   53/7
serious [3]   47/4
47/25 48/3
seriously [1]   60/10
service [2]   54/15
54/24
serving [1]   77/19
set [2]   46/8 61/15
sets [3]   20/25 21/2
85/2
seven [3]   13/11
23/10 75/24

**S**

several [3]   35/1 37/18 86/13
shall [2]   49/16 49/17
shape [1]   88/13
shell [1]   16/20
ship [1]   87/24
shipped [1]   95/5
ships [3]   87/14 87/20 87/21
short [4]   5/23 83/15 86/7 98/1
show [8]   17/9 17/10 41/9 46/24 51/18 51/18 51/19 77/1
showed [3]   39/25 63/5 80/10
showing [4]   17/13 54/23 73/22 85/1
shown [1]   75/4
shows [4]   27/9 27/10 54/18 68/23
shut [2]   53/3 53/6
shutting [2]   53/4 53/6
shuttle [1]   22/16
side [6]   7/7 22/25 28/16 29/14 38/23 58/21
side's [1]   18/25
sides [4]   10/23 12/18 22/20 42/9
SIEGEL [14]   1/22 3/15 34/1 43/8 48/13 55/21 56/24 57/3 58/1 58/22 68/19 71/8 71/16 74/14
significance [2]   36/18 37/14
significant [15]   22/23 33/21 35/10 35/11 36/24 36/25 36/25 47/16 50/1 66/6 74/7 79/7 79/9 79/10 97/24
significantly [2]   52/23 86/24
similar [4]   10/13 23/24 30/15 103/13
similarities [1]   23/21
Similarly [1]   24/7
Simon [1]   71/2
simple [2]   67/12 67/21
simplified [2]   32/15 32/16
simply [6]   11/4 46/17 67/6 75/2 78/11 78/19
single [13]   6/15 8/13 16/17 26/20 30/11 45/8 45/10 51/10 51/14 51/21 59/20 80/19 83/12
Sirius [2]   47/19 71/24

Sironsi [1]   69/5
sit [2]   30/6 49/3
sitting [1]   30/3
situation [4]   16/13 91/22 94/14 96/22
situations [1]   36/23
six [10]   5/24 7/16 16/16 23/3 27/6 41/6 43/11 49/18 68/4 75/18
six-week [1]   43/11
Slander [4]   43/12 43/15 49/15 49/17
SLAPP [1]   20/9
slide [5]   40/2 41/6 46/5 73/9 73/21
slides [3]   54/17 54/18 73/7
slightest [1]   50/12
slow [2]   5/15 103/22
slower [1]   5/13
small [1]   8/2
smaller [1]   59/9
smear [1]   36/1
SMOLLA [2]   1/20 3/9
social [2]   40/8 80/25
solely [1]   16/17
somebody [6]   50/20 61/20 75/16 90/7 90/10 91/2
somehow [1]   102/4
someone [8]   13/8 30/2 50/21 96/15 99/10 100/8 100/12 100/20
somewhat [4]   6/10 87/9 90/2 90/5
somewhere [3]   14/7 14/17 92/23
soon [1]   52/7
sorry [10]   5/11 20/2 78/9 80/3 86/11 99/15 99/17 99/17 103/22 103/24
sort [22]   4/8 11/24 16/20 17/1 17/14 25/6 25/15 26/11 28/25 35/25 36/4 36/24 37/14 40/5 42/5 51/11 54/7 58/11 79/3 83/11 84/23 99/11
sorts [2]   49/6 49/8
sounds [2]   90/2 90/5
source [2]   53/24 80/13
sources [13]   27/24 28/1 30/18 68/17 68/18 68/24 68/25 69/7 76/17 76/19 77/12 77/13 80/21
south [2]   1/21 68/11
sovereign [9]   25/8 83/15 83/24 84/15 84/17 89/19 89/25

