# Exhibit D

COURT OF APPEAL FOR ONTARIO

CITATION: Park Lawn Corporation v. Kahu Capital Partners Ltd., 2023 ONCA
129
DATE: 20230228
DOCKET: C70870

2023 ONCA 129 (CanLII)

Pepall, Trotter and Thorburn JJ.A.

BETWEEN

Park Lawn Corporation

Plaintiff

and

Kahu Capital Partners Ltd., Benedict Cheng and Alexander Zivic

Defendant

AND BETWEEN

Kahu Capital Partners Ltd.

Plaintiff by Counterclaim (Respondent)

and

Park Lawn Corporation and J. Bradley Green

Defendants by Counterclaim (Appellants)

Robert W. Staley, Nathan J. Shaheen and Andrew N. Sahai, for the appellants

Joseph Groia and Bethanie Pascutto, for the respondent

Heard: November 1, 2022

On appeal from the order of Justice Paul M. Perell of the Superior Court of Justice, dated June 3, 2022, with reasons reported at 2022 ONSC 3341, 162 O.R. (3d) 7.

Page: 2

**Pepall J.A.:**

**Introduction**

[1]     This is yet another anti-SLAPP appeal. In 2015, the *Protection of Public Participation Act, 2015*, S.O. 2015, c. 23, amended the *Courts of Justice Act*, R.S.O. 1990, c. C.43 ("*CJA*"), by introducing s. 137.1, entitled: "Prevention of Proceedings that Limit Freedom of Expression on Matters of Public Interest (Gag Proceedings)". As its title suggests, the provision was designed to discourage the use of strategic litigation to unduly limit expression on matters of public interest; it was to strike a balance to ensure that abusive claims could not proceed but legitimate ones could continue. The target of this legislation is described by the acronym 'SLAPP': strategic lawsuits against public participation. Motions under s. 137.1 of the *CJA* are commonly referred to as anti-SLAPP motions. Since the introduction of the provision, courts in Ontario have been faced with a plethora of anti-SLAPP motions and the Court of Appeal has heard about 15 appeals from anti-SLAPP motion decisions in the past two years.

[2]     In 2020, the Supreme Court provided welcome guidance on this legislative amendment in its seminal decision of *1704604 Ontario Ltd. v. Pointes Protection Association*, 2020 SCC 22, 449 D.L.R. (4th) 1, and its companion case, *Bent v. Platnick*, 2020 SCC 23, 449 D.L.R. (4th) 45.

2023 ONCA 129 (CanLII)

Page: 3

[3]    In the order under appeal, the motion judge dismissed an anti-SLAPP motion brought by the appellants, Park Lawn Corporation and its current Chief Executive Officer, J. Bradley Green. They had unsuccessfully sought an order dismissing the defamation counterclaim brought by the respondent, Kahu Capital Partners Ltd.

[4]    This appeal provides an opportunity to address the application of the direction provided by the Supreme Court in *Pointes Protection* and *Bent.*

[5]    For the reasons that follow, I would dismiss the appeal.

**Background Facts**

[6]    Park Lawn is Canada's largest funeral home and deathcare enterprise. It maintains trust funds for, among other things, future care and maintenance of cemeteries, and pre-need funds deposited by consumers. These funds are held by third party trustees and managed by third party managers. Kahu, an investment management company established under the laws of the Commonwealth of the Bahamas in 2017, managed certain of Park Lawn's trust funds.

[7]    In October 2019, the Board of Directors of Park Lawn appointed a Special Committee of independent directors to investigate allegations of misconduct against its Chief Executive Officer, Chief Operating Officer, and Chair of the Board of Directors, Andrew Clark. These allegations were initially unrelated to Kahu. In February 2020, Argent Trust Company, an independent trust company that was

2023 ONCA 129 (CanLII)

the custodian of some of Park Lawn's trust funds that were being managed by Kahu, raised with Park Lawn certain concerns about Kahu's relationship with Park Lawn.

[8]    The Special Committee and Park Lawn's Investment Committee commenced an investigation into Kahu and its relationship with Park Lawn. Ultimately, Mr. Clark relinquished his position as Park Lawn's Chair on February 17, 2020, ceased to be Park Lawn's CEO on March 31, 2020, and resigned as a director of the company effective May 12, 2020.

[9]    Mr. Clark subsequently founded Triangle Capital Corp. along with his brother and a friend. In turn, Triangle Capital funded the establishment and held an interest in Anthem Partners, an operator of cemeteries and funeral homes. Mr. Clark is a member of its Advisory Board.

