## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WE CHARITY,<br><br>                    *Plaintiff,*<br>     v.<br><br>THE CANADIAN BROADCASTING<br>CORPORATION,<br><br>                    *Defendant.* | Civil Action No. 22-00340-RDM |

### CBC'S NOTICE RESPONDING TO PLAINTIFF'S
### NOTICE OF SUPPLEMENTAL INFORMATION

WE Charity's ("WE") "Notice of Supplemental Information" seeks no relief and has no bearing on any issue pending before the Court.  Instead, it is merely the latest example of WE leveling frivolous, bad-faith accusations against CBC, its journalists, and its counsel in the hope that will somehow work to its advantage in this case and deter CBC from future reporting.

WE's latest charges relate to inquiries CBC's Harvey Cashore made to North Carolina's charitable licensing agency.  The very documents WE attaches to its Notice make clear that Mr. Cashore's inquiries were a standard example of investigative journalism, were treated by that agency as such, and were accurately characterized in the correspondence by CBC's counsel that WE now challenges.  Even worse, WE's Notice omits the vast majority of the documents it received in response to its public records request to that agency, including *all* of *WE's own* communications with it (which, in any event, WE already had).  The documents WE omitted make clear that not only did the agency exercise its own, independent regulatory judgment, it

independently concluded that Mr. Cashore's questions about conflicting testimony by WE's CFO were well-founded.

## I.  WE MISREPRESENTS THE CORRESPONDENCE FROM CBC'S COUNSEL IT CHALLENGES

Even before addressing the specifics of WE's allegations about Mr. Cashore based on the North Carolina documents, the entire premise of its "Notice" is a textbook example of a self-constructed, straw-man argument.  In order to charge that CBC's counsel wrote something that was supposedly "**not true**" (emphasis in original), WE plucks out a handful of words from a February 10 letter that were contained within a larger clause within a larger sentence.  As quoted by WE, those words are:  "CBC has nothing to do with the North Carolina Secretary of State's exercise of its regulatory authority".  By selectively quoting only those words, WE implies that CBC's counsel represented to WE that Mr. Cashore never had any communications with agency.

But CBC's counsel said nothing of the kind – quite the contrary.  Here is the full context of those words:

> While CBC has nothing to do with the North Carolina Secretary of State's exercise of its regulatory authority, if, in fact, that office inquired into WE Charity *after receiving questions from a journalist*, that would be anything but "unique".  Scores of government inquiries and investigations result from journalistic activity; indeed, that is one of the most fundamental functions of a free press.

D.E. 29-4 at 3 (emphasis added).

For context, CBC's counsel was responding to a January 26, 2023 letter from WE's counsel that had made the same charges WE repeats here:  "CBC appears to have reported WE Charity to the North Carolina Secretary of State's charitable solicitation licensing division in an effort to put pressure on its litigation opponent."  D.E. 29-3 at 4.  In his response, CBC's counsel never denied that Mr. Cashore posed questions to the agency.  Rather, CBC's point was that the timing of the events about which WE complained reflected a common example of how investigative journalism functions.

That is, it is entirely appropriate for a journalist to ask questions – and it is also entirely appropriate for a regulator to exercise its independent judgement that questions posed by a journalist raised issues that warrant further inquiry.  And that is what happened here.  As set forth below, the very documents WE attaches to its Notice, as well the larger universe of materials WE omits, make clear that Mr. Cashore was performing his function as a journalist and had no involvement (or even knowledge of) any actions the agency subsequently took based on its independent judgment.

## II.   MR. CASHORE WAS PERFORMING HIS FUNCTION AS A JOURNALIST

### A.   <u>The Underlying Canadian Political Controversy</u>

To fully appreciate why WE's charges are baseless, it is necessary to understand the context of Mr. Cashore's questions to the agency.  His questions related to a political controversy in Canada concerning the efforts of a Canadian Parliamentary Committee to seek testimony from Victor Li, WE's CFO, in 2021.  That controversy received wide coverage in the Canadian media at the time.[1]

When Mr. Li's testimony was requested by the Committee, Mr. Li told it that he could not personally appear or fully respond to its questions.  He represented that, while he still held the title of CFO, "I have been on medical leave since the summer of 2020.  I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave."  Declaration of Nathan Siegel ("Siegel Decl.") ¶ 4, Ex. 3 at 20.  Rather, "[s]ince I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as

