# EXHIBIT 2

**MAIL**

| | |
|---|---|
| From: | lproctor@sosnc.gov |
| To: | Tim Crowley |
| Subject: | Fwd: [Caution: External Mail] Questions from the Canadian Broadcasting Corporation |
| Date: | 22-Dec-2022 15:52 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| | 2021 04 09 Victor Li lawyer letter to Parliamentary Committee.pdf  [Save]  [Open] |
| Creation Date: | 22-Dec-2022 15:52 |
| Store Date: | 22-Dec-2022 17:58 |
| Status: | forwarded,opened,read |
| Box Type: | received |
| Folder: | Timothy Crowley > Mailbox |
| Message Id: | 63A4C379.domain.PO.200.20000BA.1.F6F20.1 |

Cashore's questions are at the end of the email.

>>> Harvey Cashore <harvey.cashore@cbc.ca> 12/22/2022 2:46 PM >>>
Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

Documentation filed with your office:

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS. Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020. On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

Information provided to the House of Commons ethics committee in Ottawa:

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

Questions for your office:

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period, stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore


--

Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him


Cell: 416-526-4704

Cashore's questions are at the end of the email.
>>> Harvey Cashore <harvey.cashore@cbc.ca> 12/22/2022 2:46 PM >>>
Dear Gail Etuwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

**A. Documentation filed with your office:**

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished

of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS. Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020. On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

## B. Information provided to the House of Commons ethics committee in Ottawa:

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE

Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

**Questions for your office:**

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period, stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

**MAIL**

| | |
|---|---|
| **From:** | harvey.cashore@cbc.ca |
| **To:** | Gail Eluwa |
| **CC:** | liz proctor |
| **Subject:** | [Caution: External Mail] Questions from the Canadian Broadcasting Corporation |
| **Date:** | 22-Dec-2022 14:47 |
| **Attachments:** | TEXT.htm  [Save]  [Open] |
| | headers.822  [Save]  [Open] |
| | 2021 04 09 Victor Li lawyer letter to Parliamentary Committee.pdf  [Save]  [Open] |
| | Mime.822  *(excluded from export)* |
| **Creation Date:** | 22-Dec-2022 14:46 |
| **Store Date:** | 22-Dec-2022 18:48 |
| **Status:** | forwarded,opened,read |
| **Box Type:** | received |
| **Folder:** | liz proctor Home > Mailbox |
| **Message Id:** | 63A4B43B.domain.GWIA.200.20000DF.1.843DD9.1 |

Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation.  I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity.  WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the

Canadian House of Commons parliamentary committee that was looking into WE
Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on
several occasions that Victor Li has been on leave from the charity.
Specifically, Victor Li stated to the Parliamentary committee that he went
on leave from the charity in the summer of 2020 and that he has not been
acting as its CFO since then.

In short, I am trying to understand the significance of the information
provided to Canadian members of Parliament with the information WE Charity
has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.


1.


Documentation filed with your office:


Records provided to your office show that Victor Li signed numerous
documents as CFO of WE Charity in the period after he stated he was on
leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and
October 13, 2022, respectively stated that Victor Li was the Treasurer or
CFO of WE Charity, and that he had "final responsibility for custody and/or
final distribution of contributions" and that he had "custody of
applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT
SIGNATURE: To be signed in the presence of a Notary Public who has
administered the following oath: I swear or affirm that the information
furnished in this application and all supplemental forms, reports,
documents and attachments are true and correct to the best of my knowledge
under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE
Charity provided their stamp to go along with Victor Li's signature, both
in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a

letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal" is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS.   Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020.  On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state:  "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

1.

Information provided to the House of Commons ethics committee in Ottawa:

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020.  In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already
had "a months-long absence from the workplace". The letter states that
Victor Li had the inability to concentrate for more than short periods of
time.  Savard stated that Li's medical condition "currently prevents him
from returning to work and his doctor cannot say if he ever will be able to
return."  As you can see from reading the attached, Victor Li's lawyer
stated that a return to work could cause her client undue stress that could
lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the
CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on
medical leave since the summer 2020. Since I was placed on medical leave,
WE Charity's finances have been handled by a team of accountants led by
members of the executive team as well as a director in the Finance
department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the
Parliamentary committee in Ottawa.  [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite
medical leave due to serious health issues."   His lawyer said that Li is
"unable to review or analyze large numbers of documents, or easily access
company records" and that, because of this, "he asked WE Charity to help
answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement:  "On
my doctor's advice, I have been on medical leave since the summer of 2020.
I have not been performing the duties of CFO or participating in the daily
business of WE Charity or its associated organizations since I started my
medical leave. My health issues have significantly impeded, and continue to
impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO
is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member,
Tawfiq Rangwala, published a book about WE Charity.  In the book Rangwala
stated that Li's medical condition limited his ability to speak for a

length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

Questions for your office:

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period,  stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

**A. Documentation filed with your office:**

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal" is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS.   Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020.  On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state:  "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

## B.  Information provided to the House of Commons ethics committee in Ottawa:

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020.  In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances.  His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time.  Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE

Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE

Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

**Questions for your office:**

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period, stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

contributions and that he had control of the financial records and for signing cheques.

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns:  he and him

Cell: 416-526-4704

**MAIL**

| | |
|---|---|
| **From:** | lproctor@sosnc.gov |
| **To:** | Tim Crowley, Gail Eluwa |
| **CC:** | William Toole |
| **Subject:** | Re: Report call |
| **Date:** | 22-Dec-2022 13:46 |
| **Attachments:** | TEXT.htm [Save] [Open] |
| | IMAGE.jpeg [Save] [Open] |
| **Creation Date:** | 22-Dec-2022 13:46 |
| **Store Date:** | 22-Dec-2022 17:58 |
| **Status:** | opened,read |
| **Box Type:** | received |
| **Folder:** | Timothy Crowley > Mailbox |
| **Message Id:** | 63A4A60C.domain.PO.200.20000BA.1.F6EDD.1 |

Spoke to Cashore and he is going to be emailing the document he referenced in his call to Gail and me a little later this afternoon. He's specifically interested in what the Department's response would generally be if assertions made on a notarized charitable solicitation license application are found to not be accurate.

Cashore has reached out to other state charity regulators with the same inquiry. He says the CBC isn't planning to run its story for another week or two.

A bit of background re coverage of the organization and Li:

https://www.cbc.ca/news/canada/we-charity-misled-donors-records-show-1.6251985

https://www.westernstandard.news/news/we-charity-cfo-threatened-with-jail-if-he-doesn-t-show-up-for-questioning/article_d11f5914-12fa-543c-88ad-f2d8292eedba.html

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov

>>> Tim Crowley 12/22/2022 12:59 PM >>>
Liz is going to call and try to figure this out for us a bit--why he is calling us.
>>> Gail Eluwa 12/22/2022 11:11 AM >>>
Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any

decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState
( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

**ATTACHMENT**

Spoke to Cashore and he is going to be emailing the document he referenced in his call to Gail and me a little later this afternoon. He's specifically interested in what the Department's response would generally be if assertions made on a notarized charitable solicitation license application are found to not be accurate.

Cashore has reached out to other state charity regulators with the same inquiry. He says the CBC isn't planning to run its story for another week or two.

A bit of background re coverage of the organization and Li:

https://www.cbc.ca/news/canada/we-charity-misled-donors-records-show-1.6251985

https://www.westernstandard.news/news/we-charity-cfo-threatened-with-jail-if-he-doesn-t-show-up-for-questioning /article_d11f5914-12fa-543c-88ad-f2d8292eedba.html

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov

>>> Tim Crowley 12/22/2022 12:59 PM >>>
Liz is going to call and try to figure this out for us a bit--why he is calling us.
>>> Gail Eluwa 12/22/2022 11:11 AM >>>
Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | tcrowley@sosnc.gov |
| To: | Gail Eluwa |
| CC: | William Toole, liz proctor |
| Subject: | Re: Report call |
| Date: | 22-Dec-2022 12:59 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| | IMAGE.jpeg  [Save]  [Open] |
| Creation Date: | 22-Dec-2022 12:59 |
| Store Date: | 22-Dec-2022 18:48 |
| Status: | opened,read,replied |
| Box Type: | received |
| Folder: | liz proctor Home > Mailbox |
| Message Id: | 63A49B0F.domain.PO.200.2000022.1.12A2FD.1 |

Liz is going to call and try to figure this out for us a bit--why he is calling us.

>>> Gail Eluwa 12/22/2022 11:11 AM >>>

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622Raleigh, NC 27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState ( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

TEXT.htm                                                                                    **ATTACHMENT**

Liz is going to call and try to figure this out for us a bit--why he is calling us.
>>> Gail Eluwa 12/22/2022 11:11 AM >>>
Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor
Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the
charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may
not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of
knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622 Raleigh, NC 27626 **www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com**
**/NCSecState/ @NCSecState** Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| **From:** | wtoole@sosnc.gov |
| **To:** | Tim Crowley, Gail Eluwa |
| **CC:** | liz proctor |
| **Subject:** | Re: Report call |
| **Date:** | 22-Dec-2022 12:38 |
| **Attachments:** | TEXT.htm [Save]  [Open] |
| | GW_00003.png [Save]  [Open] |
| | IMAGE_12.jpeg [Save]  [Open] |
| **Creation Date:** | 22-Dec-2022 12:38 |
| **Store Date:** | 22-Dec-2022 17:57 |
| **Status:** | opened,read |
| **Box Type:** | received |
| **Folder:** | Timothy Crowley > Mailbox |
| **Message Id:** | 63A49626.domain.PO.200.20000EC.1.77CE6.1 |

Entity is We Charity.  The canadian notary is Yvonne Mazurak, who is identified on LinkedIn as a first year trust, wills and estates lawyer in Toronto.  No red flags for our CSL processing agents.

(51) Yvonne Mazurak | LinkedIn

( https://www.linkedin.com/in/yvonnemazurak/?originalSubdomain=ca)

William W. Toole

Deputy

North Carolina Department of Secretary of State

919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 12/22/2022 11:11 AM >>>

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622Raleigh, NC

27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState

( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

TEXT.htm                                                                    ATTACHMENT

Entity is We Charity. The canadian notary is Yvonne Mazurak, who is identified on LinkedIn as a first year trust, wills and estates lawyer in Toronto. No red flags for our CSL processing agents.
(51) Yvonne Mazurak | LinkedIn


William W. Toole
Deputy
North Carolina Department of Secretary of State
919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 12/22/2022 11:11 AM >>>
Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | geluwa@sosnc.gov |
| To: | Tim Crowley |
| CC: | William Toole, liz proctor |
| Subject: | Report call |
| Date: | 22-Dec-2022 11:11 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE_3.jpeg [Save] [Open] |
| Creation Date: | 22-Dec-2022 11:11 |
| Store Date: | 22-Dec-2022 17:57 |
| Status: | opened,read,replied |
| Box Type: | received |
| Folder: | Timothy Crowley > Mailbox |
| Message Id: | 63A481B9.domain.PO.200.2000041.1.A1937.1 |

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada.

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622Raleigh, NC 27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState ( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | harvey.cashore@cbc.ca |
| To: | CSL |
| Subject: | [Caution: External Mail] Fwd: Canadian Broadcasting Corporation inquiry |
| Date: | 21-Dec-2022 14:23 |
| Attachments: | TEXT.htm [Save] [Open] |
| | headers.822 [Save] [Open] |
| | Mime.822 *(excluded from export)* |
| Creation Date: | 21-Dec-2022 14:23 |
| Store Date: | 21-Dec-2022 17:32 |
| Status: | |
| Box Type: | received |
| Folder: | CSL Home > Mailbox |
| Message Id: | 63A35D36.domain.GWIA.200.20000B6.1.8428C2.1 |

Hi there,

I just wanted to follow up with this request.

I am a reporter with the Canadian Broadcasting Corporation.

Would it be possible to speak with someone about this request?

I am at 1-416-526-4704.

Best,

Harvey Cashore

-------- Forwarded message --------
From: Harvey Cashore <harvey.cashore@cbc.ca>
Date: Sun, 18 Dec 2022 at 09:54
Subject: Canadian Broadcasting Corporation inquiry
To: <csl@sosnc.gov>


To Whom It May Concern:

I am a journalist with the Canadian Broadcasting Corporation.

I am researching a story about a Canadian-based charity, WE Charity.

I would like to speak with someone in your office about the filings WE
Charity made to North Carolina this year as part of its solicitation
license application.

I have some specific questions about particular documents that you were

provided, and how they compare to additional documentation in the research.

Would it be possible to discuss this more on the phone?

I can be reached at 416-526-4704 and at this email address.

I look forward to hearing back from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate


--
Harvey Cashore
Producer, The Fifth Estate
Pronouns:  he and him

Cell: 416-526-4704

TEXT.htm                                                                    **ATTACHMENT**

Hi there,

I just wanted to follow up with this request.

I am a reporter with the Canadian Broadcasting Corporation.

Would it be possible to speak with someone about this request?

I am at 1-416-526-4704.

Best,

Harvey Cashore

---------- Forwarded message ----------
From: **Harvey Cashore** <harvey.cashore@cbc.ca>
Date: Sun, 18 Dec 2022 at 09:54
Subject: Canadian Broadcasting Corporation inquiry
To: < csl@sosnc.gov>

To Whom It May Concern:

I am a journalist with the Canadian Broadcasting Corporation.

I am researching a story about a Canadian-based charity, WE Charity.

I would like to speak with someone in your office about the filings WE Charity made to North Carolina this year as part of its solicitation license application.

I have some specific questions about particular documents that you were provided, and how they compare to additional documentation in the research.

Would it be possible to discuss this more on the phone?

I can be reached at 416-526-4704 and at this email address.

