# EXHIBIT 3

**MAIL**

| | |
|---|---|
| **From:** | jkroetsch@bsfllp.com |
| **To:** | generalcounsel, Gail Eluwa, Ann Wall |
| **CC:** | pubs@sosnc.gov pubs |
| **Subject:** | [Caution: External Mail] Public Records Request |
| **Date:** | 07-Mar-2023 13:11 |
| **Attachments:** | TEXT.htm [Save] [Open] |
| | 3.7.2023_Public Records Request re WE Charity and CBC.pdf [Save] [Open] |
| | Mime.822 *(excluded from export)* |
| | headers.822 [Save] [Open] |
| **Creation Date:** | 07-Mar-2023 13:10 |
| **Store Date:** | 21-Mar-2023 10:29 |
| **Status:** | |
| **Box Type:** | received |
| **Folder:** | pubs Home > Mailbox |
| **Message Id:** | 64077E48.domain.GWIA.200.20000D9.1.8A710F.1 |

Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1, et seq.

Thank you for your attention to this matter.

Joseph F. Kroetsch (he/him/his)
Partner
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(t) +1 914 749 8388
(m) +1 914 772 6184
jkroetsch@bsfllp.com<mailto:jkroetsch@bsfllp.com>
www.bsfllp.com<http://www.bsfllp.com/>

---

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

TEXT.htm

**ATTACHMENT**

Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1, *et seq.*

Thank you for your attention to this matter.

**Joseph F. Kroetsch** (he/him/his)
Partner

---

## BOIES SCHILLER FLEXNER LLP

333 Main Street

Armonk, NY 10504

(t) +1 914 749 8388

(m) +1 914 772 6184

jkroetsch@bsfllp.com

www.bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 0820183 BSF]



March 7, 2023

**_Via E-Mail & Overnight Delivery_**

Ann Wall
General Counsel
N.C. Department of the Secretary of State
P.O. Box 29622
Raleigh, NC 27626-0622

Gail Eluwa
Director, Charitable Solicitation Licensing (CSL) Division
N.C. Department of the Secretary of State
P.O. Box 29622
Raleigh, NC 27626-0622

Re:     **Public Records Request**

Dear Custodian:

This is a request for public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1, *et seq.*   We request the records described below from the date range beginning January 1, 2022 and ending March 7, 2023.

Please provide copies of the following:

1. Any and all records produced, received, or distributed by Gail Eluwa, Director of the Charitable Solicitation Licensing Division relating to WE Charity, f/k/a Free the Children.

2. Any communication, including documents, emails (and attachments) to/from any North Carolina Secretary of State ("NC SOS"), personal, or other professional email accounts, and/or text messages to or from Gail Eluwa containing any of the following keywords:

   - "WE Charity"
   - "Free the Children"
   - "ME to WE"
   - "We.org"
   - "CBC"
   - "Canadian Broadcasting Company"
   - "Cashore"

**BSF**

3. All email correspondence to or from Gail Eluwa (including any NC SOS, personal, or other professional email accounts) – including attachments, carbon copy and blind carbon copy – containing any of the following keywords:

   - "WE Charity"
   - "Free the Children"
   - "ME to WE"
   - "We.org"
   - "CBC"
   - "Canadian Broadcasting Company"
   - "Cashore"

4. All email correspondence to or from Gail Eluwa (including any NC SOS, personal, or other professional email accounts) – including attachments, carbon copy, and blind carbon copy – with email addresses from either of the following domains:

   - @cbc.ca
   - @cbcnews.ca

5. All communications in any form sent to or received from any employee, agent or representative of CBC News, a division of the Canadian Broadcasting Company (CBC), by Gail Eluwa or on her behalf, on behalf of the North Carolina Secretary of State, or by or on behalf of any other employee of the North Carolina Secretary of State.

If you determine that some but not all of the information is exempt from disclosure and that you intend to withhold it, we ask that you redact it for the time being and make the rest available as requested. In any event, please provide a signed notification citing the legal authorities on which you rely if you determine that any or all of the information is exempt from disclosure.

We are also requesting that all records be provided in electronic format if possible. If you incur fees or costs related to providing these records, we will reimburse you for the reasonable cost thereof.

North Carolina law requires that you respond to and fulfill this request "as promptly as possible." If you expect a significant delay in responding to and fulfilling this request, please contact me with information about when we might expect copies of the requested records.

2

# BSF

If we can provide any clarification that will help expedite your attention to this request, please contact me at (914) 749-8388 or jkroetsch@bsfllp.com.

Thank you for processing this request.

Sincerely,

Joseph F. Kroetsch

cc:

George Jeter
Publications Director
N.C. Department of the Secretary of State
P.O. Box 29622
Raleigh, NC 27626-0622

3

**MAIL**

| | |
|---|---|
| From: | generalcounsel@sosnc.gov |
| To: | Ann Wall |
| Subject: | Fwd: [Caution: External Mail] Public Records Request (GC account email) |
| Date: | 07-Mar-2023 13:11 |
| Attachments: | text.htm  [Save]  [Open] |
| | 3.7.2023_Public Records Request re WE Charity and CBC.pdf  [Save]  [Open] |
| Creation Date: | 07-Mar-2023 13:11 |
| Store Date: | 20-Mar-2023 23:58 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Ann Wall Home > Mailbox |
| Message Id: | 64077E37.domain.PO.200.200001A.1.5F993.1 |

>>> Joseph Kroetsch <jkroetsch@BSFLLP.com> 03/07/23 13:10 >>>

Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1, et seq.

Thank you for your attention to this matter.

Joseph F. Kroetsch (he/him/his)
Partner
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(t) +1 914 749 8388
(m) +1 914 772 6184
jkroetsch@bsfllp.com<mailto:jkroetsch@bsfllp.com>
www.bsfllp.com<http://www.bsfllp.com/>
_____

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

>>> Joseph Kroetsch <jkroetsch@BSFLLP.com> 03/07/23 13:10 >>>

Please see the attached correspondence requesting access to public records pursuant to the North Carolina Public Records Act, N.C. Gen. Stat. § 132-1, *et seq.*

Thank you for your attention to this matter.

**Joseph F. Kroetsch** (he/him/his)
Partner

---

## BOIES SCHILLER FLEXNER LLP

333 Main Street

Armonk, NY 10504

(t) +1 914 749 8388

(m) +1 914 772 6184

jkroetsch@bsfllp.com

www.bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 0820183 BSF]

**MAIL**

| | |
|---|---|
| From: | echaney@schellbray.com |
| To: | Gail Eluwa |
| Subject: | [Caution: External Mail] RE: WE Charity |
| Date: | 27-Feb-2023 17:13 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| | headers.822  [Save]  [Open] |
| | Mime.822   *(excluded from export)* |
| | 2023.01.31 WE Charity response to January 5, 2023 letter from G. Eluwa.pdf  [Save]  [Open] |
| Creation Date: | 27-Feb-2023 17:12 |
| Store Date: | 27-Feb-2023 19:02 |
| Status: | |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 63FD2AFA.domain.GWIA.200.20000CC.1.89C6BB.1 |

Hi Gail,  Hope you are well.   I just wanted to check in to see if there was any movement on this.

All the best,
Ed

------------------------------------------
Ed Chaney
919.869.3080
Fax 855.386.4139
echaney@schellbray.com<mailto:echaney@schellbray.com>
------------------------------------------
SchellBray
SCHELL BRAY PLLC
Attorneys and Counselors at Law
100 Europa Drive * Suite 271 * Chapel Hill, NC 27517
www.schellbray.com<http://www.schellbray.com/>

Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.

From: Chaney Ed
Sent: Tuesday, January 31, 2023 3:31 PM
To: geluwa@sosnc.gov
Subject: WE Charity

Hi Gail,  Thanks for the opportunity to answer your questions on behalf of my client, WE Charity.  The attached letter fully addresses those questions and should put any concerns over the matter to rest.  As noted in the letter, we would appreciate a written response indicating that is the case.  Please let me know if I can be of further assistance.

All the best,
Ed

------------------------------------------

Ed Chaney
919.869.3080
Fax 855.386.4139
echaney@schellbray.com<mailto:echaney@schellbray.com>

------------------------------------------

SchellBray
SCHELL BRAY PLLC
Attorneys and Counselors at Law
100 Europa Drive * Suite 271 * Chapel Hill, NC 27517
www.schellbray.com<http://www.schellbray.com/>

Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.

TEXT.htm                                                                    ATTACHMENT

Hi Gail,  Hope you are well.   I just wanted to check in to see if there was any movement on this.


All the best,

Ed



**Ed Chaney**

919.869.3080
Fax 855.386.4139
echaney@schellbray.com


**SchellBray**

**SCHELL BRAY PLLC**
Attorneys and Counselors at Law
100 Europa Drive · Suite 271 · Chapel Hill, NC 27517

www.schellbray.com


Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.


**From:** Chaney Ed
**Sent:** Tuesday, January 31, 2023 3:31 PM
**To:** geluwa@sosnc.gov
**Subject:** WE Charity


Hi Gail,   Thanks for the opportunity to answer your questions on behalf of my client, WE Charity.  The attached letter fully addresses those questions and should put any concerns over the matter to rest.  As noted in the letter, we would appreciate a written response indicating that is the case.  Please let me know if you I can be of further assistance.


All the best,

Ed

All the best,

Ed

**Ed Chaney**

919.869.3080
Fax 855.386.4139
echaney@schellbray.com

SchellBray

**SCHELL BRAY PLLC**
Attorneys and Counselors at Law
100 Europa Drive · Suite 271 · Chapel Hill, NC 27517

www.schellbray.com

Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.



