**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WE CHARITY,<br><br>        *Plaintiff*,<br><br>    v.<br><br>CANADIAN BROADCASTING<br>CORPORATION,<br><br>        *Defendant.* | Civil Action No. 22-340 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

    The plaintiff in this case is a not-for-profit charity that seeks to foster "volunteerism in students" and to bring "education, clean water, healthcare, [and] food" to communities in Africa, Asia, and Latin America.  Dkt. 1 at 9, 14 (Compl. ¶¶ 2, 16, 19).  The charity "operates through a network of affiliated entities around the world"—which Plaintiff refers to as the "WE Organization"—including "in the United States, Canada, and the United Kingdom."  *Id.* at 14 (Compl. ¶ 18).  Plaintiff in this case is the U.S. affiliate, which is known as "WE Charity;" the Canadian affiliate, which confusingly was also known as "WE Charity," is in the "final processes of shutting down."  Dkt. 28 at 53.  Defendant Canadian Broadcasting Company ("[t]he CBC") is a Canadian radio and television public broadcaster owned by the Canadian government.  Dkt. 1 at 15–16 (Compl. ¶¶ 20, 26).

    Plaintiff brings this action against the CBC, asserting claims for defamation (Count I), breach of contract (Count II), promissory estoppel (Count III), and negligent misrepresentation (Count IV).  *Id.* at 226-29 (Compl. ¶¶ 731–60).  Each of these claims stems from news stories and promotions run by the CBC in late 2021 and early 2022 accusing the charity (without

drawing any evident distinctions between the WE Organization entities) of making misrepresentations to donors and failing to deliver promised schoolrooms in Kenya.  *Id.* at 9, 96–97 (Compl. ¶¶ 1, 3, 302).

Pending before the Court is the CBC's motion to dismiss the complaint for *forum non conveniens* and, in the alternative, to dismiss Counts II-IV for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  Dkt. 16.  For the foregoing reasons, the Court will **DENY** the CBC's motion to dismiss the entire case for *forum non conveniens* but will **GRANT** its motion to dismiss Counts II-IV for lack of subject-matter jurisdiction.

## I.  BACKGROUND

### A.    We Charity's Claims

The CBC asserts its *forum non conveniens* defense at the motion to dismiss stage, and, thus, the Court must "accept as true the allegations in the complaint and draw all reasonable inferences in [Plaintiff's] favor."  *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 872 n.1 (D.C. Cir. 2019).  But because the motion turns on factual issues that go beyond the pleadings, including disputed questions regarding foreign law and procedures, access to necessary evidence and compulsory process, the location and convenience of witnesses, and other practical problems, the Court can and must resolve those separate, disputed questions of fact.  *See*, *e.g.*, *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568 (D.C. Cir. 2010).  The Court will, accordingly, summarize the allegations contained in the complaint and, beyond that, will describe the parties' contentions respecting the relative convenience of the possible fora.

The Court must take a different approach, however, to resolving the CBC's motion to dismiss Counts II-IV for lack of subject-matter jurisdiction.  Because that motion "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," the Court will "take the

plaintiff's factual allegations as true and [will] determine whether [those allegations] bring the case within any of the exceptions to" foreign sovereign immunity "invoked by the plaintiff." *Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citations omitted). In addressing subject-matter jurisdiction, neither party relies on any facts beyond those alleged in Plaintiff's complaint, and so the Court will resolve that portion of the CBC's motion based solely on the adequacy of those allegations.

      1.    *The Parties*

"WE Charity" is a not-for-profit charitable corporation. Dkt. 1 at 14 (Compl. ¶ 19). "The original WE Charity entity was founded in Canada in 1995," *id.* (Compl. ¶ 17), by two brothers, Craig and Marc Kielburger, *id.* at 16 (Compl. ¶¶ 28–29). Today, "WE Charity operates through a network of affiliated entities around the world," including in the United States, Canada, and the United Kingdom, which the complaint refers to as the "WE Organization." *Id.* at 14 (Compl. ¶ 18). Those entities "put on domestic programming for students in their respective countries[] and raise funds to support international development projects." *Id.* Here, Plaintiff is the U.S.-based WE Charity, which is incorporated in New York and "registered in 37 states and the District of Columbia." *Id.* (Compl. ¶ 19). "WE Charity [that is, the U.S. entity] is the primary source of funding for the entire WE Organization," supporting both domestic programming in American schools and international development in various countries, including Kenya. *Id.* at 18 (Compl. ¶ 37); *see also id.* at 20 (Compl. ¶ 48) ("U.S. donors, through WE Charity, provide most of the funding for the WE Organization's development work."). Unfortunately, the complaint is imprecise in its use of the name "WE Charity," sometimes referring to the U.S. entity, at other times referring to the Canadian entity, and, perhaps most frequently, treating the two as

3

indistinguishable.  Where relevant, the Court will do its best to distinguish between these entities.

"The foreign country in which WE Charity funds the most charitable works is Kenya." *Id.* at 26 (Compl. ¶ 64).  That work includes projects for primary and secondary schools owned and run by the local government, as well as projects run directly by the WE Organization in Kenya.  *Id.* at 26-27 (Compl. ¶¶ 65–67).  According to the complaint, the WE Organization has "funded the construction or renovation of 852 schoolrooms in Kenya."  *Id.* at 27 (Compl. ¶ 68).  "Robin Wiszowaty is WE Charity's Country Director for Kenya."  *Id.* at 16 (Compl. ¶ 30).  "She is employed directly by, and receives her paychecks from, the United States-based plaintiff in this litigation" and is an American citizen who resides in Michigan.  *Id.*  Carolyn Moraa (a.k.a. Carol), a resident of Kenya, is the Director of the WE Villages Projects in East Africa and oversees some additional projects.  *Id.* at 16–17 (Compl. ¶ 31).

In 2020, a political scandal plagued the Canadian affiliate of the WE Organization, referred to in the complaint (at least at times) as "WE Charity Canada," resulting in the announced wind down of that entity.  *Id.* at 28–29 (Compl. ¶¶ 77–82).  In short, the Canadian government had awarded a project to WE Charity Canada.  *Id.* at 28 (Compl. ¶ 78).  Neither the Prime Minister nor the Finance Minister recused himself from that award decision, even though the Prime Minister "and members of his family had appeared at WE Days in Canada and in endorsements for WE Charity Canada and the Prime Minister's family members had been paid professional fees for certain appearances," and the Finance Minister's daughter previously worked for WE Charity Canada.  *Id.*  These revelations led to Parliamentary inquiries and WE Charity Canada's decision to return the government funds at a loss to the charity.  *Id.* at 29 (Compl. ¶¶ 79, 81).  In September 2021, due to the scandal and subsequent financial losses, "WE

Charity Canada announced that it would wind down its operations and establish a foundation to provide sustainable ongoing funding for existing overseas projects and programs." *Id.* (Compl. ¶ 82).

The CBC is a Canadian public broadcaster owned by the Canadian government and organized as a "crown corporation." *Id.* at 15-16 (Compl. ¶¶ 20, 26). It hosts a variety of television programs, as well as radio shows, podcasts, websites, and social media accounts. *Id.* at 15 (Compl. ¶ 21). It also "distributes and licenses its broadcast content in the United States pursuant to various commercial distribution and licensing agreements with U.S. domestic broadcasting entities." *Id.* (Compl. ¶ 23). The CBC is headquartered in Ottawa, Canada, Dkt. 16-47 at 1 (Decl. of Catherine Perry ¶ 3), and has an office in Washington, D.C., Dkt. 1 at 15 (Compl. ¶ 24).

  2. *Alleged Defamation*

The "CBC broadcasts a weekly, hour-long investigative news program called *The Fifth Estate*," which is "viewed by millions throughout Canada." *Id.* at 30 (Compl. ¶¶ 86, 88). The program is also available in the United States—by antenna reception for those near the Canadian border, by means of cable services in the Northern United States that offer it as a "channel option," and through online platforms. *Id.* (Compl. ¶ 89). According to Plaintiff, *The Fifth Estate* airs content similar to that carried on CBS's *60 Minutes* program. *Id.* (Compl. ¶ 86). *The Fifth Estate* aired two episodes about WE Charity in 2021: one on February 4, 2021 ("February Episode"), and the second, which is at issue in this case, on November 18, 2021 ("November Episode"). *Id.* (Compl. ¶ 91). "Both episodes were hosted by Mark Kelley and produced by investigative reporter Harvey Cashore." *Id.* at 30–31 (Compl. ¶ 92).

In the February Episode, which is not directly at issue in this case, the CBC stated that "WE Charity told four donors they each had funded the 'entire' cost of the same 'borehole' constructed . . . in . . . Kenya." *Id.* at 32 (Compl. ¶ 99) (footnote omitted). The CBC supported that claim with donors' internet postings, but, according to WE Charity, none of those postings "stated the donations were the sole funding for the project." *Id.* (Compl. ¶¶ 99–100). In response to the February Episode, WE Charity served the CBC with a Libel Notice of an Intended Action pursuant to Ontario law on June 2, 2021. Dkt. 16-1 at 25 (citing Dkt. 16-33). Although the Libel Notice did not distinguish between the different entities making up the WE Organization, it was submitted on behalf of "WE Charity . . . and its affiliates, subsidiaries, and representatives." Dkt. 16-33 at 8. Those same WE Charity entities served another, similar Libel Notice on July 22, 2021 in response to re-runs of the February Episode. Dkt. 16-34.

The same CBC reporters then began a further investigation into WE Charity, this time with a focus on schools the organization funded in Kenya. Dkt. 1 at 42 (Compl. ¶ 139). That investigation and subsequent reporting is the subject of this lawsuit. The complaint alleges that the CBC was "inspired to investigate WE Charity's school funding after a former donor, Reed Cowan," a news anchor from Las Vegas, Nevada, "publicly alleged that WE Charity had removed a plaque from one of the schools he funded." *Id.* (Compl. ¶ 140–41). So, again, the CBC began investigating the theory that a WE Charity entity told multiple donors that each was the sole funder for a project, but this time the investigation focused on the organization's educational projects in Kenya. *Id.* at 51 (Compl. ¶ 175).

Throughout the summer and fall of 2021, the CBC investigated the charity's educational projects in Kenya, and the parties exchanged communications related to the investigation throughout. In June 2021, Cashore reached out to Wiszowaty inquiring about the number of

6

schools funded by WE Charity per village in Kenya.  *Id.* at 52-54 (Compl. ¶¶ 178–84).  In July

2021, WE Charity's executive director, Dalal Al-Waheidi, wrote Cashore accusing the CBC of

providing WE Charity's donors with unreliable information in the course of the CBC's

investigation.  *Id.* at 54–55 (Compl. ¶ 187).  In August 2021, Al-Waheidi again reached out, this

time stating that the total number of WE Charity schoolrooms in Kenya was 852 and providing

photographs of each, along with maps of the villages and locations of those schoolrooms.  *Id.* at

57–58 (Compl. ¶¶ 195, 197).  Then, in September 2021, a CBC team travelled to Kenya at

Wiszowaty's invitation, but the CBC allegedly failed to secure the necessary government

permission to film at the schools.  *Id.* at 68–78 (Compl. ¶¶ 218–47).  That same month, the

parties agreed that the CBC would interview both Carol Moraa and Robin Wiszowaty, although,

as explained in additional detail below, Wiszowaty was never interviewed.  *Id.* at 82–92 (Compl.

