<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      WE CHARITY,                    ) Civil Action
 3                                   ) No. 1:22-CV-340
                        Plaintiff,   )
 4                                   ) **MOTION HEARING**
      vs.                            )
 5                                   )
      CANADIAN BROADCASTING          ) Washington, D.C.
 6    CORPORATION,                   ) Date:  October 30, 2023
                                     ) Time:  2:05 P.M.
 7                        Defendant. )

 8                   TRANSCRIPT OF MOTION HEARING
           HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
 9                   UNITED STATES DISTRICT JUDGE
      _____
10
                         **A P P E A R A N C E S**
11
      For Plaintiff:          MR. JOSEPH F. KROETSCH
12                            Boies Schiller Flexner LLP
                              333 Main Street
13                            Armonk, NY 10504

14                            MS. AMY L. NEUHARDT
                              Boies Schiller Flexner LLP
15                            1401 New York Avenue, NW
                              11th Floor
16                            Washington, DC 20005

17    For Defendant:          NATHAN E. SIEGEL
                              COURTNEY TURCO DeTHOMAS
18                            Davis Wright Tremaine LLP
                              1301 K Street, NW, Suite 500 East
19                            Washington, DC 20005

20                            RACHEL F. STROM
                              Davis Wright Tremaine LLP
21                            1251 Avenue of the Americas, 21st Floor
                              New York, NY 10020
22
      Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
23                            Official Court Reporter
                              United States Courthouse, Room 6714
24                            333 Constitution Avenue, NW
                              Washington, D.C. 20001
25                            202-354-3246
</pre>

1                           P R O C E E D I N G S

2                  THE COURTROOM DEPUTY:  Civil Case No. 22-340,

3       WE Charity v. Canadian Broadcasting Corporation.

4                  Would counsel please approach the podium, state your

5       name for the record, starting with plaintiff's counsel.

6                  MR. KROETSCH:  Good afternoon, Your Honor.  Joseph

7       Kroetsch and Amy Neuhardt for WE Charity.

8                  THE COURT:  Good afternoon to you.

9                  MR. SIEGEL:  Good afternoon, Your Honor.  Nathan

10      Siegel, with Rachel Strom and Courtney DeThomas, for defendant,

11      CBC.

12                 THE COURT:  All right.  Good afternoon to all of you

13      as well.

14                 So we're here for a hearing with respect to the

15      protective order in this case.  And the parties have largely

16      agreed to a protective order, and there's one issue as to which

17      they don't agree.  And that issue relates to disclosures of

18      highly sensitive information to individuals employed by the

19      Canadian Broadcasting Corporation who are engaged in reporting

20      relating to WE Charity.

21                 And the concern, as I understand it, is that it both

22      may be difficult for those individuals if they are engaged in

23      reporting with respect to WE Charity, to segregate in their own

24      minds what they've learned that is subject to protective order

25      and cannot be disclosed from what they've learned from other

1    sources; and it also may be very difficult for WE Charity to

2    carry its burden of demonstrating to the Court that a breach

3    has occurred, particularly if, in the contempt context, the

4    standard is somewhat higher than the preponderance of the

5    evidence standard.  And if the Canadian Broadcasting

6    Corporation were to assert either a privilege relating to a

7    confidential source or, presumably, even a privilege relating

8    to the newsroom in a manner that would make it difficult for --

9    to ever prove if there were a leak of the protected

10   information, how that came about.

11        On the other side, the Canadian Broadcasting

12   Corporation says that it would benefit substantially by being

13   able to consult with the reporters, who may be the same

14   individuals who were still engaged in investigation and

15   reporting with respect to WE Charity, and that it would make it

16   more difficult for the Canadian Broadcasting service to put on

17   its truth defense if it can't consult with those reporters

18   about new information that is learned through the course of

19   discovery.

20        WE Charity has proposed two alternatives.  One

21   alternative would -- to put it in WE Charity's words -- clarify

22   the burdens.  I think, in the CBC's words, it would change the

23   burden that would apply in a manner in which would shift the

24   burden to the Canadian Broadcasting Corporation to establish

25   that, if information disclosed subject to the protective order

1    appears in reporting by the Canadian Broadcasting Corporation,

2    the Canadian Broadcasting Corporation would need to demonstrate

3    that it had some independent source for that information.

4           The other alternative is to simply create a highly

5    confidential designation under the protective order and that

6    that information could not be disclosed to those who are

7    engaged in reporting relating to WE Charity.

8           I've reviewed the parties' submissions and

9    supplemental submissions, which I requested, and I have to

10   admit, I still regard this to be a difficult question.  And so

11   I would benefit from hearing somewhat further from you, and I

12   can tell you the types of things that I would like to know is

13   I'd like to know with some greater clarity exactly what it is

14   that WE Charity is concerned about in the disclosure and the

15   types of disclosures and whether there's a possibility of

16   developing a much more narrowly focused, highly confidential

17   category.

18          I think, by WE Charity's own telling of it, they

19   anticipate that a very substantial portion of the discovery

20   that they intend to produce would be subject to the heightened

21   designation, and that concerns me.

22          But I'm also interested in knowing how the Canadian

23   Broadcasting Corporation thinks the Court could go about

24   enforcing a protective order in a meaningful way without some

25   addition or modification.

1          In the papers submitted to the Court, the CBC says,

2     well, there are mechanisms to deter violations.  But, quite

3     frankly, I'm not sure what those are because I would be,

4     frankly, shocked if we had a dispute, Mr. Siegel, and if you

5     didn't stand up here and say, Judge, we're not going to tell

6     you who our source is; we have a source, we're not telling you

7     who it is, you just have to take my word for it.  Or we have

8     other bases of reporting, and we're not going to get into

9     what's going on in our newsroom.  We think that's protected,

10    and we're not going to disclose that.

11          And I understand that, and I think those are

12    arguments you're entitled to make, but I'm still concerned that

13    we may be heading in a direction which may be even more of a

14    mess down the road where there is reporting; and, if there is

15    reporting, sorting out what happened and facing even more

16    difficult issues than I face now about how do we get to the

17    bottom of what happened.

18          I will tell you that my initial inclination with

19    respect to the burden shifting is that it's very hard for me to

20    decide this in the abstract and that I do think that it's an

21    issue which will come up and would need to be resolved based on

22    the particular circumstances as they arise.  And it may be that

23    in some circumstances, just applying garden variety evidence

24    law, that the party with the greater access to the evidence has

25    some burden.

1          But if it's a clear and convincing standard and the

2     only evidence I have in front of me is that there is reporting,

3     and that reporting includes the same information that was

4     disclosed in discovery, I'm not at all sure as I sit here today

5     that I would be able to conclude, based on a presumption or

6     otherwise, that the clear and convincing standard is then

7     satisfied.  Perhaps I could, perhaps I couldn't.  I don't know

8     for sure.

9          And then, finally, I think it would be helpful for me

10    to hear a little bit more from WE Charity about the specifics

11    of its concerns and what harm in particular it anticipates or

12    is concerned about arising if, in fact, there were a disclosure

13    of material that was produced in discovery.

14         I suppose that turns, in large part, on what that

15    material is and what the circumstances are.  But that gets back

16    to my point that if WE Charity is of the view that virtually

17    all of the financial discovery and virtually all of the

18    discovery relating to donors is in the highly confidential

19    category, how do I sort through that in order to satisfy

20    something along the lines of the *Doe* standard?

21         I think that this is not precisely *Doe* because, even

22    though CBC talks about the need to consult with your clients,

23    your client is the CBC.  And there are plenty of people at the

24    CBC that you can consult with.  These are two individuals or an

25    individual who work for the CBC.

1          It may be that consulting with them is of some

2     benefit to you in the case, but it's a little bit different

3     than saying you can't talk to your client because they're just

4     not your client.  They work for your client.  But I understand

5     that there still are some practical hurdles and that it may be

6     more difficult for you to put on the defense.

7          The final thing I'll say before I give the parties a

8     chance to address my concerns is that, in thinking this

9     through, it seems to me that the role of the reporters is

10    somewhat differently situated depending on whether counsel is

11    focused on the defense that the reporting was appropriate and

12    lawful under the relevant standards versus the defense of

13    truth.

14          And I would think that, with respect to the question

15    of whether the reporting itself was appropriate under whatever

16    standard is the appropriate standard to apply in this case,

17    there, presumably, it's -- that question is based largely on

18    what the reporters knew and what they had access to, and they

19    have that and we're not going to be learning anything new with

20    respect to that.

21          That's not true, though, with respect to the truth

22    defense.  And as to the truth defense, they may well be

23    learning new things.  It does strike me, with respect to the

24    former category, their participation is, obviously, a lot more

25    important than it is with respect to the truth aspect of this.

1    And that with respect to the truth aspect of it, consulting

2    with them is important simply because they happen to be

3    particularly knowledgeable and skilled in the area, but that is

4    not something that cannot be overcome.  There are other people

5    who could become knowledgeable and who are skilled with respect

6    to investigations.

7            So those are the issues that are -- I'm thinking

8    about, and I'd be happy to hear from the parties about it.  As

9    you probably gathered, as I sit here right now, I really have

10   not reached a firm conclusion on the right result, and that's

11   why I want to hear from you.  So, Mr. Kroetsch?

12           MR. KROETSCH:  Thank you, Your Honor.  I'll take each

13   one of the points that you made in turn.  If I got any of them

14   wrong, I'm sure you will correct me.

15           The first one, as I understood it, is you're asking

16   what types of disclosures is the charity worried about coming

17   out; like, what sorts of information?  And we are in a slightly

18   strange situation, in that we're not worried about what the

19   documents actually say.  We're worried about how they will be

20   used.

21           So one category would be identifying donors, right?

22   I think there are approximately 53,000 distinct donors.  And

23   providing contact information for them, which could be used to

24   contact the donors -- frankly, scare them off -- we've seen

25   that happen before.

1       We've seen some very large, long-time donors cease

2    cooperating with WE Charity, donating to WE Charity after

3    hearing from a particular CBC reporter a hundred times,

4    literally.

5       THE COURT:  Well, isn't -- doesn't that problem arise

6    somewhat already with respect to counsel, in that counsel is

7    entitled to reach out to those individuals as potential

8    witnesses and have an investigator or counsel call them up and

9    say, will you talk to us about this case; because here's what

10    we're investigating, and we'd be very interested to know if you

11    know anything about this topic.

12       MR. KROETSCH:  I think that's fundamentally a very

13    different type of communication than, hi, my name is so and so,

14    I'm a reporter with the show that's notorious for naming and

15    shaming people.  I'm doing another episode about WE Charity,

16    and I want to talk to you and give you an opportunity, whether

17    expressly or -- but to not be in the show.

18       There's a latent threat in there that's very

19    different than a call from counsel saying, I'm just trying to

20    learn the facts for a lawsuit.  People don't want to be on *The*

21    *Fifth Estate*.

22       THE COURT:  Well, it's hard -- I mean, maybe someone

23    who -- that strikes me as a fairly empty threat in this context

24    when you're talking about the donors.

25       We're doing investigations about whether donors'

1   money is being misused and whether people are lying to donors,

2   and talk to us if you don't want to be on the show.  I'm

3   thinking to myself, the best way to get on that show is to talk

4   to them.

5          What sort of reporting is going to be, "We went out

6   and spoke to seven individuals who declined to talk to us about

7   whether their money was used in the way they hoped it would be

8   used"; breaking news.

9          MR. KROETSCH:  I can give you a concrete example, if

10   you'd like.

11          THE COURT:  Okay.

12          MR. KROETSCH:  So I don't remember off the top of my

13   head the right time period, but several months ago, as I

14   understand it, Mr. Cashore, the lead reporter on the coverage

15   for CBC about WE Charity, reached out to the Pinball Clemons

16   Foundation, which historically was one of the -- if not the

17   largest donors to WE Charity, at least for education in Kenya.

18          Many of the allegations that -- one of many of the

19   arguments we expect CBC to make, especially based on the

20   document request they served on us a couple days ago, will

21   concern the Pinball Clemons Foundation.

22          As I understand it -- it's thirdhand -- Mr. Cashore

23   told MPCF, which is what they call it -- or PCF -- that he was

24   working on another documentary and that he wanted a statement

25   about their funding of schools in Kenya.  And so they gave a

1    statement.  They didn't want to be part of this anymore, and

2    they won't talk to us anymore after 20 years of constant

3    communication.  They just don't want to be part of this mess.

4    On some level, I don't blame them.  But I don't think that same

5    thing would happen if it were just Mr. Siegel calling.

6          I think the -- what WE Charity's major donors --

7    we're not just any number of 53,000 people.  These are people

8    who are deeply invested in the charity -- they know there's

9    been all this false reporting about WE.  The Pinball Clemons

10   Foundation has been so involved that they know what to expect

11   out of CBC.

12         I understand the parties disagree about whether the

13   reporting was true or not, but many of these donors do not take

14   well to hearing further from Harvey.  And they also don't know

15   this lawsuit exists.  It's not like Mr. Cashore discloses it.

16         When we tell donors, when we have the opportunity,

17   they're really surprised.  I had no idea there was a lawsuit

18   happening.  Harvey didn't call and say there's an ongoing

19   lawsuit.  He just doesn't --

20         THE COURT:  Are the names of the donors disclosed on

21   WE Charity's charitable tax return?

22         MR. KROETSCH:  The very largest might be, but

23   certainly, the full list would not be.  I'd need to check.

24         THE COURT:  I don't know the answer to that off the

25   top of my head either, but that could be relevant.  If that

1    information is all publicly available, there wouldn't be a

2    reason to have any concern here then.

3              MR. KROETSCH:  If all of the donors are, for sure, I

4    agree; then that's a moot point.  But I don't believe that's

5    right.  I think there's some cutoff; like maybe the top 50 or

6    above X dollars.  I would have to check that.

7              So, look, donor -- donor communications are part of

8    it.

9              THE COURT:  Okay.

10             MR. KROETSCH:  Financial information; the audited

11   financials are publicly available.  That's not a concern.

12             But the charity's mostly concerned about documents

13   being taken out of context and incorrectly or falsely

14   portrayed.  I mean, it's what we contend much of the reporting

15   was predicated on.

16             THE COURT:  Sorry.  I'm just taking a look at this

17   question here.

18             I don't know if this is up to date or not, but here's

19   something that says that in 2018 the IRS dropped the

20   requirement that certain tax-exempt organizations, such as

21   charities, must file personally identifiable information about

22   their donors with their annual returns.  That's, obviously,

23   something we can dig further down.  That's 2018.  I don't know

24   for sure.

25             MR. KROETSCH:  You know, it's certainly not the only

1    category, right?  That's not the only category.

2            THE COURT:  Right.  So tell me what the other

3    categories are.

4            MR. KROETSCH:  Well, we're concerned about detailed

5    financial information being taken out of context.  There are

6    allegations in the complaint that have to do with ways that

7    financial information was, sort of, inverted in its meaning or

8    falsely portrayed, as we allege, in the challenged coverage.

9            So the concern is, if you give these reporters ammo,

10   they will misrepresent more while giving the false impression

11   that they have documents backing it up.  I mean, that's the

12   problem with all this coverage.

13           They didn't just show up and say, WE Charity is a

14   fraud; take our word for it.  They said, we've got the

15   receipts, we've got the documents, we've looked at all of it.

16   We've got this stockpile of evidence

17           THE COURT:  So in the discovery, are you going to

18   watermark the discovery with confidential markings?

19           MR. KROETSCH:  I would think -- I mean, we could

20   watermark.  I was imagining just the stamp on the corner, but

21   we could also watermark.

22           THE COURT:  Well, if you're concerned that material

23   that you're producing in discovery could end up on a Canadian

24   broadcast, in a telecast or broadcast, you probably could

25   address that concern by just using paper that has the watermark

1    across the whole page that says, "Confidential."  And if it

2    shows up like that, then you're not going to need much more

3    proof.

4              MR. KROETSCH:  That's, certainly, the most blatant

5    example.  There are a couple other examples of how this can

6    happen.

7              One way it can happen is that they just describe the

8    document and it doesn't show up in a telecast.  They just say,

9    you know, CBC has reviewed documents that indicate

10   such-and-such donor gave this much money, but there's only this

11   thing on the ground; something like that.

12             THE COURT:  Well, that, again, is one way -- maybe

13   it's something, again, I could work with.  I don't know what

14   Mr. Siegel would say to this.

15             But if there's a report like that and you have reason

16   to think that it was documents that you produced, I think

17   without saying to Mr. Siegel, you need to tell me who the

18   source was, if you say there's an independent source, just show

19   me the document that doesn't have the confidential label on

20   it -- or marking on it.  If they had a marking that wasn't

21   confidential, we'd know they got it from another source.

22             MR. KROETSCH:  Right.  And then, the last category

23   that occurs to me standing here as, potentially, problematic is

24   that they may have sources who have lots of documents, right?

25   I mean, not every employee who ever left WE Charity returned

1      their laptop, right?

2              So there may be somebody who has a lot of documents.

3      And right now -- I'm going to make Mr. Cashore the boogeyman.

4      He's just the lead reporter on this.  But for the sake of

5      discussion, right now Mr. Cashore may not even be aware that a

6      document exists that's on his source's laptop.

7              He gets our production, he's looking through

8      documents and says, oh, wow, this is interesting, calls up the

9      source and says, "Do you have this document?"  Here's the file

10     name; here's what it looks like.  Then he has a non-watermarked

11     copy.

12             I actually don't think that's terribly far-fetched.

13     We know that some documents made their way to the CBC because

14     they're the so-called leaked documents that are part of the

15     coverage.  So some access to internal WE Charity documents is

16     available to CBC.

17             THE COURT:  What if I were, then, to simply require

18     that any of the reporters -- I could, frankly, do this for

19     everybody, not just the reporters -- require anybody who

20     receives any information or materials pursuant to the discovery

21     that is protected sign and submit to me a declaration attesting

22     under the penalty of perjury that they will not disclose, they

23     will not use -- they will not use information that they obtain

24     through discovery as a means for seeking nonprivileged or

25     nondesignated versions of it.

1          And then if somebody does that and they get caught,

2     they may well go to jail because they'll be in contempt of

3     court.

4          MR. KROETSCH:  I think that would be -- that would be

5     very helpful.  I worry a little bit about the ability for a

6     reporter whose job it is to collect potentially confidential

7     information of WE Charity through lawful means to segregate in

8     their minds the different information they get and how they got

9     it.  I mean, even in good faith, somebody could just forget how

10    it is they know something.

11         THE COURT:  Right.

12         MR. KROETSCH:  So that's part of the problem.  May or

13    may not be insurmountable depending on the individual.

14         THE COURT:  Happened, apparently, to John Lennon with

15    "My Sweet Lord" in another case.

16         MR. KROETSCH:  Oh, I'm not familiar with that one.

17    But --

18         THE COURT:  It's a copyright case I'm talking about

19    where he was accused of having stolen the song.

20         MR. KROETSCH:  Right.  It can just, sort of, be

21    something that's in the back of your head, and at some point

22    you think, I came up with that.  No, you didn't.  You heard it

23    on the radio once.

24         THE COURT:  I didn't mean to say John Lennon.  I mean

25    George Harrison, actually.  I apologize to John Lennon.

1          MS. STROM:  Your Honor, you cannot defame the dead.

2          THE COURT:  I wouldn't sleep well knowing I had said

3     anything improper or unfair about John Lennon.  Go ahead.

4          MR. KROETSCH:  So there's the issue of properly

5     segregating the information.  Then, I suppose, there's also,

6     potentially, still the issue of -- I believe you said if

7     they're shown to have violated the order.  But that begs the

8     question again, how do we show they violated the order if we

9     find ourselves in a situation where they're saying I'm not

10    going to tell you where I got this information from.

11         THE COURT:  Right.  But they certainly run the risk,

12    and no one knows -- I don't know how this comes out.  I've said

13    I don't know what the answer is going to be with respect to

14    what the burden is and how it would apply in a particular case

15    if someone would be rolling the dice --

16         MR. KROETSCH:  Right.

17         THE COURT:  -- in hopes that they wouldn't get caught

18    by doing something like that if they were subject to a contempt

19    sanction if they did get caught.

20         MR. KROETSCH:  I think that's right.  Also -- and I

21    think this segues to what I understood your second question to

22    be.

23         I noticed that in CBC's supplemental briefing in

24    Footnote 1 -- also the only footnote -- they said that WE

25    Charity's proposal seems ostensibly to be premised on the

1    hypothetical concern that CBC might assert that it obtained

2    information independently from confidential sources.  But in

3    the event the scenario --

4              THE COURT:  You've got to slow down for the reporter.

5              MR. KROETSCH:  Oh, I'm sorry.

6              The Court would assess whether it should or should

7    not have any impact on the ultimate outcome; just as any court

8    would in any dispute in which a party invokes a privilege.

