**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WE CHARITY,<br><br>  *Plaintiff,*<br><br>vs.<br><br>THE CANADIAN BROADCASTING CORPORATION,<br><br>  *Defendant.* | Case No. 1:22-cv-00340-RDM-MJS |

**PLAINTIFF'S SUPPLEMENTAL SUBMISSION REGARDING OUTSTANDING DISCOVERY DISPUTES**

Plaintiff WE Charity ("Plaintiff," "WE Charity," or "WE") submits the following supplemental submission concerning the remaining discovery disputes discussed at the December 19, 2024, hearing, pursuant to the Court's December 20, 2024, order.

## INTRODUCTION

In this defamation action, WE Charity contends that CBC published a series of defamatory stories about it in the fall of 2021. CBC's central thesis was that WE Charity routinely deceived donors by promising them that their donations were fully funding schoolrooms in Kenya and that, based on CBC's research and visit to Kenya in September 2021, WE did not build hundreds of schools in Kenya it promised donors it had built. Compl. ¶¶ 3, 379–87, 425, 464–76.

To prove its defamation claim, WE Charity must prove that (1) CBC's statements were false and (2) CBC made its statements with actual malice. *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013). The first element—falsity—depends both on the documents and information CBC had when it published, but also discovery within WE Charity's control, including its communications with the donors CBC identified in its coverage, information about WE Charity's practices concerning donor communication, and information about its construction of schools. WE's subjective state of mind is not at issue: what matters is *whether* WE Charity built schools, made false promises to donors, or misappropriated donations. Not *why*.

The second element—actual malice—depends on discovery *entirely* within CBC's control because it turns on CBC's journalists' subjective state of mind, *i.e.*, *why* they published false coverage. *See US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 31 (D.D.C. 2022) (the actual malice standard "makes the speaker's state of mind the constitutional gravamen"). To prove actual malice, WE must show CBC acted with actual knowledge of falsity or reckless disregard of truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). CBC acted recklessly if it "entertained serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of . . .

1

probable falsity." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016).

Proof of actual malice typically turns on circumstantial evidence, including evidence that: a story was fabricated or based on unverified sources; the journalist had information that contradicted the reporting; the defendant had motive to defame the plaintiff; or the defendant knew it made a mistake and refused to acknowledge it. *See Biro v*, 963 F. Supp. 2d at 277. Proving actual malice therefore requires discovery into internal communications, drafts of the defamatory publications and research documents, communications with sources, and testimony about support for the statements in the defamatory publications. *See, e.g.*, *Harte–Hanks Comm., Inc v. Connaughton.*, 491 U.S. 657, 692–93 (1989) (media defendant's failure to interview an available witness supported a finding of malice); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 88 (D.D.C. 2012) (explaining "comparing the article draft to the article ultimately published" could be probative of actual malice). Such state of mind evidence is uniquely within the defendant's control.

Before the Court are three outstanding discovery issues. The two issues WE Charity raises both involve discovery squarely relevant to CBC's state of mind (and thus, actual malice) that it is shielding from WE Charity: (1) discovery relating to its journalists' prior experience with the kinds of charitable communications it mischaracterized in the defamatory publications and (2) drafts of key documents like scripts and fact checking documents that were circulated by link rather than as email attachments, and other documents circulated by link in internal CBC emails. The issue CBC raises regarding WE Charity's productions involves documents that it never requested from WE Charity prior to the Court's deadline for doing so more than a year ago.[1]

---

[1] The parties have reached an agreement on the second issue WE Charity raised in the parties' joint status report regarding documents post-dating the Complaint. *See* ECF No. 65 at 3.

