# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WE CHARITY,<br><br>       *Plaintiff,*<br>vs.<br><br>CANADIAN BROADCASTING<br>CORPORATION,<br><br>       *Defendant.* | Civil Action No. 22-00340-RDM |

### WE CHARITY'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT CANADIAN BROADCASTING CORPORATION

Plaintiff WE Charity, through its undersigned counsel and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, requests that Defendant Canadian Broadcasting Corporation produces for inspection and copying all documents responsive to the following individual requests (collectively, "the Requests") at the office of Boies Schiller Flexner LLP, 333 Main Street, Armonk, NY 10504, or such other place as agreed upon, within thirty (30) days of service of the Requests.

### I. DEFINITIONS

In addition to the definitions set forth in the Federal Rules of Civil Procedure, the following definitions apply to each of the Requests, and are deemed to be incorporated into each of said Requests:

1.   "Action" refers to this action, captioned *WE Charity v. Canadian Broadcasting Corporation*, No. 22-cv-340-RDM.

2.   "Communication(s)" is used in its broadest ordinary sense and shall mean any manner or means of disclosure, transfer or exchange of facts, information, ideas, opinions,

1

inquiries or thoughts, whether by written, oral, mechanical, telephonic, electronic or some other means of communication, and shall include the information transmitted. For the avoidance of doubt, the term "Communication" shall encompass pictures, photographs, recordings, text messages, WhatsApp messages, Signal messages, social media messages, or any other means of capturing or transmitting information.

3. "Complaint" refers to Plaintiff's Complaint filed in this Action, ECF No. 1.

4. "Concerning" is used in its broadest usual and customary meaning, and, in addition, shall mean directly or indirectly, in whole or in part, alluding to, analyzing, assessing, characterizing, commenting on, connected with, constituting, containing an implicit reference to, describing, disclosing, discussing, evidencing, explaining, identifying, memorializing, mentioning, noting, pertaining to, recording, referring to, reflecting, regarding, relating to, representing, showing, stating, suggesting, summarizing, supporting, touching upon, underlying, or otherwise involving the subject matter of the specified Request.

5. "WE Charity" means Plaintiff WE Charity or any other part of the WE Organization (as defined in the Complaint), and its employees, agents, representatives, predecessors, attorneys, consultants, and any persons acting or purporting to act on behalf of the foregoing.

6. "CBC," "You," or "Your" refers to Defendant, the Canadian Broadcasting Corporation, as well as its present or former employees, officers, partners, directors, agents, representatives, consultants, contractors, predecessors, attorneys, consultants, or members of the board of directors or board of trustees; any persons acting or purporting to act on behalf of the foregoing; and any parents, subsidiaries, affiliates, segments, or divisions both presently existing and those that previously existed.

2

7. "Document(s)" shall mean all Electronically Stored Information, data, images, and system information (e.g., logs or "metadata" created by a computer system detailing and tracking events on the system, including changes to documents), and all written, printed, typed, photographed, or graphic matter of every type or description, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof, and whether in paper form or stored on audiotape, videotape, computer, electronic, magnetic or other media (including, for example, correspondence, electronic mail, text messages, instant message dialogues, calendars, drawings, spreadsheets, databases, notes, invoices, contracts, facsimiles, voicemail messages, telephone messages and presentations). The term "Document(s)" specifically includes all drafts, versions, revisions, amendments, modifications, changes or notes related thereto, including all non-identical copies such as those that include marginalia, deletions or alterations, or other printed, stamped, post-it or handwritten revisions or notations. This definition includes any attachments, enclosures, or other matter affixed to or incorporated by reference within any other Documents responsive to these Requests.

8. "Leaked Documents" shall mean the documents described as the "leaked" internal WE Charity documents in the excerpts of the Defamatory Publications cited in Paragraphs 351, 374, 394, and 409 of the Complaint.

9. All other capitalized terms used herein shall have the meaning ascribed to them in the Complaint.

## II. INSTRUCTIONS

The following instructions apply to each of the Requests and are deemed to be incorporated in each of them:

1. Unless otherwise indicated, the relevant time period for the Requests is March 1,

3

2020, through the present.