99/6 102/17
speak [3]   38/13 70/7 78/8
speaking [4]   38/1 38/12 70/9 73/25
speaks [1]   73/7
special [1]   61/20
specific [4]   11/22 34/7 34/8 75/3
specifically [5]   10/19 18/12 34/7 37/19 82/7
specified [3]   85/13 101/11 102/9
specify [2]   10/21 85/17
speculate [4]   19/8 19/9 19/9 59/2
speculation [1]   20/14
speculative [1]   61/25
speech [1]   61/3
spent [1]   65/25
split [2]   24/1 50/21
spoke [1]   69/8
sponsorship [1]   97/25
sponte [6]   8/10 11/25 44/17 45/9 81/15 81/17
spread [1]   33/11
spreadsheets [4]   40/9 75/2 75/3 75/10
Square [1]   74/1
St [1]   69/12
stage [1]   59/9
stale [2]   60/22 61/10
standalone [1]   61/15
standard [5]   52/24 55/16 58/25 99/3 99/5
standards [1]   29/6
start [11]   3/23 4/3 12/5 18/18 21/6 51/3 52/15 74/16 77/8 78/15 103/6
start with [1]   18/18
started [2]   53/6 53/8
starting [3]   3/4 21/9 77/10
starts [1]   97/20
state [4]   29/2 54/20 95/1 96/8
state-owned [2]   95/1 96/8
stated [1]   91/7
statement [5]   7/18 42/2 46/11 46/13 87/7
statements [5]   6/20 6/21 6/23 16/7 16/21
states [95]   1/1

1/11 6/13 7/17 15/9 15/16 16/4 21/23 22/6 24/11 30/15 30/16 32/24 33/18 47/19 48/6 54/5 54/19 55/6 56/11 59/5 59/8 59/15 59/16 60/1 60/6 62/9 62/12 62/12 65/10 65/18 67/3 71/5 71/13 71/22 72/25 73/6 73/16 73/17 82/7 84/24 85/3 86/24 87/1 87/7 87/12 87/16 87/19 87/21 88/2 88/3 88/22 89/1 89/2 89/3 89/5 89/23 89/24 90/7 90/9 90/11 90/15 91/4 92/13 92/18 93/6 93/24 94/1 94/6 94/16 94/17 94/20 95/8 95/9 95/18 95/23 96/4 96/5 96/17 96/18 96/24 97/9 97/11 97/15 97/17 97/22 97/24 98/1 98/2 99/8 99/10 99/18 101/19 103/17 105/10
statute [3]   8/12 9/9 11/19
statutes [2]   51/13 67/20
statutory [1]   36/21
stays [1]   29/19
step [1]   52/6
stepping [2]   39/14 39/20
steps [2]   93/11 94/5
still [20]   6/17 21/16 21/19 21/20 22/21 23/3 25/22 29/1 31/23 32/25 44/8 53/10 53/19 54/1 54/3 55/13 63/23 75/25 79/10 82/25
stir [1]   61/9
stirring [1]   61/6
stop [1]   48/10
stopped [1]   53/25
story [22]   34/5 60/3 61/6 66/19 76/10 78/14 88/22 90/23 91/10 92/10 92/11 92/12 92/22 92/24 93/5 93/5 93/17 93/19 94/8 103/9 104/20 105/1
straight [1]   13/17
strategic [4]   12/18 14/6 14/10 15/21
strategy [2]   52/17 59/2
Street [3]   1/15 1/20 1/23

**S**

strike [3]   6/10
70/21 78/17
strikes [2]   15/15
61/24
striking [1]   10/17
STROM [4]   2/2 3/18
4/5 98/16
Strom's [1]   87/4
strong [3]   18/14
89/15 90/13
stronger [3]   36/19
90/3 90/5
strongly [3]   35/21
68/15 72/19
structure [1]   16/22
students [1]   54/21
Styron [2]   62/24
68/13
sua [6]   8/9 11/24
44/17 45/9 81/15
81/17
subject [16]   3/22
11/23 25/24 26/13
26/14 27/17 28/6
32/19 34/20 35/14
43/25 51/2 55/3
81/16 82/3 91/12
submit [4]   38/6
51/20 72/18 73/3
submitted [3]   36/11
41/11 66/13
subpoena [5]   31/1
31/2 32/3 33/2
76/22
subpoenas [1]   32/10
subsequent [1]   85/4
subsequently [1]
10/24
subset [1]   8/2
substance [1]   27/8
substantial [4]
15/9 78/5 80/16
82/10
substantially [2]
42/18 75/6
substantive [2]
43/3 56/16
suddenly [1]   72/4
sue [5]   37/16 48/5
52/19 55/11 96/17
sued [8]   6/14 52/25
53/1 55/12 59/23
60/21 61/22 102/19
sued in [1]   60/21
suffer [1]   59/14
suffering [1]   6/14
suffice [3]   85/10
85/10 85/25
sufficient [4]   30/4
51/6 99/12 100/24
suggest [2]   31/21
37/15
suggesting [3]   77/5
77/6 77/7
suing [3]   37/6 48/6
102/18
suit [3]   25/11
25/13 84/16