[10]    In June 2020, Park Lawn sued Mr. Clark for damages for various causes of action including breach of fiduciary duty and breach of confidence. It alleged, among other things, that he used Park Lawn's trust funds for the benefit of his family members, close friends and himself. In January 2021, the parties settled that action. Mr. Clark did not admit liability, nor did he pay any damages.

[11]    On May 12, 2021, Park Lawn sued Kahu, Benedict Cheng and Alexandar Zivic, for knowingly assisting Mr. Clark in his alleged misdeeds with

2023 ONCA 129 (CanLII)

respect to trust funds held by Park Lawn and for repayment of consulting and management fees paid to Kahu.

[12]    Park Lawn alleges that Mr. Cheng is prohibited by the Ontario Securities Commission from fund management activities in Ontario yet is the directing mind of Kahu and that Mr. Zivic, Kahu's Chief Executive Officer and Chief Information Officer, is merely Kahu's public face. Park Lawn alleges that Kahu was established for the purpose of managing trust funds entrusted to Park Lawn and using the trust funds for Mr. Clark. Park Lawn's claim against the defendants is based on arrangements entered into between Park Lawn and Kahu when Mr. Clark was CEO of Park Lawn and the company was under his direction. Pursuant to a consulting agreement made as of August 1, 2018, and a management agreement effective May 31, 2019, Kahu became the manager of $53 million in trust funds that had been entrusted to Park Lawn. Park Lawn had a minority ownership interest in Kahu, and Mr. Clark was one of three directors of Kahu. Park Lawn was Kahu's only client. The appellants allege that Mr. Clark received a personal benefit when the trust funds that were managed by Kahu were advanced to businesses in which Mr. Clark had a personal interest.

[13]    The facts underlying this action are similar to those that were the subject matter of the settled claim against Mr. Clark. Mr. Clark is not a party to this action.

2023 ONCA 129 (CanLII)

[14]   Before the defendants had filed their defence to the action, Park Lawn's new CEO, J. Bradley Green, made statements to *Funeral Service Insider*, an industry newsletter available to subscribers. Mr. Green maintains that he had a moral and ethical duty to speak out about Mr. Clark and his associates. He made statements about Kahu that were reported on July 12, 2021, in an article entitled: "Park Lawn Cautions the Profession Regarding Former CEO." Mr. Green states that his comments in the article were made in the public interest in an attempt to warn others in the deathcare industry about Mr. Clark and his improper actions as CEO of Park Lawn.

[15]   On July 28, 2021, the defendants delivered a statement of defence, and Kahu delivered a counterclaim alleging damages for breach of contract and defamation. Kahu joined Mr. Green as a co-defendant by counterclaim. Kahu alleges in the counterclaim that the following statements that refer to Kahu in the *Funeral Service Insider* article are defamatory. The impugned statements were that:

(a)   Argent Trust refused to sign or be part of the consulting and management agreement because the management of Park Lawn's trust funds by Kahu was "wrong to the board, to [Mr. Green] (*sic*) to everyone else" and that without the intervention of Argent Trust, "it would have been a lot worse";

2023 ONCA 129 (CanLII)

2023 ONCA 129 (CanLII)

    (b)   Park Lawn's investment committee directly oversaw its trust funds being managed by Kahu and that Park Lawn's special committee had investigated Kahu;

    (c)   Due to suspicious activity surrounding Kahu, Park Lawn moved the trust funds under management with Kahu to Argent Trust; and

    (d)   Argent Trust identified conflicts of interest and other associated problems with Kahu.

[16]   Kahu alleges that a fund it established in the autumn of 2020, and on which it spent more than $100,000 in legal and other fees, became unmarketable due to the appellants' defamatory statements. In addition, in 2021, Kahu was retained to act as a general partner and investment manager for Zama Fund, a metals and mining fund. Kahu alleges that this fund also became unmarketable due to the defamation.

[17]   The appellants brought an anti-SLAPP motion pursuant to s. 137.1 of the *CJA* to dismiss the defamation portion of the counterclaim. They did not seek to dismiss the claim for breach of contract in the counterclaim.