---

[1] *See, e.g.*, https://www.bloomberg.com/news/articles/2021-02-19/canadian-parliament-panel-will-compel-we-charity-cfo-to-testify#xj4y7vzkg; https://www.westernstandard.news/news/we-charity-cfo-threatened-with-jail-if-he-doesn-t-show-up-for-questioning/article_d11f5914-12fa-543c-88ad-f2d8292eedba.html.

well as a director in the Finance department who is a CPA." *Id.* ¶ 3, Ex. 2 at 82.  Mr. Li also represented to the Committee that he did not have personal access to, nor the capacity to review, many of the organization's records due to his medical leave. *Id.* at 58; *id*. ¶ 4, Ex. 3 at 20; (https://twitter.com/megan__savard/status/1374831474873139201/photo/2).  Mr. Li provided written answers to some questions, but stated they were largely based on his recollection and publicly available documents and he could not fully respond himself to all the questions given his lack of access to company records.  *Id*.

However, during that same time Mr. Li signed, under oath, WE's regulatory filings in North Carolina and other states.  In the North Carolina examples, he attested that he was the CFO and was, in effect, performing duties of a CFO including maintaining "custody of applicant's financial records," exercising "final responsibility for custody and/or final distribution of contributions," and attesting to the accuracy of all the information in all the documents being filed with the agency.  *See, e.g.,* D.E. 16-14 at 3-4.  The questions Mr. Cashore posed to the agency concerned the apparent conflict between Mr. Li's telling Parliament that he was "not performing the duties of CFO or participating in the daily business of WE Charity," while at the same time swearing to the agency that he was performing many of the duties of CFO.

### B.    Mr. Cashore's Inquiries to North Carolina and Other States

WE's Notice attaches some, but not even most, of the communications it received between Mr. Cashore and the North Carolina agency.[2]  In any event, all of those communications reflect the normal course of an exchange between a journalist and a public agency.  Most communications between Mr. Cashore and the agency's Public Information Officer, whose very job it is to respond to queries from journalists.  Below is a summary of those communications.

December 13:  Mr. Cashore e-mailed an agency document examiner, Samantha Williams.  Ms. Williams' name was on the agency's most recent communications with WE at the time, which are publicly available online.  Siegel Decl. ¶ 5, Ex. 4.  Mr. Cashore identified himself to Ms. Williams as a CBC journalist, explained that he was preparing research on WE, and wrote "I

---

[2] In its Notice, WE stated that it "did not attach the entirety of the documents [its counsel received from North Carolina] because they were voluminous and repetitive …."  D.E. 31 at 1 n.1.  As the Court will see, that representation is not accurate.  While the entire production was indeed voluminous (about 300 pages) and some of those documents were merely duplicates, many of the documents WE omitted were in no sense "repetitive."  To note just one example, all of WE's own communications with the agency were obviously not "repetitive" of Mr. Cashore's communications.

However, in its Notice, WE did offer to provide the entire production it received from North Carolina "upon request."  *Id.*  Concerned WE might be misrepresenting the character of those documents, CBC's counsel took it up on its offer and requested them.  Initially, WE's counsel responded by stating it would only provide them if CBC provided any other communications Mr. Cashore may have had with North Carolina, as well as any communications he had with other state agencies.  CBC's counsel was surprised at that response, given that in the Joint Status Report WE had represented to the Court that it would *not* at this juncture pursue any discovery concerning CBC's on-going journalism.  D.E. 29 at 5 ("[W]E Charity expressly does not seek to conduct discovery into CBC's ongoing journalism and will not seek information or documents post-dating the filing of the Complaint.").  CBC's counsel declined, and told WE's counsel that CBC would simply note in its Response that although WE had represented it would provide all the documents upon request, it did not.  WE's counsel then provided all the documents he stated he had received from North Carolina.  All of those documents are attached as Exhibits 1-3 to the Declaration of Nathan Siegel.