I look forward to hearing back from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate


--
Harvey Cashore
Producer, The Fifth Estate
Pronouns:  he and him

Cell: 416-526-4704

**MAIL**

| From: | harvey.cashore@cbc.ca |
|---|---|
| To: | CSL |
| Subject: | [Caution: External Mail] Canadian Broadcasting Corporation inquiry |
| Date: | 18-Dec-2022 09:54 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| | headers.822  [Save]  [Open] |
| | Mime.822   *(excluded from export)* |
| Creation Date: | 18-Dec-2022 09:54 |
| Store Date: | 18-Dec-2022 17:30 |
| Status: | |
| Box Type: | received |
| Folder: | CSL Home > Mailbox |
| Message Id: | 639F2999.domain.GWIA.200.2000020.1.83D7F7.1 |

To Whom It May Concern:

I am a journalist with the Canadian Broadcasting Corporation.

I am researching a story about a Canadian-based charity, WE Charity.

I would like to speak with someone in your office about the filings WE
Charity made to North Carolina this year as part of its solicitation
license application.

I have some specific questions about particular documents that you were
provided, and how they compare to additional documentation in the research.

Would it be possible to discuss this more on the phone?

I can be reached at 416-526-4704 and at this email address.

I look forward to hearing back from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate

**ATTACHMENT**

To Whom It May Concern:

I am a journalist with the Canadian Broadcasting Corporation.

I am researching a story about a Canadian-based charity, WE Charity.

I would like to speak with someone in your office about the filings WE Charity made to North Carolina this year as part of its solicitation license application.

I have some specific questions about particular documents that you were provided, and how they compare to additional documentation in the research.

Would it be possible to discuss this more on the phone?

I can be reached at 416-526-4704 and at this email address.

I look forward to hearing back from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate

**MAIL**

| | |
|---|---|
| **From:** | harvey.cashore@cbc.ca |
| **To:** | Samantha Williams |
| **Subject:** | [Caution: External Mail] Canadian Broadcasting Corporation inquiry |
| **Date:** | 13-Dec-2022 14:21 |
| **Attachments:** | TEXT.htm  [Save]  [Open] |
| | headers.822  [Save]  [Open] |
| | Mime.822   *(excluded from export)* |
| **Creation Date:** | 13-Dec-2022 14:21 |
| **Store Date:** | 13-Dec-2022 18:53 |
| **Status:** | forwarded,opened,read |
| **Box Type:** | received |
| **Folder:** | Samantha Williams > Mailbox |
| **Message.Id:** | 6398D0B8.domain.GWIA.200.20000F9.1.838C24.1 |

Dear Samantha Williams,

I am a journalist with the Canadian Broadcasting Corporation in Toronto.

I am preparing research related to the Canadian-based charity, WE Charity.;

I am hoping to get your help understanding some documents and correspondence that have been filed publicly by WE Charity in North Carolina.  Would there be a good time to talk on the phone?  Could I explain more about my interest when we talk?

I can be reached at 416-526-4704.

I look forward to hearing from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate

TEXT.htm                                                                                    ATTACHMENT

Dear Samantha Williams,

I am a journalist with the Canadian Broadcasting Corporation in Toronto.

I am preparing research related to the Canadian-based charity, WE Charity.;

I am hoping to get your help understanding some documents and correspondence that have been filed publicly by WE Charity in North Carolina.  Would there be a good time to talk on the phone?  Could I explain more about my interest when we talk?

I can be reached at 416-526-4704.

I look forward to hearing from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate

**SENDER: COMPLETE THIS SECTION**

- ■ Complete Items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this to the back of the mailpiece, or on the front if space permits.    GE

1. Article Addressed to:

Shell Bray PLLC
Attorneys and Counselors at Law
WE Charity
Attn: Edward T. Chaney
100 Europe Drive, Ste 271
Chapel Hill, NC 27517

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Jenkins_   ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Jenn Jackson   3/29/2023

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

RECEIVED APR 05 2023

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)

7020 3160 0002 1254 0368

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



## Gail Eluwa - Report call

**From:** Gail Eluwa
**To:** Crowley, Tim
**Date:** 12/22/2022 11:11 AM
**Subject:** Report call
**Cc:** proctor, liz; Toole, William

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey Cashore@cbc.ca, 416-526-1704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.



### *Gail L. Eluwa, MBA*
Director Charitable Solicitation Licensing
_____
NC Department of the Secretary of State

*Post Office Box 29622*
*Raleigh, NC 27626*
*WWW.SOSNC.GOV*
*geluwa@sosnc.gov*
*https://www.facebook.com/NCSecState/*
*@NCSecState*
*Tel: (919) 814-5281*
*Fax: (919) 807-2220*

William Toole

Emily's We charity. The canadian notary is Yvonne Mazurak, who is identified on Linkedin as a first year trust, wills and estates lawye
processing agents.
BSI Yvonne Mazurak | LinkedIn

Page 1 of 3

# Gail Eluwa - Report call

**From:**      Gail Eluwa
**To:**        Crowley, Tim
**Date:**      12/22/2022 11:11 AM
**Subject:**   Report call
**Cc:**        proctor, liz; Toole, William

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.



*Gail L. Eluwa, MBA*
**Director Charitable Solicitation Licensing**

**NC Department of the Secretary of State**

*Post Office Box 29622*
*Raleigh, NC  27626*
*WWW.SOSNC.GOV*
*geluwa@sosnc.gov*
*https://www.facebook.com/NCSecState/*
*@NCSecState*
*Tel: (919) 814-5281*
*Fax: (919) 807-2220*

William Toole

Emily is Vce Charity. The canadian notary is Yvonne Maounk, who is identified on LinkedIn as a first year trust, wills and estates lawye processing system.
till Yvonne Maounk LinkedIn

## Gail Eluwa - Report call



**From:**    Gail Eluwa
**To:**       Crowley, Tim
**Date:**     12/22/2022 11:11 AM
**Subject:**  Report call
**Cc:**       proctor, liz;  Toole, William

Tim,

FYI: Document Examiner transferred a call to me from CBC Canada

Call transferred by Sam from Harvey.Cashore@cbc.ca, 416-526-4704 questioning the Canadian Notarized signature of Mr. Victor Li. He stated that he has a document dated March 2021 that Victor Li for health reason could not make any decision regarding the charity. I requested that he send me a copy of the document and I would discuss the issue with the Deputy Secretary and that I may not be the person responding to his inquiry, but the Director of Communications. I also informed him that we have no way of knowing who signed the document, but require that it is signed in front of a Notary Public.



### *Gail L. Eluwa, MBA*
**Director Charitable Solicitation Licensing**

### NC Department of the Secretary of State

*Post Office Box 29622*
*Raleigh, NC  27626*
*www.sosnc.gov*
*geluwa@sosnc.gov*
*https://www.facebook.com/NCSecState/*
*@NCSecState*
*Tel: (919) 814-5281*
*Fax: (919) 807-2220*

William Toole

Entity is We Charity.  The canadian notary is Yvonne Mazurak, who is identified on LinkedIn as a first year trust, wills and estates lawye processing agents.
(51) Yvonne Mazurak | LinkedIn



# Yvonne Mazurak · 3rd

Legal Counsel

Toronto, Ontario, Canada · Contact info

468 connections

( 🔒 Message )   ( + Follow )   ( More )

## Activity
466 followers

**Yvonne hasn't posted lately**
Yvonne's recent posts and comments will be displayed here.

Show all activity →

## Experience

 **Associate - Trusts, Wills, Estates & Charities**
Fasken · Permanent Full-time
Sep 2021 - Jul 2022 · 11 mos
Toronto, Ontario, Canada

---

William W. Toole
Deputy
North Carolina Department of Secretary of State
919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the
may contain confidential and privileged information. Any unauthorized use, disclosure, or distrib
conjunction with transactions of public business, this email is subject to N.C. Public Records Law
parties.

‹          ›

Tim Crowley

Liz is going to call and try to figure this out for us a bit--why he is calling us.                          12/22/2022 12:59 PM

 IMAGE.jpeg

liz proctor

Spoke to Cashore and he is going to be emailing the document he referenced in his call to Gail and me a little    12/22/2022 1:46 PM
later this afternoon. He's specifically interested in what the Department's response would generally be if
assertions made on a notarized charitable solicitation license application are found to not be accurate.

Cashore has reached out to other state charity regulators with the same inquiry. He says the CBC isn't
planning to run its story for another week or two.

A bit of background re coverage of the organization and Li:

https://www.cbc.ca/news/canada/we-charity-misled-donors-records-show-1.6251985

https://www.westernstandard.news/news/we-charity-cfo-threatened-with-jail-if-he-doesn-t-show-up-for-
questioning/article_d11f5914-12fa-543c-88ad-f2d8292eedba.html

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov

 IMAGE.jpeg

**Gail Eluwa - [Caution: External Mail] Questions from the Canadian Broadcasting Corporation**



| | |
|---|---|
| **From:** | Harvey Cashore <harvey.cashore@cbc.ca> |
| **To:** | <geluwa@sosnc.gov> |
| **Date:** | 12/22/2022 2:47 PM |
| **Subject:** | [Caution: External Mail] Questions from the Canadian Broadcasting Corporation |
| **Cc:** | <lproctor@sosnc.gov> |
| **Attachments:** | 2021 04 09 Victor Li lawyer letter to Parliamentary Committee.pdf |

Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary

committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

### A. Documentation filed with your office:

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath:  I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS.   Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020.  On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

**B. Information provided to the House of Commons ethics committee in Ottawa:**

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

**Questions for your office:**

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period,  stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for

"custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

> Harvey Cashore &lt;harvey.cashore@cbc.ca&gt;
>
> Hi Gail and Liz,                                                              1/3/2023 3:22 PM
>
> Happy New Year.
>
> Just wanted to check in on this and see when we might be getting a response.
>
> If you would like to talk more on the phone that would be great as well.
>
> Harvey
> --
> Harvey Cashore
> Producer, The Fifth Estate
> Pronouns: he and him
>
> Cell: 416-526-4704

**Gail Eluwa - Fwd: [Caution: External Mail] Canadian Broadcasting Corporation inquiry**



| | |
|---|---|
| From: | Samantha Williams |
| To: | Gail Eluwa |
| Date: | 12/13/2022 3:20 PM |
| Subject: | Fwd: [Caution: External Mail] Canadian Broadcasting Corporation inquiry |

Ms. Gail,

A journalist is looking to talk about the charity We. Please see email below.

Thank you

*Samantha Williams*
*Notary Public, Lead Document Examiner*
*Charitable Solicitation Licensing Div.*
*NC Department of the Secretary of State*

*Post Office Box 29622*
*Raleigh, NC 27626*
*www.sosnc.gov*
*swilliams@sosnc.gov*
*Phone: 919-814-5289*

"My father used to say, 'Don't raise your voice. Improve your argument.'"—Archbishop Desmond Tutu

>>> Harvey Cashore <harvey.cashore@cbc.ca> 12/13/2022 2:21 PM >>>
Dear Samantha Williams,

I am a journalist with the Canadian Broadcasting Corporation in Toronto.

I am preparing research related to the Canadian-based charity, WE Charity.;

I am hoping to get your help understanding some documents and correspondence that have been filed publicly by WE Charity in North Carolina. Would there be a good time to talk on the phone? Could I explain more about my interest when we talk?

I can be reached at 416-526-4704.

I look forward to hearing from you.

Best regards,

Harvey Cashore
Producer, CBC - The Fifth Estate



Let's pick this matter back up after the Christmas Break.  Get some rest everyone and stay warm.  Happy Holidays.

>>> liz proctor 12/22/2022 3:52 PM >>>
Cashore's questions are at the end of the email.

>>> Harvey Cashore <harvey.cashore@cbc.ca> 12/22/2022 2:46 PM >>>
Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation.  I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity.  WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers.  My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications.  (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity.  In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity.  Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

**A. Documentation filed with your office:**

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal" is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS.   Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020.  On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state:  "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

**B. Information provided to the House of Commons ethics committee in Ottawa:**

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition

limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

**Questions for your office:**

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period,  stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704



*State of North Carolina*
*Department of the Secretary of State*

ELAINE F. MARSHALL
SECRETARY OF STATE

January 5, 2023

Victor Li
c/o WE Charity
336 Queen Street East
Toronto, ON M5A 1S8

Dear Mr. Li:

**Re: Capacity as CFO**

The Charitable Solicitation Licensing Division of the North Carolina Department of the Secretary of State is charged with charitable solicitation licensing and enforcement under N.C.G.S. Chapter 131-F et. seq. (hereinafter referred to as "the Charitable Solicitation Act") and Title 18, Chapter 11 of the North Carolina Administrative Code.

WE Charity hereinafter referred to as, "WC," is a New York non-profit corporation incorporated on December 20, 1996, is registered with the State of North Carolina as a "charitable organization" as defined by N.C.G.S. §131 F-2(3), and is subject to the requirements of the Charitable Solicitation Act of North Carolina.

We are in receipt of a response you prepared for the Canadian Standing Committee on Access to Information, Privacy and Ethics dated March 15, 2021, and submitted to the Committee by your legal representative Megan Savard on or about April 9, 2021.

In your response to the Committee, you stated that you "have been on medical leave since the summer of 2020 and have not been performing the duties of CFO…" However, during two subsequent charitable application renewal periods, you signed the following documents during the time you were on medical leave and stated to the Canadian Standing Committee on Access to Information, Privacy and Ethics you were not acting in the capacity of CFO.

- 2021
  - o   Solicitation License Application Renewal signed and notarized 7/22/2021
  - o   FY 2020, Form 990 signed 11/21/2020 and prepared by a CPA on 11/21/2020
- 2022
  - o   Solicitation License Application Renewal signed and notarized 10/13/2022
  - o   FY 2020, Form 990 signed 1/28/2022 and prepared by a CPA on 11/25/2022

In connection with your signature of these documents, you swore before a notary public, under penalty of perjury, that you were the Treasurer or Chief Fiscal Officer of WC and that the information provided to the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing Division, was true and correct to the best of your knowledge.

In light of the conflicting testimony to the Canadian Standing Committee on Access to Information, Privacy and Ethics, the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing Division is requesting documentation to substantiate your role and capacity as CFO in the signing of these documents and that the affirmations made in those documents are accurate. You must submit your response, under oath and penalty of perjury, **within fifteen (15) days after you receive this letter** to the following address:

> Gail L. Eluwa, Director
> North Carolina Department of the Secretary of State
> Charitable Solicitation Licensing Division
> P.O. Box 29622
> Raleigh, NC  27626-0622

If you have any questions, feel free to contact me at geluwa@sosnc.gov or (919) 814-5281.