SCHELL BRAY PLLC
Attorneys and Counselors at Law

WRITER'S DIRECT DIAL NUMBER:
919.869.3080

WRITER'S EMAIL ADDRESS:
echaney@schellbray.com

January 31, 2023

**VIA EMAIL**
Ms. Gail L. Eluwa, Director
North Carolina Department of the Secretary of State
Charitable Solicitation Licensing Division
PO Box 29622
Raleigh, NC 27626-0622

PAIR. H. LIVINGSTON, JR.
THOMAS C. WATKINS
MICHAEL H. GODWIN
BARBARA K. CHRISTY
JENNIFER L.J. KOENIG
MARK T. CAIN
GARLAND G. GRAHAM
AMY H. KINCAID
CHRISTINA FREEMAN PEARSALL
THOMAS P. HOCKMAN
APRIL E. KIGHT
STACEY A. BRADY
EDWARD T. CHANEY
WILLIAM H. AYCOCK II
KRISTEN J. KING
TIMOTHY A. NORDGREN
MICAH L. MALOUF
JEFFREY R. WOLFE
ADRIANNE F. EDMONDS
ANDREW D. STEFFENSEN
PETER G. MATTOCKS
JANET M. WALLACE

OF COUNSEL
DORIS R. BRAY
HOLLY H. ALDERMAN

BRAXTON SCHELL
(1924-2003)

RE:    WE Charity CFO

Dear Ms. Eluwa:

I represent WE Charity on certain matters regarding North Carolina law and am writing in response to your letter dated January 5, 2023 to my client, a copy of which is attached hereto (the "Letter"), in reference to the capacity of its CFO, Victor Li. We welcome the opportunity to clarify both the facts and the law that demonstrate that Mr. Li in fact did not give "conflicting testimony" to your office and the Canadian Standing Committee on Access to Information, Privacy and Ethics (the "Committee") in connection with its oversight of a Canadian government contract to administer a COVID relief program. Indeed, as fully explained below, WE Charity's CFO was authorized to and acted within his capacity when he signed the two Solicitation License Application Renewals and two Forms 990 referenced in the Letter (collectively, the "Forms").

**I.      As a factual matter, Mr. Li's statements were not conflicting.**

To clear up any factual confusion, Mr. Li was CFO during the time periods covered by the Forms and remains CFO today. As discussed below, a person's service as a corporate officer can be completely distinct from their employment status, if any, and nothing in the law requires otherwise. At WE Charity, as with many charities, CFO is both a corporate office and an employment position, but a change in the status of one does not automatically or necessarily change the status of the other.

In his March 15, 2021 submission to the Committee, Mr. Li was forthright that he remained in office as CFO even while on medical leave. I have attached the full

GREENSBORO | CHAPEL HILL | WINSTON-SALEM                                                             schellbray.com

1500 RENAISSANCE PLAZA • 230 NORTH ELM STREET • GREENSBORO, NC 27401      MAILING ADDRESS, P.O. BOX 21847 • GREENSBORO, NC 27420 • P 336.370.8800

Ms. Gail L. Eluwa, Director
January 31, 2023
Page 2

submission to this response in case it was not provided to you, and you will see the specific statement at the top of page 2 thereof.[1] That he also acknowledged his employment leave in that same testimony does not change the fact that remained CFO. He was authorized to sign the Forms and did so appropriately.

## II.      As a matter of law, Mr. Li's statements were not conflicting.

Ultimate responsibility of a corporation's affairs resides with its board of directors.[2] This board acts as a group and no individual director has the capacity to act on behalf of the corporation; instead, a corporation acts through its officers, who serve as the entity's primary agents as authorized by the board. Generally, the board appoints these officers, who may be members of the board of directors (volunteer or compensated) or other individuals who also may be hired as employees.

In either case, a person serves in office for such term as the bylaws provide. In fact, unless the corporation's governing documents state otherwise, a director or employee serving as an officer may remain in office even after they cease being (permanently or temporarily) a director or employee, and vice versa.[3] By way of illustration, if a person serves as both a director and treasurer of an organization, at the expiration of their term as director, they remain treasurer unless their term as treasurer is also terminated pursuant to the bylaws. Similarly, if an employee serves as CFO, that person remains in the office of CFO if they take employment leave unless their term as CFO is also terminated pursuant to the bylaws or board action.

When a person takes employment leave but remains in a corporate office, that person retains the fiduciary duties of the office described in the bylaws, but not their employment duties. Moreover, employment leave does not mean that a person cannot fulfill such fiduciary duties, as demonstrated by the fact that throughout the nonprofit sector, many such offices are occupied by volunteer board members. But even in complex publicly traded corporations, from time to time, corporate officers take employment leave but retain their fiduciary capacities as officers.[4]

---

[1] The Committee asked Mr. Li, "Are you still the CFO of WE Charity?" In his response, Mr. Li wrote, "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA." (Response to Questions at 1-2). These questions and responses pertained to WE Charity's Canadian entities, not the U.S. entity to whom the Letter is addressed, but the answers are the same: Mr. Li remained CFO of the U.S.-based WE Charity entity while on medical leave.

[2] Generally, this discussion is applicable to both nonprofit and business corporations.

[3] See, e.g., NCGS 55A-8-44(b) ("[a]n officer's removal does not affect the officer's contract rights, if any, with the corporation. An officer's resignation does not affect the corporation's contract rights, if any, with the officer."); NY Not-for-Profit Corporation Law § 714(b) ("The removal of an officer without cause shall be without prejudice to his contract rights, if any. The election or appointment of an officer shall not of itself create contract rights.")

[4] For example, Apple, Inc. CEO Steve Jobs took a well-publicized leave of absence to attend to medical issues in 2011, but remained CEO during that time while Tim Cook handled his day-to-day responsibilities. https://www.businesswire.com/news/home/20110117005471/en/Apple-Media-Advisory. Similarly, Plantronics'

Ms. Gail L. Eluwa, Director
January 31, 2023
Page 3

In sum, as a matter of law, <u>there is nothing inconsistent or conflicting</u> in a CFO, or any other corporate officer, taking medical leave for employment purposes but retaining their fiduciary role as an officer for general corporate purposes.

**III.     During medical leave, Mr. Li remained in the office of CFO pursuant to WE Charity's bylaws.**

As noted above, at WE Charity, CFO is both an officer and employment position.  Paragraph 49 of WE Charity's bylaws, on file with your office, establishes the office and provides its overall responsibilities.  It does not require the person holding office to be an employee.  In fact, pursuant to Paragraph 43 of the bylaws, the CFO, along with each other officer, serves until the earlier of:

    a)  that person's resignation;
    b)  the appointment of that person's successor;
    c)  an officer ceasing to be a director if such is a necessary qualification of the office;
    d)  the meeting at which the board elects new officers;
    e)  the officer's removal; and,
    f)  the officer's death.

None of these conditions transpired while Mr. Li was on medical leave for employment purposes.  Indeed both Mr. Li and the board desired that Mr. Li retain his fiduciary duties of the office of CFO during the leave period.  Accordingly, he remained both CFO and authorized to act in such capacity.

**IV.     Mr. Li appropriately signed the Forms in his fiduciary capacity as an officer of WE Charity, and the Forms were accurate.**

Both the Forms 990 and Solicitation License Application Renewals simply require attestation by an officer.  Neither form requires such person to be an employee; indeed both forms are frequently signed by volunteer officers.  As established above, Mr. Li remained in the office of CFO while on medical leave and continued to be authorized to sign and signed the Forms in such capacity.

Furthermore, by signing the Forms, Mr. Li appropriately represented, under the penalties of perjury, that the information in each form was true and accurate to the best of his knowledge.[5] Even though Mr. Li was on employment leave, he retained ultimate oversight over the financial systems of WE Charity, intimately understood such systems, and had the necessary relationships with the finance and accounting staff to be able to make such representations.  Moreover, as a

---

CEO Ken Kannappan took a medical leave of absence in 2013 but remained CEO and certified Plantronics' Form 10-K filing as CEO while on leave.  *See* Plantronics 10-K for FY 2013 at 9, 82 (filed March 31, 2013).
[5]  Such accurate information includes lines 21 and 22 of the Solicitation License Application Renewals.  As the CFO, Mr. Li was the officer who had final responsibility for custody and/or final distribution of contributions, and custody of the financial records.

Ms. Gail L. Eluwa, Director
January 31, 2023
Page 4

matter of law and consistent with his fiduciary obligations, Mr. Li was entitled to rely on the statements and reports produced by that same accounting and financial staff.[6]  Taking all of this into account, Mr. Li was better positioned to make such representations than many of the volunteer board members who do so regularly across the country on behalf of other charitable organizations.

Finally, and most importantly, WE Charity stands behind the accuracy of the information contained in the Forms.

## V.    Summary

In sum, as a matter of both law and fact, Mr. Li served in the office of CFO when signing the Forms and acted appropriately and within his corporate authority when he did so.

I trust that this response to your Letter will put any questions you may have had about Mr. Li's capacity as CFO to rest, and we request that you respond in writing to confirm that such is the case.

Sincerely yours,

Edward T. Chaney

Enclosures

---

[6] NY Not-for-Profit Corporation Law § 717(b); *see also* NCGS § 55A-8-42(b).



### State of North Carolina
### Department of the Secretary of State

ELAINE F. MARSHALL
SECRETARY OF STATE

January 5, 2023

Victor Li
c/o WE Charity
336 Queen Street East
Toronto, ON M5A 1S8

Dear Mr. Li:

**Re: Capacity as CFO**

The Charitable Solicitation Licensing Division of the North Carolina Department of the Secretary of State is charged with charitable solicitation licensing and enforcement under N.C.G.S. Chapter 131-F et. seq. (hereinafter referred to as "the Charitable Solicitation Act") and Title 18, Chapter 11 of the North Carolina Administrative Code.

WE Charity hereinafter referred to as, "WC," is a New York non-profit corporation incorporated on December 20, 1996, is registered with the State of North Carolina as a "charitable organization" as defined by N.C.G.S. §131 F-2(3), and is subject to the requirements of the Charitable Solicitation Act of North Carolina.

We are in receipt of a response you prepared for the Canadian Standing Committee on Access to Information, Privacy and Ethics dated March 15, 2021, and submitted to the Committee by your legal representative Megan Savard on or about April 9, 2021.

In your response to the Committee, you stated that you "have been on medical leave since the summer of 2020 and have not been performing the duties of CFO…" However, during two subsequent charitable application renewal periods, you signed the following documents during the time you were on medical leave and stated to the Canadian Standing Committee on Access to Information, Privacy and Ethics you were not acting in the capacity of CFO.

- 2021
  - Solicitation License Application Renewal signed and notarized 7/22/2021
  - FY 2020, Form 990 signed 11/21/2020 and prepared by a CPA on 11/21/2020
- 2022
  - Solicitation License Application Renewal signed and notarized 10/13/2022
  - FY 2020, Form 990 signed 1/28/2022 and prepared by a CPA on 11/25/2022

In connection with your signature of these documents, you swore before a notary public, under penalty of perjury, that you were the Treasurer or Chief Fiscal Officer of WC and that the information provided to the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing Division, was true and correct to the best of your knowledge.