¶¶ 258–83).  On November 17, 2021, WE Charity sent the CBC a preliminary report from Ken

Froese, a forensic accountant, which, according to WE Charity, "directly contradict[ed] the

central thesis" of the November Episode.  *Id.* at 92–96 (Compl. ¶¶ 284–301).  WE Charity's

donors also reached out to the CBC throughout the investigation, including in a letter from

seventy-seven of WE Charity's largest donors disputing the premise of the CBC's investigation.

*Id.* at 62 (Compl. ¶ 205).

After the CBC concluded its investigation, it began publishing content about WE

Charity's educational activities in Kenya.  According to the complaint, between November 2021

and January 2022, the CBC released eleven false and defamatory publications.  *Id.* at 96–97

(Compl. ¶ 302).  In the days leading up to the November Episode, the CBC published an array of

promotional materials, including (1) an online teaser on November 11; (2) a television promo on

November 11; (3) a second television promo on November 14; (4) website postings on

November 15; (5) a Tweet on November 15; (6) an online article on November 18; (7) an e-mail newsletter on November 18; and (7) a twenty-minute radio broadcast on November 18. *Id.*

Then, on November 18, 2021, *The Fifth Estate* aired the November Episode. *Id.* at 97 (Compl. ¶ 302). The episode ran for about sixty minutes (including commercials) and was broadcast on terrestrial and cable television and made available online on the CBC's streaming platform and on YouTube. *Id.* at 126 (Compl. ¶¶ 379–80). The premise of the episode was that "WE Charity fraudulently informed multiple donors that each was the sole funder . . . of specific educational structures in Kenya." *Id.* (Compl. ¶ 379). The November Episode highlighted allegations from donors who were purportedly misled about the nature of their donations. The Episode included allegations from Rukshan de Silva, for example, who claimed that his high school was not told that other donors would fund the same school his high school worked to fund. *Id.* at 117, 135–36 (Compl. ¶¶ 350, 391). It also included an allegation from Reed Cowan that the plaque on the schoolhouse that Reed had funded in his son's memory had been taken down and replaced by the plaque linking another donor to the same schoolhouse. *Id.* at 128 (Compl. ¶ 385). The Episode also contained allegations from Watson Jordan, who claimed that he was led to believe that he had fully funded School Number 4 in the Kenyan village of Irkaat, even though, according to the CBC, that school was fully funded at least four times over. *Id.* at 133, 141–42 (Compl. ¶ 389, 393). de Silva previously resided in Canada and now lives in Australia, while Cowan and Jordan live in the United States. *Id.* at 42, 117, 192, 197 (Compl. ¶¶ 141, 305, 582, 605).

Two additional allegedly defamatory publications followed the November Episode. First, on November 24, 2021, the CBC published a podcast containing many of the same allegations. *Id.* at 97 (Compl. ¶ 302); *id.* at 143–46 (Compl. ¶¶ 400–10). Second, on January 27, 2022, the

CBC's French-language investigative show, *Enquête*, aired its own episode about WE Charity. *Id.* at 97 (Compl. ¶ 302). According to the complaint, the *Enquête* episode was mostly a French translation of the November Episode, but with some differences, including the addition of an introduction from the *Enquête* host Marie-Maude Denis and the deletion of several minutes of content. *Id.* at 147–48 (Compl. ¶¶ 417–20).

### 3. *Contract-Related Allegations*

As part of its investigation leading up to the November Episode, the CBC expressed its intention to interview WE Charity staff. The complaint alleges that Cashore reached out to WE Charity in early September 2021 and requested to interview Carol Moraa, the Director of WE Villages Projects in East Africa. *Id.* at 82 (Compl. ¶ 258). In response to that request, Wiszowaty explained that Moraa was "best positioned to talk about the projects" but cautioned that, if the CBC had "questions specifically related to [WE Charity's] budgets, [its] decision-making process, or [its] allocation of funding [, the CBC] should reserve those questions for when [it] interview[ed]" Wiszowaty. *Id.* (Compl. ¶ 260) (emphasis omitted). Cashore responded that the CBC "would want to interview" Wiszowaty "as well" and agreed that "Carol would not be the person to ask about financials." *Id.* (Compl. ¶ 261) (emphasis omitted). The complaint alleges that, acting "[i]n reliance on Mr. Cashore's representations regarding Ms. Wiszowaty, WE Charity and Ms. Moraa agreed for [Moraa] to be interviewed . . . on camera." *Id.* (Compl. ¶ 262).

"But then, for almost two months, [the] CBC did not contact Ms. Wiszowaty to follow up on the interview," and, in November 2021, Cashore told the WE Charity founders that the CBC would air its story without interviewing Wiszowaty and without the financial information she offered to provide. *Id.* at 83 (Compl. ¶¶ 264–65). After objection from one of WE Charity's

founders, Marc Kielburger, Cashore wrote that the CBC "did not need to additionally interview Robin Wiszowaty," but stated that "[i]f Robin is available to do an interview tomorrow, [the CBC was] happy to accommodate that." *Id.* at 84 (Compl. ¶ 270) (emphasis omitted). Cashore wrote that he would like to know about any corrections to Moraa's statements, which WE Charity took to mean that any interview of Wiszowaty would be limited in scope to clarifications or corrections of Moraa's interview instead of the financial points Wiszowaty intended to address. *Id.* at 84-85 (Compl. ¶¶ 270–72).

Although Wiszowaty lives in Michigan, she was in Toronto the next business day (a Friday) and offered to do the interview on Saturday in Toronto. *Id.* at 85 (Compl. ¶ 273). The CBC responded that it would interview her on Friday only, that it would conduct the interview by videoconference rather than in-person, that it was interested in any clarifications or corrections Wiszowaty wanted to make to Moraa's testimony, and that it "would be keen to hear any additional details" about the amount of money that WE Charity "raised to build primary school houses in Kenya and how many were built." *Id.* at 85–86 (Compl. ¶ 274) (emphasis omitted). Wiszowaty responded that she was not available Friday but was in Toronto already and, accordingly, could appear for an interview in-person on Saturday. *Id.* at 86–87 (Compl. ¶ 275). She further explained that she had "never suggested that [her] purpose was to clarify or correct aspects of Carol's interview" and that, rather, "[t]he purpose of [her] request months ago to be interviewed was to share [her own] experience, inform your reporting[,] and directly respond to any claims you might be making." *Id.* at 87 (emphasis omitted).

Disregarding Wiszowaty's assertion that she had "never suggested that the purpose" of the request was to clarify or to correct anything Moraa had said during her interview and that, instead, she sought "directly [to] respond to any claims you might be making," *id.* (emphasis

omitted), the CBC responded: "if you feel Ms. Moraa's comments as a Senior WE Charity Executive in Kenya on behalf of WE Charity needs correction or clarification, we are happy to proceed with an interview with you as well." *Id.* (Compl. ¶ 276) (emphasis omitted).  The CBC also declined to conduct the interview in person, "offering" Wiszowaty only the opportunity to appear for a "video chat." *Id.*  Wiszowaty, in turn, responded that she was "concerned by the conditions [the CBC was] placing on the interview," including that the interview would not occur in person, and again explained that her interview would "complement Carol's interview, not replace or correct it." *Id.* at 88 (Compl. ¶ 277) (emphasis omitted).  The CBC responded that the interview had to be conducted by videoconference due to pandemic protocols. *Id.* at 89 (Compl. ¶ 278).  According to the complaint, "[t]hese supposed 'pandemic protocols' were obviously a pretext," as shown by the fact that "[t]he CBC conducted numerous in-person interviews for its coverage of WE Charity during the height of the pandemic." *Id.* at 89 (Compl. ¶ 279).  Citing the CBC's failure to "address any of the comments in [her] previous note," Wiszowaty responded that "it is clear that the interview, as it was intended when we spoke in September, is not what you are offering" and that, "[a]s disappointing as it is, it looks like we will not be talking tomorrow." *Id.* at 91 (Compl. ¶ 280) (emphasis omitted).  Plaintiff contends that "[h]ad WE Charity known that the CBC would not comply with its promise to interview Ms. Wiszowaty, [it] would not have permitted the CBC to conduct [a]n on-air interview of Ms. Moraa that would not address financial allegations the CBC would later publish." *Id.* at 92 (Compl. ¶ 283).

In response to the November Episode, WE Charity served the CBC with another Libel Notice of an Intended Action per Ontario law on December 22, 2021.  Dkt. 16-1 at 25; Dkt. 16-35.

**B.      Procedural History**

On February 8, 2022, Plaintiff filed the 222-page complaint now pending before this

Court.  Dkt. 1.  The complaint alleges that the CBC published various "Core Allegations" with

knowledge or reckless disregard for their falsity.  *Id.* at 149.  These allegedly false allegations

include that (1) WE Charity diverted funds solicited for use in Kenya to other purposes; (2) WE

Charity's forensic auditor confirmed that diversion of resources; (3) WE Charity claimed to fund

only 360 schoolrooms; (4) WE Charity inflated its schoolroom count by counting latrines; (5) in

the communities it visited, the CBC found only a small number of schoolrooms; (6) WE Charity

donors claimed on social media that they believed that they fully funded over 900 primary

schoolrooms in Kenya; (7) WE Charity told two donors that they each fully funded a specific

schoolhouse while making that same claim to other donors; (8) leaked WE Charity documents

show that the organization double-funded projects or failed to build certain projects; (9) WE

Charity obstructed the CBC's investigation in Kenya; and (10) WE Charity had no response to

most of the CBC's allegations.  *Id.* at 149–51 (Compl. ¶ 425).  The complaint walks through

each allegation of wrongdoing, explaining in detail how, in Plaintiff's view, the allegation was

false or otherwise misleading, and claims that the CBC was aware of the falsity of each

allegation when it made the allegation.

The complaint asserts four causes of action: defamation (Count I), *id.* at 226–27 (Compl.

¶¶ 731–41); breach of contract (Count II), *id.* at 228 (Compl. ¶¶ 742–46); promissory estoppel

(Count III), *id.* at 228–29 (Compl. ¶¶ 747–52); and negligent misrepresentation (Count IV), *id.* at

229 (Compl. ¶¶ 753–60).  With respect to the defamation claim, the complaint alleges that

Plaintiff has and will continue to suffer harm to its reputation and to its ability to fundraise

within the United States.  *Id.* at 222–26 (Compl. ¶¶ 704–30).  Counts II-IV concern the alleged

12

agreement between WE Charity and the CBC that the CBC would, in exchange for an on-air interview of Carol Moraa, also conduct an on-air interview of Wiszowaty.  Plaintiff claims that the CBC's breach of this agreement harmed the organization because, without Wiszowaty's interview, WE Charity was hampered in its ability to rebut the financial allegations at the heart of the CBC's allegations.  *Id.* at 92 (Compl. ¶ 283).  Plaintiff seeks injunctive relief ordering the CBC to cease publishing the "Core Allegations," as well as compensatory, special, and punitive damages.  *Id.* at 230.