9              So there's one more sentence.  I can read it if you

10   guys think it's necessary.  Okay.

11             So if what CBC is saying is that the Court would be

12   entitled to properly draw an adverse inference in the event

13   that the CBC refused to disclose a confidential source in the

14   context of a disclosure or an alleged disclosure of

15   confidential information, that may solve much of the problem.

16             THE COURT:  It's just a little hard for me to know.

17   It's possible that might be the right answer.  It's just hard

18   to know in the abstract --

19             MR. KROETSCH:  Right.

20             THE COURT:  -- what the answer to that question is.

21   And, quite frankly, maybe that's just as well because everyone

22   has to live with that uncertainty, that they don't know what

23   the answer to that question will be.

24             MR. KROETSCH:  That may be right.  For example, I

25   would wonder, to the extent that the law that applies to that

1    situation is D.C. or New York's source privilege law, those

2    laws, if I recall correctly, expressly bar a court from finding

3    a party to be in contempt for not disclosing the information.

4         THE COURT:  Right.  Isn't that different, though,

5    from finding them in contempt, not for a failure to disclose,

6    but for, in fact, violating a court order; and they chose not

7    to put on a defense, which they could have put on, and that's

8    their business?

9         MR. KROETSCH:  I could imagine a creative argument by

10   my smart colleagues here that, in practice, what you're doing

11   is sanctioning them for that.  It's far from clear that it's

12   even the law that applies in that context for federalism

13   reasons, for choice of law reasons.

14        THE COURT:  Right.

15        MR. KROETSCH:  But it would be, I think, simplifying

16   matters right now if it were clear that CBC's position here was

17   the Court has the power to draw an adverse inference in that

18   context.

19        THE COURT:  Could you describe for me what the scope

20   of the relevant discovery is here.  I assume that what we're

21   talking about are records of donors and financial records, not

22   from the past year or two, but back from the period of time of

23   the reporting at issue in this case.

24        MR. KROETSCH:  I mean, part of the issue there is

25   what is that relevant period of time.  I know CBC's position is

1   that it's roughly 20-something years.  It's almost the entire

2   time that the charity operated.

3          I don't know to what extent we'll have documents

4   going back to the '90s, at which point it was basically a

5   lemonade stand in a kid's front yard.  But, certainly, the

6   charity grew quickly, and we'll see what documents exist.

7          THE COURT:  I guess what I'm more concerned about is

8   not the 20 years ago, but the 6 months or year ago or even 2

9   years ago.  Remind me of when it was the reporting took place

10  here.

11         MR. KROETSCH:  The reporting took place between

12  November 2021 and January 2022.

13         THE COURT:  Okay.

14         MR. KROETSCH:  I'm actually not sure that CBC would

15  agree that documents postdating that would be outside of the

16  proper scope of discovery.  I believe the request they served

17  the other day was seeking documents through the present;

18  presumably, on the theory that somehow that's relevant to

19  substantial truth if they started running a fraud by dumb luck

20  after the story came out.

21         So in terms of what the proper scope of discovery is,

22  you know, I think Your Honor very correctly pointed out the

23  distinction between the fault evidence and the truth evidence

24  in this case, or falsity, depending on how you want to think

25  about it.

 1            THE COURT:  So -- I mean, I suppose one

 2   possibility -- and just looking for ways to narrow this and to

 3   address concerns -- would be, to the extent that there is any

 4   discovery that postdates January 2022, to allow you to

 5   designate that discovery as highly confidential in ways that

 6   the reporters wouldn't have access to it.

 7            And it's -- the stuff that is older, I'm not

 8   suggesting that it's so old that it's no longer newsworthy, but

 9   it's less newsworthy than more recent information.

10            MR. KROETSCH:  I think if that were right, we

11   wouldn't be standing here today, unfortunately.  Most of the

12   coverage from 2021 was about alleged incidents many years

13   earlier.

14            So the newsworthiness of the WE Charity documents

15   does not seem, in our experience with CBC, to be related to how

16   proximate it is in time.

17            THE COURT:  So what period of time did the reporting

18   relate to?

19            MR. KROETSCH:  Roughly, 2006 through, I think, 2016,

20   when I think about the donors who were identified.  So I think

21   Reed Cowan was donating in 2006, if I remember correctly; 2006,

22   '7, around there.

23            And on the opposite end, I think Watson Jordan was

24   donating in 2014, '15, '16.  But it may go back even further.

25   The Iroquois Ridge High School donations, Rukshan de Silva, may

```
 1    actually be 2004.  I'd have to check that.  So it's a very

 2    broad range of time.

 3            Look, our position is there are -- you know, to make

 4    that discovery manageable, if you're going to have a broad

 5    period of time, you have to have a correspondingly focused

 6    target, right?  So it can't be every donor over the course of

 7    20 years.

 8            THE COURT:  Right.

 9            MR. KROETSCH:  That's going to be, I mean, many

10    terabytes of information; it's going to be completely unwieldy.

11    That's something, I think, that it's premature to probably get

12    into today in terms of disputes we may have about the proper

13    scope of discovery.

14            But I think what you were saying earlier about there

15    being this distinction between the malice or fault evidence --

16    right? -- and that the role that the reporters at CBC will play

17    versus the truth evidence is important here, right?

18            THE COURT:  Right.

19            MR. KROETSCH:  That where the reporters at CBC are

20    most valuable is in interpreting their own documents --

21    right? -- what they had in their possession at the time that

22    they published the story; because that speaks to the subjective

23    knowledge or alleged recklessness that they acted with at the

24    time of publication for fault purposes.

25            Conversely, if you're looking at the much later -- if
```

1    you're looking at the truth defense, rather, or falsity

2    element, there, there's a much broader universe of evidence

3    that could be relevant, right?  It need not have been in their

4    possession.  It still has to be, at the end of the day, proving

5    their story to have been true, not just a completely different

6    story that went really bad.

7              But it is broader, but it's also not, as you said,

8    something where they're indispensable.

9              THE COURT:  Right.  And the problem is that it also

10   extends after 2016.

11             So the evidence that WE Charity was continuing to

12   engage in the same pattern in 2017 and '18 would tend to

13   suggest that they were doing it in 2006 to 2016.  So the -- I

14   can't just draw the line at 2016 and say, well, that's what the

15   reporting was about.

16             MR. KROETSCH:  I agree that, for purposes of the

17   truth-related discovery, 2016 is not a cutoff.  I think it's

18   probably -- we probably need to come up with some sort of

19   manageable cutoff, and that's something that the parties may be

20   able to negotiate without Court intervention, cautiously

21   optimistic.

22             But one way to draw a line here would be to say that

23   the handful of reporters who are at issue here -- right? -- I

24   think it's just Harvey Cashore, Mark Kelley, Kate McKenna, and

25   Matthew Pierce out of the -- I don't know -- hundreds,

1   thousands of reporters at CBC, should not have access to

2   documents they didn't already have access to, because they

3   didn't need that to form whatever knowledge and intent they had

4   at the time of publication.

5          And there are many other people in the world,

6   including probably at opposing counsel's law firm, who are

7   capable of figuring this out.  They don't uniquely need Harvey

8   Cashore to figure this out.

9          I understand why it might be helpful, but given the

10   very unusual challenges this poses, I mean, in the balance of

11   things, it's a risk that's not fair to force WE Charity to

12   take.

13          THE COURT:  Okay.  Let me hear from Mr. Siegel now.

14   Thank you.

15          MR. SIEGEL:  Thank you, Your Honor.  I have a lot to

16   say, in all candor.  I'm trying to think about how to organize

17   it.

18          I think what I'd like to do is, even though you

19   weren't talking that much about it with Mr. Kroetsch, start

20   with the burden shifting because I think that will help

21   illuminate what we think are the real issues here.

22          I would start out, though, by saying I just want to

23   note -- you asked Mr. Kroetsch, what are you really worried

24   about, right?  Give me an example.  The example he gave you was

25   Harvey Cashore calling the Michael Pinball Clemons Foundation,

1      one of the most public donors of WE Charity in the world.

2              THE COURT:  Well, presumably, he didn't want to give

3      me the example of saying here's some donor we haven't

4      disclosed, and we're concerned about calling this one.

5              MR. SIEGEL:  Sure.  What premise, what basis is there

6      to conclude that Harvey Cashore is going to call up a donor

7      that he only learned about from some disclosure on this case?

8      There's zero evidence of that.

9              THE COURT:  I guess -- fair enough, but there is an

10     element of human nature -- and I don't mean that in a --- at

11     all in a pejorative sense.  And this does come back to my

12     George Harrison example.

13             You get something in your head, you learn something,

14     and it's juicy.  And are you able to say to yourself, okay,

15     either I'm going to just stop reporting right now because I've

16     learned this really juicy thing, or I'm going to be able to

17     just completely --

18             MR. SIEGEL:  Sure.

19             THE COURT:  -- segregate it out of my head and I'm

20     never going to be able to do anything with it.

21             So the discovery shows that there was a number of

22     other donors who gave money, who did so with the understanding

23     that it was going to be used for building schools in Kenya.

24     And maybe you get their complaint file and people are calling

25     up and saying, I'm really upset.  You told me you were using

1    the money to build a school in Kenya; I have no evidence you

2    did it, and here's my name and here's my address and contact

3    information.

4          Even in a world in which -- I'm not saying that

5    anyone would, like, knowingly or intentionally violate the

6    protective order -- that person then has that information; they

7    know that it's, you know, eight-year-old Kevin Johnson from Des

8    Moines who wrote a letter complaining about how he gave all his

9    allowance to WE Charity to build a school and now he hears they

10   weren't building a school and he's very angry about that.

11   Kevin Johnson can't rely on that information.

12         And then the reporter a week later, two weeks later,

13   a month later, is reviewing information independently obtained,

14   and there's a reference to Kevin Johnson.  And here's Kevin

15   Johnson's contact information; here's a list of 500 people who

16   are potential people that we're thinking about calling.

17         Do you not, like, push Kevin Johnson to the top of

18   that list?  You say I'm not going to push Kevin Johnson to the

19   top of the list.  I'm going to go through and call all these

20   dead-ends that I know are dead-ends now because I can't rely on

21   the fact that I know it's actually Kevin Johnson.

22         MR. SIEGEL:  Sure.  But that risk at some level

23   exists in every case where you have people who are involved in

24   the subject matter.

25         THE COURT:  I'm sorry.  But in case after case I

1    enter protective orders, and I say the people who are, like,

2    building the new version of the software or who are trying to

3    engineer around the patent, yes, they can't have it.  They

4    can't have access to this information because of exactly that

5    risk.

6              And, you're right, that risk comes up in lots and

7    lots of cases, and nine times out of ten, the way I deal with

8    it in those cases, I say, well, don't use that engineer;

9    consult with some other engineer.  If that person is actually

10    involved in engineering around this patent, go find a different

11    engineer.

12             MR. SIEGEL:  That's not practical, Your Honor.  I

13    mean, these journalists have been working for years on these

14    investigations.

15             THE COURT:  Oh, it's completely practical to the

16    extent we're dealing with truth.

17             MR. SIEGEL:  What?

18             THE COURT:  To the extent we're dealing with the

19    truth issue -- I mean, my example, Kevin Johnson complained.

20    You could do that.  Anyone in this room could do that.  Kevin

21    Johnson complained.  What is, like, the brilliance, the

22    insight -- I mean, I've got cases --

23             MR. SIEGEL:  Right.

24             THE COURT:  I've got a criminal case right now where

25    I'm facing this issue with dealing with a criminal defendant

 1    and access to information that is sensitive, where he allegedly

 2    has some knowledge about how to deal with the information, and

 3    his liberty is at stake.  And there are not that many people

 4    who have the engineering ability to look at it.  And there's a

 5    difficult issue I have to decide in that case.

 6            This case, there are other reporters, there are other

 7    investigators.  We're not talking about rocket science here.

 8    We're not talking about, you know, there are only three

 9    engineers out there who really understand this technology, and

10    all three of them work for us, and all three of them are

11    working on these projects.  Therefore, we're at a loss.  We

12    just can't do it.

13            I mean, when you say it's not practical -- you know,

14    I think if you drop the stuff off in my chambers, I could do

15    it.

16            MR. SIEGEL:  Well, Your Honor, with respect, I don't

17    think that's true.  I mean, they've spent three years.  They've

18    talked to hundreds of people.  They've reviewed tens of

19    thousands of documents.

20            To this day, I can tell you they know more than I do,

21    and I've been spending months trying to get up to speed on

22    this.  So the idea that --

23            THE COURT:  I'm sorry, but just to pause for a

24    second, though.

25            MR. SIEGEL:  Yes.

1          THE COURT:  That's the problem there, though.  I

2     mean, it may be different categories of information are

3     different where they can see something.

4          But, I mean, in the same way that I think you make a

5     fair point that Mr. Kroetsch is not giving me a slam-dunk

6     example of what the risk is here, I also don't really, frankly,

7     see much of a slam-dunk on -- the names of donors, I mean, is

8     there something about this where the reporters are going to

9     have some greater insight with respect to the names of donors

10    in ways that some other person would not be able to, sort of,

11    figure out, yes, we'll call them or we're not going to call

12    them?

13          MR. SIEGEL:  No.  The reporters already know the

14    names of thousands of donors.  So, yes.

15          But, in other words, if we get information from

16    WE Charity about those donors and we want to go back to the

17    reporters and say, hey, how does this fit into -- right? --

18    what you already know about them; that's merely one, and it's

19    impossible to come up with all the hypothetical examples of,

20    you know, circumstances where their knowledge would be

21    relevant.

22          THE COURT:  But the knowledge is integrated in the

23    fact that they are continuing to report on this and investigate

24    this.

25          And then, how do you ask them to put up a wall in

1    their head and say, okay, I'm only going to use it now for this

2    purpose?  Now that I've learned this additional information

3    that I would not have learned but for court-compelled in

4    discovery, I'm going to somehow keep that out of my head and

5    I'm not going to use it when I'm doing my other job over here.

6          MR. SIEGEL:  Sure.  That would be our job.  That

7    would be CBC's job to police, right?  I mean, CBC is --

8          THE COURT:  But how do you do it, though?  I mean,

9    you're saying --

10         MR. SIEGEL:  What's that?

11         THE COURT:  I'm sorry to interrupt.  You say in your

12   papers there are mechanisms to deter violations.  Give me

13   something concrete other than saying it's our job and we'll do

14   it.

15         MR. SIEGEL:  Oh, absolutely.  Let's walk --

16         THE COURT:  Tell me what you'll say to your client

17   and what you'll tell them, what instructions you'll give them,

18   how you'll actually drive home to them that there's a court

19   that is extremely serious about this and if someone violates

20   one of my court orders, they will pay a price for it; how are

21   you going to drive that home to them?

22         MR. SIEGEL:  I will tell them that they cannot

23   violate a court order.  They know that.  There's no propensity

24   for them to have violated court orders.  This is not the first

25   time they've ever been sued for libel.  And they need to

```
 1    organize their journalism in a way that makes sure that doesn't
 2    happen.
 3              THE COURT:  How do you do that?  I'm not sure I could
 4    do that.  I mean, given my example before about the kid in
 5    Des Moines, how do you do that?
 6              MR. SIEGEL:  I don't know.  You're asking for
 7    hypothetical after hypothetical, right?
 8              But there is no -- there is no reason to presume that
 9    anybody is going to do anything to violate.
10              THE COURT:  Intentionally.
11              MR. SIEGEL:  What?
12              THE COURT:  Intentionally.  But my point is --
13              MR. SIEGEL:  Correct.
14              THE COURT:  -- how do you keep something -- I've been
15    sent off by Pepsi -- I've been sent by Pepsi to come up with a
16    new drink that's going to compete with Diet Coke.
17              MR. SIEGEL:  Right.
18              THE COURT:  I've been now told what the recipe for
19    Diet Coke is.  And now I'm going to go in my lab and try and
20    come up with something, but I'm not going to think at all about
21    the fact that I know what the recipe for Diet Coke is.  I'm
22    going to come up with it on my own.
23              How does a human being do that?
24              MR. SIEGEL:  There are a lot of -- they would have to
25    supervise their reporting very carefully and, if necessary,
```

1    segment off certain things.  I mean, there are lots of ways

2    that that can potentially be done if they had to.

3            I'm not saying they won't.  They could, ultimately,

4    decide they're not going to run the story.  I mean, there are a

5    million things that CBC can do -- right? -- to -- to decide

6    that we need to guard against X.  And in order to guard --

7            THE COURT:  But I -- what those things are -- I mean,

8    in your papers, you can simply say there are mechanisms.  You

9    haven't told me what they are other than to say there are

10   millions of things that can be done.

11           MR. SIEGEL:  Let me go through the burden-shifting

12   exercise.

13           THE COURT:  I'm not -- I mean, you're welcome to do

14   that, but I'm not inclined to adopt that version.  I mean, if

15   it's necessary to set up the arguments, that's fine.

16           MR. SIEGEL:  Okay.

17           THE COURT:  For the reasons I gave earlier, I just

18   think it's premature for me to decide those issues.  I don't

19   know how I decide them without knowing the particular

20   circumstances of what's happened.

21           So I'm more focused on whether to adopt the proposal

22   of a highly confidential category than to adopt a

23   burden-shifting because I just think that those are hard

24   questions to start with, and to do them in the abstract is

25   almost impossible.

```
 1              MR. SIEGEL:  Okay.  That's fine.  Well, let's --
 2     let's --
 3              THE COURT:  So you win on that one.
 4              MR. SIEGEL:  What's that?  So we won on that one.
 5     Fair enough.
 6              The whole premise of WE Charity's position is that
 7     this case is somehow unusual, right?  It's not unusual.  There
 8     have been lots of defamation cases involving matters of public
 9     concern that involve reporters that continue to report on them.
10     I mean, William Westmoreland sues CBS over Vietnam.  Vietnam --
11     CBS doesn't pull all those reporters off of reporting on
12     Vietnam.
13              THE COURT:  I can call my former boss and dear friend
14     Pierre Leval and ask him what he did about privilege in that
15     case.
16              MR. SIEGEL:  You can; indeed, you could.  The point
17     is, there are -- there are tons of times when defamation cases
18     involve suits against the media -- right? -- involving some
19     ongoing issue of public concern where -- for all the right,
20     reasons -- right? -- you want your reporters who know the most
21     about something to continue to report on them, et cetera,
22     et cetera.
23              And the idea that, you know, journalists -- news
24     organizations should be in the position of either saying we're
25     going to take that reporter off the story if we want them to
```

1    help in the lawsuit or, you know, if you -- you're going to put

2    them in the position of either getting that reporter who,

3    presumably, you don't like in the first place off the story or

4    bar that reporter from assisting in the defense.

5              THE COURT:  I don't know the answer to this.  For

6    example, I assume that in the Philip Morris/ABC case that the

7    reporters were not getting Philip Morris's internal documents,

8    not subject to a protective order in a way that could allow

9    them to report on it, or that the same people who are reporting

10   on Philip Morris were getting access to the -- I mean, again,

11   this is --

12             MR. SIEGEL:  I don't know what happened, and some of

13   those reporters actually left, I think, not that shortly after.

14   So it probably -- it probably wasn't even an issue.  But --

15             THE COURT:  I'm sorry.  When you say that this is

16   common, that's fair enough.  I guess the question then is, what

17   has happened in all those cases?  Are there not highly

18   confidential designations in those cases?  Has someone gone

19   back and looked at the protective orders in those cases and

20   said -- concluded that they're just vanilla protective orders

21   where anyone in the company can have access, including the

22   reporters, as long as they sign the protective order?

23             MR. SIEGEL:  I don't know.  In my own personal

24   experience, that's typically how it's worked.  That's all I can

25   say.  We certainly would have no objection to the reporter

1  signing the protective order or -- or anything like that.  That

2  would be part of the mechanism of -- of self-policing this.

3           THE COURT:  I'm sorry to interrupt.  My apologies.

4           But the only thing you've given me on self-policing

5  then, again, is -- I'm trying to press on what mechanisms are

6  in place.

7           And the only thing you've said about self-policing is

8  they might, I'm not telling you they would, but they might

9  decide not to report it.  That just doesn't provide me with a

10  lot of assurance to say that's a conceivable possibility.

11          MR. SIEGEL:  But this is the problem, Your Honor.  It

12  can't be that, in order to be a defendant in a libel suit, a

13  news organization has to walk up to a judge and say we're not

14  going to report on something.  No news organization --

15          THE COURT:  Of course they're entitled to report on

16  this.  There's no issue whatsoever about that, and no one says

17  otherwise.