2

**ARGUMENT**

I. **CBC Should Be Compelled to Produce Documents Concerning Its Journalists' Knowledge and Experience With Charities.**

CBC refuses to produce communications reflecting its journalists' knowledge of and prior experience with other charities responsive to WE's Requests for Production 80, 81, and 90. Ex. A at 20–21, 26. CBC has refused to produce responsive documents on two primary grounds: (1) that the Requests are an invasion of privacy, and (2) that CBC's reporting did not solely rely on WE's communications to donors, rendering the Requests not proportionate to the needs of the case. *Id.*; ECF No. 65 at 2–3. As a compromise, on January 8, 2025, WE offered to narrow its requests to the following narrowly tailored categories of documents:

1. Personalized communications from charities to Harvey Cashore, Diana Swaine, Brodie Fenlon, Matthew Pierse, Kate McKenna, Cecil Rosner, or Mark Kelley, concerning such journalists' donations or their charitable impact.
2. Communications from charities to the above journalists which reference a specific potential impact—*e.g.*, providing specific goods, or relief for a particular disaster.
3. Documents concerning the above journalists' personal participation in charitable fundraising efforts—*i.e.*, *raising* funds, not merely *giving* funds.

*See* Ex. C at 21–22. As to privacy, WE also proposed that, for the first two narrowed requests, CBC redact the dollar amount of any donation in the documents and the name of the charity at issue. *Id.* CBC rejected WE's compromise position outright, without offering any other proposal for resolution of this issue. *Id.* Especially given WE's narrowed proposal, each of CBC's objections is unavailing.

First, these documents are squarely relevant to Plaintiff's defamation claims because, as explained above, the state of mind of CBC's journalists is at issue. CBC journalists' prior experiences with the topic of their reporting is highly probative of their state of mind when making statements about WE's communications with its donors and, thus, actual malice. Courts have therefore consistently found that journalists' personal experiences are relevant in defamation cases.

3

*See, e.g.*, *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (considering author's "personal experience" in determining whether author acted with actual malice); *Hi-Tech Pharms., Inc. v. Cohen*, 277 F. Supp. 3d 236, 249 (D. Mass. 2016) (noting that in evaluating actual malice, the inquiry is "a reasonable person in [defendant's] position (with like experience and background)"); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 85 (D. D.C. 2012) (defendant's "long experience with Iranian and American politics" was relevant to actual malice).

CBC discussed the following types of WE donor communications in its reporting to support its allegation that WE deceived donors: (1) WE's personalized impact reports for donors (*see, e.g.*, Compl. ¶ 587); (2) WE's fundraising statements (*see, e.g.*, *id.* ¶ 393); (3) statements by donors describing their gifts to WE (*see, e.g.*, *id.* ¶ 402). WE is entitled to discovery regarding CBC journalists' knowledge and understanding of these types of communications sent by other charities. Take, for example, the impact reports. A core issue in the case is whether it was reasonable for someone with "like experience and background" as CBC's journalists to interpret these reports as representing to donors "that they fully funded the project" described in the report, as opposed to explaining the impact of donors' collective contributions towards a cause.

While CBC represents that its story "isn't based on impact reports or what those impact reports might mean," discovery and the defamatory publications themselves show that this is incorrect. Ex. B at 16:18–19. As WE pointed out during the hearing, CBC relied on WE impact reports in creating investigative spreadsheets tallying the number of schools donors believed they funded (*id.* at 21:7–22:13); CBC has responded to interrogatories by noting its reliance on impact reports in its investigation of the WE story (*see, e.g.*, Ex. D at 7–8 (CBC sourced information from at least two different impact reports)); and the entirety of CBC's narrative about a donor who was interviewed on camera, Watson Jordan, stemmed from Jordan and CBC's misinterpretation of an

4

impact report WE sent him (*see, e.g.*, Compl. ¶¶ 584–87). Indeed, the title of one of the defamatory publications—"Finding School No. 4"—is an explicit reference to an impact report Jordan received containing a picture of a school with the caption "Classroom 4 completed." *See* Ex. Q.

Moreover, while the impact reports were important to CBC's reporting, they were not the only donor communications that CBC relied on (and misconstrued). As explained above, CBC also relied on WE Charity marketing statements that discuss the potential impact of certain donation amounts, *e.g.*, WE's alleged statement that "$10,000 will fully construct a schoolhouse in Kenya." Compl. ¶ 393. The journalists' experience with such statements in charities' marketing is relevant to whether the journalists understood these statements to mean that every $10,000 given to the charity would go solely to school construction or they knew these statements were demonstrative of the type or magnitude of impact a $10,000 donation could have.