2. This request calls for the production of all responsive documents in Your possession, custody, or control, or in the possession, custody, or control of Your employees, accountants, attorneys, representatives, agents, or other persons acting on Your behalf, without regard to the physical location of such documents. Without limiting the term "control," a document is deemed to be within Your control if You have any ownership, possession, or custody of the document, or the right to secure the document or a copy thereof.

3. All materials produced in response to this First Set of Requests for Production of Documents will be produced consistent with the protective order and ESI protocol entered by the Court in this Action.

4. Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a document is a responsive document in its own right and must be produced.

5. In responding to this request, produce all responsive documents prepared, forwarded, considered, or reviewed.

6. In responding to this request, include documents obtained on Your behalf by Your counsel, employees, experts, agents, or any other persons acting on Your behalf.

7. If Your response is that the documents are not within Your possession or custody, describe in detail the unsuccessful efforts You made to locate each such document.

8. If Your response is that the documents are not under Your control, identify who has control and the location of the documents.

9. For the purposes of reading, interpreting, or construing the scope of these Requests, the terms used shall be given their most expansive and inclusive interpretation. This includes, without limitation, the following:

    a. The terms "all," "any," and "each" shall each be construed as encompassing any and all;
    b. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope;
    c. The use of the singular form of any word includes the plural and vice versa;
    d. The masculine, feminine or neuter pronoun shall not exclude other genders;
    e. The word "including" shall be read to mean including without limitation;
    f. The present tense shall be construed to include the past tense and vice versa;
    g. References to employees, officers, directors or agents shall include both current and former employees, officers, directors and agents;
    h. Wherever the word "including" appears, the meaning intended is "including, but not limited to."

10. Any reference to a person that is a business entity and is not otherwise defined includes that person's predecessors (including any preexisting person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other person directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, consultants, controlling shareholders (and any entity owned by any such controlling shareholder), and attorneys of any of them; and any other person acting for or on behalf of any of them.

11. Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a usual custom and usage definition in Your trade or industry, in which case they

5

shall be interpreted in accordance with such usual custom and usage definition of which You are aware.

12. If any document is withheld, in whole or in part, for any reason, including a claim of privilege, whether work-product or attorney-client privilege, confidential source privilege, or any other privilege, you shall set forth separately with respect to each such document, a log in compliance with Fed. R. Civ. P. 26(b)(5)(A) and the parties' stipulated discovery report to the Court.

13. To the extent a document subject to an assertion of privilege, a work product claim, or other objection contains any responsive information not subject to such assertion or objection, the information must be produced. Claimed irrelevance is not a lawful basis for redacting or failing to produce part of a document, the balance of which contains responsive material.

14. Any documents or other items requested concerning a certain subject matter shall also include documents or other items tending to support, contradict, rebut, or relate to statements made and conclusions drawn concerning such subject matter.

15. To the extent that there are no documents responsive to a particular request, You shall state so in writing.

16. This request is continuing, and Your response to this request must be promptly supplemented when necessary or appropriate.

### III. REQUESTS

1. All Documents and Communications Concerning the Core Allegations in the Defamatory Publications.

2. All Documents and Communications You relied on as supporting the Core Allegations in the Defamatory Publications, regardless of whether such Documents and

Communications were referenced or shown in the Defamatory Publications.

3. All Communications with, and Documents sent by or received from, Your sources for the Defamatory Publications supporting, contradicting, or Concerning the Core Allegations in the Defamatory Publications, regardless of whether You relied on such Documents and Communications.

4. All Documents You received from, and Communications with, current or former WE Charity employees, volunteers, board members, or donors supporting, contradicting, or Concerning the Core Allegations in the Defamatory Publications, regardless of whether You relied on such Documents.

5. All Documents You prepared for purposes of publishing the Defamatory Publications, including but not limited to all notes, drafts, outtakes, spreadsheets, unedited or uncut interviews or other footage (regardless of whether they were included in published coverage), or other files.