Suite [1]   1/23
suits [1]   49/9
summary [1]   29/21
summer [2]   60/3
61/1
super [1]   78/18
support [2]   27/9
27/22
supporting [1]
96/12
suppose [3]   51/5
52/19 70/12
supposed [2]   16/11
91/4
supposedly [1]   27/4
Supreme [7]   4/17
5/8 10/15 10/16
10/18 43/14 98/25
sure [19]   8/16 9/21
13/24 14/14 18/25
19/10 19/14 23/6
25/12 26/22 38/17
41/1 55/14 79/7
79/14 84/20 85/10
96/1 103/10
surprise [1]   84/4
surprised [1]   61/5
surprisingly [1]
71/14
surreply [1]   103/2
suspect [1]   78/23
Swahili [1]   70/17
Swain [1]   64/11
Sweden [3]   95/5
95/6 95/8
system [3]   20/2
31/24 32/6

**T**

tables [2]   52/6
52/6
talk [11]   7/24
37/11 65/11 76/13
80/25 86/19 91/14
93/16 93/17 100/16
105/8
talked [4]   33/16
77/13 77/16 91/25
talking [17]   3/25
8/2 15/14 35/2
39/20 54/8 56/4
56/24 64/4 65/17
76/1 78/17 79/20
80/8 92/5 100/14
101/6
talks [2]   76/5
85/14
tantamount [1]   65/6
Taylor [1]   56/17
teachers [2]   54/20
97/23
team [4]   17/20
37/17 69/21 70/3
teasers [1]   21/14
technical [1]   11/22
technically [1]
76/25
television [2]   7/22
7/22
telling [3]   27/1

50/13 58/9
tells [1]   98/11
tempted [1]   84/6
tens [1]   58/18
term [1]   89/9
terms [9]   25/1 30/9
41/3 52/3 62/5 62/6
72/7 79/16 82/19
terrible [1]   29/15
terribly [2]   22/11
22/14
terrific [1]   65/18
test [20]   5/6 5/19
5/22 14/16 14/17
16/11 20/10 22/3
31/19 38/7 43/8
43/9 52/15 73/3
73/5 74/3 95/13
95/14 96/1 98/12
tested [1]   47/1
testify [2]   33/6
38/2
testifying [1]   28/8
testimony [5]   25/20
29/8 31/8 67/7
70/10
Thanks [1]   86/4
that the [1]   29/24
the United [1]
32/23
theory [14]   19/2
35/22 35/24 36/13
37/24 58/10 71/1
92/21 93/3 94/22
98/16 98/18 98/20
102/3
therefore [5]   13/11
37/22 38/9 86/2
89/24
thinking [7]   18/25
19/2 50/25 62/6
92/7 92/14 104/12
third [16]   30/25
30/25 31/2 31/25
56/22 56/23 57/5
57/6 57/19 63/18
63/19 63/22 67/25
88/1 93/22 104/21
this mistake [1]
28/12
though [11]   6/18
14/6 17/4 23/21
30/24 61/12 65/24
75/16 88/3 89/21
92/1
thought [8]   4/3 4/9
10/2 32/22 65/9
81/20 104/14 104/16
thousand [2]   66/16
95/4
thousands [2]   17/21
83/9
three [14]   4/24
5/24 7/9 20/13
20/25 21/2 21/5
22/22 43/6 55/21
55/23 81/6 86/2
105/6
throw [1]   85/11
tied [1]   35/23