**Motion Judge's Reasons**

[18]   The motion judge dismissed the anti-SLAPP motion. He considered the applicable three-part test set out in s. 137.1 of the *CJA* and the Supreme Court of Canada's decisions in *Pointes Protection* and *Bent*. At the first stage, employing a

2023 ONCA 129 (CanLII)

generous definition for public interest, he concluded that the impugned statements concerned a matter of public interest. At the second stage, which requires the party bringing the defamation claim to show grounds to believe that it has substantial merit and there is no valid defence, he observed that a s. 137.1 motion is not a determinative adjudication of either the merits of the claim or the existence of a defence. That said, the claim must have a real prospect of success; a possible or arguable case is insufficient. Concomitantly, the defences in play should not have a real prospect of success. Here the motion judge concluded that there were grounds to believe that there was substantial merit to the defamation counterclaim and that the appellants had no valid defence.

[19]   At the third stage, he found that the harm likely suffered by Kahu was sufficiently serious that it outweighed the public interest in protecting the appellants' freedom of expression on a matter of public interest.

[20]   On the issue of harm, the appellants argued that the impugned statements caused no serious damage because Kahu was already harmed by the litigation, which was initiated before the publication of the article. The motion judge rejected this argument. He concluded that the appellants' argument was an implicit concession that Kahu did suffer some damages. The motion judge held that the commencement of a lawsuit did "not license prior or subsequent defamatory statements made outside the litigation". He found that Mr. Green "intended his words to have consequences to the reputation of Kahu Capital (and also

Page:  9

Mr. Cheng and Mr. Zivic), so it is a perverse irony for him and Park Lawn to argue that his statements to *Funeral Service Insider* were not even rubbing salt in the wounds and occasioned no harm". He concluded that the record was sufficient to establish that Kahu "was damaged by Mr. Green's purposeful statements".

[21]   The motion judge, having analyzed earlier in his reasons whether the expression justified protection from a civil lawsuit, concluded that the quality of the expression and the motivation behind it did not warrant protection. In this regard, and indeed throughout his reasons, the motion judge emphasized the overlap between the claim and the counterclaim and the strategic nature of the appellants' motion:

> Metaphorically speaking, a potent and remarkable feature of the immediate anti-SLAPP motion is that the claim and the Counterclaim are flip sides of one factual coin. On cross-examination, Mr. Green admitted that the same facts underlying the alleged breaches of fiduciary duty are at issue in the within claim. Remarkably, in the immediate case, Park Lawn is litigating again Mr. Green's allegations against Mr. Clark, which were settled in an action against Mr. Clark without an admission of liability or a payment of damages.
>
> …
>
> Remarkably, unlike most anti-SLAPP motions, if Park Lawn and Mr. Green's motion succeeds, the proceedings will not be done. Park Lawn's action will go forward, and it will seek to prove that what Mr. Green expressed to *Funeral Service Insider* was true. However, if the anti-SLAPP Motion succeeds, and Park Lawn fails to prove its case, Kahu Capital will be precluded from claiming damages [for] the harm caused to its reputation by Park

2023 ONCA 129 (CanLII)

Page:  10

> Lawn's failure to prove that what Mr. Green said was true.
> An anti-SLAPP motion designed to suppress strategic
> litigation is being used very strategically and tactically.

[22]   Having dismissed the appellants' anti-SLAPP motion, the motion judge received written submissions on costs, which he addressed in separate reasons. The appellants delivered a bill of costs for the motion and the dismissal of the action in the amount of $376,567.78 on a full indemnity basis. Kahu sought full indemnity costs of $49,093.64 and its partial indemnity costs amounted to $31,012.44. The motion judge determined that the presumption under s. 137.1(8) of the *CJA* against awarding costs to Kahu as the successful party responding to an anti-SLAPP motion had been displaced. He awarded Kahu partial indemnity costs of the anti-SLAPP motion in the amount of $31,012.44. While he recognized that the impugned expressions were a matter of public interest, he considered a number of factors to justify his discretionary decision.

**Grounds of Appeal**

[23]   On appeal, the appellants do not take issue with the motion judge's conclusions relating to the first two prongs of the s. 137.1 analysis. They did not appeal the motion judge's conclusion that there were grounds to believe that there was substantial merit to Kahu's defamation claim in the counterclaim and that the appellants had no valid defence. As such, his determination that there were grounds to believe that Kahu's defamation counterclaim had substantial merit and that the appellants had no valid defence stands unchallenged.

2023 ONCA 129 (CanLII)

[24]    Rather, the appellants claim that the motion judge erred in concluding that Kahu had proven sufficient harm caused by the defamatory statements and in failing to properly weigh any harm against the public interest in protecting Mr. Green's expression on matters of public interest.