Once CBC's counsel reviewed the documents, we saw that a lawyer representing WE had told the agency that WE and Mr. Li intended to sue CBC over Mr. Cashore's communications to the agency.  Siegel Decl. ¶ 4 Ex. 3 at 58.  Disclosure of all of Mr. Cashore's communications was precisely what WE sought to bargain in exchange for the documents it received from North Carolina.  Thus, it became apparent WE hoped to leverage its Notice in this lawsuit to surreptitiously obtain discovery for possible use in another potential case.

am hoping to get your help understanding some documents and correspondence that have been filed publicly by WE Charity in North Carolina." D.E. 31-1 at 3.

December 18 and 21: Mr. Cashore twice e-mailed what appears to be a general mailbox at the agency. He identified himself the same way and made the same request. Siegel Decl. ¶ 3, Ex. 2 at 30-33.

December 22: Mr. Cashore called Ms. Williams, who transferred the call to the division's Director, Gail Eluwa. D.E. 31-1 at 4. Ms. Eluwa reported internally to her colleagues, including to the agency's Public Information Officer (Liz Proctor), that she talked with Mr. Cashore about why he was inquiring. She reported to her colleagues that she had told Mr. Cashore that he may be hearing from the agency's Director of Communications (presumably Ms. Proctor). *Id.* Subsequently, Ms. Proctor was indeed involved in all communications with Mr. Cashore.

Later that day, the PIO (Ms. Proctor), reported internally that she also spoke to Mr. Cashore and he would be sending materials. D.E. 31-1 at 2. Mr. Cashore followed up with an email. Once again, he identified himself as a CBC journalist and explained he had questions for a possible news story. His email laid out the information that was the basis of his questions, including attaching lengthy documents and providing links to others, none of which WE provided with is Notice. Siegel Decl. ¶ 3, Ex. 2 at 58-95; ¶ 4, Ex. 3 at 19-35. The email then asked about a half dozen questions. D.E. 31-2 at 2-5.

December 28: A response from the general mailbox also instructed Mr. Cashore to communicate with Ms. Proctor, the agency's PIO. Siegel Decl. ¶ 2, Ex. 1 at 105.

January 5: After some internal discussion (*id.* at 39-40, 45, 50, 59, 68, 86), the PIO responded to Mr. Cashore. *Id.* at 30. She provided no answers to any of his specific questions. Instead, she  merely offered generic, boilerplate language about signature requirements and

opportunities to cure information. *Id.* The agency's internal discussion also makes clear that its generic response was deliberate. The PIO initially drafted an even briefer response, noting "this may be the extent of the response we want to provide Mr. Cashore's questions at this point." *Id.* at 50. Another colleague merely added some additional, boilerplate language that was "straight from the form." *Id.* at 39.

Strikingly, WE's Notice omits the agency's actual response to Mr. Cashore. Instead, WE attaches another email, written two weeks later, and passes that off as the agency's supposed response to him. D.E. 31 at 3; D.E.31-3 at 2. But that was an *internal* email from the agency's Director to her colleagues, not a response to Mr. Cashore. Siegel Decl. ¶ 2, Ex. 1 at 15.[3]

January 17: Mr. Cashore again e-mailed the agency PIO, referencing new filings from WE, and asked questions similar to those he had posed previously. *Id.* at 2.

January 19: Mr. Cashore followed up with the agency PIO, asking when she could respond to his January 17 email. *Id.* The documents do not reflect that any response was ever provided. Thus, the only response Mr. Cashore ever received from the agency was a non-responsive, boilerplate email. *Id.* at 30.

As this correspondence reflects, Mr. Cashore never filed any complaint or otherwise "reported" WE to the agency, nor did he solicit the agency to take any regulatory action. The agency treated his communications for what they obviously were – questions posed to it by a journalist. He was referred to the agency's press officer, who merely gave him a generic response and then ignored his follow-up questions.

---

[3] That January 18 email appears several times in the documents. The copy that WE attached did not include the e-mail's recipients. D.E.31-3 at 2. A more complete copy of that email, which includes the recipients, was in the documents that WE omitted from its Notice. Siegel Decl. ¶ 2, Ex. 1 at 15. Moreover, though the point is entirely academic, even if that email had been written to Mr. Cashore there would have nothing problematic about it.