Sincerely.

Gail L. Eluwa, Director

Charitable Solicitation Licensing Division



## State of North Carolina
## Department of the Secretary of State

ELAINE F. MARSHALL
SECRETARY OF STATE

March 28, 2023

Shell Bray PLLC
Attorneys and Counselors at Law
Attn: Edward T. Chaney
100 Europa Drive, Ste. 271
Chapel Hill, NC 27517

### VIA EMAIL AND CERTIFIED MAIL RETURN RECEIPT REQUESTED

Dear Mr. Chaney:

**Re: WE Charity, Victor Li Capacity as CFO**

This office is in receipt of your correspondence dated March 20, 2023, and the accompanying March 20, 2023 Affidavit of Victor Li. In that affidavit, Mr. Li states "*During the period of my medical leave ... I continued to perform certain duties of [CFO]*, including attesting to the accuracy of the annual North Carolina Solicitation License Application Renewal and Forms 990 for 2021 and 2022, and similar forms."

Mr. Li's March 20, 2023 affidavit, sworn under penalty of perjury, states that he was indeed performing at least some duties of CFO during the period of his medical leave. Certainly, you can understand the confusion created by Mr. Li's earlier March 15, 2021 written statement to the Standing Committee on Access to Information, Privacy and Ethics, Committees Directorate – House of Commons (Standing Committee) that "*I have not been performing the duties of CFO ... since I started my medical leave" in the summer of 2020.* Mr. Li's 2021 statement to the Standing Committee was absolute in its declaration that Mr. Li had "not been performing the duties of CFO," which statement of Mr. Li led to the January 31, 2023 inquiry from this Division.

Shell Bray PLLC
Edward T. Chaney, Esq.
March 23, 2023
Page 2

Thank you for obtaining the clarifying March 20, 2023 affidavit from Mr. Li.  In light of Mr. Li's
unequivocal March 2023 sworn statement, that he was indeed performing at least some duties of
CFO during the period in question. At this time, this Division has no further questions for Mr. Li
with regard to his statement to the Standing Committee that he was not performing the duties of
CFO at the time he signed the annual North Carolina Solicitation License Application Renewal
and Forms 990 for 2021 and 2022.

In addition, all correspondence directed to WE Charity or you as their representative, has been
reviewed by legal counsel within the Department of the Secretary of State.

If you have any questions, feel free to contact me at geluwa@sosnc.gov or (919) 814-5281.

Sincerely.

Gail L. Eluwa, Director

Charitable Solicitation Licensing Division





**SAVARD + FOY**

MEGAN SAVARD
Criminal and Regulatory Lawyer
megan@savardfoy.ca
416-499-9205

April 9, 2021

**BY EMAIL**

Miriam Burke
Clerk of the Committee
Standing Committee on Access to Information, Privacy and Ethics
Committees Directorate – House of Commons
131 Queen Street, Room 6-37
Ottawa, Ontario K1A 0A6

Dear Ms. Burke:

Re:   **Victor Li**
      **Response to Committee's March 23, 2021 Request**

I enclose Mr. Li's response to the Committee's March 23, 2021 request for further information. Mr. Li provides this information to assist the Committee in their inquiry and under the same conditions as described in my letter of March 15, 2021. I also enclose the following documents, provided by WE Charity and ME to WE Social Enterprises in response to some of the Committee's questions:

- Report for WE Charity by Rosen & Associates, Forensic Accounants, dated October 27, 2020
- WE Village Impact Reports
- WE Charity Donor Reports
- Baraka Hospital Impact Report

As you know, Mr. Li is on indefinite medical leave due to serious health issues. Because he is unable to review or analyze large numbers of documents, or easily access company records, he asked WE Charity to help answer the Committee's numerous questions. He provided a copy of the questions to the organization and received additional information, which he has included in his response.

Kindly get in touch if you have further questions.

Yours very truly,

Megan Savard
Encl. x 8

SAVARD FOY LLP
[illegible address line]
[illegible line]

**RESPONSES TO QUESTIONS FROM THE COMMITTEE MARCH 23, 2021**

Please find my answers to the Committee's questions below. I have relied on my personal recollection and documents that were available to me. As I could not answer all the questions, I asked WE Charity and ME to WE Social Enterprises to help. I sent them a copy of the questions and they provided me with additional information, which I have copied into this document. Where the information comes from WE Charity and ME to WE Social Enterprises, I have *italicized* the answer.

1. *What financial information was requested from the Government of Canada in their decision-making process for WE to be awarded running the Canadian Student Service Grant (CSSG)?*

I do not know. This was previously addressed in my March 15, 2021 submission:

I was not directly involved in negotiations with ESDC regarding the CSSG. ESDC would be best positioned to answer this question. To the best of my knowledge, we provided all information requested. Also, We Charity's audited financial statements are available on its website, and its charity return is available on the CRA's website.

2. *What financial controls were put in place to keep CSSG money separate from WE Charity money?*

This was previously answered in my March 15, 2021 submission:

The CSSG advance was paid to WE Charity Foundation, not WE Charity. WE had financial controls in place to ensure CSSG finances were separate from other WE entities, including setting up a separate account to manage payments and expenditures. Internally, we had implemented specific codes for expenses and invoices related to the CSSG, and the number of people with signing authority for expenses was limited to a few senior staff.

Additionally, the contribution agreement stated that WE could be subject to audits in order to verify all expenditures. The audits could range from the provision of basic audited financial statements, a potential audit by the government, and a requirement to provide books and records to Canada's Auditor General in the context of an inquiry. The contribution agreement also required regular reporting.

3. *Who had signing authority over CSSG funds?*

This was previously answered in my submission of March 15, 2021:

My understanding is that WE Charity's executive leadership team was responsible for the design and implementation of the CSSG. They were responsible for final approval of expenses related to the CSSG within the parameters approved in the contribution agreement.

Please note that Craig or Marc Kielburger did <u>not</u> have signing authority over these funds.

4. *Had WE Charity ever been responsible for dispensing $500,000,000.00 in a six-month period at any point in its history?*

This was previously answered in my submission of March 15, 2021:

No.

5. *What assurance did WE Charity provide the Government of Canada that it could handle the financial load of this fund?*

I do not know. This was previously answered in my submission of March 15, 2021:

I was not personally involved in the negotiations with the Government of Canada. WE Charity has a 25-year track record of developing programs in collaboration with governments and large organizations, including numerous projects with the Government of Canada. Further details of WE Charity's proposal to the government was included in the organization's submissions to FINA on October 19, 2020.

6. *What payment software was in place for WE to use to pay students the funds earned through this program?*

This was previously answered in my submission of March 15, 2021:

We were setting up to two systems (because of the size of the program). Our primary system was using a national payroll provider to deliver the disbursement of the CSSG cash awards to eligible student participants. Our secondary system was working with one of Canada's largest financial instructions to directly deliver the funds.

7.      *Under the line item "Project related rent" how much of the $590,000 in the WE Budget for the CSSG was for the WE GLC or for rent in other WE/Kielburger properties?*

This was previously answered in my submission of March 15, 2021:

My understanding is that this line item reflects eligible expenses of associated occupancy costs for program-related expenses including program development, training, filming, editing, technology backend systems. The document referred to in the question was a budget; ultimately, WE could only be reimbursed for eligible expenses, as defined by the contribution agreement.

8. *Why was this rent put into the budget when there was a line item for a 15% administration fee for handling the program?*

This was previously answered in my submission of March 15, 2021:

There was no 15% administration fee.  Under the contribution agreement, only eligible expenses could reimbursed. The inclusion of a 15% contingency estimate for additional administrative expenses is common in budgets and in line with industry standards.

Additionally, my understanding is that the line item referencing a 15% administration fee was from a very early proposal with respect to the project. The budget for the CSSG grant approved by ESDC had a project administration of 5.5% which would directly support expenses related to administrative staff and resources for the grant.

9. *How many cases did you have where you failed to take off taxes for the CRA or IRS from employees because they were being treated as contractors on your books?*

None. This was previously answered in my submission of March 15, 2021:

WE follows all CRA and IRS regulations, including the deduction of applicable income payroll taxes. WE has not "failed to take off taxes" for any fulltime employees.


10. *How many Staff positions in WE Charity's Executive Office report directly to Craig Kielburger, Marc Kielburger, and Roxane Joyal? This would include for example, Chiefs of Staff, Executive Assistants, Personal Assistants, Communications Staff?*

I do not know. This was previously answered in my submission of March 15, 2021:

Human resources was not part of my role as CFO.


11. *Over the past four years who were the four highest paid staff members at WE Charity (excluding payment from exterior sources)?*

This was previously answered in my submission of March 15, 2021:

WE Charity's most recent T3010 Registered Charity Information Return shows that one employee made between $120,000 and $159,999, and three employees made between $80,000 and $119,999. These people were the four highest paid employees of WE Charity.


12. *Does WE Travel have a license to operate a travel agency in Canada? In the US?*

This was previously answered in my submission of March 15, 2021:

There is no corporate entity named "WE Travel". ME to WE Trips Inc. is a registered travel agency in Canada. ME to WE Trips Inc. does not exist in the United States.


13. *Can you characterize any substantial debts owed by WE Charity? E.g. mortgages, loan payments. How much and to whom?*

This was previously answered in my submission of March 15, 2021:

WE Charity's audited financial statements are available on its website, which lists all debts and liabilities.

14. *WE has reported that the "altruistic" profits from ME to WE are transferred to We Charity. The numbers very from 50%-100%? Why such a differential? Where do the other monies go?*

I do not know what is meant by "differential." This was previously answered in my submission of March 15, 2021:

Qualified auditors have confirmed that over a five-year period ME to WE Social Enterprises has given, on average, over 90% of its profits to WE Charity. Any remaining profits have been re-invested back to help scale the social enterprise. Therefore, 100% of all profits have been either donated to WE Charity or reinvested to grow the social enterprise. Over the years, ME to WE Social Enterprises has donated more than $23 million in cash and cost-offsetting in-kind services to the charity.

WE Charity and ME to WE Social Enterprise provided the following additional information related to this question:

*This point has been consistently mis-stated and misreported in recent months by critics who claim that the number "changes" between 50%, 90% and 100%, but these numbers are consistent.*

*50% - ME to WE is required to donate a minimum of 50% of its profit*

*90% - ME to WE has donated on average 90% of its profits*

*100% - ME to WE profits every year since its founding have been donated to WE Charity or reinvested to grow the next social purpose project*

*These numbers have not changed.*

15. *Allegations have been raised that Me to We is used to cover expenses that would have appropriately been covered by We Charity. Will you provide an annual report from Me to We so we can see what is covered under the heading of "expenses"?*

This was previously answered in my submission of March 15, 2021. However, I will provide additional context.

It is correct that ME to WE Social Enterprise has in the past paid expenses that could have been appropriately covered by WE Charity. Almost all charities approach funders and partners to cover expenses via in-kind or donation to reduce a charity's expenses. WE Charity also sought in-kind support from telecoms, technology hosting companies, consulting companies, and others. A charity lowering its costs is generally accepted as a positive.

ME to WE Social Enterprise has covered various expenses for the charity, including in-kind support such as ME to WE staff volunteering to help WE Charity on its charitable programs and other services such as providing free or reduced cost accommodation for WE Charity funders to visit project locations and then donate more funds to help the charity. Any expenses paid by ME to WE Social Enterprises Inc. related to WE Charity's operations would be noted as an in-kind donation to WE Charity, and is reflected in WE Charity's audited financial reports.

16. *Excluding "in-kind" how much money flowed from ME to WE in 2019 and 2020? Please list the reasons.*
17. *How much money moved from WE Charity to ME to WE 2019 and 2020? Please list the reasons.*

WE Charity and ME to WE Social Enterprises provided the following additional information regarding this question:

*Qualified auditors have confirmed that over the past five years that ME to WE Social Enterprise has given, on average, over 90% of its profits to WE Charity. Any remaining profits have been re-invested back to help scale the social enterprise. Therefore, 100% of all profits have been either donated to WE Charity or reinvested to grow the social enterprise. Over the years, ME to WE Social Enterprise has donated more than $23 million in cash and cost-offsetting in-kind services to the charity.*

*These questions – and others related to ME to WE – are mischaracterizing ME to WE Social Enterprises and misrepresenting its purpose. ME to WE has a three-part mandate, and it would be inaccurate to present ME to WE as only a fundraising vehicle for WE Charity.*

*First, ME to WE created 1,800 empowering jobs in underserved rural WE Villages regions around the world in eco-travel, artisans products, and Fairtrade consumables. Fairtrade employment is recognized in the international development community as a legitimate and effective tool to help achieve sustainable development. For example, ME to WE Artisans paid 4x the average amount previously earned by women entrepreneurs in Kenya. This is part of the WE Villages development model to assist communities reach a point of economic self-sufficiency.*

*Second, ME to WE Social Enterprises assisted the charity by solving needs, such as building hosting facilities for WE Charity donors to see their projects located in extremely rural locations without any alternative accommodations. This leads to increased donor transparency and further donations to assist the local community, and local empowering jobs to help people lift themselves out of poverty. The charity is fortunate that the social enterprise will spend the funds and assume all risks in launching these sites. WE Charity would purchase items and services from ME to WE Social Enterprises Inc. at cost or at wholesale price, while the social enterprise would work to find other clients to subsidize the costs for WE Charity to access the services at a lower cost. When requested by WE Charity, ME to WE hosts youth on youth scholarship trips or specialized donor trips. These trips have resulted in tens of millions of dollars of direct donations to the charity for its international projects.*

*Thirdly, ME to WE provides 100% of its profits to WE Charity or reinvests to grow the social enterprise and its mission. To be clear, auditors have confirmed that over the past five years that ME to WE Social Enterprises has given, on average, over 90% of its profits to WE Charity. See HERE. Auditors have confirmed that no dividends have ever been paid by ME to WE Social Enterprises. Meaning, since founding, 100% of its profit have either been donated to WE Charity for social impact programs or reinvested to grow ME to WE Social Enterprises and its social mission. See HERE.*