In light of the conflicting testimony to the Canadian Standing Committee on Access to Information, Privacy and Ethics, the North Carolina Department of the Secretary of State, Charitable Solicitation Licensing Division is requesting documentation to substantiate your role and capacity as CFO in the signing of these documents and that the affirmations made in those documents are accurate. You must submit your response, under oath and penalty of perjury, **within fifteen (15) days after you receive this letter** to the following address:

> Gail L. Eluwa, Director
> North Carolina Department of the Secretary of State
> Charitable Solicitation Licensing Division
> P.O. Box 29622
> Raleigh, NC  27626-0622

If you have any questions, feel free to contact me at gcluwa@sosnc.gov or (919) 814-5281.

Sincerely,

Gail L. Eluwa, Director

Charitable Solicitation Licensing Division

# SAVARD
# ＋FOY

MEGAN SAVARD

Criminal and Regulatory Lawyer
msavard@savardfoy.com
416 368 5701

March 15, 2021

**BY EMAIL**

Miriam Burke
Clerk of the Committee
Standing Committee on Access to Information, Privacy and Ethics
Committees Directorate – House of Commons
131 Queen Street, Room 6-37
Ottawa, Ontario
K1A 0A6

Dear Ms Burke:

**Re:   Prospective Witness Victor Li**

I wish to thank the Committee again for accommodating Victor Li's health needs and for agreeing to accept information from him in writing. Please find enclosed his response to the Committee questions that he is capable of answering at this time.

As you know, members of the Committee have called upon the RCMP and the CRA to investigate WE Charity and are prepared to issue summonses to secure the witnesses' participation. While Mr. Li intends to cooperate fully with the Committee, he is also asserting his rights under the *Canada Evidence Act* and the *Ontario Evidence Act*. He is providing the attached responses on the understanding that they are legally compelled and subject to parliamentary privilege.

Kindly let me know if you require further information from me.

Yours very truly,

Megan Savard
Encl. x2

I have witnessed the development of WE Charity for over 20 years – from Free the Children to WE Charity as it is today. I am immensely proud of the work we have done to empower change around the world.

I thank the committee for their accommodating my health. The past year has been a significant challenge for me. On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, may ability to work. Knowing that the Committee wants to complete its investigation as soon as possible, however, I am providing answers to approximately 100 of its questions. They are based on my personal recollection and publicly available information. I trust WE Charity and ME to WE Social Enterprises Inc. can provide any information I do not have.

For ease of reference, I have categorized my answers by topic. The Committee's questions are italicized.

## Qualifications and General Background

1. *"Please provide evidence that you are certified in accounting in the U.S., the U.K. and China, as claimed on your http://WE.org profile." Source: Jesse Brown, CANADALAND*
2. *Are you willing to voluntarily provide the committee with copies of your certifications as an accountant in Canada?*

I am a Certified General Accountant and a Chartered Professional Accountant. I hold a Bachelor's degree in Accounting and a Master's degree in Finance. I did not write my WE.org profile; it is inaccurate. When I learned about the inaccuracy last summer, I asked for it to be changed. As I was on leave, I did not follow up on that request or review my profile again to determine if the change had been made.

I have attached the certificate as an accountant in Canada, as requested.

3. *Who paid your salary? That is, have you been paid recompense by WE Charity, Me to We, and/or another WE related organizations?*

I was paid by WE Charity, ME to WE Social Enterprises Inc., and the Wellbeing Foundation. My total remuneration was approximately $150,000 per year.

4. *Are you still the CFO of WE Charity?*
5. *Who is replacing you during your absence?*
6. *Are you still the CFO of Me to WE?*
7. *Who is replacing you during your absence?*

I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA.

CSSG

8. *Have you been contacted by an Officer of Parliament regarding the CSSG?*
9. *Have you been contacted by the RCMP regarding the CSSG?*

No, I have not been contacted by an Officer of Parliament or the RCMP regarding the CSSG.

10. *Your signature is on the Contribution Agreement for the CSSG.  Why was the contract retroactive to May 5, and expenses allowed to be incurred beginning on that date?*
11. *What is the significance of May 5?*

I was not personally involved with negotiations with the Government of Canada. Under the terms of the Contribution Agreement, eligible expenses incurred after May 5, 2020 would be reimbursed by ESDC.

My understanding is that the effective date (May 5, 2020) on the contract reflects when WE began working and incurring eligible expenditures to design and build the program infrastructure, (such as developing backend technology, recruiting not-for-profit partners, creating bilingual training materials, and preparing to deliver the program).

12. *Who gave you the assurance that your expenses, from May 5 onward, would be covered even though no contract was yet signed?*
13. *WE Charity began incurring "eligible expenses" on May 5, more than two months before signing the contribution agreement. As you are a signatory of the agreement, and the CFO of WE, how were you assured that expenses would be reimbursed by the Government of Canada? Who from the government or political staff in the Prime Minister's office, or any ministerial office, informed you that WE could begin incurring expenses?*
14. *Who in the government told you before May that those expenses would be eligible for reimbursement?*

I was not involved in any negotiations with the Government of Canada. My understanding is that on June 4, 2020, WE received confirmation that May 5, 2020 was the date on which it could begin claiming eligible expenses for work that had been carried out once the contribution agreement was finalized. The contract was signed on June 23, 2020.

*15. Paragraph 5.1 of the funding/contribution agreement allows monies to be spent on salary from this funding/contribution agreement.? Would this allow for the WE Charity Foundation, WE Charity, ME to WE or any WE subsidiaries or entities to pay employees, including members of the WE executive team?*

Paragraph 5.1 allowed for the WE Charity Foundation of Canada to allocate a reasonable portion of a staff's salary for duties or activities related to the project. Only staff employed by WE Charity Foundation of Canada, WE Charity, Wellbeing Foundation, or ME to WE Foundation of Canada would qualify as potential eligible expenses under the terms of the Contribution Agreement. ME to WE Social Enterprises Inc. and other organizations would not be eligible for staff expenses under this section.

*16. What financial controls were put in place to keep CSSG money separate from WE Charity money?*

The CSSG advance was paid to WE Charity Foundation, not WE Charity. WE had financial controls in place to ensure CSSG finances were separate from other WE entities, including setting up a separate account to manage payments and expenditures. Internally, we had implemented specific codes for expenses and invoices related to the CSSG, and the number of people with signing authority for expenses was limited to a few senior staff.

Additionally, the contribution agreement stated that WE could be subject to audits in order to verify all expenditures. The audits could range from the provision of basic audited financial statements, a potential audit by the government, and a requirement to provide books and records to Canada's Auditor General in the context of an inquiry. The contribution agreement also required regular reporting.

*17. Who had signing authority over CSSG funds?*

My understanding is that WE's executive team responsible for the design and implementation of the CSSG were responsible for approving expenses related to the CSSG within the parameters approved in the contribution agreement.

*18. Had WE Charity ever been responsible for dispensing $500,000,000.00 in a six-month period at any point in its history?*

No.

*19. What assurance did WE Charity provide the Government of Canada that it could handle the financial load of this fund?*

I was not personally involved in any negotiations with the Government of Canada. WE Charity has a 25-year track record of developing programs in collaboration with governments and large organizations, including numerous projects with the Government of Canada.

3

*20. What payment software was in place for WE to use to pay students the funds earned through this program?*

The team responsible for implementing the CSSG was setting up to two systems (because of the size of the program). Our primary system involved using a national payroll provider to deliver the disbursement of the CSSG cash awards to eligible student participants. Our secondary system involved working with one of Canada's largest financial instructions to directly deliver the funds.

*21. Under the line item "Project related rent" how much of the $590,000 in the WE Budget for the CSSG was for the WE GLC or for rent in other WE/Kielburger properties?*

I did not prepare this budget; it was prepared by members of the executive team responsible for negotiating with the EDSC. However, my understanding is that this line item reflects eligible expenses of associated occupancy costs for program related expenses including program development, training, filming, editing, technology backend systems. The document referred to in the question was a budget; ultimately, WE could only be reimbursed for eligible expenses, as defined by the contribution agreement.

*22. Why was this rent put into the budget when there was a line item for a 15% administration fee for handling the program?*

There was no 15% administration fee.  Under the contribution agreement, only eligible expenses could be reimbursed.

*23. Please provide documented evidence from WE Charity that the full $30 million dollars received from the Government of Canada for the Canada Student Service Grant (CSSG) has been paid back in full.*

To the best of my recollection $22 million was returned to ESDC in July 2020 and the remaining $8 million in September 2020. After WE notified the government that it intended to return all of the CSSG funds, ESDC set the process for the return of funds.

*24. In your role as Chief Financial Officer of WE Charity and in the context of the awarding of the contract to manage the student grant program, what information or documents did the federal government ask WE Charity to produce regarding its financial statements and structure?*

*25. What information or documents did WE Charity provide to the government on its financial statements before the contract was awarded to it?*

26. *What financial information was requested from the Government of Canada in their decision-making process for WE to be awarded running the Canadian Student Service Grant (CSSG)?*

I was not directly involved in any negotiations with ESDC regarding the CSSG. WE Charity's audited financial statements are available on its website, and its charity return is available on the CRA's website.

27. *Were any resources of ME to WE used or planned to be used to administer the CSSG?*

No, ME to WE Social Enterprises Inc. resources were not used or intended to be used to administer the CSSG.

**Accounting practices and finances**

28. *"Why do you not hire leading international auditors to prepare your financial statements?" Source: Charity Intelligence*

WE Charity worked with credible and reputable auditors to prepare our financial statements.

29. *"At August 2019 year-end, WE Charity had cash and investments (gross funding reserves) of $11.5m compared with $14.0m at year-end August 2018. WE Charity's bank loans increased to $13.7m in 2019 compared with $11.1m in 2018. This creates a negative funding reserve of $2.2m. For the second year, WE Charity is in breach of its financial covenants on its bank debt. Its bank has waived these conditions for the current period. These bank loans are secured against WE Charity's properties valued at $39.4m." Source: Charity Intelligence. Please provide all details and circumstances retaliated to WE Charity breaking its financial covenants its bank debt for two consecutive years?*

30. *In negotiating the CSSG grant and contribution agreement, did you or anybody involved in the negotiations inform the Government of Canada that WE broke its financial covenants for two consecutive years?*

31. *As the CFO of WE, did you advise members of the WE executive team that they should inform the Government that WE broke its bank covenants for two consecutive years?*

WE Charity did not violate its bank covenants. WE Charity has mortgages, and one of the covenants of the mortgage provisions is a requirement that WE Charity generate positive EBITDA to cover 1.3 times the mortgage payments in the fiscal year. In 2017/2018, WE Charity shifted its fiscal year from 'January to December' to 'September to August' to align with the academic year (which is how the organization operates). This resulted in a shortened fiscal year during which WE Charity made less revenue than it would have done over a full 12-month fiscal year. This change in fiscal year shifted when donations were "recognized". In accordance with accounting principles, we must recognize a donation within the timeframe in which the funds

5

are to be spent on projects. This is an accounting principle "on paper only." The lender recognized the situation and willingly waived the respective requirements without any issue or concern on their part.