The CBC moves to dismiss the complaint in its entirety for *forum non conveniens* and, in the alternative, to dismiss Counts II-IV for lack of subject-matter jurisdiction.  Dkt. 16-1 at 9.

## II.  ANALYSIS

The CBC's motion raises two distinct set of arguments—those that go to venue and those that go to the Court's subject-matter jurisdiction.  Ordinarily, a federal court must satisfy itself that it has subject-matter jurisdiction before addressing any other defense.  *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).  That rule, however, does not preclude a district court from "respond[ing] at once to a defendant's *forum non conveniens* plea"—without first addressing "whether it has authority to adjudicate the cause (subject-matter jurisdiction)"—if "it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case."  *Id.* at 425.  Starting with the CBC's *forum non conveniens* defense makes sense in this case because both parties devote the lion's share of their briefing (and of their voluminous, related submissions) to that issue and because, in any event, the CBC does not move to dismiss Plaintiff's core libel claim on jurisdictional grounds.

A.     *Forum Non Conveniens*

"A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem*, 549 U.S. at 430. "In determining whether to dismiss a case on *forum non conveniens* grounds, the district court must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 947 (D.C. Cir. 2019) (citation and internal quotation marks omitted). "The court must balance the relevant private and public interest factors in light of the degree of deference the plaintiff's choice of forum deserves." *Id.* at 948 (citation omitted); *see also KPMG Fin. Advisory Servs. Ltd. v. Diligence LLC*, No. Civ.A. 05-2204(PLF), 2006 WL 335768, at *1 (D.D.C. Feb. 14, 2006). "If an alternative forum is adequate and available and, upon weighing the public and private interests the court concludes that the alternative forum is 'the strongly preferred location for the litigation,' then the court may choose to dismiss." *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 74 (D.D.C. 2017) (quoting *MBI Grp.* (*MBI II*), 616 F.3d at 571).

1.     *Adequate and Available Alternative Forum*

According to the CBC, Ontario, Canada is the superior forum in which to hear WE Charity's suit. Dkt. 16-1 at 28. To carry its burden, the CBC must first demonstrate that Ontario provides both an "available" and "adequate" forum. *See Agudas Chasidei Chabad of United States v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008); *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 35 (D.D.C. 2018). "A foreign forum is available and adequate when it provides the plaintiff with some remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not

14

recognized." *In re Air Crash*, 352 F. Supp. 3d at 36 (citations and internal quotation marks omitted). "On the other hand, where the alternative forum could not award any relief to a plaintiff at all, courts will find that the forum is not adequate." *Id.* (citations omitted); *see also Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 394 (D.C. Cir. 2003) (holding that the Ethiopia/Eritrea Claims Commission was an inadequate forum where the plaintiff "lack[ed] a personal right to a remedy from the Commission").

Here, WE Charity argues that Ontario is an unavailable forum because the time to bring suit in Ontario has passed. Dkt. 21 at 22–25. As explained by the CBC's Canadian law expert, Brian Rogers, there are two relevant time bars on defamation claims in Ontario. First, "no action for libel stemming from a statement made in a newspaper or broadcast can be commenced unless the plaintiff has served the defendant with notice of the alleged libel within six weeks after the libel has come to the plaintiff's knowledge." Dkt. 16-48 at 3 (Decl. of Brian Rogers ¶ 12); *see also id.* at 14 ("No action for libel in a newspaper or in a broadcast lies unless the plaintiff has, within six weeks after the alleged libel has come to the plaintiff's knowledge, given to the defendant notice in writing, specifying the matter complained of, which shall be served in the same matter as a statement of claim or by delivering it to a grown-up person at the chief office of the defendant."). Second, "an action for libel stemming from a statement made in a newspaper or broadcast must be commenced within three months after the libel has come to the knowledge of the person defamed." *Id.* at 3 (Rogers Decl. ¶ 13); *see also id.* at 15 ("An action for a libel in a newspaper or in a broadcast shall be commenced within three months after the libel has come to the knowledge of the person defamed . . . .").

All agree that a statute of limitation can, at least at times, render a foreign forum unavailable. In *Fireman's Fund Insurance Co. v. Thyssen Mining Construction of Canada, Ltd.*,

703 F.3d 488, 496 (10th Cir. 2012), for example, the Tenth Circuit reversed the district court's order dismissing for *forum non conveniens*, holding (1) that the defendants were "trying to have it both ways—arguing that Canada [was] an adequate alternative forum while simultaneously raising a statute of limitations defense to the proceedings there" and (2) that, "[i]f the Canadian court rules in [the defendants'] favor . . . , [the plaintiffs] w[ould] have no adequate alternative forum."  Other courts have similarly declined to dismiss for *forum non conveniens* where a statute of limitations might bar suit in the proposed, transferee forum.  *See, e.g.*, *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1235 (9th Cir. 2011) ("The danger that the statute of limitations might serve to bar an action is one of the primary reasons for the limitation on the court's discretion with respect to the application of the doctrine of *forum non conveniens*.") (citation and internal quotation marks omitted); *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 202 (4th Cir. 2009) ("[I]f the statute of limitations has expired in the alternative forum, the forum is not available, and the motion to dismiss based on *forum non conveniens* would not be appropriate.") (citation omitted); *Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pak.*, 273 F.3d 241, 246 (2d Cir. 2001) ("[A]n adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum.") (citations omitted); *Yueh-Lan Wang ex rel. Winston Wen-Young Wong v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 26 (D.D.C. 2017) (similar).

At first glance, this case might seem to fall within this rule for two reasons.  First, because of the three-month statute of limitations, all of WE Charity's defamation claims are arguably time-barred because the allegedly defamatory material was published between November 2021 and January 2022, far more than three months ago.  *See* Dkt. 1 at 96–97 (Compl. ¶ 302).  Second, the six-week-notice bar might also preclude suit for at least some of the

challenged publications.  WE Charity did send a libel notice after the November Episode, but

that was before the January 2022 *Enquête* broadcast and thus presumably did not provide notice

of any alleged defamation in that episode.  *See* Dkt. 16-35 (Dec. 22, 2021 Libel Notice).  Nor did

the libel notice include some of the other allegedly defamatory publications that preceded the

November Episode, which WE Charity also challenges in this lawsuit.  *See id.*; Dkt. 1 at 96–97

(Compl. ¶ 302).

The CBC does not dispute any of this, but, instead proposes a solution:  The CBC

represents that it would "waive any statute of limitations or notice defense in Ontario with

respect to any or all of the Defamatory Publications and the other causes of action identified in

the Complaint, as well as any notice requirements, for up to 60 days following the dismissal of

this case."  Dkt. 16-1 at 31.   As the CBC notes, such waivers can eliminate problems with the

adequacy of an alternative forum.  *See, e.g.*, *Stromberg v. Marriott Int'l, Inc.*, 256 F. App'x 359,

360 (D.C. Cir. 2007) (holding Mexico an adequate alternative forum where "Appellees agreed to

accept service in Mexico and waived any statute of limitations defenses"); *Carijano*, 643 F.3d at

1235 ("We have affirmed *forum non conveniens* dismissals that addressed statute of limitations

concerns by requiring waiver in the foreign forum."); *Chang v. Baxter Healthcare Corp.*, 599

F.3d 728, 736 (7th Cir. 2010) ("[I]n such a case dismissal on grounds of *forum non conveniens*

should be denied unless the defendant agrees to waive the statute of limitations in that forum and

the waiver would be enforced there.").   The nub of this threshold dispute thus comes down to

whether the CBC's waiver would definitively cure the relevant timeliness problems.  The parties

offer the opinions of dueling experts on Canadian law with respect to that question.

According to the CBC's expert, the three-month statute of limitations "does not

automatically render a cause of action a nullity, but is rather an affirmative defense under

Ontario law that must be pled by the defendant."  Dkt. 16-48 at 4 (Rogers Decl. ¶ 13).  WE

Charity does not argue otherwise, and so the Court assumes that the three-month bar is waivable.

WE Charity does, however, question whether the six-week notice bar is waivable.  It argues that

"the notice requirement in the Ontario Libel and Slander Act is *not* an affirmative defense that

can be waived in Ontario."  Dkt. 21 at 16 (emphasis in original).  The CBC, in turn, disagrees

and argues that the burden is on the defendant to raise the six-week notice defense and that

Canadian courts cannot dismiss a libel action *sua sponte* for failure to comply with the notice

requirement.  Dkt. 22 at 7-8.  To resolve this question, the Court considers the declarations and

exhibits submitted by the parties' competing experts.

     WE Charity's expert, Douglas Harrison, opines that the libel notice requirement is a

condition precedent to a defamation action that is not waivable, even by agreement of the parties.

Dkt. 21-10 at 2–8 (Declaration of Douglas Harrison ¶¶ 6–26).  For support, he cites a decision

from the Ontario High Court of Justice (a predecessor of the current Superior Court of Justice),

holding that "the notice must precede the start of the action" and "is a constituent part of the

cause itself."  *Id.* at 4–5 (Harrison Decl. ¶ 13).  He also cites a decision from the Ontario Court of

Appeal, holding that the notice requirement is a "condition precedent" that "constitutes an

absolute bar . . . and forever prevents a determination of the issue on the merits."  *Id.* at 5

(Harrison Decl. ¶ 14).  He cites another decision from the Ontario High Court, stating that the bar

"is clearly mandatory" and that the "Court is nowhere empowered . . . to relieve against or

excuse non-compliance with the notice requirements."  *Id.* (Harrison Decl. ¶ 15).  And Harrison

cites other decisions employing similar, mandatory language.  *Id.* at 6–7 (Harrison Decl. ¶¶ 16–

20).  Finally, Harrison discusses caselaw from other contexts, holding that conditions precedent

are, at least at times, jurisdictional (and thus nonwaivable) in nature.  *Id.* at 7–8 (Harrison Decl. ¶¶ 21–26).