18          MR. SIEGEL:  So no news organization can do that.

19  And even the whole notion of this is problematic, right?  For

20  example, let's say there's some other story that WE Charity --

21  that comes up in the news -- right? -- six months from now,

22  nothing to do with any of this; and the CBC wants to assign

23  journalists to report on that.

24          THE COURT:  Right.

25          MR. SIEGEL:  Now they're going to have to say, well,

1     you know, we can't assign -- we were -- Mr. Cashore doesn't get

2     to see this information.  Some other journalist saw this

3     information, so now we can't assign them either.  This is not

4     the way news works.  I can't tell you that the CBC will or

5     won't report.  I don't know that the CBC could tell you that

6     right now, frankly, standing here, and no news organization

7     can.

8              But all I can tell you is, there is no -- there is

9     nothing, literally nothing, in the record, right?  I mean,

10    there is supposed to be a burden to meet to justify a --

11             THE COURT:  Right.

12             MR. SIEGEL:  -- some sort of restriction on -- on

13    lawyers communicating.  You know, as a practical matter, I

14    understand what you're saying about their employees.  But, of

15    course, the CBC has only been sued in its capacity -- is

16    vicariously liable for the conduct of those employees.  So, I

17    mean, as a practical matter, it's kind of one and the same.

18             It's -- it's prejudicing the client as much as

19    Mr. Cashore being sued personally.

20             THE COURT:  But it's prejudicing the client in the

21    same way that if you came to me and said, here's the expert we

22    want to have testify in this case --

23             MR. SIEGEL:  Right.

24             THE COURT:  -- in this patent case, this is the

25    expert we want to have testify.  He's by far the best.  In fact

1    there's no one even close to as talented as this expert is, and

2    this expert will look at the patent and all the sensitive

3    information relating to the patent -- and, by the way, yes,

4    this person is also in the process of inventing a competing

5    product for another company, and it would be prejudicial to us

6    if we couldn't use this expert.  Therefore, you can't enter a

7    protective order that precludes him from either being our

8    expert or continuing to work on the competing project at the

9    same time.

10           That's just the way it works all the time in

11   litigation.  I do that all the time.  Or I say, I'm sorry, if

12   that's the person you want as your expert, that person can't

13   have access to this particularly sensitive information because

14   that person is continuing to compete against the other party in

15   this case, and you would be doing damage.  Go find somebody

16   else, even if it's not your first choice.

17           MR. SIEGEL:  Sure.  But this isn't about electing to

18   hire an expert once litigation has started.  This is about the

19   people whose work is the subject of the litigation.

20           THE COURT:  Right.  They're entitled to -- everything

21   that relates to their work product, they're entitled to have

22   access to.

23           The question is -- what you're really saying to me is

24   they really are the equivalent of the experts.  We want to

25   prove truth separately.  They're the best people to go to

1    because they're particularly knowledgeable.  They're the

2    Einsteins of the field, and they're the very best.  There's no

3    one out there who we can use who can get up to speed who

4    understands this complicated area as well as they do.  That

5    seems analogous to an expert to me.

6             MR. SIEGEL:  Well, I disagree with that, Your Honor,

7    because everybody who is sued, in a sense, for something

8    they've done could be put in that position.  But I don't think

9    the law --

10            THE COURT:  But usually you're dealing with historic

11   fact --

12            MR. SIEGEL:  Right.

13            THE COURT:  -- and what that person did or didn't do

14   and the access to it.  Here, to the extent that the truth

15   defense is separate, they're learning new things that they

16   never knew before, where -- you know, if you had somebody who

17   was smart enough, I don't think there's any doubt -- if someone

18   had enough time and was smart enough, there's no doubt that

19   they could replicate it entirely, right?

20            The point is, is not that these individuals are

21   unique in that regard, it's just that they happen to be a

22   reservoir of a lot of information.

23            MR. SIEGEL:  Yes.  I think that's right.  I mean, I

24   would say uniquely so because they can see if there is

25   information they didn't know before; you know, how it relates

1    to what they already do know.

2              I want to go back a second to the harm.  I mean,

3    Mr. Kroetsch, essentially, came up here and said, what's the

4    harm?  The harm is that Harvey Cashore will call up donors and

5    threaten them.

6              THE COURT:  Right.

7              MR. SIEGEL:  There is zero evidence of that.  And I

8    want to show you something, Your Honor, while -- if I can --

9              (Counsel tenders document to the Court.)

10             MR. SIEGEL:  If we're talking about --

11             THE COURT:  Do you need a moment to read this?  Have

12   you seen this before?

13             MR. KROETSCH:  I've read it.  I wrote it.

14             MR. SIEGEL:  He's read it.  He wrote it.

15             THE COURT:  All right.  Go ahead.  Do you want me to

16   take a minute to read it?

17             MR. SIEGEL:  Sure.  Maybe take a minute to read it.

18             THE COURT:  Okay.  I've read it.  Thanks.

19             MR. SIEGEL:  This is an email Mr. -- this is,

20   obviously, not confidential.  Mr. Kroetsch sends him an email.

21   There's nothing wrong, in general, with communicating with

22   witnesses; obviously, we all are.

23             I do think there's a problem with sending a witness

24   an email saying the judge rejected CBC's initial challenge to

25   the case, which obviously implies that the judge has already

1    found there's some merit to their position and, therefore,

2    something that the witnesses said may be problematic.

3           I also think there's a problem with saying that it's

4    the CBC's fault by placing you in front of a -- we're going to

5    subpoena you -- and they already have subpoenaed him now.  But

6    it's the CBC's fault because they've placed you in front of a

7    false and defamatory broadcast that -- that you're being

8    dragged into this, not that we sued, not that -- or we are

9    going to decide to affirmatively subpoena you.

10          And please let me know how we can best coordinate to

11   accommodate your schedule and minimize the burden of providing

12   evidence in this case; which I think to a lot of people would

13   sound like, oh, well, my burden might have something to do with

14   what I planned to say and what I tell them I planned to say.

15          This, Your Honor, is communicating with witnesses in

16   a way that is potentially intimidating.  There is zero

17   evidence, zero, that CBC ever has or has ever contemplated

18   doing anything like this.

19          And the reason I bring this up is because I do

20   question the premise of this entire exercise.  Okay?  Whether

21   it's really a bona fide concern or not.

22          For example -- right? -- they are reserving the right

23   to show these witnesses highly confidential documents in their

24   depositions which they wouldn't have seen before, right?  So

25   it's okay to spring those documents on them in their

```
 1    depositions, these super highly sensitive documents, right?

 2    It's just not okay that they can see them -- if they're really

 3    so hypersensitive that you're worried about what would happen

 4    if they get access to them, why would you reserve the right to

 5    show them those documents in depositions?

 6             And I think there's a larger history here.  And this

 7    goes to --

 8             THE COURT:  I'm sorry.  Just to interrupt for a

 9    second.

10             MR. SIEGEL:  Yes.

11             THE COURT:  I don't know yet where I come down on

12    this issue more generally.

13             But if there are witnesses who are employees of

14    either side and they're not shown documents in advance of a

15    deposition because of a protective order that precludes showing

16    it to them, under those circumstances, if you're counsel and

17    you're planning on asking a witness about those documents at

18    the deposition, I actually think that, as a matter of common

19    courtesy, that you should inform the opposing counsel and say,

20    I know you haven't had a chance to show this to your client

21    because it's designated as confidential; I do intend to use

22    these at deposition.  I'm, therefore, lifting the highly

23    confidential designation, and I'm giving you enough notice here

24    so that if you want the time to be able to show these to your

25    client in advance of the deposition, you can do so.  I think
```

1     that's fair.

2               MR. SIEGEL:  That's fine.  That's fine.  But -- and

3     I'll be quite candid with you, Your Honor.

4               Our concern is this -- this whole exercise --

5     right? -- is -- frankly, presents the opposite policy issue.

6     It's not some kind of prejudice to WE Charity.  It's about

7     fashioning a protective order, and I understand the

8     burden-shifting issue goes more to this than the other one, so

9     that's fair.

10              To ensure that WE Charity doesn't use the production

11    of confidential info under a protective order as a pretext to

12    sort of find some collateral reason to try to sanction WE

13    Charity -- I mean, CBC.

14              THE COURT:  I understand.

15              MR. SIEGEL:  There's good reason in the history of

16    this case to be concerned about that.

17              You know, from the outset-- from the very outset --

18    within a month of their filing their complaint, CBC has been

19    trying to come up with collateral reasons -- and by collateral,

20    I mean collateral to the merits -- to, sort of, punish CBC's --

21    any ongoing reporting it's done and to unmask its confidential

22    sources, right?  They did that.

23              They started within a month or so with the complaint,

24    and it really accelerated about nine months ago when they

25    started writing letters saying, oh, Harvey Cashore is out

1     trying to find out information to help you in your forum non

2     conveniens motion.  Well, that -- I don't know if Your Honor

3     read any of that, but we kept submitting that.

4          You know, quite frankly, Your Honor, that was

5     completely bogus.  We were talking about garden-variety

6     journalistic activities by Mr. Cashore that wasn't about

7     conducting discovery for a forum non conveniens motion.  There

8     wasn't a single question they ever pointed to, they ever asked

9     anyone that had anything to do with venue or forum non

10    conveniens.  Frankly, I don't even think Mr. Cashore would know

11    how to ask such a question.

12         But the purpose of this was unmistakable, right?  It

13    was to find a pretext to say that, you know, WE Charity also

14    reserves the right to assert that CBC has waived any

15    journalistic privileges, including reporter shield laws.  They

16    then filed something accusing me of saying, oh, I've made false

17    representations to the Court about, you know, what Mr. Cashore

18    was up to.

19         Turns out, not only were those representations not

20    false, their whole argument was premised on withholding a whole

21    bunch of correspondence that Mr. Cashore had no knowledge of.

22    But they did, because it was their correspondence with this

23    North Carolina regulator that, independent of Mr. Cashore's

24    questions, thought, well, you know what, maybe his questions --

25    maybe -- you know, maybe they mean something; we ought to look

1     into it.  So they looked into it totally independent of him

2     and, frankly, I don't think the record looked so good for WE

3     Charity on that one.

4          You know, what really concerned us about this

5     burden-shifting issue was that it's a pretext.  It's a pretext

6     to find a reason to hold us in contempt.  If you think about

7     it, Your Honor, how is this going to come up?

8          I mean, candidly, even if you were assuming that

9     Harvey Cashore is Darth Vader -- which is what they seem to

10    want to presume -- if the CBC is Darth Vader, how likely is it

11    that the CBC is going to go on international television with a

12    watermarked document, confidential info?  That's not what we're

13    dealing with here.

14         If they did do that, I don't think there would be any

15    issue at all because there would probably be pretty prima facie

16    evidence of a violation.  And the burden that would shift at

17    that point would be to substantial good faith compliance --

18    right? -- which is not about whether an order has been violated

19    in the first place.  It's whether, okay, you violated an order;

20    but, you know, is there some justification you have for doing

21    so?

22              THE COURT:  Right.

23              MR. SIEGEL:  The far more likely scenario, Your

24    Honor, far more likely -- and I think Mr. Kroetsch already kind

25    of alluded to it -- is they will say -- taking a step back,

1   there is so much information out there about WE Charity, so

2   much information that the CBC already has, and I guarantee

3   what's going to happen is they will produce information,

4   whether they mark it confidential or highly confidential, that

5   CBC already has.  And they will then be able to claim -- and

6   they've already said, most of what we've produced is going to

7   be highly confidential, right?

8          And then they will claim, almost anything that CBC

9   could possibly publish about WE Charity, you're going to be

10  able to make an argument, well, it's the fruits of the

11  poisonous tree, right?  It's somehow derived from some

12  confidential -- and that's -- that's what we think is really

13  going on here.

14         And, frankly, Your Honor -- and I do agree with one

15  thing you said earlier.  If that were to happen -- and I don't

16  think the issue of confidential sources would necessarily or

17  even likely arise, right?  First of all, there might be some

18  question on the face of it if there's no real corresponding

19  information, was there a violation.

20         We might be able to show, you know, the information

21  without the source, right?  We might be able to even show an

22  email without identifying -- I mean, there are a million ways

23  that this could come down that, sort of, comes short of that.

24         THE COURT:  So what I want to do is avoid that

25  scenario.  The last thing I want to be doing is be holding a

1    contempt proceeding in this case.  And so the question is how

2    we avoid that.

3              I've asked the plaintiff -- and maybe I need more

4    help from the plaintiff on this -- what are your real concerns?

5    I mean, give me what you're really concerned about.  To the

6    extent you're saying, virtually everything we're turning over

7    in discovery or the vast majority of discovery, you know,

8    doesn't help me a lot.

9              But by the same token, though, when I say to you,

10   tell me what -- you say there are mechanisms to keep this from

11   happening.  Give me something more concrete.  I mean, quite

12   frankly, I think if I were in -- let me finish, and then I'll

13   let you talk,

14             MR. SIEGEL:  Sure.

15             THE COURT:  If I were in your shoes, I might think to

16   myself, I don't want to put my reporters in that position in

17   which they're having to make these incredibly difficult

18   decisions.

19             What I'd really like to be able to do is I'd love to

20   wait for Mr. Kroetsch to come in and say, contempt, Judge,

21   contempt, and then you stand up and say, Judge, I never even

22   gave him those documents.

23             MR. SIEGEL:  Well, I was --

24             THE COURT:  I kept them to myself.  I only asked him

25   about the documents I absolutely had to ask him about.  And

1    there are ten documents I asked him about, and none of them

2    come close to that, Judge.  That proves what these guys are up

3    to.

4             MR. SIEGEL:  No.  That's absolutely right.  As you

5    were starting to say -- I was going to say, mechanism number

6    one is, you know, we won't show them all -- frankly, we won't

7    show them all the documents in discovery or anything even close

8    to it.  I mean, they'd be spending as much time as we're going

9    to be spending, you know, holed up on our laptops.

10            There are -- we will act as gatekeepers.  Frankly, we

11   could make judgments about, you know what, I'd like to show

12   them this, but maybe it's just -- this one could get a little

13   too messy.  Right?  So we can act as gatekeepers to do that.

14            THE COURT:  I mean, if you also know what they

15   already have --

16            MR. SIEGEL:  Right.

17            THE COURT:  -- then maybe you don't want to show them

18   anything they already have to avoid that risk that they're

19   going to publish it, and then you're not going to be able to

20   come in and say, Judge, I never showed it to them.

21            MR. SIEGEL:  Sure.  But I also -- I mean, there

22   are -- put it this way, Your Honor; I, obviously,

23   can't violate -- I can't disclose attorney-client privileged

24   information.  I can't do anything.  I can also say that

25   anything that the CBC might ever consider publishing about WE

1    Charity will undoubtedly be scrutinized -- right? -- to -- so

2    between, you know, acting as gatekeepers to see what

3    information people have access to in the first place, to some

4    extent being in a position to advise about what news gathering

5    is or isn't being conducted, what is or won't be published,

6    this is part of what we understand are our responsibilities.

7           CBC is taking upon itself -- right? -- the -- we're

8    not the *Seattle Times* -- right? -- who went to the Supreme

9    Court and said --

10          THE COURT:  I know.

11          MR. SIEGEL:  -- hey, that's a prior restraint.  You

12   know, it's fair game.

13          THE COURT:  That one's decided.

14          MR. SIEGEL:  Yeah, that didn't work out so well.  We

15   are taking it upon ourselves to police ourselves.  That,

16   obviously, includes us; that includes our clients; that

17   includes everybody.

18          I will say also that we have -- and we pointed this

19   out in our papers, and the protective order provides for it.  I

20   mean, we're not being, you know, abstractly obstinate about

21   this.

22          We said, you know what, if you want to come to us and

23   say, look, you know, there's some corpus of information, you

24   know, take a look at it before you show your clients anything,

25   would you agree that -- that, you know, you're not going to

1   show your clients this.  We absolutely will have that

2   conversation.

3           And, frankly, if we don't think so, that there's any

4   real need to do it, we might say yes, or we might say, okay, we

5   won't show them this; can we just summarize.  I mean, there are

6   lots of ways we can do that.

7           I mean, we're not here being, sort of, you know,

8   rigidly obstinate to any possibility that something could arise

9   in this case, and we're willing to talk about it.  And they can

10  go to court, too, in the future.  We will, absolutely, if they

11  want to go to court over something we're not going to show our

12  clients while it's the subject of any litigation.

13          THE COURT:  Just to be -- I just want to be clear on

14  the record here.

15          I don't think anyone is talking about precluding you

16  from showing anything to your client.  You've got, presumably,

17  a general counsel for your client.  You've got corporate

18  leadership in your client.  There are lots of people where

19  there's not any question at all.  I think it's only --

20          MR. SIEGEL:  Yes, that's what I mean.  Yes.  So we

21  might discuss it with the general counsel, but we're not going

22  to show it to any journalist, and we're perfectly fine with --

23  it may be -- I mean, it's difficult because we're talking --

24  we're having this discussion in the abstract and, part of what

25  our objection to is, sort of, having this broad discussion in

1    the abstract premised upon all -- assuming all kinds of awful

2    things that CBC will do.

3         I don't really think there's a basis for that.  If

4    anything, I have concern about, you know, what --

5         THE COURT:  I'm much more concerned about the

6    inability to segregate things than I am concerned about people

7    engaged in an intentional violation of a court order.  I'm much

8    more concerned about the circumstance in which once you learn

9    something, it's very hard to know whether it's influencing your

10   decisions that come after that and what you pursue.

11        MR. SIEGEL:  I totally understand that.  What I can

12   say to that is that is a risk that we understand and that we

13   are, obviously, taking upon ourselves to avoid.  And there are

14   good faith ways that we can do our best to avoid that.

15        And I think, at the end of the day, what,

16   respectfully, we think has to be asked here is, given all that,

17   is there really a substantial risk of serious harm here?  I

18   just don't think that's been shown.

19        And a risk that can't be avoided by, you know, other

20   ways -- like, if there is a particular evidence that they're

21   worried about, you know, that kind of thing.  I mean, I assume,

22   for example, that we're going to ask for -- they're going to

23   ask -- we are about to ask for all kinds of accounting

24   information, and we're going to have to meet and confer.  We've

25   already talked about that, about what's the best way to do that

1    for experts.

2            I guarantee you, we're not going to be showing our

3    journalists every journal entry in their books of the United

4    States, Kenya, et cetera.

5            THE COURT:  Right.  I take it, though, that discovery

6    here -- at least there's a question as to the extent to which

7    it's entirely reciprocal because of the newsroom privilege.

8            And so, for example, if Mr. Kroetsch wants to know --

9    wants a copy of every document that your client has so that he

10   can know for himself whether, in fact, they already have

11   something and there's not an issue, that he's not going to get

12   an answer to that; you're going to decline to produce that?

13           MR. SIEGEL:  I just want to make sure what I

14   understand you mean by newsroom privilege.

15           THE COURT:  I haven't gone back to look at the cases

16   in recent times.  Is it Getz (phonetic) that I'm thinking of?

17   You know, is there -- my recollection -- it's been a long, long

18   time since I've looked at it -- that there's a privilege that

19   limits discovery of the newsroom because of the burden on the

20   First Amendment.

21           MR. SIEGEL:  I just want to make -- separate and

22   apart from the source privilege?

23           THE COURT:  Correct.  That's what I'm talking about.

24           MR. SIEGEL:  So we are not -- I mean, yes, there is a

25   newsroom privilege; I mean, without fighting over it or

1    anything like that.

2         I mean, we agree that for purposes of their claims in

3    this case that the newsroom privilege is a qualified privilege,

4    and it's already been overcome.  I mean, essentially, that's

5    the position that most news organizations would take in any

6    defamation case.  You're sued over that.

7         So we are not invoking a newsroom privilege with

8    respect to any of the reporting that's been done here.

9         THE COURT:  So will they then have everything --

10   every document that your client has pertaining to WE Charity so

11   that if -- if they get that, and then they turn over something

12   else that shows up on the news, they're going to say, well,

13   this wasn't in your production, and, therefore, we know it must

14   have come from what we produced to you because it wasn't in

15   your production to us.

16        MR. SIEGEL:  They'll have every document other than

17   those documents which would tend to reveal confidential

18   sources.  And with respect to those, they will likely get

19   redacted versions of some of those documents.  So, yes.

20        THE COURT:  Okay.  Presumably, to the extent that

21   we're talking about documents that WE Charity might be turning

22   over to you in discovery, they're not going to be the ones that

23   are going to reveal the identity of a confidential source, I

24   wouldn't think at least?

25        MS. STROM:  The metadata might, Your Honor.

 1              MR. SIEGEL:  I mean, there are tricky issues with

 2      that, like metadata.  And this isn't a secret.  You watch --

 3      obviously, there were on the program.  I mean, it was

 4      reported -- right? -- that the CBC obtained some leaked

 5      internal documents.  So there might be some variations.