Second, CBC's privacy objections are not well founded. As an initial matter, CBC has cited no legal authority for its position that a party is entitled to withhold discovery solely on the basis of privacy concerns. Even if CBC had done so, WE has agreed to redact the dollar amount donated and the specific charity or cause at issue, provided CBC does not offer evidence concerning elements of a document it chooses to redact. *See* Ex. C at 21–22. CBC has identified no other aspect of these documents that it contends are private.

Further, the Court has entered a Protective Order to protect confidential documents from public disclosure. *See* ECF No. 47 ¶ 1 (either party may designate documents containing "sensitive personal information" confidential). Numerous courts have held that, even in cases involving highly confidential and sensitive records, the entry of a protective order is sufficient to protect an individual's privacy interests, and privacy concerns therefore do not warrant restricting discovery. *See, e.g., Ramos v. Sessions*, 2018 WL 11511478, at *1 (D. D.C. Mar. 13, 2018) ("[T]he amended

protective order, which strictly limits the sharing of confidential medical records, adequately addresses the privacy concerns"); *Diaz-Garcia v. Surillo-Ruiz*, 45 F. Supp. 3d 163, 169 (D.P.R. 2014) ("The Court therefore finds that any privacy interests implicated by the disclosure of personnel files will be adequately safeguarded by a protective order."). CBC has cited no authority to support its position that the Protective Order is insufficient to protect its journalists' privacy.

CBC suggests that its journalists should be afforded special privacy protections because they are journalists, and that WE's request "puts a punitive personal price on investigative reporting." ECF No. 65 at 3. CBC has cited no support for this proposition, and WE is aware of none. There is simply no basis for denying a plaintiff discovery in a defamation matter (or any matter) simply because the journalist considers relevant discovery material to be private.[2]

Accordingly, the Court should order CBC to produce, at the very least, the narrowed set of documents WE proposed to CBC on January 8, 2025.

## II. CBC Should Be Compelled to Produce Documents Hyperlinked in Internal Emails.

CBC produced over 1,500 emails with hyperlinks to CBC documents stored on Google Drive ("Linking Emails"), many which have not been produced in discovery. CBC contends it is too burdensome for it to identify, produce and match up the linking and linked documents.

To relieve CBC of the burden of doing so itself, WE Charity invested significant resources identifying by filename 37 CBC documents whose drafts appear to be linked in many of the Linking Emails. Those documents are identified in Exhibit E. Rather than seek to re-link the drafts of these documents with their Linking Emails, WE Charity asked CBC to produce the drafts

---

[2] CBC's demands for privacy are not well taken given its discovery of WE Charity—which WE Charity has provided—including its entire general ledger, complete donor database, and tens of thousands of emails, photos and videos of staff. Furthermore CBC's reporting itself involved collecting footage of a WE Charity employee's wedding, inquiries about another's child care, calls to the charity founder's personal medical doctor, and many other gratuitous privacy invasions.

6

of those documents and let WE Charity itself try to match the documents up.[3]  WE Charity also identified 186 documents for which it does not believe there is a viable alternative to CBC producing the linked document(s) in a manner that re-links the documents (e.g., by producing family metadata).  CBC rejected WE Charity's proposal.

The Court should either order CBC to produce, with family metadata, all linked documents (approximately 1500 emails) listed in Exhibit N, or order CBC to accept WE Charity's compromise and re-link the 186 Linking Emails identified on Exhibit L and produce the drafts in its possession of the 37 documents on Exhibit E.  CBC has imposed far more costs and burden on itself (and WE Charity) in opposing these requests than it would have spent simply producing the documents.