6. Documents sufficient to show all recordings, outtakes, or B-roll from Your interview of Donna McFarlane Concerning WE Charity.

7. All drafts and versions of spreadsheets prepared by You and shown or referenced in the Defamatory Publications, and all Documents and Communications relied upon to prepare those spreadsheets.

8. Original copies of each of the broadcasts identified in the Complaint as Defamatory Publications in the highest resolution available to You.

9. Full, uncut, unedited copies of all video or audio recordings excerpted in the Defamatory Publications.

10. All photographs or videos of schoolrooms or facilities in Kenya that You

7

believed or were told received funding from WE Charity for their construction or renovation.

11. All Documents and Communications Concerning Harvey Cashore, Diana Swaine, Brodie Fenlon, Matthew Pierce, Kate McKenna, Cecil Rosner, or Mark Kelley's personal views, opinions, or criticisms of WE Charity, Marc Kielburger, or Craig Kielburger.

12. All Documents and Communications Concerning or containing personnel files, performance reviews, or Communications relating to any disciplinary action taken or contemplated against all journalists involved in preparing any of the Defamatory Publications, including but not limited to Harvey Cashore, Diana Swaine, Brodie Fenlon, Matthew Pierce, Kate McKenna, Cecil Rosner, or Mark Kelley.

13. All Documents and Communications supporting Your statement in the Defamatory Publications, "Adopt a Village meant targeting your donation to specific projects like building schoolhouses for kids."

14. All Documents and Communications Concerning the preliminary forensic audit report by Kenneth Froese that WE Charity provided You.

15. All Communications with Kenneth Froese or Froese Forensic Partners Concerning WE Charity.

16. All Documents and Communications Concerning the number of WE Charity-funded schoolrooms in Kenya, including but not limited to:

    a. All Documents and Communications supporting Your statement that "WE records show only 360 [primary schoolhouses in Kenya] have actually been built since its work began in 2003," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 352 of the Complaint;

    b. All Documents and Communications showing that "only 360 [primary

8

        schoolhouses in Kenya] have actually been built since [WE Charity's] work began in 2003," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 521 of the Complaint; and

    c.    All Documents and Communications supporting Your statement that "the charity's own count confirms the number of primary schoolhouses built in Kenya, 360," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 465 of the Complaint.

17.    All Documents and Communications showing that WE Charity purportedly counted latrines as schools or schoolrooms it funded in Kenya, as set forth in the excerpts of the Defamatory Publications cited in Paragraphs 483 and 485 of the Complaint.

18.    All Documents and Communications supporting Your statements in the Defamatory Publications that:

    a.    "In Pimbiniet, we counted 20 schoolhouses. Our spreadsheet shows WE Charity had received donations to fully fund 48," as set forth in the excerpt of the Defamatory Publications cited below Paragraph 494 of the Complaint;

    b.    "In all, our research showed WE Charity told donors they had fully funded 70 primary schoolhouses here. The total number on the ground, 28," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 389 of the Complaint;

    c.    "Our research revealed donors were told they had fully funded 55 schoolhouses here. In fact, there were only 12 schoolhouses and a library," as set forth in the excerpt of the Defamatory Publications cited

9

in Paragraph 389 of the Complaint;

    d.    In Sikirar, Kenya, there were "49 schoolhouses funded" and "8 built" by WE Charity, as set forth in the graphic from the Defamatory Publications cited in Paragraph 503 of the Complaint;

    e.    In Eor Ewuaso, Kenya, there were "63 schoolhouses funded" and "13 built" by WE Charity, as set forth in the graphic from the Defamatory Publications cited below Paragraph 506 of the Complaint; and

    f.    In Mwangaza, Kenya, there were "56 schoolhouses funded" and "13 built" by WE Charity, as set forth in the graphic from the Defamatory Publications cited below Paragraph 508 of the Complaint.

19. All Documents and Communications referenced in the excerpt of the Defamatory Publications cited in Paragraph 518 of the Complaint, including but not limited to the "social media posts" and "old websites" in which third parties purportedly "publicly said they had fully funded a primary schoolhouse in Kenya" and the "spreadsheets for 30 villages" in Kenya that You purportedly created.