times [4]   41/22
43/21 74/1 86/13
today [7]   41/17
47/22 64/21 64/22
75/17 77/8 84/4
today's [1]   22/24
together [3]   6/23
42/9 91/15
told [12]   4/2 27/22
32/22 36/9 40/19
40/20 63/5 65/9
78/20 97/9 104/14
104/16
tomorrow [1]   91/19
tons [1]   73/17
took [5]   36/4 36/5
69/2 71/4 91/18
tool [1]   19/24
top [1]   5/15
topic [1]   102/12
Toronto [14]   22/6
22/10 25/4 26/11
27/7 31/15 34/10
35/15 35/17 37/25
64/2 66/16 85/6
90/16
tort [4]   92/5 92/6
92/20 92/22
totality [2]   25/1
38/5
touched [1]   82/24
touchstone [1]
31/19
towards [3]   4/19
18/16 38/8
traditional [1]
63/24
trail [1]   78/13
transcript [3]   1/10
54/23 106/4
transcripts [1]
30/5
transfer [2]   33/10
55/16
transferred [3]   9/8
24/4 32/4
translate [4]   70/6
70/14 70/15 70/17
translated [1]
38/19
travel [3]   22/16
87/23 90/15
traveled [1]   66/18
treatise [1]   46/9
treble [1]   6/13
Tremaine [3]   1/23
2/2 3/18
trial [15]   4/19
10/14 18/16 19/20
22/13 22/17 22/22
25/23 29/20 29/20
29/22 29/24 59/9
67/3 69/1
tried [4]   37/14
46/21 66/17 71/3
tries [1]   11/6
Trudeau [4]   36/2
57/17 72/14 72/15
true [12]   22/8
22/25 30/24 31/4

**T**

true... **[8]**   32/23
32/25 40/21 42/18
75/6 80/17 80/18
106/4
truly **[1]**   32/18
truth **[6]**   76/14
76/24 77/7 77/25
78/11 80/16
try **[8]**   7/25 16/19
26/9 27/23 61/9
76/4 76/19 77/1
trying **[12]**   8/7
35/6 62/25 77/18
79/3 83/11 91/21
92/4 92/7 93/9
95/11 95/20
trying to **[1]**   95/11
Tunai **[1]**   34/4
turf **[1]**   59/3
turn **[6]**   15/13 40/2
42/13 42/24 43/11
74/17
turning **[1]**   103/10
turning over **[1]**
103/10
TV **[2]**   51/18 51/19
tweets **[3]**   7/25
11/12 11/16
twice **[1]**   84/5
two **[30]**   3/22 4/12
6/8 19/23 20/17
22/21 24/2 24/9
25/5 31/23 37/12
37/18 43/6 50/20
51/7 54/7 73/1
79/12 79/14 79/18
79/18 83/25 84/8
87/19 88/16 88/24
96/21 104/15 104/16
104/20
twofold **[1]**   9/16
type **[6]**   9/4 44/11
44/15 44/16 61/25
78/16
types **[2]**   49/10
54/7
typically **[6]**   9/12
12/14 12/15 12/22
51/15 90/11

**U**

U.s **[59]**   2/23 12/7
15/5 15/18 15/25
16/2 20/6 23/12
23/20 23/25 29/17
44/4 44/7 44/10
44/18 45/5 49/5
49/9 52/25 53/23
54/1 54/9 54/11
54/11 58/18 58/19
63/7 63/7 63/10
63/11 70/22 72/21
85/9 86/2 87/1
87/22 88/18 95/6
96/25 99/1 99/5
99/24 100/6 100/6
100/8 100/9 100/9
100/10 100/17

100/18 100/18
100/23 100/23 101/1
101/9 102/3 102/9
103/25 104/6
U.S. **[3]**   24/1 24/24
24/25
U.S.-based **[2]**
24/24 24/25
U.S.-Canadian **[1]**
24/1
ultimate **[1]**   25/15
ultimately **[6]**
15/11 16/10 24/12
29/22 31/13 93/6
unclear **[1]**   93/10
under **[20]**   8/4
11/12 16/12 25/10
32/18 43/12 45/23
46/13 49/15 51/21
52/14 58/8 65/3
71/10 87/17 93/3
94/22 97/12 99/3
101/1
underlying **[1]**   77/3
understood **[3]**
50/17 57/7 89/8
undertaken **[1]**   5/25
undertaking **[2]**
9/10 92/9
undisputed **[2]**
49/15 86/23
Unfortunately **[1]**
53/4
UNITED **[94]**   1/1
1/11 6/13 15/9
15/16 16/4 21/23
22/6 24/11 30/15
30/16 32/23 33/18
47/19 48/6 54/5
54/18 55/6 56/10
59/5 59/8 59/15
59/16 60/1 60/6
62/9 62/12 62/12
65/10 65/18 67/2
71/5 71/13 71/22
72/24 73/6 73/16
73/17 82/7 84/24
85/3 86/23 87/1
87/7 87/12 87/16
87/19 87/21 88/2
88/3 88/22 89/1
89/2 89/3 89/5
89/23 89/24 90/7
90/8 90/11 90/15
91/4 92/12 92/17
93/6 93/24 94/1
94/6 94/16 94/17
94/20 95/7 95/9
95/18 95/23 96/4
96/5 96/17 96/18
96/24 97/9 97/11
97/15 97/17 97/22
97/24 98/1 98/2
99/8 99/10 99/17
101/19 103/17 105/9
university **[1]**   69/4
unless **[2]**   49/17
84/6
unlikely **[1]**   30/6
unsatisfactory **[1]**