**Discussion**

[25]    Before addressing these arguments, it is helpful to first review the applicable test, remind ourselves of the original objectives of the anti-SLAPP provision found in s. 137.1 and the Supreme Court's directions in *Pointes Protection* and *Bent*, and examine the evolution of the practice relating to these motions. This in turn will inform the analysis of the arguments advanced by the appellants.

a) The test

[26]    Subsections 137.1(3) and (4) of the *CJA* set forth the test on an anti-SLAPP motion. Those subsections state:

> (3) On motion by a person against whom a proceeding is brought, a judge shall, subject to subsection (4), dismiss the proceeding against the person if the person satisfies the judge that the proceeding arises from an expression made by the person that relates to a matter of public interest.
>
> (4) A judge shall not dismiss a proceeding under subsection (3) if the responding party satisfies the judge that,
>
> (a) there are grounds to believe that,
>
> > (i) the proceeding has substantial merit, and

2023 ONCA 129 (CanLII)

> (ii) the moving party has no valid defence in the proceeding; and
>
> (b) the harm likely to be or have been suffered by the responding party as a result of the moving party's expression is sufficiently serious that the public interest in permitting the proceeding to continue outweighs the public interest in protecting that expression.

[27]   In *Pointes Protection*, Côté J. explained the shifting burden described in s. 137.1 of the *CJA*: (i) the onus is on the moving party (in this case, the appellants who were the defendants by counterclaim) to satisfy the motion judge that the proceeding arises from an expression relating to a matter of public interest; and (ii) if that burden is met, the responding party (in this case, the respondent Kahu who was the plaintiff by counterclaim) must then satisfy the motion judge that (a) there are grounds to believe that the proceeding has substantial merit and the moving party has no valid defence, and (b) the harm likely to be or that has been suffered is sufficiently serious that the public interest in permitting the proceeding to continue outweighs the public interest in protecting that expression.

[28]   Justice Côté emphasized that the weighing exercise under ss. 137.1(4)(b) is the "crux" or "core" of the s. 137.1 analysis: *Pointes Protection*, at para. 18; *Bent*, at para. 139. She explained that the "open-ended nature of s. 137.1(4)(b) provides courts with the ability to scrutinize what is really going on in the particular case before them: s. 137.1(4)(b) effectively allows motion judges to assess how allowing individuals or organizations to vindicate their rights through a lawsuit — a fundamental value in its own right in a democracy — affects, in turn, freedom of

2023 ONCA 129 (CanLII)

expression and its corresponding influence on public discourse and participation in a pluralistic democracy": *Pointes Protection*, at para. 81.

[29]   In considering "what is really going on", the cost consequences encompassed by ss. 137.1(7) and (8) may be relevant. They differ from the usual costs regime where typically costs follow the event, meaning that generally the winner receives a partial indemnity award. Pursuant to ss. 137.1(7) and (8), there is a presumption that a successful moving party will be entitled to full indemnity costs but if the responding party is successful, it is presumptively not entitled to costs of the motion. As the motion judge on this appeal was aware, this cost regime carries the potential for litigation tactics that are tethered to costs and expense rather than the merits of the case. Put differently, if the appellants were fully successful with their request, the defamation counterclaim would be dismissed and they would presumptively obtain a full indemnity costs order of $376,567.78. On completion of the anti-SLAPP proceedings, the parties would then re-engage with the litigation involving the appellants' claim and the breach of contract component of Kahu's counterclaim.

   b)  Purposes of s. 137.1

[30]   Section 137.1 expressly sets forth the purpose of the provision. The statement of purpose serves to inform both the interpretation and the application of the test. Specifically, s 137.1(1) states:

2023 ONCA 129 (CanLII)

Page:  14

The purposes of this section and sections 137.2 to 137.5 are,

> (a) to encourage individuals to express themselves on matters of public interest;
>
> (b) to promote broad participation in debates on matters of public interest;
>
> (c) to discourage the use of litigation as a means of unduly limiting expression on matters of public interest; and
>
> (d) to reduce the risk that participation by the public in debates on matters of public interest will be hampered by fear of legal action.

[31]   In *Pointes Protection*, Côté J. outlined the legislative background of the provision including the Anti-SLAPP Advisory Panel's report to the Attorney General of Ontario published in October 2010 that was the genesis of the anti-SLAPP legislation. She noted that fundamental to the Panel's proposal was a theme of balancing and proportionality: *Pointes Protection*, at para. 9.