WE, no doubt, thinks Mr. Cashore's were questions unfair and/or that information he provided as a foundation for them was inaccurate or incomplete.  CBC disagrees – and, as discussed below, it would appear the agency did as well.  In any event, persons and entities who are the subject of unflattering questions from journalists routinely think them unfair and inaccurate.  However, such opinions do not transform a journalist's questions, or any information provided to explain those questions, into legal complaints.[4]

## III.     THE AGENCY INDEPENDENTLY INVESTIGATED MR. LI, EXPRESSING SERIOUS CONCERNS ABOUT HIS CONDUCT

Remarkably, the WE Notice omits *all* of WE's *own* communications with the agency regarding Mr. Li that North Carolina provided.  Those communications took place over a period of at least three months.  They, likewise, make clear Mr. Cashore had nothing to do with, and was not privy to, any of the inquiries to WE that the agency independently decided to undertake.  The documents also show that the agency independently reviewed the information that Mr. Cashore had provided and concluded that his questions were well-founded.

Specifically, the documents show both that the agency independently decided that further inquiry was warranted and that it found WE's response to those inquiries to be unpersuasive and even evasive.  The agency ultimately obtained a sworn affidavit from Mr. Li personally, but even then indicated that it believed his newly sworn statements conflicted with his prior testimony to

---

[4] In its zeal to tar Mr. Cashore, WE also absurdly takes him to task for supposedly not "disclosing" more information to the agency, including information about CBC's *forum non conveniens* motion.  D.E. 31 at 3.  This is yet another straw man.  WE first invents a connection between Mr. Cashore's questions to the agency and that motion, then criticizes Mr. Cashore for not disclosing that invented connection.  Even more absurd, once again the document WE points to as the supposed example of Mr. Cashore's failure to disclose was an *internal* email from the PIO to her colleagues at the agency – not an email from Mr. Cashore.  D.E. 31-1 at 2.  Finally, WE chastises Mr. Cashore for not disclosing to the agency that WE is suing CBC for defamation over a different story.  *Id.*  CBC has no doubt WE would prefer that CBC's journalists discuss this lawsuit with anyone they might speak to regarding WE, since that would likely chill sources from disclosing any information about WE.  CBC respectfully disagrees with WE's view.

Parliament in Canada.  But the agency concluded the only relevant statements for its purposes were Mr. Li's statements directly to it, which did not conflict.

In short, WE's contention in its Notice that "North Carolina concluded that WE Charity did not break any law and closed the investigation that CBC prompted" is yet another misleading characterization of the actual events.  The records that WE omitted from its Notice show the following:

January 5:  The agency wrote to Victor Li and reviewed his prior sworn statements to both the agency and Canada's Parliament.  The agency stated "in light of the conflicting testimony" the agency is "requesting documentation to substantiate your role and capacity as CFO."  The agency stated Mr. Li's response must be submitted under oath.  Siegel Decl. ¶ 3, Ex. 2 at 54-55.

January 20:  There is no indication Mr. Li ever responded to the agency.  Instead Mr. Kroetsch, WE's lead counsel in this case, initially responded on behalf of WE and stated that WE would provide a response within 15 days.  *Id.* ¶ 4, Ex. 3 at 60.

January 30:  A lawyer in North Carolina retained by WE contacted the agency to let them know he would be responding on WE's behalf.  He also told the agency that Mr. Li and WE intend to sue CBC over Mr. Cashore's communications with the agency.  *Id.* at 58.

January 31:  WE's North Carolina counsel responded in writing, again on behalf of WE rather than Mr. Li.  Essentially, WE's local counsel contended that as CFO Mr. Li wore two hats for the same position:  "CFO is both a corporate office and an employment position".  *Id.* at 13-16.  WE's counsel claimed that legally there is a stark distinction between the two hats.  WE contended that when Mr. Li told Parliament he was not acting as CFO and was on medical leave, he had his employee hat on and was only referring to that.  But when Mr. Li signed the North Carolina forms as CFO, he was wearing his corporate officer hat and was never on medical leave

while wearing that.  On that basis, WE contended that Mr. Li did not give "conflicting testimony" to Parliament and the agency.  *Id.*  A cover note from WE's local counsel enclosing that response stated that it "should put any concerns over the matter [by the agency] to rest." *Id.* at 44.