*All purchase of goods and services by WE Charity from ME to WE have multiple controls in place, including processes involving senior staff, approval by the WE Charity Board of Directors, and an annual review by the independent auditor. The WE Charity audited financial statements detail the financial amounts year-by-year, including 2020, 2019, and all preceding years. The audited financials statements for each year are available via this link.*

*In addition, the following is a breakdown of the requested and historical information from ME to WE Social Enterprise. Please note these contributions is based on the ME to WE fiscal year and not the charitable fiscal year.*

| Fiscal Year | Cash Donation | In-Kind Donation | Total |
|---|---|---|---|
| 2008-2009 | $ 365,452 | $ 653,880 | $ 1,019,332 |
| 2009-2010 | $ 351,202 | $ 705,220 | $ 1,056,422 |
| 2010-2011 | $ 467,061 | $ 785,900 | $ 1,252,961 |
| 2011-2012 | $ 487,000 | $ 1,045,720 | $ 1,532,720 |
| 2012-2013 | $ 617,000 | $ 1,127,990 | $ 1,744,990 |
| 2013-2014 | $ 1,487,611 | $ 541,896 | $ 2,029,507 |
| 2014-2015 | $ 837,060 | $ 500,000 | $ 1,337,060 |
| 2015-2016 | $ 1,047,300 | $ 500,000 | $ 1,547,300 |
| 2016-2017 | $ 1,484,000 | $ 500,000 | $ 1,984,000 |
| 2017-2018 | $ 2,104,714 | $ 912,000 | $ 3,016,714 |
| 2018-2019 | $ 3,616,264 | $ 1,328,324 | $ 4,944,588 |
| 2019-2020 | $ 397,750 | $ 1,535,210 | $ 1,932,960 |
| Total | $ 13,262,414 | $ 10,136,140 | $ 23,398,554 |

*ME to WE has contributed millions more in cash (as well as significantly more in-kind donations) than the services purchased by WE Charity.*

*Some critics have noted that the charity purchases services from the social enterprise – mostly providing scholarships for youth on global service trips – and it is critical to note that when looking at the overall financials, WE Charity receives the value of the trips to benefit youth AND the full amount of the purchase price in cash donated back to WE Charity AND significant additional cash donations from ME to WE. When adding the in-kind, this amount is even more significant.*

*Over the years, many others who lead charities have asked for our advice how to establish a similar social enterprise model to assist the charity in delivering its social mission.*

18. *What compensation, financial or otherwise, have you received from any of the related corporate companies or real estate?*

A similar question (Who paid your salary? That is, have you been paid recompense by WE Charity, Me to We, and/or another WE related organizations?) was previously answered in my submission of March 15, 2021:

I was paid by WE Charity, ME to WE Social Enterprise Inc., and the Wellbeing Foundation. My total remuneration was approximately $150,000 per year.

19. *What other WE-related or Kielburger-related entities in the world are you involved with in any capacity, as a director, CFO or otherwise?*

I am the CFO of WE Charity and ME to WE Social Enterprise group of organizations. Given my expertise in financial matters, I have also voluntarily (for no financial compensation) occasionally offered my assistance to Craig and Marc Kielburger and other individuals in my network with private financial planning advice.

20. *Can you explain your relation to the property at 212 Carlton St. in Toronto. Was this building purchased with funds from WE Charity? Why was the address of Mr. Mingze Li listed as your home address? What is the relationship between you and Mr. Mingze Li? How did Mr. Mingze Li pay for 212 Carlton St.? Where did the money come from? Why was it sold at below market value? It appears that Mr. Mr. Mingze Li sold 212 Carlton St. to a Yutain Qi. Has Yutoin Qi ever been an employee of WE Charity or any associated organizations? Who currently owns 212 Carlton St?*

I have no connection to the property at 212 Carlton St. 212 Carlton St has never been owned by WE Charity and the funds for its purchase did not come from WE Charity or any other related organization. I was not involved in any transactions involving 212 Carlton St. I do not have any other information related to the sale of the property.

I answered questioned related to Mr. Mingze Li in my previous answers to Committee. Mingze Li is not related to me. (This has been misreported in the press.) Mingze Li is the nephew of a former classmate of mine from university. When Mingze Li planned to come to the University of Toronto to study commerce and finance, his uncle asked me to keep an eye out for him. I let him use my home address as a mailing address when he moved to Canada.

21. *We have been informed that some staff at Free the Children/We Charity were paid through Me to We. How many employees were paid through the for-profit wing while working for the charity?*

I do not know. The specific scope of work by employees did not fall under my purview as CFO. But my understanding is that there were some ME to WE employees who also supported specific projects with WE Charity. Any staff falling into this category would help to lower the costs of the charity to ensure more funds were allocated directly to projects helping children.

22. *The We Charity Foundation was chosen by your organization to handle these grants. It was registered with the CRA as a shell company to hold real estate assets. Has it ever been used for other tasks unrelated to its original incorporation mission of handling real estate?*

This was previously answered in my submission of March 15, 2021:

WE Charity Foundation was created in part to manage legal liability. It is legally under the governance structure of WE Charity. Prior to 2020, it never operated or held any funds for any purpose. The use of corporate entities to isolate liabilities for particular projects is not uncommon.

WE Charity Foundation does not hold, and never held, WE Charity real estate assets. In the initial application to the CRA, holding real estate was proposed, but this never occurred.

In negotiating the agreement for the Canada Student Service Grant, the government required that WE indemnify the Government of Canada from all losses related to the participation of the first 40,000 students in the program, as well as the Non-Profit Partners who were engaging those students. As outlined in Section 22 of the contribution agreement, WE was required to acquire "appropriate comprehensive general liability insurance coverage to cover claims for bodily injury or property damage resulting from anything done or omitted by the Recipient or its employees, agents or Project Participants, in carrying out the Project." WE Charity was therefore assuming significant possible legal liability for the program, especially considering the service work would be done during a global health pandemic. Such liability could overwhelm WE Charity.

As such, WE Charity counsel proposed that WE Charity Foundation be the party to the funding agreement in order to protect WE Charity's pre-existing charitable assets, which are needed to continue to deliver WE Charity's longstanding charitable programs. Prior to signing the CSSG contribution agreement, the mandate of the foundation was formally altered with the CRA to align with the CSSG requirements.

23. *Do the WE Founders have signing authority at WE Charity (and/or any of the other WE organizations).*

No.

24. *How many organizations/Corporations/Charities/Etc. are in the Global WE family?*

   *Please list them all including where they are registered,*

Structurally, there are two groups of organizations – the charitable group of organizations and the social enterprise group of organizations.

WE Charity and ME to WE Social Enterprises provided the following additional information in answer to this question:

*WE operates in multiple countries around the world, each with their own unique rules, regulations and laws. Adhering to the regulations of every country and achieving operational efficiencies to maximize social good requires multiple entities. For example, Canada requires that a charity cannot run an unrelated business. Also, in Canada, the CRA often recommends a narrow mandate for a charity to meet a specific societal need. It is incorrect to state or imply that WE Charity's structure is in any way inappropriate. This has also been subject to a formal legal opinion by Canadian charitable law experts at Miller Thomson, which operates one of the largest charitable practices in the country.*

*In all cases, WE entities roll up to either (i) WE Charity or (ii) ME to WE Social Enterprises.*

*WE Charity has publicly submitted to a special committee of the Canadian Senate researching charity laws in Canada its request that Canadian charities should be permitted to operate unrelated businesses,*

*which would have permitted WE Charity and ME to WE to be the same entity as a global charity, and cut the number of incorporated entities around the world.*

*The following is a list of WE Charity and related charitable entities to the best of the information I have available:*

*Canada: WE Charity, WE Charity Foundation, ME to WE Foundation and Wellbeing Foundation.*

*USA: WE Charity, ME to WE Foundation and Wellbeing Foundation.*

*UK: WE Charity, WE Education*

*The charitable organizations in Canada, USA, and UK have to be independent in each country, yet are all accountable to main charitable entity, WE Charity, in each respective country.*

*In Canada, for example, WE Charity is the "sole" or "founding member" of these related charities. What this means is that WE Charity's Board of Directors has significant authority over each of these charitable affiliates. This structure was established at the advice of our legal counsel. For a detailed overview of the mission, mandate, governance, and financials for the Canadian charitable entities please see our website here.*

*To further ensure accountability to WE Charity, the charity placed senior staff of WE Charity as Officers or Directors of these charity affiliates. This was done to facilitate coordination and to ensure an accountability line to the WE Charity Board. The relationships between these entities were always disclosed in our audited financial statements. As noted, this has also been subject to a formal legal opinion by Canadian charitable law experts at Miller Thomson. Please also note: all WE365 entities (Canada) are in the final process of being closed and should be completed in the coming days.*

*WE engaged counsel in each country to advise us on local regulations and operational efficiencies. The simple fact is that multiple affiliates and entities are often necessary to facilitate and optimize the social impact. In Kenya, it is Free the Children Kenya and WE Education. And WE Charity works with partner affiliate organizations in Ecuador, Haiti, India, China and Tanzania.*

*ME to WE has a common corporate structure where the parent company, ME to WE Social Enterprises, has a series of subsidiary entities that are focused on specific lines of operations that are required to be separated by legal, liability or other operational requirements.*

*Canada: ME Social Enterprises, ME to WE Trips, ME to WE Consumables, ME to WE Shop, ME to WE Asset Holding and 2569144 (owns one property under this separate legal designation due to issues around the Planning Act in Toronto). USA: ME to WE Shop; Kenya: Bogani, Araveli for Mamas, Kidumu, Linganya; Ecuador: Leaders Today, Araveli; India: ME to WE.*

*As is the case with many of the holdings, it is important to differentiate between the listed shareholder(s), which may be a person(s), for regulatory requirements, and sometimes a citizen of the specific country, and who is the ultimate beneficial owner, which in all cases is ME to WE Social Enterprise.*

25. *How many of these companies/organizations are owned partially or entirely by WE Founders Craig and Mark Kielburger or Roxanne Joyal?*

This question appears to be outside the scope of the committee's mandate to determine if there was a conflict of interest in awarding the CSSG contribution agreement. Furthermore, as a CPA, it is my fiduciary responsibility to act according to my professional training. It would not be appropriate for me to comment on private matters of these individuals. However, to respond to your question, in all cases, WE entities roll up to either WE Charity or ME to WE Social Enterprises.

26. *How many senior staff members (Executives, Directors, etc.) have received payments from ME to WE?  This would include the ED, COO, CFO and the founders?*

*Please list them.*

I receive part of my compensation from ME to WE Social Enterprise. Marc and Craig Kielburger are paid by ME to WE Social Enterprise. Neither Dalal Al-Waheidi, Executive Director of WE Charity nor Scott Baker, Chief Operation Officer for International Programming have ever been paid by ME to WE Social Enterprise.

27. *Do any WE Charity, ME to WE, or subsidiary organizations (national and/or international) do any business with companies owned by the founders or their family members this includes from rent on property to purchase of good and/or services?*

*Please list what these arrangements are.*

WE Charity and ME to WE Social Enterprises provided the following information in answer to this question:

*Yes, but the "rent" you are referring to has been widely misreported, and it is the generosity of Fred and Theresa Kielburger to provide WE Charity the use of 233 Carlton Street for a decade.*

*Fred and Theresa Kielburger have a long history of personally supporting the charitable initiatives of their sons. This includes providing WE Charity the use of 233 Carlton St. and 231 Carlton St., at an estimated in-kind value of $5.3 million over 10+ years (according to Sotheby's). Fred and Theresa Kielburger declined every year to take a tax receipt for their generous contribution, even though they could have done so. Their generosity has been certified by the WE Charity Board of Directors members and subject to independent review including by retired Ontario Court of Appeals Justice Stephen Goudge.*

*Justice Goudge reviewed the organization's relationship with the Kielburger parents and concluded: "From June, 2004 to September, 2018, WE Charity operated out of the office building at 233 Carlton Street. Fred and Theresa did not charge WE any rent for use of this building. ME to WE paid the carrying costs associated with the building, including property taxes and interest on the building's mortgage, through a targeted donation to WE Charity which was specifically earmarked for this purpose. From August, 2010 to September, 2018, WE Charity also operated out of the neighbouring office building at 231 Carlton Street, which is also owned by Fred and Theresa indirectly. Fred and Theresa did not charge WE any rent for use of the space, and paid all carrying costs associated with this building."*

*To be clear, ME to WE Social Enterprises covered the property taxes and mortgage interest only (no payment on principal) in the form of an annual donation to the charity for $97,200. The Kielburger family did not gain financially.*

*Furthermore, this question has been subject of review by multiple auditors and forensic accountants. Firstly, a standard role of an auditor is to examine and report any relevant related-party transactions, and within this framework related-party transactions between WE Charity and ME to WE and entities and people in leadership positions are disclosed on the audited financial statements. Please review the financial information which is available on our website, and the relevant link has been provided multiple times in this document. Secondly, this question was the subject of review in fall 2020 by forensic accountants, with particular note to question of related-party transactions, any form of person benefit, including real estate or "rent" to Craig Kielburger, Marc Kielburger, their spouses and parents. Craig and Marc Kielburger spoke about this forensic review in their opening statement to the Ethics committee. A copy of the report is attached.*

28. *We have heard so much about transparency yet see no financial reports or data for ME to WE. Will you provide those full financials to us?*

Please see the answer to question 16.

29. *What financial policies and systems do you use to track and account for any donations coming into any Kielburger related organization? How far back do these records go?*
30. *What systems and structures do you have in place to ensure that designated funding is actually spent in the appropriate places?*

Questions 29-30 were previously answered in my submission of March 15, 2021.

As CFO, I followed best accounting practices to track and account for donations, in accordance with CRA requirements. Our records are maintained for a minimum of 7 years. We have proper financial tracking systems, including a finance and accounting team to ensure that the funds are directed in the appropriate manner for the charitable entities. Moreover, each charitable entity is subject to an independent audit, each year.