> *32. How do you ensure that 90% of your funding gets spent on programming, who gets to decide whether that programming is considered to be charitable development work, and how do you keep your administration costs at 10% or below of all of your funding?*

As CFO, I worked to achieve WE Charity's goal of maximizing the efficiency of donors' money by maximizing the amount of money that went towards programming as opposed to administration costs. General accounting principles and CRA regulations dictate what is considered a valid programming cost. On average, 90% of funds are spent on programming. This is reflected in WE Charity's audited financial statements, which show program expenditures and support (administrative) expenditures as separate line items. Additionally, ME to WE Social Enterprises Inc. provides significant in-kind support to WE Charity to directly reduce administrative expenses.

> *33. Recent media reports suggest that multiple donors and donations were used to fund the same local infrastructure projects in Kenya? What mechanisms and safeguards were put in place to ensure this did not happen?*
> *34. What financial policies and systems do you use to track and account for any donations coming into any Kielburger related organizations?  How far back to these records go?*
> *35. What systems and structures do you have in place to ensure that designated funding is actually spent in the appropriate places?*
> *36. WE Charity's website lists your main accomplishment as having "consistently delivered perfect auditor reports and flawless accounting practices" - with that in mind, are there any reports that can explain the testimony given by Reed Cowan at committee? If not, why not?*

As CFO, I followed best accounting practices to track and account for donations, in accordance with CRA requirements.

> *37. Can you characterize any substantial debts owed by WE Charity? E.g. mortgages, loan payments. How much and to whom?*

WE Charity's audited financial statements are available on its website, which lists debts and liabilities.

> *38. Has WE Charity filed its 2020 financial return with CRA?*

Yes.

*39. Has WE Charity ever been audited by CRA?*

Yes.

*40. How many cases did you have where you failed to take off taxes for the CRA or IRS from employees because they were being treated as contractors on your books?*

WE Charity and related organizations follow all CRA and IRS regulations, including the deduction of applicable income payroll taxes. WE Charity has not "failed to take off taxes" for any fulltime employees.

## WE Charity Foundation

*41. You were the director of the WE Charity Foundation? Who did you take direction from in running this organization, as Craig and Marc Kielburger suggested they were not involved in that particular entity?*

WE Charity Foundation is a legal entity created in part to manage legal liability. It is legally under the governance structure of WE Charity and its Board of Directors.

*42. Was the WE Charity Foundation a real estate holding company?*
*43. Did you tell CRA that We Charity Foundation was a real estate holding company with listed assets in excess of $37 million in real estate?*
*44. What was the purpose of creating the WE Charity Foundation two years ago?*
*45. Please provide a full list of all the real estate holdings held by the WE Charity Foundation from when it was created to the present.*
*46. Please provide all details about the WE Charity Foundation organization, structure, and decision-making process. Were there any conflict of interests flagged with the foundation? If so, what measures were in place to recuse those with conflicts from the decision-making process?*
*47. The We Charity Foundation was chosen by your organization to handle these grants. It was registered with the CRA as a shell company to hold real estate assets. Has it ever been used for other tasks unrelated to its original incorporation mission of handling real estate?*

WE Charity Foundation was created in part to manage legal liability. It is legally under the governance structure of WE Charity. Prior to 2020, it never operated or held funds for any purpose. The use of corporate entities to isolate liabilities for particular projects is not uncommon.

WE Charity Foundation does not hold, and never held, WE Charity real estate assets. In the initial application to the CRA, holding real estate was proposed, but this never occurred.

7

In negotiating the agreement for the Canada Student Service Grant, the government required that WE indemnify the Government of Canada from all losses related to the participation of the first 40,000 students in the program, as well as the Non-Profit Partners who were engaging those students. WE Charity was therefore assuming significant possible legal liability for the program, especially considering the service work would be done during a global health pandemic. Such liability could overwhelm WE Charity.

As such, WE Charity counsel proposed that WE Charity Foundation be the party to the funding agreement in order to protect WE Charity's pre-existing charitable assets, which are needed to continue to deliver WE Charity's longstanding charitable programs. Prior to signing the CSSG contribution agreement, the mandate of the foundation was formally altered with the CRA to align with the CSSG requirements.

### Events Run and Supported by WE Charity and Related Organizations

48. *Were you aware that the WE organization, WE Charity, ME to WE, the WE Charity Foundation, or any of WE subsidiaries or entities paid speakers and reimbursed expenses to guest speakers for speaking at WE Day, or any other WE events?*

Yes.

49. *Please provide all records of payments to WE Charity or any of its associated entities made to, Justin Trudeau, Sophie Grégoire Trudeau, Margret Trudeau or Alexander Trudeau or any past and present Liberal members of parliament or past or present staff members in the Prime Minister Trudeau's office.*
50. *From 2008-present, how much has the WE organization, WE Charity, ME to WE or any of WE subsidiaries or entities paid to the following individuals. Please include the event they spoke at, the amount the individual received for their speaking engagement.*
    *Justin Trudeau*
    *Sophie Grégoire Trudeau*
    *Margret Trudeau*
    *Alexandre Trudeau*
51. *From 2008-present how much has WE Charity, ME to WE or any of WE Charity's subsidiaries or entities reimbursed expenses for the following individuals. Please include an itemized of the expenses reimbursed for each event, the event they spoke at and the date in which it occurred?*
    *Justin Trudeau*
    *Sophie Grégoire Trudeau*
    *Margret Trudeau*
    *Alexandre Trudeau*

*52. What is the total amount that your organizations, including WE but not limited to it, have paid in expenses, benefits, reimbursements, fees or any other consideration, in kind or monetary, for all of the Trudeau family members?*

This information was to FINA on October 19th, 2020. To the best of my knowledge, Justin Trudeau was not paid any speaking fees.

**Margaret Trudeau**

As provided previously disclosed to FINA, between October 2016 and March 2020, a speaking bureau was used to engage Margaret Trudeau 28times. On each occasion she attended an average of 3-5 events per engagement. For one engagement, there was no compensation. The amount she received in fees for the 27 engagements totalled $180,000.00[i] (after 20% commission paid to speaker's bureau). The total amount of expenses (hospitality costs including food, hotels, car service, and flights) was $163,654.74, which captured severalinternational trips to both the United States and United Kingdom. An additional $160 in gifts was provided to Margaret Trudeau during this time.

**Alexandre Trudeau**

As previously disclosed to FINA, between September 2017 and February 2018, a speaking bureau was used to engage Alexandre Trudeau 9 times. On each occasion he attended an average of 3-5 events per engagement.

The amount he received in engagement and ancillary event fees for these 9 engagements totalled $36,000.00[ii] (after 20% commission paid to Speaker's Spotlight). The total amount of expenses (hospitality costs including food, hotels, car service, and flights) covered for Alexandre Trudeau over the 9 engagements he attended was $22,025.42. An additional $230 in gifts was provided to Alexandre Trudeau during this time.

**Sophie Gregoire Trudeau**

As previously disclosed to FINA, between February 2012 and March 2020, SophieTrudeau attended a total of 8 WE Day events. She received a one-time speaking fee of $1,500.00 in 2012. The total amount of expenses (hospitality costsincluding hotels, car service, and flights) covered forSophie Trudeau over the 8 events she attended was $23,940.76. An additional $240 in gifts was providedto Sophie Trudeau during this time.

*53. Did the Kielburgers or WE Charity ever expressly communicate to the board that speakers were not paid for WE Day events?*

I am not aware of any such conversation.

*54. How do your WE Day events work? It would appear that you receive donor dollars into WE Charity for the event, but then a major portion of the event is in support of your*

*private social enterprise (trips, merchandise, kits, books, etc.).  So, do charitable tax deductions for companies like TELUS, Wallgreens, Allstate, etc differentiate what donations are for actual charitable work and what funds are subsiding your for profit operations*

55. *Do donor agreements include the ability to have their branding/logo/name be a part of any materials that is provided to students, schools, and school groups? If so, are they given charitable deductions for this or is this considered paid advertising?*

WE Charity only provides charitable tax deductions for donations in accordance with the CRA rules and the law.

**WE Charity board of directors**

56. *As the Chief Financial Officer, how do you explain that a member of the board of WE Charity (Michelle Douglas) has trouble understanding the organization's structure?*
57. *What information about the structure of WE Charity did you provide to the board?*

I cannot speak to what was understood by Michelle Douglas. I provided financial reports and responded to questions regarding financial matters to the board on a regular basis. I do not recall receiving a question from Michelle Douglas about WE Charity's finances or organizational structure.

58. *Was the Board of Directors made aware of the deal between WE Charity and the Government of Canada to deliver the Canada Student Service Grant, before it was announced publicly by Prime Minister Trudeau?*
59. *When was the Board of Directors first made aware that WE Charity was entering an agreement with the Government of Canada to deliver the Canada Student Service Grant? How was the Board informed?*

I was not directly involved with or responsible for informing the Board of Directors about the CSSG program. However, my understanding is (a) that the WE Charity Board of Directors was informed about the discussions with ESDC regarding the CSSG program prior to the Prime Minister's public announcement and (b) that information regarding the negotiations was shared on an ongoing basis at formal board meetings and through emails and verbal communications.

**Organizational structure / ME to WE Social Enterprises Inc.**

60. *Why does WE have such a complex structure with money passing back and forth between not-for-profit and for-profit entities?*
61. *"Why do you need so many different entities and such a complex organizational structure in order to do your work?" Source: Charity Intelligence*

10

62. *Who oversees the coordination of reporting of these 30 entities [entities linked to WE] from a structural point of view?*

In my opinion, it is not complex. The basic structure involves WE Charity and ME to WE Social Enterprises Inc.; all other organizations are sub-entities of either WE Charity or ME to WE Social Enterprises Inc. Social enterprise is an internationally recognized way of using a business to solve social issues. ME to WE Social Enterprises Inc. was created solely to comply with Canadian tax laws for charities, which do not easily accommodate social enterprises like the U.K. and the U.S. do. In other words, it was created as a by-product of outdated and charity-unfriendly Canadian tax laws.