In his initial declaration, the CBC's expert, Brian Rogers, did not address whether the six-week bar is waivable.  *See* Dkt. 16-48 at 3 (Rogers Decl. ¶ 12).  In his Reply Declaration, however, Rogers opines that the six-week rule serves as an absolute bar only if the defendant raises the issue.  Dkt. 22-26 at 1 (Reply Declaration of Brian Rogers ¶ 4).  For support, he points to Rule 25.06(3) of Ontario's *Rules of Civil Procedure*, which provides that "an opposite party who intends to contest the performance or occurrence of a condition precedent shall specify in the opposite party's pleadings the condition and its non-performance or non-occurrence."  *Id.* at 2 (Rogers Reply Decl. ¶ 6).  Rogers also cites caselaw explaining "that a plaintiffs [sic] failure to satisfy the notice requirement in [Ontario's Libel and Slander Act ("LSA")] will not be considered by a court unless it is raised by the defendant in [its] pleadings or, in certain instances, on a pre-trial motion."  *Id.* at 5 (Rogers Reply Decl. ¶ 17).  The decision of the Ontario Superior Court of Justice in *Robinson v. Club Epiphany Restaurant & Lounge*, [2001] O.J. No. 2101 (Can. Ont. S.C.J.), is directly on point.  *See* Dkt. 22-31 (Reply Ex. 5).  In that case, the plaintiffs prevailed in a small claims court defamation action, and the defendant argued on appeal to the Ontario Superior Court of Justice that the plaintiffs had failed to comply with the notice requirement.  The court rejected that argument both because the notice requirement did not apply to the brochure at issue and, more importantly for present purposes, because the defendant failed to raise the notice issue as a defense.  Consistent with Rogers' contention that the notice requirement is a condition precedent and the defendant bears the burden of raising any "non-performance or non-occurrence," Dkt. 22-26 at 2 (Rogers Reply Decl. ¶ 6), of that condition in its pleadings, the court wrote: "[A] number of cases make it clear that a notice

requirement such as that contemplated in s. 5(a) of the Act *must be pleaded . . .*," Dkt. 22-31 at 3 (emphasis added).

Another precedent, this one from the Ontario Court of Appeal, supports the same conclusion. *See Janssen-Ortho Inc. v. Amgen Canada Inc.*, [2005] O.J. No. 2265, 140 A.C.W.S. (3d) 58 (Can. Ont. C.A.) (available at Dkt. 22-32 (Reply Ex. 6)). In that case, which WE Charity's expert cites as well, the court applied Rule 25.06(3) of Ontario's *Rules of Civil Procedure* to determine whether the trial court had properly struck a libel claim for failure to provide the required notice. In concluding that the trial court acted within its discretion, the Court of Appeal held that "defendants generally should file a statement of defence [sic] pleading non-compliance with a precondition" but that a trial judge may admit evidence of non-compliance at the summary judgment stage "because it would be pointless to require the defendant to file a statement of defence [sic] before moving for summary judgment" and "an appellate court will not interfere with the motion judge's exercise of discretion." Dkt. 22-32 at 16. Although not squarely on point, that analysis is at odds with WE Charity's view that compliance with the sixty-day notice requirement is jurisdictional in nature; that it is not subject to waiver; and that a Canadian court could (and, presumably, should) dismiss WE Charity's unnoticed libel claims even if the CBC agrees not to raise the defense.

Nor are any of the Canadian precedents cited by WE Charity's expert to the contrary. The Harrison declaration cites to cases holding that noncompliance with the notice requirement "constitutes an absolute bar . . . and forever prevents a determination of the issue on the merits;" that compliance "is clearly mandatory" and that courts are not "empowered . . . to relieve against or excuse non-compliance;" and that "there is no means . . . by which the faults of the notice can be cured or avoided." Dkt. 21-10 at 5–6 (Harrison Decl. ¶¶ 14–16) (citing cases) (internal

quotation marks omitted).  And Harrison cites to other conditions precedent that the Canadian courts have treated as jurisdictional.  *Id.* at 7 (Harrison Decl. ¶ 23).  But he fails to cite a single case in which a Canadian court has dismissed an action for noncompliance with the sixty-day notice requirement where the defendant did not raise the issue at some point in the proceeding. Even more to the point, he fails to recognize that a lack of judicial authority to "excuse non-compliance" with a condition precedent, *id.* at 5 (Harrison Decl. ¶ 15), where that non-compliance is raised by the defendant, does not mean that a Canadian court must (like a U.S. court with doubts about its subject-matter jurisdiction) consider the issue *sua sponte*; rather, it simply means that a court may not reject a properly raised defense on equitable or similar grounds.  *Cf. Bain v. Off. of Att'y Gen.*, No. CV 21-1751 (RDM), 2022 WL 17904236, at *11 (D.D.C. Dec. 23, 2022) (noting that administrative exhaustion is at times jurisdictional and at times non-jurisdictional, and that non-jurisdictional exhaustion is at times mandatory and at times subject to equitable defenses).

For these reasons, the Court is unpersuaded that an Ontario court would *sua sponte* dismiss portions of Plaintiff's libel claim for failure to comply with the six-month notice requirement.  In reaching that conclusion, the Court recognizes that some possibility exists that an Ontario court might disagree.  But that possibility is remote and would not, standing alone, justify denying the CBC's *forum non conveniens* motion; legal uncertainty of some kind and to some degree exists in almost every case.  Ultimately, however, this does not matter because, as explained below, the Court concludes that the CBC has failed to carry its "heavy burden in opposing the plaintiff's chosen forum" in any event.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).  Any lingering uncertainty (of which there is little)

regarding the availability of a forum in Canada would merely add to the remaining considerations that independently support Plaintiff's choice of forum.

        2.    *Private and Public Interest Factors*

Even if the defendant's preferred forum is available and adequate, the plaintiff's choice of forum controls unless "trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to [the] plaintiff's convenience,' or [unless] the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).  In deciding whether to dismiss an action for *forum non conveniens*, the court must assess a "range of considerations," including the weight to be accorded to the plaintiff's choice of forum, the convenience to the parties, and "the practical difficulties that can attend the adjudication of a dispute in a certain locality."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996).

        i.   <u>The Plaintiff's Choice of Forum</u>

The Court starts with the question—much disputed by the parties—of how much weight to afford WE Charity's choice of forum.  In the usual course, "[a] defendant invoking *forum non conveniens* . . . bears a heavy burden in opposing the plaintiff's chosen forum."  *Sinochem*, 549 U.S. at 430.  That "presumption applies with less force," however, "when the plaintiff or real parties in interest are foreign."  *Piper Aircraft Co.*, 454 U.S. at 255.  Here, the CBC argues that WE Charity's decision to sue in the United States carries little weight because, in its view, WE Charity Canada is the "real part[y] in interest"—or, at least, it was "the nerve center for all WE Charity affiliates" at the relevant time.  Dkt. 16-1 at 33–34.  The CBC acknowledges, to be sure, that the U.S. entity's interest in the case is not "insignificant."  *Id.* at 34.  But, according to the

CBC, the far more substantial interest of WE Charity Canada signals to the CBC that WE Charity brought suit in this jurisdiction "for reasons other than convenience." *Id.* at 35.  The Court is unpersuaded for several reasons.

First, and most significantly, a plaintiff is the master of its own complaint.  Here, WE Charity has brought suit solely as a U.S. entity, and it will be bound by that decision.  It will need to prove that it—that is, the U.S. entity—was defamed, and, if successful, it will be limited to any damages suffered by that entity.  In this respect, even if WE Charity Canada suffered some separate or additional injury, the U.S. entity is the only "real part[y] in interest" to this action. *Id.* at 33.  The CBC does not dispute that, as a factual matter, the plaintiff WE Charity is a U.S. entity, nor could it.  WE Charity is a 501(c)(3) nonprofit charitable organization incorporated in the state of New York and licensed to operate in thirty-seven states and the District of Columbia. Dkt. 21-1 at 2–3 (Baker Decl. ¶¶ 8–11).  Only one of its board members resides in Canada, and the majority of its Board members reside in the United States.  *Id.* at 4 (Baker Decl. ¶ 21).  It has physical offices in Arizona, California, Illinois, New York, Minnesota, and Washington, and between 2016 and 2021 it employed between three and forty-seven staff members across the United States.  *Id.* (Baker Decl. ¶¶ 21–22).  The charity has also held numerous charitable events and programs in the United States; it "fundraises exclusively in the United States from US-based donors;" and it "has institutional partnerships with several . . . major American charitable organizations and companies," including Dow, Hershey, Microsoft Innovative Educator Experts, and the College Board.  *Id.* at 5–13 (Baker Decl. ¶¶ 24–49).

Although the CBC does not dispute any of this, it argues that the U.S. entity has significant ties to Canada and that the Canadian entity was the "nerve center for all WE Charity affiliates."  Dkt. 16-1 at 33.  It further argues that it was WE Charity Canada, not the U.S. WE

Charity, that "was responsible for remitting and recording the costs for Kenya projects, and a forensic audit involved Ontario accountants auditing primarily WE Charity Canada's financial records." *Id.* And the CBC further argues that the U.S. WE Charity was "directed by a Canadian executive team." *Id.* The CBC maintains that given the Canadian focus of the WE Charity organization *as a whole*, gamesmanship—and not convenience—is behind the plaintiff's forum choice in this case. Dkt. 16-1 at 34–35.

WE Charity disagrees and argues that "its U.S. operations are at the heart of this lawsuit." Dkt. 21 at 28. WE Charity rejects the CBC's contention that Canadian parties are more heavily invested in this lawsuit, noting that one of the donors at issue in the November Episode, Watson Jordan, is an American whose donation was approved by the U.S. Board of Directors; that funding to Kenya was overseen by a U.S. citizen employed by the U.S. entity; and, perhaps most importantly, that because WE Charity fundraises exclusively in the U.S., any harm to its reputation from the alleged defamation would be felt most strongly here. *Id.* at 28–29. WE Charity also stresses that WE Charity Canada is winding down and thus, comparatively, has less of an interest in this litigation than does the U.S. entity, which continues to fundraise and engage in charitable activity. *Id.* at 27–28. And, finally, even assuming that WE Charity Canada has an interest in the outcome of this case, that fact does not diminish the very real interest that the plaintiff U.S. entity has in "'seeking justice in [its] own court[].'" *Id.* at 29 (quoting *Simon v. Republic of Hungary*, 911 F.3d 1172, 1183 (D.C. Cir. 2018), *vacated and remanded on other grounds*, 141 S. Ct. 691 (2021)).

The CBC's efforts to cast this case as a dispute that is—in all but name—between WE Charity Canada and the CBC is unavailing. The plaintiff WE Charity is a U.S. entity with a substantial U.S. presence, and it has a substantial interest in the present dispute. That interest,

moreover, is not dependent upon or inferior to any interest the Canadian entity might also have in the case.  To the contrary, the harm that the complaint alleges is focused on the U.S. entity, rather than the Canadian one: it avers that "WE Charity is dependent upon its reputation to successfully fundraise;" that "[a]ll of WE Charity's funding comes from corporate sponsorship and donations from the United States;" that "[d]onations to WE Charity from the United States comprise a majority of the WE Organization's global funding;" that "[t]he Defamatory Statements . . . have caused special damages, including in the form of lost and reduced donations to WE Charity's charitable operations;" and that "[t]he Defamatory Statements have harmed and will continue to harm WE Charity's reputation in the United States, and specifically with WE Charity's donors located in this Country."  Dkt. 1 at 222–23 (Compl. ¶¶ 705–07, 712–13).  In contrast, according to the complaint, WE Charity Canada announced in September 2021 "that it would wind down its operations and establish a foundation to provide sustainable ongoing funding for existing overseas projects and programs" and, since then, "the WE Organization has increased its focus on its ongoing operations and fundraising in the United States."  *Id.* at 29 (Compl. ¶¶ 82–83).  Although the CBC disputes that it defamed or unjustly harmed WE Charity, it offers no reason to question WE Charity's good faith basis for focusing its allegations on the harm, if any, occurring to the U.S. entity in the United States.