 6              THE COURT:  Okay.  I'm looking for mechanisms to try

 7      and police this.

 8              Anything else then?

 9              MR. SIEGEL:  I don't think so.  Just a couple of

10      small things with the -- with respect to the scope of

11      discovery.  I don't think that really matters here in terms of

12      where we're going --

13              THE COURT:  Okay.

14              MR. SIEGEL:  -- but just to make clear what we think

15      this is.

16              In general, we think that the -- the basic reporting

17      here -- right? -- which is about schools funded versus schools

18      built and relates to what WE Charity ultimately reported in, I

19      think, 2021 to Parliament; later what WE Charity says what it

20      told CBC a little bit later in 2021.

21              So their school building campaign in Kenya began in

22      2004 and ended sometime roughly in 2021.  So I think that's

23      roughly the -- I think even in our document requests we define

24      that, basically, as the -- as the time period that we're asking

25      about up to January -- or I think it's actually up to -- we put

1     it up to the date the suit was filed.

2          And we say that that's the time period we're asking

3     about, unless we specify some other time period.  There's some

4     requests we made that are narrower time periods and that kind

5     of thing.  But that is the -- I think the relevant time period

6     of the case because that's when the development programs, the

7     school building programs that were at issue, took place.

8          There are probably small things that might relate to

9     earlier.  I think Free the Children actually started in 1995;

10    is that right?  '95, '96.  There might be little things that

11    relate to what happened earlier.  But, fundamentally, I think

12    that's what we're talking about.

13          THE COURT:  Okay.  I want to just give Mr. Kroetsch

14    one final opportunity here.

15          MR. KROETSCH:  Thank you, Your Honor.  I guess I'll

16    just go through a few things I jotted down as Mr. Siegel was

17    talking.

18          One, he referred multiple times to there being many

19    cases where this comes up.  I think our point of view is that

20    that's not clear; that this is a perennial problem for every

21    lawsuit or even every media defamation lawsuit.  Most media

22    defamation lawsuits never proceed to discovery.

23          Most media defamation lawsuits that proceed to

24    discovery, in most of those cases, my understanding is it's

25    actually quite rare for the reporters responsible for the

1    allegedly defamatory reporting that got past a motion to

2    dismiss or no motion to dismiss was filed to continue reporting

3    on exactly the same thing that's at issue in the case.  That's

4    a fairly unusual circumstance.

5            I heard *CBS v. Westmoreland*.  Maybe you've looked

6    that up since we last spoke about it; last time Mr. Siegel and

7    I talked about that case.  I don't think either of us were

8    clear, actually, what did happen with CBS's reporters.

9            THE COURT:  No.  I actually was not kidding about it.

10   I'd be happy to call Pierre Leval and ask him if he remembers.

11   His memory may be as dim as everyone else's here.  That's been

12   probably almost 40 years ago that took place.  If he has a

13   recollection of it, I'm happy to ask him what happened.

14           MR. KROETSCH:  I'm a little curious.  But I just

15   don't think that -- look, I don't doubt that if we were to find

16   every single case ever that fits this narrow set of criteria,

17   there's some case where somebody kept reporting.  But I think

18   it is unusual, and we are not proposing that we create some

19   catastrophic rule of general applicability that will imperil

20   the free press.

21           This is a very unusual set of circumstances with

22   Mr. Cashore and a few of his colleagues still reporting.  Your

23   Honor rightly pointed out that what we're talking about is not

24   prohibiting.  Especially if we're talking about a highly

25   confidential category, we're not talking about prohibiting CBC

1    from doing anything.  But we're also not talking about

2    prohibiting CBC's reporters from speaking with their attorneys.

3           We're talking about three or four reporters.  We

4    might even be willing to compromise on one:  Mr. Cashore.

5    Because he so far seems to have posed the most issues to us.

6    But it's not -- I mean, the scope that we are asking for

7    here -- right? -- in a highly confidential category is very

8    surgical.  It is just a handful of people.

9           When you were asking Mr. Siegel what might he do --

10   right? -- what concrete solutions might exist -- because we

11   completely agree that it is functionally impossible, once you

12   have information in your head, to segregate it, especially when

13   it comes to an investigative ideas-oriented process.

14          One proposal he had was segment off things from the

15   reporters.  Well, that's what we're talking about, right?

16   We're talking about segmenting off certain categories of

17   documents.  This is one where, I guess, our position might be

18   what CBC keeps saying, which is let's see which documents we're

19   producing and which documents we think we need to mark as

20   highly confidential.

21          We are not planning on marking every document highly

22   confidential, but I think, to some extent, given that we never

23   received -- we didn't receive document requests in this case

24   until Thursday evening, we don't know what we're going to be

25   producing quite yet.  We have some sense.

1      So it's foreseeable that there are certain donor

2   documents that we discussed earlier, that there is certain

3   financial information that's hard to imagine won't get produced

4   here.  But let's see how much we actually think needs to be put

5   in this category.

6      But even if we're talking about reporters at CBC who

7   have reported on WE Charity -- we identified seven them in our

8   papers.  Just going on CBC's website and looking at reporting

9   in the last few years on WE Charity, Mr. Cashore is not the

10   only reporter at CBC who knows about WE Charity.  Especially if

11   we hypothesize some story about WE Charity that's not related

12   to building schools in Kenya, why would they need to use

13   Mr. Cashore?

14      So a few other points.  In terms of the deposition,

15   what happens in a deposition with highly confidential

16   documents, I agree; we show it to the other side.  I don't

17   think that's a scenario that's, like, fully contemplated in the

18   protective order.  Maybe it could be further clarified.

19      But I can't imagine a scenario where we would be

20   asking a witness about a document that they could never have

21   seen, that their lawyer could not have shown to them.  It

22   wouldn't make much sense.  Why would we be asking them about

23   these documents?  Part of the reason we kept them segregated

24   was  there's no reason they need to know.

25      And then, finally, there were a number of personal

1    attacks on me, which I'm happy to address if you'd like, but I

2    also don't want to waste the Court's time

3                THE COURT:  I don't think you need to.

4                MR. KROETSCH:  Okay.  Terrific.  Thank you.

5                THE COURT:  All right.  So this is what I'm going to

6    do for present purposes.

7                First of all, I'm going to request that you submit to

8    me a revised version of the nondisclosure agreement, which

9    includes language indicating not only that it will not be

10   disclosed, but that the information will not be used for any

11   other purpose other than this litigation.  Add language that

12   says that.

13               The -- WE Charity can watermark any documents that

14   they produce in discovery, and I think that probably would be a

15   wise thing to do under these circumstances.

16               I very much hope that counsel will act as a

17   gatekeeper, and he'll understand the risk that everyone is

18   involved.  I really don't want to be having a contempt

19   proceeding here.  But I will say that if I do find somebody in

20   contempt, the consequences will be serious.

21               I don't know what they will be until, obviously, I

22   hear and know what happened there.  But I would not take that

23   in the slightest bit lightly.  I think it's important that

24   everyone understand that.  It could have consequences both for

25   the individual, as well as the client, in those circumstances.

1     And I hope the people approach this with that in mind.  I

2     expect everyone to comply with my orders.

3          In addition, I'm not persuaded at this point,

4     Mr. Kroetsch, that you carried your burden of demonstrating to

5     me the type of specified need not to disclose information to

6     the reporters here, in part, because it's just -- it's too in

7     gross at this point.

8          As I said, I think there's a footnote in your filing

9     in which you're candid with the Court, where you say, as

10    candor, this is going to be a very large amount of material

11    that we anticipate designating in this fashion.

12         I would encourage you, as you now have the document

13    requests and you start putting together discovery, if there are

14    particular documents that cause you particular concern and you

15    want to have a proceeding in front of me to talk about those

16    particular documents or particular categories where you can

17    actually show it to me and explain it to me in detail and

18    perhaps more with declarations which make an evidentiary

19    showing with respect to the particular risk that is involved

20    with the disclosure, I would certainly contemplate under those

21    circumstances or I would be open under those circumstances to

22    considering modifying the protective order to provide some

23    greater protection.

24         But I think, as things now stand, we just anticipate

25    that a lot of information relating to donors and to finances

1    that could be protected where there would be risk, I think that

2    that concern is not sufficiently specific and supported.

3          But as you're engaging in the discovery and you want

4    to create -- put on your desk or on your associate's desk a

5    stack of papers or documents that cause you particular concern

6    and you want to come in here and sit down with me and

7    Mr. Siegel and look at those and talk about them as particular

8    categories where I can look at them and understand with

9    specificity what the concerns are, I am open to that.  Okay?

10         And then I will -- as soon as I get the revised

11   nondisclosure form, I will go ahead and execute the proposed

12   protective order so you can all get started at least with the

13   discovery process, but with the understanding that you may need

14   to come back to me with a subgroup of documents if you can

15   explain to me in greater detail what the exact concern is with

16   the documents.

17         It may be that you come back with those documents,

18   and Mr. Siegel can say, we have those, not an issue, or maybe

19   he'll agree with you that he doesn't need to show those to his

20   client -- or not his client -- to the particular reporters

21   under those circumstances.

22         And then, finally, I suppose, what I would encourage

23   you to do is, short of coming back to me with that, is to have

24   the type of conversation that Mr. Siegel invited where,

25   hopefully, you can work it out amongst yourselves even with

1     needing to come back to me.

2              I do appreciate that there are real concerns,

3     frankly, on both sides of this equation, and I hope we can

4     strike the right balance.

5              MR. SIEGEL:  Your Honor, could I be heard on one --

6              THE COURT:  Yes.

7              MR. SIEGEL:  I want to clarify, I think is a better

8     word.  I may have said something that could have created the

9     wrong impression.  You asked me about the privilege, the

10    newsroom privilege.

11             Just to be clear what we're doing, we've made this

12    clear, anything that has to do with any of the stories that

13    they are challenging in this complaint --

14             THE COURT:  Right.

15             MR. SIEGEL:  -- we're not -- we're not shielding

16    that.  There is, of course -- I mean, there was a whole

17    political scandal in Canada over the summer.

18             THE COURT:  Right.

19             MR. SIEGEL:  We're not -- frankly, I don't think

20    they're asking for it.

21             THE COURT:  Okay.

22             MR. SIEGEL:  The only thing I'm saying is I think you

23    said something like every document at WE Charity.  Literally,

24    that would not be true.  Because there's a whole bunch of

25    reporting that has nothing to do, really, with this --

1          THE COURT:  I appreciate that clarification.  Thank

2     you.

3          MR. SIEGEL:  Thanks.

4          THE COURT:  Yes, Mr. Kroetsch?

5          MR. KROETSCH:  One point that I guess I also want to

6     clarify.  I'm thinking about a category of documents that I

7     don't know that we could have foreseen would be sensitive but

8     then was taken out of context.

9          The specific documents, the leaked documents that

10    appear in the November 2021 documentary, are several Excel

11    spreadsheets.  I don't know that looking at them somebody would

12    have said, wow, these are really confidential documents,

13    because I don't think anybody would have said they're going to

14    be half-quoted out of context and misrepresented.

15         THE COURT:  Right.

16         MR. KROETSCH:  And so those are the kinds of

17    problems where I --

18         THE COURT:  It does strike me that you have another

19    remedy as to that.  I don't think anyone wants to see you

20    necessarily amending your complaint, but if they are

21    misrepresenting documents, you do have remedies.

22         MR. KROETSCH:  I guess we could do that.

23         THE COURT:  I mean, I'm not inviting it.  It does

24    strike me, if the concern is not so much that this is sensitive

25    information they shouldn't know, but they're going to distort

1    things, they can distort anything if they want to, or someone

2    can distort anything if they want to, if that's what their goal

3    is.

4            I think that probably just becomes a category which

5    is too broad for present purposes because it could include,

6    essentially, almost any document that's produced in discovery.

7    Someone could take words out of context in ways that create the

8    false impression.

9            MR. KROETSCH:  Understood.

10           THE COURT:  All right.  Thank you.  Well, thank you

11   all.  This was helpful to me, and I suspect we still have some

12   more work to do on this, but I think we made progress.

13           (The hearing adjourned at 3:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7                   Dated this 2nd day of November, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'15** [1] - 21:24
**'16** [1] - 21:24
**'18** [1] - 23:12
**'90s** [1] - 20:4
**'95** [1] - 54:10
**'96** [1] - 54:10

**/**

**/s** [1] - 64:9

**1**

**1** [1] - 17:24
**10020** [1] - 1:21
**10504** [1] - 1:13
**11th** [1] - 1:15
**1251** [1] - 1:21
**1301** [1] - 1:18
**1401** [1] - 1:15
**1995** [1] - 54:9
**1:22-CV-340** [1] - 1:3

**2**

**2** [1] - 20:8
**20** [3] - 11:2, 20:8, 22:7
**20-something** [1] - 20:1
**20001** [2] - 1:24, 64:11
**20005** [2] - 1:16, 1:19
**2004** [2] - 22:1, 53:22
**2006** [4] - 21:19, 21:21, 23:13
**2014** [1] - 21:24
**2016** [5] - 21:19, 23:10, 23:13, 23:14, 23:17
**2017** [1] - 23:12
**2018** [2] - 12:19, 12:23
**202-354-3246** [1] - 1:25
**2021** [6] - 20:12, 21:12, 53:19, 53:20, 53:22, 62:10
**2022** [2] - 20:12, 21:4
**2023** [2] - 1:6, 64:7
**21st** [1] - 1:21
**22-340** [1] - 2:2
**2:05** [1] - 1:6
**2nd** [1] - 64:7

**3**

**30** [1] - 1:6
**333** [3] - 1:12, 1:24, 64:11

**3:30** [1] - 63:13

**4**

**40** [1] - 55:12

**5**

**50** [1] - 12:5
**500** [2] - 1:18, 26:15
**53,000** [2] - 8:22, 11:7

**6**

**6** [1] - 20:8
**6714** [2] - 1:23, 64:10

**7**

**7** [1] - 21:22

**A**

**ability** [3] - 16:5, 28:4, 64:6
**able** [14] - 3:13, 6:5, 23:20, 25:14, 25:16, 25:20, 29:10, 41:24, 45:5, 45:10, 45:20, 45:21, 46:19, 47:19
**absolutely** [5] - 30:15, 46:25, 47:4, 49:1, 49:10
**abstract** [5] - 5:20, 18:18, 32:24, 49:24, 50:1
**abstractly** [1] - 48:20
**accelerated** [1] - 42:24
**access** [15] - 5:24, 7:18, 15:15, 21:6, 24:1, 24:2, 27:4, 28:1, 34:10, 34:21, 37:13, 37:22, 38:14, 41:4, 48:3
**accommodate** [1] - 40:11
**accounting** [1] - 50:23
**accurate** [1] - 64:4
**accused** [1] - 16:19
**accusing** [1] - 43:16
**act** [3] - 47:10, 47:13, 58:16
**acted** [1] - 22:23
**acting** [1] - 48:2
**Action** [1] - 1:2
**activities** [1] - 43:6
**add** [1] - 58:11
**addition** [2] - 4:25, 59:3

**additional** [1] - 30:2
**address** [5] - 7:8, 13:25, 21:3, 26:2, 58:1
**adjourned** [1] - 63:13
**admit** [1] - 4:10
**adopt** [3] - 32:14, 32:21, 32:22
**advance** [2] - 41:14, 41:25
**adverse** [2] - 18:12, 19:17
**advise** [1] - 48:4
**affirmatively** [1] - 40:9
**afternoon** [4] - 2:6, 2:8, 2:9, 2:12
**ago** [7] - 10:13, 10:20, 20:8, 20:9, 42:24, 55:12
**agree** [10] - 2:17, 12:4, 20:15, 13:16, 45:14, 48:25, 52:2, 56:11, 57:16, 60:19
**agreed** [1] - 2:16
**agreement** [1] - 58:8
**ahead** [3] - 17:3, 39:15, 60:11
**allegations** [2] - 10:18, 13:6
**allege** [1] - 13:8
**alleged** [3] - 18:14, 21:12, 22:23
**allegedly** [2] - 28:1, 55:1
**allow** [2] - 21:4, 34:8
**allowance** [1] - 26:9
**alluded** [1] - 44:25
**almost** [5] - 20:1, 32:25, 45:8, 55:12, 63:6
**alternative** [2] - 3:21, 4:4
**alternatives** [1] - 3:20
**amending** [1] - 62:20
**Amendment** [1] - 51:20
**Americas** [1] - 1:21
**ammo** [1] - 13:9
**amount** [1] - 59:10
**AMY** [1] - 1:14
**Amy** [1] - 2:7
**analogous** [1] - 38:5
**angry** [1] - 26:10
**annual** [1] - 12:22
**answer** [7] - 11:24, 17:13, 18:17, 18:20, 18:23, 34:5, 51:12
**anticipate** [2] - 4:19, 59:11, 59:24
**anticipates** [1] - 6:11

**apart** [1] - 51:22
**apologies** [1] - 35:3
**apologize** [1] - 16:25
**appear** [1] - 62:10
**applicability** [1] - 55:19
**applies** [2] - 18:25, 19:12
**apply** [3] - 3:23, 7:16, 17:14
**applying** [1] - 5:23
**appreciate** [2] - 61:2, 62:1
**approach** [2] - 2:4, 59:1
**appropriate** [3] - 7:11, 7:15, 7:16
**area** [2] - 8:3, 38:4
**argument** [3] - 19:9, 43:20, 45:10
**arguments** [4] - 5:12, 10:19, 32:15
**arise** [4] - 5:22, 9:5, 45:17, 49:8
**arising** [1] - 6:12
**Armonk** [1] - 1:13
**aspect** [2] - 7:25, 8:1
**assert** [3] - 3:6, 18:1, 43:14
**assess** [1] - 18:6
**assign** [3] - 35:22, 36:1, 36:3
**assisting** [1] - 34:4
**associate's** [1] - 60:4
**assume** [3] - 19:20, 34:6, 50:21
**assuming** [2] - 44:8, 50:1
**assurance** [1] - 35:10
**attacks** [1] - 58:1
**attesting** [1] - 15:21
**attorney** [1] - 47:23
**attorney-client** [1] - 47:23
**attorneys** [1] - 56:2
**audited** [1] - 12:10
**available** [3] - 12:1, 12:11, 15:16
**Avenue** [4] - 1:15, 1:21, 1:24, 64:11
**avoid** [5] - 45:24, 46:2, 47:18, 50:13, 50:14
**avoided** [1] - 50:19
**aware** [1] - 15:5
**awful** [1] - 50:1

**B**

**backing** [1] - 13:11
**bad** [1] - 23:6

**balance** [2] - 24:10, 61:4
**bar** [2] - 19:2, 34:4
**based** [4] - 5:21, 6:5, 7:17, 10:19
**bases** [1] - 5:8
**basic** [1] - 53:16
**basis** [2] - 25:5, 50:3
**become** [1] - 8:5
**becomes** [1] - 63:4
**BEFORE** [1] - 1:8
**began** [1] - 53:21
**begs** [1] - 17:7
**benefit** [3] - 3:12, 4:11, 7:2
**best** [8] - 10:3, 36:25, 37:25, 38:2, 40:10, 50:14, 50:25, 64:6
**better** [1] - 61:7
**between** [4] - 20:11, 20:23, 22:15, 48:2
**bit** [5] - 6:10, 7:2, 16:5, 53:20, 58:23
**blame** [1] - 11:4
**blatant** [1] - 14:4
**bogus** [1] - 43:5
**Boies** [2] - 1:12, 1:14
**bona** [1] - 40:21
**boogeyman** [1] - 15:3
**books** [1] - 51:3
**boss** [1] - 33:13
**bottom** [1] - 5:17
**breach** [1] - 3:2
**breaking** [1] - 10:8
**briefing** [1] - 17:23
**brilliance** [1] - 27:21
**bring** [1] - 40:19
**broad** [4] - 22:2, 22:4, 49:25, 63:5
**broadcast** [3] - 13:24, 40:7
**Broadcasting** [9] - 2:3, 2:19, 3:5, 3:11, 3:16, 3:24, 4:1, 4:2, 4:23
**BROADCASTING** [1] - 1:5
**broader** [2] - 23:2, 23:7
**build** [2] - 26:1, 26:9
**building** [6] - 25:23, 26:10, 27:2, 53:21, 54:7, 57:12
**built** [1] - 53:18
**bunch** [2] - 43:21, 61:24
**burden** [17] - 3:2, 3:23, 3:24, 5:19, 5:25, 17:14, 24:20, 32:11, 32:23, 36:10,

40:11, 40:13, 42:8, 44:5, 44:16, 51:19, 59:4
**burden-shifting** [4] - 32:11, 32:23, 42:8, 44:5
**burdens** [1] - 3:22
**business** [1] - 19:8