    A.   <u>If It Is Not Ordered to Produce All Linked Documents in the 1500 Linking Emails, CBC Should Be Compelled to Produce Its Drafts of the 37 Documents in Exhibit E.</u>

The 37 documents in Exhibit E—and their drafts—are highly relevant to this case.  They include key documents that are probative of state of mind and actual malice, such as draft scripts of the defamatory publications, documents purporting to reflect CBC's fact-checking process, and research documents compiling information on which CBC claims to have relied.  *See* Ex. E.  Courts hold that contemporaneous drafts of such documents reflect a journalist's state of mind, making them highly relevant in defamation cases.  *See Palin v. New York Times Co.*, 113 F.4th 245, 277–278 (2d Cir. 2024) (discussing evolution of drafts as evidence of actual malice in reversing dismissal of defamation suit); *Broadrock Gas Servs., LLC v. AIG Specialty Ins. Co.*, 2015 WL 916464, at *7 (S.D.N.Y. Mar. 2, 2015) ("[T]he drafts are potentially relevant insofar as they may

---

[3] WE Charity's ability to forgo having CBC re-link these documents with their linking emails assumes that, as explained to WE Charity by CBC, the produced drafts will show the edits and comments noted in the Linking Emails and contain accurate date metadata.

contain admissions that were then deleted in the process of editing."); *Tavoulareas v. Piro*, 93 F.R.D. 35, 43 (D. D.C. 1981) (ordering newspaper to produce editorial communications and drafts of articles which relate to the "journalists' states of mind in publishing the allegedly false articles").

For example, emails that link to the November Episode script discuss key topics like changing school counts (for example, Ex. F, CBC000411; Ex. G, CBC000425), fact checking (for example, Ex. H, CBC000431; Ex. I, CBC000435; Ex. J, CBC000552), and internal CBC editing and thought processes (Ex. K, CBC000490). But without the version of the script being discussed in these communications, the emails provide little information. WE is entitled to review drafts of the script and other key documents as they changed *in tandem* with the journalists' discussions, and with clear date and time information so WE can compare CBC's statements against a timeline of its knowledge about key topics. Indeed, this Court has itself recognized that the script of the defamatory publications (and its prior versions) is "one of the central pieces of evidence in [WE's] case" and "it can't just be the case that . . . the iterations [of Documents] that are developed over time are just ultimately shielded from discovery and you just get sort of the end product at the end of the day." Ex. B at 63:15, 64:2–7.

Second, CBC was obligated to produce all versions of these key documents long before any issue regarding links arose. WE Charity *specifically requested* all drafts of these key documents. Ex. R at RFP 5 (request for all documents CBC "prepared for purposes of publishing the Defamatory Publications" including all "drafts."); *see also id.* at 3 (definition of "documents," including "drafts"). CBC did not previously object to producing drafts of such documents and never raised the purported burden of producing all drafts of these documents. *See* Ex. BG at 9–10 (CBC response to RFP 4, agreeing to produce responsive documents).

To the contrary, **CBC agreed to produce the drafts it is now withholding** well over a year

8

ago. In late 2023, WE Charity emphasized the importance of receiving drafts of the defamatory publications in the course of negotiating an extension to the document discovery deadlines. Ex. O at 11-12 (identifying "[d]rafts and scripts of the defamatory publications" as "priority categories of documents to be produced by CBC as soon as possible, but no later than by January 24, 2024"). CBC agreed to endeavor to produce such drafts by January 24, 2024, prior to the deadlines for substantial completion of other productions. *Id.* CBC cautioned that some drafts could take longer to locate than January 2024, but there was no question that CBC would produce drafts of documents like those listed in Exhibit E to this briefing.[4] In reliance on CBC's promise to expedite the high priority discovery including drafts, the parties agreed to the revised scheduling order set forth in a January 12, 2024 stipulation filed with the Court. Dkt. No. 48. It was only in the recent context of discussing the Linking Emails that it became clear that CBC was withholding hundreds of drafts it now refuses to produce.[5]