20. All Documents and Communications containing or reflecting "records" purportedly showing that "donors had raised money to fully fund more than 900 one-room schoolhouses in Kenya," as referenced in the excerpt of the Defamatory Publications cited in Paragraph 520 of the Complaint.

21. All Documents and Communications on which You relied for reporting that WE Charity purportedly "brought in funding for more than 900 primary schoolhouses in Kenya," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 521 of the Complaint.

22. All Documents and Communications on which You relied when reporting that

"Multiple donors were sent photos of same schoolhouses WE Charity said each had fully funded," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 584 of the Complaint, including but not limited to the WE Charity statements referenced.

23. All Documents and Communications containing or reflecting the "records" referenced in the following excerpt of the Defamatory Publications cited in Paragraph 622 of the Complaint: "In the village of Rongena, the records show eight high net worth donors paid for the exact same schoolhouse. In Irkaat, seven major donors and foundations paid for the same three schoolhouses."

24. All Documents and Communications concerning WE Charity's communications with Watson Jordan regarding schoolhouse number four in Irkaat, Kenya, including but not limited to:

  a. All Documents and Communications sent by WE Charity to Watson Jordan that state, "Here is the schoolhouse built in memory of your son," as set forth in the excerpts of the Defamatory Publications cited in Paragraphs 376 and 584 of the Complaint.

  b. All Documents and Communications supporting Your statement that "School Number 4, School Number 4. This was the one that was funded by Watson Jordan; but as we now know it was also funded by several other donors. Our research shows School Number 4 was fully funded at least four times over," as set forth in the excerpt of the Defamatory Publications cited in Paragraph 389 of the Complaint;

  c. All Documents and Communications in which WE Charity told Watson Jordan that he fully funded schoolhouse number four in Irkaat, Kenya; and

11

        d.    All Documents and Communications in which Watson Jordan states that he fully funded schoolhouse number four in Irkaat, Kenya.

25. All Documents and Communications concerning WE Charity's communications with Rukshan de Silva or Iroquois Ridge High School regarding the schoolhouse shown on screen in the November Episode at 28:01 (available at https://youtu.be/wjRjIEXh-mY?t=1681) in Pimbiniet, Kenya.

26. All Documents and Communications supporting Your assertion in the Article that WE Charity told Rukshan de Silva and his schoolmates that they fully funded a schoolroom shown in the Article accompanied by a caption reading, "Rukshan de Silva took this photo of the school in Kenya that WE Charity told him he and his schoolmates had fully funded."

27. All WE Charity Documents provided to You Concerning the Core Allegations in the Defamatory Publications, including but not limited to the Leaked Documents.

28. All Documents and Communications Concerning an "aggressive campaign orchestrated by the charity to block the scrutiny" of Your journalists, as set forth in the excerpt of the Defamatory Publications cited in Paragraph 646 of the Complaint.

29. All Documents and Communications Concerning Your travel to and from Kenya to investigate the allegations in the Defamatory Publications, including but not limited to draft and final travel and meeting itineraries, flight receipts, plane tickets, receipts for cancelled or changed travel plans, and internal communications Concerning such travel.

30. All Documents and Communications Concerning Your efforts to obtain permission from the Kenyan government to visit and film at schools in September 2021.

31. Documents sufficient to show Your policies and practices regarding reporting on or at schools (in Canada or elsewhere), including but not limited to Your efforts to obtain

permission to film or record on school properties.