5/21
Unstoppable **[3]**
56/13 62/23 68/12
unwilling **[2]**   20/19
35/14
up **[29]**   5/13 12/20
33/25 39/16 45/6
45/20 51/12 52/12
59/18 59/22 60/3
61/6 61/9 61/15
61/21 68/6 69/10
72/1 73/7 74/12
80/19 81/9 84/11
96/14 96/23 97/1
98/23 100/15 105/14
upon **[5]**   9/13 10/7
10/20 12/2 45/24
USA **[5]**   85/13 85/24
100/15 101/11 102/2
use **[5]**   19/24 52/6
87/14 87/23 91/13
used **[5]**   26/11
35/25 39/18 80/1
80/2
usually **[3]**   5/14
10/14 12/20

**V**

vain **[1]**   46/22
Vancouver **[2]**   23/18
87/14
variety **[2]**   10/5
55/2
various **[3]**   5/3
21/11 25/17
vast **[9]**   7/7 11/20
35/13 35/13 47/7
47/10 47/13 65/1
66/3
vastly **[2]**   66/22
70/4
vendors **[3]**   56/22
56/23 57/16
venue **[3]**   12/17
25/7 25/9
version **[1]**   7/15
versions **[1]**   37/18
versus **[8]**   30/2
30/5 45/5 51/17
51/18 51/18 51/18
90/9
victim **[2]**   35/25
71/4
Victor **[3]**   23/5
64/18 83/6
video **[10]**   29/11
30/2 30/5 67/6
67/11 90/19 90/22
90/22 90/23 91/1
view **[8]**   19/5 26/6
57/18 58/11 66/6
69/20 81/21 92/16
viewing **[1]**   30/2
views **[1]**   58/13
Viking **[1]**   87/20
villages **[1]**   40/9
virtual **[1]**   75/22
virtually **[3]**   13/5
13/8 59/19
virtue **[1]**   46/10

voice **[1]**   42/1
voice-over **[1]**   42/1
VT **[1]**   1/21

**W**

wait **[2]**   13/9 14/13
waiting **[1]**   100/8
waivable **[5]**   9/19
43/12 44/4 45/20
48/20
waive **[4]**   5/25 11/3
45/11 45/14
waived **[2]**   6/3 8/8
waiver **[1]**   9/13
waiving **[1]**   9/9
walking **[1]**   69/3
wants **[5]**   9/1 19/10
30/22 33/2 55/15
Washington **[6]**   1/5
1/18 1/24 2/25
54/12 66/11
watchdog **[1]**   63/1
watched **[1]**   90/22
water **[1]**   69/1
waters **[1]**   87/22
Watson **[6]**   27/4
28/4 33/19 56/9
62/10 68/11
way **[21]**   10/3 11/4
12/1 14/15 20/10
22/14 22/19 22/20
26/12 28/4 28/25
30/16 31/5 31/23
35/19 39/16 42/2
43/14 62/1 87/24
96/8
ways **[6]**   10/5 14/16
17/13 37/16 68/9
88/16
WE's **[1]**   77/20
wear **[2]**   3/25 4/1
wearing **[1]**   39/18
website **[5]**   7/24
17/19 17/19 17/25
34/2
websites **[1]**   40/8
week **[2]**   43/11
43/21
weeks **[5]**   5/25 7/16
16/16 49/18 93/8
weigh **[2]**   68/15
72/18
Welcome **[1]**   83/23
well-prepared **[1]**
84/7
Weltover **[2]**   99/1
101/7
were used **[1]**   80/1
weren't **[2]**   98/17
105/8
what's **[8]**   10/17
17/5 27/15 69/10
74/20 75/13 90/4
98/4
whatsoever **[1]**
71/11
where's **[1]**   62/18
whereas **[1]**   6/14
whichever **[1]**   83/19
white **[2]**   16/22