[32]   Justice Côté also referenced the legislative debates, particularly the statement of the Attorney General of Ontario, the Honourable Madeleine Meilleur, on the occasion of the second reading of the bill:

> If passed, this legislation will allow courts to quickly identify and deal with strategic lawsuits, minimizing the emotional and financial strain on defendants, as well as the waste of court resources.
>
> …
>
> Our proposed legislation strikes a balance that will help ensure abusive litigation is stopped, but legitimate action can continue. [Legislative Assembly of Ontario, *Official Report of Debates (Hansard)*, No. 41A, 1st Sess., 41st Parl., December 10, 2014, at p. 1975 (Hon. Madeleine Meilleur).]

2023 ONCA 129 (CanLII)

Page:  15

[33]   The new framework was not a "carte blanche" to defame. Rather, the overall theme in the legislative debates was that the anti-SLAPP legislation was designed to stop a plaintiff from silencing a defendant by pursuing meritless litigation that served to intimidate and undermine public expression. The process was intended to be efficient and economical. Presumably this would pre-empt the need for a motion judge to conduct a granular analysis. As stated in *Pointes Protection*, at para. 52, a "deep dive" into the record is not required.

c)  Practice Considerations

[34]   Unfortunately, it would appear that the practice has evolved into quite a different state than that anticipated by the Legislature and by *Pointes Protection* and *Bent*.

[35]   In *Tamming v. Paterson*, 2021 ONSC 8306, at paras. 7-9, Myers J. observed that anti-SLAPP motions have become expensive, time-consuming and open to abuse:

> These motions tend to be complex and expensive proceedings. Although they are not intended to involve a deep dive into the merits or even a detailed review akin to a motion for summary judgment, they usually do represent virtually the entire trial being played out in advance….
>
> Despite the Legislature's intention to create a preliminary hurdle, <u>the process advanced in practice is more like a marathon</u>. To that end, the mandatory 60-day time limit for resolving these motions is routinely ignored. Counsel on both sides usually need more time and, in Toronto at

2023 ONCA 129 (CanLII)

Page:  16

least, motion appointments are backlogged by far more than 60 days.

We are seeing an ever-increasing volume of anti-SLAPP motions in Toronto. The powerful remedy and the costs protections for the moving defendants make these motions attractive. The size of the endeavour can also be seen as an incentive for abusive SLAPP plaintiffs and others with incentive to expand proceedings. [Emphasis added.]

[36]   In "Canadian Anti-SLAPP Laws in Action" (2022) 100:2 Can. B. Rev. 186, Professor Hilary Young conducted a review of Ontario and British Columbia's[1] experience with anti-SLAPP litigation. Her research is reflective of many of the same observations made by Myers J. in *Tamming*. She noted, for example, that one criticism of the legislation is that the costs consequences may incentivize parties to bring an anti-SLAPP motion despite the underlying claim not being a SLAPP because even if the motion is unsuccessful, a losing moving party often will not have to pay any costs: Young, at p. 197.

[37]   Further, as noted by Myers J. and Professor Young, these motions tend to be expensive: *Tamming*, at para. 7; Young, at p. 206. The case under appeal is a good example of this: the appellants delivered a costs outline to the motion judge seeking $376,567.78 for the costs of the motion and dismissal of the defamation counterclaim. This did not include costs of the appeal.

---

[1] British Columbia's anti-SLAPP regime is similar to that of Ontario: see *Protection of Public Participation Act*, S.B.C. 2019, c. 3, s. 4.

Page:  17

[38]   To address the objectives of the legislation, it bears repeating that the emphasis of the motion should be on the "crux" or "core" of the analysis, namely the weighing exercise. This should not involve a trial of the issue or as some have put it, a "trial in a box": Young, at p. 199; *Canadian Thermo Windows Inc. v. Seangio*, 2021 ONSC 6555, at para. 97. Rather, the motion is a screening procedure. At the third stage of the test, the weighing exercise, a technical, granular analysis is not required. Instead, as directed by the *Pointes Protection* and *Bent* decisions, the motion judge should step back and ask what is really going on.

[39]   With this direction in mind and recognizing that an anti-SLAPP motion is meant to be efficient and economical, I would suggest that, as a guideline, the costs of such a motion should not generally exceed $50,000 on a full indemnity basis, although there will be exceptions and motion judges always have the power to award less, more or nothing as they see fit in the circumstances of each case.[2] If the parties and the motion judge focus on the purposes that animate the anti-SLAPP provision, the inquiry will not generally be a difficult one for a motion judge. Indeed, typically the conclusion should be obvious and one readily reached by a motion judge.

---

[2] See also Young, at p. 206.