February-March:  How exactly the agency responded to WE is not clear, because even now there appear to be gaps in the documents North Carolina provided.  Only WE, its counsel, and the agency know the full story because all the documents that seem to be missing either are, or relate to, the agency's communications with WE's counsel.[5]  However, it appears that WE's response did not "put any concerns over the matter to rest" in the agency's view.

Rather, some internal emails and draft responses that North Carolina did provide indicate that persons within the agency were quite skeptical of WE's response.  *See, e.g.*, *id.* at 39 ("Either Mr. Li was performing the duties of CFO when he signed this attestation, or he was not. We are entitled to, and we must have, a direct answer from counsel to this question."); *id.*, ¶ 3, Ex. 2 at 96 ("CSL is not questioning whether Mr. Li is in fact the CFO of WE Charity but if he should have signed renewal applications for licensure and financial documents certifying that said documents were accurate given the fact that he was on medical leave and stated he was not acting as the CFO during said time frame.").  Moreover, it appears WE later submitted an affidavit from Mr. Li to try to address the agency's concerns.  The affidavit is not in the materials received from North Carolina (though WE obviously has it anyway), and it appears to have resolved the matter.

---

[5] CBC does not know why the North Carolina response to the WE public records request, at least as forwarded to CBC counsel by WE counsel, does not include all of those communications.  Although WE presumably has all of those communications, CBC's counsel did not ask WE's counsel to produce its client's documents to fill in the gaps because, as CBC stated in the Joint Status Report, CBC does not believe discovery should commence now.  CBC only asked WE to provide the public records that it expressly offered to provide in its Notice, upon request.  Nor, if discovery were ever to commence, does CBC believe that this journalism occurring a year after this lawsuit was filed would properly be the subject of discovery.

The agency's response to that affidavit, however, is telling as to *why* it appears to have resolved the matter.  In its response to the affidavit, the agency juxtaposed the following two statements by Mr. Li:  the first in March 2021 to Parliament, and the second in his March 2023 affidavit to the agency:

> *"I have not been performing the duties of CFO . . . since I started my medical leave"* [2021].

> *"During the period of my medical leave . . . I continued to perform certain duties of [CFO]"* [2023].

Siegel Decl. *Id.* ¶ 2, Ex. 1 at 56.  The agency then wrote:

> Mr. Li's March 20, 2023 affidavit, sworn under penalty of perjury, states that he was indeed performing at least some duties of CFO during the period of his medical leave.  Certainly, you can understand the confusion created by Mr. Li's earlier March 15, 2021 written statement to the [Standing Committee] that "I have not been performing the duties of CFO . . . since I started my medical leave" in the summer of 2020.  Mr. Li's 2021 statement to the Standing Committee was absolute in its declaration that Mr. Li had "not been performing the duties of CFO," which statement of Mr. Li led to the January 31, 2023 inquiry from this Division.

> Thank you for obtaining the clarifying March 20, 2023 affidavit from Mr. Li.  In light of Mr. Li's unequivocal March 2023 sworn statement, that *he was indeed performing at least some duties of CFO* during the period in question.  At this time, this Division has no further questions for Mr. Li with regard to his statement to the Standing Committee that *he was not performing his duties of CFO* at the time he signed the annual North Carolina Solicitation License Application Renewal and Forms 990 for 2021 and 2022.

*Id.* at 56-57 (emphasis added).  In short, the agency never found that any of Mr. Li's sworn statements to it were consistent with his statements to Parliament – it rather clearly suggested otherwise.  But since his statements directly to the agency were consistent, the agency found no cause to inquire further.  *Id.*

Most importantly, all of the North Carolina documents underscore why CBC's counsel's statements in his February 10 letter that is the subject of this Notice were spot on.  Those records reflect a free press exercising its core functions.  They show that a journalist learned information he believed suggested some wrongdoing; he posed questions based on that information to a

public agency responsible for regulating the subject; the agency independently determined that the information warranted its own investigation; and the agency independently investigated.

In fact, from CBC's perspective, these documents also reflect a textbook example of the frustration journalists often experience when seeking information from the government.  They indicate the agency did not share with Mr. Cashore anything about what it actually did or found, even though that information would have been responsive to his questions.  Instead, it just provided a boilerplate response from a press officer.  Ironically, CBC is only now learning a more complete version of the story due to WE's tactics in this litigation.  Thus, WE's claim that CBC was actually involved in the agency's "exercise of its regulatory authority" is plainly refuted by these documents.