31. *What payments or reimbursements have been made from WE Travel to Marc or Craig Kielburger?*

There is no corporate entity called "WE Travel." All costs associated to travel are covered by the entity incurring the expense as it would be for any other volunteer or staff member. For example, the charity would cover travel costs for an employee travelling for business reasons related to WE Charity. There are robust financial systems in place to ensure expenses are allocated to the appropriate entity.

32. *How many schools has WE Charity/Free the Children built in the past 25 years?*
33. *Please provide a list of all schools along with the country, addresses/location, and what donor funds went into its construction.*
34. *Please also indicate any that WE built for other foundations*
35. *Please provide all impact reports for these buildings*

This information is publicly available on WE Charity's website: more than 1,500 schools and schoolrooms have been built in WE Charity partner communities. WE Charity provided the following additional information:

*WE Charity/Free The Children has worked for 25 years to ensure children have access to a quality education, along with many other programs in health, clean water, sanitation, food security, and alternative income programs. Specifically, for education, over its history, we have supported and help build over 1,500 schools and schoolrooms in 16 countries and delivered development programs in 45 countries around the world.*

*From 1995 to 2005, WE Charity was a grant-giving organization, funding local organizations in 45 countries. Schools and various development programs were implemented by local community groups in these countries. WE Charity has not maintained contact with the dozens of organizations supported during the 90s to the mid-2000s. Much of the communication and coordination with the local organizations, who worked mainly in rural communities, was done by mail and phone due to technical limitations there were the norm in developing countries until recent years.*

*In 2005, WE Charity shifted its model to deliver programming directly and within fewer countries. The 5-pillar WE Villages model was designed to remove the barriers that prevent children from completing their education. The model is multi-facetted, including funding for education, clean water and sanitation, healthcare, food security, and alternative income programs. We partner with many local stakeholders as part of its development model, this includes communities, local government officials, local foundations and other local leaders.*

*Given the above, it would take many months to collect the specific requested information tracing back 25+ years, including from early multiple partner organizations, especially in the format that you have requested.*

*To fulfill the spirit of your request, attached is information in the format in which it is currently available, including robust information for the committee about WE Charity's international programs, including over 300 pages of reports, profiles, and photos. The document provides a sample of specific communities, type of programs, number of beneficiaries, and a detailed overview of our intervention. These 300 pages provide detailed overviews of our programs in various countries, including profiles of specific communities, specific community development projects funded, and specific beneficiaries. 3 sample reports that have been provided in recent years to donors with respect to their support for a community are attached.*

36. *How many Hospitals has WE Charity/Free the Children built in the past 25 years? Please provide a list of all hospitals along with the country, addresses/location, and what donor funds went into its construction.*
37. *Please provide all impact reports for these buildings*

These questions are not within my responsibility as CFO. WE Charity provided the following information:

*WE Charity / Free The Children has built one full-scale hospital in Kenya called Baraka.*

*As part of its health pillar, WE Charity has also built and/or supported many other types of health interventions, including support for local medical clinics, mobile health units, food and nutrition programs and school-level health training programs.*

*Baraka was opened in 2010, initially as an outpatient only clinic, and has grown to a fully registered hospital with a maternity wing, inpatient services, and emergency services. 115,000 patients have received care and treatment services since its opening.*

*Attached is a sample of a report that would have been provided to supporters of Baraka and the health pillar.*

38. How many Villages were adopted in the past 25 years?
39. Please provide a list of the village along with the country, addresses/location, and what donor funds went into its construction.

    Please provide all impact reports

These questions are not within my responsibility as CFO. WE Charity provided the following information:

*From 1995 to 2005, WE Charity was a grant-giving organization, funding various programs with local organizations in 45 countries across many villages and communities. Many of the programs supported populations across wide geographic regions, such as providing medical supplies to hospitals that serve a wide catchment region. Much of the communication and coordination with the local organizations, who worked mainly in rural communities, was done by mail and phone due to technical limitations.*

*In 2005, WE Charity shifted its model to deliver programming directly and within fewer countries. WE partners with many local stakeholders as part of its development model, this includes communities, local government officials, local foundations and other local leaders.*

*Given the nature about how programs evolved over 25 years, reaching 45 countries with programs that supported infrastructure, in-kind resources such as medical supplies, and capacity building program drawing together people across a wide geographical region, it is not a simple matter to quickly calculate "how many villages" benefited from programs over that timeframe.*

*To fulfill the spirit of your request to better understand WE Charity's international programs, robust information to the committee about WE Charity's international programs is attached, including over 300 pages of reports and detailed overviews of our programs in various countries, including profiles of specific communities, specific community development projects funded, and specific beneficiaries. As noted above, 3 reports that have been provided to donors with respect to their support for a community are attached.*

40. Will you confirm who is listed as the owner of the Toriana Beach House in Kenya and what formal arrangement it has with WE Charity and/or ME to WE?

Toriana is owned by ME to WE Trips (through ME to WE Social Enterprise). I received the following additional information about the operation of Toriana from We Charity and ME to WE Social Enterprises:

*The property in Toriana was purchased for the exclusive purpose of hosting ME to WE Trips to Kenya. After volunteering at ME to WE camp locations in the Massai Mara, guests were able to stay at this property, and the revenue generated from their stay fulfills the same promise of ME to WE, namely 100%*

*of profits benefiting the work of WE Charity or are reinvested to grow the social mission. Previous to the purchase of Toriana, guests were staying at other locations, and ME to WE identified an opportunity as part of its model, as well to ensure that additional financial benefit would accrue to support the charity.*

41. *How much is the manufacturing cost of one Rafiki bracelet?*
42. *How much money is raised from selling these bracelets every year?*

I do not know. ME to WE Social Enterprises provided the following information related to this question:

*ME to WE Social Enterprise produces various products every year, and there many types of rafikies that vary substantially in retail price and production costs.*

*Women taking part in ME to WE Artisans are able to earn twice as much as what is considered a fair wage in their country—without giving up their traditional way of life. As part of ME to WE's rigorous evaluation by B-Corp[1] – reviewing finances, governance, human-resource policies, and supply chain – it demonstrated that 76% of the cost of ME to WE goods sold went to our artisans in partner communities versus other suppliers. For the sake of clarity, 76% was spent on providing opportunity and paying fair wages to small scale, independent suppliers in developing communities which is high percentage.*

*Like with all ME to WE products, 100% of the profits from the sale of rafikies have either been donated to WE Charity or reinvested back to help scale the social enterprise. Qualified auditors have confirmed that over the past five years that ME to WE Social Enterprise has given, on average, over 90% of its profits to WE Charity. Over the years, ME to WE Social Enterprise has donated more than $23 million in cash and cost-offsetting in-kind services to the charity.*

43. *How much of that money is returned to Araveli for Mamas Corporation?*
44. *Who is the registered owner of Araveli for Mamas Corporation?*

I do not know. ME to WE Social Enterprises provided the following information related to this question:

*Araveli for Mamas Corporation is part of the ME to WE structure. The funds are not "returned" to this entity, but rather, like with all entities under ME to WE Social Enterprise, the profits are donated to WE Charity or reinvested to grow the social mission.*

45. *What do you pay an average 'mama' for her work in beading a Rafiki bracelet?*

ME to WE Social Enterprises provided the following information related to this question:

*ME to WE Social Enterprise produces various products every year, and there many types of rafikies, including different sizes, price points and inputs. As a result, payment for production varies depending on many factors.*

*However, women taking part in ME to WE Artisans are able to earn twice as much as what is considered a fair wage in their country—without giving up their traditional way of life. As part of ME to WE's rigorous evaluation by B-Corp – reviewing finances, governance, human-resource policies, and supply chain – it demonstrated that 76% of the cost of ME to WE goods sold went to our artisans in partner*

---

[1] Certified B Corporations are businesses that meet the highest standards of verified social and environmental performance, public transparency, and legal accountability to balance profit and purpose. B Corps are accelerating a global culture shift to redefine success in business and build a more inclusive and sustainable economy.

*communities versus other suppliers. For the sake of clarity, 76% was spent on providing opportunity and paying fair wages to small scale, independent suppliers in developing communities, which is high percentage.*

*Aside from steady employment, ME to WE Artisans also offers small-business training for extremely marginalized women to further develop a source of income to support their families. To complete the closed loop, partial proceeds from the purchase of Artisans goods support development programs such as schools and clean water systems in the very regions where the women live and work.*

*From my understanding, in the end, ME to WE scored 108 on our B Corp evaluation—double the median score for all other B Corps. Here are some of the criteria that ME to WE got a perfect score on:*

- *Fair wages: ME to WE pays artisans who supply handmade accessories 2.2 times more than what is considered a fair wage by the B Lab.*
- *Gender equality: ME to WE has extremely high numbers of women on its team, as well as women in management.*
- *Self-evaluation: ME to WE rigorously measures the outcomes that its products and services achieve to ensure it is having the impact it wants.*

46. *Location of all property owned by the WE Organizations (We Charity and related companies related to the Kielburger brothers).*

WE Charity and ME to WE Social Enterprises provided the following in answer to this question:

*The following is an overview of WE charitable property:*

*Canada: WE charitable owned properties all located in Toronto:339-345 Queen Street E, 336-338 Queen Street E, 335-337 Queen Street E, 141 Berkeley Street Rear, 139 Berkeley Street, 333 Queen Street E. 329 Queen E, 135 Berkeley Street Rear, Unit 2A - 323 Queen E.*

*India: Rajasthan office (in the rural regions outside of Udaipur).*

*With respect to humanitarian projects, depending on the specific regulations of the country and projects, the ownership of the humanitarian project may be the local community. In some cases, such as Kenya, the humanitarian project may be held in a local ownership or trust for WE Charity in Canada and including a level 4 hospital, a women's empowerment center, 3 high school locations, a college, a community medical clinic and a farm as well as 2 houses which serve as accommodations for staff and other administrative needs. In Ecuador this includes an agricultural learning center for the community.*

*The following is an overview of ME to WE's property:*

*Canada: 145 Berkeley / 319 Queen Street E, 332-334 Queen Street E, 331 Queen Street E, Unit 2B - 323 Queen Street E*

*Kenya: Bogani volunteer camp, Toriana, and a property outside of Nairobi for women's empowerment programs (owed by ME to WE, however, held in trust for the charity).*

*India: Rajasthan Aravelli volunteer camp*

*Ecuador: Minga volunteer lodge.*

47. *Were there any moves in March/April 2020 to start selling real estate?*
48. *What plans were in place in October 2020 to start selling real estate? What properties are on the block?*

Questions 47-48 were previously answered in my submission of March 15, 2021. However, I would like to further clarify my response.

On September 9, 2020, WE Charity announced it was winding down its Canadian operations, as well as plans to sell its properties to create a charitable endowment. The WE Charity assets, which will be the basis of the charitable endowment, were listed with the realtor Colliers in October 2020, and shortly thereafter made available to potential clients. The sales process is still ongoing.

WE Charity's 2019 audited financial statement notes that WE Charity owns land and property with a net book value of approximately $39 million. There has been no major change in the value of property held by WE Charity since that time.

In March 2020, WE briefly listed some smaller properties for sale to test the real estate market at that time.

49. *Who is monitoring the financial assets of the WE organization in India and in Ecuador? What has become of these assets?*

In Ecuador and India, there is a strong local team who are responsible for the oversight and guidance of activities in the countries, including any locally owned assets.

50. *From what account in the WE organization were expenses for legal fees in Kenya paid?*
51. *What account in the WE organization was used to pay for the Israeli security firm in Kenya?*

Legal fees, like all other expenses, are allocated to the entity that incurred the expenses. To the best of my knowledge, if a security firm was engaged to support activities with the charity, expenses would have been paid by WE Charity.

52. *What was the name of the company?*

I do not know the name of the company referred to in the question. WE Charity consulted with advisors and they informed me that the names of any firms providing security should not named for security reasons.

53. *How do your WE Day events work? It would appear that you receive donor dollars into WE Charity for the event, but then a major portion of the event is in support of your private social enterprise (trips, merchandise, kits, books, etc.). So, do charitable tax deductions for companies like TELUS, Wallgreens, Allstate, etc differentiate what donations are for actual charitable work and what funds are subsidizing your for profit operations?*

Questions 53-54 were previously answered in my submission of March 15, 2021.

WE Charity only provides charitable tax deductions for donations in accordance with the CRA rules and the law.

WE Charity has provided the following further information in answer to this question:

*There seems to be a misunderstanding by certain members of the committee how WE Day works. Firstly, WE Day is a charitable event. It is not a "for profit" activity. WE Day is a youth empowerment event with the purpose of celebrating youth volunteerism and service.*

*WE Day was a series of stadium-sized events held across Canada, the U.S. the UK and the Caribbean attended annually by over 200,000 students who earned their free entry through supporting thousands of charities and causes. WE Day was "cause inclusive", meaning that youth could attend by supporting any charity or cause. The only rule was that one action must support your local community and one action must support your global community. At every WE Day dozens of causes and charities were featured on stage to inspire youth to engage in service for those causes.*

*More than a one-day event, WE Day was connected to the free, yearlong service-learning program WE Schools. Designed to enhance a school or community's existing social initiatives or spark new ones, WE Schools provides teachers with free educational resources and action campaigns to encourage students to take action in support of global and local causes including cyberbullying, mental health, equality, hunger, access to education and more.*

*Youth couldn't buy a ticket to WE Day. Students had to earn their way by taking one local and one global action through the charity's WE Schools program. Thanks to the generous support of sponsors, WE Day events were always free to attend.*

*There is also an important difference between a sponsorship and a donation. A donation takes place when funds are provided to WE Charity to support its charitable programs and no advantage (benefit or other item of value) is received by the Donor in return. As an example, WE Charity's international development program, WE Villages, is delivered around the world to empower people to lift themselves out of poverty with education, health, food, clean water and opportunity programming.*

*Sponsorship occurs when funds are provided to WE Charity, and an advantage is received in return. No charitable receipt is provided for sponsorships. As an example, WE Charity's youth empowerment event, WE Day, is a free event for youth largely because of sponsorship funds. WE Charity only provides charitable tax deductions for donations in accordance with the CRA and IRS rules and the law.*

54. *Do donor agreements include the ability to have their branding/logo/name be a part of any materials that is provided to students, schools, and school groups? If so, are they given charitable deductions for this or is this considered paid advertising?*

I do not know. WE Charity has specific educational standards for corporate engagement which are available on WE Charity's website and at this link. I refer you to this document to provide context on this question.