The organizational structure was established in consultation with our lawyers at Torys LLP and Miller Thomson LLP to ensure that WE Charity and ME to WE Social Enterprises Inc. could work together to deliver WE Charity's mission.

63. *Is it normal for a CFO to control the finances of both charities and for-profit entities under the same umbrella?*

There is no "normal" for operating a charity and a related social enterprise in Canada. As CFO, I used best accounting practices to ensure that there was no conflict in acting as CFO for both entities. The organizations had their finances independently audited separately.

64. *Why does WE Charity funnel money to ME to WE social enterprises?*
65. *How do you ensure complete separation of financial reporting and auditing between WE Charity and its for-profit arm, known as ME to WE?*
66. *WE has reported that the "altruistic" profits from ME to WE are transferred to We Charity. The numbers very from 50%-100%? Why such a differential? Where do the other monies go?*
67. *Allegations have been raised that Me to We is used to cover expenses that would have appropriately been covered by We Charity.  Will you provide an annual report from Me to We so we can see what is covered under the heading of "expenses"?*
68. *Excluding "in-kind" how much money flowed from ME to WE in 2019 and 2020?*
69. *Please list the reasons*
70. *How much money moved from WE Charity to ME to WE 2019 and 2020?*
71. *Please list the reasons*

WE Charity does not funnel money to ME to WE Social Enterprises Inc. WE Charity purchases various items and services from ME to WE Social Enterprises Inc. at cost or at wholesale price.

Qualified auditors have confirmed that over a five-year period ME to WE Social Enterprises has given, on average, over 90% of its profits to WE Charity. Any remaining profits have been re-

11

invested back to help scale the social enterprise. Therefore, 100% of all profits have been either donated to WE Charity or reinvested to grow the social enterprise. Over the years, ME to WE Social Enterprises has donated more than $20 million in cash and cost-offsetting in-kind services to the charity.

72. *What measures or safeguards were put in place to ensure that donor contributions from across the world would be separated from revenues earned through Me to WE, WE travel, merchandise sold and other ways WE earned revenue?*

WE Charity and ME to WE Social Enterprises Inc. are separate legal entities. Their finances are not mixed.

73. *We have heard so much about transparency yet see no financial reports or data for ME to WE. Will you provide those full financials to us?*

Qualified auditors have confirmed that over a five-year period ME to WE Social Enterprises has given, on average, over 90% of its profits to WE Charity. This information is available on www.we.org.

74. *Has ME to WE done any work on projects funded by the federal government?*

To the best of my knowledge, ME to WE Social Enterprises has never done any work on projects funded by the federal government.

75. *We have been informed that some staff at Free the Children/We Charity were paid through Me to We. How many employees were paid through the for-profit wing while working for the charity?*

The specific scope of work by employees did not fall under my purview as CFO.

**Real estate**

76. *Have you personally been involved in any real estate deals where property held by WE Charity, Me to We or any of the affiliate companies was transferred to you either directly or indirectly?*

No.

77. *How much real estate does WE currently hold in Canada? How much has been sold?*
78. *Where has the money gone from those sales?*
79. *Have you sold the properties, or do you plan to keep them?*
80. *Were there any moves in March/April 2020 to start selling real estate?*

81. *What plans were in place in October 2020 to start selling real estate? What properties are on the block?*

WE Charity's 2018 audited financial statement notes that WE Charity owns property worth approximately $37 million. There has been no major change in the value of property held by WE Charity since that time.

In September 2020, WE Charity began exploring selling its properties to create a charitable endowment. That process is still ongoing.

82. *What role did real estate play in WE Charity's overall strategy?*
83. *How important is real estate to the organization's mission?*

By operating out of the buildings WE Charity owns, the organization minimizes office space costs, allowing WE Charity to reduce its administrative costs and ensure that as much money as possible goes to project expenses. Owning its own property also establishes a form of reserve fund that provides long-term financial security to the organization. It is good financial practice that charities keep 6 to 24 months of reserve funds in place in order to withstand negative financial conditions. WE's reserve is established through the ownership of real estate, which allows accessible cash reserves through mortgages.

WE Charity's main building is the WE Global Learning Centre. Prior to COVID-19, it was a venue used for delivering youth programs. Additionally, prior to COVID-19, the organization had a long-term plan to establish a Campus for Good to provide free and discount space to enable non-profits, social enterprises, and community services, within a hub in downtown Toronto.

**WE trips**

84. *Were you made aware of the WE Charity trip Bill Morneau and his family took in 2017?*

I was not aware at the time of the trip but became aware soon after.

85. *How were the Morneau family travel expenses treated?*

The expenses were initially paid by WE Charity. They were reimbursed to WE Charity by Mr. Morneau.

86. *Did you issue tax receipts for these travel expenses? If so, please provide them*
87. *When Bill Morneau repaid, WE Charity (or the relevant WE entity) $41,366 on July 22, 2020 for his 2017 family trip to Kenya, did WE issue a receipt for the payment? If so, please provide a scanned copy of it.*

Expenses like this are not eligible for a tax receipt. No tax receipt was issued.

**Miscellaneous questions**

> 88. *Please describe the role of Mingze Li within the WE organization*
> 89. *In what capacity did you and Mingzie Li work together?*
> 90. *Please provide all details and information on Mingzie Li's role in acquiring real estate for the WE organization? Why was important for an international charity to acquire significant real estate holdings in Toronto?*
> 91. *To the best of your knowledge please describe the work Mingze Li did in China for the WE organization.*

Currently, Mingze Li has no role within the WE organization. He started with the organization as a junior consultant and eventually became a Senior Financial Analyst. He left the organization in August 2020 to return to school. I was not involved in any discussions about his departure as I was on medical leave. Prior to working for WE, he was a volunteer with the organization in China, as a youth coordinator for one Canadian youth trip to rural China.

As CFO, I worked with Mingze Li on a regular basis. He reported to the Director of Accounting, who reported directly to me. He had no role in acquiring real estate for WE Charity.

> 92. *How many Staff positions in WE Charity's Executive Office report directly to Craig Kielburger, Marc Kielburger, and Roxane Joyal? This would include for example, Chiefs of Staff, Executive Assistants, Personal Assistants, Communications Staff*

I do not know. Human resources was not part of my role as CFO.

> 93. *Over the past four years who were the four highest paid staff members at WE Charity (excluding payment from exterior sources)?*

WE Charity's most recent T3010 Registered Charity Information Return shows that one employee made between $120,000 and $159,999, and that three employees made between $80,000 and $119,999. These people were the four highest paid employees of WE Charity.

> 94. *Does WE Travel have a license to operate a travel agency in Canada? In the US?*

There is no corporate entity named "WE Travel". ME to WE Trips Inc. is a registered travel agency.

> 95. *ME to WE Foundation US reports US$15.8 million in program spending since 2015, but reports no staff or wages paid. What specifically was this money spent on?" Source: Charity Intelligence*

A breakdown in spending is publicly available through the IRS.

> *96. Has WE Charity or its related entities received funding from foreign governments? If so which governments?*

WE Charity and its related charitable entities within Canada have not received funding from any foreign governments.

> *97. Since November 1, 2016 to present please provide all correspondence, including electronic communications (emails, text messages and any messaging service websites or applications) with any federal elected official, any federal public office holders, any staff in any ministerial office and any public servants?*

To the best of my recollection, I have not had any such communications in my role as CFO.

> *98. WE Charity has not registered as a third-party advertiser in any federal election. Why not?*

I do not know. This decision would not have come within my responsibilities as CFO.

> *99. What are the reporting requirements for WE Charity's operations in Kenya, and do you report them based on Kenyan law, Canadian law, or both?*

WE Charity Canada follows all Kenyan law and Canadian law in conducting its charitable work in Kenya. All legal structures have been established in adherence with Kenyan laws and regulations, and there are approval systems in place for all transactions to ensure funds are spent on intended programs.

Additionally, there exists a clear quarterly project and milestone review between Free The Children Kenya and WE Charity Canada, which includes a review of donations received in Canada, the USA and the intended use for those donations.

> *100.     Has WE ever had a security breech (sic) that may have put Personal Information at risk?*

IT security was not part of my role as CFO. To the best of my knowledge, WE Charity has not had a security breach that put personal information at risk.

I trust this is satisfactory,

Victor Li

---

¹ This is an average of $6,666.66 per engagement.
ᴵᴵ This is an average of $4,333.33 per engagement.



**CHARTERED
PROFESSIONAL
ACCOUNTANTS
ONTARIO**

Chartered Professional Accountants of Ontario
130 King Street West, Suite 3400, M5X 1E1
Office of the Registrar (Member Team): 1 844 553.2726 ext. 7221
membercustomerservice@cpaontario.ca

03//10//2021

Qingtao Li , CPA, CGA
CPA Ontario Member ID: 82661585
████████████████, Richmond Hill
Ontario L4██████

Re: Confirmation of Membership in Good Standing

To Whom It May Concern:

This is to confirm that as of the date of this letter, Qingtao Li , CPA, CGA, is a member in good standing with the Chartered Professional Accountants of Ontario (CPA Ontario).

A member in good standing is permitted to use the "CPA" designation as set out in the *Chartered Professional Accountants of Ontario Act, 2017* and the by-laws and Regulations of CPA Ontario. As CPA Ontario was created by the unification of the former Certified General Accountants Association of Ontario (CGA Ontario), the Certified Management Accountants of Ontario (CMA Ontario) and the Institute of Chartered Accountants of Ontario (ICAO), in addition to their CPA designation, many of our members are also permitted to use one or more of the CGA, CMA and CA designations.

By virtue of being a member of CPA Ontario, Qingtao Li , CPA, CGA is also a member of the Chartered Professional Accountants of Canada (CPA Canada).

For any questions concerning this letter of good standing, please contact the Member Team of the Registrar's Office at 1 844 553.CPAO (2726), ext. 7221 or email membercustomerservice@cpaontario.ca.