The cases on which the CBC relies are inapposite.  First, it relies on the Supreme Court's decision in *Piper*, in which the Court held that "the presumption in favor of the respondent's forum choice applied with less than maximum force because the real parties in interest are foreign."  454 U.S. at 261.  In *Piper*, the American plaintiff was an estate administratrix for Scottish decedents and their heirs, who were the "real parties in interest."  *Id.* at 238–40.  In that case, then, a U.S. plaintiff was there merely to assert claims on behalf of others.  The same was

true in *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19 (D.D.C. 2018), in which the

two U.S. plaintiffs—personal representatives of the estates of deceased airline passengers—may

have been "selected solely for purposes of th[e] litigation," which cast "doubt on the suggestion

that their choice of forum warrants significant deference." *Id.* at 44–45. Here, there is no

evidence suggesting that the plaintiff WE Charity—that is, the U.S. entity—is merely acting on

behalf of a foreign concern—that is, the Canadian entity. Tellingly, the CBC cites to no case in

which a court has second-guessed the asserted interest of a plaintiff with an undeniably real and

personal interest in the litigation, merely because, in the defendant's view, a foreign affiliate,

which chose not to sue, arguably had a greater interest in the case. When a domestic and a

foreign entity both have real, undisputed interests in a case and only the domestic entity brings

suit, the solution is not to question that decision, but rather to hold the plaintiff to its choice and

to limit proof and damages to that entity. *Cf. Simon*, 911 F.3d at 1183 ("[T]he addition of

foreign plaintiffs does not render for naught the weighty interest of Americans seeking justice in

their own courts.").

The Court takes the CBC's point that WE Charity Canada's actions are, in many ways, at

the heart of this lawsuit, and that WE Charity United States has significant Canadian ties. Dkt.

22 at 11–16. The CBC notes, for example, that "WE Charity senior management has always

directed its global operations from Canada," *id.* at 12; that the senior team included Dalal Al-

Waheidi (Executive Director), Victor Li (CFO), Scott Baker (COO), and Marc and Craig

Keilburger (Founders), Dkt. 16-1 at 16–17; and that, according to the CBC, all five of those

individuals were based in Canada, *id.* The CBC further argues that "WE Charity Canada

actually was responsible for remitting and recording the costs for Kenya projects, . . . [that] a

forensic audit involved Ontario accountants auditing primarily WE Charity Canada's financial

26

records[,]" and, as explained, WE Charity "has always been directed by a Canadian executive team and its compliance with some of its formalities is often handled by Canadians." *Id.* at 33.

But the CBC's focus on where the senior management team for the WE Organization resided and where important events occurred conflates two separate inquiries. The first inquiry is whether the Court should accord the plaintiff's choice of forum appropriate deference. Here, a real U.S. entity, with a real interest in this ligation, has elected to sue in its home jurisdiction. Under the governing law, that decision is entitled to deference, and the facts that some (or even many) of the relevant events occurred in Canada and that some (or even many) of the relevant witnesses reside in Canada does not abrade that deference. Rather, those considerations go to the second inquiry, which the Court will turn to in the next section and which asks whether other considerations, including the convenience of the parties, access to the evidence, administrative difficulties, and the public interest, weigh in favor of transfer, notwithstanding the deference to which the plaintiff's choice of forum is entitled. For present purposes, the Court merely concludes that the U.S. entity is a real party in interest and that its decision to bring suit in its home forum is entitled to deference.

Before turning to weighing the relevant private and public factors, the Court pauses to make one final observation. According to the CBC, WE Charity is engaged in gamesmanship and has brought suit in the United States to game some tactical advantage. *Id.* at 34–35. The Court has no insight into why WE Charity decided to sue here, nor is there any obvious tactical advantage to doing so given the high bar for bringing defamation actions in the United States. But, in any event, to the extent the CBC is resisting suit in this forum, it may have its own tactical reasons for doing so. That is the nature of litigation, and, here, the Court has no reason to believe that one side or the other is engaged in any conduct that would call into question the

integrity of the judicial process.  Under these circumstances, the best course is to apply settled law and let the chips fall where they may.

   ii. <u>Private Interest Factors</u>

  The next step is for the Court to consider the relevant private interest factors.  "The considerations governing the private interest analysis include 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive[, such as] enforce[ea]bility of a judgment if one is obtained [and] relative advantages and obstacles to fair trial.'"  *Shi*, 918 F.3d at 950 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  "A plaintiff 'may not, by choice of an inconvenient forum, vex, harass, or oppress the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.'"  *Id.* (quoting *Gilbert*, 330 U.S. at 508).  "Dismissal in favor of suit elsewhere 'will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice,' such as where a plaintiff chooses a particular forum 'solely in order to harass the defendant or take advantage of favorable law.'"  *Id.* (quoting *Piper*, 454 U.S. at 249 & n. 15).

**Ease of Access to Sources of Proof**

  The CBC asserts that Ontario is the logistically advantageous forum because "the vast majority of potential witnesses and documentary evidence will be located in Canada, and specifically in Ontario."  Dkt. 16-1 at 36.  It contends that most of the people identified in the complaint, as well as most potential non-party witnesses with relevant knowledge, reside in

Canada.  *Id.*  And the CBC further contends that, even if U.S. witnesses are called, the number of

Canadian witnesses will still outnumber them.  *Id.*  Unsurprisingly, WE Charity disagrees.  In its

view, the presence of documentary evidence in Canada poses only a minimal hurdle to litigating

this case in the United States, given the ubiquity of electronic discovery and the ease with which

documents can be transferred between jurisdictions.  Dkt. 21 at 31.  Nor does WE Charity agree

that most of the likely witnesses reside in Canada.  *Id.* at 32–39.

An evaluation of the ease of access to sources of proof considers the "[l]ogistical hurdles"

to obtaining evidence and testimony in the United States.  *Shi*, 918 F.3d at 951.  Here, if the

Court were merely to count potential witnesses—or names mentioned in the complaint or in the

parties' papers—the scale would tip in favor of Ontario, although not as decidedly so as the CBC

suggests.  As the CBC notes, all twelve of the journalists and CBC executives mentioned in the

complaint live in Canada, and nine of the twelve live in Ontario.  Dkt. 16-47 at 1–2 (Perry Decl.

¶¶ 4–8).  The CBC does not indicate, however, which of these witnesses reside in Toronto and

which reside in Ottawa—and the distance between those cities is only modestly shorter than the

distance from Toronto to the District of Columbia (a flight from Toronto to Ottawa takes about

an hour, while a flight from Toronto to D.C. takes about an hour and twenty-five minutes).[1]  The

---

[1]  The CBC submits a chart purporting to show the "likely area of residence" of certain, potential
witnesses, and that chart indicates that Catherine Tait, CBC President and CEO; Brodie Felton,
CBC Editor-in-Chief, Executive Director of Daily News, English Service; Barbara Williams,
CBC Executive Vice President, English Service; and Jack Nagler, CBC Ombudsman, English
Service, all reside in Toronto.  Dkt. 16-41 at 4–5.  But the sole source that the CBC cites for
support is the declaration of Catherine Perry, who merely attests that all four reside in Ontario.
Dkt. 16-47 at 2 (Perry Decl. ¶ 5).  The CBC does not address the fact that its headquarters is
located in Ottawa, even if "one of [its] main places of business" is located in Toronto, *id.* at 1
(Perry Decl. ¶ 3), raising the question of whether at least some of the business's senior
management resides in proximity to the headquarters or to one of the other "main places of
business."  In any event, the CBC offers no proof that all four of these executives reside in
Toronto.

anchor and staff of *Enquête*, moreover, is based in Montreal, *id.* at 2 (Perry Decl. ¶ 8), and the episode of the podcast identified in the complaint was hosted by Angela Sterritt, a resident of Vancouver, British Columbia, *id.* (Perry Decl. ¶ 6); by car, Vancouver is about 2,500 miles from Toronto.  The other CBC employee identified in the complaint, Kate McKenna, who was an associate producer of the *Fifth Estate*, resides in Montreal.  *Id.* (Perry Decl. ¶ 4).

The location of the potentially relevant witnesses affiliated with WE Charity presents more of mixed bag.  The co-founders of WE Charity, Craig and Marc Kielburger; WE Charity's Chief Financial Officer, Victor Li; and WE Charity's former Executive Director, Dalal Al-Waheidi, all seem to reside in Canada.  *See* Dkt. 16-1 at 16 n.4; Dkt. 16-7 at 4–5.   But other WE Charity-affiliated witnesses reside elsewhere.  WE Charity's Executive Director, Scott Baker, resides in Quito, Ecuador; WE Charity's Country Director for Kenya, Robin Wiszowaty, resides in Roscommon, Michigan; and the Director of WE Village Projects in East Africa, Carol Moraa, lives in Kenya.  *See* Dkt. 21 at 12; Dkt. 16-8 at 3; Dkt. 1 at 16 (Compl. ¶ 30); *id.* at 16–17 (Compl. ¶ 31).

Potential third-party witnesses also present a mix bag.  Kenneth Froese, a forensic accountant, for example, was engaged to conduct an independent investigation "of the flow of funds to WE Charity's Kenyan projects" in order to "provide the CBC with independent verification of the propriety of its fundraising and charitable work in Kenya," Dkt. 1 at 93 (Compl. ¶ 288), and he lives in Ontario, Dkt. 21-12 at 1 (Declaration of Kenneth Froese ¶ 2).  The CBC claims that the Complaint mentions by name approximately thirty-five to forty other non-party individuals, Dkt. 16-1 at 26 & n.12, although it is unclear how many of these individuals the parties are likely to call as witnesses at deposition or trial.  A majority of the donors mentioned in the broadcasts, moreover, also reside in Canada.  Dkt. 22-15 at 2–6.  But

other donors, including Reed Cowan and Watson Jordon, reside in the United States. *Id.* at 5. Significantly, Cowan in mentioned sixty-two times in the complaint, and Jordan is mentioned sixty-six times, Dkt. 1; both Cowan and Jordon are featured heavily in the broadcasts; and much of the complaint is focused on WE Charity's contention that the broadcasts falsely claims that these donors, along with others, were intentionally misled by WE Charity, *see, e.g.*, Dkt. 1 at 42–46 (Compl. ¶¶ 140–55); *id.* at 191–96 (Compl. ¶¶ 582–600). Their roles as important witnesses in this case are undisputed; indeed, according to the complaint, it was Cowan's (allegedly debunked) allegations of fraud that provided the impetus for the CBC's investigation. *Id.* at 42 (Compl. ¶ 140). And other third-party witnesses mentioned throughout the complaint include Rukshan de Silva, who resides in Sydney, Australia, *id.* at 197 (Compl. ¶ 605); Laurie Styron, the executive director of CharityWatch, who lives in Chicago, Illinois, *id.* at 124 (Compl. ¶ 374); Dkt. 21 at 17; and Gaby Ghorbani, who resides in California, Dkt. 21 at 17. *See also* Dkt. 28 at 33, 56, 62–63, 68; Dkt. 16-41 at 10. Finally, counsel for WE Charity posits that "[a]ll of the damages witnesses [that it intends to call] will be American donors." Dkt. 28 at 55–56.