## C

**campaign** [1] - 53:21
**Canada** [1] - 61:17
**CANADIAN** [1] - 1:5
**Canadian** [10] - 2:3, 2:19, 3:5, 3:11, 3:16, 3:24, 4:1, 4:2, 4:22, 13:23
**candid** [2] - 42:3, 59:9
**candidly** [1] - 44:8
**candor** [2] - 24:16, 59:10
**cannot** [4] - 2:25, 8:4, 17:1, 30:22
**capable** [1] - 24:7
**capacity** [1] - 36:15
**carefully** [1] - 31:25
**Carolina** [1] - 43:23
**carried** [1] - 59:4
**carry** [1] - 3:2
**Case** [1] - 2:2
**case** [35] - 2:15, 7:2, 7:16, 9:9, 16:15, 16:18, 17:14, 19:23, 20:24, 25:7, 26:23, 26:25, 27:24, 28:5, 28:6, 33:7, 33:15, 34:6, 36:22, 36:24, 37:15, 39:25, 40:12, 42:16, 46:1, 49:9, 52:3, 52:6, 54:6, 55:3, 55:7, 55:16, 55:17, 56:23
**cases** [11] - 27:7, 27:8, 27:22, 33:8, 33:17, 34:17, 34:18, 34:19, 51:15, 54:19, 54:24
**cashore** [1] - 43:17
**Cashore** [21] - 10:14, 10:22, 11:15, 15:3, 15:5, 23:24, 24:8, 24:25, 25:6, 36:1, 36:19, 39:4, 42:25, 43:6, 43:10, 43:21, 44:9, 55:22, 56:4, 57:9, 57:13
**Cashore's** [1] - 43:23
**catastrophic** [1] - 55:19
**categories** [5] - 13:3,

29:2, 56:16, 59:16, 60:8
**category** [13] - 4:17, 6:19, 7:24, 8:21, 13:1, 14:22, 32:22, 55:25, 56:7, 57:5, 62:6, 63:4
**caught** [3] - 16:1, 17:17, 17:19
**cautiously** [1] - 23:20
**CBC** [45] - 2:11, 5:1, 6:22, 6:23, 6:24, 6:25, 9:3, 10:15, 10:19, 11:11, 14:9, 15:13, 15:16, 18:1, 18:11, 18:13, 20:14, 21:15, 22:16, 22:19, 24:1, 30:7, 32:5, 35:22, 36:4, 36:5, 36:15, 40:17, 42:13, 42:18, 43:14, 44:10, 44:11, 45:2, 45:5, 45:8, 47:25, 48:7, 50:2, 53:4, 53:20, 55:25, 56:18, 57:6, 57:10
**CBC's** [11] - 3:22, 17:23, 19:16, 19:25, 30:7, 39:24, 40:4, 40:6, 42:20, 56:2, 57:8
**CBS** [3] - 33:10, 33:11, 55:5
**CBS's** [1] - 55:8
**cease** [1] - 9:1
**certain** [5] - 12:20, 32:1, 56:16, 57:1, 57:2
**certainly** [7] - 11:23, 12:25, 14:4, 17:11, 20:5, 34:25, 59:20
**CERTIFICATE** [1] - 64:1
**certify** [1] - 64:3
**cetera** [3] - 33:21, 33:22, 51:4
**challenge** [1] - 39:24
**challenged** [1] - 13:8
**challenges** [1] - 24:10
**challenging** [1] - 61:13
**chambers** [1] - 28:14
**chance** [2] - 7:8, 41:20
**change** [1] - 3:22
**charitable** [1] - 11:21
**charities** [1] - 12:21
**Charity** [45] - 2:3, 2:7, 2:20, 2:23, 3:1, 3:15, 3:20, 4:7, 4:14, 6:10, 6:16, 9:2, 9:15,

10:15, 10:17, 13:13, 14:25, 15:15, 16:7, 21:14, 23:11, 24:11, 25:1, 26:9, 29:16, 35:20, 42:6, 42:10, 42:13, 43:13, 44:3, 45:1, 45:9, 48:1, 52:10, 52:21, 53:18, 53:19, 57:7, 57:9, 57:10, 57:11, 58:13, 61:23
**CHARITY** [1] - 1:2
**charity** [4] - 8:16, 11:8, 20:2, 20:6
**charity's** [1] - 12:12
**Charity's** [6] - 3:21, 4:18, 11:6, 11:21, 17:25, 33:6
**check** [3] - 11:23, 12:6, 22:1
**Children** [1] - 54:9
**choice** [2] - 19:13, 37:16
**chose** [1] - 19:6
**circumstance** [2] - 50:8, 55:4
**circumstances** [12] - 5:22, 5:23, 6:15, 29:20, 32:20, 41:16, 55:21, 58:15, 58:25, 59:21, 60:21
**Civil** [1] - 1:2
**civil** [1] - 2:2
**claim** [2] - 45:5, 45:8
**claims** [1] - 52:2
**clarification** [1] - 62:1
**clarified** [1] - 57:18
**clarify** [3] - 3:21, 61:7, 62:6
**clarity** [1] - 4:13
**clear** [10] - 6:1, 6:6, 9:11, 19:16, 49:13, 53:14, 54:20, 55:8, 61:11, 61:12
**Clemons** [4] - 10:15, 10:21, 11:9, 24:25
**client** [18] - 6:23, 7:3, 7:4, 30:16, 36:18, 36:20, 41:20, 41:25, 47:23, 49:16, 49:17, 49:18, 51:9, 52:10, 58:25, 60:20
**clients** [5] - 6:22, 48:16, 48:24, 49:1, 49:12
**close** [3] - 37:1, 47:2, 47:7
**Coke** [3] - 31:16, 31:19, 31:21
**collateral** [4] - 42:12,

42:19, 42:20
**colleagues** [2] - 19:10, 55:22
**collect** [1] - 16:6
**COLUMBIA** [1] - 1:1
**coming** [2] - 8:16, 60:23
**common** [2] - 34:16, 41:18
**communicating** [3] - 36:13, 39:21, 40:15
**communication** [2] - 9:13, 11:3
**communications** [1] - 12:7
**company** [2] - 34:21, 37:5
**compelled** [1] - 30:3
**compete** [2] - 31:16, 37:14
**competing** [2] - 37:4, 37:8
**complained** [2] - 27:19, 27:21
**complaining** [1] - 26:8
**complaint** [6] - 13:6, 25:24, 42:18, 42:23, 61:13, 62:20
**complete** [1] - 64:5
**completely** [6] - 22:10, 23:5, 25:17, 27:15, 43:5, 56:11
**compliance** [1] - 44:17
**complicated** [1] - 38:4
**comply** [1] - 59:2
**compromise** [1] - 56:4
**conceivable** [1] - 35:10
**concern** [17] - 2:21, 10:21, 12:2, 12:11, 13:9, 13:25, 18:1, 33:9, 33:19, 40:21, 42:4, 50:4, 59:14, 60:2, 60:5, 60:15, 62:24
**concerned** [14] - 4:14, 5:12, 6:12, 12:12, 13:4, 13:22, 20:7, 25:4, 42:16, 44:4, 46:5, 50:5, 50:6, 50:8
**concerns** [7] - 4:21, 6:11, 7:8, 21:3, 46:4, 60:9, 61:2
**conclude** [2] - 6:5, 25:6
**concluded** [1] - 34:20
**conclusion** [1] - 8:10
**concrete** [4] - 10:9,

30:13, 46:11, 56:10
**conduct** [1] - 36:16
**conducted** [1] - 48:5
**conducting** [1] - 43:7
**confer** [1] - 50:24
**Confidential** [1] - 14:1
**confidential** [34] - 3:7, 4:5, 4:16, 6:18, 13:18, 14:19, 14:21, 16:6, 18:2, 18:13, 18:15, 21:5, 32:22, 34:18, 39:20, 40:23, 41:21, 41:23, 42:11, 42:21, 44:12, 45:4, 45:7, 45:12, 45:16, 52:17, 52:23, 55:25, 56:7, 56:20, 56:22, 57:15, 62:12
**consequences** [2] - 58:20, 58:24
**consider** [1] - 47:25
**considering** [1] - 59:22
**constant** [1] - 11:2
**constitutes** [1] - 64:4
**Constitution** [2] - 1:24, 64:11
**consult** [5] - 3:13, 3:17, 6:22, 6:24, 27:9
**consulting** [2] - 7:1, 8:1
**contact** [4] - 8:23, 8:24, 26:2, 26:15
**contemplate** [1] - 59:20
**contemplated** [2] - 40:17, 57:17
**contempt** [11] - 3:3, 16:2, 17:18, 19:3, 19:5, 44:6, 46:1, 46:20, 46:21, 58:18, 58:20
**contend** [1] - 12:14
**context** [10] - 3:3, 9:23, 12:13, 13:5, 18:14, 19:12, 19:18, 62:8, 62:14, 63:7
**continue** [2] - 33:9, 33:21, 55:2
**continuing** [4] - 23:11, 29:23, 37:8, 37:14
**conveniens** [3] - 43:2, 43:7, 43:10
**conversation** [2] - 49:2, 60:24
**conversely** [1] - 22:25
**convincing** [2] - 6:1, 6:6
**cooperating** [1] - 9:2

**coordinate** [1] - 40:10
**copy** [2] - 15:11, 51:9
**copyright** [1] - 16:18
**corner** [1] - 13:20
**corporate** [1] - 49:17
**Corporation** [8] - 2:3, 2:19, 3:6, 3:12, 3:24, 4:1, 4:2, 4:23
**CORPORATION** [1] - 1:6
**corpus** [1] - 48:23
**correct** [3] - 8:14, 31:13, 51:23
**correctly** [3] - 19:2, 20:22, 21:21
**correspondence** [2] - 43:21, 43:22
**corresponding** [1] - 45:18
**correspondingly** [1] - 22:5
**Counsel** [1] - 39:9
**counsel** [12] - 2:4, 2:5, 7:10, 9:6, 9:8, 9:19, 41:16, 41:19, 49:17, 49:21, 58:16
**counsel's** [1] - 24:6
**couple** [3] - 10:20, 14:5, 53:9
**course** [5] - 3:18, 22:6, 35:15, 36:15, 61:16
**court** [12] - 16:3, 18:7, 19:2, 19:6, 30:3, 30:18, 30:20, 30:23, 30:24, 49:10, 49:11, 50:7
**COURT** [109] - 1:1, 2:8, 2:12, 9:5, 9:22, 10:11, 11:20, 11:24, 12:9, 12:16, 13:2, 13:17, 13:22, 14:12, 15:17, 16:11, 16:14, 16:18, 16:24, 17:2, 17:11, 17:17, 18:4, 18:16, 18:20, 19:4, 19:14, 19:19, 20:7, 20:13, 21:1, 21:17, 22:8, 22:18, 23:9, 24:13, 25:2, 25:9, 25:19, 26:25, 27:15, 27:18, 27:24, 28:23, 29:1, 29:22, 30:8, 30:11, 30:16, 31:3, 31:10, 31:12, 31:14, 31:18, 32:7, 32:13, 32:17, 33:3, 33:13, 34:5, 34:15, 35:3, 35:15, 35:24, 36:11, 36:20, 36:24, 37:20,

38:10, 38:13, 39:6, 39:11, 39:15, 39:18, 41:8, 41:11, 42:14, 44:22, 45:24, 46:15, 46:24, 47:14, 47:17, 48:10, 48:13, 49:13, 50:5, 51:5, 51:15, 51:23, 52:9, 52:20, 53:6, 53:13, 54:13, 55:9, 58:3, 58:5, 61:6, 61:14, 61:18, 61:21, 62:1, 62:4, 62:15, 62:18, 62:23, 63:10, 64:1
**Court** [14] - 1:22, 1:23, 3:2, 4:23, 5:1, 18:6, 18:11, 19:17, 23:20, 39:9, 43:17, 48:9, 59:9, 64:10
**Court's** [1] - 58:2
**court-compelled** [1] - 30:3
**courtesy** [1] - 41:19
**Courthouse** [1] - 1:23
**COURTNEY** [1] - 1:17
**Courtney** [1] - 2:10
**COURTROOM** [1] - 2:2
**coverage** [5] - 10:14, 13:8, 13:12, 15:15, 21:12
**Cowan** [1] - 21:21
**CRC** [2] - 1:22, 64:9
**create** [4] - 4:4, 55:18, 60:4, 63:7
**created** [1] - 61:8
**creative** [1] - 19:9
**criminal** [2] - 27:24, 27:25
**criteria** [1] - 55:16
**CRR** [2] - 1:22, 64:9
**curious** [1] - 55:14
**cutoff** [2] - 12:5, 23:17, 23:19

# D

**D.C** [4] - 1:5, 1:24, 19:1, 64:11
**damage** [1] - 37:15
**Darth** [2] - 44:9, 44:10
**Date** [1] - 1:6
**date** [2] - 12:18, 54:1
**Dated** [1] - 64:7
**Davis** [1] - 1:18
**davis** [1] - 1:20
**days** [1] - 10:20
**DC** [2] - 1:16, 1:19
**de** [1] - 21:25
**dead** [3] - 17:1, 26:20

**dead-ends** [2] - 26:20
**deal** [2] - 27:7, 28:2
**dealing** [5] - 27:16, 27:18, 27:25, 38:10, 44:13
**dear** [1] - 33:13
**decide** [8] - 5:20, 28:5, 32:4, 32:5, 32:18, 32:19, 35:9, 40:9
**decided** [1] - 48:13
**decisions** [2] - 46:18, 50:10
**declaration** [1] - 15:21
**declarations** [1] - 59:18
**decline** [1] - 51:12
**declined** [1] - 10:6
**deeply** [1] - 11:8
**defamation** [6] - 33:8, 33:17, 52:6, 54:21, 54:22, 54:23
**defamatory** [2] - 40:7, 55:1
**defame** [1] - 17:1
**Defendant** [2] - 1:7, 1:17
**defendant** [3] - 2:10, 27:25, 35:12
**defense** [10] - 3:17, 7:6, 7:11, 7:12, 7:22, 19:7, 23:1, 34:4, 38:15
**define** [1] - 53:23
**demonstrate** [1] - 4:2
**demonstrating** [2] - 3:2, 59:4
**deposition** [6] - 41:15, 41:18, 41:22, 41:25, 57:14, 57:15
**depositions** [3] - 40:24, 41:1, 41:5
**DEPUTY** [1] - 2:2
**derived** [1] - 45:11
**Des** [2] - 26:7, 31:5
**describe** [2] - 14:7, 19:19
**designate** [1] - 21:5
**designated** [1] - 41:21
**designating** [1] - 59:11
**designation** [3] - 4:5, 4:21, 41:23
**designations** [1] - 34:18
**desk** [2] - 60:4
**detail** [2] - 59:17, 60:15
**detailed** [1] - 13:4
**deter** [2] - 5:2, 30:12
**DeThomas** [2] - 1:17,

2:10
**developing** [1] - 4:16
**development** [1] - 54:6
**dice** [1] - 17:15
**Diet** [3] - 31:16, 31:19, 31:21
**different** [9] - 7:2, 9:13, 9:19, 16:8, 19:4, 23:5, 27:10, 29:2, 29:3
**differently** [1] - 7:10
**difficult** [10] - 2:22, 3:1, 3:8, 3:16, 4:10, 5:16, 7:6, 28:5, 46:17, 49:23
**dig** [1] - 12:23
**dim** [1] - 55:11
**direction** [1] - 5:13
**disagree** [2] - 11:12, 38:6
**disclose** [6] - 5:10, 15:22, 18:13, 19:5, 47:23, 59:5
**disclosed** [7] - 2:25, 3:25, 4:6, 6:4, 11:20, 25:4, 58:10
**discloses** [1] - 11:15
**disclosing** [1] - 19:3
**disclosure** [6] - 4:14, 6:12, 18:14, 25:7, 59:20
**disclosures** [3] - 2:17, 4:15, 8:16
**discovery** [36] - 3:19, 4:19, 6:4, 6:13, 6:17, 6:18, 13:17, 13:18, 13:23, 15:20, 15:24, 19:20, 20:16, 20:21, 21:4, 21:5, 22:4, 22:13, 23:17, 25:21, 30:4, 43:7, 46:7, 47:7, 51:5, 51:19, 52:22, 53:11, 54:22, 54:24, 58:14, 59:13, 60:3, 60:13, 63:6
**discuss** [1] - 49:21
**discussed** [1] - 57:2
**discussion** [3] - 15:5, 49:24, 49:25
**dismiss** [2] - 55:2
**dispute** [2] - 5:4, 18:8
**disputes** [1] - 22:12
**distinct** [1] - 8:22
**distinction** [2] - 20:23, 22:15
**distort** [3] - 62:25, 63:1, 63:2
**DISTRICT** [3] - 1:1, 1:1, 1:9

**document** [17] - 10:20, 14:8, 14:19, 15:6, 15:9, 39:9, 44:12, 51:9, 52:10, 52:16, 53:23, 56:21, 56:23, 57:20, 59:12, 61:23, 63:6
**documentary** [2] - 10:24, 62:10
**documents** [53] - 8:19, 12:12, 13:11, 13:15, 14:9, 14:16, 14:24, 15:2, 15:8, 15:13, 15:14, 15:15, 20:3, 20:6, 20:15, 20:17, 21:14, 22:20, 24:2, 28:19, 34:7, 40:23, 40:25, 41:1, 41:5, 41:14, 41:17, 46:22, 46:25, 47:1, 47:7, 52:17, 52:19, 52:21, 53:5, 56:17, 56:18, 56:19, 57:2, 57:16, 57:23, 58:13, 59:14, 59:16, 60:5, 60:14, 60:16, 60:17, 62:6, 62:9, 62:12, 62:21
**Doe** [2] - 6:20, 6:21
**dollars** [1] - 12:6
**donating** [3] - 9:2, 21:21, 21:24
**donations** [1] - 21:25
**done** [5] - 32:2, 32:10, 38:8, 42:21, 52:8
**donor** [7] - 12:7, 14:10, 22:6, 25:3, 25:6, 57:1
**donors** [24] - 6:18, 8:21, 8:22, 8:24, 9:1, 9:24, 10:1, 10:17, 11:6, 11:13, 11:16, 11:20, 12:3, 12:22, 19:21, 21:20, 25:1, 25:22, 29:7, 29:9, 29:14, 29:16, 39:4, 59:25
**donors'** [1] - 9:25
**doubt** [3] - 38:17, 38:18, 55:15
**down** [7] - 5:14, 12:23, 18:4, 41:11, 45:23, 54:16, 60:6
**dragged** [1] - 40:8
**draw** [4] - 18:12, 19:17, 23:14, 23:22
**drink** [1] - 31:16
**drive** [2] - 30:18, 30:21
**drop** [1] - 28:14
**dropped** [1] - 12:19

**dumb** [1] - 20:19
**dunk** [2] - 29:5, 29:7

# E

**East** [1] - 1:18
**education** [1] - 10:17
**eight** [1] - 26:7
**eight-year-old** [1] - 26:7
**Einsteins** [1] - 38:2
**either** [9] - 3:6, 11:25, 25:15, 33:24, 34:2, 36:3, 37:7, 41:14, 55:7
**electing** [1] - 37:17
**element** [2] - 23:2, 25:10
**email** [4] - 39:19, 39:20, 39:24, 45:22
**employed** [1] - 2:18
**employee** [1] - 14:25
**employees** [3] - 36:14, 36:16, 41:13
**empty** [1] - 9:23
**encourage** [2] - 59:12, 60:22
**end** [4] - 13:23, 21:23, 23:4, 50:15
**ended** [1] - 53:22
**ends** [2] - 26:20
**enforcing** [1] - 4:24
**engage** [1] - 23:12
**engaged** [5] - 2:19, 2:22, 3:14, 4:7, 50:7
**engaging** [1] - 60:3
**engineer** [4] - 27:3, 27:8, 27:9, 27:11
**engineering** [2] - 27:10, 28:4
**engineers** [1] - 28:9
**ensure** [1] - 42:10
**enter** [2] - 27:1, 37:6
**entire** [2] - 20:1, 40:20
**entirely** [2] - 38:19, 51:7
**entitled** [6] - 5:12, 9:7, 18:12, 35:15, 37:20, 37:21
**entry** [1] - 51:3
**episode** [1] - 9:15
**equation** [1] - 61:3
**equivalent** [1] - 37:24
**Especially** [1] - 55:24
**especially** [3] - 10:19, 56:12, 57:10
**essentially** [3] - 39:3, 52:4, 63:6
**establish** [1] - 3:24
**Estate** [1] - 9:21