CBC's response to WE Charity's attempts at compromise regarding linked documents has been rooted in deflection rather than seeking to substantiate its vague claims of burden. For example, CBC told WE Charity in response to its compromise proposal that WE failed to produce drafts of its own documents to CBC. *See* Ex. C at 2. This is flatly wrong (and brand new). Unlike CBC, WE exchanged edits to documents via email attachment, and has produced responsive, non-

---

[4]   At the time of its agreement to produce all drafts, CBC already knew that many of its documents were stored in Google Docs. In December 2023, CBC began producing spreadsheets that had been stored and edited in Google Docs. *See* Ex. S. When WE asked CBC to produce all versions of these spreadsheets, it raised a burden objection because the spreadsheets had been edited many times over many months—likely far longer than other documents. WE agreed to permit CBC to produce one version of each spreadsheet from the end of every other week as a compromise. CBC never raised any such issue with respect to drafts of any other documents, including those listed in Exhibit E.

[5]   For example, when WE Charity told CBC it believed it could remove over a thousand Linking Emails from its request if CBC ceased withholding drafts it should have produced long ago, CBC mischaracterized the proposal as *expanding* discovery. Ex. C.

9

privileged document families, including drafts attached to emails.[6]  CBC also attempted to compare its failure to produce drafts of its documents to WE Charity failing to produce all documents "auto-saved" by Microsoft Office (i.e., temporary backups in case the application crashes).  CBC did not (and cannot) identify any supportive case law, which is unsurprising as auto-saved backups are not equivalent to the drafts CBC is withholding.  Moreover, CBC has provided no evidence that WE possesses and has withheld "auto-save" files of documents, while it has admitted it can produce the withheld drafts of its scripts and other essential documents relating to the creation of the Defamatory Publications.  And, of course, WE's state of mind is not at issue, while CBC's state of mind is a central issue.  Assuming CBC repeats these points in its briefing, the Court should reject these attempts at deflection and distraction.

<u>Third</u>, producing draft documents in CBC's possession would not be unduly burdensome.  The only information CBC has provided about the purported burden of producing versions of these documents is that retrieving versions of a Google-stored document would be a manual process.  But CBC has provided no specifics about how long that process would take for each document or how many versions of each document exist, and has therefore failed to meet its burden to show that production is unduly burdensome as the party resisting discovery.  *See BuzzFeed, Inc. v. U.S. Dep't of Just.*, 318 F. Supp. 3d 347, 356 (D.D.C. 2018).  Given CBC's failure, WE Charity engaged a vendor to assess the burden in exporting all versions of a dynamic Google Doc, and that vendor has confirmed that the burden would be minimal and that third-party tools could automate the process.  Ex. M ¶ 40.

---

[6] In its email rejecting WE's proposal, CBC noted that WE has not produced drafts of a report by accountant Ken Froese. But Mr. Froese was hired to draft a report for CBC in anticipation of litigation with CBC, and drafts of his report in WE's possession (if any) have been logged as work product.  There is no challenge to that privilege assertion before the Court, and CBC is plainly conflating various, distinct issues to distract the Court from its own discovery failures.

    B.    <u>If It Is Not Ordered to Produce All Linked Documents in the 1500 Linking Emails, CBC Should Be Compelled to Produce the 186 Unidentifiable Linked Documents Listed in Exhibit BI.</u>

The Unidentifiable Linked Documents in Exhibit L are emails that link to documents on CBC's internal systems that WE has no way of identifying. These emails cannot be understood without the context of the linked documents, which in turn cannot be fully understood without the linking email. *See, e.g.*, Ex. BF. As CBC has stated to the Court (*see* Ex. B at 67:9–15) and represented to WE, CBC can access each link on its internal system but has refused to identify the linked documents based on burden. CBC should be required to produce the 186 Unidentifiable Linked Documents and link them to the emails to which they correspond.