    32.    All Documents and Communications Concerning Your efforts to obtain and report on WE Charity's position with respect to the Core Allegations in the Defamatory Publications, including but not limited to:

    a.    All Documents and Communications constituting Your "responsible communication" Concerning the Core Allegations in the Defamatory Publications;

    b.    All Documents and Communications reflecting questions You asked and documents You requested from WE Charity prior to publication of the Defamatory Publications, as referenced in Harvey Cashore's November 4, 2021 email stating, "WE Charity has provided numerous responses over the course of several months, and we are relying on those answers to inform our understanding of the research," quoted in Paragraph 693 of the Complaint;

    c.    All Documents and Communications reflecting the responses WE Charity provided to questions You asked and documents You requested from WE Charity prior to publication of the Defamatory Publications, as referenced in Harvey Cashore's November 4, 2021 email stating, "WE Charity has provided numerous responses over the course of several months, and we are relying on those answers to inform our understanding of the research," quoted in Paragraph 693 of the Complaint; and

    d.    All Documents and Communications reflecting or containing Your email communications with Marc Kielburger as referenced on *The Current* when

13

>>Mark Kelley said, "We have been in touch with Marc -- Marc Kielburger for months now via e-mail back and forth with him."

33. All Documents and Communications constituting Your "responsible communication" Concerning episodes of *The Fifth Estate*, other than the February Episode and November Episode.

34. Documents sufficient to show Your journalistic standards and practices in effect at the time of the Defamatory Publications, including but not limited to your responsible communication policy and practices.

35. All Documents and Communications Concerning ratings or viewership measures regarding Your coverage of WE Charity starting in January 2020.

36. All Documents and Communications Concerning renewal or cancellation of *The Fifth Estate*, from 2015 through 2022.

37. Documents sufficient to show the terms and conditions of confidential source agreements You entered into with each confidential source on which You relied or with whom You consulted for purposes of the Defamatory Publications.

38. All Communications with and Documents Concerning consultants, investigators, local handlers, drivers, fixers, or other third parties retained by You, directly or indirectly, Concerning the Defamatory Publications.

39. All Documents and Communications Concerning the writing, editing, translation and publication of the *Enquête* Episode.

40. All Communications with any Canadian, American, or Kenyan government official Concerning the Core Allegations in the Defamatory Publications.

41. All Documents and Communications Concerning any complaints to Your

ombudsman or investigations by an ombudsman Concerning Your coverage of WE Charity.

42. Documents sufficient to show the time and date of each publication of each of the Defamatory Publications, including re-runs, re-postings, and updates (*e.g.*, to an online article).

43. Documents sufficient to show the number of listeners, readers, likes, republications, or viewers of each online publication of each of the Defamatory Publications, including social media and third-party websites such as YouTube, Spotify, Facebook, Twitter, Sirius XM, and Apple Podcasts.

44. Documents sufficient to show Your revenue, profits, or earnings for each publication of each of the Defamatory Publications, including re-runs and online publications.

45. Documents sufficient to show the viewership and/or listenership of *The Fifth Estate*, the *Frontburner* podcast, and *The Current* radio program, from 2015 through 2022.

46. All Documents and Communications Concerning advertising and promotional materials Concerning the Defamatory Publications.

47. All Documents and Communications Concerning Your submission of any or all of the Defamatory Publications for consideration for awards, contests, or prizes.

48. Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this Action or to indemnify or reimburse You for payments made to satisfy the judgment.

49. Documents sufficient to show Your document preservation and destruction policies and practices.

50. All Documents You intend to use at trial.

Dated: August 2, 2023								Respectfully submitted,

/s/ Joseph F. Kroetsch

Joseph F. Kroetsch (*pro hac vice*)
Brooke A. Alexander (*pro hac vice*)
BOIES SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300
jkroetsch@bsfllp.com
balexander@bsfllp.com

Jonathan H. Sherman (Bar No. 468539)
Amy L. Neuhardt (Bar No. 996791)
BOIES, SCHILLER & FLEXNER, LLP
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
Tel: (202) 274-1137
Fax: (202) 237-6131
jsherman@bsfllp.com
aneuhardt@bsfllp.com

Rodney A. Smolla (Bar No. 6327)
164 Chelsea St
South Royalton, VT 05068
Tel: (864)-373-3882
rodsmolla@gmail.com

Sabina Mariella (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel: (212) 754-4541
smariella@bsfllp.com

*Attorneys for Plaintiff WE Charity*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 2, 2023, I caused a true and correct copy of the foregoing document to be transmitted via electronic mail to all counsel of record in the above-referenced matter.

                                                  /s/  Sabina Mariella
                                                  Sabina Mariella