**W**

**white... [1]**   61/5
**whitewashed [1]**
  17/16
**who's [8]**   3/25 15/8
  26/21 31/25 53/13
  56/10 64/20 75/16
**whole [6]**   6/22
  35/22 36/5 75/20
  77/14 79/8
**whose [1]**   96/16
**widget [2]**   97/8
  97/11
**willing [4]**   20/20
  22/2 35/16 67/23
**win [2]**   50/9 50/15
**window [1]**   87/11
**Wiszowaty [16]**   23/5
  24/15 24/18 24/19
  24/20 64/23 83/5
  84/12 85/7 85/21
  86/21 88/17 89/4
  93/15 103/14 105/9
**Wiszowaty's [6]**
  86/15 91/11 92/10
  101/18 103/16 104/7
**within [5]**   7/16
  38/23 41/12 44/14
  49/18
**without [5]**   44/6
  45/22 101/6 103/15
  104/6
**witness [20]**   22/15
  28/20 28/20 28/22
  29/5 30/6 30/22
  30/22 30/25 30/25
  31/2 31/24 32/17
  33/2 33/3 33/6
  50/11 63/4 69/14
  69/15
**witness-by-witness [1]**
  28/20
**witnesses [87]**
  13/11 20/18 20/19
  20/21 20/22 20/25
  21/2 21/6 21/22
  21/24 22/2 22/15
  24/3 24/10 24/23
  25/1 25/5 25/16
  26/23 30/19 30/20
  31/11 32/24 33/11
  33/21 34/12 35/10
  35/13 38/11 38/12
  42/4 42/10 48/22
  50/10 50/18 50/20
  55/20 55/24 55/25
  56/1 56/1 56/5 56/6
  57/25 59/6 59/7
  62/5 62/6 62/8 63/6
  63/8 63/10 63/11
  63/18 63/19 63/22
  63/25 63/25 64/2
  64/4 64/15 64/16
  64/18 64/19 65/2
  65/15 66/4 66/8
  67/2 67/16 67/22
  67/24 68/14 68/17
  69/9 69/11 70/8
  74/19 76/14 77/17

79/11 79/12 79/12
  79/18 79/21 82/16
  83/10
**word [8]**   35/25 64/1
  89/15 93/21 93/21
  93/22 94/3 95/12
**worded [2]**   43/15
  51/17
**words [3]**   9/5 9/12
  21/21
**work [14]**   12/1
  21/16 21/18 21/19
  21/20 41/10 48/11
  57/1 57/16 68/7
  78/12 79/1 93/21
  94/3
**worked [3]**   26/21
  32/14 79/21
**working [4]**   75/12
  75/16 75/17 75/21
**workings [1]**   26/8
**works [4]**   28/10
  29/2 31/23 70/18
**world [4]**   22/24
  52/24 96/6 96/15
**worry [2]**   21/23
  22/12
**worth [7]**   13/24
  23/19 39/14 39/19
  46/2 50/25 62/6
**worthless [1]**   60/1
**Wright [3]**   1/23 2/2
  3/18
**writing [1]**   7/18
**written [1]**   42/21
**wrong [3]**   6/4 8/15
  51/12
**wrongdoing [1]**
  83/12
**wrongs [2]**   51/16
  51/22
**wrote [3]**   27/14
  69/11 86/25

**Y**

**year [3]**   58/18
  65/25 75/19
**years [28]**   8/11
  10/19 14/24 14/24
  14/25 22/22 26/22
  32/9 32/12 32/13
  39/19 67/12 68/2
  68/4 68/5 75/24
  75/24 75/25 76/20
  79/16 80/4 83/1
  83/4 83/5 83/6 83/6
  83/7 93/4
**York [7]**   1/18 2/4
  13/10 13/11 13/12
  25/13 60/21
**young [1]**   17/24
**youth [2]**   17/22
  17/23
**YouTube [4]**   72/2
  96/16 96/19 97/1

**Z**

**Zadon [2]**   85/14
  100/19
**zero [1]**   31/21