2023 ONCA 129 (CanLII)

Page:  18

[40]   I would also add that the cost of litigation is a plague that has infected our system of justice and serves to undermine its efficacy. Here the Legislature enacted a provision designed to help people avoid a costly defamation lawsuit and preserve the opportunity for public discourse and expression, but at the same time allow legitimate actions to proceed. The procedure was to be efficient and inexpensive. Ironically, a procedure intended to avoid costly, unmeritorious, protracted defamation lawsuits has developed into a platform for sometimes costly, unmeritorious and protracted litigation. This is not to say that anti-SLAPP motions should not be brought, but rather the parameters of the ensuing litigation should be limited in scope. Providing a guideline for costs may serve to dampen the enthusiasm, no doubt well intentioned, to over-litigate an anti-SLAPP motion.

[41]   In addition, consistent with the legislation, anti-SLAPP motions should be heard no later than 60 days after the notice of motion is filed: *Courts of Justice Act*, s. 137.2(2). Subject to court availability, motion judges should generally compel compliance with this 60-day time parameter. The timeframe for these motions should act as a reminder that they are meant to be limited in scope.

[42]   Lastly, it bears repeating that a motion judge's determination on a s. 137.1 motion will be entitled to deference on appeal absent an error in law or palpable and overriding error: *Bent*, at para. 77; *Canadian Union of Postal Workers v. B'nai Brith Canada*, 2021 ONCA 529, 460 D.L.R. (4th) 245, at para. 21 ("*CUPW*"). This is especially so with respect to a motion judge's weighing of the public interest:

Page:  19

*Bangash v. Patel*, 2022 ONCA 763, at para. 12. Parties should be mindful of this standard of review when seeking to appeal an order in anti-SLAPP proceedings. As mentioned, this court has seen a proliferation of anti-SLAPP appeals.

d)  Harm Analysis

[43]    With these principles in mind, I turn to the first of the appellants' arguments on appeal. The appellants submit that the motion judge disregarded this court's decision in *Levant v. De Melle*, 2022 ONCA 79, 82 C.C.L.T. (4th) 48, leave to appeal requested, [2022] S.C.C.A. No. 88 (*Levant*), and [2022] S.C.C.A. No. 87 (*Rebel News Network Ltd.*), by failing to identify or rely on any evidence of specific harm or causation. They state that there had to be evidence from which the motion judge could draw an inference of likelihood of harm and the relevant causal link between alleged harm and the publication. They submit that it is especially important for there to be specific evidence of harm in this case because Kahu is a corporation. Moreover, Kahu attributed any harm suffered to the Park Lawn litigation, not the statements published in the *Funeral Service Insider*. The appellants submit that there was no evidence of harm attributable to the impugned expression itself.

[44]    In addition, the appellants submit that any reputational harm to Kahu was limited given that its reputation was already blemished, the audience for the publication was restricted to subscribers, Kahu had no clients when the article was

2023 ONCA 129 (CanLII)

2023 ONCA 129 (CanLII)

published and, in any event, it had only ever provided services to Park Lawn. The appellants contend that harm to Kahu from the statements was necessarily nominal at best.

[45]    In response, Kahu submits that the statements in the *Funeral Service Insider* article make serious allegations from which the likelihood of reputational harm can be readily inferred. It contends that the motion judge correctly recognized that the previous litigation and the allegedly defamatory statements are "flip sides of one factual coin", and the existence of the litigation cannot serve to immunize the appellants from the defamation counterclaim. Further, Kahu notes that while *Funeral Service Insider* is a subscription-only publication, its target audience has direct control over the allocation of investment mandates to Kahu. It also alleges it had to suspend marketing of certain funds and lost future potential clients.

[46]    Various principles on the issue of harm and causation in anti-SLAPP motions are apparent from the *Pointes Protection* and *Bent* decisions:

–  Section 137.1(4)(b) requires both: (i) the existence of harm, and (ii) causation, that is, the harm was suffered as a result of the moving party's expression.

–  Either monetary or non-monetary harm will suffice. The harm need not be monetized or quantified. Reputational harm is also relevant to the harm inquiry even if at this stage it is not quantifiable. "[R]eputation

Page:  21

is one of the most valuable assets a person or a business can possess": *Pointes Protection*, at para. 69, citing Legislative Assembly of Ontario, *Official Report of Debates (Hansard)*, No. 41A, 1st Sess., 41st Parl., December 10, 2014, at p. 1971 (Hon. Madeleine Meilleur); see also *Bent*, at para. 146*.

– A fully developed damages brief is not required.

– A responding party need not prove harm or causation but must simply provide evidence from which an inference of the likelihood of harm and causation may be drawn. No definitive determination of harm or causation is required.