## IV.   MR. CASHORE'S INQUIRIES HAD NOTHING TO DO WITH CBC'S *FORUM NON CONVENIENS* MOTION

Finally, in its Notice WE continues to insinuate that Mr. Cashore's inquiries were merely a pretext to obtain some "advantage" for CBC in its *forum non conveniens* motion.  D.E. 31 at 2. WE has now repeated this charge several times, yet has never even tried to articulate what "advantage" Mr. Cashore was supposedly trying to obtain.  And these documents further underscore why that allegation is, and has always been, categorically false and patently absurd.

CBC's *forum non conveniens* motion attached filings from several jurisdictions, including one 2021 filing from North Carolina, to illustrate that the sole plaintiff in this case, WE's U.S. affiliate, often functions as an American entity in name only.  Specifically, those filings showed that the U.S. entity has always been so entirely directed from Canada that its Canadian officers sometimes forget that it even has a nominal address and phone number in the U.S. – and instead use the same Canadian contact information in both countries.  D.E. 16-1 at 17-18 & n.6.  Mr. Cashore's inquiries to the agency had nothing remotely to do with that point, and most of the North Carolina filings that his questions to the agency referenced (which covered

several years) were not even attached to the motion.  In fact, in one of his emails Mr. Cashore told the agency that he was making inquiries in other states, so there was nothing unique about his contacting North Carolina.  D.E. 31-2 at 2.

Finally, WE points to the fact that Mr. Cashore's first communication with someone from that agency took place the afternoon of the hearing in this Court on the *forum non conveniens* motion. D.E. 31 at 2.  Again, WE does not even try to provide any explanation as to how the timing of those two events could plausibly have any connection.  Nor do WE's insinuation of a connection make any sense.

CBC's *forum non conveniens* motion was filed on May 5, 2022.  If someone wanted to find information from North Carolina to support that motion, it would make no sense to wait over seven months until the very day the record *closed* to first contact the agency.  Moreover, as CBC noted in its Joint Status Report, since Mr. Cashore is not a lawyer the only way his inquiries could have been undertaken for use in that motion would be if CBC's undersigned counsel were somehow involved in directing them – which they were not.  Indeed, notwithstanding its disingenuous disclaimer (D.E. 31 at 2 n.2.), the essence of WE's Notice accuses CBC's counsel of making a false representation to the Court and being privy to some abuse of journalism for discovery purposes.  Or, at best, WE implies that CBC's counsel are hapless naifs who are being manipulated by a corrupt client.

None of those insinuations is accurate, and in response CBC makes no pretense of any similar disclaimer.  Rather, it reserves its right to seek sanctions, including but not limited to its attorneys' fees should this case proceed in this jurisdiction, and/or any remedies that may be available to it in Canada.  The "Notice" WE filed is premised on selectively misediting opposing counsel's words; makes incendiary charges against Mr. Cashore, CBC, and its counsel that are refuted by the very materials it attaches; withholds numerous documents that places WE's conduct

in an even worse light; misrepresents both the nature of those documents and WE's reasoning for withholding them; and on that basis misrepresents the course of the very agency investigation to which it seeks to hold CBC responsible.  Nor does the subject of the Notice have any genuine bearing on any issue pending before this Court.  Rather, it is merely the latest in a series of baseless charges made by WE to both this Court and in correspondence to CBC's counsel beginning shortly after this lawsuit was filed, all of which have been directed at attacking journalism taking place since this lawsuit was filed.

Dated:  May 10, 2023                    Respectfully submitted,

                                        DAVIS WRIGHT TREMAINE LLP


                                        By:    */s/ Nathan E. Siegel*
                                               Nathan E. Siegel (Bar No. 446253)
                                               Rachel F. Strom (*pro hac vice*)
                                               Courtney DeThomas (Bar. No 888304075)
                                               1301 K Street, NW
                                               Suite 500 East
                                               Washington, DC 20005
                                               Tel: (202) 973-4237
                                               Fax: (202) 973-4499
                                               nathansiegel@dwt.com
                                               rachelstrom@dwt.com
                                               courtneydethomas@dwt.com

                                               *Attorneys for Defendant Canadian*
                                               *Broadcasting Corporation*