WE Charity only provides charitable tax deductions for donations in accordance with the CRA and IRS rules and the law.

55. *Property that was held by WE changed hands quite a few times, why was that?*

This is not an accurate statement. WE Charity sold its properties on Carlton Street in Cabbagetown when the organization relocated to Queen Street East in Corktown.

WE also developed and maintained a board-approved strategy to use real estate as an asset to ensure financial stability and maintain a low administration rate. WE developed and built the WE Global Learning Center, funded by dedicated funders, to scale its programming digitally. As part of its 25th anniversary, WE was in the process of developing the vision of a WE Social Entrepreneurship Centre.

WE is currently the in the process of selling all its charitable real estate assets in Canada and setting up an endowment to support domestic and international programming in perpetuity.

56. *Was the Brick by Brick campaign undertaken in Canada?*
57. *How much money was raised in Canada through that campaign?*
58. *How much money was raised in the United States through that campaign?*
59. *Where did that money end up, is there an accounting of money raised and what it ended up doing?*

Yes, the Brick by Brick campaign was part of WE Charity's fundraising campaign to build schools in developing countries. WE Charity has provided the following further information:

*Brick by Brick was a tool provided to schools in North America to measure against their fundraising goals, similar to a fundraising thermometer used by other charitable organizations. Schools in Canada and the United States would set a fundraising goal, divide that goal by 100 to set their "Brick by Brick" milestone. Schools would often then colour in a brick each time that milestone was met.*

*Please separately note that donors contribute to the education pillar, and funds are pooled together to advance education by funding aspects of both physical construction and education program delivery. The education pillar is much more than the physical schoolhouses and includes ongoing costs like outfitting the classrooms, school food supplements for students, building latrines and handwashing stations, building teacher accommodations, professional development opportunities for teachers, health and environmental clubs, inter-school competitions on club activities, school hygiene and school performance, student deworming and medical programs, as well as a focus on the quality of education within the classroom, with designated activities and resources to improve enrollment, attendance, and performance.*

60. *Please provide a complete list of all of entities, subsidiaries and numbered companies under control of the WE organization, WE Charity, ME to WE, the WE Charity Foundation the Kielburger's or any member of the WE executive team.*

Please see detailed response to Question 24 above.

To ask that I disclose any entity or company which is under the control of "any member of the WE executive team" is a significant overreach by this committee and also outside my responsibilities.

61. *"In an investigation published in December, Bloomberg Businessweek identified more than 30 entities spread across North America, the U.K. and Kenya linked to the Kielburgers or top WE executives. Li served as chief financial officer, director or a company signatory for at least 14 of those." Source: Bloomberg Businessweek. In relation to the quote, please provide a complete list of all entities you served as the chief financial officer, director or company signatory, from 1999 to present. Please include all entities that date back to Save the Children.*

Please see the answer to question 19. Further, the WE organization maintains records for 7 years. Records are not available from the late 90s. Based on that timeframe, I can confirm that all WE entities around the world ultimately are part of WE Charity or ME to WE Social Enterprises. Similar to many multi-national organizations, WE Charity and ME to WE Social Enterprises legally incorporates when necessary in countries of operations. Moreover, similar to many large organization, sub-entities may be used to minimize liability or for operational purposes. I serve as the CFO of WE Charity and Me to WE Social Enterprises. In that role, I oversee the financials of WE Charity and ME to WE Social Enterprise, including the sub-entities that ultimately are part of the larger entities.

Moreover, WE Charity was never known as "Save the Children"; this is a different organization.

62. *Please provide a full list of all speaking fees paid by WE or any of its associated entities, since you joined the organization in 1999.*

Due to confidentiality clauses in agreements with speakers, I am unable to provide this information. I am aware that a similar request was made to Speaker's Spotlight, which explained that it was unable to provide details due to privacy requirements.

63. *Given the statements made in WE Economy, it is clear that We Charity conducted a survey that collected data on voting in the 2011 federal election. When was this data collected and by whom? Was similar data collected in subsequent years? Was this data shared with any third parties?*

64. *Who are the third parties to whom WE Charity has contracted data analysis? Has WE Charity contracted data analysis to any third parties that also do data analysis for political parties, for example, Data Sciences?*

In response to questions 63 and 64, this is not under my purview as CFO. This does not fall under my purview as CFO. WE Charity provided the following additional information:

*This report was conducted by Mission Measurement, an organization that conducts evidence- and data-based evaluations of charities and non-profit organizations to measure their social impact. To the best of my knowledge, the raw data was not shared with any third parties, and I believe Marc and Craig Kielburger testified on March 15, 2021 to this fact.*

*Furthermore, Marc and Craig testified the purpose of the data collection was measures rates of civil engagement of WE alumni, which included: a) percentage who donated to charity in the most recent year; b) percentage who volunteered in the most recent year; c) percentage who voted in the most recent national election. Furthermore, they testified that no data was collected related to the specific party voted for by youth. They also testified that the final report (with no raw data) was frequently provided to various third parties, as it showed the success of WE Charity's model in encouraging youth to become active change-makers in their communities.*

*Marc and Craig Kielburger committed to Mr. Colin Carrie that they would provide the report to the committee.*

65. *The video that co-advertises We Charity and Justin Trudeau was produced by Door Knocker Media. What was the cost of this ad? How did this ad come about? According to information posted online, Door Knocker Media's client was WE Charity. Whose idea was it to produce this ad? Was it initiated by WE Charity? By Justin Trudeau? Or by Door Knocker Media? How did this ad come about and how has it been used?*

Video production was not part of my job as CFO. It is my understanding that Marc and Craig Kielburger testified to this on March 15, 2021. In answering questions to Mr. Colin Carrie, Craig Kielburger indicated that the Prime Minister was one of 50 people featured in the campaign. It was not a political ad, but instead, it was part of a campaign to celebrate Canada's 150th, with a message to encourage youth across the country to volunteer. The Prime Minister was not part of the campaign as the leader of the Liberal Party but as the Prime Minister of the country. The idea behind the campaign was initiated by WE Charity and it was used to celebrate Canada's 150th.

66. *What was the entire income, salary, dividends, consulting fees paid to Craig and Marc Kielburger from 1999 to the present? Please include a yearly breakdown.*

Craig and Marc Kielburger were paid by ME to WE Social Enterprises Inc, not WE Charity. ME to We Social Enterprises Inc. has never issued any dividends, so that did not form part of their compensation. Former Court of Appeal for Ontario Justice Stephen Goudge analyzed Craig and Marc Kielburger's compensation; the report is available here. To the best of my recollection, prior to 2017, Craig and Marc's salaries were lower than the salaries described in Justice Goudge's report.

67. *"Provide a list with amounts of all gifts, complimentary trips, payments or jobs given to Canadian elected officials or members of their families over the last 10 years." Source: Jesse Brown, CANADALAND*

I do not know. WE Charity provided the following information in relation to this question:

*All gifts with a value in excess of $20 would have been reported to the Ethics Commissioner by the recipient.*

*The only family member of an elected official employed by the organization would have been Grace Acann. Although I was not involved in HR decisions, I am aware that WE Charity would have benefited from the unique experience of Ms. Acann, who was born and raised in Uganda and was a refugee to Canada. As Mr. Morneau testified before the Finance Committee on July 22, 2020, his daughter worked as an unpaid co-op student at the WE organization in February and March 2019 while pursuing a community development degree at university. "After graduation, in July 2019, she was hired for a one-month position with WE, and then, after that, was offered a one-year contract as an administrative assistant in its travel department. That contract concludes at the end of August this year."*

*Information related to the total amount that WE had paid in expenses, benefits, reimbursements fees, or any other consideration in kind or monetary for all of the Trudeau family members was previously provided to FINA on October 19th, 2020, and then again in my responses provided to the committee on March 15, 2021.*

68. *"How do you explain that ME to WE Foundation has not disclosed in its US regulatory filings the non-arms-length relationships of its three directors?" Source: Charity Intelligence*

This was an error that has since been corrected. Regardless, the primary purpose of disclosure is related to director compensation, and none of those directors are compensated.

69. *"Why are you not directors, officers, or trustees of any of these charities, but rather take the title "co-founders"?" Source: Charity Intelligence*

I'm the CFO of WE Charity; I have never taken the title "co-founder".

70. *"Would you be willing to provide the Committee a complete list and organizational chart of all entities in all jurisdictions which have as directors, members, and/or officers any of the following people in the last five years: Marc Kielburger, Craig Kielburger, Kielburger family members, Dalal Al-Waheidi , Scott Baker, and Victor Li.?" Source: Charity Intelligence*

Please see detailed response in question 24

71. *What was the purpose of creating the WE Charity Foundation two years ago?*

This was previously answered in my submission of March 15, 2021:

WE Charity Foundation was created in part to manage legal liability. It is legally under the governance structure of WE Charity. Prior to 2020, it never operated or held any funds for any purpose. The use of corporate entities to isolate liabilities for particular projects is not uncommon.

WE Charity Foundation does not hold, and never held, WE Charity real estate assets. In the initial application to the CRA, holding real estate was proposed, but this never occurred.

72. *Will the Kielburgers provide the data showing that 79 percent of WE Charity participants voted in the 2011 Canadian election, double the rate of their peers?*
73. *In addition to collecting information on whether WE Day alumni vote, did the study also collect information on which party they voted for?*
74. *Will WE Charity provide a copy of the reports that Mission Measurement LLC provided to WE Charity on the project, "Free The Children Alumni Study?"*
75. *Was the report from Mission Measurement LLC shared with any third parties? Any donors? Any corporate partners? Any political parties?*
76. *What measures, if any, does WE Charity take to control the use of the WE Charity data on youth voting that has undeniably been in the hands of third parties such as Mission Measurement LLC? Is WE Charity aware of whether any of these third parties, including Mission Measurement LLC, has provided WE Charity's data on youth voting to any political parties or their partners? What precautions, if any, has WE Charity taken in order to ensure that its data on youth voting is not used by third parties for political purposes such as the targeting of swing ridings?*

In response to questions 72-76, this project did not fall under my purview as CFO. WE Charity provided the following information in relation to this question:

*This study was conducted by a third party, and raw data was not shared with WE Charity.*

*The data was not shared with any third parties, and I believe Marc and Craig Kielburger testified on March 15, 2021 to this fact.*

*Furthermore, Marc and Craig testified the purpose of the data collection was to measure rates of civil engagement of WE alumni, which included: a) percentage who donated to charity in the most recent year; b) percentage who volunteered in the most recent year; c) percentage who voted in the most recent national election. Furthermore, they testified that no data was collected related to the specific party voted for by youth. They also testified that the final report (with no raw data) was frequently provided to various third parties, as it showed the success of WE Charity's model in encouraging youth to become active change-makers in their communities.*

*Marc and Craig Kielburger committed to Mr. Colin Carrie that they would provide the report to the committee.*



**RESPONSES SUBMITTED MARCH 15, 2021**

I have witnessed the development of WE Charity for over 20 years – from Free the Children to WE Charity as it is today. I am immensely proud of the work we have done to empower change around the world.

I thank the committee for their accommodating my health. The past year has been a significant challenge for me. On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, may ability to work. Knowing that the Committee wants to complete its investigation as soon as possible, however, I am providing answers to approximately 100 of its questions. They are based on my personal recollection and publicly available information. I trust WE Charity and ME to WE Social Enterprises Inc. can provide any information I do not have.

For ease of reference, I have categorized my answers by topic. The Committee's questions are italicized.

**Qualifications and General Background**

1. *"Please provide evidence that you are certified in accounting in the U.S., the U.K. and China, as claimed on your http://WE.org profile." Source: Jesse Brown, CANADALAND*
2. *Are you willing to voluntarily provide the committee with copies of your certifications as an accountant in Canada?*

I am a Certified General Accountant and a Chartered Professional Accountant. I hold a Bachelor's degree in Accounting and a Master's degree in Finance. I did not write my WE.org profile; it is inaccurate. When I learned about the inaccuracy last summer, I asked for it to be changed. As I was on leave, I did not follow up on that request or review my profile again to determine if the change had been made.

I have attached the certificate as an accountant in Canada, as requested.

3. *Who paid your salary? That is, have you been paid recompense by WE Charity, Me to We, and/or another WE related organizations?*

I was paid by WE Charity, ME to WE Social Enterprise Inc., and the Wellbeing Foundation. My total remuneration was approximately $150,000 per year.

4. *Are you still the CFO of WE Charity?*
5. *Who is replacing you during your absence?*
6. *Are you still the CFO of Me to WE?*
7. *Who is replacing you during your absence?*

I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA.

**CSSG**

> 8.  *Have you been contacted by an Officer of Parliament regarding the CSSG?*
> 9.  *Have you been contacted by the RCMP regarding the CSSG?*

No, I have not been contacted by an Officer of Parliament or the RCMP regarding the CSSG.

> 10.  *Your signature is on the Contribution Agreement for the CSSG. Why was the contract retroactive to May 5, and expenses allowed to be incurred beginning on that date?*
> 11.  *What is the significance of May 5?*

I was not personally involved with negotiations with the Government of Canada. Under the terms of the Contribution Agreement, eligible expenses incurred after May 5, 2020 would be reimbursed by ESDC.

My understanding is that the effective date (May 5, 2020) on the contract reflects when WE began working and incurring eligible expenditures to design the program, build the program infrastructure, (such as backend technology, recruit not-for-profit partners, create bilingual training materials, and prepare to deliver the program).