Regards,

*Heidi Franken*

**Heidi Franken, CPA, CA**
Registrar

**MAIL**

| | |
|---|---|
| From: | lproctor@sosnc.gov |
| To: | liz proctor |
| Subject: | Fwd: Re: See Response from Ed Chaney, Esq. for Victor Li |
| Date: | 03-Feb-2023 10:12 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE.jpeg [Save] [Open] |
| Creation Date: | 03-Feb-2023 10:12 |
| Store Date: | 03-Feb-2023 18:32 |
| Status: | accepted,opened,read |
| Box Type: | sent |
| Folder: | liz proctor Home > Sent Items |
| Message Id: | 63DD247A.domain.PO.200.20000BA.1.F9E79.1 |

>>> William Toole 1/31/2023 5:30 PM >>>

We will need to chat about the effect of the response. Counsel does not directly address how Mr. Li's statement to parliament that "I have not been performing the duties of CFO..." nonetheless leaves room for Mr. Li to perform the duties of CFO in signing the attestation made in the filings with CSL. That attestation to CSL states that 1) Mr. Li is the CFO, and 2) that the information provided is true and correct, to the best of Mr.. Li's knowledge under penalty of perjury.

If Mr. Li by his own admission is not performing the duties of CFO, 1) why did he sign stating he was CFO; and 2) how could he make a "best of knowledge" affirmation if he was not performing the duties of CFO, which duties include having the capacity to investigate and form an opinion. "to the best of his knowledge," as to the truthfulness, completeness and accuracy of the filing to this agency?

Either Mr. Li was performing the duties of CFO when he signed this attestation, or he was not. We are entitled to, and we must have, a direct answer from counsel to this question.

William W. Toole
Deputy
North Carolina Department of Secretary of State
919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 1/31/2023 4:05 PM >>>

Re: WE Charity and Victor Li

Here is the response. I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState

( https://twitter.com/NCSecState) Tel: (919) 814-5281 Fax: (919) 807-2220

TEXT.htm                                                                    ATTACHMENT

>>> William Toole 1/31/2023 5:30 PM >>>
We will need to chat about the effect of the response. Counsel does not directly address how Mr. Li's statement to parliament that "I have not been performing the duties of CFO..." nonetheless leaves room for Mr. Li to perform the duties of CFO in signing the attestation made in the filings with CSL. That attestation to CSL states that 1) Mr. Li is the CFO, and 2) that the information provided is true and correct, to the best of Mr.. Li's knowledge under penalty of perjury.

If Mr. Li by his own admission is not performing the duties of CFO, 1) why did he sign stating he was CFO; and 2) how could he make a "best of knowledge" affirmation if he was not performing the duties of CFO, which duties include having the capacity to investigate and form an opinion, "to the best of his knowledge," as to the truthfulness, completeness and accuracy of the filing to this agency?

Either Mr. Li was performing the duties of CFO when he signed this attestation, or he was not. We are entitled to, and we must have, a direct answer from counsel to this question.

William W. Toole
Deputy
North Carolina Department of Secretary of State
919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 1/31/2023 4:05 PM >>>

Re: WE Charity and Victor Li

Here is the response. I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| **From:** | wtoole@sosnc.gov |
| **To:** | Tim Crowley, Gail Eluwa |
| **CC:** | liz proctor |
| **Subject:** | Re: See Response from Ed Chaney, Esq. for Victor Li |
| **Date:** | 31-Jan-2023 17:30 |
| **Attachments:** | TEXT.htm [Save] [Open] |
| | IMAGE_1.jpeg [Save] [Open] |
| **Creation Date:** | 31-Jan-2023 17:30 |
| **Store Date:** | 02-Feb-2023 23:19 |
| **Status:** | opened,read |
| **Box Type:** | received |
| **Folder:** | Gail Eluwa Home > Management > Mailbox |
| **Message Id:** | 63D9968B.domain.PO.200.20000EC.1.79529.1 |

We will need to chat about the effect of the response. Counsel does not directly address how Mr. Li's statement to parliament that "I have not been performing the duties of CFO..." nonetheless leaves room for Mr. Li to perform the duties of CFO in signing the attestation made in the filings with CSL. That attestation to CSL states that 1) Mr. Li is the CFO, and 2) that the information provided is true and correct, to the best of Mr.. Li's knowledge under penalty of perjury.

If Mr. Li by his own admission is not performing the duties of CFO, 1) why did he sign stating he was CFO; and 2) how could he make a "best of knowledge" affirmation if he was not performing the duties of CFO, which duties include having the capacity to investigate and form an opinion. "to the best of his knowledge," as to the truthfulness, completeness and accuracy of the filing to this agency?

Either Mr. Li was performing the duties of CFO when he signed this attestation, or he was not. We are entitled to, and we must have, a direct answer from counsel to this question.

William W. Toole

Deputy

North Carolina Department of Secretary of State

919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 1/31/2023 4:05 PM >>>

Re: WE Charity and Victor Li

Here is the response. I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState

( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

TEXT.htm                                                                ATTACHMENT

We will need to chat about the effect of the response. Counsel does not directly address how Mr. Li's statement to parliament that "I have not been performing the duties of CFO..." nonetheless leaves room for Mr. Li to perform the duties of CFO in signing the attestation made in the filings with CSL. That attestation to CSL states that 1) Mr. Li is the CFO, and 2) that the information provided is true and correct, to the best of Mr.. Li's knowledge under penalty of perjury.

If Mr. Li by his own admission is not performing the duties of CFO, 1) why did he sign stating he was CFO; and 2) how could he make a "best of knowledge" affirmation if he was not performing the duties of CFO, which duties include having the capacity to investigate and form an opinion. "to the best of his knowledge," as to the truthfulness, completeness and accuracy of the filing to this agency?

Either Mr. Li was performing the duties of CFO when he signed this attestation, or he was not. We are entitled to, and we must have, a direct answer from counsel to this question.

William W. Toole
Deputy
North Carolina Department of Secretary of State
919.814.5303

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited. In conjunction with transactions of public business, this email is subject to N.C. Public Records Law and may be disclosed to third parties.

>>> Gail Eluwa 1/31/2023 4:05 PM >>>

Re: WE Charity and Victor Li

Here is the response. I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622 Raleigh, NC 27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| **From:** | geluwa@sosnc.gov |
| **To:** | Tim Crowley |
| **CC:** | William Toole, Gail Eluwa, liz proctor |
| **Subject:** | See Response from Ed Chaney, Esq. for Victor Li |
| **Date:** | 31-Jan-2023 16:05 |
| **Attachments:** | TEXT.htm [Save] [Open] |
| | IMAGE_18.jpeg [Save] [Open] |
| | 2023.01.31 WE Charity response to January 5, 2023 letter from G. Eluwa.pdf [Save] [Open] |
| **Creation Date:** | 31-Jan-2023 16:05 |
| **Store Date:** | 03-Feb-2023 03:58 |
| **Status:** | opened,read,replied |
| **Box Type:** | received |
| **Folder:** | William Toole > Mailbox > Agency Groups > CSL > Complaints > WE Charity |
| **Message Id:** | 63D982A4.domain.PO.200.2000041.1.A2CCF.1 |

Re: WE Charity and Victor Li

Here is the response. I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState
( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

Re:  WE Charity and Victor Li

Here is the response.  I will be available after 11:00 am on Wednesday and have a 1:00 pm webinar.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | echaney@schellbray.com |
| To: | Gail Eluwa |
| Subject: | [Caution: External Mail] WE Charity |
| Date: | 31-Jan-2023 15:31 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| | Mime.822  *(excluded from export)* |
| | 2023.01.31 WE Charity response to January 5, 2023 letter from G. Eluwa.pdf  [Save]  [Open] |
| | headers.822  [Save]  [Open] |
| Creation Date: | 31-Jan-2023 15:30 |
| Store Date: | 02-Feb-2023 23:19 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 63D97AA8.domain.GWIA.200.2000036.1.87D0B3.1 |

Hi Gail,   Thanks for the opportunity to answer your questions on behalf of my client, WE Charity.  The attached letter fully addresses those questions and should put any concerns over the matter to rest.  As noted in the letter, we would appreciate a written response indicating that is the case.  Please let me know if I can be of further assistance.

All the best,
Ed

----------------------------------------

Ed Chaney
919.869.3080
Fax 855.386.4139
echaney@schellbray.com<mailto:echaney@schellbray.com>

----------------------------------------

SchellBray
SCHELL BRAY PLLC
Attorneys and Counselors at Law
100 Europa Drive * Suite 271 * Chapel Hill, NC 27517
www.schellbray.com<http://www.schellbray.com/>

Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.

TEXT.htm                                                              ATTACHMENT

Hi Gail,   Thanks for the opportunity to answer your questions on behalf of my client, WE Charity.  The attached letter fully addresses those questions and should put any concerns over the matter to rest.  As noted in the letter, we would appreciate a written response indicating that is the case.  Please let me know if I can be of further assistance.

All the best,

Ed

**Ed Chaney**

919.869.3080
Fax 855.386.4139
echaney@schellbray.com

SchellBray

**SCHELL BRAY PLLC**
Attorneys and Counselors at Law
100 Europa Drive · Suite 271 · Chapel Hill, NC 27517

www.schellbray.com

Confidentiality Notice: This electronic transmission contains information from the law firm of Schell Bray PLLC that may be confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are not authorized to use, copy, disclose or distribute the contents of this communication or any attachment. If you have received this transmission in error, please delete this message and any attachments from your system and notify us immediately by telephone at (336) 370-8800 or by reply email. Thank you for your cooperation.

| | **MAIL** |
|---|---|

| From: | lproctor@sosnc.gov |
|---|---|
| To: | Tim Crowley |
| Subject: | Fwd: [Caution: External Mail] Re: [Caution: External Mail] Re: Questions from the Canadian Broadcasting Corporation |
| Date: | 31-Jan-2023 15:19 |
| Attachments: | TEXT.htm  [Save]  [Open] |
| Creation Date: | 31-Jan-2023 15:19 |
| Store Date: | 03-Feb-2023 03:58 |
| Status: | opened |
| Box Type: | unknown |
| Folder: | William Toole > Mailbox > Agency Groups > CSL > Complaints > WE Charity > Fwd: [Caution: External Mail] Re: [Caution: External Mail] Re: Questions from the Canadian Broadcasting Corporation |
| Message Id: | 63D977CF.domain.PO.200.20000BA.1.F9A92.1 |

>>> Harvey Cashore <harvey.cashore@cbc.ca> 1/19/2023 11:20 AM >>>

Hi Liz,

Just wanted to check in on this. Do you know when you will be able to respond to this?