Although the CBC is likely correct that a greater number potential witnesses live in Canada than in the United States (or elsewhere), many important witnesses reside outside of Canada, and, even among those who live in Canada, several live a substantial distance from Toronto (or Ottawa). Nor is the Court yet in a position to evaluate which of these witnesses are most likely to play a significant role in the litigation—that is, which will be required to appear for more than a brief deposition or court appearance. And, putting aside the question of compulsory process for the moment, the Court notes that the distance from Toronto to the District of Columbia is only slightly longer than the distance from Boston, and a typical flight takes less than an hour-and-a-half.

The location of documentary evidence presents a similar picture.  Although the CBC stresses that much of the documentary evidence in the case is located in Canada, Dkt. 16-1 at 36, it fails to explain why the production or use of that evidence in the United States would pose a significant burden to either party.  As the D.C. Circuit has explained, "hurdles to obtaining evidence . . . in the United States present less of a problem than they used to in light of technological advances," *Shi*, 918 F.3d at 951, and, here, there is no reason to believe that the relevant documents are maintained solely in hard copy or that the CBC would, if given the choice, produce discovery in hard copy form.  Moreover, although the CBC notes that some of the documentary evidence may be written in French, Dkt. 16-1 at 43, that fact has no bearing on the burden of producing that discovery in the United States.

Accordingly, although the Court does not doubt that many (and perhaps a majority) of the witnesses and most of the relevant documents are in Canada, the Court cannot conclude—*ceteris paribus*—that the relatively short flight from Toronto (or Ottawa) to the District of Columbia or that the production of electronic records in the District of Columbia would impose a "harassing, vexing, [] oppressive[,]" or otherwise undue burden on the CBC if required to litigate in this forum.  *Shi*, 918 F.3d at 953.

**Availability of Compulsory Process and the Cost of Obtaining Witnesses**

More important than the ease of accessing witnesses (and documents) is the question of whether the parties can compel non-voluntary witnesses to appear at all.  *See Piper Aircraft Co.*, 454 U.S. at 259.  The CBC asserts that Ontario would provide for compulsory process of most (although not all) of the witnesses who, in its view, will play a pivotal role in the litigation. Canadian law provides for compulsory process over its residents:  Witnesses residing in Ontario may be compelled to appear by subpoena, while a separate process governs the compelled

attendance of witnesses residing in other Canadian provinces.  Dkt. 16-1 at 40 (citing Rogers

Decl. ¶ 29).  The CBC claims that the parties' attempts to subpoena witnesses in the U.S., by

contrast, will prove cumbersome under the procedure for serving letters rogatory.  *Id.* at 39; Dkt.

28 at 28.   WE Charity responds that there is no reason to believe that any of the key witnesses in

the case would decline to appear voluntarily, but adds that, if any witness declines to appear,

letters rogatory provide a sufficient (and not overly cumbersome) means of securing that

witness's testimony.  Dkt. 21 at 32, 35–36.

       WE Charity has the better of the two arguments.  To start, the Court agrees that there is

little reason to believe that the key witnesses—at least those who reside in Ontario—would

decline to appear voluntarily.  In its briefing, the CBC points to twelve potential witnesses who

were allegedly involved creating the broadcasts at issue or who were identified in the complaint

as potentially responsible CBC executives.  Dkt. 16-47 at 1–2 (Perry Decl. ¶¶ 4–8).  But, as the

CBC's counsel candidly acknowledged at oral argument, all twelve of these potential witnesses

still work for the CBC and, as a result, are easily available to the CBC without compulsory

process.  Dkt. 28 at 21–22.  The CBC remains concerned, however, that there is "no way of

knowing whether all of these employees will still be employed two or three years from now at

the time of trial."  *Id.* at 22.  Similarly, WE Charity will be required to produce any of its current

employees with relevant knowledge and, to the extent any important witnesses work for the WE

Organization but not for the U.S. entity that has brought this suit, there is no reason to believe

that those witnesses would decline to participate voluntarily in the litigation that their sister

entity has brought.  Moreover, a number of crucial WE Charity witnesses, including Wiszowaty,

Moraa, and Baker, do not reside in Canada.  *See* Dkt. 1 at 16–17 (Compl. ¶¶ 30–31) *and* Dkt 16-

8 at 3.

Among the third-party witnesses, some risk exists that a Canadian donor will decline to appear voluntarily and that the parties will be required to make use of letters rogatory.  But the same risk exists on the other side of the equation.   From WE Charity's perspective, Cowan, Jordan, and Ghorbani are all important donor witnesses, and they reside—and are subject to subpoena—in the United States, Dkt. 1 at 42, 191, 203 (Compl. ¶¶ 142, 578, 582, 635), as is Styron, who lives in Chicago and who WE Charity's alleges "react[ed] to false and misleading information that the CBC provided to her" by incorrectly opining "that WE Charity carried out an improper scheme to deliberately misle[a]d donors," Dkt. 1 at 124 (Compl. ¶ 374).  To be sure, Kenneth Froese resides in Ontario, Dkt. 21-12 at 1 (Froese Decl. ¶ 2), and would, in the ordinary course, lie beyond the subpoena power of the U.S. courts.  But he has submitted a declaration attesting that, "[i]f requested, [he] plan[s] to travel to Washington D.C. to provide live testimony in this case" and that, "as Senior Managing Director of Froese Forensic, [he has] the authority to direct other Froese Forensic employees to provide live testimony at trial and will do so if asked." *Id.* (Froese Decl. ¶¶ 3–4).

In sum, it is possible—and perhaps likely—that the parties will encounter difficulties or burdens in compelling testimony in this case.  That difficulty, however, lies on both sides of the border, and indeed extends to three other continents: Africa, South America, and Australia/Oceania.  Moreover, there is reason to believe that many—and perhaps most—of the key witnesses will appear voluntarily, either because they are employed by a party or because they want to be heard by the factfinder in the most effective manner possible.  And, more to the point, it is the CBC that is moving to dismiss, and it accordingly bears the burden of demonstrating that it will have difficulty obtaining necessary testimony if this jurisdiction retains venue.  The D.C. Circuit confronted just this question in *Shi*, where it held that the movants in

that case failed even to "suggest they [would] be unlikely to persuade their proposed witnesses located abroad . . . to appear voluntarily in a U.S. Court" and that their failure to carry that burden "weigh[ed] against dismissal." 918 F.3d at 951. Other courts are in accord. *See, e.g.*, *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) ("Here [the defendant] did not allege, much less carry its burden to show, that any witness was unwilling to testify and that compulsory process was consequently needed. When no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor."); *Neelon v. Krueger*, 63 F. Supp. 3d 165, 176 (D. Mass. 2014) (similar); *FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3, 14 (D.D.C. 2006) ("When analyzing the convenience of parties and witnesses, a defendant must show that witnesses would be unwilling to testify in the District of Columbia. Otherwise, it is assumed that the witnesses will voluntarily appear . . . .") (internal citation omitted).

Nor is the Court persuaded that litigating the case here would impose additional costs that would warrant dismissal on grounds of *forum non conveniens*. To start, the CBC has offered no evidence that the cost of litigating this case here would be "harassing, vexing, or oppressive." *Shi*, 918 F.3d. at 953. Toronto is about 350 miles from Washington, D.C., and direct flights between the two cities are frequent, relatively inexpensive, and last around an hour and a half. In today's age of modern travel, it can hardly be said that requiring witnesses to make that journey is unduly burdensome. The CBC barely argues otherwise, merely responding that by bringing this motion, it obviously thinks litigating here would be inconvenient. Dkt. 22 at 18.

In sum, then, the likelihood that many witnesses will participate voluntarily, the availability of compulsory process for unwilling witnesses, and the costs associated with litigating here do not weigh in favor of dismissal.

### Enforceability of a Judgment

WE Charity asserts that a U.S. forum is necessary to obtain a defamation judgment that will be recognized and enforced in the U.S.  Dkt. 21 at 39.  Here, WE Charity falls short. According to WE Charity, Congress has barred recognition and enforcement of a foreign judgment for defamation unless the foreign court provides at least as much protection for freedom of speech as the First Amendment.  *See id.* at 39–40 (citing the Securing the Protection of our Enduring and Established Constitutional Heritage ("SPEECH Act"), Pub. L. No. 111-223, § 1, 124 Stat. 2380 (codified as 28 U.S.C. §§ 4101–4105)).  Contending that Canadian defamation law is less protective than the First Amendment, WE Charity claims that no Canadian judgment would be enforceable in the U.S, but "a defamation judgment issued by this Court will be easily enforceable in Canada."  *See* Dkt. 21 at 40–41.  The CBC disagrees with this reading of the SPEECH Act, claiming instead that it "addresses the opposite scenario: a foreign plaintiff that sues an American defendant in a foreign jurisdiction, and then tries to domesticate a foreign judgment in a U.S. court."  Dkt. 22 at 22.

The Court is skeptical that WE Charity needs to obtain a judgment against the CBC that is enforceable in the United States, since the CBC is a Canadian entity and, presumably, most of its assets are in Canada.  Nor is the Court persuaded that WE Charity needs a U.S. judgment that will have preclusive effect in future litigation in the United States; the prospect of future litigation between the same parties raising the "same issue[s]" raised, contested, and "necessarily determined" in this case, *see Lavergne v. United States House of Representatives*, 2018 WL 4286404 at *5 (D.D.C. 2018) (three-judge court), is both remote and speculative.  And the Court is also unconvinced that only a judgment from a U.S. court will carry the weight necessary to restore WE Charity's reputation among U.S. donors; a decision from a Canadian court finding

that the Canadian Broadcasting Corporation wronged a U.S. entity would carry substantial weight.

In reply, the CBC attempts to turn this argument against WE Charity, suggesting that, if WE Charity wants to ensure that any judgment that it obtains is enforceable, it would sue in Canada, where the CBC and its asserts are located.  Dkt. 22 at 22.  But suing in the U.S. is the choice that WE Charity made, and it is free to decide whether the benefit of suing in its preferred forum outweighs any cost it may incur in enforcing whatever judgment it is able to obtain.  The CBC, for its part, will suffer no prejudice if WE Charity is forced to jump through additional hoops to enforce its judgment, if any.

Ultimately, however, as with the parties' dispute over the availability of a Canadian forum, the Court need not resolve this dispute, because the Court is—for the reasons discussed above—unpersuaded by the CBC's *forum non conveniens* argument.

### iii.   Public interest factors

The public interest factors do not weigh decisively in either direction and, accordingly, they do not alter this result.  "The considerations governing the public interest analysis include the 'administrative difficulties' [encountered] when 'litigation is piled up in congested centers,' the 'burden' of jury duty on 'a community which has no relation to the litigation,' the 'local interest in having localized controversies decided at home,' and the 'appropriateness' of trying a diversity case 'in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.'"  *Shi*, 918 F.3d at 952 (quoting *Gilbert*, 330 U.S. at 508–09).