**et** [3] - 33:21, 33:22, 51:4
**evening** [1] - 56:24
**event** [2] - 18:3, 18:12
**evidence** [18] - 3:5, 5:23, 5:24, 6:2, 13:16, 20:23, 22:15, 22:17, 23:2, 23:11, 25:8, 26:1, 39:7, 40:12, 40:17, 44:16, 50:20
**evidentiary** [1] - 59:18
**exact** [1] - 60:15
**exactly** [3] - 4:13, 27:4, 55:3
**example** [15] - 10:9, 14:5, 18:24, 24:24, 25:3, 25:12, 27:19, 29:6, 31:4, 34:6, 35:20, 40:22, 50:22, 51:8
**examples** [2] - 14:5, 29:19
**Excel** [1] - 62:10
**execute** [1] - 60:11
**exempt** [1] - 12:20
**exercise** [3] - 32:12, 40:20, 42:4
**exist** [2] - 20:6, 56:10
**exists** [3] - 11:15, 15:6, 26:23
**expect** [3] - 10:19, 11:10, 59:2
**experience** [2] - 21:15, 34:24
**expert** [9] - 36:21, 36:25, 37:1, 37:2, 37:6, 37:8, 37:12, 37:18, 38:5
**experts** [2] - 37:24, 51:1
**explain** [2] - 59:17, 60:15
**expressly** [2] - 9:17, 19:2
**extends** [1] - 23:10
**extent** [11] - 18:25, 20:3, 21:3, 27:16, 27:18, 38:14, 46:6, 48:4, 51:6, 52:20, 56:22
**extremely** [1] - 30:19

# F

**face** [2] - 5:16, 45:18
**facie** [1] - 44:15
**facing** [2] - 5:15, 27:25
**fact** [8] - 6:12, 19:6,

26:21, 29:23, 31:21, 36:25, 38:11, 51:10
**facts** [1] - 9:20
**failure** [1] - 19:5
**fair** [8] - 24:11, 25:9, 29:5, 33:5, 34:16, 42:1, 42:9, 48:12
**fairly** [2] - 9:23, 55:4
**faith** [3] - 16:9, 44:17, 50:14
**false** [6] - 11:9, 13:10, 40:7, 43:16, 43:20, 63:8
**falsely** [2] - 12:13, 13:8
**falsity** [2] - 20:24, 23:1
**familiar** [1] - 16:16
**far** [6] - 15:12, 19:11, 36:25, 44:23, 44:24, 56:5
**far-fetched** [1] - 15:12
**fashion** [1] - 59:11
**fashioning** [1] - 42:7
**fault** [5] - 20:23, 22:15, 22:24, 40:4, 40:6
**federalism** [1] - 19:12
**fetched** [1] - 15:12
**few** [4] - 54:16, 55:22, 57:9, 57:14
**fide** [1] - 40:21
**field** [1] - 38:2
**Fifth** [1] - 9:21
**fighting** [1] - 51:25
**figure** [2] - 24:8, 29:11
**figuring** [1] - 24:7
**file** [3] - 12:21, 15:9, 25:24
**filed** [3] - 43:16, 54:1, 55:2
**filing** [2] - 42:18, 59:8
**final** [2] - 7:7, 54:14
**finally** [3] - 6:9, 57:25, 60:22
**finances** [1] - 59:25
**financial** [6] - 6:17, 12:10, 13:5, 13:7, 19:21, 57:3
**financials** [1] - 12:11
**fine** [5] - 32:15, 33:1, 42:2, 49:22
**finish** [1] - 46:12
**firm** [2] - 8:10, 24:6
**First** [1] - 51:20
**first** [8] - 8:15, 30:24, 34:3, 37:16, 44:19, 45:17, 48:3, 58:7
**fit** [1] - 27:25
**fits** [1] - 55:16
**Flexner** [2] - 1:12,

1:14
**Floor** [2] - 1:15, 1:21
**focused** [4] - 4:16, 7:11, 22:5, 32:21
**Footnote** [1] - 17:24
**footnote** [2] - 17:24, 59:8
**FOR** [1] - 1:1
**force** [1] - 24:11
**foregoing** [1] - 64:4
**foreseeable** [1] - 57:1
**foreseen** [1] - 62:7
**forget** [1] - 16:9
**form** [2] - 24:3, 60:11
**former** [2] - 7:24, 33:13
**forum** [3] - 43:1, 43:7, 43:9
**Foundation** [4] - 10:16, 10:21, 11:10, 24:25
**four** [1] - 56:3
**frankly** [18] - 5:3, 5:4, 8:24, 15:18, 18:21, 29:6, 36:6, 42:5, 43:4, 43:10, 44:2, 45:14, 46:12, 47:6, 47:10, 49:3, 61:3, 61:19
**fraud** [2] - 13:14, 20:19
**Free** [1] - 54:9
**free** [1] - 55:20
**friend** [1] - 33:13
**front** [5] - 6:2, 20:5, 40:4, 40:6, 59:15
**fruits** [1] - 45:10
**full** [2] - 11:23, 64:5
**fully** [1] - 57:17
**functionally** [1] - 56:11
**fundamentally** [2] - 9:12, 54:11
**funded** [1] - 53:17
**funding** [1] - 10:25
**future** [1] - 49:10

# G

**game** [1] - 48:12
**garden** [2] - 5:23, 43:5
**garden-variety** [1] - 43:5
**gatekeeper** [1] - 58:17
**gatekeepers** [3] - 47:10, 47:13, 48:2
**gathered** [1] - 8:9
**gathering** [1] - 44:8
**general** [5] - 39:21, 49:17, 49:21, 53:16,

55:19
**generally** [1] - 41:12
**George** [2] - 16:25, 25:12
**Getz** [1] - 51:16
**given** [5] - 24:9, 31:4, 35:4, 50:16, 56:22
**goal** [1] - 63:2
**greater** [5] - 4:13, 5:24, 29:9, 59:23, 60:15
**grew** [1] - 20:6
**gross** [1] - 59:7
**ground** [1] - 14:11
**guarantee** [2] - 45:2, 51:2
**guard** [1] - 32:6
**guess** [7] - 20:7, 25:9, 34:16, 54:15, 56:17, 62:5, 62:22
**guys** [2] - 18:10, 47:2

# H

**half** [1] - 62:14
**half-quoted** [1] - 62:14
**handful** [2] - 23:23, 56:8
**happy** [4] - 8:8, 55:10, 55:13, 58:1
**hard** [7] - 5:19, 9:22, 18:16, 18:17, 32:23, 50:9, 57:3
**harm** [5] - 6:11, 39:2, 39:4, 50:17
**Harrison** [2] - 16:25, 25:12
**Harvey** [9] - 11:14, 11:18, 23:24, 24:7, 24:25, 25:6, 39:4, 42:25, 44:9
**head** [8] - 10:13, 11:25, 16:21, 25:13, 25:19, 30:1, 30:4, 56:12
**heading** [1] - 5:13
**hear** [5] - 6:10, 8:8, 8:11, 24:13, 58:22
**heard** [3] - 16:22, 55:5, 61:5
**hearing** [5] - 2:14, 4:11, 9:3, 11:14, 63:13
**HEARING** [2] - 1:4, 1:8
**hears** [1] - 26:9
**heightened** [1] - 4:20
**HELD** [1] - 1:8
**help** [5] - 24:20, 34:1,

43:1, 46:4, 46:8
**helpful** [4] - 6:9, 16:5, 24:9, 63:11
**hereby** [1] - 64:3
**hi** [1] - 9:13
**High** [1] - 21:25
**higher** [1] - 3:4
**highly** [17] - 2:18, 4:4, 4:16, 6:18, 21:5, 32:22, 34:17, 40:23, 41:1, 41:22, 45:4, 45:7, 55:24, 56:7, 56:20, 56:21, 57:15
**himself** [1] - 51:10
**hire** [1] - 37:18
**historic** [1] - 38:10
**historically** [1] - 10:16
**history** [2] - 41:6, 42:15
**hold** [1] - 44:6
**holding** [1] - 45:25
**holed** [1] - 47:9
**home** [2] - 30:18, 30:21
**Honor** [23] - 2:6, 2:9, 8:12, 17:1, 20:22, 24:15, 27:12, 28:16, 35:11, 38:6, 39:8, 40:15, 42:3, 43:2, 43:4, 44:7, 44:24, 45:14, 47:22, 52:25, 54:15, 55:23, 61:5
**HONORABLE** [1] - 1:8
**hope** [3] - 58:16, 59:1, 61:3
**hoped** [1] - 10:7
**hopefully** [1] - 60:25
**hopes** [1] - 17:17
**human** [2] - 25:10, 31:23
**hundred** [1] - 9:3
**hundreds** [2] - 23:25, 28:18
**hurdles** [1] - 7:5
**hypersensitive** [1] - 41:3
**hypothesize** [1] - 57:11
**hypothetical** [4] - 18:1, 29:19, 31:7

---
**I**
---

**idea** [3] - 11:17, 28:22, 33:23
**ideas** [1] - 56:13
**ideas-oriented** [1] - 56:13
**identifiable** [1] - 12:21
**identified** [2] - 21:20,

57:7
**identifying** [2] - 8:21, 45:22
**identity** [1] - 52:23
**illuminate** [1] - 24:21
**imagine** [2] - 19:9, 57:3, 57:19
**imagining** [1] - 13:20
**impact** [1] - 18:7
**imperil** [1] - 55:19
**implies** [1] - 39:25
**important** [4] - 7:25, 8:2, 22:17, 58:23
**impossible** [3] - 29:19, 32:25, 56:11
**impression** [3] - 13:10, 61:9, 63:8
**improper** [1] - 17:3
**IN** [1] - 1:1
**inability** [1] - 50:6
**incidents** [1] - 21:12
**inclination** [1] - 5:18
**inclined** [1] - 32:14
**include** [1] - 63:5
**includes** [5] - 6:3, 48:16, 48:17, 58:9
**including** [3] - 24:6, 34:21, 43:15
**incorrectly** [1] - 12:13
**incredibly** [1] - 46:17
**indeed** [1] - 33:16
**independent** [4] - 4:3, 14:18, 43:23, 44:1
**independently** [2] - 18:2, 26:13
**indicate** [1] - 14:9
**indicating** [1] - 58:9
**indispensable** [1] - 23:8
**individual** [3] - 6:25, 16:13, 58:25
**individuals** [7] - 2:18, 2:22, 3:14, 6:24, 9:7, 10:6, 38:20
**inference** [2] - 18:12, 19:17
**influencing** [1] - 50:9
**info** [2] - 42:11, 44:12
**inform** [1] - 41:19
**information** [58] - 2:18, 3:10, 3:18, 3:25, 4:3, 4:6, 6:3, 8:17, 8:23, 12:1, 12:10, 12:21, 13:5, 13:7, 15:20, 15:23, 16:7, 16:8, 17:5, 17:10, 18:2, 18:15, 19:3, 21:9, 22:10, 26:3, 26:6, 26:11, 26:13, 26:15, 27:4,

28:1, 28:2, 29:2, 29:15, 30:2, 36:2, 36:3, 37:3, 37:13, 38:22, 38:25, 43:1, 45:1, 45:2, 45:3, 45:19, 45:20, 47:24, 48:3, 48:23, 50:24, 56:12, 57:3, 58:10, 59:5, 59:25, 62:25
**initial** [2] - 5:18, 39:24
**insight** [2] - 27:22, 29:9
**instructions** [1] - 30:17
**insurmountable** [1] - 16:13
**integrated** [1] - 29:22
**intend** [2] - 4:20, 41:21
**intent** [1] - 24:3
**intentional** [1] - 50:7
**intentionally** [3] - 26:5, 31:10, 31:12
**interested** [2] - 4:22, 9:10
**interesting** [1] - 15:8
**internal** [3] - 15:15, 34:7, 53:5
**international** [1] - 44:11
**interpreting** [1] - 22:20
**interrupt** [3] - 30:11, 35:3, 41:8
**intervention** [1] - 23:20
**intimidating** [1] - 40:16
**inventing** [1] - 37:4
**inverted** [1] - 13:7
**invested** [1] - 11:8
**investigate** [1] - 29:23
**investigating** [1] - 9:10
**investigation** [1] - 3:14
**investigations** [3] - 8:6, 9:25, 27:14
**investigative** [1] - 56:13
**investigator** [1] - 9:8
**investigators** [1] - 28:7
**invited** [1] - 60:24
**inviting** [1] - 62:23
**invokes** [1] - 18:8
**invoking** [1] - 52:7
**involve** [2] - 33:9, 33:18
**involved** [5] - 11:10,

26:23, 27:10, 58:18, 59:19
**involving** [2] - 33:8, 33:18
**Iroquois** [1] - 21:25
**IRS** [1] - 12:19
**issue** [24] - 2:16, 2:17, 5:21, 17:4, 17:6, 19:23, 19:24, 23:23, 27:19, 27:25, 28:5, 33:19, 34:14, 35:16, 41:12, 42:5, 42:8, 44:5, 44:15, 45:16, 51:11, 54:7, 55:3, 60:18
**issues** [6] - 5:16, 8:7, 24:21, 32:18, 53:1, 56:5
**itself** [2] - 7:15, 48:7

---
**J**
---

**jail** [1] - 16:2
**January** [3] - 20:12, 21:4, 53:25
**job** [5] - 16:6, 30:5, 30:6, 30:7, 30:13
**John** [4] - 16:14, 16:24, 16:25, 17:3
**Johnson** [8] - 26:7, 26:11, 26:14, 26:17, 26:18, 26:21, 27:19, 27:21
**Johnson's** [1] - 26:15
**Jordan** [1] - 21:23
**Joseph** [1] - 2:6
**JOSEPH** [1] - 1:11
**jotted** [1] - 54:16
**journal** [1] - 51:3
**journalism** [1] - 31:1
**journalist** [2] - 36:2, 49:22
**journalistic** [2] - 43:6, 43:15
**journalists** [4] - 27:13, 33:23, 35:23, 51:3
**judge** [3] - 35:13, 39:24, 39:25
**Judge** [5] - 5:5, 46:20, 46:21, 47:2, 47:20
**JUDGE** [2] - 1:8, 1:9
**judgments** [1] - 47:11
**juicy** [2] - 25:14, 25:16
**justification** [1] - 44:20
**justify** [1] - 36:10

---
**K**
---

**Kate** [1] - 23:24

keep [3] - 30:4, 31:14, 46:10
**keeps** [1] - 56:18
**Kelley** [1] - 23:24
**Kenya** [7] - 10:17, 10:25, 25:23, 26:1, 51:4, 53:21, 57:12
**kept** [4] - 43:3, 46:24, 55:17, 57:23
**Kevin** [9] - 26:7, 26:11, 26:14, 26:17, 26:18, 26:21, 27:19, 27:20
**kid** [1] - 31:4
**kid's** [1] - 20:5
**kidding** [1] - 55:9
**kind** [5] - 36:17, 42:6, 44:24, 50:21, 54:4
**kinds** [3] - 50:1, 50:23, 62:16
**knowing** [3] - 4:22, 17:2, 32:19
**knowingly** [1] - 26:5
**knowledge** [6] - 22:23, 24:3, 28:2, 29:20, 29:22, 43:21
**knowledgeable** [3] - 8:3, 8:5, 38:1
**knows** [2] - 17:12, 57:10
**Kroetsch** [13] - 2:7, 8:11, 24:19, 24:23, 29:5, 39:3, 39:20, 44:24, 46:20, 51:8, 54:13, 59:4, 62:4
**KROETSCH** [42] - 1:11, 2:6, 8:12, 9:12, 10:9, 10:12, 11:22, 12:3, 12:10, 12:25, 13:4, 13:19, 14:4, 14:22, 16:4, 16:12, 16:16, 16:20, 17:4, 17:16, 17:20, 18:5, 18:19, 18:24, 19:9, 19:15, 19:24, 20:11, 20:14, 21:10, 21:19, 22:9, 22:19, 23:16, 39:13, 54:15, 55:14, 58:4, 62:5, 62:16, 62:22, 63:9

---
**L**
---

**lab** [1] - 31:19
**label** [1] - 14:19
**language** [2] - 58:9, 58:11
**laptop** [2] - 15:1, 15:6
**laptops** [1] - 47:9
**large** [3] - 6:14, 9:1,

59:10
**largely** [2] - 2:15, 7:17
**larger** [1] - 41:6
**largest** [2] - 10:17, 11:22
**last** [5] - 14:22, 45:25, 55:6, 57:9
**latent** [1] - 9:18
**law** [7] - 5:24, 18:25, 19:1, 19:12, 19:13, 24:6, 38:9
**lawful** [2] - 7:12, 16:7
**laws** [2] - 19:2, 43:15
**lawsuit** [7] - 9:20, 11:15, 11:17, 11:19, 34:1, 54:21
**lawsuits** [2] - 54:22, 54:23
**lawyer** [1] - 57:21
**lawyers** [1] - 36:13
**lead** [2] - 10:14, 15:4
**leadership** [1] - 49:18
**leak** [1] - 3:9
**leaked** [3] - 15:14, 53:4, 62:9
**learn** [3] - 9:20, 25:13, 50:8
**learned** [7] - 2:24, 2:25, 3:18, 25:7, 25:16, 30:2, 30:3
**learning** [3] - 7:19, 7:23, 38:15
**least** [4] - 10:17, 51:6, 52:24, 60:12
**left** [2] - 14:25, 34:13
**lemonade** [1] - 20:5
**Lennon** [4] - 16:14, 16:24, 16:25, 17:3
**less** [1] - 21:9
**letter** [1] - 26:8
**letters** [1] - 42:25
**Leval** [2] - 33:14, 55:10
**level** [2] - 11:4, 26:22
**liable** [1] - 36:16
**libel** [2] - 30:25, 35:12
**liberty** [1] - 28:3
**lifting** [1] - 41:22
**lightly** [1] - 58:23
**likely** [5] - 44:10, 44:23, 44:24, 45:17, 52:18
**limits** [1] - 51:19
**line** [2] - 23:14, 23:22
**lines** [1] - 6:20
**list** [4] - 11:23, 26:15, 26:18, 26:19
**literally** [3] - 9:4, 36:9, 61:23
**litigation** [5] - 37:11,

37:18, 37:19, 49:12, 58:11
**live** [1] - 18:22
**LLP** [4] - 1:12, 1:14, 1:18, 1:20
**long-time** [1] - 9:1
**look** [12] - 12:7, 12:16, 22:3, 28:4, 37:2, 43:25, 48:23, 48:24, 51:15, 55:15, 60:7, 60:8
**looked** [6] - 13:15, 34:19, 44:1, 44:2, 51:18, 55:5
**looking** [7] - 15:7, 21:2, 22:25, 23:1, 53:6, 57:8, 62:11
**looks** [1] - 15:10
**Lord** [1] - 16:15
**loss** [1] - 28:11
**love** [1] - 46:19
**luck** [1] - 20:19
**lying** [1] - 10:1

## M

**Main** [1] - 1:12
**major** [1] - 11:6
**majority** [1] - 46:7
**malice** [1] - 22:15
**manageable** [2] - 22:4, 23:19
**manner** [2] - 3:8, 3:23
**Mark** [1] - 23:24
**mark** [2] - 45:4, 56:19
**marking** [3] - 14:20, 56:21
**markings** [1] - 13:18
**material** [4] - 6:13, 6:15, 13:22, 59:10
**materials** [1] - 15:20
**matter** [4] - 26:24, 36:13, 36:17, 41:18
**matters** [3] - 19:16, 33:8, 53:11
**Matthew** [1] - 23:25
**McKenna** [1] - 23:24
**mean** [61] - 9:22, 12:14, 13:11, 13:19, 14:25, 16:9, 16:24, 19:24, 21:1, 22:9, 24:10, 25:10, 27:13, 27:19, 27:22, 28:13, 28:17, 29:2, 29:4, 29:7, 30:7, 30:8, 31:4, 32:1, 32:4, 32:7, 32:13, 32:14, 33:10, 34:10, 36:9, 36:17, 38:23, 39:2, 42:13, 42:20, 43:25,