<u>First</u>, the Unidentifiable Linked Documents are relevant because they are documents shared and considered by CBC's journalism team during their investigation of the defamatory publications in the context of communications CBC agreed were responsive to WE Charity's document requests. These documents are relevant to CBC's state of mind when it published the defamatory publications. And as WE explained in its prior submission, in the ordinary course of business, CBC circulated emails containing hyperlinks, and the recipient could click the hyperlink and view the linked document immediately. That is how they should be produced here. ECF No. 65 at 56. CBC argues that "dynamic documents . . . are constantly changing" and that "[t]here [are] many people that are working on them at any given time," such that "following that link will not necessarily take you to the version of the document that existed at the time of the email." *Id*. at 55:16–19, 56:3–7. But, as explained below, Google archives all drafts of Google Docs, so even if the documents were "constantly changing" and "in flux" because CBC kept creating new drafts, CBC should have preserved all of the drafts of the documents, and should be able to produce them. Moreover, WE Charity presently cannot review these documents *at all*, irrespective of version.

<u>Second</u>, producing 186 Unidentifiable Linked Documents, and identifying the emails to

11

which they correspond, would not be unduly burdensome. Although it is CBC's burden to show undue burden—not WE's burden to demonstrate that there is no undue burden—WE again engaged a vendor to assess this issue. According to that vendor, Google's Google Vault service allows parties to create litigation holds that will retain linked documents. Ex. M ¶ 2, 6–17, 22, 40. Google Vault can export documents, and an experienced vendor could rematch linked documents to the original emails in three hours. *Id.* ¶¶ 37–39. Utilizing these tools, there would be minimal burden in producing the Unidentifiable Linked Documents. Accordingly, CBC should be compelled to produce and re-link the 186 Unidentifiable Linked Documents.

  C. <u>CBC Cannot Rely on a Self-Created Burden to Avoid Discovery.</u>

  For both sets of linked documents, CBC's burden arguments have centered around the difficulties of collecting from Google Drive—the platform it chose to use to edit and circulate key documents at a time when it anticipated litigation. But CBC cannot rely on a self-created burden to excuse production of linked documents. "[T]he potential limitations and pitfalls with respect to production of hyperlinked documents from Google Vault have been widely known for many years." *In re Uber Tech., Inc.,*, 2024 WL 1772832, at *4 (N.D. Cal. Apr. 23, 2024); *see also* Ex. M ¶ 2, n.3. When a party creates a substantial burden for itself, that burden does not excuse production. *See, e.g.*, *Kozlowski v. Sears Roebuck & Co*., 73 F.R.D. 73, 76 (D. Mass. 1976) ("The defendant may not excuse itself from compliance . . . by utilizing a system of record-keeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them . . ."); *Wagner v. Dryvit Sys., Inc.,* 208 F.R.D. 606, 611 (D. Neb. 2001) ("The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information."); *Pom Wonderful LLC v. Coca-Cola Co*., 2009 WL 10655335, at *3–4 (C.D. Cal. Nov. 30, 2009) (ordering defendant to re-link emails with

attachments because a company may not shield itself from discovery due to its own poor record keeping). Based on this principle, courts have agreed that "[p]laintiffs should not suffer because Defendants have chosen a storage method that is difficult to search." *See Shenwick v. Twitter, Inc.*, 2018 WL 5735176, at *1 (N.D. Cal. Sept. 17, 2018).

CBC is a sophisticated journalism entity that is no stranger to litigation. CBC certainly knew about potential discovery issues created by utilizing the Google Suite of products and had sufficient resources to ensure the linked documents were captured and easily producible. CBC's burden arguments should be rejected because CBC created the burden itself, and because the new technology described above would permit CBC to collect the documents through a burdenless, automated process. Ex. M ¶ 40.[7]

### III. WE Charity Should Not Be Compelled to Produce Documents CBC Never Requested.

CBC claims that WE Charity has "withheld" communications about "decisions to redefine, 'renovate', and build" schoolrooms in Kenya. ECF No. 65 at 8–9. As explained at the hearing, CBC did not request these documents in its requests for production served prior to the Court's deadline to do so, and therefore has no basis for raising this issue with the Court. To be clear, WE Charity has already searched for and produced non-privileged documents responsive to CBC's RFP 91, which requests documents about WE Charity's counts of schoolrooms, including communications discussing its 2021 submission to Parliament about the number of schoolrooms

---

[7]   In its email rejecting WE's compromise, CBC contended that certain of WE's produced emails also contain links. Ex. C at 20. WE is currently determining whether it has access to the linked files identified, and will endeavor to produce any linked documents that it has not produced. Many of the links identified, however, were links to an internal database tracking information about donations that WE has already produced, and others were to external websites rather than internal WE documents. The Court should reject CBC's attempts at deflection.