– General damages are presumed in defamation actions and this alone is sufficient to constitute harm, but a responding party must provide support for a claim of special damages.

– Causation is a case-by-case inquiry undertaken by the motion judge.

[47]   When examining the issue of harm, there is a distinction between the establishment of harm (which the above points address) and the magnitude of the harm. The latter goes to the assessment of whether the harm is sufficiently serious that the public interest in permitting the proceeding to continue outweighs the public interest in protecting the expression. As Côté J. stated in *Bent*, at para. 144:

> General damages are presumed in defamation actions, and this alone is sufficient to cause harm: *Pointes Protection*, at para. 71; *Torstar*, at para. 28. However the

Page:  22

> magnitude of the harm will be important in assessing
> whether the harm is sufficiently serious that public
> interest in permitting the proceeding to continue
> outweighs the public interest in protecting the expression:
> *Pointes Protection*, at para. 70. General damages in the
> nominal sense will ordinarily not be sufficient for this
> purpose.

[48]    In assessing whether harm is sufficiently serious such that the public interest in permitting the proceeding to continue outweighs the public interest in protecting the expression, this court held, in *Lascaris v. B'nai Brith Canada*, 2019 ONCA 163, 144 O.R. (3d) 211, at para. 41, leave to appeal refused, [2019] S.C.C.A. No. 147, that some statements are so likely to cause serious harm to a person's reputation that the likelihood of harm being caused can be inferred.[3]

[49]    In *CUPW*, which was decided after *Pointes Protection* and *Bent*, this court similarly recognized that harm may be inferred when the alleged defamatory statements are serious. In that case, the motion judge dismissed an anti-SLAPP motion brought against the plaintiff union. On appeal, the defendants argued in part that the harm alleged by the plaintiff was not serious enough to permit the action to continue and that there was no evidence of specific, provable, identifiable harm. Citing this court's decision in *Lascaris*, this court dismissed that argument. Jamal J.A., writing for a unanimous panel, held that where, as in *Lascaris*, the

---

[3] See also, *LaChaux v. Independent Print Ltd.*, [2017] EWCA Civ. 1334, [2018] 2 W.L.R. 387, cited in *Levant*, at para. 68, where the court stated at para. 72 that "serious reputational harm is capable of being proved by a process of inference from the seriousness of the defamatory meaning."

2023 ONCA 129 (CanLII)

alleged defamation is significant, it is open to a motion judge to find that harm can be inferred: at para. 39. The plaintiff in that case was an organization, rather than an individual.

[50]   More recently, in *Levant,* this court again observed that harm can at times be presumed in defamation cases, but cautioned that presumed harm is generally insufficient for the purposes of s. 137.1, particularly where the plaintiff is a corporation whose reputation is not "unblemished": *Levant*, at para. 51; see also paras. 52, 67-68. In *Levant*, the court reasoned that any presumption of harm to the plaintiff corporation in that case had to be limited, not only because it was a corporation, but also because there was evidence that its reputation was not unblemished: *Levant*, at para. 52. That said, a corporation is not precluded from being awarded general damages for defamation: *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416 (C.A.), at para. 49. Moreover, as stated in *Pointes Protection*, at para. 70:

> [S]ince s. 137.1(4)(b) is, in effect, a weighing exercise, there is no threshold requirement for the harm to be sufficiently worthy of consideration. The magnitude of the harm becomes relevant when the motion judge must determine whether it is "sufficiently serious" that the public interest in permitting the proceeding to continue outweighs the public interest in protecting the expression. In other words, the magnitude of the harm simply adds weight to one side of the weighing exercise.

[51]   In the case under appeal, the motion judge correctly described the legal principles applicable to the third part of the test on an anti-SLAPP motion and

Page:  24

considered the appellants' submissions on the elements of the test. He made numerous findings of harm and causation. First, he found that the appellants had made an implicit concession that Kahu did suffer some damages. Second, he inferred that repetition of allegations of misconduct in the *Funeral Insider Report* would cause additional harm beyond the harm caused by the appellants' lawsuit. He found that Mr. Green's statements conveyed the message that Kahu participated or knowingly assisted in Mr. Clark's wrongdoing, that Kahu was not to be trusted because it was guilty of a crime, fraud, dishonesty, immorality and/or other dishonourable conduct, and that *prima facie*, the statements would tend to lower Kahu's reputation.