> 12.  *Who gave you the assurance that your expenses, from May 5 onward, would be covered even though no contract was yet signed?*
> 13.  *WE Charity began incurring "eligible expenses" on May 5, more than two months before signing the contribution agreement. As you are a signatory of the agreement, and the CFO of WE, how were you assured that expenses would be reimbursed by the Government of Canada? Who from the government or political staff in the Prime Minister's office, or any ministerial office, informed you that WE could begin incurring expenses?*
> 14.  *Who in the government told you before May that those expenses would be eligible for reimbursement?*

I was not involved with negotiations with the Government of Canada. My understanding is that on June 4, 2020, WE received confirmation that May 5, 2020 was the date on which it could begin claiming eligible expenses for work that had been carried out once the contribution agreement was finalized. The contract was signed on June 23, 2020.

15. *Paragraph 5.1 of the funding/contribution agreement allows monies to be spent on salary from this funding/contribution agreement.? Would this allow for the WE Charity Foundation, WE Charity, ME to WE or any WE subsidiaries or entities to pay employees, including members of the WE executive team?*

Paragraph 5.1 allowed for the WE Charity Foundation of Canada to allocate a reasonable portion of a staff's salary for duties or activities related to the project. Only staff employed by WE Charity Foundation of Canada, WE Charity, Wellbeing Foundation, or ME to WE Foundation of Canada would qualify as potential eligible expenses under the terms of the Contribution Agreement. ME to WE Social Enterprises Inc. and other organizations would not be eligible for staff expenses under this section.

16. *What financial controls were put in place to keep CSSG money separate from WE Charity money?*

The CSSG advance was paid to WE Charity Foundation, not WE Charity. WE had financial controls in place to ensure CSSG finances were separate from other WE entities, including setting up a separate account to manage payments and expenditures. Internally, we had implemented specific codes for expenses and invoices related to the CSSG, and the number of people with signing authority for expenses was limited to a few senior staff.

Additionally, the contribution agreement stated that WE could be subject to audits in order to verify all expenditures. The audits could range from the provision of basic audited financial statements, a potential audit by the government, and a requirement to provide books and records to Canada's Auditor General in the context of an inquiry. The contribution agreement also required regular reporting.

17. *Who had signing authority over CSSG funds?*

My understanding is that WE's executive leadership responsible for the design and implementation of the CSSG were responsible for approving expenses related to the CSSG within the parameters approved in the contribution agreement.

18. *Had WE Charity ever been responsible for dispensing $500,000,000.00 in a six-month period at any point in its history?*

No.

19. What assurance did WE Charity provide the Government of Canada that it could handle the financial load of this fund?

I was not personally involved in the negotiations with the Government of Canada. WE Charity has a 25-year track record of developing programs in collaboration with governments and large organizations, including numerous projects with the Government of Canada.

20. What payment software was in place for WE to use to pay students the funds earned through this program?

We were setting up to two systems (because of the size of the program). Our primary system was using a national payroll provider to deliver the disbursement of the CSSG cash awards to eligible student participants. Our secondary system was working with one of Canada's largest financial instructions to directly deliver the funds.

21.           Under the line item "Project related rent" how much of the $590,000 in the WE Budget for the CSSG was for the WE GLC or for rent in other WE/Kielburger properties?

My understanding is that this line item reflects eligible expenses of associated occupancy costs for program-related expenses including program development, training, filming, editing, technology backend systems. The document referred to in the question was a budget; ultimately, WE could only be reimbursed for eligible expenses, as defined by the contribution agreement.

22. Why was this rent put into the budget when there was a line item for a 15% administration fee for handling the program?

There was no 15% administration fee. WE could only be reimbursed for eligible expenses, as defined by the contribution agreement.

23. Please provide documented evidence from WE Charity that the full $30 million dollars received from the Government of Canada for the Canada Student Service Grant (CSSG) has been paid back in full.

To the best of my recollection $22 million was returned to ESDC in July 2020 and the remaining $8 million in September 2020. After WE notified the government that it intended to return all of the CSSG funds, ESDC set the process for the return of funds.

24. In your role as Chief Financial Officer of WE Charity and in the context of the awarding of the contract to manage the student grant program, what information or documents did the federal government ask WE Charity to produce regarding its financial statements and structure?
25. What information or documents did WE Charity provide to the government on its financial statements before the contract was awarded to it?

26. What financial information was requested from the Government of Canada in their decision-making process for WE to be awarded running the Canadian Student Service Grant (CSSG)?

I was not directly involved in negotiations with ESDC regarding the CSSG. We Charity's audited financial statements are available on its website, and its charity return is available on the CRA's website.

27. Were any resources of ME to WE used or planned to be used to administer the CSSG?

No, ME to WE Social Enterprises Inc. resources were not used or planned to be used to administer the CSSG.

## Accounting practices and finances

28. "Why do you not hire leading international auditors to prepare your financial statements?" Source: Charity Intelligence

During my time as CFO, we worked with credible and reputable auditors to prepare our financial statements.

29. "At August 2019 year-end, WE Charity had cash and investments (gross funding reserves) of $11.5m compared with $14.0m at year-end August 2018. WE Charity's bank loans increased to $13.7m in 2019 compared with $11.1m in 2018. This creates a negative funding reserve of $2.2m. For the second year, WE Charity is in breach of its financial covenants on its bank debt. Its bank has waived these conditions for the current period. These bank loans are secured against WE Charity's properties valued at $39.4m." Source: Charity Intelligence. Please provide all details and circumstances retaliated to WE Charity breaking its financial covenants its bank debt for two consecutive years?

30. In negotiating the CSSG grant and contribution agreement, did you or anybody involved in the negotiations inform the Government of Canada that WE broke its financial covenants for two consecutive years?

31. As the CFO of WE, did you advise members of the WE executive team that they should inform the Government that WE broke its bank covenants for two consecutive years?

WE Charity has mortgages, and one of the covenants of the mortgage provisions is that WE Charity generates positive EBITDA to cover 1.3 times the mortgage payments in the fiscal year. In 2017/2018, WE Charity shifted its fiscal year from Jan-Dec, to instead Sept-Aug to align with the academic year how the organization operates. This resulted in a shortened fiscal year during which WE Charity made less revenue than it would over a full 12-month fiscal year. This shifted when donations were "recognized". In accordance with accounting principles, we must recognize a donation in the same timeframe when

the funds will be spent on projects. This is an accounting principle "on paper only" and the lender recognized the situation and willingly waived the respective requirements without any issue or concern on their part.

32. How do you ensure that 90% of your funding gets spent on programming, who gets to decide whether that programming is considered to be charitable development work, and how do you keep your administration costs at 10% or below of all of your funding?

As CFO, I worked to achieve WE Charity's goal of maximizing the efficiency of donors' money by maximizing the amount of money that goes towards programming as opposed to administration costs. General accounting principles and CRA regulations dictate what is considered a valid programming cost. On average, 90% of funds are spent on programming. This is reflected in WE Charity's audited financial statements, which show program expenditures and support (administrative) expenditures as separate line items. Additionally, ME to WE Social Enterprises Inc. provides significant in-kind support to WE Charity to directly reduce administrative expenses.

33. Recent media reports suggest that multiple donors and donations were used to fund the same local infrastructure projects in Kenya? What mechanisms and safeguards were put in place to ensure this did not happen?
34. What financial policies and systems do you use to track and account for any donations coming into any Kielburger related organizations? How far back to these records go?
35. What systems and structures do you have in place to ensure that designated funding is actually spent in the appropriate places?
36. WE Charity's website lists your main accomplishment as having "consistently delivered perfect auditor reports and flawless accounting practices" - with that in mind, are there any reports that can explain the testimony given by Reed Cowan at committee? If not, why not?

As CFO, I followed best accounting practices to track and account for donations, in accordance with CRA requirements.

37. Can you characterize any substantial debts owed by WE Charity? E.g. mortgages, loan payments. How much and to whom?

WE Charity's audited financial statements are available on its website, which lists debts and liabilities.

38. Has WE Charity filed its 2020 financial return with CRA?

Yes.

39. Has WE Charity ever been audited by CRA?

Yes.

> 40. How many cases did you have where you failed to take off taxes for the CRA or IRS from
>     employees because they were being treated as contractors on your books?

WE follows all CRA and IRS regulations, including the deduction of applicable income payroll taxes. WE
has not "failed to take off taxes" for any fulltime employees.


## WE Charity Foundation

> 41. You were the director of the WE Charity Foundation? Who did you take direction from in
>     running this organization, as Craig and Marc Kielburger suggested they were not involved in that
>     particular entity?

WE Charity Foundation is a legal entity created in part to manage legal liability. It is legally under the
governance structure of WE Charity and its Board of Directors.

> 42. Was the WE Charity Foundation a real estate holding company?
> 43. Did you tell CRA that We Charity Foundation was a real estate holding company with listed
>     assets in excess of $37 million in real estate?
> 44. What was the purpose of creating the WE Charity Foundation two years ago?
> 45. Please provide a full list of all the real estate holdings held by the WE Charity Foundation from
>     when it was created to the present.
> 46. Please provide all details about the WE Charity Foundation organization, structure, and decision-
>     making process. Were there any conflict of interests flagged with the foundation? If so, what
>     measures were in place to recuse those with conflicts from the decision-making process?
> 47. The We Charity Foundation was chosen by your organization to handle these grants. It was
>     registered with the CRA as a shell company to hold real estate assets. Has it ever been used for
>     other tasks unrelated to its original incorporation mission of handling real estate?

WE Charity Foundation was created in part to manage legal liability. It is legally under the governance
structure of WE Charity. Prior to 2020, it never operated or held any funds for any purpose. The use of
corporate entities to isolate liabilities for particular projects is not uncommon.

WE Charity Foundation does not hold, and never held, WE Charity real estate assets. In the initial
application to the CRA, holding real estate was proposed, but this never occurred.

In negotiating the agreement for the Canada Student Service Grant, the government required that WE
indemnify the Government of Canada from all losses related to the participation of the first 40,000
students in the program, as well as the Non-Profit Partners who were engaging those students. WE
Charity was therefore assuming significant possible legal liability for the program, especially considering

the service work would be done during a global health pandemic. Such liability could overwhelm WE Charity.

As such, WE Charity counsel proposed that WE Charity Foundation be the party to the funding agreement in order to protect WE Charity's pre-existing charitable assets, which are needed to continue to deliver WE Charity's longstanding charitable programs. Prior to signing the CSSG contribution agreement, the mandate of the foundation was formally altered with the CRA to align with the CSSG requirements.

<u>WE events</u>

48. Were you aware that the WE organization, WE Charity, ME to WE, the WE Charity Foundation, or any of WE subsidiaries or entities paid speakers and reimbursed expenses to guest speakers for speaking at WE Day, or any other WE events?

Yes.

49. Please provide all records of payments to WE Charity or any of its associated entities made to, Justin Trudeau, Sophie Grégoire Trudeau, Margret Trudeau or Alexander Trudeau or any past and present Liberal members of parliament or past or present staff members in the Prime Minister Trudeau's office.

50. From 2008-present, how much has the WE organization, WE Charity, ME to WE or any of WE subsidiaries or entities paid to the following individuals. Please include the event they spoke at, the amount the individual received for their speaking engagement.
Justin Trudeau
Sophie Grégoire Trudeau
Margret Trudeau
Alexandre Trudeau

51. From 2008-present how much has WE Charity, ME to WE or any of WE Charity's subsidiaries or entities reimbursed expenses for the following individuals. Please include an itemized of the expenses reimbursed for each event, the event they spoke at and the date in which it occurred?
Justin Trudeau
Sophie Grégoire Trudeau
Margret Trudeau
Alexandre Trudeau

52. What is the total amount that your organizations, including WE but not limited to it, have paid in expenses, benefits, reimbursements, fees or any other consideration, in kind or monetary, for all of the Trudeau family members?

This information was previously provided to FINA on October 19th, 2020. To the best of my knowledge, Justin Trudeau was not paid any speaking fees.

**Margaret Trudeau**

As provided previously provided to FINA, between October 2016 and March 2020, a speaking bureau was used to engage Margaret Trudeau 28 times. On each occasion she attended an average of 3-5 events per engagement. For one engagement, there was no compensation. The amount she received in fees for the 27 engagements totalled $180,000.00[i] (after 20% commission paid to speaker's bureau). The total amount of expenses (hospitality costs including food, hotels, car service, and flights) was $163,654.74, which captured several international trips to both the United States and United Kingdom. An additional $160 in gifts was provided to Margaret Trudeau during this time.

**Alexandre Trudeau**

As previously provided to FINA, between September 2017 and February 2018, a speaking bureau was used to engage Alexandre Trudeau 9 times. On each occasion he attended an average of 3-5 events per engagement.

The amount he received in engagement and ancillary event fees for these 9 engagements totalled $36,000.00[ii] (after 20% commission paid to Speaker's Spotlight). The total amount of expenses (hospitality costs including food, hotels, car service, and flights) covered for Alexandre Trudeau over the 9 engagements he attended was $22,025.42. An additional $230 in gifts was provided to Alexandre Trudeau during this time.

**Sophie Gregoire Trudeau**

As previously provided to FINA, between February 2012 and March 2020, Sophie Trudeau attended a total of 8 WE Day events. She received a one-time speaking fee of $1,500.00 in 2012. The total amount of expenses (hospitality costs including hotels, car service, and flights) covered for Sophie Trudeau over the 8 events she attended was $23,940.76. An additional $240 in gifts was provided to Sophie Trudeau during this time.

53. Did the Kielburgers or WE Charity ever expressly communicate to the board that speakers were not paid for WE Day events?

I am not aware of any such conversation.

54. How do your WE Day events work? It would appear that you receive donor dollars into WE Charity for the event, but then a major portion of the event is in support of your private social enterprise (trips, merchandise, kits, books, etc.). So, do charitable tax deductions for companies like TELUS, Wallgreens, Allstate, etc differentiate what donations are for actual charitable work and what funds are subsiding your for profit operations

55. Do donor agreements include the ability to have their branding/logo/name be a part of any materials that is provided to students, schools, and school groups? If so, are they given charitable deductions for this or is this considered paid advertising?

WE Charity only provides charitable tax deductions for donations in accordance with the CRA and IRS rules and the law.