Thanks again for your time.

Harvey

On Tue, 17 Jan 2023 at 16:33, Harvey Cashore <harvey.cashore@cbc.ca> wrote:


Hi Liz,

Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

Could you let me know how you came to this determination?

Thanks again for all your help with our understanding of this file.

Harvey

On Thu, 5 Jan 2023 at 17:47, liz proctor <lproctor@sosnc.gov> wrote:

Hi Harvey,

North Carolina statute requires the notary to administer to the treasurer or chief financial officer, under penalty of perjury, that they are in fact treasurer or chief financial officer and that the information provided to North Carolina is true and correct to the best of the knowledge of that person. This helps affirm that the substance of the information being provided is materially accurate and encourages transparency for North Carolina's giving public.
It should also be noted that generally, if concerns are raised about inaccuracies in the substance of information provided in filings it is our practice to give the organizations in question the opportunity to cure, correct or supplement the information they have provided.

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov

Connect with us!

On the Web: http://www.sosnc.gov/

Facebook: https://www.facebook.com/NCSecState

Twitter: https://twitter.com/NCSecState

YouTube: https://www.youtube.com/c/NCSecState

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited.

>>> Harvey Cashore <harvey.cashore@cbc.ca> 1/3/2023 3:21 PM >>>
Hi Gail and Liz,

Happy New Year.

Just wanted to check in on this and see when we might be getting a response.

If you would like to talk more on the phone that would be great as well.

Harvey

On Thu, 22 Dec.2022 at 14:46, Harvey Cashore <harvey.cashore@cbc.ca> wrote:

Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

Documentation filed with your office:

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal" is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS. Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020. On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

Information provided to the House of Commons ethics committee in Ottawa:

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

Questions for your office:

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period, stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

—

Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

--

Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

--

Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704


--

Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

TEXT.htm                                                                    ATTACHMENT

>>> Harvey Cashore <harvey.cashore@cbc.ca> 1/19/2023 11:20 AM >>>
Hi Liz,

Just wanted to check in on this. Do you know when you will be able to respond to this?

Thanks again for your time.

Harvey

On Tue, 17 Jan 2023 at 16:33, Harvey Cashore < harvey.cashore@cbc.ca> wrote:
  Hi Liz,

  Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

  On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

  This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

  Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

  Could you let me know how you came to this determination?

  Thanks again for all your help with our understanding of this file.

  Harvey

  On Thu, 5 Jan 2023 at 17:47, liz proctor < lproctor@sosnc.gov> wrote:
    Hi Harvey,

    North Carolina statute requires the notary to administer to the treasurer or chief financial officer, under penalty of perjury, that they are in fact treasurer or chief financial officer and that the information provided to North Carolina is true and correct to the best of the knowledge of that person. This helps affirm that the substance of the information being provided is materially accurate and encourages transparency for North Carolina's giving public.

    It should also be noted that generally, if concerns are raised about inaccuracies in the substance of information provided in filings it is our practice to give the organizations in question the opportunity to cure, correct or supplement the information they have provided.


    Liz Proctor
    Public Information Officer
    NC Dept. of the Secretary of State
    (919) 814-5341
    lproctor@sosnc.gov


    Connect with us!

    On the Web: http://www.sosnc.gov/

    Facebook: https://www.facebook.com/NCSecState


    Twitter: https://twitter.com/NCSecState

Facebook: https://www.facebook.com/NCSecState

Twitter: https://twitter.com/NCSecState

YouTube: https://www.youtube.com/c/NCSecState

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized use, disclosure, or distribution is prohibited.

>>> Harvey Cashore <harvey.cashore@cbc.ca> 1/3/2023 3:21 PM >>>
Hi Gail and Liz,

Happy New Year.

Just wanted to check in on this and see when we might be getting a response.

If you would like to talk more on the phone that would be great as well.

Harvey

On Thu, 22 Dec 2022 at 14:46, Harvey Cashore <harvey.cashore@cbc.ca> wrote:

Dear Gail Eluwa,

Thank you for the phone call yesterday.

As I said on the phone, I am a journalist with the Canadian Broadcasting Corporation. I work for an investigative documentary program called "The Fifth Estate."

I am reaching out about a story we are preparing relating to a Canadian-based charity, WE Charity. WE Charity also has tax-exempt status with the IRS and holds charity solicitation licenses in several states.

I have some questions for which I am hoping the North Carolina Secretary of State, Charitable Solicitation Licensing division could provide answers. My story may be published on our website – cbcnews.ca – sometime early in the New Year.

My questions relate to documents that WE Charity supplied to your office between 2020 and 2022 as part of its charity license renewal applications. (I am also reaching out to other state charity licensing offices as well).

Specifically, my questions relate to Victor Li, who is stated in the documents provided to your office to be acting as the CFO of WE Charity. In the period between the fall of 2020 and 2022, Victor Li's name and signature appear on numerous documents that were sent to your office by WE Charity.

To put this all in context, I am trying to understand the significance of the documents that were filed by WE Charity to your office – as compared with other information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was looking into WE Charity's finances in 2021.

In Canada, Victor Li, his lawyer, and WE Charity have publicly stated on several occasions that Victor Li has been on leave from the charity. Specifically, Victor Li stated to the Parliamentary committee that he went on leave from the charity in the summer of 2020 and that he has not been acting as its CFO since then.

In short, I am trying to understand the significance of the information provided to Canadian members of Parliament with the information WE Charity has provided to state licensing boards in the United States.

I am hoping you can help me with these questions.

**A. Documentation filed with your office:**

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity after the summer of 2020

**A. Documentation filed with your office:**

Records provided to your office show that Victor Li signed numerous documents as CFO of WE Charity in the period after he stated he was on leave from the charity, after the summer of 2020.

For example, documents provided to your office on July 22, 2021, and October 13, 2022, respectively stated that Victor Li was the Treasurer or CFO of WE Charity, and that he had "final responsibility for custody and/or final distribution of contributions" and that he had "custody of applicant's financial records."

Victor Li signed these documents alongside a form that stated: "APPLICANT SIGNATURE: To be signed in the presence of a Notary Public who has administered the following oath: I swear or affirm that the information furnished in this application and all supplemental forms, reports, documents and attachments are true and correct to the best of my knowledge under the penalty of perjury."

As required for charities operating in North Carolina, notaries for WE Charity provided their stamp to go along with Victor Li's signature, both in 2021 and 2022.

North Carolina records also show that on October 13, 2022, you sent a letter addressed to Victor Li, stating that the WE Charity application was "incomplete" and that the Notary Stamp/Seal is "still not showing".

The records show that WE Charity responded to your letter the same day. This time they provided the notary stamp of a lawyer for WE Charity, Yvonne Mazurak, along with her signature.

The records also show that WE Charity provided North Carolina with copies of the Form 990s that they had filed with the IRS. Those form 990 documents show that on November 21, 2020, Victor Li signed Form 990 for the year ending August 31, 2020. On January 8, 2022, Victor Li signed Form 990 for the year ending August 31, 2021.

In both of those Form 990s, Victor Li is listed as a "key employee" and "the principal officer" of the Charity. The form also states that the books are "in the care of Victor Li" and that Victor Li "possesses the organization's books and records."

Under Victor Li's signature, the Form 990 documents state: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete...."

**B. Information provided to the House of Commons ethics committee in Ottawa:**

I am trying to understand the significance of the above information provided to your office compared with the information that Victor Li and his lawyer provided to the Canadian House of Commons parliamentary committee that was examining WE Charity's finances in 2021.

According to Victor Li and his lawyer, Li had been on medical leave from WE Charity as of the summer of 2020. In Canada, Li's medical leave from WE Charity was publicly stated on several occasions:

For example, on March 24 2021, Victor Li's lawyer sent a letter to the Canadian Parliamentary committee that was probing WE Charity's finances. His lawyer, Megan Savard, also sent out a tweet that republished the letter she sent to the committee. Here is the tweet:

https://twitter.com/megan__savard/status/1374831474873139201/photo/2

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time.

In that March 2021 letter, Megan Savard states that Victor Li had already had "a months-long absence from the workplace". The letter states that Victor Li had the inability to concentrate for more than short periods of time. Savard stated that Li's medical condition "currently prevents him from returning to work and his doctor cannot say if he ever will be able to return." As you can see from reading the attached, Victor Li's lawyer stated that a return to work could cause her client undue stress that could lead to his death.

In the March 2021 letter, Li summed up his medical leave: "I am still the CFO of WE Charity and ME to WE Social Enterprises Inc. I have been on medical leave since the summer 2020. Since I was placed on medical leave, WE Charity's finances have been handled by a team of accountants led by members of the executive team as well as a director in the Finance department who is a CPA."

On April 29, 2021, Victor Li's lawyer sent another letter to the Parliamentary committee in Ottawa. [See attached].

In that letter, Victor Li's lawyer again stated that Li "is on indefinite medical leave due to serious health issues." His lawyer said that Li is "unable to review or analyze large numbers of documents, or easily access company records" and that, because of this, "he asked WE Charity to help answer the Committee's numerous questions."

In that April 29, 2021 letter Victor Li made the additional statement: "On my doctor's advice, I have been on medical leave since the summer of 2020. I have not been performing the duties of CFO or participating in the daily business of WE Charity or its associated organizations since I started my medical leave. My health issues have significantly impeded, and continue to impede, my ability to work."

Earlier, on February 22, 2021 WE Charity had tweeted that "WE Charity CFO is on medical leave":

https://twitter.com/WE_Comms/status/1363935728258932747

As well, in May of this year (2022), a former WE Charity board member, Tawfiq Rangwala, published a book about WE Charity. In the book Rangwala stated that Li's medical condition limited his ability to speak for a length of time: "I could only interview Victor briefly- fifteen minutes, and only in the morning, was all the energy he could muster."

Scott Baker, the COO of WE Charity, was also quoted in Rangwala's book stating that Victor Li had been "off for months" when the Parliamentary Committe had asked Victor Li to testify (in March and April of 2021.)

**Questions for your office:**

Here are my questions:

What is the reason that North Carolina requires that a notary affirms the signature of a charity's treasurer or CFO when providing documentation to the North Carolina charity licensing office?

How important is it that a charity provides accurate information about its officers and its finances to the North Carolina Secretary of State?

How significant would it be if the sworn information provided to your office is not correct?