**Administrative Difficulties**

The CBC maintains that various administrative difficulties, including docket congestion and the fact that some of the documents at issue were written in French, weigh in favor of dismissal.  Dkt. 16-1 at 43.  In response, WE Charity notes that the CBC cites "no actual evidence of court congestion in this forum . . . [or] of any lesser court congestion in Ontario" and argues that most of the evidence that the CBC identifies (such as the *Enquête* episode) has already been translated to English or, in any event, will need to be translated for English-speaking witnesses even in a bilingual Ontario court.  Dkt. 21 at 43–44; *see, e.g.*, Dkt. 1-6 (Ex. F to Compl.) (French transcript of *Enquête*); Dkt. 1-7 (Ex. G to Compl.) (English translation of Ex. F); Dkt. 21 at 43–44.

With respect to the comparative levels of congestion of the Court and courts in Ontario, neither party has provided evidence establishing a material difference.  WE Charity relies on its expert's observation, *see* Dkt. 21 at 43; Dkt. 21-10 at 12 (Harrison Decl. ¶ 37), and the CBC, in challenging WE Charity's expert, notes that "at most" that analysis suggests that the length of time needed to proceed from filing a complaint to trial in this Court and in Ontario are "in equipoise," *see* Dkt. 22 at 24.  Given the relative lack of evidence, this consideration favors neither side.  The Court notes, however, that the parties have submitted reams of materials regarding this threshold motion, leaving this Court with the comparative efficiency advantage of having already spent many hours studying the parties' allegations and respective positions.

Turning to the question of translation, the Court recognizes that a need to translate a large quantity of evidence might favor dismissal.  *See, e.g.*, *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 33 (D.D.C. 2008) (*MBI I*), *aff'd*, *MBI II*, 616 F.3d 568 (D.C. Cir. 2010); *Croesus*, 212 F. Supp. 2d at 39.  Here, however, the Court is unpersuaded that the need

for translation carries substantial weight for three reasons.  First, the CBC is free to produce

discovery in its existing form and, accordingly, to the extent documents are written in French, the

CBC may produce them in French.  WE Charity, then, will bear the cost of translating those

documents for its review and possible use at deposition or trial.  Second, as the CBC's counsel

acknowledged at oral argument, the CBC is unaware of any witnesses who do not speak English,

Dkt. 28 at 38, thus minimizing the likelihood that the trial or depositions will take place in

French or that it will be necessary to employ an interpreter at trial or at the depositions.  Third,

the Court once again notes that it is the CBC that bears the burden of proof for present purposes,

and it has failed to demonstrate that—beyond the burden of translating emails and other

materials relating to the *Enquête* episode, which WE Charity will need to shoulder—the CBC

will need to shoulder any translation burden.

Thus, although some relevant documents are written in French, the Court is unpersuaded

that the need for translation would place any undue burden on the CBC, the Court, or any entity

other than WE Charity, and the CBC is prepared to accept that not uncommon burden in

transnational litigation.

### Localized Controversy

The CBC also maintains that Canada has a strong local interest in the dispute because

WE Charity "is virtually a household name in Canada;" Canada has a "clear interest in a dispute

about how charitable funds were spent by an international charity headquartered in Ontario;"

"media scrutiny of WE Charity arose out of a Canadian political scandal;" the CBC is Canada's

"national public broadcaster governed by Canadian statutes;" and most of the publications at

issue were "primarily researched and prepared by a . . . team based in Toronto."  Dkt. 16-1 at 41–

42; *see also* Dkt. 22 at 25.  The CBC further stresses that Ontario defamation law reflects a

39

different balance of interests than U.S. defamation law, and Ontario has a "localized interest in applying its approach to the protection of free speech and expression to speech emanating from . . . Canada's national broadcaster about a [Canadian] charity."  Dkt. 16-1 at 42.  In response, WE Charity asserts that this is not a "'localized' Canadian controversy" because U.S. interests are equally implicated.  Dkt. 21 at 44.  For several reasons, the Court concludes that this factor adds little to the CBC's arguments.

First, the earlier political controversy involving WE Charity has almost no bearing on this case.  It explains why WE Charity Canada is winding down and why the CBC might have taken an interest in a story about possible malfeasance involving WE Charity.  But the political controversy itself is unrelated to the operative allegations in this case.  Nor does the fact that "WE Charity is virtually a household name in Canada" mean that Canada has a unique interest in the adjudication of this case.  To be sure, the CBC is an instrumentality of the Canadian government, and that carries some weight.  *Cf. In re Air Crash*, 352 F. Supp. 3d at 39 (finding Malaysia has the "overwhelming interest" in part because the airline at issue is "Malaysia's national air carrier").  But the CBC leaves it at that and does not argue that it is entitled, by virtue of that status alone, to special consideration in the choice of forum or that principles of international comity favor dismissal.  At the same time, the United States has its own interest in a case in which a registered 501(c)(3) U.S. charity either (1) was injured in the United States due to the CBC's defamation; or (2) misled U.S. donors and committed other improper acts.  Likewise, the fact that the allegedly defamatory publications were researched in Canada carries some weight, but not enough to establish the type of strong, localized interest that might favor dismissal.  To the contrary, substantial portions of the broadcasts were filmed in Kenya, and other portions were filmed in the United States.  *See* Dkt. 21 at 44 (contending that the *Fifth*

*Estate* episode "is filmed almost entirely in Kenya and the U.S., and the only footage of Canada is a few stock shots of WE Canada's former headquarters and a brief montage of a CBC newsroom").  In substance, moreover, the publications addressed the use of funds raised in Canada and in the United States to fund projects in Kenya.  Although Canada has an interest in that subject matter, so does the United States and Kenya.

The CBC stresses that Canadian free speech and defamation law differs in significant ways, lacking a fault requirement while also recognizing an affirmative defense of "responsible communication," and it argues that Canada has an interest in having its news organizations judged by its free speech standards.  *See* Dkt. 16-1 at 42.  Those standards are in many ways less demanding than in the United States, but they also place "a greater premium on the opportunity to seek the dismissal of claims challenging speech early in a case, before significant costs are incurred."  *Id.*  But that contention proves too much.  In almost every case, the foreign law will differ in certain respects from U.S. law, and, here, the substantive U.S. law is, if anything, *more* protective of the interests of defamation defendants, like the CBC, than Canadian law.  It is difficult to see how Canada has a unique, localized interest in applying a less protective standard in defamation cases.

By way of comparison, in *Neelon v. Krueger*, 63 F. Supp. 3d 165, 173 (D. Mass. 2014), that court was faced with a dispute "between a resident of Massachusetts and two Canadian defendants regarding statements made in Canada and published to the United States about acts purportedly occurring in Mongolia."  *Id.*  That court determined that the case did not raise "the sort of 'localized controversy' best resolved in any particular forum."  *Id.*  "Although Canada may have a strong interest in cases involving its citizens," the court explained, "the United States has an equally strong interest in disputes affecting its own citizens."  *Id.*  The same is true here.

*See also Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 764 F. Supp. 2d 155, 157, 162–63 (D.D.C. 2011) (denying *forum non conveniens* motion even where "the Government of Canada does have a strong interest in the controversy because the alleged contract breach occurred there").

"With this public interest factor," the Court asks whether "there is an identifiable local interest in the controversy, not whether another forum also has an interest." *Bos. Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009) (quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1182 (9th Cir. 2006)). Although Canada may have a significant interest in this case, the case is not uniquely localized, and the United States also has a considerable interest (as does Kenya).

### Choice-of-Law

The CBC did not raise any choice-of-law arguments in its motion to dismiss and therefore waives any argument that this factor weighs in favor of dismissal. WE Charity, in contrast, raised the issue in its opposition brief, arguing that because U.S. law will govern the dispute if it remains in the U.S., choice of law does not favor dismissal. Dkt. 21 at 42–43. In reply, the CBC briefly argues that New York rather than D.C. law would apply if the case is heard here. Dkt. 22 at 23.

The CBC is correct that "the public interest factors point towards dismissal where the court would be required to untangle problems in conflict of laws, and in law foreign to itself." *See Piper Aircraft Co.*, 454 U.S. at 251 (internal quotation marks and citation omitted). But, here, both parties agree that U.S. law would govern if this case stays in this Court and applying common choice-of-law rules to determine whether New York or D.C. law will govern on the merits is hardly novel nor uniquely burdensome. U.S. courts make determinations of this kind

every day, and it would dramatically expand the concept of *forum non conveniens* to place significant weight on the need to make such an every-day determination.

*        *        *

This case implicates both Canadian and U.S. interests and will require the testimony of witnesses who reside in Canada, the United States, Africa, and elsewhere.   It is certainly possible—and perhaps likely—that a greater number of witnesses will be found in Canada, and it is possible—and perhaps likely—that the Canadian public will take a greater interest than the U.S. public in the case.  But those considerations are modest ones that are insufficient to overcome the substantial deference owed to WE Charity's choice of forum.  *See Shi*, 918 F.3d at 948.  The CBC bears the burden of showing that litigating this case in Ontario would be significantly more convenient, and it has failed to carry that burden.  The Court, accordingly, will deny the CBC's motion to dismiss for *forum non conveniens*.

## B.      Jurisdiction Under the FSIA

The CBC also argues that the Court lacks subject-matter jurisdiction over WE Charity's non-defamation causes of action—breach of contract (Count II), promissory estoppel (Count III), and negligent misrepresentation (Count IV).[2]  On this ground, the CBC is more successful:  The

---

[2] The CBC "does not dispute" that "this Court has subject matter jurisdiction over [WE Charity's] defamation claim," on the theory that "the transmission of a program to viewers in the United States is sufficient to confer jurisdiction over a defamation claim under the commercial activity exception to the FSIA."  Dkt. 16-1 at 46 n.19.  Because a foreign state can explicitly or implicitly waive its immunity from jurisdiction of U.S. courts, the Court need not further consider whether the defamation claim is subject to an exception under the FSIA.  *See* 28 U.S.C. § 1605 ("[A] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case in which the foreign state has waived its immunity either explicitly or by implication.");  *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022) ("Where 'explicit' waiver occurs, the foreign state expressly consents to forgo its sovereign immunity with respect to a certain class of disputes or a particular subject matter.") (cleaned up).

Court agrees that the CBC is entitled to sovereign immunity with respect to those three claims, and the Court, accordingly, will dismiss those claims for lack of jurisdiction.