44:8, 45:22, 46:5, 46:11, 47:8, 47:14, 47:21, 48:20, 49:5, 49:7, 49:20, 49:23, 50:21, 51:14, 51:24, 51:25, 52:2, 52:4, 53:1, 53:3, 56:6, 61:16, 62:23
**meaning** [1] - 13:7
**meaningful** [1] - 4:24
**means** [2] - 15:24, 16:7
**mechanism** [2] - 35:2, 47:5
**mechanisms** [6] - 5:2, 30:12, 32:8, 35:5, 46:10, 53:6
**media** [4] - 33:18, 54:21, 54:23
**meet** [2] - 36:10, 50:24
**memory** [1] - 55:11
**merely** [1] - 29:18
**merit** [1] - 40:1
**merits** [1] - 42:20
**mess** [2] - 5:14, 11:3
**messy** [1] - 47:13
**metadata** [2] - 52:25, 53:2
**Michael** [1] - 24:25
**might** [24] - 11:22, 18:1, 18:17, 24:9, 35:8, 40:13, 45:17, 45:20, 45:21, 46:15, 47:25, 49:4, 49:21, 52:21, 52:25, 53:5, 54:8, 54:10, 56:4, 56:9, 56:10, 56:17
**million** [2] - 32:5, 45:22
**millions** [1] - 32:10
**mind** [1] - 59:1
**minds** [2] - 2:24, 16:8
**minimize** [1] - 40:11
**minute** [2] - 39:16, 39:17
**misrepresent** [1] - 13:10
**misrepresented** [1] - 62:14
**misrepresenting** [1] - 62:21
**misused** [1] - 10:1
**modification** [1] - 4:25
**modifying** [1] - 59:22
**Moines** [2] - 26:8, 31:5
**moment** [1] - 39:11
**money** [5] - 10:1, 10:7, 14:10, 25:22, 26:1
**month** [2] - 26:13, 42:18, 42:23

**months** [5] - 10:13, 20:8, 28:21, 35:21, 42:24
**moot** [1] - 12:4
**Morris** [1] - 34:10
**Morris's** [1] - 34:7
**Morris/ABC** [1] - 34:6
**MOSS** [1] - 1:8
**most** [11] - 14:4, 21:11, 22:20, 25:1, 33:20, 45:6, 52:5, 54:21, 54:23, 54:24, 56:5
**mostly** [1] - 12:12
**motion** [4] - 43:2, 43:7, 55:1, 55:2
**MOTION** [2] - 1:4, 1:8
**MPCF** [1] - 10:23
**MR** [109] - 1:11, 2:6, 2:9, 8:12, 9:12, 10:9, 10:12, 11:22, 12:3, 12:10, 12:25, 13:4, 13:19, 14:4, 14:22, 16:4, 16:12, 16:16, 16:20, 17:4, 17:16, 17:20, 18:5, 18:19, 18:24, 19:9, 19:15, 19:24, 20:11, 20:14, 21:10, 21:19, 22:9, 22:19, 23:16, 24:15, 25:5, 25:18, 26:22, 27:12, 27:17, 27:23, 28:16, 28:25, 29:13, 30:6, 30:10, 30:15, 30:22, 31:6, 31:11, 31:13, 31:17, 31:24, 32:11, 32:16, 33:1, 33:4, 33:16, 34:12, 34:23, 35:11, 35:18, 35:25, 36:12, 36:23, 37:17, 38:6, 38:12, 38:23, 39:7, 39:10, 39:13, 39:14, 39:17, 39:19, 41:10, 42:2, 42:15, 44:23, 46:14, 46:23, 47:4, 47:16, 47:21, 48:11, 48:14, 49:20, 50:11, 51:13, 51:21, 51:24, 52:16, 53:1, 53:9, 53:14, 54:15, 55:14, 58:4, 61:5, 61:7, 61:15, 61:19, 61:22, 62:3, 62:5, 62:16, 62:22, 63:9
**MS** [3] - 1:14, 17:1, 52:25
**multiple** [1] - 54:18
**must** [2] - 12:21, 52:13

## N

**N.W** [1] - 64:11
**name** [4] - 2:5, 9:13, 15:10, 26:2
**names** [4] - 11:20, 29:7, 29:9, 29:14
**naming** [1] - 9:14
**narrow** [2] - 21:2, 55:16
**narrower** [1] - 54:4
**narrowly** [1] - 4:16
**NATHAN** [1] - 1:17
**Nathan** [1] - 2:9
**nature** [1] - 25:10
**necessarily** [2] - 45:16, 62:20
**necessary** [3] - 18:10, 31:25, 32:15
**need** [22] - 4:2, 5:21, 6:22, 11:23, 14:2, 14:17, 23:3, 23:18, 24:3, 24:7, 30:25, 32:6, 39:11, 46:3, 49:4, 56:19, 57:12, 57:24, 58:3, 59:5, 60:13, 60:19
**needing** [1] - 61:1
**needs** [1] - 57:4
**negotiate** [1] - 23:20
**Neuhardt** [1] - 2:7
**NEUHARDT** [1] - 1:14
**never** [7] - 25:20, 38:16, 46:21, 47:20, 54:22, 56:22, 57:20
**New** [2] - 1:15, 19:1
**new** [7] - 1:21, 3:18, 7:19, 7:23, 27:2, 31:16, 38:15
**news** [11] - 10:8, 33:23, 35:13, 35:14, 35:18, 35:21, 36:4, 36:6, 48:4, 52:5, 52:12
**newsroom** [9] - 3:8, 5:9, 51:7, 51:14, 51:19, 51:25, 52:3, 52:7, 61:10
**newsworthiness** [1] - 21:14
**newsworthy** [2] - 21:8, 21:9
**nine** [2] - 27:7, 42:24
**non** [4] - 15:10, 43:1, 43:7, 43:9
**non-watermarked** [1] - 15:10
**nondesignated** [1] - 15:25
**nondisclosure** [2] -

58:8, 60:11
**none** [1] - 47:1
**nonprivileged** [1] - 15:24
**North** [1] - 43:23
**note** [1] - 24:23
**notes** [1] - 64:5
**nothing** [5] - 35:22, 36:9, 39:21, 61:25
**notice** [1] - 41:23
**noticed** [1] - 17:23
**notion** [1] - 35:19
**notorious** [1] - 9:14
**November** [3] - 20:12, 62:10, 64:7
**number** [4] - 11:7, 25:21, 47:5, 57:25
**NW** [3] - 1:15, 1:18, 1:24
**NY** [2] - 1:13, 1:21

**O**

**objection** [2] - 34:25, 49:25
**obstinate** [2] - 48:20, 49:8
**obtain** [1] - 15:23
**obtained** [3] - 18:1, 26:13, 53:4
**obviously** [10] - 7:24, 12:22, 39:20, 39:22, 39:25, 47:22, 48:16, 50:13, 53:3, 58:21
**occurred** [1] - 3:3
**occurs** [1] - 14:23
**October** [1] - 1:6
**OF** [3] - 1:1, 1:8, 64:1
**Official** [2] - 1:23, 64:10
**OFFICIAL** [1] - 64:1
**old** [2] - 21:8, 26:7
**older** [1] - 21:7
**once** [4] - 16:23, 37:18, 50:8, 56:11
**one** [36] - 2:16, 3:20, 8:13, 8:15, 8:21, 10:16, 10:18, 14:7, 14:12, 16:16, 17:12, 18:9, 21:1, 23:22, 25:1, 25:4, 29:18, 30:20, 33:3, 33:4, 35:16, 36:17, 37:1, 38:3, 42:8, 44:3, 45:14, 47:6, 47:12, 54:14, 54:18, 56:4, 56:14, 56:17, 61:5, 62:5
**one's** [1] - 48:13
**ones** [1] - 52:22

**ongoing** [3] - 11:18, 33:19, 42:21
**open** [2] - 59:21, 60:9
**operated** [1] - 20:2
**opportunity** [3] - 9:16, 11:16, 54:14
**opposing** [2] - 24:6, 41:19
**opposite** [2] - 21:23, 42:5
**optimistic** [1] - 23:21
**order** [28] - 2:15, 2:16, 2:24, 3:25, 4:5, 4:24, 6:19, 17:7, 17:8, 19:6, 26:6, 30:23, 32:6, 34:8, 34:22, 35:1, 35:12, 37:7, 41:15, 42:7, 42:11, 44:18, 44:19, 48:19, 50:7, 57:18, 59:22, 60:12
**orders** [6] - 27:1, 30:20, 30:24, 34:19, 34:20, 59:2
**organization** [4] - 35:13, 35:14, 35:18, 36:6
**organizations** [3] - 12:20, 33:24, 52:5
**organize** [2] - 24:16, 31:1
**oriented** [1] - 56:13
**ostensibly** [1] - 17:25
**otherwise** [2] - 6:6, 35:17
**ought** [1] - 43:25
**ourselves** [4] - 17:9, 48:15, 50:13
**outcome** [1] - 18:7
**outset** [1] - 42:17
**outside** [1] - 20:15
**overcome** [2] - 8:4, 52:4
**own** [5] - 2:23, 4:18, 22:20, 31:22, 34:23

**P**

**P.M** [1] - 1:6
**p.m** [1] - 63:13
**page** [1] - 14:1
**paper** [1] - 13:25
**papers** [6] - 5:1, 30:12, 32:8, 48:19, 57:8, 60:5
**Parliament** [1] - 53:19
**part** [12] - 6:14, 11:1, 11:3, 12:7, 15:14, 16:12, 19:24, 35:2, 48:6, 49:24, 57:23,

59:6
**participation** [1] - 7:24
**particular** [14] - 5:22, 6:11, 9:3, 17:14, 32:19, 50:20, 59:14, 59:16, 59:19, 60:5, 60:7, 60:20
**particularly** [4] - 3:3, 8:3, 37:13, 38:1
**parties** [5] - 2:15, 7:7, 8:8, 11:12, 23:19
**parties'** [1] - 4:8
**party** [4] - 5:24, 18:8, 19:3, 37:14
**past** [2] - 19:22, 55:1
**patent** [5] - 27:3, 27:10, 36:24, 37:2, 37:3
**pattern** [1] - 23:12
**pause** [1] - 28:23
**pay** [1] - 30:20
**PCF** [1] - 10:23
**pejorative** [1] - 25:11
**penalty** [1] - 15:22
**people** [24] - 6:23, 8:4, 9:15, 9:20, 10:1, 11:7, 24:5, 25:24, 26:15, 26:16, 26:23, 27:1, 28:3, 28:18, 34:9, 37:19, 37:25, 40:12, 48:3, 49:18, 50:6, 56:8, 59:1
**Pepsi** [1] - 31:15
**perennial** [1] - 54:20
**perfectly** [1] - 49:22
**perhaps** [3] - 6:7, 59:18
**period** [9] - 10:13, 19:22, 19:25, 21:17, 22:5, 53:24, 54:2, 54:3, 54:5
**periods** [1] - 54:4
**perjury** [1] - 15:22
**person** [8] - 26:6, 27:9, 29:10, 37:4, 37:12, 37:14, 38:13
**personal** [2] - 34:23, 57:25
**personally** [2] - 12:21, 36:19
**persuaded** [1] - 59:3
**pertaining** [1] - 52:10
**Philip** [3] - 34:6, 34:7, 34:10
**phonetic** [1] - 51:16
**Pierce** [1] - 23:25
**Pierre** [2] - 33:14, 55:10
**Pinball** [4] - 10:15,

10:21, 11:9, 24:25
**place** [8] - 20:9, 20:11, 34:3, 35:6, 44:19, 48:3, 54:7, 55:12
**placed** [1] - 40:6
**placing** [1] - 40:4
**Plaintiff** [2] - 1:3, 1:11
**plaintiff** [2] - 46:3, 46:4
**plaintiff's** [1] - 2:5
**planned** [2] - 40:14
**planning** [2] - 41:17, 56:21
**play** [1] - 22:16
**plenty** [1] - 6:23
**podium** [1] - 2:4
**point** [13] - 6:16, 12:4, 16:21, 20:4, 29:5, 31:12, 33:16, 38:20, 44:17, 54:19, 59:3, 59:7, 62:5
**pointed** [4] - 20:22, 43:8, 48:18, 55:23
**points** [2] - 8:13, 57:14
**poisonous** [1] - 45:11
**police** [3] - 30:7, 48:15, 53:7
**policing** [3] - 35:2, 35:4, 35:7
**policy** [1] - 42:5
**political** [1] - 61:17
**portion** [1] - 4:19
**portrayed** [2] - 12:14, 13:8
**posed** [1] - 56:5
**poses** [1] - 24:10
**position** [12] - 19:16, 19:25, 22:3, 33:6, 33:24, 34:2, 38:8, 40:1, 46:16, 48:4, 52:5, 56:17
**possession** [2] - 22:21, 23:4
**possibility** [4] - 4:15, 21:2, 35:10, 49:8
**possible** [1] - 18:17
**possibly** [1] - 45:9
**postdates** [1] - 21:4
**postdating** [1] - 20:15
**potential** [2] - 9:7, 26:16
**potentially** [5] - 14:23, 16:6, 17:6, 32:2, 40:16
**power** [1] - 19:17
**practical** [6] - 7:5, 27:12, 27:15, 28:13, 36:13, 36:17
**practice** [1] - 19:10

**precisely** [1] - 6:21
**precludes** [2] - 37:7, 41:15
**precluding** [1] - 49:15
**predicated** [1] - 12:15
**prejudice** [1] - 42:6
**prejudicial** [1] - 37:5
**prejudicing** [2] - 36:18, 36:20
**premature** [2] - 22:11, 32:18
**premise** [3] - 25:5, 33:6, 40:20
**premised** [3] - 17:25, 43:20, 50:1
**preponderance** [1] - 3:4
**present** [2] - 20:17, 58:6, 63:5
**presents** [1] - 42:5
**press** [2] - 35:5, 55:20
**presumably** [7] - 3:7, 7:17, 20:18, 25:2, 34:3, 49:16, 52:20
**presume** [2] - 31:8, 44:10
**presumption** [1] - 6:5
**pretext** [4] - 42:11, 43:13, 44:5
**pretty** [1] - 44:15
**price** [1] - 30:20
**prima** [1] - 44:15
**privilege** [15] - 3:6, 3:7, 18:8, 19:1, 33:14, 51:7, 51:14, 51:18, 51:22, 51:25, 52:3, 52:7, 61:9, 61:10
**privileged** [1] - 47:23
**privileges** [1] - 43:15
**problem** [10] - 9:5, 13:12, 16:12, 18:15, 23:9, 29:1, 35:11, 39:23, 40:3, 54:20
**problematic** [3] - 14:23, 35:19, 40:2
**problems** [1] - 62:17
**proceed** [2] - 54:22, 54:23
**proceeding** [2] - 46:1, 58:19, 59:15
**proceedings** [1] - 64:6
**process** [3] - 37:4, 56:13, 60:13
**produce** [4] - 4:20, 45:3, 51:12, 58:14
**produced** [6] - 6:13, 14:16, 45:6, 52:14, 57:3, 63:6
**producing** [3] - 13:23,

56:19, 56:25
**product** [2] - 37:5, 37:21
**production** [4] - 15:7, 42:10, 52:13, 52:15
**program** [1] - 53:3
**programs** [2] - 54:6, 54:7
**progress** [1] - 63:12
**prohibiting** [3] - 55:24, 55:25, 56:2
**project** [1] - 37:8
**projects** [1] - 28:11
**proof** [1] - 14:3
**propensity** [1] - 30:23
**proper** [3] - 20:16, 20:21, 22:12
**properly** [2] - 17:4, 18:12
**proposal** [3] - 17:25, 32:21, 56:14
**proposed** [2] - 3:20, 60:11
**proposing** [1] - 55:18
**protected** [4] - 3:9, 5:9, 15:21, 60:5
**protection** [1] - 59:23
**protective** [21] - 2:15, 2:16, 2:24, 3:25, 4:5, 4:24, 26:6, 27:1, 34:8, 34:19, 34:20, 34:22, 35:1, 37:7, 41:15, 42:7, 42:11, 48:19, 57:18, 59:22, 60:12
**prove** [2] - 3:9, 37:25
**proves** [1] - 47:2
**provide** [2] - 35:9, 59:22
**provides** [1] - 48:19
**providing** [2] - 8:23, 40:11
**proving** [1] - 23:4
**proximate** [1] - 21:16
**public** [3] - 25:1, 33:8, 33:19
**publication** [2] - 22:24, 24:4
**publicly** [2] - 12:1, 12:11
**publish** [2] - 45:9, 47:19
**published** [2] - 22:22, 48:5
**publishing** [1] - 47:25
**pull** [1] - 33:11
**punish** [1] - 42:20
**purpose** [2] - 30:2, 43:12, 58:11
**purposes** [5] - 22:24,

23:16, 52:2, 58:6, 63:5
**pursuant** [1] - 15:20
**pursue** [1] - 50:10
**push** [2] - 26:17, 26:18
**put** [13] - 3:16, 3:21, 7:6, 19:7, 29:25, 34:1, 38:8, 46:16, 47:22, 53:25, 57:4, 60:4
**putting** [1] - 59:13

## Q

**qualified** [1] - 52:3
**questions** [3] - 32:24, 43:24
**quickly** [1] - 20:6
**quite** [7] - 5:2, 18:21, 42:3, 43:4, 46:11, 54:25, 56:25
**quoted** [1] - 62:14

## R

**RACHEL** [1] - 1:20
**Rachel** [1] - 2:10
**radio** [1] - 16:23
**RANDOLPH** [1] - 1:8
**range** [1] - 22:2
**rare** [1] - 54:25
**rather** [1] - 23:1
**reach** [1] - 9:7
**reached** [2] - 8:10, 10:15
**read** [8] - 18:9, 39:11, 39:13, 39:14, 39:16, 39:17, 39:18, 43:3
**real** [5] - 24:21, 45:18, 46:4, 49:4, 61:2
**really** [23] - 8:9, 11:17, 23:6, 24:23, 25:16, 25:25, 28:9, 29:6, 37:23, 37:24, 40:21, 41:2, 42:24, 44:4, 45:12, 46:5, 46:19, 50:3, 50:17, 53:11, 58:18, 61:25, 62:12
**reason** [9] - 12:2, 14:15, 31:8, 40:19, 42:12, 42:15, 44:6, 57:23, 57:24
**reasons** [5] - 19:13, 32:17, 33:20, 42:19
**receipts** [1] - 13:15
**receive** [1] - 56:23
**received** [1] - 56:23
**receives** [1] - 15:20
**recent** [1] - 21:9,

51:16
**recipe** [2] - 31:18, 31:21
**reciprocal** [1] - 51:7
**recklessness** [1] - 22:23
**recollection** [2] - 51:17, 55:13
**record** [4] - 2:5, 36:9, 44:2, 49:14
**records** [1] - 19:21
**redacted** [1] - 52:19
**Reed** [1] - 21:21
**reference** [1] - 26:14
**referred** [1] - 54:18
**refused** [1] - 18:13
**regard** [2] - 4:10, 38:21
**regulator** [1] - 43:23
**rejected** [1] - 39:24
**relate** [3] - 21:18, 54:8, 54:11
**related** [3] - 21:15, 23:17, 57:11
**relates** [4] - 2:17, 37:21, 38:25, 53:18
**relating** [7] - 2:20, 3:6, 3:7, 4:7, 6:18, 37:3, 59:25
**relevant** [8] - 7:12, 11:25, 19:20, 19:25, 20:18, 23:3, 29:21, 54:5
**rely** [2] - 26:11, 26:20
**remedies** [1] - 62:21
**remedy** [1] - 62:19
**remember** [2] - 10:12, 21:21
**remembers** [1] - 55:10
**remind** [1] - 20:9
**replicate** [1] - 38:19
**report** [10] - 14:15, 29:23, 33:9, 33:21, 34:9, 35:9, 35:14, 35:15, 35:23, 36:5
**reported** [3] - 53:4, 53:18, 57:7
**reporter** [13] - 9:3, 9:14, 10:14, 15:4, 16:6, 18:4, 26:12, 33:25, 34:2, 34:4, 34:25, 43:15, 57:10
**REPORTER** [1] - 64:1
**Reporter** [3] - 1:22, 1:23, 64:10
**reporters** [31] - 3:13, 3:17, 7:9, 7:18, 13:9, 15:18, 15:19, 21:6, 22:16, 22:19, 23:23, 24:1, 28:6, 29:8,

29:13, 29:17, 33:9, 33:11, 33:20, 34:7, 34:13, 34:22, 46:16, 54:25, 55:8, 56:2, 56:3, 56:15, 57:6, 59:6, 60:20
**reporting** [34] - 2:19, 2:23, 3:15, 4:1, 4:7, 5:8, 5:14, 5:15, 6:2, 6:3, 7:11, 7:15, 10:5, 11:9, 11:13, 12:14, 19:23, 20:9, 20:11, 21:17, 23:15, 25:15, 31:25, 33:11, 34:9, 42:21, 52:8, 53:16, 55:1, 55:2, 55:17, 55:22, 57:8, 61:25
**representations** [2] - 43:17, 43:19
**request** [3] - 10:20, 20:16, 58:7
**requested** [1] - 4:9
**requests** [4] - 53:23, 54:4, 56:23, 59:13
**require** [2] - 15:17, 15:19
**requirement** [1] - 12:20
**reserve** [1] - 41:4
**reserves** [1] - 43:14
**reserving** [1] - 40:22
**reservoir** [1] - 38:22
**resolved** [1] - 5:21
**respect** [19] - 2:14, 2:23, 3:15, 5:19, 7:14, 7:20, 7:21, 7:23, 7:25, 8:1, 8:5, 9:6, 17:13, 28:16, 29:9, 52:8, 52:18, 53:10, 59:19
**respectfully** [1] - 50:16
**responsibilities** [1] - 48:6
**responsible** [1] - 54:25
**restraint** [1] - 48:11
**restriction** [1] - 36:12
**result** [1] - 8:10
**return** [1] - 11:21
**returned** [1] - 14:25
**returns** [1] - 12:22
**reveal** [2] - 52:17, 52:23
**reviewed** [3] - 4:8, 14:9, 28:18
**reviewing** [1] - 26:13
**revised** [2] - 58:8, 60:10
**Ridge** [1] - 21:25