WE built in Kenya.[8]  But the documents CBC raises now—communications about the decisions to renovate and build specific schoolrooms—do not fairly fall within its request for documents about "counts" of schoolrooms.  The Court recognized as much at the hearing.  Ex. B at 85:4–11.

Nor can CBC request these documents now.  Both parties agreed to a November 24, 2023, deadline for service of document requests, making CBC's requests overdue by more than a year.  ECF No. 36 at 13; August 29, 2023, Minute Entry.  Rule 16(b) provides that the Court may modify a scheduling order only for "good cause."  Fed. R. Civ. P. 16(b)(4).  Here, CBC cannot show any good cause.  CBC served nearly 200 expansive requests for production in this case, and at great expense, WE Charity has spent more than a year diligently collecting and producing documents responsive to those requests.  CBC should not be permitted to serve new discovery requests now.

Finally, CBC overstates the relevance of the documents it seeks.  CBC contends that communications about how, when, and why to build or renovate specific schoolrooms are relevant because it suspects that WE Charity built and renovated additional schoolrooms in 2021 in response to CBC's investigation.  *See* Ex. B at 75:2–14.  But even if this were true (it is not), it would be irrelevant to proving the truth of CBC's allegations in the defamatory publications at issue.  The defamatory publications alleged that WE *never* built most of the schoolrooms that it promised its donors it built.  Compl. ¶ 637.  The publications did not allege that WE lied to donors about *when* it was building or renovating schools.  Accordingly, even if CBC's theory (that WE rapidly built more schoolrooms in 2021 in response to CBC's investigation) was true, that would

---

[8]   RFP 91 reads: "All documents concerning WE Charity's counts in 2021 of the number of Schoolrooms and/or Primary Schoolrooms in Kenya. This includes, but is not limited to, the number of Schoolrooms reported in WE Charity's submission to Parliament on April 16, 2021 (360); the number of Schoolrooms subsequently provided to the CBC (852); the number (852) alleged in Paragraph 196 to have been 'provided to Canada's Parliament'; and the 'thorough review of school infrastructure in Kenya' referenced in an email quoted in Paragraph 198." Ex. T at 19–20. WE's agreement to produce responsive documents is attached as Exhibit P at 14.

14

not be probative of whether it was true for CBC to claim that WE never built the schools at all.

Finally, collecting and reviewing the documents CBC seeks would be unduly burdensome and disproportionate to the needs of the case. Collecting every WE Charity communication about, for example, a particular structure's roof needing repair or specific construction projects, could require collecting communications from numerous WE employees primarily located in Kenya (and whose communications are likely in Swahili). Given the volume of documents that WE Charity has produced so far—including budgets, board materials, trackers used to monitor construction and schoolroom counts (*see* Ex. B at 76:7–9)—CBC's additional request is unnecessary, irrelevant, and not proportionate to the needs of the case.

Dated: January 27, 2025

                          Respectfully submitted,

                          /s/ *Joseph F. Kroetsch*

                          BOIES SCHILLER FLEXNER LLP

Joseph F. Kroetsch (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300
jkroetsch@bsfllp.com

Amy L. Neuhardt (Bar No. 996791)
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
Tel: (202) 274-1137
Fax: (202) 237-6131
aneuhardt@bsfllp.com

John LaSalle (*pro hac vice*)
Sabina Mariella (*pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 754-4541

jlasalle@bsfllp.com
smariella@bsfllp.com

*Attorneys for Plaintiff WE Charity*