[52]    Moreover, the motion judge found that Mr. Green intended his words to have consequences to Kahu's reputation. To use the motion judge's term, it would be ironic for Mr. Green to make these statements in the hopes that they would convince others of Kahu's misconduct, and then, for the purposes of the anti-SLAPP motion, assert that these statements could not have had any effect on Kahu's reputation. As in *Lascaris* and *CUPW*, and reading the record as a whole, it was open to the motion judge to conclude that the statements were so likely to cause serious harm to Kahu's reputation that the likelihood of harm being caused could be inferred.

[53]    As for Kahu's reputation, the motion judge did not make a finding that it was blemished. On the contrary, he observed that:

2023 ONCA 129 (CanLII)

Page:  25

- Park Lawn's action against Mr. Clark was settled without any admission of liability or damages award;

- Park Lawn's action for knowing assistance against the defendants, including Kahu, is based on the same facts that underlaid the settled claim against Mr. Clark; and

- it was plausible, based on the evidentiary record, that a trial judge could find no breach of fiduciary duties by Mr. Clark insofar as Kahu was concerned, and that there was no knowledge or assistance by Kahu.[4]

[54]   The motion judge's analysis reveals no reviewable error. He correctly set out the applicable legal principles and was satisfied that Kahu suffered harm based on the evidence before him and the inferences he drew from it. I would dismiss this ground of appeal.

e)  The Weighing Exercise

[55]   The appellants' second ground of appeal is that the motion judge failed to adequately weigh the harm to Kahu against the public interest in protecting the appellants' expression on matters of the public interest. He simply pointed to a

---

[4] In this regard the motion judge also noted that "knowing assistance is a formidable claim to prove."

single consideration, namely that the subject matter of Kahu's counterclaim overlapped with Park Lawn's underlying claim.

[56]   I disagree. The motion judge wove his weighing throughout his reasons, culminating in his conclusions at para. 105 and following. He stepped back and determined what this anti-SLAPP motion was all about. Although the motion judge did not compartmentalize his analysis to any particular degree, he did what he was supposed to do. He responded to the exhortation in *Pointes Protection* and *Bent* that, in the third part of the test, a motion judge is to scrutinize what is really going on in the case.

[57]   Here the motion judge conducted a thorough review and examined the parties' history. Legitimately in my view, he was also influenced by the fact that the litigation between the parties would not be resolved by granting the appellants' motion, that the anti-SLAPP motion was inspired by strategic and tactical considerations, and that the appellants had assumed the risks associated with litigating outside the confines of the court proceeding. In my view, these were permissible considerations. The motion judge was mindful of the purposes that animated the anti-SLAPP provision which in turn assisted him in finding the right mass for the weighing pan of the scale.

[58]   Lastly, the presence of a counterclaim will not inevitably preclude the granting of an anti-SLAPP motion. That said, an anti-SLAPP motion seeking to

2023 ONCA 129 (CanLII)

Page:  27

dismiss a counterclaim in whole or in part may ultimately add expense and delay, both of which are anathema to the purposes of s. 137.1. In this case, Park Lawn's action against the defendants will continue as will Kahu's counterclaim for damages for breach of contract regardless of the outcome of the anti-SLAPP motion. As the motion judge stated:

> Remarkably, unlike most anti-SLAPP motions, if Park Lawn and Mr. Green's motion succeeds, the proceedings will not be done. Park Lawn's action will go forward, and it will seek to prove that what Mr. Green expressed to *Funeral Service Insider* was true. However, if the anti-SLAPP Motion succeeds, and Park Lawn fails to prove its case, Kahu Capital will be precluded from claiming damages [for] the harm caused to its reputation by Park Lawn's failure to prove that what Mr. Green said was true. An anti-SLAPP motion designed to suppress strategic litigation is being used very strategically and tactically.

[59]   I would dismiss this ground of appeal.

   f)   Costs Order

[60]   Lastly, the appellants attack the motion judge's partial indemnity costs award of $31,012.44 in Kahu's favour. Although the costs regime for an anti-SLAPP motion reverses the usual presumption that a successful party is entitled to costs, a motion judge may award costs to a successful party if such an award is appropriate. The motion judge explained why he made the award he did. The factors he considered in departing from the presumptive costs regime were relevant and appropriate. An appellate court may interfere with a costs award that is plainly wrong or where there is an error in principle. Here there was neither.

Page:  28

**Disposition**

[61]   For these reasons, I would dismiss the appeal. I would order the parties to make brief written submissions on costs, not to exceed five pages in length, to be filed within 15 days of release of these reasons.

Released: February 28, 2023 "S.E.P."

"S.E. Pepall J.A."
"I agree. G.T. Trotter J.A."
"I agree. Thorburn J.A."