**WE Charity board of directors**

56. As the Chief Financial Officer, how do you explain that a member of the board of WE Charity (Michelle Douglas) has trouble understanding the organization's structure?

57. What information about the structure of WE Charity did you provide to the board?

I cannot speak to what was understood by Michelle Douglas. I provided financial reports and responded to questions regarding financial matters to the board on a regular basis. I do not recall ever receiving a question from Michelle Douglas about WE Charity's finances or organization structure.

58. Was the Board of Directors made aware of the deal between WE Charity and the Government of Canada to deliver the Canada Student Service Grant, before it was announced publicly by Prime Minister Trudeau?

59. When was the Board of Directors first made aware that WE Charity was entering an agreement with the Government of Canada to deliver the Canada Student Service Grant? How was the Board informed?

I was not directly involved with the Board of Directors regarding the CSSG program. However, my understanding is that WE Charity Board of Directors was informed about the discussions with ESDC regarding the CSSG program prior to Prime Minister's public announcement and that information regarding the negotiations was shared on an ongoing basis at formal board meetings and through emails and verbal communications.

**Organizational structure / ME to WE Social Enterprises Inc.**

60. Why does WE have such a complex structure with money passing back and forth between not-for-profit and for-profit entities?

61. "Why do you need so many different entities and such a complex organizational structure in order to do your work?" Source: Charity Intelligence

62. Who oversees the coordination of reporting of these 30 entities [entities linked to WE] from a structural point of view?

In my opinion, it is not complex. The basic structure involves WE Charity and ME to WE Social Enterprises Inc.; all other organizations are sub-entities of either WE Charity or ME to WE Social Enterprises Inc. Social enterprise is an internationally recognized way of using a business to solve social issues. The creation of ME to WE Social Enterprises Inc. was solely the by-product of Canadian tax laws for charities, which do not easily accommodate social enterprises like the U.K. and US.

The organizational structure was established in consultation with our lawyers – Torys LLP and Miller Thomson LLP to ensure that WE Charity and ME to WE Social Enterprises Inc. can work together to deliver WE Charity's mission.

> 63. Is it normal for a CFO to control the finances of both charities and for-profit entities under the same umbrella?

There is no "normal" for operating a charity and related social enterprise in Canada. As CFO, I used best accounting practices to ensure that there was no conflict in acting as CFO for both entities. The organizations had their finances independently audited separately.

> 64. Why does WE Charity funnel money to ME to WE social enterprises?
> 65. How do you ensure complete separation of financial reporting and auditing between WE Charity and its for-profit arm, known as ME to WE?
> 66. WE has reported that the "altruistic" profits from ME to WE are transferred to We Charity. The numbers very from 50%-100%? Why such a differential? Where do the other monies go?
> 67. Allegations have been raised that Me to We is used to cover expenses that would have appropriately been covered by We Charity. Will you provide an annual report from Me to We so we can see what is covered under the heading of "expenses"?
> 68. Excluding "in-kind" how much money flowed from ME to WE in 2019 and 2020?
> 69. Please list the reasons
> 70. How much money moved from WE Charity to ME to WE 2019 and 2020?
> 71. Please list the reasons

WE Charity does not funnel money to ME to WE Social Enterprises Inc. WE Charity purchases various items and services from ME to WE Social Enterprises Inc. at cost or at wholesale price.

Qualified auditors have confirmed that over the past five years that ME to WE Social Enterprise has given, on average, over 90% of its profits to WE Charity. Any remaining profits have been re-invested back to help scale the social enterprise. Therefore, 100% of all profits have been either donated to WE Charity or reinvested to grow the social enterprise. Over the years, ME to WE Social Enterprise has donated more than $20 million in cash and cost-offsetting in-kind services to the charity.

> 72. What measures or safeguards were put in place to ensure that donor contributions from across the world would be separated from revenues earned through Me to WE, WE travel, merchandise sold and other ways WE earned revenue?

WE Charity and ME to WE Social Enterprise Inc. are separate legal entities. Their finances are not mixed.

> 73. We have heard so much about transparency yet see no financial reports or data for ME to WE. Will you provide those full financials to us?

Qualified auditors have confirmed that over the past five years that ME to WE Social Enterprise has given, on average, over 90% of its profits to WE Charity. This information is available on www.we.org.

74. Has ME to WE done any work on projects funded by the federal government?

To the best of my knowledge, ME to WE Social Enterprises has never done any work on projects funded by the federal government.

75. We have been informed that some staff at Free the Children/We Charity were paid through Me to We. How many employees were paid through the for-profit wing while working for the charity?

The specific scope of work by employees did not fall under my purview as CFO.

**Real estate**

76. Have you personally been involved in any real estate deals where property held by WE Charity, Me to We or any of the affiliate companies was transferred to you either directly or indirectly?

No.

77. How much real estate does WE currently hold in Canada? How much has been sold?
78. Where has the money gone from those sales?
79. Have you sold the properties, or do you plan to keep them?
80. Were there any moves in March/April 2020 to start selling real estate?
81. What plans were in place in October 2020 to start selling real estate? What properties are on the block?

WE Charity's 2018 audited financial statement notes that WE Charity owns property worth approximately $37 million. There has been no major change in the value of property held by WE Charity since that time.

In September 2020, WE Charity began exploring selling its properties to create a charitable endowment. That process is still ongoing.

82. What role did real estate play in WE Charity's overall strategy?
83. How important is real estate to the organization's mission?

By operating out of the buildings WE Charity owns, the organization minimizes office space costs, allowing WE Charity to reduce its administrative costs and ensure the most money possible goes to project expenses. Owning its own property also establishes a form of reserve fund that provides long-term financial security to the organization. It is also recommended that charities keep 6 to 24 months of reserve funds in place in order to withstand negative financial conditions. WE's reserve is established through the ownership of real estate, which allows accessible cash reserves through mortgages.

WE Charity's main building is the WE Global Learning Centre and prior to COVID-19, it assisted in the delivery of youth programs. Additionally, prior to COVID-19, the organization had a long-term plan to establish a Campus for Good to provide free and discount space to enable non-profits, social enterprises, and community services, within a hub in downtown Toronto.

## WE trips

84. Were you made aware of the WE Charity trip Bill Morneau and his family took in 2017?

I was not aware at the time of trip but became aware soon after.

85. How were the Morneau family travel expenses treated?

The expenses were initially paid by WE Charity. They were reimbursed to WE Charity by Mr. Morneau.

86. Did you issue tax receipts for these travel expenses? If so, please provide them
87. When Bill Morneau repaid, WE Charity (or the relevant WE entity) $41,366 on July 22, 2020 for his 2017 family trip to Kenya, did WE issue a receipt for the payment? If so, please provide a scanned copy of it.

Expenses like this are not eligible for a tax receipt. No tax receipt was issued.

## Miscellaneous questions

88. Please describe the role of Mingze Li within the WE organization
89. In what capacity did you and Mingzie Li work together?
90. Please provide all details and information on Mingzie Li's role in acquiring real estate for the WE organization? Why was important for an international charity to acquire significant real estate holdings in Toronto?
91. To the best of your knowledge please describe the work Mingze Li did in China for the WE organization.

Currently, Mingze Li has no role within the WE organization. He started with the organization as a junior consultant and eventually became a Senior Financial Analyst. He left the organization in August 2020 to return to school. Prior to working for WE, he was a volunteer with the organization in China, as a youth coordinator for one Canadian youth trip to rural China.

As CFO, I worked with Mingze Li on a regular basis. He reported to the Director of Accounting, who reported directly to me. He had no role in acquiring real estate for WE Charity.

92. How many Staff positions in WE Charity's Executive Office report directly to Craig Kielburger, Marc Kielburger, and Roxane Joyal? This would include for example, Chiefs of Staff, Executive Assistants, Personal Assistants, Communications Staff

Human resources was not part of my role as CFO.

93. Over the past four years who were the four highest paid staff members at WE Charity (excluding payment from exterior sources)?

WE Charity's most recent T3010 Registered Charity Information Return shows that one employee made between $120,000 and $159,999, and three employees made between $80,000 and $119,999. These people were the four highest paid employees of WE Charity.

94. Does WE Travel have a license to operate a travel agency in Canada? In the US?

There is no corporate entity named "WE Travel". ME to WE Trips Inc. is a registered travel agency.

95. ME to WE Foundation US reports US$15.8 million in program spending since 2015, but reports no staff or wages paid. What specifically was this money spent on?" Source: Charity Intelligence

A breakdown in spending is publicly available through the IRS.

96. Has WE Charity or its related entities received funding from foreign governments? If so which governments?

WE Charity and its related charitable entities within Canada have not received funding from any foreign governments.

97. Since November 1, 2016 to present please provide all correspondence, including electronic communications (emails, text messages and any messaging service websites or applications) with any federal elected official, any federal public office holders, any staff in any ministerial office and any public servants?

To the best of my recollection, I have not had any such communications in my role as CFO.

98. WE Charity has not registered as a third-party advertiser in any federal election. Why not?

That was not part of my role as CFO.

99. What are the reporting requirements for WE Charity's operations in Kenya, and do you report them based on Kenyan law, Canadian law, or both?

WE Charity Canada follows all Kenyan law and Canadian law for its charitable work in Kenya. All legal structures have been established in adherence with Kenyan laws and regulations, and there are approval systems in place for all transactions to ensure funds are spent on intended programs.

Additionally, there exists a clear quarterly project and milestone review between Free The ChildrenKenya and WE Charity Canada, which includes a review of donations received in Canada, the USA and the intended use for those donations.

100. Has WE ever had a security breech *(sic)* that may have put Personal Information at risk?

IT security was not part of my role as CFO. To my knowledge, WE Charity has not had a security breachthat put personal information at risk.

---

[i] This is an average of $6,666.66 per engagement.
[ii] This is an average of $4,333.33 per engagement.

**MAIL**

| | |
|---|---|
| From: | geluwa@sosnc.gov |
| To: | Gail Eluwa |
| Subject: | we charity |
| Date: | 07-Mar-2023 21:38 |
| Attachments: | TEXT.htm [Save] [Open] |
| Creation Date: | 07-Mar-2023 21:38 |
| Store Date: | 21-Mar-2023 04:53 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 6407F518.domain.PO.200.2000041.1.A40B7.1 |

Bill,

RE:  Response to

I notified you previously, of my having difficulty responding to Attorney Ed Chaney in referenced to WE Charity.  My problem is clarity in identifying which statute has been violated.

As previously mentioned,

So here is draft of some of my thoughts.  Feel free to modify and or change as needed.

*******************************************************************

Dear Mr. Chaney,

RE: Victor Li Capacity as CFO

This is to acknowledge your response to CSL's inquiry to Victor Li of WE Charity regarding his Capacity as CFO dated January 31, 2023, and the singing of applications for licensure and vital financial documents submitted to the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing (CSL) Division between November 2021 and November 2022.

According to N.C.G.S. § 131F-6, "The initial application for a license for a charitable organization or sponsor shall be submitted on a form provided by the Department, signed under oath by the treasurer or chief fiscal officer of the charitable organization or sponsor." CSL is not questioning whether Mr. Li is in fact the CFO of WE Charity but if he should have signed renewal applications for licensure and financial documents certifying that said documents were accurate given the fact that he was on medical leave and stated he was not acting as the CFO during this time frame.

TEXT.htm                                                                    **ATTACHMENT**

Bill,

RE:  Response to

I notified you previously, of my having difficulty responding to Attorney Ed Chaney in referenced to WE Charity.  My problem is clarity in identifying which statute has been violated.

As previously mentioned,

So here is draft of some of my thoughts.  Feel free to modify and or change as needed.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear Mr. Chaney,

RE: Victor Li Capacity as CFO

This is to acknowledge your response to CSL's inquiry to Victor Li of WE Charity regarding his Capacity as CFO dated January 31, 2023, and the singing of applications for licensure and vital financial documents submitted to the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing (CSL) Division between November 2021 and November 2022.

According to N.C.G.S. § 131F-6. "The initial application for a license for a charitable organization or sponsor shall be submitted on a form provided by the Department, signed under oath by the treasurer or chief fiscal officer of the charitable organization or sponsor." CSL is not questioning whether Mr. Li is in fact the CFO of WE Charity but if he should have signed renewal applications for licensure and financial documents certifying that said documents were accurate given the fact that he was on medical leave and stated he was not acting as the CFO during this time frame.

**MAIL**

| | |
|---|---|
| From: | geluwa@sosnc.gov |
| To: | Tim Crowley |
| CC: | William Toole, Gail Eluwa, liz proctor |
| Subject: | Fwd: [Caution: External Mail] Public Records Request |
| Date: | 07-Mar-2023 13:14 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE.jpeg [Save] [Open] |
| | 3.7.2023_Public Records Request re WE Charity and CBC.pdf [Save] [Open] |
| Creation Date: | 07-Mar-2023 13:14 |
| Store Date: | 21-Mar-2023 04:53 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 64077EE9.domain.PO.200.2000041.1.A404D.1 |

See the attached

Post Office Box 29622Raleigh, NC

27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState

( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

>>> Joseph Kroetsch <jkroetsch@BSFLLP.com> 3/7/2023 1:10 PM >>>
Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1,et seq.

Thank you for your attention to this matter.

Joseph F. Kroetsch(he/him/his)
Partner

BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(t) +1 914 749 8388
(m) +1 914 772 6184
jkroetsch@bsfllp.com
www.bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

See the attached

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com/NCSecState/ @
NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

>>> Joseph Kroetsch <jkroetsch@BSFLLP.com> 3/7/2023 1:10 PM >>>
Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.
C. Gen. Stat. § 132-1, *et seq*.

Thank you for your attention to this matter.

**Joseph F. Kroetsch** (he/him/his)
Partner

**BOIES SCHILLER FLEXNER** LLP
333 Main Street
Armonk, NY 10504
(t) +1 914 749 8388
(m) +1 914 772 6184
jkroetsch@bsfllp.com
www.bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other
protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named
recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication
is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then
deleting this electronic message from your computer. [v.1 0820183 1BSF]