In your opinion, how significant is it that the information that WE Charity provided to your office, along with Victor Li's signature, is not the same as the information that Victor Li and his lawyer provided to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was

Victor Li made the false documentation submitted via the lawyer referred to the Canadian Parliamentary committee referenced above?

In summary, I am hoping to understand, from your perspective, how one can reconcile WE Charity and Victor Li's statements in Canada – that he was on medical leave from WE Charity, absent from the workplace, that he was not handling the finances of the charity and that he could not "easily access" company records nor concentrate for a length of time – with documents provided to your office, in the same time period, stating that he was a "key" employee and "principal officer" of WE Charity, and stating that he signed those submissions, under penalty of perjury, affirming the accuracy of the contents of the documents and stating he had responsibility for "custody and/or final distribution of contributions" and that he had "control of the financial records and for signing cheques."

Any responses you can provide me to the above questions would be greatly appreciated.

Thanks again,

Harvey Cashore

--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704


--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704


--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704


--
Harvey Cashore
Producer, The Fifth Estate
Pronouns: he and him

Cell: 416-526-4704

**MAIL**

| | |
|---|---|
| From: | geluwa@sosnc.gov |
| To: | Tim Crowley |
| CC: | William Toole, Gail Eluwa, liz proctor |
| Subject: | Victor Li of WE Charity |
| Date: | 30-Jan-2023 11:54 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE_9.jpeg [Save] [Open] |
| Creation Date: | 30-Jan-2023 11:54 |
| Store Date: | 03-Feb-2023 03:57 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | William Toole > Mailbox > Agency Groups > CSL > Complaints > WE Charity |
| Message Id: | 63D7F654.domain.PO.200.2000041.1.A2C10.1 |

FYI: Just had a telephone discussion with Ed Chaney, a local attorney who has been retained to provide a response to CSL regarding our inquiry to Victor Li of WE Charity.

Ed and I presented at the NC Center for Nonprofits' Workshop this past November 2022 and have some familiarity with each other. The response is due February 3, 2023. He asked if needed, could there be some flexibility in submitting the response. I informed to contact me should he need additional time.

He also mentioned that Victor Li never relinquished his fiduciary responsibilities as CFO and there is a difference between the role of an officer and the role of an employee. I reminded him that Victor Li stated that he was not acting in the capacity of a CFO in his March 15, 2021 response to the Canadian Parliament.

Ed shared with me that Victor Li/WE Charity plans to file a defamation suit against the Canadian Broadcasting Corporation (CBC) for contacting various regulators regarding this matter.

I told him, that I would wait to see his response to the inquiry before responding.

---------------------------------------------------
Ed Chaney
919.869.3080
Fax 855.386.4139
echaney@schellbray.com
-------------------------

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState
( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

FYI: Just had a telephone discussion with Ed Chaney, a local attorney who has been retained to provide a response to CSL regarding our inquiry to Victor Li of WE Charity.

Ed and I presented at the NC Center for Nonprofits' Workshop this past November 2022 and have some familiarity with each other. The response is due February 3, 2023. He asked if needed, could there be some flexibility in submitting the response. I informed to contact me should he need additional time.

He also mentioned that Victor Li never relinquished his fiduciary responsibilities as CFO and there is a difference between the role of an officer and the role of an employee. I reminded him that Victor Li stated that he was not acting in the capacity of a CFO in his March 15, 2021 response to the Canadian Parliament.

Ed shared with me that Victor Li/WE Charity plans to file a defamation suit against the Canadian Broadcasting Corporation (CBC) for contacting various regulators regarding this matter.

I told him, that I would wait to see his response to the inquiry before responding.

**Ed Chaney**

919.869.3080
Fax 855.386.4139
echaney@schellbray.com

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com /NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | jkroetsch@bsfllp.com |
| To: | Gail Eluwa |
| Subject: | [Caution: External Mail] Correspondence re WE Charity |
| Date: | 20-Jan-2023 09:45 |
| Attachments: | TEXT.htm [Save] [Open] |
| | headers.822 [Save] [Open] |
| | Mime.822 *(excluded from export)* |
| Creation Date: | 20-Jan-2023 09:45 |
| Store Date: | 20-Jan-2023 18:47 |
| Status: | |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 63CAA90E.domain.GWIA.200.20000CD.1.8716B1.1 |

Ms. Eluwa,

My firm represents WE Charity, a New York charitable organization registered with the State of North Carolina.

Late yesterday, my client received your letter dated January 5, 2023 requesting a response within fifteen days of receipt. Per your request, WE Charity will provide a response to your letter on or before February 3, 2023.

In the interim, if there is any way we can be of assistance to you, I am reachable by email or by phone at 914-772-6184.

Sincerely,
Joseph Kroetsch

Joseph F. Kroetsch (he/him/his)
Partner
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(t) +1 914 749 8388
(m) +1 914 772 6184
jkroetsch@bsfllp.com<mailto:jkroetsch@bsfllp.com>
www.bsfllp.com<http://www.bsfllp.com/>

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

TEXT.htm                                                                    **ATTACHMENT**

Ms. Eluwa,

My firm represents WE Charity, a New York charitable organization registered with the State of North Carolina.

Late yesterday, my client received your letter dated January 5, 2023 requesting a response within fifteen days of receipt. Per your request, WE Charity will provide a response to your letter on or before February 3, 2023.

In the interim, if there is any way we can be of assistance to you, I am reachable by email or by phone at 914-772-6184.

Sincerely,

Joseph Kroetsch

**Joseph F. Kroetsch** (he/him/his)
Partner

---

## BOIES SCHILLER FLEXNER LLP

333 Main Street

Armonk, NY 10504

(t) +1 914 749 8388

(m) +1 914 772 6184

jkroetsch@bsflp.com

www.bsflp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

**MAIL**

| | |
|---|---|
| From: | geluwa@sosnc.gov |
| To: | Gail Eluwa, liz proctor |
| CC: | William Toole, Tim Crowley |
| Subject: | Re: see my comments to you - Harvey Cashore |
| Date: | 19-Jan-2023 16:40 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE_4.jpeg [Save] [Open] |
| | IMAGE_2.jpeg [Save] [Open] |
| Creation Date: | 19-Jan-2023 16:40 |
| Store Date: | 19-Jan-2023 18:44 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 63C9B8D2.domain.PO.200.2000041.1.A2657.1 |

Liz,

CSL has not received a response yet.

Post Office Box 29622Raleigh, NC

27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState (

https://twitter.com/NCSecState )Tel: (919) 814-5281Fax: (919) 807-2220

>>> Gail Eluwa 1/18/2023 8:50 AM >>>
CSL does not rescind a charitable license nor ask them to cease and desist solicitation activities based upon an allegation. WE Charity is still under review to determine if a violation of the statue has occurred.

Gail

********************************************************************

Hi Liz,

Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

Could you let me know how you came to this determination?

Thanks again for all your help with our understanding of this file.

Harvey

Harvey Cashore
Producer, The Fifth Estate


Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState (
https://twitter.com/NCSecState )Tel: (919) 814-5281Fax: (919) 807-2220

TEXT.htm                                                                    **ATTACHMENT**

Liz,

CSL has not received a response yet.

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com/NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

>>> Gail Eluwa 1/18/2023 8:50 AM >>>
CSL does not rescind a charitable license nor ask them to cease and desist solicitation activities based upon an allegation.  WE Charity is still under review to determine if a violation of the statue has occurred.

Gail

*****************************************************************************************
Hi Liz,

Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

Could you let me know how you came to this determination?

Thanks again for all your help with our understanding of this file.

Harvey

Harvey Cashore
Producer, The Fifth Estate

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com/NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220

**MAIL**

| | |
|---|---|
| From: | lproctor@sosnc.gov |
| To: | Gail Eluwa |
| Subject: | Re: see my comments to you - Harvey Cashore |
| Date: | 19-Jan-2023 15:07 |
| Attachments: | TEXT.htm [Save] [Open] |
| | IMAGE.jpeg [Save] [Open] |
| Creation Date: | 19-Jan-2023 15:07 |
| Store Date: | 19-Jan-2023 18:44 |
| Status: | opened,read |
| Box Type: | received |
| Folder: | Gail Eluwa Home > Management > Mailbox |
| Message Id: | 63C9A30C.domain.PO.200.20000BA.1.F8D33.1 |

Gail -

Has there been any response from Li to the your Jan. 5th letter?

Thanks,

Liz

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov

>>> Gail Eluwa 1/18/2023 8:50 AM >>>
CSL does not rescind a charitable license nor ask them to cease and desist solicitation activities based upon an allegation. WE Charity is still under review to determine if a violation of the statue has occurred.

Gail

*******************************************************************************
Hi Liz,

Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

Could you let me know how you came to this determination?

Thanks again for all your help with our understanding of this file.

Harvey

Harvey Cashore
Producer, The Fifth Estate

Post Office Box 29622Raleigh, NC
27626www.sosnc.govgeluwa@sosnc.govhttps://www.facebook.com/NCSecState/@NCSecState
( https://twitter.com/NCSecState) Tel: (919) 814-5281Fax: (919) 807-2220

TEXT.htm                                                                              **ATTACHMENT**

Gail -

Has there been any response from Li to the your Jan. 5th letter?

Thanks,

Liz

Liz Proctor
Public Information Officer
NC Dept. of the Secretary of State
(919) 814-5341
lproctor@sosnc.gov


>>> Gail Eluwa 1/18/2023 8:50 AM >>>
CSL does not rescind a charitable license nor ask them to cease and desist solicitation activities based upon an allegation.  WE Charity is still under review to determine if a violation of the statue has occurred.

Gail

*****************************************************************************************
Hi Liz,

Today I noticed that there are two new documents filed with the North Carolina Secretary of State relating to WE Charity.

On January 13, 2023, WE Charity filed form 8868 and stated that the books of WE Charity are "in the care of" Victor Li.

This morning, on January 17, 2023, lead document examiner Demian Silvers wrote to Victor Li, granting him permission to extend WE Charity's federal tax filing extension until April 15, 2023.

Has the North Carolina Secretary of State determined that Victor Li is now acting as the CFO of WE Charity and that he has custody of the books of WE Charity?

Could you let me know how you came to this determination?

Thanks again for all your help with our understanding of this file.

Harvey

Harvey Cashore
Producer, The Fifth Estate

Post Office Box 29622 Raleigh, NC  27626 www.sosnc.gov geluwa@sosnc.gov https://www.facebook.com
/NCSecState/ @NCSecState Tel: (919) 814-5281 Fax: (919) 807-2220