The Foreign Sovereign Immunities Act ("FSIA") provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  A "foreign state" includes "an agency or instrumentality of a foreign state" (1) that "is a separate legal person, corporate or otherwise," (2) that "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) that "is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  *Id.* § 1603(a)–(b).  Here, the parties agree that the CBC, a so-called "crown corporation" wholly owned by the Canadian government, is an agency or instrumentality of Canada.  Dkt. 1 at 15–16 (Compl. ¶ 26).  The CBC is therefore immune from suit in the United States, unless one of the FSIA exceptions applies.  *See Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 861 (D.C. Cir. 2022) ("But the presumption" of FSIA immunity "is subject to several statutory exceptions . . . which constitute the sole basis to obtain subject matter jurisdiction.") (internal citation omitted).  Because sovereign immunity must be assessed "on a claim-by-claim basis," the Court must "review[] the causes of action separately" to determine whether an exception applies to each claim.  *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 712–15 (D.C. Cir. 2022).  Under settled D.C. Circuit precedent, "the plaintiff bears the initial burden" of overcoming the "presumption of immunity" and, accordingly, must "produc[e] evidence that an exception applies."  *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Only if the plaintiff bears this initial burden of production must the defendant carry the "burden of persuasion to show [that] the exception does not apply."  *Id.*

In an effort to carry its initial burden, WE Charity identifies only one arguably available exception to the FSIA, the "commercial activity exception."  Dkt. 21 at 48–52.  That exception applies to causes of action that are "based [1] upon a commercial activity carried on in the United States by the foreign state," [2] "or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," [3] "or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

As explained above, WE Charity's non-defamation claims relate to an alleged contract between WE Charity and the CBC.  WE Charity alleges, in particular, that on September 10, 2021, Wiszowaty agreed on behalf of WE Charity to permit the CBC to interview Moraa on the condition that the CBC would agree, in turn, to interview Wiszowaty about financial matters.  Dkt. 1 at 82–83 (Compl. ¶¶ 258–62).  The CBC proceeded to interview Moraa but did not interview Wiszowaty.  *Id.* at 83 (Compl. ¶¶ 263–64).  Then, in November 2021, the CBC informed WE Charity that it would publish its coverage without interviewing Wiszowaty.  *Id.* (Compl. ¶ 265).  To be sure, later that same month, the CBC offered to interview Wiszowaty, *id.* at 84 (Compl. ¶¶ 270), but WE Charity argues that the CBC's offer was simply an effort "to mitigate [the] damages from [its earlier] breach," Dkt. 21 at 47, and that the CBC never lived up to its end of the bargain.  After some back-and-forth, Wiszowaty declined to be interviewed on the theory that the scope and nature of the interview were not as originally promised.  Dkt. 1 at 91 (Compl. ¶ 280).

In seeking to overcome the "presumption of immunity," WE Charity focuses on the third prong of the commercial activity exception and argues that CBC's alleged breach of contract caused a direct effect in the United States.  Dkt. 21 at 48–52.  The parties agree (or at least do not

dispute) that WE Charity's contract-based causes of action clear the first hurdle for invoking that exception:  Accepting WE Charity's allegations as true for present purpose, those claims are based on "an act" committed outside the United States "in connection with a commercial activity."  *See Odhiambo v. Republic of Kenya*, 764 F.3d 31, 38 (D.C. Cir. 2014).  The question is whether that act—the alleged breach—caused a "direct effect in the United States."  28 U.S.C. § 1605(a)(2).  The D.C. Circuit's "direct effect cases involving alleged breaches of contract have turned on whether the contract in question established the United States as a place of performance."  *Odhiambo*, 764 F.3d at 38.  "By definition," the court explained, "breaching a contract that establishes the United States as a place of performance will have a *direct* effect here, whereas breaching a contract that establishes a different or unspecific place of performance can affect the United States only *indirectly*, as the result of some intervening event such as the plaintiff's move to this country."  *Id.* (emphasis in original).

*Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005), is illustrative. In that case, the plaintiff sued Saudi Arabia for breach of contract, among other causes of action, based on Saudi Arabia's termination of a state-sponsored annuity fund for foreigners workers and failure to provide adequate notice of the termination and a full refund of the payments made to the fund on his behalf.  *Id.* at 84–85.  The D.C. Circuit was unpersuaded that the commercial activity exception exposed Saudi Arabia to suit, concluding that the plaintiff's claims failed to satisfy the "direct effect in the United States" requirement.  *Id.* at 89–91.  As the court explained, the Supreme Court "defined the term 'direct effects'" in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), and, in doing so, the Court limited that term to those "effects" that "follow[] as an immediate consequence of the defendant's . . . activity."  *Id.* at 90. (cleaned up). In *Weltover*, that meant that the plaintiffs could pursue their claims against Argentina for the

unilateral "rescheduling of the maturity date of certain bonds" because "New York was . . . the place of performance for Argentina's ultimate contractual obligations" and, thus, the rescheduling had a "direct effect" in the United States. *Id.* (cleaned up). But the Supreme Court's reasoning in *Weltover* did not extend to *Peterson* because, in *Peterson*, the plaintiff did not allege or proffer any evidence that Saudi Arabia had agreed—expressly or implicitly—to make payment to him in the United States. *Id.* at 90–91. In short, the Court must focus on the place of performance—or the place of promised performance—and not the place where the plaintiff happened to reside or suffered some incidental or indirect loss.

The D.C. Circuit has reached similar conclusions in a host of other cases. *See, e.g.*, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 600–01 (D.C. Cir. 2013) ("[W]e ask whether the complaint alleges that Hungary promised to perform specific obligations in the United States."); *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010) (holding that the exception did apply where, among other things "the travel agency agreement was negotiated in and called for performance in the United States"); *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994) ("Neither New York nor any other United States location was designated as the 'place of performance' . . . ."); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988) ("But financial hardship fortuitously suffered *in the United States* is not a direct effect . . . .") (emphasis added). As the D.C. Circuit has summarized its precedent:

> [T]his Court's cases draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States.

*Odhiambo*, 764 F.3d at 40.

47

WE Charity maintains that it satisfies this rule because the parties contemplated that the interview of Wiszowaty would occur in the United States, and, more particularly, in Michigan, where Wiszowaty lives.  Dkt. 21 at 46–47.  The Court is unpersuaded:  Neither the complaint nor any evidence WE Charity has proffered suggests that the parties ever agreed—or mutually contemplated—that the interview would occur in any specific location, much less in Michigan.

Recognizing the difficulty that it faces, WE Charity argues that the CBC had a "course of performance" of interviewing "on-air sources on-camera at the source's location" and that the "CBC knew that Ms. Wiszowaty was in the U.S. and both parties contemplated the interview would be there."  *Id.* at 49.  That assertion is remarkable *ipse dixit* for a case in which the complaint covers 760 numbered paragraphs and 222 pages.  Dkt. 1.  Even if the CBC often—or even usually—interviewed sources "at the source's location," that practice would not establish an agreed upon place of performance.  It is difficult to imagine that WE Charity would have, or could have, claimed that the CBC breached the alleged agreement had it, for example, offered to interview Wiszowaty on-air and in-person while she was in Toronto on other business (as Wiszowaty later proposed).  *Id.* at 86–88 (Compl. ¶¶ 275–277).  And the assertion that "both parties contemplated that the interview would" occur in Michigan is just that—it is an assertion, unsupported by any substantive factual allegations or evidence.  More is needed to satisfy WE Charity's burden of production.

The facts that are before the Court, moreover, belie WE Charity's unsupported assertion.  There is evidence, for example, that the CBC "contemplated" interviewing Wiszowaty in Kenya, where Cashore seems to have believed she was located at the time.  *See* Dkt. 21-9 at 16 (email from Cashore to Wiszowaty stating, "We plan to be in Kenya by the end of next week and are hoping we can arrange an interview with you at a time that works for you.").  Wiszowaty

responded that she was "presently in the United States so an interview . . . in Kenya this week is not possible." *Id.* at 14.  Tellingly, she merely said that she was not available for an interview in Kenya "this week," and it hardly surprising that Cashore assumed that he would be able to interview WE Charity's Country Director for Kenya in Kenya.  Dtk. 1 at 16 (Compl. ¶ 30). More importantly, WE Charity fails to point to any evidence—or even an allegation—indicating that the CBC (expressly or implicitly) agreed to travel to Michigan to interview Wiszowaty.  Nor does WE Charity point to any evidence—or allegation—suggesting the Wiszowaty or anyone else at the charity was even aware, at the time the parties entered the alleged agreement, that the CBC had a "course of performance" of interviewing individuals at the source's location, much less that the parties mutually relied upon that "course of performance" when they entered the alleged agreement.

Changing tack, WE Charity next argues that performance in the United States is not required to establish "direct effects" in a contract case. Dkt. 21 at 50–51.  For support, it relies on *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661 (D.C. Cir. 2010).  "In th[at] case the Canadian government terminated a contract with a U.S. company to provide cruise ship services in Canada."  *Id.* at 662.  "Because this left the U.S. company unable to consummate fully negotiated, multi-million-dollar subcontracts with U.S.-based cruise lines to provide the necessary ships," and because the contract at issue required the company "to subcontract with two U.S.-based cruise lines," the D.C. Circuit "conclude[d] that Canada's termination of the contract had a 'direct effect' in the United States."  *Id.* at 662–63.  WE Charity focuses on the court's observation that "[t]he FSIA, however, requires only that effect be 'direct,' not that the foreign sovereign agree that the effect would occur."  *Id.* at 665.  In the very next sentence, however, the court added: "In any event, the contract itself required the ships to

come from Holland America and Royal Caribbean cruise lines," which are both U.S.-based companies, *id.*, and so "the travel agency agreement . . . called for performance in the United States." *Id.* In a subsequent decision, moreover, the D.C. Circuit confirmed that the test is "whether the complaint alleges that [a party] promised to perform specific obligations in the United States." *de Csepel*, 714 F.3d at 600–01. But even if substantial lost revenue in the United States flowing directly from a breach of contract were sufficient to satisfy the direct effects requirement—even where the place of performance was not in the United States—the facts of *Cruise Connections* are a far cry from those that WE Charity outlines here. Most notably, nothing in this case turns on whether the CBC would have interviewed Wiszowaty in Michigan, in Canada, or in Kenya.

Finally, WE Charity tries to satisfy the other two prongs of the commercial activity exception. It first claims that this "action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2); *see* Dkt. 21 at 51. That argument is based on the same unsupported theory that the parties agreed to interview Wiszowaty in Michigan. It further claims that "the action is based upon . . . an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2); *see* Dkt. 21 at 51-52. This argument posits that the "CBC was to perform its portion of the contract in Michigan and did broadcast to the U.S. without [the] benefit of the content of Ms. Wiszowaty's interview." Again, there is no evidence that the parties anticipated performing in Michigan, and the wholly conclusory allegations contained in the complaint carry no weight, *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Perhaps anticipating the uphill nature of its argument, WE Charity seeks leave to re-plead the relevant portions of its complaint should the Court grant the CBC's motion to dismiss its

non-defamation claims.  Dkt. 21 at 48.  On the present record, the Court is unpersuaded that granting leave to amend would serve the interests of justice, even under the liberal standard contained in Rule 15.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (noting that a court need not grant leave to amend where futile).  The parties have presented lengthy papers and volumes of exhibits, along with lengthy oral arguments, yet WE Charity has failed to even hint at a theory or set of facts that might meet its burden of production.  If there is more to the story, however, WE Charity may file a motion explaining why granting leave to amend a complaint that already exceeds 200 pages would not be futile, along with a proposed, amended complaint (and redline), as required by the Court's rules.

The Court will, accordingly, dismiss WE Charity's three non-defamation claims, without prejudice.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for *forum non conveniens* is hereby **DENIED**, and its motion to dismiss Counts II, III, and IV for lack of subject-matter jurisdiction is **GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  June 27, 2023