**rightly** [1] - 55:23
**rigidly** [1] - 49:8
**risk** [13] - 17:11, 24:11, 26:22, 27:5, 27:6, 29:6, 47:18, 50:12, 50:17, 50:19, 58:17, 59:19, 60:1
**RMR** [2] - 1:22, 64:9
**road** [1] - 5:14
**rocket** [1] - 28:7
**role** [2] - 7:9, 22:16
**rolling** [1] - 17:15
**room** [1] - 27:20
**Room** [2] - 1:23, 64:10
**roughly** [4] - 20:1, 21:19, 53:22, 53:23
**Rukshan** [1] - 21:25
**rule** [1] - 55:19
**run** [2] - 17:11, 32:4
**running** [1] - 20:19

## S

**sake** [1] - 15:4
**sanction** [2] - 17:19, 42:12
**sanctioning** [1] - 19:11
**satisfied** [1] - 6:7
**satisfy** [1] - 6:19
**saw** [1] - 36:2
**scandal** [1] - 61:17
**scare** [1] - 8:24
**scenario** [5] - 18:3, 44:23, 45:25, 57:17, 57:19
**schedule** [1] - 40:11
**Schiller** [2] - 1:12, 1:14
**School** [1] - 21:25
**school** [5] - 26:1, 26:9, 26:10, 53:21, 54:7
**schools** [5] - 10:25, 25:23, 53:17, 57:12
**science** [1] - 28:7
**scope** [6] - 19:19, 20:16, 20:21, 22:13, 53:10, 56:6
**scrutinized** [1] - 48:1
**Seattle** [1] - 48:8
**second** [4] - 17:21, 28:24, 39:2, 41:9
**secret** [1] - 53:2
**see** [10] - 20:6, 29:3, 29:7, 36:2, 38:24, 41:2, 48:2, 56:18, 57:4, 62:19
**seeking** [2] - 15:24, 20:17

**seem** [2] - 21:15, 44:9
**Sefranek** [3] - 1:22,
64:9, 64:9
**SEFRANEK** [1] - 64:3
**segment** [2] - 32:1,
56:14
**segmenting** [1] -
56:16
**segregate** [5] - 2:23,
16:7, 25:19, 50:6,
56:12
**segregated** [1] - 57:23
**segregating** [1] - 17:5
**segues** [1] - 17:21
**self** [3] - 35:2, 35:4,
35:7
**self-policing** [3] -
35:2, 35:4, 35:7
**sending** [1] - 39:23
**sends** [1] - 39:20
**sense** [4] - 25:11,
38:7, 56:25, 57:22
**sensitive** [7] - 2:18,
28:1, 37:2, 37:13,
41:1, 62:7, 62:24
**sent** [2] - 31:15
**sentence** [1] - 18:9
**separate** [2] - 38:15,
51:21
**separately** [1] - 37:25
**serious** [3] - 30:19,
50:17, 58:20
**served** [2] - 10:20,
20:16
**service** [1] - 3:16
**set** [3] - 32:15, 55:16,
55:21
**seven** [2] - 10:6, 57:7
**several** [2] - 10:13,
62:10
**shaming** [1] - 9:15
**shield** [1] - 43:15
**shielding** [1] - 61:15
**shift** [2] - 3:23, 44:16
**shifting** [6] - 5:19,
24:20, 32:11, 32:23,
42:8, 44:5
**shocked** [1] - 5:4
**shoes** [1] - 46:15
**short** [2] - 45:23,
60:23
**shortly** [1] - 34:13
**show** [27] - 9:14, 9:17,
10:2, 10:3, 13:13,
14:8, 14:18, 17:8,
39:8, 40:23, 41:5,
41:20, 41:24, 45:20,
45:21, 47:6, 47:7,
47:11, 47:17, 48:24,
49:1, 49:5, 49:11,

49:22, 57:16, 59:17,
60:19
**showed** [1] - 47:20
**showing** [4] - 41:15,
49:16, 51:2, 59:19
**shown** [4] - 17:7,
41:14, 50:18, 57:21
**shows** [3] - 14:2,
25:21, 52:12
**side** [3] - 3:11, 41:14,
57:16
**sides** [1] - 61:3
**Siegel** [12] - 2:10, 5:4,
11:5, 14:14, 14:17,
24:13, 54:16, 55:6,
56:9, 60:7, 60:18,
60:24
**SIEGEL** [68] - 1:17,
2:9, 24:15, 25:5,
25:18, 26:22, 27:12,
27:17, 27:23, 28:16,
28:25, 29:13, 30:6,
30:10, 30:15, 30:22,
31:6, 31:11, 31:13,
31:17, 31:24, 32:11,
32:16, 33:1, 33:4,
33:16, 34:12, 34:23,
35:11, 35:18, 35:25,
36:12, 36:23, 37:17,
38:6, 38:12, 38:23,
39:7, 39:10, 39:14,
39:17, 39:19, 41:10,
42:2, 42:15, 44:23,
46:14, 46:23, 47:4,
47:16, 47:21, 48:11,
48:14, 49:20, 50:11,
51:13, 51:21, 51:24,
52:16, 53:1, 53:9,
53:14, 61:5, 61:7,
61:15, 61:19, 61:22,
62:3
**sign** [2] - 15:21, 34:22
**signing** [1] - 35:1
**Silva** [1] - 21:25
**simplifying** [1] - 19:15
**simply** [4] - 4:4, 8:2,
15:17, 32:8
**single** [2] - 43:8, 55:16
**sit** [3] - 6:4, 8:9, 60:6
**situated** [1] - 7:10
**situation** [3] - 8:18,
17:9, 19:1
**six** [1] - 35:21
**skilled** [2] - 8:3, 8:5
**slam** [2] - 29:5, 29:7
**slam-dunk** [1] - 29:5,
29:7
**sleep** [1] - 17:2
**slightest** [1] - 58:23
**slightly** [1] - 8:17

**slow** [1] - 18:4
**small** [2] - 53:10, 54:8
**smart** [3] - 19:10,
38:17, 38:18
**so-called** [1] - 15:14
**software** [1] - 27:2
**solutions** [1] - 56:10
**solve** [1] - 18:15
**someone** [7] - 9:22,
17:15, 30:19, 34:18,
38:17, 63:1, 63:7
**sometime** [1] - 53:22
**somewhat** [4] - 3:4,
4:11, 7:10, 9:6
**song** [1] - 16:19
**soon** [1] - 60:10
**sorry** [9] - 12:16, 18:5,
26:25, 28:23, 30:11,
34:15, 35:3, 37:11,
41:8
**sort** [12] - 6:19, 10:5,
13:7, 16:20, 23:18,
29:10, 36:12, 42:12,
42:20, 45:23, 49:7,
49:25
**sorting** [1] - 5:15
**sorts** [1] - 8:17
**sound** [1] - 40:13
**source** [13] - 3:7, 4:3,
5:6, 14:18, 14:21,
15:9, 18:13, 19:1,
45:21, 51:22, 52:23
**source's** [1] - 15:6
**sources** [6] - 3:1,
14:24, 18:2, 42:22,
45:16, 52:18
**speaking** [1] - 56:2
**speaks** [1] - 22:22
**specific** [2] - 60:2,
62:9
**specificity** [1] - 60:9
**specifics** [1] - 6:10
**specified** [1] - 59:5
**specify** [1] - 54:3
**speed** [2] - 28:21, 38:3
**spending** [3] - 28:21,
47:8, 47:9
**spent** [1] - 28:17
**spreadsheets** [1] -
62:11
**spring** [1] - 40:25
**stack** [1] - 60:5
**stake** [1] - 28:3
**stamp** [1] - 13:20
**stand** [4] - 5:5, 20:5,
46:21, 59:24
**standard** [7] - 3:4, 3:5,
6:1, 6:6, 6:20, 7:16
**standards** [1] - 7:12
**standing** [3] - 14:23,

21:11, 36:6
**start** [4] - 24:19,
24:22, 32:24, 59:13
**started** [6] - 20:19,
37:18, 42:23, 42:25,
54:9, 60:12
**starting** [2] - 2:5, 47:5
**state** [1] - 2:4
**statement** [2] - 10:24,
11:1
**States** [2] - 1:23, 51:4
**STATES** [2] - 1:1, 1:9
**stenographic** [1] -
64:5
**step** [1] - 44:25
**still** [8] - 3:14, 4:10,
5:12, 7:5, 17:6, 23:4,
55:22, 63:11
**stockpile** [1] - 13:16
**stolen** [1] - 16:19
**stop** [1] - 23:18
**stories** [1] - 61:12
**story** [9] - 20:20,
22:22, 23:5, 23:6,
32:4, 33:25, 34:3,
35:20, 57:11
**strange** [1] - 8:18
**Street** [2] - 1:12, 1:18
**strike** [4] - 7:23, 61:4,
62:18, 62:24
**strikes** [1] - 9:23
**STROM** [3] - 1:20,
17:1, 52:25
**Strom** [1] - 2:10
**stuff** [2] - 21:7, 28:14
**subgroup** [1] - 60:14
**subject** [8] - 2:24,
3:25, 4:20, 17:18,
26:24, 34:8, 37:19,
49:12
**subjective** [1] - 22:22
**submissions** [2] - 4:8,
4:9
**submit** [2] - 15:21,
58:7
**submitted** [1] - 5:1
**submitting** [1] - 43:3
**subpoena** [2] - 40:5,
40:9
**subpoenaed** [1] - 40:5
**substantial** [4] - 4:19,
20:19, 44:17, 50:17
**substantially** [1] -
3:12
**such-and-such** [1] -
14:10
**sued** [6] - 30:25,
36:15, 36:19, 38:7,
40:8, 52:6
**sues** [1] - 33:10

**sufficiently** [1] - 60:2
**suggest** [1] - 23:13
**suggesting** [1] - 21:8
**suit** [2] - 35:12, 54:1
**Suite** [1] - 1:18
**suits** [1] - 33:18
**summarize** [1] - 49:5
**summer** [1] - 61:17
**super** [1] - 41:1
**supervise** [1] - 31:25
**supplemental** [2] -
4:9, 17:23
**supported** [1] - 60:2
**suppose** [4] - 6:14,
17:5, 21:1, 60:22
**supposed** [1] - 36:10
**Supreme** [1] - 48:8
**surgical** [1] - 56:8
**surprised** [1] - 11:17
**suspect** [1] - 63:11
**Sweet** [1] - 16:15

**T**

**talented** [1] - 37:1
**talks** [1] - 6:22
**TAMARA** [1] - 64:3
**Tamara** [3] - 1:22,
64:9, 64:9
**target** [1] - 22:6
**tax** [2] - 11:21, 12:20
**tax-exempt** [1] - 12:20
**technology** [1] - 28:9
**telecast** [2] - 13:24,
14:8
**television** [1] - 44:11
**ten** [2] - 27:7, 47:1
**tend** [2] - 23:12, 52:17
**tenders** [1] - 39:9
**tens** [1] - 28:18
**terabytes** [1] - 22:10
**terms** [4] - 20:21,
22:12, 53:11, 57:14
**terribly** [1] - 15:12
**terrific** [1] - 58:4
**testify** [2] - 36:22,
36:25
**THE** [111] - 1:1, 1:1,
1:8, 2:2, 2:8, 2:12,
9:5, 9:22, 10:11,
11:20, 11:24, 12:9,
12:16, 13:2, 13:17,
13:22, 14:12, 15:17,
16:11, 16:14, 16:18,
16:24, 17:2, 17:11,
17:17, 18:4, 18:16,
18:20, 19:4, 19:14,
19:19, 20:7, 20:13,
21:1, 21:17, 22:8,
22:18, 23:9, 24:13,

25:2, 25:9, 25:19, 26:25, 27:15, 27:18, 27:24, 28:23, 29:1, 29:22, 30:8, 30:11, 30:16, 31:3, 31:10, 31:12, 31:14, 31:18, 32:7, 32:13, 32:17, 33:3, 33:13, 34:5, 34:15, 35:3, 35:15, 35:24, 36:11, 36:20, 36:24, 37:20, 38:10, 38:13, 39:6, 39:11, 39:15, 39:18, 41:8, 41:11, 42:14, 44:22, 45:24, 46:15, 46:24, 47:14, 47:17, 48:10, 48:13, 49:13, 50:5, 51:5, 51:15, 51:23, 52:9, 52:20, 53:6, 53:13, 54:13, 55:9, 58:3, 58:5, 61:6, 61:14, 61:18, 61:21, 62:1, 62:4, 62:15, 62:18, 62:23, 63:10
**theory** [1] - 20:18
**therefore** [5] - 28:11, 37:6, 40:1, 41:22, 52:13
**they've** [9] - 2:24, 2:25, 28:17, 28:18, 30:25, 38:8, 40:6, 45:6
**thinking** [6] - 7:8, 8:7, 10:3, 26:16, 51:16, 62:6
**thinks** [1] - 4:23
**thirdhand** [1] - 10:22
**thousands** [3] - 24:1, 28:19, 29:14
**threat** [2] - 9:18, 9:23
**threaten** [1] - 39:5
**three** [5] - 28:8, 28:10, 28:17, 56:3
**Thursday** [1] - 56:24
**today** [3] - 6:4, 21:11, 22:12
**together** [1] - 59:13
**token** [1] - 46:9
**tons** [1] - 33:17
**took** [4] - 20:9, 20:11, 54:7, 55:12
**top** [5] - 10:12, 11:25, 12:5, 26:17, 26:19
**topic** [1] - 9:11
**totally** [2] - 44:1, 50:11
**TRANSCRIPT** [1] - 1:8
**transcript** [2] - 64:4, 64:6
**tree** [1] - 45:11
**Tremaine** [2] - 1:18,

1:20
**tricky** [1] - 53:1
**true** [7] - 7:21, 11:13, 23:5, 28:17, 61:24, 64:4, 64:5
**truth** [15] - 3:17, 7:13, 7:21, 7:22, 7:25, 8:1, 20:19, 20:23, 22:17, 23:1, 23:17, 27:16, 27:19, 37:25, 38:14
**truth-related** [1] - 23:17
**try** [3] - 31:19, 42:12, 53:6
**trying** [7] - 9:19, 24:16, 27:2, 28:21, 35:5, 42:19, 43:1
**TURCO** [1] - 1:17
**turn** [2] - 8:13, 52:11
**turning** [2] - 46:6, 52:21
**turns** [2] - 6:14, 43:19
**two** [4] - 3:20, 6:24, 19:22, 26:12
**type** [3] - 9:13, 59:5, 60:24
**types** [3] - 4:12, 4:15, 8:16
**typically** [1] - 34:24

### U

**ultimate** [1] - 18:7
**ultimately** [2] - 32:3, 53:18
**uncertainty** [1] - 18:22
**under** [10] - 4:5, 7:12, 7:15, 15:22, 41:16, 42:11, 58:15, 59:20, 59:21, 60:21
**understood** [3] - 8:15, 17:21, 63:9
**undoubtedly** [1] - 48:1
**unfair** [1] - 17:3
**unfortunately** [1] - 21:11
**unique** [1] - 38:21
**uniquely** [2] - 24:7, 38:24
**United** [2] - 1:23, 51:3
**UNITED** [2] - 1:1, 1:9
**universe** [1] - 23:2
**unless** [1] - 54:3
**unmask** [1] - 42:21
**unmistakable** [1] - 43:12
**unusual** [6] - 24:10, 33:7, 55:4, 55:18, 55:21

**unwieldy** [1] - 22:10
**up** [40] - 5:5, 5:21, 9:8, 12:18, 13:11, 13:13, 13:23, 14:2, 14:8, 15:8, 16:22, 23:18, 25:6, 25:25, 27:6, 28:21, 29:19, 29:25, 31:15, 31:20, 31:22, 32:15, 35:13, 35:21, 38:3, 39:3, 39:4, 40:19, 42:19, 43:18, 44:7, 46:21, 47:2, 47:9, 52:12, 53:25, 54:1, 54:19, 55:6
**upset** [1] - 25:25

### V

**Vader** [2] - 44:9, 44:10
**valuable** [1] - 22:20
**vanilla** [1] - 34:20
**variations** [1] - 53:5
**variety** [2] - 5:23, 43:5
**vast** [1] - 46:7
**venue** [1] - 43:9
**version** [3] - 27:2, 32:14, 58:8
**versions** [2] - 15:25, 52:19
**versus** [3] - 7:12, 22:17, 53:17
**vicariously** [1] - 36:16
**Vietnam** [3] - 33:10, 33:12
**view** [2] - 6:16, 54:19
**violate** [4] - 26:5, 30:23, 31:9, 47:23
**violated** [5] - 17:7, 17:8, 30:24, 44:18, 44:19
**violates** [1] - 30:19
**violating** [1] - 19:6
**violation** [3] - 44:16, 45:19, 50:7
**violations** [2] - 5:2, 30:12
**virtually** [3] - 6:16, 6:17, 46:6
**vs** [1] - 1:4

### W

**wait** [1] - 46:20
**waived** [1] - 43:14
**walk** [2] - 30:15, 35:13
**wall** [1] - 29:25
**wants** [4] - 35:22, 51:8, 51:9, 62:19
**Washington** [5] - 1:5, 1:16, 1:19, 1:24,

64:11
**waste** [1] - 58:2
**watch** [1] - 53:2
**watermark** [5] - 13:18, 13:20, 13:21, 13:25, 58:13
**watermarked** [2] - 15:10, 44:12
**Watson** [1] - 21:23
**ways** [10] - 13:6, 21:2, 21:5, 29:10, 32:1, 45:22, 49:6, 50:14, 50:20, 63:7
**WE** [53] - 1:2, 2:3, 2:7, 2:20, 2:23, 3:1, 3:15, 3:20, 3:21, 4:7, 4:14, 4:18, 6:10, 6:16, 9:2, 9:15, 10:15, 10:17, 11:6, 11:9, 11:21, 13:13, 14:25, 15:15, 16:7, 17:24, 21:14, 23:11, 24:11, 25:1, 26:9, 29:16, 33:6, 35:20, 42:6, 42:10, 42:12, 43:13, 44:2, 45:1, 45:9, 47:25, 52:10, 52:21, 53:18, 53:19, 57:7, 57:9, 57:10, 57:11, 58:13, 61:23
**website** [1] - 57:8
**week** [1] - 26:12
**weeks** [1] - 26:12
**welcome** [1] - 32:13
**Westmoreland** [2] - 33:10, 55:5
**whatsoever** [1] - 35:16
**whole** [8] - 14:1, 33:6, 35:19, 42:4, 43:20, 61:16, 61:24
**William** [1] - 33:10
**willing** [2] - 49:9, 56:4
**win** [1] - 33:3
**wise** [1] - 58:15
**withholding** [1] - 43:20
**witness** [3] - 39:23, 41:17, 57:20
**witnesses** [6] - 9:8, 39:22, 40:2, 40:15, 40:23, 41:13
**won** [1] - 33:4
**wonder** [1] - 18:25
**word** [3] - 5:7, 13:14, 61:8
**words** [4] - 3:21, 3:22, 29:15, 63:7
**works** [2] - 36:4, 37:10
**world** [3] - 24:5, 25:1,

26:4
**worried** [6] - 8:16, 8:18, 8:19, 24:23, 41:3, 50:21
**worry** [1] - 16:5
**wow** [2] - 15:8, 62:12
**Wright** [2] - 1:18, 1:20
**writing** [1] - 42:25
**wrote** [3] - 26:8, 39:13, 39:14

### Y

**yard** [1] - 20:5
**year** [3] - 19:22, 20:8, 26:7
**years** [10] - 11:2, 20:1, 20:8, 20:9, 21:12, 22:7, 27:13, 28:17, 55:12, 57:9
**York** [2] - 1:15, 1:21
**York's** [1] - 19:1
**yourself** [1] - 25:14
**yourselves** [1] - 60:25

### Z

**zero** [4] - 25:8, 39:7, 40:16, 40:17